**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| RTI HOLDING COMPANY, LLC,[1] | ) | Case No. 20-12456 |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |

**DECLARATION OF SHAWN LEDERMAN, CHIEF EXECUTIVE OFFICER,
IN SUPPORT OF FIRST DAY PLEADINGS**

I, Shawn Lederman, declare and state as follows:

1.      I am the Chief Executive Officer of debtor and debtor in possession Ruby

Tuesday, Inc. ("RTI"), and have been a member of RTI's Board of Directors since December

2017.  I have over 20 years of private equity, finance, and consulting experience in strategic

planning, corporate revitalization, turnarounds, and mergers and acquisitions.  I am a Principal of

NRD Capital Management, LLC.  Prior to joining NRD in 2016, I worked as a Director on the

Private Equity Team at Highland Capital Management, L.P.  In this capacity, I was involved

---

[1]  The Debtors in these chapter 11 cases and the last four digits of each Debtor's U.S. tax identification number are as follows: RTI Holding Company, LLC (4966); Ruby Tuesday, Inc. (5239); Ruby Tuesday, LLC (1391); RTBD, LLC (6505); RT of Carroll County, LLC (8836); RT Denver Franchise, L.P. (2621); RT Detroit Franchise, LLC (8738); RT Distributing, LLC (6096); RT Finance, LLC (7242); RT FL Gift Cards, Inc. (2189); RT Florida Equity, LLC (7159); RT Franchise Acquisition, LLC (1438); RT of Fruitland, Inc. (1103); RT Indianapolis Franchise, LLC (6016); RT Jonesboro Club (2726); RT KCMO Franchise, LLC (7020); RT Kentucky Restaurant Holdings, LLC (7435); RT Las Vegas Franchise, LLC (4969); RT Long Island Franchise, LLC (4072); RT of Maryland, LLC (7395); RT Michiana Franchise, LLC (8739); RT Michigan Franchise, LLC (8760); RT Minneapolis Franchise, LLC (2746); RT Minneapolis Holdings, LLC (7189); RT New England Franchise, LLC (4970); RT New Hampshire Restaurant Holdings, LLC (7438);  RT New York Franchise, LLC (1154); RT Omaha Franchise, LLC (7442); RT Omaha Holdings, LLC (8647); RT One Percent Holdings, LLC (6689); RT One Percent Holdings II, LLC (2817); RT Orlando Franchise, LP (5105); RT Restaurant Services, LLC (7283); RT South Florida Franchise, LP (3535); RT Southwest Franchise, LLC (9715); RT St. Louis Franchise, LLC (6010); RT Tampa Franchise, LP (5290); RT Western Missouri Franchise, LLC (6082); RT West Palm Beach Franchise, LP (0359); RTTA, LP (0035); RTT Texas, Inc. (2461); RTTT, LLC (9194); Ruby Tuesday of Allegany County, Inc. (8011); Ruby Tuesday of Bryant, Inc. (6703); Ruby Tuesday of Columbia, Inc. (4091); Ruby Tuesday of Frederick, Inc. (4249); Ruby Tuesday of Linthicum, Inc. (8716); Ruby Tuesday of Marley Station, Inc. (1641); Ruby Tuesday of Pocomoke City, Inc. (0472); Ruby Tuesday of Russellville, Inc. (1601); and  Ruby Tuesday of Salisbury, Inc. (5432). The Debtors' mailing address is 333 East Broadway Ave., Maryville, TN 37804.

.

with all aspects of the firm's investment process, including sourcing new opportunities, leading due diligence, negotiation and financing, supporting operations, planning and integration of successful acquisitions, portfolio monitoring, and board governance.  Previously, I was a Vice President at Buccino & Associates, Inc., a middle market consulting firm that specialized in working with troubled companies.  In this role, I was involved with the assessment, reorganization and recapitalization of companies in the manufacturing, healthcare, food, and retail industries.  Prior to joining Buccino, I was a Consultant at Putnam, Hayes, & Bartlett and later Charles River Associates, Inc.  In these roles, I worked on behalf of major electric utility companies, evaluating their strategic alternatives in a deregulating environment, analyzing merger and acquisition candidates, and assessing the market value of electric generating and transmission assets.  I earned an M.B.A. degree from New York University's Stern School of Business and a B.S. degree in Finance and International Management from Boston University.

2.      I am generally familiar with the current day-to-day operations, business, and financial affairs of RTI and its debtor affiliates (the "Debtors" or, collectively, the "Company"), as well as their books and records.  Except as otherwise indicated, all facts set forth in this declaration are based on (a) my personal knowledge of the Debtors' employees, operations, and finances; (b) information learned from my review of relevant documents; (c) information supplied to me by other members of the Debtors' management team and its advisors; or (d) or my opinion based on my experience, knowledge and information concerning the Debtors' operations and financial condition. I am over the age of 18 and am authorized to submit this declaration on behalf of the Debtors.  If called upon to, I could and would testify competently to the facts set forth herein.

DOCS_LA:332459.8 76136/001

3.     On October 7, 2020 (the "Petition Date"), the Debtors filed voluntary petitions under chapter 11 of the United States Bankruptcy Code (the "Bankruptcy Code") with the United States Bankruptcy Court for the District of Delaware (the "Court").  The Debtors have filed numerous motions and pleadings which seek various types of "first day" relief which will enable them to meet necessary obligations, fulfill their obligations as debtors in possession and avoid a disruption of their business operations  (collectively, the "First Day Pleadings"). I am familiar with each First Day Pleading and believe that the relief requested in each is necessary to enable the Debtors to operate in chapter 11 with minimal disruption and is critical to enable the Debtors to maintain their value as a going concern. Accordingly, granting each First Day Pleading is in the best interest of the Debtors' estates and their creditors. The facts set forth in each First Day Pleading are incorporated by this reference.

4.     This declaration is organized into four sections: (a) section one provides background information about the Debtors; (b) section two includes detailed information about the Debtors' assets and liabilities; (c) section three describes the events leading to the filing of the Company's chapter 11 cases and (d) section four summarizes the relief requested and the legal and factual bases supporting each First Day Pleading.  With respect to section four of this declaration, capitalized terms not otherwise defined therein shall have the same meanings as defined in the relevant First Day Pleading being discussed.

## I.

## BACKGROUND AND OPERATIONS

**A.     General Background**

5.     The Debtors develop, operate, and franchise casual dining restaurants in the United States, Guam, and five foreign countries under the Ruby Tuesday® brand.  The

Company-owned and operated restaurants (i.e., non-franchise) are concentrated primarily in the Southeast, Northeast, Mid-Atlantic and Midwest regions of the United States.

6.      The first Ruby Tuesday restaurant was opened in 1972 in Knoxville, Tennessee, near the campus of the University of Tennessee.  The chain quickly became known as a "go to" location for casual dining fare.  The Ruby Tuesday  concept -- which at the time consisted of 16 restaurants -- was acquired by Morrison Restaurants Inc. ("Morrison") in 1982. During the following years, Morrison grew the concept to over 300 restaurants. In conjunction with a spin-off transaction that occurred in 1996, Morrison was reincorporated in the State of Georgia and changed its name to Ruby Tuesday, Inc.

7.      The Company began its franchise program in 1997 with the opening of one domestic and two international franchised Ruby Tuesday restaurants. As of the Petition Date, the Debtors have franchise arrangements with ten franchise groups which operate Ruby Tuesday restaurants in eight states, Guam, and five foreign countries.



DOCS_LA:332459.8 76136/001

**B.**    <u>**Operations**</u>

8.      As of the Petition Date, there were over 250 Ruby Tuesday restaurants worldwide offering a wide variety of menu options, including burgers, signature baby-back ribs, steaks, seafood, chicken, and appetizers, and an extensive Garden Bar.  Ruby Tuesday restaurants primarily serve customers through a full-service format and feature a separate bar offering cocktails, beer and wine.  They also offer the RubyTueGo® curbside service, delivery via third party companies, and a catering program for businesses, organizations, and group events at both Company-owned and franchised restaurants.

9.      The Debtors currently are managing operations from their corporate headquarters in Maryville, Tennessee.

**C.**    <u>**Franchising**</u>

10.     Domestic Ruby Tuesday concept franchisees are generally required to pay a royalty fee of 4% and a marketing and purchasing fee of 1.5% of monthly gross sales. Additionally, under the terms of the franchise agreements, domestic Ruby Tuesday concept franchisees pay a national advertising fee of up to 1.5% of monthly gross sales to cover their pro rata portion of the costs associated with the Company's national advertising campaigns.

11.     The Debtors provide ongoing training and assistance to franchisees in connection with the operation and management of each restaurant through a training facility, meetings, computer-based training, and by written or other material.

**D.**    <u>**Suppliers**</u>

5

12.     The Debtors negotiate directly with suppliers for the purchase of raw and processed materials and maintain contracts with select suppliers for both Company-owned and franchised restaurants.  These contracts may include provisions for the distribution of products via a cost-plus delivery fee basis under a term-based contract with a renewal option.

13.     The Debtors use purchase commitment contracts to stabilize the potentially volatile prices of certain food commodities. Because of the relatively short storage life of inventories, limited storage facilities at the restaurants, the requirement for fresh products and the numerous sources of goods, a minimum amount of inventory is maintained at the restaurants.

**E.     Personnel**

14.     As of the Petition Date, the Debtors employed approximately 7,300 employees. The Debtors' employees are not covered by a collective bargaining agreement.  As a result of mandated closures caused by the COVID-19 pandemic, the Debtors were forced to furlough approximately 7,000 employees.  Furloughed employees are not paid but remain covered by the Company's applicable health benefits programs if they continue to submit their weekly contribution amount.  The Company hopes to invite many of these employees to return to active status, to the extent they have not already, as sales levels return.

15.     The Debtors' officers are the following:  Aziz Hashim (President); Shawn Lederman (Chief Executive Officer); Ellen Clarry (Chief Supply Chain Officer); Jenifer Harmon (Chief Marketing Officer); Stephanie Burke Medley (Chief Strategy Officer); Darrin White (Chief Operating Officer); Michael Dorsey (Senior Controller).

**F.     The Debtors' Corporate Structure and Organization**

16.     For the period 1996 to 2017, RTI was a publicly traded company on the New York Stock Exchange ("NYSE").  On October 16, 2017, RTI entered into a merger agreement

6

with affiliates of NRD Partners II, L.P. ("NRD Partners II"), RTI Holding Company, LLC ("Holding") and its wholly-owned subsidiary, RTI Merger Sub, LLC ("Merger Subsidiary"). Pursuant to the terms of the merger agreement, Merger Subsidiary was merged with and into RTI with RTI surviving the merger as a wholly-owned subsidiary of Holding (the "Merger").  As a result of the Merger, RTI's stock ceased to be traded on the NYSE on December 21, 2017.

17.     Holding is a Debtor.  Its equity is held by the following affiliates of NRD Partners II:  RTI Investment Company, LLC, Strategic Financial Intermediation II, LLC ("SFI"), and NRD RT Holdings, LLC.  All Debtors, other than Holding, are direct or indirect wholly-owned subsidiaries of RTI, which is, in turn, a wholly-owned subsidiary of Holding.[2]  A corporate organizational chart is attached hereto as **Exhibit A**.

18.     The principal functions of the Debtors are operated in a centralized manner through RTI.  Of the 51 Debtors: (a) 13 were formed to hold liquor licenses in Arkansas or Maryland due to applicable liquor regulations, which required distinct ownership and/or organizational structures for such entities; (b) 32 were formed in connection with the Company's re-purchase of previously franchised restaurants (in some cases, former franchisees retained a 1% or 50% interest in such restaurants for some period of time after the restaurant was reacquired, which 1% or 50% interest was later repurchased by one of the Debtors, as a result of which the ownership of these restaurant entities in some cases still reflects a 50/50% or 99/1% split of ownership); (c) the remaining 6 entities were formed for specific administrative purposes:  RTBD LLC (fka RTBD Inc.) ("RTBD") was formed to hold the intellectual property assets of the enterprise; RT Finance LLC was formed to enter into an intercompany note with the remaining Debtors for tax planning purposes – although the tax planning strategy is no longer in

---

[2] However, the shareholders of the Debtors that own liquor licenses in the State of Maryland also include certain third parties who reside in Maryland.

active use, the intercompany note remains in place; RT FL Gift Cards, Inc., was formed in

Florida to operate the brand's gift card program; and Ruby Tuesday, LLC, RT Distributing, LLC

and RT Restaurant Services, LLC were formed to provide various support and procurement

services, though none of these entities has actively been used for such purposes in recent years.

## SECTION II

## THE DEBTORS' ASSETS AND LIABILITIES

A.    **The Debtors' Assets**

19.    The Debtors have the following material assets:

- Real Property:  Historically, the Company acquired and owned fee title to

several of its restaurant locations and undeveloped parcels of land.  Concurrent with the

consummation of the Merger, on December 21, 2017, RTI entered into a Real Estate Sale

Contract (the "Sale Agreement") with SFI, an affiliate of NRD Partners II.  Under the terms of

the Sale Agreement, SFI purchased 178 real properties from RTI for approximately $242.2

million.  SFI simultaneously sold the same properties to five strategic buyers (collectively, the

"Sale/Leaseback Purchasers"), and such Sale/Leaseback Purchasers concurrently, as landlords

for each respective pool of properties acquired by such Sale/Leaseback Purchasers, leased all of

the real properties back to RTI, as tenant.  In connection with SFI's sale to the Sale/Leaseback

Purchasers, the Debtors received net sales proceeds of approximately $240.8 million.  During the

year ended June 4, 2019, the Debtors completed sale-leaseback transactions of the land and

building for four Debtor-owned restaurants to unrelated third parties for net proceeds of $6

million.  During the year ended June 4, 2020, the Debtors completed seven additional sale-

leaseback transactions in exchange for net proceeds of $11.4 million.  The Debtors continue to

own fee title to various parcels of developed and undeveloped real estate in the states of

8

Alabama, Connecticut, Florida, Indiana, Kentucky, Maryland, Michigan, Missouri, New Jersey, North Carolina, Ohio, Pennsylvania, Tennessee, Texas, and Virginia.

- **RT Lodge**:  In 1997, RTI acquired a leasehold interest in a restaurant and special event destination named Morningside Inn and surrounding 7.25 acre property (the "RT Lodge"), at Maryville College in Maryville, Tennessee.  RTI developed the hotel property, restoring the grounds and residence and adding two additional buildings for guest accommodations, and renamed it "RT Lodge."  The Company has a ground lease on the property which expires on December 31, 2070.  As of the Petition Date, the Debtors operate RT Lodge for corporate retreats and special events, and, in recent years, opened the hotel and dining room to the public.

- **Trade and Service Marks**:  The Debtors have registered certain trade and service marks with the United States Patent and Trademark Office, including the name "Ruby Tuesday".  All such intellectual property is owned by RTBD.  RTI holds a license to use all such trade and service marks, including the right to sub-license the related trade and service marks. Registration of the Ruby Tuesday trademark expires in fiscal year 2025, unless renewed.

- **Cash**: As of the Petition Date, the Debtors have unrestricted cash of approximately $4.0 million.

- **Liquor Licenses**.  The Debtors own liquor licenses valued in the approximate aggregate amount of $13.9 million.

- **Related-Party Note Receivable/Bond Payable**: In connection with the Sale Agreement described above, RTI entered into a promissory note with SFI (the "SFI Note") under

which SFI agreed to pay RTI $239.8 million (the "SFI Note Receivable").[3]  The SFI Note Receivable matures on December 31, 2037, and accrues interest at an annual rate of 4.50%. Under the terms of the SFI Note, there are no principal payments contractually due prior to the maturity date and any payments made prior to the maturity date are made solely at the discretion of SFI.  Contemporaneous with the execution of the SFI Note, Holding entered into an unsecured floating rate bond payable to SFI under which Holding agreed to pay SFI $230.8 million (the "SFI Bond Payable").  The SFI Bond Payable matures on December 21, 2037, and accrues interest annually at a floating rate equal to the 20-year Treasury bill rate plus 200 basis points. Under the terms of the SFI Bond Payable, there are no principal payments contractually due prior to the maturity date and any principal payments made prior to the maturity date are made solely at the discretion of the Debtors.  Interest is paid bi-annually.  SFI and the Debtors have not made their respective interest payments since July 15, 2019.  As of the Petition Date, the balance of the SFI Note Receivable is approximately $230,827,786.00, and the balance of the SFI Bond Payable is $239,767,314.  SFI also contributed $10 million to Holding in exchange for 10 million units of preferred membership interests with priority distribution rights from Holding.

- Rabbi Trusts:  The Company sponsors three "top hat",[4] non-qualified, unfunded, deferred compensation plans:  an Executive Supplemental Pension Plan for management holding positions at the Vice-President level or higher for at least five years ("ESPP"); a Management Retirement Plan, for employees having 15 or more years of service and minimum average compensation of $40,000 over three consecutive years (the "MRP"); and a

---

[3] Among other things, the structure of the real estate transaction enabled its treatment as an "installment sale" for tax purposes, thereby permitting the Debtors to defer a significant portion of the tax payments on the proceeds of the sale.

[4] The term "top hat" refers generally to arrangements that are (i) not required to meet most ERISA or IRC requirements that are imposed on "qualified" (or tax-favored) plans , and (ii) created and maintained for the purpose of providing deferred compensation or retirement benefits to a select group of individuals, usually key executives, management or highly-compensated employees.

Deferred Compensation Plan ("DCP"), for management or "highly compensated employees" (under applicable IRS rules).  Additionally, prior to January 1, 2005, RTI maintained the Ruby Tuesday, Inc. Deferred Compensation Plan (the "Old DCP") that was originally established by an indenture dated December 18, 1989.  Benefit payments under the ESPP and MRP have been funded by company-owned life insurance policies (COLI) having an approximate aggregate surrender value as of September 15, 2020, of $22.4 million and around $111,700 in cash.  The DCP holds interests in various funds having an aggregate vested balance of approximately $5,234,764.66 as of September 24, 2020.  Title to such assets is held by the Company in "rabbi trusts." The ESPP, MRP and Old DCP have all been frozen.  On September 29, 2020, the Company was served by an "Interpleader Complaint" by Regions Bank ("Regions"), the trustee of the rabbi trust associated with the ESPP and MRP, which was filed in the United States District Court for the Northern District of Alabama, in which Regions seeks a determination of rights in the assets held in the rabbi trusts.  The complaint names as defendants RTI and all persons and entities which Regions believes claim an interest in such assets.

- **Furniture, Fixtures & Equipment and Other Personal Property**: The Debtors own miscellaneous restaurant equipment, office equipment, furniture and computers.

**B.    Liabilities**

20.    **Senior Secured Credit Facility**.  The Debtors, as borrowers, are parties to that certain Credit and Guaranty Agreement (as amended, the "Prepetition Credit Facility") dated as of December 21, 2017, by and among Holding, as guarantor borrower representative, TCW Direct Lending LLC, TCW Skyline Lending, L.P., and TCW Brazos Fund LLC (the foregoing three entities, collectively, "TCW"), Goldman Sachs Specialty Lending Group, L.P., as administrative agent and collateral agent ("GSSLG"), and Goldman Sachs Bank USA as issuing

11

bank (together, with GSSLG, "GS", and together with TCW, the "Prepetition Secured Lenders"). The Prepetition Credit Facility provided for a term loan to be drawn on the closing date of the Merger in the principal amount of $115 million (the "Term Loan") and up to $12.5 million of revolving commitments to be used for the issuance of standby letters of credit (the "LC Facility").

21.     The Prepetition Credit Facility has been amended seven times by way of the following:  Limited Waiver and First Amendment to the Credit and Guaranty Agreement, dated February 9, 2018; Limited Waiver and Second Amendment to the Credit and Guaranty Agreement, dated June 29, 2018; Limited Waiver, Consent and Third Amendment to the Credit and Guaranty Agreement, dated December 5, 2018; the Fourth Amendment and Limited Waiver to the Credit and Guaranty Agreement, dated May 10, 2019; the Fifth Amendment and Waiver to the Credit and Guaranty Agreement, dated September 3, 2019; the Sixth Amendment to the Credit and Guaranty Agreement, dated April 17, 2020; and the Seventh Amendment to the Credit and Guaranty Agreement, dated September 22, 2020 (the "Seventh Amendment"), whereby, among other provisions, the Prepetition Lenders waived purported defaults, agreed to amendments to various financial covenants and provisions dealing with the sale/leaseback transactions, in each case in exchange for a release.

22.     Pursuant to the Seventh Amendment, the Prepetition Lenders also provided the Company with $2 million in funding under the Prepetition Credit Facility to support the Company's operations through the Petition Date.

23.     The Prepetition Credit Facility is secured by (a) a guarantee by each of the Debtors of the obligations of each of the other Debtors, (b) a first priority security interest in substantially all the assets of the Debtors, (c) a first priority pledge on 100% of the equity

securities of each domestic subsidiary of the Debtors and 65% of the equity securities of each foreign subsidiary of the Debtors, and (d) a mortgage on certain owned real properties of the Debtors.  As of the Petition Date, the indebtedness owing under the Prepetition Credit Facility is approximately $42.7 million, composed of $30.9 million (Term Loan); $11.8 million (LC Facility).[5]

24.    The following is a summary of the outstanding letters of credit issued pursuant to the LC Facility:

| Beneficiary | Purpose of L/C | LC Amount |
|---|---|---|
| Safety National Casualty Corporation | Insurance Liability | 7,700,000.00 |
| The Travelers Indemnity Group | Insurance Liability | 0.00 |
| Constellation New Energy | In lieu of Deposit | 229,474.00 |
| National Union fire Insurance Company | Insurance Liability | 115,860.00 |
| Hartford Fire Insurance Company | Insurance Liability | 1,500,000.00 |
| Nolin | In lieu of Deposit for Electrical Work | 6,500.00 |
| **Grand Total** | | **9,551,834.00** |

25.    Accounts Payable. As of the Petition Date, the Debtors owe approximately $18.8 million to landlords, utilities, employees, taxing authorities, third party vendors, insurance premiums and other service providers.

26.    Former Shareholders' Rights Litigation.  RTI is currently engaged in a dissenting shareholder's appraisal action in Georgia Superior Court (Fulton County), entitled *Ruby Tuesday, Inc. v. Cede & Co. et al.*, and bearing Case No. 2018-cv-304101 (the "Dissenters Action").  Several RTI shareholders opposed the 2017 Merger and refused offers to acquire their shares for the price of $2.40 per share.   RTI commenced the Dissenters Action on April 19,

---

[5] The amounts set forth herein are rounded and are for illustration purposes only.  The Debtors reserve the right to object to these or any other claims asserted against their bankruptcy estates.

2018, as required under Georgia's Dissenters' Rights statute, to determine the fair value of the dissenting shareholders' shares. The named respondents include Quadre Investments L.P. (3,000,000 shares), Lawrence N. Lebow (520,629 shares), Jonathan Lebow (180,100 shares), Miriam D. Roth (102,000 shares), Powell Anderson Capital L.P. (74,000 shares), and Leland Wykoff (800 shares).  The purpose of the Dissenters Action is for the court to appraise the fair value of the RTI shares as of December 21, 2017.  A trial date has not been set.

27.    <u>Paycheck Protection Program (PPP) Loan</u>.  RTI is indebted in the amount of $10 million in PPP loan debt through Zions Bancorporation, N.A., dba California Bank & Trust, available through the Coronavirus Aid, Relief, and Economic Security Act (CARES Act).  The loan bears interest at one percent (1%), is repayable through 18 payments of $562,774.97 beginning on December 12, 2020, and matures on May 12, 2022.  The Debtors anticipate that 100% is subject to forgiveness.

**SECTION III**

**<u>EVENTS LEADING TO THE COMMENCEMENT OF THE BANKRUPTCY CASES</u>**

28.    Since the Merger, the Company has struggled in an increasingly competitive and challenging business environment.  Despite multiple efforts to address the situation, the Company ultimately has not been able to overcome the difficulties from the overall decline in the casual dining sector, greatly exacerbated by regulatory responses to contain the COVID-19 pandemic.

A.    **<u>Business Operations and Financial Condition Since the Merger</u>**

29.    At the time of the Merger, the Debtors operated around 541 restaurants.  The Company was not immune from the overall shift in customer spending from casual dining to

14

fast-food and fast-casual restaurant concepts, which had been underway for a few years prior to the Merger.[6]

30.    Many industry observers also point to other macro headwinds, including the decline of mall traffic which disproportionately affect the Company's mall-based locations and the emergence of alternative delivery methods including at-home meal kits, grocery delivery, and third-party delivery services that have increased the availability of dining options.

31.    As a consequence of declining market conditions, the Debtors were not in compliance with certain financial covenants within the Prepetition Credit Facility during the fiscal quarters ended December 4, 2018, and March 5, 2019.  On May 10, 2019, the Debtors entered into a limited waiver and amendment to the Prepetition Credit Facility (the "Limited Waiver and Amendment").  Additionally, during calendar year 2019, the Debtors paid approximately $43 million of principal on the Prepetition Credit Facility, including more than $37 million of prepayments, primarily with proceeds from the sales of real estate and through sale-leaseback transactions, as discussed above.  As a result of the Limited Waiver and Amendment and prepayments, the Debtors were in compliance with covenants under the Prepetition Credit Facility leading into the second half of 2019.

32.    In response to these challenges, the Company closed underperforming locations, sold and leased-back 189 restaurants (178 were sold and leased-back at acquisition), reduced annual corporate overhead by over 45%, and accelerated to-go and online (collectively "off-premise") ordering.  Additionally, the Company hired seasoned industry operators to oversee day-to-day operations and strategic planning. These initiatives began to normalize performance

---

[6] *See* Alex Dixon, *Are We Witnessing the Death of Casual Dining?* (FSR Magazine, Nov. 2016), https://www.fsrmagazine.com/chain-restaurants/are-we-witnessing-death-casual-dining (as of Oct. 2, 2020).

across the right-sized portfolio, while allowing for the disposition of assets from non-performing locations to substantially reduce debt.

33.     With these changes, RTI dissolved 20 subsidiary entities that served no ongoing purpose in order to alleviate the administrative burden of maintaining the separate corporate existence for these entities.  Any outstanding assets at any such entities were distributed to RTI as part of the wind-down of such entities.

34.     Despite these significant operational improvements, the industry pressures mounted, the Debtors continued to experience negative operating results and were again in covenant default under the Prepetition Credit Agreement for the fiscal quarters ending December 3, 2019, and March 3, 2020.  As of March 3, 2020, the number of Company restaurants had declined to 421.

**B.     The COVID-19 Pandemic**

35.     Beginning in the early spring of this year, restaurants throughout the world have been negatively affected by the COVID-19 pandemic, many to the point of permanent closure.[7]

---

[7] *See* Nancy Luna, *National Restaurant Association report: Pandemic has forced 100,000 restaurant closures in six months* (Restaurant-Hospitality.com Sept. 14, 2020)  https://www.restaurant-hospitality.com/operations/national-restaurant-association-report-pandemic-has-forced-100000-restaurant-closures-six?NL=RH-01&Issue=RH-01_20200915_RH-01_164&sfvc4enews=42&cl=article_2_b&utm_rid=CPG06000002253267&utm_campaign=41064&utm_medium=email&elq2=3edf0580589543c8aed9d28dd2992442  (as of Oct. 2, 2020) ("Other NRA findings: consumer spending in restaurants were down 34% on average in August; the foodservice industry has lost $165 billion in revenue from March to July; 60% of operators say their restaurant's total operational costs (as a percent of sales) are higher than they were prior to the COVID-19 outbreak; on average, restaurant operators say their current staffing levels are only 71% of what they would typically be in the absence of COVID-19; about 3 million restaurant workers are still out of work; and, as previously stated by the  NRA, the industry is on track to lose $240 billion in sales by the end of the year."); Kelly McCarthy, *Nearly 16,000 restaurants have closed permanently due to the pandemic, Yelp data shows* (ABC News, July 24, 2020), https://abcnews.go.com/Business/16000-restaurants-closed-permanently-due-pandemic-yelp-data/story?id=71943970 (as of Oct. 2, 2020); Edward  Ludlow, *One-Quarter of American Restaurants Won't Reopen, OpenTable Says*  (BLOOMBERG, May 14, 2020), https://www.bloomberg.com/news/articles/2020-05-14/one-quarter-of-american-restaurants-won-t-reopen-opentable-says  (as of Oct. 2, 2020); Jonathan Maze, *From the Editor:  Facing the Future Together* (Restaurant Business, Apr. 3, 2020), https://www.restaurantbusinessonline.com/operations/editor-facing-future-together  (as of Oct. 2, 2020) ("[T]he industry has borne the brunt of the economic impact of the shutdown. It's very likely that

The lack of predictability in the spread of the virus coupled with the necessary responses of governments to try and limit exposure by preventing gatherings has eviscerated the restaurant industry, whose business model largely depends on providing social environments for people to meet and enjoy dining out.  The impact of the coronavirus is particularly disruptive to restaurant chains, such as Ruby Tuesday, that operate throughout the United States and in foreign countries and, consequently, must contend with a patchwork of health regulations as the virus impacts different communities with varying levels of severity at different times:  some states and local governments are beginning to permit dining rooms to reopen (albeit with occupancy limits) while others limit sales distribution to take-out service or outdoor dining.[8]  However, the almost complete elimination of in-store dining, which historically has represented over 90% of the Company's total sales, struck at the heart of the Company's business model.

36.     As a result, the COVID-19 pandemic put an unprecedented strain on the financial condition and personnel of the Company.  Government actions such as mandated restaurant closures, mandated mall closures, shelter in place orders, carry-out only orders, reduced hour orders, and social distancing/self-quarantining orders and guidance created a situation whereby the Company's revenues dropped so substantially that it could no longer sustain its normal operating costs.  Rental obligations, as a fixed expense, were particularly difficult to manage since they were not reduced in line with revenue deterioration.  Consequently, in early 2020, the COVID-19 pandemic and other factors forced the Debtors and many franchisees to close all but one of the dining rooms across all Ruby Tuesday restaurants.

---

several million people lost their restaurant jobs. Thousands of locations are already permanently closed. Others could follow.").

[8] *See* OpenTable, *A State-by-State Guide to Coronavirus-Related Restrictions at Restaurants* (OpenTable.com, July 13, 2020), https://blog.opentable.com/2020/states-provinces-restaurants-reopen-guide-coronavirus/ (as of Oct. 2, 2020).

37.     As the COVID-19 pandemic continued, by April 7, 2020, the Company had 350 remaining locations of which 281 were serving customers on a delivery or carryout basis only, 68 were temporarily closed and only one of which operated a dining room.  Prior to April 7, 2020, 71 stores were closed.  As of the Petition Date, the Debtors have 236 Company-owned dining rooms that are open and are offering full dining services, albeit under capacity and other restrictions which continue to diminish the Debtors' ability to sustain their operations at such locations.  The Debtors do not intend to reopen 185 of their restaurants that were closed during the pandemic.  The Company continues to assess the impact of new regulations and evaluate restaurant performance.

38.     Despite this unprecedented volatility in its business, the Company took immediate steps to be responsive to changes in the environments in which its restaurants operate, to address its financial condition with its key stakeholders and to implement relief efforts to support furloughed and terminated employees and maintain goodwill in the community.

39.     First, where permitted by the applicable state or local government, the Company immediately expanded the availability of third-party delivery and off-premise services across its stores and established new third-party relationships.

40.     Second, in addition to offering traditional Ruby Tuesday menu items, the Company introduced a virtual kitchen initiative, through which it utilizes excess capacity to offer other brands via third-party delivery.  Third, the Company implemented a "Ruby's Pantry" option that allows customers to purchase uncooked food, groceries and other essentials, all of which may be ordered through its website, www.rubytuesday.com/ruby-tue-go.

41.     The benefits of these changes were significant.  As of August 24, 2020, the year-to-date revenue from third-party delivery had grown over 450% versus the same time frame in

18

the prior year.  The RubyTueGo business also grew over 93% in the same period.  These initiatives are expected to contribute to a recovery as economies reopen and the Company leaves behind the impact of COVID-19.

42.     As part of its operational pivot to an off-premise business, the Company worked to help ensure the safety of its employees and customers by implementing additional on-site food preparation and pick-up protocols, including distancing requirements.  The safety of employees and guests is critical to the Company and every store meets or exceeds all local COVID-19 and health regulations.

43.     To further support the Ruby Tuesday family, the Company implemented a "Team Member Purchase Program", permitting team members to purchase any product served or used in their restaurant at the same cost that the Company pays for such product.  In addition, the "Ruby Has Heart" foundation, which was initially founded in 2001 to help employees struggling after 9/11, continues today funded by employees' contributions. Ruby Has Heart assists current team members in emergency circumstances with bills and other expenses, if their applications are approved.

44.     Also, in response to requests by its loyal customer base, the Company provides a portal through its website to support community relief efforts, including facilitating the donation of boxed meals to frontline workers, furloughed employees, and local emergency relief efforts.

45.     In addition to operational changes, the Company entered into negotiations with its Prepetition Lenders, various landlords, suppliers and service providers in order to address liquidity challenges.  These discussions permitted the Debtors to defer certain obligations (such as rent) while continuing to assess their ability to reopen and repurpose certain segments of their business despite the unpredictability of the pandemic.

46.     The Company also negotiated several concessions from its Prepetition Secured Lenders, including: (a) permitting the Company to retain and use the proceeds of such PPP loans for certain permitted purposes; (b) deferring payment of certain fees; and (c) permitting the Company to conduct certain asset sales, to retain some or all of the proceeds of such asset sales that would otherwise be subject to mandatory prepayment, and to capitalize certain fees that would otherwise be immediately payable as a result of such asset sales.

47.     Since the pandemic began in March 2020, the Company worked diligently with landlords to seek relief on amounts due in order to combat the loss of guest traffic and sales.   As of September 2020, the Company has negotiated over 200 lease modifications resulting in more than $1.5 million in rent abatement and $5.1 million in rent deferrals.  Several leases were terminated as well involving future lease obligations of approximately $17.3 million. The Company continues to work with landlords to assess the impact of government restrictions and negotiate rental market obligations.

48.     Prior to commencing its bankruptcy cases, the Company engaged in discussions with its Prepetition Secured Lenders in order to formulate the parameters of a restructuring that would provide the Company with the best opportunity for strengthening its financial position and maintaining its operations as a going concern.  To that end, on September 22, 2020, the parties entered into a Restructuring Support Agreement Term Sheet that contemplates, among other provisions, (a) debtor in possession financing to sustain the Debtors' operations during their bankruptcy cases; (b) the formulation of a business plan for the future of Ruby Tuesday; (c) confirmation of a plan of reorganization that results in certain members of its lender group acquiring ownership in the Company; and (d) the provision of exit financing to sustain a reorganized Ruby Tuesday as it emerges from bankruptcy protection.

DOCS_LA:332459.8 76136/001

49.    The Company also retained professionals to explore processes for assessing and streamlining its business, analyzing strategic alternatives and improving its liquidity, including those focused on lease management, restructuring and attracting investment.

50.    For example, the Company retained the services of FocalPoint Partners, LLC ("FocalPoint"), to design the appropriate process to solicit interest in, and contact various potential strategic and financial counterparties for the purpose of exploring, transactions to address the Company's liquidity concerns and support its contemplated forward operations. With respect to any such potential transaction, FocalPoint also advises the Company on the risks and benefits of considering a transaction with respect to the Company's intermediate and long-term business prospects and strategic alternatives to maximize the business enterprise value of the Company.

51.    The Company also retained CR3 Partners, LLC, as its financial advisors, to prepare appropriate financial models, complete analyses and consult with the Company and assist its other professionals regarding potential restructuring alternatives in connection with the Company's discussions with its Prepetition Lenders, its exploration of liquidity alternatives, and the development of a plan of reorganization.

## SECTION IV

## FIRST DAY PLEADINGS

52.    To enable the Debtors to minimize the adverse effects of these cases, the Debtors are requesting various types of relief in their First Day Pleadings.  Generally, the First Day Pleadings are designed to meet the Debtors' goals of (a) continuing their operations in chapter 11 with as little disruption and loss of productivity as possible, (b) maintaining the confidence and support of their customers, employees, vendors, suppliers, and service providers during the

Debtors' reorganization process, and (c) establishing procedures for the smooth and efficient administration of these chapter 11 cases.

53.     I have reviewed each of the First Day Pleadings and believe the facts set forth therein are true and correct.  I believe that the relief sought in each of the First Day Pleadings is narrowly tailored to meet the goals described above and, ultimately, will enhance the Debtors' ability to achieve a successful reorganization.  Furthermore, I believe that with respect to those First Day Pleadings requesting the authority to pay discrete prepetition claims or to continue selected prepetition programs, the relief requested is essential to the Debtors' reorganization and granting the relief within the first twenty-one days of the chapter 11 cases is necessary to avoid immediate and irreparable harm to the Debtors and their employees, customers, vendors, and creditors.

54.     The Debtors have an immediate need to continue the orderly operation of their business by securing goods and paying employees in the normal course of business.  The Debtors' continued operations will enable them to preserve the going concern value of their estates and maintain vendor and customer confidence.

## A.    <u>Administrative and Procedural Motions</u>

55.     The Debtors will present several purely administrative or procedural First Day Pleadings: (a) a motion to jointly administer the Debtors' bankruptcy cases, (b) a motion to file a consolidated list of creditors, and (c) an application to employ Epiq Corporate Restructuring, LLC, as claims and noticing agent under 28 U.S.C. § 156.

## B.    <u>Debtors' Motion to File a Consolidated List of Creditors in Lieu of Submitting a Separate Mailing Matrix for Each Debtor ("Consolidated Matrix Motion")</u>

56.     As in many large chapter 11 cases that are jointly administered, the Debtors do not maintain lists of the names and addresses of their respective creditors on a debtor-specific basis in the ordinary course of their business.  The Debtors have prepared a consolidated creditor matrix that may receive certain notices during these cases.  Requiring the Debtors to segregate and convert their records to provide fifty-one separate Debtor-specific creditor matrices would be unnecessarily burdensome and would result in duplicate filings.

57.     Similarly, the Debtors have proposed certain notice procedures that are designed to (a) provide service of most documents only to those parties in interest on a "Master Service List," with any party in interest eligible to be put on the Master Service List upon request, and (b) with several exceptions, provide electronic service of documents whenever possible to reduce costs and to speed up the service process.  The Debtors believe that these procedures are fair, will provide adequate service to all relevant parties of all pleadings and documents, and will save significant amounts in administrative costs that would otherwise detract from potential recoveries in these cases.

**C.     Motion for Entry of an Order Authorizing the Debtors to (I) Pay and/or Honor Prepetition Wages, Salaries, Commissions, Incentive Payments, Employee Benefits, and Other Compensation and Pay Temporary and Contract Workers; (II) Remit Withholding Obligations and Deductions; (III) Maintain Employee Compensation and Benefits Programs and Pay Related Administrative Obligations; and (IV) Have Applicable Banks and Other Financial Institutions Receive, Process, Honor, and Pay Certain Checks Presented for Payment and Honor Certain Fund Transfer Requests ("Employee Wage & Benefits Motion")**

58.     As of the Petition Date, the Debtors employed approximately 7,300 Employees. Full-time Employees are those normally scheduled to work on average of 30 or more hours per week while part-time Employees are those normally scheduled to work on average of less than 30 hours per week.  Except as otherwise noted, the Benefits described in the Employee Wage & Benefits Motion are generally limited to full-time Employees.  Approximately 700 Employees

are salaried and approximately 6,600 Employees are paid on an hourly basis.  The continued and uninterrupted support of the Debtors' employees is essential to the success of the Debtors' business.  Maintaining the goodwill of the Debtors' employees and ensuring the uninterrupted availability of their services will protect the going concern value of the estates and maximize the value ultimately available to creditors by assisting the Debtors in maintaining the necessary "business as usual" atmosphere and preserving the Debtors' relationships with customers and vendors.  Interruptions in payment of prepetition employee-related obligations, including wages, health and other benefits, and reimbursement of business expenses, will impose hardship on the employees and is certain to jeopardize their continued performance during this critical time.

59.     To minimize the personal hardship that employees will suffer if prepetition employee-related obligations are not paid when due, and to maintain the employees' morale, I believe that it is important that the Debtors be permitted to pay and/or perform, as applicable, employee-related obligations, including: (a) employee wages, salaries, commissions, incentive payments, vacation and holiday pay, and other accrued compensation, (b) prepetition business expenses, (c) prepetition contributions to, and benefits under, employees' benefit plans (medical, dental, vision), (d) remittances to various third party employee-benefit providers on behalf of employees, and all Prepetition Employee Obligations as defined in the Employee Wage & Benefits Motion, including:

| Wages or Benefits | Total |
|---|---:|
| Gross Wages | $1,710,000 |
| ADP administrative fees (payroll processing) | $40,000 |
| Reimbursable Expenses | $150,000 |
| Third Party Labor Provider Costs | $65,000 |
| Commissions (RT Lodge) | $7,500 |

| Incentive Program Payments | $140,000 |
| Medical Plan | $850,000 |
| COBRA Administrative fees | $1,000 |
| Health Savings Account fees | $7,500 |
| Life Insurance Plan, AD&D and Employee Disability Plan | $25,000 |
| Miscellaneous Benefits | $50,000 |
| State Workers' Compensation Bureaus | $25,000 |

**D.**  **Debtors' Motion for Entry of an Order Authorizing the Debtors to Honor Certain Prepetition Obligations to Customers and to Otherwise Continue Certain Customer Programs in the Ordinary Course of Business ("Customer Programs Motion")**

60.  I believe that maintaining the loyalty, support, and goodwill of the Debtors' customers is critical to their reorganization efforts.  In addition, the Debtors must maintain positive customer relationships and their reputation for reliability to ensure that their customers continue to purchase the Debtors' products during the pendency of these chapter 11 cases.

61.  Specifically, the customer programs generally relate to the Debtors' programs in which they offer coupons, promotions, gift cards, credits, and a loyalty program to customers (the "Customer Programs").   I believe that the Debtors' ability to continue Customer Programs and to honor their obligations thereunder in the ordinary course of business is necessary to retain their reputation for reliability, to meet competitive market pressures, and to ensure customer satisfaction, in order to retain current customers, attract new ones, and, ultimately, enhance revenue and profitability for the benefit of all of the Debtors' stakeholders.

62.  The Debtors offer Be Our Guest (BOG) or Be My Guest (BMG) cards, which are credits provided to customers by corporate or restaurant-level management to encourage customers to return or to reward a customer for long-term loyalty.  The outstanding balance of BOG and BMG cards as of the Petition Date is approximately $65,000.

63. The Debtors maintain a program called So Connected, which is a loyalty program built to reward the Debtors' customers for their commitment to the brand. Members of the So Connected program are entitled to Free Birthday Burger each year (value up to $11). In addition, the Debtors issue coupons to So Connected members each month that may be redeemed in the same month. So Connected has liability each month for coupons to be honored, but they do not extend beyond the month. As of the Petition Date, the Debtors hold approximately 5.6 million subscribed members' names and emails in its database. The So Connected Free Birthday Burger represents approximately 7,000 birthday redemptions per month (approximately $77,000 in value).

64. The Debtors maintain three donation programs to (a) support frontline workers, (b) provide meals for furloughed employees, and (c) support community relief programs:

> (i) Frontline Heroes Boxed Meal Donations. Since the Debtors instituted this program in response to the Covid-19 pandemic, almost 9,000 boxed meals have been donated by guests for $7.99 each. With each donated meal, the Debtors match one meal. I anticipate that the cost of continuing this program postpetition will be less than $15,000 per month.

> (ii) Meals for Furloughed Employees. Members of the public may also donate to support Ruby Tuesday employees affected by the coronavirus. All funds collected from guests online are used to provide meals to those Ruby Tuesday team members that have been furloughed during the Covid-19 pandemic.

> (iii) Community Emergency Relief Funds. The Debtors collect donations from customers to provide meals to support community relief efforts.

65. In connection with the Debtors' RT Lodge operations, the Debtors charge and apply deposits for special event bookings. As of the Petition Date, the Debtors are holding thirty (30) deposits in the amount of $5,000 each, for a total of $150,000. Typically, the deposits would be applied to the final bill. However, in the event of cancellation, the Debtors may refund some or all of the deposits.

66.     The Debtors utilize several credit card companies to process customer sales less any chargebacks and any processing fees charged.  I believe that maintaining the use of credit cards is essential to the continuing operation of the Debtors' business because the vast majority of the Debtors' sales are made using these payment methods.

67.     It is my understanding that the Customer Programs are standard in the industry for retail companies such as the Debtors.  If the Debtors are not able to offer any of the Customer Programs, their ability to conduct business and general sales will be severely hampered.  On the other hand, continuing to administer their Customer Programs without interruption during the pendency of these cases will help preserve the Debtors' valuable customer relationships and goodwill.  Additionally, continued maintenance of the Customer Programs will allow the Debtors to maintain their competitive edge in the industry.  Importantly, the Debtors' competitors maintain similar programs.  As such, the Debtors' various customers have a ready audience willing to meet such customers' needs and take such customers' business away from the Debtors.  Therefore, if the Debtors are unable to continue their Customer Programs or to pay amounts due and owing to their customers under the various Customer Programs, the Debtors risk alienating certain customer constituencies, losing customers to the Debtors' competitors, and suffering the corresponding losses in customer loyalty and goodwill that will harm the Debtors' goal of maximizing value for all constituents.

**E.      Motion of the Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay Certain Prepetition Claims (A) Arising Under the Perishable Agricultural Commodities Act, (B) To Critical Vendors and Service Providers, and (C) Arising Under Section 503(B)(9) of the Bankruptcy Code (II) Authorizing Banks to Honor and Process Related Checks and Electronic Transfers; and (III) Granting Related Relief ("Critical Vendor Motion")**

68.     The Debtors negotiate directly with suppliers for the purchase of raw and processed materials for both Debtor-owned and franchised restaurants. Timely, uninterrupted

provision of goods and services is crucial to the Debtors' business.  Particularly at the commencement of these Chapter 11 Cases, the Debtors cannot afford to have their supply of food and vital supplies cut off.  They must ensure they have the means to pay critical third party vendors who supply the Debtors with essential goods and services ("Critical Vendors"), vendors who sold products to the Debtors that may be deemed "perishable agricultural commodities," under the Perishable Agricultural Commodities Act of 1930, as amended ("PACA Claimants") and vendors from whom the Debtors received goods in the ordinary course of business, within the twenty-day period immediately prior to the Petition Date – ("503(b)(9) Claimants")  so that the flow of crucial goods will be provided and services will be maintained without interruption.  I believe that any such interruption would be devastating to the Debtors, their business and their efforts to restructure.

69.     Various third parties may be able to assert liens against statutorily-created trust assets or against the assets of the Debtors and their estates, including the PACA Claimants.  In addition, due to the nature of the Debtors' business operations, certain vendors may possess claims for administrative expenses pursuant to section 503(b)(9) of the Bankruptcy Code.  Also, the Debtors have determined, in an exercise of their business judgment, that their continued receipt of certain goods and services from certain key vendors is necessary to ensure that there are not any unexpected or inopportune interruptions in the Debtors' business operations, and to preserve and maximize the value of the estates.  Without the relief requested herein, I am concerned that many of the PACA Claimants, the 503(b)(9) Claimants, and the Critical Vendors may cease delivering goods and providing services to the Debtors, which could have devastating consequences for the Debtors' efforts to continue to operate its business in the ordinary course in order to effectuate a successful restructuring.

70.     To the best of my knowledge, I estimate that, as of the Petition Date, the aggregate amount owed to PACA Claimants is approximately $500,000, the amount owed on account of Critical Vendor claims is approximately $1,600,000, and the aggregate amount of the 503(b)(9) Claims is approximately $500,000.

**F.     Motion Pursuant to Sections 105(a), 507(a)(8), and 541(d) of the Bankruptcy Code for an Order Authorizing the Payment of Prepetition Sales, Use and Franchise Taxes and Similar Taxes and Fees ("Tax Motion")**

71.     The Debtors, in the ordinary course of their business, incur various tax liabilities, including, among other things, sales and use taxes, franchise taxes, and certain other business license fees (the "Prepetition Taxes").  Based on a review of the Debtors' books and records, I believe that, as of the Petition Date, accrued but unpaid prepetition liabilities incurred in the ordinary course of business total approximately $2,200,000 in unremitted sales and use taxes. As of the Petition Date, the Debtors do not believe they there are any Franchise Taxes or Business Fees due and owing but, in an abundance of caution, the Debtors are requesting authority to pay up to $25,000.00 each for unremitted Franchise Taxes and Business Fees.

72.     The Debtors seek entry of an order authorizing them to pay the Prepetition Taxes. The Debtors have ample business justification to pay the Prepetition Taxes because it is my understanding that (a) many, if not all, of the Prepetition Taxes would be priority claims under the Bankruptcy Code that likely would be paid in full under a chapter 11 plan, (b) certain of the Prepetition Taxes may not constitute property of the Debtors' estates, (c) the Debtors are required to pay the Prepetition Taxes to maintain their good standing in the jurisdictions in which they do business, (d) failure to pay certain Prepetition Taxes could give rise to liens on certain of the Debtors' property, and (e) the Debtors' directors and officers could face personal liability if certain Prepetition Taxes are not paid.  Therefore, to prevent immediate and irreparable harm that

would result from such disruptions and distractions, the Debtors seek authority to pay these

claims on a first day basis up to a maximum amount of $2,200,000 in the aggregate.

G.    **Motion of Debtors for Interim and Final Orders (A) Approving the Debtors' Proposed  Adequate Assurance of Payment for Future Utility Services, (B) Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Services, (C) Approving the Debtors' Proposed Procedures for Resolving Adequate Assurance Requests, and (D) Granting Related Relief ("Utilities Motion")**

73.    The Debtors utilize various services provided by numerous utility companies

(collectively, the "Utility Companies").  Because the Utility Companies provide essential

services to the Debtors and their retail operations, any significant interruption in utility services

would be highly problematic.  In fact, the temporary or permanent discontinuation of utilities

services at any of the Debtors' locations could irreparably disrupt business operations, and, as a

result, fundamentally undermine the Debtors' restructuring efforts.  On average, the Debtors pay

approximately $1,400,000 each month for third party Utility Services and approximately $3,500

per month for a third-party processor of utility bills, Summit Energy Service aka Schneider

Electric ("Summit").  The Debtors believe that, as of the Petition Date, they owe Summit

approximately $3,700 for administrative fees.

74.    The Debtors will propose procedures to protect the rights of Utility Companies by

providing such Utility Companies with a deposit in an amount equal to approximately two weeks

of the Debtors' aggregate utility expenses.  The Debtors submit that the deposit (which will be in

the amount of $511,199), in conjunction with the Debtors' ability to pay for future utility

services in the ordinary course of business and their existing security deposits, constitutes

sufficient adequate assurance of future payment to the Utility Companies. The Debtors estimate

the amount of Prepetition Deposits held by all Utility Providers is approximately $2 million[9].

**H.**  **Motion of Debtors for Order under Sections 105, 345, 363, 1107 and 1108 of the Bankruptcy Code Authorizing (I) Maintenance of Existing Bank Accounts; (II) Continuance of Existing Cash Management System, Bank Accounts, Checks and Related Forms; (III) Continued Performance of Intercompany Transactions; (IV) Limited Waiver of Section 345(B) Deposit and Investment Requirements and (V) Granting Related Relief ("Cash Management Motion")**

75.     In the ordinary course of business, the Debtors operate a cash management system

(the "Cash Management System") involving twelve (12) depository accounts for the collection of

cash from operations at their 236 restaurants, eight (8) disbursement accounts for payable and

payroll obligations, and ten (10) other bank accounts that are critical to continue the efficient

operation and administration of their business.  The Cash Management System provides a well-

established mechanism for the collection, management, and disbursement of funds used in the

Debtors' business.

76.     I believe that the Cash Management System provides numerous benefits including

the ability to (a) receive customer payments; (b) allow a mechanism for deposits; (c) pay

employee wages and benefits; and (d) pay vendors.  The Debtors' ability to continue their Cash

Management System in the ordinary course of their business is essential to their operations.

Absent the ability to maintain their Cash Management System, the Debtors would have to

significantly alter their business operations to comply with United States Trustee established

guidelines.  The Cash Management System provides benefits to the Debtors, such as enabling

them to: (a) control and monitor corporate funds; (b) ensure cash availability; and (c) reduce

costs and administrative expenses by facilitating the movement of funds.

---

[9] As discussed above, the Debtors have closed several under-performing restaurants permanently due to adverse economic factors, including the COVID-19 pandemic.  As a result, some of the Utility Providers may be holding excessive deposits.  The Debtors are working with the Utility Providers to obtain the release of excess deposits.

77.     In light of the substantial size and complexity of the Debtors' operations, any disruption in the Debtors' cash management procedures will hamper the Debtors' efforts to preserve and enhance the value of their estates.  Altering the Cash Management System could disrupt payments to employees and key vendors.  Therefore, I believe that it is essential that the Debtors be permitted to continue to use their Cash Management System in accordance with their existing cash management procedures and in accordance with the DIP Motion.

78.     In addition, in the ordinary course of their business, the Debtors engage in Intercompany Transactions as more fully set forth in the Cash Management Motion.  The Cash Management System and other processes allow the Debtors to track all obligations owing between related entities.  The Debtors seek the authority to continue their Intercompany Transactions in the ordinary course of business as further set forth in the Cash Management Motion.

I.      **Motion of Debtors for Order Under Sections 105, 361, 362, 363, 364, 1107 and 1108 of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 6003 (A) Authorizing the Debtors to (I) Maintain and Renew Existing Insurance Policies; (II) Continue Insurance Premium Financing Programs; and (III) Pay Insurance Premium Financing Obligations Arising Thereunder; and (B) Authorizing Financial Institutions to Honor All Obligations Related Thereto (the "Insurance Premium Financing Motion")**

79.     Pursuant to the Insurance Premium Financing Motion, the Debtors seek entry of an order which would authorize the Debtors to maintain their numerous insurance policies providing coverage for commercial general liability, umbrella liability, property, boiler & machinery/equipment, terrorism, flood, business automobile, employed lawyer professional liability, directors' and officers' liability, network security/privacy, crime, and workers' compensation (collectively, the "Policies").  A summary of the Debtors' Policies by type, carrier,

DOCS_LA:332459.8 76136/001

term and limit is set forth on Exhibit B to the Insurance Premium Financing Motion.  These Policies are essential to the preservation of the Debtors' business, and assets, and, in many instances, such insurance coverage is required by regulation, law, or contract that governs the Debtors' business.

80.     The Policies are essential to the Debtors' business and I believe that it is in the best interests of the Debtors' estates to continue to pay the amounts due under the various policies and premium financing agreements ("PFA"), regardless of whether a given payment became due prior to or after the Petition Date.  Unless the Debtors are authorized to continue to pay pursuant to the Policies and PFAs on a monthly basis, the insurance financier ("Insurance Financier") will have the right to cancel the financed policies and will be entitled to recover the unearned premiums from its collateral.  The termination of the Policies would leave the Debtors' estates at risk of catastrophic loss if an unforeseen event occurred.  To avoid this risk, the Debtors would need to obtain new insurance policies and pay the policies, which they may not be able to obtain at favorable prices, or be required to pay the policies in full, which would in turn reduce the estates' assets available to pay creditors.

81.     The Debtors also seek authority to continue and renew all of the Policies throughout the duration of these Chapter 11 Cases.  I submit that the continuation, renewal or negotiation of these Policies and PFAs falls squarely within the ordinary course of their business.  Out of an abundance of caution, the Debtors request that the Court authorize them to renew the Policies and PFAs as they expire in the ordinary course of business, including entering into new PFAs with the Insurance Financier or other similar premium insurance financing companies as

33

and when the existing PFAs expire post-petition, and to continue making monthly payments on account of any Policy for which the Debtor makes monthly premium payments.

## II.

## <u>CONCLUSION</u>

For all of the reasons set forth herein and in the First Day Pleadings, I respectfully request that the Court grant the relief requested in each of the First Day Pleadings.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated:  October  7, 2020
At: Maryville, Tennessee

_____
Shawn Lederman
Chief Executive Officer

DOCS_LA:332459.8 76136/001