# IN THE UNITED STATES BANKRUPTCY COURT

# FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| RTI HOLDING COMPANY, LLC,[1] | ) | Case No. 20-12456 |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |

## MOTION OF DEBTORS FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING DEBTORS TO (A) OBTAIN POSTPETITION FINANCING  PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 364(C)(1), 364(C)(2), 364(C)(3), 364(D)(1), AND 364(E) OF THE BANKRUPTCY CODE AND (B) USE CASH COLLATERAL PURSUANT TO 11 U.S.C. § 363, (II) GRANTING ADEQUATE PROTECTION PURSUANT TO 11 U.S.C. §§ 361, 362, 363, AND 364, AND (III) SCHEDULING FINAL HEARING

The above-captioned debtors and debtors in possession (collectively, the

"Debtors") hereby submit this motion (this "Motion") for entry of an interim order on an

expedited basis (the "Interim Order") substantially in the form attached hereto as **Exhibit 1**, and

following a final hearing to be set by the Court (the "Final Hearing"), entry of a final order (the

"Final Order"), pursuant to sections 105, 361, 362, 363, and 364 of title 11 of the United States

---

[1] The Debtors in these chapter 11 cases and the last four digits of each Debtor's U.S. tax identification number are as follows: RTI Holding Company, LLC (4966); Ruby Tuesday, Inc. (5239); Ruby Tuesday, LLC (1391); RTBD, LLC (6505); RT of Carroll County, LLC (8836); RT Denver Franchise, L.P. (2621); RT Detroit Franchise, LLC (8738); RT Distributing, LLC (6096); RT Finance, LLC (7242); RT FL Gift Cards, Inc. (2189); RT Florida Equity, LLC (7159); RT Franchise Acquisition, LLC (1438); RT of Fruitland, Inc. (1103); RT Indianapolis Franchise, LLC (6016); RT Jonesboro Club (2726); RT KCMO Franchise, LLC (7020); RT Kentucky Restaurant Holdings, LLC (7435); RT Las Vegas Franchise, LLC (4969); RT Long Island Franchise, LLC (4072); RT of Maryland, LLC (7395); RT Michiana Franchise, LLC (8739); RT Michigan Franchise, LLC (8760); RT Minneapolis Franchise, LLC (2746); RT Minneapolis Holdings, LLC (7189); RT New England Franchise, LLC (4970); RT New Hampshire Restaurant Holdings, LLC (7438);  RT New York Franchise, LLC (1154); RT Omaha Franchise, LLC (7442); RT Omaha Holdings, LLC (8647); RT One Percent Holdings, LLC (6689); RT One Percent Holdings II, LLC (2817); RT Orlando Franchise, LP (5105); RT Restaurant Services, LLC (7283); RT South Florida Franchise, LP (3535); RT Southwest Franchise, LLC (9715); RT St. Louis Franchise, LLC (6010); RT Tampa Franchise, LP (5290); RT Western Missouri Franchise, LLC (6082); RT West Palm Beach Franchise, LP (0359); RTTA, LP (0035); RTT Texas, Inc. (2461); RTTT, LLC (9194); Ruby Tuesday of Allegany County, Inc. (8011); Ruby Tuesday of Bryant, Inc. (6703); Ruby Tuesday of Columbia, Inc. (4091); Ruby Tuesday of Frederick, Inc. (4249); Ruby Tuesday of Linthicum, Inc. (8716); Ruby Tuesday of Marley Station, Inc. (1641); Ruby Tuesday of Pocomoke City, Inc. (0472); Ruby Tuesday of Russellville, Inc. (1601); and  Ruby Tuesday of Salisbury, Inc. (5432). The Debtors' mailing address is 333 East Broadway Ave., Maryville, TN 37804.
.

Code (as amended, the "<u>Bankruptcy Code</u>"), rules 2002, 4001, 6004, and 9014 of the Federal

Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"), and rules 2002-1(b), 4001-2, and

9013-1(m) of the Local Rules of Bankruptcy Practice and Procedure of the United States

Bankruptcy Court for the District of Delaware (the "<u>Local Rules</u>"), (i) authorizing the Debtors to

obtain postpetition financing and to use cash collateral, (ii) granting adequate protection, and (iii)

scheduling a final hearing.

The Debtors have the consent of the Pre-Petition Secured Parties (as defined

below) to obtain financing and access cash collateral on the terms described herein.

<u>**Overview**</u>

1.       The Debtors seek authority to consummate a new senior, secured debtor-

in-possession financing facility with their existing Pre-Petition Lenders (as defined below).  The

DIP Facility (as defined below) will consist of term loans in the aggregate principal amount of

$18.5 million (including a $9.6 million sub-facility to be used solely for the reimbursement of

any draws under certain existing letters of credit).  The DIP Facility includes a roll-up of the

Debtors' prepetition letter of credit facility (potential exposure of approximately $9.6 million)

upon entry of the Interim Order and, upon entry of the Final Order, a roll-up of $2.0 million in

prepetition bridge advances *plus* accrued and unpaid interest and fees related thereto as of the

date of the Final Order.  The new money advances that will be available to the Debtors under the

DIP Facility total $6.9 million, of which $3.0 million will be available upon entry of the Interim

Order.  The DIP Facility will consensually prime the obligations of the Pre-Petition Secured

2

Parties as to the Pre-Petition Collateral (as defined below), and will provide needed financing during the Debtors' cases pending consummation of the Debtors' contemplated chapter 11 plan.

2.     Specifically, by this Motion, the Debtors seek the entry of an Interim Order and a Final Order, *inter alia*:

a.     authorizing Ruby Tuesday, Inc. ("RTI") and the remaining Debtors to obtain secured postpetition financing on a superpriority basis pursuant to the terms and conditions of that certain "Debtor-in-Possession Credit and Guaranty Agreement," in substantially the form attached (without exhibits or schedules) as Exhibit A to the Interim Order (as the same may be amended, supplemented, restated or otherwise modified from time to time in accordance with its terms, the "DIP Credit Agreement"), by and among RTI and certain subsidiaries of RTI, as Borrowers, RTI Holding Company, LLC ("Holdings"), as Borrower Representative and a Guarantor, certain other subsidiaries of Holdings, each as a Guarantor, Goldman Sachs Specialty Lending Group, L.P. ("GSSLG"), as Administrative Agent and Collateral Agent (in such capacities, the "DIP Agent"), Goldman Sachs Bank USA ("GS Bank"), as issuer of the Existing Letters of Credit ("Issuing Bank"), and each Lender party thereto (together with Issuing Bank, collectively, the "DIP Lenders", and together with DIP Agent, collectively, the "DIP Secured Parties")), in an aggregate principal amount not to exceed $18,500,000, consisting of a term loan facility in the aggregate principal amount of $18,500,000 (the "DIP Facility", and any draws on the DIP Facility, the "DIP Loans"), of which $12,600,000 will be available immediately upon entry of the Interim Order. Such DIP Facility includes (i) a $9,600,000 sub-facility to be used solely for the reimbursement of any draws made under the Existing Letters of Credit, which sub-facility shall account for $9,600,000 of the total amount that will be available immediately upon entry of the Interim Order and which Existing Letters of Credit, upon entry of the Interim Order, shall be treated as having been issued under the DIP Credit Agreement and shall constitute part of the Credit Extensions and Obligations and be entitled to all of the benefits and security of the DIP Loan Documents, the DIP Collateral (as defined below) and the Interim Order, in each case as provided in the DIP Loan Documents (as defined below) and the Interim Order and (ii) a roll-up of Term Loans (as defined in the Pre-Petition Credit Agreement (as defined below)) in the aggregate principal amount of $2,000,000 extended to the Debtors by the DIP Lenders on the Seventh Amendment Effective Date *plus* all accrued and unpaid interest and fees related thereto as of the entry of the Final Order (which accrued and unpaid interest and fees are equal to not less than $11,681.11 as of the Petition Date (as defined below)), which Term Loans and accrued and

3

unpaid interest and fees shall, upon entry of the Final Order, be treated as having been issued under the DIP Credit Agreement, constitute part of the Credit Extensions and Obligations and be entitled to all of the benefits and security of the DIP Loan Documents, the DIP Collateral and the Final Order, in each case as provided in the DIP Loan Documents and the Final Order;

b.     authorizing the Debtors to execute the DIP Credit Agreement and all other documents, agreements and instruments delivered pursuant thereto or executed or filed in connection therewith, all as may be reasonably requested by the DIP Agent (as the same may be amended, restated, supplemented or otherwise modified from time to time in accordance with their respective terms, and, collectively with the DIP Credit Agreement, the "<u>DIP Loan Documents</u>");

c.     authorizing the Debtors to use the proceeds from the DIP Facility as permitted in the DIP Loan Documents and in accordance with the Interim Order, the Final Order, and the DIP Budget (as defined in the Interim Order);

d.     granting to the DIP Agent, for itself and for the benefit of the DIP Lenders, first priority security interests in and liens on all assets that constitute the DIP Collateral (as defined below) to secure the DIP Facility and all obligations owing and outstanding thereunder and under the DIP Loan Documents, as applicable, the Interim Order, and the Final Order, as applicable (collectively, and including all "Obligations" as described in the DIP Credit Agreement, the "<u>DIP Obligations</u>"), which shall rank senior in priority to all other liens other than Permitted Priority Liens (as defined in the Interim Order) (other than the Pre-Petition Liens) as described in the Interim Order and payment of the Carve-Out (as defined in the Interim Order);

e.     granting superpriority administrative expense claims against each Debtor's estate to the DIP Agent and the DIP Lenders with respect to the DIP Obligations in accordance with Section 364(c)(1) of the Bankruptcy Code over any and all administrative expenses of any kind or nature subject and subordinate only to the payment of the Carve-Out;

f.     authorizing the Debtors to use Cash Collateral (as defined in the Interim Order);

g.     authorizing the Debtors to grant adequate protection to the Pre-Petition Agent (as defined below) on behalf of the Pre-Petition Secured Parties[2] (as defined below) to the extent of any diminution in value of their interest in

---

[2] As of the Petition Date, the Pre-Petition Secured Parties are the same parties as the DIP Secured Parties.

the Pre-Petition Collateral (as defined below) and subject to the Carve-Out;

h.    vacating and modifying the automatic stay pursuant to Section 362 of the Bankruptcy Code (the "Automatic Stay") to the extent necessary to implement and effectuate the terms and provisions of the Interim Order, the Final Order and the DIP Loan Documents;

i.    waiving any applicable stay with respect to the effectiveness and enforceability of the Interim Order (including under Bankruptcy Rule 6004); and

j.    scheduling a hearing (the "Final Hearing"), pursuant to Bankruptcy Rule 4001(c)(2), to consider final approval of the DIP Facility, use of Cash Collateral and other Requested Relief pursuant to the proposed Final Order, as set forth in the Interim Order and the DIP Loan Documents filed with this Court.

3.    The Debtors require the DIP Facility and access to cash collateral in order to continue operations with their ordinary course prepetition practices, without material interruption or alteration, and to move forward with a plan confirmation process. Further, the Debtors have the consent of the Pre-Petition Secured Parties to obtain financing and access Cash Collateral on the terms described in this Motion.

**Jurisdiction and Venue**

4.    The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated February 29, 2012. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2), and the Debtors confirm their consent pursuant to Rule 9013-1(f) of the Local Rules to the entry of a final order by the Court in connection with this Motion to the extent

that it is later determined that the Court, absent consent of the parties, cannot enter final orders or

judgments in connection herewith consistent with Article III of the United States Constitution.

5.        The statutory predicates for the relief sought herein are sections 105, 361,

362, 363, 364, 503, and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001(b), 6004,

and 9014, and Local Rules 2002-1(b), 4001-2, and 9013-1(m).  Venue is proper pursuant to 28

U.S.C. §§ 1408 and 1409.

### Background

6.        On October 7, 2020 (the "Petition Date"), each of the Debtors filed

with this Court a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The

Debtors are operating their business and managing their properties as debtors in possession

pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

7.        The factual background regarding the Debtors, including their historical

business operations and the events precipitating the chapter 11 filing, is set forth in detail in the

*Declaration of Shawn Lederman, Chief Executive Officer of Ruby Tuesday, Inc., in Support of*

*First Day Pleadings* (the "First Day Declaration") filed concurrently herewith and fully

incorporated herein by reference.[3]

---

[3] Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the First Day
Declaration or the Interim Order, as applicable, and to the extent not described therein, the meaning ascribed to them
in the DIP Credit Agreement.

## Relevant Factual Background

### A.    The Debtors' Ongoing Business

8.    As noted above, the Debtors are an operating business.  The Debtors develop, operate, and franchise casual dining restaurants in the United States, Guam, and five foreign countries under the Ruby Tuesday® brand.  The Debtors' owned and operated restaurants (i.e., non-franchise) are concentrated primarily in the Southeast, Northeast, Mid-Atlantic and Midwest regions of the United States.   As of the Petition Date, the Debtors have over 7,200 employees.

9.    The Debtors intend to continue operations in the ordinary course during these chapter 11 cases, and to preserve going concern value for the benefit of all constituents.

### B.    Pre-Petition Credit Agreement

10.    Pursuant to that certain "Credit and Guaranty Agreement," dated as of December 21, 2017 (as has been amended, restated or modified from time to time prior to the Petition Date, the "Pre-Petition Credit Agreement", and together with all agreements, documents, notes, mortgages, security agreements, pledges, guarantees, subordination agreements, instruments, amendments, and any other agreements delivered pursuant thereto or in connection therewith, the "Pre-Petition Credit Agreement Documents"), among (a) RTI and certain subsidiaries of RTI, as borrowers (in such capacity, the "Pre-Petition Borrowers"), (b) Holdings, as borrower representative (in such capacity, the "Pre-Petition Borrower Representative"), together with certain subsidiaries of RTI as guarantors (collectively, the "Pre-Petition Guarantors"), (c) GSSLG, as administrative agent, collateral agent, and syndication agent (in

such capacities, the "Pre-Petition Agent"), (d) GS Bank, as issuing bank (the "Pre-Petition Issuing Bank"), and (e) each lender party thereto (together with Pre-Petition Issuing Bank, collectively, the "Pre-Petition Lenders", and together with the Pre-Petition Agent, collectively, the "Pre-Petition Secured Parties"), the Pre-Petition Lenders provided term loan commitments, revolving loan commitments and other financial accommodations to, or for the benefit of, the Pre-Petition Borrowers and the Pre-Petition Guarantors (such loans and financial accommodations, the "Pre-Petition Loans", and such facility, the "Pre-Petition Facility").  As of the Petition Date, the Debtors were jointly and severally indebted to the Pre-Petition Secured Parties in the aggregate principal amount of $37,856,513.21, consisting of (a) $26,304,679.21 in the aggregate principal amount of Term Loans (as defined in the Pre-Petition Credit Agreement), (b) $2,000,000.00 in the aggregate principal amount of Revolving Loans (as defined in the Pre-Petition Credit Agreement), and (c) $9,551,834.00 in the aggregate principal amount of Existing Letters of Credit (as defined in the Pre-Petition Credit Agreement) (collectively, together with accrued and unpaid interest with respect thereto and any additional fees, costs, expenses (including any attorneys', financial advisors', and other professionals' fees and expenses), reimbursement obligations, indemnification obligations, contingent obligations, and other charges of whatever nature, whether or not contingent, whenever arising, due, or owing that would constitute Obligations (as defined in the Pre-Petition Credit Agreement) owing under or in connection with the Pre-Petition Credit Agreement Documents, the "Pre-Petition Obligations"), which Pre-Petition Obligations have been guaranteed on a joint and several basis by each of the Pre-Petition Borrowers and the Pre-Petition Guarantors.

11.     As more fully set forth in the Pre-Petition Credit Agreement Documents, the Pre-Petition Obligations are secured by first priority liens on and security interests in the "Collateral" under and as defined in the Pre-Petition Credit Agreement Documents (collectively, the "Pre-Petition Liens") in substantially all of the Debtors' assets to the extent set forth in the Pre-Petition Credit Documents (the "Pre-Petition Collateral").

12.     Pursuant to the Interim Order, the Debtors will be representing, acknowledging and agreeing that, as of the Petition Date, (a) the Pre-Petition Liens constitute valid, binding, enforceable, and perfected liens with priority over any and all other liens (other than Pre-Petition Permitted Prior Liens, as defined below) and the Debtors shall not raise or join any challenge or defense, including, without limitation, respectively, avoidance, reductions, recharacterization, subordination (whether equitable, contractual, or otherwise), claims, counterclaims, cross-claims, offsets, recoupments, objections, defenses, or any other challenges under the Bankruptcy Code or any applicable law or regulation by any person or entity; (b) the Pre-Petition Liens were senior in priority over any and all other liens on the Pre-Petition Collateral, subject only to liens senior by operation of law or permitted by the Pre-Petition Credit Agreement Documents, and solely to the extent any such liens were valid, properly perfected, non-avoidable and senior in priority to the Pre-Petition Liens as of the Petition Date (the "Pre-Petition Permitted Prior Liens"); (c) the Pre-Petition Obligations are unconditionally owing by the Debtors and constitute legal, valid, binding, and non-avoidable obligations of the Debtors enforceable in accordance with the terms of the applicable Pre-Petition Credit Agreement Documents; (d) no offsets, recoupments, challenges, objections, defenses, claims, or

counterclaims of any kind or nature to any of the Pre-Petition Obligations exist, and no portion of

the Pre-Petition Obligations is subject to any challenge or defense including, without limitation,

avoidance, disallowance, reductions, set-off, offset, disgorgement, recharacterization,

subordination (whether equitable, contractual or otherwise), counterclaims, cross-claims,

defenses or any other challenges pursuant to the Bankruptcy Code or any applicable law or

regulation; (e) the Debtors shall not raise or join in any assertion of any claims, objections,

challenges, causes of action, and/or choses in action, including without limitation, avoidance

claims under Chapter 5 of the Bankruptcy Code or applicable state law equivalents or actions for

recovery or disgorgement, against any of the Pre-Petition Secured Parties, or any of their

respective affiliates, agents, attorneys, advisors, professionals, officers, directors, and employees

arising out of, based upon or related to the Pre-Petition Facility; and (f) the Debtors have waived,

discharged, and released any right to challenge any of the Pre-Petition Obligations, the priority of

the Pre-Petition Obligations, and the validity, extent, and priority of the Pre-Petition Liens.

**C.**    **Background to Proposed DIP Facility**

13.    Recognizing the need for additional financing, the Debtors began the

process of soliciting prospective lenders with the opportunity to provide a debtor-in-possession

loan facility.  The Debtors contacted ten (10) potential financing sources (in addition to ongoing

discussions with the Debtors' current lender group) and six (6) potential funding sources

subsequently executed non-disclosure agreements with the Debtors.  The Debtors provided due

diligence materials with respect to the Debtors to each of the six (6) parties.  Three (3) parties

submitted non-binding indications of interest.

14.     The Debtors explored exit financing with each of the above parties as well. Of the three (3) parties who had submitted non-binding indications of interest, one (1) of them also proposed that their debtor-in-possession loan would convert into exit financing upon the successful consummation of a plan of reorganization, while two (2) parties indicated a likely desire to do so upon further review.

15.     In evaluating the various proposals, the Debtors sought to (i) secure financing which would provide sufficient liquidity for both the pendency of these proceedings and for the Debtors to execute upon their business plan post-emergence; and (ii) minimize the Debtors' cost of capital.  In particular, given the significant challenges facing the restaurant industry particularly during the Covid-19 period, the Debtors believed that it was particularly important to secure an attractive debtor-in-possession financing package that would also serve as a stepping stone into an exit facility. By having a debtor-in-possession financing commitment in hand, the Debtors are sending a strong message to the market that the Debtors have the capacity to successfully implement their anticipated restructuring.

16.     After careful review of their financing options, the Debtors concluded that the DIP Lenders' proposed terms would allow the Debtors to meet their goals and provide the Debtors with sufficient liquidity on economic terms that were superior to terms proposed by any other prospective lender.  In connection with the DIP Facility, the DIP Lenders also provided a term sheet for exit financing that would continue to provide liquidity for the Debtors' operations post-emergence.  The Debtors subsequently negotiated the terms of the debtor-in-possession financing with the DIP Lenders and their counsel.  Such negotiations were conducted at arms'

length and in good faith and proceeded over several weeks as the Debtors sought to secure the

best possible terms under the circumstances.  The outcome of such negotiations is the DIP Credit

Agreement.

<u>**Concise Statement of Relief Requested**</u>

17.     In accordance with Bankruptcy Rule 4001(b) and Local Rule 4001-2,

below is a summary[4] of the terms of the proposed financing and use of cash collateral:

| | |
|---|---|
| **BORROWER:** | Ruby Tuesday, Inc. and certain Debtor subsidiaries, and RTI Holding Company, LLC as Borrower Representative. |
| **GUARANTORS:** | The remaining Debtors. |
| **DIP AGENT:** | GSSLG. |
| **DIP LENDERS:** | TCW and GSSLG (GS Bank is the Issuing Bank for the Existing Letters of Credit). |
| **DIP FACILITY:** | A priming DIP Facility, with superpriority liens and superpriority administrative expense claims, in an amount of up to $18.5 million (including a $9.6 million subfacility for any draws under the Existing Letters of Credit). |
| | Roll-up of Existing Letters of Credit obligations (potential exposure of $9.6 million) upon entry of the Interim Order. |
| | Upon entry of the Final Order, roll-up of $2.0 million of bridge advances made prior to the Petition Date *plus* accrued and unpaid interest and fees related thereto as of the entry of the Final Order. |
| | Total of new money available is $6.9 million, of which $3.0 million will be available upon entry of the Interim Order. |
| **USE OF PROCEEDS:** | The Debtors shall use the Cash Collateral and the proceeds of the Term Loans for only the following purposes, in each case, in |

---

[4]  The summaries and descriptions of the terms and conditions for the proposed financing and use of cash collateral and the provisions of the Interim Order set forth in this Motion are intended solely for informational purposes to provide the Court and parties in interest with an overview of the significant terms thereof.  The summaries and descriptions are qualified in their entirety by the proposed Interim Order and DIP Loan Documents.  In the event there is any conflict between this Motion and the Interim Order, the Interim Order will control in all respects and, in the event there is any conflict between this Motion and the DIP Loan Documents, the DIP Loan Documents will control in all respects.

accordance with (i) the Interim Order and the Final Order and (ii) the Budget, including:  (A) to reimburse Issuing Bank with respect to draws under the Existing Letters of Credit; (B) for working capital and general corporate purposes of the Debtors, (C) to pay interest, premiums, fees and expenses payable hereunder and under the other Credit Documents to the DIP Secured Parties, (D) to pay restructuring costs and professional fees of the Debtors, (E) to effectuate the roll-up of indebtedness as set forth in the DIP Credit Agreement, and (F) to make adequate protection payments.

Up to $25,000 in the aggregate of proceeds of the DIP Loans, Cash Collateral and Carve-Out (collectively) may be used by a Creditors' Committee to investigate (but not to commence or pursue any litigation, objection, or challenge to) the Pre-Petition Obligations, the Pre-Petition Liens and/or claims against the Releases prior to the Challenge Period Termination Date (as each is defined in the Interim Order).

**INTEREST RATE:**     The Loans shall bear interest on the unpaid principal amount thereof from the date made through repayment (whether by acceleration or otherwise) thereof as follows:

a.      if a Base Rate Loan, at the Base Rate, <u>plus</u> the Applicable Margin; or

b.      if a LIBOR Rate Loan, at the Adjusted LIBOR Rate, <u>plus</u> the Applicable Margin.

Notwithstanding anything to the contrary contained in the DIP Credit Agreement in no event shall (A) the Adjusted LIBOR Rate be less than 1.00% per annum or (B) the Base Rate be less than 4.00% per annum.

"Applicable Margin" means (a) with respect to Loans that are LIBOR Rate Loans, a percentage, per annum, equal to 10.00% and (b) with respect to Loans that are Base Rate Loans, a percentage, per annum, equal to 9.00%.

Per the Budget, the effective interest rate for the Term Loans under the DIP Facility is 11.0% per annum.

**FEES:**     Borrowers agree to pay to the Lenders:

a.      commitment fees equal to (A) the average of the daily difference between (I) the aggregate Commitments then in effect and (II) the Term Loans outstanding at such time <u>plus</u> the Letter of Credit Usage at such time; <u>multiplied</u> <u>by</u> (B) 0.50% per annum; and

b.      Letter of Credit Fees equal to 8.00% per annum on the maximum aggregate amount of available to be drawn under all Existing Letters of Credit shall be payable quarterly in arrears and shared proportionately by the Lenders (including the Issuing Bank).

c.      All fees shall be calculated on the basis of a 360-day year and the actual number of days elapsed and shall be payable in Cash and (A) in respect of the fees payable under item (a) above, monthly in arrears (B) in respect of the Letter of Credit Fees under item (b) above, quarterly in arrears, in each case, on the last day of such quarter or month, as applicable, commencing on the first such date to occur after the Closing Date, and on the Maturity Date.

Borrowers further agree to pay directly to Issuing Bank for its own account the following Letter of Credit Fees:

a.      a fronting fee equal to (A) the average aggregate daily maximum amount available to be drawn under all Existing Letters of Credit (determined as of the close of business on any date of determination), <u>multiplied</u> <u>by</u> (B) 0.25%, per annum; and

b.      such documentary and processing charges for any transfer or payment of an Existing Letter of Credit as are in accordance with Issuing Bank's standard schedule for such charges and as in effect at the time of such transfer or payment, as the case may be.

Borrowers further agree to pay to the Lenders (i) upon the Closing Date, a commitment fee equal $3,700, and (ii) upon the Maturity Date, an exit fee equal to $3,700.

**MATURITY:**          The earliest to occur of:  (a) the date which is thirty (30) days after the Outside Date (as defined in the RSA) or such later date as agreed to by Administrative Agent and Lenders in accordance with the RSA; (b) acceleration of the Obligations due to the occurrence of an Event of Default; (c) the effective date of a confirmed plan of reorganization or liquidation that provides for payment in full in Cash of all Obligations owing under the DIP Facility and the Pre-Petition Obligations in accordance with the RSA or is otherwise acceptable to DIP Lenders in their respective reasonable discretion; (d) the date which is the closing date of any sale of all or substantially all of the Debtors' assets; (e) the entry of an order by the Bankruptcy Court granting relief from the automatic stay permitting foreclosure of any assets of any Debtor, in any case, in excess of $250,000 in the aggregate; or (f) the date on which (i) any of the cases shall be dismissed or converted to a case under Chapter 7 of the Bankruptcy Code, (ii) a trustee under Chapter 11

of the Bankruptcy Code shall be appointed in any of the cases, or (iii) an examiner having enlarged powers relating to the operation of the business of any Borrower or any Guarantor (beyond those set forth under Section 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code shall be appointed

**DIP COLLATERAL:**    All of the property, assets or interests in property or assets of each Debtor, and all "property of the estate" (within the meaning of the Bankruptcy Code) of each Debtor, of any kind or nature whatsoever, real or personal, tangible or intangible or mixed, now existing or hereafter acquired or created, including, without limitation, all of each Debtor's now owned or hereafter acquired right, title, and interest in and to: (v) all of the property, assets or interests in property or assets of each Debtor and all "property of the estate" (other than the DIP Collateral Excluded Accounts (as defined in the Pledge and Security Agreement)), including, without limitation, the Pre-Petition Collateral, all leases (to the extent not included in the Pre-Petition Collateral) and, to the extent any property, assets or interests of any Debtor are excluded from the DIP Collateral, such as certain liquor licenses or leases that restrict the grant of a security interest or lien in such assets, the proceeds of such property, assets or interests; (w) the proceeds and products, whether tangible or intangible, of any of the foregoing, including proceeds of insurance covering any or all of the foregoing, and any money or other tangible or intangible property resulting from the sale, exchange, collection or other disposition of any of the foregoing, or any portion thereof or interest therein, and the proceeds thereof; (x) all other property and assets (other than the DIP Collateral Excluded Accounts (as defined in the Pledge and Security Agreement)) including, without limitation, Cash Collateral and all cash and non-cash proceeds, rents, products, substitutions, accessions, offspring and profits of any of the collateral described above; (y) avoidance actions under chapter 5 of the Bankruptcy Code or applicable state law ("Avoidance Actions", and the proceeds thereof, "Avoidance Actions Proceeds"); and (z) a pledge of 100% of the Capital Stock of each Debtor's respective Subsidiaries, (collectively with (v)-(y), the "DIP Collateral"); subject only to (i) the Permitted Priority Liens (other than the Pre-Petition Liens), and (ii) prior payment of the Carve-Out. Notwithstanding the foregoing, Avoidance Actions and Avoidance Actions Proceeds shall not constitute DIP Collateral until after the entry of the Final Order.

**DIP SUPERPRIORITY CLAIMS:**    The DIP Agent, for the benefit of the DIP Secured Parties, is granted an allowed superpriority administrative expense claim (the "DIP Superpriority Claim") pursuant to section 364(c)(1) of the

Bankruptcy Code in each of the Debtors' cases and in any successor case(s) under the Bankruptcy Code (including any case or cases under chapter 7 of the Bankruptcy Code, the "Successor Case(s)") for all DIP Obligations, having priority over any and all other claims against the Debtors, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kinds specified in or arising or ordered under sections 105(a), 326, 328, 330, 331, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 726, 1113, and 1114 and any other provision of the Bankruptcy Code or otherwise, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, which allowed DIP Superpriority Claim shall be payable from and have recourse to all pre- and postpetition property of the Debtors, including all cash and cash equivalents, and all proceeds thereof including, without limitation but subject to entry of a Final Order, any Avoidance Actions and Avoidance Actions Proceeds. The DIP Superpriority Claim granted in this paragraph shall be subject and subordinate in priority of payment only to prior payment of the Carve-Out. Except as referenced in the Interim Order, no other superpriority claims shall be granted or allowed in these Chapter 11 Cases or in any Successor Case(s). The DIP Superpriority Claim shall be senior in all respects to any superpriority claims granted in these Chapter 11 Cases including, without limitation, on account of any break-up fee or expense reimbursement that may be granted by the Court in connection with any sale of the Debtors' assets and the Adequate Protection Superpriority Claim.

**ADEQUATE PROTECTION:**    *Adequate Protection Liens*. Subject to challenge rights under the Interim Order, to secure the Diminution Claim, the Pre-Petition Agent, for itself and for the benefit of the Pre-Petition Lenders, is hereby granted (effective and perfected upon the date of the Interim Order and without the necessity of execution by the Debtors of mortgages, security agreements, pledge agreements, financing statements and/or other agreements or instruments) valid, perfected, postpetition security interests and liens (the "Replacement Liens") in and on all of the Pre-Petition Collateral, provided, however, that the Replacement Liens shall only be and remain subject and subordinate to (i) the DIP Liens and/or payment of any DIP Obligations on account thereof, (ii) the Permitted Priority Liens (other than the Pre-Petition Liens), and (iii) prior payment of the Carve-Out.

*Adequate Protection Superpriority Claims*. Subject to challenge rights under the Interim Order, as further adequate protection for and solely to the extent of the Diminution Claim, the Pre-Petition Agent, for itself and for the benefit of the Pre-Petition Lenders, is

hereby granted a superpriority claim with priority over all administrative expense claims and unsecured claims against the Debtors or their estates, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kind specified in or ordered pursuant to sections 105, 326, 328, 503(b), 506(c), 507(a), 507(b), 546(c), 552(b), 726, 1113 and 1114 and any other provision of the Bankruptcy Code (the "Adequate Protection Superpriority Claim"), which allowed Adequate Protection Superpriority Claim shall be payable from and have recourse to all pre- and postpetition property of the Debtors, including all cash and cash equivalents, and all proceeds thereof including without limitation, but subject to and upon entry of the Final Order (and excluding avoidance actions against any of the Pre-Petition Secured Parties, in their capacities as such), any Avoidance Actions and Avoidance Actions Proceeds. The Adequate Protection Superpriority Claim shall be subordinate and subject only to the DIP Superpriority Claim and prior payment of the Carve-Out.

*Pre-Petition Secured Parties' Legal Fees and Expenses*. The Pre-Petition Secured Parties shall each receive from the Debtors payment of all reasonable and documented outstanding fees and expenses (the "Pre-Petition Fee Payments"), including, but not limited to, fees and expenses of legal counsel, incurred by the Pre-Petition Secured Parties, to the extent provided for under the Pre-Petition Credit Agreement. The prior or simultaneous payment of all invoiced and outstanding Pre-Petition Fee Payments as of the Petition Date shall be a condition to funding of any portion of the DIP Loans. The Pre-Petition Fee Payments are hereby approved and shall not be subject to disgorgement by any party for any reason.

As additional adequate protection, the Pre-Petition Secured Parties shall be entitled to (i) cash payment of post-petition interest on the Pre-Petition Obligations as such interest becomes due and payable at the applicable non-default rate thereunder and (ii) the additional benefits set forth in the Interim Order, including Paragraphs 14 (Restrictions on Use of Funds); 15 (Challenge Period); 17 (Estate Release); 19 (Section 506(c) Waiver Upon Entry of Final Order); 20 (No Marshaling); 21 (Equities of the Case Waiver Upon Entry of Final Order); and 35 (Sale/Conversion/Dismissal) of the Interim Order.

CARVE-OUT:    a.    The DIP Liens, the DIP Superpriority Claim, the Replacement Liens, and the Adequate Protection Superpriority Claims shall be subject and subordinate only to prior payment of: (i) fees payable to the United States Trustee pursuant to 28 U.S.C.

§ 1930(a)(6) or to the Clerk of the Court (the "Case Administration Fees"), (ii) unpaid professional fees and expenses payable to any legal or financial advisors retained by the Debtors (the "Debtors' Professional Fees") or any Creditors' Committee (the "Committee's Professional Fees", and together with the Debtors' Professional Fees, the "Professional Fees") that are incurred or accrued prior to the date on which the DIP Agent provides written notice to the Debtors and the Creditors' Committee of the occurrence of either an Event of Default or the Maturity Date (such notice, the "Carve-Out Trigger Notice", and the date of a delivery of such notice to the Debtors and the Creditors' Committee (if any), the "Carve-Out Trigger Date"), but solely if, as and to the extent such Professional Fees (whenever incurred prior to the Carve-Out Trigger Date) are or have been provided for in, and are consistent with, the DIP Budget (subject to the Permitted Variances) and are ultimately allowed by the Court pursuant to section 330 of the Bankruptcy Code, including upon being earned and payable, any success fees and expenses payable to any investment bank of the Debtors per the terms of its engagement letter approved by the Requisite Lenders and any order of the Court approving such engagement and (iii) unpaid (x) Debtors' Professional Fees incurred or accrued on or after the Carve-Out Trigger Date in an aggregate amount not to exceed $100,000 and (y) Committee's Professional Fees incurred or accrued on or after the Carve-Out Trigger Date in an aggregate amount not to exceed $25,000, in each case under clauses (x) and (y) to the extent allowed at any time, whether by interim order, procedural order or otherwise (clauses (i), (ii) and (iii), collectively, the "Carve-Out", and clause (iii) alone, the "Capped Carve-Out").  Subject to the immediately preceding sentence, so long as the Carve-Out Trigger Date has not occurred, the Debtors shall be permitted to pay Case Administration Fees and Professional Fees allowed and payable under Bankruptcy Code sections 330, 331, and 503, as provided in the DIP Loan Documents and the DIP Budget (subject to the Permitted Variances).   Any payment of Carve-Out expenses incurred after the occurrence of the Carve-Out Trigger Date, including any payment of Professional Fees, shall permanently reduce the Capped Carve-Out on a dollar-for-dollar basis.  Without limiting the generality of the foregoing, the Carve-Out shall not include, apply to or be available for any success fee or similar payment to any professionals or other persons, including, without limitation, any such fee payable in connection with a restructuring or asset disposition with respect to any of the Debtors or otherwise unless otherwise agreed to in writing by the DIP Agent and the Requisite Lenders (or all affected Lenders, as applicable) in accordance with the DIP Credit Agreement.

b.      Prior to the Carve-Out Trigger Date: (i) an amount sufficient to pay the Professional Fees set forth in clause (a)(ii) above (excluding any success fees) may be funded by the Debtors on a weekly basis into a trust account held by the Debtors' general bankruptcy counsel (the "Professional Fee Trust Account") in the amount specified under the Budget (without taking into consideration any Permitted Variances) for such week (the "Professional Fee Trust Weekly Amounts"), (ii) the Debtors shall be permitted to borrow under the DIP Credit Agreement to fund the Professional Fee Trust Weekly Amounts and (iii) the Debtors shall pay all Professional Fees allowed by the Court first from the Professional Fee Trust Account.  Following the Carve-Out Trigger Date, the Debtors shall be permitted to borrow under the DIP Credit Agreement to fund the Professional Fee Trust Account for all unpaid Professional Fees set forth in clauses (a)(ii) and (a)(iii) above, to the extent not previously funded.  Any excess amounts remaining in the Professional Fee Trust Account after payment of the Professional Fees shall be refunded to the Debtors and shall remain DIP Collateral.

**MILESTONES**:        The Debtors shall implement the Restructuring Transactions (as defined in the RSA) in accordance with the DIP Milestones (as defined in the RSA) which shall include the following:

Plan Milestones

a.      No later than three (3) Business Days after Petition Date, the Debtors shall file the Bankruptcy Plan and any disclosure statement related thereto (the "Disclosure Statement") in form and substance reasonably acceptable to the Lenders.

b.      No later than forty-five (45) days after Petition Date, the Disclosure Statement shall be approved by the Bankruptcy Court, with a voting deadline that is no later than thirty (30) days after such approval.

c.      No later than (i) one hundred five (105) days after the Petition Date, or (ii) one hundred twenty (120) days after the Petition Date in the event that a Topping Bid is selected at any auction, the Bankruptcy Plan shall be confirmed (such date described in the foregoing clauses (i) and (ii), the "Outside Date"), and

d.      No later than thirty (30) days after confirmation of the Bankruptcy Plan, the Bankruptcy Plan shall become effective (the "Effective Date"); provided, that the Agents and Lenders will consider in good faith any reasonable request by the Debtors for an extension of such time.

Sale Milestones

a.      Not later than three (3) Business Days after the Petition Date, file an application to retain FocalPoint as investment banker to:

b.      assist the Debtors in evaluating, structuring, negotiating and implementing the terms (including pricing) and conditions of any proposed transaction, including any proposed section 363 sale or chapter 11 plan (each, a "**Transaction**" and each, other than the Bankruptcy Plan, an "Alternative Transaction");

c.      assist the Debtors in preparing, revising, or updating marketing materials;

d.      prepare, revise, or update a list or lists of potential purchasers;

e.      contact potential purchasers to solicit their interest in any Transaction and to provide them with the confidential information memorandum under a confidential disclosure agreement;

f.      compile and disseminate due diligence materials to prospective purchasers and maintain a secure data vault for review of due diligence materials;

g.      participate in due diligence visits, meetings and consultations between the Debtors and interested potential purchasers, and coordinate and track distribution of all information related to a Transaction with such parties;

h.      assist the Debtors with evaluating offers, indications of interest, negotiating agreements and definitive contracts; and

i.      attend auctions and, to the extent required, provide affidavits in support, in the Bankruptcy Court with respect to any matters in connection with or arising out of the foregoing.

j.      Not later than thirty (30) days after the Petition Date, obtain an order approving FocalPoint as investment banker.

k.      The Debtors shall, no later than three (3) days after the Petition Date, file a motion to approve the procedures governing the sale and marketing process for the sale of the Debtors' assets (the "Bidding Procedures") to be heard on shortened time fourteen (14) days later, which motion shall in form and substance be acceptable to the Lenders.

l.        No later than twenty (20) days after Petition Date, the Bankruptcy Court shall have entered an order approving the Bidding Procedures, which order shall in form and substance be reasonably acceptable to the Lenders.

m.        No earlier than sixty (60) days and no later than one hundred five (105) days after the Petition Date, the Debtors shall hold an auction, if a Topping Bid is received by the Debtors.

n.        (i) No later than three (3) days after the auction, the Topping Bid, if any, selected at the auction shall be approved by the Bankruptcy Court, and (ii) no later than sixty (60) days after the Bankruptcy Court approves such Topping Bid, the sale will close and the proceeds of such sale shall be used to pay the Lenders and the Pre-Petition Lenders until such time as they are paid in full in Cash.

**CONDITIONS PRECEDENT TO CLOSING:**        Usual and customary conditions to Closing for transactions of this type.

**REPRESENTATIONS AND WARRANTIES:**        Usual and customary representations and warranties for transactions of this type.

**AFFIRMATIVE AND NEGATIVE COVENANTS:**        Usual and customary covenants for transactions of this type, including, without limitation, usual and customary financial reporting requirements.

**EVENTS OF DEFAULT:**        Usual and customary events of defaults for facilities of this type and purpose, including but not limited to:

Failure to Make Payments When Due.  Failure by any Debtor to pay (i) when due the principal of any Loan whether at stated maturity, by acceleration or otherwise; (ii) when due any installment of principal of any Loan, by notice of voluntary prepayment, by mandatory prepayment or otherwise; (iii) within three (3) Business Days of when due, any interest on any Loan or any fee or any premium or other amount due hereunder; or (iv) any amount payable to Issuing Bank in reimbursement of any drawing under an Existing Letter of Credit.

Default in Other Agreements.  (i) Other than any such failure in existence on the Petition Date, failure of any Debtor or any of its Subsidiaries to pay when due any principal of or interest on or any other amount, including any payment in settlement, payable in respect of one or more items of Indebtedness (other than

Indebtedness referred to in <u>Section 0</u> of the DIP Credit Agreement and the Pre-Petition Obligations) in an individual principal amount of $500,000 or more or with an aggregate principal amount of $1,500,000 or more, in any case, beyond the grace period, if any, provided therefor; or (ii) other than any such breach or default in existence on the Petition Date, breach or default by any Debtor or any of its Subsidiaries with respect to any other material term of (A) one or more items of Indebtedness in the individual or aggregate principal amounts referred to in <u>clause (i)</u> of <u>Section 0</u>, or (B) any loan agreement, mortgage, indenture or other agreement relating to such item or items of Indebtedness, in each case beyond the grace period, if any, provided therefor, if the effect of such breach or default is to cause, or to permit the holder or holders of that Indebtedness (or a trustee on behalf of such holder or holders), with or without the passage of time, to cause, that Indebtedness to become or be declared due and payable (or subject to a compulsory repurchase or other redemption) prior to its stated maturity or the stated maturity of any underlying obligation, as the case may be; or

<u>Breach of Certain Covenants</u>.  Failure of any Debtor to perform or comply with any term or condition contained in the following provisions of the DIP Credit Agreement: (i) <u>Section **Error! Reference source not found.**</u> (Use of Proceeds), <u>Section 5.1(k)</u> (Financial Statements and Other Reports), <u>Section **Error! Reference source not found.**</u> (Existence), <u>Section **Error! Reference source not found.**</u> (Maintenance of Properties), <u>Section **Error! Reference source not found.**</u> (Insurance), <u>Section **Error! Reference source not found.**</u> (Inspections), <u>Section 5.7</u> (Lenders Meetings), <u>Section **Error! Reference source not found.**</u> (Compliance with Laws), <u>Section **Error! Reference source not found.**(b)</u> (Cash Management Systems), <u>Section 5.15</u> (Bankruptcy Matters; RSA) or <u>Section **Error! Reference source not found.**</u>; or (ii) <u>Section **Error! Reference source not found.**</u> (Financial Statements and Other Reports) (other than <u>Section 5.1(k)</u>) or <u>Section **Error! Reference source not found.**</u> (Payment of Taxes and Claims), <u>Section **Error! Reference source not found.**</u> (Subsidiaries), <u>Section **Error! Reference source not found.**</u> (Additional Real Estate Assets), and such Default continues for seven (7) Business Days or more; or

<u>Breach of Representations, etc.</u>  Any representation, warranty, certification or other statement made or deemed made by any Debtor in any DIP Loan Document or in any statement or certificate at any time given by any Debtor or any of its Subsidiaries in writing pursuant hereto or thereto or in connection herewith or therewith shall be false in any material respect as of the date made or deemed made; or

<u>Other Defaults Under Credit Documents</u>.  Any Debtor shall default in the performance of or compliance with any term contained in the DIP Credit Agreement or any of the other Credit Documents, other than any such term referred to in any other Section of Section **Error! Reference source not found.** of the DIP Credit Agreement, and such default shall not have been remedied or waived within thirty (30) days after the earlier of (i) an officer of such Debtor becoming aware of such default, or (ii) receipt by Borrower Representative of notice from Administrative Agent or any Lender of such default; or

<u>Dismissal</u>.  (A) Any of the cases shall be dismissed or converted to a case under Chapter 7 of the Bankruptcy Code, (B) a trustee under Chapter 11 of the Bankruptcy Code shall be appointed in any of the cases, or (C) an examiner having enlarged powers relating to the operation of the business of any Borrower or any Guarantor (beyond those set forth under Section 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code shall be appointed; or

<u>Interim Order or Final Order Stayed</u>.  (A) An order of a court of competent jurisdiction shall be entered staying or rescinding the Interim Order or the Final Order; (B) an order of a court of competent jurisdiction shall be entered amending, supplementing or otherwise modifying the Interim Order without the written consent of the Requisite Lenders, or the Final Order without the written consent of the Requisite Lenders; (C) until such time as the Pre-Petition Obligations are paid in full as contemplated by the RSA, without the written consent of the Requisite Lenders under the Pre-Petition Credit Agreement, the Pre-Petition Lenders' Cash Collateral shall be used in a manner inconsistent with the orders authorizing use of Cash Collateral or (except as provided in the Final Order) an order of a court of competent jurisdiction authorizes the use of Cash Collateral without the written consent of the Requisite Lenders; or (D) an order of a court of competent jurisdiction shall be entered terminating the use of the Pre-Petition Lenders' Cash Collateral; or

<u>Bankruptcy Plan</u>. The filing by any Debtor of any plan of reorganization, or a pleading seeking approval of plan of reorganization, other than a Bankruptcy Plan, or the termination of the Debtors' "exclusive period" under Section 1121 of the Bankruptcy Code for the filing of a plan of reorganization; or

<u>Challenge of Certain Claims</u>.  Any attempt by any Debtor to obtain, or if any other party in interest obtains, an order of the Bankruptcy Court or other judgment, and the effect of such order

or judgment is to, invalidate, reduce or otherwise impair Administrative Agent's, Pre-Petition Agent's, Pre-Petition Lenders', or Lenders' claims, or to subject Lenders' or Pre-Petition Lenders' collateral to any surcharge pursuant to Sections 506(c), 552(b), or 105(a) of the Bankruptcy Code, or an order is entered by the Bankruptcy Court avoiding or requiring disgorgement by Administrative Agent, Collateral Agent, Pre-Petition Agent, Pre-Petition Lenders or Lenders of any amounts paid pursuant to the Credit Documents or the Pre-Petition Credit Documents; or

Substitution of Collateral.  Any Debtor shall apply for an order substituting any assets for all or any portion of the Collateral; or

Unauthorized Payments.  Any payment on, or application for authority to pay, any pre-petition claim owing to terminated employees, bond claims, principal under the Pre-Petition Credit Documents, and lease rejection damages, other than those required to be paid with the DIP Facility pursuant to the terms of the DIP Facility, without the Requisite Lenders' prior written consent; or

Unpermitted Payment.  Any Debtor shall make any payments of Pre-Petition Indebtedness other than (i) as permitted under the Interim Order and/or the Final Order (as applicable), (ii) as permitted by any of the orders entered by the Bankruptcy Court on or about the Petition Date and in the approximate amounts reflected on the Budget, (iii) as otherwise permitted in this Agreement, or (iv) in connection with the assumption of any contract or lease approved by the Bankruptcy Court and consented to by the Requisite Lenders, or any Debtor shall pay, or agree to pay, any breakup, termination or similar fee, unless otherwise consented to by the Requisite Lenders; or

Relief from Stay.  An order shall be entered granting relief from the automatic stay permitting foreclosure of any assets of any Debtor in excess of $250,000 in the aggregate, unless such relief is sought by Administrative Agent or any Lender; or

Material Adverse Effect.  There shall occur any event after the Petition Date which results in a Material Adverse Effect; or

Delay.  The entry of the Final Order shall not have occurred within thirty (30) days after the Petition Date; or

Certain Motions.  Except for the Carve-Out, any Debtor shall file any pleading seeking, or otherwise consenting to, (i) the invalidation, subordination or otherwise challenging the Liens and super-priority claim status granted to secure the Obligations

hereunder or the Pre-Petition Obligations, or (ii) any relief under Sections 506(c), 552(b), or 105(a) of the Bankruptcy Code with respect to any assets which secure the Pre-Petition Obligations or an order shall be entered by the Bankruptcy Court invalidating or subordinating the Liens or the super-priority claim status of the Obligations under the DIP Credit Agreement; or

Final Determination.  The Bankruptcy Court or any other court having jurisdiction over the Debtors makes a final determination with respect to any motion or proceeding brought by any Person which results in the impairment of the rights of Administrative Agent or Lenders under any of the Credit Documents; or

Adequate Protection.  The payment of, or granting adequate protection to, any Person, other than as expressly set forth in the Orders and the Budget; or

Venue.  An order shall have been entered by the Bankruptcy Court providing for a change in venue with respect to the Cases without the approval of the Requisite Lenders and Administrative Agent; or

RSA; Milestones.  (A) A default or breach of any type occurs, in any case, beyond the grace period, if any, provided therefor, under the RSA; (B) the Debtors fail to satisfy any Milestone (as set forth on Schedule 8.1) for any reason whatsoever; (C) any of the Credit Parties shall enter into an agreement for, or shall file (or support or fail to file responding materials opposing a motion by a third party seeking any such relief within the time frame provided for the filing of such response or objection by the respective court) a motion seeking, or the Bankruptcy Court shall enter, an order authorizing, a sale of all or substantially all of such Credit Party's assets unless such sale (x) provides for cash consideration at closing that is sufficient to pay all Obligations and Pre-Petition Obligations in Cash in full on the closing date of such sale and (y) is consistent with the RSA; or (D) the RSA is terminated for any reason whatsoever; or

Advisors.  (i) FocalPoint Securities, LLC shall cease to be engaged by the Debtors in the capacity, and pursuant to the terms, consistent with the RSA (including as a result of the Bankruptcy Court failing to timely enter an order approving such engagement), (ii) CR3 Partners, LLC shall cease to be engaged by the Debtors in the capacity, and pursuant to terms, engaged by the Debtors prior to the Petition Date (including as a result of the Bankruptcy Court failing to timely enter an order approving such engagement), or (iii) the lease restructuring advisor engaged by the Debtors in

accordance with <u>Section 3.1(i)</u> of the DIP Credit Agreement shall cease to be engaged by the Debtors in the capacity, and pursuant to terms, engaged by the Debtors prior to the Petition Date (including as a result of the Bankruptcy Court failing to timely enter an order approving such engagement); or

<u>Judgments and Attachments</u>.    Any money judgment, writ or warrant of attachment or similar process involving an amount in excess of $1,000,000 individually and in the aggregate (in either case to the extent not adequately covered by insurance as to which a solvent and unaffiliated insurance company has acknowledged coverage) shall be entered or filed against any Debtor or any of its Subsidiaries or any of their respective assets and shall remain undischarged, unvacated, unbonded or unstayed for a period of sixty (60) days (or in any event later than five (5) days prior to the date of any proposed sale thereunder); or

<u>Dissolution</u>.    Any order, judgment or decree shall be entered against any Debtor decreeing the dissolution or split up of such Debtor and such order shall remain undischarged or unstayed for a period in excess of thirty (30) days; or

<u>Change of Control</u>.  A Change of Control shall occur; or

<u>Guaranties, Collateral Documents and other Credit Documents</u>.  At any time after the execution and delivery thereof, (i) the Guaranty for any reason, other than the satisfaction in full in Cash of all Obligations, shall cease to be in full force and effect (other than in accordance with its terms) or shall be declared to be null and void or any Guarantor shall repudiate its obligations thereunder; (ii) this Agreement or any Collateral Document ceases to be in full force and effect (other than by reason of a release of Collateral in accordance with the terms hereof or thereof or the satisfaction in full in Cash of the Obligations in accordance with the terms hereof) or shall be declared null and void, or Collateral Agent shall not have or shall cease to have a valid and perfected Lien in any Collateral purported to be covered by the Collateral Documents with the priority required by the relevant Collateral Document, in each case for any reason other than solely the failure of Collateral Agent or any Secured Party to take any action within its sole control;  or  (iii) any  Debtor  shall  contest  the  validity  or enforceability of any Credit Document in writing or deny in writing that it has any further liability, including with respect to future advances by Lenders, under any Credit Document to which it is a party.

**REMEDIES:**    Subject to the terms of the Interim Order and the Final Order, the automatic stay provisions of section 362 of the Bankruptcy Code are vacated and modified without the need for further Court order to permit the DIP Agent, for itself and on behalf of the DIP Lenders, upon the occurrence and during the continuance of an Event of Default, and without any interference from the Debtors or any other party in interest but subject to five (5) business days' prior written notice (which may be delivered by electronic mail) (the "Remedies Notice Period") to the Debtors, their counsel, counsel to any Creditors' Committee and the U.S. Trustee, to exercise all rights and remedies provided for in the DIP Loan Documents, this Interim Order or under other applicable bankruptcy and non-bankruptcy law including, without limitation, the right to (A) cease making DIP Loans and/or suspend or terminate the commitments under the DIP Loan Documents; (B) declare all DIP Obligations immediately due and payable; (C) take any actions reasonably calculated to preserve or safeguard the DIP Collateral or to prepare the DIP Collateral for sale; (D) foreclose or otherwise enforce the DIP Liens on any or all of the DIP Collateral; (E) set off any amounts held as Cash Collateral (including, without limitation, in any Cash Collateral account held for the benefit of the DIP Agent and DIP Lenders); and/or (F) exercise any other default-related rights and remedies under the under the DIP Loan Documents or this Interim Order. The Remedies Notice Period shall run concurrently with any notice period provided for under the DIP Loan Document.

The automatic stay of section 362(a) of the Bankruptcy Code, to the extent applicable, shall be deemed terminated without the necessity of any further action by the Court in the event that the Debtors, the Creditors' Committee, if any, and/or the U.S. Trustee have not obtained an order from this Court to the contrary prior to the expiration of the Remedies Notice Period.

**MARSHALING/EQUITIES OF THE CASE WAIVERS:**    Waivers of marshaling and equities of the case rights in favor of the DIP Secured Parties and the Pre-Petition Secured Parties immediately upon entry of the Interim Order.

**WAIVERS AND AMENDMENTS:**    Usual and customary terms for facilities of this type and purpose.

**EXPENSES AND INDEMNIFICATION:**    Usual and customary terms for facilities of this type and purpose.

### Disclosures

18.     Pursuant to Bankruptcy Rule 4001 and Local Rule 4001-2, a debtor in possession seeking authority to use cash collateral or obtain financing must disclose the presence and location of certain provisions contained in the documentation evidencing the cash collateral usage or financing.  The debtor in possession must also justify the inclusion of such provisions. Set forth below are the disclosures required in accordance with such rules:

      a.     Local Rule 4001-2(a)(i)(A) requires a debtor to disclose whether it has granted cross-collateralization to a prepetition secured creditor in connection with the debtor's cash collateral usage or additional financing.  **The proposed Interim Order and Final Order provide for a roll-up of (i) the Existing Letter of Credit obligations (approximately $9.6 million in potential exposure) upon entry of the Interim Order and (ii) $2.0 million of prepetition bridge advances upon entry of the Final Order. Interim Order at Recital G, ¶3(a), and ¶5.**

      b.     Local Rule 4001-2(a)(i)(B) and Bankruptcy Rule 4001(c)(1)(B)(iii) require the disclosure of provisions or findings of fact that (i) bind the estate or other parties in interest with respect to the validity, perfection or amount of a secured creditor's prepetition lien or (ii) the waiver of claims against the secured creditor without first giving parties in interest at least seventy-five (75) days from the entry of the order and the Committee at least sixty (60) days from the date of its formation to investigate such matters.  **The proposed Interim Order and Final Order contain findings or admissions by the Debtors relating to the validity, perfection, enforceability and amount of the Pre-Petition Secured Parties' prepetition liens and claims, subject to a standard challenge period for any committee or other party in interest.  Interim Order Recital D and ¶15.**

      c.     Local Rule 4001-2(a)(i)(C) and Bankruptcy Rule 4001(c)(1)(B)(x) require the disclosure of provisions that seek to waive a debtor's rights without notice under section 506(c) of the Bankruptcy Code.  **The proposed Interim Order provides, subject to entry of the Final Order, for a waiver of the Debtors' rights under section 506(c) of the Bankruptcy Code as to the DIP Secured Parties and the Pre-Petition Secured Parties.  Interim Order ¶19.**

      d.     Local Rule 4001-2(a)(i)(D) requires disclosure of provisions that immediately grant to the prepetition secured creditor liens on the debtor's claims and causes of action arising under sections 544, 545, 547, 548 and 549 of the Bankruptcy Code.  **The proposed Interim Order grants liens on, and superpriority claims payable from, Avoidance Actions and the proceeds thereof, subject to entry of the Final Order.  Interim Order ¶9(b), ¶10, and ¶12(b).**

e.      Local Rule 4001-2(a)(i)(E) requires disclosure of provisions that deem prepetition secured debt to be postpetition debt or use postpetition loans from a prepetition secured creditor to pay part or all of that secured creditor' prepetition debt (other than as provided in section 552(b) of the Bankruptcy Code).  **As noted above, the proposed Interim Order and Final Order provide for a roll-up of (i) the Existing Letter of Credit obligations (approximately $9.6 million in potential exposure) upon entry of the Interim Order and (ii) $2.0 million of prepetition bridge advances upon entry of the Final Order**.  **Interim Order at Recital G, ¶3(a), and ¶5**.

f.      Local Rule 4001-2(a)(i)(F) requires disclosure of provisions that provide disparate treatment for the professionals retained by a creditors' committee from those professionals retained by the debtor with respect to a professional fee carve-out.  **The proposed Interim Order does not provide for disparate treatment for committee professionals, except that the amounts budgeted are lower**.

g.      Local Rule 4001-2(a)(i)(G) requires disclosure of provisions that provide for the priming of any secured lien without the consent of that lienholder.  **The proposed Interim Order does not provide for the priming of any secured lien without the consent of that lienholder**.

h.      Bankruptcy Rule 4001(c)(1)(B)(ii) requires disclosure of the provision of adequate protection or priority for claims arising prior to the commencement of the case.  **The proposed Interim Order specifies the adequate protection to be provided to the Pre-Petition Secured Parties.  Interim Order at Recital F, ¶12, and ¶19.**

i.      Bankruptcy Rule 4001(c)(1)(B)(iv) requires disclosure of provisions that constitute a waiver or modification of the automatic stay.  **The proposed Interim Order describes the modification of the automatic stay to the extent necessary to implement the Interim Order**.  **Interim Order ¶18 and ¶23.**

j.      Bankruptcy Rule 4001(c)(1)(B)(vii) requires disclosure of provisions that waive or modify the applicability of nonbankruptcy law relating to the perfection of a lien on property of the estate.  **The proposed Interim Order includes provisions that provide for the automatic perfection and validity of the DIP Liens without the necessity of any further filing or recording under the laws of any jurisdiction**.  **Interim Order ¶22.**

### **Need for Financing and Use of Cash Collateral**

19.      The Debtors have an urgent and immediate need for access to funds available under the DIP Facility and the use of the Cash Collateral.  Such funding is necessary in order for the Debtors to have sufficient liquidity to operate their business, satisfy their vendor

and customer obligations, and pay their employees.   Without immediate access to the DIP

Facility and Cash Collateral, the Debtors would be forced to terminate operations and liquidate

their assets, which would put thousands of the Debtors' dedicated employees out of work and

irreparably damage the Debtors' efforts to maintain going concern value or to maximize

recoveries for all stakeholders through a chapter 11 plan.  Accordingly, the Debtors strongly urge

the Court to authorize the DIP Facility and continued use of Cash Collateral on the terms

contemplated herein, initially on an interim basis and, following a final hearing, on a final basis.

The Debtors have the consent of the Pre-Petition Secured Parties to implement the DIP Facility

and access Cash Collateral on the terms set forth in this Motion.

## **Basis for Relief**

### A.   **The Debtors Should Be Permitted to Obtain Postpetition Financing Pursuant to Section 364(c) of the Bankruptcy Code**

20.   Section 364(c) of the Bankruptcy Code requires a finding, made after

notice and a hearing, that the debtors seeking postpetition financing on a secured basis cannot

"obtain unsecured credit allowable under section 503(b)(l) of [the Bankruptcy Code] as an

administrative expense."  11 U.S.C. § 364(c).  In addition, section 364(d)(1) of the Bankruptcy

Code, which governs the incurrence of postpetition debt secured by "priming" liens, provides

that the court, after notice and a hearing, may:

> authorize the obtaining of credit or the incurring of debt secured by
> a senior or equal lien on property of the estate that is subject to a
> lien only if --
>
>> (A)    the [debtor] is unable to obtain credit
>> otherwise; and
>>
>> (B)    there is adequate protection of the interest of
>> the holder of the lien on the property of the estate

> on which such senior or equal lien is proposed to be
> granted.

11 U.S.C. § 364(d)(l).

21.     In evaluating proposed postpetition financing under section 364(c) of the

Bankruptcy Code, courts perform a qualitative analysis and generally consider similar factors,

including whether:

> a.     unencumbered credit or alternative financing without superpriority
> status is available to the debtor;
>
> b.     the credit transactions are necessary to preserve assets of the estate;
>
> c.     the terms of the credit agreement are fair, reasonable, and
> adequate;
>
> d.     the proposed financing agreement was negotiated in good faith and
> at arm's-length and entry thereto is an exercise of sound and
> reasonable business judgment and in the best interest of the
> debtors' estate and its creditors; and
>
> e.     the proposed financing agreement adequately protects Pre-Petition
> Lenders.

*See, e.g.*, *In re Aqua Assoc.*, 123 B.R. 192 (Bankr. E.D. Pa. 1991) (applying the first three factors

in making a determination under section 364(c)); *In re Crouse Group, Inc.*, 71 B.R. 544 (Bankr.

E.D. Pa. 1987) (same); *Bland v. Farmworker Creditors*, 308 B.R. 109, 113-14 (S.D. Ga. 2003)

(applying all factors in making a determination under section 364(d)).

22.     For the reasons discussed below, the Debtors satisfy the standards required

to obtain postpetition financing in these cases on a secured superpriority and priming lien basis

under sections 364(c)(1), (2) and (3) of the Bankruptcy Code.

**B.      The Debtors Were Unable to Obtain Financing on More Favorable Terms**

23.     The Debtors are already highly leveraged and the principal goal of these

cases is to effectuate a restructuring that will reduce the Debtors' secured debt and interest

burden.  Under these circumstances, the Debtors are not able to obtain alternative financing from

outside parties on an unsecured or junior secured basis.

24.     As outlined above, the Debtors engaged in an extensive marketing process

in order to obtain exit and debtor-in-possession financing.  The DIP Lenders offered the best

available economic proposal for a combination of exit and DIP financing.  The DIP Lenders are

unwilling to lend into the DIP Facility except on a fully secured and senior (*i.e.*, priming) basis

as to the DIP Collateral.

25.     The Debtors respectfully submit that their efforts to obtain postpetition

financing therefore satisfy the standard required under section 364(c) of the Bankruptcy Code.

*See, e.g.*, *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988) (where few lenders

can or will extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to

require [the debtor] to conduct such an exhaustive search for financing").

**C.      The Proposed Financing is Necessary to Maximize the Value of the Debtors' Estates**

26.     The Debtors are an operating restaurant business with thousands of

employees, vendors, and customers that depend on the Debtors' continuing performance of their

ongoing business obligations.  The Debtors have an urgent and immediate need to obtain

financing and for authority to use Cash Collateral subject to the terms of this Motion in order to,

among other things:  (a) continue to operate their business in an orderly manner; (b) maintain

their valuable relationships with employees, vendors, and customers; (c) pay various

administrative professionals' fees to be incurred in the Chapter 11 Cases; and (d) support the

Debtors' working capital, general corporate and overall operational needs.  The foregoing

expenditures are critically necessary to preserve and maintain the going concern value of the

Debtors' business and, ultimately, help ensure a successful reorganization under the Debtors'

contemplated chapter 11 plan.  Without access to funding under the DIP Facility and use of Cash

Collateral, the Debtors would be forced to cease operations and liquidate their assets.

**D.      The Terms of the Proposed Financing are Fair, Reasonable, and Appropriate**

27.      In considering whether the terms of postpetition financing are fair and

reasonable, courts consider the terms in light of the relative circumstances of both the debtor and

the potential lender.  *In re Farmland Indus., Inc.*, 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003);

*see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. (In re*

*Ellingsen MacLean Oil Co.)*, 65 B.R. 358, 365 (W.D. Mich. 1986) (a debtor may have to enter

into hard bargains to acquire funds).

28.      The terms of the DIP Credit Agreement were negotiated in good faith and

at arm's-length between the Debtors and the DIP Lenders, resulting in an agreement that is

designed to permit the Debtors to maximize the value of their assets through the pre-negotiated

plan confirmation process.  The proposed terms are fair, reasonable and appropriate under the

circumstances, and should be approved.  *See, e.g.*, *Bray v. Shenandoah Fed. Sav. and Loan Ass'n*

*(In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986) (stating that section 364(d) of the

Bankruptcy Code imposes no duty to seek credit from every possible lender); *In re Western*

*Pacific Airlines, Inc.*, 223 B.R. 567 (Bankr. D. Colo. 1997) (authorizing postpetition financing

that would preserve the value of the debtor's assets).

E.       **Entry Into the Proposed Financing Reflects the Debtors' Sound Business Judgment**

29.      A debtor's decision to enter into a postpetition lending facility under

section 364 of the Bankruptcy Code is governed by the business judgment standard.  *See, e.g.*,

*Trans World Airlines, Inc. v. Travelers Int'l AG (In re Trans World Airlines, Inc.)*, 163 B.R. 964,

974 (Bankr. D. Del. 1994) (approving postpetition credit facility because such facility

"reflect[ed] sound and prudent business judgment"); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34,

38 (Bankr. S.D.N.Y. 1990) (financing decisions under section 364 of the Bankruptcy Code must

reflect a debtor's business judgment).

30.      Bankruptcy courts routinely accept a debtor's business judgment on many

business decisions, including the decision to borrow money.  *See, e.g., Group of Inst.*

*Investors v. Chicago, Mil., St. P. & Pac.*, 318 U.S. 523, 550 (1943) (holding that decisions

regarding assumption or rejection of leases are left to the business judgment of the debtor); *In re*

*Simasko Prod. Co.,* 47 B.R. 444, 449 (D. Colo. 1985) ("[b]usiness judgments should be left to

the board room and not to this Court").  Further, one court has noted that "[m]ore exacting

scrutiny [of the debtors' business decisions] would slow the administration of the debtor's estate

and increase its cost, interfere with the Bankruptcy Code's provision for private control of

administration of the estate, and threaten the court's ability to control a case impartially."

*Richmond Leasing Co. v. Capital Bank, N.A.,* 762 F.2d 1303, 1311 (5th Cir. 1985).

31.      Bankruptcy courts generally will defer to a debtor in possession's business

judgment regarding the need for and the proposed use of funds, unless such decision is arbitrary

and capricious, *In re Curlew Valley Assocs.,* 14 B.R. 506, 511-13 (Bankr. D. Utah 1981); *see*

*also Trans World Airlines, Inc.,* 163 B.R. at 974 (approving interim loan, receivables facility and

asset-based facility based upon prudent business judgment of the debtor), and generally will not

second-guess a debtor in possession's business decisions involving "a business judgment made

in good faith, upon a reasonable basis, and within the scope of his authority under the Code."

*Curlew Valley,* 14 B.R. at 513-14 (footnotes omitted).

32.    For the reasons set forth above, the Debtors' sound business judgment

clearly supports approval of the DIP Facility in order to allow the Debtors to gain access to needed

financing and thereby maximize value for all constituents.

**F.    Section 363 of the Bankruptcy Code Authorizes the Debtors' Use of Cash Collateral**

33.    Section 363(c)(2) of the Bankruptcy Code provides that a debtor in

possession may not use cash collateral unless (A) each entity that has an interest in such cash

collateral provides consent, or (B) the court approves the use of cash collateral after notice and a

hearing.  *See* 11 U.S.C. § 363(c).  Section 363(e) of the Bankruptcy Code provides that, "on

request of an entity that has an interest in property used . . . or proposed to be used . . . by the

[debtor in possession], the court . . . shall prohibit or condition such use . . . as is necessary to

provide adequate protection of such interest."  11 U.S.C. § 363(e).

34.    By this Motion, the Debtors seek authority to use the Pre-Petition

Collateral, including Cash Collateral, pursuant to the DIP Budget and on terms consistent with

the proposed Interim Order.

35.    Bankruptcy Rule 4001(b) permits a court to approve a debtor's request for

use of cash collateral during the 14-day period following the filing of a motion requesting

authorization to use cash collateral, "only . . . as is necessary to avoid immediate and irreparable harm to the estate pending a final hearing." Bankruptcy Rule 4001(b)(2). In examining requests for interim relief under this rule, courts apply the same business judgment standard applicable to other business decisions. *See, e.g., In re Simasko Production Co.*, 47 B.R. 444, 449 (D. Colo. 1985); *see also In re Ames Dep't Stores Inc.,* 115 B.R. 34, 38 (Bankr. S.D.N.Y. 1990). After the 14-day period, the request for use of cash collateral is not limited to those amounts necessary to prevent harm to the debtor's business.

36.    As previously noted, in order to continue to operate their business and maintain going concern value, the Debtors require access to the DIP Facility and the Pre-Petition Collateral, including the use of Cash Collateral. Such use will provide the Debtors with the necessary funds to fully honor all of their ongoing obligations to employees, vendors, and customers and allow the Debtors to proceed promptly towards confirmation of their proposed prepackaged plan. The Debtors' goal is to make this bankruptcy process as seamless as possible from the perspective of the Debtors' employees, vendors, and customers.

37.    Absent access to Cash Collateral, the Debtors would face immediate and irreparable harm. The Debtors' business would be shut down and their assets liquidated, which would result in the termination of thousands of the Debtors' employees and loss of going concern value at the expense of the Debtors' stakeholders. The Debtors also would not be able to proceed with confirmation of their contemplated chapter 11 plan. Thus, immediate access to Cash Collateral is essential to the Debtors' continued viability and ability to successfully reorganize.

**G.      Sections 105 and 363 of the Bankruptcy Code
         Authorize the Debtors' Use of Cash Collateral**

38.      Section 363(c)(2) of the Bankruptcy Code provides that a debtor in

possession may not use cash collateral unless (i) each entity that has an interest in such cash

collateral provides consent, or (ii) the court approves the use of cash collateral after notice and a

hearing.  11 U.S.C. § 363(c).  Section 105(a) of the Bankruptcy Code provides that the court may

issue any order that is necessary or appropriate to carry out the provisions of title 11.  11 U.S.C.

§ 105(a).

39.      Here, the Debtors have the consent of the Pre-Petition Secured Parties to

access Cash Collateral on the terms described in the Motion and set forth in the Interim Order

and Final Order.  In addition, the Pre-Petition Secured Parties' interests in the Pre-Petition

Collateral are adequately protected by a combination of protections proposed in the Interim

Order and through the preservation of going concern value in the Debtors' assets.

**H.      The Proposed Adequate Protection of the Pre-Petition Secured Parties is Warranted**

40.      Section 363(e) of the Bankruptcy Code provides that, "on request of an

entity that has an interest in property used . . . or proposed to be used . . . by the [debtor in

possession], the court . . . shall prohibit or condition such use . . . as is necessary to provide

adequate protection of such interest."  11 U.S.C. § 363(e).  Courts typically authorize a debtor to

use cash collateral to continue operations so long as the interests asserted by affected creditors in

such collateral, which equal the value of the collateral rather than of the debt, are adequately

protected or they consent to such use.  *Id.*; *U.S. Ass'n of Tex. v. Timbers of Inwood Forest

Assocs., Ltd.*, 484 U.S. 365 (1988) (interest in property referenced in 11 U.S.C. § 363(e) refers to

the value of the collateral as opposed to the value of the loan).  What constitutes adequate

protection must be decided on a case-by-case basis.  *See, e.g., MBank Dallas v. O'Connor (In re*

*O'Connor)*, 808 F.2d 1393, 1396-97 (10th Cir. 1987) (citing *Martin v. United States (In re*

*Martin)*, 761 F.2d 472, 474 (8th Cir. 1985)); *Metro. Life Ins. Co. v. Monroe Park (In re Monroe*

*Park)*, 17 B.R. 934, 940 (D. Del. 1982) (citations omitted).

41.      Section 361 of the Bankruptcy Code authorizes a debtor to provide

adequate protection by granting replacement liens, making periodic cash payments, or granting

such other relief "as will result in the realization by such entity of the indubitable equivalent of

such entity's interest in such property."  11 U.S.C. § 361.  According to the legislative history of

section 361 of the Bankruptcy Code, a finding of adequate protection is "left to case-by-case

interpretation and development.  It is expected that the courts will apply the concept [of adequate

protection] in light of the facts of each case and general equitable principles."  H.R. Rep. No.

595, 95th Cong., 1st Sess. 339 (1977), reprinted in 1978 U.S.C.C.A.N. 5787, 6295; *see also*

*O'Connor*, 808 F.2d at 1396-97 ("[T]he courts have considered 'adequate protection' a concept

which is to be decided flexibly on the proverbial 'case-by-case' basis.").

42.      The Interim Order authorizes the Debtors to use Cash Collateral in

exchange for providing adequate protection to the Pre-Petition Secured Parties by: (i) granting,

solely to the extent of any Diminution Claim, additional and replacement security interests in and

liens on the Debtors' assets; (ii) granting, solely to the extent of any Diminution Claim, to the

extent provided by sections 503(b) and 507(b) of the Bankruptcy Code, an allowed

administrative claim in these chapter 11 cases; and (iii) making adequate protection payments to

reimburse the accruing interest (at the non-default rate) under the Pre-Petition Credit Agreement

Documents and reasonable fees and costs incurred by the Pre-Petition Secured Parties to the

extent provided for under the Pre-Petition Credit Agreement.  Further, the Debtors request to

modify the automatic stay imposed pursuant to section 362 of the Bankruptcy Code to the extent

necessary to implement and effectuate the terms and provisions of the Interim Order and Final

Order.

43.     The various cash collateral protections described above are sufficient

under the present circumstances to provide adequate protection to the Pre-Petition Secured

Parties.  The DIP Budget contemplates that the Debtors will use the Cash Collateral to satisfy

their ordinary course obligations.  Hence, the Debtors' business will continue to be operated

consistent with prepetition practices.

44.     In sum, the proposed adequate protection components described above are

fair and reasonable and compensate the Pre-Petition Secured Parties for any possible diminution

in value of the Debtors' assets securing the Pre-Petition Liens.  Given the significant value that

the Debtors stand to lose in the event that they are denied access to the continued use of Cash

Collateral, such protections are appropriate.  Without the use of Cash Collateral, the Debtors'

operations will cease and the Debtors' estates and their creditors will be irreparably damaged.

**Interim Order and Final Hearing**

45.     Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors

request that the Court set a date for the Final Hearing that is as soon as practicable, and fix the

time and date prior to the final hearing for parties to file objections to the Motion.

46.     The urgent need to preserve going concern value, and avoid immediate and irreparable harm to all of the Debtors' estates, makes it imperative that the Debtors be authorized to access the DIP Facility and use Cash Collateral, pending the Final Hearing, in order to continue their operations and to allow the Debtors to administer their cases.  Without the ability to make draws under the DIP Facility and use Cash Collateral, the Debtors would be unable to meet their ongoing obligations and would be unable to fund their working capital needs, thus causing irreparable harm to the Debtors and the value of these estates.  Accordingly, the Debtors respectfully request that, pending the hearing on a Final Order, the Interim Order be approved in all respects and that the terms and provisions of the Interim Order be implemented and be deemed binding and that, after the Final Hearing, the Final Order be approved in all respects and the terms and provisions of the Final Order be implemented and be deemed binding.

### Notice of Motion

47.     Notice of this Motion shall be given to the following parties or, in lieu thereof, to their counsel, if known: (a) the Office of the United States Trustee; (b) counsel to the Pre-Petition Secured Parties and DIP Secured Parties; (c) each of the Debtors' depository banks; and (d) the Debtors' fifty largest unsecured creditors on a consolidated basis.  As the Motion is seeking "first day" relief, within two business days after the hearing on the Motion, the Debtors will serve copies of the Motion and any order entered respecting the Motion as required by Del. Bankr. LR 9013-1(m).  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

## Notice with Respect to Final Hearing

48.     No trustee, examiner or statutory committee has been appointed in the

Debtors' cases.  Pursuant to Bankruptcy Rule 4001, the Debtors respectfully request that they be

authorized to provide notice of the Final Hearing by serving a copy of this Motion, together with

the Interim Order, by hand or overnight mail or courier service (or for those set up to receive

electronic transmissions, by electronic transmission), upon the following parties, or their counsel,

if known: (a) the Office of the United States Trustee; (b) the Debtors' fifty largest unsecured

creditors on a consolidated basis; (c) counsel to the Pre-Petition Secured Parties and DIP Secured

Parties; (d) each of the Debtors' depository banks; (e) any other known party that asserts a lien

against the Debtors' assets; and (f) all parties that have filed notices of appearance and requests

for notices in these cases.  The Debtors respectfully request that such notice is sufficient and

request that this Court find that no further notice of the Final Hearing and Final Order is

required.

## No Prior Request

49.     No prior request for the relief requested herein has been made to this or

any other court.  Pursuant to Local Rule 9013-1(f), the Debtors consent to the entry of a final

judgment or order with respect to the Motion if it is determined that this Court would lack

Article III jurisdiction to enter such final order or judgment absent the consent of the parties.

WHEREFORE, the Debtors request entry of the Interim Order and the Final

Order under sections 105, 361, 362, 363, 503, and 507 of the Bankruptcy Code, Bankruptcy Rules

2002, 4001, 6004, and 9014, and Local Rules 2002-1(b), 4001-2, and 9013-1(m), (i) authorizing

the Debtors to obtain postpetition financing and use cash collateral, (ii) granting adequate

protection, and (iii) scheduling a final hearing, as described herein.


Dated:    October 8, 2020                    PACHULSKI STANG ZIEHL & JONES LLP

                                             */s/ James E. O'Neill*
                                             Richard M. Pachulski (CA Bar No. 90073)
                                             Jeffrey W. Dulberg (CA Bar No. 181200)
                                             Malhar S. Pagay (CA Bar No. 189289)
                                             James E. O'Neill (Bar No. 4042)
                                             919 North Market Street, 17th Floor
                                             P.O. Box 8705
                                             Wilmington, DE  19899-8705 (Courier 19801)
                                             Telephone:  302-652-4100
                                             Facsimile:  302-652-4400
                                             email:  rpachulski@pszjlaw.com
                                                     jdulberg@pszjlaw.com
                                                     mpagay@pszjlaw.com
                                                     joneill@pszjlaw.com

                                             [Proposed] Counsel to the Debtors and Debtors in
                                             Possession