**<u>EXHIBIT 1</u>**

**Proposed Interim Order**

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| RTI HOLDING COMPANY, LLC,[1] | ) | Case No. 20-12456 |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |

**INTERIM ORDER (I) AUTHORIZING DEBTORS TO (A) OBTAIN POSTPETITION FINANCING PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), AND 364(e) AND (B) USE CASH COLLATERAL PURSUANT TO 11 U.S.C. § 363, (II) GRANTING ADEQUATE PROTECTION PURSUANT TO 11 U.S.C. §§ 361, 362, 363, AND 364, AND (III) SCHEDULING FINAL HEARING**

Upon the *Motion of Debtors For Entry Of Interim And Final Orders (I) Authorizing Debtors To (A) Obtain Postpetition Financing Pursuant To 11 U.S.C. §§ 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), And 364(e) And (B) Use Cash Collateral Pursuant To 11 U.S.C. § 363, (II) Granting Adequate Protection Pursuant To 11 U.S.C. §§ 361, 362, 363, And 364, And (III) Scheduling Final Hearing* (the "Motion"),[2] seeking entry of (i) an interim order (this "Interim Order"); (ii) a final order (the "Final Order"); and (iii) requesting related

---

[1] The Debtors in these chapter 11 cases and the last four digits of each Debtor's U.S. tax identification number are as follows: RTI Holding Company, LLC (4966); Ruby Tuesday, Inc. (5239); Ruby Tuesday, LLC (1391); RTBD, LLC (6505); RT of Carroll County, LLC (8836); RT Denver Franchise, L.P. (2621); RT Detroit Franchise, LLC (8738); RT Distributing, LLC (6096); RT Finance, LLC (7242); RT FL Gift Cards, Inc. (2189); RT Florida Equity, LLC (7159); RT Franchise Acquisition, LLC (1438); RT of Fruitland, Inc. (1103); RT Indianapolis Franchise, LLC (6016); RT Jonesboro Club (2726); RT KCMO Franchise, LLC (7020); RT Kentucky Restaurant Holdings, LLC (7435); RT Las Vegas Franchise, LLC (4969); RT Long Island Franchise, LLC (4072); RT of Maryland, LLC (7395); RT Michiana Franchise, LLC (8739); RT Michigan Franchise, LLC (8760); RT Minneapolis Franchise, LLC (2746); RT Minneapolis Holdings, LLC (7189); RT New England Franchise, LLC (4970); RT New Hampshire Restaurant Holdings, LLC (7438); RT New York Franchise, LLC (1154); RT Omaha Franchise, LLC (7442); RT Omaha Holdings, LLC (8647); RT One Percent Holdings, LLC (6689); RT One Percent Holdings II, LLC (2817); RT Orlando Franchise, LP (5105); RT Restaurant Services, LLC (7283); RT South Florida Franchise, LP (3535); RT Southwest Franchise, LLC (9715); RT St. Louis Franchise, LLC (6010); RT Tampa Franchise, LP (5290); RT Western Missouri Franchise, LLC (6082); RT West Palm Beach Franchise, LP (0359); RTTA, LP (0035); RTT Texas, Inc. (2461); RTTT, LLC (9194); Ruby Tuesday of Allegany County, Inc. (8011); Ruby Tuesday of Bryant, Inc. (6703); Ruby Tuesday of Columbia, Inc. (4091); Ruby Tuesday of Frederick, Inc. (4249); Ruby Tuesday of Linthicum, Inc. (8716); Ruby Tuesday of Marley Station, Inc. (1641); Ruby Tuesday of Pocomoke City, Inc. (0472); Ruby Tuesday of Russellville, Inc. (1601); and Ruby Tuesday of Salisbury, Inc. (5432). The Debtors' mailing address is 333 East Broadway Ave., Maryville, TN 37804.

[2] Unless otherwise defined, capitalized terms used herein shall have the meanings ascribed to them in the DIP Credit Agreement (as defined below).

relief (collectively, the "<u>Requested Relief</u>") and the Debtors' having requested on the record at the interim hearing on the Motion (the "<u>Interim Hearing</u>") that the Court enter an Interim Order, *inter alia*:

(a)    authorizing Ruby Tuesday, Inc. ("<u>RTI</u>") and its affiliated debtors (collectively, the "<u>Debtors</u>") to obtain secured postpetition financing on a superpriority basis pursuant to the terms and conditions of that certain "Debtor-in-Possession Credit and Guaranty Agreement," in substantially the form attached hereto (without exhibits or schedules) as <u>Exhibit A</u> (as the same may be amended, supplemented, restated or otherwise modified from time to time in accordance with its terms, the "<u>DIP Credit Agreement</u>"), by and among RTI and certain subsidiaries of RTI, as Borrowers, RTI Holding Company, LLC ("<u>Holdings</u>"), as Borrower Representative and a Guarantor, certain other subsidiaries of Holdings, each as a Guarantor, Goldman Sachs Specialty Lending Group, L.P. ("<u>GSSLG</u>"), as Administrative Agent and Collateral Agent (in such capacities, the "<u>DIP Agent</u>"), Goldman Sachs Bank USA ("<u>GS Bank</u>"), as issuer of the Existing Letters of Credit ("<u>Issuing Bank</u>"), and each Lender party thereto (together with Issuing Bank, collectively, the "<u>DIP Lenders</u>", and together with DIP Agent, collectively, the "<u>DIP Secured Parties</u>"), in an aggregate principal amount not to exceed $18,500,000, consisting of a term loan facility in the aggregate principal amount of $18,500,000 (the "<u>DIP Facility</u>", and any draws on the DIP Facility, the "<u>DIP Loans</u>"), of which $12,600,000 will be available immediately upon entry of this Interim Order. Such DIP Facility includes (i) a $9,600,000 sub-facility to be used solely for the reimbursement of any draws made under the Existing Letters of Credit, which sub-facility shall account for $9,600,000 of the total amount that will be available immediately upon entry of this Interim Order and which Existing Letters of Credit, upon entry of this Interim Order, shall be treated as having been issued under the DIP Credit Agreement and shall

2

constitute part of the Credit Extensions and Obligations and be entitled to all of the benefits and security of the DIP Loan Documents, the DIP Collateral (as defined below) and this Interim Order, in each case as provided in the DIP Loan Documents (as defined below) and this Interim Order and (ii) a roll-up of Term Loans (as defined in the Pre-Petition Credit Agreement (as defined below)) in the aggregate principal amount of $2,000,000 extended to the Credit Parties by the DIP Lenders on the Seventh Amendment Effective Date *plus* all accrued and unpaid interest and fees related thereto as of the entry of the Final Order (which accrued and unpaid interest and fees are equal to not less than $11,681.11 as of the Petition Date (as defined below)), which Term Loans and accrued and unpaid interest and fees shall, upon entry of the Final Order, be treated as having been issued under the DIP Credit Agreement, constitute part of the Credit Extensions and Obligations and be entitled to all of the benefits and security of the DIP Loan Documents, the DIP Collateral and the Final Order, in each case as provided in the DIP Loan Documents  and the Final Order;

(b)      authorizing the Debtors to execute the DIP Credit Agreement and all other documents, agreements and instruments delivered pursuant thereto or executed or filed in connection therewith, all as may be reasonably requested by the DIP Agent (as the same may be amended, restated, supplemented or otherwise modified from time to time in accordance with their respective terms, and, collectively with the DIP Credit Agreement, the "<u>DIP Loan Documents</u>");

(c)      authorizing the Debtors to use the proceeds from the DIP Facility as permitted in the DIP Loan Documents and in accordance with this Interim Order, the Final Order, and the DIP Budget (as defined below);

[AM_ACTIVE 402640889_19]

(d)      granting to the DIP Agent, for itself and for the benefit of the DIP Lenders, first priority security interests in and liens on all assets that constitute the DIP Collateral (as defined below) to secure the DIP Facility and all obligations owing and outstanding thereunder and under the DIP Loan Documents, as applicable, this Interim Order, and the Final Order, as applicable (collectively, and including all "Obligations" as described in the DIP Credit Agreement, the "<u>DIP Obligations</u>"), which shall rank senior in priority to all other liens other than Permitted Priority Liens (as defined below) (other than the Pre-Petition Liens) as described herein and payment of the Carve-Out (as defined below);

(d)      granting superpriority administrative expense claims against each Debtor's estate to the DIP Agent and the DIP Lenders with respect to the DIP Obligations in accordance with Section 364(c)(1) of the Bankruptcy Code over any and all administrative expenses of any kind or nature subject and subordinate only to the payment of the Carve-Out;

(e)      authorizing the Debtors to use Cash Collateral (as defined below);

(f)      authorizing the Debtors to grant adequate protection to the Pre-Petition Agent (as defined below) on behalf of the Pre-Petition Secured Parties[3] (as defined below) to the extent of any diminution in value of their interest in the Pre-Petition Collateral (as defined below) and subject to the Carve-Out;

(g)      vacating and modifying the automatic stay pursuant to Section 362 of the Bankruptcy Code (the "<u>Automatic Stay</u>") to the extent necessary to implement and effectuate the terms and provisions of the Interim Order, the Final Order and the DIP Loan Documents;

---

[3]  As of the Petition Date, the Pre-Petition Secured Parties are the same parties as the DIP Secured Parties.

(h)     waiving any applicable stay with respect to the effectiveness and enforceability of the Interim Order (including under Rule 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"));

(i)     scheduling a hearing (the "Final Hearing"), pursuant to Bankruptcy Rule 4001(c)(2), to consider final approval of the DIP Facility, use of Cash Collateral and other Requested Relief pursuant to a proposed final order, as set forth in the Motion and the DIP Loan Documents filed with this Court;

and the interim hearing on the Requested Relief (the "Interim Hearing") having been held on October 8, 2020; and upon all of the pleadings filed with the Court and the evidence proffered or adduced at the Interim Hearing; and the Court having heard and resolved or overruled any and all objections to the Requested Relief; and it appearing that the Requested Relief is in the best interests of the Debtors, their estates, and creditors; and upon the record herein; and after due deliberation thereon, and good and sufficient cause appearing therefor:

### IT IS HEREBY FOUND AND DETERMINED THAT:[4]

A.     Petition Date.  On October 7, 2020 (the "Petition Date"), the Debtors commenced their chapter 11 cases (these "Chapter 11 Cases") by filing voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Court").  The Debtors are operating their businesses and managing their affairs as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  As of the date hereof, no trustee, examiner or official committee of creditors holding unsecured claims (a "Creditors' Committee") has been appointed in any of these Chapter 11 Cases.

---

[4]  Findings of fact shall be construed as conclusions of law, and conclusions of law shall be construed as findings of fact, as applicable, pursuant to Bankruptcy Rule 7052.

B.    <u>Jurisdiction; Venue</u>.  The Court has jurisdiction over these Chapter 11 Cases, the parties and the Debtors' property pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. §157(b)(2)(D).  The Court is a proper venue of these Chapter 11 Cases and the Requested Relief under 28 U.S.C. §§ 1408 and 1409.

C.    <u>Notice</u>.  Proper, timely, adequate and sufficient notice under the circumstances of the Motion and the Interim Hearing has been provided in accordance with the Bankruptcy Code, Bankruptcy Rules 2002, 4001(b), (c), and (d), and 9014, and the local rules for the United States Bankruptcy Court for the District of Delaware (the "<u>Local Rules</u>"), and no other or further notice of the Motion with respect to the relief requested at the Interim Hearing or the entry of this Interim Order shall be required.

D.    <u>Debtors' Acknowledgments and Stipulations</u>.    The Debtors acknowledge, represent, stipulate, and agree, subject to the terms and provisions of Paragraph 15 below:

(i)    *Pre-Petition Obligations*.  Pursuant to that certain "Credit and Guaranty Agreement," dated as of December 21, 2017 (as has been amended, restated or modified from time to time prior to the Petition Date, the "<u>Pre-Petition Credit Agreement</u>", and together with all agreements, documents, notes, mortgages, security agreements, pledges, guarantees, subordination agreements, instruments, amendments, and any other agreements delivered pursuant thereto or in connection therewith, the "<u>Pre-Petition Credit Agreement Documents</u>"), among (a) RTI and certain subsidiaries of RTI, as borrowers (in such capacity, the "<u>Pre-Petition Borrowers</u>"), (b) Holdings, as borrower representative (in such capacity, the "<u>Pre-Petition Borrower Representative</u>"), together with certain subsidiaries of RTI as guarantors (collectively, the "<u>Pre-Petition Guarantors</u>"), (c) GSSLG, as administrative agent, collateral agent, and syndication agent (in such capacities, the "<u>Pre-Petition Agent</u>"), (d) GS Bank, as issuing bank

6

(the "<u>Pre-Petition Issuing Bank</u>"), and (e) each lender party thereto (together with Pre-Petition

Issuing Bank, collectively, the "<u>Pre-Petition Lenders</u>", and together with the Pre-Petition Agent,

collectively, the "<u>Pre-Petition Secured Parties</u>"), the Pre-Petition Lenders provided term loan

commitments, revolving loan commitments and other financial accommodations to, or for the

benefit of, the Pre-Petition Borrowers and the Pre-Petition Guarantors (such loans and financial

accommodations, the "<u>Pre-Petition Loans</u>", and such facility, the "<u>Pre-Petition Facility</u>").  As of

the Petition Date, the Debtors were jointly and severally indebted to the Pre-Petition Secured

Parties in the aggregate principal amount of $37,856,513.21, consisting of (a) $26,304,679.21 in

the aggregate principal amount of Term Loans (as defined in the Pre-Petition Credit Agreement),

(b) $2,000,000.00 in the aggregate principal amount of Revolving Loans (as defined in the Pre-

Petition Credit Agreement), and (c) $9,551,834.00 in the aggregate principal amount of Existing

Letters of Credit (as defined in the Pre-Petition Credit Agreement) (collectively, together with

accrued and unpaid interest with respect thereto and any additional fees, costs, expenses

(including any attorneys', financial advisors', and other professionals' fees and expenses),

reimbursement obligations, indemnification obligations, contingent obligations, make-whole

premiums, call premiums, yield maintenance premiums, and other charges of whatever nature,

whether or not contingent, whenever arising, due, or owing that would constitute Obligations (as

defined in the Pre-Petition Credit Agreement) owing under or in connection with the Pre-Petition

Credit Agreement Documents, the "<u>Pre-Petition Obligations</u>"), which Pre-Petition Obligations

have been guaranteed on a joint and several basis by each of the Pre-Petition Borrowers and the

Pre-Petition Guarantors.

        (ii)    *Pre-Petition Credit Agreement Liens and Collateral.*  As more fully set

forth in the Pre-Petition Credit Agreement Documents, the Pre-Petition Obligations are secured

by first priority liens on and security interests in the "Collateral" under and as defined in the Pre-Petition Credit Agreement Documents (collectively, the "Pre-Petition Liens") in substantially all of the Debtors' assets to the extent set forth in the Pre-Petition Credit Documents (the "Pre-Petition Collateral").

(iii) *Validity, Perfection and Priority of Pre-Petition Liens and Pre-Petition Obligations.* The Debtors represent, acknowledge and agree that, as of the Petition Date, (a) the Pre-Petition Liens constitute valid, binding, enforceable, and perfected liens with priority over any and all other liens (other than Pre-Petition Permitted Prior Liens, as defined below) and the Debtors shall not raise or join any challenge or defense, including, without limitation, respectively, avoidance, reductions, recharacterization, subordination (whether equitable, contractual, or otherwise), claims, counterclaims, cross-claims, offsets, recoupments, objections, defenses, or any other challenges under the Bankruptcy Code or any applicable law or regulation by any person or entity; (b) the Pre-Petition Liens were senior in priority over any and all other liens on the Pre-Petition Collateral, subject only to liens senior by operation of law or permitted by the Pre-Petition Credit Agreement Documents, and solely to the extent any such liens were valid, properly perfected, non-avoidable and senior in priority to the Pre-Petition Liens as of the Petition Date (the "Pre-Petition Permitted Prior Liens"); (c) the Pre-Petition Obligations are unconditionally owing by the Debtors and constitute legal, valid, binding, and non-avoidable obligations of the Debtors enforceable in accordance with the terms of the applicable Pre-Petition Credit Agreement Documents; (d) no offsets, recoupments, challenges, objections, defenses, claims, or counterclaims of any kind or nature to any of the Pre-Petition Obligations exist, and no portion of the Pre-Petition Obligations is subject to any challenge or defense including, without limitation, avoidance, disallowance, reductions, set-off, offset, disgorgement, recharacterization,

8

subordination (whether equitable, contractual or otherwise), counterclaims, cross-claims, defenses or any other challenges pursuant to the Bankruptcy Code or any applicable law or regulation; (e) the Debtors shall not raise or join in any assertion of any claims, objections, challenges, causes of action, and/or choses in action, including without limitation, avoidance claims under Chapter 5 of the Bankruptcy Code or applicable state law equivalents or actions for recovery or disgorgement, against any of the Pre-Petition Secured Parties, or any of their respective affiliates, agents, attorneys, advisors, professionals, officers, directors, and employees arising out of, based upon or related to the Pre-Petition Facility; and (f) the Debtors have waived, discharged, and released any right to challenge any of the Pre-Petition Obligations, the priority of the Pre-Petition Obligations, and the validity, extent, and priority of the Pre-Petition Liens.

(iv)     *No Control*. None of the Pre-Petition Secured Parties or the DIP Secured Parties controls the Debtors or their operations, has authority to determine the manner in which any of the Debtors' operations are conducted or is a control person or insider of the Debtors or any of their affiliates by virtue of any of the actions taken with respect to, in connection with, related to, or arising from this Interim Order, the DIP Facility, the DIP Loan Documents, the Pre-Petition Facility, and/or the Pre-Petition Credit Agreement Documents.

(v)     *Payments in Respect of Pre-Petition Obligations.*  Any payments made on account of the Pre-Petition Obligations prior to the Petition Date were (a) payments out of the Pre-Petition Collateral, and/or (b) made in the ordinary course of business, and did not diminish any property otherwise available for distribution to unsecured creditors;

(vi)     *Cash Collateral*.  All of the Debtors' cash, including the cash in their deposit accounts, wherever located, whether as original collateral or proceeds of other Pre-

[AM_ACTIVE 402640889_19]

Petition Collateral, other than cash held in Excluded Accounts (as defined in the Pre-Petition Credit Agreement) constitutes Cash Collateral securing the Pre-Petition Obligations;

(vii)    *Necessary Approvals*.  Upon approval of this Interim Order by the Court, the Debtors have obtained all authorizations, consents and approvals required to be obtained from, and have made all filings with and given all notices required to be given to, all federal, state and local governmental agencies, authorities and instrumentalities in connection with the execution, delivery, validity and enforceability of the DIP Loan Documents to which any Debtor is a party and the use of Cash Collateral as provided herein;

(viii)    *DIP Liens and Obligations.*  (a) Until such time as all DIP Obligations are indefeasibly paid in full in cash, the Debtors shall not in any way prime or seek to prime (or otherwise cause to be subordinated in any way) the liens and security interests provided to the DIP Secured Parties by offering a subsequent lender or any party-in-interest a superior or *pari passu* lien or claim pursuant to section 364(d) of the Bankruptcy Code, or otherwise, except with respect to (I) the Permitted Priority Liens (other than the Pre-Petition Liens) as described herein and (II) prior payment of the Carve-Out; and (b) until such time as all DIP Obligations are indefeasibly paid in full in cash, the Debtors shall not in any way or at any time permit to exist an administrative expense claim against the Debtors of any kind or nature whatsoever, including, without limitation, claims for any administrative expenses of the kind specified in, or arising or ordered under sections 105, 326, 328, 503(b), 506(c), 507(a), 507(b), 546(c), 552(b), 726, 1113 and 1114 of the Bankruptcy Code, that is superior to or *pari passu* with the DIP Superpriority Claim (as defined below) provided herein, except with respect to prior payment of the Carve-Out;

10

(ix)    the Debtors have requested that the Pre-Petition Secured Parties consent to, among other things, (a) the Debtors' use of Cash Collateral securing the Pre-Petition Obligations and the other Pre-Petition Collateral, (b) the incurrence of the DIP Obligations by the Credit Parties and the Credit Parties' guarantees of the DIP Obligations under the DIP Loan Documents and (c) the Debtors' granting of the priming DIP Liens (as defined below) in connection therewith. The Pre-Petition Agent and Pre-Petition Lenders are entitled, pursuant to sections 361, 363(e), and 364(d)(l) of the Bankruptcy Code, to adequate protection of their respective interests in the Pre-Petition Collateral, including the Cash Collateral securing the Pre-Petition Obligations (x) in exchange for their consent to allow the Debtors' use of such Pre-Petition Collateral, including the Cash Collateral securing the Pre-Petition Obligations, and (y) for any diminution resulting from the sale, lease or use by the Debtors (or other decline in value) of Cash Collateral securing the Pre-Petition Obligations and any other Pre-Petition Collateral, the priming of the Pre-Petition Liens by the DIP Agent and DIP Lenders pursuant to this Interim Order, the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code, or otherwise.

E.    <u>Cash Collateral</u>.  For purposes of this Interim Order, the term "<u>Cash Collateral</u>" shall mean and include all "cash collateral," as defined in section 363 of the Bankruptcy Code, in or on which the DIP Agent or the Pre-Petition Agent have, for the benefit of the DIP Lenders or the Pre-Petition Lenders, respectively, a lien, security interest or other interest (including, without limitation, any adequate protection liens or security interests) whether existing on the Petition Date, arising pursuant to this Interim Order or otherwise and shall include, without limitation:

11

(i)      all cash proceeds arising from the collection, sale, lease or other disposition, use or conversion of any real or personal property, including insurance policies, in or on which the DIP Lenders or the Pre-Petition Lenders have a lien or a replacement lien (if any), whether as part of the DIP Collateral or the Pre-Petition Collateral or pursuant to an order of the Court or applicable law or otherwise, and whether such property has been converted to cash, existed as of the commencement of these Chapter 11 Cases, or arose or was generated thereafter;

(ii)      all of the respective deposits, refund claims and rights in retainers of the Debtors on which the DIP Secured Parties or the Pre-Petition Secured Parties hold a lien or replacement lien (if any), whether as part of the DIP Collateral or the Pre-Petition Collateral or pursuant to an order of the Court or applicable law or otherwise; and

(iii)      the proceeds of any sale of DIP Collateral or Pre-Petition Collateral, including any Asset Sales.

F.      Adequate Protection.  Each of the Pre-Petition Secured Parties is entitled, pursuant to sections 361, 363(e), and 364(d)(1) of the Bankruptcy Code, to adequate protection of their respective interests in the Pre-Petition Collateral, including the Cash Collateral securing the Pre-Petition Obligations, in exchange for the Debtors' use of such Pre-Petition Collateral, to the extent of any diminution in value of the Pre-Petition Collateral including, without limitation, any diminution in value resulting from the sale, lease, or use by the Debtors (or other decline in value) of Cash Collateral securing the Pre-Petition Obligations and any other Pre-Petition Collateral, the priming of the Pre-Petition Liens of the Pre-Petition Agent on and in the Pre-Petition Collateral, for itself and for the benefit of the Pre-Petition Lenders, by the DIP Agent or the DIP Lenders, and the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code.

[AM_ACTIVE 402640889_19]

G.    <u>Roll-Up</u>.  Subject to (i) the entry of this Interim Order, the Existing Letters of Credit shall be deemed issued under the DIP Credit Agreement, and any reimbursement obligations in connection with any draws of such Existing Letters of Credit shall constitute DIP Obligations and (ii) the entry of the Final Order, Term Loans (as defined in the Pre-Petition Credit Agreement) in an aggregate principal amount of $2,000,000 extended to the Credit Parties by the DIP Lenders on the Seventh Amendment Effective Date *plus* all accrued and unpaid interest and fees related thereto as of the entry of the Final Order shall be converted into DIP Obligations.  Such conversion or deemed issuance (collectively, the "<u>DIP Roll-Up Obligations</u>") shall be authorized as compensation for, in consideration for, and not as payments under, adequate protection for or otherwise on account of, any Pre-Petition Obligations.  The Pre-Petition Secured Parties would not otherwise consent to the use of their Cash Collateral securing the Pre-Petition Obligations or the subordination of their liens to the DIP Liens, and the DIP Lenders would not be willing to provide the DIP Loans or extend credit to the Debtors thereunder without the inclusion of the DIP Roll-Up Obligations in the DIP Obligations.

H.    <u>Purpose and Necessity of Financing</u>. The Debtors require the financing described in the Requested Relief (i) for working capital and general corporate purposes of the Credit Parties, (ii) to pay fees and expenses incurred by the DIP Secured Parties in connection with the DIP Loan Documents as provided therein, (iii) to make adequate protection payments to the Pre-Petition Lenders as provided in this Interim Order, (iv) to pay restructuring costs and Professional Fees of the Borrowers and Guarantors relating solely to these Chapter 11 Cases, and (v) for other purposes as provided in and subject to the terms of the DIP Credit Agreement, and in all cases, subject to compliance with the DIP Budget (and Permitted Variances).  If the Debtors do not obtain authorization to borrow under the DIP Credit Agreement, they will suffer

13

immediate and irreparable harm.  The Debtors are unable to obtain adequate unsecured credit allowable as an administrative expense under section 503 of the Bankruptcy Code, or other sufficient financing under sections 364(c) or (d) of the Bankruptcy Code, on more favorable terms than those set forth in the DIP Loan Documents, based on the totality of the circumstances. A loan facility in the amount provided by the DIP Loan Documents is not available to the Debtors without granting the DIP Agent, for the benefit of the DIP Lenders, superpriority claims, liens, and security interests, pursuant to sections 364(c)(1), 364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy Code, as provided in this Interim Order and the DIP Loan Documents.  After considering all alternatives, the Debtors have concluded, in the exercise of their sound business judgment, that the DIP Facility represents the best financing available to them at this time.

   I. <u>Good Cause Shown</u>.  Good cause has been shown for entry of this Interim Order. The ability of the Debtors to obtain sufficient working capital and liquidity under the DIP Loan Documents is vital to the Debtors' estates and creditors.  The liquidity to be provided under the DIP Loan Documents will enable the Debtors to continue to operate their businesses in the ordinary course and preserve the value of the Debtors' assets.  Among other things, entry of this Interim Order is necessary to maximize the value of the Debtors' assets and to avoid immediate and irreparable harm to the Debtors and their estates, and, accordingly, is in the best interests of the Debtors, their estates and their creditors.  The terms of the DIP Facility are fair and reasonable, reflect each Debtor's exercise of its respective business judgment, and are supported by reasonably equivalent value and fair consideration.

   J. <u>Sections 506(c) And 552(b) Waivers</u>.  In light of (i) the DIP Agent's and the DIP Lenders' agreement to permit their DIP Liens and DIP Superpriority Claim (as defined below) to be subject to prior payment of the Carve-Out, and in exchange for and as a material inducement

14

to the DIP Agent and DIP Lenders to agree to provide the DIP Facility and (ii) the Pre-Petition

Agent's and the Pre-Petition Lenders' agreement to permit their Pre-Petition Liens, Replacement

Liens (as defined below) and Adequate Protection Superpriority Claim (as defined below) to be

subject to prior payment of the Carve-Out, the DIP Liens, and the DIP Superpriority Claim and

to permit the use of their Cash Collateral securing the Pre-Petition Obligations for payments

made in accordance with the DIP Budget (subject to the Permitted Variances) and the terms of

this Interim Order, the DIP Agent, the DIP Lenders, the Pre-Petition Agent and the Pre-Petition

Lenders are each entitled to (a) subject to entry of the Final Order, a waiver of any "equities of

the case" claims under section 552(b) of the Bankruptcy Code and (b) subject to entry of the

Final Order, a waiver of the provisions of section 506(c) of the Bankruptcy Code.

K.   <u>Good Faith</u>.   The terms of the DIP Loan Documents, including, without

limitation, the interest rates and fees applicable, and intangible factors relevant thereto, are more

favorable to the Debtors than any available from alternative sources.  Based upon the record

before the Court, the DIP Loan Documents have been negotiated in good faith and at arm's-

length among the Debtors, the DIP Lenders and the DIP Agent.  Any DIP Loans and other

financial accommodations made to the Debtors by the DIP Agent and the DIP Lenders pursuant

to the DIP Loan Documents and this Interim Order shall be deemed to have been extended by the

DIP Agent and the DIP Lenders in good faith, as that term is used in section 364(e) of the

Bankruptcy Code, and the DIP Agent and the DIP Lenders shall be entitled to all protections

afforded thereby.

L.   <u>Fair Consideration and Reasonably Equivalent Value</u>.  Each of the Debtors has

received and will receive fair and reasonable consideration in exchange for access to the DIP

Loans and all other financial accommodations provided under the DIP Loan Documents and this

15

Interim Order.  The terms of the DIP Loan Documents are fair and reasonable, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties and are supported by reasonably equivalent value and fair consideration.

M.     Immediate Entry of Interim Order.  The Debtors have requested immediate entry of this Interim Order pursuant to Bankruptcy Rule 4001(c)(2).  The permission granted herein to enter into the DIP Loan Documents and to obtain funds thereunder is necessary to avoid immediate and irreparable harm to the Debtors.  This Court concludes that entry of this Interim Order is in the best interests of the Debtors' respective estates and creditors as its implementation will, among other things, allow for access to the financing necessary for the continued flow of supplies and services to the Debtors necessary to sustain the operation of the Debtors' existing businesses and further enhance the Debtors' prospects for a successful reorganization or sale of substantially all of their assets.  Based upon the foregoing findings, acknowledgements and conclusions, and upon the record made before this Court at the Interim Hearing, and good and sufficient cause appearing therefor;

**IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:**

1.     Motion Approved.  The Motion is granted on an interim basis as set forth herein, and the Debtors' incurrence of the DIP Facility and use of Cash Collateral on an interim basis is authorized, subject to the terms of this Interim Order.

2.     Objections Overruled.  Any objections, reservations of rights or other statements with respect to the Motion and entry of the Interim Order, to the extent not withdrawn or resolved, are overruled on the merits. This Interim Order shall become effective immediately upon its entry.

[AM_ACTIVE 402640889_19]

## AUTHORIZATION FOR DIP FINANCING AND USE OF CASH COLLATERAL

3.     <u>Authorization For DIP Financing And Use of Cash Collateral Pursuant to DIP Budget</u>.

(a)     The Debtors are hereby authorized, on an interim basis, to incur DIP Obligations immediately subject to the terms of this Interim Order, the DIP Budget (subject to the Permitted Variances) and the DIP Loan Documents, in the aggregate principal amount of up to $12,600,000 (inclusive of the Existing Letters of Credit) (the "<u>Maximum Interim Borrowing</u>"). The Maximum Interim Borrowing includes up to $3,000,000 of new money advances.   The Borrowers are hereby authorized to borrow money pursuant to the DIP Credit Agreement, and each Guarantor under the DIP Credit Agreement is hereby authorized to provide a guaranty of payment in respect of the Debtors' obligations with respect to such borrowings, subject to any limitations on borrowing under the DIP Loan Documents, including working capital and general corporate requirements of the Debtors, bankruptcy-related costs and expenses, reimbursement obligations with respect to the Existing Letters of Credit and any other amounts required or allowed to be paid in accordance with this Interim Order, but only as and to the extent authorized by the DIP Budget (subject to the Permitted Variances) and the DIP Loan Documents.

(b)     Prior to the Maturity Date, the Debtors are authorized to use Cash Collateral subject to and in accordance with the terms, conditions, and limitations set forth in this Interim Order, the DIP Budget (subject to the Permitted Variances) and the DIP Loan Documents, without further approval by the Court, including, for avoidance of doubt, and consistent with the DIP Loan Documents, the use of cash proceeds from any Assets Sales for repayment of the Pre-Petition Obligations, and following repayment of the Pre-Petition Obligations in full in cash, repayment of the DIP Obligations.

17

(c)    The Debtors have delivered to the DIP Agent a rolling cash forecast, in Microsoft Excel format, in form, scope and substance satisfactory to the DIP Lenders, for a period of thirteen (13) weeks beginning on the Petition Date and updated every four (4) weeks thereafter in accordance with the terms of the DIP Credit Agreement, setting forth projected cash flows and disbursements, a copy of which is attached hereto as Exhibit B (the "DIP Budget").  The DIP Budget shall at all times be in form and substance acceptable to the DIP Agent and the DIP Lenders and approved in writing by each, in their respective sole discretion, in accordance with the DIP Credit Agreement.  The Debtors shall provide updates to the DIP Budget at least once every four (4) weeks and other financial reporting with respect to the Debtors, in accordance with the terms of the DIP Loan Documents.  Funds borrowed under the DIP Credit Agreement and Cash Collateral used under this Interim Order, as well as other cash held by the Debtors, shall be used by the Debtors in accordance with the DIP Budget (subject to the Permitted Variances), the DIP Loan Documents and this Interim Order.  The consent of the DIP Lenders to any DIP Budget shall not be construed as a commitment to provide DIP Loans or to permit the use of Cash Collateral (subject to the Carve-Out) after the occurrence of the Maturity Date, regardless of whether the aggregate funds shown on the DIP Budget have been expended.

(d)    Any amendments, supplements or modifications to the DIP Budget must be consented to in writing by the Requisite Lenders, in their sole discretion in accordance with the DIP Credit Agreement, prior to the implementation thereof and shall not require further notice, hearing, or court order; provided, however, that the Debtors will provide written notice of any such amendment, supplement or modification to the Creditors' Committee.

(e)    The DIP Secured Parties (i) may assume the Debtors will comply with the DIP Budget (subject to the Permitted Variances), (ii) shall have no duty to monitor such compliance

18

and (iii) shall not be obligated to pay (directly or indirectly from the DIP Collateral or Pre-Petition Collateral) any unpaid expenses incurred or authorized to be incurred pursuant to any DIP Budget. All advances and extensions of credit shall be based upon the terms and conditions of the DIP Loan Documents, as the same may be adjusted from time to time.

(f)     [Reserved].

(g)     Notwithstanding anything in this Interim Order to the contrary, the DIP Loan Documents shall expire, and the DIP Loans made pursuant to this Interim Order and the DIP Loan Documents will mature, and together with all interest thereon and any other obligations accruing under the DIP Loan Documents, will become due and payable (unless such obligations become due and payable earlier pursuant to the terms of the DIP Loan Documents and this Interim Order by way of acceleration or otherwise) on the Maturity Date.

4.     <u>Authority to Execute and Deliver Necessary Documents</u>.

(a)     Each of the Debtors is authorized to negotiate, prepare, enter into, and deliver the DIP Loan Documents, in each case including any amendments thereto. Each of the Debtors is further authorized to negotiate, prepare, enter into and deliver any UCC financing statements, pledge and security agreements, mortgages or deeds of trust, or similar documents or agreements encumbering all of the DIP Collateral and securing all of the Debtors' obligations under the DIP Loan Documents, each as may be reasonably requested by the DIP Secured Parties.

(b)     Each of the Debtors is further authorized to (i) perform all of its obligations under the DIP Loan Documents, and such other agreements as may be required by the DIP Loan Documents to give effect to the terms of the financing provided for therein and in this Interim Order, and (ii) perform all acts required under the DIP Loan Documents and this Interim Order.

19

5.      Pre-Petition Obligations Roll-Up.   Subject to and effective upon entry of this Interim Order, the DIP Liens shall secure the DIP Roll-Up Obligations with respect to the Existing Letters of Credit, including the reimbursement obligations with respect thereto, which shall be deemed to be incurred by the Debtors under the DIP Loan Documents and subject to the terms and conditions set forth in the DIP Loan Documents.

6.      Valid and Binding Obligations.   All obligations under the DIP Loan Documents shall constitute valid, binding, and nonavoidable obligations of each of the Debtors, enforceable against each of them and each of their successors and assigns, in accordance with their terms and the terms of this Interim Order, and no obligation, payment, transfer, or grant of a lien or security interest under the DIP Loan Documents or this Interim Order shall be stayed, restrained, voidable, or recoverable under the Bankruptcy Code or under any applicable law (including, without limitation, under section 502(d) of the Bankruptcy Code) or subject to any avoidance, reduction, set off, offset, recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaims, cross-claims, defenses, or any other challenges under the Bankruptcy Code or any applicable law or regulation by any person or entity.

7.      Authorization for Payment of DIP Financing Fees and Expenses.   All fees paid and payable, and all costs and/or expenses reimbursed or reimbursable (including, costs and expenses referred to in the DIP Loan Documents and the DIP Agent's and DIP Lenders' attorneys' fees and expenses), under the DIP Loan Documents, by the Debtors to the DIP Secured Parties are hereby approved and shall not be subject to disgorgement by any party for any reason.  Subject to the notice provision below, the Debtors are hereby authorized to pay all such fees, costs and expenses in accordance with the terms of the DIP Loan Documents and this Interim Order, without any requirement that the Debtors, the DIP Agent, the DIP Lenders or any

20

of their respective counsel file any further application or other pleading, notice, or document with the Court for approval or payment of such fees, costs, or expenses.  Subject to the notice provision below, the Debtors agree to pay promptly (without further order of or application to the Court) (a) all of the DIP Agent's actual and reasonable costs and expenses of preparation of the DIP Loan Documents and any consents, amendments, waivers, or other modifications thereto; (b) all the reasonable fees, expenses and disbursements of counsel to the DIP Agent and DIP Lenders (including for avoidance of doubt, Issuing Bank) in connection with the negotiation, preparation, execution, and administration of the DIP Loan Documents and any consents, amendments, waivers or other modifications thereto and any other documents or matters requested by any Borrower or Guarantor; (c) all the actual costs and reasonable expenses of creating and perfecting Liens in favor of DIP Agent, for the benefit of the DIP Secured Parties, including filing and recording fees, expenses and Taxes, stamp or documentary Taxes, search fees, title insurance premiums, and reasonable fees, expenses and disbursements of counsel to DIP Agent; (d) all of the DIP Agent's actual costs and reasonable fees, expenses for and disbursements of any of DIP Agent's, auditors, accountants, consultants or appraisers whether internal or external, and all reasonable attorneys' fees (including allocated costs of internal counsel and expenses and disbursements of outside counsel) incurred by DIP Agent; (e) all of the actual costs and reasonable expenses (including the reasonable fees, expenses, and disbursements of any appraisers, consultants, advisors and agents employed or retained by DIP Agent and its counsel) in connection with the custody or preservation of any of the DIP Collateral; (f) all of the other actual and reasonable costs and expenses incurred by the DIP Agent and/or DIP Lenders in connection with the negotiation, preparation and execution of the DIP Loan Documents and any consents, amendments, waivers or other modifications thereto and the transactions contemplated

21

thereby; (g) after the occurrence of a Default or an Event of Default, all costs and expenses, including reasonable attorneys' fees (including allocated costs of internal counsel) and costs of settlement, incurred by DIP Agent and/or DIP Lenders in enforcing any DIP Obligations of or in collecting any payments due from any Credit Party under the DIP Loan Documents by reason of such Default or Event of Default (including in connection with the sale of, collection from, or other realization upon any of the DIP Collateral or the enforcement of the Guaranty) or in connection with any refinancing or restructuring of the credit arrangements provided thereunder in the nature of a "work out" or pursuant to any insolvency or bankruptcy cases or proceedings (including these Chapter 11 Cases); and (h) any other fees or expenses as required by the DIP Loan Documents.  Subject to the notice provision below, the foregoing fees, costs, and expenses of the DIP Agent and the DIP Lenders authorized by this Interim Order, whether incurred prior to or after the Petition Date, including, without limitation, all fees referred to in the DIP Loan Documents, shall be deemed fully earned, non-refundable and irrevocable as of the date of this Interim Order.  None of the DIP Agent's or DIP Lenders' attorneys, financial advisors and accountants' fees and disbursements shall be subject to the prior approval of this Court or the guidelines of the Office of the United States Trustee for this region (the "U.S. Trustee"), and no recipient of any such payment shall be required to file with respect thereto any interim or final fee application with this Court.  Any such fees, costs and expenses shall be evidenced by a summary invoice (redacted, as necessary, to protect any applicable privilege) and delivered to the Debtors, the U.S. Trustee, and any Creditors' Committee.  The U.S. Trustee and any Creditors' Committee shall have ten (10) business days from the date of such delivery within which to object in writing to such payment.  Following the expiration of such period, the applicable counsel shall notify the Debtors in writing of the expiration of such period and the

22

absence of any objection by the U.S. Trustee or any Creditors' Committee, and the Debtors shall pay such invoice within five (5) business days of such written notice, without the need for further application to or order of the Court.  In the event that, within such period, the U.S. Trustee or any Creditors' Committee raises an objection to a particular invoice, the applicable counsel shall notify the Debtors in writing of the objection and the Debtors shall pay the fees and expenses not subject to the objection within five (5) business days of such written notice, without the need for further application to or order of the Court.

8.    Amendments, Consents, Waivers, and Modifications.    The Debtors, with the express written consent of the DIP Agent and Requisite Lenders (or all affected DIP Lenders, as required in accordance with the DIP Credit Agreement) in accordance with the DIP Credit Agreement, may enter into any non-material amendments, consents, waivers, or modifications to the DIP Loan Documents without the need for further notice and hearing or any order of this Court.

## DIP LIENS AND DIP SUPERPRIORITY CLAIMS

9.    DIP Liens

(a)    To secure the DIP Obligations, the DIP Agent is hereby granted for the benefit of the DIP Secured Parties (i) pursuant to section 364(c)(2), a perfected first-priority lien on the DIP Collateral (as defined below) to the extent that such DIP Collateral was not subject to Permitted Priority Liens[5]; (ii) pursuant to section 364(c)(3), a perfected lien on the DIP Collateral junior to any Permitted Priority Liens (other than the Pre-Petition Liens) on such DIP Collateral, and (iii) pursuant to section 364(d) of the Bankruptcy Code, a perfected first-priority, priming and senior

---

[5] "Permitted Priority Liens" means valid, enforceable, non-avoidable and perfected liens in existence on the Petition Date (including valid liens in existence on the Petition Date that are perfected after the Petition Date as permitted by § 546(b) of the Bankruptcy Code).

[AM_ACTIVE 402640889_19]

security interest and lien on the DIP Collateral subject to any Permitted Priority Liens (other than the Pre-Petition Liens), in each case subject to the Carve-Out ((i)-(iii) collectively, the "DIP Liens").

(b)        The DIP Liens shall attach to all of the property, assets or interests in property or assets of each Debtor, and all "property of the estate" (within the meaning of the Bankruptcy Code) of each Debtor, of any kind or nature whatsoever, real or personal, tangible or intangible or mixed, now existing or hereafter acquired or created, including, without limitation, all of each Debtor's now owned or hereafter acquired right, title, and interest in and to: (v) all of the property, assets or interests in property or assets of each Debtor and all "property of the estate" (other than the DIP Collateral Excluded Accounts (as defined in the Pledge and Security Agreement)), including, without limitation, the Pre-Petition Collateral, all leases (to the extent not included in the Pre-Petition Collateral) and, to the extent any property, assets or interests of any Debtor are excluded from the DIP Collateral, such as certain liquor licenses or leases that restrict the grant of a security interest or lien in such assets, the proceeds of such property, assets or interests; (w) the proceeds and products, whether tangible or intangible, of any of the foregoing, including proceeds of insurance covering any or all of the foregoing, and any money or other tangible or intangible property resulting from the sale, exchange, collection or other disposition of any of the foregoing, or any portion thereof or interest therein, and the proceeds thereof; (x) all other property and assets (other than the DIP Collateral Excluded Accounts (as defined in the Pledge and Security Agreement)) including, without limitation, Cash Collateral and all cash and non-cash proceeds, rents, products, substitutions, accessions, offspring and profits of any of the collateral described above; (y) avoidance actions under chapter 5 of the Bankruptcy Code or applicable state law ("Avoidance Actions", and the proceeds thereof,

24

"Avoidance Actions Proceeds"); and (z) a pledge of 100% of the Capital Stock of each Debtor's respective Subsidiaries, (collectively with (v)-(y), the "DIP Collateral"); subject only to (i) the Permitted Priority Liens (other than the Pre-Petition Liens), and (ii) prior payment of the Carve-Out.  Notwithstanding the foregoing, Avoidance Actions and Avoidance Actions Proceeds shall not constitute DIP Collateral until after the entry of the Final Order.

(c)     The DIP Liens shall be effective immediately upon the entry of this Interim Order and shall not at any time be made subject or subordinated to, or made *pari passu* with, any other lien, security interest or claim existing as of the Petition Date, or created under sections 363 or 364(d) of the Bankruptcy Code or otherwise, other than (i) the Permitted Priority Liens (other than the Pre-Petition Liens) as provided herein; and (ii) prior payment of the Carve-Out.

(d)     The DIP Liens shall be and hereby are deemed fully perfected liens and security interests, effective and perfected upon the date of this Interim Order, without the necessity of execution by the Debtors of mortgages, security agreements, pledge agreements, financing agreements, financing statements or any other agreements or instruments, such that no additional actions need be taken by the DIP Agent or the DIP Lenders to perfect such interests.

(e)     Those certain control agreements (collectively, the "Control Agreements"), entered into by and among RTI, certain other Pre-Petition Borrowers or Pre-Petition Guarantors (in each case, to the extent such Pre-Petition Borrowers or Pre-Petition Guarantors are party thereto), the Pre-Petition Agent and the applicable Bank (as defined in the proposed order attached as Exhibit A to the *Motion of Debtors for Order under Sections 105, 345, 363, 364, 503, 1107 and 1108 of the Bankruptcy Code Authorizing (I) Maintenance of Existing Bank Accounts; (II) Continuance of Existing Cash Management System, Bank Accounts, Checks and Related Forms; (III) Continued Performance of Intercompany Transactions; (IV) Limited Waiver of*

25

*Section 345(b) Deposit and Investment Requirements and (V) Granting Related Relief* (the "Cash Management Motion") and as listed in Exhibit B to the Cash Management Motion), shall inure to the benefit of the DIP Agent and the DIP Lenders.  Each Bank shall comply with instructions given to it by the DIP Agent (including at the direction of the Requisite Lenders in accordance with the DIP Credit Agreement), without the further consent of any other party to the applicable Control Agreement.  This Interim Order hereby amends each Control Agreement so that, until such time as the applicable Bank receives written notice from the DIP Agent (including at the direction of the Requisite Lenders in accordance with the DIP Credit Agreement), each reference to "Lender," "Collateral Agent" or "Secured Party" in the applicable Control Agreement is replaced by the DIP Agent.

10.     DIP Lenders' Superpriority Claim.  The DIP Agent, for the benefit of the DIP Secured Parties, is hereby granted an allowed superpriority administrative expense claim (the "DIP Superpriority Claim") pursuant to section 364(c)(1) of the Bankruptcy Code in each of the Debtors' Chapter 11 Cases and in any successor case(s) under the Bankruptcy Code (including any case or cases under chapter 7 of the Bankruptcy Code, the "Successor Case(s)") for all DIP Obligations, having priority over any and all other claims against the Debtors, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kinds specified in or arising or ordered under sections 105(a), 326, 328, 330, 331, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 726, 1113, and 1114 and any other provision of the Bankruptcy Code or otherwise, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, which allowed DIP Superpriority Claim shall be payable from and have recourse to all pre- and postpetition property of the Debtors, including all cash and cash equivalents, and all proceeds

26

thereof including, without limitation but subject to entry of a Final Order, any Avoidance Actions and Avoidance Actions Proceeds.  The DIP Superpriority Claim granted in this paragraph shall be subject and subordinate in priority of payment only to prior payment of the Carve-Out.  Except as referenced in this Interim Order, no other superpriority claims shall be granted or allowed in these Chapter 11 Cases or in any Successor Case(s).  The DIP Superpriority Claim shall be senior in all respects to any superpriority claims granted in these Chapter 11 Cases including, without limitation, on account of any break-up fee or expense reimbursement that may be granted by the Court in connection with any sale of the Debtors' assets and the Adequate Protection Superpriority Claim.

11.    <u>Survival of DIP Liens and DIP Superpriority Claim</u>.  The DIP Liens, DIP Superpriority Claim and other rights and remedies granted under this Interim Order to the DIP Agent, for the benefit of itself and the DIP Lenders, shall continue in this and any Successor Case(s) and shall be valid and enforceable against any trustee appointed in any or all of the Debtors' Chapter 11 Cases and/or upon the dismissal of any or all of the Debtors' Chapter 11 Cases or any Successor Case(s) and such liens and security interests shall maintain their priority as provided in this Interim Order until all the DIP Obligations have been indefeasibly paid in full in cash and the DIP Lenders' commitments have been terminated in accordance with the DIP Loan Documents.

<b><u>ADEQUATE PROTECTION FOR PRE-PETITION COLLATERAL USE</u></b>

12.    <u>Adequate Protection for Pre-Petition Secured Parties</u>.  As adequate protection for any diminution in the value of the Pre-Petition Collateral resulting from the incurrence of the DIP Obligations, the use of Cash Collateral securing the Pre-Petition Obligations, the granting of DIP Liens and the agreement of the Pre-Petition Secured Parties to subordinate their right to

27

receive payment from the proceeds of Pre-Petition Collateral to the prior payment of the Carve-Out (collectively, the "Diminution Claim"), the Pre-Petition Agent (on behalf of the Pre-Petition Lenders) is hereby granted (in each case subject to the DIP Liens, the DIP Superpriority Claim and prior payment of the Carve-Out) the following adequate protection:

(a) Adequate Protection Liens.    Subject to Paragraph 15 hereof, to secure the Diminution Claim, the Pre-Petition Agent, for itself and for the benefit of the Pre-Petition Lenders, is hereby granted (effective and perfected upon the date of this Interim Order and without the necessity of execution by the Debtors of mortgages, security agreements, pledge agreements, financing statements and/or other agreements or instruments) valid, perfected, postpetition security interests and liens (the "Replacement Liens") in and on all of the Pre-Petition Collateral, provided, however, that the Replacement Liens shall only be and remain subject and subordinate to (i) the DIP Liens and/or payment of any DIP Obligations on account thereof, (ii) the Permitted Priority Liens (other than the Pre-Petition Liens), and (iii) prior payment of the Carve-Out.

(b) Adequate Protection Superpriority Claims.  Subject to Paragraph 15 hereof, as further adequate protection for and solely to the extent of the Diminution Claim, the Pre-Petition Agent, for itself and for the benefit of the Pre-Petition Lenders, is hereby granted a superpriority claim with priority over all administrative expense claims and unsecured claims against the Debtors or their estates, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kind specified in or ordered pursuant to sections 105, 326, 328, 503(b), 506(c), 507(a), 507(b), 546(c), 552(b), 726, 1113 and 1114 and any other provision of the Bankruptcy Code (the "Adequate Protection Superpriority Claim"), which allowed Adequate Protection Superpriority Claim

28

shall be payable from and have recourse to all pre- and postpetition property of the Debtors, including all cash and cash equivalents, and all proceeds thereof including without limitation, but subject to and upon entry of the Final Order (and excluding avoidance actions against any of the Pre-Petition Secured Parties, in their capacities as such), any Avoidance Actions and Avoidance Actions Proceeds.  The Adequate Protection Superpriority Claim shall be subordinate and subject only to the DIP Superpriority Claim and prior payment of the Carve-Out.

(c)      Pre-Petition Secured Parties' Legal Fees and Expenses.  The Pre-Petition Secured Parties shall each receive from the Debtors payment of all reasonable and documented outstanding fees and expenses (the "Pre-Petition Fee Payments"), including, but not limited to, fees and expenses of legal counsel, incurred by the Pre-Petition Secured Parties, to the extent provided for under the Pre-Petition Credit Agreement.  The prior or simultaneous payment of all invoiced and outstanding Pre-Petition Fee Payments as of the Petition Date shall be a condition to funding of any portion of the DIP Loans.  The Pre-Petition Fee Payments are hereby approved and shall not be subject to disgorgement by any party for any reason.

(d)      As additional adequate protection, the Pre-Petition Secured Parties shall be entitled to (i) cash payment of post-petition interest on the Pre-Petition Obligations as such interest becomes due and payable at the applicable non-default rate thereunder and (ii) the additional benefits set forth in this Interim Order, including Paragraphs 14 (Restrictions on Use of Funds); 15 (Challenge Period); 17 (Estate Release); 19 (Section 506(c) Waiver Upon Entry of Final Order); 20 (No Marshaling); 21 (Equities of the Case Waiver Upon Entry of Final Order); and 35 (Sale/Conversion/Dismissal) hereof.

(e)    <u>Consent to Priming and Adequate Protection</u>.  The Pre-Petition Secured Parties consent to the Debtors' use of Cash Collateral securing the Pre-Petition Obligations and the priming provided for herein; <u>provided</u>, <u>however</u>, that such consent to the priming, the use of Cash Collateral securing the Pre-Petition Obligations and the sufficiency of the adequate protection provided for herein is expressly conditioned upon the entry of this Interim Order relating to the DIP Loan Documents and DIP Loans set forth herein, and such consent shall not be deemed to extend to any replacement or other debtor in possession financing other than the DIP Loans provided under the DIP Loan Documents; <u>provided</u>, <u>further</u>, that such consent shall be of no force and effect in the event this Interim Order is not entered and the DIP Loan Documents and DIP Loans as set forth herein are not approved.

## **CARVE-OUT; RESTRICTIONS ON USE OF FUNDS**

13.    <u>Carve-Out</u>.

(a)    The DIP Liens, the DIP Superpriority Claim, the Replacement Liens and the Adequate Protection Superpriority Claims shall be subject and subordinate only to prior payment of: (i) fees payable to the United States Trustee pursuant to 28 U.S.C. § 1930(a)(6) or to the Clerk of the Court (the "<u>Case Administration Fees</u>"), (ii) unpaid professional fees and expenses payable to any legal or financial advisors retained by the Debtors (the "<u>Debtors' Professional Fees</u>") or any Creditors' Committee (the "<u>Committee's Professional Fees</u>", and together with the Debtors' Professional Fees, the "<u>Professional Fees</u>") that are incurred or accrued prior to the date on which the DIP Agent provides written notice to the Debtors and the Creditors' Committee of the occurrence of either an Event of Default or the Maturity Date (such notice, the "<u>Carve-Out Trigger Notice</u>", and the date of a delivery of such notice to the Debtors and the Creditors' Committee (if any), the "<u>Carve-Out Trigger Date</u>"), but solely if, as

30

and to the extent such Professional Fees (whenever incurred prior to the Carve-Out Trigger

Date) are or have been provided for in, and are consistent with, the DIP Budget (subject to the

Permitted Variances) and are ultimately allowed by the Court pursuant to section 330 of the

Bankruptcy Code, including upon being earned and payable, any success fees and expenses

payable to any investment bank of the Debtors per the terms of its engagement letter approved

by the Requisite Lenders and any order of the Court approving such engagement and (iii)

unpaid (x) Debtors' Professional Fees incurred or accrued on or after the Carve-Out Trigger

Date in an aggregate amount not to exceed $100,000 and (y) Committee's Professional Fees

incurred or accrued on or after the Carve-Out Trigger Date in an aggregate amount not to

exceed $25,000, in each case under clauses (x) and (y) to the extent allowed at any time,

whether by interim order, procedural order or otherwise (clauses (i), (ii) and (iii), collectively,

the "Carve-Out", and clause (iii) alone, the "Capped Carve-Out").  Subject to the immediately

preceding sentence, so long as the Carve-Out Trigger Date has not occurred, the Debtors shall

be permitted to pay Case Administration Fees and Professional Fees allowed and payable

under Bankruptcy Code sections 330, 331, and 503, as provided in the DIP Loan Documents

and the DIP Budget (subject to the Permitted Variances).  Any payment of Carve-Out

expenses incurred after the occurrence of the Carve-Out Trigger Date, including any payment

of Professional Fees, shall permanently reduce the Capped Carve-Out on a dollar-for-dollar

basis.  Without limiting the generality of the foregoing, the Carve-Out shall not include, apply

to or be available for any success fee or similar payment to any professionals or other persons,

including, without limitation, any such fee payable in connection with a restructuring or asset

disposition with respect to any of the Debtors or otherwise unless otherwise agreed to in

[AM_ACTIVE 402640889_19]

writing by the DIP Agent and the Requisite Lenders (or all affected Lenders, as applicable) in accordance with the DIP Credit Agreement.

(b)    Prior to the Carve-Out Trigger Date: (i) an amount sufficient to pay the Professional Fees set forth in clause (a)(ii) above (excluding any success fees) may be funded by the Debtors on a weekly basis into a trust account held by the Debtors' general bankruptcy counsel (the "Professional Fee Trust Account") in the amount specified under the DIP Budget (without taking into consideration any Permitted Variances) for such week (the "Professional Fee Trust Weekly Amounts"), (ii) the Debtors shall be permitted to borrow under the DIP Credit Agreement to fund the Professional Fee Trust Weekly Amounts and (iii) the Debtors shall pay all Professional Fees allowed by the Court first from the Professional Fee Trust Account.    Following the Carve-Out Trigger Date, the Debtors shall be permitted to borrow under the DIP Credit Agreement to fund the Professional Fee Trust Account for all unpaid Professional Fees set forth in clauses (a)(ii) and (a)(iii) above, to the extent not previously funded.  Any excess amounts remaining in the Professional Fee Trust Account after payment of the Professional Fees shall be refunded to the Debtors and shall remain DIP Collateral.

(c)    Nothing contained in this Interim Order shall be construed:  (i) to exempt those persons hereafter receiving interim compensation payments or reimbursement of expenses pursuant to any such Court-approved procedure from the applicable provisions of bankruptcy law, including the requirements that such compensation or reimbursement be allowed on a final basis after the filing of appropriate fee applications, and, if applicable, any subsequent order of this Court requiring that such payments be disgorged, and/or (ii) as consent to the allowance of any fees and expenses referred to above, and shall not affect any right of the DIP Agent or the DIP Lenders to object to the reasonableness of such amounts.

32

14.    <u>Restrictions on Use of Funds</u>.  Notwithstanding anything in this Interim Order or the DIP Loan Documents to the contrary, no proceeds of the DIP Facility, any DIP Collateral or Pre-Petition Collateral (including, without limitation, Cash Collateral) or any portion of the Carve-Out may be used in any manner to (a) request authorization to obtain postpetition loans or other financial accommodations pursuant to section 364(c) or (d) of the Bankruptcy Code or otherwise, other than from the DIP Agent or DIP Lenders, unless the proceeds of such loans or accommodations are or will be sufficient, and will be used, to indefeasibly pay in full in cash all DIP Obligations, the Pre-Petition Obligations and the adequate protection obligations set forth in Paragraph 12 hereof, (b) pay any amount for any use not provided for under <u>Section 2.5</u> of the DIP Credit Agreement and as set forth in the DIP Budget (subject to the Permitted Variances), (c) investigate (except as set forth in Paragraph 15 below), assert, join, commence, support or prosecute any cause of action or claim, counter-claim, action, proceeding, application, motion, objection, defense or other contested matter seeking any order, judgment, determination or similar relief against the DIP Agent, the DIP Lenders, the Pre-Petition Agent or the Pre-Petition Lenders (in their respective capacities as such) or any of their respective Related Parties (in their respective capacities as such), with respect to any transaction, occurrence, omission, or action related to the DIP Liens, the DIP Obligations, the Pre-Petition Liens or the Pre-Petition Obligations, including, without limitation, (i) any Avoidance Actions or other actions arising under chapter 5 of the Bankruptcy Code; (ii) any action relating to any act or omission related to, or aspect of, the relationship between or among any of the DIP Agent, the DIP Lenders, the Pre-Petition Agent or the Pre-Petition Lenders (in their respective capacities as such), on the one hand, and the Debtors or any of their affiliates, on the other; (iii) any action with respect to the validity and extent of the DIP Obligations or the Pre-Petition Obligations or the validity,

33

perfection, extent, enforceability and/or priority of the DIP Liens, the Pre-Petition Liens or the Replacement Liens; (iv) any action seeking to invalidate, set aside, avoid or subordinate, in whole or in part, the DIP Liens, the Pre-Petition Liens or the Replacement Liens; or (v) any action that has the effect of preventing, hindering or delaying, whether directly or indirectly, the DIP Agent, the DIP Lenders, the Pre-Petition Agent or the Pre-Petition Lenders in respect of the enforcement of their liens and security interests in the DIP Collateral, Cash Collateral or the Pre-Petition Collateral; (d) pay any Claim of a Creditor (as such terms are defined in the Bankruptcy Code) without the prior written consent of the DIP Agent and the Requisite Lenders in accordance with the DIP Credit Agreement (or all affected Lenders to the extent required by the DIP Credit Agreement) unless otherwise approved by the Court; and/or (e) use or seek to use Cash Collateral or sell or otherwise dispose of DIP Collateral, unless otherwise permitted hereby or by the DIP Loan Documents, without the consent of the DIP Agent and the Requisite Lenders in accordance with the DIP Credit Agreement (or all affected Lenders to the extent required by the DIP Credit Agreement).  Notwithstanding the foregoing, up to $25,000 in the aggregate of proceeds of the DIP Loans, Cash Collateral and Carve-Out (collectively) may be used by a Creditors' Committee to investigate (but not to commence or pursue any litigation, objection, or challenge to) the Pre-Petition Obligations, the Pre-Petition Liens and/or claims against the Releases prior to the Challenge Period Termination Date (as each is defined below).

15.    <u>Reservation of Certain Third Party Rights and Bar of Challenges and Claims</u>.

(a)    The Debtors' acknowledgements, agreements and stipulations set forth in Paragraph D above (the "<u>Debtors' Stipulations</u>") shall be binding upon the Debtors upon entry of this Interim Order; <u>provided</u>, <u>however</u>, that the Debtors shall be permitted to share information with the Creditors' Committee upon a request therefor by the Creditors' Committee in

connection with the investigation of claims against the Releases and shall be permitted to use the proceeds of the DIP Loans, the DIP Collateral and the Cash Collateral to pay any Debtors' Professional Fees incurred in connection therewith.  The Debtors' Stipulations shall be binding upon each other party in interest, including the Creditors' Committee, if any, unless such Creditors' Committee or any other party in interest having standing other than the Debtors (or if these Chapter 11 Cases are converted to cases under chapter 7 prior to the expiration of the Challenge Period (as defined below), the chapter 7 trustee in such Successor Case(s)), first, commences, by the earlier of (x) with respect to any Creditors' Committee, the date that is sixty (60) calendar days from the formation of any Creditors' Committee, and (y) with respect to other parties in interest with requisite standing other than the Debtors or any Creditors' Committee, seventy-five (75) calendar days following the date of entry of the Interim Order (such time period established by the earlier of clauses (x) and (y), the "Challenge Period," and the date that is the next calendar day after the termination of the Challenge Period in the event that either (i) no Challenge (as defined below) is properly raised during the Challenge Period or (ii) such Challenge is fully and finally adjudicated, shall be referred to as the "Challenge Period Termination Date"), (A) a contested matter, adversary proceeding, or other action or "claim" (as defined in the Bankruptcy Code) challenging or otherwise objecting to the admissions, stipulations, findings or releases included in the Debtors' Stipulations or (B) a contested matter, adversary proceeding, or other action against any or all of the Pre-Petition Agent or the Pre-Petition Secured Parties in connection with or related to the Pre-Petition Obligations or the actions or inactions of the Pre-Petition Agent or the Pre-Petition Secured Parties arising out of or related to the Pre-Petition Obligations or otherwise, including, without limitation, any claim against the Pre-Petition Agent or any or all of the Pre-Petition Secured Parties in the nature of a

35

"lender liability" cause of action, setoff, counterclaim or defense to the Pre-Petition Obligations (including, but not limited to, those under sections 506, 544, 547, 548, 549, 550, and/or 552 of the Bankruptcy Code (in each case including a contested matter, adversary proceeding, or other action or "claim" brought derivatively on behalf of one or more Debtors' estates but excluding, solely for the purpose of this Interim Order, those under section 506(c) of the Bankruptcy Code) ((A) and (B) collectively, the "Challenges" and, each individually, a "Challenge"), and second, obtains a final, non-appealable order in favor of such party in interest sustaining any such Challenge in any such timely-filed contested matter, adversary proceeding, or other action.

(b)    Upon the Challenge Period Termination Date and for all purposes in these Chapter 11 Cases and any Successor Case(s), (i) all payments made to or for the benefit of the Pre-Petition Agent or the Pre-Petition Lenders pursuant to, or otherwise authorized by, this Interim Order or otherwise (whether made prior to, on, or after the Petition Date) shall be indefeasible and not be subject to counterclaim, set-off, subordination, recharacterization, defense, or avoidance, (ii) any and all such Challenges by any party in interest shall be deemed to be forever released, waived and barred, (iii) the Pre-Petition Obligations shall be deemed to be a fully allowed and fully secured claim within the meaning of section 506 of the Bankruptcy Code, and (iv) the Debtors' Stipulations in Paragraph D hereof and the releases in Paragraph 17 hereof shall be binding on all parties in interest, including any Creditors' Committee as if such parties had made such Debtors' Stipulations.

16.    <u>Prohibition on Granting of Additional Liens and Interests</u>.  No liens, claims, interests or priority status, other than the Carve-Out or Permitted Priority Liens, if any, having a lien or administrative priority superior to, *pari passu* with, or junior to that of the DIP Liens, the DIP Superiority Claim, the Adequate Protection Superiority Claims or the Replacement

36

Liens granted by this Interim Order, shall be granted while any portion of the DIP Obligations remain outstanding, or any commitment under the DIP Loan Documents remains in effect, without the prior written consent of the DIP Agent and the Requisite Lenders in accordance with the DIP Credit Agreement (or all affected Lenders to the extent required by the DIP Credit Agreement).

17.    <u>Release</u>.    The release, discharge, waivers, settlements, compromises and agreements set forth in this Paragraph 17 shall be deemed effective upon entry of the Interim Order, and subject only to the rights set forth in Paragraph 15 above.  The Debtors forever and irrevocably (a) release, discharge, and acquit the DIP Agent, the DIP Lenders, the Pre-Petition Agent and the Pre-Petition Lenders (in their respective capacities as such), and each of their respective former, current or future officers, employees, directors, agents, representatives, owners, members, partners, financial advisors, legal advisors, shareholders, managers, consultants, accountants, attorneys, affiliates and successors and predecessors in interest (in their respective capacities as such) (collectively, the "<u>Releases</u>") of and from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness and obligations, of every type, including, without limitation, any claims arising from any actions relating to any aspect of the relationship among the DIP Agent, the DIP Lenders, the Pre-Petition Lenders or the Pre-Petition Agent (in their respective capacities as such) and the Debtors and their affiliates including any equitable subordination or recharacterization claims or defenses, with respect to or relating to the DIP Obligations, the DIP Liens, the DIP Loan Documents, the Pre-Petition Obligations, the Pre-Petition Liens, the Pre-Petition Credit Agreement Documents, the Debtors' attempts to restructure the Pre-Petition Obligations, any and all claims and causes of action arising under title 11 of the United States Code and any and all claims regarding the

37

validity, priority, perfection, or avoidability of the liens or secured claims of the DIP Secured

Parties and the Pre-Petition Secured Parties; and (b) waive any and all defenses (including,

without limitation, offsets and counterclaims of any nature or kind) as to the validity, perfection,

priority, enforceability and non-avoidability of the DIP Obligations, the DIP Liens, the Pre-

Petition Obligations and the Pre-Petition Liens.

## REMEDIES; MODIFICATION OF AUTOMATIC STAY

18.     Remedies and Stay Modification.

(a)     The automatic stay provisions of section 362 of the Bankruptcy Code are, to the

extent applicable, vacated and modified without further application or motion to, or order from,

the Court, to the extent necessary so as to permit the following, and neither section 105 of the

Bankruptcy Code nor any other provision of the Bankruptcy Code or applicable law shall be

utilized to prohibit the exercise, enjoyment and enforcement of any of such rights, benefits,

privileges and remedies regardless of any change in circumstances (whether or not foreseeable):

(i)     Whether or not a Default or an Event of Default under the DIP Loan

Documents or a default by any of the Debtors of any of their obligations under this Interim Order

has occurred, (A) to require all cash, checks or other collections or proceeds from DIP Collateral

received by any of the Debtors to be deposited in accordance with the requirements of the DIP

Loan Documents, and to apply any amounts so deposited and other amounts paid to or received

by the DIP Agent and the DIP Lenders under the DIP Loan Documents in accordance with any

requirements of the DIP Loan Documents, (B) the right to file or record any financing

statements, mortgages or other instruments or other documents to evidence the security interests

in and liens upon the DIP Collateral, (C) the right to charge and collect any interest, fees, costs

and other expenses accruing at any time under the DIP Loan Documents as provided therein, and

[AM_ACTIVE 402640889_19]

(D) the right to give the Debtors any notice provided for in any of the DIP Loan Documents or this Interim Order.

(ii)    Subject to subparagraph (a)(iv) below, the automatic stay provisions of section 362 of the Bankruptcy Code are vacated and modified without the need for further Court order to permit the DIP Agent, for itself and on behalf of the DIP Lenders, upon the occurrence and during the continuance of an Event of Default, and without any interference from the Debtors or any other party in interest but subject to five (5) business days' prior written notice (which may be delivered by electronic mail) (the "Remedies Notice Period") to the Debtors, their counsel, counsel to any Creditors' Committee and the U.S. Trustee, to exercise all rights and remedies provided for in the DIP Loan Documents, this Interim Order or under other applicable bankruptcy and non-bankruptcy law including, without limitation, the right to (A) cease making DIP Loans and/or suspend or terminate the commitments under the DIP Loan Documents; (B) declare all DIP Obligations immediately due and payable; (C) take any actions reasonably calculated to preserve or safeguard the DIP Collateral or to prepare the DIP Collateral for sale; (D) foreclose or otherwise enforce the DIP Liens on any or all of the DIP Collateral; (E) set off any amounts held as Cash Collateral (including, without limitation, in any Cash Collateral account held for the benefit of the DIP Agent and DIP Lenders); and/or (F) exercise any other default-related rights and remedies under the under the DIP Loan Documents or this Interim Order.  The Remedies Notice Period shall run concurrently with any notice period provided for under the DIP Loan Documents.

(iii)    Upon the occurrence of an Event of Default or a default by any of the Debtors of any of their obligations under this Interim Order, and without being subject to the Remedies Notice Period, (A) the DIP Agent, for itself and the benefit of the DIP Lenders, may

immediately charge interest at the default rate set forth in the DIP Loan Documents and (B) twenty-four (24) hours after the DIP Agent delivers a notice of an Event of Default to the Borrower Representative, the DIP Agent shall, subject to the Carve-Out, have no further obligation to permit the continued use of Cash Collateral.

(iv)    The automatic stay of section 362(a) of the Bankruptcy Code, to the extent applicable, shall be deemed terminated without the necessity of any further action by the Court in the event that the Debtors, the Creditors' Committee, if any, and/or the U.S. Trustee have not obtained an order from this Court to the contrary prior to the expiration of the Remedies Notice Period.

(v)    If the DIP Lenders are entitled, and have elected in accordance with the provisions hereof, to direct the DIP Agent to enforce the DIP Liens or exercise any other default-related remedies following expiration of the Remedies Notice Period, the Debtors shall cooperate with the DIP Agent and the DIP Lenders in connection with such enforcement by, among other things, (A) providing at all reasonable times access to the Debtors' premises to representatives or agents of the DIP Agent or the DIP Lenders (including any collateral liquidator or consultant), (B) providing the DIP Agent and the DIP Lenders and their representatives or agents, at all reasonable times access to the Debtors' books and records and any information or documents requested by the DIP Agent or the DIP Lenders or their respective representatives, (C) performing all other obligations set forth in the DIP Loan Documents, and (D) taking reasonable steps to safeguard and protect the DIP Collateral, and the Debtors shall not otherwise interfere with or actively encourage others to interfere with the DIP Agent's or the DIP Lenders' enforcement of rights.

40

(vi)     Upon the occurrence and during the continuance of a Default or an Event of Default under the DIP Loan Documents, a violation of the terms of or an event of default under this Interim Order or occurrence of the Maturity Date, the DIP Agent, at the direction of the Requisite Lenders in accordance with the DIP Credit Agreement (or all affected Lenders to the extent required by the DIP Credit Agreement), shall have no further obligation to provide financing under the DIP Loan Documents.

(vii)     This Court shall retain exclusive jurisdiction to hear and resolve any disputes and enter any orders required by the provisions of this Interim Order and relating to the application, re-imposition or continuance of the automatic stay of section 362(a) of the Bankruptcy Code or other injunctive relief requested.

## **MISCELLANEOUS**

19.     <u>Limitation on Section 506(c) Claims</u>.  Subject to entry of the Final Order and as additional adequate protection for the use of Cash Collateral, no costs or expenses of administration which have been or may be incurred in these Chapter 11 Cases or any Successor Case(s) at any time shall be surcharged against, and no person may seek to surcharge any costs or expenses of administration against, the DIP Secured Parties, the Pre-Petition Secured Parties or any of their respective claims, the Carve-Out, the DIP Collateral or the Pre-Petition Collateral, pursuant to sections 105 or 506(c) of the Bankruptcy Code or otherwise, without the prior written consent, as applicable, of the DIP Agent and the Requisite Lenders in accordance with the DIP Credit Agreement (or all affected Lenders to the extent required by the DIP Credit Agreement). No action, inaction, or acquiescence by the DIP Secured Parties or the Pre-Petition Secured Parties shall be deemed to be or shall be considered evidence of any alleged consent to a

41

surcharge against the DIP Secured Parties, the Pre-Petition Secured Parties, any of their respective claims, the Carve-Out, the DIP Collateral or the Pre-Petition Collateral.

20.     <u>No Marshaling</u>.  The DIP Secured Parties and the Pre-Petition Secured Parties shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral or the Pre-Petition Collateral.  Without limiting the generality of the immediately preceding sentence, no party shall be entitled, directly or indirectly, to direct the exercise of remedies or seek (whether by order of this Court or otherwise) to marshal or otherwise control the disposition of the DIP Collateral after an Event of Default under the DIP Loan Documents or termination or breach under the DIP Loan Documents.

21.     <u>Equities of the Case Waiver Upon Entry of Final Order</u>.  The DIP Agent, the DIP Secured Parties and the Pre-Petition Secured Parties shall each be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and no person may assert an "equities of the case" claim under section 552(b) of the Bankruptcy Code against the DIP Secured Parties or the Pre-Petition Secured Parties with respect to proceeds, product, offspring or profits of any of the DIP Collateral or the Pre-Petition Collateral.

22.     <u>Additional Perfection Measures</u>.  The DIP Liens and the Replacement Liens shall be perfected by operation of law immediately upon entry of this Interim Order.  None of the Debtors, the DIP Secured Parties or the Pre-Petition Secured Parties shall be required to enter into or obtain landlord waivers, mortgagee waivers, bailee waivers, warehouseman waivers or any other waiver or consent, or to file or record financing statements, mortgages, deeds of trust, leasehold mortgages, notices of lien or similar instruments in any jurisdiction (including, trademark, copyright, trade name or patent assignment filings with the United States Patent and Trademark Office, Copyright Office or any similar agency with respect to intellectual property or

42

filings with any other federal agencies/authorities), or obtain consents from any licensor or similarly situated party-in-interest, or take any other action in order to validate and to perfect the DIP Liens or the Replacement Liens.

(a)    If the DIP Agent (including at the direction of the Requisite Lenders in accordance with the DIP Credit Agreement (or all affected Lenders to the extent required by the DIP Credit Agreement)), chooses to take any action to obtain consents from any landlord, licensor or other party in interest, to file mortgages, financing statements, notices of lien or similar instruments or to otherwise record or perfect such security interests and liens, the DIP Agent is hereby authorized, but not directed, to take such action or to request that the Debtors take such action on its behalf (and the Debtors are hereby authorized and directed to take such action), and no defect in any such act shall affect or impair the validity, perfection and enforceability of the liens granted hereunder.

(b)    In lieu of obtaining such consents or filing any such mortgages, financing statements, notices of lien or similar instruments, the DIP Agent may choose to file a true and complete copy of this Interim Order in any place at which any such instruments would or could be filed, together with a description of the Collateral, and such filing by the DIP Agent shall have the same effect as if such mortgages, deeds of trust, financing statements, notices of lien or similar instruments had been filed or recorded at the time and on the date of entry of this Interim Order.

23.    <u>Application of Collateral Proceeds</u>.  To the extent required by this Interim Order and the DIP Loan Documents, after an Event of Default, the Debtors are hereby authorized and directed to remit to the DIP Agent, subject to the payment of or reserve for the Carve-Out and allowed claims secured by Permitted Priority Liens (other than the Pre-Petition Liens) as

43

described herein, one-hundred percent (100%) of all collections on, and proceeds of, the DIP Collateral, and the automatic stay provisions of section 362 of the Bankruptcy Code are hereby modified to permit the DIP Agent or the DIP Lenders to retain and apply all collections, remittances, and proceeds of the DIP Collateral in accordance with the DIP Loan Documents.  In furtherance of the foregoing:

(a)        all cash, securities, investment property and other items of any Debtor deposited with any bank or other financial institution, other than the DIP Collateral Excluded Accounts (as defined in the Pledge and Security Agreement), shall be subject to a perfected, first priority security interest in favor of the DIP Agent (or its designee);

(b)        upon the occurrence of the Maturity Date and the expiration of the Remedies Notice Period, each bank or other financial institution with an account of any Debtor, other than the DIP Collateral Excluded Accounts (as defined in the Pledge and Security Agreement), is hereby authorized and instructed to (i) comply at all times with any instructions originated by the DIP Agent (or its designee) to such bank or financial institution directing the disposition of cash, securities, investment property and other items from time to time credited to such account, without further consent of any Debtor, including, without limitation, any instruction to send to the DIP Agent (or its designee) by wire transfer (to such account as the DIP Agent (or its designee) shall specify, or in such other manner as the DIP Agent (or its designee) shall direct) all such cash, securities, investment property and other items held by it and (ii) subject to entry of the Final Order, waive any right of set off, banker's lien or other similar lien, security interest or encumbrance as against the DIP Agent (or its designee);

(c)        any deposit account control agreement executed and delivered by any bank or other financial institution, any Debtor and the DIP Agent in connection with the DIP Loan

44

Documents shall establish control in favor of the DIP Agent of any and all accounts subject thereto and any and all cash, securities, investment property and other items of any Debtor deposited therein to secure the DIP Obligations; and

(d)     any deposit account control agreement executed and delivered by any bank or other financial institution, any Debtor and the Pre-Petition Agent prior to the Petition Date in connection with the Pre-Petition Credit Agreement Documents shall establish co-control in favor of the DIP Agent of any and all accounts subject thereto and any and all cash, securities, investment property and other items of any Debtor deposited therein to secure the DIP Obligations (provided that primary control rights shall vest in the DIP Agent), and all rights thereunder in favor of the Pre-Petition Agent shall inure also to the benefit of, and shall be exercisable exclusively by, the DIP Agent, until all of the DIP Obligations have been indefeasibly paid in full in cash, at which time exclusive control shall automatically revert to the Pre-Petition Agent.

24.     <u>Access to Collateral</u>. Notwithstanding anything contained herein to the contrary, and without limiting any other rights or remedies of the DIP Agent or the DIP Lenders contained in this Interim Order or the DIP Loan Documents, or otherwise available at law or in equity, and subject to the terms of the DIP Loan Documents, upon five (5) business days' written notice to the landlord, lienholder, licensor or other third party owner of any leased or licensed premises or intellectual property that an Event of Default under the DIP Loan Documents, or a default by any of the Debtors of any of their obligations under this Interim Order, has occurred and is continuing or that the Maturity Date has occurred, the DIP Agent (including at the direction of the Requisite Lenders in accordance with the DIP Credit Agreement (or all affected Lenders to the extent required by the DIP Credit Agreement)), (i) may, unless otherwise provided in any

45

separate agreement by and between the applicable landlord or licensor and the DIP Agent or the Pre-Petition Agent (the terms of which shall be reasonably acceptable to the parties thereto), enter upon any leased or licensed premises of any of the Debtors for the purpose of exercising any remedy with respect to DIP Collateral located thereon and (ii) shall be entitled to all of the Debtors' rights and privileges as lessee or licensee under the applicable lease or license and to use any and all trademarks, trade names, copyrights, licenses, patents or any other similar assets of the Debtors, which are owned by or subject to a lien of any third party and which are used by the Debtors in their businesses, in either the case of subparagraph (i) or (ii) of this paragraph, without interference from lienholders, landlords or licensors thereunder, subject to such lienholders', landlords', or licensors' rights under applicable law, provided, however, that the DIP Lenders shall pay only base rent payable during the period of such occupancy or use by the DIP Agent calculated on *a per diem* basis.  Nothing herein shall require the Debtors, the DIP Agent or the DIP Lenders to assume any lease or license under section 365(a) of the Bankruptcy Code as a precondition to the rights afforded to the DIP Agent and the DIP Lenders in this paragraph.

25.    [Reserved].

26.    Delivery of Documentation.  The Debtors (and/or their legal or financial advisors) shall deliver to the DIP Agent, counsel to the DIP Lenders, and, after the Maturity Date and the repayment of the DIP Obligations in full in cash, counsel to the Pre-Petition Lenders, all financial reports, budgets, forecasts, and all other legal or financial documentation, pleadings and/or filings that are either (i) required to be provided (by the Debtors and/or their legal or financial advisors) to the DIP Agent and/or the DIP Lenders pursuant to the DIP Loan Documents or the Pre-Petition Agent, as the case may be, or (ii) reasonably requested by the DIP

[AM_ACTIVE 402640889_19]

Agent and/or the DIP Lenders (or their legal and financial advisors) or by the Pre-Petition Agent and/or the Pre-Petition Lenders (or their advisors), as the case may be.

27.     <u>Access to Books and Records</u>.    The Debtors (and/or their legal and financial advisors) will (a) keep proper books, records and accounts in accordance with GAAP in which full, true, and correct entries shall be made of all dealings and transactions in relation to their business and activities, (b) cooperate, consult with and provide to the DIP Secured Parties all such information as required or allowed under the DIP Loan Documents or the provisions of this Interim Order or that is afforded to the Creditors' Committee and/or the Creditors' Committee's respective legal or financial advisors, (c) permit, consistent with the DIP Loan Documents, representatives of the DIP Secured Parties to visit and inspect any of their respective properties, to examine and make abstracts or copies from any of their respective books and records, to conduct a collateral audit and analysis of their respective inventory and accounts, to tour the Debtors' business premises and other properties, and to discuss, and provide advice with respect to, their respective affairs, finances, properties, business operations and accounts with their respective officers, employees and independent public accountants as often as may reasonably be desired, and (d) permit, consistent with the DIP Loan Documents, representatives of the DIP Secured Parties to consult with and advise the Debtors' management on matters concerning the general status of the Debtors' business, financial condition and operations.

28.     <u>Lenders Not Responsible Persons</u>.    In (a) making the decision to make the DIP Loans; (b) administering the DIP Loans; (c) extending other financial accommodations to the Debtors under the DIP Loan Documents; (d) making the decision to make the loans and financial accommodations under the Pre-Petition Credit Agreement Documents; (e) administering the loans and financial accommodations extended under the Pre-Petition Credit Agreement

[AM_ACTIVE 402640889_19]

Documents; (f) extending other financial accommodations to the Debtors under the Pre-Petition Credit Agreement Documents; and (g) making the decision to collect the indebtedness and obligations of the Debtors, none of the DIP Secured Parties or the Pre-Petition Secured Parties shall be considered to (x) owe any fiduciary obligation to the Debtors or any other party with respect to their exercise of any consent rights afforded them under the DIP Loan Documents or this Interim Order or (y) be exercising control over any operations of the Debtors or acting in any way as a responsible person, or as an owner or operator under any applicable law.

29.    <u>Successors and Assigns</u>.  The DIP Loan Documents and the provisions of this Interim Order shall be binding upon the Debtors, the DIP Agent, the DIP Lenders, the Pre-Petition Agent, the Pre-Petition Lenders and each of their respective successors and assigns, and shall inure to the benefit of the Debtors, the DIP Agent, the DIP Lenders, the Pre-Petition Agent, the Pre-Petition Lenders and each of their respective successors and assigns including, without limitation, any trustee, examiner with expanded powers, responsible officer, estate administrator or representative or similar person appointed in a case for any Debtor under any chapter of the Bankruptcy Code.  The terms and provisions of this Interim Order shall also be binding on all of the Debtors' creditors, equity holders and all other parties in interest, including, but not limited to a trustee appointed under chapter 7 or chapter 11 of the Bankruptcy Code.

30.    <u>Debtors Will Not Challenge Credit Bid Rights</u>.  Without prejudice to any rights or claims reserved pursuant to Paragraph 15 hereof as to any party in interest other than the Debtors (and subject to the limitations therein), no Debtor shall object to any DIP Lender credit bidding up to the full amount of its outstanding DIP Obligations or, subject to entry of the Final Order, any Pre-Petition Lender credit bidding up to the full amount of its outstanding Pre-Petition Obligations, in each case including, without limitation, any accrued interest and expenses, in any

48

sale of any DIP Collateral whether such sale is effectuated through section 363 of the Bankruptcy Code in a Chapter 11 or Chapter 7 proceeding, under section 1129 in a Chapter 11 proceeding, by a Chapter 7 trustee in a Chapter 7 proceeding or otherwise. The DIP Lenders and Pre-Petition Lenders expressly reserve the right to credit bid up to the full amount of their outstanding DIP Obligations or Pre-Petition Obligations, including, without limitation, all principal, interest, fees, expenses, call premiums, yield maintenance premiums and other fees and charges; provided, however, that the Debtors expressly preserve their rights to contest the allowance of any call premium and yield maintenance premium under the Pre-Petition Credit Agreement.

31.    Binding Nature of Agreement.  Each of the DIP Loan Documents to which any of the Debtors are or will become a party shall constitute legal, valid and binding obligations of the Debtors party thereto, enforceable in accordance with their terms.  The DIP Loan Documents have been or will be properly executed and delivered to the DIP Agent or the DIP Lenders by the Debtors, no later than one business day after entry of this Interim Order.  Unless otherwise consented to in writing, the rights, remedies, powers, privileges, liens and priorities of the DIP Agent, the DIP Lenders, the Pre-Petition Agent, and the Pre-Petition Lenders provided for in this Interim Order, the DIP Loan Documents or otherwise shall not be modified, altered or impaired in any manner by any subsequent order (including a confirmation or sale order), by any plan of reorganization or liquidation in these Chapter 11 Cases, by the dismissal or conversion of these Chapter 11 Cases or in any subsequent case under the Bankruptcy Code.

32.    Subsequent Reversal or Modification.  This Interim Order is entered pursuant to section 364 of the Bankruptcy Code, and Bankruptcy Rules 4001(b) and (c), granting the DIP Lenders all protections afforded by section 364(e) of the Bankruptcy Code.  If any or all of the

provisions of this Interim Order are hereafter reversed, modified, vacated or stayed, that action will not affect (a) the validity of any obligation, indebtedness or liability incurred hereunder by any of the Debtors to the DIP Agent, the DIP Lenders, the Pre-Petition Agent and the Pre-Petition Lenders, prior to the date of receipt by the DIP Agent and the Pre-Petition Agent of written notice of the effective date of such action or (b) the validity and enforceability of any lien or priority authorized or created under this Interim Order or pursuant to the DIP Loan Documents. Notwithstanding any such reversal, stay, modification or vacatur, any postpetition indebtedness, obligation or liability incurred by any of the Debtors to the DIP Agent, the DIP Lenders, the Pre-Petition Agent and the Pre-Petition Lenders prior to written notice to the DIP Agent and the Pre-Petition Agent of the effective date of such action, shall be governed in all respects by the original provisions of this Interim Order, and the DIP Agent, the DIP Lenders, the Pre-Petition Agent and the Pre-Petition Lenders, shall be entitled to all the rights, remedies, privileges and benefits granted herein and in the DIP Loan Documents with respect to all such indebtedness, obligations or liability.

33. <u>Collateral Rights</u>. If any party who holds a lien or security interest in DIP Collateral or Pre-Petition Collateral that is junior and/or subordinate to the DIP Liens, the Replacement Liens or the Pre-Petition Liens in such DIP Collateral or Pre-Petition Collateral receives or is paid the proceeds of such DIP Collateral or Pre-Petition Collateral prior to the indefeasible payment in full in cash and the complete satisfaction of (a) all DIP Obligations under the DIP Loan Documents and termination of the commitment in accordance with the DIP Loan Documents and (b) the Pre-Petition Obligations under the Pre-Petition Credit Agreement Documents, such junior or subordinate lienholder shall be deemed to have received, and shall hold, the proceeds of any such DIP Collateral or Pre-Petition Collateral in trust for the DIP

Lenders and the Pre-Petition Lenders and shall immediately turn over such proceeds for application by the DIP Agent and the Pre-Petition Agent to repay the DIP Obligations and the Pre-Petition Obligations in accordance with the DIP Loan Documents, the Pre-Petition Credit Agreement Documents and this Interim Order until indefeasibly paid in full in cash.

34.    <u>No Waiver</u>.  This Interim Order shall not be construed in any way as a waiver or relinquishment of any rights that the DIP Agent, DIP Lenders, Pre-Petition Agent or Pre-Petition Lenders may have to bring or be heard on any matter brought before this Court.

35.    <u>Sale/Conversion/Dismissal</u>.  If an order dismissing or converting any of these Chapter 11 Cases under sections 305 or 1112 of the Bankruptcy Code or otherwise, or appointing a chapter 11 trustee or a responsible officer or examiner with expanded powers, is at any time entered, such order shall provide that (a) the DIP Liens, the DIP Superpriority Claim, the Replacement Liens and the Adequate Protection Superpriority Claims granted hereunder and in the DIP Loan Documents shall continue in full force and effect, remain binding on all parties-in-interest, and maintain their priorities as provided in this Interim Order and the DIP Loan Documents until all DIP Obligations are indefeasibly paid in full in cash and completely satisfied and the commitments under the DIP Loan Documents are terminated in accordance with the DIP Loan Documents and (b) this Court shall retain jurisdiction, notwithstanding such dismissal, for purposes of enforcing the DIP Liens, the DIP Superpriority Claim, the Replacement Liens and the adequate protection obligations set forth in Paragraph 12 hereof.

36.    <u>Limits on Lenders' Liability</u>.  Nothing in this Interim Order or in any of the DIP Loan Documents, the Pre-Petition Credit Agreement Documents or any other documents related thereto shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Secured Parties, or, subject to Paragraph 15 of this Interim Order, the Pre-Petition Secured

Parties, of any liability for any claims arising from any and all activities by the Debtors or any of their subsidiaries or affiliates in the operation of their businesses or in connection with their restructuring efforts.

37.    <u>Priority of Terms</u>.  To the extent of any conflict between or among (a) the express terms or provisions of any of the DIP Loan Documents, the Motion, the Requested Relief, any other order of this Court or any other agreements, on the one hand, and (b) the terms and provisions of this Interim Order, on the other hand, unless such term or provision herein is phrased in terms of "as defined in" "as set forth in" or "as more fully described in" the DIP Loan Documents (or words of similar import), the terms and provisions of this Interim Order shall govern.

38.    <u>No Third Party Beneficiary</u>.  Except as explicitly set forth herein, no rights are created hereunder for the benefit of any third party, any creditor or any direct, indirect or incidental beneficiary.

39.    <u>Survival</u>.  Except as otherwise provided herein, (a) the protections afforded under this Interim Order, and any actions taken pursuant thereto, shall survive the entry of an order (i) dismissing any of these Chapter 11 Cases or (ii) converting any of these Chapter 11 Cases into a case pursuant to chapter 7 of the Bankruptcy Code, and (b) the DIP Liens, the Replacement Liens, the DIP Superpriority Claim and the Adequate Protection Superpriority Claim shall continue in these Chapter 11 Cases, in any such successor case or after any such dismissal. Except as otherwise provided herein, the DIP Liens, the Replacement Liens, the DIP Superpriority Claim and the Adequate Protection Superpriority Claim shall maintain their priorities as provided in this Interim Order, the Final Order and the DIP Loan Documents, and not be modified, altered or impaired in any way by any other financing, extension of credit,

52

incurrence of indebtedness (except with respect to any additional financing to be provided by the DIP Agent or the DIP Lenders in accordance with the Final Order), or any conversion of any of these Chapter 11 Cases into a case pursuant to chapter 7 of the Bankruptcy Code or dismissal of any of these Chapter 11 Cases or by any other act or omission until (i) all DIP Obligations are indefeasibly paid in full in cash and completely satisfied and the commitments under the DIP Loan Documents are terminated in accordance therewith, and (ii) the Pre-Petition Obligations have been or are deemed to have been satisfied in accordance with the Bankruptcy Code.

40.     <u>Adequate Notice/Scheduling of Final Hearing</u>.  The notice given by the Debtors of the Interim Hearing was given in accordance with Bankruptcy Rules and the Local Rules, such notice was sufficient under the particular circumstances and no other or further notice of the request for relief granted at the Interim Hearing is required.  The Debtors shall promptly mail copies of this Interim Order and notice of the Final Hearing to any known party affected by the terms of this Interim Order and/or Final Order and any other party requesting notice after the entry of this Interim Order.  Any objection to the relief sought at the Final Hearing shall be made in writing setting forth with particularity the grounds thereof, and filed with the Court and served so as to be *actually received* no later than seven (7) days prior to the Final Hearing at 4:00 p.m. (Eastern) by the following: (a) proposed counsel to the Debtors, Pachulski Stang Ziehl & Jones LLP, 10100 Santa Monica Blvd. 13th Foor, Los Angeles, CA 90067-4003 (Attn.: Richard Pachulski and Malhar S. Pagay); (b) counsel to GSSLG and GS Bank, (i) Cleary Gottlieb Steen & Hamilton LLP, One Liberty Plaza, New York, NY 10006 (Attn: Sean O'Neal and Jane VanLare); and (ii) Hunton Andrews Kurth LLP, Bank of America Plaza, Suite 4100, 600 Peachtree Street, N.E., Atlanta, GA 30308-2216 (Attn: Greta T. Griffith); (c) counsel to TCW Direct Lending LLC, TCW Skyline Lending, L.P., and TCW Brazos Fund LLC, Paul Hastings

53

LLP, 515 South Flower Street, Twenty-Fifth Floor, Los Angeles, CA 90071 (Attn: Justin Rawlins); (d) each Bank identified on Exhibit B attached to the Cash Management Motion, at the "Bank Name and Address" set forth therein; (e) the Office of the United States Trustee, 844 King Street, Suite 2207, Wilmington, DE 19801; and (f) any Creditors' Committee appointed in these cases.  The Court shall conduct a Final Hearing on the Requested Relief commencing on [___,] 2020 at [_____] (Eastern).

41.    <u>Immediate Binding Effect; Entry of Interim Order</u>.  This Interim Order shall be valid and fully effective immediately upon entry, notwithstanding the possible application of Bankruptcy Rules 6004(h), 7062, and 9014, or otherwise, and the Clerk of the Court is hereby directed to enter this Interim Order on the Court's docket in these Chapter 11 Cases.

42.    <u>Proofs of Claim</u>.  Notwithstanding any order of this Court to the contrary, the Pre-Petition Agent, Pre-Petition Lenders, DIP Agent and DIP Lenders hereby are relieved of any obligation or requirement to file proofs of claim in these Chapter 11 Cases with respect to any Pre-Petition Obligations or DIP Obligations and any other claims or liens granted hereunder or created hereby.  The Debtors' Stipulations shall be deemed to constitute a timely filed proof of claim for the Pre-Petition Agent and the Pre-Petition Lenders upon approval of this Interim Order, and the Pre-Petition Agent and the Pre-Petition Lenders shall be treated under section 502(a) of the Bankruptcy Code as if they each have filed a proof of claim.  Notwithstanding the foregoing, the Pre-Petition Agent and the Pre-Petition Lenders are hereby authorized and entitled, in their discretion, but not required, to file (and amend and/or supplement, as they see fit) a proof of claim and/or aggregate proofs of claim in each of these Chapter 11 Cases or Successor Case(s) for any claim allowed herein.

[AM_ACTIVE 402640889_19]

43.    <u>Retention of Jurisdiction</u>.  This Court shall retain exclusive jurisdiction over all matters pertaining to the implementation, interpretation and enforcement of this Interim Order.

Dated:  Wilmington, Delaware
                _____, 2020


          _____
              UNITED STATES BANKRUPTCY JUDGE

[AM_ACTIVE 402640889_19]

EXHIBIT A

**DIP CREDIT AGREEMENT**
**(without exhibits or schedules)**

[see attached]

**EXECUTION VERSION**

**DEBTOR-IN-POSSESSION
CREDIT AND GUARANTY AGREEMENT**

**dated as of [_____], 2020**

**among**

**RUBY TUESDAY, INC.,**
**as a Chapter 11 Debtor and Debtor-in-Possession and a Borrower,**

**CERTAIN SUBSIDIARIES OF RUBY TUESDAY, INC.**
**PARTY HERETO FROM TIME TO TIME,**
**each as a Chapter 11 Debtor and Debtor-in-Possession and as a Borrower,**

**RTI HOLDING COMPANY, LLC,**
**as a Chapter 11 Debtor and Debtor-in-Possession, Holdings and Borrower Representative,**

**CERTAIN OTHER CREDIT PARTIES**
**PARTY HERETO FROM TIME TO TIME,**
**each as a Chapter 11 Debtor and Debtor-in-Possession and as a Guarantor,**

**THE LENDERS PARTY HERETO FROM TIME TO TIME,**
**as Lenders,**

**and**

**GOLDMAN SACHS SPECIALTY LENDING GROUP, L.P.,**
**as Administrative Agent and Collateral Agent.**

_____

**$18,500,000 Senior Secured Credit Facility**

_____

## TABLE OF CONTENTS

**Page:**

SECTION 1.    DEFINITIONS AND INTERPRETATION ................................................................2

    1.1.    Definitions ................................................................................2

    1.2.    Accounting Terms .......................................................................30

    1.3.    Interpretation, etc ....................................................................30

SECTION 2.    LOANS AND EXISTING LETTERS OF CREDIT ..........................................30

    2.1.    Term Loans ................................................................................30

    2.2.    [Intentionally Reserved] ..............................................................32

    2.3.    Existing Letters of Credit and Purchase of Participations Therein ..................32

    2.4.    Pro Rata Shares; Availability of Funds ..............................................35

    2.5.    Use of Proceeds ........................................................................35

    2.6.    Evidence of Debt; Register; Notes ...................................................37

    2.7.    Interest on Loans ......................................................................37

    2.8.    Conversion/Continuation ..............................................................39

    2.9.    Default Interest .......................................................................40

    2.10.    Fees .................................................................................40

    2.11.    Scheduled Payments ...................................................................41

    2.12.    Voluntary Prepayments/Commitment Reductions ........................................41

    2.13.    Mandatory Prepayments/Commitment Reductions ........................................42

    2.14.    Application of Prepayments/Reductions ...............................................43

    2.15.    General Provisions Regarding Payments ...............................................44

    2.16.    Ratable Sharing .......................................................................45

    2.17.    Making or Maintaining LIBOR Rate Loans ..............................................46

    2.18.    Increased Costs; Capital Adequacy ...................................................48

    2.19.    Taxes; Withholding, etc ..............................................................49

    2.20.    Obligation to Mitigate ...............................................................52

    2.21.    Defaulting Lenders ...................................................................52

    2.22.    Removal or Replacement of a Lender ..................................................53

    2.23.    Appointment of Borrower Representative ..............................................54

    2.24.    Reallocation .........................................................................54

    2.25.    Priority and Liens ...................................................................55

SECTION 3.    CONDITIONS PRECEDENT ...............................................................56

    3.1.    Closing Date.................................................................................................56

    3.2.    Conditions to Each Credit Extension .........................................................58

SECTION 4.    REPRESENTATIONS AND WARRANTIES........................................59

    4.1.    Organization; Requisite Power and Authority; Qualification................59

    4.2.    Capital Stock and Ownership.....................................................................59

    4.3.    Due Authorization .......................................................................................60

    4.4.    No Conflict....................................................................................................60

    4.5.    Governmental Consents ..............................................................................60

    4.6.    Binding Obligation.......................................................................................60

    4.7.    Historical Financial Statements .................................................................60

    4.8.    [Intentionally Reserved]..............................................................................61

    4.9.    No Material Adverse Effect .........................................................................61

    4.10.    Insurance ......................................................................................................61

    4.11.    Adverse Proceedings, etc ............................................................................61

    4.12.    Filing of Tax Returns ..................................................................................61

    4.13.    Properties ......................................................................................................61

    4.14.    Environmental Matters................................................................................62

    4.15.    Pre-Petition Credit Documents ..................................................................62

    4.16.    Material Contracts; Franchise Agreements; Liquor Subsidiary
        Contracts.......................................................................................................62

    4.17.    Governmental Regulation ...........................................................................63

    4.18.    Use of Proceeds; Margin Stock...................................................................63

    4.19.    Employee Matters ........................................................................................63

    4.20.    [Intentionally Reserved.].............................................................................64

    4.21.    Certain Fees .................................................................................................64

    4.22.    Chapter 11 Case Matters ............................................................................64

    4.23.    Budget ...........................................................................................................64

    4.24.    Compliance with Statutes, etc ....................................................................64

    4.25.    Disclosure .....................................................................................................65

    4.26.    Sanctions; Anti-Terrorism and Anti-Corruption Laws ...........................65

    4.27.    Information Security Requirements; Personal Information ....................66

    4.28.    Food Safety ..................................................................................................66

    4.29.    Intellectual Property....................................................................................66

    4.30.    Accounts .......................................................................................................67

SECTION 5.    AFFIRMATIVE COVENANTS ....................................................67

    5.1.    Financial Statements and Other Reports...........................................67

    5.2.    Existence ....................................................................................71

    5.3.    Payment of Taxes and Claims......................................................71

    5.4.    Maintenance of Properties ...........................................................71

    5.5.    Insurance ....................................................................................72

    5.6.    Inspections .................................................................................72

    5.7.    Lenders Meetings........................................................................72

    5.8.    Compliance with Laws ...............................................................73

    5.9.    Environmental.............................................................................73

    5.10.    Subsidiaries ..............................................................................74

    5.11.    Additional Real Estate Assets ...................................................75

    5.12.    Information Security Requirements; Personal Information...............75

    5.13.    Further Assurances....................................................................75

    5.14.    Miscellaneous Business Covenants ...........................................76

    5.15.    Bankruptcy Matters; RSA .........................................................77

    5.16.    Compliance Protocols ...............................................................77

    5.17.    Use of Proceeds.........................................................................77

SECTION 6.    NEGATIVE COVENANTS .......................................................77

    6.1.    Indebtedness................................................................................78

    6.2.    Liens ...........................................................................................78

    6.3.    Equitable Lien ............................................................................79

    6.4.    No Further Negative Pledges ......................................................79

    6.5.    Restricted Junior Payments ........................................................79

    6.6.    Restrictions on Subsidiary Distributions ....................................79

    6.7.    Investments .................................................................................80

    6.8.    Bankruptcy Matters....................................................................80

    6.9.    Fundamental Changes; Disposition of Assets; Acquisitions .................81

    6.10.    Disposal of Subsidiary Interests................................................82

    6.11.    Sales and Lease-Backs..............................................................83

    6.12.    Transactions with Shareholders and Affiliates ...........................83

    6.13.    Conduct of Business; Foreign Subsidiaries ...............................83

    6.14.    Permitted Activities of Holdings and the Wicomico County Subsidiaries................................................83

    6.15.    Fiscal Year .................................................................................84

iii

| 6.16. | Deposit Accounts | 84 |
| 6.17. | Amendments to Organizational Agreements, Material Contracts and Liquor Subsidiary Contracts | 85 |
| 6.18. | Prepayments of Certain Indebtedness | 85 |
| 6.19. | Compliance With Anti-Terrorism Laws, Anti-Corruption Laws and Sanctions | 85 |
| 6.20. | Capital Stock | 86 |
| 6.21. | Board Fees | 86 |
| SECTION 7. | GUARANTY | 86 |
| 7.1. | Guaranty of the Obligations | 86 |
| 7.2. | Contribution by Guarantors | 86 |
| 7.3. | Payment by Guarantors | 87 |
| 7.4. | Liability of Guarantors Absolute | 87 |
| 7.5. | Waivers by Guarantors | 89 |
| 7.6. | Guarantors' Rights of Subrogation, Contribution, etc | 89 |
| 7.7. | Subordination of Other Obligations | 90 |
| 7.8. | Continuing Guaranty | 90 |
| 7.9. | Authority of any Credit Party | 90 |
| 7.10. | Financial Condition of Borrowers | 90 |
| 7.11. | Bankruptcy, etc | 91 |
| 7.12. | Discharge of Guaranty Upon Sale of Guarantor | 91 |
| 7.13. | Keepwell | 92 |
| SECTION 8. | EVENTS OF DEFAULT | 92 |
| 8.1. | Events of Default | 92 |
| 8.2. | [Intentionally Reserved] | 97 |
| 8.3. | Cooperation of Credit Parties | 97 |
| SECTION 9. | AGENTS | 97 |
| 9.1. | Appointment of Agents | 97 |
| 9.2. | Powers and Duties | 97 |
| 9.3. | General Immunity | 98 |
| 9.4. | Agents Entitled to Act as Lender | 99 |
| 9.5. | Lenders' Representations, Warranties and Acknowledgment | 99 |
| 9.6. | Right to Indemnity | 100 |
| 9.7. | Successor Administrative Agent and Collateral Agent | 100 |
| 9.8. | Collateral Documents and Guaranty | 101 |

iv

9.9.     Certain Agreements of Pre-Petition Agent ........................................................102

SECTION 10. MISCELLANEOUS ...................................................................................102

10.1.    Notices .................................................................................................................102

10.2.    Expenses ..............................................................................................................103

10.3.    Indemnity .............................................................................................................104

10.4.    Set-Off .................................................................................................................105

10.5.    Amendments and Waivers ...................................................................................105

10.6.    Successors and Assigns; Participations ...............................................................107

10.7.    Independence of Covenants .................................................................................110

10.8.    Survival of Representations, Warranties and Agreements ...................................110

10.9.    No Waiver; Remedies Cumulative .......................................................................110

10.10.   Marshalling; Payments Set Aside ........................................................................111

10.11.   Severability ..........................................................................................................111

10.12.   Obligations Several; Actions in Concert..............................................................111

10.13.   Headings ..............................................................................................................111

10.14.   APPLICABLE LAW ...........................................................................................111

10.15.   CONSENT TO JURISDICTION .........................................................................112

10.16.   WAIVER OF JURY TRIAL .................................................................................113

10.17.   Confidentiality .....................................................................................................113

10.18.   Usury Savings Clause ..........................................................................................114

10.19.   Counterparts .........................................................................................................115

10.20.   Effectiveness ........................................................................................................115

10.21.   Patriot Act ...........................................................................................................115

10.22.   Priority and Liens ................................................................................................115

10.23.   No Discharge; Survival of Claims .......................................................................115

SECTION 11. CROSS-GUARANTY OF BORROWERS ...............................................116

11.1.    Cross-Guaranty ....................................................................................................116

11.2.    Waivers by Borrowers ..........................................................................................116

11.3.    Benefit of Guaranty..............................................................................................116

11.4.    Waiver of Subrogation, Etc..................................................................................117

11.5.    Election of Remedies ...........................................................................................117

11.6.    Limitation.............................................................................................................117

11.7.    Contribution with Respect to Guaranty Obligations............................................118

11.8.    Liability Cumulative ............................................................................................119

v

11.9.    DIP Order Controls .............................................................................................119

**APPENDICES:**    A       Term Loan Commitments
                   B       Notice Addresses

**SCHEDULES:**     1.1(a)  Existing Letters of Credit
                   4.1     Jurisdictions of Organization
                   4.2     Capital Stock and Ownership
                   4.10    Insurance
                   4.13    Real Estate Assets
                   4.16    (a) Material Contracts; (b) Franchise Agreements; (c) Liquor
                           Subsidiary Contracts
                   4.20    Employee Benefit Plans
                   4.30    Accounts
                   6.1     Certain Indebtedness
                   6.2     Certain Liens
                   6.7     Certain Investments
                   6.9(c)  Certain Closing Date Real Estate Sale Contracts
                   6.9(d)  Minimum Sale Prices for certain Real Estate Assets
                   6.9(f)  RT Lodge Minimum Sale Price
                   6.12    Certain Affiliate Transactions
                   8.1     Milestones

**EXHIBITS:**      A-1     Funding Notice
                   A-2     Conversion/Continuation Notice
                   B       Term Loan Note
                   C       Compliance Certificate
                   D       Assignment Agreement
                   E       Certificate Regarding Non-Bank Status
                   F       Form of Budget
                   G       Closing Date Certificate
                   H       Counterpart Agreement

GS/RT – DIP Credit and Guaranty Agreement
81776891

## DEBTOR-IN-POSSESSION CREDIT AND GUARANTY AGREEMENT

This **DEBTOR-IN-POSSESSION CREDIT AND GUARANTY AGREEMENT**, dated as of [_____], 2020, is entered into by and among **RUBY TUESDAY, INC.,** a Georgia corporation (**"RTI"**), as a Borrower, **CERTAIN SUBSIDIARIES OF RTI PARTY HERETO FROM TIME TO TIME**, as Borrowers, **RTI HOLDING COMPANY, LLC,** a Delaware limited liability company (**"Holdings"**), as Borrower Representative, **HOLDINGS AND CERTAIN SUBSIDIARIES OF RTI**, as Guarantors, each such Borrower and Guarantor as a Chapter 11 Debtor and Debtor-in-Possession, the Lenders party hereto from time to time, **GOLDMAN SACHS SPECIALTY LENDING GROUP, L.P.** (**"GSSLG"**), as administrative agent (**"Administrative Agent"**) and collateral agent (**"Collateral Agent"**), and **GOLDMAN SACHS BANK USA** (**"GS Bank"**), as the issuer of the Existing Letters of Credit (**"Issuing Bank"**).

## RECITALS:

**WHEREAS**, capitalized terms used in the Preamble and these Recitals and not otherwise defined shall have the respective meanings set forth for such terms in Section 1.1;

**WHEREAS**, on October 7, 2020 (the **"Petition Date"**), Borrowers and Guarantors filed voluntary petitions and initiated proceedings under Chapter 11 of the Bankruptcy Code (collectively, the **"Cases"**) with the United States Bankruptcy Court for the District of Delaware (the **"Bankruptcy Court"**), and have continued in possession of their respective assets and in the management of their respective businesses pursuant to Sections 1107 and 1108 of the Bankruptcy Code;

**WHEREAS**, Borrowers and Guarantors are party to (i) that certain Credit and Guaranty Agreement, dated as of December 21, 2017 (as amended, modified or supplemented from time to time prior to the Petition Date, the **"Pre-Petition Credit Agreement"**), among Borrowers, Guarantors, the lenders party thereto (collectively, the **"Pre-Petition Lenders"**), GS Bank, as Issuing Bank (as defined therein) and GSSLG, as administrative agent and collateral agent (in such capacities, the **"Pre-Petition Agent"**), pursuant to which Borrowers and Guarantors executed and delivered various Credit Documents, as defined therein (collectively with the Pre-Petition Credit Agreement, the **"Pre-Petition Credit Documents"**) which, among other things, guaranteed and secured the obligations of all of the Borrowers and Guarantors under the Pre-Petition Credit Agreement, and (ii) that certain Restructuring Support Agreement, dated as of [_____], 2020 (the **"RSA"**), among Borrowers, Guarantors, the Pre-Petition Lenders and the Pre-Petition Agent;

**WHEREAS**, in accordance with the terms of the RSA and the terms hereof, the Pre-Petition Lenders have agreed to extend a debtor-in-possession, super-priority, senior secured credit facility to Borrowers, in an aggregate principal amount not to exceed $18,500,000, consisting of a $18,500,000 aggregate principal amount of Term Loans (including a $9,600,000 sub-facility to be used solely for the reimbursement to Issuing Bank for any draws under the Existing Letters of Credit), the proceeds of which will be used in accordance with the Budget or to so reimburse Issuing Bank;

**WHEREAS**, on the Seventh Amendment Effective Date, certain loans were advanced to the Credit Parties, which loans shall be "rolled up" and deemed to have been issued under this Agreement on the Closing Date in accordance with the terms hereof; and

**WHEREAS**, in connection therewith, (i) each Borrower has agreed to secure all of its respective Obligations by granting to Collateral Agent, for the benefit of Secured Parties, a First Priority Lien on substantially all of its respective assets, including a pledge of 100% of the Capital Stock of each of its respective Subsidiaries, and (ii) each Guarantor has agreed to guarantee the Obligations of the other Credit Parties and to secure all of its respective Obligations by granting to Collateral Agent, for the benefit of Secured Parties, a First Priority Lien on substantially all of its respective assets, including a pledge of 100% of the Capital Stock of each of its respective Subsidiaries (including, with respect to Holdings, RTI);

**NOW, THEREFORE**, in consideration of the premises and the agreements, provisions and covenants herein contained, the parties hereto agree as follows:

## SECTION 1.  DEFINITIONS AND INTERPRETATION

**1.1.    Definitions.**  The following terms used herein, including in the Preamble, Recitals, Appendices, Schedules and Exhibits, shall have the following meanings:

"**13-Week Forecast**" as defined in <u>Section 5.1(k)</u>.

"**Adjusted LIBOR Rate**" means, for any Interest Rate Determination Date with respect to an Interest Period for a LIBOR Rate Loan, the rate equal to the greater of (x) 1.00% per annum, and (y) the rate per annum obtained by <u>dividing</u> (a) (i) the rate per annum equal to the rate determined by Administrative Agent to be the London interbank offered rate administered by the ICE Benchmark Administration (or any other Person that takes over the administration of that rate) for deposits (for delivery on the first day of such period) with a term equivalent to such period in Dollars displayed on the ICE LIBOR USD page of the Reuters Screen (or any replacement Reuters page that displays such rate) or on the appropriate page of any other information service that publishes that rate from time to time in place of Reuters, determined as of approximately 11:00 a.m. (London, England time) on such Interest Rate Determination Date, or (ii) in the event the rate referenced in the preceding <u>clause (i)</u> is not available, the rate per annum equal to the offered quotation rate to first class banks in the London interbank market by JPMorgan Chase Bank, N.A.) for deposits (for delivery on the first day of the relevant period) with a term equivalent to such period in Dollars, determined as of approximately 11:00 a.m. (London, England time) on such Interest Rate Determination Date, <u>by</u> (b) an amount equal to (i) one, <u>minus</u> (ii) the Applicable Reserve Requirement.

"**Administrative Agent**" as defined in the Preamble.

"**Adverse Proceeding**" means any action, suit, proceeding (whether administrative, judicial or otherwise), governmental investigation or arbitration (whether or not purportedly on behalf of any Credit Party or any of its Subsidiaries) at law or in equity, or before or by any Governmental Authority, domestic or foreign (including any Environmental Claims), whether pending or, to the knowledge of any Credit Party or any of its Subsidiaries, threatened against or affecting any Credit Party or any of its Subsidiaries or any property of any Credit Party

2

or any of its Subsidiaries, excluding the Cases (but including, for the avoidance of doubt, any such action, suit, proceeding, governmental investigation or arbitration arising after the Petition Date, as well as any adversary proceedings or other actions in the Cases).

"**Affected Lender**" as defined in <u>Section 2.17(b)</u>.

"**Affected Loans**" as defined in <u>Section 2.17(b)</u>.

"**Affiliate**" means, as applied to any Person, any other Person directly or indirectly controlling, controlled by, or under common control with such Person, including the possession, directly or indirectly, of the power to vote, appoint directors (or similar governing body), direct or cause the direction of the management and policies of such Person, whether through voting Securities, or by contract or otherwise.  For the purposes of this definition, "control" (including, with correlative meanings, the terms "controlling," "controlled by" and "under common control with"), as applied to any Person, means the possession, directly or indirectly, of the power to vote 5% or more of the Securities having ordinary voting power for the election of directors (or similar governing body) of such Person.

"**Agent**" means each of Administrative Agent and Collateral Agent.

"**Aggregate Amounts Due**" as defined in <u>Section 2.16</u>.

"**Aggregate Payments**" as defined in <u>Section 7.2</u>.

"**Agreement**" means this Debtor-in-Possession Credit and Guaranty Agreement, dated as of the Closing Date, as amended, restated, supplemented or otherwise modified from time to time.

"**Allocable Amount**" as defined in <u>Section 11.7</u>.

"**Anti-Corruption Laws**" means any requirement of law related to bribery or anti-corruption, including the United States Foreign Corrupt Practices Act of 1977, as now and hereafter in effect, or any successor statute.

"**Anti-Terrorism Law**" means any requirement of law related to money laundering or financing terrorism, including the Patriot Act, the Currency and Foreign Transactions Reporting Act (also known as the "Bank Secrecy Act," 31 U.S.C. §§5311-5330 and 12 U.S.C. §§1818(s), 1820(b) and 1951-1959), the Trading With the Enemy Act (50 U.S.C. §1 <u>et seq</u>., as amended), Executive Order 13224 (effective September 24, 2001) and each of the foreign assets control regulations of the United States Treasury Department (31 C.F.R., Subtitle B, Chapter V, as amended), in each case, as now and hereafter in effect, or any successor statutes.

"**Applicable Margin**" means (a) with respect to Loans that are LIBOR Rate Loans, a percentage, per annum, equal to 10.00% and (b) with respect to Loans that are Base Rate Loans, a percentage, per annum, equal to 9.00%.

"**Applicable Reserve Requirement**" means, at any time, for any LIBOR Rate Loan, the maximum rate, expressed as a decimal, at which reserves (including any basic marginal,

3

special, supplemental, emergency or other reserves) are required to be maintained with respect thereto against "Eurocurrency liabilities" (as defined in Regulation D of the Board of Governors of the Federal Reserve System, as in effect from time to time) under regulations issued from time to time by the Board of Governors of the Federal Reserve System or other applicable banking regulator.  Without limiting the effect of the foregoing, the Applicable Reserve Requirement shall reflect any other reserves required to be maintained by such member banks with respect to (a) any category of liabilities which includes deposits by reference to which the applicable Adjusted LIBOR Rate or any other interest rate of a Loan is to be determined or (b) any category of extensions of credit or other assets which include LIBOR Rate Loans.  A LIBOR Rate Loan shall be deemed to constitute Eurocurrency liabilities and as such shall be deemed subject to reserve requirements without benefits of credit for proration, exceptions or offsets that may be available from time to time to the applicable Lender.  The rate of interest on LIBOR Rate Loans shall be adjusted automatically on and as of the effective date of any change in the Applicable Reserve Requirement.

**"Approved Electronic Communication"** as defined in Section 10.1(b).

**"Asset Sale"** means a sale, lease or sublease (as lessor or sublessor), sale and leaseback, assignment, conveyance, transfer, license or other disposition to, or any exchange of property with, any Person (other than another Credit Party which is not Holdings), in one transaction or a series of transactions, of all or any part of any Credit Party's or any of its Subsidiaries' businesses, assets or properties of any kind, whether real, personal, or mixed and whether tangible or intangible, whether now owned or hereafter acquired, including the Capital Stock of any Credit Party or any of its Subsidiaries, other than inventory sold or leased in the ordinary course of business.  For purposes of clarification, **"Asset Sale"** shall include (a) the sale or other disposition for value of any contracts (including, for the avoidance of doubt, any assignment(s) or potential assignment(s) of any applicable purchase options and similar rights by the Credit Parties under any leases or similar agreements), and (b) the early termination or modification of any contract resulting in the receipt by any Credit Party or any of its Subsidiaries of a Cash payment or other consideration in exchange for such event (other than payments in the ordinary course for accrued and unpaid amounts due through the date of termination or modification).

**"Assignment Agreement"** means an assignment and assumption agreement substantially in the form of Exhibit D, with such amendments or modifications as may be approved by Administrative Agent.

**"Authorized Officer"** means, as applied to any Person, any individual holding the position of chairman of the board (if an officer), chief executive officer, president or one of its vice presidents (or the equivalent thereof), and such Person's chief financial officer or treasurer.

**"Avoidance Actions"** as defined in Section 2.25.

**"Bankruptcy Court"** as defined in the Recitals hereto.

**"Bankruptcy Code"** means Title 11 of the United States Code entitled "Bankruptcy," as now and hereafter in effect, or any successor statute.

"**Bankruptcy Plan**" means a chapter 11 plan of reorganization or liquidation for the Credit Parties that is prepared and distributed in accordance with the Bankruptcy Code, provides for the indefeasible payment in full in Cash of all of the Obligations, in any case, consistent in all respects with the terms of the RSA and otherwise in form and substance reasonably satisfactory to Administrative Agent and Lenders (including with respect to the treatment of any outstanding Pre-Petition Obligations).

"**Base Rate**" means, for any day, a rate per annum equal to the greatest of (a) the Prime Rate in effect on such day, (b) the Federal Funds Effective Rate in effect on such day, plus 0.50%, and (c) 4.00% per annum. Any change in the Base Rate due to a change in the Prime Rate or the Federal Funds Effective Rate shall be effective on the effective day of such change in the Prime Rate or the Federal Funds Effective Rate, respectively.

"**Base Rate Loan**" means a Loan bearing interest at a rate determined by reference to the Base Rate.

"**Beneficiary**" means each Agent, Issuing Bank and Lender.

"**Blocked Person**" as defined in Section 4.26.

"**Borrower**" means RTI and each Subsidiary of RTI indicated on the signature pages hereto as a "Borrower." For the avoidance of doubt, the term "Borrower" shall also include any entity joined as a Borrower to this Agreement and the other Credit Documents after the Closing Date pursuant to Section 5.10.

"**Borrower Representative**" means Holdings, as Borrower Representative pursuant to Section 2.23.

"**Budget**" means a rolling cash forecast, in Microsoft Excel format, in form, scope and substance satisfactory to Lenders, for a period of thirteen (13) weeks, beginning on the Petition Date and updated at least once every four (4) weeks thereafter in accordance with the terms hereof, setting forth projected cash flows and disbursements; provided, (i) a cash forecast substantially in the form, scope and substance as attached hereto as Exhibit F shall be deemed satisfactory to Lenders and (ii) any updated budget proposed by the Credit Parties shall not replace the then existing Budget except to the extent approved by Administrative Agent and the Lenders in their sole discretion.

"**Business Day**" means (a) any day excluding Saturday, Sunday and any day which is a legal holiday under the laws of the State of New York or the State of Texas or is a day on which banking institutions located in either such state are authorized or required by law or other governmental action to close, and (b) with respect to all notices, determinations, fundings and payments in connection with the Adjusted LIBOR Rate or any LIBOR Rate Loans, any day which is a Business Day described in clause (a) of this definition and which is also a day for trading by and between banks in Dollar deposits in the London interbank market.

"**Capital Lease**" means, as applied to any Person, any lease of any property (whether real, personal or mixed) by that Person (a) as lessee that, in conformity with GAAP, is or should be accounted for as a capital lease on the balance sheet of that Person or (b) as lessee

which is a transaction of a type commonly known as a "synthetic lease" (i.e., a transaction that is treated as an operating lease for accounting purposes but with respect to which payments of rent are intended to be treated as payments of principal and interest on a loan for federal income Tax purposes).

"**Capital Stock**" means any and all shares, interests, participations or other equivalents (however designated) of capital stock of a corporation, any and all equivalent ownership interests in a Person (other than a corporation), including partnership interests and membership interests, and any and all warrants, rights or options to purchase or other arrangements or rights to acquire any of the foregoing.

"**Carve-Out**" as defined in the Interim Order or, following entry of the Final Order, the Final Order.

"**Cases**" as defined in the Recitals hereto.

"**Cash**" means money, currency or a credit balance in any demand or Deposit Account; provided, however, notwithstanding anything to the contrary contained herein, for purposes of calculating compliance with the requirements of Sections 3 and 6 "**Cash**" shall exclude any amounts that would not be considered "cash" under GAAP or "cash" as recorded on the books of the Credit Parties.

"**Cash Collateral**" as defined in the Interim Order or, following entry of the Final Order, the Final Order.

"**Cash Equivalents**" means, as at any date of determination, (a) marketable securities (i) issued or directly and unconditionally guaranteed as to interest and principal by the United States government or (ii) issued by any agency of the United States the obligations of which are backed by the full faith and credit of the United States, in each case maturing within one (1) year after such date; (b) marketable direct obligations issued by any state of the United States or any political subdivision of any such state or any public instrumentality thereof, in each case maturing within one (1) year after such date and having, at the time of the acquisition thereof, a rating of at least A-1 from S&P or at least P-1 from Moody's; (c) commercial paper maturing no more than one (1) year from the date of creation thereof and having, at the time of the acquisition thereof, a rating of at least A-1 from S&P or at least P-1 from Moody's; (d) certificates of deposit or bankers' acceptances maturing within one (1) year after such date and issued or accepted by any Lender or by any commercial bank organized under the laws of the United States or any state thereof or the District of Columbia that (i) is at least "adequately capitalized" (as defined in the regulations of its primary federal banking regulator) and (ii) has Tier 1 capital (as defined in such regulations) of not less than $100,000,000; and (e) shares of any money market mutual fund that (i) has substantially all of its assets invested continuously in the types of investments referred to in clauses (a) and (b) of this definition, (ii) has net assets of not less than $500,000,000 and (iii) has the highest rating obtainable from either S&P or Moody's.

"**Certificate Regarding Non-Bank Status**" means a certificate of an applicable Lender substantially in the form of Exhibit E, with such amendments or modifications as may be approved by Administrative Agent.

6

"**Change of Control**" means, at any time, (a) Sponsor shall cease to beneficially own and control, directly or indirectly, at least 75% on a fully diluted basis of the economic and voting interests in the voting Capital Stock of Holdings; (b) any Person or "group" (within the meaning of Rules 13d-3 and 13d-5 under the Exchange Act) other than Sponsor, SFI or Co-Invest (in the case of each of SFI and Co-Invest, solely with respect to the Capital Stock owned by such Person on the Closing Date, or Capital Stock issued to SFI upon conversion of the Capital Stock of Holdings owned by SFI as of the Closing Date) (i) shall have acquired beneficial ownership of 15% or more on a fully diluted basis of the voting and/or economic interest in the Capital Stock of Holdings or (ii) shall have obtained the power (whether or not exercised) to appoint, replace or remove the manager of Holdings; (c) Sponsor's Management Advisor shall cease to be the manager of Holdings; (d) Aziz Hashim shall cease to exert exclusive management control over Sponsor's Management Advisor; (e) Holdings shall cease to beneficially own and control 100% on a fully diluted basis of the economic and voting interest in the Capital Stock of RTI; (f) (i) the board of directors of RTI shall cease to consist of 5 directors, (ii) at least two of the members of the board of directors of RTI cease to be independent directors, (iii) either of the independent directors appointed to the board of directors of RTI prior to the Petition Date shall fail to serve in such capacity for any reason whatsoever, unless a replacement satisfactory to the Requisite Lenders is appointed within 10 Business Days, or (iv) the affirmative vote of at least 1 independent director shall cease to be required for decisions regarding restructuring, executive compensation or transactions with Affiliates; or (g) RTI shall cease to beneficially own and control, directly or indirectly, (i) 100% on a fully diluted basis of the economic and voting interest in the Capital Stock of any of its Subsidiaries (other than the Maryland Liquor Subsidiaries) and (ii) the economic and voting interest in the Capital Stock of the Maryland Liquor Subsidiaries as disclosed on Schedule 4.2; provided, nothing in this clause (g) is intended to limit any action expressly permitted by this Agreement.

"**Closing Date**" means [_____], 2020.

"**Closing Date Certificate**" means a certificate of an Authorized Officer of Holdings substantially in the form of Exhibit G.

"**Co-Invest**" means NRD RT Holdings LLC, a Delaware limited liability company.

"**Collateral**" means, collectively, all of the real, personal and mixed property (including Capital Stock) of the Credit Parties in which Liens are granted or purported to be granted pursuant to the Collateral Documents, the Interim Order or the Final Order as security for the Obligations.

"**Collateral Agent**" as defined in the Preamble.

"**Collateral Assignment of Contracts**" means that certain Collateral Assignment of Contracts, dated as of the Closing Date, with respect to the collateral assignment of the Liquor Subsidiary Contracts related to the use of liquor licenses in the operation of Restaurant(s) in Maryland.

"**Collateral Document**" means any of the Pledge and Security Agreement, any control agreements with respect to the Controlled Accounts, the Mortgages, each Collateral

Assignment of Contracts and all other instruments, documents and agreements delivered by any Credit Party pursuant to this Agreement or any of the other Credit Documents in order to grant or purport to grant to Collateral Agent, for the benefit of Secured Parties, a Lien on any real, personal or mixed property of that Credit Party as security for the Obligations.

**"Commitment"** means any Term Loan Commitment.

**"Committee"** means any official committee of unsecured creditors appointed pursuant Section 1102 of the Bankruptcy Code in the Cases.

**"Commodity Exchange Act"** means the Commodity Exchange Act (7 U.S.C. § 1 et seq.), as amended from time to time, and any successor statute.

**"Compliance Certificate"** means a certificate of the chief financial officer of Borrower Representative (or other senior executive officer of Borrower Representative or RTI who has financial expertise and is familiar with the terms and conditions of this Agreement and the financial statements and financial condition of Holdings and its Subsidiaries) substantially in the form of Exhibit C.

**"Consolidated Capital Expenditures"** means, for any period, the aggregate of all expenditures of Holdings and its Subsidiaries during such period determined on a consolidated basis that, in accordance with GAAP, are or should be included in "purchase of property and equipment or which should otherwise be capitalized" or similar items reflected in the consolidated statement of cash flows of Holdings and its Subsidiaries.

**"Contractual Obligation"** means, as applied to any Person, any provision of any Security issued by that Person or of any indenture, mortgage, deed of trust, contract, undertaking, agreement or other instrument to which that Person is a party or by which it or any of its properties is bound or to which it or any of its properties is subject.

**"Contributing Guarantors"** as defined in Section 7.2.

**"Controlled Account"** means a Deposit Account or a securities account of a Credit Party which is subject to the control of Collateral Agent, for the benefit of the Secured Parties, in accordance with the terms of the Pledge and Security Agreement, the terms hereof and the terms of a satisfactory control agreement (including, for the avoidance of doubt, in reliance on Section 9.9).

**"Controlled Entity"** means any Credit Party's Controlled Affiliates. As used in this definition, **"Controlled"** means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting Securities, by contract or otherwise.

**"Conversion/Continuation Date"** means the effective date of a continuation or conversion, as the case may be, as set forth in the applicable Conversion/Continuation Notice.

**"Conversion/Continuation Notice"** means a conversion/continuation notice substantially in the form of Exhibit A–2.

8

"**Counterpart Agreement**" means a counterpart agreement substantially in the form of Exhibit H delivered by Borrower Representative and each New Subsidiary pursuant to Section 5.10.

"**Credit Date**" means the date of a Credit Extension.

"**Credit Document**" means any of this Agreement, the Notes, if any, the Collateral Documents, the Orders, the Closing Date Certificate, any documents or certificates executed by a Credit Party in favor of Issuing Bank relating to the Existing Letters of Credit and all other documents, instruments or agreements executed and delivered by a Credit Party or any other Person for the benefit of any Agent, Issuing Bank or any Lender in connection herewith.

"**Credit Extension**" means the making of a Loan or the deemed issuance of each Existing Letter of Credit hereunder on or after the Closing Date.

"**Credit Party**" means each Borrower and each Guarantor.

"**Current Rate**" as defined in Section 2.7(a).

"**Default**" means a condition or event that, after notice or lapse of time or both, would constitute an Event of Default.

"**Default Excess**" means, with respect to any Defaulting Lender, the excess, if any, of such Defaulting Lender's Pro Rata Share of the aggregate outstanding principal amount of Loans of all Lenders (calculated as if all Defaulting Lenders (other than such Defaulting Lender) had funded all of their respective Defaulted Loans) over the aggregate outstanding principal amount of all Loans of such Defaulting Lender.

"**Default Period**" means, with respect to any Defaulting Lender, the period commencing on the date of the applicable Funding Default, violation of Section 9.5(c) or other circumstances set forth in Section 2.21, and ending on the earliest of the following dates: (a) the date on which all Commitments are cancelled or terminated and/or the Obligations are declared or become immediately due and payable; (b) the date on which (i) the Default Excess with respect to such Defaulting Lender shall have been reduced to zero (whether by the funding by such Defaulting Lender of any Defaulted Loans of such Defaulting Lender or by the non-pro rata application of any voluntary or mandatory prepayments of the Loans in accordance with the terms of Section 2.12 or Section 2.13 or by a combination thereof) and (ii) such Defaulting Lender shall have delivered to Borrower Representative and Administrative Agent a written reaffirmation of its intention to honor its obligations hereunder with respect to its Commitments; (c) the date on which Borrower Representative, Administrative Agent and the Requisite Lenders waive all Funding Defaults of such Defaulting Lender in writing; and (d) the date on which Administrative Agent shall have waived all violations of Section 9.5(c) by such Defaulting Lender in writing.

"**Default Rate**" means any interest payable pursuant to Section 2.9.

"**Defaulted Loan**" as defined in Section 2.21.

"**Defaulting Lender**" as defined in Section 2.21.

9

**"Deposit Account"** means a demand, time, savings, passbook or like account with a bank, savings and loan association, credit union or like organization, other than an account evidenced by a negotiable certificate of deposit.

**"DIP Facility"** means the credit facility contemplated in this Agreement and other Credit Documents.

**"Dollars"** and the sign **"$"** mean the lawful money of the United States.

**"Domestic Subsidiary"** means any Subsidiary of Holdings formed or organized under the laws of the United States, any state thereof or the District of Columbia.

**"Eligible Assignee"** means (a) any Lender, any Affiliate (other than a natural person) of a Lender or any Related Fund of a Lender; and (b) (i) any commercial bank, finance company, insurance company, or other financial institution or fund that is engaged in making, purchasing, or otherwise investing in commercial loans in the ordinary course of its business and (ii) any other Person (other than a natural Person), in each case, approved by Administrative Agent and the Requisite Lenders (in each case, as such approval shall not be unreasonably withheld, conditioned or delayed); underlined provided, (A) neither (I) Holdings nor any Affiliate of Holdings, nor (II) Sponsor nor any Affiliate of Sponsor (including, for the avoidance of doubt, SFI, Co-Invest and their respective Affiliates), nor (III) any Defaulting Lender shall, in any event, be an Eligible Assignee, and (B) no Person owning or controlling any trade debt or Indebtedness of any Credit Party other than the Obligations or any Capital Stock of any Credit Party other than, in the case of GSSLG or TCW and their respective Affiliates and Related Funds, pursuant to the Warrants, in any case, unless approved by Administrative Agent, shall, in any event, be an Eligible Assignee.

**"Employee Benefit Plan"** means any "employee benefit plan" as defined in Section 3(3) of ERISA which is (or within the previous six (6) years was) sponsored, maintained or contributed to by, or required to be contributed to by, any Credit Party, any of its Subsidiaries or, with respect to any such plan that is subject to Title IV of ERISA or Sections 412 and 430 of the Internal Revenue Code, any of their respective ERISA Affiliates.

**"Environmental Claim"** means any investigation, notice, notice of violation, claim, action, suit, proceeding, demand, abatement order or other order or directive (conditional or otherwise), by any Governmental Authority or any other Person, arising (a) pursuant to or in connection with any actual or alleged violation of any Environmental Law; (b) in connection with any Hazardous Material or any actual or alleged Hazardous Materials Activity; or (c) in connection with any actual or alleged damage, injury, threat or harm to health, safety, natural resources or the environment.

**"Environmental Laws"** means any and all foreign or domestic, federal or state (or any subdivision of either of them), statutes, ordinances, orders, rules, regulations, judgments, Governmental Authorizations, or any other requirements of Governmental Authorities relating to (a) environmental matters, including those relating to any Hazardous Materials Activity; (b) the generation, use, storage, transportation or disposal of Hazardous Materials; or (c) occupational safety and health, industrial hygiene, land use or the protection of human, plant or animal health or welfare, in any manner applicable to any Credit Party or any of its Subsidiaries or any Facility.

10

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended from time to time, and any successor thereto.

"**ERISA Affiliate**" means, as applied to any Person, (a) any corporation which is a member of a controlled group of corporations within the meaning of Section 414(b) of the Internal Revenue Code of which that Person is a member; (b) any trade or business (whether or not incorporated) which is a member of a group of trades or businesses under common control within the meaning of Section 414(c) of the Internal Revenue Code of which that Person is a member; and (c) solely for purposes of provisions relating to Section 412 of the Internal Revenue Code, any member of an affiliated service group within the meaning of Section 414(m) or (o) of the Internal Revenue Code of which that Person, any corporation described in clause (a) of this definition or any trade or business described in clause (b) of this definition is a member. Any former ERISA Affiliate of any Credit Party or any of its Subsidiaries shall continue to be considered an ERISA Affiliate of such Credit Party or any such Subsidiary within the meaning of this definition with respect to the period such entity was an ERISA Affiliate of such Credit Party or such Subsidiary and with respect to liabilities arising after such period for which such Credit Party or such Subsidiary could be liable under the Internal Revenue Code or ERISA.

"**ERISA Event**" means (a) a "reportable event" within the meaning of Section 4043 of ERISA and the regulations issued thereunder with respect to any Pension Plan (excluding those for which the provision for thirty (30) days' notice to the PBGC has been waived by regulation); (b) the failure to meet the minimum funding standard of Section 412 of the Internal Revenue Code with respect to any Pension Plan (whether or not waived in accordance with Section 412(c) of the Internal Revenue Code) or the failure to make by its due date a required installment under Section 430(j) of the Internal Revenue Code with respect to any Pension Plan or the failure to make any required contribution to a Multiemployer Plan; (c) the provision by the administrator of any Pension Plan pursuant to Section 4041(a)(2) of ERISA of a notice of intent to terminate such plan in a distress termination described in Section 4041(c) of ERISA; (d) the withdrawal by any Credit Party or any of its Subsidiaries or any of their respective ERISA Affiliates from any Pension Plan with two or more contributing sponsors or the termination of any such Pension Plan resulting in material liability to any Credit Party or any of its Subsidiaries or any of their respective ERISA Affiliates pursuant to Section 4063 or 4064 of ERISA; (e) the institution by the PBGC of proceedings to terminate any Pension Plan or to appoint a trustee to administer any Pension Plan; (f) the imposition of liability on any Credit Party or any of its Subsidiaries or any of their respective ERISA Affiliates pursuant to Section 4062(e) or 4069 of ERISA or by reason of the application of Section 4212(c) of ERISA; (g) the withdrawal of any Credit Party or any of its Subsidiaries or any of their respective ERISA Affiliates in a complete or partial withdrawal (within the meaning of Sections 4203 and 4205 of ERISA) from any Multiemployer Plan if there is any potential liability therefor, or the receipt by any Credit Party or any of its Subsidiaries or any of their respective ERISA Affiliates of notice from any Multiemployer Plan that it is in reorganization or insolvency pursuant to Section 4241 or 4245 of ERISA, or that it intends to terminate or has terminated under Section 4041A or 4042 of ERISA; (h) the occurrence of an act or omission which could reasonably be expected to give rise to the imposition on any Credit Party, any of its Subsidiaries or any of their respective ERISA Affiliates of material fines, penalties, Taxes or related charges under Chapter 43 of the Internal Revenue Code or under Section 409, Section 502(c), (i) or (l), or Section 4071 of ERISA in respect of any Employee Benefit Plan; (i) the assertion of a claim (other than routine claims for benefits) against any Employee Benefit Plan other than a Multiemployer Plan

11

or the assets thereof, or against any Credit Party, any of its Subsidiaries or any of their respective ERISA Affiliates in connection with any Employee Benefit Plan, which could reasonably be expected to result in a material liability to a Credit Party; (j) receipt from the Internal Revenue Service of notice of the failure of any Pension Plan (or any other Employee Benefit Plan intended to be qualified under Section 401(a) of the Internal Revenue Code) to qualify under Section 401(a) of the Internal Revenue Code, or the failure of any trust forming part of any Pension Plan to qualify for exemption from taxation under Section 501(a) of the Internal Revenue Code; or (k) the imposition of a Lien pursuant to Section 430(k) of the Internal Revenue Code or pursuant to Section 303(k) of ERISA with respect to any Pension Plan.

"**Event of Default**" means each of the conditions or events set forth in <u>Section 8.1</u>.

"**Exchange Act**" means the Securities Exchange Act of 1934, as amended from time to time, and any successor statute.

"**Excluded Account**" as defined in the Pre-Petition Credit Agreement.

"**Excluded Swap Obligation**" means, with respect to any Guarantor, (a) as it relates to all or a portion of the Guaranty of such Guarantor, any Swap Obligation if, and to the extent that, such Swap Obligation (or any Guaranty thereof) is or would otherwise become illegal or unlawful under the Commodity Exchange Act or any rule, regulation or order of the Commodity Futures Trading Commission (or the application or official interpretation of any thereof) by virtue of such Guarantor's failure for any reason to constitute an "eligible contract participant" as defined in the Commodity Exchange Act and the regulations thereunder at the time the Guaranty of such Guarantor becomes effective with respect to such Swap Obligation; or (b) as it relates to all or a portion of the grant by such Guarantor of a security interest, any Swap Obligation if, and to the extent that, such Swap Obligation (or such security interest in respect thereof) is or would otherwise become illegal or unlawful under the Commodity Exchange Act or any rule, regulation or order of the Commodity Futures Trading Commission (or the application or official interpretation of any thereof) by virtue of such Guarantor's failure for any reason to constitute an "eligible contract participant" as defined in the Commodity Exchange Act and the regulations thereunder at the time the security interest of such Guarantor becomes effective with respect to such Swap Obligation.

"**Excluded Taxes**" means (a) any Tax on the overall net income of a Lender or any Affiliate thereof; (b) any Taxes associated with or arising out of FATCA (for purposes of this definition, "**FATCA**" means Section 1471 through 1474 of the Internal Revenue Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof and any agreements entered into pursuant to Section 1471(b)(1) of the Internal Revenue Code); (c) in the case of a Non-US Lender, any Taxes that Borrowers are not required to pay in accordance with the express provisions of <u>Section 2.19(c)</u>; and <u>(d)</u> in the case of a Non-US Lender, any Taxes associated with or arising out of the failure of such Lender or an Affiliate thereof to issue a valid IRS Form W-9 to any Borrower, which such Lender or Affiliate thereof is legally eligible and required to provide.

12

"**Existing Letters of Credit**" means those letters of credit issued and outstanding as of the Closing Date, as the same are deemed to be issued under Section 2.3 and are listed on Schedule 1.1(a).

"**Facility**" means any real property (including all buildings, fixtures or other improvements located thereon) now, hereafter or heretofore owned, leased, operated or used by any Credit Party or any of its Subsidiaries or any of their respective predecessors or Affiliates.

"**Fair Share**" as defined in Section 7.2.

"**Fair Share Contribution Amount**" as defined in Section 7.2.

"**Federal Funds Effective Rate**" means for any day, the rate per annum (expressed, as a decimal, rounded upwards, if necessary, to the next higher 1/100 of 1%) equal to the weighted average of the rates on overnight federal funds transactions with members of the Federal Reserve System arranged by federal funds brokers on such day, as published by the Federal Reserve Bank of New York on the Business Day next succeeding such day; provided, (a) if such day is not a Business Day, the Federal Funds Effective Rate for such day shall be such rate on such transactions on the next preceding Business Day as so published on the next succeeding Business Day and (b) if no such rate is so published on such next succeeding Business Day, the Federal Funds Effective Rate for such day shall be the average rate charged to GSSLG or any other Lender selected by Administrative Agent on such day on such transactions as determined by Administrative Agent.

"**Final Order**" means a final order of the Bankruptcy Court, that, without limitation, approves the DIP Facility and grants the Liens and security interests contained herein and therein, which order is not stayed, and is consented to by the Requisite Lenders and the Requisite Lenders under the Pre-Petition Credit Agreement, in each case, in their respective reasonable discretion.

"**Financial Officer Certification**" means, with respect to the financial statements for which such certification is required, the certification of the chief financial officer of Borrower Representative (or other senior executive officer of Borrower Representative or RTI who has financial expertise and is familiar with the terms and conditions of this Agreement and the financial statements and financial condition of Holdings and its Subsidiaries) that such financial statements fairly present, in all material respects, the financial condition of Holdings and its Subsidiaries as at the dates indicated and the results of their operations and their cash flows for the periods indicated, subject to changes resulting from audit and normal year-end adjustments.

"**First Priority**" means, with respect to any Lien created or purported to be created in any Collateral pursuant to any Collateral Document, the Interim Order or the Final Order, that such Lien is the only Lien to which such Collateral is subject, other than any Permitted Lien.

"**Fiscal Month**" means the consecutive five (5) week periods in the case of fiscal months one (1), four (4), seven (7) and ten (10) (and in the case solely of Fiscal Year 2022, fiscal month twelve (12)) beginning on the first Wednesday closest to June 1, September 1, December 1 and March 1, respectively, and the consecutive four (4) week periods in the case of all other Fiscal

13

Months, conforming to a 5-4-4 fiscal calendar as adopted by the Credit Parties and in effect as of the Closing Date.

"**Fiscal Quarter**" means a consecutive three Fiscal Month period ending on the first Tuesday closest to September 1, December 1, March 1 and June 1 in the cases of Fiscal Quarters one (1), two (2), three (3) and four (4), respectively.

"**Fiscal Year**" means a consecutive fifty-three week period ending on the first Tuesday closest to June 1 in calendar year 2017 and 2022, and a consecutive fifty-two week period ending on the first Tuesday closest to June 1 in each other calendar year.

"**Flood Hazard Property**" means any Real Estate Asset subject to a Mortgage in favor of Collateral Agent, for the benefit of the Secured Parties, and located in an area designated by the Federal Emergency Management Agency as having special flood or mud slide hazards.

"**Food Safety Laws**" means all requirements of law or Governmental Authorization relating to food and related products, including the Federal Food, Drug and Cosmetic Act, the Food Security Act of 1985, the Federal Trade Commission Act, the Fair Packaging and Labeling Act, the Consumer Product Safety Commission Act, the Poison Prevention Packaging Act, the Food Safety Modernization Act, 21 CFR § Part 111, and any other applicable comparable U.S. State statutes and all regulations promulgated under each of the foregoing.

"**Foreign Subsidiary**" means any Subsidiary of Holdings that is not a Domestic Subsidiary.

"**Franchise Agreements**" means (a) all franchise agreements and other similar agreements entered into by RTI or any other Credit Party, as the franchisor, and a third party franchisee, and (b) all development agreements, entered into by RTI or any other Credit Party, as any of the same may from time to time be amended, restated, supplemented or otherwise modified from time to time.

"**Funding Default**" as defined in Section 2.21.

"**Funding Guarantors**" as defined in Section 7.2.

"**Funding Notice**" means a notice substantially in the form of Exhibit A-1.

"**GAAP**" means, subject to the limitations on the application thereof set forth in Section 1.2, United States generally accepted accounting principles in effect as of the date of determination thereof.

"**Governmental Acts**" means any act or omission, whether rightful or wrongful, of any present or future de jure or de facto Governmental Authority.

"**Governmental Authority**" means the government of the United States or any other nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court (including the Bankruptcy Court), central bank

14

or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national bodies such as the European Union or the European Central Bank).

**"Governmental Authorization"** means any permit, license, authorization, plan, directive, consent order or consent decree of or from any Governmental Authority, including each of the Orders.

**"Grantor"** as defined in the Pledge and Security Agreement.

**"GS Bank"** as defined in the Preamble.

**"GSSLG"** as defined in the Preamble.

**"Guaranteed Obligations"** as defined in Section 7.1.

**"Guarantor"** means Holdings, Borrowers (solely with respect to the Obligations of the Subsidiaries of Holdings (other than Borrowers)) and each other Subsidiary of Holdings (other than the Wicomico County Subsidiaries).

**"Guarantor Payment"** as defined in Section 11.7.

**"Guarantor Subsidiary"** means each Guarantor other than Holdings.

**"Guaranty"** means the guaranty of each Guarantor set forth in Section 7.

**"Hazardous Materials"** means any chemical, material or substance, exposure to which is prohibited, limited or regulated under any Environmental Law, including hazardous or toxic substances and petroleum in any form.

**"Hazardous Materials Activity"** means any past, current, proposed or threatened activity, event or occurrence involving any Hazardous Materials, including the use, manufacture, possession, storage, holding, presence, existence, location, Release, threatened Release, discharge, placement, generation, transportation, processing, construction, treatment, abatement, removal, remediation, disposal, disposition or handling of any Hazardous Materials, and any corrective action or response action with respect to any of the foregoing.

**"Highest Lawful Rate"** means the maximum lawful interest rate, if any, that at any time or from time to time may be contracted for, charged, or received under the laws applicable to any Lender which are presently in effect or, to the extent allowed by law, under such applicable laws which may hereafter be in effect and which allow a higher maximum nonusurious interest rate than applicable laws now allow.

**"Historical Financial Statements"** means, as of the Closing Date, the most recent financial statements of Holdings and its Subsidiaries delivered to the Pre-Petition Lenders under Section 5.1(a) and Section 5.1(b) of the Pre-Petition Credit Agreement.

**"Holdings"** as defined in the Preamble.

"**Indebtedness**" as applied to any Person, means, without duplication, (a) all indebtedness for borrowed money; (b) that portion of obligations with respect to Capital Leases that is properly classified as a liability on a balance sheet in conformity with GAAP; (c) notes payable and drafts accepted representing extensions of credit whether or not representing obligations for borrowed money; (d) any obligation owed for all or any part of the deferred purchase price of property or services (excluding any such obligations incurred under ERISA); (e) all indebtedness secured by any Lien on any property or asset owned or held by that Person regardless of whether the indebtedness secured thereby shall have been assumed by that Person or is nonrecourse to the credit of that Person; (f) the face amount of any letter of credit (including any Existing Letter of Credit) issued for the account of that Person or as to which that Person is otherwise liable for reimbursement of drawings; (g) the direct or indirect guaranty, endorsement (otherwise than for collection or deposit in the ordinary course of business), co-making, discounting with recourse or sale with recourse by such Person of the obligation of another; (h) any obligation of such Person the primary purpose or intent of which is to provide assurance to an obligee that the obligation of the obligor thereof will be paid or discharged, or any agreement relating thereto will be complied with, or the holders thereof will be protected (in whole or in part) against loss in respect thereof; (i) any liability of such Person for an obligation of another through any agreement (contingent or otherwise) (x) to purchase, repurchase or otherwise acquire such obligation or any security therefor, or to provide funds for the payment or discharge of such obligation (whether in the form of loans, advances, stock purchases, capital contributions or otherwise) or (y) to maintain the solvency or any balance sheet item, level of income or financial condition of another if, in the case of any agreement described under clause (x) or (y) of this clause (i), the primary purpose or intent thereof is as described in clause (h) of this definition; and (j) all obligations of such Person in respect of any exchange traded or over the counter derivative transaction, whether entered into for hedging or speculative purposes.

"**Indemnified Liabilities**" means, collectively, any and all liabilities, obligations, losses, damages (including natural resource damages), penalties, claims (including Environmental Claims), costs (including the costs of any investigation, study, sampling, testing, abatement, cleanup, removal, remediation or other response action necessary to remove, remediate, clean up or abate any Hazardous Materials Activity), expenses and disbursements of any kind or nature whatsoever (including Taxes), the reasonable fees and disbursements of counsel for Indemnitees in connection with any investigative, administrative or judicial proceeding commenced or threatened by any Person, whether or not any such Indemnitee shall be designated as a party or a potential party thereto, and any fees or expenses incurred by Indemnitees in enforcing this indemnity), whether direct, indirect or consequential and whether based on any federal, state or foreign laws, statutes, rules or regulations (including securities and commercial laws, statutes, rules or regulations and Environmental Laws), on common law or equitable cause or on contract or otherwise, that may be imposed on, incurred by, or asserted against any such Indemnitee, in any manner relating to or arising out of (a) this Agreement or any of the other Credit Documents or the transactions contemplated hereby or thereby (including the Lenders' agreement to make Credit Extensions or the use or intended use of the proceeds thereof, or any enforcement of any of the Credit Documents (including any sale of, collection from, or other realization upon any of the Collateral or the enforcement of the Guaranty)); or (b) any Environmental Claim or any Hazardous Materials Activity relating to or arising from, directly or indirectly, any past or present activity, operation, land ownership, or practice of any Credit Party or any of its Subsidiaries.

16

"**Indemnitee**" as defined in <u>Section 10.3</u>.

"**Indemnitee Agent Party**" as defined in <u>Section 9.6</u>.

"**Intellectual Property**" as defined in the Pledge and Security Agreement.

"**Interest Payment Date**" means with respect to (a) any Base Rate Loan, (i) the last day of each Fiscal Month commencing on the first such date to occur after the Closing Date and (ii) the Maturity Date; and (b) any LIBOR Rate Loan, (i) the last day of each Interest Period applicable to such Loan and (ii) the Maturity Date.

"**Interest Period**" means, in connection with a LIBOR Rate Loan, an interest period of one month, as selected by Borrower Representative in the applicable Notice, (a) initially, commencing on the Credit Date or Conversion/Continuation Date thereof, as the case may be; and (b) thereafter, commencing on the day on which the immediately preceding Interest Period expires; <u>provided</u>, (i) if an Interest Period would otherwise expire on a day that is not a Business Day, such Interest Period shall expire on the next succeeding Business Day unless no further Business Day occurs in such month, in which case such Interest Period shall expire on the immediately preceding Business Day; (ii) any Interest Period that begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period) shall, subject to <u>clause (iii)</u> of this definition, end on the last Business Day of a calendar month; and (iii) no Interest Period with respect to the Loans or any portion thereof shall extend beyond the Maturity Date.

"**Interest Rate Determination Date**" means, with respect to any Interest Period, the date that is two (2) Business Days prior to the first day of such Interest Period.

"**Interim Order**" means an emergency order approved by the Bankruptcy Court entered prior to the date of the Final Order that permits borrowing under the DIP Facility, which Interim Order is in form and substance reasonably satisfactory to the Requisite Lenders and the Requisite Lenders under the Pre-Petition Credit Agreement.

"**Internal Revenue Code**" means the Internal Revenue Code of 1986, as amended to the date hereof and from time to time hereafter, and any successor statute.

"**Investment**" means (a) any direct or indirect purchase or other acquisition by Holdings or any of its Subsidiaries of, or of a beneficial interest in, any of the Securities of any other Person; (b) any direct or indirect redemption, retirement, purchase or other acquisition for value, by any Subsidiary of Holdings from any Person, of any Capital Stock of such Person; and (c) any direct or indirect loan, advance (other than advances to employees for moving, entertainment and travel expenses, drawing accounts and similar expenditures in the ordinary course of business) or capital contributions by Holdings or any of its Subsidiaries to any other Person, including all Indebtedness and accounts receivable from that other Person that are not current assets or did not arise from sales to that other Person in the ordinary course of business. The amount of any Investment shall be the original cost of such Investment, <u>plus</u> the cost of all additions thereto, without any adjustments for increases or decreases in value, or write-ups, write-downs or write-offs with respect to such Investment.

"**Issuing Bank**" as defined in the Preamble.

"**Joint Venture**" means a joint venture, partnership or other similar arrangement, whether in corporate, partnership or other legal form; provided, in no event shall any corporate Subsidiary of any Person be considered to be a Joint Venture to which such Person is a party.

"**Lender**" means each financial institution listed on the signature pages hereto as a Lender and any other Person that becomes a party hereto pursuant to an Assignment Agreement.

"**Letter of Credit Cash Collateralization**" means (a) providing cash collateral (pursuant to documentation reasonably satisfactory to the Issuing Bank, including provisions that specify that all commissions, fees, charges and expenses provided for in this Agreement (including any fronting fees) will continue to accrue while the Existing Letters of Credit are outstanding) to be held by the Issuing Bank and given to secure that portion of the Obligations related to outstanding Existing Letters of Credit, in an amount equal to 105.0% of the then applicable Letter of Credit Usage, (b) delivering to the Issuing Bank documentation executed by all beneficiaries under the Existing Letters of Credit, in form and substance reasonably satisfactory to the Issuing Bank, terminating all of such beneficiaries' rights under the Existing Letters of Credit, or (c) providing to the Issuing Bank a standby letter of credit, in form and substance reasonably satisfactory to the Issuing Bank, from a commercial bank acceptable to the Issuing Bank (in its sole discretion) naming Issuing Bank as the beneficiary thereof, for the purpose of securing that portion of the Obligations related to outstanding Existing Letters of Credit, in an amount equal to 105.0% of the then applicable Letter of Credit Usage (it being understood that all commissions, fees, charges and expenses provided for in this Agreement (including any fronting fees) will continue to accrue while the Existing Letters of Credit are outstanding and that any such amounts that accrue must be additional amounts that can be drawn under any such standby letter of credit).

"**Letter of Credit Fees**" means the fees payable to the Lenders and Issuing Bank, as the case may be, in connection with the Existing Letters of Credit, as set forth in Section 2.10(a)(ii) and Section 2.10(b).

"**Letter of Credit Usage**" means, as at any date of determination, the sum of (a) the maximum aggregate amount which is, or at any time thereafter may become, available for drawing under all Existing Letters of Credit then outstanding, and (b) the aggregate amount of all drawings under Existing Letters of Credit honored by Issuing Bank and not theretofore reimbursed by or on behalf of Borrowers.

"**LIBOR Rate Loan**" means a Loan bearing interest at a rate determined by reference to the Adjusted LIBOR Rate.

"**Lien**" means (a) any lien, mortgage, pledge, assignment, security interest, right of set off, charge or encumbrance of any kind (including any agreement to give any of the foregoing, any conditional sale or other title retention agreement, and any lease in the nature thereof) and any option, trust or other preferential arrangement having the practical effect of any of the foregoing, and (b) in the case of Securities, any purchase option, call or similar right of a third party with respect to such Securities.

"**Liquor Subsidiary Contracts**" means all management agreements, option agreements, voting proxies, indemnification agreements and other agreements entered into by any Credit Party and/or any Subsidiary of a Credit Party (or a shareholder thereof) related to the use of liquor licenses in the operation of a Restaurant or group of Restaurants, as any of the same may from time to time be amended, restated, supplemented or otherwise modified from time to time in accordance with the terms hereof.

"**Loan**" means a Term Loan.

"**Margin Stock**" as defined in Regulation U of the Board of Governors of the Federal Reserve System, as in effect from time to time.

"**Maryland Liquor Subsidiaries**" means (a) (i) Ruby Tuesday of Allegany County, Inc., a Maryland corporation, (ii) Ruby Tuesday of Columbia, Inc., a Maryland corporation, (iii) Ruby Tuesday of Linthicum, Inc., a Maryland corporation, (iv) Ruby Tuesday of Marley Station, Inc., a Maryland corporation, (v) Ruby Tuesday of Frederick, Inc., a Maryland corporation, (vi) Ruby Tuesday of Pocomoke City, Inc., a Maryland corporation, (vii) RT of Maryland, LLC, a Maryland limited liability company, and (viii) RT of Carroll County, LLC, a Maryland limited liability company, and (b) the Wicomico County Subsidiaries.

"**Material Adverse Effect**" means a material adverse effect on and/or material adverse developments arising after the commencement of the Cases with respect to (i) the business operations, properties, assets, condition (financial or otherwise) or prospects of Holdings and its Subsidiaries taken as a whole; (ii) the ability of any Credit Party to fully and timely perform its Obligations; (iii) the legality, validity, binding effect, or enforceability against a Credit Party of a Credit Document to which it is a party; or (iv) the rights, remedies and benefits available to, or conferred upon, any Agent and any Lender or any Secured Party under any Credit Document; provided, that the filing and administration of the Cases shall not constitute a Material Adverse Effect.

"**Material Contract**" means (a) that certain Master Distribution Agreement by and between RTI and Performance Food Group, dated November 15, 2006, as in effect on the Closing Date, together with any amendments, renewals or replacements thereof in accordance with the terms hereof, (b) any master lease or similar agreement which relates to thirty (30) or more restaurant locations of the Credit Parties, together with any renewals or replacements thereof, and (c) any individual or related series of Franchise Agreements which relate to thirty (30) or more restaurant locations of the Credit Parties, together with any amendments, renewals or replacements thereof in accordance with the terms hereof.

"**Maturity Date**" means the earliest to occur of:  (a) the date which is thirty (30) days after the Outside Date (as defined in the RSA) or such later date as agreed to by Administrative Agent and Lenders in accordance with the RSA; (b) acceleration of the Obligations due to the occurrence of an Event of Default in accordance with Section 8.1; (c) the effective date of a confirmed plan of reorganization or liquidation that provides for payment in full in Cash of all Obligations owing under the DIP Facility and the Pre-Petition Obligations in accordance with the RSA or is otherwise acceptable to Lenders in their respective reasonable discretion; (d) the date which is the closing date of any sale of all or substantially all of the Credit Parties' assets;

19

(e) the entry of an order by the Bankruptcy Court granting relief from the automatic stay permitting foreclosure of any assets of any Credit Party or Credit Parties, in any case, in excess of $250,000 in the aggregate; or (f) the date on which (i) any of the Cases shall be dismissed or converted to a case under Chapter 7 of the Bankruptcy Code, (ii) a trustee under Chapter 11 of the Bankruptcy Code shall be appointed in any of the Cases, or (iii) an examiner having enlarged powers relating to the operation of the business of any Borrower or any Guarantor (beyond those set forth under Section 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code shall be appointed.

"**Moody's**" means Moody's Investor Services, Inc. and any successor thereto.

"**Mortgage**" means a mortgage, deed of trust, deed to secure debt or similar agreement in form and substance reasonably satisfactory to Collateral Agent evidencing the Lien in favor of Collateral Agent on a Real Estate Asset, as amended, restated, supplemented or otherwise modified from time to time.

"**Mortgage Deliverables**" means, with respect to any particular Real Estate Asset:

(a)     fully-executed and notarized Mortgages, in proper form for recording in all appropriate places in all applicable jurisdictions with respect to such Real Estate Asset;

(b)     the payment of all fees and Taxes (including mortgage recording, stamp and intangible Taxes) related to the filing and/or recording of any Mortgage Deliverable;

(c)     evidence of flood insurance with respect to each Flood Hazard Property that is located in a community that participates in the National Flood Insurance Program, in each case in compliance with any applicable regulations of the Board of Governors of the Federal Reserve System, in form and substance reasonably satisfactory to Collateral Agent;

(d)     any information reasonably requested by Administrative Agent regarding environmental matters relating to such Real Estate Asset; and

(e)     such other agreements or instruments as may reasonably be requested by Collateral Agent in connection therewith.

"**Multiemployer Plan**" means any Employee Benefit Plan which is a "multiemployer plan" as defined in Section 3(37) of ERISA.

"**Net Asset Sale Proceeds**" means, with respect to any Asset Sale, an amount equal to:  (a) gross Cash payments received by any Credit Party or any of its Subsidiaries from such Asset Sale, minus (b) (i) all associated costs incurred in connection with such Asset Sale, including legal, underwriting discounts, brokerage fees and commissions with respect to such Asset Sale, in any case, to the extent the same constitute a Valid Expense, (ii) payment of the outstanding principal amount of, premium or penalty, if any, and interest on any Permitted Debt (other than the Loans) that is secured by a Permitted Lien on the Capital Stock or assets in question and that is required to be repaid under the terms thereof as a result of such Asset Sale, and (iii) Cash Taxes directly owed or owing with respect to such Asset Sale after factoring all actual and expected deductions available on a consolidated basis and based on the reasonable good faith determination

of the Credit Parties.  For the avoidance of doubt, the term "**Net Asset Sale Proceeds**" is not intended to include, and shall not include, either (x) on-going royalty payments, franchise fees or license fees received in the ordinary course of business by a Credit Party pursuant to a Franchise Agreement or license agreement, or (y) on-going rent payments received in the ordinary course of business by a Credit Party pursuant to any lease or sublease under which RTI or any of its Subsidiaries is the lessor or sub-lessor.

"**Net Insurance/Condemnation Proceeds**" means an amount equal to:  (a) any gross Cash payments or proceeds received by any Credit Party or any of its Subsidiaries (i) under any casualty insurance policies (excluding any business interruption or life insurance policies held in trust for the exclusive benefit of pension plan participant obligations) or (ii) as a result of the taking of any assets of any Credit Party by any Person pursuant to the power of eminent domain, condemnation or otherwise, or pursuant to a sale of any such assets to a purchaser with such power under threat of such a taking; minus (b) all associated costs incurred in connection with the adjustment or settlement of any claims of any Credit Party in respect thereof, including (i) legal, underwriting discounts, brokerage fees and commissions in connection with the adjustment or settlement of any claims of any Credit Party in respect thereof, in any case, to the extent the same constitute a Valid Expense, (ii) payment of the outstanding principal amount of, premium or penalty, if any, and interest on any Permitted Debt (other than the Loans) that is secured by a Permitted Lien on the Capital Stock or assets in question and that is required to be repaid under the terms thereof in connection with the adjustment or settlement of any claims of any Credit Party in respect thereof, and (iii) Cash Taxes directly owed or owing in connection with the adjustment or settlement of any claims of any Credit Party in respect thereof after factoring all actual and expected deductions available on a consolidated basis and based on the reasonable good faith determination of the Credit Parties.

"**New Subsidiary**" as defined in the definition of "New Subsidiary Deliverables."

"**New Subsidiary Deliverables**" means, with respect to any Subsidiary required to be joined under Section 5.10 (each, a "**New Subsidiary**"):

(a)    each of the deliverables described in Section 3.1(b) with respect to such New Subsidiary;

(b)    in order to create in favor of Collateral Agent, for the benefit of Secured Parties, a valid, perfected First Priority security interest in the personal property Collateral of such New Subsidiary, each of the following:

(i)    evidence satisfactory to Collateral Agent of the compliance by such New Subsidiary and each Credit Party of its obligations under the Pledge and Security Agreement and the other Collateral Documents (including their obligations to authorize or execute, as the case may be, and deliver UCC financing statements, originals of securities, instruments and chattel paper and any agreements governing deposit and/or securities accounts as provided therein);

(ii)    (A) the results of a recent search, by a Person satisfactory to Collateral Agent, of all effective UCC financing statements (or equivalent filings) made

21

with respect to any personal or mixed property of such New Subsidiary in the appropriate jurisdictions (as determined by Collateral Agent), together with copies of all such filings disclosed by such search, and (B) UCC termination statements (or similar documents) duly executed by all applicable Persons for filing in all applicable jurisdictions as may be necessary to terminate any effective UCC financing statements (or equivalent filings) disclosed in such search (other than any such financing statements in respect of Permitted Liens); and

(iii)    evidence that each applicable Person shall have, as applicable (x) taken or caused to be taken any other action, executed and delivered or caused to be executed and delivered any other agreement, document and instrument in accordance with Section 5.11, and (y) made or caused to be made any other filing and recording (other than as set forth herein) reasonably required by Collateral Agent in accordance with the applicable Collateral Documents;

(c)    [Intentionally Reserved.];

(d)    Collateral Agent shall have received a certificate from the Credit Parties' insurance broker or other evidence satisfactory to it that all insurance required to be maintained pursuant to Section 5.5 is in full force and effect, together with endorsements naming the Collateral Agent, for the benefit of Secured Parties, as additional insured and loss payee thereunder to the extent required under Section 5.5, in each case, with respect to such New Subsidiary; and

(e)    supplements to Schedules 4.1 and 4.2 reflecting such New Subsidiary.

**"Non-US Lender"** as defined in Section 2.19(c).

**"Note"** means a Term Loan Note.

**"Notice"** means, as the context requires, a Funding Notice or a Conversion/Continuation Notice.

**"Obligations"** means all obligations of every nature of each Credit Party from time to time owed to the Agents (including former Agents) or any of them and the Lenders or any of them, under any Credit Document, whether for principal, interest, all reimbursement obligations with respect to the Existing Letters of Credit, fees, expenses, indemnification or otherwise. "**Obligations**" shall not include Excluded Swap Obligations.  For the avoidance of doubt, any reference herein or in any other Credit Document to the satisfaction, repayment, or payment in full of the Obligations (or words of like import) shall include (i) all costs and expenses payable by the Credit Parties to Issuing Bank pursuant to the Credit Documents and that have accrued and are unpaid regardless of whether demand has been made therefor, and (ii) in the case of contingent reimbursement obligations with respect to Existing Letters of Credit, providing Letter of Credit Cash Collateralization with respect thereto.

**"Obligee Guarantor"** as defined in Section 7.7.

**"Operating Report"** means, for any applicable period with respect to Holdings and its Subsidiaries, a report containing commentary, summaries and reports by management

pertaining to the material aspects of: same-store-sales, traffic and average ticket metrics, general and administrative headcount by function, Restaurant beginning and ending unit counts with reconciliations from units closed and refranchised in such period, changes to senior executive management, progress of cost savings and other strategic initiatives, in all respects in form and substance reasonably satisfactory to Administrative Agent.

**"Orders"** means, collectively, the Interim Order and the Final Order.

**"Organizational Documents"** means (a) with respect to any corporation, its certificate or articles of incorporation or organization, as amended, its bylaws, as amended and any stockholders' or similar agreements, as amended; (b) with respect to any limited partnership, its certificate of limited partnership, as amended, and its partnership agreement, as amended; (c) with respect to any general partnership, its partnership agreement, as amended; and (d) with respect to any limited liability company, its articles of organization, as amended, and its operating agreement, as amended. In the event any term or condition of this Agreement or any other Credit Document requires any Organizational Document to be certified by a secretary of state or similar governmental official, the reference to any such **"Organizational Document"** shall only be to a document of a type customarily certified by such governmental official.

**"Participant Register"** as defined in Section 10.6(h).

**"Patriot Act"** means Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA Patriot Act of 2001).

**"PBGC"** means the Pension Benefit Guaranty Corporation or any successor thereto.

**"Pension Plan"** means any Employee Benefit Plan, other than a Multiemployer Plan, which is subject to Section 412 or 430 of the Internal Revenue Code or Title IV of ERISA.

**"Permitted Debt"** means the Indebtedness of the Credit Parties permitted pursuant to Section 6.1.

**"Permitted Investments"** means the Investments of the Credit Parties permitted pursuant to Section 6.7.

**"Permitted Liens"** means each of the Liens permitted pursuant to Section 6.2.

**"Permitted Priority Liens"** means valid, enforceable, non-avoidable and perfected Liens in existence on the Petition Date (including valid Liens in existence on the Petition Date that are perfected after the Petition Date as permitted by § 546(b) of the Bankruptcy Code).

**"Permitted Variances"** means, as of each Variance Report Date, total aggregate disbursements (i) for the weekly period ending on the applicable Variance Report Date, of not more than 125.0% of the total aggregate disbursement amounts set forth for such weekly period in the Budget, or (ii) on a cumulative basis for the period commencing on the Petition Date and ending on the applicable Variance Report Date, of not more than 115.0% of the total aggregate disbursement amounts set forth for such period in the Budget.

23

**"Person"** means and includes natural persons, corporations, limited partnerships, general partnerships, limited liability companies, limited liability partnerships, joint stock companies, Joint Ventures, associations, companies, trusts, banks, trust companies, land trusts, business trusts or other organizations, whether or not legal entities, and Governmental Authorities.

**"Personal Information"** means any information relating to an identified or identifiable individual, to the extent regulated under laws applicable to the Credit Parties and their Subsidiaries, including name; postal address; email address or other online contact information (such as an online user ID); telephone number; date of birth; social security number (or its equivalent); driver's license number (or other government-issued identification number); employee identification number; electronic signature; account information (including financial account information); payment card data (including primary account number, expiration date, service code, magnetic stripe data or equivalent on a chip, CAV2/CVC2/CVV2/CID and PIN number); place of birth; education or academic record; resume or other job applicant information; access code, password, security question and answer; shared secret or security token used for authentication; credit report information; birth or marriage certificate; medical information; health insurance information; biometric data; regardless of the media in which it is contained. For the avoidance of doubt, as used in this Agreement, the term "Personal Information" shall not include anonymous, aggregated or de-identified information.

**"Petition Date"** as defined in the Recitals hereto.

**"Pledge and Security Agreement"** means that certain Pledge and Security Agreement, dated as of the Closing Date, by and among the Credit Parties and Collateral Agent, as amended, restated, supplemented or otherwise modified from time to time.

**"Pre-Petition Agent"** as defined in the Recitals hereto.

**"Pre-Petition Collateral"** means, collectively, the "Collateral" (as defined in the Pre-Petition Credit Agreement) in existence on the Petition Date and all products and proceeds thereof, in any case, securing the Pre-Petition Obligations.

**"Pre-Petition Credit Agreement"** as defined in the Recitals hereto.

**"Pre-Petition Credit Documents"** as defined in the Recitals hereto.

**"Pre-Petition Lenders"** as defined in the Recitals hereto.

**"Pre-Petition Obligations"** means all "Obligations", as defined in the Pre-Petition Credit Agreement.

**"Pre-Petition Security Interests"** means the Liens on and security interests in the Pre-Petition Collateral securing the Pre-Petition Obligations.

**"Prime Rate"** means the rate of interest quoted in *The Wall Street Journal*, "Money Rates" section as the prime rate (currently defined as the base rate on corporate loans posted by at least 70% of the ten (10) largest United States banks), as in effect from time to time. The Prime

24

Rate is a reference rate and does not necessarily represent the lowest or best rate actually charged to any customer.  Any Agent or Lender may make commercial loans or other loans at rates of interest at, above or below the Prime Rate.

"**Primed Liens**" as defined in Section 2.25.

"**Principal Office**" means, for each of Administrative Agent and Issuing Bank, such Person's "Principal Office" as set forth on Appendix B, or such other office as such Person may from time to time designate in writing to Borrower Representative, Administrative Agent and each Lender; provided, however, for the purpose of making any payment on the Obligations or any other amount due hereunder or any other Credit Document, the Principal Office of Administrative Agent shall be 200 West Street, New York, New York  10282 (or such other location within the City and State of New York as Administrative Agent may from time to time designate in writing to Borrower Representative and each Lender).

"**Pro Rata Share**" means, with respect to all payments, computations and other matters relating to the Term Loan of any Lender, the percentage obtained by dividing (i) the Term Loan Exposure of that Lender, by (ii) the aggregate Term Loan Exposure of all Lenders.

"**Professional Fees**" means the fees and reimbursable expenses of Professional Persons.

"**Professional Person**" means a Person who is an attorney, financial advisor, accountant, appraiser, monitor, auctioneer or other professional Person and who is retained, with Bankruptcy Court approval, by (a) the Credit Parties pursuant to any one or more of Sections 327, 328(a) and 363 of the Bankruptcy Code or (b) the Committee pursuant to Section 1103(a) of the Bankruptcy Code.

"**Qualified ECP Guarantor**" means, in respect of any Swap Obligation, each Credit Party that has total assets exceeding $10,000,000 at the time the relevant Guaranty or grant of the relevant security interest becomes effective with respect to such Swap Obligation or such other Person as constitutes an "eligible contract participant" under the Commodity Exchange Act or any regulations promulgated thereunder and can cause another Person to qualify as an "eligible contract participant" at such time by entering into a keepwell under Section 1a(18)(A)(v)(II) of the Commodity Exchange Act.

"**Real Estate Asset**" means, at any time of determination, any interest (fee, leasehold, license or otherwise) then owned or otherwise held by any Credit Party in any real property.

"**Register**" as defined in Section 2.6(b).

"**Reimbursement Date**" as defined in Section 2.3(d).

"**Related Fund**" means, with respect to any Lender that is an investment fund, (a) any other investment fund that invests in commercial loans and that is managed or advised by the same investment advisor as such Lender or by an Affiliate of such investment advisor

and (b) any finance company, insurance company or other financial institution which temporarily warehouses loans for any Lender or any Person described in <u>clause (a)</u> of this definition.

"**Related Parties**" means any of the officers, directors, employees, agents, attorneys, representatives, subsidiaries, Affiliates or shareholders of a Person.

"**Release**" means any release, spill, emission, leaking, pumping, pouring, injection, escaping, deposit, disposal, discharge, dispersal, dumping, leaching or migration of any Hazardous Material into the indoor or outdoor environment (including the abandonment or disposal of any barrels, containers or other closed receptacles containing any Hazardous Material), including the movement of any Hazardous Material through the air, soil, surface water or groundwater.

"**Replacement Lender**" as defined in <u>Section 2.22</u>.

"**Replacement Liens**" as defined in the Interim Order or, following entry of the Final Order, the Final Order.

"**Requisite Lenders**" means one or more Lenders representing more than 50% of the aggregate Term Loan Exposure of all Lenders; <u>provided</u>, <u>however</u>, in the event any Lender (or group of Affiliated Lenders) holds more than 35% of the total Commitments and/or Loans, the vote of such Lender (or group of Affiliated Lenders) shall be required for Requisite Lenders (but only for so long as such threshold is satisfied).

"**Restaurant**" means a Ruby Tuesday restaurant owned and operated by a Credit Party.

"**Restricted Junior Payments**" means (a) any direct or indirect dividend or other distribution on account of any Capital Stock of any Credit Party; (b) any direct or indirect redemption, retirement, sinking fund or similar payment, purchase or other acquisition of any shares of Capital Stock of any Credit Party; (c) any payment made to retire or obtain surrender of any outstanding warrants, options or other rights to acquire shares of any Credit Party; (d) management, consulting or similar fees (including, for clarity, board of director fees and expenses) paid or payable to Sponsor or its Affiliates, including, for the avoidance of doubt, SFI, Co-Invest, Restaurant Management Services, LLC, NRD Capital Management, LLC, Sponsor's Management Advisor and their respective Affiliates (which, for clarity, shall not include non-bonus compensation or benefits paid in the ordinary course of business consistent with past practices); and (e) any payment or prepayment of principal, premium, interest, fee, or redemption, repurchase, retirement, defeasance, sinking fund or similar payment with respect to Subordinated Indebtedness.

"**RSA**" as defined in the Recitals hereto.

"**RT Lodge**" means the event facility and restaurant operated by RTI commonly known as "RT Lodge" and located at 1406 Wilkinson Pike, Maryville, Tennessee.

"**RTI**" as defined in the Preamble hereto.

"**S&P**" means Standard & Poor's Ratings Group, a division of The McGraw Hill Corporation, and any successor thereto.

"**Sanctioned Country**" means, at any time, a country, territory or region that is, or whose government is, the subject or target of any Sanctions.

"**Sanctioned Person**" means, at any time, any Person with whom dealings are restricted or prohibited under Sanctions, including (a) any Person listed in any Sanctions-related list of designated Persons maintained by the United States (including by OFAC, the United States Department of the Treasury, or the United States Department of State), or by the United Nations Security Council, the European Union or any EU member state, Her Majesty's Treasury of the United Kingdom or any other relevant sanctions authority; (b) any Person located, operating, organized or resident in a Sanctioned Country; or (c) any Person owned or controlled, directly or indirectly, by any such Person described in clause (a) or (b) of this definition.

"**Sanctions**" means sanctions or trade embargoes enacted, imposed, administered or enforced from time to time by (a) the United States government, including those administered by the United States Department of the Treasury's Office of Foreign Assets Control (OFAC), United States Department of State, or United States Department of Commerce; (b) the United Nations Security Council, the European Union or any of its member states, Her Majesty's Treasury of the United Kingdom; (c) Canada (or any provincial government); or (d) any other relevant sanctions authority.

"**SBA**" means the Small Business Act (Public Law 85-536, as amended).

"**Secured Parties**" means each Agent, Lender and Issuing Bank and shall include, all former Agents, Lenders and Issuing Banks to the extent that any Obligations owing to such Persons were incurred while such Persons were Agents, Lenders or Issuing Banks and such Obligations have not been indefeasibly paid or satisfied in full in Cash.

"**Securities**" means any stock, shares, partnership interests, voting trust certificates, certificates of interest or participation in any profit-sharing agreement or arrangement, options, warrants, bonds, debentures, notes, or other evidences of indebtedness, secured or unsecured, convertible, subordinated or otherwise, or in general any instruments commonly known as "securities" or any certificates of interest, shares or participations in temporary or interim certificates for the purchase or acquisition of, or any right to subscribe to, purchase or acquire, any of the foregoing.

"**Securities Act**" means the Securities Act of 1933, as amended from time to time, and any successor statute.

"**Seventh Amendment**" means that certain Seventh Amendment to Credit and Guaranty Agreement, dated as of the Seventh Amendment Effective Date, by and among Holdings, the other Credit Parties party thereto, Pre-Petition Agent and the Pre-Petition Lenders party thereto.

"**Seventh Amendment Effective Date**" means September 22, 2020.

**"SFI"** means Strategic Financial Intermediation II LLC, a Delaware limited liability company.

**"Sponsor"** means NRD Partners II, L.P., a Delaware limited partnership.

**"Sponsor's Management Advisor"** means NRD Capital Management II, LLC, a Delaware limited liability company, the management advisor of Sponsor.

**"Subordinated Indebtedness"** means any Indebtedness or other obligations of Holdings or any of its Subsidiaries which is subordinated to the Obligations as to right and time of payment and as to other rights and remedies thereunder and having such other terms as are, in each case, satisfactory to Administrative Agent.

**"Subsidiary"** means, with respect to any Person, any corporation, partnership, limited liability company, association, joint venture or other business entity of which more than 50% of the total voting power of shares of Capital Stock entitled (without regard to the occurrence of any contingency) to vote in the election of the Person or Persons (whether directors, managers, trustees or other Persons performing similar functions) having the power to direct or cause the direction of the management and policies thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof; provided, in determining the percentage of ownership interests of any Person controlled by another Person, no ownership interest in the nature of a "qualifying share" of the former Person shall be deemed to be outstanding.

**"Superpriority Claim"** as defined in Section 2.25.

**"Swap Obligation"** means, with respect to any Guarantor, any obligation to pay or perform under any agreement, contract or transaction that constitutes a "swap" within the meaning of Section 1a(47) of the Commodity Exchange Act.

**"Tax"** means any present or future tax, levy, impost, duty, assessment, charge, fee, deduction or withholding of any nature and whatever called, by whomsoever, on whomsoever and wherever imposed, levied, collected, withheld or assessed; provided, "Tax on the overall net income" of a Person shall be construed as a reference to a tax imposed by the jurisdiction in which that Person is organized or in which that Person's applicable principal office (and/or, in the case of a Lender, its lending office) is located or in which that Person (and/or, in the case of a Lender, its lending office) is deemed to be doing business on all or part of the net income, profits or gains (whether worldwide, or only insofar as such income, profits or gains are considered to arise in or to relate to a particular jurisdiction, or otherwise) of that Person (and/or, in the case of a Lender, its applicable lending office).

**"TCW"** means, individually and collectively, TCW Direct Lending LLC, a Delaware limited liability company, TCW Skyline Lending, L.P., a Delaware limited partnership, and TCW Brazos Fund LLC, a Delaware limited liability company.

**"Term Loan"** means a term loan made by a Lender to Borrowers pursuant to Section 2.1(a), Section 2.1(c) or Section 2.1(d).

**"Term Loan Commitment"** means the commitment of a Lender to make or otherwise fund Term Loans and to acquire participations in Existing Letters of Credit and **"Term Loan Commitments"** means such commitments of all Lenders in the aggregate.  The amount of each Lender's Term Loan Commitment, if any, is set forth on <u>Appendix A</u> or in the applicable Assignment Agreement, subject to any adjustment or reduction pursuant to the terms and conditions hereof.  The aggregate amount of the Term Loan Commitments as of the Closing Date is $18,500,000.

**"Term Loan Exposure"** means, with respect to any Lender, as of any date of determination, (a) prior to the termination of the Term Loan Commitments, that Lender's Term Loan Commitment <u>plus</u> the outstanding principal amount of the Term Loans of such Lender; and (b) after the termination of the Term Loan Commitments, (i) the sum of the aggregate outstanding principal amount of the Term Loans of such Lender; (ii) in the case of Issuing Bank, the aggregate Letter of Credit Usage in respect of all Existing Letters of Credit (net of any participations by Lenders in such Existing Letters of Credit), and (iii) the aggregate amount of all participations by that Lender in any outstanding Existing Letters of Credit or any unreimbursed drawing under any Existing Letter of Credit.

**"Term Loan Note"** means a promissory note evidencing a Term Loan Commitment and/or Term Loans in the form of <u>Exhibit B</u>, as amended, restated, supplemented or otherwise modified from time to time.

**"Terminated Lender"** as defined in <u>Section 2.21</u>.

**"Topping Bid"** means the highest and best bid (or bids) submitted by one or more third parties, other than the Secured Parties; <u>provided</u>, that such bid (or bids) must provide for Cash deposits of no less than 10.0% of the purchase price and provide for Cash consideration at closing that is sufficient to pay all Obligations and all Pre-Petition Obligations in full in Cash on the applicable closing date.

**"Trade Announcements"** as defined in <u>Section 10.17</u>.

**"Type of Loan"** means a Base Rate Loan or a LIBOR Rate Loan.

**"UCC"** means the Uniform Commercial Code as in effect from time to time in the State of New York or, when the context implies, the Uniform Commercial Code as in effect from time to time in any other applicable jurisdiction.

**"United States"** means the United States of America.

**"Valid Expense"** means an expense that is reasonably documented, factually supportable, actually incurred (as determined in accordance with GAAP), and paid or payable to Persons who are not Affiliates of Holdings and its Subsidiaries.

**"Variance Report Date"** means, for each week (ending on Tuesday), the date which is on or before the second Business Day of such week (Thursday or the following Business Day if such Thursday is not a Business Day); <u>provided</u>, that the first Variance Report Date shall not occur until after the second Tuesday following the Petition Date.

"**Warrant**" as defined in the Pre-Petition Credit Agreement.

"**Wicomico County Subsidiaries**" means each of RT of Fruitland, Inc., a Maryland corporation, and Ruby Tuesday of Salisbury, Inc., a Maryland corporation.

1.2.    **Accounting Terms.**  Except as otherwise expressly provided herein, all accounting terms not otherwise defined herein shall have the meanings assigned to them in conformity with GAAP.  Financial statements and other information required to be delivered by Borrower Representative to Administrative Agent and the Lenders pursuant to Sections 5.1(a) and 5.1(b) shall be prepared in accordance with GAAP as in effect at the time of such preparation (and delivered together with the reconciliation statements provided for in Section 5.1(e), if applicable). Subject to the foregoing, calculations in connection with the definitions, covenants and other provisions hereof shall utilize accounting principles and policies in conformity with those used to prepare the Historical Financial Statements.

1.3.    **Interpretation, etc.**  Any of the terms defined herein may, unless the context otherwise requires, be used in the singular or the plural, depending on the reference.  References herein to the "Preamble" or any "Recital," "Section," "Appendix," "Schedule" or "Exhibit" shall be to the preamble or a recital, a section, an appendix, a schedule or an exhibit, as the case may be, hereof unless otherwise specifically provided.  The use herein of the word "include" or "including," when following any general statement, term or matter, shall not be construed to limit such statement, term or matter to the specific items or matters set forth immediately following such word or to similar items or matters, whether or not no limiting language (such as "without limitation" or "but not limited to" or words of similar import) is used with reference thereto, but rather shall be deemed to refer to all other items or matters that fall within the broadest possible scope of such general statement, term or matter.  Any reference to any law, statute, rule or regulation of any Governmental Authority shall be deemed to refer to such law, statute, rule or regulation, as amended, renewed, extended or replaced from time to time.

## SECTION 2.  LOANS AND EXISTING LETTERS OF CREDIT

2.1.    **Term Loans.**

(a)    Term Loan Commitments.  Prior to the Maturity Date, subject to the terms and conditions hereof and for the limited purposes set forth herein, each Lender severally agrees to make Term Loans to Borrowers upon request of Borrowers in an aggregate amount up to but not exceeding such Lender's Term Loan Commitment; provided, (i) no Term Loan shall exceed the remaining Term Loan Commitment of such Lender, and (ii) all Term Loans made under this Section 2.1(a) at the request of Borrowers shall not exceed $6,900,000 in any event.  Any amount borrowed under this Section 2.1(a) and subsequently repaid or prepaid may not be re-borrowed. Subject to Sections 2.11(a), 2.12 and 2.13 all amounts owed under this Section 2.1(a) with respect to the Term Loans shall be paid in full in Cash no later than the Maturity Date.  Each Lender's Term Loan Commitment shall (x) automatically and permanently be reduced by the amount of each Term Loan made under this Section 2.1(a) and (y) terminate immediately and without further action by any Person on the Maturity Date.  For the avoidance of doubt, the initial Term Loans made under this Section 2.1(a) shall be net funded of those amounts due and owing under Section 3.1(o).

30

(b)      <u>Borrowing Mechanics for Term Loans</u>.

(i)      Whenever Borrowers desire that the Lenders make Term Loans under <u>Section 2.1(a)</u>, Borrower Representative shall deliver to Administrative Agent a duly executed Funding Notice no later than 12:00 p.m. (New York City time) at least three Business Days in advance of the proposed Credit Date in the case of a LIBOR Rate Loan, and at least one Business Day in advance of the proposed Credit Date in the case of a Base Rate Loan.  Except as otherwise provided herein, a Funding Notice for a Term Loan, as applicable, that is a LIBOR Rate Loan shall be irrevocable on and after the related Interest Rate Determination Date, and Borrowers shall be bound to make a borrowing in accordance therewith.  Promptly upon receipt by Administrative Agent of such Funding Notice, Administrative Agent shall notify each Lender of the proposed borrowing.

(ii)      Each Lender shall make its Term Loan available to Administrative Agent not later than 2:00 p.m. (New York City time) on the applicable Credit Date, by wire transfer of same day funds in Dollars, at Administrative Agent's Principal Office.  Upon satisfaction or waiver of the conditions precedent specified herein, Administrative Agent shall make the proceeds of the Term Loans available to Borrowers on the applicable Credit Date by causing an amount of same day funds in Dollars equal to the proceeds of all such Loans received by Administrative Agent from Lenders to be credited to the account of Borrower Representative at Administrative Agent's Principal Office or to such other account as may be designated in writing to Administrative Agent by Borrower Representative.

(iii)      Term Loans under <u>Section 2.1(a)</u> (a) shall be made in an aggregate minimum amount of $1,000,000 and integral multiples of $100,000 in excess of that amount (or, as applicable, the amount of the remaining unused Term Loan Commitments available to be borrowed under this <u>Section 2.1(a)</u>), and (b) may not be requested more than twice per calendar month.

(c)      <u>Term Loans in respect of Existing Letters of Credit</u>.  In addition to the foregoing, Term Loans in an amount not to exceed $9,600,000 shall be solely made in the manner and at the times set forth in <u>Section 2.3</u>.  Any amount borrowed under this <u>Section 2.1(c)</u> and subsequently repaid or prepaid may not be re-borrowed.  Subject to <u>Sections 2.11(a)</u>, <u>2.12</u> and <u>2.13</u> all amounts owed under this <u>Section 2.1(c)</u> with respect to the Term Loans shall be paid in full in Cash no later than the Maturity Date.  Each Lender's Term Loan Commitment shall (x) automatically and permanently be reduced by the amount of each Term Loan made under this <u>Section 2.1(c)</u> and (y) terminate immediately and without further action by any Person on the Maturity Date.

(d)      <u>Term Loans in respect of the Indebtedness incurred on the Seventh Amendment Effective Date</u>.  In addition to the foregoing, in accordance with the RSA and subject to the terms and conditions hereof, the Indebtedness in an aggregate principal amount of $2,000,000 incurred by the Borrowers on the Seventh Amendment Effective Date in accordance with the Seventh Amendment, <u>plus</u> all accrued and unpaid interest and fees related thereto as of the entry of the Final Order, shall be "rolled up" and deemed to be incurred on the date of the entry of the Final Order as Term Loans and shall, as of such date, constitute Term Loans and Obligations

31

incurred under this Agreement without further action by any Person.  The amount borrowed under this <u>Section 2.1(d)</u> on the Closing Date and subsequently repaid or prepaid may not be re-borrowed.  Subject to <u>Sections 2.11(a)</u>, <u>2.12</u> and <u>2.13</u>, all amounts owed under this <u>Section 2.1(d)</u> with respect to the Term Loans shall be paid in full in Cash no later than the Maturity Date.  Each Lender's Term Loan Commitment shall (x) automatically and permanently be reduced on the Closing Date by the amount of each Term Loan made under this <u>Section 2.1(d)</u> and (y) terminate immediately and without further action by any Person on the Maturity Date.

(e)      In no event shall Borrower request, and no Lender shall be required to make, any Term Loans (whether under <u>Section 2.1(a)</u>, <u>Section 2.1(c)</u> or <u>2.1(d)</u>) in an aggregate principal amount greater than the amount approved by the Bankruptcy Court pursuant to the Interim Order or, when applicable, the Final Order.

**2.2.**      [Intentionally Reserved].

**2.3.      Existing Letters of Credit and Purchase of Participations Therein.**

(a)      <u>Existing Letters of Credit</u>.  Subject to the terms and conditions hereof, the Existing Letters of Credit shall be deemed to be issued by Issuing Bank under the terms of this Agreement and shall no longer constitute obligations under the Pre-Petition Credit Documents. For the avoidance of doubt, in no event shall any Existing Letter of Credit be extended, renewed (including pursuant to any "evergreen" provisions contained therein) or amended in any manner whatsoever, unless otherwise agreed in writing by Issuing Bank and the Requisite Lenders.

(b)      [Intentionally Reserved.]

(c)      <u>Responsibility of Issuing Bank With Respect to Requests for Drawings and Payments</u>.  In determining whether to honor any drawing under any Existing Letter of Credit by the beneficiary thereof, Issuing Bank shall be responsible only to examine the documents delivered under such Existing Letter of Credit with reasonable care so as to ascertain whether they appear on their face to be in accordance with the terms and conditions of such Existing Letter of Credit. As between any Credit Party and Issuing Bank, the Credit Parties assume all risks of the acts and omissions of, or misuse of the Existing Letters of Credit, by the respective beneficiaries of such Existing Letters of Credit.  In furtherance and not in limitation of the foregoing, Issuing Bank shall not be responsible for:  (i) the form, validity, sufficiency, accuracy, genuineness or legal effect of any document submitted by any party in connection with the application for and issuance of any such Existing Letter of Credit, even if it should in fact prove to be in any or all respects invalid, insufficient, inaccurate, fraudulent or forged; (ii) the validity or sufficiency of any instrument transferring or assigning or purporting to transfer or assign any such Existing Letter of Credit or the rights or benefits thereunder or proceeds thereof, in whole or in part, which may prove to be invalid or ineffective for any reason; (iii) failure of the beneficiary of any such Existing Letter of Credit to comply fully with any conditions required in order to draw upon such Existing Letter of Credit; (iv) errors, omissions, interruptions or delays in transmission or delivery of any messages, by mail, cable, telegraph, telex or otherwise, whether or not they be in cipher; (v) errors in interpretation of technical terms; (vi) any loss or delay in the transmission or otherwise of any document required in order to make a drawing under any such Existing Letter of Credit or of the proceeds thereof; (vii) the misapplication by the beneficiary of any such Existing Letter of Credit

of the proceeds of any drawing under such Existing Letter of Credit; or (viii) any consequences arising from causes beyond the control of Issuing Bank, including any Governmental Acts; none of the above shall affect or impair, or prevent the vesting of, any of Issuing Bank's rights or powers hereunder. Without limiting the foregoing and in furtherance thereof, any action taken or omitted by Issuing Bank under or in connection with the Existing Letters of Credit or any documents and certificates delivered thereunder, if taken or omitted in good faith, shall not give rise to any liability on the part of Issuing Bank to any Credit Party.

(d)     Reimbursement by Borrowers of Amounts Drawn or Paid Under Existing Letters of Credit. In the event Issuing Bank has determined to honor a drawing under an Existing Letter of Credit, it shall immediately notify Borrower Representative and Administrative Agent, and Borrowers shall reimburse Issuing Bank on or before the Business Day immediately following the date on which such drawing is honored (the **"Reimbursement Date"**) in an amount in Dollars and in same day funds equal to the amount of such honored drawing; provided, anything contained herein to the contrary notwithstanding, (i) unless Borrower Representative shall have notified Administrative Agent and Issuing Bank prior to 10:00 a.m. (New York City time) on the date such drawing is honored that Borrowers intend to reimburse Issuing Bank for the amount of such honored drawing with funds other than the proceeds of Term Loans, Borrowers shall be deemed to have given a timely Funding Notice to Administrative Agent requesting Lenders to make Term Loans that are Base Rate Loans on the Reimbursement Date in an amount in Dollars equal to the amount of such honored drawing, and (ii) Lenders shall, on the Reimbursement Date, make Term Loans that are Base Rate Loans in the amount of such honored drawing, the proceeds of which shall be applied directly by Administrative Agent to reimburse Issuing Bank for the amount of such honored drawing; provided, further, if for any reason proceeds of Term Loans are not received by Issuing Bank on the Reimbursement Date in an amount equal to the amount of such honored drawing, Borrowers shall reimburse Issuing Bank, on demand, in an amount in same day funds equal to the excess of the amount of such honored drawing over the aggregate amount of such Term Loans, if any, which are so received. Nothing in this Section 2.3(d) shall be deemed to relieve any Lender from its obligation to make Term Loans on the terms and conditions set forth herein, and Administrative Agent and Borrowers shall retain any and all rights Borrowers may have against any Lender resulting from the failure of such Lender to make such Term Loans under this Section 2.3(d).

(e)     Lenders' Purchase of Participations in Existing Letters of Credit. Each Lender shall be deemed to have purchased, and hereby agrees to irrevocably purchase, from Issuing Bank a participation in each Existing Letter of Credit and any drawings honored thereunder in an amount equal to such Lender's Pro Rata Share (with respect to the Commitments) of the maximum amount which is or at any time may become available to be drawn thereunder. In the event that Borrowers shall fail for any reason to reimburse Issuing Bank as provided in Section 2.3(d), Issuing Bank shall promptly notify each Lender having a Commitment of the unreimbursed amount of such honored drawing and a Term Loan will automatically be deemed requested by the Credit Parties, and shall be made by each Lender, based on such Lender's Pro Rata Share of the Commitments. Each Lender shall thereafter make available to Issuing Bank an amount equal to its respective Term Loan, in Dollars and in same day funds, at the office of Issuing Bank specified in such notice, not later than 12:00 p.m. (New York City time) on the first business day (under the laws of the jurisdiction in which such office of Issuing Bank is located) after the date notified by Issuing Bank. In the event that any Lender fails to make available to Issuing Bank on such business

33

day the amount of such Lender's Term Loan as provided in this <u>Section 2.3(e)</u>, Issuing Bank shall be entitled to recover such amount on demand from such Lender together with interest thereon for three (3) Business Days at the rate customarily used by Issuing Bank for the correction of errors among banks and thereafter at the Base Rate.  Nothing in this <u>Section 2.3(e)</u> shall be deemed to prejudice the right of any Lender having a Commitment to recover from Issuing Bank any amounts made available by such Lender to Issuing Bank pursuant to this <u>Section 2.3</u> in the event that it is determined that the payment with respect to an Existing Letter of Credit in respect of which payment was made by such Lender constituted bad faith, gross negligence or willful misconduct on the part of Issuing Bank, as determined by a court of competent jurisdiction in a final, non-appealable order.  In the event Issuing Bank shall have been reimbursed by other Lenders pursuant to this <u>Section 2.3(e)</u> for all or any portion of any drawing honored by Issuing Bank under an Existing Letter of Credit, such Issuing Bank shall distribute to each Lender having a Commitment which has paid all amounts payable by it under this <u>Section 2.3(e)</u> with respect to such honored drawing such Lender's Pro Rata Share of all payments subsequently received by Issuing Bank from Borrowers in reimbursement of such honored drawing when such payments are received.  Any such distribution shall be made to a Lender at its primary address set forth below its name on <u>Appendix B</u> or at such other address as such Lender may request.

(f)     <u>Obligations Absolute</u>.  The obligation of Borrowers to reimburse Issuing Bank for drawings honored under the Existing Letters of Credit issued by it and to repay any Term Loans made by Lenders pursuant to <u>Section 2.3(d)</u> and the obligations of Lenders under <u>Section 2.3(e)</u> shall be unconditional and irrevocable and shall be paid strictly in accordance with the terms hereof under all circumstances including any of the following circumstances:  (i) any lack of validity or enforceability of any Existing Letter of Credit; (ii) the existence of any claim, set-off, defense or other right which any Credit Party or any Lender may have at any time against a beneficiary or any transferee of any Existing Letter of Credit (or any Persons for whom any such transferee may be acting), Issuing Bank, Lender or any other Person or, in the case of a Lender, against a Credit Party, whether in connection herewith, the transactions contemplated herein or any unrelated transaction (including any underlying transaction between any Credit Party or one of its Subsidiaries and the beneficiary for which any Existing Letter of Credit was procured); (iii) any draft or other document presented under any Existing Letter of Credit proving to be forged, fraudulent, invalid or insufficient in any respect or any statement therein being untrue or inaccurate in any respect; (iv) payment by Issuing Bank under any Existing Letter of Credit against presentation of a draft or other document which does not substantially comply with the terms of such Existing Letter of Credit; (v) any adverse change in the business, operations, properties, assets, condition (financial or otherwise) or prospects of Holdings or any of its Subsidiaries; (vi) any breach hereof or any other Credit Document by any party thereto; (vii) any other circumstance or happening whatsoever, whether or not similar to any of the foregoing; or (viii) the fact that a Default or an Event of Default shall have occurred and be continuing; <u>provided</u>, in each case, that payment by Issuing Bank under the applicable Existing Letter of Credit shall not have constituted bad faith, gross negligence or willful misconduct of Issuing Bank under the circumstances in question, as determined by a court of competent jurisdiction in a final, non-appealable order.

(g)     <u>Indemnification</u>.  Without duplication of any obligation of any Credit Party under <u>Section 10.2</u> or <u>10.3</u>, in addition to amounts payable as provided herein, each Credit Party hereby agrees to protect, indemnify, pay and save harmless Issuing Bank from and against any and all claims, demands, liabilities, damages, losses, costs, charges and expenses (including reasonable

34

fees, expenses and disbursements of counsel and allocated costs of internal counsel) which Issuing Bank may incur or be subject to as a consequence, direct or indirect, of (i) the issuance of any Existing Letter of Credit by Issuing Bank, other than as a result of (A) the bad faith, gross negligence or willful misconduct of Issuing Bank, as determined by a court of competent jurisdiction in a final, non-appealable order, or (B) the wrongful dishonor by Issuing Bank of a proper demand for payment made under any Existing Letter of Credit issued by it, or (ii) the failure of Issuing Bank to honor a drawing under any such Existing Letter of Credit as a result of any Governmental Act.

### 2.4. Pro Rata Shares; Availability of Funds.

(a)    Pro Rata Shares.  All Loans shall be made, and all participations required to be purchased, by the Lenders simultaneously and proportionately to their respective Pro Rata Shares, it being understood that no Lender shall be responsible for any default by any other Lender in such other Lender's obligation to make a Loan requested hereunder or purchase a participation required hereby nor shall any Commitment of any Lender be increased or decreased as a result of a default by any other Lender in such other Lender's obligation to make a Loan requested hereunder or purchase a participation required hereby other than as set forth in Section 2.24.

(b)    Availability of Funds.  Unless Administrative Agent shall have been notified by any Lender prior to the applicable Credit Date that such Lender does not intend to make available to Administrative Agent the amount of such Lender's Loan requested on such Credit Date, Administrative Agent may assume that such Lender has made such amount available to Administrative Agent on such Credit Date and Administrative Agent may, in its sole discretion, but shall not be obligated to, make available to or on behalf of Borrowers a corresponding amount on such Credit Date.  If such corresponding amount is not in fact made available to Administrative Agent by such Lender, Administrative Agent shall be entitled to recover such corresponding amount on demand from such Lender together with interest thereon, for each day from such Credit Date until the date such amount is paid to Administrative Agent, at the customary rate set by Administrative Agent for the correction of errors among banks for three (3) Business Days and thereafter at the Base Rate.  If such Lender does not pay such corresponding amount forthwith upon Administrative Agent's demand therefor, Administrative Agent shall promptly notify Borrower Representative and Borrowers shall immediately pay such corresponding amount to Administrative Agent together with interest thereon, for each day from such Credit Date until the date such amount is paid to Administrative Agent, at the rate payable hereunder for Base Rate Loans.  Nothing in this Section 2.4(b) shall be deemed to relieve any Lender from its obligation to fulfill its Commitments hereunder or to prejudice any rights that Borrowers may have against any Lender as a result of any default by such Lender hereunder.

### 2.5. Use of Proceeds.

(a)    The Credit Parties shall use the Cash Collateral and the proceeds of the Term Loans for only the following purposes, in each case, in accordance with (i) the Orders and (ii) the Budget, including in accordance with Section 6.8(d):  (A) to reimburse Issuing Bank with respect to draws under the Existing Letters of Credit in accordance with Section 2.3; (B) for working capital and general corporate purposes of the Credit Parties, (C) to pay interest, premiums, fees and expenses payable hereunder and under the other Credit Documents to the Agents and the

Lenders, as provided under the Credit Documents and the Orders, (D) to pay restructuring costs and Professional Fees of the Credit Parties related solely to the Cases, (E) to effectuate the roll-up of Indebtedness under Section 2.1(d), and (F) to make adequate protection payments as set forth in the Orders.

(b)     Notwithstanding anything to the contrary in this Agreement, no proceeds of the Term Loans, the Cash Collateral or the Carve-Out may be used by any Credit Party in any manner to:

(i)     request authorization to obtain post-petition loans or other financial accommodations pursuant to section 364(c) or (d) of the Bankruptcy Code or otherwise, other than from any Agent or any Lender, unless the proceeds of such loans or accommodations are or will be sufficient, and will be used, to indefeasibly pay in full in Cash all Obligations, the Pre-Petition Obligations and the Adequate Protection Superpriority Claim (as defined in the Orders);

(ii)     pay any expenses, other than the amounts set forth in the Budget (subject to the disbursements not prohibited under Section 6.8(d));

(iii)     object, contest or raise any defense to the validity, perfection, priority, extent or enforceability of any amount due under, or the Liens or security interests granted under, the Credit Documents or Pre-Petition Credit Documents;

(iv)     investigate (other than as set forth in the Orders), initiate, assert, join or prosecute any claims or defenses or commence any cause of action against (x) any Agent, any Lender or any of their respective Related Parties under or relating to this Agreement or any other Credit Document, (y) against the Pre-Petition Agent, Pre-Petition Lenders or any of their respective Related Parties under or relating to the Pre-Petition Credit Agreement Documents, or (z) against the Pre-Petition Agent, the Pre-Petition Lenders or any of their respective Related Parties under or relating to any other loan or extensions of credit provided to any of the Credit Parties or their respective Affiliates;

(v)     prevent, hinder or delay, whether directly or indirectly, Collateral Agent's assertion or enforcement of its Liens on the Collateral, or its efforts to realize upon any Collateral under the Credit Documents or exercise any other rights and remedies under the Credit Documents or applicable law;

(vi)     other than to the extent authorized by the Bankruptcy Court, pay any claim of any creditor in the Cases without the prior written consent of the Requisite Lenders; or

(vii)     use or seek to use Cash Collateral or sell or otherwise dispose of Collateral, unless otherwise permitted by the Orders or by this Agreement, without the consent of the Requisite Lenders.

(c)     No portion of the proceeds of any Credit Extension shall be used in any manner that causes or might cause such Credit Extension or the application of such proceeds to violate Regulation T, Regulation U or Regulation X of the Board of Governors of the Federal

Reserve System, as in effect from time to time, or any other regulation thereof or to violate the Exchange Act.

**2.6.    Evidence of Debt; Register; Notes.**

(a)    <u>Evidence of Debt</u>.  Each Lender shall maintain on its internal records an account or accounts evidencing the Obligations of Borrowers to such Lender, including the amounts of the Loans made by it and each repayment and prepayment in respect thereof.  Any such recordation shall be conclusive and binding on Borrowers, absent manifest error; <u>provided</u>, that such Lender's failure to make any such recordation, or any error in such recordation, shall not affect any Lender's Commitments or Borrowers Obligations in respect of any applicable Loans; <u>provided</u>, <u>further</u>, in the event of any inconsistency between the Register and any Lender's records, the recordations in the Register shall govern.

(b)    <u>Register</u>.  Administrative Agent shall maintain at its Principal Office a register for the recordation of the names and addresses of Lenders and the Commitments and Loans of each Lender from time to time (the **"Register"**).  The Register shall be available for inspection by Borrower Representative or any Lender at any reasonable time and from time to time upon reasonable prior notice.  Administrative Agent shall record in the Register the Commitments and the Loans, and each repayment or prepayment in respect of the principal amount of the Loans, and any such recordation shall be conclusive and binding on Borrowers and each Lender, absent manifest error; <u>provided</u>, failure to make any such recordation, or any error in such recordation, shall not affect any Lender's Commitments or Borrowers' Obligations in respect of any Loan.  Each Borrower hereby designates the entity serving as Administrative Agent to serve as such Borrower's agent solely for purposes of maintaining the Register as provided in this <u>Section 2.6(b)</u> and each Borrower hereby agrees that, to the extent such entity serves in such capacity, the entity serving as Administrative Agent and its officers, directors, employees, agents and affiliates shall constitute "Indemnitees."

(c)    <u>Notes</u>.  If so requested by any Lender by written notice to Borrower Representative (with a copy to Administrative Agent) at least two (2) Business Days prior to the Closing Date, or at any time thereafter, Borrowers shall execute and deliver to such Lender (and/or, if applicable and if so specified in such notice, to any Person who is an assignee of such Lender pursuant to <u>Section 10.6</u>) on the Closing Date (or, if such notice is delivered after the Closing Date, promptly after Borrower Representative's receipt of such notice) a Note or Notes to evidence such Lender's Term Loan Commitment and Term Loans.

**2.7.    Interest on Loans.**

(a)    Except as otherwise set forth herein, the Loans shall bear interest on the unpaid principal amount thereof from the date made through repayment (whether by acceleration or otherwise) thereof as follows (interest under this <u>Section 2.7(a)</u>, the **"Current Rate"**):

(i)    if a Base Rate Loan, at the Base Rate, <u>plus</u> the Applicable Margin; or

(ii)    if a LIBOR Rate Loan, at the Adjusted LIBOR Rate, <u>plus</u> the Applicable Margin.

37

Notwithstanding anything to the contrary contained herein in no event shall (A) the Adjusted LIBOR Rate be less than 1.00% per annum or (B) the Base Rate be less than 4.00% per annum.

(b)    The basis for determining the Current Rate with respect to any Loan, and the Interest Period with respect to any LIBOR Rate Loan, shall be selected by Borrower Representative and notified to Administrative Agent and Lenders pursuant to the applicable Notice. If on any day a Loan is outstanding with respect to which a Notice has not been delivered to Administrative Agent in accordance with the terms hereof specifying the applicable basis for determining the Current Rate, then for that day such Loan shall be a Base Rate Loan.

(c)    In connection with LIBOR Rate Loans there shall be no more than five (5) Interest Periods outstanding at any time. In the event Borrower Representative fails to specify between a Base Rate Loan or a LIBOR Rate Loan in the applicable Notice, such Loan (if outstanding as a LIBOR Rate Loan) will be automatically converted into a Base Rate Loan on the last day of the then current Interest Period for such Loan (or if outstanding as a Base Rate Loan will remain as, or (if not then outstanding) will be made as, a Base Rate Loan). As soon as practicable after 10:00 a.m. (New York City time) on each Interest Rate Determination Date, Administrative Agent shall determine (which determination shall, absent manifest error, be final, conclusive and binding upon all parties) the interest rate that shall apply to the LIBOR Rate Loans for which an interest rate is then being determined for the applicable Interest Period and shall promptly give notice thereof (in writing or by telephone confirmed in writing) to Borrower Representative and each Lender.

(d)    Interest payable at the Current Rate shall be computed on the basis of a 360-day year, in each case for the actual number of days elapsed in the period during which it accrues. In computing interest on any Loan, the date of the making of such Loan or the first day of an Interest Period applicable to such Loan or, with respect to a Base Rate Loan being converted from a LIBOR Rate Loan, the date of conversion of such LIBOR Rate Loan to such Base Rate Loan, as the case may be, shall be included, and the date of payment of such Loan or the expiration date of an Interest Period applicable to such Loan or, with respect to a Base Rate Loan being converted to a LIBOR Rate Loan, the date of conversion of such Base Rate Loan to such LIBOR Rate Loan, as the case may be, shall be excluded; provided, if a Loan is repaid on the same day on which it is made, one (1) day's interest shall be paid on that Loan.

(e)    Except as otherwise set forth herein, interest at the Current Rate on each Loan shall be payable in Cash and in arrears (A) on and to each Interest Payment Date applicable to that Loan, (B) upon any prepayment of that Loan, whether voluntary or mandatory, to the extent accrued on the amount being prepaid, and (C) on the Maturity Date.

(f)    [Intentionally Reserved]

(g)    Borrowers agree to pay to Issuing Bank, with respect to drawings honored under any Existing Letter of Credit, interest on the amount paid by Issuing Bank in respect of each such honored drawing from the date such drawing is honored to but excluding the date such amount is reimbursed by or on behalf of Borrowers at a rate equal to (i) for the period from the date such drawing is honored to but excluding the applicable Reimbursement Date, the rate of interest

38

otherwise payable hereunder with respect to Base Rate Loans, and (ii) thereafter, a rate which is the lesser of (A) 2.00% per annum in excess of the rate of interest otherwise payable hereunder with respect to Base Rate Loans, and (B) the Highest Lawful Rate.

(h)    Interest payable pursuant to Section 2.7(g) shall be computed on the basis of a 360-day year for the actual number of days elapsed in the period during which it accrues, and shall be payable on demand or, if no demand is made, on the date on which the related drawing under an Existing Letter of Credit is reimbursed in full.  Promptly upon receipt by Issuing Bank of any payment of interest pursuant to Section 2.7(g), Issuing Bank shall distribute to each Lender, out of the interest received by Issuing Bank in respect of the period from the date such drawing is honored to but excluding the date on which Issuing Bank is reimbursed for the amount of such drawing (including any such reimbursement out of the proceeds of any Loans), the amount that such Lender would have been entitled to receive in respect of the Letter of Credit Fees that would have been payable in respect of such Existing Letter of Credit for such period if no drawing had been honored under such Existing Letter of Credit.  In the event Issuing Bank shall have been reimbursed by Lenders for all or any portion of such honored drawing, Issuing Bank shall distribute to each Lender which has paid all amounts payable by it under Section 2.3(e) with respect to such honored drawing such Lender's Pro Rata Share of any interest received by Issuing Bank in respect of that portion of such honored drawing so reimbursed by Lenders for the period from the date on which Issuing Bank was so reimbursed by Lenders to but excluding the date on which such portion of such honored drawing is reimbursed by Borrowers.

### 2.8.    Conversion/Continuation.

(a)    Subject to Section 2.17 and so long as no Default or Event of Default shall have occurred and then be continuing, Borrowers shall have the option:

(i)    to convert at any time all or any part of any Term Loan equal to $1,000,000 and integral multiples of $100,000 in excess of that amount from one Type of Loan to another Type of Loan; provided, a LIBOR Rate Loan may only be converted on the expiration of the Interest Period applicable to such LIBOR Rate Loan unless Borrowers shall pay all amounts due under Section 2.17 in connection with any such conversion; or

(ii)    upon the expiration of any Interest Period applicable to any LIBOR Rate Loan, to continue all or any portion of such Loan equal to $1,000,000 and integral multiples of $100,000 in excess of that amount as a LIBOR Rate Loan.

(b)    Borrower Representative shall deliver a Conversion/Continuation Notice to Administrative Agent no later than 10:00 a.m. (New York City time) at least one (1) Business Day in advance of the proposed conversion date (in the case of a conversion to a Base Rate Loan) and at least three (3) Business Days in advance of the proposed Conversion/Continuation Date (in the case of a conversion to, or a continuation of, a LIBOR Rate Loan).  Except as otherwise provided herein, a Conversion/Continuation Notice for conversion to, or continuation of, any LIBOR Rate Loans (or telephonic notice in lieu thereof) shall be irrevocable on and after the related Interest Rate Determination Date, and Borrowers shall be bound to effect a conversion or continuation in accordance therewith.

**2.9.** **Default Interest.** Upon the occurrence of an Event of Default, the principal amount of all Loans outstanding and, to the extent permitted by applicable law, any interest payments on the Loans or any fees or other amounts owed hereunder, shall thereafter bear interest payable on demand at a rate that is 2.0% per annum in excess of the interest rate otherwise payable hereunder with respect to the applicable Loans (or, in the case of any such fees and other amounts, at a rate which is 2.0% per annum in excess of the interest rate otherwise payable hereunder for Base Rate Loans); provided, any LIBOR Rate Loans may be converted to Base Rate Loans at the election of Administrative Agent at any time after the occurrence of such Event of Default (irrespective of whether the Interest Period in effect at the time of such conversion has expired) and thereupon shall become Base Rate Loans and shall thereafter bear interest payable upon demand at a rate which is 2.0% per annum in excess of the interest rate otherwise payable hereunder for Base Rate Loans.  Payment or acceptance of the increased rates of interest provided for in this Section 2.9 is not a permitted alternative to timely payment and shall not constitute a waiver of any Event of Default or otherwise prejudice or limit any rights or remedies of Administrative Agent or any Lender.  For the purposes of clarity, all Letter of Credit Fees shall be increased by 2.0% per annum at any time the Default Rate is in effect.

**2.10.** **Fees.**

(a)     Borrowers agree to pay to the Lenders:

(i)     commitment fees equal to (A) the average of the daily difference between (I) the aggregate Commitments then in effect and (II) the Term Loans outstanding at such time plus the Letter of Credit Usage at such time; multiplied by (B) 0.50% per annum; and

(ii)     Letter of Credit Fees equal to 8.00% per annum on the maximum aggregate amount of available to be drawn under all Existing Letters of Credit shall be payable quarterly in arrears and shared proportionately by the Lenders (including the Issuing Bank).

(iii)     All fees referred to in this Section 2.10(a) shall be paid to Administrative Agent as set forth in Section 2.15(a) and, upon receipt, Administrative Agent shall promptly distribute to each applicable Lender its Pro Rata Share thereof. Further, all fees referred to in this Section 2.10(a) shall be calculated on the basis of a 360-day year and the actual number of days elapsed and shall be payable in Cash and (A) in respect of the fees payable under Section 2.10(a)(i), monthly in arrears (B) in respect of the Letter of Credit Fees payable under Section 2.10(a)(ii), quarterly in arrears, in each case, on the last day of such quarter or month, as applicable, commencing on the first such date to occur after the Closing Date, and on the Maturity Date.

(b)     Borrowers agree to pay directly to Issuing Bank for its own account the following Letter of Credit Fees:

(i)     a fronting fee equal to (A) the average aggregate daily maximum amount available to be drawn under all Existing Letters of Credit (determined as of the close of business on any date of determination), multiplied by (B) 0.25%, per annum; and

GS/RT – DIP Credit and Guaranty Agreement
81776891

(ii)    such documentary and processing charges for any transfer or payment of an Existing Letter of Credit as are in accordance with Issuing Bank's standard schedule for such charges and as in effect at the time of such transfer or payment, as the case may be.

(c)    Borrowers agree to pay to the Lenders (i) upon the Closing Date, a commitment fee equal $3,700, and (ii) upon the Maturity Date, an exit fee equal to $3,700.  The fees referred to in this Section 2.10(c) shall be paid to Administrative Agent as set forth in Section 2.15(a) and, upon receipt, Administrative Agent shall promptly distribute to each applicable Lender its Pro Rata Share thereof.  Further, all fees referred to in this Section 2.10(c) shall be payable in Cash.

**2.11.  Scheduled Payments.**

(a)    Term Loans.  The principal amount of the Term Loans, together with all other amounts owed hereunder with respect thereto, shall, in any event, be paid in full no later than the Maturity Date.

(b)    Existing Letters of Credit.  No Existing Letter of Credit shall remain outstanding after the Maturity Date unless, with the consent of Collateral Agent and Issuing Bank, Letter of Credit Cash Collateralization has been provided with respect to such outstanding Existing Letters of Credit.

**2.12.  Voluntary Prepayments/Commitment Reductions.**

(a)    Voluntary Prepayments.

(i)    Any time and from time to time:

(A)    with respect to Base Rate Loans, Borrowers may prepay any such Loans on any Business Day in whole or in part, in an aggregate minimum amount of $1,000,000 and integral multiples of $100,000 in excess of that amount; and

(B)    with respect to LIBOR Rate Loans, Borrowers may prepay any such Loans on any Business Day in whole or in part (together with any amounts due pursuant to Section 2.17(c)) in an aggregate minimum amount of $1,000,000 and integral multiples of $100,000 in excess of that amount;

(ii)    all such prepayments shall be made:

(A)    upon not less than one (1) Business Day's prior written or telephonic notice in the case of Base Rate Loans; and

(B)    upon not less than three (3) Business Days' prior written or telephonic notice in the case of LIBOR Rate Loans;

in each case, given to Administrative Agent by 12:00 p.m. (New York City time) on the date required and, if given by telephone, promptly confirmed in writing to Administrative Agent (and Administrative Agent will promptly transmit such telephonic or original notice for Term Loans by telefacsimile or telephone to each Lender).  Upon the giving of any such notice, the principal amount of the Loans specified in such notice shall become due and payable on the prepayment date specified therein.  Any such voluntary prepayment shall be (x) applied as specified in Section 2.14(a) and (y) accompanied by any amounts due under Section 2.17(c) in connection therewith.

(b)    <u>Voluntary Commitment Reductions</u>.

(i)    Borrowers may, upon not less than three (3) Business Days' prior written or telephonic notice confirmed in writing to Administrative Agent (which original written or telephonic notice Administrative Agent will promptly transmit by telefacsimile or telephone to each applicable Lender), at any time and from time to time terminate in whole or permanently reduce in part the Commitments in an amount up to the amount by which the Commitments exceed the Letter of Credit Usage at the time of such proposed termination or reduction; <u>provided</u>, any such partial reduction of the Commitments shall be in an aggregate minimum amount of $1,000,000 and integral multiples of $100,000 in excess of that amount.

(ii)    Borrower Representative's notice to Administrative Agent shall designate the date (which shall be a Business Day) of such termination or reduction and the amount of any partial reduction, and such termination or reduction of the Commitments shall be effective on the date specified in Borrower Representative's notice and shall reduce the Commitment of each Lender proportionately to its Pro Rata Share thereof.

## 2.13.    **Mandatory Prepayments/Commitment Reductions.**

(a)    <u>Asset Sales</u>.  No later than the first Business Day following the date of receipt by any Credit Party of any Net Asset Sale Proceeds, (i) the Credit Parties shall first remit 100% of such Net Asset Sale Proceeds to the Pre-Petition Agent for application to the Pre-Petition Obligations in accordance with the Pre-Petition Credit Agreement until all Pre-Petition Obligations are paid in full in Cash and (ii) following the payment in full in Cash of the Pre-Petition Obligations, the Credit Parties shall remit 100% of such Net Asset Sale Proceeds to Administrative Agent to prepay the Loans and/or permanently reduce the Commitments as set forth in Section 2.14(a).  Notwithstanding the foregoing, solely with respect to the Asset Sales permitted under Section 6.9(e), the Credit Parties may retain Net Asset Sale Proceeds therefrom in an aggregate amount not to exceed $100,000, to the extent the same is approved by the Bankruptcy Court.

(b)    <u>Insurance/Condemnation Proceeds</u>.  No later than the first Business Day following the date of receipt by any Credit Party, or Administrative Agent as loss payee, of any Net Insurance/Condemnation Proceeds, the Credit Parties shall prepay the Loans and/or the Commitments shall be permanently reduced as set forth in Section 2.14(a) in an aggregate amount equal to 100% of such Net Insurance/Condemnation Proceeds.

(c)    <u>Issuance of Equity Securities</u>.  On the date of receipt by any Credit Party of any Cash proceeds from a capital contribution to, or the issuance of any Capital Stock of, such

42

Credit Party or any of its Subsidiaries, Borrowers shall prepay the Loans and/or the Commitments shall be permanently reduced as set forth in Section 2.14(a) in an aggregate amount equal to 100% of such proceeds, net of underwriting discounts and commissions and other reasonable costs and expenses associated therewith, in each case, to the extent constituting Valid Expenses, including reasonable legal fees and expenses.

(d)      Issuance of Debt.  On the date of receipt by any Credit Party or any of its Subsidiaries of any Cash proceeds from the incurrence of any Indebtedness of any Credit Party or any of its Subsidiaries (other than with respect to any Indebtedness permitted to be incurred pursuant to Section 6.1), Borrowers shall prepay the Loans and/or the Commitments shall be permanently reduced as set forth in Section 2.14(a) in an aggregate amount equal to 100% of such proceeds, net of underwriting discounts and commissions and other reasonable costs and expenses associated therewith, in each case, to the extent constituting Valid Expenses, including reasonable legal fees and expenses.

(e)      [Intentionally Reserved.]

(f)      [Intentionally Reserved.]

(g)      [Intentionally Reserved.]

(h)      Tax Refunds.  No later than the first Business Day following receipt by any Credit Party or any of its Subsidiaries of any Tax refunds, Borrowers shall prepay Loans and/or the Commitments shall be reduced as set forth in Section 2.14(a) in the amount of such excess.

(i)      Prepayment Certificate.  Concurrently with any prepayment of the Loans and/or reduction of the Commitments pursuant to Section 2.12 and Section 2.13, Borrower Representative shall deliver to Administrative Agent a certificate of an Authorized Officer of Borrower Representative demonstrating the calculation of the amount of the applicable net proceeds or other amounts and compensation owing to Lenders.  In the event that Borrower Representative shall subsequently determine that the actual amount received exceeded the amount set forth in such certificate, Borrowers shall promptly make an additional prepayment of the Loans and/or the Commitments shall be permanently reduced in an amount equal to such excess, and Borrower Representative shall concurrently therewith deliver to Administrative Agent a certificate of an Authorized Officer of Borrower Representative demonstrating the derivation of such excess.

**2.14.   Application of Prepayments/Reductions.**

(a)      Application of Voluntary and Mandatory Prepayments.  Any voluntary prepayments of the Term Loan pursuant to Section 2.12, and any mandatory prepayment of any Loan pursuant to Section 2.13 shall, in each case, be applied as follows:

first, to the payment of all fees and all expenses specified in Section 10.2, to the full extent thereof;

second, to the payment of any accrued interest (other than Default Rate interest), if any;

third, to the payment of any accrued interest at the Default Rate;

fourth, to prepay the Term Loans to the full extent thereof;

fifth, to provide Letter of Credit Cash Collateralization with respect to the Existing Letters of Credit and to permanently reduce the Commitments by the amount of such Letter of Credit Cash Collateralization; and

sixth, to further permanently reduce the Commitments to the full extent thereof; and

seventh, to pay any other Obligations then outstanding to the full extent thereof.

(b)    Application of Prepayments of Loans to Base Rate Loans and LIBOR Rate Loans.  Any prepayment of the Loans shall be applied first to Base Rate Loans to the full extent thereof before application to LIBOR Rate Loans, in each case in a manner which minimizes the amount of any payments required to be made by Borrower Representative pursuant to Section 2.17(c).

**2.15.    General Provisions Regarding Payments.**

(a)    All payments by Borrowers of principal, interest, fees and other Obligations shall be made by wire transfer not later than 2:00 p.m. (New York City time) on the date specified for payment under this Agreement to the account designated by Administrative Agent from time to time maintained by Administrative Agent or its Affiliates for the account of the Lenders or Administrative Agent, as the case may be, in Dollars in immediately available funds. Any payment received after 2:00 p.m. (New York City time) shall be deemed received on the next Business Day. All payments in respect of the principal amount of any Loan shall be accompanied by payment of accrued interest on, and any fees and costs required to be paid with respect to, the principal amount being repaid or prepaid.

(b)    Administrative Agent shall promptly distribute to each Lender at such address and/or account as such Lender shall indicate in writing, such Lender's applicable Pro Rata Share of all payments and prepayments of principal and interest due hereunder, together with all other amounts due with respect thereto, including all fees payable with respect thereto, to the extent received by Administrative Agent.

(c)    Notwithstanding the foregoing provisions hereof, if any Conversion/Continuation Notice is withdrawn as to any Affected Lender or if any Affected Lender makes Base Rate Loans in lieu of its Pro Rata Share of any LIBOR Rate Loans, Administrative Agent shall give effect thereto in apportioning payments received thereafter.

(d)    Subject to the provisos set forth in the definition of "Interest Period," whenever any payment to be made hereunder shall be stated to be due on a day that is not a Business Day, such payment shall be made on the next succeeding Business Day and such extension of time shall be included in the computation of the payment of interest hereunder or of the commitment fees hereunder.

(e)    Administrative Agent shall deem any payment by or on behalf of Borrowers hereunder that is not made in same day funds prior to 2:00 p.m. (New York City time) to be a non-conforming payment. Any such payment shall not be deemed to have been received by Administrative Agent until the later of (i) the time such funds become available funds, and (ii) the applicable next Business Day. Administrative Agent shall give prompt telephonic notice to Borrower Representative and each applicable Lender (confirmed in writing) if any payment is non-conforming. Any non-conforming payment may constitute or become a Default or Event of Default in accordance with the terms of Section 8.1(a). Interest shall continue to accrue on any principal as to which a non-conforming payment is made until such funds become available funds (but in no event less than the period from the date of such payment to the next succeeding applicable Business Day) at the Default Rate determined pursuant to Section 2.9 from the date such amount was due and payable until the date such amount is paid in full in Cash.

(f)    If an Event of Default shall have occurred and not otherwise been waived, and the Obligations have become due and payable in full in Cash hereunder, whether by acceleration, maturity or otherwise, all payments or proceeds received by any Agent hereunder or under any Collateral Document in respect of any of the Obligations, including all proceeds received by any Agent in respect of any sale, any collection from, or other realization upon all or any part of the Collateral, shall be applied in full or in part as follows: first, to the payment of all costs and expenses of such sale, collection or other realization, including reasonable compensation to each Agent and its agents and counsel, and all other expenses, liabilities and advances made or incurred by any Agent in connection therewith, and all amounts for which any Agent is entitled to indemnification hereunder or under any Collateral Document (in its capacity as an Agent and not as a Lender) and all advances made by any Agent under any Collateral Document for the account of the applicable Grantor, and to the payment of all costs and expenses paid or incurred by any Agent in connection with the exercise of any right or remedy hereunder or under any Collateral Document, all in accordance with the terms hereof or thereof, together with (x) the costs, expenses, indemnities, fees and premiums owing to Issuing Bank in connection with the Existing Letters of Credit and (y) the Letter of Credit Cash Collateralization for all outstanding Existing Letters of Credit (such amounts under the foregoing clauses (x) and (y) to be paid pro rata with other amounts owing under this clause "first"); second, to the extent of any excess of such proceeds, to the payment of the principal, accrued and unpaid interest (including interest accrued at the Default Rate) and fees owing with respect to the Loans, for the ratable benefit of the Lenders; third, to the extent of any excess of such proceeds, to the payment of all other Obligations for the ratable benefit of the Lenders; and fourth, to the extent of any excess of such proceeds, to the payment to or upon the order of such Grantor or to whosoever may be lawfully entitled to receive the same or as a court of competent jurisdiction may direct.

**2.16.   Ratable Sharing.**   Lenders hereby agree among themselves that, except as otherwise provided in the Collateral Documents with respect to amounts realized from the exercise of rights with respect to Liens on the Collateral, if any of them shall, whether by voluntary payment (other than a voluntary prepayment of Loans made and applied in accordance with the terms hereof), through the exercise of any right of set-off or banker's lien, by counterclaim or cross action or by the enforcement of any right under the Credit Documents or otherwise, or as adequate protection of a deposit treated as Cash Collateral, receive payment or reduction of a proportion of the aggregate amount of principal, interest, amounts payable in respect of Existing Letters of Credit, fees and other amounts then due and owing to such Lender hereunder or under the other

Credit Documents (collectively, the **"Aggregate Amounts Due"** to such Lender) which is greater than the proportion received by any other Lender in respect of the Aggregate Amounts Due to such other Lender, then the Lender receiving such proportionately greater payment shall (a) notify Administrative Agent and each other Lender of the receipt of such payment and (b) apply a portion of such payment to purchase participations (which it shall be deemed to have purchased from each seller of a participation simultaneously upon the receipt by such seller of its portion of such payment) in the Aggregate Amounts Due to the other Lenders so that all such recoveries of Aggregate Amounts Due shall be shared by all Lenders in proportion to the Aggregate Amounts Due to them; <u>provided</u>, if all or part of such proportionately greater payment received by such purchasing Lender is thereafter recovered from such Lender upon the bankruptcy or reorganization of any Credit Party or otherwise (including in the Cases), those purchases shall be rescinded and the purchase prices paid for such participations shall be returned to such purchasing Lender ratably to the extent of such recovery, but without interest.  Each Credit Party expressly consents to the foregoing arrangement and agrees that any holder of a participation so purchased may exercise any and all rights of banker's lien, set-off or counterclaim with respect to any and all monies owing by a Credit Party to that holder with respect thereto as fully as if that holder were owed the amount of the participation held by that holder.

### 2.17.    Making or Maintaining LIBOR Rate Loans.

(a)    <u>Inability to Determine Applicable Interest Rate</u>.  In the event that Administrative Agent shall have determined (which determination shall be final and conclusive and binding upon all parties hereto), on any Interest Rate Determination Date with respect to any LIBOR Rate Loans, that by reason of circumstances affecting the London interbank market adequate and fair means do not exist for ascertaining the interest rate applicable to such LIBOR Rate Loans on the basis provided for in the definition of "Adjusted LIBOR Rate," Administrative Agent shall on such date give notice (by telefacsimile or by telephone confirmed in writing) to Borrower Representative and each Lender of such determination, whereupon (i) no Loans may be made as, or continued as or converted to, LIBOR Rate Loans until such time as Administrative Agent notifies Borrower Representative and Lenders that the circumstances giving rise to such notice no longer exist, and (ii) any Funding Notice or Conversion/Continuation Notice given by Borrower Representative with respect to any LIBOR Rate Loan in respect of which such determination was made shall be deemed to be rescinded by Borrower Representative, or shall be deemed a Funding Notice or Conversion/Continuation Notice for a Base Rate Loan, at the election of Borrower Representative.

(b)    <u>Illegality or Impracticability of LIBOR Rate Loans</u>.  In the event that on any date any Lender shall have determined (which determination shall be final and conclusive and binding upon all parties hereto but shall be made only after consultation with Borrower Representative and Administrative Agent) that the making, maintaining or continuation of its LIBOR Rate Loans (i) has become unlawful as a result of compliance by such Lender in good faith with any law, treaty, governmental rule, regulation, guideline or order (or would conflict with any such treaty, governmental rule, regulation, guideline or order not having the force of law even though the failure to comply therewith would not be unlawful), or (ii) has become impracticable, as a result of contingencies occurring after the date hereof which materially and adversely affect the London interbank market or the position of such Lender in that market, then, and in any such event, such Lender shall be an **"Affected Lender"** and it shall on that day give notice (by

46

telefacsimile or by telephone confirmed in writing) to Borrower Representative and Administrative Agent of such determination (which notice Administrative Agent shall promptly transmit to each other Lender). Thereafter, (A) the obligation of the Affected Lender to make or continue Loans as, or to convert Loans to, LIBOR Rate Loans shall be suspended until such notice shall be withdrawn by the Affected Lender; (B) to the extent such determination by the Affected Lender relates to a LIBOR Rate Loan then being requested by Borrower Representative pursuant to a Funding Notice or a Conversion/Continuation Notice, the Affected Lender shall make such Loan as (or continue such Loan as or convert such Loan to, as the case may be) a Base Rate Loan; (C) the Affected Lender's obligation to maintain its outstanding LIBOR Rate Loans (the **"Affected Loans"**) shall be terminated at the earlier to occur of the expiration of the Interest Period then in effect with respect to the Affected Loans or when required by law; and (D) the Affected Loans shall automatically convert into Base Rate Loans on the date of such termination. Notwithstanding the foregoing, to the extent a determination by an Affected Lender as described above relates to a LIBOR Rate Loan then being requested by Borrower Representative pursuant to a Funding Notice or a Conversion/Continuation Notice, Borrower Representative shall have the option, subject to the provisions of Section 2.17(c), to rescind such Funding Notice or Conversion/Continuation Notice as to all Lenders by giving notice (by telefacsimile or by telephone confirmed in writing) to Administrative Agent of such rescission on the date on which the Affected Lender gives notice of its determination as described above (which notice of rescission Administrative Agent shall promptly transmit to each other Lender). Except as provided in the immediately preceding sentence, nothing in this Section 2.17(b) shall affect the obligation of any Lender other than an Affected Lender to make or maintain Loans as, or to convert Loans to, LIBOR Rate Loans in accordance with the terms hereof.

(c)     Compensation for Breakage or Non-Commencement of Interest Periods. Borrowers shall compensate each Lender, upon written request by such Lender (which request shall set forth the basis for requesting such amounts), for all reasonable losses, expenses and liabilities (including any interest paid or calculated to be due and payable by such Lender to lenders of funds borrowed by it to make or carry its LIBOR Rate Loans and any loss, expense or liability sustained by such Lender in connection with the liquidation or re-employment of such funds but excluding loss of anticipated profits) which such Lender may sustain: (i) if for any reason (other than a default by such Lender) a borrowing of any LIBOR Rate Loan does not occur on a date specified therefor in a Funding Notice or a telephonic request for borrowing, or a conversion to or continuation of any LIBOR Rate Loan does not occur on a date specified therefor in a Conversion/Continuation Notice or a telephonic request for conversion or continuation; (ii) if any prepayment or other principal payment of, or any conversion of, any of its LIBOR Rate Loans occurs on any day other than the last day of an Interest Period applicable to that Loan (whether voluntary, mandatory, automatic, by reason of acceleration, or otherwise); or (iii) if any prepayment of any of its LIBOR Rate Loans is not made on any date specified in a notice of prepayment given by Borrower Representative.

(d)     Booking of LIBOR Rate Loans. Any Lender may make, carry or transfer LIBOR Rate Loans at, to, or for the account of any of its branch offices or the office of an Affiliate of such Lender.

(e)     Assumptions Concerning Funding of LIBOR Rate Loans. Calculation of all amounts payable to a Lender under this Section 2.17 and under Section 2.18 shall be made as

though such Lender had actually funded each of its relevant LIBOR Rate Loans through the purchase of a LIBOR deposit bearing interest at the rate obtained pursuant to <u>clause (a)</u> of the definition of "Adjusted LIBOR Rate" in an amount equal to the amount of such LIBOR Rate Loan and having a maturity comparable to the relevant Interest Period and through the transfer of such LIBOR deposit from an offshore office of such Lender to a domestic office of such Lender in the United States; <u>provided</u>, <u>however</u>, each Lender may fund each of its LIBOR Rate Loans in any manner it sees fit and the foregoing assumptions shall be utilized only for the purposes of calculating amounts payable under this <u>Section 2.17</u> and under <u>Section 2.18</u>.

(f)     <u>Dodd-Frank/Basel III</u>.  For the avoidance of doubt, this <u>Section 2.17</u> shall apply to all requests, rules, guidelines or directives concerning liquidity and capital adequacy issued by any United States regulatory authority (A) under or in connection with the implementation of the Dodd-Frank Wall Street Reform and Consumer Protection Act and (B) in connection with the implementation of the recommendations of the Bank for International Settlements or the Basel Committee on Banking Regulations and Supervisory Practices (or any successor or similar authority), regardless of the date adopted, issued, promulgated or implemented (which determination shall, absent manifest error, be final and conclusive and binding upon all parties hereto).

**2.18.    Increased Costs; Capital Adequacy.**

(a)     <u>Compensation For Increased Costs and Taxes</u>.  Subject to the provisions of <u>Section 2.19</u> (which shall be controlling with respect to the matters covered thereby), in the event that any Lender (which term shall include Issuing Bank for purposes of this <u>Section 2.18(a)</u>) shall determine (which determination shall, absent manifest error, be final and conclusive and binding upon all parties hereto) that any law, treaty or governmental rule, regulation or order, or any change therein or in the interpretation, administration or application thereof (including the introduction of any new law, treaty or governmental rule, regulation or order), or any determination of a Governmental Authority, in each case that becomes effective after the date hereof, or compliance by such Lender with any guideline, request or directive issued or made after the date hereof by any Governmental Authority (whether or not having the force of law):  (i) subjects such Lender (or its applicable lending office) to any additional Tax (other than any Tax on the overall net income of such Lender) with respect to this Agreement or any of the other Credit Documents or any of its obligations hereunder or thereunder or any payments to such Lender (or its applicable lending office) of principal, interest, fees or any other amount payable hereunder; (ii) imposes, modifies or holds applicable any reserve (including any marginal, emergency, supplemental, special or other reserve), special deposit, compulsory loan, FDIC insurance or similar requirement against assets held by, or deposits or other liabilities in or for the account of, or advances or loans by, or other credit extended by, or any other acquisition of funds by, any office of such Lender (other than any such reserve or other requirements with respect to LIBOR Rate Loans that are reflected in the definition of "Adjusted LIBOR Rate"); or (iii) imposes any other condition (other than with respect to a Tax matter) on or affecting such Lender (or its applicable lending office) or its obligations hereunder or the London interbank market; and the result of any of the foregoing is to increase the cost to such Lender of agreeing to make, making or maintaining Loans hereunder or to reduce any amount received or receivable by such Lender (or its applicable lending office) with respect thereto; then, in any such case, Borrowers shall promptly pay to such Lender, upon receipt of the statement referred to in the next sentence, such additional amount or amounts (in the form of an

48

increased rate of, or a different method of calculating, interest or otherwise as such Lender in its sole discretion shall determine) as may be necessary to compensate such Lender for any such increased cost or reduction in amounts received or receivable hereunder.  Such Lender shall deliver to Borrower Representative (with a copy to Administrative Agent) a written statement, setting forth in reasonable detail the basis for calculating the additional amounts owed to such Lender under this Section 2.18(a), which statement shall be conclusive and binding upon all parties hereto absent manifest error.

(b)     Capital Adequacy Adjustment.  In the event that any Lender (which term shall include Issuing Bank for purposes of this Section 2.18(b)) shall have determined (which determination shall, absent manifest error, be final and conclusive and binding upon all parties hereto) that (i) the adoption, effectiveness, phase-in or applicability of any law, rule or regulation (or any provision thereof) regarding capital adequacy, or any change therein or in the interpretation or administration thereof by any Governmental Authority charged with the interpretation or administration thereof, or (ii) compliance by such Lender (or its applicable lending office) or any company controlling such Lender with any guideline, request or directive regarding capital adequacy (whether or not having the force of law) of any such Governmental Authority, in each case after the Closing Date, has or would have the effect of reducing the rate of return on the capital of such Lender or any company controlling such Lender as a consequence of, or with reference to, such Lender's Loans, Commitments or Existing Letters of Credit, or participations therein or other obligations hereunder with respect to the Loans or Existing Letters of Credit to a level below that which such Lender or such controlling company could have achieved but for such adoption, effectiveness, phase-in, applicability, change or compliance (taking into consideration the policies of such Lender or such controlling company with regard to capital adequacy), then from time to time, within ten (10) Business Days after receipt by Borrower Representative from such Lender of the statement referred to in the next sentence, Borrowers shall pay to such Lender such additional amount or amounts as will compensate such Lender or such controlling company on an after-Tax basis for such reduction.  Such Lender shall deliver to Borrower Representative (with a copy to Administrative Agent) a written statement, setting forth in reasonable detail the basis for calculating the additional amounts owed to Lender under this Section 2.18(b), which statement shall be conclusive and binding upon all parties hereto absent manifest error.  For the avoidance of doubt, clauses (i) and (ii) of this Section 2.18(b) shall apply to all requests, rules, guidelines or directives concerning liquidity and capital adequacy issued by any United States regulatory authority (A) under or in connection with the implementation of the Dodd-Frank Wall Street Reform and Consumer Protection Act and (B) in connection with the implementation of the recommendations of the Bank for International Settlements or the Basel Committee on Banking Regulations and Supervisory Practices (or any successor or similar authority), regardless of the date adopted, issued, promulgated or implemented (which determination shall, absent manifest error, be final and conclusive and binding upon all parties hereto).

### 2.19.  Taxes; Withholding, etc.

(a)     Payments to Be Free and Clear.  All sums payable by any Credit Party hereunder and under the other Credit Documents shall (except to the extent required by law) be paid free and clear of, and without any deduction or withholding on account of, any Tax (other than an Excluded Tax) imposed, levied, collected, withheld or assessed by or within the United States or any political subdivision in or of the United States or any other jurisdiction from or to

49

which a payment is made by or on behalf of any Credit Party or by any federation or organization of which the United States or any such jurisdiction is a member at the time of payment.

(b)    <u>Withholding of Taxes</u>.  If any Credit Party or any other Person is required by law to make any deduction or withholding on account of any such Tax from any sum paid or payable by any Credit Party to Administrative Agent or any Lender (which term shall include Issuing Bank for purposes of this <u>Section 2.19(b)</u>) under any of the Credit Documents: (i) Borrower Representative shall notify Administrative Agent of any such requirement or any change in any such requirement as soon as Borrower Representative becomes aware of it; (ii) Borrowers shall pay any such Tax before the date on which penalties attach thereto, such payment to be made (if the liability to pay is imposed on any Credit Party) for its own account or (if that liability is imposed on Administrative Agent or such Lender, as the case may be) on behalf of and in the name of Administrative Agent or such Lender; (iii) except with respect to an Excluded Tax, the sum payable by such Credit Party in respect of which the relevant deduction, withholding or payment is required shall be increased to the extent necessary to ensure that, after the making of that deduction, withholding or payment, Administrative Agent or such Lender, as the case may be, receives on the due date a net sum equal to what it would have received had no such deduction, withholding or payment been required or made; and (iv) within thirty (30) days after paying any sum from which it is required by law to make any deduction or withholding, and within thirty (30) days after the due date of payment of any Tax which it is required by <u>clause (ii)</u> of this <u>Section 2.19(b)</u> to pay, Borrower Representative shall deliver to Administrative Agent evidence satisfactory to the other affected parties of such deduction, withholding or payment and of the remittance thereof to the relevant taxing or other authority; <u>provided</u>, no such additional amount shall be required to be paid to any Lender under <u>clause (iii)</u> of this <u>Section 2.19(b)</u> except to the extent that any change after the date hereof (in the case of each Lender listed on the signature pages hereof on the Closing Date) or after the effective date of the Assignment Agreement pursuant to which such Lender became a Lender (in the case of each other Lender) in any such requirement for a deduction, withholding or payment as is mentioned therein shall result in an increase in the rate of such deduction, withholding or payment from that in effect at the date hereof or at the date of such Assignment Agreement in respect of payments to such Lender.

(c)    <u>Evidence of Exemption From United States Withholding Tax</u>.  Each Lender that is not a United States Person (as such term is defined in Section 7701(a)(30) of the Internal Revenue Code) for United States federal income Tax purposes (a **"Non-US Lender"**) shall deliver to Administrative Agent for transmission to Borrower Representative, on or prior to the Closing Date (in the case of each Lender listed on the signature pages hereof on the Closing Date) or on or prior to the date of the Assignment Agreement pursuant to which it becomes a Lender (in the case of each other Lender), and at such other times as may be necessary in the determination of Borrower Representative or Administrative Agent (each in the reasonable exercise of its discretion), (i) two (2) original copies of Internal Revenue Service Form W-8BEN-E or W-8ECI (or any successor forms), properly completed and duly executed by such Lender, and such other documentation required under the Internal Revenue Code and reasonably requested by Borrower Representative to establish that such Lender is not subject to deduction or withholding of United States federal income Tax with respect to any payments to such Lender of principal, interest, fees or other amounts payable under any of the Credit Documents, or (ii) if such Lender is not a "bank" or other Person described in Section 881(c)(3) of the Internal Revenue Code and cannot deliver Internal Revenue Service Form W-8ECI pursuant to <u>clause (i)</u> of this <u>Section 2.19(c)</u>, a Certificate

Regarding Non-Bank Status together with two (2) original copies of Internal Revenue Service Form W-8BEN-E (or any successor form), properly completed and duly executed by such Lender, and such other documentation required under the Internal Revenue Code or reasonably requested by Borrower Representative to establish that such Lender is not subject to deduction or withholding of United States federal income Tax with respect to any payments to such Lender of interest payable under any of the Credit Documents.  Each Lender required to deliver any forms, certificates or other evidence with respect to United States federal income Tax withholding matters pursuant to this Section 2.19(c) hereby agrees, from time to time after the initial delivery by such Lender of such forms, certificates or other evidence, whenever a lapse in time or change in circumstances renders such forms, certificates or other evidence obsolete or inaccurate in any material respect, that such Lender shall promptly deliver to Administrative Agent for transmission to Borrower Representative two (2) new original copies of Internal Revenue Service Form W-8BEN-E or W-8ECI, or a Certificate Regarding Non-Bank Status and two (2) original copies of Internal Revenue Service Form W-8BEN-E (or any successor form), as the case may be, properly completed and duly executed by such Lender, and such other documentation required under the Internal Revenue Code and reasonably requested by Borrower Representative to confirm or establish that such Lender (or the beneficial owner) is not subject to deduction or withholding of United States federal income Tax with respect to payments to such Lender under the Credit Documents, or notify Administrative Agent and Borrower Representative of its inability to deliver any such forms, certificates or other evidence.  Borrowers shall not be required to pay any additional amount to any Non-US Lender under Section 2.19(b)(iii) if such Lender shall have failed (I) to deliver the forms, certificates or other evidence referred to in the second sentence of this Section 2.19(c), or (II) to notify Administrative Agent and Borrower Representative of its inability to deliver any such forms, certificates or other evidence, as the case may be; provided, if such Lender shall have satisfied the requirements of the first sentence of this Section 2.19(c) on the Closing Date or on the date of the Assignment Agreement pursuant to which it became a Lender, as applicable, nothing in this last sentence of Section 2.19(c) shall relieve Borrowers of Borrowers' obligation to pay any additional amounts pursuant this Section 2.19 in the event that, as a result of any change in any applicable law, treaty or governmental rule, regulation or order, or any change in the interpretation, administration or application thereof, such Lender is no longer properly entitled to deliver forms, certificates or other evidence at a subsequent date establishing the fact that such Lender is not subject to withholding as described herein.

(d)     Excluded Taxes.  Borrowers shall have no obligation to pay any additional amounts pursuant to this Section 2.19 with respect to Excluded Taxes.

(e)     Dodd-Frank/Basel III.  For the avoidance of doubt, this Section 2.19 shall apply to all requests, rules, guidelines or directives concerning liquidity and capital adequacy issued by any United States regulatory authority (A) under or in connection with the implementation of the Dodd-Frank Wall Street Reform and Consumer Protection Act and (B) in connection with the implementation of the recommendations of the Bank for International Settlements or the Basel Committee on Banking Regulations and Supervisory Practices (or any successor or similar authority), regardless of the date adopted, issued, promulgated or implemented (which determination shall, absent manifest error, be final and conclusive and binding upon all parties hereto).

**2.20.  Obligation to Mitigate**.  Each Lender (which term shall include Issuing Bank for purposes of this Section 2.20) agrees that, as promptly as practicable after the officer of such Lender responsible for administering its Loans or Existing Letters of Credit, as the case may be, becomes aware of the occurrence of an event or the existence of a condition that would cause such Lender to become an Affected Lender or that would entitle such Lender to receive payments under Section 2.17, 2.18 or 2.19, it will, to the extent not inconsistent with the internal policies of such Lender and any applicable legal or regulatory restrictions, use reasonable efforts to (a) make, issue, fund or maintain its Credit Extensions, including any Affected Loans, through another office of such Lender, or (b) take such other measures as such Lender may deem reasonable, if as a result thereof the circumstances which would cause such Lender to be an Affected Lender would cease to exist or the additional amounts which would otherwise be required to be paid to such Lender pursuant to Section 2.17, 2.18 or 2.19 would be materially reduced and if, as determined by such Lender in its sole discretion, the making, issuing, funding or maintaining of such Commitments, Loans or Existing Letters of Credit through such other office or in accordance with such other measures, as the case may be, would not otherwise adversely affect such Commitments, Loans or Existing Letters of Credit or the interests of such Lender; provided, such Lender will not be obligated to utilize such other office pursuant to this Section 2.20 unless Borrowers agrees to pay all incremental expenses incurred by such Lender as a result of utilizing such other office as described above.  A certificate as to the amount of any such expenses payable by Borrowers pursuant to this Section 2.20 (setting forth in reasonable detail the basis for requesting such amount) submitted by such Lender to Borrower Representative (with a copy to Administrative Agent) shall be conclusive absent manifest error.

**2.21.  Defaulting Lenders.**  Anything contained herein to the contrary notwithstanding, in the event that any Lender (a) violates any provision of Section 9.5(c), (b) other than at the direction or request of any Governmental Authority, defaults in its obligation to fund any Term Loan or its portion of any unreimbursed payment under Section 2.3(e) (in each case, a **"Defaulted Loan"** and the failure to so fund a **"Funding Default"**); (c) has notified Borrower Representative or Administrative Agent that it does not intend to comply with its funding obligations or has made a public statement to that effect with respect to its funding obligations hereunder or under other agreements generally in which it commits to extend credit; (d) has failed, within three (3) Business Days after reasonable request by Administrative Agent, to confirm in a manner satisfactory to Administrative Agent that it will comply with its funding obligations (provided, that such Lender shall cease to be a Defaulting Lender pursuant to this clause (d) upon receipt of such confirmation by Administrative Agent); or (e) has, or has a direct or indirect parent company that has, (i) become the subject of a proceeding under the Bankruptcy Code or any other debtor relief law or (ii) had a receiver, conservator, trustee, administrator, assignee for the benefit of creditors or similar Person charged with reorganization or liquidation of its business or a custodian appointed for it (in each case, a **"Defaulting Lender"**) then (A) during any Default Period with respect to such Defaulting Lender, such Defaulting Lender shall be deemed not to be a "Lender" for purposes of voting on any matters (including the granting of any consents or waivers) with respect to any of the Credit Documents; (B) to the extent permitted by applicable law, until such time as the Default Excess, if any, with respect to such Defaulting Lender shall have been reduced to zero, (I) any voluntary prepayment of the Loans shall, if Administrative Agent so directs at the time of making such voluntary prepayment, be applied to the Loans of other Lenders as if such Defaulting Lender had no Loans outstanding and the Term Loan Exposure of such Defaulting Lender were zero, and (II) any mandatory prepayment of the Loans shall, if Administrative Agent so directs at the time of

52

making such mandatory prepayment, be applied to the Loans of other Lenders (but not to the Loans of such Defaulting Lender) as if such Defaulting Lender had funded all Defaulted Loans of such Defaulting Lender, it being understood and agreed that Borrowers shall be entitled to retain any portion of any mandatory prepayment of the Loans that is not paid to such Defaulting Lender solely as a result of the operation of the provisions of this clause (B); (C) such Defaulting Lender's Commitments, Loans and Pro Rata Share of the Letter of Credit Usage shall be excluded for purposes of calculating the commitment fees payable to Lenders in respect of any day during any Default Period with respect to such Defaulting Lender, and such Defaulting Lender shall not be entitled to receive any commitment fee pursuant to Section 2.10 with respect to such Defaulting Lender's Commitment in respect of any Default Period with respect to such Defaulting Lender; and (D) the outstanding Term Loans and Letter of Credit Usage as at any date of determination shall be calculated as if such Defaulting Lender had funded all Defaulted Loans of such Defaulting Lender. No Commitment of any Lender shall be increased or otherwise affected, and, except as otherwise expressly provided in this Section 2.21, performance by the Credit Parties of their respective obligations hereunder and the other Credit Documents shall not be excused or otherwise modified as a result of any Funding Default or the operation of this Section 2.21. The rights and remedies against a Defaulting Lender under this Section 2.21 are in addition to other rights and remedies which Borrowers may have against such Defaulting Lender with respect to any Funding Default and which Administrative Agent or any Lender may have against such Defaulting Lender with respect to any Funding Default or violation of Section 9.5(c).

**2.22. Removal or Replacement of a Lender.** Anything contained herein to the contrary notwithstanding, in the event that: (a) (i) any Lender (an **"Increased-Cost Lender"**) shall give notice to Borrower Representative that such Lender is an Affected Lender or that such Lender is entitled to receive payments under Section 2.18, 2.19 or 2.20, (ii) the circumstances which have caused such Lender to be an Affected Lender or which entitle such Lender to receive such payments shall remain in effect, and (iii) such Lender shall fail to withdraw such notice within five (5) Business Days after Borrower Representative's request for such withdrawal; or (b) (i) any Lender shall become a Defaulting Lender, (ii) the Default Period for such Defaulting Lender shall remain in effect, and (iii) such Defaulting Lender shall fail to cure the default as a result of which it has become a Defaulting Lender within five (5) Business Days after Borrower Representative's request that it cure such default; or (c) in connection with any proposed amendment, modification, termination, waiver or consent with respect to any of the provisions hereof as contemplated by Section 10.5, the consent of Administrative Agent and the Requisite Lenders shall have been obtained but the consent of one or more of such other Lenders (each a **"Non-Consenting Lender"**) whose consent is required shall not have been obtained; then, with respect to each such Increased-Cost Lender, Defaulting Lender or Non-Consenting Lender (the **"Terminated Lender"**), Administrative Agent may (and, in the case of an Increased-Cost Lender with respect to which Borrower Representative has identified a Replacement Lender, Administrative Agent shall, after receiving written request from Borrower Representative, remove such Increased-Cost Lender), by giving written notice to Borrower Representative and any Terminated Lender of its election to do so, elect to cause such Terminated Lender (and such Terminated Lender hereby irrevocably agrees) to assign its outstanding Loans and its Commitments, if any, in full to one or more Eligible Assignees (each, a **"Replacement Lender"**) in accordance with the provisions of Section 10.6 and Terminated Lender shall pay any fees payable thereunder in connection with such assignment; provided, (1) on the date of such assignment, the Replacement Lender shall pay to Terminated Lender an amount equal to the sum of (A) an amount equal to the principal of, and all

53

accrued interest on, all outstanding Loans of the Terminated Lender, (B) an amount equal to all unreimbursed drawings that have been funded by such Terminated Lender, together with all then unpaid interest with respect thereto at such time and (C) an amount equal to all accrued, but theretofore unpaid fees owing to such Terminated Lender pursuant to Section 2.10; (2) on the date of such assignment, Borrowers shall pay any amounts payable to such Terminated Lender pursuant to Section 2.18 or 2.19; and (3) in the event such Terminated Lender is a Non-Consenting Lender, each Replacement Lender shall consent, at the time of such assignment, to each matter in respect of which such Terminated Lender was a Non-Consenting Lender; provided, Administrative Agent may not make such election with respect to any Terminated Lender that is also an Issuing Bank unless, prior to the effectiveness of such election, Administrative Agent shall have caused each outstanding Existing Letter of Credit issued thereby to be cancelled.   In the event that the Terminated Lender fails to execute an Assignment Agreement pursuant to Section 10.6 within five (5) Business Days after receipt by the Terminated Lender of notice of replacement pursuant to this Section 2.22 and presentation to such Terminated Lender of an Assignment Agreement evidencing an assignment pursuant to this Section 2.22, the Terminated Lender shall be deemed to have executed and delivered such Assignment Agreement, and upon the execution and delivery of Assignment Agreement by the Replacement Lender and Administrative Agent, shall be effective for purposes of this Section 2.22 and Section 10.6.  Upon the prepayment of all amounts owing to any Terminated Lender and the termination of such Terminated Lender's Commitments, if any, such Terminated Lender shall no longer constitute a "Lender" for purposes hereof; provided, any rights of such Terminated Lender to indemnification hereunder shall survive as to such Terminated Lender.

2.23.    **Appointment of Borrower Representative.**  Each Credit Party hereby designates Holdings as Borrower Representative hereunder to act on its behalf for the purposes of issuing Notices, giving instructions with respect to the disbursement of the proceeds of the Loans, selecting interest rate options, giving and receiving all other notices and consents hereunder or under any of the other Credit Documents and taking all other actions (including in respect of compliance with covenants and amendments to the Credit Documents) on behalf of any Credit Party or Credit Parties under the Credit Documents.  Borrower Representative hereby accepts such appointment as Borrower Representative.  Each Agent and each Lender may regard any notice or other communication pursuant to any Credit Document from Borrower Representative as a notice or communication from all Credit Parties, and may give any notice or communication required or permitted to be given to any Credit Party or Credit Parties hereunder to Borrower Representative on behalf of such Credit Party or Credit Parties.  Each Credit Party agrees that each notice, election, representation and warranty, covenant, agreement and undertaking made on its behalf by Borrower Representative shall be deemed for all purposes to have been made by such Credit Party and shall be binding upon and enforceable against such Credit Party to the same extent as if the same had been made directly by such Credit Party.

2.24.    **Reallocation.**  If any Lender is a Defaulting Lender, all or a portion of such Defaulting Lender's obligations with respect to Existing Letters of Credit (unless such Lender is the Issuing Bank) shall, at Administrative Agent's election at any time or upon Issuing Bank's written request delivered to Administrative Agent (in each case, whether before or after the occurrence of any Default or Event of Default), be reallocated to and assumed by the Lenders that are not Defaulting Lenders in accordance with their Pro Rata Share (calculated as if the Defaulting Lender's Pro Rata Share was reduced to zero and each other Lender's Pro Rata had been increased

proportionately); provided, that no such Lender shall be reallocated any such amounts or be required to fund any amounts that would cause the sum of its outstanding Term Loan Exposure to exceed its Commitment.

### 2.25.   Priority and Liens.

(a)     Each of the Credit Parties hereby covenants and agrees that upon the entry of, and subject to, the Interim Order (and, when entered, the Final Order) and subject to the Carve-Out in all respects, the Obligations:

(i)     pursuant to Section 364(c)(1) of the Bankruptcy Code, shall at all times constitute an allowed super-priority administrative expense claim in the Cases (the "**Superpriority Claim**"), subject only to the Carve-Out and having priority over any and all other administrative expenses, diminution claims and all other priority claims against the Credit Parties, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all other administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and over any and all other administrative expenses or other claims arising under sections 105, 326, 327, 328, 30, 331, 365, 503(b), 506(c), 507(a), 507(b), 726, 1113 or 1114 of the Bankruptcy Code, which super-priority claims in respect of the DIP Facility shall rank *pari passu* with each other;

(ii)     pursuant to section 364(c)(2) of the Bankruptcy Code, shall be secured by valid, binding, continuing, enforceable, fully perfected First Priority Liens on all Collateral to the extent that such Collateral was not subject to Permitted Priority Liens; it being agreed that such Collateral shall include claims and causes of action under sections 502(d), 544, 545, 547, 548, 550 and 553 of the Bankruptcy Code (collectively, "**Avoidance Actions**") and the proceeds thereof, subject to the entry of the Final Order by the Bankruptcy Court;

(iii)     pursuant to Section 364(d)(l) of the Bankruptcy Code, shall be secured by valid, binding, continuing, enforceable, fully perfected First Priority senior priming Liens on all Collateral, which Liens shall be senior to the Liens securing the Pre-Petition Security Interests and any Liens to which the Pre-Petition Security Interests are senior or rank *pari passu* (the "**Primed Liens**"), subject, in each case, only to Permitted Priority Liens (other than the Primed Liens) and the Carve-Out; and

(iv)     pursuant to Section 364(c)(3) of the Bankruptcy Code, shall be secured by valid, binding, continuing, enforceable, fully-perfected, junior Liens on all Collateral, subject to Permitted Priority Liens (other than the Pre-Petition Security Interests) and the Carve-Out.

(b)     The relative priorities of the Liens described in this Section 2.25 with respect to the Collateral shall be as set forth in the Orders and the Collateral Documents. In accordance with the Orders, all of the Liens described in this Section 2.25 shall be effective and perfected upon entry of the Orders, without the necessity of the execution, recordation or filings by the Credit Parties of security agreements, control agreements, financing statements or other similar documents or the possession or control by the Collateral Agent of, or over, any Collateral,

as set forth in the Orders. For the avoidance of doubt and notwithstanding the foregoing, any Superpriority Claims and Liens as set forth above or in the Collateral Documents with respect to Avoidance Actions and the proceeds thereof shall, in each case, be subject to the entry (and terms) of the Final Order.

## SECTION 3. CONDITIONS PRECEDENT

**3.1.    Closing Date**. The obligation of each Lender or Issuing Bank, as applicable, to make a Credit Extension on the Closing Date is subject to the satisfaction, or waiver in accordance with <u>Section 10.5</u>, of the following conditions on or before the Closing Date:

(a)    <u>Credit Documents</u>. Administrative Agent shall have received sufficient copies of each Credit Document, in each case, originally executed and delivered by each applicable Credit Party and any other applicable Persons for each Lender.

(b)    <u>Organizational Documents; Incumbency</u>. Administrative Agent shall have received (i) sufficient copies of each Organizational Document executed and delivered by each Credit Party, as applicable, and, to the extent applicable, certified as of a recent date by the appropriate governmental official, for each Lender, each dated the Closing Date or a recent date prior thereto; (ii) signature and incumbency certificates of the officers of such Person executing the Credit Documents to which it is a party; (iii) resolutions of the board of directors (or similar governing body) of each Credit Party approving and authorizing the execution, delivery and performance of this Agreement and the other Credit Documents to which it is a party or by which it or its assets may be bound as of the Closing Date, certified as of the Closing Date by its secretary or an assistant secretary as being in full force and effect without modification or amendment; and (iv) a good standing certificate from the applicable Governmental Authority of each Credit Party's jurisdiction of incorporation, organization or formation and in each jurisdiction in which it is qualified as a foreign corporation or other entity to do business (except to the extent that the failure to be so qualified could not reasonably be expected to have a Material Adverse Effect), each dated a recent date prior to the Closing Date.

(c)    <u>Organizational and Capital Structure</u>. The organizational structure and capital structure of Holdings and its Subsidiaries shall be as set forth on <u>Schedule 4.2</u>.

(d)    <u>Budget</u>. Administrative Agent shall have received the Budget, together with a certificate of an Authorized Officer of Borrower Representative certifying that such Budget presents, in all material respects, on a pro forma basis, the projected financial operations and disbursements of the Credit Parties for the period specified therein and such forecasts in the view of the management of the Credit Parties are reasonably achievable based upon reasonable assumptions and other information available to the Credit Parties as of the Petition Date.

(e)    <u>First Day Orders</u>. Administrative Agent and Lenders shall have received reasonably satisfactory evidence of the entry of orders approving all "first day" motions (including any motions related to Cash management or any critical vendor or supplier motions), which motions and orders shall, in each case, be in form and substance reasonably satisfactory to the Requisite Lenders.

(f)    <u>Interim Order</u>.  (i) The Interim Order shall have been entered by the Bankruptcy Court, shall be in full force and effect and shall not have been vacated, stayed, modified or amended in any respect without the prior written consent of the Requisite Lenders, and (ii) the Credit Parties shall be in compliance with the terms of the Interim Order in all respects.

(g)    <u>No Litigation</u>.  There shall not exist any action, suit, investigation, litigation, proceeding, hearing or other legal or regulatory developments, pending or threatened in any court (including the Bankruptcy Court) or before any arbitrator or Governmental Authority, which matter is not subject to the automatic stay in the Cases and that, in the reasonable opinion of Administrative Agent, singly or in the aggregate, materially impairs the transactions contemplated by the Credit Documents.

(h)    <u>Completion of Proceedings</u>.   All partnership, corporate and other proceedings taken or to be taken in connection with the transactions contemplated hereby and all documents incidental thereto not previously found acceptable by Administrative Agent and its counsel shall be reasonably satisfactory in form and substance to Administrative Agent and its counsel in all material respects, and Administrative Agent and its counsel shall have received all such counterpart originals or certified copies of such documents as Administrative Agent may reasonably request.

(i)    <u>Real Estate Restructuring Advisor</u>.  The Credit Parties shall have engaged a lease restructuring advisor on terms and conditions, and pursuant to agreements, reasonably satisfactory to the Requisite Lenders.

(j)    [Intentionally Reserved.]

(k)    <u>Personal Property Collateral</u>.  In order to create in favor of Collateral Agent, for the benefit of Secured Parties, a valid, perfected First Priority security interest in the personal property Collateral, Collateral Agent shall have received:

(i)    evidence satisfactory to Collateral Agent of the compliance by each Credit Party with their obligations under the Pledge and Security Agreement and the other Collateral Documents (including their obligations to authorize or execute, as the case may be, and deliver UCC financing statements, originals of securities, instruments and chattel paper and any agreements governing Deposit Accounts or Securities Accounts as provided therein);

(ii)    duly executed and, as appropriate, notarized Intellectual Property Security Agreements, in proper form for filing or recording in all appropriate places in all applicable jurisdictions; and

(iii)    evidence that each Credit Party shall have taken or caused to be taken any other action, executed and delivered or caused to be executed and delivered any other agreement, document and instrument  and made or caused to be made any other filing and recording reasonably required by Collateral Agent.

(l)    <u>Financial Statements</u>.   Lenders shall have received from Holdings the Historical Financial Statements.

(m)     Evidence of Insurance.  Collateral Agent shall have received a certificate from Borrower Representative's insurance broker or other evidence reasonably satisfactory to it that all insurance required to be maintained pursuant to Section 5.5 is in full force and effect.

(n)     [Intentionally Reserved.]

(o)     Fees and Expenses.  Borrowers shall have paid to Administrative Agent (i) the fees payable on the Closing Date referred to in Section 2.10, and (ii) all expenses of (A) Administrative Agent and each Lender and (B) Pre-Petition Agent and each Pre-Petition Lender, in each case, incurred prior to the Closing Date (including attorneys' fees).

(p)     Mortgage Deliverables.  Administrative Agent shall have received all Mortgage Deliverables with respect to all Real Estate Assets of the Credit Parties owned on the Closing Date, the RT Lodge and the headquarters of the Credit Parties.

(q)     No Material Adverse Effect.  Since the Petition Date, no event, circumstance or change shall have occurred that has caused or evidences, either in any case or in the aggregate, a Material Adverse Effect.

(r)     Bankruptcy Plan.  Other than the RSA, the Credit Parties shall not have executed, entered into or otherwise committed to any plan or restructuring support agreement or any other agreement or understanding concerning the terms of a chapter 11 plan or other exit strategy without the prior written consent of Administrative Agent and Lenders.

(s)     Restructuring Support Agreement.  The RSA shall have been executed and delivered by all parties thereto and shall remain in full force and effect.

**3.2.    Conditions to Each Credit Extension.**

(a)     Conditions Precedent.  The obligation of each Lender to make any Credit Extension on any Credit Date, including the Closing Date, is subject to the satisfaction, or waiver in accordance with Section 10.5, of the following conditions precedent:

(i)     Administrative Agent shall have received a fully-executed and delivered Funding Notice (other than to the extent not required by Section 2.3);

(ii)     any requested Term Loan under Section 2.1(a) shall not exceed the remaining available Commitments and shall be within the Budget;

(iii)     as of such Credit Date, the representations and warranties contained herein and in the other Credit Documents shall be true and correct in all material respects on and as of that Credit Date to the same extent as though made on and as of that date (unless such representation and warranty is qualified as to materiality or Material Adverse Effect, in which case, such representation and warranty shall be true and correct in all respects), except to the extent such representations and warranties specifically relate to an earlier date, in which case such representations and warranties shall have been true and correct in all material respects on and as of such earlier date (unless such representation

and warranty is qualified as to materiality or Material Adverse Effect, in which case, such representation and warranty shall be true and correct in all respects);

(iv)    as of such Credit Date, no event shall have occurred and be continuing or would result from the consummation of the applicable Credit Extension that would constitute a Default or an Event of Default;

(v)    as of such Credit Date, the applicable Order shall remain in effect and shall not have been modified or amended without the consent of the Requisite Lenders and shall not have been reversed or stayed pending appeal; and

(vi)    after giving effect to such Credit Extension (excluding any proceeds thereof that will be applied on the same Business Day as such Credit Extension), the aggregate Cash and Cash Equivalents of Holdings and its Subsidiaries will not exceed $6,000,000.

(b)    <u>Notices</u>.  Any Notice shall be executed by an Authorized Officer of Borrower Representative in a writing delivered to Administrative Agent.  In lieu of delivering a Notice, Borrower Representative may give Administrative Agent telephonic notice by the required time of any proposed borrowing, proposed issuance, conversion or continuation, as the case may be; <u>provided</u>, each such notice shall be promptly confirmed in writing by delivery of the applicable Notice to Administrative Agent on or before the applicable date of borrowing, proposed issuance, conversion or continuation.  Neither Administrative Agent nor any Lender shall incur any liability to Borrower Representative or any other Credit Party in acting upon any telephonic notice referred to above that Administrative Agent believes in good faith to have been given by a duly authorized officer or other Person authorized on behalf of Borrower Representative or for otherwise acting in good faith.

## SECTION 4.    REPRESENTATIONS AND WARRANTIES

In order to induce the Agents and Lenders and Issuing Bank to enter into this Agreement and to make each Credit Extension to be made thereby, each Credit Party represents and warrants to each Agent and Lender and Issuing Bank, on the Closing Date and on each Credit Date, that the following statements are true and correct:

**4.1.    Organization; Requisite Power and Authority; Qualification.**  Each Credit Party (a) is duly organized, validly existing and in good standing under the laws of its jurisdiction of organization as identified in <u>Schedule 4.1</u>, (b) subject to the entry of the Interim Order (or the Final Order, when applicable) by the Bankruptcy Court, has all requisite power and authority to own and operate its properties, to carry on its business as now conducted and as proposed to be conducted, to enter into the Credit Documents to which it is a party and to carry out the transactions contemplated thereby, and (c) is qualified to do business and in good standing in every jurisdiction where its assets are located and wherever necessary to carry out its business and operations, except in jurisdictions where the failure to be so qualified or in good standing has not had, and could not be reasonably expected to have, a Material Adverse Effect.

**4.2.    Capital Stock and Ownership.**  The Capital Stock of each Credit Party has been duly authorized and validly issued and is fully paid and non-assessable.  Except as set forth on

Schedule 4.2, as of the date hereof, there is no existing option, warrant, call, right, commitment or other agreement to which any Credit Party or any of its Subsidiaries is a party requiring, and there is no membership interest or other Capital Stock of any Credit Party outstanding which upon conversion or exchange would require, the issuance by any Credit Party of any additional membership interests or other Capital Stock of any Credit Party or other Securities convertible into, exchangeable for or evidencing the right to subscribe for or purchase, a membership interest or other Capital Stock of any Credit Party.  Schedule 4.2 correctly sets forth the ownership interest of each Credit Party and its Subsidiaries (including, for the avoidance of doubt, each of the Maryland Liquor Subsidiaries) as of the Closing Date.

**4.3.    Due Authorization.**  Subject to the entry of the Interim Order (or the Final Order, when applicable) by the Bankruptcy Court, the execution, delivery and performance of the Credit Documents have been duly authorized by all necessary action on the part of each Credit Party that is a party thereto.

**4.4.    No Conflict.**  Subject to the entry of the Interim Order (or the Final Order, when applicable) by the Bankruptcy Court, the execution, delivery and performance by the Credit Parties of the Credit Documents to which they are parties and the consummation of the transactions contemplated by the Credit Documents do not and will not (a) violate any provision of any law or any governmental rule or regulation applicable to any Credit Party, any of the Organizational Documents of any Credit Party, or any order, judgment or decree of any court or other agency of government binding on any Credit Party; (b) conflict with, result in a breach of or constitute (with due notice or lapse of time or both) a default under (i) any Material Contract or (ii) any other material Contractual Obligation of any Credit Party, in each case under this underline clause (b), except as could not be reasonably expected to have a Material Adverse Effect; (c) result in or require the creation or imposition of any Lien upon any of the properties or assets of any Credit Party (other than any Liens created under any of the Credit Documents in favor of Collateral Agent, on behalf of Secured Parties); or (d) require any approval of stockholders, members or partners or any approval or consent of any Person under any Contractual Obligation of any Credit Party, except for such approvals or consents which will be obtained on or before the Closing Date and disclosed in writing to Lenders.

**4.5.    Governmental Consents.**  The execution, delivery and performance by the Credit Parties of the Credit Documents to which they are parties and the consummation of the transactions contemplated by the Credit Documents do not and will not require any registration with, consent or approval of, or notice to, or other action to, with or by, any Governmental Authority, except for (a) filings and recordings with respect to the Collateral to be made or otherwise delivered to Collateral Agent for filing and/or recordation as of the Closing Date, and (b) the entry and continued effectiveness of the Orders.

**4.6.    Binding Obligation.**  Subject to the entry of the Interim Order (or the Final Order, when applicable) by the Bankruptcy Court, each Credit Document has been duly executed and delivered by each Credit Party that is a party thereto and is the legally valid and binding obligation of such Credit Party, enforceable against such Credit Party in accordance with its respective terms.

**4.7.    Historical Financial Statements.**  The Historical Financial Statements were prepared in conformity with GAAP (except as may be indicated in the notes thereto) and fairly

60

present, in all material respects, the financial position, on a consolidated basis, of the Persons described in such financial statements as at the respective dates thereof and the results of operations and cash flows, on a consolidated basis, of the entities described therein for each of the periods then ended, subject, in the case of any such unaudited financial statements, to changes resulting from audit and normal year-end adjustments.  As of the Closing Date, neither Holdings nor any of its Subsidiaries has any contingent liability or liability for Taxes, long-term lease or unusual forward or long-term commitment that is not reflected in the Historical Financial Statements or the notes thereto and which in any such case is material in relation to the business, operations, properties, assets, condition (financial or otherwise) or prospects of Holdings and any of its Subsidiaries taken as a whole.

**4.8.**    [Intentionally Reserved]

**4.9.    No Material Adverse Effect.**  Since the Petition Date, no event, circumstance or change has occurred that has caused or evidences, either in any case or in the aggregate, a Material Adverse Effect.

**4.10.    Insurance.**  Schedule 4.10 sets forth all material insurance coverages maintained by each Credit Party on the Closing Date, including the names of insurers, policy limits and deductibles. No Credit Party has received written notice of cancellation or intent not to renew any of such policies, and there has not occurred, and no Credit Party is aware of any occurrence or the existence of any condition (other than general industry-wide conditions) such as could reasonably be expected to cause any of such insurers to cancel any of such insurance coverages, or could be reasonably likely to materially increase the premiums charged to any Credit Party for coverages consistent with the scope and amounts of coverages as in effect on the Closing Date.

**4.11.    Adverse Proceedings, etc.**  There are no Adverse Proceedings, individually or in the aggregate, that could reasonably be expected to have a Material Adverse Effect.  Without otherwise limiting the other provisions hereof, neither Holdings nor any of its Subsidiaries (a) is in violation of any applicable laws (including Environmental Laws and Food Safety Laws) that, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect or (b) is subject to or in default with respect to any final judgments, writs, injunctions, decrees, orders, rules or regulations of any court or any federal, state, municipal or other governmental department, commission, board, bureau, agency or instrumentality, domestic or foreign, that, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

**4.12.    Filing of Tax Returns.**  Except as otherwise permitted under Section 5.3, (a) all federal and state Tax returns and reports and (b) all other material Tax returns and reports, in each case, of each Credit Party and its Subsidiaries required to be filed by any of them have been timely filed.

**4.13.    Properties.**

(a)    Title.  Each Credit Party and its Subsidiaries has (i) good, sufficient and legal title to (in the case of fee interests in real property), (ii) valid leasehold interests in (in the case of leasehold interests in real or personal property), and (iii) good title to (in the case of all other personal property), all of their respective properties and assets reflected in their respective

Historical Financial Statements referred to in <u>Section 4.5</u> and in the most recent financial statements delivered pursuant to <u>Section 5.1</u>, in each case except for assets disposed of since the date of such financial statements in the ordinary course of business or as otherwise permitted under <u>Section 6.9</u>. All such properties and assets are free and clear of Liens, other than Permitted Liens.

(b)     <u>Real Estate</u>. As of the Closing Date, <u>Schedule 4.13</u> contains a true, accurate and complete list of (i) all Real Estate Assets and (ii) all leases, subleases, assignments of leases or licenses affecting each Real Estate Asset of any Credit Party, regardless of whether such Credit Party is the landlord, tenant, licensor or licensee (whether directly or as an assignee or successor in interest) under such lease, sublease, assignment or license.

**4.14.    Environmental Matters.**  Neither Holdings nor any of its Subsidiaries nor any of their respective Facilities or operations are subject to any outstanding written order, consent decree or settlement agreement with any Person relating to any Environmental Law, any Environmental Claim, or any Hazardous Materials Activity that, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.  Neither Holdings nor any of its Subsidiaries has received any letter or request for information under Section 104 of the Comprehensive Environmental Response, Compensation, and Liability Act (42 U.S.C. § 9604) or any comparable state law.  There are and, to each of Holdings' and its Subsidiaries' knowledge, have been, no conditions, occurrences, or Hazardous Materials Activities which could reasonably be expected to form the basis of an Environmental Claim against any Credit Party or any of its Subsidiaries that, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect. Neither Holdings nor any of its Subsidiaries and, to such Credit Party's knowledge, no predecessor of any Credit Party or any of its Subsidiaries has filed any notice under any Environmental Law indicating past or present treatment of Hazardous Materials at any Facility, and no Credit Party or any of its Subsidiaries has any operation that involves the transportation, treatment, storage or disposal of hazardous waste, as defined under 40 C.F.R. Parts 260-270 or any state equivalent. Compliance with all current or reasonably foreseeable future requirements pursuant to or under Environmental Laws could not be reasonably expected to have, individually or in the aggregate, a Material Adverse Effect.  No event or condition has occurred or is occurring with respect to any Credit Party or any of its Subsidiaries relating to any Environmental Law, any Release of Hazardous Materials, or any Hazardous Materials Activity which individually or in the aggregate has had, or could reasonably be expected to have, a Material Adverse Effect.

**4.15.    Pre-Petition Credit Documents**.  The Credit Parties acknowledge and agree (i) that the Pre-Petition Credit Documents are valid and enforceable and (ii) subject to the terms of the Orders and the Liens hereunder or any Order, the Replacement Liens, the Carve-Out and the Permitted Liens, the Pre-Petition Agent for the benefit of the Pre-Petition Lenders has a valid, enforceable and fully perfected first priority Lien in all of the "Collateral" described under the Pre-Petition Credit Documents, including Cash Collateral, and all proceeds thereof; <u>provided</u>, that the representations and warranties contained in this <u>Section 4.15</u> shall not bind the Committee or any other party in interest until the expiration of the "Challenge Period" under and as defined in the Orders.

**4.16.    Material Contracts; Franchise Agreements; Liquor Subsidiary Contracts.**

(a)    Schedule 4.16(a) contains a true, correct and complete list of all the Material Contracts in effect on the Closing Date.  The Material Contracts described in this Section 4.16, together with any updates provided pursuant to Section 5.1(n), are in full force and effect and no defaults currently exist thereunder (other than as described in Schedule 4.16 or in such updates).

(b)    Schedule 4.16(b) includes a complete and accurate list of each Franchise Agreement to which any Credit Party is a party, with (i) the street address of each franchised unit covered by such Franchise Agreement, (ii) the unit number of each such franchised unit, (iii) the name of the franchisee for each franchised unit, and (iv) the effective date and expiration date of such Franchise Agreement.

(c)    Schedule 4.16(c) includes a complete and accurate list of each Liquor Subsidiary Contract.  Each Liquor Subsidiary Contract is in full force and effect and no Credit Party has any knowledge of any default that has occurred and is continuing thereunder, and each such agreement constitutes the legally valid and binding obligation of each party thereto, enforceable against such party in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws relating to or limiting creditors' rights generally or by equitable principles.

**4.17.    Governmental Regulation.**  Neither Holdings nor any of its Subsidiaries is subject to regulation under the Public Utility Holding Company Act of 2005, the Federal Power Act or the Investment Company Act of 1940 or under any other federal or state statute or regulation which may limit its ability to incur Indebtedness or which may otherwise render all or any portion of the Obligations unenforceable.  Neither Holdings nor any of its Subsidiaries is a "registered investment company" or a company "controlled" by a "registered investment company" or a "principal underwriter" of a "registered investment company" as such terms are defined in the Investment Company Act of 1940.

**4.18.    Use of Proceeds; Margin Stock.**  None of the proceeds of the Loans made to such Credit Party will be used in a manner other than as expressly set forth in Section 2.5.  Neither Holdings nor any of its Subsidiaries is engaged principally, or as one of its important activities, in the business of extending credit for the purpose of purchasing or carrying any Margin Stock.  No part of the proceeds of the Loans made to such Credit Party will be used to purchase or carry any such Margin Stock or to extend credit to others for the purpose of purchasing or carrying any such Margin Stock or for any purpose that violates, or is inconsistent with, the provisions of Regulation T, U or X of the Board of Governors of the Federal Reserve System.

**4.19.    Employee Matters.**  No Credit Party nor any of its Subsidiaries is engaged in any unfair labor practice that could reasonably be expected to have a Material Adverse Effect.  There is (a) no unfair labor practice complaint pending against any Credit Party or any of its Subsidiaries, or to the knowledge of any Credit Party, threatened against any of them before the National Labor Relations Board and no grievance or arbitration proceeding arising out of or under any collective bargaining agreement is so pending against any Credit Party or any of its Subsidiaries or to the knowledge of any Credit Party, threatened against any of them, (b) no strike or work stoppage in existence or threatened involving any Credit Party or any of its Subsidiaries, and (c) to the knowledge of any Credit Party, no union representation question existing with respect to the employees of any Credit Party or any of its Subsidiaries and, to the knowledge of any Credit Party,

63

no union organization activity that is taking place, except (with respect to any matter specified in clause (a), (b) or (c) of this Section 4.19, either individually or in the aggregate) such as is not reasonably likely to have a Material Adverse Effect.

**4.20.**    [Intentionally Reserved.]

**4.21.    Certain Fees.**  No broker's or finder's fee or commission will be payable with respect hereto or any of the transactions contemplated hereby.

**4.22.    Chapter 11 Case Matters**.

(a)    (i) The Cases were commenced on the Petition Date in accordance with applicable law and proper notice thereof has been given, (ii) proper notice for the hearing for the approval of the Interim Order has been given, and (iii) proper notice for the hearing for the approval of the Final Order will be (or after the entry of the Final Order, has been) given.

(b)    After the entry of the Interim Order, and pursuant to and to the extent permitted in the Interim Order and the Final Order, the Obligations will constitute allowed administrative expense claims in the Cases having the priority set forth in the Orders.

(c)    After the entry of the Interim Order and the execution of the Collateral Documents, the Obligations will be secured by a valid and perfected, enforceable and unavoidable first priority, priming Lien with priority over the Liens of the Pre-Petition Agent on all of the Collateral and the proceeds thereof to the extent provided and as more fully set forth in the Orders and the Collateral Documents.

(d)    The Interim Order (with respect to the period prior to entry of the Final Order) or the Final Order (with respect to the period on or after entry of the Final Order), as the case may be, is in full force and effect and has not been reversed, terminated, stayed, materially modified or amended in any manner without the prior written consent of the Requisite Lenders.

(e)    Notwithstanding the provisions of Section 362 of the Bankruptcy Code, upon the maturity (whether by acceleration or otherwise) of any of the Obligations, Administrative Agent and Lenders shall be entitled to immediate payment of such Obligations and to enforce the remedies provided for hereunder, without further application to or order by the Bankruptcy Court, subject to and as more fully set forth in the Orders.

**4.23.    Budget**.  The Budget reasonably presents, in all material respects, on a pro forma basis, the projected financial operations and disbursements of the Credit Parties for the period specified therein and such projections, in the view of the management of the Credit Parties, are achievable based upon reasonable assumptions and other information available to the Credit Parties as of the first day of the applicable period.

**4.24.    Compliance with Statutes, etc**.  Without limiting the specificity of any other representations and warranties contained herein, each Credit Party and its Subsidiaries is in compliance with all applicable statutes, regulations and orders of, and all applicable restrictions imposed by, all Governmental Authorities, in respect of the conduct of its business and the ownership of its property (including compliance with all applicable (a) Food Safety Laws and (b)

64

Environmental Laws with respect to any Real Estate Asset or governing its business and the requirements of any permits issued under such Environmental Laws with respect to any such Real Estate Asset or the operations of such Credit Party or any of its Subsidiaries), except such non-compliance that, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

4.25.    **Disclosure.**  No representation or warranty of any Credit Party contained in any Credit Document or in any other documents, certificates or written statements furnished to Lenders by or on behalf of any Credit Party or any of its Subsidiaries for use in connection with the transactions contemplated hereby contains any untrue statement of a material fact or omits to state a material fact (known to any Credit Party, in the case of any document not furnished by any of them) necessary in order to make the statements contained herein or therein not misleading in light of the circumstances in which the same were made.  Any projections and pro forma financial information contained in such materials are based upon good faith estimates and assumptions believed by the Credit Parties to be reasonable at the time made, it being recognized by Lenders that such projections as to future events are not to be viewed as facts and that actual results during the period or periods covered by any such projections may differ from the projected results.  There are no facts known (or which should upon the reasonable exercise of diligence be known) to any Credit Party (other than matters of a general economic nature) that, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect and that have not been disclosed herein or in such other documents, certificates and statements furnished to Lenders for use in connection with the transactions contemplated hereby.

4.26.    **Sanctions; Anti-Terrorism and Anti-Corruption Laws**.

(a)    None of the Credit Parties nor any of their Affiliates or, to any Credit Party's knowledge, their respective officers, directors, brokers or agents of such Person or Affiliate (i) has violated any Anti-Terrorism Laws or Sanction, (ii) has engaged in any transaction, investment, undertaking or activity that conceals the identity, source or destination of the proceeds from any category of prohibited offenses designed by the Organization for Economic Co-operation and Development's Financial Action Task Force on Money Laundering, (iii) is a Person whose name appears on the list of Specially Designated Nationals and Blocked Persons published by OFAC (an "**OFAC Listed Person**") or is otherwise a Sanctioned Person, (iv) is an agent, department, or instrumentality of, or is otherwise beneficially owned by, controlled by or acting on behalf of, directly or indirectly, (A) any OFAC Listed Person or (B) any other Sanctioned Person or Sanctioned Country, or (v) is otherwise blocked, the subject or target of Sanctions or engaged in any activity in violation of Sanctions or Anti-Terrorism Laws (each OFAC Listed Person, Sanctioned Person, Sanctioned Country and each other Person, entity, organization and government of a country described in clauses (iii), (iv) or (v) of this Section 4.26(a), a "**Blocked Person**").  No Credit Party nor any Controlled Entity has been notified that its name appears or may in the future appear on a list of Persons that engage in investment or other commercial activities in Iran or any other Sanctioned Country.  No part of the proceeds from the Loans made hereunder constitutes or will constitute funds obtained on behalf of any Blocked Person or will otherwise be used by Borrowers, directly or indirectly, or lent, contributed or otherwise made available to any Person (x) in connection with any investment in, or any transactions or dealings with, any Blocked Person, (y) to fund any activities or business of or with any Sanctioned Person, or in any Sanctioned Country or (z) otherwise in any manner that would result in a violation of

65

Sanctions by any Person (including any Person participating in the Loans, whether as underwriter, advisor, investor or otherwise).

(b)    None of the Credit Parties nor any of their Affiliates or, to any Credit Party's knowledge, their respective officers, directors, brokers or agents acting or benefiting in any capacity in connection with the Loans (i) deals in or otherwise engages, or has dealt or otherwise engaged, in any transaction related to, any property or interests in property blocked pursuant to any Anti-Terrorism Law or Sanction, (ii) engages in or conspires to, or engaged or conspired to, engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in any Anti-Terrorism Law or Sanction, (iii) has been found in violation of, charged with, or convicted under any Anti-Terrorism Law, (iv) to any Credit Party's knowledge after making due inquiry, is under investigation by any Governmental Authority for possible violation of Anti-Terrorism Laws or any Sanctions, (v) has been assessed civil penalties under any Anti-Terrorism Laws or any Sanctions, or (vi) has had any of its funds seized or forfeited in an action under any Anti-Terrorism Laws.

(c)    No Credit Party nor any of its Affiliates (i) has been charged with, or convicted of bribery or any other anti-corruption related activity under any applicable Anti-Corruption Laws, (ii) to each Credit Party's knowledge after making due inquiry, is under investigation by any Governmental Authority for possible violation of Anti-Corruption Laws, or (iii) has been assessed civil or criminal penalties under any Anti-Corruption Laws.  No part of the proceeds of the Loans will be used, directly or indirectly, for any payments to any governmental official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of the Anti-Corruption Laws.  Each Credit Party, each of its Subsidiaries and, to their knowledge, each of their respective directors, officers and employees and agents are in compliance with all Anti-Corruption Laws.

**4.27.    Information Security Requirements; Personal Information**.  No privacy or information security enforcement action, investigation, litigation or claim (including under the laws, rules, regulation, directives and governmental requirements set forth in Section 5.12) has been filed against any Credit Party or any of its Subsidiaries.

**4.28.    Food Safety**.    All products designed, developed, manufactured, prepared, assembled, packaged, tested, labeled, distributed, marketed or sold by or on behalf of the Credit Parties that are subject to the jurisdiction of the United States Food and Drug Administration or a comparable Government Authority have been and are being designed, developed, tested, manufactured, prepared, assembled, packaged, distributed, labeled, marketed and sold in compliance in all material respects with all applicable Food Safety Laws, including product approval or clearance, good manufacturing practices, labeling, advertising and promotion, record-keeping, adverse event reporting, and have been and are being tested, investigated, designed, developed, manufactured, prepared, assembled, packaged, labeled, distributed, marketed, and sold in compliance in all material respects with each applicable Food Safety Law.

**4.29.    Intellectual Property.**  Each Credit Party owns, or is licensed (or authorized) to use, all Intellectual Property material to the conduct of its business as currently conducted, except where the consequences, direct or indirect, if any, could not reasonably be expected to have a

66

Material Adverse Effect.  To the knowledge of each Credit Party, the operation of such Credit Party's business and the use of Intellectual Property owned by such Credit Party or licensed by such Credit Party do not infringe, misappropriate, dilute or otherwise violate the Intellectual Property rights of any person.  No claim or litigation regarding any Intellectual Property owned by a Credit Party is pending or, to the knowledge of any Credit Party, threatened in writing against any Credit Party or Subsidiary.  The Credit Parties have taken (and caused all their Subsidiaries to take) all commercially reasonable steps to maintain, enforce and protect the owned Intellectual Property of the Credit Parties and maintain the Credit Parties' rights in any licensed Intellectual Property, in each case, that is material to the conduct of their business as currently conducted.

**4.30.    Accounts.**  Schedule 4.30 sets forth all of the Credit Parties' Deposit Accounts, Securities Accounts and Commodities Accounts, in each case, together with the name of the depositary institution, account number and type of such account or accounts.  As used in this Section 4.30, "Deposit Accounts," "Securities Accounts" and "Commodities Accounts" shall have the meaning ascribed thereto in the Pledge and Security Agreement.

## SECTION 5.    AFFIRMATIVE COVENANTS

Each Credit Party covenants and agrees that so long as any Commitment is in effect and until payment in full in Cash of all Obligations (other than contingent indemnification Obligations for which no claim has been asserted) and cancellation or expiration of all Existing Letters of Credit, each Credit Party shall perform, and shall cause each of its Subsidiaries to perform, all covenants in this Section 5.

**5.1.    Financial Statements and Other Reports.**  Unless otherwise provided below, Borrower Representative shall deliver to Administrative Agent and Lenders:

(a)    Monthly Reports.  As soon as available, and in any event within thirty (30) days after the end of each Fiscal Month (including, for the avoidance of doubt, Fiscal Months which began prior to the Closing Date), the consolidated balance sheet of Holdings and its Subsidiaries as at the end of such Fiscal Month and the related consolidated statements of income, consolidated statements of cash flows of Holdings and its Subsidiaries for such Fiscal Month and for the period from the beginning of the then current Fiscal Year to the end of such Fiscal Month, setting forth in each case in comparative form the corresponding figures for the corresponding periods of the previous Fiscal Year, all in reasonable detail, in Microsoft Excel format, together with a schedule of reconciliations for any reclassifications with respect to prior Fiscal Months or periods (and, in connection therewith, copies of any restated financial statements for any impacted Fiscal Month or period) a Financial Officer Certification and a same store sales report;

(b)    Quarterly Financial Statements.  As soon as available, and in any event within forty-five (45) days after the end of each Fiscal Quarter of each Fiscal Year (including, for the avoidance of doubt, the Fiscal Quarter which began prior to the Closing Date, and the fourth Fiscal Quarter), the consolidated balance sheets of Holdings and its Subsidiaries as at the end of such Fiscal Quarter and the related consolidated statements of income and cash flows of Holdings and its Subsidiaries for such Fiscal Quarter and for the period from the beginning of the then current Fiscal Year to the end of such Fiscal Quarter, setting forth in each case in comparative form the corresponding figures for the corresponding periods of the previous Fiscal Year, all in

67

reasonable detail, in Microsoft Excel format, together with a Financial Officer Certification and an Operating Report;

(c)    [Intentionally Reserved]

(d)    <u>Compliance Certificate</u>.    Together with each delivery of financial statements of Holdings and its Subsidiaries pursuant to <u>Sections 5.1(a)</u> and <u>5.1(b)</u>, a duly executed and completed Compliance Certificate;

(e)    <u>Statements of Reconciliation after Change in Accounting Principles</u>.    If, as a result of any change in accounting principles and policies from those used in the preparation of the Historical Financial Statements, the consolidated financial statements of each Credit Party and its Subsidiaries delivered pursuant to <u>Section 5.1(a)</u> or <u>5.1(b)</u> will differ in any material respect from the consolidated financial statements that would have been delivered pursuant to such subdivisions had no such change in accounting principles and policies been made, then, together with the first delivery of such financial statements after such change, one or more statements of reconciliation for all such prior financial statements in form and substance reasonably satisfactory to Administrative Agent;

(f)    <u>Notice of Material Events</u>.    (i) Promptly upon any officer of any Credit Party obtaining knowledge (A) of any condition or event that constitutes a Default or an Event of Default or that notice has been given to Borrower Representative with respect thereto; (B) that any Person has given any notice to any Credit Party or any of its Subsidiaries or taken any other action with respect to any event or condition set forth in <u>Section 8.1(b)</u>; or (C) of the occurrence of any event or change that has caused or evidences, either in any case or in the aggregate, a Material Adverse Effect, a certificate of its Authorized Officers specifying the nature and period of existence of such condition, event or change, or specifying the notice given and action taken by any such Person and the nature of such claimed Event of Default, Default, default, event or condition, and what action the Credit Parties have taken, are taking and propose to take with respect thereto; (ii) at least (A) three (3) days, in the case of any pleading or motion in connection with which the consent of Administrative Agent and/or Requisite Lenders is required and (B) one (1) Business Day, in all other cases, prior to filing (or, if not practicable, as soon as reasonably practicable), copies of all pleadings and motions (other than "first day" motions and proposed orders, but including (x) the Bankruptcy Plan and any disclosure statement related thereto (which shall be provided as soon as practicable in advance of filing) and (y) the pleadings in respect of the DIP Facility, including any motion, any declarations, any responsive pleadings and the proposed Orders (in each case, which must be in form, scope and substance reasonably satisfactory to Administrative Agent and which shall be provided as soon as practicable in advance of filing)) to be filed by or on behalf of any Credit Party with the Bankruptcy Court in the Cases, which such pleadings shall include Administrative Agent as a notice party; and (iii) on a timely basis as specified in any Order, copies of all notices required to be given to all parties specified in such Order, in the manner specified therefor therein;

(g)    <u>Notice of Litigation</u>.    Promptly upon any officer of any Credit Party obtaining knowledge of (i) the filing of, or non-frivolous threat of, any Adverse Proceeding not previously disclosed in writing by the Credit Parties to Lenders, or (ii) any material development in any Adverse Proceeding that, in the case of either <u>clause (i)</u> or <u>(ii)</u> of this sentence if adversely

68

determined, could be reasonably expected to have a Material Adverse Effect, or seeks to enjoin or otherwise prevent the consummation of, or to recover any damages or obtain relief as a result of, the transactions contemplated hereby, written notice thereof together with such other information as may be reasonably available to the Credit Parties to enable Lenders and their counsel to evaluate such matters;

(h)     Labor Matters.  Each Credit Party shall give Administrative Agent prompt notice of (a) any unfair labor practice complaint pending against any Credit Party or any of its Subsidiaries, or to the knowledge of any Credit Party, threatened against any of them before the National Labor Relations Board and any grievance or arbitration forum proceeding arising out of or under any collective bargaining agreement that is so pending against any Credit Party or any of its Subsidiaries or to the knowledge of any Credit Party, threatened against any of them, (b) any strike or work stoppage in existence or threatened involving any Credit Party or any of its Subsidiaries, and (c) any union representation question existing with respect to the employees of any Credit Party or any of its Subsidiaries or any union organization activity that is taking place;

(i)     Notice of Prepayment Events.  Written notice of any Asset Sale, any receipt of Net Insurance/Condemnation Proceeds, any receipt of proceeds from the issuance of Capital Stock and any receipt of a Tax Refund.

(j)     ERISA.    (i) Promptly upon becoming aware of the occurrence of or forthcoming occurrence of any ERISA Event, a written notice specifying the nature thereof, what action any Credit Party, any of its Subsidiaries or any of their respective ERISA Affiliates has taken, is taking or proposes to take with respect thereto and, when known, any action taken or threatened by the Internal Revenue Service, the Department of Labor or the PBGC with respect thereto; and (ii) with reasonable promptness, copies of (A) each Schedule B (Actuarial Information) to the annual report (Form 5500 Series) filed by any Credit Party or any of its Subsidiaries with the United States Department of Labor with respect to each Pension Plan; (B) all notices received by any Credit Party, any of its Subsidiaries or any of their respective ERISA Affiliates (if such ERISA Affiliates provides copies of such notice to any Credit Party) from a Multiemployer Plan sponsor concerning an ERISA Event; and (C) copies of such other documents or governmental reports or filings relating to any Employee Benefit Plan as Administrative Agent shall reasonably request;

(k)     Budget.  (i) Before the Petition Date, the Budget (which must be attached to the Interim Order and the Final Order); (ii) at least once every 4 weeks, an update of the Budget, which update shall be satisfactory in form and substance to the Requisite Lenders in their respective sole discretion; (iii) on or before Friday of each week, a consolidated rolling thirteen-week cash flow forecast for Holdings and its Subsidiaries (together with a comparison of actual payments to budgeted line items for the prior weekly period and on a cumulative basis since the Petition Date), in Microsoft Excel format and in form satisfactory to the Requisite Lenders in their respective sole discretion (the "**13-Week Forecast**"); (iv) each week (ending on Tuesday), on the Variance Report Date, a weekly variance report, in a form reasonably satisfactory to the Requisite Lenders, which variance report will show actual sales, collections and disbursements made by the Credit Parties in the immediately preceding week, together with a comparison to the sales, collections and disbursements reflected in the Budget and noting therein all variances, on a line-item basis, from amounts set forth for such period in the 13-Week Forecast, and including

69

explanations for all material variances (such explanations shall include the degree to which the variance is a permanent variance from the Budget (if known), the cause of the variance and how the source of such variance is expected to impact the Budget); and (v) each week (ending on Tuesday), on the Variance Report Date, a detailed summary of same store sales for the prior week and a detailed Asset Sale pipeline summary, in each case, in substantially the same form as the reports being provided to Administrative Agent and Lenders prior to the Petition Date;

(l)     Insurance Report.  Upon the reasonable request of Administrative Agent, a report in form and substance reasonably satisfactory to Administrative Agent outlining all material insurance coverage maintained as of the date of such report by Holdings and its Subsidiaries and all material insurance coverage planned to be maintained by Holdings and its Subsidiaries in the immediately succeeding Fiscal Year;

(m)     Notice of Change in Board of Directors.  With reasonable promptness, written notice of any change in the board of directors (or similar governing body) or executive officers of Holdings or RTI;

(n)     Notice Regarding Material Contracts.  Promptly, and in any event within five (5) days after (i) any Material Contract of any Credit Party or any of its Subsidiaries is terminated or amended in a manner that is materially adverse to such Credit Party or such Subsidiary, as the case may be, or (ii) any new Material Contract is entered into, a written statement describing such event, with copies of such material amendments or new contracts, delivered to Administrative Agent (to the extent such delivery is permitted by the terms of any such Material Contract, as the case may be; provided, no such prohibition on delivery shall be effective if it were bargained for by such Credit Party or its applicable Subsidiary with the intent of avoiding compliance with this Section 5.1(n)), and an explanation of any actions being taken with respect thereto;

(o)     Environmental Reports and Audits.  As soon as practicable following receipt thereof, copies of all environmental audits and reports with respect to environmental matters at any Facility or which relate to any environmental liabilities of any Credit Party or its Subsidiaries which, in any such case, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect;

(p)     Information Regarding Collateral.  Borrower Representative shall furnish to Collateral Agent at least ten (10) Business Days' prior written notice of any change (i) in any Credit Party's corporate name, (ii) in any Credit Party's identity or corporate structure, or (iii) in any Credit Party's Federal Taxpayer Identification Number.  Each Credit Party agrees not to effect or permit any change referred to in the immediately preceding sentence unless all filings have been made under the UCC or otherwise that are required in order for Collateral Agent to continue at all times following such change to have a valid, legal and perfected security interest in all the Collateral and for the Collateral at all times following such change to have a valid, legal and perfected security interest as contemplated in the Collateral Documents.  Borrower Representative also agrees to promptly notify Collateral Agent if any material portion of the Collateral is damaged or destroyed;

(q)     [Intentionally Reserved]

GS/RT – DIP Credit and Guaranty Agreement
81776891

(r)     [Intentionally Reserved]

(s)     [Intentionally Reserved]; and

(t)     <u>Other Information</u>.  Promptly upon their becoming available, copies of such other information and data with respect to any Credit Party or any of its Subsidiaries as from time to time may be reasonably requested by Administrative Agent or any Lender (it being understood and agreed that (i) Administrative Agent and the Lenders shall be authorized to communicate directly with CR3 Partners, LLC and (ii) Administrative Agent and the Lenders shall be authorized to communicate directly with FocalPoint Securities, LLC and the lease restructuring advisor engaged by the Credit Parties in accordance with <u>Section 3.1(i)</u>, in each case under this <u>clause (ii)</u>, in accordance with <u>Section 5.14(c)</u>).

**5.2.    Existence.**  Each Credit Party will, and will cause each of its Subsidiaries to, at all times preserve and keep in full force and effect its existence and all rights and franchises, licenses and permits material to its business; <u>provided</u>, no Credit Party or any of its Subsidiaries shall be required to preserve any such existence, right or franchise, licenses and permits if such Person's board of directors (or similar governing body) shall determine that the preservation thereof is no longer desirable in the conduct of the business of such Person, and that the loss thereof is not disadvantageous in any material respect to such Person or to Lenders.

**5.3.    Payment of Taxes and Claims.**  Each Credit Party will, and will cause each of its Subsidiaries to, pay all Taxes imposed for the period from and after the commencement of the Cases upon each Credit Party or any of its properties or assets or in respect of any of its income, businesses or franchises before any penalty or fine accrues thereon, and all claims (including claims for labor, services, materials and supplies) for sums that have become due and payable and that by law have or may become a Lien upon any of its properties or assets, prior to the time when any penalty or fine shall be incurred with respect thereto; <u>provided</u>, no such Tax or claim need be paid if it is being contested in good faith by appropriate proceedings promptly instituted and diligently conducted, so long as (a) adequate reserve or other appropriate provision, as shall be required in conformity with GAAP shall have been made therefor, and (b) in the case of a Tax or claim which has or may become a Lien against any of the Collateral, such contest proceedings conclusively operate to stay the sale of any portion of the Collateral to satisfy such Tax or claim. No Credit Party will, nor will it permit any of its Subsidiaries to, file or consent to the filing of any consolidated income Tax return with any Person (other than any Credit Party).  In addition, the Credit Parties agree to pay to the relevant Governmental Authority in accordance with applicable law any current or future stamp or documentary Taxes or any other excise or property Taxes, charges or similar levies (including mortgage recording Taxes, transfer Taxes and similar fees) imposed by any Governmental Authority that arise from any payment made hereunder or from the execution, delivery or registration of, or otherwise with respect to, this Agreement.

**5.4.    Maintenance of Properties.**  Each Credit Party shall, and shall cause each of its Subsidiaries to, maintain or cause to be maintained in good repair, working order and condition, ordinary wear and tear excepted, all material properties used or useful in the business of each Credit Party and its Subsidiaries and from time to time will make or cause to be made all appropriate repairs, renewals and replacements thereof, in any case, except with respect to any

failure to so maintain, repair, renew and replace as could not reasonably be expected to result in a Material Adverse Effect.

**5.5.    Insurance.**  The Credit Parties shall maintain or cause to be maintained, with financially sound and reputable insurers, (a) business interruption insurance, directors and officers insurance reasonably satisfactory to Administrative Agent and (b) casualty insurance, such public liability insurance, third party property damage insurance with respect to liabilities, losses or damage in respect of the assets, properties and businesses of each Credit Party and its Subsidiaries as may customarily be carried or maintained under similar circumstances by Persons of established reputation engaged in similar businesses, in each case in such amounts (giving effect to self-insurance), with such deductibles, covering such risks and otherwise on such terms and conditions as shall be customary for such Persons and otherwise reasonably satisfactory to Administrative Agent.  Without limiting the generality of the foregoing, each Credit Party shall maintain or cause to be maintained (i) flood insurance with respect to each Flood Hazard Property that is located in a community that participates in the National Flood Insurance Program, in each case in compliance with any applicable regulations of the Board of Governors of the Federal Reserve System and (ii) replacement value casualty insurance on the Collateral under such policies of insurance, with such insurance companies, in such amounts, with such deductibles, and covering such risks as are at all times carried or maintained under similar circumstances by Persons of established reputation engaged in similar businesses.  Each such policy of insurance shall (A) name Collateral Agent, on behalf of the Lenders, as an additional insured thereunder as its interests may appear and (B) in the case of each casualty insurance policy, contain a loss payable clause or endorsement, reasonably satisfactory in form and substance to Collateral Agent, that names Collateral Agent, on behalf of the Secured Parties, as the loss payee thereunder and provides for at least thirty (30) days' prior written notice to Collateral Agent of any modification or cancellation of such policy.

**5.6.    Inspections.**  Each Credit Party shall, and shall cause each of its Subsidiaries to, permit any authorized representatives designated by any Agent or any Lender to visit and inspect any of the properties of any Credit Party and any of its respective Subsidiaries, to inspect, copy and take extracts from its and their financial and accounting records and other books and records, to inspect any Collateral, and to discuss its and their affairs, finances and accounts with its and their officers and independent public accountants, all upon reasonable notice and at such reasonable times during normal business hours and as often as may reasonably be requested. Agents and Lenders shall use their commercially reasonable efforts to ensure any such inspection is conducted in such a manner so as not to interfere unreasonably with the conduct of the business of the Credit Parties and their Subsidiaries.

**5.7.    Lenders Meetings.**

(a)    Senior management of the Credit Parties and CR3 Partners, LLC shall participate in a weekly telephone call with Administrative Agent and Lenders, at such time as may be agreed to by Borrower Representative, Administrative Agent and the Lenders, to discuss performance against the Budget, the Credit Parties' operating results and other matters requested by Administrative Agent and the Lenders.

(b)      FocalPoint Securities, LLC, together with a representative of Borrower Representative designated by Borrower Representative, shall participate in a weekly telephone call with Administrative Agent and Lenders, at such time as may be agreed to by Borrower Representative, Administrative Agent and the Lenders, to discuss the status of asset sales and other matters requested by Administrative Agent and the Lenders.

(c)      The lease restructuring advisor engaged by the Credit Parties in accordance with <u>Section 3.1(i)</u>, together with a representative of Borrower Representative designated by Borrower Representative, shall participate in a weekly telephone call with Administrative Agent and Lenders, at such time as may be agreed to by Borrower Representative, Administrative Agent and the Lenders, to discuss the status of lease restructurings and other matters requested by Administrative Agent and the Lenders.

**5.8.      Compliance with Laws.**  In addition to the other provisions hereof, and without limiting the generality of other provisions of this Agreement, each Credit Party and its Subsidiaries shall comply with all applicable statutes, regulations and orders of, and all applicable restrictions imposed by, all Governmental Authorities, in respect of the conduct of its business and the ownership of its property, including compliance with all applicable (a) Environmental Laws with respect to any Real Estate Asset or governing its business and the requirements of any permits issued under such Environmental Laws with respect to any such Real Estate Asset or the operations of such Credit Party or any of its Subsidiaries, (b) Sanctions, (c) Anti-Corruption Laws, (d) Anti-Terrorism Laws and (e) Food Safety Laws, in the case of <u>clauses (a)</u> through <u>(e)</u> of this sentence, except to the extent that such non-compliance, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

**5.9.      Environmental.**

(a)      <u>Environmental Disclosure</u>.  Borrower Representative shall deliver to Administrative Agent and the Lenders:

(i)      as soon as practicable following receipt thereof, copies of all environmental audits, investigations, analyses and reports of any kind or character, whether prepared by personnel of a Credit Party or any of its Subsidiaries or by independent consultants, Governmental Authorities or any other Persons, with respect to significant environmental matters at any Facility or with respect to any Environmental Claims which, in any such case, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect;

(ii)      promptly upon the occurrence thereof, written notice describing in reasonable detail (A) any Release required to be reported to any federal, state or local governmental or regulatory agency under any applicable Environmental Laws, (B) any remedial action taken by any Credit Party or any other Person in response to (I) any Hazardous Materials Activities the existence of which has a reasonable possibility of resulting in one or more Environmental Claims having, individually or in the aggregate, a Material Adverse Effect or (II) any Environmental Claims that, individually or in the aggregate, have a reasonable possibility of resulting in a Material Adverse Effect, and (C) any Credit Party's discovery of any occurrence or condition on any real property

73

adjoining or in the vicinity of any Facility that could reasonably be expected to cause such Facility or any part thereof to be subject to any material restrictions on the ownership, occupancy, transferability or use thereof under any Environmental Laws;

(iii)    as soon as practicable following the sending or receipt thereof by any Credit Party or any of its Subsidiaries, a copy of any and all written communications with respect to (A) any Environmental Claims that, individually or in the aggregate, have a reasonable possibility of giving rise to a Material Adverse Effect, (B) any Release required to be reported to any Governmental Authority, and (C) any request for information from any Governmental Authority that suggests such agency is investigating whether any Credit Party or any of its Subsidiaries may be potentially responsible for any Hazardous Materials Activity;

(iv)    prompt written notice describing in reasonable detail (A) any proposed acquisition of stock, assets, or property by any Credit Party or any of its Subsidiaries that could reasonably be expected to (I) expose any Credit Party or any of its Subsidiaries to, or result in, Environmental Claims that could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect or (II) affect the ability of any Credit Party or any of its Subsidiaries to maintain in full force and effect all material Governmental Authorizations required under any Environmental Laws for their respective operations and (B) any proposed action to be taken by any Credit Party or any of its Subsidiaries to modify current operations in a manner that could reasonably be expected to subject any Credit Party or any of its Subsidiaries to any additional material obligations or requirements under any Environmental Laws; and

(v)    with reasonable promptness, such other documents and information as from time to time may be reasonably requested by Administrative Agent in relation to any matters disclosed pursuant to this <u>Section 5.9(a)</u>.

(b)    <u>Hazardous Materials Activities, Etc</u>.  Each Credit Party shall promptly take, and shall cause each of its Subsidiaries promptly to take, any and all actions necessary to (i) cure any violation of applicable Environmental Laws by such Credit Party or its Subsidiaries that could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect and (ii) make an appropriate response to any Environmental Claim against such Credit Party or any of its Subsidiaries and discharge any obligations it may have to any Person thereunder where failure to do so could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

**5.10.    Subsidiaries.**  In the event that any Person becomes a Subsidiary of any Credit Party, the applicable Credit Party shall, within ten (10) Business Days after such Person becomes a Subsidiary, (a) cause such Subsidiary to become a "Borrower" or a "Guarantor" hereunder, in Administrative Agent's sole discretion, and a Grantor under the Pledge and Security Agreement by executing and delivering to Administrative Agent and Collateral Agent a Counterpart Agreement and (b) take all such actions and execute and deliver, or cause to be executed and delivered, all other New Subsidiary Deliverables.  With respect to each such Subsidiary, Borrower Representative shall promptly deliver to Administrative Agent written notice setting forth with respect to such Person (i) the date on which such Person became a Subsidiary of RTI, and (ii) all

of the data required to be set forth in Schedules 4.1 and 4.2 with respect to all Subsidiaries of RTI; provided, such written notice shall be deemed to supplement Schedule 4.1 and 4.2 for all purposes hereof.

**5.11.    Additional Real Estate Assets.**  In the event that any Credit Party acquires, leases or licenses a Real Estate Asset after the Closing Date, then such Credit Party shall, with respect to any owned Real Estate Asset, deliver all Mortgage Deliverables to Administrative Agent within ten (10) Business Days after the acquisition of such Real Estate Asset.  In addition to the foregoing, the Credit Parties shall, at the request of the Requisite Lenders, deliver, from time to time, to Administrative Agent such appraisals as are required by law or regulation of Real Estate Assets with respect to which Collateral Agent has been granted a Lien.

**5.12.    Information Security Requirements; Personal Information.**  Each Credit Party shall comply and shall cause its Subsidiaries to comply, in all material respects, and to the extent applicable to such Person, with (a) all international, federal, state, provincial and local laws, rules, regulations, directives and governmental requirements currently in effect and as they become effective relating in any way to the privacy, confidentiality or security of Personal Information, including the Gramm-Leach-Bliley Act, 15 U.S.C. §§ 6801-6827, and all regulations implementing the same; the Health Insurance Portability and Accountability Act of 1996 and all regulations implementing the same; the Fair Credit Reporting Act, 15 U.S.C. § 1681 et seq., as amended by the Fair and Accurate Credit Transactions Act, and all regulations implementing each of the same; the rules and regulations of the National Automated Clearing House Association, information security breach notification laws (such as Cal. Civ. Code §§ 1798.29, 1798.82 through 1798.84); laws imposing minimum information security requirements (such as Cal. Civ. Code § 1798.81.5 and 201 Mass. Code Reg. 17.00); laws requiring the secure disposal of records containing certain Personal Information (such as N.Y. Gen. Bus. Law § 399-H); the European Union Directives governing general data protection (Directive 1995/46/EC) and electronic commerce (Directive 2002/58/EC); the Canadian Personal Information Protection and Electronic Documents Act (PIPEDA) and relevant provincial laws and (b) all applicable industry standards concerning privacy, data protection, confidentiality or information security, including the Payment Card Industry Data Security Standard, in each case, to the extent such laws, rules, regulations, directives and governmental requirements and such industry standards apply to it, its property or its business, in each case of clauses (a) and (b) above, except to the extent that the failure to do so could not reasonably be expected to have a Material Adverse Effect.

**5.13.    Further Assurances.**  At any time or from time to time upon the request of Administrative Agent, each Credit Party shall, at its expense, promptly execute, acknowledge and deliver such further documents and do such other acts and things as Administrative Agent or Collateral Agent may reasonably request in order to effect fully the purposes of the Credit Documents, including providing Lenders with any information reasonably requested pursuant to Section 10.21.  In furtherance and not in limitation of the foregoing, each Credit Party shall take such actions as Administrative Agent or Collateral Agent may reasonably request from time to time to ensure that the Obligations are guaranteed by the Guarantors and are secured by First Priority Liens on the Collateral of each Credit Party and all of the outstanding Capital Stock of RTI and its Subsidiaries.

**5.14.  Miscellaneous Business Covenants.**   Unless otherwise consented to by Administrative Agent and the Requisite Lenders:

(a)   <u>Non-Consolidation</u>.   Each Credit Party and its Subsidiaries shall (i) maintain entity records and books of account separate from those of any other entity which is an Affiliate of such entity; (ii) not commingle its funds or assets with those of any other entity which is an Affiliate of such entity (other than another Credit Party); and (iii) provide that its board of directors (or similar governing body) shall hold all appropriate meetings to authorize and approve such entity's actions, which meetings shall be separate from those of other entities that are not Credit Parties.

(b)   <u>Cash Management Systems</u>.   Each Credit Party and its Subsidiaries shall establish and maintain Cash management systems reasonably satisfactory to Administrative Agent, including with respect to the Controlled Accounts for Deposit Accounts other than Excluded Accounts.   For the avoidance of doubt, those Cash management systems implemented and maintained by RTI and its Subsidiaries as of the Closing Date satisfy this <u>Section 5.14(b)</u> on the Closing Date.

(c)   <u>Communication with Accountants and Other Advisors</u>.   Each Credit Party hereby authorizes Administrative Agent (and each Lender) to communicate with (x) FocalPoint Securities, LLC, (y) the lease restructuring advisor engaged by the Credit Parties in accordance with <u>Section 3.1(l)</u>, and (z) such Credit Party's independent certified public accountants and authorizes and shall instruct those advisors and accountants to communicate (including, in the case of the accountants, the delivery of audit drafts and letters to management) with Administrative Agent (and each Lender) information relating to any Credit Party with respect to the business, results of operations and financial condition of any Credit Party (including the status of asset sales and lease restructurings, as applicable); <u>provided</u>, <u>however</u>, (i) Administrative Agent (or such Lender) shall provide Borrower Representative with notice at least five (5) Business Days prior to first initiating any such communication and (ii) a representative of Borrower Representative designated by Borrower Representative shall be copied on, privy to, or otherwise included in all such communications.

(d)   <u>Activities of Management</u>.   Each member of the senior management team of each Credit Party shall devote all or substantially all of his or her professional working time, attention, and energies to the management of the businesses of the Credit Parties; <u>provided</u>, in no event will this <u>clause (d)</u> apply to any member of the board of directors (or similar governing body) of a Credit Party who is not also a member of the senior management team of such Credit Party.

(e)   <u>Contractual Obligations</u>.   Each Credit Party and its Subsidiaries shall use commercially reasonable efforts to (i) perform, observe and fulfill each the obligations, covenants or conditions contained in any of its Contractual Obligations for the period from and after the commencement of the Cases, including the Material Contracts and Franchise Agreements, other than those Contractual Obligations that the Credit Parties are contesting in good faith and (ii) promptly and diligently exercise each material right it may have in respect of its Contractual Obligations, including under any Material Contract or Franchise Agreement, at its own expense, except in each case of <u>clause (i)</u> and <u>(ii)</u> of this sentence, to the extent that such failure would not reasonably be expected to have a Material Adverse Effect.   For the avoidance of doubt, this <u>clause</u>

(e) is not intended to cover, and shall not relate to, this Agreement and the other Credit Documents which shall be governed in all instances by the other provisions hereof and thereof.

**5.15.   Bankruptcy Matters; RSA.**

(a)    <u>Minimum Cash Flow</u>.  As of the end of each week reflected in the Budget (Tuesday), beginning with the first full week following the Petition Date, the Credit Parties shall, on a cumulative basis from the Petition Date, have achieved at least 85.0% of the "Net Operating Cash Flow" as set forth in the Budget.

(b)    <u>RSA</u>.  Each Credit Party shall comply in a timely manner with its obligations and responsibilities (i) as a debtor-in-possession under the Bankruptcy Code and any order of the Bankruptcy Court, as such order may be amended and in effect from time to time, and (ii) under the RSA.

(c)    <u>Material Pleadings</u>. The Credit Parties will (i) deliver to Administrative Agent and the Lenders, as soon as practicable in advance of the filing with the Bankruptcy Court, but no later than two (2) Business Days prior to distribution, unless impracticable, in which case, as soon as reasonably practicable prior to filing, copies of all material documents, motions and pleadings related to the Orders and this Agreement, and (ii) provide Administrative Agent and the Lenders with a reasonable opportunity to review and comment on all such documents, motions and pleadings, which documents, motions and pleadings shall, in any event, be reasonably satisfactory to the Administrative Agent and the Lenders.

**5.16.   Compliance Protocols.**  Each Credit Party shall, and shall cause its Subsidiaries to, in the ordinary course of business and in consultation with appropriate legal counsel, create, maintain, implement and update written policies, procedures and guidelines for its employees (including appropriate training for employees with respect thereto) for its business and operations and compliance in all material respects with the requirements of all applicable laws, rules, regulations and orders of any Governmental Authority with respect to compliance with (a) (i) the laws set forth in <u>Section 5.12</u> and (ii) Food Safety Laws, and (b) all (i) Sanctions, (ii) Anti-Corruption Laws and (iii) Anti-Terrorism Laws.  For the avoidance of doubt, those policies, procedures and guidelines implemented and maintained by RTI and its Subsidiaries as of the Closing Date, in form and substance provided to Administrative Agent and Lenders prior to the Closing Date, as the same relate to those laws set forth in <u>clause (a)</u> above satisfy this covenant on the Closing Date.

**5.17.   Use of Proceeds.**  The proceeds of the Loans shall be used in accordance with the terms of <u>Section 2.5</u>.

## SECTION 6.    NEGATIVE COVENANTS

Each Credit Party covenants and agrees that, so long as any Commitment is in effect and until payment in full in Cash of all Obligations (other than contingent indemnification Obligations for which no claim has been asserted) and cancellation or expiration of all Existing Letters of Credit, such Credit Party shall perform, and shall cause each of its Subsidiaries to perform, all covenants in this <u>Section 6</u>.

**6.1.    Indebtedness.**  No Credit Party shall, nor shall it permit any of its Subsidiaries to, directly or indirectly, create, incur, assume or guaranty, or otherwise become or remain directly or indirectly liable with respect to any Indebtedness, except:

(a)    the Obligations; and

(b)    Indebtedness existing on the Closing Date and listed on <u>Schedule 6.1</u> (including Indebtedness under the Pre-Petition Credit Agreement).

**6.2.    Liens.**  No Credit Party shall, nor shall it permit any of its Subsidiaries to, directly or indirectly, create, incur, assume or permit to exist any Lien on or with respect to any property or asset of any kind (including any document or instrument in respect of goods or accounts receivable) of any Credit Party or any of its Subsidiaries, whether now owned or hereafter acquired, or any income or profits therefrom, or file or permit the filing of, or permit to remain in effect, any financing statement or other similar notice of any Lien with respect to any such property, asset, income or profits under the UCC of any state or under any similar recording or notice statute, except:

(a)    Liens in favor of Collateral Agent for the benefit of Secured Parties granted pursuant to any Credit Document;

(b)    Liens existing on the Closing Date and described in <u>Schedule 6.2</u> (including Liens securing the Pre-Petition Obligations (including any "adequate protection" replacement Liens with respect thereto)); and

(c)    any of the following Liens arising after the Petition Date in the ordinary course of business:  (i) Liens for Taxes (A) not yet due and payable or (B) if obligations with respect to such Taxes are being contested in good faith by appropriate proceedings promptly instituted and diligently conducted so long as (x) the aggregate amount of such Taxes does not exceed $250,000, or (y) such proceedings are resolved within sixty (60) days after the institution thereof; (ii) statutory Liens of landlords, banks (and rights of set-off), of carriers, warehousemen, mechanics, repairmen, workmen and materialmen, and other Liens imposed by law (other than any such Lien imposed pursuant to Section 401(a)(29) or 412(n) of the Internal Revenue Code or by ERISA), in each case, (A) incurred in the ordinary course of business (x) for amounts not yet overdue or (y) for amounts that are overdue and that (in the case of any such amounts overdue for a period in excess of five (5) Business Days) are being contested in good faith by appropriate proceedings, so long as such reserves or other appropriate provisions, if any, as shall be required by GAAP shall have been made for any such contested amounts, or (B) to the extent permitted under the terms of any applicable Mortgage; (iii) Liens incurred in the ordinary course of business in connection with workers' compensation, unemployment insurance and other types of social security, and other similar obligations (exclusive of obligations for the payment of borrowed money or other Indebtedness), so long as no foreclosure, sale or similar proceedings have been commenced with respect to any portion of the Collateral on account thereof; (iv) easements, rights-of-way, restrictions, encroachments, and other minor defects or irregularities in title, in each case, which do not and will not interfere in any material respect with the ordinary conduct of the business of any Credit Party or any of its Subsidiaries; (v) any interest or title of a lessor or sublessor under any lease of Real Estate Asset permitted hereunder; (vi) any zoning or similar law

78

or right reserved to or vested in any governmental office or agency to control or regulate the use of any real property; and (vii) customary rights of set-off, bankers' Liens, revocation, refund or chargeback under deposit agreements or under UCC or common law of banks or other financial institutions where the Credit Parties deposit in the ordinary course of business.

**6.3.    Equitable Lien.**  If any Credit Party or any of its Subsidiaries shall create or assume any Lien upon any of its properties or assets, whether now owned or hereafter acquired, other than Permitted Liens, it shall make or cause to be made effective provisions whereby the Obligations will be secured by such Lien equally and ratably with any and all other Indebtedness secured thereby as long as any such Indebtedness shall be so secured; <u>provided</u>, notwithstanding the foregoing, this covenant shall not be construed as a consent by the Requisite Lenders to the creation or assumption of any such Lien not otherwise permitted hereby.

**6.4.    No Further Negative Pledges.**  Except with respect to (a) specific property encumbered to secure payment of particular Indebtedness or to be sold pursuant to an executed agreement with respect to a permitted Asset Sale and (b) restrictions by reason of customary provisions restricting assignments, subletting or other transfers contained in leases, licenses and similar agreements entered into in the ordinary course of business (<u>provided</u>, such restrictions are limited to the property or assets secured by such Liens or the property or assets subject to such leases, licenses or similar agreements, as the case may be) no Credit Party nor any of its Subsidiaries shall enter into any agreement prohibiting the creation or assumption of any Lien upon any of its properties or assets, whether now owned or hereafter acquired.

**6.5.    Restricted Junior Payments.**  No Credit Party shall, nor shall it permit any of its Subsidiaries or Affiliates through any manner or means or through any other Person to, directly or indirectly, declare, order, pay, make or set apart, or agree to declare, order, pay, make or set apart, any sum for any Restricted Junior Payment, except:

(a)    payments by Subsidiaries of a Credit Party (other than Holdings) to such Credit Party; and

(b)    Restricted Junior Payments in the amounts and during the periods specifically set forth in the Budget (including, for the avoidance of doubt, payments permitted in accordance with <u>Section 6.21</u>).

Notwithstanding anything herein to the contrary, no amount shall be permitted to be distributed by any Credit Party to any Person other than a Credit Party to pay, or otherwise in connection with, any Tax resulting from the cancellation or discharge of Indebtedness.

**6.6.    Restrictions on Subsidiary Distributions.**  Except as otherwise permitted under this Agreement, no Credit Party shall, nor shall it permit any of its Subsidiaries to, create or otherwise cause or suffer to exist or become effective any consensual encumbrance or restriction of any kind on the ability of any other Credit Party to (a) pay dividends or make any other distributions on any of such Credit Party's Capital Stock owned by a Credit Party, (b) repay or prepay any Indebtedness owed by such Credit Party to any other Credit Party, (c) make loans or advances to any other Credit Party, or (d) transfer any of its property or assets to any other Credit Party other than restrictions (i) in agreements evidencing Capital Leases and purchase money

Indebtedness permitted by <u>Section 6.1</u> that impose restrictions on the property so acquired, (ii) by reason of customary provisions restricting assignments, subletting or other transfers contained in leases, licenses, joint venture agreements and similar agreements entered into in the ordinary course of business, and (iii) that are or were created by virtue of any transfer of, agreement to transfer or option or right with respect to any property, assets or Capital Stock not otherwise prohibited under this Agreement.

      **6.7.**   **Investments.** No Credit Party shall, nor shall it permit any of its Subsidiaries to, directly or indirectly, make or own any Investment in any Person, including any Joint Venture and any Foreign Subsidiary, except:

      (a)     Investments in Cash and Cash Equivalents;

      (b)     equity Investments owned as of the Closing Date in any other Credit Party and Investments made after the Closing Date in any other Credit Party; and

      (c)     Investments existing on the Closing Date and described in <u>Schedule 6.7</u>.

Notwithstanding the foregoing, in no event shall any Credit Party make any Investment which results in or facilitates in any manner any Restricted Junior Payment not otherwise permitted under the terms of <u>Section 6.5</u>.

      **6.8.**   **Bankruptcy Matters.**

      (a)     <u>Certain Payments</u>. Except as permitted in the applicable Order and other than applications to the Bankruptcy Court for authority to make any such payments upon, and in connection with, the confirmation of a Bankruptcy Plan, no Credit Party shall, or shall apply to the Bankruptcy Court for authority to, make any non-ordinary course payments, other than (a) non-ordinary course payments contemplated by the first day orders (and any related final orders with respect thereto), (b) the payment of cure amounts in connection with the assumption of contracts approved by the Bankruptcy Court and approved and consented to by the Requisite Lenders and (c) other payments in the amounts and during the periods set forth in the Budget.

      (b)     <u>Chapter 11 Claims</u>. Except for the Carve-Out, no Credit Party shall, nor shall any Credit Party apply to the Bankruptcy Court for authority to, incur, create, assume, suffer to exist or permit any super-priority claim or Lien which is *pari passu* with or senior to (a) the claims of Administrative Agent and Lenders granted pursuant to the Credit Documents or (b) prior to payment in full of the Pre-Petition Obligations as contemplated by the RSA, the claims of Pre-Petition Agent and Pre-Petition Lenders granted pursuant to the Orders.

      (c)     <u>Pre-Petition Payments</u>. Without the prior written consent of Administrative Agent, as directed by the Requisite Lenders, no Credit Party shall, nor shall any Credit Party apply to the Bankruptcy Court for authority to: (a) make any payment with respect to pre-petition obligations of any of Credit Parties (other than as permitted by the first-day orders, the Orders or this Agreement (including with respect to the Pre-Petition Obligations)), (b) amend, modify or change any agreement or document relating to any pre-petition Indebtedness, or (c) make any payment on any post-petition Indebtedness outside of such Credit Party's ordinary course of business; <u>provided</u>, <u>however</u>, (i) Credit Parties may make the payments specifically contemplated

80

in the first-day orders, the Budget or payments in connection with the assumption of any contract or lease approved by the Bankruptcy Court and consented to by the Requisite Lenders; and (ii) Credit Parties may apply to the Bankruptcy Court for authority to make any such payments or changes upon, and in connection with, the confirmation of a Bankruptcy Plan.

(d)    <u>Maximum Cash Disbursements</u>.  The Credit Parties shall not disburse any amounts in excess of the Budget, subject to the Permitted Variances.

(e)    <u>Minimum Liquidity</u>.  The Credit Parties shall not permit Liquidity to be less than $1,000,000 at any time.  As used herein, "**Liquidity**" means, as of any date of determination, an amount equal to (i) the remaining amount available to be drawn by the Credit Parties as of such date in accordance with <u>Section 2.1(a)</u> <u>plus</u> (ii) the unrestricted Cash of the Credit Parties held as of such date in Controlled Accounts.

**6.9.    Fundamental Changes; Disposition of Assets; Acquisitions.**  No Credit Party shall, nor shall it permit any of its Subsidiaries to, (i) enter into any transaction of merger or consolidation, or liquidate, wind-up or dissolve itself (or suffer any liquidation or dissolution), or convey, sell, lease or sublease (as lessor or sublessor), (ii) exchange, transfer or otherwise dispose of, in one transaction or a series of transactions, all or any part of its business, assets or property of any kind whatsoever, whether real, personal or mixed and whether tangible or intangible, whether now owned or hereafter acquired, or (iii) acquire by purchase or otherwise (other than purchases or other acquisitions of inventory, materials and equipment and Consolidated Capital Expenditures in the ordinary course of business to the extent otherwise made in accordance with the Budget) the business, property or fixed assets of, or Capital Stock or other evidence of beneficial ownership of, any Person or any division or line of business or other business unit of any Person, except:

(a)    sales or other dispositions of assets that do not constitute Asset Sales;

(b)    Investments made in accordance with <u>Section 6.7</u>;

(c)    to the extent approved by the Bankruptcy Court, Asset Sales with respect to certain Real Estate Assets of the Credit Parties for which a binding purchase or sale agreement has been executed by the applicable Credit Party prior to the Closing Date but which Asset Sales are consummated after the Closing Date and prior to November 10, 2020, in any case, solely in accordance with the terms and conditions of those agreements set forth on <u>Schedule 6.9(c)</u> (without further amendment by the parties thereto); <u>provided</u>, the Net Asset Sale Proceeds thereof are applied by the Credit Parties in accordance with <u>Section 2.13(a)</u>;

(d)    Asset Sales of certain fee-owned Real Estate Assets which are approved by the Bankruptcy Court, as long as (i) the Net Asset Sale Proceeds from any such Asset Sale are 100% Cash or Cash Equivalents, (ii) the purchaser in any such Asset Sale is not an Affiliate of any Credit Party, (iii) the terms of any such Asset Sale shall (A) be arms-length, including "as-is" or similar limited representations from the seller Credit Party, and (B) not impose any material residual obligations on the seller Credit Party (contingent or otherwise) other than customary indemnification obligations, (iv) the Cash purchase price for such Real Estate Asset shall equal or exceed (I) 75.0% of the "Hilco BOV" set forth on <u>Schedule 6.9(d)</u> with respect to such Real Estate

81

Asset or (II) 95.0% of the "Hilco BOV" set forth on <u>Schedule 6.9(d)</u> with respect to all such Real Estate Assets in the aggregate, and (v) the Net Asset Sale Proceeds of any such Asset Sale are applied by the Credit Parties in accordance with <u>Section 2.13(a)</u>;

      (e)     certain Asset Sales by the Credit Parties of assets other than Real Estate Assets which are approved by the Bankruptcy Court, as long as either (i) (A) Administrative Agent shall have provided its prior approval to any such Asset Sale (which approval may be via email) and (B) the Net Asset Sale Proceeds thereof are applied by the Credit Parties in accordance with <u>Section 2.13(a)</u> or (ii) solely to the extent the Net Asset Sale Proceeds from any such Asset Sale are less than $25,000, each of the following conditions is satisfied: (A) the Net Asset Sale Proceeds from such Asset Sale are 100% Cash or Cash Equivalents, (B) the purchaser in any such Asset Sale is not an Affiliate of any Credit Party, (C) the terms of any such Asset Sale shall (I) be arms-length, including "as is" or similar limited representations from the seller Credit Party, (II) not impose any material residual obligations on the seller Credit Party (contingent or otherwise) other than customary indemnification obligations, and (III) be for at least the fair market value of the applicable asset(s) as determined in the good faith judgement of the seller Credit Party in light of the facts and circumstances at the time of such Asset Sale, and (E) the Net Asset Sale Proceeds thereof are applied by the Credit Parties in accordance with <u>Section 2.13(a)</u>;

      (f)     an Asset Sale of the RT Lodge to the extent approved by the Bankruptcy Court, as long as (i) such Asset Sale does not occur in any event prior to October 9, 2020, (ii) GSSLG has not elected to receive the Lodge Consideration (as defined in the RSA) in accordance with the RSA, (iii) the Net Asset Sale Proceeds from any such Asset Sale are 100% Cash or Cash Equivalents, (iv) the purchaser in any such Asset Sale is not an Affiliate of any Credit Party, (v) the terms of any such Asset Sale shall (A) be arms-length, including "as-is" or similar limited representations from the seller Credit Party, and (B) not impose any material residual obligations on the seller Credit Party (contingent or otherwise) other than customary indemnification obligations, (vi) the Cash purchase price for such Real Estate Asset shall equal or exceed the amount set forth on <u>Schedule 6.9(f)</u>, and (vii) the Net Asset Sale Proceeds of any such Asset Sale are applied by the Credit Parties in accordance with <u>Section 2.13(a)</u>; and

      (g)     other Asset Sales which are approved by both the Bankruptcy Court and the Requisite Lenders, in their reasonable discretion, in any case, as long as the Net Asset Sale Proceeds thereof are applied by the Credit Parties in accordance with <u>Section 2.13(a)</u>.

      Subject to compliance with <u>Section 2.13</u>, and at the sole cost and expense of the Credit Parties, promptly upon the written request of Borrower Representative, Collateral Agent shall deliver to the applicable Credit Party, such documents and instruments reasonably necessary to release any Liens securing the interests of the Secured Parties that have attached to any Collateral that has been sold in compliance with this <u>Section 6.9</u>, including the termination of any Mortgage encumbering the Collateral so sold in compliance with this <u>Section 6.9</u>. For the avoidance of doubt and notwithstanding the foregoing, no Credit Party shall assign any purchase option or similar right arising under any lease or similar agreement, in any case, without the prior written consent of the Requisite Lenders.

    **6.10.**   **Disposal of Subsidiary Interests.**  No Credit Party shall, nor shall it permit any of its Subsidiaries to, (a) directly or indirectly sell, assign, pledge or otherwise encumber or dispose

of any Capital Stock of any of its Subsidiaries, except to qualify directors if required by applicable law, or as required under applicable law to permit such Credit Party to secure a liquor license; or (b) permit any of its Subsidiaries directly or indirectly to sell, assign, pledge or otherwise encumber or dispose of any Capital Stock of any of its Subsidiaries, except to another Credit Party (subject to the restrictions on such disposition otherwise imposed hereunder), or to qualify directors if required by applicable law, or as required under applicable law to permit such Credit Party to secure a liquor license.

**6.11.    Sales and Lease-Backs.**  No Credit Party shall, nor shall it permit any of its Subsidiaries to, directly or indirectly, become or remain liable as lessee or as a guarantor or other surety with respect to any lease of any property (whether real, personal or mixed), whether now owned or hereafter acquired, which such Credit Party (a) has sold or transferred or is to sell or to transfer to any other Person (other than another Credit Party) or (b) intends to use for substantially the same purpose as any other property which has been or is to be sold or transferred by such Credit Party to any Person (other than another Credit Party) in connection with such lease.

**6.12.    Transactions with Shareholders and Affiliates.**  No Credit Party shall, nor shall it permit any of its Subsidiaries to, directly or indirectly, enter into or permit to exist any transaction (including the purchase, sale, lease or exchange of any property or the rendering of any service) with any holder of 5% or more of any class of Capital Stock of any Credit Party or any of its Subsidiaries (or any Affiliate of such holder) or with any Affiliate of any Credit Party or of any such holder; provided, however, the Credit Parties and their Subsidiaries may enter into or permit to exist any such transaction if both (a) Administrative Agent and the Requisite Lenders in their reasonable discretion have consented thereto in writing prior to the consummation thereof, and (b) the terms of such transaction are not less favorable to such Credit Party or that Subsidiary, as the case may be, than those that might be obtained at the time from a Person who is not such a holder or Affiliate; provided, further, the foregoing restrictions shall not apply to (i) subject to compliance by Holdings with Section 6.14(a) hereof, any transaction between the Credit Parties; (ii) reasonable and customary fees paid to members of the board of directors (or similar governing body), officers and members of senior management of the Credit Parties in the amounts and during the periods specifically set forth in the Budget; and (iii) transactions existing on the Closing Date and described in Schedule 6.12.  Borrower Representative shall disclose in writing each transaction with any holder of 5% or more of any class of Capital Stock of any Credit Party or any of its Subsidiaries or with any Affiliate of Holdings or of any such holder to Administrative Agent.

**6.13.    Conduct of Business; Foreign Subsidiaries.**  No Credit Party shall, nor shall it permit any of its Subsidiaries to, engage in any business other than owning, operating and franchising Ruby Tuesday restaurants, offering virtual restaurant fulfillment services, operating the RT Lodge and other business activities reasonably related thereto.  No Credit Party shall create or acquire any Foreign Subsidiary.

**6.14.    Permitted Activities of Holdings and the Wicomico County Subsidiaries.**

(a)    Holdings shall not (i) incur, directly or indirectly, any Indebtedness or any other obligations or liability whatsoever other than the Obligations and any Indebtedness of Holdings permitted under Section 6.1(b)); (ii) create or suffer to exist any Lien upon any property or assets now owned or hereafter acquired by it other than (A) the Liens created under the

83

Collateral Documents to which it is a party and (B) Permitted Liens applicable to Holdings; (iii) engage in any business or activity or own any assets other than (A) holding 100% of the Capital Stock of RTI; (B) performing its obligations and activities incidental thereto under the Credit Documents and the RSA; and (C) making Restricted Junior Payments and Investments to the extent permitted by this Agreement; (iv) consolidate with or merge with or into, or convey, transfer or lease all or substantially all its assets to, any Person; (v) sell or otherwise dispose of any Capital Stock of any of its Subsidiaries; (vi) create or acquire any Subsidiary or make or own any Investment in any Person other than RTI; or (vii) fail to hold itself out to the public as a legal entity separate and distinct from all other Persons.  In addition, Holdings shall not create, store or locate at its office located at 4170 Ashford Dunwoody Road, Suite 390, Atlanta, Georgia 30319 any material books and records relating to Holdings and its Subsidiaries and their respective businesses which are not otherwise accessible (whether electronically or as a result of duplicates being located at an applicable location) from a location owned or leased by RTI or one of its Subsidiaries.

(b)       Each of the Wicomico County Subsidiaries shall not, and RTI shall not permit either of the Wicomico County Subsidiaries to, (i) incur, directly or indirectly, any Indebtedness or any other obligation or liability whatsoever other than any Indebtedness existing under its Liquor Subsidiary Contracts; (ii) create or suffer to exist any Lien upon any property or assets now owned or hereafter acquired by it other than Liens disclosed to Administrative Agent on Schedule 6.2; (iii) engage in any business or activity or own any assets other than holding a Maryland liquor license in accordance with applicable law and performing such Wicomico County Subsidiary's obligations and activities incidental thereto and to the extent not inconsistent with the applicable Liquor Subsidiary Contracts; (iv) consolidate with or merge with or into, or convey, transfer or lease all or substantially all its assets to, any Person; (v) sell or otherwise dispose of any Capital Stock of any of its Subsidiaries; (vi) create or acquire any Subsidiary or make or own any Investment in any Person; or (vii) fail to hold itself out to the public as a legal entity separate and distinct from all other Persons.

**6.15.    Fiscal Year.**  No Credit Party shall, nor shall it permit any of its Subsidiaries to change its Fiscal Year-end from the first Tuesday ended closest to June 1 of each year.

**6.16.    Deposit Accounts.**  No Credit Party shall establish or maintain a Deposit Account or a securities account that is not a Controlled Account and no Credit Party shall deposit funds in a Deposit Account or a securities account which is not a Controlled Account, in each case, except to the extent permitted, an Excluded Account.  No Credit Party shall (a) grant any other Person (other than another Credit Party) Automated Clearing House (ACH) or similar debit rights to any Controlled Account other than in connection with any lease agreements constituting Sale Leaseback Transaction Documents (as defined in the Pre-Petition Credit Agreement), (b) allow any Credit Card Processor (as defined in the Pre-Petition Credit Agreement) to transfer money owing to any Credit Party or its Subsidiaries to any account that is not a Controlled Account, or (c) during the continuation of an Event of Default, if requested by Collateral Agent, fail to promptly (but no later than the Business Day following such request by Collateral Agent) instruct any Credit Card Processor to transfer money owing to the Credit Parties or their Subsidiaries to an account designated by Collateral Agent.  In furtherance of the foregoing, in the event any applicable Excluded Account at any time contains funds in excess of the limits set forth in clause (c) of the definition of the term "Excluded Account", the Credit Parties shall promptly (and in any event

within three (3) Business Days of the date that such limits are exceeded) transfer all such excess amounts to a Controlled Account.

**6.17.    Amendments to Organizational Agreements, Material Contracts and Liquor Subsidiary Contracts.** No Credit Party shall (a) amend or permit any amendments to any Credit Party's or the Wicomico County Subsidiaries' Organizational Documents, (b) amend or permit any amendments to, or terminate or waive any provision of, any Material Contract or Liquor Subsidiary Contract, or (c) amend, provide a consent under, subordinate, waive any term of, agree to forbear with respect to or otherwise alter in any manner whatsoever that certain Promissory Note, dated December 21, 2017, owing by SFI to RTI, in any case, without the prior written consent of Administrative Agent. No Credit Party shall amend or permit any amendments to, or agree to terminate, terminate, agree to waive or waive any provision of, any loan document or other agreement evidencing any CARES Act Indebtedness (as defined in the Pre-Petition Credit Agreement) without the prior written consent of Administrative Agent, except that any Credit Party may at any time seek forgiveness of any of the CARES Act Indebtedness. In addition, no Credit Party shall take any action of any kind whatsoever to in any manner limit those matters requiring the affirmative vote of at least one independent director of RTI on the Petition Date.

**6.18.    Prepayments of Certain Indebtedness.** No Credit Party shall, nor shall it permit any of its Affiliates to, directly or indirectly, prepay, redeem, purchase, defease, exchange or repurchase any (i) Permitted Debt (other than amounts owing under the Credit Documents), or (ii) any obligation owing under a lease, other than solely in the amounts and during the periods specifically set forth in the Budget, and no Credit Party shall amend or modify any of the terms of any Permitted Debt or Permitted Liens without the prior written consent of Administrative Agent.

**6.19.    Compliance With Anti-Terrorism Laws, Anti-Corruption Laws and Sanctions.** No Credit Party shall, nor shall it permit any of its Affiliates to:

(a)    (i) violate any Anti-Terrorism Laws or Anti-Corruption Laws, (ii) engage in any transaction, investment, undertaking or activity that conceals the identity, source or destination of the proceeds from any category of prohibited offenses designated by the Organization for Economic Co-operation and Development's Financial Action Task Force on Money Laundering, (iii) become (including by virtue of being owned or controlled by a Blocked Person), own or control a Blocked Person or any other Sanctioned Person or (iv) knowingly permit any of their respective Affiliates to violate these laws or engage in these actions;

(b)    use, directly or indirectly, the proceeds of the Loans, or lend, contribute or otherwise make available such proceeds to any Person, (x) to fund any activities or business of or with any Sanctioned Person or Sanctioned Country, or (y) in any other manner that would result in a violation of Sanctions or any Anti-Terrorism Laws or Anti-Corruption Laws by any Person (including any Person participating in the Loans, whether as underwriter, advisor, investor, or otherwise); or

(c)    (i) deal in, or otherwise engage in any transaction related to, any property or interests in property blocked pursuant to any Anti-Terrorism Law or Sanctions, or (ii) engage in or conspire to engage in any transaction that evades or avoids, or has the purpose of evading or

avoiding, or attempt to violate, any of the prohibitions set forth in any Anti-Terrorism Law or Sanctions, or (iii) knowingly permit any of their respective Affiliates to do any of the foregoing.

**6.20.    Capital Stock.**  No Credit Party shall issue any Capital Stock.

**6.21.    Board Fees.**  No Credit Party shall pay any board fees or expenses (or similar fees or amounts to Persons serving in a similar role for any Credit Party), other than board of director fees and expenses paid to each director of RTI not to exceed (a) $27,500 per director in any calendar month or (b) $137,500 for all directors of RTI in any calendar month.

## SECTION 7.    GUARANTY

**7.1.    Guaranty of the Obligations.**  Subject to the provisions of Section 7.2, Guarantors jointly and severally hereby irrevocably and unconditionally guaranty to Administrative Agent for the ratable benefit of the Beneficiaries the due and punctual payment in full in Cash of all Obligations when the same shall become due, whether at stated maturity, by required prepayment, declaration, acceleration, demand or otherwise (collectively, the **"Guaranteed Obligations"**).

**7.2.    Contribution by Guarantors.**  All Guarantors desire to allocate among themselves (collectively, the **"Contributing Guarantors"**), in a fair and equitable manner, their obligations arising under this Guaranty. Accordingly, in the event any payment or distribution is made on any date by a Guarantor (a **"Funding Guarantor"**) under this Guaranty such that its Aggregate Payments exceeds its Fair Share as of such date, such Funding Guarantor shall be entitled to a contribution from each of the other Contributing Guarantors in an amount sufficient to cause each Contributing Guarantor's Aggregate Payments to equal its Fair Share as of such date.  **"Fair Share"** means, with respect to a Contributing Guarantor as of any date of determination, an amount equal to (a) the ratio of (i) the Fair Share Contribution Amount with respect to such Contributing Guarantor, to (ii) the aggregate of the Fair Share Contribution Amounts with respect to all Contributing Guarantors; multiplied by (b) the aggregate amount paid or distributed on or before such date by all Funding Guarantors under this Guaranty in respect of the obligations Guaranteed. **"Fair Share Contribution Amount"** means, with respect to a Contributing Guarantor as of any date of determination, the maximum aggregate amount of the obligations of such Contributing Guarantor under this Guaranty that would not render its obligations hereunder subject to avoidance as a fraudulent transfer or conveyance under Section 548 of Title 11 of the United States Code or any comparable applicable provisions of state law; provided, solely for purposes of calculating the **"Fair Share Contribution Amount"** with respect to any Contributing Guarantor for purposes of this Section 7.2, any assets or liabilities of such Contributing Guarantor arising by virtue of any rights to subrogation, reimbursement or indemnification or any rights to or obligations of contribution hereunder shall not be considered as assets or liabilities of such Contributing Guarantor.  **"Aggregate Payments"** means, with respect to a Contributing Guarantor as of any date of determination, an amount equal to (I) the aggregate amount of all payments and distributions made on or before such date by such Contributing Guarantor in respect of this Guaranty (including in respect of this Section 7.2), minus (II) the aggregate amount of all payments received on or before such date by such Contributing Guarantor from the other Contributing Guarantors as contributions under this Section 7.2.   The amounts payable as contributions hereunder shall be determined as of the date on which the related payment or distribution is made by the applicable Funding Guarantor.   The allocation among Contributing

GS/RT – DIP Credit and Guaranty Agreement
81776891

Guarantors of their obligations as set forth in this <u>Section 7.2</u> shall not be construed in any way to limit the liability of any Contributing Guarantor hereunder. Each Guarantor is a third party beneficiary to the contribution agreement set forth in this <u>Section 7.2</u>.

**7.3.     Payment by Guarantors.**  Subject to <u>Section 7.2</u>, Guarantors hereby jointly and severally agree, in furtherance of the foregoing and not in limitation of any other right which any Beneficiary may have at law or in equity against any Guarantor by virtue hereof, that upon the failure of Borrowers to pay any of the Guaranteed Obligations when and as the same shall become due, whether at stated maturity, by required prepayment, declaration, acceleration, demand or otherwise, Guarantors shall upon demand pay, or cause to be paid, in Cash, to Administrative Agent for the ratable benefit of Beneficiaries, an amount equal to the sum of the unpaid principal amount of all Guaranteed Obligations then due as aforesaid, accrued and unpaid interest on such Guaranteed Obligations and all other Guaranteed Obligations then owed to Beneficiaries as aforesaid.

**7.4.     Liability of Guarantors Absolute.**  Each Guarantor agrees that its obligations hereunder are irrevocable, absolute, independent and unconditional and shall not be affected by any circumstance which constitutes a legal or equitable discharge of a guarantor or surety other than payment in full in Cash of the Guaranteed Obligations (other than contingent indemnification Obligations for which no claim has been made). In furtherance of the foregoing and without limiting the generality thereof, each Guarantor agrees as follows:

(a)     this Guaranty is a guaranty of payment when due and not of collectability. This Guaranty is a primary obligation of each Guarantor and not merely a contract of surety;

(b)     Administrative Agent may enforce this Guaranty upon the occurrence of an Event of Default notwithstanding the existence of any dispute between any Borrower and any Beneficiary with respect to the existence of such Event of Default;

(c)     the obligations of each Guarantor hereunder are independent of the obligations of Borrowers and the obligations of any other guarantor (including any other Guarantor) of the obligations of Borrowers, and a separate action or actions may be brought and prosecuted against such Guarantor whether or not any action is brought against Borrowers or any of such other guarantors and whether or not Borrowers are joined in any such action or actions;

(d)     payment by any Guarantor of a portion, but not all, of the Guaranteed Obligations shall in no way limit, affect, modify or abridge any Guarantor's liability for any portion of the Guaranteed Obligations which has not been paid. Without limiting the generality of the foregoing, if Administrative Agent is awarded a judgment in any suit brought to enforce any Guarantor's covenant to pay a portion of the Guaranteed Obligations, such judgment shall not be deemed to release such Guarantor from its covenant to pay the portion of the Guaranteed Obligations that is not the subject of such suit, and such judgment shall not, except to the extent satisfied by such Guarantor, limit, affect, modify or abridge any other Guarantor's liability hereunder in respect of the Guaranteed Obligations;

(e)     any Beneficiary, upon such terms as it deems appropriate, without notice or demand and without affecting the validity or enforceability hereof or giving rise to any reduction,

87

limitation, impairment, discharge or termination of any Guarantor's liability hereunder, from time to time may (i) renew, extend, accelerate, increase the rate of interest on, or otherwise change the time, place, manner or terms of payment of the Guaranteed Obligations; (ii) settle, compromise, release or discharge, or accept or refuse any offer of performance with respect to, or substitutions for, the Guaranteed Obligations or any agreement relating thereto and/or subordinate the payment of the same to the payment of any other obligations; (iii) request and accept other guaranties of the Guaranteed Obligations and take and hold security for the payment hereof or the Guaranteed Obligations; (iv) release, surrender, exchange, substitute, compromise, settle, rescind, waive, alter, subordinate or modify, with or without consideration, any security for payment of the Guaranteed Obligations, any other guaranties of the Guaranteed Obligations, or any other obligation of any Person (including any other Guarantor) with respect to the Guaranteed Obligations; (v) enforce and apply any security now or hereafter held by or for the benefit of such Beneficiary in respect hereof or the Guaranteed Obligations and direct the order or manner of sale thereof, or exercise any other right or remedy that such Beneficiary may have against any such security, in each case as such Beneficiary in its sole discretion may determine consistent herewith and any applicable security agreement, including foreclosure on any such security pursuant to one or more judicial or nonjudicial sales, whether or not every aspect of any such sale is commercially reasonable, and even though such action operates to impair or extinguish any right of reimbursement or subrogation or other right or remedy of any Guarantor against Borrowers or any security for the Guaranteed Obligations; and (vi) exercise any other rights available to it under the Credit Documents; and

(f)      this Guaranty and the obligations of Guarantors hereunder shall be valid and enforceable and shall not be subject to any reduction, limitation, impairment, discharge or termination for any reason (other than payment in full in Cash of the Guaranteed Obligations (other than contingent indemnification Obligations for which no claim has been made)), including the occurrence of any of the following, whether or not any Guarantor shall have had notice or knowledge of any of them:  (i) any failure or omission to assert or enforce, or agreement or election not to assert or enforce, or the stay or enjoining, by order of court, by operation of law or otherwise, of the exercise or enforcement of, any claim or demand or any right, power or remedy (whether arising under the Credit Documents, at law, in equity or otherwise) with respect to the Guaranteed Obligations or any agreement relating thereto, or with respect to any other guaranty of or security for the payment of the Guaranteed Obligations; (ii) any rescission, waiver, amendment or modification of, or any consent to departure from, any of the terms or provisions (including provisions relating to events of default) hereof, any of the other Credit Documents or any agreement or instrument executed pursuant thereto, or of any other guaranty or security for the Guaranteed Obligations, in each case whether or not in accordance with the terms hereof or such Credit Document or any agreement relating to such other guaranty or security; (iii) the Guaranteed Obligations, or any agreement relating thereto, at any time being found to be illegal, invalid or unenforceable in any respect; (iv) the application of payments received from any source (other than payments received pursuant to the other Credit Documents or from the proceeds of any security for the Guaranteed Obligations, except to the extent such security also serves as collateral for indebtedness other than the Guaranteed Obligations) to the payment of indebtedness other than the Guaranteed Obligations, even though any Beneficiary might have elected to apply such payment to any part or all of the Guaranteed Obligations; (v) any Beneficiary's consent to the change, reorganization or termination of the corporate structure or existence of any Credit Party or any of its Subsidiaries and to any corresponding restructuring of the Guaranteed Obligations;

88

(vi) any failure to perfect or continue perfection of a security interest in any collateral which secures any of the Guaranteed Obligations; (vii) any defenses, set-offs or counterclaims which Borrowers may allege or assert against any Beneficiary in respect of the Guaranteed Obligations, including failure of consideration, breach of warranty, payment, statute of frauds, statute of limitations, accord and satisfaction and usury; and (viii) any other act or thing or omission, or delay to do any other act or thing, which may or might in any manner or to any extent vary the risk of any Guarantor as an obligor in respect of the Guaranteed Obligations.

7.5.    **Waivers by Guarantors.**  Each Guarantor hereby waives, for the benefit of Beneficiaries:  (a) any right to require any Beneficiary, as a condition of payment or performance by such Guarantor, to (i) proceed against Borrowers, any other guarantor (including any other Guarantor) of the Guaranteed Obligations or any other Person, (ii) proceed against or exhaust any security held from Borrowers, any such other guarantor or any other Person, (iii) proceed against or have resort to any balance of any Deposit Account or securities account or credit on the books of any Beneficiary in favor of Borrowers or any other Person, or (iv) pursue any other remedy in the power of any Beneficiary whatsoever; (b) any defense arising by reason of the incapacity, lack of authority or any disability or other defense of Borrowers or any other Guarantor, including any defense based on or arising out of the lack of validity or the unenforceability of the Guaranteed Obligations or any agreement or instrument relating thereto or by reason of the cessation of the liability of Borrowers or any other Guarantor from any cause other than payment in full in Cash of the Guaranteed Obligations; (c) any defense based upon any statute or rule of law which provides that the obligation of a surety must be neither larger in amount nor in other respects more burdensome than that of the principal; (d) any defense based upon any Beneficiary's errors or omissions in the administration of the Guaranteed Obligations, except behavior which amounts to bad faith; (e) (i) any principles or provisions of law, statutory or otherwise, which are or might be in conflict with the terms hereof and any legal or equitable discharge of such Guarantor's obligations hereunder, (ii) the benefit of any statute of limitations affecting such Guarantor's liability hereunder or the enforcement hereof, (iii) any rights to set-offs, recoupments and counterclaims, and (iv) promptness, diligence and any requirement that any Beneficiary protect, secure, perfect or insure any security interest or lien or any property subject thereto; (f) notices, demands, presentments, protests, notices of protest, notices of dishonor and notices of any action or inaction, including acceptance hereof, notices of default hereunder or any agreement or instrument related thereto, notices of any renewal, extension or modification of the Guaranteed Obligations or any agreement related thereto, notices of any extension of credit to any Borrower and notices of any of the matters referred to in <u>Section 7.4</u> and any right to consent to any thereof; and (g) any defenses or benefits that may be derived from or afforded by law which limit the liability of or exonerate guarantors or sureties, or which may conflict with the terms hereof.

7.6.    **Guarantors' Rights of Subrogation, Contribution, etc.**  Until the Guaranteed Obligations (other than contingent indemnification Obligations for which no claim has been made) shall have been indefeasibly paid in full in Cash and the Commitments shall have terminated and all Existing Letters of Credit shall have expired or been cancelled, each Guarantor hereby waives any claim, right or remedy, direct or indirect, that such Guarantor now has or may hereafter have against any Borrower or any other Guarantor or any of its assets in connection with this Guaranty or the performance by such Guarantor of its obligations hereunder, in each case whether such claim, right or remedy arises in equity, under contract, by statute, under common law or otherwise and including (a) any right of subrogation, reimbursement or indemnification that such Guarantor

now has or may hereafter have against any Borrower with respect to the Guaranteed Obligations, (b) any right to enforce, or to participate in, any claim, right or remedy that any Beneficiary now has or may hereafter have against any Borrower, and (c) any benefit of, and any right to participate in, any Collateral or security now or hereafter held by any Beneficiary.  In addition, until the Guaranteed Obligations (other than contingent indemnification Obligations for which no claim has been made) shall have been indefeasibly paid in full in Cash and the Commitments shall have terminated and all Existing Letters of Credit shall have expired or been cancelled, each Guarantor shall withhold exercise of any right of contribution such Guarantor may have against any other guarantor (including any other Guarantor) of the Guaranteed Obligations, including any such right of contribution as contemplated by <u>Section 7.2</u>.  Each Guarantor further agrees that, to the extent the waiver or agreement to withhold the exercise of its rights of subrogation, reimbursement, indemnification and contribution as set forth herein is found by a court of competent jurisdiction to be void or voidable for any reason, any rights of subrogation, reimbursement or indemnification such Guarantor may have against Borrowers or against any collateral or security, and any rights of contribution such Guarantor may have against any such other guarantor, shall be junior and subordinate to any rights any Beneficiary may have against Borrowers, to all right, title and interest any Beneficiary may have in any such collateral or security, and to any right any Beneficiary may have against such other guarantor.  If any amount shall be paid to any Guarantor on account of any such subrogation, reimbursement, indemnification or contribution rights at any time when all Guaranteed Obligations shall not have been finally and indefeasibly paid in full in Cash (other than contingent indemnification Obligations for which no claim has been made), such amount shall be held in trust for Administrative Agent on behalf of Beneficiaries and shall forthwith be paid over to Administrative Agent for the benefit of Beneficiaries to be credited and applied against the Guaranteed Obligations, whether matured or unmatured, in accordance with the terms hereof.

**7.7.    Subordination of Other Obligations.**  Any Indebtedness of Borrowers or any Guarantor now or hereafter held by any Guarantor (the **"Obligee Guarantor"**) is hereby subordinated in right of payment to the Guaranteed Obligations, and any such indebtedness collected or received by the Obligee Guarantor after an Event of Default has occurred and is continuing shall be held in trust for Administrative Agent on behalf of Beneficiaries and shall forthwith be paid over to Administrative Agent for the benefit of Beneficiaries to be credited and applied against the Guaranteed Obligations but without affecting, impairing or limiting in any manner the liability of the Obligee Guarantor under any other provision hereof.

**7.8.    Continuing Guaranty.**  This Guaranty is a continuing guaranty and shall remain in effect until all of the Guaranteed Obligations (other than contingent indemnification Obligations for which no claim has been made) shall have been indefeasibly paid in full in Cash and the Commitments shall have terminated and all Existing Letters of Credit shall have expired or been cancelled.  Each Guarantor hereby irrevocably waives any right to revoke this Guaranty as to future transactions giving rise to any Guaranteed Obligations.

**7.9.    Authority of any Credit Party.**  It is not necessary for any Beneficiary to inquire into the capacity or powers of any Credit Party or the officers, directors or agents acting or purporting to act on behalf of any of them.

**7.10.    Financial Condition of Borrowers.**  Any Credit Extension may be made to Borrowers or continued from time to time without notice to or authorization from any Guarantor

90

regardless of the financial or other condition of Borrowers at the time of any such grant or continuation, as the case may be. No Beneficiary shall have any obligation to disclose or discuss with any Guarantor its assessment, or any Guarantor's assessment, of the financial condition of Borrowers. Each Guarantor has adequate means to obtain information from Borrowers on a continuing basis concerning the financial condition of Borrowers and their ability to perform its obligations under the Credit Documents, and each Guarantor assumes the responsibility for being and keeping informed of the financial condition of Borrowers and of all circumstances bearing upon the risk of nonpayment of the Guaranteed Obligations. Each Guarantor hereby waives and relinquishes any duty on the part of any Beneficiary to disclose any matter, fact or thing relating to the business, operations or conditions of Borrowers now known or hereafter known by any Beneficiary.

### 7.11.  Bankruptcy, etc.

(a)    The obligations of Guarantors hereunder shall not be reduced, limited, impaired, discharged, deferred, suspended or terminated by any case or proceeding, voluntary or involuntary, involving the bankruptcy, insolvency, receivership, reorganization, liquidation or arrangement of any Borrower or any other Guarantor or by any defense which any Borrower or any other Guarantor may have by reason of the order, decree or decision of any court or administrative body resulting from any such proceeding.

(b)    Each Guarantor acknowledges and agrees that any interest on any portion of the Guaranteed Obligations which accrues after the commencement of any case or proceeding referred to in Section 7.11(a) (or, if interest on any portion of the Guaranteed Obligations ceases to accrue by operation of law by reason of the commencement of such case or proceeding, such interest as would have accrued on such portion of the Guaranteed Obligations if such case or proceeding had not been commenced) shall be included in the Guaranteed Obligations because it is the intention of Guarantors and Beneficiaries that the Guaranteed Obligations which are guaranteed by Guarantors pursuant hereto should be determined without regard to any rule of law or order which may relieve Borrowers of any portion of such Guaranteed Obligations. Guarantors shall permit any trustee in bankruptcy, receiver, debtor in possession, assignee for the benefit of creditors or similar Person to pay Administrative Agent, or allow the claim of Administrative Agent in respect of, any such interest accruing after the date on which such case or proceeding is commenced.

(c)    In the event that all or any portion of the Guaranteed Obligations are paid by Borrowers, the obligations of Guarantors hereunder shall continue and remain in full force and effect or be reinstated, as the case may be, in the event that all or any part of such payment(s) are rescinded or recovered directly or indirectly from any Beneficiary as a preference, fraudulent transfer or otherwise, and any such payments which are so rescinded or recovered shall constitute Guaranteed Obligations for all purposes hereunder.

### 7.12.  Discharge of Guaranty Upon Sale of Guarantor.  If all of the Capital Stock of any Guarantor or any of its successors in interest hereunder shall be sold or otherwise disposed of (including by merger or consolidation) in accordance with the terms and conditions hereof, the Guaranty of such Guarantor or such successor in interest, as the case may be, hereunder shall

automatically be discharged and released without any further action by any Beneficiary or any other Person effective as of the time of such Asset Sale.

**7.13.  Keepwell.**  Each Qualified ECP Guarantor hereby jointly and severally absolutely, unconditionally and irrevocably undertakes to provide such funds or other support as may be needed from time to time by each other Credit Party to honor all of its obligations under this Guaranty in respect of Swap Obligations; provided, however, each Qualified ECP Guarantor shall only be liable under this Section 7.13 for the maximum amount of such liability that can be hereby incurred without rendering its obligations under this Section 7.13, or otherwise under this Guaranty, voidable under applicable law relating to fraudulent conveyance or fraudulent transfer, and not for any greater amount.  The obligations of each Qualified ECP Guarantor under this Section 7.13 shall remain in full force and effect until payment in full in Cash of all Obligations (other than contingent indemnification Obligations for which no claim has been made).  Each Qualified ECP Guarantor intends that this Section 7.13 constitute, and this Section 7.13 shall be deemed to constitute, a "keepwell, support, or other agreement" for the benefit of each other Credit Party for all purposes of Section a(18)(A)(v)(II) of the Commodity Exchange Act.

## SECTION 8.    EVENTS OF DEFAULT

**8.1.  Events of Default.**  If any one or more of the following conditions or events shall occur:

(a)  Failure to Make Payments When Due.  Failure by any Credit Party to pay (i) when due the principal of any Loan whether at stated maturity, by acceleration or otherwise; (ii) when due any installment of principal of any Loan, by notice of voluntary prepayment, by mandatory prepayment or otherwise; (iii) within three (3) Business Days of when due, any interest on any Loan or any fee or any premium or other amount due hereunder; or (iv) any amount payable to Issuing Bank in reimbursement of any drawing under an Existing Letter of Credit.

(b)  Default in Other Agreements.  (i) Other than any such failure in existence on the Petition Date, failure of any Credit Party or any of its Subsidiaries to pay when due any principal of or interest on or any other amount, including any payment in settlement, payable in respect of one or more items of Indebtedness (other than Indebtedness referred to in Section 8.1(a) and the Pre-Petition Obligations) in an individual principal amount of $500,000 or more or with an aggregate principal amount of $1,500,000 or more, in any case, beyond the grace period, if any, provided therefor; or (ii) other than any such breach or default in existence on the Petition Date, breach or default by any Credit Party or any of its Subsidiaries with respect to any other material term of (A) one or more items of Indebtedness in the individual or aggregate principal amounts referred to in clause (i) of this Section 8.1(b), or (B) any loan agreement, mortgage, indenture or other agreement relating to such item or items of Indebtedness, in each case beyond the grace period, if any, provided therefor, if the effect of such breach or default is to cause, or to permit the holder or holders of that Indebtedness (or a trustee on behalf of such holder or holders), with or without the passage of time, to cause, that Indebtedness to become or be declared due and payable (or subject to a compulsory repurchase or other redemption) prior to its stated maturity or the stated maturity of any underlying obligation, as the case may be; or

(c)    <u>Breach of Certain Covenants</u>.  Failure of any Credit Party to perform or comply with any term or condition contained in (i) <u>Section 2.5</u> (Use of Proceeds), <u>Section 5.1(k)</u> (Financial Statements and Other Reports), <u>Section 5.2</u> (Existence), <u>Section 5.4</u> (Maintenance of Properties), <u>Section 5.5</u> (Insurance), <u>Section 5.6</u> (Inspections), <u>Section 5.7</u> (Lenders Meetings), <u>Section 5.8</u> (Compliance with Laws), <u>Section 5.14(b)</u> (Cash Management Systems), <u>Section 5.15</u> (Bankruptcy Matters; RSA) or <u>Section 6</u>; or (ii) <u>Section 5.1</u> (Financial Statements and Other Reports) (other than <u>Section 5.1(k)</u>) or <u>Section 5.3</u> (Payment of Taxes and Claims), <u>Section 5.10</u> (Subsidiaries), <u>Section 5.11</u> (Additional Real Estate Assets), and such Default under this <u>clause (ii)</u> continues for seven (7) Business Days or more; or

(d)    <u>Breach of Representations, etc.</u>  Any representation, warranty, certification or other statement made or deemed made by any Credit Party in any Credit Document or in any statement or certificate (including any document delivered pursuant to <u>Section 5.1(k)</u>) at any time given by any Credit Party or any of its Subsidiaries in writing pursuant hereto or thereto or in connection herewith or therewith shall be false in any material respect as of the date made or deemed made; or

(e)    <u>Other Defaults Under Credit Documents</u>.  Any Credit Party shall default in the performance of or compliance with any term contained herein or any of the other Credit Documents, other than any such term referred to in any other Section of this <u>Section 8.1</u>, and such default shall not have been remedied or waived within thirty (30) days after the earlier of (i) an officer of such Credit Party becoming aware of such default, or (ii) receipt by Borrower Representative of notice from Administrative Agent or any Lender of such default; or

(f)    <u>Bankruptcy Matters</u>.

(i)    <u>Dismissal</u>.  (A) Any of the Cases shall be dismissed or converted to a case under Chapter 7 of the Bankruptcy Code, (B) a trustee under Chapter 11 of the Bankruptcy Code shall be appointed in any of the Cases, or (C) an examiner having enlarged powers relating to the operation of the business of any Borrower or any Guarantor (beyond those set forth under Section 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code shall be appointed; or

(ii)    <u>Interim Order or Final Order Stayed</u>.  (A) An order of a court of competent jurisdiction shall be entered staying or rescinding the Interim Order or the Final Order; (B) an order of a court of competent jurisdiction shall be entered amending, supplementing or otherwise modifying the Interim Order without the written consent of the Requisite Lenders, or the Final Order without the written consent of the Requisite Lenders; (C) until such time as the Pre-Petition Obligations are paid in full as contemplated by the RSA, without the written consent of the Requisite Lenders under the Pre-Petition Credit Agreement, the Pre-Petition Lenders' Cash Collateral shall be used in a manner inconsistent with the orders authorizing use of Cash Collateral or (except as provided in the Final Order) an order of a court of competent jurisdiction authorizes the use of Cash Collateral without the written consent of the Requisite Lenders; or (D) an order of a court of competent jurisdiction shall be entered terminating the use of the Pre-Petition Lenders' Cash Collateral; or

(iii) <u>Bankruptcy Plan</u>. The filing by any Credit Party of any plan of reorganization, or a pleading seeking approval of plan of reorganization, other than a Bankruptcy Plan, or the termination of the Credit Parties' "exclusive period" under Section 1121 of the Bankruptcy Code for the filing of a plan of reorganization; or

(iv) <u>Challenge of Certain Claims</u>. Any attempt by any Credit Party to obtain, or if any other party in interest obtains, an order of the Bankruptcy Court or other judgment, and the effect of such order or judgment is to, invalidate, reduce or otherwise impair Administrative Agent's, Pre-Petition Agent's, Pre-Petition Lenders', or Lenders' claims, or to subject Lenders' or Pre-Petition Lenders' collateral to any surcharge pursuant to Sections 506(c), 552(b), or 105(a) of the Bankruptcy Code, or an order is entered by the Bankruptcy Court avoiding or requiring disgorgement by Administrative Agent, Collateral Agent, Pre-Petition Agent, Pre-Petition Lenders or Lenders of any amounts paid pursuant to the Credit Documents or the Pre-Petition Credit Documents; or

(v) <u>Substitution of Collateral</u>. Any Credit Party shall apply for an order substituting any assets for all or any portion of the Collateral; or

(vi) <u>Unauthorized Payments</u>. Any payment on, or application for authority to pay, any pre-petition claim owing to terminated employees, bond claims, principal under the Pre-Petition Credit Documents, and lease rejection damages, other than those required to be paid with the DIP Facility pursuant to the terms of the DIP Facility, without the Requisite Lenders' prior written consent; or

(vii) <u>Unpermitted Payment</u>. Any Credit Party shall make any payments of Pre-Petition Indebtedness other than (i) as permitted under the Interim Order and/or the Final Order (as applicable), (ii) as permitted by any of the orders entered by the Bankruptcy Court on or about the Petition Date and in the approximate amounts reflected on the Budget, (iii) as otherwise permitted in this Agreement, or (iv) in connection with the assumption of any contract or lease approved by the Bankruptcy Court and consented to by the Requisite Lenders, or any Credit Party shall pay, or agree to pay, any breakup, termination or similar fee, unless otherwise consented to by the Requisite Lenders; or

(viii) <u>Relief from Stay</u>. An order shall be entered granting relief from the automatic stay permitting foreclosure of any assets of any Credit Party in excess of $250,000 in the aggregate, unless such relief is sought by Administrative Agent or any Lender; or

(ix) <u>Material Adverse Effect</u>. There shall occur any event after the Petition Date which results in a Material Adverse Effect; or

(x) <u>Delay</u>. The entry of the Final Order shall not have occurred within thirty (30) days after the Petition Date; or

(xi) <u>Certain Motions</u>. Except for the Carve-Out, any Credit Party shall file any pleading seeking, or otherwise consenting to, (i) the invalidation, subordination or otherwise challenging the Liens and super-priority claim status granted to secure the Obligations hereunder or the Pre-Petition Obligations, or (ii) any relief under Sections

94

506(c), 552(b), or 105(a) of the Bankruptcy Code with respect to any assets which secure the Pre-Petition Obligations or an order shall be entered by the Bankruptcy Court invalidating or subordinating the Liens or the super-priority claim status of the Obligations hereunder; or

(xii)    Final Determination.  The Bankruptcy Court or any other court having jurisdiction over the Credit Parties makes a final determination with respect to any motion or proceeding brought by any Person which results in the impairment of the rights of Administrative Agent or Lenders under any of the Credit Documents; or

(xiii)    Adequate Protection.    The payment of, or granting adequate protection to, any Person, other than as expressly set forth in the Orders and the Budget; or

(xiv)    Venue.  An order shall have been entered by the Bankruptcy Court providing for a change in venue with respect to the Cases without the approval of the Requisite Lenders and Administrative Agent; or

(xv)    RSA; Milestones.  (A) A default or breach of any type occurs, in any case, beyond the grace period, if any, provided therefor, under the RSA; (B) the Credit Parties fail to satisfy any Milestone (as set forth on Schedule 8.1) for any reason whatsoever; (C) any of the Credit Parties shall enter into an agreement for, or shall file (or support or fail to file responding materials opposing a motion by a third party seeking any such relief within the time frame provided for the filing of such response or objection by the respective court) a motion seeking, or the Bankruptcy Court shall enter, an order authorizing, a sale of all or substantially all of such Credit Party's assets unless such sale (x) provides for cash consideration at closing that is sufficient to pay all Obligations and Pre-Petition Obligations in Cash in full on the closing date of such sale and (y) is consistent with the RSA; or (D) the RSA is terminated for any reason whatsoever (other than a termination under Section 11.2(d) of the RSA); or

(g)    Advisors.  (i) FocalPoint Securities, LLC shall cease to be engaged by the Credit Parties in the capacity, and pursuant to the terms, consistent with the RSA (including as a result of the Bankruptcy Court failing to timely enter an order approving such engagement), (ii) CR3 Partners, LLC shall cease to be engaged by the Credit Parties in the capacity, and pursuant to terms, engaged by the Credit Parties prior to the Petition Date (including as a result of the Bankruptcy Court failing to timely enter an order approving such engagement), or (iii) the lease restructuring advisor engaged by the Credit Parties in accordance with Section 3.1(i) shall cease to be engaged by the Credit Parties in the capacity, and pursuant to terms, engaged by the Credit Parties prior to the Petition Date (including as a result of the Bankruptcy Court failing to timely enter an order approving such engagement); or

(h)    Judgments and Attachments.  Any money judgment, writ or warrant of attachment or similar process involving an amount in excess of $1,000,000 individually and in the aggregate (in either case to the extent not adequately covered by insurance as to which a solvent and unaffiliated insurance company has acknowledged coverage) shall be entered or filed against any Credit Party or any of its Subsidiaries or any of their respective assets and shall remain

undischarged, unvacated, unbonded or unstayed for a period of sixty (60) days (or in any event later than five (5) days prior to the date of any proposed sale thereunder); or

(i)  <u>Dissolution</u>.  Any order, judgment or decree shall be entered against any Credit Party decreeing the dissolution or split up of such Credit Party and such order shall remain undischarged or unstayed for a period in excess of thirty (30) days; or

(j)  [Intentionally Reserved]; or

(k)  <u>Change of Control</u>.  A Change of Control shall occur; or

(l)  <u>Guaranties, Collateral Documents and other Credit Documents</u>.  At any time after the execution and delivery thereof, (i) the Guaranty for any reason, other than the satisfaction in full in Cash of all Obligations, shall cease to be in full force and effect (other than in accordance with its terms) or shall be declared to be null and void or any Guarantor shall repudiate its obligations thereunder; (ii) this Agreement or any Collateral Document ceases to be in full force and effect (other than by reason of a release of Collateral in accordance with the terms hereof or thereof or the satisfaction in full in Cash of the Obligations in accordance with the terms hereof) or shall be declared null and void, or Collateral Agent shall not have or shall cease to have a valid and perfected Lien in any Collateral purported to be covered by the Collateral Documents with the priority required by the relevant Collateral Document, in each case for any reason other than solely the failure of Collateral Agent or any Secured Party to take any action within its sole control; or (iii) any Credit Party shall contest the validity or enforceability of any Credit Document in writing or deny in writing that it has any further liability, including with respect to future advances by Lenders, under any Credit Document to which it is a party;

**THEN**, subject to any limitations imposed by the Orders, Administrative Agent may, and at the request of (or with the consent of) the Requisite Lenders shall, upon notice to Borrower Representative, in any case, without further order of or application to the Bankruptcy Court, (A) the Commitments, if any, of each Lender having such Commitments shall immediately terminate; (B) each of the following shall immediately become due and payable, in each case without presentment, demand, protest or other requirements of any kind, all of which are hereby expressly waived by each Credit Party:  (w) the unpaid principal amount of and accrued interest on the Loans, (x) an amount equal to the maximum amount that may at any time be drawn under all Existing Letters of Credit then outstanding (regardless of whether any beneficiary under any such Existing Letter of Credit shall have presented, or shall be entitled at such time to present, the drafts or other documents or certificates required to draw under such Existing Letters of Credit), and (y) all other Obligations; <u>provided</u>, the foregoing shall not affect in any way the obligations of Lenders under Section 2.3(e); (C) Administrative Agent may cause Collateral Agent to enforce any and all Liens and security interests created pursuant to Collateral Documents; and (D) Administrative Agent (including at the request of Issuing Bank) shall direct Borrowers to provide (and Borrowers hereby agree upon receipt of such notice, or upon the occurrence of any Event of Default specified in Sections **Error! Reference source not found.** to provide) to Administrative Agent Letter of Credit Cash Collateralization, to be held as security for Borrowers' reimbursement Obligations in respect of the Existing Letters of Credit then outstanding under arrangements acceptable to Administrative Agent and Issuing Bank.  Additionally the Administrative Agent may, and at the request of (or with the consent of) the Requisite Lenders shall, take any other action or exercise any other right

96

or remedy of any Agent or any Lenders under any of the Credit Documents, the Orders or applicable law.

**8.2.** [Intentionally Reserved]

**8.3.    Cooperation of Credit Parties.**

(a)    Subject to the terms of the Orders, if an Event of Default shall have occurred and be continuing, each Credit Party shall, and, if applicable, shall cause each of its Subsidiaries to, take any action which the Agents may reasonably request in the exercise of their rights and remedies under any Credit Document in order to transfer or assign any Collateral to Collateral Agent for the benefit of the Secured Parties or to such one or more third parties as Collateral Agent may designate, or to any combination of the foregoing.

(b)    Subject to the terms of the Orders, to enforce the provisions of this Section 8.3, the Agents are empowered to seek from any Governmental Authority, to the extent required, consent to or approval of any involuntary transfer of control of any entity whose Collateral is subject to any Credit Document for the purpose of seeking a bona fide purchaser to whom control ultimately will be transferred. Each Credit Party agrees to, and, if applicable, shall cause each of its Subsidiaries to agree to, cooperate with any such purchaser and with the Agents in the preparation, execution and filing of any forms and providing any information that may be necessary or helpful in obtaining the consent of any Governmental Authority to the assignment to such purchaser of the Collateral.

(c)    Without limiting the obligations of any Credit Party hereunder in any respect, subject to the terms of the Orders, each Credit Party further agrees that if an Event of Default shall have occurred and be continuing, it, or any of its Subsidiaries, should fail or refuse for any reason whatsoever, including any refusal to execute and file any completed application necessary or appropriate to obtain any consent from any Governmental Authority necessary or appropriate for the exercise of any right of any Agent hereunder, then such application may be executed and filed on such Credit Party's behalf by the clerk of any court of competent jurisdiction without notice to such Credit Party pursuant to court order.

## SECTION 9.    AGENTS

**9.1.    Appointment of Agents.** GSSLG is hereby appointed Administrative Agent and Collateral Agent hereunder and under the other Credit Documents and each Lender hereby authorizes GSSLG, in such capacity, to act as its agent in accordance with the terms hereof and the other Credit Documents. Each Agent hereby agrees to act upon the express conditions contained herein and the other Credit Documents, as applicable. The provisions of this Section 9 are solely for the benefit of the Agents and Lenders and no Credit Party shall have any rights as a third party beneficiary of any of the provisions thereof. In performing its functions and duties hereunder, each Agent shall act solely as an agent of Lenders and does not assume and shall not be deemed to have assumed any obligation towards or relationship of agency or trust with or for any Credit Party or any of its Subsidiaries.

**9.2.    Powers and Duties.** Each Lender irrevocably authorizes each Agent to take such action on such Lender's behalf and to exercise such powers, rights and remedies hereunder and

under the other Credit Documents as are specifically delegated or granted to such Agent by the terms hereof and thereof, together with such powers, rights and remedies as are reasonably incidental thereto. Each Agent shall have only those duties and responsibilities that are expressly specified herein and the other Credit Documents. Each Agent may exercise such powers, rights and remedies and perform such duties by or through its agents or employees. No Agent shall have, by reason hereof or any of the other Credit Documents, a fiduciary relationship in respect of any Secured Party; and nothing herein or any of the other Credit Documents, expressed or implied, is intended to or shall be so construed as to impose upon any Agent any obligations in respect hereof or any of the other Credit Documents except as expressly set forth herein or therein.

**9.3.    General Immunity.**

(a)    <u>No Responsibility for Certain Matters</u>.  No Agent shall be responsible to any Secured Party for the execution, effectiveness, genuineness, validity, enforceability, collectability or sufficiency hereof or any other Credit Document or for any representations, warranties, recitals or statements made herein or therein or made in any written or oral statements or in any financial or other statements, instruments, reports or certificates or any other documents furnished or made by any Agent to any other Secured Party or by or on behalf of any Credit Party to any Agent or any other Secured Party in connection with the Credit Documents and the transactions contemplated thereby or for the financial condition or business affairs of any Credit Party or any other Person liable for the payment of any Obligations, nor shall any Agent be required to ascertain or inquire as to the performance or observance of any of the terms, conditions, provisions, covenants or agreements contained in any of the Credit Documents or as to the use of the proceeds of the Loans or as to the existence or possible existence of any Event of Default or Default or to make any disclosures with respect to the foregoing. Anything contained herein to the contrary notwithstanding, Administrative Agent shall not have any liability arising from confirmations of the amount of outstanding Loans, Letter of Credit Usage or the component amounts thereof.

(b)    <u>Exculpatory Provisions</u>.  No Agent nor any of its officers, partners, directors, employees or agents shall be liable to any Secured Party for any action taken or omitted by any Agent under or in connection with any of the Credit Documents except to the extent caused by such Agent's gross negligence or willful misconduct, as determined by a court of competent jurisdiction in a final, non-appealable order. Each Agent shall be entitled to refrain from any act or the taking of any action (including the failure to take an action) in connection herewith or any of the other Credit Documents or from the exercise of any power, discretion or authority vested in it hereunder or thereunder unless and until such Agent shall have received instructions in respect thereof from the Requisite Lenders (or such other Lenders as may be required to give such instructions under <u>Section 10.5</u>) and, upon receipt of such instructions from the Requisite Lenders (or such other Lenders, as the case may be), such Agent shall be entitled to act or (where so instructed) refrain from acting, or to exercise such power, discretion or authority, in accordance with such instructions. Without prejudice to the generality of the foregoing, (i) each Agent shall be entitled to rely, and shall be fully protected in relying, upon any communication, instrument or document believed by it to be genuine and correct and to have been signed or sent by the proper Person or Persons, and shall be entitled to rely and shall be protected in relying on opinions and judgments of attorneys (who may be attorneys for a Credit Party and its Subsidiaries), accountants, experts and other professional advisors selected by it; and (ii) no Secured Party shall have any

98

right of action whatsoever against any Agent as a result of such Agent acting or (where so instructed) refraining from acting hereunder or any of the other Credit Documents in accordance with the instructions of the Requisite Lenders (or such other Lenders as may be required to give such instructions under Section 10.5).

      **9.4.**    **Agents Entitled to Act as Lender.**  The agency hereby created shall in no way impair or affect any of the rights and powers of, or impose any duties or obligations upon, any Agent in its individual capacity as a Lender hereunder.  With respect to its participation in the Loans and the Existing Letters of Credit, each Agent shall have the same rights and powers hereunder as any other Lender and may exercise the same as if it were not performing the duties and functions delegated to it hereunder, and the term "Lender" shall, unless the context clearly otherwise indicates, include each Agent in its individual capacity.  Any Agent and its Affiliates may accept deposits from, lend money to, own securities of, and generally engage in any kind of banking, trust, financial advisory or other business with any Credit Party or any of its Affiliates as if it were not performing the duties specified herein, and may accept fees and other consideration from the Credit Parties for services in connection herewith and otherwise without having to account for the same to Lenders.  All parties hereto hereby (a) acknowledge that GSSLG, TCW and/or their Affiliates and Related Funds may also invest in, and/or own Capital Stock and Securities of, the Credit Parties and their respective Affiliates and (b) waive any conflict arising therefrom.

      **9.5.**    **Lenders' Representations, Warranties and Acknowledgment.**

      (a)    Each Lender represents and warrants that it has made its own independent investigation of the financial condition and affairs of Holdings and its Subsidiaries in connection with Credit Extensions hereunder and that it has made and shall continue to make its own appraisal of the creditworthiness of Holdings and its Subsidiaries.  No Agent shall have any duty or responsibility, either initially or on a continuing basis, to make any such investigation or any such appraisal on behalf of Lenders or to provide any Lender with any credit or other information with respect thereto, whether coming into its possession before the making of the Loans or at any time or times thereafter, and no Agent shall have any responsibility with respect to the accuracy of or the completeness of any information provided to Lenders.

      (b)    Each Lender, by delivering its signature page to this Agreement, shall be deemed to have acknowledged receipt of, and consented to and approved, each Credit Document and each other document required to be approved by any Agent, the Requisite Lenders, Issuing Bank or Lenders, as applicable on the Closing Date.

      (c)    Each Lender (i) represents and warrants that as of the Closing Date neither such Lender nor its Affiliates or Related Funds owns or controls, or owns or controls any Person owning or controlling, any trade debt or Indebtedness of any Credit Party other than the Obligations or any Capital Stock of any Credit Party, other than in the case of GSSLG and TCW and their Affiliates and Related Funds, pursuant to the Warrants, and (ii) covenants and agrees that from and after the Closing Date neither such Lender nor its Affiliates and Related Funds shall purchase any trade debt or Indebtedness of any Credit Party other than the Obligations or Capital Stock described in clause (i) of this Section 9.5(c) without the prior written consent of Administrative Agent.

**9.6.    Right to Indemnity.**  Each Lender (including, for purposes of this <u>Section 9.6</u>, Issuing Bank), in proportion to its Pro Rata Share, severally agrees to indemnify each Agent, their Affiliates and their respective officers, partners, directors, trustees, employees and agents of each Agent (each, an **"Indemnitee Agent Party"**), to the extent that such Indemnitee Agent Party shall not have been reimbursed by any Credit Party, for and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, reasonable and documented expenses (including counsel fees and disbursements) or disbursements of any kind or nature whatsoever which may be imposed on, incurred by or asserted against such Indemnitee Agent Party in exercising its powers, rights and remedies or performing its duties hereunder or under the other Credit Documents or otherwise in its capacity as such Indemnitee Agent Party in any way relating to or arising out of this Agreement or the other Credit Documents, **IN ALL CASES, WHETHER OR NOT CAUSED BY OR ARISING, IN WHOLE OR IN PART, OUT OF THE COMPARATIVE, CONTRIBUTORY, OR SOLE NEGLIGENCE OF SUCH INDEMNITEE AGENT PARTY**; <u>provided,</u> no Lender shall be liable for any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements resulting from such Indemnitee Agent Party's gross negligence or willful misconduct, as determined by a court of competent jurisdiction in a final, non-appealable order. If any indemnity furnished to any Indemnitee Agent Party for any purpose shall, in the opinion of such Indemnitee Agent Party, be insufficient or become impaired, such Indemnitee Agent Party may call for additional indemnity and cease, or not commence, to do the acts indemnified against until such additional indemnity is furnished; <u>provided</u>, in no event shall this sentence require any Lender to indemnify any Indemnitee Agent Party against any liability, obligation, loss, damage, penalty, action, judgment, suit, cost, expense or disbursement in excess of such Lender's Pro Rata Share thereof; <u>provided</u>, <u>further</u>, this sentence shall not be deemed to require any Lender to indemnify any Indemnitee Agent Party against any liability, obligation, loss, damage, penalty, action, judgment, suit, cost, expense or disbursement described in the proviso in the immediately preceding sentence.

**9.7.    Successor Administrative Agent and Collateral Agent.**

(a)    Administrative Agent and Collateral Agent may resign at any time by giving at least thirty (30) days' prior written notice thereof to the Lenders and Borrower Representative. Upon any such notice of resignation, the Requisite Lenders shall have the right, upon five (5) Business Days' notice to Borrower Representative, to appoint a successor Administrative Agent and Collateral Agent; <u>provided</u>, in no event will any Agent be a Defaulting Lender.  Upon the acceptance of any appointment as Administrative Agent and Collateral Agent hereunder by a successor Administrative Agent and Collateral Agent, that successor Administrative Agent and Collateral Agent shall thereupon succeed to and become vested with all the rights, powers, privileges and duties of the retiring Administrative Agent and Collateral Agent and the retiring Administrative Agent and Collateral Agent shall promptly (i) transfer to such successor Administrative Agent and Collateral Agent all sums, Securities and other items of Collateral held under the Collateral Documents, together with all records and other documents necessary or appropriate in connection with the performance of the duties of the successor Administrative Agent and Collateral Agent under the Credit Documents, and (ii) execute and deliver to such successor Administrative Agent and Collateral Agent such amendments to financing statements, and take such other actions, as may be necessary or appropriate in connection with the assignment to such successor Administrative Agent and Collateral Agent of the security interests created under the

Collateral Documents, whereupon such retiring Administrative Agent and Collateral Agent shall be discharged from its duties and obligations hereunder.  After any retiring Administrative Agent's and Collateral Agent's resignation hereunder as Administrative Agent and Collateral Agent, the provisions of this <u>Section 9</u> shall inure to its benefit as to any actions taken or omitted to be taken by it while it was Administrative Agent and Collateral Agent hereunder.

(b)    Notwithstanding anything herein to the contrary, any Agent may assign its rights and duties as such to an Affiliate of GSSLG without the prior written consent of, or prior written notice to, any Credit Party or the Lenders; <u>provided</u>, the Credit Parties and the Lenders may deem and treat such assigning Agent as such for all purposes hereof, unless and until such assigning Agent provides written notice to Borrower Representative and the Lenders of such assignment.  Upon such assignment such Affiliate shall succeed to and become vested with all rights, powers, privileges and duties as the applicable Agent hereunder and under the other Credit Documents.

### 9.8.    Collateral Documents and Guaranty.

(a)    <u>Agents under Collateral Documents and Guaranty</u>.  Each Lender hereby further authorizes Administrative Agent or Collateral Agent, as applicable, on behalf of and for the benefit of the Lenders, to be the agent for and representative of Lenders with respect to the Guaranty, the Collateral and the Collateral Documents.  Subject to <u>Section 10.5</u>, without further written consent or authorization from Lenders, Administrative Agent or Collateral Agent, as applicable may execute any documents or instruments necessary to (i) release any Lien encumbering any item of Collateral that is the subject of a sale or other disposition of assets permitted hereby or to which the Requisite Lenders (or such other Lenders as may be required to give such consent under <u>Section 10.5</u>) have otherwise consented, or (ii) release any Guarantor from the Guaranty pursuant to <u>Section 7.12</u> or with respect to which the Requisite Lenders (or such other Lenders as may be required to give such consent under <u>Section 10.5</u>) have otherwise consented.

(b)    <u>Right to Realize on Collateral and Enforce Guaranty</u>.  Anything contained in any of the Credit Documents to the contrary notwithstanding, the Credit Parties, Administrative Agent, Collateral Agent and each Lender hereby agree that (i) no Lender shall have any right individually to realize upon any of the Collateral or to enforce the Guaranty, it being understood and agreed that all powers, rights and remedies hereunder may be exercised solely by Administrative Agent, on behalf of the Secured Parties in accordance with the terms hereof and all powers, rights and remedies under the Collateral Documents may be exercised solely by Collateral Agent, and (ii) in the event of a foreclosure by Collateral Agent on any of the Collateral pursuant to a public or private sale, Collateral Agent or any Lender may be the purchaser of any or all of such Collateral at any such sale and Collateral Agent, as agent for and representative of Secured Parties (but not any Lender or Lenders in its or their respective individual capacities unless the Requisite Lenders shall otherwise agree in writing) shall be entitled, for the purpose of bidding and making settlement or payment of the purchase price for all or any portion of the Collateral sold at any such public sale, to use and apply any of the Obligations as a credit on account of the purchase price for any collateral payable by Collateral Agent at such sale.

**9.9.    Certain Agreements of Pre-Petition Agent.**  GSSLG, for purposes of this <u>Section 9.9</u> in its capacity as Pre-Petition Agent, hereby agrees for the benefit of Administrative Agent and Collateral Agent to hold that part of the Collateral that is in its possession or control (or in the possession or control of its agents or bailees) to the extent that possession or control thereof is taken to perfect a Lien thereon under the UCC as bailee for Collateral Agent (such bailment being intended, among other things, to satisfy the requirements of Sections 8-106(d)(3), 8-301(a)(2) and 9-313(c) of the UCC), including, for the avoidance of doubt, all Controlled Accounts and all certificated Capital Stock and instruments.  With respect to any Controlled Accounts, GSSLG, as Pre-Petition Agent, shall give directions to the applicable financial institutions under its agreements with such financial institutions at the request of Collateral Agent.

## SECTION 10.  MISCELLANEOUS

**10.1.    Notices.**

(a)    <u>Notices Generally</u>. Unless otherwise specifically provided herein, any notice or other communication herein required or permitted to be given to a Credit Party or Agent, shall be sent to such Person's mailing address, telefacsimile number and/or email address(es) (if approved in accordance with the terms hereof) as provided on <u>Appendix B</u> or in the other relevant Credit Document, and in the case of Issuing Bank or any Lender, the mailing address as indicated on <u>Appendix B</u> or otherwise indicated by Administrative Agent and Borrower Representative in writing.  Each notice hereunder shall be in writing and may be personally served or sent by facsimile (excluding any notices to any Agent or any Affiliate of Agent that is a Lender in its capacity as such), United States mail or courier service or email (if approved in accordance with the terms hereof) and shall be deemed to have been given when (i) delivered in person or by courier service and signed for against receipt thereof, (ii) upon receipt of facsimile, (iii) three (3) Business Days after depositing it in the United States mail with postage prepaid and properly addressed, or (iv) as set forth in <u>clause (b)(i)</u> of this <u>Section 10.1</u> with respect to notices approved in accordance with the terms hereof to be sent by email; <u>provided</u>, (x) no notice to any Agent in its capacity as such shall be effective until received by such Agent and (y) any notice sent to any Agent by email shall also be sent by United States mail or courier service in accordance with the foregoing; <u>provided</u>, <u>further</u>, any such notice or other communication shall, at the request of Administrative Agent, be provided to any sub-agent appointed pursuant to <u>Section 9</u> as designated by Administrative Agent from time to time.  Any party hereto may change its address (including telefacsimile, email address (if approved in accordance with the terms hereof) or telephone number) for notices and other communications hereunder by notice to each of Administrative Agent and Borrower Representative. At any time a single Person shall be acting as Administrative Agent and Collateral Agent, any notice or communication that shall have been delivered by Borrower Representative to Administrative Agent or to Collateral Agent, as the case may be, shall also be deemed to have been delivered to Collateral Agent and Administrative Agent, respectively.

(b)    <u>Electronic Communications</u>.

(i)    Notices and other communications to any Agent, Issuing Bank, Lender or Credit Party hereunder may be delivered or furnished by email pursuant to procedures approved by Administrative Agent in its sole discretion (each such email communication approved by Administrative Agent, an **"Approved Electronic**

**Communication"**); provided, that, notwithstanding the foregoing, in no event will notices by email be effective to any Agent, Issuing Bank or Lender, or pursuant to Section 2, if any such Person has notified Administrative Agent that it is incapable of receiving notices under such Section 2 by email.  Any Agent may, in its sole discretion, agree to accept notices and other communications to it hereunder by email pursuant to procedures approved by it; provided, that approval of such procedures may be limited to particular notices or communications.  In the case of any notices by email permitted in accordance with this Agreement, unless Administrative Agent otherwise prescribes, any notices and other communications permitted to be sent to an email address shall be delivered during normal business hours and deemed received upon the sender's receipt of an acknowledgment from the intended recipient (such as by the "return receipt requested" function, as available, return email or other written acknowledgment, but excluding any automatic reply to such email), except that, if such notice or other communication is not sent prior to noon, local time at the location of the recipient, then such notice or communication shall be deemed not to have been received until the opening of business on the next Business Day for the recipient, at the earliest.

(ii)     Each Credit Party understands that the distribution of material through an electronic medium is not necessarily secure and that there are confidentiality and other risks associated with such distribution and agrees and assumes the risks associated with such electronic distribution, except to the extent caused by the bad faith, willful misconduct or gross negligence of Administrative Agent, as determined by a final, non-appealable judgment of a court of competent jurisdiction.

(iii)     Each Credit Party, each Lender, Issuing Bank and each Agent agrees that Administrative Agent may, but shall not be obligated to, store any Approved Electronic Communications in accordance with Administrative Agent's customary document retention procedures and policies.

(iv)     Any notice of Default or Event of Default may be provided by telephone if confirmed promptly thereafter by delivery of written notice thereof.

**10.2.   Expenses.**  The Credit Parties agree to pay promptly (without further order of or application to the Bankruptcy Court) (a) all Administrative Agent's actual and reasonable costs and expenses of preparation of the Credit Documents and any consents, amendments, waivers or other modifications thereto; (b) all the reasonable fees, expenses and disbursements of counsel to Agents and Lenders (including, for purposes of this Section 10.2, Issuing Bank) in connection with the negotiation, preparation, execution and administration of the Credit Documents and any consents, amendments, waivers or other modifications thereto and any other documents or matters requested by any Credit Party; (c) all the actual costs and reasonable expenses of creating and perfecting Liens in favor of Collateral Agent, for the benefit of Secured Parties, including filing and recording fees, expenses and Taxes, stamp or documentary Taxes, search fees, title insurance premiums and reasonable fees, expenses and disbursements of counsel to each Agent and of counsel providing any opinions that any Agent or the Requisite Lenders may request in respect of the Collateral or the Liens created pursuant to the Collateral Documents; (d) all Administrative Agent's actual costs and reasonable fees, expenses for, and disbursements of any of Administrative Agent's, auditors, accountants, consultants or appraisers whether internal or external, and all

reasonable attorneys' fees (including allocated costs of internal counsel and expenses and disbursements of outside counsel) incurred by Administrative Agent; (e) all the actual costs and reasonable expenses (including the reasonable fees, expenses and disbursements of any appraisers, consultants, advisors and agents employed or retained by Collateral Agent and its counsel) in connection with the custody or preservation of any of the Collateral; (f) all other actual and reasonable costs and expenses incurred by each Agent and Lender in connection with the syndication of the Loans and Commitments and the negotiation, preparation and execution of the Credit Documents and any consents, amendments, waivers or other modifications thereto and the transactions contemplated thereby; and (g) after the occurrence of a Default or an Event of Default, all costs and expenses, including reasonable attorneys' fees (including allocated costs of internal counsel) and costs of settlement, incurred by any Agent and Lenders in enforcing any Obligations of or in collecting any payments due from any Credit Party hereunder or under the other Credit Documents by reason of such Default or Event of Default (including in connection with the sale of, collection from, or other realization upon any of the Collateral or the enforcement of the Guaranty) or in connection with any refinancing or restructuring of the credit arrangements provided hereunder in the nature of a "work-out" or pursuant to any insolvency or bankruptcy cases or proceedings (including the Cases).  For the avoidance of doubt and notwithstanding the foregoing, the Credit Parties shall not be charged for, and shall have no obligation to reimburse, any fees and expenses of Administrative Agent or any Lender incurred directly in connection with the "Governance Documents" and the "Exit Financing Documents" (as each such term is defined in the RSA), including any exhibits, schedules, amendments, modifications, supplements and appendices related thereto; provided, the foregoing exclusion is not intended to, and shall not in any manner, limit the customary expense reimbursement provisions to be included in the "Exit Financing Documents" themselves.

### 10.3.    Indemnity.

(a)    In addition to the payment of expenses pursuant to Section 10.2, whether or not the transactions contemplated hereby shall be consummated, each Credit Party agrees to defend (subject to Indemnitees' selection of counsel), indemnify, pay and hold harmless, each Agent and Lender (including, for purposes of this Section 10.3, Issuing Bank), their Affiliates and their respective officers, partners, directors, trustees, employees and agents of each Agent and each Lender (each, an **"Indemnitee"**), from and against any and all Indemnified Liabilities, **IN ALL CASES, WHETHER OR NOT CAUSED BY OR ARISING, IN WHOLE OR IN PART, OUT OF THE COMPARATIVE, CONTRIBUTORY, OR SOLE NEGLIGENCE OF SUCH INDEMNITEE**; provided, no Credit Party shall have any obligation to any Indemnitee hereunder with respect to any Indemnified Liabilities to the extent such Indemnified Liabilities arise from the bad faith, gross negligence or willful misconduct, as determined by a court of competent jurisdiction in a final, non-appealable order, of that Indemnitee.  To the extent that the undertakings to defend, indemnify, pay and hold harmless set forth in this Section 10.3 may be unenforceable in whole or in part because they are violative of any law or public policy, the applicable Credit Party shall contribute the maximum portion that it is permitted to pay and satisfy under applicable law to the payment and satisfaction of all Indemnified Liabilities incurred by Indemnitees or any of them.  In the event that an Indemnitee becomes involved in any capacity in any action, proceeding or investigation brought by or against any Person relating to or arising out of any related matter and whether or not the transactions contemplated hereby shall be consummated, each Credit Party agrees that on demand it will reimburse such Indemnitee for its legal and other

expenses (including the cost of any investigation and preparation therefor) incurred in connection therewith.

(b)    To the extent permitted by applicable law, no Credit Party shall assert, and each Credit Party hereby waives, any claim against the Agents and the other Secured Parties and their respective Affiliates, directors, employees, attorneys or agents, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) (whether or not the claim therefor is based on contract, tort or duty imposed by any applicable legal requirement) arising out of, in connection with, as a result of, or in any way related to, this Agreement or any Credit Document or any agreement or instrument contemplated hereby or thereby or referred to herein or therein, the transactions contemplated hereby or thereby, any Loan or the use of the proceeds thereof or any act or omission or event occurring in connection therewith, and each Credit Party hereby waives, releases and agrees not to sue upon any such claim or any such damages, whether or not accrued and whether or not known or suspected to exist in its favor.

**10.4.    Set-Off.**  In addition to any rights now or hereafter granted under applicable law and not by way of limitation of any such rights, upon the occurrence of any Event of Default each Lender, Issuing Bank and their respective Affiliates are hereby authorized by each Credit Party at any time or from time to time subject to the consent of Administrative Agent (such consent not to be unreasonably withheld or delayed), without notice to any Credit Party or to any other Person (other than Administrative Agent), any such notice being hereby expressly waived, to set off and to appropriate and to apply any and all deposits (general or special, including Indebtedness evidenced by certificates of deposit, whether matured or unmatured, but not including trust accounts (in whatever currency)) and any other Indebtedness at any time held or owing by such Lender to or for the credit or the account of any Credit Party (in whatever currency) against and on account of the obligations and liabilities of any Credit Party to such Lender and Issuing Bank hereunder, the Existing Letters of Credit and participations therein and under the other Credit Documents, including all claims of any nature or description arising out of or connected hereto, the Existing Letters of Credit and participations therein or with any other Credit Document, irrespective of whether or not (a) such Lender shall have made any demand hereunder, (b) the principal of or the interest on the Loans or any amounts in respect of the Existing Letters of Credit or any other amounts due hereunder shall have become due and payable pursuant to Section 2 and although such obligations and liabilities, or any of them, may be contingent or unmatured or (c) such obligation or liability is owed to a branch or office of such Lender or Issuing Bank different from the branch or office holding such deposit or obligation or such Indebtedness.

**10.5.    Amendments and Waivers.**

(a)    Requisite Lenders' Consent.  Subject to Sections 10.5(b) and 10.5(c), no amendment, modification, termination or waiver of any provision of the Credit Documents, or consent to any departure by any Credit Party therefrom, shall in any event be effective without the written concurrence of Administrative Agent and the Requisite Lenders.

(b)    Affected Lenders' Consent.  Without the written consent of each Lender (other than a Defaulting Lender) that would be affected thereby, no amendment, modification, termination, or consent shall be effective if the effect thereof would:

(i)  extend the Maturity Date;

(ii)  waive, reduce or postpone any scheduled repayment (but not prepayment);

(iii)  extend the stated expiration date of any Existing Letter of Credit;

(iv)  reduce the rate of interest on any Loan (other than any waiver of any increase in the interest rate applicable to any Loan pursuant to Section 2.9) or any fee payable hereunder;

(v)  extend the time for payment of any such interest or fees;

(vi)  reduce the principal amount of any Loan or any reimbursement obligation in respect of any Existing Letter of Credit;

(vii)  amend, modify, terminate or waive any provision of Section 2.14(a), this Section 10.5(b) or Section 10.5(c);

(viii)  amend the definition of "Requisite Lenders" or "Pro Rata Share"; provided, with the consent of Administrative Agent and the Requisite Lenders, additional Credit Extensions may be included in the determination of "Requisite Lenders" or "Pro Rata Share" on substantially the same basis as the Term Loan Commitments and the Term Loans are included on the Closing Date;

(ix)  release all or substantially all of the Collateral or all or substantially all of the Guarantors from the Guaranty, in each case, except as expressly provided in the Credit Documents; or

(x)  consent to the assignment or transfer by any Credit Party of any of its rights and obligations under any Credit Document.

(c)  Other Consents.  No amendment, modification, termination or waiver of any provision of the Credit Documents, or consent to any departure by any Credit Party therefrom, shall:

(i)  increase any Commitment of any Lender over the amount thereof then in effect without the consent of such Lender; provided, no amendment, modification or waiver of any condition precedent, covenant, Default or Event of Default shall constitute an increase in any Commitment of any Lender;

(ii)  amend, modify, terminate or waive any portion of (A) Section 2.3, (B) to the extent any such modification, waiver, consent or termination would be adverse to Issuing Bank, Section 2.5, Section 2.15(f), Section 2.16, Section 4.18, Section 4.26 or Section 5.20, or (C) any other provisions pertaining to the Issuing Bank or any rights or duties of the Issuing Bank, in any case, without the written consent of Administrative Agent and Issuing Bank; or

106

(iii)    amend, modify, terminate or waive any provision of <u>Section 9</u> as the same applies to any Agent, or any other provision hereof as the same applies to the rights or obligations of any Agent, in each case without the consent of such Agent.

(d)    <u>Execution of Amendments, etc.</u>  Administrative Agent may, but shall have no obligation to, with the concurrence of any Lender, execute amendments, modifications, waivers or consents on behalf of such Lender.  Any waiver or consent shall be effective only in the specific instance and for the specific purpose for which it was given.  No notice to or demand on any Credit Party in any case shall entitle any Credit Party to any other or further notice or demand in similar or other circumstances.  Any amendment, modification, termination, waiver or consent effected in accordance with this <u>Section 10.5</u> shall be binding upon each Lender at the time outstanding, each future Lender and, if signed by a Credit Party, on such Credit Party.

**10.6.    Successors and Assigns; Participations.**

(a)    <u>Generally</u>.  This Agreement shall be binding upon the parties hereto and their respective successors and assigns and shall inure to the benefit of the parties hereto and the successors and assigns of Lenders.  No Credit Party's rights or obligations hereunder nor any interest therein may be assigned or delegated by any Credit Party without the prior written consent of all Lenders.  Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, Indemnitee Agent Parties under <u>Section 9.6</u>, Indemnitees under <u>Section 10.3</u>, their respective successors and assigns permitted hereby and, to the extent expressly contemplated hereby, Affiliates of each of the Agents and Lenders) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)    <u>Register</u>.  The Credit Parties, Administrative Agent and Lenders shall deem and treat the Persons listed as Lenders in the Register as the holders and owners of the corresponding Commitments and Loans listed therein for all purposes hereof, and no assignment or transfer of any such Commitment or Loan shall be effective, in each case, unless and until an Assignment Agreement effecting the assignment or transfer thereof shall have been delivered to and accepted by Administrative Agent and recorded in the Register as provided in <u>Section 10.6(e)</u>.  Prior to such recordation, all amounts owed with respect to the applicable Commitment or Loan shall be owed to the Lender listed in the Register as the owner thereof, and any request, authority or consent of any Person who, at the time of making such request or giving such authority or consent, is listed in the Register as a Lender shall be conclusive and binding on any subsequent holder, assignee or transferee of the corresponding Commitments or Loans.

(c)    <u>Right to Assign</u>.  Each Lender shall have the right at any time to sell, assign or transfer all or a portion of its rights and obligations under this Agreement, including all or a portion of its Commitment or Loans owing to it or other Obligations (<u>provided</u>, <u>however</u>, each such assignment shall be of a uniform, and not varying, percentage of all rights and obligations under and in respect of any Loan and any related Commitments):

(i)    to any Person meeting the criteria of <u>clause (a)</u> of the definition of the term of "Eligible Assignee" upon the giving of notice to Administrative Agent; and

(ii)    to any Person otherwise constituting an Eligible Assignee with the consent of (x) Administrative Agent and the Requisite Lenders (in any case, not to be unreasonably withheld, conditioned or delayed), and (y) Issuing Bank (not to be unreasonably withheld, conditioned or delayed); provided, each such assignment pursuant to this Section 10.6(c)(ii) shall be in an aggregate amount of not less than $1,000,000 (or such lesser amount as may be agreed to by Administrative Agent (not to be unreasonably withheld, conditioned or delayed) or as shall constitute the aggregate amount of the Commitments and Term Loans of the assigning Lender) with respect to the assignment of the Commitments and Term Loans.

(d)    Mechanics.  The assigning Lender and the assignee thereof shall execute and deliver to Administrative Agent an Assignment Agreement, together with such forms, certificates or other evidence, if any, with respect to United States federal income Tax withholding matters as the assignee under such Assignment Agreement may be required to deliver to Administrative Agent pursuant to Section 2.19(c).

(e)    Notice of Assignment.  Upon its receipt and acceptance of a duly executed and completed Assignment Agreement, any forms, certificates or other evidence required by this Agreement in connection therewith, Administrative Agent shall record the information contained in such Assignment Agreement in the Register, shall give prompt notice thereof to  Borrower Representative and shall maintain a copy of such Assignment Agreement.

(f)    Representations and Warranties of Assignee.  Each Lender, upon execution and delivery hereof or upon executing and delivering an Assignment Agreement, as the case may be, represents and warrants as of the Closing Date or as of the applicable Effective Date (as defined in the applicable Assignment Agreement) that (i) it is an Eligible Assignee or Defaulting Lender; (ii) it has experience and expertise in the making of or investing in commitments or loans such as the applicable Commitments or Loans, as the case may be; (iii) it will make or invest in, as the case may be, its Commitments or Loans for its own account in the ordinary course of its business and without a view to distribution of such Commitments or Loans within the meaning of the Securities Act or the Exchange Act or other federal securities laws (it being understood that, subject to the provisions of this Section 10.6, the disposition of such Commitments or Loans or any interests therein shall at all times remain within its exclusive control); and (iv) such Lender does not own or control, or own or control any Person owning or controlling, any trade debt or Indebtedness of any Credit Party other than the Obligations or any Capital Stock of any Credit Party other than, in the case of GSSLG, TCW and their Affiliates and Related Funds, pursuant to the Warrants.

(g)    Effect of Assignment.   Subject to the terms and conditions of this Section 10.6, as of the "Effective Date" specified in the applicable Assignment Agreement: (i) the assignee thereunder shall have the rights and obligations of a "Lender" hereunder to the extent such rights and obligations hereunder have been assigned to it pursuant to such Assignment Agreement and shall thereafter be a party hereto and a "Lender" for all purposes hereof; (ii) the assigning Lender thereunder shall, to the extent that rights and obligations hereunder have been assigned thereby pursuant to such Assignment Agreement, relinquish its rights (other than any rights which survive the termination hereof under Section 10.8) and be released from its obligations hereunder (and, in the case of an Assignment Agreement covering all or the remaining

GS/RT – DIP Credit and Guaranty Agreement
81776891

portion of an assigning Lender's rights and obligations hereunder, such Lender shall cease to be a party hereto; <u>provided</u>, anything contained in any of the Credit Documents to the contrary notwithstanding, (x) Issuing Bank shall continue to have all rights and obligations thereof with respect to such Existing Letters of Credit until the cancellation or expiration of such Existing Letters of Credit and the reimbursement of any amounts drawn thereunder, and (y) such assigning Lender shall continue to be entitled to the benefit of all indemnities hereunder as specified herein with respect to matters arising out of the prior involvement of such assigning Lender as a Lender hereunder); (iii) the Commitments shall be modified to reflect the Commitment of such assignee and any Commitment of such assigning Lender, if any; and (iv) if any such assignment occurs after the issuance of any Note hereunder, the assigning Lender shall, upon the effectiveness of such assignment or as promptly thereafter as practicable, surrender its applicable Notes to Administrative Agent for cancellation, and thereupon Borrowers shall issue and deliver new Notes, if so requested by the assignee and/or assigning Lender, to such assignee and/or to such assigning Lender, with appropriate insertions, to reflect the new Commitments and/or outstanding Loans of the assignee and/or the assigning Lender.

(h)    <u>Participations</u>.  Each Lender shall have the right at any time to sell one or more participations to any Person (other than any Defaulting Lender or any Credit Party, any of its Subsidiaries or any of its Affiliates) in all or any part of its Commitments, Loans or in any other Obligation.  The holder of any such participation, other than an Affiliate of the Lender granting such participation, shall not be entitled to require such Lender to take or omit to take any action hereunder except with respect to any amendment, modification or waiver that would (i) extend the final scheduled Maturity Date of any Loan or Existing Letter of Credit in which such participant is participating, or reduce the rate or extend the time of payment of interest or fees thereon (except in connection with a waiver of applicability of any post-default increase in interest rates) or reduce the principal amount thereof, or increase the amount of the participant's participation over the amount thereof then in effect (it being understood that a waiver of any Default or Event of Default or of a mandatory reduction in the Commitment shall not constitute a change in the terms of such participation, and that an increase in any Commitment or Loan shall be permitted without the consent of any participant if the participant's participation is not increased as a result thereof); (ii) consent to the assignment or transfer by any Credit Party of any of its rights and obligations under this Agreement; or (iii) release all or substantially all of the Collateral under the Collateral Documents or all or substantially all of the Guarantors from the Guaranty (in each case, except as expressly provided in the Credit Documents) supporting the Loans hereunder in which such participant is participating.  Each Credit Party agrees that each participant shall be entitled to the benefits of <u>Sections 2.17(c)</u>, <u>2.18</u> and <u>2.19</u> to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to <u>clause (c)</u> of this <u>Section 10.6</u>; <u>provided</u>, (A) a participant shall not be entitled to receive any greater payment under <u>Section 2.18</u> or <u>2.19</u> than the applicable Lender would have been entitled to receive with respect to the participation sold to such participant, unless the sale of the participation to such participant is made with Borrower Representative's prior written consent, and (B) a participant that would be a Non-US Lender if it were a Lender shall not be entitled to the benefits of <u>Section 2.19</u> unless Borrower Representative is notified of the participation sold to such participant and such participant agrees, for the benefit of the Credit Parties, to comply with <u>Section 2.19</u> as though it were a Lender.  To the extent permitted by law, each participant also shall be entitled to the benefits of <u>Section 10.4</u> as though it were a Lender, provided such Participant agrees to be subject to <u>Section 2.16</u> as though it were a Lender.  Any Lender that sells a participation hereunder shall, acting solely for this purpose as an

agent of the Credit Parties, maintain a register on which it enters the name and address of each participant and the principal and corresponding interest amount of each participant's interest in the Loans, Commitments or other Obligations (the **"Participant Register"**); provided, no Lender shall be required to disclose or share the information contained in such Participant Register with any Credit Party or any other Person, except as required (x) by law or (y) to satisfy the requirements of Treasury Regulation 5f.103-1(c). The entries in the Participant Register shall be conclusive in the absence of manifest error.

(i)     Certain Other Assignments.  In addition to any other assignment permitted pursuant to this Section 10.6, any Lender may assign, pledge and/or grant a security interest in, all or any portion of its Loans, the other Obligations owed by or to such Lender, and its Notes, if any, to secure obligations of such Lender, including any Federal Reserve Bank as collateral security pursuant to Regulation A of the Board of Governors of the Federal Reserve System, as in effect from time to time, and any operating circular issued by such Federal Reserve Bank; provided, no Lender, as between the Credit Parties and such Lender, shall be relieved of any of its obligations hereunder as a result of any such assignment and pledge; provided, further, in no event shall the applicable Federal Reserve Bank, pledgee or trustee be considered to be a "Lender" or be entitled to require the assigning Lender to take or omit to take any action hereunder.

**10.7.   Independence of Covenants.**  All covenants hereunder shall be given independent effect so that if a particular action or condition is not permitted by any of such covenants, the fact that it would be permitted by an exception to, or would otherwise be within the limitations of, another covenant shall not avoid the occurrence of a Default or an Event of Default if such action is taken or condition exists.

**10.8.   Survival of Representations, Warranties and Agreements.**  All representations, warranties and agreements made herein shall survive the execution and delivery hereof and the making of any Credit Extension.  Notwithstanding anything herein or implied by law to the contrary, the agreements of each Credit Party set forth in Section 2.17(c) (Compensation for Breakage or Non-Commencement of Interest Periods), Section 2.18 (Increased Costs; Capital Adequacy), Section 2.19 (Taxes; Withholding, etc.), Section 10.2 (Expenses), Section 10.3 (Indemnity), Section 10.4 (Set-Off) and Section 10.10 (Marshalling; Payments Set Aside) and the agreements of Lenders set forth in Section 2.16 (Ratable Sharing), Section 9.3(b) (Exculpatory Provisions) and Section 9.6 (Right to Indemnity) shall survive the payment of the Loans, the cancellation or expiration of the Existing Letters of Credit and the reimbursement of any amounts drawn thereunder, and the termination hereof.

**10.9.   No Waiver; Remedies Cumulative.**  No failure or delay on the part of any Agent or any Lender in the exercise of any power, right or privilege hereunder or under any other Credit Document shall impair such power, right or privilege or be construed to be a waiver of any default or acquiescence therein, nor shall any single or partial exercise of any such power, right or privilege preclude other or further exercise thereof or of any other power, right or privilege.  The rights, powers and remedies given to each Agent and each Lender hereby are cumulative and shall be in addition to and independent of all rights, powers and remedies existing by virtue of any statute or rule of law or in any of the other Credit Documents.  Any forbearance or failure to exercise, and any delay in exercising, any right, power or remedy hereunder shall not impair any such right,

power or remedy or be construed to be a waiver thereof, nor shall it preclude the further exercise of any such right, power or remedy.

**10.10.  Marshalling; Payments Set Aside.**  Neither any Agent nor any Lender shall be under any obligation to marshal any assets in favor of any Credit Party or any other Person or against or in payment of any or all of the Obligations.  To the extent that any Credit Party makes a payment or payments to Administrative Agent, Issuing Bank or the Lenders (or to Administrative Agent, on behalf of the Lenders or Issuing Bank), or Administrative Agent, Collateral Agent, Issuing Bank or Lenders enforce any security interests or exercise their rights of setoff, and such payment or payments or the proceeds of such enforcement or setoff or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside and/or required to be repaid to a trustee, receiver or any other party under any bankruptcy law, any other state or federal law, common law or any equitable cause, then, to the extent of such recovery, the obligation or part thereof originally intended to be satisfied, and all Liens, rights and remedies therefor or related thereto, shall be revived and continued in full force and effect as if such payment or payments had not been made or such enforcement or setoff had not occurred.

**10.11.  Severability.**  In case any provision in or obligation hereunder or any other Credit Document shall be invalid, illegal or unenforceable in any jurisdiction, the validity, legality and enforceability of the remaining provisions or obligations, or of such provision or obligation in any other jurisdiction, shall not in any way be affected or impaired thereby.

**10.12.  Obligations Several; Actions in Concert.**  The obligations of the Lenders hereunder are several and no Lender (or Agent) shall be responsible for the obligations or Commitment of any other Lender hereunder.  Nothing contained herein or in any other Credit Document, and no action taken by the Lenders pursuant hereto or thereto, shall be deemed to constitute the Lenders as a partnership, an association, a joint venture or any other kind of entity. Anything in this Agreement or any other Credit Document to the contrary notwithstanding, each Lender hereby agrees with each other Lender that no Lender shall take any action to protect or enforce its rights arising out of this Agreement or any Note or otherwise with respect to the Obligations without first obtaining the prior written consent of Administrative Agent or the Requisite Lenders (as applicable), it being the intent of the Lenders that any such action to protect or enforce rights under this Agreement and any Note or otherwise with respect to the Obligations shall be taken in concert and at the direction or with the consent of Administrative Agent or the Requisite Lenders (as applicable).

**10.13.  Headings.**  Section headings herein are included herein for convenience of reference only and shall not constitute a part hereof for any other purpose or be given any substantive effect.

**10.14. APPLICABLE LAW.  THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO CONFLICT OF LAWS PRINCIPLES (OTHER THAN SECTIONS 5-1401 AND 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW) THEREOF.**

**10.15.  CONSENT TO JURISDICTION.**

(a)  **EACH CREDIT PARTY HEREBY CONSENTS AND AGREES THAT THE BANKRUPTCY COURT SHALL HAVE EXCLUSIVE JURISDICTION TO HEAR AND DETERMINE ANY CLAIMS OR DISPUTES AMONG THE CREDIT PARTIES, AGENTS AND LENDERS PERTAINING TO THIS AGREEMENT, THE OTHER CREDIT DOCUMENTS OR TO ANY MATTERS ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE OTHER CREDIT DOCUMENTS: <u>PROVIDED</u>, THAT EACH AGENT, EACH LENDER AND EACH CREDIT PARTY ACKNOWLEDGE THAT ANY APPEALS FROM THE BANKRUPTCY COURT MAY HAVE TO BE HEARD BY A COURT OTHER THAN THE BANKRUPTCY COURT; <u>PROVIDED</u>, <u>FURTHER</u>, THAT NOTHING IN THIS AGREEMENT SHALL BE DEEMED OR OPERATE TO PRECLUDE ANY AGENT FROM BRINGING SUIT OR TAKING OTHER LEGAL ACTION IN ANY OTHER JURISDICTION TO REALIZE ON THE COLLATERAL OR ANY OTHER SECURITY FOR THE OBLIGATIONS, OR TO ENFORCE A JUDGMENT OR OTHER COURT ORDER IN FAVOR OF ANY AGENT. EACH PARTY HERETO EXPRESSLY SUBMITS AND CONSENTS IN ADVANCE TO SUCH JURISDICTION IN ANY ACTION OR SUIT COMMENCED IN ANY SUCH COURT, AND EACH PARTY HERETO HEREBY WAIVES ANY OBJECTION THAT SUCH PARTY MAY HAVE BASED UPON LACK OF PERSONAL JURISDICTION, IMPROPER VENUE OR FORUM NON CONVENIENS AND HEREBY CONSENTS TO THE GRANTING OF SUCH LEGAL OR EQUITABLE RELIEF AS IS DEEMED APPROPRIATE BY SUCH COURT.  FOR THE AVOIDANCE OF DOUBT, EACH OF THE CREDIT PARTIES, LENDERS AND AGENTS HEREBY ACKNOWLEDGE THE JURISDICTION AND CONSTITUTIONAL AUTHORITY OF THE BANKRUPTCY COURT TO ENTER FINAL ORDERS IN CONNECTION WITH ANY DISPUTES OR ISSUES OF INTERPRETATION THAT MAY ARISE UNDER OR IN CONNECTION WITH THIS AGREEMENT OR THE OTHER CREDIT DOCUMENTS, AND EXPLICITLY CONSENT TO THE ENTRY OF A FINAL ORDER BY SUCH BANKRUPTCY COURT IN RELATION THERETO.**

(b)  **EACH CREDIT PARTY HEREBY AGREES THAT PROCESS MAY BE SERVED ON IT BY CERTIFIED MAIL, RETURN RECEIPT REQUESTED, TO THE ADDRESSES PERTAINING TO IT AS SPECIFIED IN <u>SECTION 10.1(b)</u>.  ANY AND ALL SERVICE OF PROCESS AND ANY OTHER NOTICE IN ANY SUCH ACTION, SUIT OR PROCEEDING SHALL BE EFFECTIVE AGAINST ANY CREDIT PARTY IF GIVEN BY REGISTERED OR CERTIFIED MAIL, RETURN RECEIPT REQUESTED, OR BY ANY OTHER MEANS OR MAIL WHICH REQUIRES A SIGNED RECEIPT, POSTAGE PREPAID, MAILED AS PROVIDED ABOVE.  IN THE EVENT ANY CREDIT PARTY SHALL NOT MAINTAIN AN OFFICE IN NEW YORK CITY, SUCH CREDIT PARTY SHALL PROMPTLY APPOINT AND MAINTAIN AN AGENT QUALIFIED TO ACT AS AN AGENT FOR SERVICE OF PROCESS WITH RESPECT TO THE COURTS SPECIFIED IN THIS <u>SECTION 10.15</u>, AND ACCEPTABLE TO THE ADMINISTRATIVE AGENT, AS EACH CREDIT PARTY'S AUTHORIZED AGENT TO ACCEPT AND ACKNOWLEDGE ON EACH CREDIT PARTY'S BEHALF SERVICE OF ANY AND ALL PROCESS WHICH MAY BE SERVED IN ANY SUCH ACTION, SUIT OR PROCEEDING.**

**10.16.  WAIVER OF JURY TRIAL.  EACH OF THE PARTIES HERETO HEREBY AGREES TO WAIVE ITS RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING HEREUNDER OR UNDER ANY OF THE OTHER CREDIT DOCUMENTS OR ANY DEALINGS BETWEEN THEM RELATING TO THE SUBJECT MATTER OF THIS LOAN TRANSACTION OR THE LENDER/BORROWER RELATIONSHIP THAT IS BEING ESTABLISHED.  THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL-ENCOMPASSING OF ANY AND ALL DISPUTES THAT MAY BE FILED IN ANY COURT AND THAT RELATE TO THE SUBJECT MATTER OF THIS TRANSACTION, INCLUDING CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY CLAIMS AND ALL OTHER COMMON LAW AND STATUTORY CLAIMS.  EACH PARTY HERETO ACKNOWLEDGES THAT THIS WAIVER IS A MATERIAL INDUCEMENT TO ENTER INTO A BUSINESS RELATIONSHIP, THAT EACH HAS ALREADY RELIED ON THIS WAIVER IN ENTERING INTO THIS AGREEMENT, AND THAT EACH WILL CONTINUE TO RELY ON THIS WAIVER IN ITS RELATED FUTURE DEALINGS.  EACH PARTY HERETO FURTHER WARRANTS AND REPRESENTS THAT IT HAS REVIEWED THIS WAIVER WITH ITS LEGAL COUNSEL AND THAT IT KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL.  THIS WAIVER IS IRREVOCABLE, MEANING THAT IT MAY NOT BE MODIFIED EITHER ORALLY OR IN WRITING (OTHER THAN BY A MUTUAL WRITTEN WAIVER SPECIFICALLY REFERRING TO THIS <u>SECTION 10.16</u> AND EXECUTED BY EACH OF THE PARTIES HERETO), AND THIS WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS OR MODIFICATIONS HERETO OR ANY OF THE OTHER CREDIT DOCUMENTS OR TO ANY OTHER DOCUMENTS OR AGREEMENTS RELATING TO THE LOANS MADE HEREUNDER.   IN THE EVENT OF LITIGATION, THIS AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT**.

**10.17. Confidentiality.**  Each Agent and each Lender shall hold all non-public information regarding the Credit Parties obtained by such Agent or such Lender in connection with this Agreement in accordance with such Agent's and such Lender's customary procedures for handling confidential information of such nature (but no less than commercially reasonable care), it being understood and agreed by the Credit Parties that, in any event, Administrative Agent may disclose such information to the Lenders and each Agent and each Lender may make disclosures of such information (a) to Affiliates of such Lender or such Agent and to their respective officers, directors, members, partners, employees, legal counsel, independent auditors and other agents, experts and advisors (and to other Persons authorized by a Lender or Agent to organize, present or disseminate such information in connection with disclosures otherwise made in accordance with this <u>Section 10.17</u>); (b) as reasonably required by any potential or prospective Eligible Assignee or participant in connection with the contemplated assignment, transfer or participation of any Loans or any participations therein or by any direct or indirect contractual counterparties (or the professional advisors thereto) to any swap or derivative transaction relating to Borrower and its obligations; (c) to any rating agency on a confidential basis when required by it; (d) to any Lender's financing sources; (e) in connection with the exercise of any remedies hereunder or under any other Credit Document or any suit, action or proceeding relating to the Credit Documents or the enforcement of rights thereunder; (f) disclosures made pursuant to the order of any court or

113

administrative agency or in any pending legal or administrative proceeding, or otherwise as required by applicable law or compulsory legal process (in which case such Person agrees to inform Borrower Representative promptly thereof to the extent not prohibited by law); (g) disclosures made upon the request or demand of any regulatory or quasi-regulatory authority purporting to have jurisdiction over such Person or any of its Affiliates; and (h) disclosures with the consent of Borrower Representative; provided, in the case of clauses (b), (d) and (h) of this sentence, the recipients of such confidential information are advised of and agree to be bound by either the provisions of this Section 10.17 or any other provisions at least as restrictive as this Section 10.17.  Notwithstanding anything to the contrary set forth herein, any Person required to maintain the confidentiality of information as provided in this Section 10.17 shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such information as such Person would accord to its own confidential information, but no less than commercially reasonable care.  Notwithstanding the foregoing, on or after the Closing Date, Administrative Agent may, at its own expense issue news releases and publish "tombstone" advertisements and other announcements relating to this transaction in newspapers, trade journals and other appropriate media (which may include use of logos of one or more of the Credit Parties) (collectively, **"Trade Announcements"**).  No Lender or Credit Party (or any of its Affiliates) shall issue any Trade Announcement except (i) disclosures required by applicable law, regulation, legal process or the rules of the Securities and Exchange Commission or (ii) with the prior approval of Administrative Agent.  Furthermore, the Credit Parties and the Lenders shall not, without the prior written consent of GSSLG, in each instance, (A) use in advertising, publicity, or otherwise the name of Goldman Sachs & Co. LLC, any Lender or any of their respective Affiliates, or any partner or employee of Goldman Sachs & Co. LLC, any Lender or any of their respective Affiliates, or (B) represent that any product or any service provided has been approved or endorsed by Goldman Sachs & Co. LLC, any Lender, or any of their respective Affiliates.

**10.18.  Usury Savings Clause.**  Notwithstanding any other provision herein, the aggregate interest rate charged or agreed to be paid with respect to any of the Obligations, including all charges or fees in connection therewith deemed in the nature of interest under applicable law shall not exceed the Highest Lawful Rate.  If the rate of interest (determined without regard to the immediately preceding sentence) under this Agreement at any time exceeds the Highest Lawful Rate, the outstanding amount of the Loans made hereunder shall bear interest at the Highest Lawful Rate until the total amount of interest due hereunder equals the amount of interest which would have been due hereunder if the stated rates of interest set forth in this Agreement had at all times been in effect.  In addition, if when the Loans made hereunder are repaid in full in Cash the total interest due hereunder (taking into account the increase provided for above) is less than the total amount of interest which would have been due hereunder if the stated rates of interest set forth in this Agreement had at all times been in effect, then to the extent permitted by law, Borrowers shall pay to Administrative Agent an amount equal to the difference between the amount of interest paid and the amount of interest which would have been paid if the Highest Lawful Rate had at all times been in effect.  Notwithstanding the foregoing, it is the intention of Lenders and Borrowers to conform strictly to any applicable usury laws.  Accordingly, if any Lender contracts for, charges, or receives any consideration which constitutes interest in excess of the Highest Lawful Rate, then any such excess shall be cancelled automatically and, if previously paid, shall at such Lender's option be applied to the outstanding amount of the Loans made hereunder or be refunded to Borrowers.  In determining whether the interest contracted for, charged, or received by

Administrative Agent or a Lender exceeds the Highest Lawful Rate, such Person may, to the extent permitted by applicable law, (a) characterize any payment that is not principal as an expense, fee, or premium rather than interest, (b) exclude voluntary prepayments and the effects thereof, and (c) amortize, prorate, allocate, and spread in equal or unequal parts the total amount of interest, throughout the contemplated term of the Obligations hereunder.

**10.19.  Counterparts.**  This Agreement and the other Credit Documents may be executed in any number of counterparts (any of which may be delivered by email or other electronic transmission), each of which when so executed and delivered shall be deemed an original, but all such counterparts together shall constitute but one and the same instrument.  Any party delivering an executed counterpart of this Agreement or any other Credit Document via email or other electronic transmission shall, upon the request by Administrative Agent, also deliver a manually executed original to Administrative Agent or its counsel, but the failure to do so does not affect the validity, enforceability or binding effect of this Agreement or any other Credit Document.

**10.20.  Effectiveness.**  This Agreement shall become effective upon the execution of a counterpart hereof by each of the parties hereto and receipt by Borrower Representative and Administrative Agent of written or telephonic notification of such execution and authorization of delivery thereof.  The provisions of this Agreement and the other Credit Documents set forth the entire agreement and understanding between the parties as to the subject matter hereof and thereof and supersede all prior agreements, oral or written, and all other communications between the parties relating to the subject matter hereof and thereof.

**10.21.  Patriot Act.**  Each Lender and Administrative Agent (for itself and not on behalf of any Lender) hereby notifies the Credit Parties that pursuant to the requirements of the Patriot Act, it is required to obtain, verify and record information that identifies the Credit Parties, which information includes the name and address of the Credit Parties and other information that will allow such Lender or Administrative Agent, as applicable, to identify the Credit Parties in accordance with the Patriot Act.

**10.22.  Priority and Liens.**  Each Borrower and each Guarantor hereby covenants, represents and warrants that the Obligations of Borrowers and Guarantors hereunder and under the other Credit Documents shall at all times be perfected and secured as set forth in the applicable Order.

**10.23.  No Discharge; Survival of Claims.**  Each Borrower and each Guarantor agrees that to the extent its Obligations hereunder are not satisfied in full, (a) its Obligations arising hereunder shall not be discharged by the entry of a confirmation order (and each Borrower and each Guarantor, pursuant to Section 1141(d)(4) of the Bankruptcy Code, hereby waives any such discharge) and (b) the super-priority claim granted to Administrative Agent and Lenders pursuant to the Orders and described in <u>Section 10.22</u> and the Liens granted to Administrative Agent and Lenders pursuant to the Orders and described in <u>Section 10.22</u> shall not be affected in any manner by the entry of a confirmation order.

**SECTION 11.          CROSS-GUARANTY OF BORROWERS**

**11.1.    Cross-Guaranty.** Each Borrower hereby agrees that such Borrower is jointly and severally liable for, and hereby absolutely and unconditionally guarantees to Administrative Agent for the ratable benefit of the Beneficiaries, the full and prompt payment (whether at stated maturity, by acceleration or otherwise) and performance of, all Obligations owed or hereafter owing to Agents and Lenders by each other Credit Party. Each Borrower agrees that its guaranty obligation hereunder is a continuing guaranty of payment and performance and not of collection, that its obligations under this <u>Section 11</u> shall not be discharged until payment and performance, in full in Cash, of the Obligations (other than contingent indemnification Obligations for which no claim has been made) has occurred, and that its obligations under this <u>Section 11</u> shall be absolute and unconditional, irrespective of, and unaffected by:

(a)      the genuineness, validity, regularity, enforceability or any future amendment of, or change in, this Agreement, any other Credit Document or any other agreement, document or instrument to which any Credit Party is or may become a party;

(b)      the absence of any action to enforce this Agreement (including this <u>Section 11</u>) or any other Credit Document, or the waiver or consent by any Agent or any Lender with respect to any of the provisions hereof or thereof;

(c)      the existence, value or condition of, or failure to perfect its Lien against, any security for the Obligations or any action, or the absence of any action, by any Beneficiary in respect thereof (including the release of any such security);

(d)      the insolvency of any Credit Party or any other Person; or

(e)      any other action or circumstances that might otherwise constitute a legal or equitable discharge or defense of a surety or guarantor.

Each Borrower shall be regarded, and shall be in the same position, as principal debtor with respect to the Obligations guaranteed hereunder.

**11.2.    Waivers by Borrowers.** Each Borrower expressly waives all rights it may have now or in the future under any statute, at common law, at law, in equity or otherwise, to compel any Beneficiary to marshal assets or to proceed in respect of the Obligations guaranteed hereunder against any other Credit Party, any other party or against any security for the payment and performance of the Obligations before proceeding against, or as a condition to proceeding against, such Borrower. Borrowers and the Beneficiaries agree that the foregoing waivers are of the essence of the transaction contemplated by this Agreement and the other Credit Documents and that, but for the provisions of this <u>Section 11</u> and such waivers, the Beneficiaries would decline to enter into this Agreement.

**11.3.    Benefit of Guaranty.** Each Borrower agrees that the provisions of this <u>Section 11</u> are for the benefit of the Beneficiaries and their respective successors, transferees, endorsees and assigns, and nothing herein contained shall impair, as between any other Borrower and the Beneficiaries, the obligations of such other Borrower under the Credit Documents.

**11.4.    Waiver of Subrogation, Etc.**  Notwithstanding anything to the contrary in this Agreement or in any other Credit Document, and except as set forth in <u>Section 11.7</u>, each Borrower hereby expressly and irrevocably waives any and all rights at law or in equity to subrogation, reimbursement, exoneration, contribution, indemnification or set off and any and all defenses available to a surety, guarantor or accommodation co-obligor until the Obligations (other than contingent indemnification Obligations for which no claim has been made) are indefeasibly paid in full in Cash.  Each Borrower acknowledges and agrees that this waiver is intended to benefit the Beneficiaries and shall not limit or otherwise affect such Borrower's liability hereunder or the enforceability of this <u>Section 11.4</u>, and that the Beneficiaries and their respective successors and assigns are intended third party beneficiaries of the waivers and agreements set forth in this <u>Section 11.4</u>.

**11.5.    Election of Remedies.**  If any Beneficiary may, under applicable law, proceed to realize its benefits under any of the Credit Documents giving such Beneficiary a Lien upon any Collateral, whether owned by any Borrower or by any other Person, either by judicial foreclosure or by non-judicial sale or enforcement, any Agent or any Lender may, at its sole option, determine which of its remedies or rights it may pursue without affecting any of its rights and remedies under this <u>Section 11</u>.  If, in the exercise of any of its rights and remedies, any Beneficiary shall forfeit any of its rights or remedies (including its right to enter a deficiency judgment against any Borrower or any other Person), whether because of any applicable laws pertaining to "election of remedies" or the like, each Borrower hereby consents to such action by any Beneficiary and waives any claim based upon such action, even if such action by any Beneficiary shall result in a full or partial loss of any rights of subrogation that each Borrower might otherwise have had but for such action by any Beneficiary.  Any election of remedies that results in the denial or impairment of the right of any Beneficiary to seek a deficiency judgment against any Borrower shall not impair any other Borrower's obligation to pay the full amount of the Obligations.  In the event any Agent shall bid at any foreclosure or trustee's sale or at any private sale permitted by law or the Credit Documents, such Agent may bid all or less than the amount of the Obligations and the amount of such bid need not be paid by such Agent but shall be credited against the Obligations.  The amount of the successful bid at any such sale, whether an Agent or any other party is the successful bidder, shall be conclusively deemed to be the fair market value of the Collateral and the difference between such bid amount and the remaining balance of the Obligations shall be conclusively deemed to be the amount of the Obligations guaranteed under this <u>Section 11</u>, notwithstanding that any present or future law or court decision or ruling may have the effect of reducing the amount of any deficiency claim to which any Beneficiary might otherwise be entitled but for such bidding at any such sale.

**11.6.    Limitation.**  Notwithstanding any provision herein contained to the contrary, each Borrower's liability under this <u>Section 11</u> (which liability is in any event in addition to amounts for which such Borrower is primarily liable under this Agreement) shall be limited to an amount not to exceed as of any date of determination the lesser of:

(a)    the net amount of all Loans advanced or transferred to any other Credit Party under this Agreement and then re-loaned or otherwise transferred to, or for the benefit of, such Borrower; and

(b)    the amount that could be claimed by the Beneficiaries from such Borrower under this <u>Section 11</u> without rendering such claim voidable or avoidable under Section 548 of Chapter 11 of the Bankruptcy Code or under any applicable state Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or similar statute or common law after taking into account, among other things, such Borrower's right of contribution and indemnification from each other Borrower under <u>Section 11.7</u>.

**11.7.    Contribution with Respect to Guaranty Obligations.**

(a)    To the extent that any Borrower shall make a payment under this <u>Section 11</u> of all or any of the Obligations (other than Loans made to such Borrower for which it is primarily liable) (a **"Guarantor Payment"**) that, taking into account all other Guarantor Payments then previously or concurrently made by any other Borrower, exceeds the amount that such Borrower would otherwise have paid if each Borrower had paid the aggregate Obligations satisfied by such Guarantor Payment in the same proportion that such Borrower's "Allocable Amount" (as defined below) (as determined immediately prior to such Guarantor Payment) bore to the aggregate Allocable Amounts of each of Borrowers as determined immediately prior to the making of such Guarantor Payment, then, following indefeasible payment in full in Cash of the Obligations (other than contingent indemnification Obligations for which no claim has been made) and termination of the Commitments, such Borrower shall be entitled to receive contribution and indemnification payments from, and be reimbursed by, each other Borrower for the amount of such excess, pro rata based upon their respective Allocable Amounts in effect immediately prior to such Guarantor Payment.

(b)    As of any date of determination, the **"Allocable Amount"** of any Borrower shall be equal to the maximum amount of the claim that could then be recovered from such Borrower under this <u>Section 11</u> without rendering such claim voidable or avoidable under Section 548 of Chapter 11 of the Bankruptcy Code or under any applicable state Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or similar statute or common law.

(c)    This <u>Section 11.7</u> is intended only to define the relative rights of Borrowers and nothing set forth in this <u>Section 11.7</u> is intended to or shall impair the obligations of Borrowers, jointly and severally, to pay any amounts as and when the same shall become due and payable in accordance with the terms of this Agreement. Nothing contained in this <u>Section 11.7</u> shall limit the liability of any Borrower to pay the Loans made directly or indirectly to such Borrower and accrued interest, fees and expenses with respect thereto for which such Borrower shall be primarily liable.

(d)    The parties hereto acknowledge that the rights of contribution and indemnification hereunder shall constitute assets of Borrowers to which such contribution and indemnification is owing.

(e)    The rights of the indemnifying Borrowers against other Credit Parties under this <u>Section 11.7</u> shall be exercisable upon the full and indefeasible payment of the Obligations and the termination of the Commitments.

**11.8.   Liability Cumulative.**   The liability of Borrowers under this <u>Section 11</u> is in addition to and shall be cumulative with all liabilities of each Borrower to the Beneficiaries under this Agreement and the other Credit Documents to which such Borrower is a party or in respect of any Obligations or obligation of the other Borrower, without any limitation as to amount, unless the instrument or agreement evidencing or creating such other liability specifically provides to the contrary.

**11.9.   DIP Order Controls.**   In the event of any inconsistency between the provisions of the Orders and this Agreement, the provisions of the Orders shall govern.

GS/RT – DIP Credit and Guaranty Agreement
81776891

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be duly executed and delivered by their respective officers thereunto duly authorized as of the date first written above.

**RUBY TUESDAY, INC.,**
as a Borrower


By:_____
Name:    Aziz Hashim
Title:     President

**RTI HOLDING COMPANY, LLC**,
as a Guarantor and Borrower Representative

By:        NRD Capital Management II, LLC,
             its Manager


By:_____
Name:    Aziz Hashim
Title:     Managing Member

**OTHER BORROWERS:**

**RUBY TUESDAY OF ALLEGANY COUNTY, INC.**
**RUBY TUESDAY OF COLUMBIA, INC.**
**RUBY TUESDAY OF FREDERICK, INC.**
**RUBY TUESDAY OF LINTHICUM, INC.**
**RUBY TUESDAY OF MARLEY STATION, INC.**
**RUBY TUESDAY OF POCOMOKE CITY, INC.**
**RT OF CARROLL COUNTY, LLC**
**RT OF MARYLAND, LLC**


By:_____
Name:    Aziz Hashim
Title:     Credit and Loan Officer

**OTHER BORROWERS CONTINUED:**

**RT DENVER FRANCHISE, L.P.**
**RT DETROIT FRANCHISE, LLC**
**RT DISTRIBUTING, LLC**
**RT FINANCE, LLC**
**RT FL GIFT CARDS, INC.**
**RT FLORIDA EQUITY, LLC**
**RT FRANCHISE ACQUISITION, LLC**
**RT INDIANAPOLIS FRANCHISE, LLC**
**RT JONESBORO CLUB**
**RT KCMO FRANCHISE, LLC**
**RT KENTUCKY RESTAURANT HOLDINGS, LLC**
**RT LAS VEGAS FRANCHISE, LLC**
**RT LONG ISLAND FRANCHISE, LLC**
**RT MICHIANA FRANCHISE, LLC**
**RT MICHIGAN FRANCHISE, LLC**
**RT MINNEAPOLIS FRANCHISE, LLC**
**RT MINNEAPOLIS HOLDINGS, LLC**
**RT NEW ENGLAND FRANCHISE, LLC**
**RT NEW HAMPSHIRE RESTAURANT HOLDINGS, LLC**
**RT NEW YORK FRANCHISE, LLC**
**RT OMAHA FRANCHISE, LLC**
**RT OMAHA HOLDINGS, LLC**
**RT ONE PERCENT HOLDINGS II, LLC**
**RT ONE PERCENT HOLDINGS, LLC**
**RT ORLANDO FRANCHISE, L.P.**
**RT RESTAURANT SERVICES, LLC**
**RT SOUTH FLORIDA FRANCHISE, L.P.**
**RT SOUTHWEST FRANCHISE, LLC**
**RT ST. LOUIS FRANCHISE, LLC**
**RT TAMPA FRANCHISE, L.P.**
**RT WEST PALM BEACH FRANCHISE, L.P.**
**RT WESTERN MISSOURI FRANCHISE, LLC**
**RTBD, LLC**
**RTT TEXAS, INC.**
**RTTA, LP**
**RTTT, LLC**
**RUBY TUESDAY OF BRYANT, INC.**
**RUBY TUESDAY OF RUSSELLVILLE, INC.**
**RUBY TUESDAY, LLC**


By:_____
Name:    Aziz Hashim
Title:     President

**GOLDMAN SACHS SPECIALTY LENDING GROUP, L.P.**, as Administrative Agent, Collateral Agent and Lender

By:_____
Name:
Title:

**GOLDMAN SACHS BANK USA**, as Issuing Bank

By:_____
Name:
Title:

**TCW DIRECT LENDING LLC**,
as a Lender

By:    TCW Asset Management Company, LLC,
       its Investment Advisor


By:_____
Name:
Title:


**TCW SKYLINE LENDING, L.P.**,
as a Lender

By:    TCW Asset Management Company, LLC,
       its Investment Advisor


By:_____
Name:
Title:


**TCW BRAZOS FUND LLC**,
as a Lender

By:    TCW Asset Management Company, LLC,
       its Investment Advisor


By:_____
Name:
Title:

**APPENDIX A TO**
**CREDIT AND GUARANTY AGREEMENT**

**Term Loan Commitments**

| Lender | Term Loan Commitment | Pro Rata Share |
|---|---|---|
| **Goldman Sachs Specialty Lending Holdings, Inc.** | $9,250,000.00 | **50.00%** |
| **TCW Direct Lending LLC** | $6,771,000.00 | **36.60%** |
| **TCW Skyline Lending, L.P.** | $1,147,000.00 | **6.20%** |
| **TCW Brazos Fund LLC** | $1,332,000.00 | **7.20%** |
| **Total** | **$18,500,000.00** | **100.00%** |

Appendix A

**APPENDIX B TO
CREDIT AND GUARANTY AGREEMENT**

**Notice Addresses**

**RTI HOLDING COMPANY, LLC,**
as Borrower Representative

> RTI Holding Company, LLC
> 4170 Ashford Dunwoody Road, Suite 390
> Atlanta, Georgia  30319
> Attention:  Aziz Hashim
> Email: ahashim@nrdcapital.com

in each case, with a copy to:

> Pachulski Stang Ziehl & Jones LLP
> 10100 Santa Monica Blvd., 13th Floor
> Los Angeles, CA 90067
> Attention: Richard M. Pachulski
> Email: rpachulski@pszjlaw.com

> and

> Cheng Cohen LLC
> 363 West Erie Street, Suite 500
> Chicago, Illinois  60654
> Attention:  Amy Cheng
> Email:  amy.cheng@chengcohen.com

**GOLDMAN SACHS SPECIALTY LENDING GROUP, L.P.,**
as Administrative Agent, Collateral Agent and a Lender

Principal Office:

       Goldman Sachs Specialty Lending Group, L.P.
       2001 Ross Avenue, Suite 2800
       Dallas, Texas  75201
       Attention: Ruby Tuesday Account Manager
       Email:  gs-slg-notices@gs.com

in each case, with a copy (which shall not constitute notice) to:

       Hunton & Williams LLP
       Bank of America Plaza, Suite 4100
       600 Peachtree Street, N.E.
       Atlanta, Georgia  30308-2216
       Attention:  Greta T. Griffith, Esq.
       Telecopier: (404) 888-4190

**GOLDMAN SACHS BANK USA**,
as Issuing Bank

Principal office:

> Goldman Sachs Bank USA
> 2001 Ross Avenue, Suite 2800
> Dallas, Texas  75201
> Attention: Ruby Tuesday Account Manager
> Email:  gs-slg-notices@gs.com

in each case, with a copy (which shall not constitute notice) to:

> Hunton & Williams LLP
> Bank of America Plaza, Suite 4100
> 600 Peachtree Street, N.E.
> Atlanta, Georgia  30308-2216
> Attention:  Greta T. Griffith, Esq.
> Telecopier: (404) 888-4190

**TCW DIRECT LENDING LLC**
**TCW SKYLINE LENDING, L.P.**
**TCW BRAZOS FUND LLC,**
each as a Lender

       TCW Direct Lending LLC
       200 Clarendon Street, 51st Floor
       Boston, Massachusetts  02116
       Attention:     Ruby Tuesday Account Manager
       Email:         Michael.Anello@tcw.com

       with a copy (which shall not constitute notice) to:

       Paul Hastings LLP
       515 South Flower Street, 25th Floor
       Los Angeles, CA 90071
       Attention: Justin Rawlins
       E-mail: justinrawlins@paulhastings.com

## Schedule 8.1

### Milestones

The Credit Parties shall implement the Restructuring Transactions (as defined in the RSA) in accordance with the DIP Milestones (as defined in the RSA) which shall include the following:

<u>Plan Milestones</u>

   a) No later than three (3) Business Days after Petition Date, the Credit Parties shall file the Bankruptcy Plan and any disclosure statement related thereto (the "**Disclosure Statement**") in form and substance reasonably acceptable to the Lenders.

   b) No later than forty-five (45) days after Petition Date, the Disclosure Statement shall be approved by the Bankruptcy Court, with a voting deadline that is no later than thirty (30) days after such approval.

   c) No later than (i) one hundred five (105) days after the Petition Date, or (ii) one hundred twenty (120) days after the Petition Date in the event that a Topping Bid is selected at any auction, the Bankruptcy Plan shall be confirmed (such date described in the foregoing <u>clauses (i)</u> and <u>(ii)</u>, the "**Outside Date**"), and

   d) No later than thirty (30) days after confirmation of the Bankruptcy Plan, the Bankruptcy Plan shall become effective (the "**Effective Date**"); <u>provided</u>, that the Agents and Lenders will consider in good faith any reasonable request by the Credit Parties for an extension of such time.

<u>Sale Milestones</u>

   a) Not later than three (3) Business Days after the Petition Date, file an application to retain FocalPoint as investment banker to:

      a. assist the Credit Parties in evaluating, structuring, negotiating and implementing the terms (including pricing) and conditions of any proposed transaction, including any proposed section 363 sale or chapter 11 plan (each, a "**Transaction**" and each, other than the Bankruptcy Plan, an "**Alternative Transaction**");

      b. assist the Credit Parties in preparing, revising, or updating marketing materials;

      c. prepare, revise, or update a list or lists of potential purchasers;

      d. contact potential purchasers to solicit their interest in any Transaction and to provide them with the confidential information memorandum under a confidential disclosure agreement;

      e. compile and disseminate due diligence materials to prospective purchasers and maintain a secure data vault for review of due diligence materials;

      f.   participate in due diligence visits, meetings and consultations between the Credit Parties and interested potential purchasers, and coordinate and track distribution of all information related to a Transaction with such parties;

      g.   assist the Credit Parties with evaluating offers, indications of interest, negotiating agreements and definitive contracts; and

      h.   attend auctions and, to the extent required, provide affidavits in support, in the Bankruptcy Court with respect to any matters in connection with or arising out of the foregoing.

b)   Not later than thirty (30) days after the Petition Date, obtain an order approving FocalPoint as investment banker.

c)   The Credit Parties shall, no later than three (3) days after the Petition Date, file a motion to approve the procedures governing the sale and marketing process for the sale of the Credit Parties' assets (the "**Bidding Procedures**") to be heard on shortened time fourteen (14) days later, which motion shall in form and substance be acceptable to the Lenders.

d)   No later than twenty (20) days after Petition Date, the Bankruptcy Court shall have entered an order approving the Bidding Procedures, which order shall in form and substance be reasonably acceptable to the Lenders.

e)   No earlier than sixty (60) days and no later than one hundred five (105) days after the Petition Date, the Credit Parties shall hold an auction, if a Topping Bid is received by the Credit Parties.

f)   (i) No later than three (3) days after the auction, the Topping Bid, if any, selected at the auction shall be approved by the Bankruptcy Court, and (ii) no later than sixty (60) days after the Bankruptcy Court approves such Topping Bid, the sale will close and the proceeds of such sale shall be used to pay the Lenders and the Pre-Petition Lenders until such time as they are paid in full in Cash.

EXHIBIT B

**BUDGET**

[see attached]

**Ruby Tuesday, Inc.**
DIP Budget
*(US $ in 000s)*

| Actual / Forecast --> | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 16-Week Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Petition Fcst | Post Fcst | Post Fcst | Post Fcst | Post Fcst | Post Fcst | Post Fcst | Post Fcst | Post Fcst | Post Fcst | Post Fcst | Post Fcst | Post Fcst | Post Fcst | Post Fcst | Post Fcst | Fcst |
| Period Ending --> | P5 W1 | P5 W2 | P5 W3 | P5 W4 | P6 W1 | P6 W2 | P6 W3 | P6 W4 | P7 W1 | P7 W2 | P7 W3 | P7 W4 | P7 W5 | P8 W1 | P8 W2 | P8 W3 | |
| Week Starting Date --> | 10/07/20 | 10/14/20 | 10/21/20 | 10/28/20 | 11/04/20 | 11/11/20 | 11/18/20 | 11/25/20 | 12/02/20 | 12/09/20 | 12/16/20 | 12/23/20 | 12/30/20 | 01/06/21 | 01/13/21 | 01/20/21 | 10/07/20 |
| Week Ending Date --> | 10/13/20 | 10/20/20 | 10/27/20 | 11/03/20 | 11/10/20 | 11/17/20 | 11/24/20 | 12/01/20 | 12/08/20 | 12/15/20 | 12/22/20 | 12/29/20 | 01/05/21 | 01/12/21 | 01/19/21 | 01/26/21 | 01/26/21 |
| **Operating Receipts** | | | | | | | | | | | | | | | | | |
| Restaurant operations | 5,017 | 4,963 | 4,957 | 4,956 | 5,029 | 5,037 | 5,038 | 5,039 | 5,111 | 5,120 | 5,121 | 5,121 | 5,121 | 5,194 | 5,203 | 5,204 | 81,231 |
| Other | 37 | 39 | 42 | 69 | 41 | 42 | 43 | 67 | 42 | 42 | 42 | 42 | 72 | 47 | 219 | 118 | 1,005 |
| Total Operating Receipts | 5,054 | 5,003 | 4,999 | 5,025 | 5,070 | 5,079 | 5,081 | 5,105 | 5,153 | 5,162 | 5,164 | 5,164 | 5,193 | 5,241 | 5,421 | 5,322 | 82,236 |
| **Operating Disbursements** | | | | | | | | | | | | | | | | | |
| COGS Vendors (PFG & Fintech) | (1,821) | (1,697) | (1,683) | (1,681) | (1,683) | (1,701) | (1,705) | (1,705) | (1,704) | (1,723) | (1,727) | (1,726) | (1,725) | (1,730) | (1,754) | (1,758) | (27,524) |
| Total Payroll | (2,335) | (2,221) | (2,152) | (2,211) | (2,150) | (2,178) | (2,231) | (2,246) | (2,186) | (2,208) | (2,261) | (2,213) | (2,271) | (2,212) | (2,242) | (2,296) | (35,613) |
| Service Channel | (300) | (300) | (300) | (300) | (300) | (300) | (300) | (300) | (300) | (300) | (300) | (300) | (300) | (300) | (300) | (300) | (4,800) |
| Sales Tax | (175) | (1,401) | (88) | (88) | (102) | (1,636) | (205) | (102) | (81) | (1,300) | (162) | (81) | (83) | (1,321) | (165) | (83) | (7,073) |
| Utilities | - | - | (350) | (350) | (350) | (350) | (350) | (350) | (350) | (350) | (350) | (350) | (350) | (350) | (350) | (350) | (4,900) |
| Rent | - | - | - | (50) | - | - | - | (50) | - | - | - | - | (2,736) | - | - | - | (2,836) |
| Property Tax | - | - | (12) | (84) | (51) | (28) | (326) | (48) | (63) | (11) | (396) | (449) | (509) | (2) | (198) | (143) | (2,399) |
| IT | (210) | (53) | (48) | (84) | (111) | (30) | (6) | (169) | (46) | (53) | (6) | (91) | (84) | (69) | (30) | (123) | (1,211) |
| Ordinary course prof service | (68) | (277) | (58) | (140) | (62) | (252) | (58) | (175) | (33) | (281) | (58) | (175) | (33) | (79) | (235) | (110) | (2,097) |
| Insurance | (27) | (5) | (53) | (33) | (73) | (7) | (5) | (81) | (73) | (143) | (5) | (5) | (81) | (73) | (7) | (5) | (677) |
| Marketing | - | (115) | (65) | (340) | (250) | (250) | (250) | (250) | (250) | (250) | (250) | (250) | (250) | (250) | (250) | (250) | (3,520) |
| Other | (189) | (195) | (95) | (298) | (95) | (195) | (95) | (298) | (95) | (362) | (95) | (160) | (283) | (195) | (195) | (95) | (2,839) |
| Total Operating Disbursements | (5,126) | (6,264) | (4,904) | (5,738) | (5,228) | (6,928) | (5,532) | (5,773) | (5,182) | (6,980) | (5,611) | (5,800) | (8,704) | (6,482) | (5,725) | (5,513) | (95,488) |
| **Net Operating Cash Flow** | (71) | (1,262) | 95 | (713) | (158) | (1,849) | (450) | (668) | (28) | (1,818) | (447) | (637) | (3,511) | (1,241) | (304) | (191) | (13,252) |
| **Restructuring** | | | | | | | | | | | | | | | | | |
| Restructuring Professional Fees Escrow | (259) | (249) | (233) | (300) | (365) | (228) | (221) | (276) | (351) | (221) | (221) | (269) | (592) | (156) | (211) | (156) | (4,271) |
| Secured Lender Professional Fees | (115) | (115) | (115) | (115) | (115) | (115) | (70) | (70) | (70) | (70) | (70) | (30) | (30) | (30) | (30) | (25) | (1,140) |
| US Trustee Fees | - | - | - | - | - | - | - | - | - | - | - | - | - | (250) | - | (83) | (333) |
| Utility deposit | - | - | - | (511) | - | - | - | - | - | - | - | - | - | - | - | - | (511) |
| Adequate Protection (pre-petition debt) | - | - | - | (199) | - | - | - | (265) | - | - | - | (322) | - | - | - | - | (786) |
| Secured Lender Professional Fees (pre-petition) | (1,277) | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | (1,277) |
| DIP Loan Interest and Fees | - | - | - | (86) | - | - | - | (127) | - | - | - | - | (166) | - | - | - | (378) |
| Total Restructuring | (1,651) | (324) | (348) | (1,211) | (480) | (343) | (291) | (738) | (421) | (291) | (251) | (299) | (1,109) | (436) | (236) | (265) | (8,697) |
| **Net Cash Flow Before Other Trust / Estate** | (1,723) | (1,586) | (253) | (1,924) | (638) | (2,192) | (742) | (1,406) | (449) | (2,109) | (698) | (936) | (4,621) | (1,677) | (540) | (456) | (21,949) |
| **Other Trust / Estate Receipts & (Disbursements)** | | | | | | | | | | | | | | | | | |
| Deferred Comp Plan | - | - | - | - | - | - | 5,290 | - | - | - | - | - | - | - | - | - | 5,290 |
| COLI Trust from ESP/MRP Plans | - | - | - | - | - | 22,631 | - | - | - | - | - | - | - | - | - | - | 22,631 |
| Asset sales | - | - | - | - | - | - | - | - | 1,520 | - | - | - | - | - | - | - | 1,520 |
| Paydown from asset sales | - | - | - | - | - | - | - | - | - | (1,520) | - | - | - | - | - | - | (1,520) |
| Total Other Trust / Estate Receipts & (Disbursements) | - | - | - | - | - | 22,631 | 5,290 | - | - | - | - | - | - | - | - | - | 27,921 |
| **Net Cash Flow** | (1,723) | (1,586) | (253) | (1,924) | (638) | 20,439 | 4,548 | (1,406) | (449) | (2,109) | (698) | (936) | (4,621) | (1,677) | (540) | (456) | 5,972 |
| **Liquidity Summary** *[non-escrow]* | | | | | | | | | | | | | | | | | |
| Beginning Cash *[non-escrow]* | 5,410 | 6,687 | 5,101 | 4,848 | 6,424 | 5,786 | 26,225 | 30,774 | 29,368 | 28,918 | 26,809 | 26,111 | 25,175 | 20,555 | 18,877 | 18,337 | 5,410 |
| Net Cash Flow | (1,723) | (1,586) | (253) | (1,924) | (638) | 20,439 | 4,548 | (1,406) | (449) | (2,109) | (698) | (936) | (4,621) | (1,677) | (540) | (456) | 5,972 |
| DIP Advances / (Paydowns) | 3,000 | - | - | 3,500 | - | - | - | - | - | - | - | - | - | - | - | - | 6,500 |
| Ending Cash *[non-escrow]* | 6,687 | 5,101 | 4,848 | 6,424 | 5,786 | 26,225 | 30,774 | 29,368 | 28,918 | 26,809 | 26,111 | 25,175 | 20,555 | 18,877 | 18,337 | 17,882 | 17,882 |
| Restructuring Professionals Escrow | 259 | 469 | 702 | 1,002 | 1,187 | 1,080 | 1,301 | 1,577 | 1,798 | 1,267 | 1,488 | 1,757 | 1,969 | 1,417 | 1,629 | 1,785 | 1,785 |
| Utility Deposit Escrow | - | - | - | 511 | 511 | 511 | 511 | 511 | 511 | 511 | 511 | 511 | 511 | 511 | 511 | 511 | 511 |
| **Ending Cash + Escrowed Cash** | 6,946 | 5,570 | 5,549 | 7,937 | 7,484 | 27,816 | 32,586 | 31,456 | 31,228 | 28,587 | 28,110 | 27,443 | 23,035 | 20,806 | 20,477 | 20,178 | 20,178 |
| **DIP Facility Summary** | | | | | | | | | | | | | | | | | |
| Beginning DIP Balance | - | 12,571 | 12,571 | 12,571 | 18,071 | 18,071 | 18,071 | 18,071 | 18,071 | 18,071 | 18,071 | 18,071 | 18,071 | 18,071 | 18,071 | 18,071 | - |
| + Advances | 3,000 | - | - | 3,500 | - | - | - | - | - | - | - | - | - | - | - | - | 6,500 |
| + Pre-Petition LC Roll-up | 9,571 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 9,571 |
| + Pre-Petition Roll-Up | - | - | - | 2,000 | - | - | - | - | - | - | - | - | - | - | - | - | 2,000 |
| **Ending DIP Balance** | 12,571 | 12,571 | 12,571 | 18,071 | 18,071 | 18,071 | 18,071 | 18,071 | 18,071 | 18,071 | 18,071 | 18,071 | 18,071 | 18,071 | 18,071 | 18,071 | 18,071 |

**Ruby Tuesday, Inc.**
DIP Budget - Professional Fees Schedule
*(US $ in 000s)*

| | Petition Fcst | Post Fcst | Post Fcst | Post Fcst | Post Fcst | Post Fcst | Post Fcst | Post Fcst | Post Fcst | Post Fcst | Post Fcst | Post Fcst | Post Fcst | Post Fcst | Post Fcst | Post Fcst | Fcst |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Week Number -->** | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 16-Week Total |
| **Period Ending -->** | P5 W1 | P5 W2 | P5 W3 | P5 W4 | P6 W1 | P6 W2 | P6 W3 | P6 W4 | P7 W1 | P7 W2 | P7 W3 | P7 W4 | P7 W5 | P8 W1 | P8 W2 | P8 W3 | |
| **Week Starting Date -->** | 10/07/20 | 10/14/20 | 10/21/20 | 10/28/20 | 11/04/20 | 11/11/20 | 11/18/20 | 11/25/20 | 12/02/20 | 12/09/20 | 12/16/20 | 12/23/20 | 12/30/20 | 01/06/21 | 01/13/21 | 01/20/21 | 10/07/20 |
| **Week Ending Date -->** | 10/13/20 | 10/20/20 | 10/27/20 | 11/03/20 | 11/10/20 | 11/17/20 | 11/24/20 | 12/01/20 | 12/08/20 | 12/15/20 | 12/22/20 | 12/29/20 | 01/05/21 | 01/12/21 | 01/19/21 | 01/26/21 | 01/26/21 |
| **Restructuring Professional Fees Escrow** | | | | | | | | | | | | | | | | | |
| **Debtor** | | | | | | | | | | | | | | | | | |
| Debtor Counsel | (133) | (133) | (133) | (133) | (133) | (133) | (133) | (133) | (133) | (133) | (133) | (133) | (133) | (133) | (133) | (133) | (2,133) |
| Debtor FA | (76) | (76) | (70) | (67) | (57) | (50) | (43) | (43) | (43) | (43) | (43) | (36) | (13) | (13) | (13) | (13) | (717) |
| Investment Banker | - | - | - | - | (55) | - | - | - | (55) | - | - | - | (55) | - | - | - | (165) |
| Valuation Expert | - | - | - | - | - | - | - | - | - | - | - | - | (250) | - | - | - | (250) |
| Lease Advisor | (50) | - | - | - | (75) | - | - | - | (75) | - | - | - | (75) | - | - | - | (275) |
| Noticing & Claims Agent Fees | - | - | - | (55) | - | - | - | (55) | - | - | - | (55) | - | - | (55) | - | (220) |
| Total Debtor | (259) | (209) | (203) | (255) | (320) | (183) | (176) | (231) | (306) | (176) | (176) | (224) | (547) | (146) | (201) | (146) | (3,761) |
| **UCC** | | | | | | | | | | | | | | | | | |
| UCC Counsel | - | - | (30) | (30) | (30) | (30) | (30) | (30) | (30) | (30) | (30) | (30) | (30) | (10) | (10) | (10) | (360) |
| UCC FA | - | - | - | (15) | (15) | (15) | (15) | (15) | (15) | (15) | (15) | (15) | (15) | - | - | - | (150) |
| Total UCC | - | - | (30) | (45) | (45) | (45) | (45) | (45) | (45) | (45) | (45) | (45) | (45) | (10) | (10) | (10) | (510) |
| **Total Restructuring Professional Fees Escrow** | (259) | (209) | (233) | (300) | (365) | (228) | (221) | (276) | (351) | (221) | (221) | (269) | (592) | (156) | (211) | (156) | (4,271) |

| Restructuring Professional Fees ("RPF") Escrow Balance Summary | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Beginning RPF Balance** | $ - | $ 259 | $ 469 | $ 702 | $ 1,002 | $ 1,187 | $ 1,080 | $ 1,301 | $ 1,577 | $ 1,798 | $ 1,267 | $ 1,488 | $ 1,757 | $ 1,969 | $ 1,417 | $ 1,629 | $ - |
| + Escrowed Fees | 259 | 209 | 233 | 300 | 365 | 228 | 221 | 276 | 351 | 221 | 221 | 269 | 592 | 156 | 211 | 156 | 4,271 |
| - Cash Disbursements | - | - | - | - | (180) | (335) | - | - | (130) | (753) | - | - | (380) | (708) | - | - | (2,486) |
| **Ending RPF Balance** | $ 259 | $ 469 | $ 702 | $ 1,002 | $ 1,187 | $ 1,080 | $ 1,301 | $ 1,577 | $ 1,798 | $ 1,267 | $ 1,488 | $ 1,757 | $ 1,969 | $ 1,417 | $ 1,629 | $ 1,785 | $ 1,785 |

| Secured Lender Professional Fees (not part of RPF) | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Secured Lender Counsel | (75) | (75) | (75) | (75) | (75) | (75) | (30) | (30) | (30) | (30) | (30) | (30) | (30) | (30) | (25) | (25) | (740) |
| Secured Lender FA | (40) | (40) | (40) | (40) | (40) | (40) | (40) | (40) | (40) | (40) | - | - | - | - | - | - | (400) |
| **Total Secured Lender Professional Fees** | (115) | (115) | (115) | (115) | (115) | (115) | (70) | (70) | (70) | (70) | (30) | (30) | (30) | (30) | (25) | (25) | (1,140) |