IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| RTI HOLDING COMPANY, LLC,[1] | ) | Case No. 20-12456 (JTD) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |

### RUBY TUESDAY, INC.'S MOTION FOR AN ORDER AUTHORIZING RUBY TUESDAY, INC. TO EXERCISE ITS OWNERSHIP RIGHTS OVER TRUST ASSETS CURRENTLY HELD IN A "RABBI TRUST" FOR RUBY TUESDAY, INC.'S NONQUALIFIED EXECUTIVE SUPPLEMENTAL PENSION PLAN AND MANAGEMENT RETIREMENT PLAN

Ruby Tuesday, Inc. ("RTI"), one of the debtors and debtors in possession (collectively, the

"Debtors") in the above captioned cases hereby files this motion (the "Motion") for entry of an

order, in substantially the form attached hereto as **Exhibit G** (the "Proposed Order"),

(i) authorizing RTI to exercise its ownership rights over assets held in a "rabbi trust" (the

"Trust") for two of RTI's nonqualified deferred compensation "top hat" benefit plans -- an

---

[1] The Debtors in these chapter 11 cases and the last four digits of each Debtor's U.S. tax identification number are as follows: RTI Holding Company, LLC (4966); Ruby Tuesday, Inc. (5239); Ruby Tuesday, LLC (1391); RTBD, LLC (6505); RT of Carroll County, LLC (8836); RT Denver Franchise, L.P. (2621); RT Detroit Franchise, LLC (8738); RT Distributing, LLC (6096); RT Finance, LLC (7242); RT FL Gift Cards, Inc. (2189); RT Florida Equity, LLC (7159); RT Franchise Acquisition, LLC (1438); RT of Fruitland, Inc. (1103); RT Indianapolis Franchise, LLC (6016); RT Jonesboro Club (2726); RT KCMO Franchise, LLC (7020); RT Kentucky Restaurant Holdings, LLC (7435); RT Las Vegas Franchise, LLC (4969); RT Long Island Franchise, LLC (4072); RT of Maryland, LLC (7395); RT Michiana Franchise, LLC (8739); RT Michigan Franchise, LLC (8760); RT Minneapolis Franchise, LLC (2746); RT Minneapolis Holdings, LLC (7189); RT New England Franchise, LLC (4970); RT New Hampshire Restaurant Holdings, LLC (7438);  RT New York Franchise, LLC (1154); RT Omaha Franchise, LLC (7442); RT Omaha Holdings, LLC (8647); RT One Percent Holdings, LLC (6689); RT One Percent Holdings II, LLC (2817); RT Orlando Franchise, LP (5105); RT Restaurant Services, LLC (7283); RT South Florida Franchise, LP (3535); RT Southwest Franchise, LLC (9715); RT St. Louis Franchise, LLC (6010); RT Tampa Franchise, LP (5290); RT Western Missouri Franchise, LLC (6082); RT West Palm Beach Franchise, LP (0359); RTTA, LP (0035); RTT Texas, Inc. (2461); RTTT, LLC (9194); Ruby Tuesday of Allegany County, Inc. (8011); Ruby Tuesday of Bryant, Inc. (6703); Ruby Tuesday of Columbia, Inc. (4091); Ruby Tuesday of Frederick, Inc. (4249); Ruby Tuesday of Linthicum, Inc. (8716); Ruby Tuesday of Marley Station, Inc. (1641); Ruby Tuesday of Pocomoke City, Inc. (0472); Ruby Tuesday of Russellville, Inc. (1601); and Ruby Tuesday of Salisbury, Inc. (5432). The Debtors' mailing address is 333 East Broadway Ave., Maryville, TN 37804.

Executive Supplemental Retirement Plan (the "ESPP") and a Management Retirement Plan (the "MRP"),[2] (ii) authorizing and directing the trustee of the Trust, Regions Bank (the "Trustee"), to liquidate and transfer RTI's assets held in the Trust (the "Trust Assets") to RTI's bankruptcy estate, and (iii) authorizing the termination of the Trust and the discharge of all of the Trustee's obligations to the Trust after all of the Trust Assets or their proceeds have been transferred to RTI. In support of this Motion, RTI respectfully states:

**Jurisdiction**

1.      The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated February 29, 2012.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2), and the Debtors confirm their consent pursuant to Rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules") to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

2.      The statutory bases for the relief requested herein are sections 105(a), 363(b), 541 and 542 of Title 11 of the United States Code (the "Bankruptcy Code"), rules 6003, 6004, and

---

[2] RTI is also the Primary Sponsor of two "defined benefit" deferred compensation plans (DCPs) involving a different "rabbi trust" that is not the subject of this Motion.

9013 of the Federal Rules of Bankruptcy Procedures (the "Bankruptcy Rules") and Local Rule

9013-1(f).  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

## Background

3.    On October 7, 2020 (the "Petition Date"), the Debtors commenced these

cases by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code.  The Debtors

have continued in possession of their property and have continued to operate and manage their

business as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

No trustee, examiner or committee has been appointed in the Debtors' chapter 11 cases.

4.    The Debtors develop, operate, and franchise casual dining restaurants in the

United States, Guam, and five foreign countries under the Ruby Tuesday® brand.  The company-

owned and operated restaurants (i.e., non-franchise) are concentrated primarily in the Southeast,

Northeast, Mid-Atlantic and Midwest regions of the United States.

5.    The factual background regarding the Debtors, including their current and

historical business operations and the events precipitating their chapter 11 filings, is set forth in

detail in the *Declaration of Shawn Lederman, Chief Executive Officer of Ruby Tuesday, Inc., in*

*Support of First Day Pleadings* (the "First Day Declaration") filed on the Petition Date and fully

incorporated herein by reference.[3]

6.    The centerpiece of the Debtors' proposed restructuring through their chapter

11 cases, which has the support of the Debtors' senior secured lenders and postpetition lenders, is a

dual-track process pursuant to the terms of a Restructuring Support Agreement, dated October 8,

---

[3] Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the First Day Declaration.

2020, entered into between the Debtors and their senior secured lenders (the "RSA"), that provides

for either (a) the stand-alone reorganization of the Debtors business; or (b) the sale of substantially

all of the Debtors' assets if a bid (or bids) is submitted by one or more third parties other than the

Debtors' secured creditors that, *inter alia*, provides for cash consideration at closing that is

sufficient to pay all DIP Facility claims and Pre-Petition Secured Debt Claims in cash in full on the

closing date.

**A.     RTI'S Non-Qualified Defined Benefit Plans**

7.      RTI is the current "Primary Sponsor" of the ESPP and the MRP (the

"Plans"), which are nonqualified deferred compensation "top hat"[4] defined benefit plans. The ESPP

and the MRP are unfunded plans that are intended to (a) comply with the requirements of section

409A of the Internal Revenue Code of 1986, as amended (the "IRC"), and (b) qualify for the

exemptions provided under sections 201, 301, and 401 of the Employee Retirement Income

Security Act of 1974, as amended ("ERISA").

8.      The ESPP was originally established on or about May 27, 1983, by a

predecessor to RTI and was amended and restated by RTI as of January 1, 2007, as the Ruby

Tuesday, Inc. Executive Supplemental Pension Plan primarily to comply with, and make changes

permitted by, newly-created IRC section 409A and the rules and regulations promulgated

thereunder.  The ESPP was created and maintained to provide supplemental retirement benefits to

participants (the "ESPP Participants") as part of an integrated executive retirement program on an

---

[4] The term "top hat" refers generally to arrangements that are (i) not required to meet most ERISA or IRC requirements
that are imposed on "qualified" (or tax-favored) plans, and (ii) created and maintained for the purpose of providing
deferred compensation or retirement benefits to a select group of individuals, usually key executives, management or
highly-compensated employees.

unfunded basis.[5] Pursuant to a Fifth Amendment to the amended and restated ESPP, there was a freeze on the accrual of benefits and the addition of new ESPP participants for all but two employees and, as of January 1, 2018, the ESPP was fully frozen. A true and correct copy of the restated Ruby Tuesday, Inc. Executive Supplemental Pension Plan and subsequent amendments thereto are attached hereto as **Exhibit A.**

9.	The MRP was originally established on June 1, 1989, by a predecessor to RTI, Morrison Incorporated ("Morrison"). RTI became the "Primary Sponsor" of the MRP as provided in the Third and Fourth Amendments to the MRP. The MRP was created and maintained for the purpose of providing a select group of management or highly-compensated long-term employees (the "MRP Participants," and together with the ESPP Participants, the "Participants") the security of receiving a defined level of retirement benefits from the MRP on an unfunded basis.[6] The Sixth Amendment to the MRP, dated April 9, 2001, provided for a freeze of the MRP, effective June 1, 2001, that terminated the accrual of benefits under the plan for all existing employees and prohibited the addition of any new MRP participants. A true and correct copy of the MRP and amendments thereto are attached hereto as **Exhibit B**.

10.	The ESPP and the MRP were terminated effective March 1, 2019, by resolution of RTI's board of directors (the "RTI Board"). Final distributions were anticipated to be

---

[5] Section 12.8 (Unfunded Plan) of the ESPP provides: "Any Participant who may have or claim any interest in or right to any compensation, payment or benefit payable hereunder, shall rely solely upon the unsecured promise of the Plan Sponsor as set forth herein for the payment thereof, and nothing herein contained shall be construed to give or vest in the Participant or any other person now or at any time in the future, any right, title, interest or claim in or to any specific asset, fund, reserve, account or property of any kind whatever owned by the Plan Sponsor or in which it may have any right title or interest now or at any time in the future."

[6] Article III (Funding) of the MRP provides: "The Plan shall be unfunded and all benefits payable under the Plan shall be paid solely out of the Company's assets which are available to satisfy the claims of the Company's general creditors."

made to the ESPP and MRP participants after March 1, 2020, and before March 1, 2021, subject to IRC rules and regulations that prohibit such distributions in the event of a downturn in RTI's financial health.

**B.      The Rabbi Trust**

11.      On February 24, 1992, a Trust Agreement (the "Trust Agreement") was established for the ESPP and MRP by Morrison Incorporated ("Morrison"), a predecessor entity to RTI and Primary Sponsor and Plan Sponsor of the Plans at that time.  The 1992 Trust Agreement was established to assist the "Primary Sponsor" and any of its related corporations or businesses in meeting obligations to participants or beneficiaries of participants in the Plans. As recited in the Trust Agreement: "the Primary Sponsor desires to enter into an irrevocable grantor trust, within the meaning of Section 671 of the IRC to assist the Primary Sponsor and any of its related corporations and businesses in meeting its obligations" under the Plans. As set forth above, RTI is the current Plan Sponsor of the Plans. A true and correct copy of the 1992 Trust Agreement is attached as **Exhibit C**.

12.      On or about March, 7, 1996, pursuant to a spin-off transaction where Morrison Restaurants, Inc. ("MRI"), was reincorporated and named Ruby Tuesday, Inc., a new Trust Agreement (the "1996 Trust Agreement", and together with the Trust Agreement, the "Trust Agreements") was entered into by one of the spin-off entities, Morrison Fresh Cooking, Inc., ("MFCI") as the "Primary Sponsor" for the Morrison Fresh Cooking, Inc. Executive Supplemental Pension Plan and the Morrison Fresh Cooking, Inc. Management Retirement Plan (collectively, the "MFCI Plans").  As with the Trust Agreement, the 1996 Trust Agreement was intended to be an irrevocable grantor trust within the meaning of Section 671 of the IRC to assist the Primary Sponsor

and any of its related corporations and businesses in meeting its obligations under the MFCI Plans.

A true and correct copy of the 1996 Trust Agreement and an amendment thereto is attached as

**Exhibit D**.[7]

13. The Trust Agreement provides for the establishment of a fund with the

trustee of the Trust (defined herein as the Trust Assets), to be held and administered in accordance

with the Trust. *See* Trust Agreement, § 2. Pursuant to a merger of AmSouth Bank of Alabama – the

trustee under the Trust Agreement -- with Regions Bank, Regions Bank is the current Trustee of the

Trust.

14. The Trust Agreement was intended to provide additional assurance to the

Participants that their unfunded benefits under the Plans would be met in the future but, like all

rabbi trust agreements, the Trust Agreement provides that the Trust Assets remain the property of

the Plan Sponsor and the rights of the Participants to the Trust Assets do not exceed those of a

general creditor of the Plan Sponsor in the event of the Plan Sponsor's insolvency. Specifically,

section 8(a) of the Trust Agreement provides:

> **The Fund assets shall be treated as general assets of the Plan Sponsor
> and shall remain subject to claims of the general creditors of the Plan
> Sponsor under applicable state and federal law.** Nothing in this Trust
> Agreement shall affect the rights of any participant as general creditor of
> the Plan Sponsor. No participant shall have a preferred claim on or any
> beneficial ownership in the Fund prior to the time for distribution to the
> participant under the terms of a Plan or the terms of this Trust Agreement.
> In the event that the Plan Sponsor becomes insolvent as described in

---

[7] Until shortly before the Petition Date, it had been the understanding of RTI for some period of time that the 1996
Trust Agreement had replaced the Trust Agreement as the governing instrument for RTI's Plans. However, it now
appears that (i) the Trust Agreement remains the governing instrument for its Trust Assets; (ii) the 1996 Trust
Agreement was only for the employees of MFCI who were no longer participants in the ESPP and MRP; and (iii) MRI
was the Plan Sponsor at that time. RTI is currently seeking the Trustee's agreement that the Trust Agreement and not
the 1996 Trust Agreement is the governing document for the Trust Assets. However, the basis for the relief being
sought in this Motion is the same regardless of whether the Trust Agreement or the 1996 Trust Agreement is the
governing instrument for the Trust Assets, as the substantive provisions of the 1996 Trust Agreement and the Trust
Agreement are entirely identical, including all of the headings and paragraph sections.

Subsection (c) below, each participant shall be deemed to waive any priority the participant may have under law as an employee with respect to any claim against the Plan Sponsor and the Trust beyond the rights the Participant would have as a general creditor of the Plan Sponsor.

*Id.* § 8(a) (emphasis added).

15.    Pursuant to section 8(c) of the Trust Agreement, upon receipt of written notice from the board of directors of the Plan Sponsor of the "insolvency" of the Plan Sponsor (as defined in the Trust Agreement), "the Trustee shall suspend all further payments to participants or their beneficiaries and shall hold the assets of the Trust for the benefit of the creditors of the Plan Sponsor in the manner directed by a court of competent jurisdiction." The Trust Agreement similarly provides that: "In the event the Trustee has actual knowledge of the insolvency of the Plan Sponsor, the Trustee shall hold the assets of the Trust for the benefit of the creditors of the Plan Sponsor in the manner directed by a court of competent jurisdiction." *Id.*

16.    RTI is and had been insolvent prior to its chapter 11 filing within the meaning of the Trust Agreement's definition of insolvency which provides: "the term 'insolvency' shall mean the inability of the Plan Sponsor to pay its debts as they become due in the usual course of business or that the liabilities of the Plan Sponsor are in excess of its assets." *Id.*  Based on a determination of the RTI Board that RTI was insolvent under the insolvency definition in the Trust Agreement prior to the Debtors' bankruptcy filings, on September 2, 2020, a written notice of insolvency (the "Notice of Insolvency") was sent to the Trustee at the direction of the RTI Board. A true and correct copy of the Notice of Insolvency is attached as **Exhibit E** and a true and correct copy of the Written Consent of the RTI Board to the Notice of Insolvency is attached hereto as **Exhibit F**.

17.     On September 10, 2020, the Trustee acknowledged acceptance of the RTI Board's notification that "the Plan Sponsor of the Plans is insolvent within the meaning of Section 8(c) of the Trust Agreement."   A further letter was sent to the Trustee on September 11, 2020, on behalf of RTI and the RTI Board confirming that the Notice of Insolvency was sent at the direction of the RTI Board.  Thus, due to RTI's insolvency, as well as its subsequent chapter 11 filing, the Trust Assets can no longer be used to pay benefits, even if otherwise due prior to September 2, 2020, to the Participants who are general creditors of RTI, but must be held by the Trustee for the benefit of the creditors of RTI in the manner directed by a court of competent jurisdiction.

18.     As of September 15, 2020, the Trust holds Company-Owned Life Insurance ("COLI") policies with an estimated cash surrender value of $22,347,955.67 and approximately $111,730.07 of cash on hand.  Thus, the liquidation and return of the Trust Assets to RTI's bankruptcy estate will provide RTI with substantial funds and liquidity for the benefit of its bankruptcy estate and creditors, including the Participants.  Specifically, under the terms of the RSA, in order to secure the Exit Financing contemplated therein and successfully emerge from these chapter 11 cases, the Debtors must have minimum liquidity of $12.5 million after satisfying their obligations to creditors under the Plan.

C.      **The Interpleader Action**

19.     On September 28, 2020, the Trustee filed an Interpleader Complaint (the "Interpleader Complaint") in the United States District Court for the Northern District of Alabama, Southern Division, Case No. 2:20 –cv-01437-ACA (the "Interpleader Action"), naming RTI as the Plan Sponsor of the Plans on whose behalf the Trust makes monthly payments and as the Grantor of the Trust, and naming RTI and the Participants of the Plans as Interpleader Defendants.  The

Interpleader Complaint seeks relief with respect to competing demands by Participants of the Plans for certain payments allegedly due prior to the Notice of Insolvency. The Interpleader Complaint also states, *inter alia*, that in the event of a bankruptcy proceeding or insolvency proceeding by any party to the action, that the Trustee stands ready to comply with the instructions of any court of competent jurisdiction presiding over such proceeding, including a bankruptcy court.

**D.      Transfer of the Trust Assets to RTI**

20.      RTI has consulted with the Trustee regarding the transfer of the Trust Assets and the relief requested in this Motion. The Trustee has advised RTI that it will direct the liquidation and return of the Trust Assets to RTI, including those subject to the Interpleader Action, if this is provided for in an unstayed order of this Court pursuant to the requirement of section 8(c) of the Trust Agreement. The Trustee also advised RTI that (a) cash assets in the Rabbi Trust can be paid to RTI within three (3) or four (4) business days after such action is authorized and directed by this Court in an order and (b) it believes the liquidation of the remaining Trust Assets by the Trustee and the return of the cash proceeds to RTI's bankruptcy estate can be accomplished within six (6) business days after such action is authorized and directed by this Court in an order, and possibly sooner if the Court orders that the proceeds from the liquidation of the COLI policies be paid directly to an account of RTI instead of first being paid to the Trustee and then to RTI.[8]

**Relief Requested**

21.      By this Motion, RTI seeks entry of the Proposed Order directing the Trustee to liquidate and transfer the Trust Assets to RTI's bankruptcy estate and authorizing the

---

[8] The speed at which the COLI policies are liquidated ultimately will be determined by the various insurance companies that issued the policies.

termination of the Trust and the discharge of the Trustee's obligations to the Trust after all of

the Trust Assets or their proceeds have been transferred to RTI pursuant to an order of this

Court.

**Basis for Relief Requested**

**A.     The Trust Assets Constitute Property of the Bankruptcy Estate**

22.     Section 541(a)(1) of the Bankruptcy Code broadly defines property of the

estate to include any legal or equitable interests of the debtor, wherever located, as of the

commencement of a bankruptcy case. *See United States v. Whiting Pools, Inc.*, 462 U.S. 198, 203

(1983) (holding that section 541(a)(1) defines what is included in the estate and encompasses any

property made available to the estate by other provisions of the Bankruptcy Code); *see also*

*Georgia Pac. Corp. v. Sigma Serv. Corp.,* 712 F.2d 962, 967–68 (5th Cir. 1983) (holding that,

where the estate had a legal interest in property, the property was required to be turned over to

enable the bankruptcy court to decide entitlement to sum); *see generally* Analysis of H.R. 8200,

H.R. Rep. No. 595, 95th Cong. 1st Sess. 367–68 (1977) (noting that the scope of section 541(a)(1)

is broad and was intended to include any property made available to the estate by other provisions

of the Bankruptcy Code).

23.     Pursuant to section 541 of the Bankruptcy Code, because the Trust

Agreement explicitly states that the Trust Assets are subject to the claims of RTI's creditors, the

Trust Assets constitute property of RTI's bankruptcy estate. *See, e.g.*, *In re IT Group., Inc.*, 448

F.3d 661, 669–70 (3d Cir. 2006), *as amended* (July 10, 2006) (stating that rabbi trust beneficiaries'

claims to deferred amounts are *pari passu* with company's general unsecured creditors); *Bank of*

*Am., N.A. v. Moglia*, 330 F.3d 942, 943 (7th Cir. 2003) (affirming bankruptcy court decision that

trust corpus was included in property of the bankruptcy estate); *Goodman v. Res. Trust Corp.*, 7 F.3d 1123 (4th Cir. 1993) (affirming the holding that the company had the right under the terms of its trust agreements to recover trust assets in order to satisfy claims of creditors); *In re Downey Reg'l Med. Ctr.-Hosp., Inc.*, 441 B.R. 120, 130–31 (BAP 9th Cir. 2010) (holding that deferred compensation plan trust assets were not beyond the reach of the company's general unsecured creditors and were therefore property of the bankruptcy estate); *In re Bill Heard Enterprises, Inc.*, 419 B.R. 858, 866 (Bankr. N.D. Ala. 2009) (holding that rabbi trust and all assets contained therein are property of the bankruptcy estate); *In re Collins & Aikman Corp.,* 2006 WL 2310798, *3 (Bankr. E.D. Mich. 2006) (holding that life insurance policies in a rabbi trust are property of the estate).

24.     Because the Trust Assets constitute property of RTI's estate, the Trustee must immediately provide the Trust Assets to RTI pursuant to section 542 of the Bankruptcy Code. *See Collins*, 2006 WL 2310798 at *3 (holding that the debtor was entitled to assets held in a rabbi trust pursuant to section 542(a)).  Section 542(a) of the Bankruptcy Code provides, in relevant part:

> Except as provided in subsection (c) or (d) of this section, an entity, other than a custodian, in possession, custody, or control, during the case, of property that the trustee may use, sell, or lease under section 363 of this title . . . shall deliver to the trustee, and account for, such property or the value of such property . . .

11 U.S.C. § 542(a).

25.     Section 542(a) provides that entities, other than a custodian, having possession, custody, or control of property that belongs to the debtor must turn over such property. Section 101(11) of the Bankruptcy Code defines custodian as a:

(a) receiver or trustee of any of the property of the debtor, appointed in a case or proceeding under this title;

(b) assignee under a general assignment for the benefit of the debtor's creditors; or

(c) trustee, receiver, or agent under applicable law, or under a contract, that is appointed or authorized to take charge of property of the debtor for the purpose of enforcing a lien against such property, or for the purpose of general administration of such property for the benefit of the debtor's creditors.

11 U.S.C. § 101(11).

26. The Trustee does not qualify as a custodian under section 101(11) because it is not a trustee, receiver, or agent appointed or authorized by this Court to take charge of property of RTI. Moreover, the Trust Agreement does not authorize the Trustee to take charge of the RTI's property for the purpose of enforcing a lien against Trust Assets or to generally administer the Trust Assets for the benefit of the RTI's creditors. *Id*. Thus, the Trustee is required to deliver the Trust Assets to RTI, subject to the requirement in the Trust Agreement that it be done in the manner directed by a court of competent jurisdiction.

27. Further, even if the Trustee did qualify as a custodian, section 543(b)(1) requires a custodian in possession or control of any property of the debtor to deliver the property to such debtor if: (a) the custodian has custody possession or control of the property; and (b) such property is the property of the debtor. *Sovereign Bank v. Schwab*, 414 F.3d 450, 454 (3d Cir. 2005). It is undisputed that the Trustee has custody of the Trust Assets, and, as discussed above, the Trust Assets are property of the estate. Therefore, even assuming the Trustee is a custodian, the Trustee is still required to turn over the Trust Assets to RTI.

**B.** **RTI's Decision to Exercise its Ownership Rights Over the Trust Assets is an Exercise of Its Sound Business Judgment and in the Best Interests of Its Estate and Creditors**

28.     Section 363(b)(1) of the Bankruptcy Code provides, in relevant part, that

"[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of

business, property of the estate." 11 U.S.C. § 363(b)(1).  In determining whether to authorize the

use of property outside the ordinary course of business, courts require a debtor to show that it is

based upon the debtor's sound business judgment and proposed in good faith. *See, e.g., In re Martin*

*(Myers v. Martin)*, 91 F.3d 389, 395 (3d Cir. 1996) (citing *In re Schipper (Fulton State Bank v.*

*Schipper*), 933 F.2d 513, 515 (7th Cir. 1991)); *Comm. of Equity Sec. Holders v. Lionel Corp. (In re*

*Lionel Corp.)*, 722 F.2d 1063, 1070 (2d Cir. 1983); *In re Abbotts Dairies of Penn., Inc.*, 788 F.2d

143 (3d Cir. 1986) (implicitly adopting the "sound business judgment" test of *Lionel Corp.* and

requiring good faith); *In re Delaware and Hudson Ry. Co.*, 124 B.R. 169 (D. Del. 1991)

(concluding that the Third Circuit adopted the "sound business judgment" test in the *Abbotts*

*Dairies* decision); *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999)

(same); *In re Del. & Hudson Ry. Co.*, 124 B.R. 169, 178 (D. Del. 1991) (affirming decision

permitting debtor to sell assets where sound business reasons supported the sale).  Section 105(a) of

the Bankruptcy Code, in turn, authorizes this Court to "issue any order, process, or judgment that is

necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).

29.     RTI's decision to exercise its ownership rights over the Trust Assets at this

time is an exercise of sound business judgment, is undertaken in good faith and is in the best

interest of RTI and its estate and creditors.  Indeed, transferring the Trust Assets to RTI's control

will lead to a cash inflow of over $22 million, thereby providing RTI's bankruptcy estate with

significant liquidity. Taking action to secure its ownership rights over the Trust Assets falls

squarely within RTI's rights under the Trust Agreement. By pursuing these rights, RTI is not affecting the interests of any other party. Indeed, the Trust Assets are solely assets of RTI for the benefit of RTI's creditors. As expressly provided in the Trust Agreement, the Trust Assets are subject to the claims of RTI's creditors and upon the insolvency of RTI as defined in the Trust Agreement, each Participant "shall be deemed to waive any priority the participant may have under law as an employee with respect to any claim against the Plan Sponsor and the Trust beyond the rights the participant would have as a general creditor of the Plan Sponsor." *See* Trust Agreement, § 8(a). Moreover, the Participants do not have any beneficial ownership interest in the Trust Assets because the Trust Assets at all times remained property of RTI. *See, IT Group, Inc.*, *supra* 448 F.3d at 669-70 (holding that funds held in deferred compensation plan that qualified as a rabbi trust were not subject to the claims of participants whose rights to the trust funds were no greater than the rights of general unsecured creditors, citing to similar analysis and holdings of other courts of appeal). Additionally, for the avoidance of doubt, the relief being sought herein is without prejudice to the unsecured claims of the Participants against RTI or other Debtors to the extent they hold any such claims.

30.     Similar relief to that sought herein has been granted by other courts, including courts in this District. *See e.g. In re The PMI Group, Inc.*, Case No. 11-13730 (BLS) (Bankr. D. Del. 2013) [Docket No. 760]; *In re BearingPoint, Inc.*, Case No. 09-10691 (REG) (Bankr. S.D.N.Y. 2010) [Docket No. 1825]; *In re Washington Mutual*, *Inc.*, Case No. 08-12229 (MFW) (Bankr. D. Del. 2011) [Docket No. 7836-1]; *In re American Home Mortgage Holdings, Inc.*, Case No. 07-11047 (CSS) (Bankr. D. Del. 2007) [Docket No. 1840].

**C.     The Trustee Has Indicated that it has No Objection to the Relief Requested in this Motion**

31.     Finally, RTI has consulted with the Trustee and its counsel regarding the

relief requested in this Motion. The Trustee has indicated it will promptly direct the liquidation and

transfer of the Trust Assets to RTI upon authorization and direction by an unstayed order of this

Court to do so.  Once all of the Trust Assets or their proceeds have been transferred to RTI, the

Trustee has requested that RTI obtain court authorization to terminate the Trust pursuant to the

terms of the Trust providing that "the Trust shall terminate and all Fund assets shall be distributed

… on the complete distribution of the Fund in accordance with the terms and provisions of the

Plans." *See* Trust Agreement at § 12(b).  RTI submits that transfer of the Trust Assets to RTI under

the terms of Section 8 of the Trust Agreement satisfies this termination provision.

**Notice**

32.     Notice of this Motion shall be given to the following parties or, in lieu

thereof, to their counsel, if known: (a) the Office of the United States Trustee; (b) Goldman Sachs

Specialty Lending Group, LP (as administrative and collateral agent); (c) the Debtors' fifty  largest

unsecured creditors on a consolidated basis; (d) the Trustee; and (e) the Participants.  In light of the

nature of the relief requested herein, the Debtors submit that no other or further notice is required.

**No Prior Request**

33.     No prior motion for the relief requested herein has been made to this or any

other court.

## **Conclusion**

WHEREFORE, RTI respectfully requests that the Court enter the Proposed Order,

substantially in the form annexed hereto as **Exhibit G**, granting (a) the relief requested herein, and

(b) such other and further relief as the Court may deem proper.


Dated:  October 15, 2020          PACHULSKI STANG ZIEHL & JONES LLP
       Wilmington, Delaware


                              */s/ James E. O'Neill*
                              Richard M. Pachulski (CA Bar No. 90073)
                              Malhar S. Pagay (CA Bar No. 189289)
                              James E. O'Neill (Bar No. 4042)
                              Victoria A. Newmark (CA Bar No. 183581)
                              919 North Market Street, 17th Floor
                              P.O. Box 8705
                              Wilmington, Delaware  19899-8705 (Courier 19801)
                              Telephone:  302-652-4100
                              Facsimile:   302-652-4400
                              email:  rpachulski@pszjlaw.com
                                      mpagay@pszjlaw.com
                                      joneill@pszjlaw.com
                                      vnewmark@pszjlaw.com

                              [Proposed] Counsel to the Debtors and Debtors in
                              Possession