# IN THE UNITED STATES BANKRUPTCY COURT

# FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| RTI HOLDING COMPANY, LLC,[1] | ) | Case No. 20-12456 (JTD) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**DEBTORS' MOTION FOR ENTRY OF AN ORDER PURSUANT TO
SECTIONS 105(a) AND 503(b) OF THE BANKRUPTCY CODE ABATING RENTS
UNDER UNEXPIRED LEASES OF NONRESIDENTIAL REAL
PROPERTY FOR RESTAURANTS AFFECTED BY GOVERNMENT REGULATIONS**

The above-captioned debtors and debtors in possession (the "Debtors") hereby move (the "Motion") the Court for the entry of an order, pursuant to sections 105(a) and 503(b) of Title 11 of the United States Code (the "Bankruptcy Code"), abating rents under nonresidential real

---

[1] The Debtors in these chapter 11 cases and the last four digits of each Debtor's U.S. tax identification number are as follows: RTI Holding Company, LLC (4966); Ruby Tuesday, Inc. (5239); Ruby Tuesday, LLC (1391); RTBD, LLC (6505); RT of Carroll County, LLC (8836); RT Denver Franchise, L.P. (2621); RT Detroit Franchise, LLC (8738); RT Distributing, LLC (6096); RT Finance, LLC (7242); RT FL Gift Cards, Inc. (2189); RT Florida Equity, LLC (7159); RT Franchise Acquisition, LLC (1438); RT of Fruitland, Inc. (1103); RT Indianapolis Franchise, LLC (6016); RT Jonesboro Club (2726); RT KCMO Franchise, LLC (7020); RT Kentucky Restaurant Holdings, LLC (7435); RT Las Vegas Franchise, LLC (4969); RT Long Island Franchise, LLC (4072); RT of Maryland, LLC (7395); RT Michiana Franchise, LLC (8739); RT Michigan Franchise, LLC (8760); RT Minneapolis Franchise, LLC (2746); RT Minneapolis Holdings, LLC (7189); RT New England Franchise, LLC (4970); RT New Hampshire Restaurant Holdings, LLC (7438); RT New York Franchise, LLC (1154); RT Omaha Franchise, LLC (7442); RT Omaha Holdings, LLC (8647); RT One Percent Holdings, LLC (6689); RT One Percent Holdings II, LLC (2817); RT Orlando Franchise, LP (5105); RT Restaurant Services, LLC (7283); RT South Florida Franchise, LP (3535); RT Southwest Franchise, LLC (9715); RT St. Louis Franchise, LLC (6010); RT Tampa Franchise, LP (5290); RT Western Missouri Franchise, LLC (6082); RT West Palm Beach Franchise, LP (0359); RTTA, LP (0035); RTT Texas, Inc. (2461); RTTT, LLC (9194); Ruby Tuesday of Allegany County, Inc. (8011); Ruby Tuesday of Bryant, Inc. (6703); Ruby Tuesday of Columbia, Inc. (4091); Ruby Tuesday of Frederick, Inc. (4249); Ruby Tuesday of Linthicum, Inc. (8716); Ruby Tuesday of Marley Station, Inc. (1641); Ruby Tuesday of Pocomoke City, Inc. (0472); Ruby Tuesday of Russellville, Inc. (1601); and Ruby Tuesday of Salisbury, Inc. (5432). The Debtors' mailing address is 333 East Broadway Ave., Maryville, TN 37804.

property leases for restaurants affected by government regulations. In support of the Motion, the Debtors respectfully state as follows:

## PRELIMINARY STATEMENT

1. The Debtors request the Court enter an order abating rent payments for stores closed or otherwise limited in operations as a result of any governmental order or restriction until such restriction or order has been lifted and to reflect the extent and duration of such forced governmental closures or limitations. This requested relief is necessary to protect the Debtors' contractual and common law rights under certain commercial real estate leases and to ensure their ability to successfully reorganize in these cases (the "Chapter 11 Cases"), which is in the best interests of the Debtors' estates and all stakeholders.

2. These Chapter 11 Cases were commenced during the unprecedented global pandemic caused by the outbreak of the novel coronavirus disease (COVID-19) that has infected millions of people around the world, killed over 200,000 people in the United States, and disrupted daily social and economic life. Beginning in the early spring of this year, restaurants throughout the world were negatively affected by the COVID-19 pandemic, many to the point of permanent closure.[2] The lack of predictability in the spread of the virus coupled with the necessary responses of governments to try and limit exposure by preventing gatherings has eviscerated the restaurant industry, whose business model largely depends on providing social

---

[2] *See* Kelly McCarthy, *Nearly 16,000 restaurants have closed permanently due to the pandemic, Yelp data shows* (ABC News, July 24, 2020), https://abcnews.go.com/Business/16000-restaurants-closed-permanently-due-pandemic-yelp-data/story?id=71943970 (as of Oct. 2, 2020); Edward Ludlow, *One-Quarter of American Restaurants Won't Reopen, OpenTable Says* (BLOOMBERG, May 14, 2020), https://www.bloomberg.com/news/articles/2020-05-14/one-quarter-of-american-restaurants-won-t-reopen-opentable-says (as of Oct. 2, 2020); Jonathan Maze, *From the Editor: Facing the Future Together* (Restaurant Business, Apr. 3, 2020), https://www.restaurantbusinessonline.com/operations/editor-facing-future-together (as of Oct. 2, 2020) ("[T]he industry has borne the brunt of the economic impact of the shutdown. It's very likely that several million people lost their restaurant jobs. Thousands of locations are already permanently closed. Others could follow.").

environments for people to meet and enjoy dining out. The impact of the coronavirus is particularly disruptive to restaurant chains, such as Ruby Tuesday, that operate throughout the United States and in foreign countries and, consequently, must contend with a patchwork of health regulations as the virus impacts different communities with varying levels of severity at different times. Some states and local governments are beginning to permit dining rooms to reopen (albeit with occupancy limits) while others limit sales distribution to take-out service or outdoor dining.[3] However, the almost complete elimination of in-store dining, which historically has represented over 90% of the Company's total sales, struck at the heart of Ruby Tuesday's business model.

3. As a result, the COVID-19 pandemic put an unprecedented strain on the financial condition and personnel of the Company. Government actions such as mandated restaurant closures, mandated mall closures, shelter in place orders, carry-out only orders, reduced hour orders, and social distancing/self-quarantining orders and guidance created a situation whereby the Company's revenues dropped so substantially that it could no longer sustain its normal operating costs. Rental obligations, as a fixed expense, were particularly difficult to manage since they were not reduced in line with revenue deterioration. Consequently, in early 2020, the COVID-19 pandemic and other factors forced the Debtors and many franchisees to close all but one of the dining rooms across all Ruby Tuesday restaurants.

4. As the COVID-19 pandemic continued, by April 7, 2020, the Company had 350 remaining locations of which 281 were serving customers on a delivery or carry-out basis only, 68 were temporarily closed and only one of which operated a dining room. Prior to April 7,

---

[3] *See* OpenTable, *A State-by-State Guide to Coronavirus-Related Restrictions at Restaurants* (OpenTable.com, July 13, 2020), https://blog.opentable.com/2020/states-provinces-restaurants-reopen-guide-coronavirus/ (as of Oct. 2, 2020).

2020, 71 stores were closed. As of the Petition Date, the Debtors have 236 company-owned dining rooms that are open and are offering full dining services, albeit under capacity and other restrictions which continue to diminish the Debtors' ability to sustain their operations at such locations.[4]

5. As a result of necessary costs related to resuming operations and in recognition of the unpredictability of the continuing impact of the coronavirus, the Debtors anticipate that the payment of rent as it comes due during the first 60 days of these Chapter 11 Cases will severely strain the financial resources of the Debtors. Accordingly, in order to preserve critical financial resources and avoid being inundated with motions to compel the payment of rent on November 1, 2020, or to compel the rejection of leases, the Debtors already have filed their *Motion for Entry of an Order Extending Time for Performance of Obligations Under Unexpired Leases of Nonresidential Real Property Pursuant to Bankruptcy Code Section 365(d)(3)* (the "Rent Deferral Motion"). Pursuant to the Rent Deferral Motion, the Debtors seek an order extending the time for performance of obligations under the Debtors' unexpired leases of nonresidential real properties, including payment of rent, for the first 60 days of these Chapter 11 Cases, until after December 6, 2020.

6. As discussed further herein, the Debtors' post-petition obligation to pay rent for the restaurants should be excused, in whole or in part, for at least three reasons: (a) by shutting down or otherwise significantly limiting the Debtors' business operations, the Government Regulations (defined below) entirely frustrated the fundamental purpose of the Debtors' leases; (b) the COVID-19 pandemic and related public health measures triggered certain force majeure

---

[4] The Debtors do not intend to reopen 185 of their restaurants that were closed during the pandemic. The Company continues to assess the impact of new regulations and evaluate restaurant performance.

provisions in the Debtors' leases that expressly relieve the Debtors of their rent obligations; and (c) the Court can (and should) exercise its inherent, equitable powers to protect the Debtors from paying substantial rent obligations in return for which they receive no—or a significantly limited—benefit. Accordingly, the Debtors request the Court enter an order abating the Debtors' rent payments at the restaurants from the date such Government Regulations went into effect until they are lifted.

7. Based on the devastating impact that COVID-19 has had on the Debtors' business, the rent reduction sought herein is appropriate. The Debtors respectfully submit that ample cause exists for the relief requested herein.

## JURISDICTION AND VENUE

8. This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

9. The statutory bases for the relief requested in this Motion are sections 105(a) and 503(b) of the Bankruptcy Code.

## BACKGROUND

**A.    General Background**

10. On October 7, 2020 (the "Petition Date"), the Debtors commenced these Chapter 11 Cases by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code. The Debtors have continued in the possession of their property and have continued to operate and manage their business as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee, examiner, or committee has been appointed in these Chapter 11 Cases.

11. The Debtors develop, operate, and franchise casual dining restaurants in the United States, Guam, and five foreign countries under the Ruby Tuesday® brand. The company-owned and operated restaurants (i.e., non-franchise) are concentrated primarily in the Southeast, Northeast, Mid-Atlantic and Midwest regions of the United States.

12. The factual background regarding the Debtors, including their current and historical business operations and the events precipitating the chapter 11 filings, is set forth in detail in the *Declaration of Shawn Lederman, Chief Executive Officer of Ruby Tuesday, Inc., in Support of First Day Pleadings* (the "First Day Declaration") filed on the Petition Date and fully incorporated herein by reference.[5]

**B.    The Impact of COVID-19 on the Debtors' Restaurant Operations**

13. The Debtors operate 236 restaurants (the "Operating Restaurants") in commercial spaces either owned by the Debtors or governed by lease agreements (the "Operating Leases") in 25 states, with the largest concentrations in the states of Florida, Georgia, North Carolina Tennessee, Virginia, Pennsylvania, and South Carolina. Twenty-two of the Debtors' leased restaurants under a unitary lease have been permanently closed (the "Non-Operating Restaurants" and together with the Operating Restaurants, the "Restaurants"), but the Debtors have not yet sought to reject the related lease agreements (the "Non-Operating Leases" and, together with the Operating Leases, the "Leases"). The Restaurants are located in Florida (35), Georgia (26 open, 1 closed), North Carolina (24 open, 3 closed), Tennessee (19), Virginia (18 open, 2 closed), Pennsylvania (17 open, 2 closed), South Carolina (14 open, 1 closed), Maryland (10 open, 1 closed), Missouri (8), New York (8), Ohio (8 open, 1 closed), Alabama (7 open; 4

---

[5] Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the First Day Declaration.

closed), West Virginia (6 open, 1 closed), Indiana (5 open, 1 closed), New Jersey (5), Connecticut (4 open, 1 closed), Delaware (4), Maine (3), Michigan (3), Mississippi (3 open, 1 closed), Colorado (2), Kentucky (2 open, 1 closed), Massachusetts (2), Nebraska (2 open, 1 closed), Arkansas (1 closed), Illinois (1), (collectively, the "States"), all of which have issued governmental regulations, recommendations, or orders as a result of the COVID-19 crisis that impair economic activity and directly affect the Restaurants' operations (the "State Regulations"). An illustrative snapshot of the State Regulations that are currently in effect in each of the relevant States is attached as **Exhibit B** hereto.

14. Additionally, virtually every county and municipality in which the Debtors operate have issued separate regulations, recommendations or orders affecting the Restaurants, some of which continue to restrict operations more tightly than the States (collectively with the State Regulations, the "Government Regulations").

15. Initial reports of COVID-19 were unremarkable until mid-March 2020. Over the following weeks, all states and local jurisdictions, with the exception of one, had closed restaurant dining rooms to patrons pursuant to the Governmental Regulations. Restaurants were only permitted to provide food and non-alcoholic beverages via delivery or take-out. Guests were not permitted in dining rooms. The historical run rate on delivery and take-out for the Debtors was low, accounting for less than 10% of total revenue. The dining room closures were devastating to the Debtors' business, with an initial revenue loss exceeding 80%. Based on the loss of revenue, it was impossible to cover fixed costs and, in many instances, variable costs. The decision was made to close Restaurants. Over the course of the past seven months of COVID-19, more than 40% of the Restaurants have been permanently closed.

7

DOCS_LA:332506.5

16. Menus were streamlined with an eye towards reducing inventory, operational complexity and labor. The Garden Bar, which is Ruby Tuesday's most signature item and brand differentiator, could not be offered due to regulations regarding self-service. Seven months into the pandemic, nearly 40% of Restaurants still are not permitted to offer a self-service Garden Bar.

17. Beginning in late April of this year, the jurisdictions began to reopen dining rooms. The criteria for reopening were not evenly administered. The regulations varied by jurisdiction – state, county, city. Therefore, there were multiple regulations within many states. Social distancing of a minimum of six feet was mandated in all jurisdictions. The capacity requirements started at a maximum 25% permitted seating capacity. No bar service was allowed. Jurisdictions continued to open dining rooms throughout the summer, with the New Jersey and Philadelphia markets being the last to reopen in September. As of the date of this Motion, more than half of the Debtors' restaurants are still highly constrained at 25-50% of dining room capacity in addition to social distancing requirements. For example, the Debtors' highest volume restaurant, Tower Road in Denver, falls under a jurisdictional rule requiring no more than 50% of dining room capacity or a maximum of 50 guests, whichever number is lower. This restaurant's revenue is currently tracking at far below 50% of its pre-COVID-19 run rate. Many jurisdictions only allow bar seating if the bar is not being used for bar service or if there is a clearly designated and separated section of the bar being used for bar service, while still observing social distancing rules.

18. The Debtors' monthly rent and related obligations are approximately $2.74 million and generally arise on the first of each month.

**RELIEF REQUESTED**

19. By this Motion, the Debtors seek the entry of an order, pursuant to sections 105(a) and 503(b) of the Bankruptcy Code, abating rents that the Debtors are obligated to pay under unexpired leases of nonresidential real property, from the date such Government Regulations went into effect until they are lifted (the "Rent Abatement").

**BASIS FOR RELIEF**

**A.      Applicable Legal Standards**

20. The Debtors' postpetition cure obligations with respect to unpaid prepetition rents, should be calculated with reference to the terms of the leases and applicable state law. *In re FLYi, Inc.*, 377 B.R. 140, 143 (Bankr. Del. 2007) ("The determination of property rights under lease agreements and otherwise is governed by state law and the agreement between the parties."); *In re Klein Sleep Products, Inc.*, 78 F.3d 18 (2d Cir. 1996) ("stub rent" and related obligations are presumed to be at the rates set forth in the leases); *Towers v. Chickering & Gregory (In re Pacific-Atlantic Trading Co.)*, 27 F.3d 401, 405 (9th Cir. 1994) (same). Accordingly, the Debtors' rent obligations remain subject to any and all available defenses under the leases and applicable state law.

**B.      Common Law Doctrines Support the Debtors' Request for Rent Abatement**

21. Under common law, impossibility, frustration of purpose, and impracticability may excuse performance of a contract if they are based on an unforeseeable event occurring after the contract was made. Most jurisdictions also recognize common law defenses of "impracticability" and "frustration of purpose" to excuse non-performance of contractual obligations. These doctrines apply here and excuse the Debtors' performance under the Leases.

### i. *Frustration of Purpose*

22. When an event or change of circumstances is outside of the realm of possibilities and the parties could not foresee it occurring at the time the contract was entered into, a party's contractual obligations may be excused. *See* Restatement (Second) of Contract § 265 (1981); *Salkin v. Palm Beach Int'l, Inc. (n re Maxko Petroleum, LLC)*, 425 B.R. 852, 872 (Bankr. S.D. Fla. 2010) (citing *Home Design Center-Joint Venture v. County Appliances of Naples, Inc.*, 563 So.2d 767, 770 (Fla. Dist. Ct. App.1990); *Brenner v. Little Red School House, Ltd.*, 274 S.E. 2d 206, (N.C. 1981). This common law doctrine— "frustration of purpose"—is recognized in the majority of states and occurs when the "principal purpose" of the contract is "substantially frustrated without . . . fault by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made," rendering the remaining duties discharged unless otherwise provided for in the contract. *See* Restatement (Second) of Contract § 265. This doctrine applies to leases. *See, e.g.*, *Valencia Ctr., Inc. v. Publix Super Markets, Inc.*, 464 So. 2d 1267, 1269 (Fla. Dist. Ct. App. 1985); *North American Capital Corp. v. McCants*, 510 S.W.2d 901 (Tenn. 1974).

23. When changed circumstances "make[] one party's performance virtually worthless to the other," in other words, frustrating the primary purpose of the contract and rendering it meaningless, a party may be excused of its contractual obligations. *See* Restatement (Second) of Contracts § 265, Comment a (1981); *Wheelabrator Envtl. Sys., Inc. v. Galante*, 136 F. Supp. 2d 21, 34 (D. Conn. 2001) (to successfully argue frustration of purpose, a party must identify an event and demonstrate that "the event substantially frustrated his principal purpose [and that] the nonoccurrence of the supervening event was a basic assumption on which the contract was made" (quoting *O'Hara v. Connecticut*, 218 Conn. 628, 638 n.7 (Conn. 1991)

(citing Restatement § 265)); *Drummond Coal Sales, Inc. v. Norfolk S. Ry. Co.*, Civil Action No. 7:16cv00489, 2018 U.S. Dist. LEXIS 143047, at *37 (W.D. Va. Aug. 22, 2018) (evidence must show that the contract's principal purpose has been "substantially frustrated").

24. As noted in the First Day Declaration, in-store dining is the core of the Debtors' business. As such, the Government Regulations restricting on-premises dining have rendered the purpose of the Leases meaningless. *See* **Exhibit B**. No one, including the Debtors and the lessors, could have predicted a global pandemic or its catastrophic effects when entering into the Leases. Accordingly, the Debtors should be excused from paying rent obligations at the Restaurants because the Government Regulations have frustrated the purpose of the Leases. *See* Restatement (Second) of Contracts § 265.

  ii. *Impossibility of Performance*

25. Section 261 of the Restatement (Second) of Contracts provides that a failure to perform contract obligations is excused "[w]here, after a contract is made, a party's performance is made impracticable without his fault by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made . . . unless the language or the circumstances indicate the contrary." Restatement (Second) of Contracts § 261 (Am. Law Inst. 1981). "Under the doctrine of impossibility of performance …, a party is discharged from performing a contractual obligation which is impossible to perform and the party neither assumed the risk of impossibility nor could have acted to prevent the event rendering the performance impossible." *Step Plan Servs., Inc. v. Koresko*, 12 A.3d 401, 411 (Pa. Super. Ct. 2010).

26. "[T]he doctrine of impossibility of performance 'refers to those factual situations, too numerous to catalog, where the purposes, for which the contract was made, have, on one

side, become impossible to perform.'" *Kamel v. Kenco/the Oaks at Boca Raton, LP*, No. 07-80905-CIV, 2008 WL 2245831, at *3 (S.D. Fla. May 29, 2008), *aff'd*, 321 F. App'x 807 (11th Cir. 2008) (quoting *Crown Ice Machine Leasing Co. v. Sam Senter Farms, Inc.*, 174 So.2d 614, 617 (Fla. Dist. Ct. App. 1965)). "The defense is less rigid than its name suggests, as the 'doctrine is not limited to strict impossibility, but includes "impracticability" due to unreasonable expense.'" *Id.*; *Diamond Corporation v. Jewelers Mutual Insurance Company*, 409 F. Supp. 3d 1332, 1337-38 (N.D. Ga. 2019); *see also Tallman Pools of Georgia, Inc. v. Fellner*, 160 Ga. App. 722, 724, 288 S.E.2d 46, 48-49 (1981); *North American Capital Corp. v. McCants*, 510 S.W.2d 901 (Tenn. 1974).

27. Courts have long viewed an intervening regulation or judicial order that precludes performance as an event that may give rise to a defense of impossibility or impracticability. *See Sch. Dist. of Borough of Olyphant v. Am. Sur. Co. of N.Y.*, 322 Pa. 22, 29 (1936) (citing Restatement (First) of Contracts § 458 (Am. Law Inst. 1932)); *Hart v. Arnold*, 2005 PA Super 328 ¶¶ 34, 38 (2005); *Messer v. Laurel Hill Assocs.*, 401 S.E. 2d 843 (N.C. 1991). Moreover, regulations limiting economic activity can excuse performance as impracticable. *Litman v. Peoples Nat. Gas Co.*, 303 Pa. Super. 345, 348 (1982) (gas company's performance was prohibited by an order of the Public Utility Commission, which barred gas companies from entering new service contracts beyond their peak capacity in response to a natural gas shortage); *Kasemer v. Nat'l Fuel Gas Distrib. Corp.*, 279 Pa. Super. 334, 338 41 (1980), *aff'd*, 495 Pa. 284, (1981) (same).

28. Here, the Governmental Regulations have rendered it impossible for the Debtors to conduct normal dine-in restaurant operations. As discussed above, initially, the regulations imposed by the States required a total shut-down of the Debtors' operations. Reopening has

been gradual and revenues have not yet recovered. Almost seven months into the pandemic, the Debtors have reopened operations to the extent possible but, nonetheless, are unable to use the premises to full capacity. Among other things, as discussed above, the number of patrons at one time remains limited in many jurisdictions; the Debtors' beer, wine and liquor business has been significantly impacted with bar stools required to be placed at no less than six foot intervals; and approximately 40% of the restaurants cannot have a Garden Bar, which is a significant competitive differentiator and additional driver of the Debtors' revenue.

### C. Government Regulations Triggered the Leases' Force Majeure Clauses, Excusing the Debtors' Rent Obligations

29. Several of the Debtors' Leases include a force majeure clause. A commonly appearing clause provides:

> Landlord and/or Tenant shall be excused for the period of any delay and shall not be deemed in default with respect to the performance of any of the terms, covenants, and conditions of this Lease when prevented from so doing by cause or causes beyond the Landlord's and/or Tenant's control, which shall include, without limitation, all labor disputes, governmental regulations or controls, fire or other casualty, inability to obtain any material, services, acts of God, or any other cause, whether similar or dissimilar to the foregoing, not within the control of the Landlord and/or Tenant.[6]

30. In response to the COVID-19 crisis, the States' governors and/or public health authorities unilaterally shut down dine-in operations for restaurants and all of the States continue to restrict dine-in service. As the Debtors are primarily dine-in establishments, the locations are configured as such. Specifically, the Debtors would have no need to lease 1,176,000 square feet

---

[6] Taken from the "Lease Agreement" for the Pike Creek, Delaware, Restaurant ("Pike Creek Lease"), § 32. Although the Debtors' leases are too numerous to attach and cite individually, many of the Debtors' leases contain this exact language, or language that is substantially similar. *See, e.g.*, the Debtors' Niceville, Florida, Lease (§ 31); Statesboro, Georgia, Lease (§ 32); Easton, Maryland, Lease (§ 34) (collectively, the "Example Leases"). True and correct copies of relevant excerpts from the Example Leases are attached as **Exhibit C** to this Motion.

13

of commercial real estate[7] if their business model emphasized takeout dining or delivery; the Leases therefore anticipate in-store consumption of food and drink. *See, e.g.*, Pike Creek Lease (leasing 8,000 square feet for the Debtors' operation of a restaurant, including on-premises liquor, beer and wine consumption.).

31. The unprecedented Government Regulations were unilateral exercises of States' authority to control the spread of coronavirus. The Debtors had no control over the pandemic or the resulting Government Regulations. Accordingly, and because the force majeure provisions excuse the Debtors from performing "any terms, covenants, and conditions" on account of "acts of God" or "governmental regulations or controls" or "any other cause, whether similar or dissimilar to the foregoing, not within the control of [the Debtors]", the Debtors are excused from paying rent as of the date of the Governmental Regulations.

### D. The Court's Inherent, Equitable Powers Support Rent Abatement

32. In addition to the reasons stated above, this Court has broad authority to take necessary and appropriate actions in light of, among other things, the global pandemic. *See Marrama v. Citizens Bank*, 549 U.S. 365, 375 (2007) (citing 11 U.S.C. § 105). Such actions are within the Court's sound discretion. *See, e.g.*, *In re Greene*, 103 B.R. 83, 89 (Bankr. S.D. NY 1989).

33. Courts nationwide have already begun considering the effects of COVID-19 on commercial dealings such as real property lease obligations. These courts have taken an honest view of what has occurred, uniformly recognizing the gravity of the situation. Importantly, no court has summarily denied a commercial tenant its day in court to seek relief from the COVID-19 disaster. Instead, courts have offered relief to tenants, and in some cases have already cleared

---

[7] This figure does not include the six (6) locations that are owned in fee by the Debtors.

the way for common law arguments sounding in frustration and impossibility. *See Simon Property Group, L.P. v. Pacific Sunwear Stores, LLC*, Cause No. 49DO1-2006-PL-020195 (Indiana Commercial Court, June 26, 2020) (granting defendant's motion for a temporary restraining order, and provisionally finding that defendant's impossibility defense satisfies the likelihood of success on the merits because "[t]he effects of both the COVID-19 disease and the public health responses to it on the national economy have sent profound shockwaves throughout all facets of the commercial sector. Courts around the country are now grappling with how the monumental impacts of the COVID-19 crises are affecting arrangements between businesses and other service providers who entered into deals without ever entertaining the possibility that the performance would be interrupted by a global pandemic."); *Elmsford Apartment Associates v. Cuomo*, 2020 WL 3498456 (S.D.N.Y. June 29, 2020) (noting the unprecedented scope of COVID-19); *In re Bread & Butter Concepts*, LLC, No. 19-22400 (DLS) [Docket No. 219] (Bankr. D. Kan. May 15, 2020) (acknowledging that if the debtor were forced to pay rent immediately despite pandemic-related shut downs, it would likely be unable to continue operations. Accordingly, the court held that "these unprecedented circumstances require flexible application of the Bankruptcy Code and exercise of the Court's equitable powers ... to grant further relief" such as deferring rent payments) (emphasis added); *In re Pier 1 Imports, Inc.*, 2020 WL 2374539 (Bankr. E.D. Va. May 10, 2020) (delaying debtor-retailers' payment of certain accrued but unpaid rent during a "limited operations period" when their stores were closed due to stay-at-home orders entered in connection with corona virus pandemic).

34. Where, as here, the COVID-19 pandemic has taken a massive toll on operations, at least one court has abated rent accordingly. *In re Hitz Restaurant Group*, Case No. 20-05012, 2020 WL 2924523 (Bankr. N.D. Ill. June 3, 2020). In the *Hitz* case, Hitz Restaurant Group

("Hitz") operated a restaurant in the City of Chicago pursuant to a lease. Hitz did not pay its rent for February 2020, and on February 24, 2020, the company filed a chapter 11 bankruptcy petition. Hitz then did not pay any of its post-petition rent for March, April, May, or June. Shortly after Hitz's bankruptcy filing, Illinois Governor J.B. Pritzker issued a series of executive orders that substantially limited business activity in the State of Illinois due to the COVID-19 pandemic. The first executive order that applied to restaurants went into effect on March 16, 2020. This order mandated, "All businesses in the State of Illinois that offer food or beverages for on-premises consumption—including restaurants, bars, grocery stores, and food halls—must suspend service for and may not permit on-premises consumption." Ill. Exec. Order 2020-7. However, this order went on to say that restaurants were still permitted and encouraged to serve customers for the purposes of take-out and delivery. The subsequent Illinois Stay at Home Order contained substantively the same restrictions, but notably added, "No provision contained in this Executive Order shall be construed as relieving any individual of the obligation to pay rent, to make mortgage payments, or to comply with any other obligation that an individual may have under tenancy or mortgage." Ill. Exec. Order 2020-10. Hitz's landlord filed a motion asking the Court to compel Hitz to pay its rent for February through June 2020. *See In re Hitz Rest. Grp.*, Case No. 20-05012, at Docket No. 21. Hitz opposed the motion on the basis that the lease contained a force majeure clause that fully excused its obligation to pay rent for those months, since the Executive Orders were events contemplated in this clause.[8]

---

[8] This provision read, in part:

> "Landlord and Tenant shall each be excused from performing its obligations or undertakings provided in this Lease, in the event, but only so long as the performance of any of its obligations are prevented or delayed, retarded or hindered by . . . laws, governmental action or inaction, orders of government. . . . Lack of money shall not be grounds for Force Majeure."

*Hitz Rest. Grp.*, 2020 WL 2924523 at *2.

35. The *Hitz* court found that, beginning on March 16, 2020, the force majeure clause was "unambiguously triggered" by the Executive Orders because they were both "governmental action" and "orders of government" as contemplated by the clause. The court also found that the restrictions under the Executive Orders were the proximate cause for Hitz's nonpayment of rent, "because it prevented Debtor from operating normally and restricted its business to take-out, curbside pick-up, and delivery." *Id.* at *2.

36. *Hitz* is squarely on point here. Because the Government Regulations prohibit the Debtors from operating their business at the Restaurants as contemplated in the Leases and because paying the rent obligations for those Restaurants would not benefit the Debtors' estates or their stakeholders, the Debtors respectfully request that the Court excuse the Debtors' rent payment obligations until such Government Regulations are lifted. Specifically, the Debtors request that the Court exercise its inherent, equitable powers to excuse rent payments at the Restaurants based on the extent and duration of the closures and limitations imposed by the Government Regulations.

## **NOTICE**

37. Notice of this Motion shall be provided to the following parties or, in lieu thereof, to their counsel, if known: (a) the Office of the United States Trustee; (a) the Office of the United States Trustee; (b) Goldman Sachs Specialty Lending Group, LP (as administrative and collateral agent); (c) the counterparties to the Leases; and (d) the Debtors' fifty largest unsecured creditors on a consolidated basis. The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

## NO PRIOR REQUEST

38. No prior request for the relief sought in this Motion has been made to this Court or any other court.

WHEREFORE, the Debtors respectfully request that the Court grant the Motion and enter the order, substantially in the form attached hereto as **Exhibit A**, abating rents arising under the Debtors' unexpired leases of nonresidential real property.

| | |
|---|---|
| Dated: October 16, 2020 | PACHULSKI STANG ZIEHL & JONES LLP |

*/s/ James E. O'Neill*
Richard M. Pachulski (CA Bar No. 90073)
Malhar S. Pagay (CA Bar No. 189289)
James E. O'Neill (Bar No. 4042)
Victoria A. Newmark (CA Bar No. 183581)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19899-8705 (Courier 19801)
Telephone: 302-652-4100
Facsimile: 302-652-4400
email: rpachulski@pszjlaw.com
 mpagay@pszjlaw.com
 joneill@pszjlaw.com
 vnewmark@pszjlaw.com

[Proposed] Counsel to the Debtors and Debtors in Possession