## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| *In re:* | Chapter 11 |
|  | Case No. 20-12456 (JTD) |
| RTI HOLDING COMPANY, LLC, et. al., | Jointly Administered |
| Debtors. | **Re: Docket Nos. 138 & 140** |

**OBJECTION OF THE AD HOC GROUP OF PARTICIPANTS TO (I) RUBY TUESDAY, INC.'S MOTION FOR AN ORDER AUTHORIZING RUBY TUESDAY, INC. TO EXERCISE ITS OWNERSHIP RIGHTS OVER TRUST ASSETS CURRENTLY HELD IN A "RABBI TRUST" FOR RUBY TUESDAY, INC.'S NON-QUALIFIED EXECUTIVE SUPPLEMENTAL PENSION PLAN AND MANAGEMENT RETIREMENT PLAN AND (II) RUBY TUESDAY, INC.'S MOTION FOR AN ORDER AUTHORIZING RUBY TUESDAY, INC. TO EXERCISE ITS OWNERSHIP RIGHTS OVER TRUST ASSETS CURRENTLY HELD IN A "RABBI TRUST" FOR RUBY TUESDAY, INC.'S NON-QUALIFIED "DEFINED CONTRIBUTION" - DEFERRED COMPENSATION PLANS**

The Ad Hoc Group of Plan Participants (hereinafter collectively "Participants" or the "Ad Hoc Plan Group") [1] in the Ruby Tuesday, Inc. (collectively, "RTI" or "Debtors") Executive Supplemental Pension Plan ("ESPP") and/or RTI Management Retirement Plan ("MRP"), and/or the "Defined Contribution" Deferred Compensation Plan (the "DCP") (collectively the "Plans"), by and through their undersigned counsel, hereby files this Objection to: *Ruby Tuesday, Inc.'s Motion for an Order Authorizing Ruby Tuesday, Inc. to Exercise Its Ownership Rights Over Trust Assets Currently Held in a "Rabbi Trust" for Ruby Tuesday, Inc.'s Nonqualified Executive*

---

[1] The Ad Hoc Plan Group includes Pfilip G. Hunt, Kimberly Grant, J. Russell Mothershed, Marguerite Duffy, Scarlett May, Daniel Bettis, Lee Wallace, Danny Koontz, Jeffrey Van Horne, Ronald & Priscilla Vilord, Marcelino R. Largel, Veronica Shannon Hepp, Andrew Hepp, Eric Paul, Tamara and Kirk Cunningham, E.E. Bishop, Collin Cope, Craig Nelson, Robert McClenagan, Ronnie Tatum, Perry Brownlee, Nicolas Ibrahim, Patrick Cowley, Sandra Herrington, Ronald Harman, Karen Grau, Belinda Sharp, David Cline, James and Erin Buettgen, Joe and /Betty Byrum, Larry Davis, Vickie Gruver, Michael Roder, James Litchford, Lelia and Maxwell Piet, James Holland, Sarah and Eubie Stacey, Mark and Mary Potter, Larry Thompson, Rick Smith, Ross Jackson, Charles Rosete, James Holman, Joe R. Seaitz, Gere or Mary Herbolsheimer, Paul or Maurice Freeman, Rebecca or Robert Brown, Anne Dillard-McGeoch, Clark T. Glenn.

*Supplemental Pension Plan and Management Retirement Plan* [D.I. No. 138] and *Ruby Tuesday,*

*Inc.'s Motion for an Order Authorizing Ruby Tuesday, Inc. to Exercise Its Ownership Rights Over*

*Trust Assets Currently Held in a "Rabbi Trust" for Ruby Tuesday, Inc.'s Nonqualified "Defined*

*Contribution" Deferred Compensation Plans* [D.I. No. 140] (collectively the "Motions" or

"Retirement Asset Confiscation Motions "). In further support of this Objection, the Participants

respectfully state as follows:

## PRELIMINARY STATEMENT

The Debtors improperly seek by way of a motion instead of by way of an adversary

proceeding a summary determination, without affording the Plans' Participants substantive and

procedural due process rights, permitting the Debtors to use assets which are no longer property

of the Debtors' estate. Pursuant to the terms of the Plans and the Trust document, these assets

should have been distributed to Plan Participants well before the bankruptcy petition was filed due

to a change of control and the eventual termination of the Plans as of March 1, 2019. The Debtors

intentionally and willfully failed to give the Participants notice of their rights as a result of these

events in order to keep the Participants from seeking the accelerated distribution of the benefits to

which they were entitled. As a result the Trust assets are not property of the Debtors' bankruptcy

estate; moreover, due to the Debtors' wrongful conduct, a constructive trust should be imposed

upon the corpus of the trust and these assets should be immune from forfeiture in the bankruptcy

estate.

## BACKGROUND

1.       On October 7, 2020 (the "Petition Date"), the Debtors each filed a voluntary

petition for relief under chapter 11 of title 11 of the United States Code with the United States

Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), which cases have been

jointly consolidated for administrative purposes only (the "Chapter 11 Cases"). The Debtors

2

continue to operate their businesses and manage their properties as debtors and debtors-in-possession pursuant to 11 U.S.C. §§ 1107(a) and 1108.  On October 26, 2020, the United States Trustee appointed an Official Committee of Unsecured Creditors.  No trustee or examiner has been appointed in the Chapter 11 Cases. The Participants do not consent to entry of final judgment by this Court in connection with the Retirement Asset Confiscation Motions.

## FACTS

2.	The Participants are former employees of RTI who were promised an additional retirement benefit for their services.  RTI now seeks to improperly take back these promised retirement benefits contrary to their promises, contracts, and obligations under the Plans and trust agreement.  Some of the Plan Participants are over 80 years old and have been receiving benefits from the trust for many years.   The promised benefits are key to many of the participants' day-to-day living expenses.   See, *Declaration of Russ Mothershed in Support of Objection* ¶ 2, attached hereto as Exhibit 1.

3.	The ESPP was established by a predecessor of RTI in May 1983.   The MRP was established by a predecessor of RTI in June 1989.  According to RTI, the Plans have been ongoing plans of RTI, even though frozen, until terminated in March 1, 2019.  Upon information and belief, the DCP is ongoing.  D.I. 138, ¶ 10.

4.	RTI's predecessor established a Trust to fund the benefit obligations under the ESPP and MRP.  D.I. 138, Ex. D, at 1 (the "Trust Agreement").  The governing Trust Agreement binds successors of the plan sponsor, including RTI.  *Id*. at Section 13(i).

5.	The Trust Agreement expressly incorporates all terms and conditions contained within the ESPP and MRP.  *Id*. at Section 1.

3

6.      The ESPP and MRP Plans are primarily funded by corporate owned life insurance ("COLI") policies.  The COLI policies are, and at all times have been, segregated from the general assets of RTI and are assigned to and held by the trustee for the ESPP and MRP, currently Regions Bank ("Regions").[2]  See, *Exhibit 1,* ¶ 3.

7.      The 2017 10-K from RTI states in pertinent part:

> Although considered to be unfunded, we own whole-life insurance contracts in order to provide a source of funding for benefits due under the terms of the Executive Supplemental Pension Plan and the Management Retirement Plan. Benefits payable under these two plans are paid from a rabbi trust which holds the insurance contracts.
>
> …
>
> To provide a source for the payment of benefits under the Executive Supplemental Pension Plan and the Management Retirement Plan, we own life insurance contracts on some of the participants. The cash value of these policies (Level 2), which are included within the Other Assets caption in our Consolidated Balance Sheets, was $25.4 million and $27.9 million at June 6, 2017 and May 31, 2016, respectively. In addition, we reclassified as Restricted cash in our Consolidated Balance Sheets as of June 6, 2017 and May 31, 2016 $1.4 million and $0.4 million, respectively, of cash held in trust that is restricted for benefit payments under these plans.  We maintain a rabbi trust to hold the policies and death benefits as they are received.[3]

8.      Morrison Restaurant, Inc. ("MRI") was founded in about 1920; MRI acquired RTI in about 1982; MRI was originally listed on the NASDAQ.  It subsequently was listed on the NYSE in the early 1990s.  The Participants are former employees of MRI (or one its related entities) and RTI.  On December 21, 2017, NRD Capital, LLC ("NRD") purchased RTI.  Prior to the purchase, RTI was a publicly traded company.

---

[2] Attached as Exhibit 2 to this Objection, are the pleadings from the Interpleader action filed by Regions in the United States Court for the Northern District of Alabama, Southern Division.

[3] This Court can take judicial notice of the 10-Ks of RTI pursuant to Federal Rule of Evidence § 201.

2861881.1 099998-00014

9. When NRD purchased RTI, a "change of control" occurred as defined in the trust document. D.I. 138, Ex. C, Section 13(d).

10. Section 5 "Funding" of the trust document provides as follows:

(a) Except as otherwise provided in this Section 5, no Plan Sponsor shall be required to make any particular contribution of assets to the Fund. <u>Within thirty (30) days following a Change of Control, however, each Plan Sponsor shall be required to contribute to the Fund the amounts which are determined by the Trustee's Agent as necessary to fund the present value actuarial equivalent of unpaid benefits accrued in favor of each participant under the Plans</u>, determined as of the immediately preceding December 31. Thereafter, each Plan Sponsor shall be required to make similar annual contributions within thirty (30) days after each succeeding December 31 in an amount determined by the Trustee's Agent based upon the present value actuarial equivalent of unpaid benefits accrued in favor of each participant under the Plans as of that December 31.

D.I. 138-4; pp. 6-7 (*emphasis added*).

11. Upon information and belief, RTI never made the required contribution to fully fund the trust within 30 days of the change of control or following each subsequent calendar year as mandated by Section 5 of the trust document.

12. Upon information and belief, the ESPP and MRP plans were terminated effective March 1, 2019, by resolution of RTI's board of directors; thereby, effectively divesting RTI of any legal or equitable interest in the Trust assets. According to the Debtors' Motions, final lump sum distributions were anticipated to be made to the Participants in the ESPP and MRP after March 1, 2020, but before March 1, 2021, subject to the Internal Revenue Code ("<u>IRC</u>") rules and regulations that prohibit such distributions. D.I. 138, ¶10.

13. With regard to Plan termination, the ESPP provides as follows:

9.3 <u>Effect of Plan Termination on SERP Benefits</u>

(a) In the event the Plan is terminated, each Participant who has a vested Accrued Benefit shall have a right to a retirement benefits [sic] described in Section 5, which such Participant had accrued

5

through the date of the termination of the Plan. Except as provided in Subsection (b) below, retirement benefits will be paid in accordance with Section 6.

(b)[4]    Notwithstanding the provisions of Section 9.3(a), the Company may cause each Plan Sponsor to pay a lump sum Actuarial Equivalent (of, if applicable, Appendix E) value of any retirement benefits due to Participants upon a termination but only if the Company determines that such payment of retirement benefits will not constitute an impermissible acceleration of payments under one of the exceptions provided in Treasury Regulations Section 1.409A-3(j)(4)(ix), or any successor guidance. ***In such an event, payment shall be made at the earliest date permitted under such guidance.***

D.I. 138-2, p. 15 (*emphasis added*).

14.    The applicable IRC rules and regulations defining the "earliest date permitted under such [IRS] guidance" is found in Treasury Regulations Section 1.409A-3(j)(4)(ix)(C)(3) where it states as follows:

> (ix)  Plan terminations and liquidations.  A plan may provide for the acceleration of the time and form of a payment, or a payment under such plan may be made, where the acceleration of the payment is made pursuant to a termination and liquidation of the plan in accordance with one of the following:
>
> (C)  The service recipient's termination and liquidation of the plan, provided that –
>
> (3) No payments in liquidation of the plan are made within 12 months of the date the service recipient takes all necessary action to irrevocably terminate and liquidate the plan other than payments that would be payable under the terms of the plan if the action to terminate and liquidate the plan had not occurred….

Treasury Regulations Section 1.409A-3(j)(4)(ix)(C)(3).

---

[4] As amended by the "Third Amendment to the Ruby Tuesday, Inc. Executive Supplemental Pension Plan (Amended and Restated as of January 1, 2007) executed on January 6, 2010.

2861881.1 099998-00014

15.     According to the above IRS guidance, the terms of the Trust and the ESPP, the earliest date distributions could have occurred was March 1, 2020.  Hence, the ESPP and Trust Agreement mandated a March 1, 2020, payment of all benefits under the Plan.

16.     Under the Trust Agreement, "No participant shall have a preferred claim on or any beneficial ownership in the Fund prior to the time for distribution to the participant under the terms of a Plan or the terms of this Trust Agreement."  D.E. #138, Ex. D, Section 8(a). Participants now have a preferred claim on and/or beneficial ownership to the Fund because final distributions were due and payable as of March 1, 2020.

17.     Upon information and belief, RTI took no action after March 1, 2019, towards preparing to liquidate and distribute the Trust assets.  Upon information and belief, it never notified Regions, nor the Participants, of its decision to terminate the Plans and gave the Participants no notice of their rights to distributions as a result.

18.     Therefore, no Participant ever filed a claim for benefits, and no Participant ever received their required distribution as of March 1, 2020 or anytime thereafter.  See Exhibit 1, ¶ 6.

19.     Contrary to terms of the Trust Agreement and ESPP, Participants who were in payment status at the time of the Plans' terminations continued to receive monthly payments from March 1, 2020 through July 2020.  This further misled and misdirected the Participants as to their rights to lump sum distributions.  See Exhibit 1, ¶ 7.

20.     Contrary to the terms of the Trust Agreement and ESPP, RTI improperly ordered Regions to cease payments to Participants under the ESPP and MRP Plan as of August 1, 2020. RTI did not give an explanation as to why the payments should cease and gave no indication that RTI was insolvent.  See Exhibit 2, Interpleader Complaint, Ex. 2, (July 21, 2020 email).

2861881.1 099998-00014

21.     No notice was given to Participants that RTI was ordering all payments to cease under the ESPP and MRP Plans.  See Exhibit 1, ¶ 8.

22.     RTI distributed a letter dated August 1, 2020, from the RTI Human Resources Department to certain Participants who had contacted RTI or Regions about the non-payments of their benefits.  This letter is attached as Exhibit 3.

23.     This letter explained that making payments under the Plans "could jeopardize the company's ability to continue as a going concern."  The letter further stated that RTI "intends to resume benefit payments as soon as practicable once the company's financial health is no longer an issue." Exhibit 3.

24.     Regions' September 11, 2020, letter to the Plan Participants stated that "[o]n September 2, 2020, the Trustee was notified by the Ruby Tuesday board of directors that Ruby Tuesday is insolvent."  Prior to September 2, 2020, Regions had never been informed that RTI was insolvent.  See Exhibit 4.

25.     In reliance on the August 1, 2020, letter from RTI, and without notice of the March 2019 Plan terminations and their rights to lump sum distributions, Participants in the Plans, believed that monthly benefit payments under the Plans would be halted temporarily but that RTI would subsequently resume payments. Exhibit 3.

26.     On September 28, 2020, Regions filed an interpleader action in the United States District Court in the Northern District Alabama seeking guidance over what actions it should take regarding the assets in the RTI trust.  See, Exhibit 2.

27.     On October 7, 2020, approximately two months after sending the August 1, 2020, letter to Participants and a few days after the Regions interpleader action was filed, RTI and its subsidiaries each filed for voluntary relief under Chapter 11 of the Bankruptcy Code.

8

# ARGUMENT

## I. THE RETIREMENT CONFISCATION MOTIONS MUST BE DENIED BECAUSE THEY ARE PROCEDURALLY IMPROPER AND DEFECTIVE.

28.     At the outset, the Retirement Asset Confiscation Motions must be denied since they seek relief that can only be obtained by filing an adversary proceeding. There is no procedural support in the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") to proceed by motion practice. The Retirement Asset Confiscation Motions ask this Court in passive terms for an order compelling turnover of funds that do not belong to the Debtors' estates or for a declaratory judgment that the funds constitute property of the Debtors' estates. The Debtors are attempting to litigate by motion an action that raises serious questions under Federal ERISA law which concern a determination by this Court of the Debtors' interest in property related to the Plans. Under Bankruptcy Rule 7001, this relief can only be obtained in an adversary proceeding, which the Debtors have not done. This failure will deprive the Plan Participants of their procedural and substantive due process rights.

29.     Bankruptcy Rule 7001 lists several types of matters that are adversary proceedings:

> (1) a proceeding to recover money or property, other than a proceeding to compel the debtor to deliver property to the trustee, or a proceeding under § 554(b) or § 725 of the Code, Rule 2017, or Rule 6002;

> (2) a proceeding to determine the validity, priority, or extent of a lien or other interest in property, but not a proceeding under Rule 3012 or Rule 4003(d);

> * * *

> (7) a proceeding to obtain an injunction or other equitable relief, except when a chapter 9, chapter 11, chapter 12, or chapter 13 plan provides for the relief;

> * * *

> (9) a proceeding to obtain a declaratory judgment relating to any of the foregoing. . . .

9

Fed. R. Bankr. P. 7001.

"The [Bankruptcy] Rules are binding and courts must abide by them unless there is an irreconcilable conflict with the Bankruptcy Code." *In re Mansaray-Ruffin*, 530 F.3d 230, 235 (3d Cir. 2008). "[T]he code defines the creation, alteration or elimination of substantive rights but the Bankruptcy Rules define the process by which these privileges may be effected." *In re Fesq*, 153 F.3d 113, 116 (3d Cir. 1998) (citation omitted). By "requiring a complaint and a summons, providing for an answer and discovery, and generally concluding only after trial or a dispositive motion," an adversary proceeding provides the defendant with greater procedural protection than a contested matter. *In re Mansaray-Ruffin*, 530 F.3d at 237.

30. Consistent with those requirements, this Court has denied relief that was raised as a contested matter where the relief fell under the matters in Bankruptcy Rule 7001. *See, e.g.*, *In re SS Body Armor I, Inc.*, 527 B.R. 597, 607 (Bankr. D. Del. 2015) (Sontchi, J.) (noting opposition to stay relief motion was procedurally improper because it sought to enjoin a shareholder action); *In re The Fairchild Corp.*, Case No. 09-10899 (CSS), 2009 WL 4546581, at *7 (Bankr. D. Del. Dec. 1, 2009) (denying relief that sought "essentially an *ex parte* request for declaratory judgment" because party "should file the appropriate adversary action"; denying debtor's request for injunction extending the stay to non-debtors because "such relief in this instance requires initiation of an adversary proceeding"); *cf. In re SS Body Armor I, Inc.*, 615 B.R. 540, 550 (Bankr. D. Del. 2020) (Sontchi, C.J.) (denying motion to the extent it sought an injunction compelling debtor to take action because "it is improper absent an adversary proceeding"). Other courts agree. *See, e.g.*, *In re Foster*, 2016 WL 1105594, at *2 n.4 (Bankr. W.D. Okla. Mar. 21, 2016) ("[A]ny order compelling Debtors to surrender the Collateral to OMCC would be an injunction, which can only be obtained . . . through an adversary proceeding and not by motion."); *In re Gollnitz*, 456 B.R.

10

733, 738 (Bankr. W.D.N.Y. 2011) ("[A] mere motion will not suffice to compel action by the debtor."); *In re The Education Res. Institute, Inc.*, 442 B.R. 20, 23 (Bankr. D. Mass. 2010) ("[T]o the extent TERI . . . asks the Court to order First Marblehead to take a particular action, Rule 7001(7) requires the filing of an adversary proceeding."); *In re Geotel, Inc.*, 145 B.R. 763, 764 (Bankr. E.D.N.Y 1992) ("What the Trustee is seeking is a mandatory injunction to compel the payment of unspecified and unknown claims by Oxford. . . . Not only would a civil action provide Oxford with a full and fair opportunity to defend itself, but it would clarify the relevant facts. . . . Proceeding by way of motion is unfair to the parties involved.").

31.     First, the Retirement Asset Confiscation Motions requests relief that falls under Bankruptcy Rule 7001.  The Debtors request an order "directing the Trustee to liquidate and transfer the Trust Assets to RTI's bankruptcy estate and authorizing the termination of the Trust and the discharge of the Trustee's obligations to the Trust after all the Trust Assets or their proceeds have been transferred to RTI pursuant to an order of this Court." Retirement Asset Confiscation Motions ¶ 21.  By its own terms that is *at least* a request for a mandatory injunction requiring the Trustee to take an action—pay the Trust assets to the Debtors.  Alternatively, the Retirement Asset Confiscation Motions are an attempt to recover property.  See*, In re Harry C. Partridge, Jr. & Sons, Inc.*, 43 B.R. 669, 672 (Bankr. S.D.N.Y. 1984) ("An action for breach of contract constitutes an adversary proceeding which must be commenced by a summons and complaint because such action is designed to recover money or property within the meaning of Bankruptcy Rule 7001(1).").  In either case, that requires an adversary proceeding.  But, as noted above, underlying the request for mandatory relief is the assertion that the Debtors are entitled to a declaration that the Trust Assets belong to the Debtors' estates.  *See In re Janica Mansaray-Ruffin*, 530 F.3d 230, 242 (3d Cir. 2008) (due process and the federal rules of bankruptcy procedure

2861881.1 099998-00014

require property interests to be decided through adversary proceedings). At their core, the Retirement Asset Confiscation Motions seek relief that must be sought by adversary proceeding and, therefore, are procedurally defective.

32. Second, proceeding by contested matter prejudices the parties, namely the Plan Participants, by depriving them of their right to due process and the procedural protections afforded by the Part VII Rules of Bankruptcy Procedure. The Debtors violated due process in two ways.

33. For one, in proceeding by motion, the Debtors deprived the Plan Participants of their due process rights to respond to the Debtors' allegations, counter-claim, and proceed in accordance with the Bankruptcy Rules' mandatory protections. There exists no procedural mechanism for the Plan Participants to "counter-claim" or counter-sue the Debtors, the Plan Trustees and other individuals by motion, as there would be if the Debtors filed a complaint, which the Plan Participants could answer with their counter-claims and defenses. *See* Fed. R. Bankr. P. 7003, 7007. Thus, the Retirement Asset Confiscation Motions deprives the Plan Participants of their right to file counter-claims against the Debtors, Trustee and other individuals for, among other things, breaches of fiduciary duties and proceed with discovery and contested evidence under the Part VII rules. According to the Third Circuit, "[t]he Rules are there for a reason." *In re Mansaray-Ruffin*, 530 F.3d at 237. "[W]here the Rules require an adversary proceeding—which entails a fundamentally different, and heightened, level of procedural protections—to resolve a particular issue, a creditor has the due process right not to have that issue resolved without one." *Id.* at 242. By proceeding on motion to seek relief that is subject to Bankruptcy Rule 7001, the Debtors improperly deprived the Plan Participants of their due process rights. The Retirement Asset Confiscation Motions therefore should be denied.

2861881.1 099998-00014

34.     For another, the Debtors completely ignore the fact that the Plan Trustee has already commenced an interpleader action in federal district court in Alabama.  But interpleader and the formal procedures associated with it are not contemplated by contested matters.  *See* Fed. R. Bankr. P. 9014 (stating which Part VII rules apply in contested matters; Bankruptcy Rule 7014 (third party practice) is not listed).  Similar to the general pleading rules in adversary proceedings, Bankruptcy Rule 7014 requires formal pleadings for impleading a third party and opportunity for the third party to respond.  *See* Fed. R. Bankr. P. 7014.  For these reasons, the Debtors' motions are fatally flawed and cannot be considered by the Court.   *See also In re Irby,* 321 B.R. 468, 470 (Bankr. N.D. Ohio 2005) ("The delineation between an adversary proceedings and contested matters has, as its underpinnings, concerns over due process. In more detail, and while not true in every situation, the delineation between these two procedural methods for resolving disputes is predicated upon the general assumption that certain controversies in bankruptcy will involve more complex issues and affect greater substantial rights, thereby requiring the greater procedural protections afforded by the Federal Rules of Procedure. While other matters in bankruptcy will involve relatively uncomplicated disputes that can be adjudicated summarily, thereby making motion practice a better tool for judicial economy.") (citing *In re Riding,* 44 B.R. 846, 858-59 (Bankr. D. Utah 1984).[5]

---

[5] In order to correct the procedural deficiencies and make sure that all parties are afforded due process, the Ad Hoc Group intends to commence an adversary proceeding against the Debtors, Plan Trustees and certain officers and directors of the Debtors seeking, among other things, a declaratory judgment that the Plan Assets are held in trust for the beneficiaries under ERISA and are excluded from all of the Debtors' estates.  By commencing an adversary proceeding, all of the procedural safeguards available under the Federal Rules of Bankruptcy Procedure will be available to all litigants.  Accordingly, this Court should either deny the Retirement Asset Confiscation Motions or consolidate the motions with the adversary proceeding.

2861881.1 099998-00014

## II. THE BANKRUPTCY CODE EXCLUDES THE PLAN ASSETS FROM THE DEBTORS' ESTATES.

35. Section 541(b)(7)(A) and (B) of the Bankruptcy Code exclude from the Debtors' estates the Plan assets. The statute mandates, without ambiguity or qualification: "Property of the estate does not include…any amount…withheld [or received] by an employer from the wages of employees for payment as contributions…to…an employee benefit plan that is subject to title I of the Employee Retirement Income Security Act of 1974…" The statute unambiguously applies to the Plans at issue and the Plan assets.

36. In the instant case, there is no dispute that the Plans are employee benefit plans, as defined by Title I of ERISA. Any funds taken by the Debtors from the Plan Participants do not belong to the Debtors because the funds were taken from ERISA employee benefit plan accounts. Thus, the deferred compensation funds that the Debtors deposited into the Plans were and are not assets of the bankruptcy estates and cannot be used to satisfy the Debtors' obligations to their creditors.[6]

## III. THE DEBTORS, THROUGH THE PLAN TRUSTEE, HOLD THE PLAN ASSETS ONLY IN TRUST.

37. To the extent the Court does not find that the Plan Assets are excluded from the Debtors' estates as ERISA benefit plans, then the Plan Participants submit that the Debtors, through the Plan Trustees, hold the Plan Assets in trust for the benefit of the Plan Participants.

38. Pursuant to section 541(d) of the Bankruptcy Code,

> Property in which the debtor holds, as of the commencement of the case, only legal title and not an equitable interest, such as a mortgage secured by real property, or an interest in such a mortgage, sold by

---

[6] Although there have been a handful of decisions since its enactment as part of the 2005 amendments to the Bankruptcy Code finding that section 541(b)(7) does not apply to Top Hat plans, there is no controlling law on point in this circuit. The Plan Participants intend to litigate this issue in connection with the adversary proceeding.

14

the debtor but as to which the debtor retains legal title to service or supervise the servicing of such mortgage or interest, becomes property of the estate under subsection (a)(1) or (2) of this section only to the extent of the debtor's legal title to such property, but not to the extent of any equitable interest in such property that the debtor does not hold.

11 U.S.C. § 541(d).

39.     "Under section 541(d), property held in trust for another is 'not property of the bankruptcy estate because the debtor does not have an equitable interest in it." *In re Taub*, 427 B.R. 208, 220 (Bankr. E.D.N.Y. 2010).  See also, *Begier v. I.R.S.*, 496 U.S. 53, 59 (1990) ("[b]ecause the debtor does not own an equitable interest in property he holds in trust for another, the interest is not 'property of the estate.'").

40.     As stated by the United States Court of Appeals for the Second Circuit, "where the debtor's conduct gives rise to the imposition of a constructive trust, so that the debtor holds only bare legal title to the property, subject to a duty to reconvey it to the rightful owner, the estate will generally hold the property subject to the same restrictions…Indeed the Supreme Court has declared that, while the outer boundaries of the bankruptcy estate may be uncertain, Congress plainly excluded property of others held by the debtor in trust at the time of the filing of the petition…". *In re Howard's Appliance Corp.*, 874 F.2d 88, 93 (2d Cir. 1989) (quoting *U.S. v. Whiting Pools, Inc.*, 462 U.S. 198, 205 (1983)).

**IV.     THE TRUST FUNDS FOR THE ESPP AND THE MRP ARE BEING HELD IN A CONSTRUCTIVE TRUST FOR THE BENEFIT OF THE PLAN PARTICIPANTS AND ARE, THEREFORE, NOT PROPERTY OF THE BANKRUPTCY ESTATE PURSUANT TO SECTION 541 OF THE BANKRUPTCY CODE.**

41.     The question of whether the imposition of a constructive trust is appropriate in a particular set of circumstances is governed, in the first instance by state law.  *In re Flanagan*, 503 F.3d 171, 181 (2d Cir. 2007); see also, *Butner v. United States*, 440 U.S. 48, 54-55 (1979).  Under Delaware law, a court will impose a constructive trust "when a defendant's fraudulent, unfair or

15

unconscionable conduct causes him to be unjustly enriched at the expense of another to whom he owed some duty." *Lasalle Nat'l Bank v. Perelman*, 82 F. Supp.2d 279, 295 (D. Del. 2000) (citing *Dodge v. Wilmington Trust Co.*, 1995 WL 106380, at *7 (Del Ch. Feb. 3, 1995)).[7] According to the Delaware Supreme Court:

> If one party obtains legal title to property, not only by fraud or by violation of confidence or of fiduciary relations, but in any other unconscientious manner, so that he cannot equitably retain the property which really belongs to another, equity carries out its theory of a double ownership, equitable and legal, by impressing a constructive trust upon the property in favor of the one who is in good conscience entitled to it, and who is considered in equity as the beneficial owner.

*Adams v. Jankouskas*, 452 A.2d 148, 152 (Del. 1982).

42.    RTI intentionally and fraudulently withheld information from the Plan Participants when it terminated the Plans March 1, 2019. In fact, the Participants had no knowledge that the Plans had been terminated until October 15, 2020, when RTI filed the instant Motions. Had the Participants known of the termination in a timely manner, they could have exercised their rights under the Plans for accelerated distributions. Instead, RTI willfully and unconscionably withheld this information and further led them to believe that their benefits were not in jeopardy by continuing to make monthly benefit payments through July 2020.

43.    In order to prove unjust enrichment, a party must show the following: 1) an enrichment; 2) an impoverishment, 3) a relation between the enrichment and the impoverishment,

---

[7] Should the Court be inclined to consider the imposition of a constructive trust under Georgia law, the standard is essentially identical. See, *In re Francois*, 525 B.R. 531 (N.D. Ga. 2015) (under Georgia law, constructive trust is means by which court can prevent unjust enrichment); *GMRI, Inc. v. Independence Bank of Georgia*, 212 F. Supp.3d 1306 (2016) (constructive trust is impressed upon property when it is against equity that the person holding title to the property be allowed to enjoy the beneficiary interest in the property).

2861881.1 099998-00014

4) the absence of justification and 5) the absence of a remedy provided by law. *Jackson Nat'l Life Ins. Co. v. Kennedy*, 741 A.2d 377, 393-394 (Del. Ch. 1999).

44.     As plan sponsor for the ESPP and the MRP, RTI undoubtedly had obligations to protect and invest the funds in the Trust for the benefit of the Plan Participants and to act in accordance with its obligations under the Plans and in accordance with the Trust Agreement.  RTI acted in direct contravention of those obligations by failing to fully fund the Trust upon a change in control, by failing to notify the Participants of the Plans' terminations, and failing to disburse the funds to the Participants within the mandated timeframe.

45.     The Plans' Participants, through no fault of their own, were denied their contractual rights to distributions from their retirement accounts prior to the insolvency and eventual bankruptcy of RTI.  If RTI is now permitted to raid the Trust for its own benefit, it will be grossly and unjustly enriched to the impoverishment of the Plan Participants.  This conduct is clearly unjust enrichment and the type of "violation of confidence" that the Court in *Adams* contemplated.  Equity demands the imposition of a constructive trust on the property for its beneficial owners – the Plan Participants.

46.     This Court is authorized under Section 105 of the Bankruptcy Code, 11 U.S.C. § 105(a), to exercise its equitable powers and impose a constructive trust in order to prevent the dissipation of the Trust assets and to protect the interests of the Plan Participants.  The Plan Participants will be irreparably harmed if the Debtor's Motions are granted.

47.     The Court in *In re Washington Mutual, Inc*., Case No. 08-12229 (MFW) (Bankr. D. Del. 2011) [Docket No. 7836-1], addressed the imposition of a constructive trust on retirement plan assets being held in a trust where the debtor had engaged in wrongful and deceitful conduct. Certain participants in a "top hat" plan objected to the debtor's motion for authority to terminate

17

the plan and related trusts and to exercise ownership rights over the trust assets. The participants argued that a year before the debtor had become insolvent and filed for bankruptcy, they had become entitled to receive distributions under the plans due to a change in control provision in the plans. The participants claimed that they had sought distributions, which the debtor wrongfully refused to make. *Id*. at 12. The Court concluded that the participants were in fact entitled to their immediate distributions upon the change of control and that the debtor had acted wrongfully in denying the requests. The Court went on to find that the Bankruptcy Code does not preclude the application of constructive trust law and that the participants had alleged sufficient "inequitable conduct" by the debtors to warrant the imposition of a constructive trust. *Id.* at 25. However, the Court finally determined that the constructive trust in that matter must fail because there was no identifiable trust *res* separate from the general assets of the debtor on which to impose the constructive trust. The Court states, there was "no nexus or property identifiably belonging to the Plan Participants on which a constructive trust can be placed," therefore, the constructive trust must fail. *Id*. at 29.

48.     Similar to the *Washington Mutual* case, the debtor in this case is guilty of wrongful conduct and a constructive trust is warranted. Contrary to *Washington Mutual*, here there is a distinguishable separate *res* that constitutes the Trust assets – the COLI Policies. The COLI policies are segregated from the general assets of RTI and have been under the custodial care of Regions.

49.     Not only are the COLI policies a *res* separate from RTI's assets, once the Plans were terminated and the obligation to pay the distributions by March 1, 2020 arose, the COLI policies became the sole property of the Participants and RTI no longer held any legal or equitable

2861881.1 099998-00014

interest in the Trust Assets.. As of March 1, 2020, Regions should have liquidated and distributed the assets to Participants.

50.     RTI failed to distribute the assets of the Trust after twelve months from the Plans' terminations.  As a result of this delay, other factors eventually came to bear upon the solvency of RTI, including the COVID-19 pandemic.  However, at the time of RTI's insolvency and subsequent bankruptcy petition, the assets in the trust were not property of RTI, but belonged to the Plan Participants.  Therefore, a constructive trust should be imposed on these assets for the sole benefit of the Participants and not part of the bankruptcy estate.

## V.     THE PLAN PARTICIPANTS ARE ENTITLED TO RECOVER BENEFITS DUE THEM UNDER THE PLANS UNDER ERISA § 502(A)(1)(B); 29 U.S.C. § 1132(A)(1)(B).

51.     ERISA provides a cause of action "by a participant or beneficiary . . . to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan."  29 U.S.C. § 1132(a)(1)(B).

52.     RTI terminated the Plans on March 1, 2019.  It was required, under the terms of the ESPP to distribute the assets of the Trust at the "earliest date permitted under such [IRS] guidance," which would have been March 1, 2020.

53.     RTI never informed the Plan Participants of the Plans' terminations or their resultant rights; therefore, the Participants were deprived of their rights to even file a claim for benefits.

54.     Had the Plan Participants known of the Plan terminations, they could have filed a claim for benefits.  Any such claim would have been subject to the Plan's claims review procedure. In the ESPP, this is found in Article 10 which provides as follows:

> 10.1    Notice of Denial.  If a Participant is denied a claim for benefits under the Plan, the Plan Administrator shall provide to the claimant written notice of the denial within ninety (90) days (forty-

19

> five (45) days with respect to a denial of any claim for benefits due
> to the Participant's Disability) after the Plan Administrator received
> the claim, unless special circumstances require an extension of time
> for processing the claim.

D.I. No. 138-2, p. 15.

55.     The Plan document further provides a right to review of claims denials and other

rights as part of the claims review procedure.  See, *Id.* pp. 15-19.  Seeking review now would be

futile.  The Plan Participants were deprived of all of these rights by virtue of RTI's conduct.

## VI.     ADDITIONAL DISCOVERY IS NEEDED TO DETERMINE THE STATUS OF THE DCP.

56.     RTI terminated the ESPP and MRP and notified neither Regions, the trustee, nor

the Plan Participants.  Given this fact, discovery is needed to determine if RTI similarly terminated

the DCP, which may have a significant impact on the rights of these parties.[8]

### CONCLUSION

57.     RTI, as Plan Sponsor for the ESPP, MRP and the DCP owed obligations to the Plan

Participants to, *inter alia*, act in accordance with the governing Plan and Trust documents.  With

regard to the ESPP and MRP, RTI violated its duties by depriving the Plan Participants of the

knowledge of their rights to distributions upon the termination of the Plans.  Now RTI is petitioning

the Court to raid the assets of this Trust, to which it has no legitimate ownership rights, for its

unjust gain and to the irreparable harm of the Plan Participants.  This Court should declare that the

Plans assets do not constitute property of the Debtors' estates.

---

[8] Additional discovery is likely needed concerning the solvency of the Debtors.

2861881.1 099998-00014

58. This Court should impose a constructive trust on the assets of the trust as a matter of equity in order to avoid irreparable undue hardship to the Plan Participants and the unfair and unjust benefit to RTI's bankruptcy estate.

59. Furthermore, this Court should allow Plan Participants time for additional discovery in which to determine the details of the DCP and to determine their rights thereunder.

62. In further support of this Objection, Plan Participants submit the Declaration of Mitchell W. Hedstrom, attached hereto as Exhibit 5.

**WHEREFORE**, the Plan Participants respectfully request that the Court deny the relief requested in the Motions by the Debtors and impose a constructive trust on the Trust assets for the sole benefit of the Plan Participants. Plan Participants further request the Court award them all costs associated with these proceedings, including legal fees, as provided in the Trust Agreement, Section 6(j).

Dated: November 5, 2020  
Wilmington, Delaware

**GIBBONS P.C.**

By:   /s/ Howard A. Cohen                          
        Howard A. Cohen (Del. Bar No. 4082)  
        300 Delaware Ave., Suite 1015  
        Wilmington, DE 19801-1671  
        Telephone: (302) 518-6300  
        Facsimile: (302) 429-6294  
        Email:  hcohen@gibbonslaw.com

        -and-

        Robert K. Malone (admitted *pro hac vice*)  
        One Gateway Center  
        Newark, New Jersey 07102-5310  
        Telephone:  (973) 596-4500  
        Facsimile:  (973) 596-0545  
        Email: rmalone@gibbonslaw.com

2861881.1 099998-00014

**HOLIFIELD & JANICH, PLLC**

Al Holifield (admitted p*ro hac vice*)
Kelly Mann (admitted p*ro hac vice*)
11907 Kingston Pike, Suite 201
Knoxville, Tennessee 37934
Phone: (865) 566-0115
Facsimile: (865) 566-0119
E-mail: <u>aholifield@holifieldlaw.com</u>

*Counsel for the Ad Hoc Group of Plan
Participants*

2861881.1 099998-00014