IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| RTI HOLDING COMPANY, LLC,[1] | Case No. 20-12456 (JTD) |
| Debtors. | (Jointly Administered) |

---

## DISCLOSURE STATEMENT FOR DEBTORS' CHAPTER 11 PLAN

---

### IMPORTANT DATES

- Date by which Ballots must be received:  **[●] at 4:00 p.m. (EST)**

- Plan Confirmation Objection Deadline: **[●]  at 4:00 p.m. (EST)**

- Hearing on Confirmation of the Plan:  **[●] at [●] (EST)**

> **THIS DISCLOSURE STATEMENT HAS BEEN SUBMITTED TO THE BANKRUPTCY COURT FOR APPROVAL UNDER CHAPTER 11 OF THE BANKRUPTCY CODE.  THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT.  THIS IS NOT A SOLICITATION OF VOTES TO ACCEPT OR REJECT THE PLAN IN ACCORDANCE WITH BANKRUPTCY CODE SECTION 1125 AND WITHIN THE MEANING OF BANKRUPTCY CODE SECTION 1126.  THE INFORMATION IN THIS DISCLOSURE STATEMENT IS SUBJECT TO CHANGE.**

---

[1]  The Debtors in these chapter 11 cases and the last four digits of each Debtor's U.S. tax identification number are as follows: RTI Holding Company, LLC (4966); Ruby Tuesday, Inc. (5239); Ruby Tuesday, LLC (1391); RTBD, LLC (6505); RT of Carroll County, LLC (8836); RT Denver Franchise, L.P. (2621); RT Detroit Franchise, LLC (8738); RT Distributing, LLC (6096); RT Finance, LLC (7242); RT FL Gift Cards, Inc. (2189); RT Florida Equity, LLC (7159); RT Franchise Acquisition, LLC (1438); RT of Fruitland, Inc. (1103); RT Indianapolis Franchise, LLC (6016); RT Jonesboro Club (2726); RT KCMO Franchise, LLC (7020); RT Kentucky Restaurant Holdings, LLC (7435); RT Las Vegas Franchise, LLC (4969); RT Long Island Franchise, LLC (4072); RT of Maryland, LLC (7395); RT Michiana Franchise, LLC (8739); RT Michigan Franchise, LLC (8760); RT Minneapolis Franchise, LLC (2746); RT Minneapolis Holdings, LLC (7189); RT New England Franchise, LLC (4970); RT New Hampshire Restaurant Holdings, LLC (7438);  RT New York Franchise, LLC (1154); RT Omaha Franchise, LLC (7442); RT Omaha Holdings, LLC (8647); RT One Percent Holdings, LLC (6689); RT One Percent Holdings II, LLC (2817); RT Orlando Franchise, LP (5105); RT Restaurant Services, LLC (7283); RT South Florida Franchise, LP (3535); RT Southwest Franchise, LLC (9715); RT St. Louis Franchise, LLC (6010); RT Tampa Franchise, LP (5290); RT Western Missouri Franchise, LLC (6082); RT West Palm Beach Franchise, LP (0359); RTTA, LP (0035); RTT Texas, Inc. (2461); RTTT, LLC (9194); Ruby Tuesday of Allegany County, Inc. (8011); Ruby Tuesday of Bryant, Inc. (6703); Ruby Tuesday of Columbia, Inc. (4091); Ruby Tuesday of Frederick, Inc. (4249); Ruby Tuesday of Linthicum, Inc. (8716); Ruby Tuesday of Marley Station, Inc. (1641); Ruby Tuesday of Pocomoke City, Inc. (0472); Ruby Tuesday of Russellville, Inc. (1601); and  Ruby Tuesday of Salisbury, Inc. (5432). The Debtors' mailing address is 333 East Broadway Ave., Maryville, TN 37804.

Dated:  November 6, 2020

PACHULSKI STANG ZIEHL & JONES LLP
Richard M. Pachulski (CA Bar No. 90073)
Malhar S. Pagay (CA Bar No. 189289)
James E. O'Neill (DE Bar No. 4042)
Victoria A. Newmark (CA Bar No. 183581)
919 North Market Street, 17th Floor
Wilmington, DE  19899-8705 (Courier 19801)
Telephone: 302/652-4100
Facsimile:  302/652-4400
E-mail:    rpachulski@pszjlaw.com
           mpagay@pszjlaw.com
           joneill@pszjlaw.com
           vnewmark@pszjlaw.com

Counsel for the Debtors and Debtors in Possession

# **TABLE OF CONTENTS**

**Page**

ARTICLE I. EXECUTIVE SUMMARY ...................................................................1
    A.    INTRODUCTION ..................................................................................1
    B.    RULES OF INTERPRETATION...........................................................1
    C.    PLAN SUPPORT FROM CONSENTING LENDERS AND
          SHAREHOLDERS..................................................................................2
    D.    PURPOSE AND EFFECT OF THE PLAN .........................................2
          1.    Plan of Reorganization Under Chapter 11 of the
               Bankruptcy Code ...................................................................2
          2.    Financial Restructurings in Connection with the Plan ........5
          3.    Plan Overview .......................................................................6
    E.    VOTING PROCEDURES AND SOLICITATION MATERIALS...............9
          1.    Who May Vote on the Plan ...................................................9
          2.    Voting Record Date ............................................................10
          3.    Voting Agent .......................................................................10
          4.    Solicitation Package, Ballots and Notices ........................10
          5.    Voting Procedures ..............................................................11
          6.    Exemption from Securities Act Registration Requirements...........12
          7.    Filing of the Plan Supplement ...........................................12
    F.    CONFIRMATION OF THE PLAN ......................................................12
          1.    Confirmation Hearing.........................................................12
          2.    Deadline for Objecting to Confirmation of the Plan .......12
          3.    Notice Parties.....................................................................13
          4.    Effect of Confirmation of the Plan ...................................13
    G.    CONSUMMATION OF THE PLAN .....................................................14
    H.    RISK FACTORS .................................................................................14
ARTICLE II.  15
GENERAL BACKGROUND TO THE CHAPTER 11 CASES.......................................15
    A.    THE DEBTORS' ORGANIZATIONAL STRUCTURE............................15
    B.    OVERVIEW OF THE DEBTORS' BUSINESS.......................................15
          1.    The Debtors' Business Operations ...................................16
          2.    Franchising ........................................................................16
          3.    Suppliers ............................................................................16
          4.    Personnel............................................................................16
          5.    Owned Real Property and Sale-Leaseback Transactions ...............17
          6.    RT Lodge ............................................................................17
          7.    Related Party Note/Bond Receivable ...............................17
          8.    Rabbi Trusts.......................................................................18
    C.    DEBTORS' PREPETITION CAPITAL STRUCTURE ............................18
          1.    Prepetition Credit Facility.................................................18
          2.    Other Prepetition Obligations ..........................................19
ARTICLE III.  20
CHAPTER 11 CASES...................................................................................................20
    A.    EVENTS LEADING TO COMMENCEMENT OF THE

i

CHAPTER 11 CASES....................................................................20
   1.   Business Operations and Financial Condition Since the
      Merger...............................................................................20
   2.   The COVID-19 Pandemic ................................................21
   3.   Creditor Negotiations and Entry into Restructuring Support
      Agreement.........................................................................23
B.   DEBTOR IN POSSESSION FINANCING..................................24
C.   FIRST AND SECOND DAY RELIEF........................................25
   1.   Procedural Motions...........................................................25
   2.   Stabilizing Operations......................................................26
   3.   Retention of Chapter 11 Advisors ...................................26
D.   SALE PROCESS ........................................................................27
E.   OTHER MATERIAL EVENTS IN THE CHAPTER 11 CASES .............28
   1.   Executory Contract and Unexpired Lease Rejection
      Procedures Motions ..........................................................28
   2.   Appointment of the Creditors' Committee ......................28
   3.   Meeting of Creditors........................................................29
   4.   Claims Bar Date................................................................29
   5.   The Real Property Rents Deferral and Abatement Motions...........29
   6.   Motions Regarding Rabbi Trust Assets...........................29
ARTICLE IV. SUMMARY OF THE PLAN ..................................................30
A.   ADMINISTRATIVE, DIP FACILITY, AND PRIORITY TAX
      CLAIMS .....................................................................................30
   1.   Administrative Expense Claims .......................................30
   2.   Professional Fee Claims ...................................................31
   3.   DIP Facility Claims ..........................................................32
   4.   Priority Tax Claims...........................................................32
B.   CLASSIFICATION AND TREATMENT OF CLASSIFIED
      CLAIMS AND EQUITY INTERESTS.......................................33
   1.   Summary...........................................................................33
C.   ELIMINATION OF VACANT CLASSES .................................34
D.   CLASSIFICATION AND TREATMENT OF CLAIMS AND
      EQUITY INTERESTS ................................................................34
   1.   Class 1 – Non-Tax Priority Claims...................................34
   2.   Class 2 – Miscellaneous Secured Claims ........................35
   3.   Class 3 – Prepetition Secured Debt Claims .....................35
   4.   Class 4 – General Unsecured Claims................................37
   5.   Class 5 – Preserved Intercompany Claims .......................38
   6.   Class 6 – Extinguished Intercompany Claims..................38
   7.   Class 7 – Dissenters Claims..............................................38
   8.   Class 8 – Equity Interests in Holding ..............................38
   9.   Class 9 – Intercompany Interests......................................39
E.   SPECIAL PROVISION GOVERNING CLAIMS RELATED TO
      ASSUMED EXECUTORY CONTRACTS OR UNEXPIRED
      LEASES AND UNIMPAIRED CLAIMS...................................39
F.   ACCEPTANCE OR REJECTION OF THE PLAN .....................39

ii

|  | 1. | Presumed Acceptance of Plan | 39 |
|---|---|---|---|
|  | 2. | Voting Classes | 39 |
|  | 3. | Acceptance by Impaired Classes of Claims and Equity Interests | 39 |
|  | 4. | Cramdown; Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code | 40 |
|  | 5. | Continuing Susceptibility to Claim Objection; Solicitation in Good Faith | 40 |
| G. | | MEANS FOR IMPLEMENTATION OF THE PLAN | 40 |
|  | 1. | General Settlement of Claims | 40 |
|  | 2. | Corporate Existence | 40 |
|  | 3. | Vesting of Assets | 41 |
|  | 4. | Exit L/C Facility | 42 |
|  | 5. | Exit Term Loan Facility | 42 |
|  | 6. | Exit Facility | 43 |
|  | 7. | Management Incentive Plan | 44 |
|  | 8. | Issuance of New Common Shares, and Related Documentation | 44 |
|  | 9. | Substantive Consolidation for Plan Purposes | 45 |
|  | 10. | Release of Liens, Claims and Equity Interests | 46 |
|  | 11. | Amended Organizational Documents | 46 |
|  | 12. | Directors and Officers of RT Asset Company | 46 |
|  | 13. | Corporate Action | 47 |
|  | 14. | Cancellation of Notes, Certificates and Instruments | 48 |
|  | 15. | Cancellation of Existing Instruments Governing Security Interests | 49 |
|  | 16. | Preserved Intercompany Claims; Intercompany Interests; Corporate Reorganization | 49 |
|  | 17. | Restructuring Transactions | 50 |
|  | 18. | Consenting Lenders Fees and Expenses | 51 |
|  | 19. | Asset Sales Postpetition | 51 |
| H. | | TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES | 52 |
|  | 1. | Assumption and Rejection of Executory Contracts and Unexpired Leases | 52 |
|  | 2. | Assignment of Executory Contracts or Unexpired Leases | 53 |
|  | 3. | Rejection of Executory Contracts or Unexpired Leases | 53 |
|  | 4. | Cure of Defaults for Assumed Executory Contracts and Unexpired Leases | 54 |
|  | 5. | Objections to Assumption, Assignment or Cure of Executory Contracts or Unexpired Leases | 55 |
|  | 6. | Post-Effective Date Management Agreements | 55 |
|  | 7. | Director and Officer Insurance Policies | 55 |
|  | 8. | Indemnification Provisions | 56 |
|  | 9. | Compensation and Benefit Programs | 56 |
|  | 10. | Workers' Compensation Benefits | 56 |

iii

|  | 11. | Insurance Policies ................................................................ 57 |

| I. | | PROVISIONS GOVERNING DISTRIBUTIONS .......................... 57 |
|  | 1. | Distributions for Claims Allowed as of the Effective Date ............. 57 |
|  | 2. | Distributions on Account of Claims Allowed After the Effective Date .................................................................... 57 |
|  | 3. | Delivery and Distributions and Undeliverable or Unclaimed Distributions ..................................................................... 58 |
|  | 4. | Compliance with Tax Requirements/Allocations ........................... 62 |
|  | 5. | Timing and Calculation of Amounts to Be Distributed ................. 62 |
|  | 6. | Setoffs ................................................................................ 63 |
|  | 7. | Surrender of Canceled Instruments or Securities ......................... 63 |
|  | 8. | Lost, Stolen, Mutilated or Destroyed Securities ........................... 63 |

| J. | | PROCEDURES CONCERNING CONTINGENT, UNLIQUIDATED AND DISPUTED CLAIMS ......................................... 64 |
|  | 1. | Rights of Reorganized Debtors with Respect to Allowance of Claims and Equity Interests .......................................... 64 |
|  | 2. | No Distributions to Holders of Disputed Claims or Equity Interests Pending Resolution of the Dispute ...................... 64 |
|  | 3. | Resolving Disputed Claims and Equity Interests ........................... 64 |
|  | 4. | Distributions after Allowance of Disputed Claims or Equity Interests ..................................................................... 65 |

| K. | | CONDITIONS PRECEDENT TO CONSUMMATION OF THE PLAN ..................................................................................... 65 |
|  | 1. | Conditions Precedent to Consummation ...................................... 66 |
|  | 2. | Waiver of Conditions ............................................................... 67 |
|  | 3. | Notice of Effective Date .......................................................... 67 |
|  | 4. | Effect of Non-Occurrence of Conditions to Consummation .......... 67 |

| L. | | EFFECT OF CONFIRMATION; AND RELEASE, INJUNCTION AND RELATED PROVISIONS ..................................... 68 |
|  | 1. | Compromise and Settlement ..................................................... 68 |
|  | 2. | Mutual Release by the Debtors and Released Parties .................... 69 |
|  | 3. | Releases by Holders of Claims and Interests ............................... 70 |
|  | 4. | Exculpation ........................................................................... 71 |
|  | 5. | Injunctions ........................................................................... 71 |
|  | 6. | Protection against Discriminatory Treatment .............................. 72 |
|  | 7. | Reimbursement or Contribution ................................................ 73 |
|  | 8. | Recoupment .......................................................................... 73 |
|  | 9. | Waiver of Certain Avoidance Actions ......................................... 73 |
|  | 10. | Preservation of Rights of Action ............................................... 73 |

| ARTICLE V. | | PLAN CONFIRMATION ....................................................... 74 |
|  A. | | CONFIRMATION HEARING AND OBJECTIONS ........................ 74 |
|  B. | | STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE PLAN ..................................................................... 75 |
|  | 1. | Best Interests of Creditors Test / Liquidation Analysis ................ 76 |
|  | 2. | Feasibility ............................................................................. 77 |
|  | 3. | Acceptance by Impaired Classes ............................................... 78 |

iv

| | | |
|---|---|---|
| | 4. | Confirmation Without Acceptance by Impaired Classes | 79 |
| C. | | CONSUMMATION OF THE PLAN | 81 |
| ARTICLE VI. RISK FACTORS | | | 81 |
| A. | | RISKS RELATING TO CONFIRMATION AND CONSUMMATION OF THE PLAN | 81 |
| | 1. | Parties in Interest May Object to the Debtors' Classification of Claims and Equity Interests | 81 |
| | 2. | The Debtors May Object to the Amount or Classification of a Claim or Equity Interest | 81 |
| | 3. | The Debtors May Fail to Satisfy the Vote Requirement | 82 |
| | 4. | The Debtors May Not Be Able to Secure Confirmation of the Plan | 82 |
| | 5. | Non-Consensual Confirmation of the Plan May Be Necessary | 83 |
| | 6. | Releases, Injunctions, and Exculpations Provisions May Not Be Approved | 83 |
| | 7. | The Restructuring Support Agreement May Terminate. | 83 |
| | 8. | Risks of Not Obtaining the Funding Under the Exit Facility | 83 |
| | 9. | The Conditions Precedent to the Effective Date of the Plan May Not Occur | 83 |
| B. | | RISKS RELATING TO THE CHAPTER 11 PROCESS | 84 |
| | 1. | The Debtors' Exclusivity Period May Terminate | 84 |
| | 2. | Prolonged Continuation of the Chapter 11 Cases Is Likely To Harm the Debtors' Business | 84 |
| | 3. | The Chapter 11 Cases May Be Converted to Cases Under Chapter 7 of the Bankruptcy Code | 84 |
| C. | | RISKS RELATING TO RECOVERIES UNDER THE PLAN | 85 |
| | 1. | The Recovery to Holders of Allowed Claims Can Not Be Stated With Absolute Certainty | 85 |
| | 2. | The Value of New Common Shares Can Not Be Stated With Absolute Certainty | 85 |
| | 3. | Holders of Equity Securities in RT Asset Company May Not Be Able to Recover in Future Cases of Bankruptcy, Liquidation or Reorganization | 85 |
| | 4. | The New Common Shares and New Warrants Will Be Illiquid | 85 |
| | 5. | There Is Not an Established Market for Equity Securities in RT Asset Company, and Holders of New Common Shares Will Be Subject to Restrictions on Resale and Transfer, Including Under the Amended Organizational Documents, Which Could Make Such Interests Illiquid | 86 |
| D. | | RISK FACTORS RELATING TO THE DEBTORS' BUSINESS, INDUSTRY AND MARKET FACTORS | 87 |
| | 1. | Continued Risk Upon Confirmation and Consummation | 87 |
| | 2. | Recent Global Economic Trends, especially in Response to the COVID-19 Outbreak Could Adversely Affect the |

Debtors' Business, Results of Operations, and Financial Condition, Primarily Through Disruption of the Debtors' Restaurants ........................................................................ 87

3.     The Company May Face Risks Associated With Current or Future Litigation and Claims ........................................... 88

4.     The Debtors Are Subject to Restrictive Covenants .......... 88

5.     The Debtors May Fail in Their Lease Rationalization Efforts ............................................................................... 88

6.     Large Holders of the Prepetition Secured Debt Claims May Control the New Common Shares .................................... 88

7.     Tax Implications of the Plan ............................................ 89

E.     RISK FACTORS ASSOCIATED WITH FORWARD-LOOKING STATEMENTS ...................................................................... 89

1.     The Financial Information Contained Herein Is Based on the Debtors' Books and Records and, Unless Otherwise Stated, No Audit Was Performed ...................................... 89

2.     Financial Projections and Other Forward-Looking Statements Are Not Assured, Are Subject to Inherent Uncertainty Due to the Numerous Assumptions Upon Which They Are Based and, as a Result, Actual Results May Vary ......................................................................... 89

F.     DISCLOSURE STATEMENT DISCLAIMER ......................... 90

1.     The Information Contained Herein Is for Soliciting Votes Only ................................................................................. 90

2.     This Disclosure Statement Was Not Approved by the Securities and Exchange Commission .............................. 90

3.     The Debtors Relied on Certain Exemptions From Registration Under the Securities Act ............................. 90

4.     This Disclosure Statement Contains Forward-Looking Statements ....................................................................... 90

5.     No Legal or Tax Advice Is Provided to You by This Disclosure Statement ...................................................... 91

6.     No Admissions Are Made by This Disclosure Statement ............... 91

7.     No Reliance Should Be Placed on Any Failure to Identify Litigation Claims or Projected Objections ...................... 91

8.     Nothing Herein Constitutes a Waiver of Any Right to Object to Claims or Equity Interests or Recover Transfers and Assets ....................................................................... 91

9.     The Information Used Herein Was Provided by the Debtors and Was Relied Upon by the Debtors' Advisors ............. 92

10.    The Potential Exists for Inaccuracies and the Debtors Have No Duty to Update ......................................................... 92

11.    No Representations Made Outside the Disclosure Statement Are Authorized ............................................................... 92

ARTICLE VII. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN ................................................. 92

DOCS_LA:332991.15 76136/002

A.    LIQUIDATION UNDER CHAPTER 7 OF THE BANKRUPTCY
      CODE ........................................................................................92
B.    FILING OF AN ALTERNATIVE PLAN OF
      REORGANIZATION..................................................................93
ARTICLE VIII. ISSUANCE AND RESALE OF NEW COMMON SHARES
AND NEW WARRANTS UNDER THE PLAN .......................................93
A.    EXEMPTION FROM REGISTRATION REQUIREMENTS OF
      THE SECURITIES ACT AND BLUE SKY LAWS .................93
      1.    Section 1145(a) of the Bankruptcy Code (Offer and
            Issuance of Exchange Common Shares and New Warrants)...........93
      2.    Section 4(a)(2) of the Securities Act, Rule 506 of
            Regulation D, and Rule 701 Under the Securities Act
            (Offer and Issuance of New Common Shares and Other
            Equity Securities Under Management Incentive Plan)...................94
B.    RESALES OF NEW COMMON SHARES, AND NEW
      WARRANTS...............................................................................94
      1.    Resales of the Exchange Securities ...................................94
      2.    Resales of the MIP Securities ..........................................96
ARTICLE IX. SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX
CONSEQUENCES OF THE PLAN .........................................................96
A.    GENERAL...................................................................................96
B.    U.S. FEDERAL INCOME TAX CONSEQUENCES TO THE
      DEBTORS ..................................................................................98
      1.    Cancellation of Debt Income ...........................................98
      2.    Potential Limitations on NOL Carryforwards and Other
            Tax Attributes ................................................................99
C.    CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES
      TO U.S. HOLDERS OF ALLOWED CLAIMS UNDER THE
      PLAN.......................................................................................102
      1.    Treatment of a Debt Instrument as a Security ...............102
      2.    Consequences to Holders of Allowed General Unsecured
            Claims...........................................................................103
      3.    Equity Interests .............................................................103
      4.    Accrued But Untaxed Interest .......................................103
      5.    Limitation on Use of Capital Losses .............................104
      6.    Net Investment Income Tax............................................104
      7.    Information Reporting and Backup Withholding...........104
D.    CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES
      TO NON-U.S. HOLDERS OF ALLOWED CLAIMS OR
      EQUITY INTERESTS UNDER THE PLAN ...........................104
      1.    Gain Recognition ..........................................................105
      2.    Interest .........................................................................105
      3.    U.S. Federal Income Tax Consequences to Non-U.S.
            Holders of Owning and Disposing of Equity Interests in RT
            Lodge Company, New Common Shares or the New
            Warrants........................................................................106

vii

      4.     FATCA ........................................................................................... 108

   E.     GENERAL DISCLAIMER ...................................................................... 108

ARTICLE X. RECOMMENDATION ............................................................................ 109

DOCS_LA:332991.15 76136/002

**IMPORTANT INFORMATION FOR YOU TO READ**

THE DEADLINE TO VOTE ON THE PLAN IS [●], AT 4:00 P.M. EASTERN TIME.

FOR YOUR VOTE TO BE COUNTED, YOUR BALLOT MUST BE ACTUALLY RECEIVED BY THE VOTING AGENT BEFORE THE VOTING DEADLINE AS DESCRIBED HEREIN.

This Disclosure Statement provides information regarding the Debtors' Plan, which the Debtors seek to have confirmed by the Bankruptcy Court.  A copy of the Plan is attached hereto as **Exhibit A**.  Unless otherwise noted, all capitalized terms used but not otherwise defined herein have the meaning ascribed to them in the Plan.

The Debtors and the Consenting Lenders each support approval of the Plan.

The consummation and effectiveness of the Plan are subject to certain material conditions precedent described herein and set forth in Article IX of the Plan. There is no assurance that the Bankruptcy Court will confirm the Plan or, if the Bankruptcy Court does confirm the Plan, that the conditions necessary for the Plan to go effective will be satisfied or otherwise waived.

You are encouraged to read this Disclosure Statement (including Article VI hereof entitled "Risk Factors") and the Plan in their entirety before submitting your Ballot to vote on the Plan.

The Bankruptcy Court's approval of this Disclosure Statement does not constitute a guarantee by the Bankruptcy Court of the accuracy or completeness of the information contained herein or an endorsement by the Bankruptcy Court of the merits of the Plan. Summaries of the Plan and statements made in this Disclosure Statement are qualified in their entirety by reference to the Plan. The summaries of the financial information and the documents annexed to this Disclosure Statement or otherwise incorporated herein by reference are qualified in their entirety by reference to those documents. The statements contained in this Disclosure Statement are made only as of the date of this Disclosure Statement, and there is no assurance that the statements contained herein will be correct at any time after such date. Except as otherwise provided in the Plan or in accordance with applicable law, the Debtors are under no duty to update or supplement this Disclosure Statement.

The Debtors are providing the information in this Disclosure Statement to Holders of Claims and Equity Interests for purposes of soliciting votes to accept or reject the Debtors' Chapter 11 Plan pursuant to chapter 11 of the Bankruptcy Code. In the event of any inconsistency between the Disclosure Statement and the Plan, the relevant provisions of the Plan will govern. Nothing in this Disclosure Statement may be relied upon or used by any entity for any other purpose. Before deciding whether to vote for or against the Plan, each Holder entitled to vote should carefully consider all of the information in this Disclosure Statement, including the Risk Factors described in Article VI.

The Debtors urge each Holder of a Claim or Equity Interest entitled to vote to consult with its own advisors with respect to any legal, financial, securities, tax, or business advice in reviewing this Disclosure Statement, the Plan, and each proposed transaction contemplated by the Plan.

This Disclosure Statement contains, among other things, summaries of the Plan, certain statutory provisions, certain events in the Debtors' Chapter 11 Cases, and certain documents

related to the Plan, attached hereto and/or incorporated by reference herein. Although the Debtors believe that these summaries are fair and accurate, they are qualified in their entirety to the extent that they do not set forth the entire text of such documents or statutory provisions or every detail of such events. In the event of any inconsistency or discrepancy between a description in this Disclosure Statement and the terms and provisions of the Plan or any other documents incorporated herein by reference, the Plan or such other documents will govern for all purposes. Factual information contained in this Disclosure Statement has been provided by the Debtors' management except where otherwise specifically noted.

The Debtors do not represent or warrant that the information contained herein or attached hereto is without any material inaccuracy or omission. The Debtors have prepared this Disclosure Statement in accordance with section 1125 of the Bankruptcy Code, Bankruptcy Rule 3016(b), and Local Bankruptcy Rule 3017 and is not necessarily prepared in accordance with federal or state securities laws or other similar laws.

In preparing this Disclosure Statement, the Debtors relied on financial data derived from the Debtors' books and records and on various assumptions regarding the Debtors' businesses. Although the Debtors believe that such financial information fairly reflects the financial condition of the Debtors as of the date hereof and that the assumptions regarding future events reflect reasonable business judgments, the Debtors make no representations or warranties as to the accuracy of the financial information contained in this Disclosure Statement or assumptions regarding the Debtors' businesses and their future results and operations.  The Debtors expressly caution readers not to place undue reliance on any forward looking statements contained herein.

PACHULSKI STANG ZIEHL & JONES LLP ("PSZ&J") IS GENERAL INSOLVENCY COUNSEL TO THE DEBTORS.  PSZ&J HAS RELIED UPON INFORMATION PROVIDED BY THE DEBTORS IN CONNECTION WITH PREPARATION OF THIS DISCLOSURE STATEMENT.  PSZ&J HAS NOT INDEPENDENTLY VERIFIED THE INFORMATION CONTAINED HEREIN.

This Disclosure Statement does not constitute, and should not be construed as, an admission of fact, liability, stipulation, or waiver. The Debtors may seek to investigate, file, and prosecute Claims and may object to Claims after the Confirmation or Effective Date of the Plan irrespective of whether this Disclosure Statement identifies such Claims or objections to Claims.

The Debtors are making the statements and providing the financial information contained in this Disclosure Statement as of the date hereof, unless otherwise specifically noted. Although the Debtors may subsequently update the information in this Disclosure Statement, the Debtors have no affirmative duty to do so, and expressly disclaim any duty to publicly update any forward looking statements, whether as a result of new information, future events, or otherwise. Holders of Claims and Equity Interests reviewing this Disclosure Statement should not infer that, at the time of their review, the facts set forth herein have not changed since this Disclosure Statement was filed. Information contained herein is subject to completion, modification, or amendment. The Debtors reserve the right to file an amended or modified Plan and related Disclosure Statement from time to time, subject to the terms of the Plan.

The Debtors have not authorized any Entity to give any information about or concerning the Plan other than that contained in this Disclosure Statement. The Debtors have not authorized any representations concerning the Debtors or the value of their property other than as set forth in this Disclosure Statement.

If the Bankruptcy Court confirms the Plan and the Effective Date occurs, the terms of the Plan and the restructuring transactions contemplated by the Plan will bind the Debtors, any Person acquiring property under the Plan, all Holders of Claims and Equity Interests (including those Holders of Claims and Equity Interests that do not submit Ballots to accept or reject the Plan or that are not entitled to vote on the Plan), and any other Person or Entity as may be ordered by the Bankruptcy Court in accordance with the applicable provisions of the Bankruptcy Code.

## SPECIAL NOTICE REGARDING FEDERAL AND STATE SECURITIES LAWS

Neither this Disclosure Statement nor the Plan has been filed with the United States Securities and Exchange Commission (the "SEC") or any state authority.  The Plan has not been approved or disapproved by the SEC or any state securities commission and neither the SEC nor any state securities commission has passed upon the accuracy or adequacy of this Disclosure Statement or the merits of the Plan.  Any representation to the contrary is a criminal offense.

This Disclosure Statement has been prepared pursuant to section 1125 of the Bankruptcy Code and Bankruptcy Rule 3016(b) and is not necessarily in accordance with federal or state securities laws or other similar laws.  The securities to be issued on or after the effective date will not have been the subject of a registration statement filed with the SEC under the Securities Act of 1933, as amended (the "Securities Act") or any securities regulatory authority of any state under any state securities law ("Blue Sky Laws").  The Debtors are relying on the exemptions from the Securities Act and equivalent state law registration requirements provided by section 1145(a) of the Bankruptcy Code, Section 4(a)(2) of the Securities Act, Rule 506 of Regulation D and Rule 701 promulgated under the Securities Act, and similar provisions of Blue Sky Laws to exempt the offer and issuance of new securities in connection with the solicitation and the Plan from registration under the Securities Act and Blue Sky Laws.

This Disclosure Statement contains "forward looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Such statements consist of any statement other than a recitation of historical fact and can be identified by the use of forward looking terminology such as "may," "expect," "anticipate," "estimate," or "continue" or the negative thereof or other variations thereon or comparable terminology. You are cautioned that all forward looking statements are necessarily speculative and there are certain risks and uncertainties that could cause actual events or results to differ materially from those referred to in such forward looking statements. You are referred to Article VI of this Disclosure Statement for a discussion of certain of such risks and uncertainties.  The Liquidation Analysis (as defined below), distribution projections, and other information contained herein and attached hereto are estimates only, and the timing and amount of actual distributions to Holders of Allowed Claims may be affected by many factors that cannot be predicted. Any analyses, estimates, or recovery projections may or may not turn out to be accurate.

Making investment decisions based on the information contained in this Disclosure Statement and/or the Plan is therefore highly speculative. The Debtors recommend that potential recipients of any securities issued pursuant to the Plan consult their own legal counsel concerning the securities laws governing the transferability of any such securities.

## QUESTIONS AND ADDITIONAL INFORMATION

If you would like to obtain copies of this Disclosure Statement, the Plan, or any of the documents attached hereto or referenced herein, or have questions about the solicitation and voting process or these Chapter 11 Cases generally, please contact the Debtors' Voting Agent by (a) calling the Debtors' restructuring hotline at _____; (b) emailing

_____; (c) visiting the Debtors' restructuring website at: https://dm.epiq11.com/case/rubytuesday/info; and/or (d) writing to the Voting Agent at: _____.

## **EXHIBITS**

EXHIBIT A – Plan of Reorganization

EXHIBIT B – Restructuring Support Agreement

EXHIBIT C – Organizational Chart of the Debtors

EXHIBIT D – Liquidation Analysis

EXHIBIT E – Financial Projections

---

THE DEBTORS HEREBY ADOPT AND INCORPORATE EACH EXHIBIT
ATTACHED TO THIS DISCLOSURE STATEMENT BY REFERENCE
AS THOUGH FULLY SET FORTH HEREIN.

---

# ARTICLE I.
# EXECUTIVE SUMMARY

## A.    INTRODUCTION

RTI Holding Company, LLC, a Delaware limited liability company, together with its affiliates identified on the title page above, as debtors and debtors in possession (collectively, the "Debtors", and collectively with their non-debtor Affiliates, the "Company"), each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") on October 7, 2020 (the "Petition Date"). The Debtors' Chapter 11 Cases are jointly administered under lead case name RTI Holding Company, LLC and lead case number 20-12456 (JTD).

Before soliciting acceptances of a proposed chapter 11 plan of reorganization, section 1125 of the Bankruptcy Code requires a debtor to prepare a disclosure statement that contains information of a kind, and in sufficient detail, to permit a hypothetical reasonable investor to make an informed judgment regarding acceptance of the plan of reorganization. Accordingly, the Debtors submit this disclosure statement (this "Disclosure Statement"), pursuant to section 1125 of the Bankruptcy Code, to Holders of Claims against and Equity Interests in the Debtors in connection with the solicitation of votes for acceptance of the *Debtors' Chapter 11 Plan* [Docket No. [____], dated November [__], 2020 (including all exhibits thereto and as amended, supplemented, or modified from time to time in accordance with its terms, the "Plan"). A copy of the Plan is attached hereto as **Exhibit A** and incorporated herein by reference. The Plan constitutes a separate chapter 11 plan for each of the Debtors.

On [●], the Bankruptcy Court entered an order [Docket No. [●]] (the "Disclosure Statement Order") (a) approving the Disclosure Statement as containing adequate information, (b) approving, among other things, the dates, procedures, notices and forms applicable to the process of soliciting votes on and providing notice of the Plan and certain vote tabulation procedures, (c) establishing the deadline for filing objections to the Plan, and (d) scheduling the Confirmation Hearing.

A hearing to consider confirmation of the Plan is scheduled to be held before the Honorable John T. Dorsey at [●] prevailing Eastern Time on [●] at the Bankruptcy Court, 824 Market Street, 5th Floor, Courtroom #5, Wilmington, Delaware 19801.

Additional information with respect to confirmation of the Plan is provided in Article IV of this Disclosure Statement. This Disclosure Statement includes information about, without limitation, (i) the Debtors' business, prepetition operations, financial history, and events leading up to these Chapter 11 Cases, (ii) the significant events that occurred thus far in these Chapter 11 Cases, (iii) the anticipated recoveries of Creditors under the Plan, (iv) the procedures by which the Debtors intend to solicit and tabulate votes on the Plan, (v) the Plan confirmation process, (vi) certain risk factors to be considered before voting on the Plan, and (vi) discussions relating to certain securities registration and tax consequences of the Plan. The descriptions and summaries of certain provisions of, and financial transactions contemplated by, the Plan being proposed by the Debtors relate to the Plan filed with the Bankruptcy Court.

## B.    RULES OF INTERPRETATION

The following rules for interpretation and construction shall apply to this Disclosure Statement:  (1) capitalized terms used in the Disclosure Statement and not otherwise defined

shall have the meaning ascribed to such terms in the Plan; (2) unless otherwise specified, any reference in this Disclosure Statement to a contract, instrument, release, indenture, or other agreement or document shall be a reference to such document in the particular form or substantially on such terms and conditions described; (3) unless otherwise specified, any reference in this Disclosure Statement to an existing document, schedule, or exhibit, whether or not Filed, shall mean such document, schedule, or exhibit, as it may have been or may be amended, modified, or supplemented; (4) any reference to an entity as a Holder of a Claim or Equity Interest includes that Entity's successors and assigns; (5) unless otherwise specified, all references in this Disclosure Statement to Sections are references to Sections of this Disclosure Statement; (6) unless otherwise specified, all references in this Disclosure Statement to exhibits are references to exhibits in this Disclosure Statement; (7) unless otherwise set forth in this Disclosure Statement, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; and (8) any term used in capitalized form in this Disclosure Statement that is not otherwise defined in this Disclosure Statement or the Plan but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to such term in the Bankruptcy Code or the Bankruptcy Rules, as applicable.

## C.    PLAN SUPPORT FROM CONSENTING LENDERS AND SHAREHOLDERS

Prior to the Petition Date, the Debtors engaged in extensive, good-faith negotiations with their Prepetition Secured Creditors to develop a comprehensive financing, restructuring, and recapitalization plan to be implemented through these Chapter 11 Cases. That agreement was memorialized in the Restructuring Support Agreement, attached hereto as **Exhibit B**, executed by the Debtors and the Prepetition Secured Creditors. The Debtors and the Prepetition Secured Creditors determined that it was the best option for the Debtors to file for chapter 11 with an agreement on a Plan that provides the possibility of recoveries to all of the Debtors' stakeholders and allows the Debtors to undertake the necessary financial and operational restructurings.

The Plan reflects the agreement reached with the Prepetition Secured Creditors to reorganize the Debtors as a going-concern business, back-stopped by a parallel sale process. The Debtors and the Prepetition Secured Creditors believe that the financial restructurings, the operational restructuring (through, among other things, focused lease rejections) and the other transactions reflected in the Plan will position the Reorganized Debtors well to succeed post emergence from bankruptcy. With a sustainable business plan and adequate operating liquidity, the Reorganized Debtors will be positioned to compete more effectively in the evolving restaurant industry.

**THE DEBTORS AND PREPETITION SECURED CREDITORS SUPPORT THE PLAN AND BELIEVE THAT THE COMPROMISES CONTEMPLATED UNDER THE PLAN ARE FAIR AND EQUITABLE, MAXIMIZE THE VALUE OF THE DEBTORS' ESTATES, AND MAXIMIZE RECOVERY FOR ALL STAKEHOLDERS. FOR THESE REASONS AND OTHERS DESCRIBED HEREIN, THE DEBTORS STRONGLY RECOMMEND THAT YOU VOTE TO ACCEPT THE PLAN.**

## D.    PURPOSE AND EFFECT OF THE PLAN

### 1.    Plan of Reorganization Under Chapter 11 of the Bankruptcy Code

The Plan reflects the agreement reached among the Debtors and Prepetition Secured Creditors to follow a dual path whereby the Debtors will either reorganize via a consensual transaction that would provide for the Debtors to emerge from these chapter 11 proceedings under new ownership by the Prepetition Secured Creditors or sell their assets as a going concern. The Debtors and the Prepetition Secured Creditors believe that the financial

2

restructuring, the operational restructuring (through, among other things, focused lease rejections) and the other transactions reflected in the Plan would position the Reorganized Debtors well to succeed post-emergence from bankruptcy. With a sustainable business plan and adequate operating liquidity, the Reorganized Debtors will be positioned to compete more effectively in the challenging casual dining industry. Pursuant to the Plan, the operations of the Debtors will be bifurcated. Specifically, all of RTI's operating assets other than RT Lodge and interests in its subsidiaries shall be transferred to RT Asset Company, which shall be wholly-owned after the Effective Date by TCW, subject to dilution. Also, pursuant to the Plan, the Debtors will transfer to each Holder of an Allowed Subclass 3A Claim its Pro Rata share of one hundred percent (100%) of the Equity Interests in RT Lodge Company, which shall retain the RT Lodge.

For purposes of illustration, the current organizational structure of the Debtors and the post-Effective Date organizational structure of the Reorganized Debtors after consummation of the transactions contemplated under the Plan are as follows:

### **CURRENT STRUCTURE**



## POST-EFFECTIVE DATE STRUCTURE

[Operating Assets Other than RT Lodge]

Holders of Allowed Subclass 3B Claims

RT ASSET COMPANY
(Ruby Tuesday, LLC,
or other Reorganized Debtor with
the consent of GS)

48 Subsidiaries

The Debtors, through their investment banker, FocalPoint Securities, LLC ("FocalPoint"), will concurrently run a sales process through which, if an acceptable "Topping Bid" is received, the Debtors will sell the Assets pursuant to Court-approved bidding procedures. If a Topping Bid is received and a Successful Bid is selected after the Auction for the Assets, then the Confirmation Hearing shall be the sale hearing and the Confirmation Order shall be the order approving such sales under sections 363 and/or 1123(a)(5)(D) of the Bankruptcy Code. The Successful Bid at the Auction must provide for cash consideration at closing that is sufficient to pay all of the Prepetition Secured Debt Claims and DIP Facility Claims (other than any such Claims that have been credit bid in connection with a Successful Bid) in cash in full on the closing date. Upon payment of the DIP Facility Claims and Prepetition Secured Debt Claims (other than any such Claims that have been credit bid in connection with a Successful Bid) in full, the Restructuring described above and herein shall not occur, and the Reorganized Debtors (including, without limitation, RT Asset Company in its capacity as Distribution Agent under this Plan), will administer the Reorganized Debtors' assets and implement the Plan as a liquidating "pot" plan for the benefit of creditors.

A bankruptcy court's confirmation of a plan binds the debtor, any entity acquiring property under the plan, any holder of a claim or an equity interest in a debtor and all other entities as may be ordered by the bankruptcy court in accordance with the applicable

provisions of the Bankruptcy Code to the terms and conditions of the confirmed plan, whether or not such Entity voted on the plan or affirmatively voted to reject the plan.

### 2.    Financial Restructurings in Connection with the Plan

As of the Petition Date, the Debtors had outstanding funded debt obligations in the aggregate principal amount of approximately $37.91 million, and related interest and accruals.  Additionally, as of the Petition Date, the Debtors had an estimated $18.8 million of outstanding accounts payable, on an unsecured basis, to vendors, customers, service providers, and landlords.

The Debtors' pro forma exit capital structure will consist of (a) the Exit L/C Facility (equal to up to $10,000,000 or such lesser amount agreed by the Reorganized Debtors), (b) the Exit Term Loan (equal to the lesser of (i) $30,000,000 less 90% of the Net Sale Proceeds, if any, in excess of $2,500,000 (excluding any proceeds from the sale of RT Lodge) and (ii) 1.2 times the agreed Broker's Opinion of Value of the Debtors' real property) and (c) New Common Shares in RT Asset Company:

5

| Prepetition and Post-Emergence Capital Structure | | |
|---|---|---|
| **($ millions)**<br>**Prepetition Funded Debt** | **Prepetition**[2] | **Post-Emergence**[2] |
| Prepetition Revolver | $11.55[3] | |
| Prepetition Term Loans | $26.36 | |
| | | |
| **Post-Emergence Funded Debt** | | |
| Exit L/C Facility | | $9.63 |
| Exit Term Loan Facility | | $30.00 |
| | | |
| **Total Funded Debt** | **$37.91** | **$39.63** |

### 3.    Plan Overview

Under the Plan, certain Claims are not classified and are entitled under the Bankruptcy Code (and the Plan) to a full recovery (*i.e.*, Administrative Expense Claims, including DIP Facility Claims and Professional Fee Claims, and Priority Tax Claims).  For all other Claims against, and all Equity Interests in, the Debtors, the Plan designates Classes of Claims and Classes of Equity Interests and provides treatments that take into account the differing nature and priority under the Bankruptcy Code of the various classified Claims and Equity Interests.  In accordance with section 1122 of the Bankruptcy Code, the Plan provides for nine (9) Classes of Claims against and/or Equity Interests in the Debtors.

The following chart briefly summarizes the classification and treatment of classified Claims and Equity Interests under the Plan.[4]  Amounts listed below are estimated.

**THE PROJECTED RECOVERIES SET FORTH IN THE TABLE BELOW ARE ESTIMATES ONLY AND THEREFORE ARE SUBJECT TO CHANGE.  FOR A COMPLETE DESCRIPTION OF THE DEBTORS' CLASSIFICATION AND TREATMENT OF CLAIMS OR EQUITY INTERESTS, REFERENCE SHOULD BE MADE TO THE ENTIRE PLAN AND THE RISK FACTORS DESCRIBED IN ARTICLE VI BELOW.  THE TABLE IS INTENDED FOR ILLUSTRATIVE PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR A REVIEW OF THE PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY.  FOR CERTAIN CLASSES OF CLAIMS, THE ACTUAL AMOUNT OF ALLOWED CLAIMS COULD BE MATERIALLY DIFFERENT THAN THE ESTIMATED AMOUNTS SHOWN IN THE TABLE BELOW BASED UPON, AMONG OTHER THINGS, THE TOTAL AMOUNT OF ALLOWED CLAIMS IN A PARTICULAR CLASS.**

---

[2] Dollar amounts are in millions and do not include accrued and unpaid interest, fees, expenses and other obligations.

[3] Amount consists of Existing Letters of Credit in the approximate amount of $9.55 million and prepetition revolving loan advance of $2 million.

[4] This chart is only a summary of the classification and treatment of Claims and Equity Interests under the Plan.  References should be made to the entire Disclosure Statement and the Plan for a complete description.

**ESTIMATED RECOVERIES AND OTHER MATTERS**

| Class | Type of Claim or Interest | Estimated Prepetition Claim Amount[5] | Impairment | Entitled to Vote | Estimated Percentage Recovery[6] |
|---|---|---|---|---|---|
| 1 | Non-Tax Priority Claims | $0 - 770,331[7] | No | No | 100% |
| 2 | Miscellaneous Secured Claims | $0.50 million | No | No | 100% |
| 3 | Prepetition Secured Debt Claims[8] | $37.91 million | Yes | Yes | [___] – [__]% |
| 4 | General Unsecured Claims | $112.1 - 117.4 million | Yes | Yes | [___] – [__]% |
| 5 | Preserved Intercompany Claims | N/A | No | No | N/A |
| 6 | Extinguished Intercompany Claims | N/A | Yes | No | N/A |
| 7 | Dissenters Claims | N/A | Yes | No | N/A |
| 8 | Equity Interests in Holding | N/A | Yes | No | N/A |
| 9 | Intercompany Interests | N/A | No | No | 100% |

---

[5] Except as indicated, all Estimated Prepetition Claim Amounts are projected estimates only, estimated as of the Effective Date (after, *inter alia*, reduction for payments or the honoring of Claims pursuant to the First Day Motions or Second Day Motions), and actual amounts may be materially greater or less than those set forth herein.

[6] All percentage recoveries indicated for Impaired Classes are estimates only based upon the proposed treatment of such Claims and Equity Interests in the respective Classes, as more fully set forth below and in the Plan. Actual percentage recoveries for such Classes may be materially greater or less than those set forth herein as a result of, among other things, the total amount of Allowed Claims in a particular Class.

[7] Estimated based on amounts outstanding as of the week ended October 27, 2020. Most or all of the Non-Tax Priority Claims represent wage-related claims or benefits. All or substantially all will be paid or honored in the ordinary course prior to confirmation of the Plan pursuant to the First Day Motions.

[8] The Estimated Prepetition Claim Amount with respect to the Prepetition Secured Debt Claims is estimated as of the Petition Date and does not include accrued and unpaid interest, fees, expenses and other obligations.

7

| Class | Nature of Claim or Interest | Plan Treatment |
|---|---|---|
| 1 | Non-Tax Priority Claims | Each Holder of an Allowed Class 1 Claim shall receive in full satisfaction, settlement, discharge and release of, and in exchange for, its Allowed Class 1 Claim:<br><br>(1)Cash from the RT Priority Claim Reserve equal to the amount of such Allowed Class 1 Claim on the later of, or, in each case, as soon as reasonably practicable thereafter, (x) the Initial Distribution Date if such Class 1 Claim is an Allowed Class 1 Claim on the Effective Date, (y) the date on which such Class 1 Claim becomes an Allowed Class 1 Claim or (z) the date due in the ordinary course of business in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Class 1 Claim; or<br><br>(2)At the election of the Debtors (after consultation with the Prepetition Agent), such other less favorable treatment as to which the Holder of such Allowed Class 1 Claim and the Debtors or the Reorganized Debtors, as applicable, agree in writing. |
| 2 | Miscellaneous Secured Claims | Each Holder of an Allowed Class 2 Claim shall receive in full satisfaction, settlement, discharge and release of, and in exchange for, its Allowed Class 2 Claim:<br><br>(1)Cash equal to the amount of such Allowed Class 2 Claim on the later of, or, in each case, as soon as reasonably practicable thereafter, (i) the Initial Distribution Date if such Class 2 Claim is an Allowed Class 2 Claim on the Effective Date or (ii) the date on which such Class 2 Claim becomes an Allowed Class 2 Claim; or<br><br>(2)At the election of the Debtors (after consultation with the Prepetition Agent) or the Reorganized Debtors, as applicable, either: (x) Reinstatement (with the Holder, as applicable, retaining the Liens securing its Allowed Miscellaneous Secured Claim as of the Effective Date until full and final payment thereof); (y) return of the Collateral securing such Allowed Class 2 Claim by the Initial Distribution Date; or (z) such other less favorable treatment as to which the Holder of such Allowed Class 2 Claim and the Debtors or the Reorganized Debtors, as applicable, shall have agreed upon in writing. |
| 3 | Prepetition Secured Debt Claims | Notwithstanding any provisions of the Plan to the contrary, unless the Holders of the Prepetition Secured Debt Claims (other than with respect to any such Claims that have been credit bid in connection with a Successful Bid) have been paid in full previously from Net Sale Proceeds, the Prepetition Secured Debt Claims shall be deemed Allowed Claims in the aggregate principal amount of $37,912,018.87 as of the Petition Date, plus accrued and unpaid interest, fees, expenses and other obligations arising under the Prepetition Credit and Guaranty Agreement but not including any draws or any repayment of obligations related to letters of credit issued pursuant to the Prepetition Credit and Guaranty Agreement or postpetition interest accrued under such agreement.<br><br>On the Effective Date, (1) unless the Holders of the DIP Facility Claims and Prepetition Secured Debt Claims (other than with respect to any such Claims that have been credit bid in connection with a Successful Bid) have been paid in full previously from Net Sale Proceeds, each Holder of an Allowed Subclass 3A Claim shall receive, in full satisfaction, settlement, discharge and release of, and in exchange for such claim, its Pro Rata share of (i) the GS Cash Payment, (ii) any GS Adjustment Equity, and (iii) one hundred percent (100%) of the equity in RT Lodge Company; and (2) unless it has been paid in full previously from Net Sale Proceeds, each Holder of an Allowed Subclass 3B Claim shall receive, in full satisfaction, settlement, discharge and release of, and in exchange for such claim, its Pro Rata share of (i) the TCW Cash Payment and (ii) one hundred percent (100%) of the equity in RT Asset Company less any GS Adjustment Equity, subject to dilution on account of the Warrants and MIP, with all such entities, distributions and transfers subject to ARTICLE V.P of the Plan and the definition of Restructuring in ARTICLE I.C of the Plan.  If a Successful Bid is selected after the Auction, notwithstanding anything to the contrary herein |

DOCS_LA:332991.15 76136/002

| Class | Nature of Claim or Interest | Plan Treatment |
|---|---|---|
| | | (including, but not limited to, the description of the DIP Facility as priming), the proceeds of all Asset Sales by the Debtors made prior to the Effective Date shall first be applied to the repayment of the Prepetition Secured Debt Claims (other than any such Claims that have been credit bid in connection with a Successful Bid) on the Effective Date, and following their repayment in full, repayment of the DIP Facility Claims (other than any such Claims that have been credit bid in connection with a Successful Bid) as set forth in ARTICLE II.C of the Plan on the Effective Date. For avoidance of doubt, Class 3 shall be a Vacant Class if the Prepetition Secured Debt Claims (other than any such Claims that have been credit bid in connection with a Successful Bid) have been paid in full from Net Sale Proceeds before the Effective Date, and the subsections a – e of ARTICLE III.C.3 of the Plan (other than the immediately preceding sentence and this sentence) shall no longer be operative. If Class 3 shall be come a Vacant Class, then in addition all of the provisions of the Plan related to ARTICLE III.C.3.c of the Plan shall not be operative, including (without limitation) provisions that implement or reference exit financing or the assumption of executory contracts and unexpired leases of the Debtors, unless such contracts and/or leases are listed on a schedule to the Plan Supplement. |
| 4 | General Unsecured Claims | Subject to ARTICLE VII.B.3 of the Plan, each Holder of an Allowed General Unsecured Claim, in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed General Unsecured Claims shall receive its Pro Rata share of [___] (the "Class 4 Aggregate Cash Distribution"). |
| 5 | Preserved Intercompany Claims | On the Effective Date, the Preserved Intercompany Claims shall be Reinstated, as set forth in ARTICLE V.P of the Plan. |
| 6 | Extinguished Intercompany Claims | On the Effective Date, the Extinguished Intercompany Claims shall be extinguished. |
| 7 | Dissenters Claims | On the Effective Date, pursuant to section 510(b) of the Bankruptcy Code, the Dissenters Claims shall be subordinated to the same priority as Equity Interests in RTI and shall be extinguished. |
| 8 | Equity Interests in Holding | On the Effective Date, the Equity Interests in Holding shall be extinguished. |
| 9 | Intercompany Interests | Each Allowed Intercompany Interest in each of the Reorganized Subsidiaries shall be Reinstated for purposes of the Subsidiary Structure Maintenance, as set forth in ARTICLE V.P of the Plan. |

## E.    VOTING PROCEDURES AND SOLICITATION MATERIALS

### 1.    Who May Vote on the Plan

Each Holder of an Allowed Claim as of the applicable voting record date in Classes 3 and 4 are Impaired and entitled to vote either to accept or to reject the Plan. Only those votes cast by Holders of Allowed Claims or Equity Interests in Classes 3 and 4 shall be counted in determining whether acceptances have been received sufficient in number and amount to confirm the Plan. An Impaired Class of Claims shall have accepted the Plan if: (a) the Holders (other than any Holder designated under section 1126(e) of the Bankruptcy Code) of at least two-thirds in amount of the Allowed Claims actually voting in such Class have voted to accept the Plan, and (b) the Holders (other than any Holder designated under section 1126(e) of the Bankruptcy Code) of more than one-half in number of the Allowed Claims actually voting in such Class have voted to accept the Plan.

Classes 1, 2, 5, and 9 are Unimpaired under the Plan, are each deemed to accept the Plan by operation of law, and are not entitled to vote on the Plan.

9

Classes 6, 7 and 8 are Impaired under the Plan and are deemed to reject the Plan by operation of law, and is not entitled to vote on the Plan.

Without limiting the foregoing, in the event that any Class of Claims entitled to vote on the Plan fails to accept the Plan as required by section 1129(a) of the Bankruptcy Code, the Plan may be amended or modified in accordance with the terms therein and, in any event, the Debtors, subject to any consent that may be required in the Plan or under the Restructuring Support Agreement, reserve the right to seek confirmation of the Plan over such rejection pursuant to section 1129(b) of the Bankruptcy Code.

### 2.    Voting Record Date

The Bankruptcy Court has approved the close of business on [•], as the voting record date (the "Voting Record Date").  The Voting Record Date is the date for determining (1) which Holders of Claims are entitled to vote to accept or reject the Plan and receive the Solicitation Package and (2) whether Claims have been properly assigned or transferred to an assignee pursuant to Bankruptcy Rule 3001(e) such that the assignee can vote as the Holder of a Claim.  The Voting Record Date shall apply to all of the Debtors' creditors and other parties in interest.

### 3.    Voting Agent

The Debtors have retained Epiq Corporate Restructuring, LLC (the "**Voting Agent**") to, among other things, act as claims and solicitation agent in connection with the solicitation of votes to accept or reject the Plan.  Inquiries relating to the solicitation process, voting instructions, related procedures and copies of the solicitation materials may be directed to the Voting Agent at no charge by: (a) accessing the Debtors' restructuring website at [https://epiq11.com/case/rubytuesday/info]; (b) calling the Voting Agent at [_____] (toll free); or (c) emailing [_____].  The Voting Agent, however, is not authorized to provide, and will not provide, legal or financial advice.

### 4.    Solicitation Package, Ballots and Notices

Voting Classes.  The following materials constitute the solicitation package with respect to the Plan enclosed herewith (the "Solicitation Package"):

- a solicitation cover letter from the Company addressed to the voting creditor;

- the appropriate form of Ballot and instructions for completing the Ballot;

- the voting instructions and solicitation procedures approved by the Bankruptcy Court (the "Voting Procedures");

- this Disclosure Statement with all exhibits;

- the Plan (as an exhibit hereto);

- a notice of the Confirmation Hearing approved by the Bankruptcy Court for transmission to Holders of Claims and other parties in interest (the "Confirmation Hearing Notice");

- a copy of the Disclosure Statement Order; and

- such other materials as the Bankruptcy Court may direct.

10

Only Holders of Prepetition Secured Claims (Class 3) and General Unsecured Claims (Class 4) are entitled to vote to accept or reject the Plan.

Notices of Non-Voting Status.  As set forth above, certain Holders of Claims and Equity Interests are not entitled to vote on the Plan.  As a result, such parties will not receive Solicitation Packages but, instead, will receive the Confirmation Hearing Notice that explains, among other things, (i) that Classes 1, 2, 5 and 9 are Unimpaired under the Plan, and therefore, are presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, (ii) that Classes 6, 7 and 8 are Impaired under the Plan and are presumed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code, (iii) instructions for such Holders of Claims and Equity Interests on how they may obtain a copy of the Plan and this Disclosure Statement, (iv) the deadline by which to object to confirmation of the Plan, and (v) the Confirmation Hearing date and time.

Contract and Lease Counterparties.  Parties to certain of the Debtors' Executory Contracts and Unexpired Leases may not have Claims pending the disposition of their Executory Contracts and Unexpired Leases by assumption or rejection under the Plan.  Such parties nevertheless will receive the Confirmation Hearing Notice.

### 5.    Voting Procedures

To be counted as a vote to accept or reject the Plan, such Holder's properly completed and executed Ballot must be received by the Voting Agent by **4:00 p.m. (prevailing Eastern Time) on [•] (the "Voting Deadline")** and in accordance with the voting instructions attached to each Ballot.  The Voting Agent will process and tabulate received Ballots and will File a voting report (the "**Voting Report**") as soon as practicable on or after the Voting Deadline but prior to the Confirmation Hearing. The Voting Report will include (a) a list of all Ballots received but not counted and the reason for not counting such Ballots and (b) a list of all non-compliant, deficient Ballots for which the Debtors have waived such non-compliance or deficiency.  Parties may contact the Voting Agent with any questions related to the Voting Procedures applicable to their Claims.

**THE INFORMATION CONTAINED IN THIS ARTICLE I.E.5 IS INTENDED FOR SUMMARY PURPOSES ONLY.  HOLDERS OF CLAIMS IN THE VOTING CLASSES SHOULD REVIEW CAREFULLY IN FULL AND FOLLOW THE SPECIFIC INSTRUCTIONS PROVIDED ON SUCH HOLDER'S BALLOT AND THE ACCOMPANYING VOTING PROCEDURES.**

**ANY BALLOT THAT IS PROPERLY EXECUTED BY THE HOLDER OF A CLAIM BUT FAILS TO CLEARLY INDICATE AN ACCEPTANCE OR REJECTION, OR THAT INDICATES BOTH AN ACCEPTANCE AND A REJECTION OF THE PLAN, SHALL NOT BE COUNTED.**

**ANY BALLOT RECEIVED AFTER THE VOTING DEADLINE SHALL NOT BE COUNTED UNLESS THE COMPANY IN ITS DISCRETION DECIDES OTHERWISE.**

**EACH HOLDER OF A CLAIM MUST VOTE ALL OF ITS CLAIMS WITHIN A PARTICULAR CLASS EITHER TO ACCEPT OR REJECT THE PLAN AND MAY NOT SPLIT SUCH VOTES.  BY SIGNING AND RETURNING A BALLOT, EACH HOLDER OF A CLAIM WILL CERTIFY TO THE BANKRUPTCY COURT AND THE DEBTORS THAT NO OTHER BALLOTS WITH RESPECT TO SUCH CLAIM HAVE BEEN CAST OR, IF ANY OTHER BALLOTS HAVE BEEN CAST WITH RESPECT TO SUCH CLASS OF CLAIMS, SUCH OTHER BALLOTS INDICATED THE SAME VOTE TO ACCEPT OR**

REJECT THE PLAN.

> PRIOR TO DECIDING WHETHER AND HOW TO VOTE ON THE PLAN, EACH HOLDER OF A CLAIM OR AN EQUITY INTEREST IN A VOTING CLASS IS URGED TO CONSIDER CAREFULLY ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT, INCLUDING THE RISK FACTORS DESCRIBED IN ARTICLE VI HEREIN TITLED, "RISK FACTORS."

### 6. Exemption from Securities Act Registration Requirements

The Company intends to rely on section 1145 of the Bankruptcy Code to exempt from registration under the Securities Act and Blue Sky Laws the offer and issuance of Common Shares and New Warrants under the Plan, including New Common Shares issuable after the Effective Date upon the exercise of the New Warrants.

The Company intends to rely on section 4(a)(2) of the Securities Act and Rule 506 of Regulation D and/or Rule 701 under the Securities Act to exempt from registration under the Securities Act and Blue Sky Laws the offer and the issuance of New Common Shares, New Warrants and other Equity Securities to officers and other key employees of the Company pursuant to the Management Incentive Plan.

### 7. Filing of the Plan Supplement

The Debtors will file the Plan Supplement no later than five (5) Business Days before the Confirmation Hearing. Parties may request (and obtain at the Debtors' expense) a copy of the Plan Supplement by: (i) accessing the Debtors' restructuring website at [ https://epiq11.com/case/rubytuesday/info ]; (ii) calling the Voting Agent at [_____] (toll free); or (iii) emailing [_____] .

## F. CONFIRMATION OF THE PLAN

### 1. Confirmation Hearing

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing to consider confirmation of a chapter 11 plan. Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to such confirmation.

**The Bankruptcy Court has scheduled a Confirmation Hearing to be held on [•], at [•] (prevailing Eastern time)**. The Confirmation Hearing may be continued from time to time by the Bankruptcy Court or the Debtors without further notice other than by such adjournment being announced in open court or by a notice of adjournment filed with the Bankruptcy Court and served on such parties as the Bankruptcy Court may order. Moreover, the Plan or any Exhibit, Plan Schedule or Plan Document may be amended or modified, if necessary, in accordance with the terms therein, pursuant to section 1127 of the Bankruptcy Code, prior to, during or as a result of the Confirmation Hearing, without further notice to parties in interest, in all cases, however, subject to any consent that may be required in the Plan or the Restructuring Support Agreement.

### 2. Deadline for Objecting to Confirmation of the Plan

**The Bankruptcy Court has scheduled the Confirmation Objection Deadline for [•], at [•] (prevailing Eastern time)**. Any objection to confirmation of the Plan must: (i) be in writing; (ii) conform to the Bankruptcy Rules and the Local Rules; (iii) state the name of

12

the applicable Debtor, the name of the objecting party and the amount and nature of the Claim of such Entity in each applicable Chapter 11 Case or the amount of Equity Interests held by such Entity in each applicable Chapter 11 Case; (iv) state with particularity the legal and factual bases and nature of any objection to the Plan and, if practicable, a proposed modification to the Plan that would resolve such objection; and (v) be filed, contemporaneously with a proof of service, with the Bankruptcy Court and served so that it is **actually received** by no later than the Confirmation Objection Deadline by the Notice Parties.

CONFIRMATION OBJECTIONS NOT TIMELY FILED AND SERVED IN THE MANNER SET FORTH HEREIN MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT AND MAY BE OVERRULED WITHOUT FURTHER NOTICE. INSTRUCTIONS WITH RESPECT TO THE CONFIRMATION HEARING AND DEADLINES WITH RESPECT TO CONFIRMATION WILL BE INCLUDED IN THE NOTICE OF CONFIRMATION HEARING TO BE APPROVED BY THE BANKRUPTCY COURT.

### 3.    Notice Parties

All notices, requests, objections, or demands shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows (collectively, the "Notice Parties"):

(a)    The Debtors, Ruby Tuesday, Inc., 333 E. Broadway Ave., Maryville, Tennessee 37804 (Attn:  Shawn Lederman);

(b)    Counsel to the Debtors, Pachulski Stang Ziehl & Jones LLP, 919 North Market Street, 17th Floor, Wilmington, DE 19899-8705 (Courier 19801) (Attn:  Richard M. Pachulski (rpachulski@pszjlaw.com); Malhar S. Pagay (mpagay@pszjlaw.com); James E. O'Neill, Esq. (joneill@pszjlaw.com));

(c)    Counsel to Goldman Sachs Specialty Lending Group, L.P., Cleary Gottlieb Steen & Hamilton LLP, One Liberty Plaza, New York, New York 10006 (Attn: Sean O'Neal (soneal@cgsh.com) and Jane VanLare (jvanlare@cgsh.com)), and Hunton Andrews Kurth LLP, Bank of America Plaza, Suite 4100, 600 Peachtree Street, N.E., Atlanta, Georgia 30308-2216 (Attn: Greta T. Griffith (ggriffith@HuntonAK.com));

(d)    Counsel to TCW Direct Lending LLC, TCW Skyline Lending, L.P. and TCW Brazos Fund LLC, Paul Hastings LLP, 515 South Flower Street Twenty-Fifth Floor, Los Angeles, CA 90071 (Attn: Justin Rawlins (justinrawlins@paulhastings.com) and Aaron Gober-Sims (aarongobersims@paulhastings.com)); and

(e)    The Office of the United States Trustee for the District of Delaware, 844 King St., Suite 2207, Wilmington, DE 19801 (Attn: Linda Richenderfer).

### 4.    Effect of Confirmation of the Plan

"Confirmation" is the technical term for the Bankruptcy Court's approval of a plan of reorganization.  The timing, standards and factors considered by the Bankruptcy Court in deciding whether to confirm a plan of reorganization are discussed below.

13

It is a condition to confirmation of the Plan that the Bankruptcy Court shall have entered the Confirmation Order in form and substance reasonably acceptable to the Debtors and the Requisite Lenders (as defined in the Restructuring Support Agreement (as defined below)).  Confirmation of a plan of reorganization by the Bankruptcy Court binds the debtor, any issuer of securities under a plan of reorganization, any person acquiring property under a plan of reorganization, any creditor or equity interest holder of a debtor, and any other person or entity as may be ordered by the Bankruptcy Court in accordance with the applicable provisions of the Bankruptcy Code.  Subject to certain limited exceptions, the order issued by the Bankruptcy Court confirming a plan of reorganization discharges a debtor from any debt that arose before the confirmation of such plan of reorganization and provides for the treatment of such debt in accordance with the terms of the confirmed plan of reorganization.

As more fully set forth in the Plan, and except as expressly provided otherwise therein or in the Confirmation Order, the treatment of Claims and Equity Interests under the Plan shall be in complete satisfaction, settlement, discharge and release of all Claims and Equity Interests or other rights of a Holder of a Claim or Equity Interest relating to any of the Debtors or the Reorganized Debtors or their respective Assets.  The Plan also contains certain other provisions relating to (a) the compromise and settlement of Claims and Equity Interests, (b) the mutual release by the Debtors and the Released Parties, (c) the release by Holders of Claims or Equity Interests, and each of their respective Related Persons, and (d) the exculpation of certain parties.

## G.    CONSUMMATION OF THE PLAN

Following confirmation of the Plan, Consummation of the Plan shall occur on the Business Day as determined by the Debtors after they reasonably determine that certain conditions have been met or waived pursuant to Article IX of the Plan, which date shall be specified in a notice filed by the Reorganized Debtors with the Bankruptcy Court (the "Effective Date").

ON THE EFFECTIVE DATE, AND EFFECTIVE AS OF THE EFFECTIVE DATE, THE PLAN WILL BIND, AND WILL BE DEEMED BINDING UPON, ALL HOLDERS OF CLAIMS AGAINST AND EQUITY INTERESTS IN THE DEBTORS AND SUCH HOLDER'S RESPECTIVE SUCCESSORS AND ASSIGNS, TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, NOTWITHSTANDING WHETHER OR NOT SUCH HOLDER (A) WILL RECEIVE OR RETAIN ANY PROPERTY OR INTEREST IN PROPERTY UNDER THE PLAN, (B) HAS FILED A PROOF OF CLAIM OR EQUITY INTEREST IN THE CHAPTER 11 CASES OR (C) FAILED TO VOTE TO ACCEPT OR REJECT THE PLAN OR AFFIRMATIVELY VOTED TO REJECT THE PLAN.

## H.    RISK FACTORS

**PRIOR TO DECIDING WHETHER AND HOW TO VOTE ON THE PLAN, EACH HOLDER OF A CLAIM OR AN EQUITY INTEREST IN A VOTING CLASS HAS BEEN URGED TO CONSIDER CAREFULLY ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT, INCLUDING THE RISK FACTORS DESCRIBED IN ARTICLE VI HEREIN TITLED, "RISK FACTORS."**

14

# ARTICLE II.

## GENERAL BACKGROUND TO THE CHAPTER 11 CASES

### A.    THE DEBTORS' ORGANIZATIONAL STRUCTURE

For the period 1996 to 2017, RTI was a publicly traded company on the New York Stock Exchange ("NYSE").  On October 16, 2017, RTI entered into a merger agreement with affiliates of NRD Partners II, L.P. ("NRD Partners II"), RTI Holding Company, LLC ("Holding") and its wholly-owned subsidiary, RTI Merger Sub, LLC ("Merger Subsidiary"). Pursuant to the terms of the merger agreement, Merger Subsidiary was merged with and into RTI with RTI surviving the merger as a wholly-owned subsidiary of Holding (the "Merger").  As a result of the Merger, RTI's stock ceased to be traded on the NYSE on December 21, 2017.

Holding is a Debtor.  Its equity is held by the following affiliates of NRD Partners II: RTI Investment Company, LLC, Strategic Financial Intermediation II, LLC ("SFI"), and NRD RT Holdings, LLC.  All Debtors, other than Holding, are direct or indirect wholly-owned subsidiaries of RTI, which is, in turn, a wholly-owned subsidiary of Holding.  A corporate organizational chart is attached hereto as **Exhibit C**.

The principal functions of the Debtors are operated in a centralized manner through RTI.  Of the 51 Debtors: (a) 13 were formed to hold liquor licenses in Arkansas or Maryland due to applicable liquor regulations, which required distinct ownership and/or organizational structures for such entities; (b) 32 were formed in connection with the Company's re-purchase of previously franchised restaurants (in some cases, former franchisees retained a 1% or 50% interest in such restaurants for some period of time after the restaurant was reacquired, which 1% or 50% interest was later repurchased by one of the Debtors, as a result of which the ownership of these restaurant entities in some cases still reflects a 50/50% or 99/1% split of ownership); and (c) the remaining 6 entities were formed for specific administrative purposes:  RTBD LLC (fka RTBD Inc.) ("RTBD") was formed to hold the intellectual property assets of the enterprise; RT Finance LLC was formed to enter into an intercompany note with the remaining Debtors for tax planning purposes – although the tax planning strategy is no longer in active use, the intercompany note remains in place; RT FL Gift Cards, Inc., was formed in Florida to operate the brand's gift card program; and Ruby Tuesday, LLC, RT Distributing, LLC and RT Restaurant Services, LLC were formed to provide various support and procurement services, though none of these entities has actively been used for such purposes in recent years.

### B.    OVERVIEW OF THE DEBTORS' BUSINESS

The Debtors develop, operate, and franchise casual dining restaurants in the United States, Guam, and five foreign countries under the Ruby Tuesday® brand.  The Company-owned and operated restaurants (i.e., non-franchise) are concentrated primarily in the Southeast, Northeast, Mid-Atlantic and Midwest regions of the United States.

The first Ruby Tuesday restaurant was opened in 1972 in Knoxville, Tennessee, near the campus of the University of Tennessee.  The chain quickly became known as a "go to" location for casual dining fare.  The Ruby Tuesday concept -- which at the time consisted of 16 restaurants -- was acquired by Morrison Restaurants Inc. ("Morrison") in 1982. During the following years, Morrison grew the concept to over 300 restaurants. In conjunction with a spin-off transaction that occurred in 1996, Morrison was reincorporated in the State of Georgia and changed its name to Ruby Tuesday, Inc.

15

The Company began its franchise program in 1997 with the opening of one domestic and two international franchised Ruby Tuesday restaurants. As of the Petition Date, the Debtors have franchise arrangements with ten franchise groups which operate Ruby Tuesday restaurants in eight states, Guam, and five foreign countries.

## 1.    The Debtors' Business Operations

As of the Petition Date, there were over 250 Ruby Tuesday restaurants worldwide offering a wide variety of menu options, including burgers, signature baby-back ribs, steaks, seafood, chicken, and appetizers, and an extensive Garden Bar.  Ruby Tuesday restaurants primarily serve customers through a full-service format and feature a separate bar offering cocktails, beer and wine.  They also offer the RubyTueGo® curbside service, delivery via third party companies, and a catering program for businesses, organizations, and group events at both Company-owned and franchised restaurants.

The Debtors currently are managing operations from their corporate headquarters in Maryville, Tennessee.

## 2.    Franchising

Domestic Ruby Tuesday concept franchisees are generally required to pay a royalty fee of 4% and a marketing and purchasing fee of 1.5% of monthly gross sales. Additionally, under the terms of the franchise agreements, domestic Ruby Tuesday concept franchisees pay a national advertising fee of up to 1.5% of monthly gross sales to cover their pro rata portion of the costs associated with the Company's national advertising campaigns.

The Debtors provide ongoing training and assistance to franchisees in connection with the operation and management of each restaurant through a training facility, meetings, computer-based training, and by written or other material.

## 3.    Suppliers

The Debtors negotiate directly with suppliers for the purchase of raw and processed materials and maintain contracts with select suppliers for both Company-owned and franchised restaurants.  These contracts may include provisions for the distribution of products via a cost-plus delivery fee basis under a term-based contract with a renewal option.

The Debtors use purchase commitment contracts to stabilize the potentially volatile prices of certain food commodities. Because of the relatively short storage life of inventories, limited storage facilities at the restaurants, the requirement for fresh products and the numerous sources of goods, a minimum amount of inventory is maintained at the restaurants.

## 4.    Personnel

As of the Petition Date, the Debtors employed approximately 7,300 employees. The Debtors' employees are not covered by a collective bargaining agreement.  As a result of mandated closures caused by the COVID-19 pandemic, the Debtors were forced to furlough approximately 7,000 employees.  Furloughed employees are not paid but remain covered by the Company's applicable health benefits programs if they continue to submit their weekly contribution amount.  The Company hopes to invite many of these employees to return to active status, to the extent they have not already, as sales levels return.

The Debtors' officers are the following: Aziz Hashim (President); Shawn Lederman (Chief Executive Officer); Ellen Clarry (Chief Supply Chain Officer); Jenifer Harmon (Chief Marketing Officer); Stephanie Burke Medley (Chief Strategy Officer); Darrin White (Chief Operating Officer); Michael Dorsey (Senior Controller).

5.    **Owned Real Property and Sale-Leaseback Transactions**

Historically, the Company acquired and owned fee title to several of its restaurant locations and undeveloped parcels of land. Concurrent with the consummation of the Merger, on December 21, 2017, RTI entered into a Real Estate Sale Contract (the "Sale Agreement") with SFI, an affiliate of NRD Partners II. Under the terms of the Sale Agreement, SFI purchased 178 real properties from RTI for approximately $242.2 million. SFI simultaneously sold the same properties to five strategic buyers (collectively, the "Sale/Leaseback Purchasers"), and such Sale/Leaseback Purchasers concurrently, as landlords for each respective pool of properties acquired by such Sale/Leaseback Purchasers, leased all of the real properties back to RTI, as tenant. In connection with SFI's sale to the Sale/Leaseback Purchasers, the Debtors received net sales proceeds of approximately $240.8 million. During the year ended June 4, 2019, the Debtors completed sale-leaseback transactions of the land and building for four Debtor-owned restaurants to unrelated third parties for net proceeds of $6 million. During the year ended June 4, 2020, the Debtors completed seven additional sale-leaseback transactions in exchange for net proceeds of $11.4 million. The Debtors continue to own fee title to various parcels of developed and undeveloped real estate in the states of Alabama, Connecticut, Florida, Indiana, Kentucky, Maryland, Michigan, Missouri, New Jersey, North Carolina, Ohio, Pennsylvania, Tennessee, Texas, and Virginia.

6.    **RT Lodge**

In 1997, RTI acquired a leasehold interest in a restaurant and special event destination named Morningside Inn and surrounding 7.25 acre property (the "RT Lodge"), at Maryville College in Maryville, Tennessee. RTI developed the hotel property, restoring the grounds and residence and adding two additional buildings for guest accommodations, and renamed it "RT Lodge." The Company has a ground lease on the property which expires on December 31, 2070. As of the Petition Date, the Debtors operate RT Lodge for corporate retreats and special events, and, in recent years, opened the hotel and dining room to the public.

7.    **Related Party Note/Bond Receivable**

In connection with the Sale Agreement described above, RTI entered into a promissory note with SFI (the "SFI Note") under which SFI agreed to pay RTI $239.8 million (the "SFI Note Receivable"). The SFI Note Receivable matures on December 31, 2037, and accrues interest at an annual rate of 4.50%. Under the terms of the SFI Note, there are no principal payments contractually due prior to the maturity date and any payments made prior to the maturity date are made solely at the discretion of SFI. Contemporaneous with the execution of the SFI Note, Holding entered into an unsecured floating rate bond payable to SFI under which Holding agreed to pay SFI $230.8 million (the "SFI Bond Payable"). The SFI Bond Payable matures on December 21, 2037, and accrues interest annually at a floating rate equal to the 20-year Treasury bill rate plus 200 basis points. Under the terms of the SFI Bond Payable, there are no principal payments contractually due prior to the maturity date and any principal payments made prior to the maturity date are made solely at the discretion of the Debtors. Interest is paid bi-annually. SFI and the Debtors have not made their respective interest payments since July 15, 2019. As of the Petition Date, the balance of the SFI Note Receivable is approximately $230,827,786.00, and the balance of the SFI Bond Payable is $239,767,314. SFI also

17

contributed $10 million to Holding in exchange for 10 million units of preferred membership interests with priority distribution rights from Holding.

### 8.    Rabbi Trusts

The Company sponsors three "top hat", non-qualified, unfunded, deferred compensation plans: an Executive Supplemental Pension Plan for management holding positions at the Vice-President level or higher for at least five years ("ESPP"); a Management Retirement Plan, for employees having 15 or more years of service and minimum average compensation of $40,000 over three consecutive years (the "MRP"); and a Deferred Compensation Plan ("DCP"), for management or "highly compensated employees" (under applicable IRS rules). Additionally, prior to January 1, 2005, RTI maintained the Ruby Tuesday, Inc. Deferred Compensation Plan (the "Old DCP") that was originally established by an indenture dated December 18, 1989. Benefit payments under the ESPP and MRP have been funded by company-owned life insurance policies (COLI) having an approximate aggregate surrender value as of September 15, 2020, of $22.4 million and around $111,700 in cash. The DCP holds interests in various funds having an aggregate vested balance of approximately $5,234,764.66 as of September 24, 2020. Title to such assets is held by the Company in "rabbi trusts." The ESPP, MRP and Old DCP have all been frozen. On September 29, 2020, the Company was served by an "Interpleader Complaint" by Regions Bank ("Regions"), the trustee of the rabbi trust associated with the ESPP and MRP, which was filed in the United States District Court for the Northern District of Alabama, in which Regions seeks a determination of rights in the assets held in the rabbi trusts. The complaint names as defendants RTI and all persons and entities which Regions believes claim an interest in such assets.

### C.    DEBTORS' PREPETITION CAPITAL STRUCTURE

The Debtors' prepetition capital structure is summarized below:

### 1.    Prepetition Credit Facility

The Debtors, as borrowers, are parties to that certain Credit and Guaranty Agreement (as amended, the "Prepetition Credit Facility") dated as of December 21, 2017, by and among Holding, as guarantor borrower representative, TCW Direct Lending LLC, TCW Skyline Lending, L.P., and TCW Brazos Fund LLC (the foregoing three entities, collectively, "TCW"), Goldman Sachs Specialty Lending Group, L.P., as administrative agent and collateral agent ("GSSLG"), and Goldman Sachs Bank USA as issuing bank (together, with GSSLG, "GS", and together with TCW, the "Prepetition Secured Creditors"). The Prepetition Credit Facility provided for a term loan to be drawn on the closing date of the Merger in the principal amount of $115 million (the "Term Loan") and up to $12.5 million of revolving commitments to be used for the issuance of standby letters of credit (the "LC Facility").

The Prepetition Credit Facility has been amended seven times by way of the following: Limited Waiver and First Amendment to the Credit and Guaranty Agreement, dated February 9, 2018; Limited Waiver and Second Amendment to the Credit and Guaranty Agreement, dated June 29, 2018; Limited Waiver, Consent and Third Amendment to the Credit and Guaranty Agreement, dated December 5, 2018; the Fourth Amendment and Limited Waiver to the Credit and Guaranty Agreement, dated May 10, 2019; the Fifth Amendment and Waiver to the Credit and Guaranty Agreement, dated September 3, 2019; the Sixth Amendment to the Credit and Guaranty Agreement, dated April 17, 2020; and the Seventh Amendment to the Credit and Guaranty Agreement, dated September 22, 2020 (the "Seventh Amendment"), whereby, among other provisions, the Prepetition Secured Creditors waived purported defaults, agreed to amendments to various financial covenants

and provisions dealing with the sale/leaseback transactions, in each case in exchange for a release.

Pursuant to the Seventh Amendment, the Prepetition Secured Creditors also provided the Company with $2 million in funding under the Prepetition Credit Facility to support the Company's operations through the Petition Date.

The Prepetition Credit Facility is secured by (a) a guarantee by each of the Debtors of the obligations of each of the other Debtors, (b) a first priority security interest in substantially all the assets of the Debtors, (c) a first priority pledge on 100% of the equity securities of each domestic subsidiary of the Debtors and 65% of the equity securities of each foreign subsidiary of the Debtors, and (d) a mortgage on certain owned real properties of the Debtors.  As of the Petition Date, the aggregate principal amount owing under the Prepetition Credit Facility was $37,912,018.87, composed of $26,358,629.31 in the aggregate principal amount of Term Loans; $2,001,555.56 million in the aggregate principal amount of Revolving Loans (as defined in the Prepetition Credit Facility); and $9,551,834.00 in the aggregate principal amount of Existing Letters of Credit issued pursuant to the LC Facility.

The following is a summary of the outstanding letters of credit issued pursuant to the LC Facility:

| Beneficiary | Purpose of L/C | LC Amount |
| --- | --- | --- |
| Safety National Casualty Corporation | Insurance Liability | 7,700,000.00 |
| The Travelers Indemnity Group | Insurance Liability | 0.00 |
| Constellation New Energy | In lieu of Deposit | 229,474.00 |
| National Union fire Insurance Company | Insurance Liability | 115,860.00 |
| Hartford Fire Insurance Company | Insurance Liability | 1,500,000.00 |
| Nolin | In lieu of Deposit for Electrical Work | 6,500.00 |
| **Grand Total** | | **9,551,834.00** |

## 2.    Other Prepetition Obligations

Accounts Payable.  As of the Petition Date, the Debtors owe approximately $18.8 million to landlords, utilities, employees, taxing authorities, third party vendors, insurance premiums and other service providers.

Former Shareholders' Rights Litigation.  RTI is currently engaged in a dissenting shareholder's appraisal action in Georgia Superior Court (Fulton County), entitled *Ruby Tuesday, Inc. v. Cede & Co. et al.*, and bearing Case No. 2018-cv-304101 (the "Dissenters Action").  Several RTI shareholders opposed the 2017 Merger and refused offers to acquire their shares for the price of $2.40 per share.   RTI commenced the Dissenters Action on April 19, 2018, as required under Georgia's Dissenters' Rights statute, to determine the fair value of the dissenting shareholders' shares. The named respondents include Quadre Investments L.P. (3,000,000 shares), Lawrence N. Lebow (520,629 shares), Jonathan Lebow (180,100 shares), Miriam D. Roth (102,000 shares), Powell Anderson Capital L.P. (74,000 shares), and Leland Wykoff (800 shares).  The purpose of the Dissenters Action is for the court to appraise the fair value of the RTI shares as of December 21, 2017.  A trial date has not been set.

Paycheck Protection Program (PPP) Loan.  RTI is indebted in the amount of $10 million in PPP loan debt through Zions Bancorporation, N.A., dba California Bank & Trust, available through the Coronavirus Aid, Relief, and Economic Security Act (CARES Act). The loan bears interest at one percent (1%), is repayable through 18 payments of $562,774.97 beginning on December 12, 2020, and matures on May 12, 2022.  The Debtors anticipate that 100% is subject to forgiveness.

## ARTICLE III.

## CHAPTER 11 CASES

## A.    EVENTS LEADING TO COMMENCEMENT OF THE CHAPTER 11 CASES

Since the Merger, the Company has struggled in an increasingly competitive and challenging business environment.  Despite multiple efforts to address the situation, the Company ultimately has not been able to overcome the difficulties from the overall decline in the casual dining sector, greatly exacerbated by regulatory responses to contain the COVID-19 pandemic.

### 1.    Business Operations and Financial Condition Since the Merger

At the time of the Merger, the Debtors operated around 541 restaurants.  The Company was not immune from the overall shift in customer spending from casual dining to fast-food and fast-casual restaurant concepts, which had been underway for a few years prior to the Merger.

Many industry observers also point to other macro headwinds, including the decline of mall traffic which disproportionately affects the Company's mall-based locations and the emergence of alternative delivery methods including at-home meal kits, grocery delivery, and third-party delivery services that have increased the availability of dining options.

As a consequence of declining market conditions, the Debtors were not in compliance with certain financial covenants within the Prepetition Credit Facility during the fiscal quarters ended December 4, 2018, and March 5, 2019.  On May 10, 2019, the Debtors entered into a limited waiver and amendment to the Prepetition Credit Facility (the "Limited Waiver and Amendment").  Additionally, during calendar year 2019, the Debtors paid approximately $43 million of principal on the Prepetition Credit Facility, including more than $37 million of prepayments, primarily with proceeds from the sales of real estate and through sale-leaseback transactions, as discussed above.  As a result of the Limited Waiver and Amendment and prepayments, the Debtors were in compliance with covenants under the Prepetition Credit Facility leading into the second half of 2019.

In response to these challenges, the Company closed underperforming locations, sold and leased-back 189 restaurants (178 were sold and leased-back at acquisition), reduced annual corporate overhead by over 45%, and accelerated to-go and online (collectively "off-premise") ordering.  Additionally, the Company hired seasoned industry operators to oversee day-to-day operations and strategic planning. These initiatives began to normalize performance across the right-sized portfolio, while allowing for the disposition of assets from non-performing locations to substantially reduce debt.

With these changes, RTI dissolved 20 subsidiary entities that served no ongoing purpose in order to alleviate the administrative burden of maintaining the separate corporate existence for these entities.  Any outstanding assets at any such entities were distributed to RTI as part of the wind-down of such entities.

20

Despite these significant operational improvements, the industry pressures mounted, the Debtors continued to experience negative operating results and were again in covenant default under the Prepetition Credit Agreement for the fiscal quarters ending December 3, 2019 and March 3, 2020.[9]  As of March 3, 2020, the number of Company restaurants had declined to 421.

## 2.    The COVID-19 Pandemic

Beginning in the early spring of this year, restaurants throughout the world have been negatively affected by the COVID-19 pandemic, many to the point of permanent closure.  The lack of predictability in the spread of the virus coupled with the necessary responses of governments to try and limit exposure by preventing gatherings has eviscerated the restaurant industry, whose business model largely depends on providing social environments for people to meet and enjoy dining out.  The impact of the coronavirus is particularly disruptive to restaurant chains, such as Ruby Tuesday, that operate throughout the United States and in foreign countries and, consequently, must contend with a patchwork of health regulations as the virus impacts different communities with varying levels of severity at different times:  some states and local governments are beginning to permit dining rooms to reopen (albeit with occupancy limits) while others limit sales distribution to take-out service or outdoor dining.   However, the almost complete elimination of in-store dining, which historically has represented over 90% of the Company's total sales, struck at the heart of the Company's business model.

As a result, the COVID-19 pandemic put an unprecedented strain on the financial condition and personnel of the Company.  Government actions such as mandated restaurant closures, mandated mall closures, shelter in place orders, carry-out only orders, reduced hour orders, and social distancing/self-quarantining orders and guidance created a situation whereby the Company's revenues dropped so substantially that it could no longer sustain its normal operating costs.  Rental obligations, as a fixed expense, were particularly difficult to manage since they were not reduced in line with revenue deterioration.  Consequently, in early 2020, the COVID-19 pandemic and other factors forced the Debtors and many franchisees to close all but one of the dining rooms across all Ruby Tuesday restaurants.

As the COVID-19 pandemic continued, by April 7, 2020, the Company had 350 remaining locations of which 281 were serving customers on a delivery or carryout basis only, 68 were temporarily closed and only one of which operated a dining room.  Prior to April 7, 2020, 71 stores were closed.  As of the Petition Date, the Debtors have 236 Company-owned dining rooms that are open and are offering full dining services, albeit under capacity and other restrictions which continue to diminish the Debtors' ability to sustain their operations at such locations.  The Debtors do not intend to reopen 185 of their restaurants that were closed during the pandemic.[10]

Despite this unprecedented volatility in its business, the Company took immediate steps to be responsive to changes in the environments in which its restaurants operate, to address its financial condition with its key stakeholders and to implement relief efforts to support furloughed and terminated employees and maintain goodwill in the community.

First, where permitted by the applicable state or local government, the Company immediately expanded the availability of third-party delivery and off-premise services across its stores and established new third-party relationships.

---

[9]  The Debtors were also in covenant default under the Prepetition Credit Agreement for the fiscal quarters ending June 3, 2020 and September 3, 2020.

[10] The Company continues to assess the impact of new regulations and evaluate restaurant performance.

Second, in addition to offering traditional Ruby Tuesday menu items, the Company introduced a virtual kitchen initiative, through which it utilizes excess capacity to offer other brands via third-party delivery.  Third, the Company implemented a "Ruby's Pantry" option that allows customers to purchase uncooked food, groceries and other essentials, all of which may be ordered through its website, www.rubytuesday.com/ruby-tue-go.

The benefits of these changes were significant.  As of August 24, 2020, the year-to-date revenue from third-party delivery had grown over 450% versus the same time frame in the prior year.  The RubyTueGo business also grew over 93% in the same period.  These initiatives are expected to contribute to a recovery as economies reopen and the Company leaves behind the impact of COVID-19.

As part of its operational pivot to an off-premise business, the Company worked to help ensure the safety of its employees and customers by implementing additional on-site food preparation and pick-up protocols, including distancing requirements.  The safety of employees and guests is critical to the Company and every store meets or exceeds all local COVID-19 and health regulations.

To further support the Ruby Tuesday family, the Company implemented a "Team Member Purchase Program", permitting team members to purchase any product served or used in their restaurant at the same cost that the Company pays for such product.  In addition, the "Ruby Has Heart" foundation, which was initially founded in 2001 to help employees struggling after 9/11, continues today funded by employees' contributions. Ruby Has Heart assists current team members in emergency circumstances with bills and other expenses, if their applications are approved.

Also, in response to requests by its loyal customer base, the Company provides a portal through its website to support community relief efforts, including facilitating the donation of boxed meals to frontline workers, furloughed employees, and local emergency relief efforts.

In addition to operational changes, the Company entered into negotiations with its Prepetition Secured Creditors, various landlords, suppliers and service providers in order to address liquidity challenges.  These discussions permitted the Debtors to defer certain obligations (such as rent) while continuing to assess their ability to reopen and repurpose certain segments of their business despite the unpredictability of the pandemic.

The Company also negotiated several concessions from its Prepetition Secured Creditors, including: (a) permitting the Company to retain and use the proceeds of such PPP loans for certain permitted purposes; (b) deferring payment of certain fees; and (c) permitting the Company to conduct certain asset sales, to retain some or all of the proceeds of such asset sales that would otherwise be subject to mandatory prepayment, and to capitalize certain fees that would otherwise be immediately payable as a result of such asset sales.

Since the pandemic began in March 2020, the Company worked diligently with landlords to seek relief on amounts due in order to combat the loss of guest traffic and sales. As of September 2020, the Company has negotiated over 200 lease modifications resulting in more than $1.5 million in rent abatement and $5.1 million in rent deferrals.  Several leases were terminated as well, involving future lease obligations of approximately $17.3 million. The Company continues to work with landlords to assess the impact of government restrictions and negotiate rental market obligations.

22

The Company also retained professionals to explore processes for assessing and streamlining its business, analyzing strategic alternatives and improving its liquidity, including those focused on lease management, restructuring and attracting investment.

For example, the Company retained the services of FocalPoint Securities, LLC ("FocalPoint") to design the appropriate process to solicit interest in, and contact various potential strategic and financial counterparties for the purpose of exploring, transactions to address the Company's liquidity concerns and support its contemplated forward operations. With respect to any such potential transaction, FocalPoint also advises the Company on the risks and benefits of considering a transaction with respect to the Company's intermediate and long-term business prospects and strategic alternatives to maximize the business enterprise value of the Company.

The Company also retained CR3 Partners, LLC ("CR3"), as its financial advisor, to prepare appropriate financial models, complete analyses and consult with the Company and assist its other professionals regarding potential restructuring alternatives in connection with the Company's discussions with its Prepetition Secured Creditors, its exploration of liquidity alternatives, and the development of a plan of reorganization.

## 3. Creditor Negotiations and Entry into Restructuring Support Agreement

Prior to commencing its bankruptcy cases, the Company engaged in discussions with its Prepetition Secured Creditors in order to formulate the parameters of a restructuring that would provide the Company with the best opportunity for strengthening its financial position and maintaining its operations as a going concern. To that end, on September 18, 2020, the parties entered into that certain Restructuring Support Agreement Term Sheet (together with that certain Restructuring Support Agreement, dated as of October 8, 2020, by and among the Debtors and the Prepetition Secured Creditors, the "Restructuring Support Agreement") that contemplates, among other provisions, (a) debtor in possession financing to sustain the Debtors' operations during their bankruptcy cases; (b) the formulation of a business plan for the future of Ruby Tuesday; (c) confirmation of a plan of reorganization that results in certain members of its lender group acquiring ownership in the Company; and (d) the provision of exit financing to sustain a reorganized Ruby Tuesday as it emerges from bankruptcy protection. A copy of the Restructuring Support Agreement is attached as **Exhibit B** hereto.

The Restructuring Support Agreement obligates the Debtors to, among other things, take all necessary action reasonably required to propose and seek confirmation of the Plan in accordance with certain milestones, including:

### *Plan-Related Milestones*

(i)     No later than forty-five (45) days after the Petition Date, the Disclosure Statement shall be approved by the Bankruptcy Court, with a voting deadline that is no later than thirty (30) days after such approval;

(ii)     No later than (i) one hundred five (105) days after the Petition Date, or (ii) one hundred twenty (120) days after the Petition Date in the event that a Topping Bid (as defined below) is selected at the auction (as set forth in the RSA), the Plan shall be confirmed; and

(iii)     No later than thirty (30) days after confirmation of the Plan, the Plan shall become effective; provided that the Parties (as defined in the RSA) will consider in good faith any reasonable request by the Debtors for an extension of such time.

*Sale-Related Milestones*

(i)      Not later than three (3) days after the Petition Date, file a motion to approve the procedures governing the sale and marketing process for the sale of the Debtors' assets (the "Bidding Procedures") to be heard on shortened time fourteen (14) days later, which motion shall in form and substance be acceptable to the Prepetition Secured Creditors;

(ii)      Not later than three (3) business days after the Petition Date, file an application to retain FocalPoint as investment banker;

(iii)      Not later than thirty (30) days after the Petition Date, obtain an order approving FocalPoint as investment banker.

(iv)      No later than twenty (20) days after Petition Date, the Bankruptcy Court shall have entered an order approving the Bidding Procedures, which order shall in form and substance be reasonably acceptable to the Prepetition Secured Creditors.

(v)      No earlier than sixty (60) days and no later than one hundred five (105) days after the Petition Date, the Debtors shall hold an auction, if a Topping Bid is received by the Debtors.

(vi)(i)   No later than three (3) days after the auction, the Successful Bid, if any, selected at the auction shall be approved by the Bankruptcy Court, and (ii) no later than sixty (60) days after the Bankruptcy Court approves such Successful Bid, the sale will close and the net proceeds of such sale shall be used to pay the Prepetition Secured Debt Claims and DIP Facility Claims in full.

In the event that any of these milestones are not satisfied or waived, then the Prepetition Secured Creditors may seek to terminate the Restructuring Support Agreement in accordance with its terms and, with it, the Prepetition Secured Creditors' support of the Plan.

In connection with the Restructuring Support Agreement, the Debtors also obtained the Prepetition Secured Creditors' support of the Debtors' use of cash collateral and the Debtors' proposed debtor in possession financing facility, as further described below.

Consistent with the Restructuring Support Agreement, on October 7, 2020, the Debtors commenced these voluntary Chapter 11 Cases.  The entities that filed for Chapter 11 are obligors under each of the Debtors' funded debt facilities.

## B.      DEBTOR IN POSSESSION FINANCING

On the Petition Date, the Debtors sought Bankruptcy Court approval of a senior secured, superpriority debtor in possession financing facility (as amended, modified, or supplemented from time to time, the "DIP Facility") extended by the Prepetition Secured Creditors (the "DIP Secured Parties").  The DIP Facility provides the Debtors access to a term loan in the aggregate principal amount of $18.5 million (including a $9.6 million sub-facility to be used solely for the reimbursement of any draws under certain Existing Letters of Credit).

On October 9, 2020, the Bankruptcy Court approved the DIP Facility on an interim basis [Docket No. 87] (the "Interim DIP Order") on the terms set forth in the debtor in

possession credit agreement (as amended, modified, or supplemented from time to time, the "DIP Credit Agreement").  [On _____ ___ , 2020, the Bankruptcy Court approved the DIP Facility on a final basis [Docket No. ___] (the "Final DIP Order" and, together with the Interim DIP Order, the "DIP Orders")].

Pursuant to the DIP Credit Agreement and the Interim DIP Order, the Debtors used proceeds of the DIP Facility to pay certain outstanding prepetition obligations.  The DIP Facility also provided the Debtors with liquidity to, among other things:  (a) continue to operate their business in an orderly manner; (b) maintain their valuable relationships with vendors, suppliers, customers and employees; (c) pay various administrative professionals' fees to be incurred in the Chapter 11 Cases; and (d) support the Debtors' working capital, general corporate and overall operational needs – all of which are necessary to preserve and maintain the going concern value of the Debtors' business and, ultimately, help ensure a successful reorganization under the Plan.

The DIP Credit Agreement obligates the Debtors to, among other things, take all necessary action reasonably required to propose and seek confirmation of the Plan in accordance with certain milestones, including:

- No later than forty-five (45) days after the Petition Date, the disclosure statement shall be approved by the Bankruptcy Court, with a voting deadline that is no later than thirty (30) days after such approval;

- No later than (i) one hundred five (105) days after the Petition Date, or (ii) one hundred twenty (120) days after the Petition Date in the event that a Topping Bid is selected at any auction, the plan shall be confirmed; and

- No later than thirty (30) days after confirmation of the plan, the plan shall become effective; provided, that the DIP Facility Agent and DIP Facility Lenders will consider in good faith any reasonable request by the Debtors for an extension of such time.

The Exit Lender has also committed to provide the exit financing required by the Debtors to consummate the Plan.

## C.    FIRST AND SECOND DAY RELIEF

Upon commencing the Chapter 11 Cases, the Debtors filed a number of motions (the "First Day Motions") with the Bankruptcy Court seeking relief designed to, among other things, prevent interruptions to the Debtors' business, ease the strain on the Debtors' relationships with certain essential constituents, including employees, vendors, customers and utility providers, provide access to much needed working capital and allow the Debtors to retain certain advisors to assist them with the administration of the Chapter 11 Cases.  A first day hearing was held on October 8, 2020.  A "second day" hearing was held on October 22, 2020, at which the Bankruptcy Court approved certain of the First Day Motions on a final basis and certain additional relief requested by the Debtors.

### 1.    Procedural Motions

To facilitate a smooth and efficient administration of these Chapter 11 Cases, the Debtors filed certain procedural motions requesting orders for:

- joint administration of the Debtors' Chapter 11 Cases;

- preparing a list of creditors and filing a consolidated list of their fifty (50) largest unsecured creditors;

25

- filing a consolidated list of creditors in lieu of submitting separate mailing matrices for each Debtor;

- enforcing the automatic stay and bankruptcy termination provisions of the Bankruptcy Code; and

- establishing procedures for interim compensation and reimbursement of expenses for Professionals and Creditors' Committee members.

## 2.    Stabilizing Operations

Recognizing that any interruption of the Debtors' business, even for a brief period of time, would negatively impact their operations, customer relationships, revenue and profits, and facilitate a stabilization of their businesses and effectuate a smooth transition into operating as debtors in possession, the Debtors sought and obtained orders authorizing them to:

- maintain and administer customer programs and honor their obligations arising under or relating to those customer programs

- pay prepetition wages, salaries and other compensation, reimbursable employee expenses and employee medical and similar benefits;

- determine adequate assurance for future utility service and establish procedures for utility providers to object to such assurance;

- continue insurance coverage, including performance under their premium financing agreements and self-insurance programs, and enter into new insurance policies, if necessary;

- establish certain procedures for certain transfers with respect to Equity Interests;

- maintain their existing cash management systems;

- remit and pay certain taxes and fees;

- pay certain obligations to critical vendors, claims arising under the Perishable Agricultural Commodities Act and administrative expense claims arising under Bankruptcy Code section 503(b)(9).

In addition to the foregoing relief, to prevent the imposition of the automatic stay from disrupting their business and to ensure continued deliveries on favorable credit terms, the Debtors sought and obtained Bankruptcy Court approval to pay the prepetition claims of certain vendors and third-party service providers who the Debtors believed were essential to the ongoing operation of their business.  Importantly, the Debtors had discretion to condition payments of these prepetition claims on the vendor's execution of a vendor agreement, which, among other things, provided the Debtors with the opportunity to obtain customary trade terms throughout the pendency of these Chapter 11 Cases.  The Debtors' ability to pay the Claims of these vendors and service providers was critical to maintaining their ongoing business operations at the early stages of their Chapter 11 Cases.

## 3.    Retention of Chapter 11 Advisors

The Debtors are in the process of retaining these advisors to assist them in carrying out their duties and to represent their interests in the Chapter 11 Cases:

26

(a) Pachulski Stang Ziehl & Jones LLP, as restructuring counsel;

(b) CR3 Partners, LLC, as financial advisor;

(c) FocalPoint, as investment banker;

(d) Hilco Real Estate, LLC, as real estate advisor;

(e) Cheng Cohen LLC, as special corporate and franchise counsel;

(f) Baker Donelson Bearman Caldwell & Berkowitz, PC, as special real estate lease, labor, employment and ERISA counsel;

(g) Johnson Associates, Inc., as compensation advisor; and

(h) Epiq Corporate Restructuring, LLC, as claims and noticing agent and as voting and solicitation agent.

## D.   SALE PROCESS

In the spring of 2020, the Debtors retained FocalPoint to assist in the exploration of a potential refinancing and/or restructuring transaction (the "Out of Court Transaction") in order to refinance its existing senior debt and fund a turnaround plan, including through seeking continued rent abatements and/or concessions from their landlords to provide relief during these unprecedented times.

Prior to the Petition Date, the Company conducted a robust marketing process including outreach to a broad universe of 154 financial investors.  As a result, 67 parties executed nondisclosure agreements and were provided with confidential evaluation materials and access to a virtual data room; 61 parties declined after initial review of the opportunity prior to executing a nondisclosure agreement; and 26 parties reviewed the nondisclosure agreement and preliminary transaction information without providing definitive indication either way.  At the initial indication of interest ("IOI") deadline of August 14, 2020, one party had submitted an IOI but ultimately withdrew the consideration after further review.  Without any interested party in the Out of Court Transaction, the Debtors determined, among other reasons, that it was necessary to file these Chapter 11 Cases. As described below, the Company plans to engage in a marketing process during the Chapter 11 Cases to evaluate whether a viable Topping Bid exists.

To allow the Debtors to ensure the transaction contemplated by the RSA maximizes value for the benefit of their bankruptcy estates and creditors, the RSA also provides for a dual process through which, as part its proposed amended engagement by the Debtors, FocalPoint will market the business and evaluate potential alternatives for exit financing, in addition to seeking bids for a potential sale of all, or substantially all, of the Debtors' assets in parallel with the Restructuring Transactions under the Plan.  These activities shall include, but not be limited to (i) developing a list of potential investors and buyers of the Company, (ii) drafting and distributing a short summary and non-disclosure agreement ("NDA"), (iii) upon receipt of signed NDAs, distributing a confidential memorandum that will be developed, summarizing due diligence information, and (iv) providing access to a virtual data room for review by interested parties.  In accordance with the bid procedures to be filed by the Debtors with the Court, FocalPoint will request feedback from potential buyers with regard to a Topping Bid, and will field interest from alternative providers of the exit financing as well.   Solely in the event that a Topping Bid yields a recovery more favorable than that under the Restructuring Transactions contemplated by the Plan, the Debtors may choose to pursue the Topping Bid. The parallel sale process will allow the Debtors to ensure

27

that the disposition of their Chapter 11 Cases maximizes value, regardless of whether such cases culminate in a sale or a restructuring contemplated by the Plan.

Accordingly, following the Petition Date, with the continued assistance of FocalPoint and in parallel with the Restructuring Transactions, the Debtors are continuing their marketing process and will solicit bids for a Topping Bid, in accordance with the terms and conditions of the RSA. To that end, as discussed further herein, the Debtors have sought approval of bidding procedures with the Bankruptcy Court and set forth certain dates that would allow a potential sale transaction to proceed on a parallel path to the Plan.

## E.    OTHER MATERIAL EVENTS IN THE CHAPTER 11 CASES

### 1.    Executory Contract and Unexpired Lease Rejection Procedures Motions

In connection with their restructuring efforts, the Debtors are attempting to enhance the competitiveness of their nationwide operations, which, among other things, involves a careful and comprehensive evaluation of all aspects of the Debtors' leases and supply chain. The Debtors intend to utilize the tools afforded a chapter 11 debtor to achieve the necessary cost savings and operational effectiveness envisioned in their revised strategic business plan, including modifying or, in some cases eliminating, burdensome or under-utilized or burdensome agreements and leases. As such, the Debtors are conducting a comprehensive analysis of their executory contracts and unexpired leases and have engaged, and intend to continue to engage, in extensive discussions with contract and lease counterparties regarding the contributions such parties are making to the restructuring process and can make to the post-emergence businesses. For this purpose, the Debtors filed a motion to establish procedures for rejecting executory contracts and unexpired leases as they are identified (the "Rejection Procedures Motion"). On October 22, 2020, the Bankruptcy Court entered an order approving the Rejection Procedures Motion [Docket No. 171].

For certain executory contracts and unexpired leases that the Debtors have already determined to reject, the Debtors have filed the *Motion for the Entry of an Order Authorizing the Debtors to Reject Certain Executory Contracts and Unexpired Leases Pursuant to 11 U.S.C. § 365, (B) Abandon Any Remaining Personal Property Located at the Leased Premises Pursuant to 11 U.S.C. § 554; and (C) Fix A Bar Date for Claims of Counterparties* [Docket No. 44]; *Motion for the Entry of an Order Authorizing the Debtors to Reject Certain Unexpired Leases Pursuant to 11 U.S.C. § 365, (B) Abandon Any Remaining Personal Property Located at the Leased Premises Pursuant to 11 U.S.C. § 554; and (C) Fix A Bar Date for Claims of Counterparties* [Docket No. 46]; *Motion for the Entry of an Order Authorizing the Debtors to Reject Certain Executory Contracts and Unexpired Leases Pursuant to 11 U.S.C. § 365, (B) Abandon Any Remaining Personal Property Located at the Leased Premises Pursuant to 11 U.S.C. § 554; and (C) Fix A Bar Date for Claims of Counterparties* [Docket No. 49] (the "Lease Rejection Motions"). On October 22, 2020, the Bankruptcy Court entered orders authorizing the Debtors to reject certain executory contracts and unexpired leases and to abandon any remaining personal property located on the applicable leased premises [Docket Nos. 170, 178 & 179].

### 2.    Appointment of the Creditors' Committee

On October 26, 2020, the United States Trustee appointed the Creditors' Committee pursuant to section 1102 of the Bankruptcy Code. As of the date hereof, the Creditors' Committee consists of (a) National Retail Properties, L.P.; (b) Performance Food Group, Inc.; (c) Wendover ZS LLC; (d) Strategic Equipment, LLC; and (e) Denny Kagasoff.

[The Creditors' Committee has retained or is in the process of retaining, as applicable, the following professionals, each *nunc pro tunc* to _____, 2020:

(a) _____, as lead counsel [Docket No. ___]; (b) _____, as financial advisor [Docket No. ___]; and (c) _____, as Delaware co-counsel [Docket No. ___]].

### 3.    Meeting of Creditors

The United States Trustee has scheduled a meeting of creditors pursuant to section 341 of the Bankruptcy Code on November 18, 2020, at 3:00 p.m. (Eastern Time).  In accordance with Bankruptcy Rule 9001(5) (which requires, at a minimum, that one representative of the Debtors appear at such meeting of creditors for the purpose of being examined by the United States Trustee and other attending parties in interest), one representative of the Debtors, as well as counsel to the Debtors, attended the meeting and answered questions posed by the United States Trustee and other parties in interest present at the meeting.

### 4.    Claims Bar Date

On October 16, 2020, the Debtors filed a motion for to establish the deadline for filing proofs of claim, including requests for payment under Bankruptcy Code section 503(b)(9) (the "Claims Bar Date Motion").  On October 22, 2020, the Bankruptcy Court entered its order on the Claims Bar Date Motion, providing that (1) except in the cases of governmental units and certain other exceptions explicitly set forth herein, all proofs of claim must be filed so that they are actually received on or before the date that is thirty (30) days from the date the Debtors file their schedules of assets and liabilities, and (2) the last day for governmental units to file proofs of claim shall be April 5, 2021.

### 5.    The Real Property Rents Deferral and Abatement Motions

As discussed above, to curtail the spread of COVID-19, states and local governments have implemented a tidal wave of restrictions including mandatory stay home orders, closures of "nonessential" businesses, as well as occupancy regulations. Such restrictions have made it difficult for businesses that rely on in-store traffic, such as restaurants and retailers, to generate the revenue needed to pay their rent under commercial leases.  In this regard, Subsection 365(d)(3) of the Bankruptcy Code expressly provides that the court may extend for "cause" the time for a debtor's performance of any such obligations coming due during the first sixty days of the case.  On the grounds that governmental shutdown regulations due to COVID-19 constitute such "cause", the Debtors have moved to extend the time to perform under their remaining real property leases during the first 60 days of the Chapter 11 Cases (the "Rent Deferral Motion") [Docket No. 79].  On October 22, 2020, the Bankruptcy Court entered its order approving the Rent Deferral Motion on an interim basis [Docket No. 180].

Additionally, based upon the existence of *force majeure* clauses in certain of the Debtors' real property leases and common law doctrines of impossibility and frustration of purpose, the Debtors have also moved to excuse their performance of obligations arising under their real property leases for the period that government COVID-19 restrictions are in place [Docket No. 145].

### 6.    Motions Regarding Rabbi Trust Assets

As discussed above, rabbi trusts currently hold the Company's title to certain financial assets that historically have been used to pay benefits to participants under three "top hat",  non-qualified, unfunded, deferred compensation plans. The Debtors have filed two motions seeking Bankruptcy Court authorization to exercise ownership rights in such trust assets [Docket Nos. 138 & 140].  If granted, these motions would enable the Debtors to

29

access the value of certain company-owned life insurance policies and investment funds to pay estate expenses and claims.

## ARTICLE IV.
## SUMMARY OF THE PLAN

THIS ARTICLE IS INTENDED ONLY TO PROVIDE A SUMMARY OF THE MATERIAL TERMS OF THE PLAN AND IS QUALIFIED BY REFERENCE TO THE ENTIRE DISCLOSURE STATEMENT AND THE PLAN AND SHOULD NOT BE RELIED ON FOR A COMPREHENSIVE DISCUSSION OF THE PLAN.  TO THE EXTENT THERE ARE ANY INCONSISTENCIES OR CONFLICTS BETWEEN THIS ARTICLE IV AND THE PLAN, THE TERMS AND CONDITIONS SET FORTH IN THE PLAN SHALL CONTROL AND GOVERN.

## A.     ADMINISTRATIVE, DIP FACILITY, AND PRIORITY TAX CLAIMS

### 1.     Administrative Expense Claims

On or before the Effective Date, the Debtors shall establish the RT Administrative Expense Claim Reserve and fund the RT Administrative Expense Claim Reserve with Cash in an amount equal to the RT Administrative Expense Claim Reserve Amount.  The Cash transferred to the RT Administrative Expense Claim Reserve shall not be used for any purpose other than to pay Allowed Administrative Expense Claims, and no payments on account of such Claims shall be made from any source other than the RT Administrative Expense Claim Reserve; provided, that RT Asset Company may release funds from the RT Administrative Expense Claim Reserve to RT Asset Company on a rolling basis solely to the extent that the funds held in the RT Administrative Expense Claim Reserve exceed the then-current aggregate amount of outstanding and unpaid Allowed Administrative Expense Claims (as estimated in good faith by RT Asset Company in consultation with the Prepetition Secured Creditors).

On the later of the Effective Date or the date on which an Administrative Expense Claim becomes an Allowed Administrative Expense Claim, or, in each such case, as soon as practicable thereafter, each Holder of an Allowed Administrative Expense Claim, subject to the following**Error! Reference source not found.**, shall receive, in full satisfaction, settlement, discharge and release of, and in exchange for, such Claim either (i) payment in full in Cash from the RT Administrative Expense Claim Reserve for the unpaid portion of such Allowed Administrative Expense Claim; or (ii) such other less favorable treatment as agreed to in writing by the Debtors or RT Asset Company (as applicable) and such Holder; provided, however, that Administrative Expense Claims incurred by the Debtors in the ordinary course of business may be paid in the ordinary course of business in the discretion of the Debtors or RT Asset Company (as applicable) in accordance with such applicable terms and conditions relating thereto without further notice to or order of the Bankruptcy Court; provided, further, however, that other than Holders of (i) DIP Facility Claims, (ii) Professional Fee Claims, (iii) Administrative Expense Claims Allowed by an order of the Bankruptcy Court on or before the Effective Date, (iv) Administrative Expense Claims of the Prepetition Agent and its professionals, which, to the extent reasonable and documented, are Allowed Administrative Expense Claims, or (v) Administrative Claims that are not Disputed and arose in the ordinary course of business and were paid or are to be paid in

30

accordance with the terms and conditions of the particular transaction giving rise to such Administrative Expense Claim, the Holder of any Administrative Expense Claim shall have filed a Proof of Claim by no later than the Administrative Expense Claims Bar Date.

After the Effective Date, RT Asset Company (on behalf itself, the Debtors, the Reorganized Debtors or RT Lodge Company, as applicable) shall evaluate, settle and pay Allowed Administrative Expense Claims out of the RT Administrative Expense Claim Reserve without further Bankruptcy Court approval.  In the event that RT Asset Company (on behalf itself, the Debtors, the Reorganized Debtors or RT Lodge Company, as applicable) objects to an Administrative Expense Claim (other than any Allowed Administrative Expense Claim) and there is no settlement, the Bankruptcy Court shall determine the Allowed amount of such Administrative Expense Claim.  All statutory fees payable under 28 U.S.C. § 1930(a) shall be paid as such fees become due (without the necessity of the United States trustee filing a proof of Claim or obtaining a Bankruptcy Court order allowing such amounts).

## 2.    Professional Fee Claims

On or before the Effective Date, the Debtors shall establish the RT Professional Fee Claim Reserve and fund the RT Professional Fee Claim Reserve with Cash in an amount equal to the RT Professional Fee Claim Reserve Amount.  The Cash transferred to the RT Professional Fee Claim Reserve shall not be used for any purpose other than to pay Allowed Professional Fee Claims, and no payments on account of such Claims shall be made from any source other than the RT Professional Fee Claim Reserve; provided, that RT Asset Company may release funds from the RT Professional Fee Claim Reserve to RT Asset Company, held with respect to each Professional, after payment in full of all amounts Allowed with respect to such Professional's final fee application by a Final Order.

Professionals or other Entities asserting Professional Fee Claims for services rendered through the Effective Date must File, within thirty (30) days after the Effective Date, and serve on RT Asset Company and such other Entities who are designated by the Bankruptcy Rules, the Confirmation Order or other order of the Bankruptcy Court, an application for final allowance of such Professional Fee Claim; provided that the Reorganized Debtors shall pay professionals in the ordinary course of business for any work performed after the Effective Date, including those reasonable and documented fees and expenses incurred by professionals in connection with the implementation and consummation of the Plan, in each case without further application or notice to or order of the Bankruptcy Court in full, in Cash; provided, further, that any professional who may receive compensation or reimbursement of expenses pursuant to the Ordinary Course Professionals Order may continue to receive such compensation and reimbursement of expenses for services rendered before the Effective Date, without further Bankruptcy Court order, pursuant to the Ordinary Course Professionals Order.

Objections to any Professional Fee Claim must be Filed and served on RT Asset Company and the requesting party by thirty (30) days after the Filing of the applicable request for payment of the Professional Fee Claim.  Within five (5) Business Days of the entry of an order approving an Allowed Professional Fee Claim, RT Asset Company shall pay the Allowed Professional Fee Claim in full with Cash from the RT Professional Fee Claim Reserve.

Upon the Effective Date, except as otherwise set forth herein with respect to Professional Fee Claims, any requirement that professionals comply with sections 327 through 331 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and RT Asset Company shall employ and pay its professionals in the ordinary course of business.  Professionals retained by any Creditors'

31

Committee may be paid only for services rendered on or after the Effective Date if such services are permitted pursuant to ARTICLE XIII.A of the Plan.

For the avoidance of doubt, the Consenting Lenders Fees and Expenses, or estimated to be incurred, through the Effective Date shall be paid in full in Cash without the requirement to file a Proof of Claim, Administrative Expense Claim form, retention or fee applications or any other pleading or request for payment and without any requirement for notice to or action, order or approval of the Bankruptcy Court.

### 3.   DIP Facility Claims

The DIP Facility shall be an up to $18,500,000 new money loan facility (including a $9,600,000 subfacility for any draws under Existing Letters of Credit) provided by the Prepetition Secured Creditors to the Debtors, which facility shall constitute a superpriority administrative claim against the Debtors secured by a superpriority priming Lien on substantially all of the assets of their Estates.

The amount advanced or to be advanced under the Interim DIP Order shall be in the aggregate principal amount of up to $12,600,000 (inclusive of the Existing Letters of Credit), which includes up to $3,000,000 of new money advances.

Unless otherwise agreed to by the DIP Facility Lenders, on the Effective Date, in full satisfaction, settlement, discharge and release of, and in exchange for, such DIP Facility Claims (in an amount outstanding determined as of the Effective Date), all DIP Facility Claims (other than any such Claims that have been credit bid in connection with a Successful Bid) shall be indefeasibly paid and satisfied in full in Cash from available Cash. For the avoidance of doubt, the DIP Facility Claims shall not be paid with Cash from the Exit Facility.

Except as otherwise expressly provided in the DIP Facility, upon indefeasible payment and/or satisfaction in full of all DIP Facility Claims, the DIP Facility Loan Documents and all related loan documents, and all Liens and security interests granted to secure the DIP Facility Claims, shall be immediately terminated, extinguished and released, and the DIP Facility Agent shall promptly execute and deliver to RT Asset Company and/or RT Lodge Company, as applicable, such instruments of termination, release, satisfaction and/or assignment (in recordable form) as may be reasonably requested by RT Asset Company and/or RT Lodge Company (as the case may be) to effectuate the foregoing. Notwithstanding the foregoing, the DIP Facility Loan Documents and all related loan documents shall continue in effect solely for the purpose of preserving the DIP Facility Agent's, the DIP Facility Lenders', Prepetition Agent's, the Prepetition Secured Creditors' right to any contingent or indemnification obligations of the Debtors pursuant and subject to the terms of the DIP Facility Loan Documents or DIP Orders.

Notwithstanding anything to the contrary herein (including, but not limited to, the description of the DIP Facility as priming), the proceeds of all Asset Sales by the Debtors made prior to the Effective Date shall first be applied to the repayment of the Prepetition Secured Debt Claims (other than any such Claims that have been credit bid in connection with a Successful Bid), and following their repayment in full, repayment of the DIP Facility Claims (other than any such Claims that have been credit bid in connection with a Successful Bid).

### 4.   Priority Tax Claims

On or before the Effective Date, the Debtors shall establish the RT Priority Claim Reserve and fund the RT Priority Claim Reserve with Cash in an amount equal to the RT

DOCS_LA:332991.15 76136/002

Priority Claim Reserve Amount.  The Cash transferred to the RT Priority Claim Reserve Amount shall not be used for any purpose other than to pay Allowed Priority Tax Claims and Allowed Non-Tax Priority Claims (but not Allowed Administrative Expense Claims), and no payments on account of such Claims shall be made from any source other than the RT Priority Claim Reserve; provided, that RT Asset Company may release funds from the RT Priority Claim Reserve to RT Asset Company on a rolling basis solely to the extent that the funds held in the RT Priority Claim Reserve exceed the then-current aggregate amount of outstanding and unpaid Allowed Priority Tax Claims and Allowed Non-Tax Priority Claims (as estimated in good faith by RT Asset Company in consultation with the Prepetition Secured Creditors).

Unless a Holder of an Allowed Priority Tax Claim agrees to less favorable treatment, in exchange for full and final satisfaction, settlement, release and discharge of such Allowed Priority Tax Claim, on the later of (i) the Initial Distribution Date if such Priority Tax Claim is an Allowed Priority Tax Claim as of the Effective Date or (ii) the date on which such Priority Tax Claim becomes an Allowed Priority Tax Claim, each Holder of an Allowed Priority Tax Claim shall receive, at the election of the Debtors or RT Asset Company (as applicable):  (1) Cash from the RT Priority Claim Reserve in an amount equal to the amount of such Allowed Priority Tax Claim; (2) Cash from the RT Priority Claim Reserve in an amount agreed to by such Holder and the Debtors or the Reorganized Debtors, as applicable; provided, however, that such parties may further agree for the payment of such Allowed Priority Tax Claim at a later date; or (3) Cash from the RT Priority Claim Reserve in an aggregate amount of such Allowed Priority Tax Claim payable in installment payments over a period not more than five years after the Petition Date, pursuant to section 1129(a)(9)(C) of the Bankruptcy Code.  Payment of statutory fees due pursuant to 28 U.S.C. § 1930(a)(6) shall be made at all appropriate times until the entry of a final decree; provided, however, that the Debtors or the Reorganized Debtors, as applicable, may prepay any or all such Claims at any time, without premium or penalty.

## B.    CLASSIFICATION AND TREATMENT OF CLASSIFIED CLAIMS AND EQUITY INTERESTS

### 1.    Summary

All Claims and Equity Interests, except Administrative Expense Claims (including DIP Facility Claims and Professional Fee Claims) and Priority Tax Claims, are classified in the Classes set forth below.  In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims and Priority Tax Claims have not been classified.

The categories of Claims and Equity Interests listed below classify Claims and Equity Interests for all purposes including, without limitation, voting, confirmation and distribution pursuant to the Plan and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.  The Plan deems a Claim or Equity Interest to be classified in a particular Class only to the extent that the Claim or Equity Interest qualifies within the description of that Class and shall be deemed classified in a different Class to the extent that any remainder of such Claim or Equity Interest qualifies within the description of such different Class.  A Claim or Equity Interest is in a particular Class only to the extent that any such Claim or Equity Interest is Allowed in that Class and has not been paid, released or otherwise settled prior to the Effective Date.  Additionally, for voting purposes and to comply with Bankruptcy Code section 1122(a), each Allowed Miscellaneous Secured Claim shall be deemed to be in its own subclass.

33

**<u>Summary of Classification and Treatment of Classified Claims and Equity Interests</u>**

| Class | Claim | Status | Voting Rights |
|---|---|---|---|
| 1 | Non-Tax Priority Claims | Unimpaired | Deemed to Accept |
| 2 | Miscellaneous Secured Claims | Unimpaired | Deemed to Accept |
| 3 | Prepetition Secured Debt Claims | Impaired | Entitled to Vote |
| 4 | General Unsecured Claims | Impaired | Entitled to Vote |
| 5 | Preserved Intercompany Claims | Unimpaired | Deemed to Accept |
| 6 | Extinguished Intercompany Claims | Impaired | Deemed to Reject |
| 7 | Dissenters Claims | Impaired | Deemed to Reject |
| 8 | Equity Interests in Holding | Impaired | Deemed to Reject |
| 9 | Intercompany Interests | Unimpaired | Deemed to Accept |

## C.    ELIMINATION OF VACANT CLASSES

Any Class that, as of the commencement of the Confirmation Hearing, does not have at least one Holder of a Claim or Equity Interest that is Allowed, or Claims or Equity Interests temporarily allowed for voting purposes under Bankruptcy Rule 3018(a), in an amount greater than zero for voting purposes shall be considered vacant, deemed eliminated from the Plan for purposes of voting to accept or reject the Plan, and disregarded for purposes of determining whether the Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to such Class (each, a "<u>Vacant Class</u>").

## D.    CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS

### 1.    **Class 1 – Non-Tax Priority Claims**

(a)    <u>Classification</u>:  Class 1 consists of the Non-Tax Priority Claims.

(b)    <u>Treatment</u>:  Each Holder of an Allowed Class 1 Claim shall receive in full satisfaction, settlement, discharge and release of, and in exchange for, its Allowed Class 1 Claim:

1.    Cash from the RT Priority Claim Reserve equal to the amount of such Allowed Class 1 Claim on the later of, or, in each case, as soon as reasonably practicable thereafter, (x) the Initial Distribution Date if such Class 1 Claim is an Allowed Class 1 Claim on the Effective Date, (y) the date on which such Class 1 Claim becomes an Allowed Class 1 Claim or (z) the date due in the ordinary course of business in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Class 1 Claim; or

2.   At the election of the Debtors (after consultation with the Prepetition Agent), such other less favorable treatment as to which the Holder of such Allowed Class 1 Claim and the Debtors or the Reorganized Debtors, as applicable, agree in writing.

(c)   <u>Impairment and Voting</u>:  Class 1 is Unimpaired, and the Holders of Class 1 Claims are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Class 1 Claims are not entitled to vote to accept or reject the Plan and may not receive Ballots.

**2.   Class 2 – Miscellaneous Secured Claims**

(a)   <u>Classification</u>:  Class 2 consists of the Miscellaneous Secured Claims.

(b)   <u>Treatment</u>:  Each Holder of an Allowed Class 2 Claim shall receive in full satisfaction, settlement, discharge and release of, and in exchange for, its Allowed Class 2 Claim:

1.   Cash equal to the amount of such Allowed Class 2 Claim on the later of, or, in each case, as soon as reasonably practicable thereafter, (i) the Initial Distribution Date if such Class 2 Claim is an Allowed Class 2 Claim on the Effective Date or (ii) the date on which such Class 2 Claim becomes an Allowed Class 2 Claim; or

2.   At the election of the Debtors (after consultation with the Prepetition Agent) or the Reorganized Debtors, as applicable, either: (x) Reinstatement (with the Holder, as applicable, retaining the Liens securing its Allowed Miscellaneous Secured Claim as of the Effective Date until full and final payment thereof); (y) return of the Collateral securing such Allowed Class 2 Claim by the Initial Distribution Date; or (z) such other less favorable treatment as to which the Holder of such Allowed Class 2 Claim and the Debtors or the Reorganized Debtors, as applicable, shall have agreed upon in writing.

(c)   <u>Impairment and Voting</u>:  Class 2 is Unimpaired, and the Holders of such Class 2 Claims are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, such Holders of Class 2 Claims are not entitled to vote to accept or reject the Plan and may not receive Ballots.

**3.   Class 3 – Prepetition Secured Debt Claims**

(a)   <u>Classification</u>:  Class 3 consists of the Prepetition Secured Debt Claims.  The Allowed Subclass 3A Claim and Allowed Subclass 3B

DOCS_LA:332991.15 76136/002

Claim shall be classified in subclass 3A and subclass 3B, respectively. As contemplated by ARTICLE II.C of the Plan, any Allowed Subclass 3C Claim shall be paid by or rolled up into the DIP Facility, so is not expected to be outstanding as of the Effective Date.

(b)     Allowance:  Notwithstanding any provisions of the Plan to the contrary, unless the Holders of the Prepetition Secured Debt Claims (other than with respect to any such Claims that have been credit bid in connection with a Successful Bid) have been paid in full previously from Net Sale Proceeds, the Prepetition Secured Debt Claims shall be deemed Allowed Claims in the aggregate principal amount of $37,912,018.87 as of the Petition Date, plus accrued and unpaid interest, fees, expenses and other obligations arising under the Prepetition Credit and Guaranty Agreement but not including any draws or any repayment of obligations related to letters of credit issued pursuant to the Prepetition Credit and Guaranty Agreement or postpetition interest accrued under such agreement.

(c)     Treatment:  On the Effective Date, (1) unless the Holders of the DIP Facility Claims and Prepetition Secured Debt Claims (other than with respect to any such Claims that have been credit bid in connection with a Successful Bid) have been paid in full previously from Net Sale Proceeds, each Holder of an Allowed Subclass 3A Claim shall receive, in full satisfaction, settlement, discharge and release of, and in exchange for such claim, its Pro Rata share of (i) the GS Cash Payment, (ii) any GS Adjustment Equity, and (iii) one hundred percent (100%) of the equity in RT Lodge Company; and (2) unless it has been paid in full previously from Net Sale Proceeds, each Holder of an Allowed Subclass 3B Claim shall receive, in full satisfaction, settlement, discharge and release of, and in exchange for such claim, its Pro Rata share of (i) the TCW Cash Payment and (ii) one hundred percent (100%) of the equity in RT Asset Company less any GS Adjustment Equity, subject to dilution on account of the Warrants and MIP, with all such entities, distributions and transfers subject to ARTICLE V.P of the Plan and the definition of Restructuring in ARTICLE I.C of the Plan.  If a Successful Bid is selected after the Auction, notwithstanding anything to the contrary herein (including, but not limited to, the description of the DIP Facility as priming), the proceeds of all Asset Sales by the Debtors made prior to the Effective Date shall first be applied to the repayment of the Prepetition Secured Debt Claims (other than any such Claims that have been credit bid in connection with a Successful Bid) on the Effective Date, and following their repayment in full, repayment of the DIP Facility Claims (other than any such Claims that have been credit bid in connection with a Successful Bid) as set forth in ARTICLE II.C of the Plan on the Effective Date.  For avoidance of doubt, Class 3 shall be a Vacant Class if the Prepetition Secured Debt Claims (other than any such Claims that have been credit bid in connection with a Successful

36

Bid) have been paid in full from Net Sale Proceeds before the Effective Date, and the subsections a – e of ARTICLE III.C.3 of the Plan (other than the immediately preceding sentence and this sentence) shall no longer be operative.  If Class 3 shall be come a Vacant Class, then in addition all of the provisions of the Plan related to ARTICLE III.C.3.c of the Plan shall not be operative, including (without limitation) provisions that implement or reference exit financing or the assumption of executory contracts and unexpired leases of the Debtors, unless such contracts and/or leases are listed on a schedule to the Plan Supplement.

(d)   <u>Impairment and Voting</u>:  Unless the Holders of the Prepetition Secured Debt Claims (other than with respect to any such Claims that have been credit bid in connection with a Successful Bid) have been paid in full previously from Net Sale Proceeds, Subclasses 3A and 3B are Impaired, and Holders of Allowed Class 3A Claims and Allowed Class 3B Claims are entitled to vote in their respective subclasses to accept or reject the Plan and shall receive Ballots. If the Holders of the Prepetition Secured Debt Claims (other than with respect to any such Claims that have been credit bid in connection with a Successful Bid) have been paid in full prior to the Effective Date from Net Sale Proceeds, then Class 3 shall be come a Vacant Class.  If the Prepetition Secured Debt Claims (other than with respect to any such Claims that have been credit bid in connection with a Successful Bid) will be paid in full from Net Sale Proceeds on the Effective Date, then their Prepetition Secured Debt Claims are unimpaired, they are not entitled to vote, and they are deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.

(e)   For the avoidance of doubt, on the Effective Date, the Debtors shall pay all Consenting Lenders Fees and Expenses in accordance with ARTICLE V.R of the Plan and all fees and expenses of the Prepetition Agent in accordance with ARTICLE V.S of the Plan.

**4.    Class 4 – General Unsecured Claims**

(a)   <u>Classification</u>:  Class 4 consists of the General Unsecured Claims.

(b)   <u>Treatment</u>:  Subject to ARTICLE VII.B.3 of the Plan, each Holder of an Allowed General Unsecured Claim, in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed General Unsecured Claims shall receive its Pro Rata share of [____] (the "<u>Class 4 Aggregate Cash Distribution</u>").

(c)   <u>Impairment and Voting</u>:  Class 4 is Impaired, and Holders of General Unsecured Claims are entitled to vote to accept or reject the Plan and shall receive Ballots.

5.  **Class 5 – Preserved Intercompany Claims**

    (a)   <u>Classification</u>:  Class 5 consists of the Preserved Intercompany Claims.

    (b)   <u>Treatment</u>: On the Effective Date, the Preserved Intercompany Claims shall be Reinstated, as set forth in ARTICLE V.P of the Plan.

    (c)   <u>Impairment and Voting</u>:  Class 5 is Unimpaired, and the Holders of such Preserved Intercompany Claims are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, such Holders of Class 5 Claims are not entitled to vote to accept or reject the Plan and shall not receive Ballots.

6.  **Class 6 – Extinguished Intercompany Claims**

    (a)   <u>Classification</u>:  Class 6 consists of the Extinguished Intercompany Claims.

    (b)   <u>Treatment</u>: On the Effective Date, the Extinguished Intercompany Claims shall be extinguished.

    (c)   <u>Impairment and Voting</u>:  Class 6 is Impaired, and Holders of Extinguished Intercompany Claims are deemed to have rejected the Plan and shall not receive Ballots.

7.  **Class 7 – Dissenters Claims**

    (a)   <u>Classification</u>:  Class 7 consists of Dissenters Claims.

    (b)   <u>Treatment</u>: On the Effective Date, pursuant to section 510(b) of the Bankruptcy Code, the Dissenters Claims shall be subordinated to the same priority as Equity Interests in RTI and shall be extinguished.

    (c)   <u>Impairment and Voting</u>:  Class 7 is Impaired, and Holders of Dissenters Claims are deemed to have rejected the Plan and shall not receive Ballots.

8.  **Class 8 – Equity Interests in Holding**

    (a)   <u>Classification</u>:  Class 8 consists of the Equity Interests in Holding.

    (b)   <u>Treatment</u>: On the Effective Date, the Equity Interests in Holding either (1) if GS selects Reorganized Holding to be RT Lodge Company, preserved and distributed in accordance with the Plan or (2) shall be extinguished.

    (c)   <u>Impairment and Voting</u>:  Class 8 is Impaired, and Holders of Equity Interests in Holding are deemed to have rejected the Plan and shall not receive Ballots.

DOCS_LA:332991.15 76136/002

9. **Class 9 – Intercompany Interests**

    (a)    <u>Classification</u>:  Class 9 consists of the Intercompany Interests.

    (b)    <u>Treatment</u>:  Each Allowed Intercompany Interest in each of the Reorganized Subsidiaries shall be Reinstated for purposes of the Subsidiary Structure Maintenance, as set forth in ARTICLE V.P of the Plan.

    (c)    <u>Impairment and Voting</u>:  Class 9 is Unimpaired, and Holders of Intercompany Interests are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Thus, the Holders of the Intercompany Interests are not entitled to vote to accept or reject the Plan and shall not receive Ballots.

## E. SPECIAL PROVISION GOVERNING CLAIMS RELATED TO ASSUMED EXECUTORY CONTRACTS OR UNEXPIRED LEASES AND UNIMPAIRED CLAIMS

Obligations with respect to assumed Executory Contracts and Unexpired Leases are separately addressed in ARTICLE VI of the Plan.  Except as otherwise provided in the Plan, nothing under the Plan shall affect the Debtors' rights in respect of any Unimpaired Claims, cure obligations as to any arrears or defaults that may exist with respect to contracts to be assumed under the Plan, or the performance of assumed obligations under such Executory Contracts or Unexpired Leases, including, without limitation, all rights in respect of legal and equitable defenses thereto, or setoffs or recoupments there against.

## F. ACCEPTANCE OR REJECTION OF THE PLAN

### 1. Presumed Acceptance of Plan

Class 1, Class 2, Class 5 and Class 9 are Unimpaired under the Plan, and, therefore, are presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, the Holders of Claims in Class 1, Class 2, Class 5 and Class 9 are not entitled to vote to accept or reject the Plan and shall not receive Ballots.

### 2. Voting Classes

Each Holder of an Allowed Claim as of the applicable voting record date in the Voting Classes (Classes 3 and 4) will be entitled to vote to accept or reject the Plan and will receive ballots containing detailed voting instructions.

### 3. Acceptance by Impaired Classes of Claims and Equity Interests

Except as otherwise provided in section 1126(e) of the Bankruptcy Code, (i) pursuant to section 1126(c) of the Bankruptcy Code, an Impaired Class of Claims has accepted the Plan if (x) the Holders of at least two-thirds (2/3) in amount of the Allowed Claims actually voting in such Class have voted to accept this Plan and (y) the Holders of more than one-half (1/2) in number of the Allowed Claims actually voting in such Class have voted to accept this Plan and (ii) pursuant to section 1126(d) of the Bankruptcy Code, an Impaired Class of Equity Interests has accepted the Plan if Holders of at least two-thirds (2/3) in amount of the Allowed Equity Interests actually voting in such Class have voted to accept the Plan.

###### 4.    Cramdown; Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code

If any Class of Claims or Equity Interests is deemed to reject this Plan or is entitled to vote on this Plan and does not vote to accept this Plan, the Debtors may, subject to any consent that may be required herein or under the RSA, (i) seek confirmation of this Plan under section 1129(b) of the Bankruptcy Code or (ii) amend or modify this Plan, or any Exhibit, Plan Schedule or Plan Document, in accordance with the terms hereof and the Bankruptcy Code, in order to satisfy the requirements of section 1129(b) of the Bankruptcy Code, if necessary. If a controversy arises as to whether any Claims or Equity Interests, or any class of Claims or Equity Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

###### 5.    Continuing Susceptibility to Claim Objection; Solicitation in Good Faith

The Debtors have, and upon the Effective Date the Reorganized Debtors and RT Lodge Company shall be deemed to have, solicited votes on the Plan from the Voting Classes in good faith and in compliance with the applicable provisions of the Bankruptcy Code. Accordingly, the Debtors, the Reorganized Debtors and RT Lodge Company and each of their respective Related Persons shall be entitled to, and upon the Confirmation Date are hereby granted, the protections of section 1125(e) of the Bankruptcy Code.

Except as expressly provided in the Plan or in any order entered in the Chapter 11 Cases prior to the Effective Date, no Claim or Equity Interest shall become an Allowed Claim or Allowed Equity Interest unless and until such Claim or Equity Interest is deemed Allowed under the Plan or the Bankruptcy Code or the Bankruptcy Court has entered a Final Order in the Chapter 11 Cases allowing such Claim or Equity Interest. Notwithstanding anything to the contrary herein, after the Effective Date and subject to the other provisions of the Plan, the Reorganized Debtors and/or RT Lodge Company, as applicable, shall have and shall retain any and all rights and defenses under bankruptcy or nonbankruptcy law that the Debtors had with respect to any Claim, except with respect to any Claim Allowed by order of the Bankruptcy Court.

#### G.    MEANS FOR IMPLEMENTATION OF THE PLAN

##### 1.    General Settlement of Claims

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good faith and integrated compromise and global settlement of all Claims and Equity Interests and controversies resolved pursuant to the Plan.

##### 2.    Corporate Existence

**ARTICLE I.** The Debtors all shall continue to exist after the Effective Date as separate legal entities, with all of the powers of corporations, limited liability companies, memberships and partnerships pursuant to the applicable law in their states of incorporation or organization subject to the terms of, and except as otherwise provided in or by, the Plan and the Alternative Structures. The respective limited liability company agreements, articles or certificate of incorporation and by-laws (or other applicable formation documents) in effect prior to the Effective Date for each Debtor shall continue to be in effect after the Effective Date, except (i) with respect to RT Asset Company, as to which there shall be amended and restated limited liability company agreement or other applicable organizational documents as set forth in the Amended Organization Documents Filed as an Exhibit with the

Plan Supplement without prejudice to any right to terminate such existence (whether by merger or otherwise) under applicable law after the Effective Date and (ii) as any other Debtor's limited liability company agreements, articles or certificate of incorporation or by-laws (or other formation documents) may be amended or amended and restated pursuant to this Plan without any further notice to or action, order, or approval of the Bankruptcy Court or any other court of competent jurisdiction (other than the requisite filings required under applicable state, provincial, or federal law).

**ARTICLE II.** On or after the Confirmation Date or as soon thereafter as is reasonably practicable, the Debtors, Reorganized Debtors or RT Lodge Company, as applicable, may undertake the Restructuring Transactions and, to the extent determined necessary or appropriate by the Debtors, with the consent of the Prepetition Agent, Prepetition Secured Creditors and any Committee (which consent shall not be unreasonably withheld or delayed), the Reorganized Debtors, as applicable or their successors, or RT Lodge Company may take all other actions to effect any transaction described in, approved by, or necessary or appropriate to effectuate this Plan and that is consistent with the RSA, including, without limitation:  (i) the execution and delivery of appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition, transfer, dissolution, name change, Chapter 11 Case closing, plans of reorganization, transfer or extinguishment of Intercompany Interests among RT Lodge Company, the Reorganized Debtors or other successors to, or Affiliates of, the Debtors, or liquidation, containing terms that are consistent with the terms of this Plan and the Plan Documents and that satisfy the requirements of applicable law and any other terms to which the applicable entities may agree (the "Alternative Structures"); (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any Asset, property, right, liability, debt, or obligation on terms consistent with the terms of this Plan and having other terms to which the applicable parties agree; (iii) the filing of appropriate certificates or articles of formation or incorporation and amendments thereto, reincorporation, merger, consolidation, conversion, or dissolution pursuant to applicable law; (iv) the Restructuring Transactions; and (v) all other actions that the applicable entities determine to be necessary or appropriate, including, without limitation, making filings or recordings that may be required by applicable law in connection with such transactions.

### 3.    Vesting of Assets

Also on the Effective Date:  (i) if the RT Lodge has not been sold by the Effective Date, the RT Lodge shall vest in RT Lodge Company, one hundred percent (100%) of the Equity Interests in RT Lodge Company shall vest in the Holders of the Allowed Subclass 3A Claims on a Pro Rata basis, and RT Lodge Company shall, at the direction of the Prepetition Secured Creditors, designate any assets of RTI that have not been sold prior to the Effective Date and are not directly related to and directly useful to the operations of RT Lodge to RT Asset Company, and (ii) to the extent any Assets (other than the RT Lodge) remain unsold as of the Effective Date, such Assets (other than the RT Lodge) shall vest in RT Asset Company.  Except as otherwise provided in the Plan or the Confirmation Order, on or after the Effective Date, all property and Assets of the Estates (including, without limitation, Causes of Action, Litigation Claims, and, unless otherwise waived or released pursuant to an order of the Bankruptcy Court or the Plan, Avoidance Actions) and any property and Assets acquired by the Debtors pursuant to the Plan shall vest in RT Lodge Company or the Reorganized Debtors or their successor, including under the Alternative Structures, free and clear of all Liens, Claims, charges or other encumbrances.  Except as may be otherwise provided in the Plan, on and after the Effective Date, the Reorganized Debtors and RT Lodge Company with regard to their respective Assets may operate their businesses and may use, acquire or dispose of property and compromise or settle any Claims without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by the Plan and the

41

Confirmation Order. Without limiting the foregoing, the Reorganized Debtors and RT Lodge Company with regard to their respective Assets shall pay the charges that they incur after the Effective Date for reasonable and documented Professionals' fees, disbursements, expenses or related support services (including reasonable and documented fees relating to the preparation of Professional fee applications) in the ordinary course of business and without application or notice to, or order of, the Bankruptcy Court.

For clarity, the Executory Contracts and Unexpired Leases assumed by a Debtor and/or a Reorganized Debtor (other than RTI or Reorganized RTI) that are not related to RT Lodge shall be, at the written direction of TCW, assigned to RT Asset Company on the Effective Date without the need for a further authorization by the Bankruptcy Court as set forth in ARTICLE VI.B of the Plan and the Executory Contracts and Unexpired Leases assumed by a Debtor and/or a Reorganized Debtor that are related to RT Lodge shall be, at the written direction of GS, assigned to RT Lodge Company on the Effective Date, without the need for a further authorization by the Bankruptcy Court as set forth in ARTICLE VI.B of the Plan.

### 4.    Exit L/C Facility

Unless an Alternative Exit Lender is providing an Alternative Exit Facility under alternative terms, the Exit L/C Facility shall be an up to $10,000,000 (or such lesser amount agreed to by the parties) standby letter of credit facility provided by the Exit Lender as a new facility to RT Asset Company on the Effective Date, which facility shall be First Out and secured by a first Lien (which is *pari passu* with the Lien of the Exit Term Loan Facility) on substantially all of the assets of RT Asset Company and which shall have GS Bank or its affiliate as issuing bank. GS Bank or its affiliate shall serve as the initial issuer of all replacement and re-issued standby letters of credit under the Exit L/C Facility, including, without limitation, the roll up of $9,600,000 of outstanding letters of credit under the DIP Facility; provided, that in no event shall any letter of credit issued by GS Bank or its affiliate under the Exit L/C Facility have an expiration date later than one (1) year from the Effective Date; provided further that the Exit Loan Documents shall provide GS Bank or its affiliate, as applicable, with all of the rights related to cash collateralization that GS Bank possesses in its capacity as "Issuing Bank" under the DIP Credit Agreement, which cash collateralization rights shall be acceptable to GS Bank or its affiliate, as applicable, in its sole discretion.

RT Asset Company shall be authorized to enter into the Exit L/C Facility on or before the Effective Date, subject to the occurrence of the Effective Date. The Confirmation Order shall be deemed approval of the Exit L/C Facility, and the Exit L/C Facility shall be governed by the Exit Loan Documents. The obligations of RT Asset Company (and any Subsidiaries that are parties to the Exit L/C Facility) under the Exit L/C Facility shall be secured by substantially all of its assets, whether now existing or hereinafter acquired on a pari passu basis with the Lien of the Exit Term Loan Facility. The Exit L/C Facility shall be repaid in full from the proceeds of the liquidation of the collateral that is subject to the Lien securing the Exit Facility on a first-out ("First Out") basis before any proceeds of the liquidation of such collateral is repaid under the Exit Term Loan Facility.

### 5.    Exit Term Loan Facility

Unless an Alternative Exit Lender is providing an Alternative Exit Facility under alternative terms, the Exit Term Loan Facility shall be a new money loan facility provided by the Exit Lender to RT Asset Company on the Effective Date, which facility shall be available up to the Exit Term Loan Facility Amount and secured by a first Lien (which is pari passu with the Lien of the Exit L/C Facility but subject to its First Out right) on substantially all of the assets of the Reorganized Debtors, which shall be used to fund (a) the

42

Cash part of the distribution to each Holder of the Allowed Subclass 3A Claims as set forth in ARTICLE III.C.3.c of the Plan; and (b) the Cash part of the distribution to each Holder of the Allowed Subclass 3B Claims as set forth in ARTICLE III.C.3.c of the Plan.

RT Asset Company shall be authorized to enter into the Exit Term Loan Facility on or before the Effective Date, subject to the occurrence of the Effective Date, and the Confirmation Order shall be deemed approval of the Exit Term Loan Facility, which shall be governed by the Exit Loan Documents.

In establishing the register of lenders and Exit Lenders under the Exit Loan Documents, the Exit Agent shall be entitled to conclusively rely upon (without further inquiry) any certificate, schedule, register, list, or other document provided by the Debtors, the Reorganized Debtors and/or the Distribution Agent.

**6.    Exit Facility**

If TCW is the Exit Lender, on the Effective Date it shall receive Warrants exercisable for New Common Shares equal to 25% of the total amount of Exchange Common Shares distributed on the Effective Date (subject to dilution by any New Common Shares issued from time to time pursuant to the MIP). In the event there is more than one Exit Lender, such Warrant shall instead be provided to each of them on a Pro Rata basis.

RT Asset Company shall be authorized to enter into the Exit Facility on or before the Effective Date, subject to the occurrence of the Effective Date. The Confirmation Order shall be deemed approval of the Exit Facility, the Exit Loan Documents and all transactions contemplated thereby, and authorization of all actions to be taken, undertakings to be made, and obligations to be incurred by the Reorganized Debtors in connection therewith, including, without limitation, the payment of all reasonable and documented fees, indemnities, and expenses provided for therein, and authorization of the Reorganized Debtors to enter into and execute the Exit Loan Documents and such other documents as may be required to effectuate the treatment afforded by the Exit Facility.

On the Effective Date, RT Asset Company shall be and is authorized to execute and deliver the Exit Loan Documents and any related loan documents, and shall be and is authorized to execute, deliver, file, record and issue any other notes, guarantees, deeds of trust, security agreements, documents (including UCC financing statements), amendments to the foregoing, or agreements in connection therewith, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity, subject to any lien limitations set forth herein. The obligations of RT Asset Company (and any Subsidiaries that are parties to the Exit Facility) under the Exit Facility shall be secured by substantially all of its assets, whether now existing or hereinafter acquired.

On the Effective Date, all of the Liens and security interests to be granted in accordance with the Exit Loan Documents (a) shall be deemed to be granted in good faith, for legitimate business purposes, and for reasonably equivalent value, (b) shall be legal, binding, and enforceable Liens on, and security interests in, the collateral granted thereunder in accordance with the terms of the Exit Loan Documents, (c) shall be deemed automatically perfected on the Effective Date and have a first priority, subject only to such Liens and security interests as may be permitted under the Exit Loan Documents, and (d) shall not be subject to avoidance, recharacterization, or equitable subordination for any purposes whatsoever and shall not constitute preferential transfers, fraudulent transfers, or fraudulent conveyances under the Bankruptcy Code or any applicable non-bankruptcy law.

Except as otherwise provided in the Plan or the Confirmation Order, all Cash necessary for the Reorganized Debtors to make payments required pursuant to the Plan shall be obtained from the Exit Facility and the Reorganized Debtors' Cash balances, including Cash from operations; provided, however, that the Reorganized Debtors' Cash balances – and not Cash from the Exit Facility – shall be used to pay the DIP Facility Claims and all cure costs in connection with any assumed Executory Contract or Unexpired Lease.

If an Alternative Exit Facility will be provided by an Alternative Exit Lender, provisions similar the authorization provisions above shall be included in the Plan Supplement.

### 7.    Management Incentive Plan

On the Effective Date, 15% of the equity of RT Asset Company shall be reserved for the issuance by the New Board of stock, warrants, options, or other Equity Securities in connection with RT Asset Company's MIP (such reserve, the "MIP Pool"), and issuances of the New Common Shares in respect thereof will dilute the Exchange Common Shares issued on the Effective Date.  Of such equity of RT Asset Company in the MIP Pool, all of which shall be subject to a three-year vesting period, 7.5% shall be allocated to RT Asset Company's management upon implementation of the MIP and 7.5% shall be reserved for future allocations.  The remaining terms of the MIP shall be determined by the New Board.

### 8.    Issuance of New Common Shares, and Related Documentation

On and after the Effective Date, RT Asset Company shall be authorized to and shall issue the New Common Shares to the Holders of Claims and Equity Interests, as applicable, as set forth in this Plan without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity.  On the Effective Date, the Exchange Common Shares are to be distributed (or issuable under the Amended Organizational Documents), as provided in the Plan, to each Holder of Allowed Subclass 3B Claims and each Holder of Allowed Subclass 3A Claims with regard to the GS Adjustment Equity as set forth in ARTICLE III.C.3.c of the Plan.  The issuance of New Common Shares by RT Asset Company is authorized without the need for any further corporate action or without any further action by the Debtors or the Reorganized Debtors, as applicable.  All of the shares of New Common Shares issued pursuant to the Plan shall be duly authorized, validly issued, fully paid and non-assessable.

On the Effective Date, RT Asset Company and all the holders of the Exchange Common Shares shall be deemed to be parties to the Amended Organizational Documents, substantially in the form contained in the Plan Supplement, without the need for execution by any such holder.  The Amended Organizational Documents shall be binding on RT Asset Company and all parties receiving, and all holders of, New Common Shares; provided, that regardless of whether such parties execute the Amended Organizational Documents, such parties shall be deemed to have signed the Amended Organizational Documents which shall be binding on such parties as if they had actually signed it.  To the extent that RT Asset Company elects to be organized as a limited liability company, each Holder receiving New Common Shares may be required to execute a signature page to the applicable limited liability company agreement or Amended Organizational Documents as a condition precedent to such distribution, to the extent that such Holder is not deemed to accept any and all of such terms as a condition to receiving such distribution.

As of the Petition Date, no class of Equity Securities of Holding was registered under the Securities Exchange Act, and Holding was not subject to any of the periodic reporting obligations of such Act.  Except as otherwise provided under the Amended Organizational

Documents, in each case consistent with the RSA, or unless otherwise determined by the New Board in accordance with applicable non-bankruptcy law, it is intended that, from or after the Effective Date, neither RT Asset Company nor RT Lodge Company will have any class of its Equity Securities registered under or become subject to any of the periodic reporting obligations of such Act.

To the extent that any such instruments constitute "securities" under applicable securities laws, the offer and sale of Exit Term Loans, Exchange Common Shares pursuant to the Plan shall be effected without registration under Section 5 of the Securities Act, and without registration under any applicable state securities or "blue sky" law, in reliance upon the exemption from such registration requirements afforded by section 1145 of the Bankruptcy Code.

The offer and sale of Equity Securities to officers and other key employees of the Reorganized Debtors pursuant to the MIP shall be effected without registration under Section 5 of the Securities Act, and without registration under any applicable state securities or "blue sky" law, in reliance upon available exemptions from such registration requirements afforded by section 4(a)(2) of the Securities Act and Rule 506 of Regulation D and/or Rule 701 promulgated thereunder.

The New Common Shares of RT Asset Company shall constitute a single class of Equity Security in RT Asset Company and, other than as contemplated under the MIP or by issuance of New Common Stock upon any exercise of Warrants as set forth in the Plan, there shall exist no other Equity Securities, warrants, options, or other agreements to acquire any equity interest in RT Asset Company.  From and after the Effective Date, after giving effect to the transactions contemplated hereby, the authorized capital stock or other equity securities of RT Asset Company shall be that number of shares of New Common Shares as may be designated in the Amended Organizational Documents.

### 9.    Substantive Consolidation for Plan Purposes

The Plan serves as a motion by the Debtors seeking entry, pursuant to section 105 of the Bankruptcy Code, of an order authorizing, on the Effective Date, the substantive consolidation of the Estates of all of the Debtors for purposes of classifying and treating all Claims under the Plan, including for voting, confirmation, and distribution purposes only. Substantive consolidation shall not (i) alter the state of incorporation of any Debtor for purposes of determining applicable law of any of the Causes of Action, Litigation Claim or Avoidance Action (ii) alter or impair the legal and equitable rights of the Debtors to enforce any of the Causes of Action, Litigation Claims or Avoidance Actions or (iii) otherwise impair, release, discharge, extinguish or affect any of the Causes of Action, Litigation Claims or Avoidance Actions, or issues raised as a part of any thereof.

If substantive consolidation is ordered, then on and after the Effective Date, all Assets and liabilities of the Debtors shall be treated as though they were merged into a single estate solely for purposes of treatment of and distributions on Claims.  All duplicative Claims (identical in both amount and subject matter) Filed against more than one of the Debtors shall automatically be expunged so that only one Claim survives against the consolidated Debtors.  All guarantees by any Debtor of the obligations of any other Debtor shall be eliminated so that any Claim and any guarantee thereof by any other Debtor, as well as any joint and/or several liability of any Debtor with respect to any other Debtor, shall be treated as one collective obligation of the Debtors.  Any alleged defaults under any applicable agreement with the Debtors arising from substantive consolidation under the Plan shall be deemed cured as of the Effective Date.

45

10.      **Release of Liens, Claims and Equity Interests**

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan, all Liens, Claims, Equity Interests, mortgages, deeds of trust, or other security interests against the property of the Estates shall be fully released, terminated, extinguished and discharged, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity.  Any Entity holding such Liens or Equity Interests will, pursuant to section 1142 of the Bankruptcy Code, promptly execute and deliver to the Reorganized Debtors and/or RT Lodge Company (as the case may be), such instruments of termination, release, satisfaction and/or assignment (in recordable form) as may be reasonably requested by the Reorganized Debtors and/or RT Lodge Company.

11.      **Amended Organizational Documents**

The Amended Organizational Documents shall satisfy the provisions of the Plan and the Bankruptcy Code, and shall (i) include, among other things, pursuant to section 1123(a)(6) of the Bankruptcy Code, a provision prohibiting the issuance of non-voting equity securities, but only to the extent required by section 1123(a)(6) of the Bankruptcy Code; (ii) authorize the issuance of New Common Shares in an amount not less than the amount necessary to permit the distributions thereof required or contemplated by the Plan; (iii) to the extent necessary or appropriate as determined by the Debtors (after consultation with each Holder of an Allowed Subclass 3B Claim and each Holder of an Allowed Subclass 3A Claim if any GS Adjustment Equity is distributed to such Holder), include restrictions on the Transfer of New Common Shares; and (iv) to the extent necessary or appropriate, include such provisions as may be needed to effectuate and consummate the Plan and the transactions contemplated herein.

Also, after the Effective Date, the Reorganized Debtors and/or RT Lodge Company, as the case may be, may amend and restate their limited liability company agreements, certificates or articles of incorporation and by-laws, and other applicable organizational documents, as permitted by applicable law and their respective charters, by-laws and other organizational documents.

12.      **Directors and Officers of RT Asset Company**

The New Board shall be comprised initially of five (5) directors, who shall consist of:  (i) the Chief Executive Officer of RT Asset Company (ii) two (2) directors selected by the Holders of a majority of the Allowed Subclass 3B Claims and (iii) two (2) independent directors (with an initial term of one year, after which the members of the New Board shall be appointed as provided in the Amended Organizational Documents.  Any directors designated pursuant to this section shall be subject to approval of the Bankruptcy Court pursuant to section 1129(a)(5) of the Bankruptcy Code.  The New Board shall have authorized or ratified any proposed transaction or transfer relating to any matters.

The board of directors of RT Lodge Company as of the Effective Date shall be selected by the Holders of a majority of the Allowed Subclass 3A Claims, each such Holder acting in its respective sole discretion.

Except as set forth in the Plan, any other directors or officers of the Debtors shall be deemed removed as of the Effective Date.

Pursuant to section 1129(a)(5) of the Bankruptcy Code, the Debtors shall disclose, in a Plan Supplement or on the record at the Confirmation Hearing, the identity and affiliations of any Person proposed to serve on the initial board of directors or as an officer of the Reorganized Debtors, and, to the extent such Person is an insider other than by virtue of being a director or officer, the nature of any compensation for such Person.  Each such director and each officer shall serve from and after the Effective Date pursuant to applicable law and the terms of the Amended Organizational Documents and the other constituent and organizational documents of the Reorganized Debtors.  The existing board of directors of Holding shall be deemed to have resigned on and as of the Effective Date, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity.

## 13.    Corporate Action

Each of the Debtors and the Reorganized Debtors and/or RT Lodge Company, as applicable, may take any and all actions to execute, deliver, File or record such contracts, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and implement the provisions of the Plan or to effectuate the Alternative Structures, including, without limitation, the distribution of the securities to be issued pursuant hereto in the name of and on behalf of RT Asset Company and/or RT Lodge Company, and, in each case, except as expressly required pursuant to the Plan or the RSA, without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by the security holders, officers or directors of the Debtors or the Reorganized Debtors, as applicable, or by any other Person.

Other actions necessary to effect the Alternative Structures may include:  (i) the execution and delivery of appropriate agreements or other documents of merger, amalgamation, consolidation, restructuring, conversion, disposition, transfer, arrangement, continuance, dissolution, sale, purchase or liquidation containing terms that are consistent with the terms of the Plan and that satisfy the applicable requirements of applicable law and any other terms to which the applicable Debtors or Reorganized Debtors (or RT Lodge Company, as applicable) may agree; (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption or delegation of any asset, property, right, liability, debt or obligation on terms consistent with the terms of the Plan and having other terms to which the applicable parties agree; (iii) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion, amalgamation, arrangement, continuance or dissolution pursuant to applicable state or provincial law; and (iv) all other actions that the applicable Debtors or Reorganized Debtors (or RT Lodge Company, as applicable) determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law in connection with the Alternative Structures.  If and to the extent necessary, any controlling organization or formation documents or agreements for the Reorganized Debtors and/or RT Lodge Company shall be deemed amended to authorize the foregoing.

Prior to, on or after the Effective Date (as appropriate), all matters provided for pursuant to the Plan that would otherwise require approval of the stockholders, directors, managers or members of any Debtor (as of prior to the Effective Date) shall be deemed to have been so approved and shall be in effect prior to, on or after the Effective Date (as appropriate) pursuant to applicable law and without any requirement of further action by the stockholders, directors, managers or members of such Debtors, or the need for any approvals, authorizations, actions or consents of any Person (except as expressly required pursuant to the RSA).

All matters provided for in the Plan involving the legal or corporate structure of any Debtor or any Reorganized Debtor, as applicable (or RT Lodge Company, as applicable), and any legal or corporate action required by any Debtor or any Reorganized Debtor as applicable (or RT Lodge Company, as applicable) in connection with the Plan, shall be deemed to have occurred and shall be in full force and effect in all respects, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by the security holders, officers or directors of any Debtor or any Reorganized Debtor, as applicable (or RT Lodge Company, as applicable), or by any other Person (except as expressly required pursuant to the RSA).  On the Effective Date, the appropriate officers of each Debtor and each Reorganized Debtor, as applicable (or RT Lodge Company, as applicable), are authorized to issue, execute, deliver, and consummate the transactions contemplated by, the contracts, agreements, documents, guarantees, pledges, consents, securities, certificates, resolutions and instruments contemplated by or described in the Plan in the name of and on behalf of the Debtor and each Reorganized Debtor, as applicable (or RT Lodge Company, as applicable), in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by any Person (except as expressly required pursuant to the RSA).  The secretary and any assistant secretary or managing member of each Debtor and each Reorganized Debtor, as applicable (or RT Lodge Company, as applicable), shall be authorized to certify or attest to any of the foregoing actions.

### 14.    Cancellation of Notes, Certificates and Instruments

Except for the purpose of evidencing a right to a distribution under this Plan and except as otherwise set forth in this Plan, on the Effective Date, all agreements, instruments, Securities and other documents evidencing any prepetition Claim against the Debtors (or, solely in the event that GS does not select Reorganized Holding to be RT Lodge Company, Equity Interests in Holding) and any rights of any Holder in respect thereof shall be deemed cancelled, discharged, and of no force or effect (including, solely in the event that GS does not select Reorganized Holding to be RT Lodge Company, any relating to the Equity Interests in Holding).  Except for the purpose of evidencing a right to a distribution under this Plan and except as otherwise set forth in this Plan, the holders of or parties to such cancelled instruments, Securities, and other documentation shall have no rights arising from or related to such instruments, Securities, or other documentation or the cancellation thereof and the obligations of the Debtors thereunder or in any way related thereto shall be fully released, terminated, extinguished and discharged, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by any Person. Notwithstanding such cancellation and discharge or anything to the contrary in the Plan or the Confirmation Order, the Prepetition Credit and Guaranty Agreement and any other agreement, instrument, or document related to each of the foregoing shall continue in full force and effect to the extent necessary to: (1) allow Holders of Claims and Equity Interests to receive Plan Distributions; (2) allow the Reorganized Debtors or the Distribution Agent (or RT Lodge Company, as applicable), as the case may be, to make distributions pursuant to the Plan; (3) allow the Prepetition Agent to receive distributions under the Plan on account of the Prepetition Secured Debt Claims, respectively, for further distribution in accordance with the Plan and the Prepetition Credit and Guaranty Agreement; (4) allow the Prepetition Agent to seek and/or receive compensation and/or reimbursement of fees and expenses in accordance with the Plan or any order of the Bankruptcy Court; (5) preserve all rights, remedies, indemnities, powers, and protections of the Prepetition Agent (including all rights to payment of fees and expenses) as against any person or entity other than the Debtors or Reorganized Debtors (or RT Lodge Company, as applicable), and any money or property distributable to the beneficial holders under the relevant instrument (including any

48

rights to priority of payment) and any exculpations of the Prepetition Agent (which rights, remedies, indemnities, powers and protections against all persons and entities other than the Debtors or Reorganized Debtors (or RT Lodge Company, as applicable) and against such distributable money or property and which exculpations shall survive and remain in full force and effect, and not be released, discharged or affected in any way by the terms of the Plan or the Confirmation Order, notwithstanding anything to the contrary contained in the Plan or the Confirmation Order); (6) allow the Prepetition Agent to enforce any rights and obligations owed to each of them under this Plan or the Confirmation Order; (7) permit the Prepetition Agent to appear and be heard in the Chapter 11 Cases, or in any proceeding in the Bankruptcy Court or any other court; (8) permit the Prepetition Agent to exercise rights and obligations relating to the interests of the Prepetition Secured Creditors, to the extent consistent with this Plan and the Confirmation Order, and (9) permit the Prepetition Agent to perform any functions that are necessary to effectuate any of the foregoing.  Except as expressly provided pursuant to this Plan, each of the Prepetition Agent, and their respective agents, successors, and assigns shall be fully relieved and discharged from all of their duties and obligations associated with the Prepetition Credit and Guaranty Agreement.  The commitments and obligations (if any) of the Prepetition Secured Creditors to extend any further or future credit or financial accommodations to any of the Debtors, any of their respective subsidiaries or any of their respective successors or assigns under the Prepetition Credit and Guaranty Agreement, shall fully terminate and be of no further force or effect on the Effective Date.

### 15.    Cancellation of Existing Instruments Governing Security Interests

Upon the full payment or other satisfaction of an Allowed Miscellaneous Secured Claim, or promptly thereafter, the Holder of such Allowed Miscellaneous Secured Claim shall deliver to the Debtors, Reorganized Debtors or RT Lodge Company, as applicable, any Collateral or other property of a Debtor held by such Holder, together with any termination statements, instruments of satisfaction, or releases of all security interests with respect to its Allowed Miscellaneous Secured Claim that may be reasonably required to terminate any related financing statements, mortgages, mechanics' or other statutory Liens, or lis pendens, or similar interests or documents.

On the Effective Date, any Lien in Collateral of any Debtor or Reorganized Debtor, as applicable (or RT Lodge Company, as applicable), held for the DIP Facility Claims and/or the Prepetition Secured Debt Claims shall be cancelled and of no further force or effect.  Notwithstanding any other provision hereof, as a condition of any distribution for the benefit of Holders of DIP Facility Claims and/or Prepetition Secured Debt Claims, the respective collateral agents therefore shall deliver to the Debtors or Reorganized Debtors, as applicable (or RT Lodge Company, as applicable), at the Debtors' or Reorganized Debtors' (or RT Lodge Company's, as applicable) expense, any Collateral or other property of a Debtor or Reorganized Debtor, as applicable (or RT Lodge Company, as applicable), held for DIP Facility Claims and/or Prepetition Secured Debt Claims, together with any termination statements, instruments of satisfaction, or releases of all Liens that may be reasonably requested by the Debtors or the Reorganized Debtors (or RT Lodge Company, as applicable) to terminate any related financing statements, mortgages, or similar interests or documents.

### 16.    Preserved Intercompany Claims; Intercompany Interests; Corporate Reorganization

As stated above in the definition of the term Restructuring in ARTICLE I.C of the Plan:  (1) if the Assets have not been sold by the Effective Date, then concurrently on the Effective Date, (a) the Equity Interests in RT Asset Company would be distributed to (x) each Holder of the Allowed Subclass 3A Claims (if any GS Adjustment Equity would be

distributed on account of such Claim) and (y) each Holder of the Allowed Subclass 3B Claims; (b) RTI would transfer its Assets, other than RT Lodge, and the Equity Interests in the Reorganized Subsidiaries (as well as any non-Debtor subsidiaries of RTI or the Reorganized Subsidiaries) to RT Asset Company; (2) if the RT Lodge has not been sold by the Effective Date, then concurrently on the Effective Date, Holding would transfer to each Holder of the Allowed Subclass 3A Claims its Pro Rata share of one hundred percent (100%) of the Equity Interests in RT Lodge Company; and (3) if GS does not select Reorganized Holding to be RT Lodge Company, the Equity Interests in Holding would be extinguished.  Consistent with ARTICLE III.C.4, ARTICLE V.C and ARTICLE V.Q of the Plan, the Debtors (with the written consent of each of the Prepetition Secured Creditors, which may not be unreasonably denied or delayed) may designate and allocate Assets of the Estates and related obligations (including, without limitation, the RT Asset Obligations and RT Lodge Obligations) of the Debtors among the Reorganized Debtors and RT Lodge Company pursuant to one or more exhibits to the Plan Supplement, as such allocation may be amended, modified and/or supplemented on or before the Effective Date.

On the Effective Date, or as soon thereafter as is practicable, without the need for any further corporate action or approval of any board of directors, management, or shareholders of any Debtor or Reorganized Debtor, as applicable (or RT Lodge Company, as applicable), (a) the certificates and all other documents, as well as any uncertificated interests, representing the Intercompany Interests shall be deemed to be in full force and effect (and shall be retained by the Holders thereof prior to the Effective Date) and (b) all Preserved Intercompany Claims and Intercompany Interests shall be reinstated in full or in part (collectively, the "Subsidiary Structure Maintenance") except, to the extent that the Debtors, Reorganized Debtors, their Affiliates or their successors, as applicable, as they determine necessary (after consultation with the Prepetition Secured Creditors), may effectuate Alternative Structures, which may include, without limitation, merger or dissolution of certain Debtors or Reorganized Debtors (and/or RT Lodge Company, as the case may be) and the cancellation of certain Intercompany Interests, the transfer of Intercompany Interests among Reorganized Debtors, their successors, RT Lodge Company or their Affiliates (other than any Equity Parent) or cancellation or discharge in full or in part of, or contribution, distribution or other transfer between and among the Debtors or their Affiliates (other than any Equity Parent) in full or in part of Preserved Intercompany Claims.

On the Effective Date, or as soon thereafter as is practicable, the Debtors listed on Exhibit A to the Plan will be liquidated pursuant to the Plan and a certificate of cancellation or dissolution, as applicable for each such Debtor, will be filed with Delaware's Secretary of State or the appropriate authority immediately after the Effective Date.  Each such liquidation shall be effective as of the Effective Date pursuant to the Plan and the Confirmation Order.

## 17.    Restructuring Transactions

On or after the Confirmation Date, the Debtors, Reorganized Debtors or RT Lodge Company, as applicable, may undertake the Restructuring Transactions and take all other actions consistent with this Plan as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Restructuring Transactions under and in connection with this Plan, including effectuation of the Alternative Structures and all Asset Sales (including, without limitation, the sale of RT Assets and/or RT Lodge in one or more sale transactions).

Consistent with ARTICLE III.C.4 and ARTICLE V.P of the Plan, the Debtors (with the written consent of each of the Prepetition Secured Creditors) may designate and allocate Assets of the Estates and related Allowed Claims against and obligations of the Debtors

(including, without limitation, the RT Asset Obligations and RT Lodge Obligations) among the Reorganized Debtors and RT Lodge Company pursuant to one or more exhibits to the Plan Supplement, as such allocation may be amended, modified and/or supplemented on or before the Effective Date.

### 18.    Consenting Lenders Fees and Expenses

Prior to the Effective Date, to the extent not previously paid pursuant to the DIP Orders, the Debtors shall pay in full in Cash all outstanding Consenting Lenders Fees and Expenses incurred, or estimated to be incurred, through the Effective Date, in accordance with the terms of the applicable orders (including the DIP Orders), engagement letters, or other applicable contractual arrangements, but without regard to any notice or objection period as may be contained in such applicable orders, engagement letters, or other applicable contractual arrangements, subject to adjustment, if necessary, for the actual Consenting Lenders Fees and Expenses incurred.

### 19.    Asset Sales Postpetition

The Debtors shall have commenced a sale process for the Assets in accordance with the Sale Milestones, which require that the Debtors file with the Bankruptcy Court a motion to approve marketing and bidding procedures for the Assets.  The requested bidding procedures shall require that (i) an Auction be held (if a Topping Bid is received by the Debtors) no earlier than 60 days and no later than 105 days after such order is entered; (ii) a Successful Bidder be selected no later than three days after such Auction; and (iii) the closing of the sale occur within 60 days after the Bankruptcy Court approves the sale to the Successful Bidder.  If a Topping Bid is received and a Successful Bid is selected after the Auction for the Assets, then the Confirmation Hearing shall be the sale hearing and the Confirmation Order shall be the order approving such sale under section 363 and/or 1123(a)(5)(D) of the Bankruptcy Code.  The Successful Bid at the Auction must provide for cash consideration at closing that is sufficient to pay all of the Prepetition Secured Debt Claims and DIP Facility Claims (other than any such Claims that have been credit bid in connection with a Successful Bid) in cash in full on the closing date.

Any Topping Bid (or Topping Bids) must provide for cash deposits of no less than 10% of the purchase price and provide for cash consideration at closing that is sufficient to pay all DIP Facility Claims and Prepetition Secured Debt Claims (other than any such Claims that have been credit bid in connection with a Successful Bid) in cash in full on the closing date.

The DIP Facility Lenders and the Prepetition Secured Creditors reserve the right to credit bid the entire amount of all obligations under the DIP Credit Agreement and Prepetition Credit and Guaranty Agreement, as applicable, including without limitation, all principal interest, fees, expenses, call premiums, yield maintenance and other fees and charges; provided, however, the Debtors expressly preserve their rights to contest the allowance of any call premium and yield maintenance premium under the Prepetition Credit and Guaranty Agreement and shall not be required under the DIP Facility to stipulate the allowance of such premiums.  Any credit bid by the DIP Facility Lenders or the Prepetition Secured Creditors may include the principal amount of obligations under the DIP Credit Agreement and Prepetition Credit and Guaranty Agreement, as applicable, plus all accrued interest.

The sale of the Assets to any Successful Bidder shall be on an "as is, where is and with all faults" basis and without representations or warranties of any kind, nature, or description by the Debtors, their agents or estates except to the extent set forth in the Successful Bidder's asset purchase agreement.  If a Successful Bid is selected after the

51

Auction for the Assets, at the Confirmation Hearing, the Debtor shall seek Bankruptcy Court approval of the sale of the Assets to the Successful Bidder(s), free and clear of all liens, claims and encumbrances, and other interests pursuant to section 363(f) and/or 1141(c) of the Bankruptcy Code with all such liens, claims and encumbrances, and other interests attaching to the proceeds of the sale, except as otherwise provided with the same validity and in the same order of priority as they attached to the Assets prior to the sale. The Debtor shall submit and present additional evidence, as necessary, at the Confirmation Hearing demonstrating that such sale is fair, reasonable, and in the best interest of the Debtors' estates and all interested parties, and satisfies the standards necessary to approve a sale of substantially all of a debtor's assets articulated by the Court of Appeals for the Third Circuit in *In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143 (3d Cir. 1986), as applicable. The closing of the sale to a Successful Bidder shall take place in accordance with the terms of the Successful Bidder's asset purchase agreement, as approved by the Bankruptcy Court at the Confirmation Hearing and the approved bidding procedures.

Notwithstanding anything to the contrary herein, all Asset Sales shall be subject to the prior consent of the Prepetition Secured Creditors unless such sale (1) does not require the consent of the Prepetition Secured Creditors because it satisfies the standards set forth in section 6.9(e) of the DIP Credit Agreement or (2) provides for the binding commitment to pay and pays the Prepetition Secured Creditors in at or above an agreed-upon release price in Cash at closing.

Upon payment in full from Net Sale Proceeds of the DIP Facility Claims and the Prepetition Secured Debt Claims (other than any such Claims that have been credit bid in connection with a Successful Bid), the Prepetition Secured Debt Claims shall no longer be classified or treated under the Plan, the Restructuring described herein shall not occur, and the Reorganized Debtors (including, without limitation, RT Asset Company in its capacity as Distribution Agent under this Plan) shall administer the Reorganized Debtors' assets and implement the Plan as a liquidating "pot" plan for the benefit of its constituencies in accordance with the terms of this Plan and the Confirmation Order.

## H.    TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### 1.    Assumption and Rejection of Executory Contracts and Unexpired Leases

On the Effective Date, all Executory Contracts and Unexpired Leases of the Debtors shall be deemed assumed by the applicable Debtor in accordance with, and subject to, the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, except for those Executory Contracts (including, without limitation, employment agreements) and Unexpired Leases that:

- have previously expired or terminated pursuant to their own terms or by agreement of the parties thereto;

- have been rejected by order of the Bankruptcy Court;

- are the subject of a motion to reject pending on the Effective Date;

- are identified in the Rejected Executory Contract/Unexpired Lease List; or

- are rejected pursuant to the terms of the Plan.

52

Without amending or altering any prior order of the Bankruptcy Court approving the assumption or rejection of any Executory Contract or Unexpired Lease, entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of such assumptions and rejections pursuant to sections 365(a) and 1123 of the Bankruptcy Code. To the maximum extent permitted by law, to the extent any provision in any Executory Contract or Unexpired Lease assumed or assumed and assigned to a successor pursuant to the Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the Debtors' assumption or assumption and assignment to a successor (including, but not limited to, RT Asset Company or RT Lodge Company, as applicable) of such Executory Contract or Unexpired Lease, then such provision shall be deemed modified such that the transactions contemplated by the Plan shall not entitle the non-debtor party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto. Each Executory Contract and Unexpired Lease assumed pursuant to this Article of the Plan shall revest in and be fully enforceable by the Debtors or the applicable successor (including, but not limited to, RT Asset Company or RT Lodge Company, as the case may be) in accordance with its terms, except as modified by agreement of the counterparty to the Executory Contract or Unexpired Lease, any order of the Bankruptcy Court authorizing and providing for its assumption, or applicable law.

## 2.    Assignment of Executory Contracts or Unexpired Leases

As of the Effective Date, unless the DIP Facility Claims and Prepetition Secured Debt Claims (other than any such Claims that have been credit bid in connection with a Successful Bid) shall have been paid in full from Net Sale Proceeds on or before the Effective Date, all Executory Contracts and Unexpired Leases not identified in the Rejected Executory Contract/Unexpired Lease List shall be deemed assumed and, to the extent applicable, assigned to the designated Reorganized Debtor; *provided, however*, that such Executory Contracts and Unexpired Leases relating to RT Lodge shall be assumed and assigned to RT Lodge Company. The Confirmation Order shall constitute an order of the Bankruptcy Court approving any such assumptions identified in this Article of the Plan pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date.

## 3.    Rejection of Executory Contracts or Unexpired Leases

All Executory Contracts and Unexpired Leases identified in the Rejected Executory Contract/Unexpired Lease List shall be deemed rejected as of the Effective Date. In addition, if the DIP Facility Claims and Prepetition Secured Debt Claims (other than any such Claims that have been credit bid in connection with a Successful Bid) shall have been paid in full from Net Sale Proceeds on or before the Effective Date, then all Executory Contracts and Unexpired Leases that have not been (a) assumed and assigned to the Successful Bidder(s) as of the closing of the sale or (b) identified in a schedule of assumed Executory Contracts and Unexpired Leases that may be included in the Plan Supplement shall be deemed rejected as of the Effective Date. The Confirmation Order shall constitute an order of the Bankruptcy Court approving the rejections identified in the Rejected Executory Contract/Unexpired Lease List and this Article of the Plan pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date.

All Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases pursuant to the Plan or the Confirmation Order, if any, must be Filed with the Bankruptcy Court: (a) within thirty (30) days after the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection or such other date as may be set by such order, other than for Unexpired Leases of non-residential real property; and (b) by the later of thirty (30) days (x) after the date the Debtors relinquish control of the premises to the affected landlord counterparty by notifying the affected landlord counterparty in writing of the Debtors' unequivocal and irreversible

53

surrender of the leased property to the affected landlord counterparty and either (i) turning over keys to the affected landlord or its property manager, or (ii) notifying the affected landlord or its property manager in writing that the keys are not available but that the landlord may rekey the leased premises, and (y) the effective date of the rejection, for Unexpired Leases of non-residential real property ((a) and (b) together, the "Rejection Claim Bar Date").  The Debtors or Reorganized Debtors, as the case may be, shall provide notice of such rejection and specify the appropriate deadline for the filing of such Proof of Claim.  The deadline for filing a Proof of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases pursuant to a prior order of the Bankruptcy Court shall be as set forth in such order; provided, however if such order does not set such a deadline, the deadline shall be the Rejection Claim Bar Date.  Each Claim arising from the rejection of any Executory Contract or Unexpired Lease shall be treated as a General Unsecured Claim subject to any applicable limitation or defense under the Bankruptcy Code and applicable law.

Any Entity that is required to File a Proof of Claim arising from the rejection of an Executory Contract or an Unexpired Lease that fails to do so shall be forever barred, estopped and enjoined from asserting such Claim, and such Claim shall not be enforceable, against the Debtors, the Reorganized Debtors or the Estates, and the Debtors, the Reorganized Debtors and their Estates and property shall be forever discharged from any and all indebtedness and liability with respect to such Claim unless otherwise ordered by the Bankruptcy Court or as otherwise provided in the Plan.  All such Claims will, as of the Effective Date, be subject to the permanent injunction set forth in ARTICLE X.E.2 of the Plan.  If such Claim is untimely filed, it shall not be Allowed for distribution purposes pursuant to Plan, unless the Claims Objection Bar Date passes without an objection or other proceeding to disallow, or otherwise eliminate or reduce such Claim having been initiated.

Notwithstanding anything to the contrary herein, all rights of the Debtors, the Reorganized Debtors, RT Lodge Company and any counterparty to any Executory Contract or Unexpired Lease are reserved in the event that the Debtors, the Reorganized Debtors or RT Lodge Company, as applicable, amend their decision with respect to the rejection of any Executory Contract or Unexpired Lease.

### 4.     Cure of Defaults for Assumed Executory Contracts and Unexpired Leases

Any monetary amounts by which any Executory Contract or Unexpired Lease to be assumed hereunder is in default shall be satisfied, under section 365(b)(1) of the Bankruptcy Code, by the Debtors upon the earlier of assumption thereof and the Effective Date, by payment of the undisputed default amount in Cash or on such other terms as the parties to such Executory Contract or Unexpired Lease may otherwise agree, subject to ARTICLE VI.E of the Plan.  The Debtors may serve a notice on parties to Executory Contracts and Unexpired Leases to be assumed reflecting the Debtors' intention to assume the Executory Contract or Unexpired Lease in connection with this Plan and setting forth the proposed cure (if any).  If a counterparty to any Executory Contract or Unexpired Lease that the Debtors intend to assume does not receive such a notice, the proposed cure for such Executory Contract or Unexpired Lease shall be deemed to be zero dollars ($0).

Notwithstanding anything to the contrary in the Plan, with respect to any assumed Unexpired Lease of non-residential real property, the Debtors (or, if after the Effective Date, the applicable Reorganized Debtor or, solely in the case of any Unexpired Lease that relates to the RT Lodge and has been assumed and assigned to RT Lodge Company, RT Lodge Company), shall remain liable for all obligations arising under the Unexpired Lease that were not otherwise required to be asserted as a cure cost, including:  (1) for amounts owed or accruing under such Unexpired Lease that are unbilled or not yet due as of the

54

Confirmation Hearing regardless of when such amounts or obligations accrued, on account of common area maintenance, insurance, taxes, and similar charges; (2) any regular or periodic adjustment or reconciliation of charges under such Unexpired Lease that are not due or have not been determined as of the Confirmation Hearing; (3) any percentage rent that comes due under such Unexpired Lease; (4) post-assumption obligations under such Unexpired Lease; and (5) any obligations to indemnify the non-Debtor counterparty under such Unexpired Lease for any claims of third parties pursuant to the terms of the Unexpired Lease, which are not known or liquidated by the time of the Confirmation Hearing (and therefore not payable as a cure cost pursuant to Bankruptcy Code § 365(b)(1)(a)).  Other than with respect to cure amounts fixed in connection with this Plan, all rights of the parties to any assumed Unexpired Lease of non-residential real property to dispute amounts due thereunder are preserved.

### 5.   Objections to Assumption, Assignment or Cure of Executory Contracts or Unexpired Leases

Any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assumption or assignment to a successor or any related monetary cure amount must be Filed, served and actually received by the Debtors at least five (5) Business Days prior to the Confirmation Hearing.  Any counterparty to an Executory Contract and Unexpired Lease that fails to object timely to the proposed assumption, assignment or cure amount shall be deemed to have consented to such assumption or assumption and assignment, and to such cure, of its Executory Contract or Unexpired Lease.  The Confirmation Order shall constitute an order of the Bankruptcy Court approving any proposed assignments of Executory Contracts or Unexpired Leases pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date.  In the event of a dispute regarding assumption, assumption and assignment, or cure of any Executory Contract or Unexpired Lease, any applicable disputed cure payments shall be made following the entry of a Final Order or orders resolving the dispute and approving the assumption or assumption and assignment to a successor, and cure.  The Debtors  reserve the right to reject any Executory Contract or Unexpired Lease at any time in lieu of assuming or assuming and assigning it to a successor.  Should the parties be unable to resolve a dispute regarding the amount of any payments required to cure a default with respect to an Unexpired Lease being assumed by the Debtors within thirty (30) days following the Confirmation Date, such parties may request a hearing before the Bankruptcy Court to resolve such dispute upon fourteen (14) days' notice.

### 6.   Post-Effective Date Management Agreements

Subject to the prior written consent of the Prepetition Secured Creditors (or either of them as applicable to RT Asset Company or RT Lodge Company), nothing herein shall prevent or prohibit the Debtors, the Reorganized Debtors and/or RT Lodge Company from entering into new management employment agreements with their key management to be effective as of the Effective Date, covering, without limitation, base salary, incentives, and executive benefits.

### 7.   Director and Officer Insurance Policies

Upon the Effective Date, the Reorganized Debtors will have similar insurance coverage to the D&O Liability Insurance Policies in effect upon the Petition Date.  Any such policy in effect, including any coverage for an extended discovery period (or "tail policy"), as of the Effective Date, shall be deemed an assumed contract to the extent executory.  For the avoidance of doubt, any new D&O Liability Insurance Policies that are to be purchased and effective as of the Effective Date shall be in form and substance reasonably satisfactory to the Debtors and the Prepetition Secured Creditors.

55

8.      **Indemnification Provisions**

The Debtors may file (subject to the consent of the Prepetition Secured Creditors), as part of the Plan Supplement, a Schedule of Assumed Compensation and Benefit Programs in form and substance acceptable to the Prepetition Secured Creditors.  To the extent included in such Schedule of Assumed Compensation and Benefit Programs, indemnification provisions in place immediately prior to the Effective Date (whether in the by-laws, certificate of incorporation, board resolutions, contracts, or otherwise) for the current and former directors, officers and employees of the Debtors who served in such capacity with respect to the Debtors, or based upon any act or omission taken or omitted in such capacities for or on behalf of the Debtors, shall be assumed by the Reorganized Debtors, and shall survive effectiveness of the Plan unless rejected pursuant to ARTICLE VI.C of the Plan.  No such assumption shall in any way extend the scope or term of any indemnification provision beyond that contemplated in the underlying contract or document as applicable; provided, further, that the Reorganized Debtors shall have no indemnification obligations for any losses, liabilities, or expenses arising out of conduct determined by a Final Order to have constituted actual fraud, gross negligence, bad faith, or willful misconduct.

9.      **Compensation and Benefit Programs**

As stated in the subsection immediately above, the Debtors may file (subject to the consent of the Prepetition Secured Creditors, which consent shall not be unreasonably withheld), as part of the Plan Supplement, a Schedule of Assumed Compensation and Benefit Programs in form and substance acceptable to the Prepetition Secured Creditors. Except as otherwise provided in the Confirmation Order, the Plan and/or Plan Supplement, as identified in the Schedule of Assumed Compensation and Benefit Programs, unless rejected pursuant to ARTICLE VI.C of the Plan, all such identified employment and severance policies, and all compensation and benefit plans, policies, and programs of the Debtors applicable to its employees, retirees, and non-employee directors and the employees and retirees of its subsidiaries, including, without limitation, all savings plans, retirement plans, healthcare plans, disability plans, vacation and paid time off programs, severance benefit plans, incentive plans ((x) with the terms and payouts under such, and (y) other than equity incentive plans providing for the distribution of equity in the Debtors, which shall be replaced by the MIP), life, and accidental death and dismemberment insurance plans, are treated as Executory Contracts under the Plan and on the Effective Date shall be assumed pursuant to the provisions of sections 365 and 1123 of the Bankruptcy Code, in each case to the extent listed on the Schedule of Assumed Compensation and Benefit Programs.

Notwithstanding anything to the contrary herein, the Debtors may not adopt any new executive compensation or retention plans or bonuses, or make any related payments without the prior written consent of the Prepetition Secured Creditors, which consent shall not be unreasonably withheld.

10.     **Workers' Compensation Benefits**

Except as otherwise provided in the Plan, as of the Effective Date, the applicable Reorganized Debtor (or, solely to the extent related to the RT Lodge and assumed by RT Lodge Company, RT Lodge Company) shall continue to honor its obligations under: (i) all applicable workers' compensation laws in states in which the applicable Reorganized Debtor (or, as applicable, RT Lodge Company) operates; and (ii) the Debtors' written contracts, agreements, agreements of indemnity, self-insurer workers' compensation bonds, and any other policies, programs, and plans regarding or relating to workers' compensation and workers' compensation insurance.  All such contracts and agreements are treated as Executory Contracts under the Plan and, unless rejected pursuant to ARTICLE VI.C of the Plan, on the Effective Date shall be assumed and assigned to the applicable Reorganized

56

Debtor (or, solely to the extent related to the RT Lodge and assumed by RT Lodge Company, RT Lodge Company) pursuant to the provisions of sections 365 and 1123 of the Bankruptcy Code.  Notwithstanding anything to the contrary contained in the Plan, confirmation of the Plan shall not impair or otherwise modify any rights of the Reorganized Debtors or RT Lodge Company (as applicable) under any such contracts, agreements, policies, programs or plans regarding or relating to workers' compensation or workers' compensation insurance.

### 11.    Insurance Policies

Other than the insurance policies otherwise discussed herein, all other insurance policies to which any Debtor is a party as of the Effective Date shall be deemed to be and treated as Executory Contracts and shall, unless rejected pursuant to ARTICLE VI.C of the Plan, be assumed by the applicable Reorganized Debtor (as applicable) and shall continue in full force and effect thereafter in accordance with their respective terms.  RT Lodge Company shall enter into insurance policies in form and substance acceptable to GS in its sole discretion, which insurance policies shall be in full force and effect as of the Effective Date or as soon as practicable thereafter.

## I.    PROVISIONS GOVERNING DISTRIBUTIONS

### 1.    Distributions for Claims Allowed as of the Effective Date

Except as otherwise provided in the Plan, a Final Order or as agreed to by the relevant parties, the Distribution Agent shall make initial distributions under the Plan on account of Claims Allowed before the Effective Date on or as soon as practicable after the Initial Distribution Date.  To the extent reasonably practicable, the Reorganized Debtors or the Distribution Agent shall make distributions no less frequently than annually following the Effective Date.

### 2.    Distributions on Account of Claims Allowed After the Effective Date

(a)    Payments and Distributions on Disputed Claims:  Except as otherwise provided in the Plan, a Final Order or as agreed to by the relevant parties, if a Disputed Claim becomes an Allowed Claim after the Effective Date, distributions that would be past due under the Plan on account of such Disputed Claim if it had previously been an Allowed Claim shall be made within thirty (30) days after the Disputed Claim becomes an Allowed Claim, or as soon as practicable thereafter, without any interest to be paid on account of such Claim unless it is a Secured Clam and such payment is required under applicable bankruptcy law.

(b)    Special Rules for Distributions to Holders of Disputed Claims: Notwithstanding any provision otherwise in the Plan and except as otherwise agreed to by the relevant parties no partial payments and no partial distributions shall be made with respect to a Disputed Claim until all such disputes in connection with such Disputed Claim have been resolved by settlement or Final Order, and such Claim has become an Allowed Claim.  In the event that there are Disputed Claims requiring adjudication and resolution, the Reorganized

DOCS_LA:332991.15 76136/002

Debtors shall establish appropriate reserves for potential payment of such Claims pursuant to ARTICLE VII.B.3 of the Plan.

(c)    <u>The Disputed General Unsecured Claims Reserve</u>: On the Effective Date, the Reorganized Debtors shall establish from available Cash of the Debtors and withhold from distributions as a reserve for Class 4 a portion of the Class 4 Aggregate Cash Distribution (the "<u>Class 4 Reserve</u>"), which amount to be withheld shall be determined prior to the Effective Date by the Debtors (in consultation with the Prepetition Secured Creditors and any Creditors' Committee) subject to the following.  The amount of Cash to be withheld as a part of the Class 4 Reserve for the benefit of a Holder of a Disputed Claim in Class 4 shall be equal to the lesser of the amount set forth in the following clause (a) and the amount set forth in the following clause (b): (a) (i) if no estimation is made by the Bankruptcy Court pursuant to ARTICLE VIII in the Plan, the amount of Cash necessary to satisfy the distributions required to be made pursuant to the Plan based on the asserted amount of the Disputed Claim or, if the Claim is denominated as contingent or unliquidated as of the Distribution Record Date, the amount that the Debtors elect to withhold on account of such Claim in the Class 4 Reserve; or (b) Cash necessary to satisfy the distributions required to be made pursuant to the Plan based on an amount as may be agreed upon by the Holder of such Disputed Claim and the Reorganized Debtors.  As Disputed Claims are Allowed, the Distribution Agent shall distribute, in accordance with this section and the other terms of the Plan, Cash to Holders of Allowed General Unsecured Claims, and the Class 4 Reserve shall be adjusted accordingly.  To the extent reasonably practicable, any such distributions payable from the Class 4 Reserve to the holders of Allowed General Unsecured Claims shall be made no less frequently than annually following the Effective Date.

**3.    Delivery and Distributions and Undeliverable or Unclaimed Distributions**

(a)    <u>Record Date for Distributions</u>: At the close of business on the Distribution Record Date, the Claims Register and any register maintained by the Prepetition Agent or its agents (each, a "<u>Register</u>," and collectively the "<u>Registers</u>"), shall be closed and the Debtors or the Reorganized Debtors (as the case may be), the Distribution Agent, the Prepetition Agent, and their respective agents shall not be required to make any further changes in the record holders of any of the Claims.  The Debtors or the Reorganized Debtors (as the case may be), the Distribution Agent and the Prepetition Agent shall have no obligation to recognize any transfer of the Claims occurring on or after the Distribution Record Date.  Any party responsible for making distributions shall instead be authorized and entitled to recognize only those Holders of Claims listed on the Registers as of the close of

58

business on the Distribution Record Date.  If a Claim, other than one based on a publicly traded security, is transferred 20 or fewer days before the Distribution Record Date, the Distribution Agent shall make distributions to the transferee only to the extent practical and, in any event, only if the relevant transfer form contains an unconditional and explicit certification and waiver of any objection to the transfer by the transferor.

At the close of business on the Distribution Record Date, the transfer ledgers for the Equity Interests in Holding shall be closed until the Effective Date, and there shall be no further changes in the record holders of such Equity Interests until the Effective Date.

The Reorganized Debtors, the Distribution Agent, and each of their respective agents, successors, and assigns shall have no obligation to recognize the transfers of Claims or Equity Interests not occurring timely in accordance herewith and shall be entitled instead to recognize and deal for all purposes hereunder with only those record holders on the Claims Register, the Registers or the transfer ledgers, as applicable, as of the close of business on the Distribution Record Date irrespective of the number of distributions to be made under the Plan to such Persons or the date of such distributions.  The Prepetition Agent shall be authorized to provide its Register, if any, to the Reorganized Debtors or the Distribution Agent for purposes of making distributions under the Plan.

(b)     <u>Delivery of Distributions in General</u>: Distributions of Cash may be made either by check drawn on a domestic bank or wire transfer from a domestic bank, at the option of the Reorganized Debtors, except that, permissively, Cash payments made to foreign Creditors may be made in such funds and by such means as are necessary or customary in a particular foreign jurisdiction.

Except as otherwise provided in the Plan, Plan Distributions to Holders of Allowed Claims shall be delivered to the address for each such Holder as indicated on the Debtors' records as of the date of any such distribution or on the Registers with respect to Holders of Prepetition Secured Debt Claims; provided, however, that the manner of such distributions shall be determined at the discretion of the Debtors or the Reorganized Debtors, as applicable; and provided further, that the address for each Holder of an Allowed Claim shall be deemed to be the address set forth in any Proof of Claim Filed by that Holder or in each of the Registers with respect to Holders of Prepetition Secured Debt Claims.

Notwithstanding any provisions in the Plan to the contrary, the Prepetition Credit and Guaranty Agreement shall continue in effect to the extent necessary to allow the Debtors or Reorganized Debtors, as

59

applicable, either directly or through the Distribution Agent to make Plan Distributions pursuant to this Plan on account of the Prepetition Secured Debt Claims.  The Prepetition Agent shall not act as Distribution Agent with respect to any distributions of Exit Term Loan, New Common Stock, or, except as expressly provided in the Plan or in the Confirmation Order, any other distributions under the Plan and shall have no responsibility or liability for such distributions.

(c)     <u>Distributions by Distribution Agents</u>: Except as otherwise set forth in this ARTICLE VII.B of the Plan, all or a portion of the Plan Distributions shall be made by the Reorganized Debtors as Distribution Agent, or by such other Entity or Entities designated by the Debtors as Distribution Agent(s) on or before the Effective Date or thereafter, unless the Plan or the Confirmation Order specifically provides otherwise.  The Reorganized Debtors, or such other Entity or Entities designated by the Debtors to be Distribution Agent(s), shall not be required to give any bond or surety or other security for the performance of such Distribution Agent's duties unless otherwise ordered by the Bankruptcy Court.

The Distribution Agent shall be empowered to (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (b) make all Plan Distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Distribution Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Distribution Agent to be necessary and proper to implement the provisions of the Plan.

(d)     <u>Minimum Distributions</u>: Notwithstanding anything herein to the contrary, the Reorganized Debtors or the Distribution Agent shall not be required to make distributions or payments of less than $100 and shall not be required to make partial distributions or payments of fractions of dollars, shares or warrants.  Whenever any payment or distribution of a fraction of a dollar, fraction of a share of New Common Shares under the Plan would otherwise be called for, the actual payment or distribution shall reflect a rounding down of such fraction to the nearest whole dollar or whole share.

(e)     <u>Undeliverable Distributions</u>:

1.    Holding of Certain Undeliverable Distributions:  If any distribution to a Holder of an Allowed Claim made in accordance herewith is returned to the Reorganized Debtors (or their Distribution Agent(s)) as undeliverable, no further distributions shall be made to such Holder unless and until the Reorganized Debtors (or their Distribution Agent) are notified in writing of

such Holder's then current address, at which time all currently due missed distributions shall be made to such Holder within thirty (30) days following such notification or as soon as practicable thereafter. Undeliverable distributions shall remain in the possession of the Reorganized Debtors, subject to the following subsection hereof, until such time as any such distributions become deliverable.  Undeliverable distributions shall not be entitled to any interest, dividends or other accruals of any kind.

2. Failure to Claim Undeliverable Distributions:  Except as otherwise provided in the Plan, any Holder of an Allowed Claim, irrespective of when a Claim becomes an Allowed Claim, that does not notify the Reorganized Debtors of such Holder's then current address in accordance herewith within the latest of (i) one year after the Effective Date, (ii) 60 days after the attempted delivery of the undeliverable distribution and (iii) 180 days after the date such Claim becomes an Allowed Claim shall have its Claim for such undeliverable distribution discharged and shall be forever barred, estopped and enjoined from asserting any such Claim against the Reorganized Debtors or their property.  In such cases, (i) any Exchange Common Shares, or Cash held for distribution on account of Allowed Claims in Class 4  shall be redistributed to Holders of Allowed Claims in such Class and as may be limited by the Plan, within seventy-five (75) days thereafter and (ii) any Cash held for distribution to any other creditors shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and become property of the Reorganized Debtors, free of any Claims of such Holder with respect thereto.  Nothing contained herein shall require the Reorganized Debtors or any Distribution Agent(s) to attempt to locate any Holder of an Allowed Claim.

3. Failure to Present Checks:  Checks issued by the Distribution Agent on account of Allowed Claims shall be null and void if not negotiated within 120 days after the issuance of such check. Requests for reissuance of any check shall be made directly to the Distribution Agent by the Holder of the relevant Allowed Claim with respect to which such check originally was issued.  Any Holder of an Allowed Claim holding an un-negotiated check that does not request reissuance of such un-negotiated check within 180 days after the date of mailing or other delivery of such check shall have its Claim for such un-negotiated check discharged and be discharged and forever barred, estopped and enjoined from asserting any such Claim against the Reorganized Debtors or their property.  In such cases, any Cash held for payment on account of such Claims shall be property of the Reorganized Debtors, free of any Claims of such Holder with respect thereto.  Nothing

61

contained herein shall require the Reorganized Debtors to attempt to locate any Holder of an Allowed Claim.

### 4.      Compliance with Tax Requirements/Allocations

In connection with the Plan, to the extent applicable, the Reorganized Debtors shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions pursuant hereto shall be subject to such withholding and reporting requirements.  Notwithstanding any provision in the Plan to the contrary, the Reorganized Debtors and the Distribution Agent shall be authorized to take any and all actions that may be necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions or establishing any other mechanisms they believe are reasonable and appropriate.  The Reorganized Debtors reserve the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support and other spousal awards, and related liens and encumbrances. Notwithstanding the foregoing, each Holder of an Allowed Claim that is to receive a distribution hereunder shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any Government Unit, including income, withholding and other tax obligations, on account of such distribution.  The Reorganized Debtors and the Distribution Agent(s) have the right, but not the obligation, not to make a distribution until such Holder has made arrangements satisfactory to the Reorganized Debtors and the Distribution Agent(s) for payment of any such tax obligations.  The Reorganized Debtors and the Distribution Agent(s) may require, as a condition to the receipt of a distribution, that the Holder of an Allowed Claim complete the appropriate Form W-8 or Form  W-9, as applicable to each Holder.  If such Holder fails to comply with such request within one year, such distribution shall be deemed an unclaimed distribution.

In connection with the distribution of New Common Shares to current or former employees of the Debtors, RT Asset Company shall take whatever actions are necessary to comply with applicable U.S. federal, state, local and non-U.S. tax withholding obligations, including, when applicable, withholding from distributions a portion of the New Common Shares, selling such securities or requiring Holders of such securities to contribute the Cash necessary to satisfy tax withholding obligations including, without limitation, income, social security and Medicare taxes, and RT Asset Company shall pay such withheld taxes to the appropriate Governmental Unit.

To the extent that any Allowed Claim entitled to distribution under the Plan consists of indebtedness and accrued but unpaid interest thereon, such distributions shall, for all income tax purposes, be allocated first to the principal amount of the Claim (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claim, to the portion of such Claim representing accrued but unpaid interest.

### 5.      Timing and Calculation of Amounts to Be Distributed

On the Effective Date or as soon as reasonably practicable thereafter (or if a Claim is not an Allowed Claim on the Effective Date, on the date that such a Claim becomes an Allowed Claim, or as soon as reasonably practicable thereafter), or at such other time as may be specified in the Plan, each Holder of an Allowed Claim against the Debtors shall receive the full amount of the distributions that the Plan provides for Allowed Claims in the applicable Class, provided that, in the event that any payment or act under the Plan is

required to be made or performed on a date that is not on a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.  If and to the extent that there are Disputed Claims, distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in ARTICLE VII of the Plan. Except as otherwise provided herein, Holders of Claims shall not be entitled to interest, dividends or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.

### 6.    Setoffs

        The Debtors and the Reorganized Debtors may withhold (but not setoff except as set forth below) from the distributions called for hereunder on account of any Allowed Claim, other than the Allowed Claim of a Prepetition Secured Creditor and other than from distributions consisting of payments to be made under an assumed Executory Contract or assumed Unexpired Lease to the extent such withholding is precluded thereunder by enforceable provisions thereof, an amount equal to any claims, equity interests, rights and Causes of Action of any nature that the Debtors or the Reorganized Debtors may hold against the Holder of any such Allowed Claim.  In the event that any such claims, equity interests, rights and Causes of Action of any nature that the Debtors or the Reorganized Debtors may hold against the Holder of any such Allowed Claim, other than the Allowed Claim of a Prepetition Secured Creditor, are adjudicated by Final Order or otherwise resolved, the Reorganized Debtors may, pursuant to section 553 of the Bankruptcy Code or applicable non-bankruptcy law, set off against any Allowed Claim, other than the Allowed Claim of a Prepetition Secured Creditor, and the distributions to be made pursuant hereto on account of such Allowed Claim (before any distribution is made on account of such Allowed Claim), the amount of any adjudicated or resolved claims, equity interests, rights and Causes of Action of any nature that the Debtors or the Reorganized Debtors may hold against the Holder of any such Allowed Claim, but only to the extent of such adjudicated or resolved amount (and except as such set off may be precluded by an assumed Executory Contract or assumed Unexpired Lease to the extent precluded thereunder by enforceable provisions thereof).  Neither the failure to effect such a setoff nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors or the Reorganized Debtors of any such claims, equity interests, rights and Causes of Action that the Debtors or the Reorganized Debtors may possess against any such Holder, except as specifically provided herein.

### 7.    Surrender of Canceled Instruments or Securities

        As a condition precedent to receiving any distribution on account of its Allowed Claim, each record Holder of a Prepetition Secured Debt Claim shall be deemed to have surrendered the certificates or other documentation underlying each such Claim, and all such surrendered certificates and other documentations shall be deemed to be canceled pursuant to ARTICLE V.N and ARTICLE V.O of the Plan, except to the extent otherwise provided in the Plan.

### 8.    Lost, Stolen, Mutilated or Destroyed Securities

        In addition to any requirements under any applicable agreement and applicable law, any Holder of a Claim or Equity Interest evidenced by a security or note that has been lost, stolen, mutilated, or destroyed will, in lieu of surrendering such security or note to the extent required by the Plan, deliver to the Distribution Agent:  (x) evidence reasonably satisfactory to the Distribution Agent of such loss, theft, mutilation, or destruction; and (y) such security or indemnity as may be required by the Distribution Agent to hold such party harmless from any damages, liabilities, or costs incurred in treating such individual as a Holder of an Allowed Claim or Equity Interest.  Upon compliance with this Article of the Plan as

63

determined by the Distribution Agent by a Holder of a Claim or Equity Interest evidenced by a security or note, such Holder will, for all purposes under the Plan, be deemed to have surrendered such security or note to the applicable Distribution Agents.

## J.    PROCEDURES CONCERNING CONTINGENT, UNLIQUIDATED AND DISPUTED CLAIMS

### 1.    Rights of Reorganized Debtors with Respect to Allowance of Claims and Equity Interests

Notwithstanding anything to the contrary herein, after the Effective Date and subject to the other provisions of the Plan, the Reorganized Debtors shall have and shall retain any and all rights and defenses under bankruptcy or nonbankruptcy law that the Debtors had with respect to any Claim or Equity Interest, except with respect to any Claim or Equity Interest deemed Allowed under the Plan (including the Prepetition Secured Debt Claims) or by orders of the Bankruptcy Court.

### 2.    No Distributions to Holders of Disputed Claims or Equity Interests Pending Resolution of the Dispute

Under no circumstances shall any distributions be made on account of any Claim or Equity Interest that is not an Allowed Claim or Equity Interest.  Except as expressly provided in the Plan or in any order entered in the Chapter 11 Cases prior to the Effective Date (including, without limitation, the Confirmation Order and the DIP Orders), no Claim or Equity Interest shall  become an Allowed Claim unless and until such Claim or Equity Interest is deemed Allowed under the Plan or the Bankruptcy Code or the Bankruptcy Court has entered a Final Order, including, without limitation, the Confirmation Order, in the Chapter 11 Cases allowing such Claim or Equity Interest.  No payment or other distribution or treatment shall be made on account of a Disputed Claim or Equity Interest, even if a portion of the Claim or Equity Interest is not disputed, unless and until such Disputed Claim or Equity Interest becomes an Allowed Claim or Equity Interest and the amount of such Allowed Claim or Equity Interest is determined by a Final Order, provided, however, that the Reorganized Debtors and the subject Holder, may determine allowance of a Disputed Claim or Equity Interest after the Effective Date without further order of the Bankruptcy Court. Notwithstanding any other provision of the Plan, the Reorganized Debtors and any Distribution Agent shall have no obligation to make any distribution to a specific Holder of an Allowed Claim if such Holder is also the Holder of a Disputed Claim.

### 3.    Resolving Disputed Claims and Equity Interests

All of the following objection, estimation and resolution procedures are cumulative and not exclusive of one another.

(a)    <u>Generally</u>: The Debtors and Reorganized Debtors intend to attempt to resolve Disputed Claims and Equity Interests consensually or through judicial means outside the Bankruptcy Court.  Nevertheless, from and after the Confirmation Date but before the Effective Date, the Debtors, and, after the Effective Date, the Reorganized Debtors, shall have the exclusive right to object to Claims and Equity Interests and resolve such objections pending as of the Confirmation Date and, may, in their discretion, file with the Bankruptcy Court an objection to the allowance of any Disputed Claim or Equity Interest or any other appropriate motion or adversary proceeding with respect thereto

64

until the Claims Objection Bar Date and prosecute all such pending objections, motions or adversary proceedings. All such matters pending as of the Confirmation Date shall be litigated to Final Order, provided, however, that, except to the extent otherwise provided in the Confirmation Order, the Reorganized Debtors are authorized to settle, or withdraw any such matters with respect to any Disputed Claim or Equity Interest following the Effective Date without further notice or authorization of the Bankruptcy Court, in which event such Claim or Equity Interest shall be deemed to be an Allowed Claim or Equity Interest in the amount compromised for purposes of the Plan. The Reorganized Debtors shall have the sole authority to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order or approval of the Bankruptcy Court.

(b)     Estimation: After the Confirmation Date but before the Effective Date, the Debtors and, after the Effective Date, the Reorganized Debtors may, at any time, request that the Bankruptcy Court estimate (a) any Disputed Claim or Equity Interest pursuant to applicable law and (b) any contingent or unliquidated Claim or Equity Interest pursuant to applicable law, including, without limitation, section 502(c) of the Bankruptcy Code, and the Bankruptcy Court shall retain jurisdiction under 28 U.S.C. §§ 157 and 1334 to estimate any Disputed Claim or Equity Interest, contingent Claim or Equity Interest or unliquidated Claim or Equity Interest, including during the litigation concerning any objection to any Claim or Equity Interest or during the pendency of any appeal relating to any such objection. Claims or Equity Interests may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court. The rights and objections of all parties are reserved in connection with any such estimation proceeding.

## 4.     Distributions after Allowance of Disputed Claims or Equity Interests

Following the date on which a Disputed Claim or Equity Interest becomes an Allowed Claim or Equity Interest after the Initial Distribution Date, the Reorganized Debtors shall pay directly to the Holder of such Allowed Claim or Equity Interest the amount or consideration provided for under the Plan, as applicable, and in accordance therewith.

## K.     CONDITIONS PRECEDENT TO CONSUMMATION OF THE PLAN

The failure to satisfy or waive a condition to Consummation may be asserted, as applicable, by the Debtors, the Prepetition Agent and/or the Prepetition Secured Creditors regardless of the circumstances giving rise to the failure of such condition to be satisfied.

## 1. Conditions Precedent to Consummation

Consummation of the Plan shall occur on the Business Day as determined by the Debtors with the consent of the Prepetition Agent and the Prepetition Secured Creditors (not to be unreasonably withheld or delayed) after they reasonably determine that the following conditions have been met or waived pursuant to the provisions of ARTICLE IX of the Plan:

a. The Bankruptcy Court has entered the Confirmation Order not later than 90 days after the Petition Date (unless waived or extended as set forth in ARTICLE IX.B of the Plan), and such order is in form and substance reasonably acceptable to the Debtors, the Prepetition Agent, and the Prepetition Secured Creditors.

b. The Confirmation Order provides that, among other things, the Debtors, the Reorganized Debtors or RT Lodge Company, as appropriate, are authorized and directed to take all actions necessary or appropriate to consummate the Plan, including, without limitation, entering into, implementing and consummating the contracts, instruments, releases, leases, indentures and other agreements or documents or Alternative Structures created in connection with or described in the Plan.

c. All actions, documents, certificates and agreements necessary to implement the Plan have been effected or executed and delivered to the required parties and, to the extent required, Filed with the applicable Governmental Units in accordance with applicable laws.

d. The Plan Documents are consistent with, and in form and substance as required by the approvals and consents set forth in, the RSA; provided, however, for the avoidance of doubt, any Plan Documents regarding organizational and governance matters of the Reorganized Debtors, including, without limitation, the Amended Organizational Documents, shall be acceptable to the Debtors, each Holder of the Allowed Subclass 3B Claims and each Holder of the Allowed Subclass 3A Claims (if any GS Adjustment Equity is distributed on account of such Claim) each in their respective reasonable discretion.

e. The Debtors shall have established the RT Professional Fee Claim Reserve and funded the RT Professional Fee Claim Reserve with Cash in an amount equal to the RT Professional Fee Claim Reserve Amount.

f. The Debtors shall have established the RT Priority Claim Reserve and funded the RT Priority Claim Reserve with Cash in an amount equal to the RT Professional Fee Claim Reserve Amount.

g. The Debtors shall have established the RT Administrative Expense Claim Reserve and funded the RT Administrative Expense Claim Reserve with Cash in an amount equal to the RT Administrative Expense Claim Reserve Amount.

h. The DIP Facility Claims (other than any such Claims that have been credit bid in connection with a Successful Bid) shall have been repaid in cash in full.

i. The Debtors shall have paid the cure costs on account of all Assumed Contracts and Unexpired Leases.

j. All documents and agreements necessary to implement the Plan, including, without limitation, the Exit Loan Documents, the Amended Organizational Documents have (a) all conditions precedent to such documents and agreements

satisfied or waived pursuant to the terms of such documents or agreements, (b) been tendered for delivery and/or (c) been effected or executed, as applicable.

k.  The RSA is in full force and effect.

l.  All Consenting Lenders Fees and Expenses have been paid in accordance with ARTICLE V.R of the Plan.

m.  The New Board and senior management shall have been selected as contemplated by the Plan.

n.  All governmental and third-party approvals and consents, including Bankruptcy Court approval, necessary in connection with the transactions provided for in this Plan have been obtained, are not subject to unfulfilled conditions, and are in full force and effect, and all applicable waiting periods have expired without any action having been taken by any competent authority that would restrain, prevent, or otherwise impose materially adverse conditions on such transactions.

o.  All statutory fees and obligations then due and payable to the Office of the United States Trustee shall have been paid and satisfied in full.

## 2.    Waiver of Conditions

The conditions to Consummation of the Plan set forth in this Article of the Plan, other than the condition that the Bankruptcy Court has entered a Confirmation Order in form and substance reasonably acceptable to the Debtors, the Prepetition Agent and the Prepetition Secured Creditors, may be waived (or, with respect to the condition in ARTICLE IX.A.1 of the Plan that the Confirmation Order be entered within 120 days after the Petition Date, extended), in whole or in part, by the Debtors with the consent of the Prepetition Agent and the Prepetition Secured Creditors (which consent shall not be unreasonably withheld or delayed), in each case without further notice, leave, hearing or order of the Bankruptcy Court or any formal action and, thereupon, Consummation may occur.

## 3.    Notice of Effective Date

The Debtors or Reorganized Debtors, as the case may be, shall file with the Bankruptcy Court a notice of the occurrence of the Effective Date within a reasonable period of time after the conditions in ARTICLE IX.A of the Plan have been satisfied or waived pursuant to ARTICLE IX.B of the Plan.

## 4.    Effect of Non-Occurrence of Conditions to Consummation

If prior to Consummation of the Plan, the Confirmation Order is vacated pursuant to a Final Order, then except as provided in any order of the Bankruptcy Court vacating the Confirmation Order, (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan, assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan and any document or agreement executed pursuant hereto shall be deemed null and void except as may be set forth in a separate order entered by the Bankruptcy Court; and (3) nothing contained in the Plan shall:  (a) constitute a waiver or release of any Claims by or against, or any Equity Interests in, the Debtors or any other Entity, or Causes of Action; (b) prejudice in any manner the rights of the Debtors or any other Entity; or (c) constitute an admission, acknowledgement, offer or undertaking of any sort by the Debtors or any other Entity.

**L.    EFFECT OF CONFIRMATION; AND RELEASE, INJUNCTION AND RELATED PROVISIONS**

**1.    Compromise and Settlement**

a.  Except as expressly provided in the Plan or the Confirmation Order, all distributions and rights afforded under the Plan and the treatment of Claims and Equity Interests under the Plan shall be, and shall be deemed to be, in exchange for, and in complete satisfaction, settlement, discharge and release of, all Claims against the Debtors and any other obligations, suits, judgments, damages, debts, rights, remedies, Causes of Action or liabilities of any nature whatsoever, and of all Equity Interests, or other rights of a holder of an Equity Interest, relating to any of the Debtors, the Reorganized Debtors or RT Lodge Company or any of their respective assets, property and estates, or interests of any nature whatsoever, including any interest accrued on such Claims from and after the Petition Date, and regardless of whether any property shall  have been distributed or retained pursuant to the Plan on account of such Claims or other obligations, suits, judgments, damages, debts, rights, remedies, Causes of Action or liabilities, or Equity Interests or other rights of a holder of an Equity Security or other ownership interest, and upon the Effective Date, the Debtors, the Reorganized Debtors and RT Lodge Company shall (i) be deemed to have received a discharge under section 1141(d)(1)(A) of the Bankruptcy Code and release from any and all Claims and any other obligations, suits, judgments, damages, debts, rights, remedies, Causes of Action or liabilities, and any Equity Interests or other rights of a holder of an Equity Security or other ownership interest, of any nature whatsoever, including, without limitation, liabilities that arose before the Effective Date (including prior to the Petition Date), and all debts of the kind specified in sections 502(g), 502(h) or 502(i) of the Bankruptcy Code, whether or not (a) a Proof of Claim based upon such debt is filed or deemed filed under section 501 of the Bankruptcy Code, (b) a Claim based upon such debt is Allowed under section 502 of the Bankruptcy Code (or is otherwise resolved), or (c) the holder of a Claim based upon such debt voted to accept the Plan and (ii) terminate and cancel all rights of any Equity Security holder in any of the Debtors and all Equity Interests, subject to the Subsidiary Structure Maintenance or Alternative Structures.

b.  Notwithstanding anything contained herein to the contrary, the allowance, classification and treatment of all Allowed Claims and their respective distributions and treatments under the Plan takes into account and conforms to the relative priority and rights of the Claims and the Equity Interests in each Class in connection with any contractual, legal and equitable subordination rights relating thereto whether arising under general principles of equitable subordination, section 510(b) and (c) of the Bankruptcy Code or otherwise.  As of the Effective Date, any and all such rights described in the preceding sentence are settled, compromised and released pursuant to the Plan.

c.  The Confirmation Order shall constitute the Bankruptcy Court's finding and determination that the settlements reflected in the Plan are (i) in the best interests of the Debtors, their estates and all Holders of Claims, (ii) fair, equitable and reasonable, (iii) made in good faith and (iv) approved by the Bankruptcy Court pursuant to sections 105(a) and 363 of the Bankruptcy Code and Bankruptcy Rule 9019.  In addition, the allowance, classification and treatment of Allowed Claims take into account any Causes of Action, whether under the Bankruptcy Code or otherwise under applicable non-bankruptcy law, that may exist:  (a) between the Debtors, Reorganized Debtors and Estates, on the one hand, and the Released Parties, on the other hand (to the extent set forth in the release contained in

68

ARTICLE X.B of the Plan); and (b) as between the Releasing Parties and the Released Parties (to the extent set forth in the release contained in ARTICLE X.C of the Plan); and, as of the Effective Date, any and all such Causes of Action are settled, compromised and released pursuant to the Plan. The Confirmation Order shall approve the releases in the Plan of all contractual, legal and equitable subordination rights or Causes of Action that are satisfied, compromised and settled pursuant to the Plan.

      d.  Except as expressly provided in the Plan or the Confirmation Order, all Persons shall be precluded from asserting against each of the Debtors, the Debtors' respective assets, property and Estates, the Reorganized Debtors and RT Lodge Company any other or further Claims, or any other obligations, suits, judgments, damages, debts, rights, remedies, Causes of Action or liabilities of any nature whatsoever, and all Equity Interests or other rights of a holder of an Equity Interest, relating to any of the Debtors, Reorganized Debtors or RT Lodge Company or any of their respective assets, property and estates based upon any act, omission, transaction or other activity of any nature that occurred prior to the Effective Date. In accordance with the foregoing, except as expressly provided in the Plan or the Confirmation Order, the Confirmation Order shall constitute a judicial determination, as of the Effective Date, of the discharge of all such Claims or other obligations, suits, judgments, damages, debts, rights, remedies, Causes of Action or liabilities, and any Equity Interests or other rights of a holder of an Equity Interest and termination of all rights of any such holder in any of the Debtors, pursuant to sections 524 and 1141 of the Bankruptcy Code, and such discharge shall void and extinguish any judgment obtained against the Debtors, the Reorganized Debtors, RT Lodge Company or any of their respective assets, property and Estates at any time, to the extent such judgment is related to a discharged Claim, debt or liability or terminated right of any holder of any Equity Interest in any of the Debtors or terminated Equity Interest.

## 2.      Mutual Release by the Debtors and Released Parties

      Except as otherwise provided in this Plan, on the Confirmation Date and effective as of the Effective Date, for good and valuable consideration provided by each of the Debtors, the Reorganized Debtors, RT Lodge Company and the Estates, on the one hand, and the Released Parties, on the other hand, to the fullest extent permissible under applicable law, the Debtors, the Reorganized Debtors, RT Lodge Company and the Estates, on the one hand, and the Released Parties, on the other hand, shall, and shall be deemed to, conclusively, absolutely, unconditionally, irrevocably, and forever release, waive, void, extinguish and discharge each other, their Related Persons, and their respective property from any and all Claims, Equity Interests, obligations, debts, rights, suits, damages, Causes of Action, remedies, judgments, defenses, counterclaims, and liabilities of any nature whatsoever, including any derivative Claims asserted or which could be asserted on behalf of a Debtor, a Reorganized Debtor and/or RT Lodge Company, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, disputed or undisputed, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity, or otherwise, that the Debtors, the Reorganized Debtors, RT Lodge Company and the Estates, on the one hand, and Released Parties, on the other hand, would have been legally entitled to assert against the other, their Related Persons or their property in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Equity Interest or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Reorganized Debtors, RT Lodge Company, any transactions contemplated by the Plan, the Chapter 11 Cases, the DIP Facility, the DIP Facility Loan Documents, the Prepetition Credit and Guaranty Agreement, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the Reorganized Debtors or RT Lodge Company, any payments,

distributions, or dividends any Debtor or Affiliate paid to or received from any Released Party, fraudulent or preferential transfer or conveyance, tort, contract, breach of fiduciary duty, violation of state or federal laws, including securities laws, negligence, the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Equity Interests prior to or in the Chapter 11 Cases, the negotiation, formulation, or preparation of the RSA, the Plan, the Disclosure Statement, the Plan Supplement, or related agreements, instruments, or other documents; provided, however, that the foregoing release shall not operate to waive or release any Claims, obligations, debts, rights, suits, damages, remedies, Causes of Action, and liabilities in respect of RT Lodge Company or any Debtor, Reorganized Debtor or Estate, on the one hand, or any Released Party, on the other hand, solely to the extent: (1) arising out of or relating to any act or omission of such purportedly released Entity that constitutes actual fraud, gross negligence, bad faith, or willful misconduct as determined by Final Order of a court of competent jurisdiction; or (2) arising under the Plan, the Confirmation Order, or the Plan Documents.

### 3.    Releases by Holders of Claims and Interests

Except as otherwise provided in this Plan, on the Confirmation Date and effective as of the Effective Date, for good and valuable consideration, to the fullest extent permissible under applicable law, each of the Releasing Parties shall, and shall be deemed to, conclusively, absolutely, unconditionally, irrevocably, and forever release, waive, void, extinguish, and discharge each Released Party (and each such Released Party so discharged and released shall be deemed discharged and released by the Releasing Parties) and their respective property from any and all Claims, Equity Interests, obligations, debts, rights, suits, damages, Causes of Action, remedies, judgments, defenses, counterclaims, and liabilities of any nature whatsoever, including any derivative Claims asserted or which could be asserted on behalf of a Debtor and/or a Reorganized Debtor, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, disputed or undisputed, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise, that such Releasing Party would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Equity Interest or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Reorganized Debtors, any transactions contemplated by the Plan, the Chapter 11 Cases, the Prepetition Credit and Guaranty Agreement, the DIP Facility, the DIP Facility Loan Documents, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors, any payments, distributions, or dividends any Debtor or Affiliate paid to or received from any Released Party, fraudulent or preferential transfer or conveyance, tort, contract, breach of fiduciary duty, violation of state or federal laws, including securities laws, negligence, the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Equity Interests prior to or in the Chapter 11 Cases, the negotiation, formulation, or preparation of the RSA, the Plan, the Disclosure Statement, the Plan Supplement, or related agreements, instruments, or other documents; provided, however, that the foregoing release shall not operate to waive or release any Claims, obligations, debts, rights, suits, damages, remedies, Causes of Action, and liabilities in respect of any Released Party, solely to the extent: (1) arising out of or relating to any act or omission of such Released Party that constitutes actual fraud, gross negligence, bad faith, or willful misconduct as determined by Final Order of a court of competent jurisdiction or (2) arising under the Plan, the Confirmation Order, or the Plan Documents.

70

4.      **Exculpation**

Notwithstanding anything contained herein to the contrary, the Exculpated Parties shall neither have, nor incur any liability to any Entity for any act on or after the Petition Date and on or before the Effective Date taken or omitted to be taken in connection with, or related to, the Chapter 11 Cases, the formulation, negotiation, solicitation, preparation, dissemination, confirmation, or implementation of the Plan, or consummation of the Plan, the RSA, the Disclosure Statement, the Plan Supplement, the Amended Organizational Documents, or other new corporate governance documents, any transactions contemplated by the Plan, the MIP, the Exit L/C Facility, the Exit Term Loan Facility, the issuance, distribution, and/or sale of any shares of the New Common Shares, or any other Security offered, issued, or distributed in connection with the Plan, the Chapter 11 Cases, or any contract, instrument, release or other agreement, or document created or entered into in connection with the Plan or Alternative Structures or any other prepetition or postpetition act taken or omitted to be taken in connection with or in contemplation of the restructuring of the Debtors; provided, however, that each Exculpated Party shall be entitled to rely upon the advice of counsel concerning his, her or its duties pursuant to, or in connection with, the Plan or any other related document, instrument, or agreement; provided, further, that the foregoing "Exculpation" shall have no effect on the liability of any Entity solely to the extent resulting from any such act or omission that is determined in a Final Order to have constituted fraud, gross negligence, bad faith or willful misconduct.

5.      **Injunctions**

(a)     <u>Confirmation Date Injunction</u>: ALL INJUNCTIONS OR STAYS PROVIDED FOR IN THE CHAPTER 11 CASES UNDER SECTION 105 OR 362 OF THE BANKRUPTCY CODE, OR OTHERWISE, AND IN EXISTENCE ON THE CONFIRMATION DATE, SHALL  REMAIN IN FULL FORCE AND EFFECT UNTIL THE EFFECTIVE DATE.

(b)     <u>Effective Date Injunctions</u>:

1.   Injunction Against All Entities: EXCEPT AS OTHERWISE PROVIDED IN THE PLAN, FROM AND AFTER THE EFFECTIVE DATE, ALL ENTITIES ARE PERMANENTLY ENJOINED FROM COMMENCING OR CONTINUING IN ANY MANNER, ANY SUIT, ACTION OR OTHER PROCEEDING, OR CREATING, PERFECTING OR ENFORCING ANY LIEN OF ANY KIND, ON ACCOUNT OF OR RESPECTING ANY CLAIM, DEMAND, LIABILITY, OBLIGATION, DEBT, RIGHT, CAUSE OF ACTION, EQUITY INTEREST, OR REMEDY RELEASED OR TO BE RELEASED, EXCULPATED OR TO BE EXCULPATED, OR DISCHARGED OR TO BE DISCHARGED PURSUANT TO THE PLAN OR THE CONFIRMATION ORDER.  BY ACCEPTING DISTRIBUTIONS PURSUANT TO THE PLAN, EACH HOLDER OF AN ALLOWED CLAIM OR EQUITY INTEREST SHALL  BE DEEMED TO HAVE SPECIFICALLY CONFIRMED ITS CONSENT TO THIS INJUNCTION.

2. Injunction Against Holders of Released, Discharged or Exculpated Claims: Except as otherwise provided in the Plan or for obligations issued pursuant to the Plan, all Entities that have held, hold, or may hold Claims or Equity Interests that have been released pursuant to ARTICLE X.B or ARTICLE X.C of the Plan, discharged pursuant to ARTICLE X.A of the Plan, or are subject to exculpation pursuant to ARTICLE X.D of the Plan, are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, RT Lodge Company, the Released Parties, or the Exculpated Parties: (a) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Equity Interests; (b) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims or Equity Interests; (c) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or Estates of such Entities on account of or in connection with or with respect to any such Claims or Equity Interests; (d) asserting any right of setoff (except for setoffs asserted prior to the Petition Date), subrogation, or of any kind against any obligation due from such Entities or against the property or Estates of such Entities on account of or in connection with or with respect to any such Claims or Equity Interests; and (e) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Equity Interests released, exculpated, or settled pursuant to the Plan. Notwithstanding anything to the contrary herein, nothing in the Confirmation Order or in the Plan shall in any way limit, reduce, or otherwise bar an otherwise valid and enforceable right of setoff, subrogation, or recoupment against the Debtors to the extent that such right is based upon a non-residential real property lease or applicable bankruptcy law.

**6.      Protection against Discriminatory Treatment**

In accordance with section 525 of the Bankruptcy Code, and consistent with paragraph 2 of Article VI of the United States Constitution, no Governmental Unit shall discriminate against RT Lodge Company or any Reorganized Debtor, or any Entity with which RT Lodge Company or a Reorganized Debtor has been or is associated, solely because RT Lodge Company or such Reorganized Debtor was a Debtor under chapter 11, may have been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before such Debtor was granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

### 7.    Reimbursement or Contribution

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the Effective Date, such Claim shall be forever disallowed notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Effective Date (a) such Claim has been adjudicated as noncontingent, or (b) the relevant Holder of a Claim has filed a noncontingent Proof of Claim on account of such Claim, and a Final Order has been entered determining such Claim as no longer contingent.

### 8.    Recoupment

In no event shall any Holder of Claims or Equity Interests be entitled to recoup any Claim or Equity Interest against any Claim, right, or Cause of Action of the Debtors or the Reorganized Debtors, as applicable, unless such Holder actually has performed such recoupment and provided notice thereof in writing to the Debtors on or before the Effective Date, notwithstanding any indication in any proof of Claim or Equity Interest or otherwise that such Holder asserts, has, or intends to preserve any right of recoupment; provided that (1) the foregoing provisions of this subsection shall be inapplicable to the extent prohibited by otherwise applicable bankruptcy law and as to assumed Executory Contracts and assumed Unexpired Leases and (2) all defenses of the Debtors and Reorganized Debtors to recoupment are preserved; and provided further that the provisions of this subsection are subject to any express, contrary provisions of the Plan.

### 9.    Waiver of Certain Avoidance Actions

As set forth with regard to each person or entity listed in an exhibit to the Plan Supplement, on the Effective Date, the Reorganized Debtors shall be deemed to waive and release all Avoidance Actions against such persons and entities of the Reorganized Debtors as of the Effective Date that shall continue to provide goods, services and/or financing to RT Asset Company on and after the Effective Date on terms that, with respect to the provision of goods and/or services, are no less favorable than the terms offered to the Debtors on the Petition Date and, with respect to the provision of financing, are satisfactory, in each case as determined by the Debtors and the Prepetition Secured Creditors (or just TCW (and, if any, its assigns) if there will be no GS Adjustment Equity issued on the Effective Date pursuant to ARTICLE III.C.3.c(1) of the Plan) in the exercise of their reasonable business judgment.

### 10.    Preservation of Rights of Action

(a)    <u>Maintenance of Causes of Action</u>: Except as otherwise provided in ARTICLE X of the Plan or elsewhere in the Plan or the Confirmation Order, after the Effective Date, the Reorganized Debtors and RT Lodge Company, as applicable, shall retain all rights to commence, pursue, litigate or settle, as appropriate, any and all Causes of Action and Litigation Claims, whether existing as of the Petition Date or thereafter arising, and Avoidance Actions, in any court or other tribunal including, without limitation, in an adversary proceeding Filed in the Chapter 11 Cases.  The Reorganized Debtors and RT Lodge Company (as applicable), as the successors in interest to the Debtors and the Estates, may, and shall have the exclusive right to, enforce, sue on, settle, compromise, transfer or assign (or decline to do any of the foregoing) any or all of the Litigation Claims without

notice to or approval from the Bankruptcy Court. In accordance with the provisions of this Plan, and pursuant to sections 105(a) and 363 of the Bankruptcy Code and Bankruptcy Rule 9019, without any further notice to or action, order or approval of the Bankruptcy Court, after the Effective Date, the Reorganized Debtors and RT Lodge Company (as applicable) may compromise and settle Litigation Claims.

(b)     Preservation of All Causes of Action Not Expressly Settled or Released: Unless a Cause of Action, Litigation Claim or Avoidance Action against a Holder of a Claim or an Equity Interest or other Entity is expressly waived, relinquished, released, compromised or settled in the Plan or any Final Order (including, without limitation, the Confirmation Order), the Debtors expressly reserve such Cause of Action, Litigation Claim or Avoidance Action for later adjudication by the Debtors, the Reorganized Debtors or, as applicable, RT Lodge Company (including, without limitation, Causes of Action, Litigation Claims and Avoidance Actions not specifically identified or of which the Debtors may presently be unaware or that may arise or exist by reason of additional facts or circumstances unknown to the Debtors at this time or facts or circumstances that may change or be different from those the Debtors now believe to exist) and, therefore, no preclusion doctrine, including, without limitation, the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable or otherwise) or laches shall apply to such Causes of Action or Litigation Claims upon or after the confirmation of the Plan or Consummation of the Plan based on the Disclosure Statement, the Plan or the Confirmation Order, except where such Causes of Action, Litigation Claims or Avoidance Actions have been expressly released in the Plan (including, without limitation, and for the avoidance of doubt, the releases contained in ARTICLE X of the Plan) or any other Final Order (including, without limitation, the Confirmation Order).  In addition, the Debtors, the Reorganized Debtors and RT Lodge Company expressly reserve the right to pursue or adopt any claims alleged in any lawsuit in which any Debtor is a plaintiff or an interested party against any Entity.

As stated in ARTICLE V.S of the Plan, the Debtors preserve their rights to contest the allowance of any call premium or yield maintenance premium under the Prepetition Credit and Guaranty Agreement.

### ARTICLE V.
### PLAN CONFIRMATION

## A.     CONFIRMATION HEARING AND OBJECTIONS

A hearing to consider confirmation of the Plan will be held on **[•] at [•] (prevailing Eastern time)** before the Bankruptcy Court.  The Confirmation Hearing may be continued from time to time by the Bankruptcy Court or the Debtors without further notice other than

by such adjournment being announced in open court or by a notice of adjournment filed with the Bankruptcy Court and served on such parties as the Bankruptcy Court may order. Moreover, the Plan or any Exhibit, Plan Schedule or Plan Document may be amended or modified, if necessary, in accordance with the terms therein, pursuant to section 1127 of the Bankruptcy Code, prior to, during or as a result of the Confirmation Hearing, without further notice to parties in interest, in all cases, however, subject to any consent that may be required in the Plan or the Restructuring Support Agreement.

All objections to confirmation of the Plan must be filed with the Bankruptcy Court and served on the Debtors and any other parties in accordance with the Disclosure Statement Order on or before [•] **at [•] (prevailing Eastern time)** (the "Confirmation Objection Deadline").

Any objection to confirmation of the Plan must:  (i) be in writing; (ii) conform to the Bankruptcy Rules and the Local Rules; (iii) state the name of the applicable Debtor, the name of the objecting party and the amount and nature of the Claim of such Entity in each applicable Chapter 11 Case or the amount of Equity Interests held by such Entity in each applicable Chapter 11 Case; (iv) state with particularity the legal and factual bases and nature of any objection to the Plan and, if practicable, a proposed modification to the Plan that would resolve such objection; and (v) be filed, contemporaneously with a proof of service, with the Bankruptcy Court and served so that it is **actually received** by no later than the Confirmation Objection Deadline by the Notice Parties (as defined in Article I.F.3 herein).

> CONFIRMATION OBJECTIONS NOT TIMELY FILED AND SERVED IN THE MANNER SET FORTH HEREIN MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT AND MAY BE OVERRULED WITHOUT FURTHER NOTICE.

## B.   STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE PLAN

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies the requirements of section 1129 of the Bankruptcy Code.  The Debtors believe that:  (i) the Plan satisfies or will satisfy all of the statutory requirements of chapter 11 of the Bankruptcy Code; (ii) the Debtors have complied or will have complied with all of the requirements of chapter 11 of the Bankruptcy Code; and (iii) the Plan has been proposed in good faith.  Specifically, the Debtors believe that the Plan satisfies or will satisfy the applicable confirmation requirements of section 1129 of the Bankruptcy Code set forth below.

- The Plan complies with the applicable provisions of the Bankruptcy Code;

- The Debtors have complied and will comply with the applicable provisions of the Bankruptcy Code;

- The Plan has been proposed in good faith and not by any means forbidden by law;

- Any payment made or promised under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Cases, or in connection with the Plan and incident to the case, has been or will be disclosed to the Bankruptcy Court, and any such payment:  (a) made before the confirmation of the Plan is reasonable; or (b) is subject to the approval of the Bankruptcy Court as reasonable if it is to be fixed after confirmation of the Plan;

- The Debtors will disclose the identity and affiliations of any individual proposed to serve, after confirmation of the Plan, as a director or officer of the Debtors, an affiliate of the Debtors participating in the plan with the Debtors, or a successor to the Debtors under the Plan.  The appointment to, or continuance in, such office by such individual, will be consistent with the interests of creditors and equity security holders and with public policy and the Debtors will have disclosed the identity of any insider that the Reorganized Debtors will employ or retain, and the nature of any compensation for such insider;

- Either each Holder of an Impaired Claim against, or Equity Interest in, the Debtors will (A) have accepted the Plan or will receive or retain under the Plan on account of such Claim or Equity Interest property of a value, as of the Effective Date of the Plan, that is not less than the amount that such Holder would receive or retain if the Debtors were liquidated on that date under chapter 7 of the Bankruptcy Code, or (B) if section 1111 (b)(2) of the Bankruptcy Code applies to such Claim, receive or retain under the Plan on account of such Claim property of a value, as of the Effective Date of the Plan, that is not less than the value of such Holder's interest in the estate's interest in the property that secures such claims;

- Each Class of Claims or Equity Interests that is entitled to vote on the Plan will either have accepted the Plan or will not be Impaired under the Plan, or the Plan can be confirmed without the approval of such voting Class pursuant to section 1129(b) of the Bankruptcy Code;

- Except to the extent that the Holder of a particular Claim will agree to a different treatment of its Claim, the Plan provides that Administrative Expense Claims and Priority Claims will be paid in full in Cash on the Effective Date, or as soon thereafter as is reasonably practicable;

- At least one Class of Impaired Claims will accept the Plan, determined without including any acceptance of the Plan by any insider holding a Claim in that Class;

- Confirmation of the Plan will not likely be followed by the liquidation or the need for further financial reorganization of the Debtors or any successor thereto under the Plan;

- The Debtors have paid or will pay all fees payable under section 1930 of title 28, and the Plan provides for the payment of all such fees on the Effective Date; and

- The Plan provides for the continuation after the Effective Date of payment of all retiree benefits.

### 1.    Best Interests of Creditors Test / Liquidation Analysis

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that the Bankruptcy Court find, as a condition to confirmation of a chapter 11 plan, that each holder of a claim or equity interest in each impaired class:  (i) has accepted the plan; or (ii) among other things, will receive or retain under the plan property of a value, as of the effective date of the plan, that is not less than the amount that such Person would receive if each of the debtors were liquidated under chapter 7 of the Bankruptcy Code.  To make these findings, the Bankruptcy Court must:  (1) estimate the Cash proceeds (the "Liquidation Proceeds") that a chapter 7 trustee would generate if each Debtor's Chapter 11 Case were converted to a chapter 7 case on the Effective Date and the assets of such Debtor's Estate were liquidated; (2) determine the distribution (the "Liquidation

Distribution") that each non-accepting Holder of a Claim or Equity Interest would receive from the Liquidation Proceeds under the priority scheme dictated in chapter 7; and (3) compare each Holder's Liquidation Distribution to the distribution under the Plan ("Plan Distribution") that such Holder would receive if the Plan were confirmed and consummated, as estimated in ARTICLE I.D.3 of this Disclosure Statement.

To assist the Bankruptcy Court in making the findings required under section 1129(a)(7) of the Bankruptcy Code, the Debtors prepared a "Liquidation Analysis", a copy of which is attached hereto as **Exhibit D**, for comparison with the estimated Plan recoveries described in ARTICLE I.D.3 of this Disclosure Statement.

The Liquidation Analysis presents "High" and "Low" estimates of Liquidation Proceeds, thus representing a range of the Debtors' assumptions relating to the costs incurred during a liquidation and the proceeds realized as a result thereof. The "High" and "Low" estimates of Liquidation Proceeds for the Chapter 11 Cases are [$____ and $_____], respectively, which are substantially less than the value to be realized by stakeholders under the Plan. For additional detail with respect to such estimates, refer to the Liquidation Analysis attached hereto as **Exhibit D**. It is assumed that the liquidation would occur over a period of [__] months. The projected date of conversion to a hypothetical chapter 7 liquidation (the "Assumed Effective Date") is [_____], 202[_]. In each case, it is assumed that the chapter 7 trustee would enter into an agreement with the Debtors' secured creditors to wind-down operations and sell the remainder of the Debtors' assets on a piecemeal basis.

The Liquidation Analysis reflects that the Plan Distribution that each Holder of a Claim or Equity Interest is projected and estimated to receive or retain under the Plan as of the Assumed Effective Date is not less than the Liquidation Distribution that such Holder is projected and estimated to receive if the Chapter 11 Cases were converted to chapter 7 of the Bankruptcy Code as of the Assumed Effective Date.

THE STATEMENTS IN THE LIQUIDATION ANALYSIS, INCLUDING ESTIMATES OF ALLOWED CLAIMS, WERE PREPARED SOLELY TO ASSIST THE BANKRUPTCY COURT IN MAKING THE FINDINGS REQUIRED UNDER SECTION 1129(a)(7) AND MAY NOT BE USED OR RELIED UPON FOR ANY OTHER PURPOSE.

THE DEBTORS BELIEVE THAT ANY ANALYSIS OF A HYPOTHETICAL LIQUIDATION IS NECESSARILY SPECULATIVE. THERE ARE A NUMBER OF ESTIMATES AND ASSUMPTIONS UNDERLYING THE LIQUIDATION ANALYSIS THAT ARE INHERENTLY SUBJECT TO SIGNIFICANT ECONOMIC, COMPETITIVE AND OPERATIONAL UNCERTAINTIES AND CONTINGENCIES BEYOND THE CONTROL OF THE DEBTORS OR A CHAPTER 7 TRUSTEE. NEITHER THE LIQUIDATION ANALYSIS, NOR THE FINANCIAL INFORMATION ON WHICH IT IS BASED, HAS BEEN EXAMINED OR REVIEWED BY INDEPENDENT ACCOUNTANTS IN ACCORDANCE WITH STANDARDS PROMULGATED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS. THERE CAN BE NO ASSURANCE THAT ACTUAL RESULTS WOULD NOT VARY MATERIALLY FROM THE HYPOTHETICAL RESULTS PRESENTED IN THE LIQUIDATION ANALYSIS.

### 2.    Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires that the Bankruptcy Court find that confirmation is not likely to be followed by the liquidation of the Reorganized Debtors or the need for further financial reorganization, unless the plan contemplates such

liquidation.  For purposes of demonstrating that the Plan meets this "feasibility" standard, the Debtors have analyzed the ability of the Reorganized Debtors to meet their obligations under the Plan and to retain sufficient liquidity and capital resources to conduct their business.

The Debtors believe that the Plan meets the feasibility requirement set forth in section 1129(a)(11) of the Bankruptcy Code.  In connection with the development of the Plan and for the purposes of determining whether the Plan satisfies this feasibility standard, the Debtors analyzed their ability to satisfy their financial obligations while maintaining sufficient liquidity and capital resources.  The Debtors developed a business plan and prepared financial projections for fiscal years 2021 through 20[__] (the "<u>Financial Projections</u>").  The Financial Projections, together with the assumptions on which they are based, are attached hereto as **Exhibit E**.

In general, as illustrated by the Financial Projections, the Debtors believe that with the deleveraged capital structure provided under the Plan and the added funding availability under the Exit Facility, the Reorganized Debtors should have sufficient Cash flow and Cash on hand to make all payments required pursuant to the Plan while conducting ongoing business operations.  The Debtors believe that confirmation and Consummation is, therefore, not likely to be followed by the liquidation or further reorganization of the Reorganized Debtors.  Accordingly, the Debtors believe that the Plan satisfies the feasibility requirement of section 1129(a)(11) of the Bankruptcy Code.

THE FINANCIAL PROJECTIONS, INCLUDING THE UNDERLYING ASSUMPTIONS, SHOULD BE CAREFULLY REVIEWED IN EVALUATING THE PLAN.  WHILE THE DEBTORS BELIEVE THAT THE ASSUMPTIONS UNDERLYING THE FINANCIAL PROJECTIONS, WHEN CONSIDERED ON AN OVERALL BASIS, ARE REASONABLE IN LIGHT OF CURRENT CIRCUMSTANCES AND EXPECTATIONS, NO ASSURANCE CAN BE GIVEN THAT THE FINANCIAL PROJECTIONS WILL BE REALIZED.  THE DEBTORS MAKE NO REPRESENTATION OR WARRANTY AS TO THE ACCURACY OF THE FINANCIAL PROJECTIONS.

The Financial Projections have not been examined or compiled by independent accountants.  The Debtors make no representation as to the accuracy of the Financial Projections or their ability to achieve the projected results.  Many of the assumptions on which the projections are based are inherently subject to significant economic and competitive uncertainties and contingencies beyond the control of the Debtors and their management.  Inevitably, some assumptions will not materialize and unanticipated events and circumstances may affect the actual financial results.  Therefore, the actual results achieved throughout the three-year period of the Financial Projections may vary from the projected results and the variations may be material.  All Holders of Claims and Equity Interests that are entitled to vote to accept or reject the Plan are urged to examine carefully all of the assumptions on which the financial projections are based in connection with their evaluation of the Plan.

### 3.  Acceptance by Impaired Classes

The Bankruptcy Code requires, as a condition to confirmation, that, except as described in the following section, each class of claims or equity interests that is impaired under a plan, accept the plan.  A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such class is not required.  A class is "impaired" unless the plan:  (1) leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder of such claim or interest; or (2) notwithstanding any contractual provision or applicable law that entitles the

78

holder of such claim or interest to demand or receive accelerated payment of such claim or interest after the occurrence of a default— (A) cures any such default that occurred before or after the commencement of the Chapter 11 Cases, other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code or of a kind that section 365(b)(2) expressly does not require to be cured; (B) reinstates the maturity of such claim or interest as such maturity existed before such default; (C) compensates the holder of such claim or interest for any damages incurred as a result of any reasonable reliance by such holder on such contractual provision or such applicable law; (D) if such claim or such interest arises from any failure to perform a nonmonetary obligation, other than a default arising from failure to operate a nonresidential real property lease subject to section 365(b)(1)(A), compensates the holder of such claim or such interest (other than the debtor or an insider) for any actual pecuniary loss incurred by such holder as a result of such failure; and (E) does not otherwise alter the legal, equitable, or contractual rights to which such claim or interest entitles the holder of such claim or interest.

Section 1126(c) of the Bankruptcy Code, except as otherwise provided in section 1126(e) of the Bankruptcy Code, defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of claims in that class, but for that purpose counts only those who actually vote to accept or to reject the plan and are not insiders.  Thus, a class of claims will have voted to accept the plan only if two-thirds in amount and a majority in number actually voting cast their ballots in favor of acceptance.  Section 1126(d) of the Bankruptcy Code, except as otherwise provided in section 1126(e) of the Bankruptcy Code, defines acceptance of a plan by a class of impaired equity interests as acceptance by holders of at least two-thirds in amount of equity interests in that class actually voting to accept or to reject the plan. (Section 1126(e) of the Bankruptcy Code permits the Bankruptcy Court to designate and not count the vote of an entity whose acceptance or rejection of the Plan was not in good faith or was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.)

Classes 1, 2, 5, and 9 are not Impaired under the Plan, and, as a result, the Holders of such Claims or Intercompany Interests are deemed to have accepted the Plan.

Claims in Classes 3 and 4 are Impaired under the Plan, and as a result, the Holders of Claims in such Class are entitled to vote on the Plan.

Pursuant to section 1129 of the Bankruptcy Code, the Holders of Claims in each Voting Class must accept the Plan for the Plan to be confirmed without application of the "fair and equitable test" to such Class, and without considering whether the Plan "discriminates unfairly" with respect to such Class, as both standards are described herein.  As stated above, the Voting Classes (Classes 3 and 4), will have accepted the Plan if the Plan is accepted by at least two-thirds in amount and a majority in number of the Claims of such Class (other than any Claims of creditors designated under section 1126(e) of the Bankruptcy Code) that have voted to accept or reject the Plan.

### 4.    Confirmation Without Acceptance by Impaired Classes

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if less than all impaired classes entitled to vote on the plan have accepted it, *provided* that the plan has been accepted by at least one impaired class of claims.  Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired Class's rejection or deemed rejection of the Plan, the Plan will be confirmed, at the Debtors' request, in a procedure commonly known as "cram down," so long as the Plan does not "discriminate unfairly" and is "fair and equitable" with respect to each Class of Claims or Equity Interests that is impaired under, and has not accepted, the Plan.

79

a.    <u>No Unfair Discrimination</u>

This test applies to classes of claims or equity interests that are of equal priority and are receiving different treatment under the Plan.  The test does not require that the treatment be the same or equivalent, but that such treatment be "fair." In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims of equal rank (e.g., classes of the same legal character).  Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly and, accordingly, a plan could treat two classes of unsecured creditors differently without unfairly discriminating against either class.

b.    <u>Fair and Equitable Test</u>

This test applies to classes of different priority and status (e.g., secured versus unsecured) and includes the general requirement that no class of claims receive more than 100% of the amount of the allowed claims in such class.  As to the dissenting class, the test sets different standards depending on the type of claims or equity interests in such class:

The condition that a plan be "fair and equitable" to a non-accepting Class of Secured Claims includes the requirements that: (a) the Holders of such Secured Claims retain the liens securing such Claims to the extent of the Allowed amount of the Claims, whether the property subject to the liens is retained by the debtors or transferred to another entity under the Plan; (b) each Holder of a Secured Claim in the Class receives deferred Cash payments totaling at least the Allowed amount of such Claim with a present value, as of the Effective Date of the Plan, at least equivalent to the value of the secured claimant's interest in the debtor's property subject to the liens; or (c) such Holders of Secured Claims realize the indubitable equivalence of such Claims.

The condition that a plan be "fair and equitable" with respect to a non-accepting Class of unsecured Claims includes the requirement that either: (a) the plan provides that each Holder of a Claim of such Class receive or retain, on account of such Claim, property of a value, as of the Effective Date of the plan, equal to the allowed amount of such Claim; or (b) the Holder of any Claim or Equity Interest that is junior to the Claims of such Class will not receive or retain under the plan, on account of such junior Claim or Equity Interest, any property.

The condition that a plan be "fair and equitable" to a non-accepting Class of Equity Interests includes the requirements that either: (a) the plan provides that each Holder of an Equity Interest in that Class receives or retains under the plan, on account of that Equity Interest, property of a value, as of the Effective Date of the plan, equal to the greater of (i) the allowed amount of any fixed liquidation preference to which such Holder is entitled, (ii) any fixed redemption price to which such Holder is entitled, or (iii) the value of such interest; or (b) if the Class does not receive such an amount as required under (a), no Class of Equity Interests junior to the non-accepting Class (if any) may receive a distribution under the plan.

To the extent that any class of Claims or Class of Equity Interests either reject the Plan or are deemed to have rejected the Plan, the Debtors reserve the right to seek (a) confirmation of the Plan under section 1129(b) of the Bankruptcy Code and/or (b) modify the Plan in accordance with Article XIII.C of the Plan.

Notwithstanding the rejection of any Class that votes to reject the Plan, the Debtors do not believe that the Plan discriminates unfairly against any Impaired Class of Claims or Equity Interests.  The Debtors believe that the Plan and the treatment of all Classes of

Claims and Equity Interests under the Plan satisfy the foregoing requirements for non-consensual confirmation of the Plan.

## C.     CONSUMMATION OF THE PLAN

The Plan will be consummated on the Effective Date.  For a more detailed discussion of the conditions precedent to the consummation of the Plan and the impact of failure to meet such conditions, see Article IX of the Plan.

### ARTICLE VI.
### <u>RISK FACTORS</u>

> PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN, ALL HOLDERS OF CLAIMS THAT ARE IMPAIRED AND ENTITLED TO VOTE ON THE PLAN SHOULD READ AND CONSIDER CAREFULLY THE RISK FACTORS SET FORTH HEREIN, AS WELL AS ALL OTHER INFORMATION SET FORTH OR OTHERWISE REFERENCED IN THIS DISCLOSURE STATEMENT.  ALTHOUGH THESE RISK FACTORS ARE MANY, THESE FACTORS SHOULD NOT BE REGARDED AS CONSTITUTING THE ONLY RISKS PRESENT IN CONNECTION WITH THE DEBTORS' BUSINESS OR THE PLAN AND ITS IMPLEMENTATION.

## A.     RISKS RELATING TO CONFIRMATION AND CONSUMMATION OF THE PLAN

### 1.     Parties in Interest May Object to the Debtors' Classification of Claims and Equity Interests

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class.  The Debtors believe that the classification of Claims and Equity Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Equity Interests, each encompassing Claims or Equity Interests, as applicable, that are substantially similar to the other Claims and Equity Interests in each such Class.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.  Issues or disputes relating to classification and/or treatment could result in a delay in the confirmation and consummation of the Plan and could increase the risk that the Plan will not be confirmed or consummated.

### 2.     The Debtors May Object to the Amount or Classification of a Claim or Equity Interest

Except as otherwise provided in the Plan, the Debtors, with any required approvals or consents as set forth in the Restructuring Support Agreement, and, after the Effective Date, the Reorganized Debtors reserve the right to object to the amount or classification of any Claim or Equity Interest under the Plan.  The estimates set forth in this Disclosure Statement cannot be relied on by any Holder of a Claim or Equity Interest where such Claim or Equity Interest is or may become subject to an objection, counterclaim or other suit by the Debtors.  Any Holder of a Claim or Equity Interest that is or may become subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

### 3.      The Debtors May Fail to Satisfy the Vote Requirement

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, confirmation of the Plan.  In the event that sufficient votes are not received, the Debtors may seek to accomplish an alternative chapter 11 plan.  There can be no assurance that the terms of any such alternative chapter 11 plan would be similar or as favorable to the Holders of Allowed Claims or Equity Interests as those proposed in the Plan.

### 4.      The Debtors May Not Be Able to Secure Confirmation of the Plan

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan and requires, among other things, findings by the bankruptcy court that: (a) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (b) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization unless such liquidation or reorganization is contemplated by the plan; and (c) the value of distributions to non-accepting Holders of Claims within a particular class under such plan will not be less than the value of distributions such holders would receive if the debtor was liquidated under chapter 7 of the Bankruptcy Code.

There can be no assurance that the requisite acceptances to confirm the Plan will be received.  Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan.  A non-accepting Holder of an Allowed Claim or Equity Interest might challenge either the adequacy of this Disclosure Statement or whether the balloting procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules.  Even if the Bankruptcy Court determined that the Disclosure Statement, the balloting procedures and voting results were appropriate, the Bankruptcy Court could still decline to confirm the Plan if it found that any of the statutory requirements for confirmation had not been met, including the requirement that the terms of the Plan do not "unfairly discriminate" and are "fair and equitable" to non-accepting Classes, or the Plan contains other terms disapproved of by the Bankruptcy Court.

The Debtors (subject to any consent that may be required under the Restructuring Support Agreement) reserve the right to modify the terms and conditions of the Plan as necessary for confirmation.  Any such modifications could result in less favorable treatment of any non-accepting Class, as well as any Classes junior to such non-accepting Class, than the treatment currently provided in the Plan.  Such less favorable treatment could include a distribution of property to the Class affected by the modification of a lesser value than currently provided in the Plan or no distribution of property whatsoever under the Plan.  Section 1127 of the Bankruptcy permits the Debtors to modify the Plan at any time before confirmation, but not if such modified Plan fails to meet the requirements for confirmation. The Debtors or the Reorganized Debtors may modify the Plan at any time after confirmation of the Plan and before substantial consummation of the Plan if circumstances warrant such modification and the Bankruptcy Court, after notice and a hearing, confirms the Plan as modified, but not if such modified Plan fails to meet the requirements for confirmation.  The Debtors will comply with the disclosure and solicitation requirements set forth in section 1125 of the Bankruptcy Code with respect to the modified Plan.  Any Holder of a Claim or Equity Interest that has accepted or rejected the Plan is deemed to have accepted or rejected, as the case may be, the Plan as modified, unless, within the time fixed by the Bankruptcy Court, such Holder changes its previous acceptance or rejection.

5.      **Non-Consensual Confirmation of the Plan May Be Necessary**

In the event that any impaired class of claims or equity interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm such a plan at the proponents' request if at least one impaired class has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class) ("Accepting § 1129(a)(10) Class") and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired classes.  If there is an Accepting § 1129(a)(10) Class, the Debtors believe that the Plan satisfies these other requirements and the Debtors may request such non-consensual confirmation in accordance with subsection 1129(b) of the Bankruptcy Code.  Nevertheless, in the event that a Voting Class does not accept the Plan, there can be no assurance that the Bankruptcy Court will reach this conclusion.

6.      **Releases, Injunctions, and Exculpations Provisions May Not Be Approved**

Article X of the Plan provides for certain releases, injunctions, and exculpations, including a release of liens and third-party releases that may otherwise be asserted against the Debtors, Reorganized Debtors, or Released Parties, as applicable.  The releases, injunctions, and exculpations provided in the Plan may not be approved.  If the releases are not approved, certain Released Parties may withdraw their support for the Plan.  The releases provided to the Released Parties and the exculpation provided to the Exculpated Parties are necessary to the success of the Debtors' reorganization because the Released Parties and Exculpated Parties have made significant contributions to the Debtors' reorganization efforts and have agreed to make further contributions.

7.      **The Restructuring Support Agreement May Terminate.**

As set forth herein, the Restructuring Support Agreement may terminate if, among other things, the deadlines set forth in such agreement are not met or if the conditions precedent to the respective party's obligations to support the Plan or to confirm the Plan are not satisfied in accordance with the terms of such agreement.  If the Restructuring Support Agreement terminates, the Debtors may not be able to obtain the support of the Holders of Claims required to confirm the Plan.  If the Restructuring Support Agreement terminates and the Debtors lose the support of important creditor constituencies, the Debtors likely would not be able to consummate the Plan as currently proposed.

8.      **Risks of Not Obtaining the Funding Under the Exit Facility**

The Plan is predicated on, among other things, consummation of the Exit Facility and the receipt of the funding contemplated under the Exit Facility.  Although the Exit Lender has committed to providing the Exit Facility upon the Debtors' emergence from chapter 11, there can be no assurance that the conditions precedent to consummation of the Exit Facility will be met or otherwise waived.

9.      **The Conditions Precedent to the Effective Date of the Plan May Not Occur**

As more fully set forth in Article IX of the Plan, the Effective Date of the Plan is subject to a number of conditions precedent.  If such conditions precedent are not waived or not met, the Effective Date will not take place. Although the Debtors believe that the Effective Date may occur within approximately one month after the Confirmation Date,

there can be no assurance as to such timing, or as to whether the Effective Date will, in fact, occur.

## B.    RISKS RELATING TO THE CHAPTER 11 PROCESS

### 1.    The Debtors' Exclusivity Period May Terminate

At the outset of the Chapter 11 Cases, the Bankruptcy Code provides the Debtors with the exclusive right to propose the Plan and prohibits creditors and others from proposing a plan.  The Debtors will have retained the exclusive right to propose the Plan upon filing their petitions.  If the Bankruptcy Court terminates that right, however, or the exclusivity period expires, there could be a material adverse effect on the Debtors' ability to achieve confirmation of the Plan in order to achieve the Debtors' stated goals.

### 2.    Prolonged Continuation of the Chapter 11 Cases Is Likely To Harm the Debtors' Business

A prolonged continuation of these Chapter 11 Cases may adversely affect the Debtors' business and operations. So long as the Chapter 11 Cases continue, senior management of the Debtors will be required to spend a significant amount of time and effort dealing with the Debtors' reorganization instead of focusing exclusively on business operations. Prolonged continuation of the Chapter 11 Cases also may make it more difficult to attract and retain management and other key personnel necessary to the success and growth of the Debtors' business. In addition, so long as the Chapter 11 Cases continue, the Debtors may be required to incur substantial costs for professional fees and other expenses associated with the proceedings. The prolonged continuation of the Chapter 11 Cases may also require the Debtors to seek additional financing, either under the DIP Facility or otherwise, in order to service their debt and other obligations.  It may not be possible for the Debtors to obtain additional financing during the pendency of the Chapter 11 Cases on commercially favorable terms or at all.  If the Debtors were to require additional financing during the Chapter 11 Cases and were unable to obtain the financing, it is unlikely the Debtors could successfully reorganize.

### 3.    The Chapter 11 Cases May Be Converted to Cases Under Chapter 7 of the Bankruptcy Code

If the Bankruptcy Court finds that it would be in the best interest of creditors and/or the debtor in a chapter 11 case, the Bankruptcy Court may convert a chapter 11 bankruptcy case to a case under chapter 7 of the Bankruptcy Code.  In such event, a chapter 7 trustee would be appointed or elected to liquidate the debtor's assets for distribution in accordance with the priorities established by the Bankruptcy Code.  The Debtors believe that liquidation under chapter 7 would result in significantly smaller distributions being made to creditors than those provided for in the Plan because of (a) the likelihood that the assets would have to be sold or otherwise disposed of in a disorderly fashion over a short period of time, rather than reorganizing or selling the business as a going concern at a later time in a controlled manner, (b) additional administrative expenses involved in the appointment of a chapter 7 trustee, and (c) additional expenses and Claims, some of which would be entitled to priority, that would be generated during the liquidation, including Claims resulting from the rejection of Unexpired Leases and other Executory Contracts in connection with cessation of operations.

## C.    RISKS RELATING TO RECOVERIES UNDER THE PLAN

### 1.    The Recovery to Holders of Allowed Claims Can Not Be Stated With Absolute Certainty

The Claims estimates set forth herein are based on various assumptions and are estimates. The actual amounts of Allowed Claims may differ significantly from those estimates should one or more underlying assumption prove to be incorrect. Such differences may adversely affect the percentage recovery to Holders of such Allowed Claims under the Plan. Moreover, the estimated recoveries set forth herein are necessarily based on numerous assumptions, the realization of many of which are beyond the Debtors' control, including, without limitation, (a) the successful reorganization of the Debtors, (b) an assumed date for the occurrence of the Effective Date, (c) the Debtors' ability to achieve the operating and financial results included in the Financial Projections, (d) the Debtors' ability to maintain adequate liquidity to fund operations, and (e) the assumption that capital and equity markets remain consistent with current conditions.

The actual amounts of Allowed Claims may differ significantly from those estimates should one or more underlying assumptions prove to be incorrect, which could affect the percentage recovery to Holders of such Allowed Claims under the Plan, in some instances adversely. Also, the estimated recoveries to Holders of Allowed Claims are not intended to represent the private sale values of the Reorganized Debtors' securities.

### 2.    The Value of New Common Shares Can Not Be Stated With Absolute Certainty

On the Effective Date, 100% of the New Common Shares will be issued to various creditors on account of their Claims, but will be subject to dilution by issuance of New Common Shares upon exercise of the New Warrants or pursuant to the MIP.  Despite the Debtors' best efforts to value the New Common Shares, various uncertainties, including market conditions, the Debtors' inability to implement their business plan, and lack of a market for the New Common Shares may cause fluctuations or variations in value of the New Common Shares not fully accounted for herein.

In addition, the value of the New Common Shares may be impacted by changes to the Reorganized Debtors' post-emergence capital structure.

### 3.    Holders of Equity Securities in RT Asset Company May Not Be Able to Recover in Future Cases of Bankruptcy, Liquidation or Reorganization

On the Effective Date or such other date as specified in the Plan, the Equity Securities will be distributed to the Holders of Allowed Claims in Class 3.  Upon such Plan Distribution date, in its capacity as a Holder of an Equity Security, each Holder of such Equity Securities will become subordinated to all liabilities of the Reorganized Debtors. Therefore, the assets of the Reorganized Debtors would not be available for distribution to any holder of such Equity Securities, in respect of such Equity Securities, in any bankruptcy, liquidation or reorganization of the Reorganized Debtors unless and until all indebtedness of the Reorganized Debtors has been paid.

### 4.    The New Common Shares and New Warrants Will Be Illiquid

There is no organized trading market for the New Common Shares or New Warrants and no such market is expected to emerge after the Effective Date.  In the absence of any such market, the value of such securities may not be readily determinable and holders thereof must be prepared to bear the risk of their investment in such securities indefinitely.

Resales of the New Common Shares and New Warrants may be restricted under applicable federal and state securities laws, as discussed in Article VI of this Disclosure Statement. The New Common Shares, New Warrants, and shares of New Common Shares issuable upon exercise of New Warrants may be subject to material restrictions on transferability and other restrictions set forth in the Amended Organizational Documents.

**5.      There Is Not an Established Market for Equity Securities in RT Asset Company, and Holders of New Common Shares Will Be Subject to Restrictions on Resale and Transfer, Including Under the Amended Organizational Documents, Which Could Make Such Interests Illiquid**

No established market exists for the Equity Securities in RT Asset Company. RT Asset Company is not expected, in the near future, to cause Equity Securities of RT Asset Company to be listed on any national exchange or interdealer quotation system or to cooperate with any registered broker-dealer who may seek to initiate price quotations for the Equity Securities of RT Asset Company in the over the counter market. In addition, the Amended Organizational Documents governing the New Common Shares in RT Asset Company will contain restrictions on transfer by Holders, including transfers to certain prohibited transferees, prohibition on transfers that could result in RT Asset Company being required to file reports under the Exchange Act, and compliance with certain rights of first offer and, if applicable, tag-along and drag-along rights. Therefore, there cannot be any assurance that the Equity Securities in RT Asset Company will be a tradable, liquid security at any time after the Effective Date. If no public market for the Equity Securities of RT Asset Company develops, holders of such securities may have difficulty selling or obtaining timely and accurate valuation with respect to such securities.

Even if a market were to develop in the future, there cannot be any assurance as to the degree of price volatility in any market that develops for the Equity Securities in RT Asset Company. Some Holders who receive Equity Securities in RT Asset Company pursuant to the Plan may not elect to hold equity on a long-term basis. Sales by future equity holders of a substantial number of interests after the Effective Date could significantly reduce the market price of the Equity Securities in RT Asset Company. Moreover, the perception that these equity holders might sell significant amounts of the Equity Securities of RT Asset Company could depress the market price of such interests for a considerable period. Sales of the Equity Securities in RT Asset Company, and the possibility thereof, could make it more difficult for RT Asset Company to sell equity, or equity-related securities, in the future at a time and price that they consider appropriate.

The valuation of Equity Securities in RT Asset Company contained in this Disclosure Statement is not an estimate of the prices at which the Equity Securities in RT Asset Company may trade or be sold in the future, and the Debtors have not attempted to make any such estimate in connection with the development of the Plan. The value of the Equity Securities in RT Asset Company ultimately may be substantially higher or lower than reflected in the valuation assumptions provided in this Disclosure Statement.

Transfers of Equity Securities in RT Lodge Company may be subject to customary restrictions consistent with the preservation of the net operating loss and other tax attributes of the Debtors. If Alternative Structures are determined to be utilized that cause RT Asset Company to be treated as a partnership for U.S. federal income tax purposes, transfers of Equity Securities in RT Asset Company will be subject to customary restrictions to avoid treatment as a "publicly traded partnership".

### D. RISK FACTORS RELATING TO THE DEBTORS' BUSINESS, INDUSTRY AND MARKET FACTORS

#### 1. Continued Risk Upon Confirmation and Consummation

Even if the Plan is confirmed and Consummated, the Debtors will continue to face a number of risks, including certain risks that are beyond their control, such as deterioration or other changes in economic conditions, changes in the industry, potential revaluing of their assets due to chapter 11 proceedings, changes in demand for premium denim. Some of these concerns and effects typically become more acute when a case under the Bankruptcy Code continues for a protracted period without indication of how or when the case may be completed. As a result of these risks and others, there is no guarantee that a chapter 11 plan of reorganization reflecting the Plan will achieve the Debtors' stated goals.

Further, even if the Debtors' debts are reduced and/or discharged through the Plan, the Debtors may need to raise additional funds through public or private debt or equity financing or other various means to fund the Debtors' business after the completion of the proceedings related to the Chapter 11 Cases. Adequate funds may not be available when needed or may not be available on favorable terms.

#### 2. Recent Global Economic Trends, especially in Response to the COVID-19 Outbreak Could Adversely Affect the Debtors' Business, Results of Operations, and Financial Condition, Primarily Through Disruption of the Debtors' Restaurants

Recent global economic conditions, including disruption of financial markets, could adversely affect the Debtors' business, results of operations and financial condition, primarily through disrupting their customers' businesses. Higher rates of unemployment and lower levels of business activity generally adversely affect the level of demand for dining out. Global financial markets have experienced significant volatility and losses as a result of the recent COVID-19 outbreak. Any resulting economic downturn could negatively impact customer demand and spending in the impacted regions and cause an oversupply of goods that could result in meaningful margin pressure.

The recent outbreak of COVID-19 has significantly disrupted financial markets. This outbreak and the actions taken by federal, state and local governments in response to the outbreak have significantly affected virtually all facets of the U.S. and global economies. Restrictions on and public concern regarding travel and public interaction have materially curtailed retail and hospitality activity. The COVID-19 outbreak has resulted in the temporary closure of many of the Debtors' restaurants and may result in extended closures in the future. The timely delivery of goods to the Debtors' by their suppliers could be adversely affected by supply chain disruptions.

The Debtors are closely monitoring developments in connection with this outbreak. Quarantines and other measures imposed in response to the COVID-19 outbreak, as well as ongoing concern regarding the virus' potential impact, have had and will likely continue to have a negative effect on economies and financial markets, including supply chain issues and other business disruptions. The Debtors expect the outbreak will materially affect results in the current and potentially future operating periods; however, the duration and extent of potential disruptions is highly uncertain and will depend on future developments with respect to the spread and severity of the virus. An extended period of further economic deterioration could exacerbate the other risks described herein.

Additional effects of the recent conditions in the global economy include higher rates of unemployment, consumer hesitancy, and limited availability of credit, each of which may constrict the Debtors' business operations.

87

These have had an effect on the Debtors' revenue growth and incoming payments, and the impact may continue. If these or other conditions limit the Debtors' ability to grow revenue or cause the Debtors' revenue to decline and the Debtors cannot reduce costs on a timely basis or at all, the Debtors' operating results may be materially and adversely affected.

### 3. The Company May Face Risks Associated With Current or Future Litigation and Claims

From time to time, the Company is involved in a variety of lawsuits, claims and other proceedings relating to the conduct of its business. These suits concern issues including contract disputes, employment actions, employee benefits, taxes, and personal injury matters. Due to the uncertainties of litigation, the Company can give no assurance that it will prevail on all claims made against it in the lawsuits that the Company currently faces or that additional claims will not be made against the Company in the future. While it is not feasible to predict the outcome of all pending lawsuits and claims, the Company does not believe that the disposition of any such pending matters is likely to have a materially adverse effect on its financial condition or liquidity, although the resolution in any reporting period of one of more of these matters could have an adverse effect on the Company's operating results for that period. Also, the Company can give no assurance that any other lawsuits or claims brought in the future will not have an adverse effect on its financial condition, liquidity or operating results.

### 4. The Debtors Are Subject to Restrictive Covenants

The DIP Facility includes financial covenants that, among other things, require the Debtors to perform within a budget and meet certain milestones. If the Debtors are unable to achieve the results that are contemplated in their business plan, they may fail to comply with these covenants.

Furthermore, the DIP Facility contains limitations on the Debtors' ability, among other things, to incur additional indebtedness, make capital expenditures, pay dividends, make investments (including acquisitions) or sell assets. If the Debtors fail to comply with the covenants in the DIP Facility and are unable to obtain a waiver or amendment of such covenants, an event of default will occur thereunder. The DIP Facility contains other events of defaults customary for debtor in possession financings.

### 5. The Debtors May Fail in Their Lease Rationalization Efforts

The Debtors' efforts to renegotiate leases and close stores during the Chapter 11 Cases is an effort to cut costs and maintain profitability. The Debtors' forward-looking financial projections are based on a certain amount of savings and number of operating stores, which amount anticipates substantial concessions from various landlords. If the Debtors are unable to reach satisfactory terms with the quantity of landlords they anticipate, the Debtors may be forced to close additional stores, decreasing revenue. Further, the actual savings may be substantially greater than or less than the projected savings ranges.

### 6. Large Holders of the Prepetition Secured Debt Claims May Control the New Common Shares

Implementation of the Plan is anticipated to result in a small number of Holders of Prepetition Secured Debt Claims or their assignees owning a significant percentage of the shares of outstanding New Common Shares. These holders or their assignees could, among other things, exercise a controlling influence over the business and affairs of RT Asset Company and the other Reorganized Debtors.

88

### 7.    Tax Implications of the Plan

The U.S. federal income tax consequences of the Plan are complex and are subject to significant uncertainties.  The Debtors have not requested and do not intend to seek any ruling from the IRS on the tax consequences of the Plan.  Even if the Debtors decide to request a ruling, there would be no assurance that the IRS would rule favorably or that any ruling would be issued before the Effective Date.  In addition, in such case, there still would be significant tax uncertainties, which would not be the subject of any ruling request.  Thus, there can be no assurance that the IRS will not challenge the various positions the Debtors have taken, or intend to take, with respect to the U.S. federal income tax treatment in the Plan, or that a court would not sustain such a challenge.  *See* "Summary of Certain U.S. Federal Income Tax Consequences of the Plan," at Article IX herein.  Each Holder of an Equity Interest or a Claim is urged to consult its own tax advisor for the U.S. federal, state, local, and non-U.S. income, estate and other tax consequences applicable under the Plan.

### E.    RISK FACTORS ASSOCIATED WITH FORWARD-LOOKING STATEMENTS

### 1.    The Financial Information Contained Herein Is Based on the Debtors' Books and Records and, Unless Otherwise Stated, No Audit Was Performed

**The financial information contained in this Disclosure Statement has not been audited**.  In preparing this Disclosure Statement, the Debtors relied on financial data derived from their books and records that was available at the time of such preparation.  Although the Debtors have used their reasonable business judgment to ensure the accuracy of the financial information provided in this Disclosure Statement and, while the Debtors believe that such financial information fairly reflects the financial condition of the Debtors, the Debtors are unable to warrant or represent that the financial information contained herein and attached hereto is without inaccuracies.

### 2.    Financial Projections and Other Forward-Looking Statements Are Not Assured, Are Subject to Inherent Uncertainty Due to the Numerous Assumptions Upon Which They Are Based and, as a Result, Actual Results May Vary

This Disclosure Statement contains various projections concerning the Reorganized Debtors' operations, including the Financial Projections, that are, by their nature, forward looking, and which projections are necessarily based on certain assumptions and estimates regarding the anticipated future performance of the Reorganized Debtors, including, without limitation, their ability to maintain or increase revenue and gross margins, control future operating expenses, or make necessary capital expenditures, as well as assumptions concerning general business and economic conditions and overall industry performance and trends, which the Debtors are unable to control.  Should any or all of these assumptions or estimates ultimately prove to be incorrect or not materialize, the actual future experiences of the Reorganized Debtors may turn out to be different from the Financial Projections.  In particular, a majority of the Company's operating expenses are fixed costs that are not directly dependent on sales performance.  If sales decline, the Company may be unable to reduce or offset these fixed operating expenses in the short term. Failure to meet certain of the Financial Projections could result in a decrease in liquidity, EBITDA and, ultimately, enterprise value that could leave the Company with an insufficient equity cushion and free cash flow to capitalize the business and sustain it.

Also, because the Liquidation Analysis, distribution projections, and other information contained herein and attached hereto are estimates only, the timing and amount of actual distributions to Holders of Allowed Claims may be affected by many factors that cannot be predicted.

Specifically, the projected financial results contained in this Disclosure Statement reflect numerous assumptions concerning the anticipated future performance of the Reorganized Debtors, some of which may not materialize, including, without limitation, assumptions concerning:  (a) the timing of confirmation and Consummation of the Plan in accordance with its terms; (b) the anticipated future performance of the Reorganized Debtors, including, without limitation, the Debtors' ability to maintain or increase revenue and gross margins, control future operating expenses or make necessary capital expenditures; (c) general business and economic conditions; (d) overall industry performance and trends; (e) the Debtors' ability to maintain market strength and receive vendor support; and (f) customer preferences continuing to support the Debtors' business plan.

DUE TO THE INHERENT UNCERTAINTIES ASSOCIATED WITH PROJECTING FINANCIAL RESULTS GENERALLY, THE PROJECTIONS CONTAINED IN THIS DISCLOSURE STATEMENT SHOULD NOT BE CONSIDERED ASSURANCES OR GUARANTEES OF THE AMOUNT OF FUNDS OR THE AMOUNT OF CLAIMS THAT MAY BE ALLOWED IN THE VARIOUS CLASSES.  WHILE THE DEBTORS BELIEVE THAT THE FINANCIAL PROJECTIONS CONTAINED IN THIS DISCLOSURE STATEMENT ARE REASONABLE, THERE CAN BE NO ASSURANCE THAT THEY WILL BE REALIZED.

## F.    DISCLOSURE STATEMENT DISCLAIMER

### 1.    The Information Contained Herein Is for Soliciting Votes Only

The information contained in this Disclosure Statement is for purposes of soliciting votes on the Plan and may not be relied upon for any other purposes.

### 2.    This Disclosure Statement Was Not Approved by the Securities and Exchange Commission

Neither the SEC nor any state regulatory authority has passed upon the accuracy or adequacy of this Disclosure Statement, or the exhibits or the statements contained herein, and any representation to the contrary is unlawful.

### 3.    The Debtors Relied on Certain Exemptions From Registration Under the Securities Act

This Disclosure Statement has been prepared pursuant to sections 1125 and 1126, as applicable, of the Bankruptcy Code and Rule 3016(b) of the Bankruptcy Rules and does not necessarily conform to disclosure requirements of federal or state securities laws or other similar laws.  The offer and issuance of the New Common Shares and New Warrants under the Plan has not been registered under the Securities Act or Blue Sky Laws.  To the maximum extent permissible by law, the offer and issuance of the New Common Shares and the New Warrants under the Plan will be exempt from registration under the Securities Act and applicable Blue Sky Laws by virtue of section 1145 of the Bankruptcy Code, section 4(a)(2) of the Securities Act or Rule 506 of Regulation D and/or Rule 701 promulgated under the Securities Act.

### 4.    This Disclosure Statement Contains Forward-Looking Statements

This Disclosure Statement contains "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995.  Such statements consist of any statement other than a recitation of historical fact and can be identified by the use of forward looking terminology such as "may," "expect," "anticipate," "estimate" or

"continue" or the negative thereof or other variations thereon or comparable terminology. The reader is cautioned that all forward-looking statements are necessarily speculative and there are certain risks and uncertainties that could cause actual events or results to differ materially from those referred to in such forward-looking statements. The Liquidation Analysis, distribution projections and other information contained herein and attached hereto are estimates only, and the timing and amount of actual distributions to Holders of Allowed Claims may be affected by many factors that cannot be predicted. Therefore, any analyses, estimates or recovery projections may or may not turn out to be accurate.

### 5.    No Legal or Tax Advice Is Provided to You by This Disclosure Statement

**This Disclosure Statement is not legal or tax advice to You**. The contents of this Disclosure Statement should not be construed as legal, business or tax advice, and are not personal to any person or entity. Each Holder of a Claim or an Equity Interest should consult his or her own legal counsel and accountant with regard to any legal, tax and other matters concerning his or her Claim or Equity Interest. This Disclosure Statement may not be relied upon for any purpose other than as a disclosure of certain information to determine how to vote on the Plan or object to confirmation of the Plan.

### 6.    No Admissions Are Made by This Disclosure Statement

The information and statements contained in this Disclosure Statement will neither (a) constitute an admission of any fact or liability by any Entity (including, without limitation, the Debtors or the Consenting Lenders) nor (b) be deemed evidence of the tax or other legal effects of the Plan on the Debtors, the Reorganized Debtors, the Consenting Lenders, Holders of Allowed Claims or Equity Interests or any other parties in interest.

Notwithstanding any rights of approval, pursuant to the Restructuring Support Agreement or otherwise, as to the form of substance of this Disclosure Statement, the Plan or any other document relating to the transactions contemplated thereunder, neither the Consenting Lenders nor their respective representatives, members, financial or legal advisors or agents, has independently verified the information contained herein or takes any responsibility therefor and none of the foregoing entities or persons makes any representations or warranties whatsoever concerning the information contained herein.

### 7.    No Reliance Should Be Placed on Any Failure to Identify Litigation Claims or Projected Objections

No reliance should be placed on the fact that a particular litigation claim or projected objection to a particular Claim or Equity Interest is, or is not, identified in this Disclosure Statement. The Debtors, with any consent or approval required by the Restructuring Support Agreement, or the Reorganized Debtors may seek to investigate, file and prosecute litigation rights and claims against any third parties and may object to Claims after the Confirmation Date or Effective Date of the Plan irrespective of whether the Disclosure Statement identifies such litigation claims or objections to Claims or Equity Interests.

### 8.    Nothing Herein Constitutes a Waiver of Any Right to Object to Claims or Equity Interests or Recover Transfers and Assets

The vote by a Holder of an Allowed Claim for or against the Plan does not constitute a waiver or release of any Claims or rights of the Debtors or the Reorganized Debtors (or any party in interest, as the case may be) to object to that Holder's Allowed Claim regardless of whether any Claims or Causes of Action of the Debtors or their Estates are specifically or generally identified herein.

91

**9.      The Information Used Herein Was Provided by the Debtors and Was Relied Upon by the Debtors' Advisors**

Counsel to and other advisors retained by the Debtors have relied upon information provided by the Debtors in connection with the preparation of this Disclosure Statement. Although counsel to and other advisors retained by the Debtors have performed certain limited due diligence in connection with the preparation of this Disclosure Statement, they have not verified independently the information contained herein.

**10.      The Potential Exists for Inaccuracies and the Debtors Have No Duty to Update**

The statements contained in this Disclosure Statement are made by the Debtors as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has not been a change in the information set forth herein since that date. While the Debtors have used their reasonable business judgment to ensure the accuracy of all of the information provided in this Disclosure Statement and in the Plan, the Debtors nonetheless cannot, and do not, confirm the current accuracy of all statements appearing in this Disclosure Statement. Further, although the Debtors may subsequently update the information in this Disclosure Statement, the Debtors have no affirmative duty to do so unless ordered to do so by the Bankruptcy Court.

**11.      No Representations Made Outside the Disclosure Statement Are Authorized**

No representations concerning or relating to the Debtors, the Chapter 11 Cases or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement. Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than as contained in or included with this Disclosure Statement should not be relied upon by you in arriving at your decision. You should promptly report unauthorized representations or inducements to the counsel to the Debtors and the United States Trustee.

## ARTICLE VII.
## ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

### A.      LIQUIDATION UNDER CHAPTER 7 OF THE BANKRUPTCY CODE

If no chapter 11 plan can be confirmed, some or all of the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code, in which case a trustee would be elected or appointed to liquidate the Debtors' assets. In performing the liquidation analysis, the Debtors have assumed that all Holders of Claims and Equity Interests will be determined to have "claims" that are entitled to share in the proceeds from any such liquidation. The Debtors believe that liquidation under chapter 7 would result in smaller distributions being made to creditors than those provided for in the Plan because of (i) the additional administrative expenses involved in the appointment of a trustee and attorneys and other professionals to assist such trustee, (ii) additional expenses and claims, some of which would be entitled to priority, which would be generated during the liquidation and from the rejection of unexpired leases and executory contracts in connection with the cessation of the Debtors' operations, and (iii) the failure to realize the greater, going-concern value of all of the Debtors' assets.

## B.  FILING OF AN ALTERNATIVE PLAN OF REORGANIZATION

If the Plan is not confirmed, the Debtors or any other party in interest could attempt to formulate a different plan of reorganization.  Such a plan might involve either a reorganization and continuation of the Debtors' business or an orderly liquidation of the Debtors' assets.

During the negotiations prior to the filing of the Plan, the Debtors explored various alternatives to the Plan.  The Debtors believe that the Plan will enable the Debtors to emerge from chapter 11 successfully and expeditiously, preserves the Debtors' business and allows creditors to realize the highest recoveries under the circumstances.  In a liquidation under chapter 11 of the Bankruptcy Code, the assets of the Debtors would be sold in an orderly fashion over a more extended period of time than in a liquidation under chapter 7, and a trustee need not be appointed.  Accordingly, creditors would receive greater recoveries than in a chapter 7 liquidation.  Although a chapter 11 liquidation is preferable to a chapter 7 liquidation, the Debtors believe that a liquidation under chapter 11 is a much less attractive alternative to creditors and interest holders than the Plan because the Plan provides for a greater return to creditors and interest holders.

Moreover, the prolonged continuation of the Chapter 11 Cases is likely to adversely affect the Debtors' business and operations.  So long as the Chapter 11 Cases continue, senior management of the Debtors will be required to spend a significant amount of time and effort dealing with the Debtors' reorganization instead of focusing exclusively on business operations.  Prolonged continuation of the Chapter 11 Cases also will make it more difficult to attract and retain management and other key personnel necessary to the success and growth of the Debtors' business.  In addition, the longer the Chapter 11 Cases continue, the more likely it is that the Debtors' customers and suppliers will lose confidence in the Debtors' ability to reorganize their business successfully and will seek to establish alternative commercial relationships.  Further, so long as the Chapter 11 Cases continue, the Debtors will be required to incur substantial costs for professional fees and other expenses associated with the proceedings.  The prolonged continuation of the Chapter 11 Cases may also require the Debtors to seek additional financing in order to service their debt and other obligations.  It may not be possible for the Debtors to obtain additional financing during the pendency of the Chapter 11 Cases on commercially favorable terms or at all.  If the Debtors were to require additional financing during the Chapter 11 Cases and were unable to obtain the financing on favorable terms or at all, it is unlikely the Debtors could successfully reorganize.

## ARTICLE VIII.
## ISSUANCE AND RESALE OF NEW COMMON SHARES
## AND NEW WARRANTS UNDER THE PLAN

## A.  EXEMPTION FROM REGISTRATION REQUIREMENTS OF THE SECURITIES ACT AND BLUE SKY LAWS

### 1.  Section 1145(a) of the Bankruptcy Code (Offer and Issuance of Exchange Common Shares and New Warrants)

The Debtors are relying on the exemption provided by section 1145(a)(1) of the Bankruptcy Code from the registration requirements of the Securities Act and applicable Blue Sky Laws to exempt the offer and issuance of New Common Shares and New Warrants to Holders of Prepetition Secured Debt Claims, respectively, on the Effective Date.  Section 1145(a)(1) of the Bankruptcy Code provides that the registration requirements of Section 5 of the Securities Act and any applicable Blue Sky Laws will not apply to the offer or sale of stock, warrants or other securities by a debtor under a plan of reorganization if (i) the offer

or sale occurs under a plan of reorganization, (ii) the recipients of securities hold a claim against, an interest in or claim for administrative expense against the debtor and (iii) the securities are issued in exchange for a claim against or interest in a debtor or are issued principally in such exchange and partly for cash and property.

The Debtors are relying on the exemption provided by section 1145(a)(2) of the Bankruptcy Code from the registration requirements of the Securities Act and applicable Blue Sky Laws to exempt the offer and issuance of New Common Shares issuable after the Effective Date upon the exercise of New Warrants on the Effective Date.  Section 1145(a)(2) of the Bankruptcy Code provides that the registration requirements of Section 5 of the Securities Act and any applicable Blue Sky Laws will not apply to the offer or sale of any security through any warrant, option, right to subscribe, or conversion privilege that was sole in the manner specified in section 1145(a)(1) of the Bankruptcy Code, or the sale of a security upon the exercise of such a warrant, option, right or privilege.

### 2.     Section 4(a)(2) of the Securities Act, Rule 506 of Regulation D, and Rule 701 Under the Securities Act (Offer and Issuance of New Common Shares and Other Equity Securities Under Management Incentive Plan)

The Debtors are relying on the exemptions provided by Section 4(a)(2) of the Securities Act, Rule 506 of Regulation D and/or Rule 701 promulgated under the Securities Act from the registration requirements of the Securities Act to exempt the offer and issuance of the New Common Shares and other Equity Securities to directors, officers and other key employees of the Debtors pursuant to the MIP (the "MIP Securities").  Section 4(a)(2) of the Securities Act exempts transactions by an issuer not involving any public offering, and Regulation D provides a safe harbor under Section 4(a)(2) for transactions that meet certain requirements, including that directors, officers and other key employees of the Debtors qualify as "accredited investors" within the meaning of U.S. securities laws.

Rule 701 under the Securities Act provides a safe harbor exemption from registration under the Securities Act for equity securities issued as employee compensation. Accordingly, the Debtors believe that the MIP Securities issued to directors, officers and other key employees of the Debtors will be exempt from registration under the Securities Act.

In reliance upon the exemptions provided by section 1145(a) of the Bankruptcy Code, Section 4(a)(2) of the Securities Act, Rule 506 of Regulation D under the Securities Act and/or Rule 701 promulgated under the Securities Act, as discussed in the preceding paragraphs, the Debtors believe that the offer and issuance of the New Common Shares, the MIP Securities and the New Warrants under the Plan, including the shares of New Common Shares issuable after the Effective Date upon exercise of New Warrants, will be exempt from registration under the Securities Act.

## B.     RESALES OF NEW COMMON SHARES, AND NEW WARRANTS

### 1.     Resales of the Exchange Securities

As discussed in ARTICLE VIII.A.2 of the Plan, the offer and issuance of Exchange Common Shares and New Warrants issued on the Effective Date, and New Common Shares issuable after the Effective Date upon exercise of New Warrants (collectively, the "Exchange Securities"), is anticipated to be exempt under section 1145(a)(1) of the Bankruptcy Code from registration under the Securities Act and applicable Blue Sky Laws. Section 1145(c) of the Bankruptcy Code provides that securities issued pursuant to a registration exemption under section 1145(a)(1) of the Bankruptcy Code ("Exempt 1145(a)(1) Securities") are deemed to have been issued pursuant to a public offering.

94

Therefore, to the extent the offer and sale of any Exchange Securities are Exempt 1145(a)(1) Securities, they are not considered "restricted securities" and may generally be resold by any holder thereof without registration under the Securities Act pursuant to the exemption provided by Section 4(a)(1) thereof, unless the holder is an "underwriter" with respect to such securities, as such term is defined in section 1145(b)(1) of the Bankruptcy Code.  In addition, Exchange Securities that are Exempt 1145(a)(1) Securities generally may be resold by the recipients thereof without registration under state securities or "blue sky" laws pursuant to various exemptions provided by the respective laws of the individual states (collectively, "Blue Sky Laws").  However, the availability of such exemptions cannot be known unless individual states' Blue Sky Laws are examined, and recipients of securities issued under the Plan are advised to consult with their own counsel as to the availability of any such exemption from registration under federal securities laws and any relevant state securities laws in any given instance and as to any applicable requirements or conditions to the availability thereof.

Section 1145(b)(1) of the Bankruptcy Code defines an "underwriter" for purposes of the Securities Act as one who, subject to certain exceptions, (a) purchases a claim with a view to distribution of any security to be received in exchange for such claim, (b) offers to sell securities offered or sold under the plan for the holders of such securities, (c) offers to buy securities issued under the plan from the holders of such securities, if the offer to buy is made with a view to distribution of such securities, and if such offer is under an agreement made in connection with the plan, with the consummation of the plan or with the offer or sale of securities under the plan, or (d) is an issuer, as used in Section 2(a)(11) of the Securities Act, with respect to such securities, which (as described below) includes "control persons" of the issuer.

The term "issuer," as used in Section 2(a)(11) of the Securities Act, includes any person directly or indirectly controlling or controlled by, an issuer of securities, or any person under direct or indirect common control with such issuer.  "Control" (as defined in Rule 405 under the Securities Act) means the possession, direct or indirect, of the power to direct or cause the direction of the policies of a person, whether through the ownership of voting securities, by contract, or otherwise.  Accordingly, an officer or director of a reorganized debtor or its successor under a plan of reorganization may be deemed to be "in control" of such debtor or successor, particularly if the management position or directorship is coupled with ownership of a significant percentage of the reorganized debtor's or its successor's voting securities.  Moreover, the legislative history of section 1145 of the Bankruptcy Code suggests that a creditor who owns ten percent (10%) or more of the voting securities of a reorganized debtor may be presumed to be a "control person."

Notwithstanding the foregoing, "control person" underwriters may be able to sell securities without registration pursuant to the resale limitations for control securities under Rule 144 of the Securities Act which, in effect, permit the resale of securities received by such underwriters pursuant to a chapter 11 plan, subject to applicable volume limitations and current public information, notice and manner of sale requirements. Parties who believe they may be statutory underwriters as defined in section 1145 of the Bankruptcy Code are advised to consult with their own legal advisers as to the availability of the exemption provided by Rule 144 and other exemptions from registration under the Securities Act.

**WHETHER OR NOT ANY PARTICULAR PERSON WOULD BE DEEMED TO BE AN "UNDERWRITER" OF NEW COMMON SHARES, OR NEW WARRANTS TO BE ISSUED PURSUANT TO THE PLAN OR AN "AFFILIATE" OF RT ASSET COMPANY WOULD DEPEND UPON VARIOUS FACTS AND CIRCUMSTANCES APPLICABLE TO THAT PERSON.  ACCORDINGLY, THE DEBTORS EXPRESS NO VIEW AS TO WHETHER ANY SUCH PERSON WOULD BE SUCH AN "UNDERWRITER" OR AN "AFFILIATE."  IN VIEW OF THE**

95

**COMPLEX, SUBJECTIVE NATURE OF THE QUESTION OF WHETHER A PARTICULAR PERSON MAY BE AN UNDERWRITER OR AN AFFILIATE OF THE REORGANIZED DEBTORS, THE DEBTORS MAKE NO REPRESENTATIONS CONCERNING THE RIGHT OF ANY PERSON TO TRADE IN SECURITIES OF RT ASSET COMPANY.  ACCORDINGLY, THE DEBTORS RECOMMEND THAT POTENTIAL RECIPIENTS OF ANY SHARES OF NEW COMMON SHARES OR NEW WARRANTS TO BE ISSUED PURSUANT TO THE PLAN CONSULT THEIR OWN COUNSEL CONCERNING WHETHER THEY MAY FREELY TRADE SUCH SECURITIES.**

**The Debtors recommend that potential recipients of the Exchange Securities consult their own counsel concerning their ability to freely trade their Exchange Securities without registration under applicable federal securities laws and Blue Sky Laws.**

**2.      Resales of the MIP Securities**

The offer and issuance of the MIP Securities is covered by Section 4(a)(2) of the Securities Act, Rule 506 of Regulation D and/or Rule 701 promulgated under the Securities Act, and will not be exempt under section 1145 of the Bankruptcy Code.  Therefore, such shares of New Common Shares will be considered "restricted securities" as defined by Rule 144 of the Securities Act and may not be sold except pursuant to an effective registration statement or pursuant to an applicable exemption from the registration requirements of the Securities Act, such as, under certain conditions, the resale provisions of Rule 144 of the Securities Act (as discussed below).  The Debtors express no view as to whether any Person or Entity may freely resell the MIP Securities.

**The Debtors recommend that potential recipients of the MIP Securities consult their own counsel concerning their ability to freely trade the MIP Securities without registration under applicable federal securities laws and Blue Sky Laws and the availability of Rule 144 for exempt resales.**

**The Debtors recommend that potential recipients of securities under the Plan consult their own counsel concerning their ability to freely trade such securities without registration under applicable federal securities laws and Blue Sky Laws.**

**ARTICLE IX.**
**SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN**

**A.      GENERAL**

The following disclosure (the "Tax Disclosure") summarizes certain U.S. federal income tax consequences of the implementation of the Plan to the Debtors and certain Holders of Claims and Equity Interests.  This summary is based on the Internal Revenue Code of 1986, as amended (the "Tax Code"), Treasury Regulations promulgated thereunder, and administrative and judicial interpretations and practice, all as in effect on the date of the Disclosure Statement and all of which are subject to change, with possible retroactive effect.  Due to the lack of definitive judicial and administrative authority in a number of areas, substantial uncertainty may exist with respect to some of the tax consequences described below.  No opinion of counsel has been obtained and the Debtors do not anticipate seeking a ruling from the Internal Revenue Service (the "IRS") as to any of the tax consequences of the Plan discussed below.  There can be no assurance that the IRS will not challenge one or more of the tax consequences of the Plan described below.

96

This summary does not apply to Holders of Claims and Equity Interests that are otherwise subject to special treatment under U.S. federal income tax law (including, without limitation, banks, governmental authorities or agencies, financial institutions, insurance companies, pass-through entities, tax-exempt organizations, brokers and dealers in securities, mutual funds, small business investment companies, regulated investment companies, real estate investment trusts, employees, persons who received their Claims and Equity Interests as compensation, and persons holding Claims and Equity Interests that are a hedge against, or that are hedged against, currency risk or that are part of a straddle, constructive sale, or conversion transaction).  Further, unless explicitly indicated otherwise, this summary does not address Holders of the Allowed Subclass 3A Claims. The following discussion assumes that Holders of Claims or Equity Interests (except in the case of Holders of General Unsecured Claims that were not based on holding Prepetition Secured Loans) hold such Claims or Equity Interests as "capital assets" within the meaning of section 1221 of the Tax Code.  This summary assumes that the Prepetition Secured Claims are property treated as debt for U.S. federal income tax purposes.  Moreover, this summary does not purport to cover all aspects of U.S. federal income taxation that may apply to the Debtors and Holders of Claims or Equity Interests based upon their particular circumstances. Additionally, this summary does not discuss any tax consequences that may arise under any laws other than U.S. federal income tax law, including under state, local, estate, gift, foreign. or any other applicable tax law.

For purposes of this summary, a "U.S. Holder" means a Holder of a Claim or Equity Interest that is, for U.S. federal income tax purposes: (i) an individual that is a citizen or resident of the United States; (ii) a corporation, or other entity treated as a corporation for U.S. federal income tax purposes, created or organized in or under the laws of the United States, any state thereof or the District of Columbia; (iii) an estate, the income of which is subject to U.S. federal income taxation regardless of its source; or (iv) a trust, if (a) a court within the United States is able to exercise primary supervision over its administration and one or more U.S. persons have the authority to control all of the substantial decisions of such trust, or (b) it has a valid election in effect under applicable Treasury regulations to be treated as a U.S. person.  A "Non-U.S. Holder" means a Holder of a Claims or Equity Interests that is not a U.S. Holder and is, for U.S. federal income tax purposes, an individual, corporation (or other entity treated as a corporation for U.S. federal income tax purposes), estate or trust.

If an entity classified as a partnership for U.S. federal income tax purposes holds a Claims or Equity Interests, the U.S. federal income tax treatment of a partner (or other owner) of the entity generally will depend on the status of the partner (or other owner) and the activities of the entity.  Such partner (or other owner) should consult its tax advisor as to the tax consequences of the Plan.

THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX.  ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO HOLDERS OF CLAIMS OR EQUITY INTERESTS.  ALL HOLDERS OF CLAIMS OR EQUITY INTERESTS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE FEDERAL, STATE, LOCAL, NON-U.S. AND ANY OTHER APPLICABLE TAX CONSEQUENCES APPLICABLE UNDER THE PLAN.

B.      **U.S. FEDERAL INCOME TAX CONSEQUENCES TO THE DEBTORS**

1.      **Cancellation of Debt Income**

Generally, the discharge of a debt obligation of a debtor for an amount less than the adjusted issue price (in most cases, the amount the debtor received on incurring the obligation, with certain adjustments) creates cancellation of debt ("COD") income, that must be included in the debtor's income. The amount of the Debtors' COD income depends upon the value of the Plan consideration distributed on account of the Allowed Claims against the Debtors relative to the amount of such Allowed Claims (or adjusted issue price if different from the amount of the Allowed Claims), as well as the extent to which those Allowed Claims constitute debt for federal income tax purposes and to the extent the payment of such Allowed Claims would be deductible for tax purposes. However, COD income is excluded from taxable income by a taxpayer that is a debtor in a reorganization case if the discharge is granted by the bankruptcy court or pursuant to a plan of reorganization approved by a bankruptcy court. The Plan, if approved, would enable the Debtors to qualify for this bankruptcy exclusion rule with respect to any COD income triggered by the Plan.

If debt of a Debtor is discharged in a reorganization case qualifying for the bankruptcy exclusion certain income tax attributes otherwise available and of value to the debtor are reduced, in most cases by the amount of the COD income. Tax attributes subject to reduction include, in the following order: (a) net operating losses ("NOLs") and NOL carryforwards; (b) most credit carryforwards, including the general business credit and the minimum tax credit; (c) capital losses and capital loss carryforwards; (d) the tax basis of the debtor's assets, but not in an amount greater than the excess of the aggregate tax bases of the property held by the debtor immediately after the discharge over the aggregate amount of the debtor's liabilities immediately after the discharge; and (e) foreign tax credit carryforwards. A debtor may elect instead to reduce the basis of depreciable property first.

In the case of affiliated corporations filing a consolidated return, such as the Debtors, that are taxed as corporations (the "Ruby Tuesday Consolidated Group"), the attribute reduction rules apply first to the separate attributes of or attributable to the particular corporation whose debt is being discharged, and then, if necessary, to certain attributes of other members of the group. Accordingly, COD income of a debtor would result first in the reduction of any NOLs and other attributes, including asset basis, of or attributable to such debtor, and then, potentially, of consolidated NOLs and/or basis of or attributable to other members of the consolidated group. If the debtor is a member of a consolidated group and is required to reduce its basis in the stock of another group member, a "look-through rule" generally requires a corresponding reduction in the tax attributes of the lower-tier member. If the amount of a debtor's excluded COD income exceeds the amount of attribute reduction resulting from the application of the foregoing rules, certain other tax attributes of the consolidated group may also be subject to reduction. Finally, if the attribute reduction is less than the amount of COD income and a member of the Ruby Tuesday Consolidated Group has an excess loss account (an "ELA") (i.e., negative basis in the stock of another member of the consolidated group), the Ruby Tuesday Consolidated Group will recognize taxable income to the extent of the lesser of such ELA or the amount of the COD income that was not offset by tax attribute reduction. NOL reduction does not occur until immediately after the close of the taxable year in which the debt discharge occurs, *i.e.*, after use of any such NOLs and other attributes to determine the consolidated group's taxable income for the tax year in which the debt is discharged. Basis reduction applies to assets owned by a debtor at the beginning of the tax year following the discharge.

98

The Debtors expect to realize COD income in connection with the implementation of the Plan and are continuing to explore the impact the implementation of the Plan on Debtor tax attributes upon emergence.

## 2. Potential Limitations on NOL Carryforwards and Other Tax Attributes

As of June 4, 2019, the Debtors' U.S federal income tax NOL carryforwards were approximately $56 million. The Debtors estimate that their U.S. federal income tax NOL carryforwards have increased to approximately $93 million as of June 2, 2020. The Debtors have not determined the magnitude of additional NOLs expected to be incurred since then through the Petition Date, the Effective Date, or the first fiscal year that will end following the effective date, all of which could be impacted by the implementation of the Plan.

As of June 2, 2020, the Debtors also have the following other U.S. federal income tax attributes:

| | |
|---|---|
| General Business and Foreign Tax Credits (Unlimited) | $21.4 million[11] |
| General Business and Foreign Tax Credits (Limited) | $94.6 million[12] |
| Disallowed business interest expense carryforward | $19.9 million[13] |

As of the Petition Date, $44.5 million of the Debtors' NOLs are subject to the limitations set forth in Tax Code section 382 (discussed below), as a result of the Merger in 2017 that resulted in a change of ownership. The Debtors do not believe that the balance of the NOLs are currently subject to any limitations.

### a. Limitation on NOLs and Other Tax Attributes

Under Tax Code section 382, if a "loss corporation" (generally, a corporation with NOLs and/or built-in losses) undergoes an "ownership change," the amount of its pre-change losses (including certain losses or deductions which are "built-in," i.e., economically accrued but unrecognized as of the date of the ownership change) that may be utilized to offset future taxable income generally are subject to an annual limitation. Similar rules apply to a corporation's capital loss carryforwards and tax credits.

The issuance of Equity Interests in RT Lodge Company pursuant to the Plan is expected to result in an ownership change for purposes of Tax Code section 382. Accordingly, if the Debtors were to emerge with any NOLs, other pre-change losses or other tax attributes following attribute reduction, and subject to the discussion below of certain special bankruptcy exceptions, RT Lodge Company's pre-change losses may be subject to an annual limitation. This limitation applies in addition to, and not in lieu of, any other

---

[11] The breakdown of $21.429 million in general business credits that *are not* subject to Tax Code § 383 limitations is:  Foreign Tax Credit:  $51,000 ($30,000 expires 2029); Work Opportunity Tax Credit:  $3.658 million ($1.273 million expires 2038); Empowerment Zone Credit:  $3,000 ($3,000 expires 2038); and FICA Tip Credit:  $17.717 million ($3.94 million expires 2038).

[12] The breakdown of $94.57 million in general business credits that *are* limited by Tax Code § 383 as a result of 2017 Merger transaction is:  Foreign Tax Credit:  $311,000 ($117,000 expires 2024); Work Opportunity Tax Credit:  $17.17 million ($3.277 million expires 2032); Empowerment Zone Credit:  $77,000 ($13,000 expires 2033); FICA Tip Credit:  $77.012 million ($3.894 million expires 2031).

[13] *See* 26 U.S.C. § 163(j) (Limitation on business interest).

similar limitation that may already or in the future be in effect and the attribute reduction that may result from COD.

      b.      <u>General Section 382 and 383 Limitations</u>

In general, the amount of the annual limitation to which a corporation that undergoes an ownership change will be subject is equal to the product of (i) the fair market value of the stock of the loss corporation (or, in the case of a consolidated group, generally the stock of the common parent) immediately before the ownership change (with certain adjustments) and (ii) the "long term tax exempt rate" in effect for the month in which the ownership change occurs (e.g., 1.12% for ownership changes occurring in October 2020). If a corporation (or a consolidated group) in bankruptcy undergoes an ownership change pursuant to a confirmed bankruptcy plan, the fair market value of the stock of the corporation is generally determined immediately after (rather than before) the ownership change, after giving effect to the discharge of creditors' claims but subject to certain adjustments. In no event, however, can the stock value for this purpose exceed the pre-change gross value of the corporation's assets.

Any portion of the annual limitation that is not used in a given year may be carried forward, thereby adding to the annual limitation for the subsequent taxable year. However, if the corporation (or the consolidated group) does not continue its historic business or use a significant portion of its historic assets in a new business for at least two years after the ownership change, unless the corporation qualifies for certain bankruptcy exceptions, the annual limitation resulting from the ownership change is reduced to zero, thereby precluding any utilization of the corporation's pre-change losses, absent any increases due to recognized built-in gains, as described in "Built-in Gains or Losses". In addition, if a redemption or other corporate contraction occurs in connection with the ownership change of the loss corporation (or the consolidated group), or if the loss corporation (or the consolidated group) has substantial nonbusiness assets, the annual limitation is reduced to take the redemption, other corporate contraction or nonbusiness assets into account. Furthermore, if the corporation (or the consolidated group) undergoes a second ownership change, the second ownership change may result in a lesser (but never a greater) annual limitation with respect to any losses that existed at the time of the first ownership change.

The Tax Code § 383 credit limitation applies to limit the amount of regular tax liability that can be offset by pre-change credits of the new loss corporation. The limitation for a post-change year bears a direct relationship to the amount of the section 382 limitation that remains after taking into account the reduction in the loss corporation's taxable income during a post-change year as a result of its pre-change losses. A loss corporation is required to offset its pre-change losses and credits in a specific order against its limitation.

      c.      <u>Built-in Gains and Losses</u>

A net unrealized built-in gain ("<u>NUBIG</u>") or net unrealized built-in loss ("<u>NUBIL</u>") is generally the difference between the fair market value of a loss corporation's assets and its tax basis in the assets, subject to a statutorily defined threshold amount. In certain cases, the NUBIG or NUBIL of a consolidated group generally is calculated on a consolidated basis, subject to special rules. If a loss corporation has a NUBIG immediately prior to the ownership change, the annual limitation may be increased as certain gains are recognized during the five-year period beginning on the date of the ownership change (the "<u>Recognition Period</u>"). If a loss corporation has a NUBIL immediately prior to the ownership change, certain losses recognized during the Recognition Period also would be subject to the annual limitation and thus may reduce the amount of deductions, losses, and/or pre-change NOLs that could be used by the loss corporation during the Recognition Period.

If a loss corporation has a NUBIG immediately prior to an ownership change, any recognized built-in gain ("RBIG") will increase the annual limitation in the taxable year the RBIG is recognized.  An RBIG generally is any gain (and certain income) with respect to an asset held immediately before the date of the ownership change that is recognized during the Recognition Period to the extent of the fair market value of the asset over its tax basis immediately prior to the ownership change.  However, the aggregate amount of all RBIGs that are recognized during the Recognition Period may not exceed the NUBIG.  On the other hand, if a loss corporation has a NUBIL immediately prior to an ownership change, any recognized built-in losses ("RBILs") will be subject to the annual limitation in the same manner as pre-change NOLs.  An RBIL generally is any loss (and certain deductions) with respect to an asset held immediately before the date of the ownership change that is recognized during the Recognition Period to the extent of the excess of the tax basis of the asset over its fair market value immediately prior to the ownership change.  However, the aggregate amount of all RBILs that are recognized during the Recognition Period may not exceed the NUBIL.  RBIGs and RBILs may be recognized during the Recognition Period for depreciable and amortizable assets that are not actually disposed.

d.    <u>Special Bankruptcy Exceptions</u>

An exception to the foregoing annual limitation rules generally applies when existing shareholders and "qualified creditors" of a debtor corporation under the jurisdiction of a court in a chapter 11 case receive, in respect of their claims or interests, at least 50% of the vote and value of the stock of the reorganized debtor (or a controlling corporation if also in chapter 11) pursuant to a confirmed plan (the "<u>Section 382(l)(5) Exception</u>").  Under the Section 382(l)(5) Exception, a debtor's pre-change losses (including NUBILs, if any) are not limited on an annual basis, but instead NOL carryforwards will generally be reduced by the amount of any interest deductions claimed during the three taxable years preceding the effective date of the plan of reorganization, and during the part of the taxable year prior to and including the effective date of the plan of reorganization, in respect of all debt converted into stock in the reorganization.  If the Section 382(l)(5) Exception applies and a debtor undergoes another ownership change within two years after the effective date of the plan of reorganization, then the debtor's pre-change losses effectively are eliminated in their entirety.  For purposes of the Section 382(l)(5) Exception, a "qualified creditor" generally consists of certain long-term creditors (who held the claims continuously for at least 18 months prior to the filing of the bankruptcy petition), and ordinary course creditors (e.g., trade creditors).  In determining whether the Section 382(l)(5) Exception applies, certain Holders of claims that would own a de minimis amount of the debtor's stock pursuant to the debtor's plan are presumed to have held their claims since the origination of such claims.  In general, this de minimis rule applies to Holders of claims who would own directly or indirectly less than 5% of the total fair market value of the debtor's stock pursuant to the plan.  The application of this rule to the Reorganized Debtors is uncertain.  If a debtor qualifies for the Section 382(l)(5) Exception, the exception applies unless the debtor affirmatively elects for it not to apply.

If the Section 382(l)(5) Exception applies, a subsequent ownership change with respect to the Reorganized Debtors occurring within two years after the Effective Date will result in the reduction of the annual limitation that would otherwise apply to the subsequent ownership change to zero.  Thus, an ownership change within two years after the Effective Date would eliminate the ability of the Reorganized Debtors to use pre-ownership change NOLs or RBILs thereafter.  If a change of ownership occurs after the two years following the Effective Date, then the Reorganized Debtors will become subject to limitation in the use of their NOLs based upon the value of the Ruby Tuesday Consolidated Group at the time of that subsequent change.

101

Where the Section 382(l)(5) Exception is not applicable to a corporation in bankruptcy (either because the debtor does not qualify for it or the debtor otherwise elects not to utilize the Section 382(l)(5) Exception), a second special rule will generally apply (the "Section 382(l)(6) Exception"). Under the Section 382(l)(6) Exception, the annual limitation will be calculated by reference to the lesser of the value of the debtor corporation's new stock (with certain adjustments) immediately after the ownership change or the value of such debtor corporation's assets (determined without regard to liabilities) immediately before the ownership change. This differs from the ordinary rule that requires the fair market value of a debtor corporation that undergoes an ownership change to be determined before the events giving rise to the ownership change. The annual limitation may be increased if the Ruby Tuesday Consolidated Group has a NUBIG at the time of an ownership change. If, however, the Ruby Tuesday Consolidated Group, or one or more Debtors, has a NUBIL at the time of an ownership change, the annual limitation may apply to such net unrealized built-in loss.

The Section 382(l)(6) Exception also differs from the Section 382(l)(5) Exception in that the debtor corporation is not required to reduce its NOL carryforwards by the amount of interest deductions claimed within the prior three-year period, and the debtor may undergo a change of ownership within two years of the Effective Date without triggering the elimination of its pre-change losses.

The Debtors have not yet determined whether RT Lodge Company is eligible for the Section 382(l)(5) Exception. Even if the Section 382(l)(5) Exception otherwise applies, the Reorganized Debtors may elect to not have the Section 382(l)(5) Exception apply, in which event the Section 382(l)(6) Exception would apply. RT Lodge Company will have until the due date of the tax return for the taxable year of the Effective Date to make such a determination. Transfers of Equity Securities in RT Lodge Company may be subject to customary restrictions consistent with the preservation of the NOLs, NUBILs, and other tax attributes of the Debtors, including as necessary to avoid a second ownership change that would eliminate the benefits of the Section 382(l)(5) Exception.

## C. CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES TO U.S. HOLDERS OF ALLOWED CLAIMS UNDER THE PLAN

The U.S. federal income tax consequences of the Plan to U.S. Holders of Claims (including the character, amount and timing of income, gain or loss recognized) generally will depend upon, among other factors: (i) the manner in which the U.S. Holder acquired a Claim; (ii) the length of time a Claim has been held; (iii) whether a Claim was acquired at a discount; (iv) whether the U.S. Holder has taken a bad debt deduction in the current or prior years; (v) whether the U.S. Holder has previously included accrued but unpaid interest with respect to a Claim; (vi) the U.S. Holder's method of tax accounting; and (vii) whether the Debtors reorganize as is expected. Therefore, U.S. Holders of Claims are urged to consult their tax advisors for information that may be relevant to their specific situation and circumstances and the particular tax consequences to such Holders as a result thereof.

### 1. Treatment of a Debt Instrument as a Security

As an initial matter, the U.S. federal income tax consequences to U.S. Holders of Claims may depend, in part, on whether the debt instrument underlying a Claim is a "security" of the Debtor that is issuing the consideration being received by a holder of such Claim. Whether an instrument constitutes a "security" for these purposes is determined based on all the facts and circumstances, but most authorities have held that term-length of a debt instrument at issuance is an important factor in determining whether such an instrument is a security. These authorities have indicated that a term of less than five years is evidence that the instrument is not a security, whereas a term of ten years or more is evidence that

such debt instrument is a security.  There are numerous other factors that could be taken into account in determining whether a debt instrument is a security, including, without limitation: (1) the security for payment; (2) the creditworthiness of the obligor; (3) the subordination or lack thereof to other creditors; (4) the right to vote or otherwise participate in the management of the obligor; (5) convertibility of the instrument into an equity interest of the obligor; (6) whether payments of interest are fixed, variable or contingent; and (7) whether such payments are made on a current basis or accrued.  The Debtors have not determined whether any of the obligations under the Prepetition Credit Facility or the Exit Facility were or will be considered securities for these purposes.  Each U.S. Holder should consult with its tax advisor on whether it should treat the Prepetition Credit Facility and the Exit Facility as a security for purposes of the reorganization provisions of the Tax Code.

### 2.    Consequences to Holders of Allowed General Unsecured Claims

In general, Holders of Allowed General Unsecured Claims will recognize gain or loss with respect to its Allowed General Unsecured Claim in an amount equal to the difference between (i) the sum of the amount of any Cash and the fair market value of its interest in any other property received (other than any consideration attributable to a Claim for accrued but unpaid interest or original issue discount ("OID")) and (ii) the adjusted tax basis of the Claim exchanged therefor (other than any tax basis attributable to accrued but unpaid interest or accrued OID previously included in the holder's taxable income).

### 3.    Equity Interests

Equity Interests will be deemed automatically cancelled, released, and extinguished and the obligations of the Debtors and the Reorganized Debtors thereunder will be discharged.  U.S. Holders of Equity Interests should recognize a capital loss for U.S. federal income tax purposes in an amount equal to the Holder's adjusted tax basis of its Equity Interest.  The utilization of capital losses may be subject to certain limitations.

### 4.    Accrued But Untaxed Interest

A portion of the consideration received by Holders of Claims may be attributable to Accrued but Untaxed Interest on such Claims.  Such amount should be taxable to that Holder as interest income if such accrued interest has not been previously included in the Holder's gross income for U.S. federal income tax purposes.

The tax basis of any New Common Shares or Equity Interests in RT Lodge Company received in satisfaction of accrued interest should equal the amount of such accrued interest.  The holding period for such New Common Shares or Equity Interests in RT Lodge Company should begin on the day following the Effective Date.

If the fair value of the consideration is not sufficient to fully satisfy all principal and interest on Allowed Claims, the extent to which such consideration will be attributable to Accrued but Untaxed Interest is unclear.  Under the Plan, the aggregate consideration to be distributed to Holders of Allowed Claims in each Class will be allocated first to the principal amount of Allowed Claims, with any excess allocated unpaid interest that accrued on such Claims, if any.  Certain legislative history indicates that an allocation of consideration as between principal and interest provided in a chapter 11 plan of reorganization is binding for U.S. federal income tax purposes.  The IRS could take the position, however, that the consideration received by the U.S. Holder should be allocated in some way other than as provided in the Plan.  U.S. Holders of Claims should consult their own tax advisors regarding the proper allocation of the consideration received by them under the Plan.

103

### 5.       Limitation on Use of Capital Losses

U.S. Holders who recognize capital losses may be subject to limits on their use of capital losses.  For U.S. Holders other than corporations, capital losses may be used to offset any capital gains (without regard to holding periods) plus ordinary income to the extent of the lesser of (i) $3,000 ($1,500 for married individuals filing separate returns), or (ii) the excess of the capital losses over the capital gains.  Non-corporate U.S. Holders may carry over unused capital losses and apply them to capital gains and a portion of their ordinary income, though losses from the sale or exchange of capital assets may only be used to offset capital gains.  For corporate U.S. Holders, capital losses may only be used to offset capital gains.  U.S. Holders who have more capital losses than can be used in a tax year may be allowed to carry over the excess capital losses for use in succeeding tax years.  For corporate U.S. Holders, unused capital losses may be carried forward for the five years following the capital loss year or carried back to the three years preceding the capital loss year.  Non-corporate U.S. Holders may carry over unused capital losses for an unlimited number of years.

### 6.       Net Investment Income Tax

Certain U.S. Holders that are individuals, estates or trusts are required to pay an additional 3.8% Medicare tax on "unearned" net investment income (i.e., income received from, among other things, the sale or other disposition of certain capital assets).  Holders that are individuals, estates or trusts should consult their tax advisors regarding the effect, if any, of this tax provision on their ownership and disposition of any consideration to be received under the Plan.

### 7.       Information Reporting and Backup Withholding

All distributions to U.S. Holders of Claims under the Plan are subject to any applicable tax withholding, including employment tax withholding.  Under U.S. federal income tax law, interest, dividends and other reportable payments may be, under certain circumstances, subject to "backup withholding" at the then-applicable withholding rate (currently 24%).  Backup withholding generally applies if a Holder (i) fails to furnish its social security number or other taxpayer identification number ("TIN"), (ii) furnishes an incorrect TIN, (iii) fails properly to report interest or dividends, or (iv) under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the TIN provided is its correct TIN and that it is a U.S. person not subject to backup withholding.  Backup withholding is not an additional tax but merely an advance payment, which may be refunded to the extent it results in an overpayment of tax and if the appropriate information is supplied to the IRS.  Certain U.S. Holders are exempt from backup withholding, including, in certain circumstances, corporations and financial institutions.

The Debtors will withhold all amounts required by law to be withheld from payments of interest.  The Debtors will comply with all applicable reporting requirements of the IRS.

### D.       CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES TO NON-U.S. HOLDERS OF ALLOWED CLAIMS OR EQUITY INTERESTS UNDER THE PLAN

The rules governing U.S. federal income taxation of a Non-U.S. Holder are complex. The following discussion includes only certain U.S. federal income tax consequences of the Plan to Non-U.S. Holders.  The discussion does not include any non-U.S. tax considerations. Non-U.S. Holders should consult with their own tax advisors to determine the effect of U.S.

federal, state, and local tax laws, as well as any other applicable non-U.S. tax laws and/or treaties, with regard to their participation in the transactions contemplated by the Plan, their ownership of Claims or Equity Interests, and the ownership and disposition of the Equity Interests in RT Lodge Company, the New Common Shares, the New Warrants, and other consideration, as applicable.

### 1.    Gain Recognition

Any gain realized by a Non-U.S. Holder on the exchange of its Claim generally will not be subject to U.S. federal income taxation unless (a) the Non-U.S. Holder is an individual who was present in the United States for 183 days or more during the taxable year in which the Restructuring Transactions occur and certain other conditions are met or (b) such gain is effectively connected with the conduct by such Non-U.S. Holder of a trade or business in the United States (and, if an income tax treaty applies, such gain is attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States).

If the first exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such Non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of the exchange. If the second exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax with respect to any gain realized on the exchange if such gain is effectively connected with the Non-U.S. Holder's conduct of a trade or business in the United States in the same manner as a U.S. Holder (except that the Medicare tax would generally not apply). In order to claim an exemption from withholding tax, such Non-U.S. Holder will be required to provide a properly executed IRS Form W-8ECI (or such successor form as the IRS designates). In addition, if such a Non-U.S. Holder is a corporation, it may be subject to a branch profits tax equal to 30 percent (or such lower rate provided by an applicable treaty) of its effectively connected earnings and profits for the taxable year, subject to certain adjustments.

### 2.    Interest

Payments to a Non-U.S. Holder that are attributable to accrued but untaxed interest generally will not be subject to U.S. federal income tax or withholding, provided that the withholding agent has received or receives, prior to payment, appropriate documentation (generally, IRS Form W-8BEN or W-8BEN-E) establishing that the Non-U.S. Holder is not a U.S. person.  Interest income, however, may be subject to U.S. withholding if:

(i) the Non-U.S. Holder actually or constructively owns 10% or more of the total combined voting power of all classes of RT Asset Company shares entitled to vote;

(ii) the Non-U.S. Holder is a "controlled foreign corporation" that is a "related person" with respect to RT Asset Company (each, within the meaning of the Tax Code); or

(iii) the Non-U.S. Holder is a bank receiving interest described in Tax Code section 881(c)(3)(A).

A Non-U.S. Holder that does not qualify for the portfolio interest exemption from withholding tax with respect to accrued but untaxed interest that is not effectively connected income generally will be subject to withholding of U.S. federal income tax at a 30% rate (or at a reduced rate or exemption from tax under an applicable income tax treaty) on payments that are attributable to such interest or accrued but untaxed interest.  For purposes of

105

providing a properly executed IRS Form W-8BEN or W-8BEN-E, special procedures are provided under applicable Treasury regulations for payments through qualified foreign intermediaries or certain financial institutions that hold customers' securities in the ordinary course of their trade or business.

If such interest is effectively connected with the conduct by the Non-U.S. Holder of a trade or business within the United States (in which case, provided the Non-U.S. Holder provides a properly executed IRS Form W-8ECI (or successor form) to the withholding agent, the Non-U.S. Holder (x) generally will not be subject to withholding tax, but (y) will be subject to U.S. federal income tax in the same manner as a U.S. Holder (unless an applicable income tax treaty provides otherwise. In addition, if such Non-U.S. Holder is a corporation for U.S. federal income tax purposes, it may also be subject to a branch profits tax with respect to such Non-U.S. Holder's effectively connected earnings and profits that are attributable to the accrued but untaxed interest at a rate of 30% (or at a reduced rate or exemption from tax under an applicable income tax treaty)).

**3.    U.S. Federal Income Tax Consequences to Non-U.S. Holders of Owning and Disposing of Equity Interests in RT Lodge Company, New Common Shares or the New Warrants[14]**

a.    Dividends on Equity Interests in RT Lodge Company

Any distributions made with respect to Equity Interests in RT Lodge Company (including constructive distributions) will constitute dividends for U.S. federal income tax purposes to the extent of RT Lodge Company's current or accumulated earnings and profits as determined under U.S. federal income tax principles.  Except as described below, dividends paid with respect to Equity Interests in RT Lodge Company held by a Non-U.S. Holder that are not effectively connected with a Non-U.S. Holder's conduct of a U.S. trade or business (or if an income tax treaty applies, are not attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States) will be subject to U.S. federal withholding tax at a rate of 30% (or lower treaty rate or exemption from tax, if applicable).  A Non-U.S. Holder generally will be required to satisfy certain IRS certification requirements in order to claim a reduction of or exemption from withholding under a tax treaty by filing IRS Form W-8BEN or W-8BEN-E (or a successor form) upon which the Non-U.S. Holder certifies, under penalties of perjury, its status as a non-U.S. person and its entitlement to the lower treaty rate or exemption from tax with respect to such payments.  Dividends paid with respect to Equity Interests in RT Lodge Company held by a Non-U.S. Holder that are effectively connected with a Non-U.S. Holder's conduct of a U.S. trade or business (and if an income tax treaty applies, are attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States) generally will be subject to U.S. federal income tax in the same manner as a U.S. Holder. In addition, if such Non-U.S. Holder is a corporation for U.S. federal income tax purposes, it may also be subject to a branch profits tax with respect to such Non-U.S. Holder's effectively connected earnings and profits that are attributable to the dividends at a rate of 30% (or at a reduced rate or exemption from tax under an applicable income tax treaty).

b.    Dividends on New Common Shares

Any distributions made with respect to New Common Shares (including constructive distributions) will constitute dividends for U.S. federal income tax purposes to the extent of

---

[14] This discussion assumes that the New Common Shares are corporate stock and that the New Warrants are warrants in respect of such stock.  If the New Common Shares are treated as interests in a partnership for federal income tax purposes, the tax consequences would differ from those described below.

RT Asset Company's current or accumulated earnings and profits as determined under U.S. federal income tax principles.  Except as described below, dividends paid with respect to New Common Shares held by a Non-U.S. Holder that are not effectively connected with a Non-U.S. Holder's conduct of a U.S. trade or business (or if an income tax treaty applies, are not attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States) will be subject to U.S. federal withholding tax at a rate of 30% (or lower treaty rate or exemption from tax, if applicable).  A Non-U.S. Holder generally will be required to satisfy certain IRS certification requirements in order to claim a reduction of or exemption from withholding under a tax treaty by filing IRS Form W-8BEN or W-8BEN-E (or a successor form) upon which the Non-U.S. Holder certifies, under penalties of perjury, its status as a non-U.S. person and its entitlement to the lower treaty rate or exemption from tax with respect to such payments.  Dividends paid with respect to New Common Shares held by a Non-U.S. Holder that are effectively connected with a Non-U.S. Holder's conduct of a U.S. trade or business (and if an income tax treaty applies, are attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States) generally will be subject to U.S. federal income tax in the same manner as a U.S. Holder. In addition, if such Non-U.S. Holder is a corporation for U.S. federal income tax purposes, it may also be subject to a branch profits tax with respect to such Non-U.S. Holder's effectively connected earnings and profits that are attributable to the dividends at a rate of 30% (or at a reduced rate or exemption from tax under an applicable income tax treaty).

> c.  Sale, Redemption, or Repurchase of Equity Interests in RT Lodge Company, New Common Shares or New Warrants

A Non-U.S. Holder generally will not be subject to U.S. federal income tax with respect to any gain realized on the sale or other taxable disposition (including a cash redemption) of Equity Interests in RT Lodge Company, New Common Shares or the New Warrants, unless:

> (i)  such Non-U.S. Holder is an individual who is present in the United States for 183 days or more in the taxable year of disposition or who is subject to special rules applicable to former citizens and residents of the U.S.;

> (ii)  such gain is effectively connected with such Non-U.S. Holder's conduct of a U.S. trade or business (and if an income tax treaty applies, such gain is attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States); or

> (iii)  RT Lodge Company or RT Asset Company, as applicable, is or has been a "United States real property holding corporation" for U.S. federal income tax purposes (a "USRPHC") at any time during the shorter of the Non-U.S. holder's holding period for the Equity Interests in RT Lodge Company or the New Common Shares, as applicable, and the five-year period ending on the date of disposition.

If the first exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30% (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such Non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of disposition of Equity Interests in RT Lodge Company, New Common Shares and/or the New Warrants.  If the second exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax with respect to such gain in the same manner as a U.S. Holder; and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to earnings and profits effectively connected with a U.S. trade or business that are attributable to such gains at a rate of 30% (or at a reduced rate or exemption from tax under an applicable income tax treaty).

DOCS_LA:332991.15 76136/002

Generally, a corporation is a USRPHC if the fair market value of its United States real property interests equals or exceeds 50% of the sum of the fair market value of its worldwide real property interests and its other assets used or held for use in a trade or business. Any gain that is taxable because RT Asset Company is a USRPHC will generally be taxable in the same manner as gain that is effectively connected income (as described above), except that the branch profits tax will not apply. While there is no assurance that the IRS will agree with such position, the Debtors believe that based on current business plans and operations, Holding is not and RT Asset Company should not become a USRPHC in the future.

The exercise of the New Warrants by Non- U.S. Holders generally will not give rise to the realization of gain or loss upon the exercise of such New Warrants.

If the terms of the New Warrants provide for any adjustment to the number of shares of New Common Shares for which the New Warrants may be exercised or to the exercise price of the New Warrants, such adjustment may, under certain circumstances, result in constructive distributions that could be taxable to the Non-U.S. Holder of the New Warrants. If no appropriate adjustment is made to the number of shares of New Common Shares for which the New Warrants may be exercised or to the exercise price of such New Warrants, a constructive distribution may result that could be taxable to the holders of New Common Shares.

### 4.    FATCA

Under the Foreign Account Tax Compliance Act ("FATCA"), foreign financial institutions and certain other foreign entities must report certain information with respect to their U.S. account holders and investors or be subject to withholding on the receipt of "withholdable payments." For this purpose, "withholdable payments" are generally U.S.-source payments of fixed or determinable, annual or periodical income (including dividends, if any, on Equity Interests in RT Lodge Company or New Common Shares), and also include gross proceeds from the sale of any property of a type which can produce U.S. source interest or dividends (which would include Equity Interests in RT Lodge Company or New Common Shares). FATCA withholding will apply even if the applicable payment would not otherwise be subject to U.S. federal nonresident withholding tax.

Each Non-U.S. Holder should consult its own tax advisor regarding the possible impact of these rules on such Non-U.S. Holder's ownership of Equity Interests in RT Lodge Company, New Common Shares and/or New Warrants.

THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF U.S. FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER OF A CLAIM IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION. ALL HOLDERS OF CLAIMS AGAINST THE DEBTORS SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTION CONTEMPLATED BY THE RESTRUCTURING, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL OR FOREIGN TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.

### E.    GENERAL DISCLAIMER

THE FOREGOING U.S. FEDERAL INCOME TAX SUMMARY HAS BEEN PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. THE FOREGOING

SUMMARY DOES NOT DISCUSS ALL ASPECTS OF U.S. FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION.  ALL HOLDERS OF CLAIMS AND EQUITY INTERESTS SHOULD CONSULT WITH THEIR OWN TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL, OR NON-U.S. TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.

## ARTICLE X.
## RECOMMENDATION

In the opinion of the Debtors, the Plan is preferable to the alternatives described in this Disclosure Statement because it provides for a greater distribution to the Holders of Allowed Claims and Equity Interests than would otherwise result in a liquidation under chapter 7 of the Bankruptcy Code.  In addition, any alternative other than confirmation of the Plan could result in extensive delays and increased administrative expenses resulting in smaller distributions to Holders of Allowed Claims than that which is proposed under the Plan.  Accordingly, the Debtors recommend that all Holders of Impaired Claims entitled to vote support confirmation of the Plan and vote to accept the Plan.

[Remainder of Page Intentionally Blank]

109

Dated:  November  6, 2020          Respectfully submitted,

                                   RTI HOLDING COMPANY, LLC, on behalf of itself
                                   and each of the other Debtors


                                   By:_____
                                   Shawn Lederman
                                   Title:Chief Executive Officer


Submitted by:

/s/ James E. O'Neill_____
Richard M. Pachulski (CA Bar No. 90073)
Malhar S. Pagay (CA Bar No. 189289)
James E. O'Neill (Bar No. 4042)
**PACHULSKI STANG ZIEHL & JONES LLP**
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware  19899-8705 (Courier 19801)
Telephone:  302-652-4100
Facsimile:   302-652-4400
Email:rpachulski@pszjlaw.com
        mpagay@pszjlaw.com
        joneill@pszjlaw.com

Counsel for Debtors and Debtors in Possession


**[Signature page to Disclosure Statement for
Debtors' Chapter 11 Plan]**

110