# IN THE UNITED STATES BANKRUPTCY COURT

# FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| RTI HOLDING COMPANY, LLC,[1] | ) | Case No. 20-12456 (JTD) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

## MOTION OF DEBTORS FOR AN ORDER (A) APPROVING BID PROCEDURES FOR THE SALE OF THE DEBTORS' ASSETS, (B) APPROVING CERTAIN BIDDER INCENTIVES IN CONNECTION WITH THE DEBTORS' ENTRY INTO A STALKING HORSE AGREEMENT, IF ANY, AND (C) APPROVING PROCEDURES FOR THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

The above-captioned debtors and debtors in possession (the "Debtors") hereby

move (the "Motion") the Court for the entry of an order, pursuant to sections 105(a), 363, 365,

503, 507, 1123 and 1141 of title 11 of the United States Code (the "Bankruptcy Code"), Rules

2002 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and

Rules 2002-1 and 6004-1 of the Local Rules of Bankruptcy Practice and Procedure of the United

---

[1] The Debtors in these Chapter 11 Cases and the last four digits of each Debtor's U.S. tax identification number are as follows: RTI Holding Company, LLC (4966); Ruby Tuesday, Inc. (5239); Ruby Tuesday, LLC (1391); RTBD, LLC (6505); RT of Carroll County, LLC (8836); RT Denver Franchise, L.P. (2621); RT Detroit Franchise, LLC (8738); RT Distributing, LLC (6096); RT Finance, LLC (7242); RT FL Gift Cards, Inc. (2189); RT Florida Equity, LLC (7159); RT Franchise Acquisition, LLC (1438); RT of Fruitland, Inc. (1103); RT Indianapolis Franchise, LLC (6016); RT Jonesboro Club (2726); RT KCMO Franchise, LLC (7020); RT Kentucky Restaurant Holdings, LLC (7435); RT Las Vegas Franchise, LLC (4969); RT Long Island Franchise, LLC (4072); RT of Maryland, LLC (7395); RT Michiana Franchise, LLC (8739); RT Michigan Franchise, LLC (8760); RT Minneapolis Franchise, LLC (2746); RT Minneapolis Holdings, LLC (7189); RT New England Franchise, LLC (4970); RT New Hampshire Restaurant Holdings, LLC (7438); RT New York Franchise, LLC (1154); RT Omaha Franchise, LLC (7442); RT Omaha Holdings, LLC (8647); RT One Percent Holdings, LLC (6689); RT One Percent Holdings II, LLC (2817); RT Orlando Franchise, LP (5105); RT Restaurant Services, LLC (7283); RT South Florida Franchise, LP (3535); RT Southwest Franchise, LLC (9715); RT St. Louis Franchise, LLC (6010); RT Tampa Franchise, LP (5290); RT Western Missouri Franchise, LLC (6082); RT West Palm Beach Franchise, LP (0359); RTTA, LP (0035); RTT Texas, Inc. (2461); RTTT, LLC (9194); Ruby Tuesday of Allegany County, Inc. (8011); Ruby Tuesday of Bryant, Inc. (6703); Ruby Tuesday of Columbia, Inc. (4091); Ruby Tuesday of Frederick, Inc. (4249); Ruby Tuesday of Linthicum, Inc. (8716); Ruby Tuesday of Marley Station, Inc. (1641); Ruby Tuesday of Pocomoke City, Inc. (0472); Ruby Tuesday of Russellville, Inc. (1601); and Ruby Tuesday of Salisbury, Inc. (5432). The Debtors' mailing address is 333 East Broadway Ave., Maryville, TN 37804.

States Bankruptcy Court for the District of Delaware (the "<u>Local Rules</u>") for: an order

substantially in the proposed form attached hereto as **<u>Exhibit A</u>** (the "<u>Bid Order</u>"):

1.    establishing bid procedures (the "<u>Bid Procedures</u>"), substantially in the form attached as <u>Exhibit 1</u> to the Bid Procedures Order, in connection with the sale or sales (the "<u>Sale</u>") of substantially all of the Debtors' assets (the "<u>Assets</u>");

2.    authorizing the Debtors, in their discretion, exercised in good faith, to enter into a stalking horse purchase agreement with respect to a bid for the purchase of all or substantially all of the Assets that satisfies the criteria for a Topping Bid (as defined below) (a "<u>Stalking Horse Agreement</u>") pursuant to the terms of the Bid Procedures;

3.    authorizing the Debtors to offer a breakup fee of up to 3.0% of the total cash consideration offered for the applicable Assets (the "<u>Breakup Fee</u>") and an expense reimbursement of up to $500,000 (the "<u>Expense Reimbursement</u>" and, together with the Breakup Fee, the "<u>Bidder Incentives</u>") for a purchaser to serve as the Stalking Horse Bidder (as defined below), if any;

4.    scheduling an auction for the Sale (the "<u>Auction</u>") and approving the form and manner of notice thereof (the "<u>Bid Procedures/Auction Notice</u>"); and

5.    establishing certain procedures relating to the assumption and assignment of executory contracts and unexpired leases in connection with the Sale, including notice of proposed cure amounts (the "<u>Assumption and Assignment Procedures</u>"), and approving the form and manner of notice of the proposed assumption and assignment of executory contracts and unexpired leases (the "<u>Cure Notice</u>").

In support of this Motion, the Debtors respectfully state the following:

**PRELIMINARY STATEMENT**

1.    To expeditiously exit bankruptcy while maximizing the value of their estates, the Debtors are moving forward swiftly with a marketing process for the purpose of ascertaining the most favorable means to restructure their debts.  The centerpiece of the Debtors' proposed restructuring, which has the support of the Debtors' senior secured lenders and postpetition lenders, Goldman Sachs Specialty Lending Group, L.P. ("<u>GS</u>" or the "<u>Agent</u>"), and TCW Direct Lending LLC, a Delaware limited liability company, TCW Skyline Lending, L.P., a

2

Delaware limited partnership, and TCW Brazos Fund LLC (collectively, "TCW", together with

GS, the "Secured Creditors"), is a dual-track process that provides for either (a) the stand-alone

reorganization of the Debtors business (the "Stand-Alone Reorganization") pursuant to the terms

of a Restructuring Support Agreement, dated October 8, 2020, entered into between the Debtors

and the Secured Creditors (the "RSA"); or (b) the sale of substantially all of the Debtors' assets

(the "Sale Process") and distributions to creditors of the net sales proceeds (the "Sale") to the

Secured Creditors upon their credit bid or to a third party if a bid (or bids) is submitted by one or

more third parties other than the Secured Creditors that, *inter alia*, provides for cash

consideration at closing that is sufficient to pay all DIP Facility claims and Pre-Petition Secured

Debt Claims (as defined in the RSA) in cash in full on the closing date (a "Topping Bid").

   2.  The Bid Procedures will provide the formal framework for the Sale

Process, which has been designed to elicit value-maximizing bids for substantially all of the

Debtors' assets. Among other things, the Bid Procedures (a) set forth the timeline for the Sale

Process that is reasonable and appropriate to elicit value-maximizing bids for the Debtors' assets

in accordance with the RSA, (b) set forth the basic rules for submitting bids for the Debtors'

assets and a potential Auction and (c) provide major creditor groups with consultation rights at

various stages in the process.  The proposed Bid Procedures comply with the requirements of the

Bankruptcy Code, the Bankruptcy Rules and the Local Rules and, therefore, should be approved.

3.     The following is a summary timeline identifying the relevant dates and proposed deadlines in connection with the Bid Procedures, Sale and Plan processes:[2]

a.     November 9, 2020: Service of Disclosure Statement hearing notice;

b.     November 16, 2020, at 4:00 p.m. (Eastern Time): Deadline for objections to Bid Procedures;

c.     November 18, 2020, at 4:00 p.m. (Eastern Time):  Deadline for replies to objections to Bid Procedures;

d.     November 20, 2020, at [_:__ _.m.] (Eastern Time): Bid Procedures hearing; Service of Bid Procedures/Auction Notice and service of Cure Notice;

e.     November 30, 2020:   Deadline to Object to Disclosure Statement;

f.     December 7, 2020, at [_:__ _.m.] (Eastern Time):  Hearing regarding approval of Disclosure Statement;

g.     December 10, 2020:  Deadline for execution of Stalking Horse Agreement, if any;

h.     December 14, 2020:  Service of Notice of Confirmation Hearing and filing of form of Asset Purchase Agreement;

---

[2] Proposed deadlines and dates and times for hearings relating to the Plan process if no Topping Bid is received is included for informational purposes only.  Approval of such proposed deadlines and hearing dates and times relating to Plan confirmation will be sought by separate motion.

DOCS_LA:332723.5 76136/001

i.      January 7, 2021, at 5:00 p.m. (Eastern Time): Qualified Bids (as defined below) due;

j.      January 11, 2021:  Deadline to Vote on and Object to Plan Confirmation[3] (if *no* Topping Bid received);

k.      January 15, 2021:  Deadline to Reply to Objections to Plan Confirmation (if *no* Topping Bid received);

l.      January 19, 2021, at 10:00 a.m. (Eastern Time):  Auction (if Topping Bid received);

m.      January 20, 2021, at [_:__ _.m.] (Eastern Time):  Hearing regarding Confirmation of the Plan (the "Confirmation Hearing") (if *no* Topping Bid received);

n.      January 22, 2021, at [_:__ _.m.] (Eastern Time):  Successful Bid approval hearing;[4]

o.      January 29, 2021:  Deadline for objections to (1) proposed assumption/assignment of contracts and leases in connection with Sale; and (2) Plan confirmation (if Topping Bid received);

p.      February 3, 2021:  Deadline for replies to any objections to (1) proposed assumption/assignment of contracts and leases in

---

[3] Twenty-eight (28) days after service of notice.

[4] No later than three days after Auction, per RSA.

connection with Sale; and (2) Plan confirmation (if Topping Bid received);

q.       February 4, 2021, at [_:__ _.m.] (Eastern Time):  Confirmation Hearing (if Topping Bid received);

r.       February 19, 2021:  Deadline for Effective Date of the Plan (if *no* Topping Bid received);[5] and

s.       March 23, 2021:  Deadline to close Sale with Successful Bidder or Back-Up Bidder (if Topping Bid received).

**If no Topping Bid is received, the Debtors reserve the right to accelerate the timetable for Confirmation of their Plan, including by rescheduling the Confirmation Hearing to an earlier date, subject to the schedule and approval of the Court.**

## JURISDICTION AND VENUE

4.       This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

5.       Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

6.       The statutory predicates for the relief sought herein are sections 105, 363, 365, 503, 507, 1107 and 1108 of chapter 11 of the Bankruptcy Code, Bankruptcy Rules 2002(a)(2), 6004, 6006 and 9014 and Local Rules 2002-1(b), 6004-1 and 9006-1.

---

[5] No later than 30 days after the Confirmation Hearing, subject to Debtors' reasonable request for extension, per RSA.

DOCS_LA:332723.5 76136/001

**BACKGROUND**

7.      On October 7, 2020 (the "Petition Date"), the Debtors commenced these

chapter 11 cases by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

The Debtors have continued in the possession of their property and have continued to operate

and manage their business as debtors in possession pursuant to sections 1107(a) and 1108 of the

Bankruptcy Code.  On October 26, 2020, the United States Trustee appointed an official

committee of unsecured creditors in these cases (the "Committee").

8.      The Debtors develop, operate, and franchise casual dining restaurants in

the United States, Guam, and five foreign countries under the Ruby Tuesday® brand.  The

company-owned and operated restaurants (i.e., non-franchise) are concentrated primarily in the

Southeast, Northeast, Mid-Atlantic and Midwest regions of the United States.

9.      The factual background regarding the Debtors, including their current and

historical business operations and the events precipitating the chapter 11 filings, is set forth in

detail in the *Declaration of Shawn Lederman, Chief Executive Officer of Ruby Tuesday, Inc., in*

*Support of First Day Pleadings* (the "First Day Declaration") filed on the Petition Date and fully

incorporated herein by reference.[6]

**THE PROPOSED SALE TRANSACTION AND BID PROCEDURES**

**A.      The Proposed Sale Transaction**

10.      The Debtors have filed or shortly will file their Plan of Reorganization

(the "Plan") and Disclosure Statement.  The Plan and Disclosure Statement are the result of

---

[6]  Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the First Day
Declaration.

extensive, arm's-length negotiations between the Debtors and Secured Creditors. As explained

above, the Plan contemplates two possible resolutions of the Debtors' chapter 11 cases: (a) the

Sale if certain conditions are satisfied (as described in greater detail below) or (b) if those

conditions are not satisfied, the Stand-Alone Reorganization.

11.    Pursuant to this Motion, the Debtors are seeking approval of the Bid

Procedures and certain related relief that will govern the proposed Sale Process. This Motion

does not seek approval of the sale of any Assets. Such relief will be sought in connection with,

and pursuant to, confirmation of the Plan.

12.    The Debtors will seek approval of the sale or sales of substantially all of

their Assets only in the event that the Sale Process is successful in attracting a Topping Bid. The

Bid Procedures set forth a formula, which will be used to determine the minimum amount that a

bid or collection of bids must provide for the Debtors to proceed with the Sale. In summary, the

Debtors will proceed with the Auction only if a bid (or bids) is received which benefits the

estates, provides for cash deposits of no less than ten percent (10%) of the purchase price and for

cash consideration that is sufficient to pay all DIP Facility claims and Pre-Petition Secured Debt

Claims in full on the closing date.

13.    Solely in the event that a Sale yields a recovery more favorable than that

under the restructuring transactions contemplated by the Plan, the Debtors may choose to pursue

the Sale, subject to the terms and conditions of the RSA. The parallel sale process will allow the

Debtors to ensure that the disposition of their chapter 11 cases maximizes value, regardless of

whether such cases culminate in a Sale or a restructuring contemplated by the Plan. While the

8

Debtors reserve the right to make a determination at any time whether to proceed with the Sale to conclusion, the Debtors will make such evaluation after the January 7, 2021, bid deadline, at which time the Debtors will file a notice with the Court to inform parties in interest whether one or more bids constituting a Topping Bid have been received.

14.     Approval of any Sale shall be considered and authorized in connection with confirmation of the Plan.

A.     **Description of Assets Being Sold**

15.     As of the Petition Date, there were over 236 Ruby Tuesday restaurants worldwide offering a wide variety of menu options, including burgers, signature baby-back ribs, steaks, seafood, chicken, and appetizers, and an extensive Garden Bar.  Ruby Tuesday restaurants primarily serve customers through a full-service format and feature a separate bar offering cocktails, beer and wine.  They also offer the RubyTueGo® curbside service, delivery via third party companies, and a catering program for businesses, organizations, and group events at both company-owned and franchised restaurants.

16.     The Debtors currently are managing operations from their corporate headquarters in Maryville, Tennessee.

17.     The Debtors occupy the majority of their restaurant locations pursuant to unexpired nonresidential real property leases.  The Debtors also own fee title to various parcels of developed and undeveloped real estate in the states of Alabama, Connecticut, Florida, Indiana, Kentucky, Maryland, Michigan, Missouri, New Jersey, North Carolina, Ohio, Pennsylvania, Tennessee, Texas, and Virginia.  In connection with their operations, the Debtors have registered

certain trade and service marks with the United States Patent and Trademark Office, including the name "Ruby Tuesday". The Debtors also own liquor licenses valued in the approximate aggregate amount of $13.9 million.

**B.    The Sale Process**

18.    The Debtors' Sale Process is being managed by their investment banker, FocalPoint Securities, LLC ("FocalPoint"). In the spring of 2020, the Debtors retained FocalPoint to assist in the exploration of a potential refinancing and/or restructuring transaction (the "Out of Court Transaction") in order to refinance its existing senior debt and fund a turnaround plan, including through seeking continued rent abatements and/or concessions from their landlords to provide relief during these unprecedented times.

19.    Prior to the Petition Date, FocalPoint conducted a robust marketing process including outreach to a broad universe of 154 financial investors. As a result, 67 parties executed nondisclosure agreements and were provided with confidential evaluation materials and access to a virtual data room; 61 parties declined after initial review of the opportunity prior to executing a nondisclosure agreement; and 26 parties reviewed the nondisclosure agreement and preliminary transaction information without providing definitive indication either way. At the initial indication of interest ("IOI") deadline of August 14, 2020, one party had submitted an IOI but ultimately withdrew the consideration after further review. Without any party interested in pursuing an Out of Court Transaction, the Debtors determined, among other reasons, that it was necessary to file these chapter 11 cases.

20.     To allow the Debtors to ensure the Sale Process maximizes value for the benefit of their bankruptcy estates and creditors, FocalPoint is marketing the business (and evaluating potential alternatives for Exit Financing pursuant to the Plan), in order to seek bids for a potential sale of all, or substantially all, of the Debtors' assets in parallel with the restructuring transactions under the Plan.  These activities include, but are not limited to (a) developing a list of potential investors and buyers of the company, (b) drafting and distributing a short summary and non-disclosure agreement ("NDA"), (c) upon receipt of signed NDAs, distributing a confidential memorandum summarizing due diligence information, and (d) providing access to a virtual data room for review by interested parties.  FocalPoint will request feedback from potential buyers and will field interest from alternative providers of the Exit Financing as well.

21.     Accordingly, following the Petition Date, with the continued assistance of FocalPoint and in parallel with the Restructuring Transactions, the Debtors are continuing their marketing process, in accordance with the terms and conditions of the RSA.  FocalPoint has prepared additional documentation in support of the marketing effort and is prepared to move expeditiously postpetition to provide further information to potential bidders as the process moves forward, and to work quickly to ensure a full and fair opportunity to every potential bidder on the timeline proposed in the Motion.  FocalPoint will also be providing a copy of this Motion and exhibits to potentially interested parties.

22.     Following entry by the Court of the Bid Procedures Order providing for the Break-Up Fee and the Expense Reimbursement for the Stalking Horse Purchaser, if any, FocalPoint will continue its marketing efforts with potential bidders, which will include "blast"

11

electronic communications informing potentially interested parties of the Debtors' chapter 11

filings and their ongoing sales effort.  The Debtors believe that this marketing and sale process

will preserve going concern value and maximize recoveries for all stakeholders.

**C.      Description of Bid Procedures**

23.    The Debtors are requesting that the Court approve the Bid Procedures for

the sale of the Assets.[7]  The following is a summary of the proposed Bid Procedures that

contains the key terms that are required to be highlighted pursuant to Local Rule 6004-1(c).[8]

> **A.      Preliminary Bid Documents**.  To receive due diligence information, including
> full access to the Debtors' electronic data room and to additional non-public
> information regarding the Debtors, a potential bidder (each, an "Interested Party")
> must deliver to each of:  (i) the Debtors: c/o Ruby Tuesday, Inc., 333 E.
> Broadway Ave., Maryville, TN 37804 (Attn: Shawn Lederman
> (SLederman@rubytuesday.com)); (ii) counsel to the Debtors: Pachulski, Stang,
> Ziehl & Jones LLP, 10100 Santa Monica Blvd., 13th Floor, Los Angeles, CA
> 90067 (Attn: Malhar S. Pagay, Esquire (mpagay@pszjlaw.com)); and (iii)
> investment banker to the Debtors: FocalPoint Securities, LLC, FocalPoint
> Securities, LLC ("FocalPoint"), 11150 Santa Monica Blvd., Suite 1550, Los
> Angeles, California 90025 (Attn: Richard F. NeJame) and at
> rnejame@focalpointllc.com), the following documents (the "Preliminary Bid
> Documents"): (a) an executed confidentiality agreement on terms reasonably

---

[7] The form of Bid Procedures Order contains dates proposed by the Debtors. These dates are subject to the availability and approval of the Court and may change.

[8] This summary is qualified in its entirety by the provisions of the Bid Procedures and Bid Procedures Order. Unless otherwise defined within this Motion, capitalized terms used within this summary only shall have the meanings ascribed to them in the Bid Procedures or the Bid Procedures Order, as applicable.

acceptable to the Debtors, to the extent not already executed (each, a "Confidentiality Agreement"); (b) a statement and other factual support demonstrating to the Debtors' satisfaction in the exercise of their reasonable business judgment that the Interested Party has a *bona fide* interest in purchasing some or all of the Assets, provided that such information shall not be required to the extent the Interested Party's interest and wherewithal are known to the Debtors' investment banker; and (c) preliminary proof by the Interested Party of its financial capacity to close the Interested Party's proposed Transaction(s), which may include financial statements of, or verified financial commitments obtained by, the Interested Party (or, if the Interested Party is an entity formed for the purpose of acquiring the desired Assets, the party that will bear liability for a breach), the adequacy of which will be assessed by the Debtors (including in consultation with their advisors). Only those Interested Parties who, in the Debtors' determination, have submitted acceptable Preliminary Bid Documents (each, a "Potential Bidder") may submit bids.

**B.**     **Stalking Horse Bidder.** The Debtors, in their discretion, exercised in good faith and in consultation with the Consultation Parties, may execute, subject to higher or otherwise better offers, a purchase agreement (the "Stalking Horse Agreement") with a Qualified Bidder that submits a Qualified Bid that is a Topping Bid. The counterparty to such Stalking Horse Agreement will serve as the stalking horse bidder (the "Stalking Horse Bidder") at the Auction, if one is held. If the Debtors choose to enter into a Stalking Horse Agreement, the Debtors, in their discretion, exercised in good faith and after consultation with the Consultation Parties, may offer the Stalking Horse Bidder the Breakup Fee of no more than 3.0% of the total cash consideration payable under such Stalking Horse Agreement plus the Expense Reimbursement for the Stalking Horse Bidder's actual out-of-pocket costs not to exceed $500,000. In the event that a Stalking Horse Agreement is entered into, the Debtors will promptly file such agreement with the Court.

**C.**     **Bid Requirements (Local Bankr. R. 6004-1(c)(i)(A), (B)).** Any bid by a Qualified Bidder must be submitted in writing and determined by the Debtors, in their reasonable discretion, to be a Topping Bid that satisfies the following conditions:

1.   Purpose. The Bid must clearly identify the following: (i) the particular Assets, or the portion thereof, identified with reasonable specificity, to be acquired, including, without limitation, each and every executory contract and unexpired lease to be assumed by the Debtors and assigned and sold to the Bidder; and (ii) the liabilities and obligations to be assumed, including any debt to be assumed.

2.   Deposit. Each Bid must be accompanied by a cash deposit in the amount equal to 10% of the aggregate cash portion of the purchase price of the Bid to be held in a segregated account by the Debtors (the "Deposit").

DOCS_LA:332723.5 76136/001

3. <u>Total Consideration</u>.  Each Bid must identify the form and amount of the total consideration to be provided to the Debtors in cash and non-cash components to be paid, including assumed liabilities (the "<u>Bid Value</u>").

4. <u>Minimum Bid</u>.  If a Stalking Horse Agreement has been executed, and the Potential Bidder is bidding on all or substantially all of the Assets, the consideration set forth in such bid is higher or better than the consideration provided by the Stalking Horse Agreement, taking into account any Breakup Fee, Expense Reimbursement and Minimum Overbid.

5. <u>Asset Purchase Agreement</u>.  Each Bid must include a signed asset purchase agreement, together with all exhibits and schedules thereto, the form of which will be provided by the Debtors to any Potential Bidder before the Bid Deadline, along with a redline version of such agreement relative to the Stalking Horse Agreement, if any, pursuant to which the Qualified Bidder proposes to effectuate the Transaction (collectively, the "<u>Transaction Documents</u>").

6. <u>Tax Structure; Structure</u>.  The Bid must specify with particularity its tax structure, including whether it is intended to be structured in a tax-free manner or if the Debtors, under the Bid, will incur any incremental tax liabilities.  The Bid must also identify the structure proposed for undertaking the Transaction, including the specific assets of the Debtors being acquired and liabilities being assumed, the proposed steps to accomplish such acquisition, and any financial, legal, or tax considerations upon which the Bid's proposed structure relies.

7. <u>Timeline to Close</u>.  The Bid must provide a commitment to close no later than sixty (60) days after approval of the Bid by the Court.

8. <u>Outside Date</u>.  The Bid must include a signed writing stating that the Potential Bidder's offer is irrevocable until the selection of the Successful Bidder, provided that if such bidder is selected as the Successful Bidder or the Back-Up Bidder (each, as defined below) its offer shall remain irrevocable until the later of (a) the closing of the Sale to the Successful Bidder or the Back-Up Bidder, and (b) March 24, 2021 (the "<u>Outside Date</u>");

9. <u>Sources of Financing; Adequate Assurance</u>.  To the extent that a Bid is not accompanied by evidence of the Bidder's capacity to consummate the proposed Transaction(s) set forth in its Bid with cash on hand, each Bid must contain written evidence of a commitment for financing or other evidence of the ability to consummate the Transaction at the Purchase Price (including sufficient financial or other information to establish adequate assurance of future performance pursuant to section 365(f)(2) of the Bankruptcy Code and, if applicable, section 365(b)(3) of the Bankruptcy Code to the non-Debtor counterparties to any executory contracts and unexpired leases to be assumed by the Debtors and assigned and sold to the Potential Bidder in connection

14

with the proposed transaction) satisfactory to the Debtors in their reasonable discretion, after consultation with the Consultation Parties, with appropriate contact information for such financing sources.

10. <u>No Financing Approval or Diligence Outs</u>.  A Bid shall not be conditioned on the obtaining or the sufficiency of financing or any internal approval, or on the outcome or review of due diligence, but may be subject to the accuracy at the closing of specified representations and warranties or the satisfaction at the closing of specified conditions.

11. <u>Employees</u>.  A Bid shall contain a detailed description of how the Potential Bidder intends to treat current employees of the Debtors.

12. <u>Authorization</u>.  Each Bid must contain evidence that the Potential Bidder has obtained authorization or approval from its board of directors (or a comparable governing body acceptable to the Debtors) with respect to the submission of its Bid and the consummation of the Transactions contemplated in such Bid.

13. <u>Disclaimer of Fees</u>.  Except for the Stalking Horse Bid, each Bid must disclaim any right to receive a fee analogous to any break-up fee, termination fee, expense reimbursement or similar type of payment.

14. <u>Identity</u>.  Each Bid must fully disclose the identity of each entity that will be bidding or otherwise participating in connection with such Bid (including each equity holder or other financial backer of the Potential Bidder, including if such Potential Bidder is an entity formed for the purpose of consummating the proposed Transaction contemplated by such Bid), and the complete terms of any such participation.  Under no circumstances shall any undisclosed principals, equity holders, or financial backers be associated with any Bid.  Each Bid must also include contact information for the specific person(s) and counsel whom the Debtors or their advisors should contact regarding such Bid.  Nothing herein shall preclude multiple Potential Bidders from submitting a joint Bid, subject to the Debtors' prior written consent to such submission and the disclosure requirements set forth herein, and the Debtors reserve the right (in consultation with the Consultation Parties) to combine individual bids for subsets of the Assets to form a Topping Bid.

15. <u>Consent to Jurisdiction</u>.  The Bidder must submit in writing to the exclusive jurisdiction of the Court (and to the Court entering a final judgement) and waive any right to a jury trial in connection with any disputes relating to Debtors' qualification of Bids, the Auction, the construction and enforcement of these Bid Procedures, and the Transaction documents and the closing, as applicable.

16. <u>No Collusion</u>.  The Bidder must acknowledge in writing (i) that it has not engaged in any collusion with respect to any Bids or the Transaction,

specifying that it did not agree with any other party, including, but not limited to, any other Potential Bidders or interested third parties, to control price or exert undue influence over the process; and (ii) agree not to engage in any such collusion or undue influence with respect to any Bids, the Auction, the Transaction, or the sale process.

17. <u>Good Faith Offer</u>.  The Bid must constitute a good faith, *bona fide* offer to effectuate the Transaction.

18. <u>As-Is, Where-Is</u>.  Each Bid must include a written acknowledgement and representation that the Potential Bidder: (1) has had an opportunity to conduct any and all due diligence regarding the Purchased Assets prior to making its offer; (2) has relied solely upon its own independent review, investigation, and/or inspection of any documents and/or the Purchased Assets in making its Bid; and (3) did not rely upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied by operation of law, or otherwise, regarding the Purchased Assets or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in the Bid Documents.

**D.**     **Bid Deadline.**  Each bid must be transmitted so as to be ***actually received*** by counsel to the Debtors and the Debtors' investment banker on or before **January 7, 2021, at 5:00 p.m. (prevailing Eastern Time)** (the "<u>Bid Deadline</u>").

**E.**     **Right to Credit Bid.**  The Secured Creditors shall be deemed to be Qualified Bidders in the event that they elect to credit bid.  For the avoidance of doubt, the Secured Creditors shall not be required to make the Deposit in connection with any credit bid.

**F.**     **The Auction.**  If the Debtors receive one or more Qualified Bids that are, either individually or in combination, constitute a Topping Bid, the Debtors will conduct an auction (the "<u>Auction</u>") to determine the highest or otherwise best bid among the Topping Bids or any credit bid(s) with respect to the Purchased Assets.  The Auction will commence on January 19, 2021, at 10:00 a.m. (prevailing Eastern Time) at the offices of Pachulski, Stang, Ziehl & Jones LLP, 919 North Market Street, 17th Floor, Wilmington, DE 19801, or on such other date and/or at such other location as determined by the Debtors, in consultation with the Consultation Parties and, if any, the Stalking Horse Bidder.[9]  Before the Auction commences, the Debtors will notify all Qualified Bidders in writing of the highest or otherwise best Qualified Bid(s) that, either individually or in combination with other Qualified Bids, constitute a Topping Bid, as determined in the Debtor's business judgement, in consultation with the Consultation Parties (the "<u>Baseline Bid</u>").

**G.**     **Bidding Increments (Local Bankr. R. 6004-1(c)(i)(C)).**  Any Overbid following the Baseline Bid shall be in increments of at least [$100,000] in cash or other

---

[9] The Debtors may request that the Auction be held telephonically or via video conferencing.

consideration acceptable to the Debtors.  The Debtors will announce at the Auction the material terms of each Overbid, value each Overbid in accordance with these Bid Procedures and provide each Qualified Bidder with an opportunity to make a subsequent Overbid.  To the extent that an Overbid has been accepted entirely or in part because of the addition, deletion, or modification of a provision or provisions in the applicable Transaction Documents, the Debtors will provide notice to each participant of the value ascribed by the Debtors to any such added, deleted, or modified provision or provisions, with such value being determined by the Debtors in their reasonable discretion after consultation with the Consultation Parties.

H.      **Backup Bidder (Local Bankr. R. 6004-1(c)(i)(E)).**  If a Successful Bidder fails to consummate a proposed transaction because of a breach by such Successful Bidder, the Debtors will not have any obligation to return the Deposit deposited by such Successful Bidder, which may be retained by the Debtors as damages, in addition to any and all other rights, remedies, or causes of action that may be available to the Debtors, and the Debtors shall be free to consummate the proposed transaction with the applicable backup bidder (the "Backup Bidder") without the need for an additional hearing or order of the Court.  The Back-Up Bid, if any, will remain open and binding on the Back-Up Bidder until consummation of the Successful Bid with the Successful Bidder.  If the Successful Bidder fails to consummate the Successful Bid within the time set forth therein, the Debtors will be authorized, but not required, to select the Back-Up Bidder, if any, as the new Successful Bidder, and shall proceed to consummate the Successful Bid of the new Successful Bidder.

I.      **Highest or Otherwise Best Offer.**  The Auction shall continue until there is only one Qualified Bid that the Debtors determine, in the exercise of their reasonable business judgment, in consultation with the Consultation Parties, to be the highest or otherwise best bid among the Topping Bids or any credit bid(s) for the Purchased Assets submitted by a Qualified Bidder during the Auction for the Purchased Assets (the "Successful Bid") and the next highest or otherwise best Qualified Bid after the Successful Bid among the Topping Bids or any credit bid(s) (the "Back-Up Bid"), at which point the Auction will be closed; *provided* that the Auction shall not close unless and until all Qualified Bidders have been given a reasonable opportunity to submit an Overbid at the Auction to the then prevailing highest Bid.  Such acceptance by the Debtors of the Successful Bid is conditioned upon approval by the Court of the Successful Bid.

DOCS_LA:332723.5 76136/001

**J.**    **Reservation of Rights (Local Bankr. R. 6004-1(c)(i)(D)).**  The Debtors reserve the right, in their reasonable discretion and subject to the exercise of their business judgment, after consultation with the Consultation Parties, subject to certain exceptions provided in the Bid Procedures, to alter or terminate these Bid Procedures, to alter or modify any Auction rules or procedures, to waive terms and conditions set forth herein with respect to all potential bidders, alter the assumptions set forth herein, and/or to terminate discussions with any and all prospective acquirers and investors at any time and without specifying the reasons therefor, in each case in any manner that will best promote the goals of the bidding process, or impose, at or prior to the conclusion of the Auction, additional customary terms and conditions on the sale of the Assets.

24.    Importantly, the Bid Procedures recognize the Debtors' fiduciary obligations to maximize sale value, and, as such, do not impair the Debtors' ability to consider all qualified bid proposals and, as noted, preserve the Debtors' right to modify the Bid Procedures as necessary or appropriate to maximize value for the Debtors' estates, following consultation with the Consultation Parties; *provided that*, without the Secured Creditors' prior written consent, the Debtors cannot waive or modify any provisions of the Bid Procedures relating to (a) the definition of a Topping Bid, (b) the requirement that the Stalking Horse Bid and any Qualified Bid, either individually or in combination with other Qualified Bids, shall be a Topping Bid, (c) the requirement that any credit bid by the Secured Creditors shall be deemed to be a Qualified Bid, (d) the Secured Creditors' right to credit bid, subject to the Debtors' right, pursuant to that certain Restructuring Support Agreement Term Sheet, dated September 18, 2020, by and between the Debtors and Secured Creditors (the "RSA Term Sheet") to contest the allowance and inclusion in any such credit bid of any call premium and yield maintenance premium under the Credit Agreement, or (e) any deadlines or milestones included in the Bid Procedures that constitute Sale Milestones in the RSA Term Sheet.

25.      Pursuant to Local Rule 6004-1(c)(ii), each bidder participating at the
Auction will be required to confirm that it has not engaged in any collusion with respect to the
bidding or the sale. The Auction will be conducted openly and will be transcribed. However, the
Debtors request that the Court waive the requirement in Local Rule 6004-1(c)(ii) that all
creditors be permitted to attend the Auction, and, instead, limit attendance at the Auction to
Qualified Bidders and the Consultation Parties and their professionals and representatives as set
forth in the Bid Procedures.

26.      In addition, the Debtors will file a copy of the executed Stalking Horse
Agreement, if any, promptly after entering into such agreement and will highlight the relevant
provisions required by Local Rule 6004-1. In addition, by no later than December 14, 2020, the
Debtors will file with the Court copies of the form of purchase agreement that they intend to
send to potential bidders and will highlight the relevant provisions required by Local Rule 6004-
1.

### Return of Good Faith Deposit

27.      The Good Faith Deposit of the Successful Bidder (or the Back-up Bidder
that becomes a Successful Bidder) shall be applied to the purchase price of such transaction at
Closing.  The Debtors will hold the Good Faith Deposits of the Successful Bidder and the next
highest Qualified Bidder in a segregated account until the closing of the sale with the Successful
Bidder or the next highest Qualified Bidder, as applicable.  Good Faith Deposits of all other
Qualified Bidders shall be held in a segregated account, and thereafter returned to the respective
bidders following the conclusion of the Auction.  If a Successful Bidder (including any Back-up

Bidder that has become the Successful Bidder) fails to consummate an approved sale because of a breach or failure to perform on the part of such Successful Bidder, the Debtors shall be entitled to retain the Successful Bidder's Good Faith Deposit as part of the Debtors' damages resulting from such Successful Bidder's breach or failure to perform.

**BASIS FOR RELIEF REQUESTED**

A.      **The Bid Procedures Are Appropriate and
Will Maximize the Value Received for the Assets.**

28.      Section 1123(a)(5)(D) of the Bankruptcy Code permits the sale of all or some of a debtor's assets pursuant to a plan. 11 U.S.C. § 1123(a)(5)(D). Moreover, under section 105(a) of the Bankruptcy Code, "[t]he court may issue any order . . . that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). In essence, the Court may enter an order that safeguards the value of the debtor's estate if doing so is consistent with the Bankruptcy Code. *See, e.g.*, *Chinichian v. Campolongo (In re Chinichian)*, 784 F.2d 1440, 1443 (9th Cir. 1986) ("Section 105 sets out the power of the bankruptcy court to fashion orders as necessary pursuant to the purposes of the Bankruptcy Code."); *In re Cooper Props. Liquidating Trust, Inc.*, 61 B.R. 531, 537 (Bankr. W.D. Tenn. 1986) (acknowledging that "the [b]ankruptcy [c]ourt is one of equity and as such it has a duty to protect whatever equities a debtor may have in property for the benefit of its creditors as long as that protection is implemented in a manner consistent with the bankruptcy laws.").

29.      To that end, courts recognize that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate, and, therefore, are appropriate in the context of bankruptcy sales. *In re Edwards*, 228 B.R. 552,

20

561 (Bankr. E.D. Pa. 1998) ("The purpose of procedural bidding orders is to facilitate an open

and fair public sale designed to maximize value for the estate."); *see also Official Comm. Of*

*Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650,

659 (S.D.N.Y. 1992) (bidding procedures "encourage bidding and . . . maximize the value of the

debtor's assets"); *In re Financial News Network, Inc.*, 126 B.R. 152, 156 (Bankr. S.D.N.Y. 1991)

("court-imposed rules for the disposition of assets . . . [should] provide an adequate basis for

comparison of offers, and [should] provide for a fair and efficient resolution of bankrupt

estates").

30.    Procedures to dispose of assets, similar to the proposed Bid Procedures,

have been approved in other bankruptcy cases.  *See, e.g.*, *In re IMRIS, Inc.*, Case No. 15-11133

(CSS) (Bankr. D. Del. June 16, 2015); *In re Velti Inc.*, Case No. 13-12878(PJW) (Bankr. D. Del.

Nov. 20, 2013); *In re Orchard Supply Hardware Stores Corp.*, Case No.  13-11565 (CSS)

(Bankr. D. Del. Jul. 8, 2013); *In re Conex Holdings LLC*, Case No. 11-10501(CSS) (Bankr. D.

Del. Sept. 14, 2011); *In re Barnes Bay Dev. Ltd.*, Case No. 11-10792 (PJW) (Bankr. D. Del. May

19, 2011); *In re East West Resort Dev. V, L.P., L.L.L.P.*, Case No. 10-10452 (BLS) (Bankr. D.

Del. March 31, 2010); *In re Dana Corp.*, Case No. 06-10354 (Bankr. S.D.N.Y. Oct. 19, 2006); *In*

*re Delphi Corp.*, Case No. 05-44481 (Bankr. S.D.N.Y. June 22, 2006); *In re Oxford Automotive,*

*Inc.*, Case No. 04-74377 (Bankr. E.D. Mich. Jan. 24, 2005); *see also In re Calpine Corp.*, Case

No. 05-60200 (Bankr. S.D.N.Y. Dec. 6, 2006).

31.    The Debtors believe that the Bid Procedures will establish the parameters

under which the value of the Assets may be tested at an auction.  Such procedures will increase

the likelihood that the Debtors' creditors will receive the greatest possible consideration for the Debtors' Assets because they will ensure a competitive and fair bidding process.  They also allow the Debtors to undertake an auction in as expeditious and efficient manner as possible, which the Debtors believe is essential to maximizing the value of the Debtors' estates for their creditors.

32.     The Debtors also believe that the proposed Bid Procedures will promote active bidding from seriously interested parties and will dispel any doubt as to the best and highest offer reasonably available for the Debtors' Assets.  In particular, the proposed Bid Procedures will allow the Debtors to conduct an auction in a controlled, fair, and open fashion that will encourage participation by financially capable bidders who demonstrate the ability to close a transaction.  Further, the Bid Procedures provide the Debtors with the opportunity to consider all Qualified Bids and to select, in their reasonable business judgment, the highest and best offer(s) for the Assets.

33.     In sum, the Debtors believe that the Bid Procedures will encourage bidding for the Assets and are consistent with the relevant standards governing auction proceedings and bidding incentives in bankruptcy proceedings.  Accordingly, the proposed Bid Procedures are reasonable, appropriate, and within the Debtors' sound business judgment.

**B.      The Proposed Notice of Bid Procedures, Auction, and Sale Is Appropriate**

34.     The Debtors believe that they will obtain the maximum recovery for creditors of the Debtors' estates if the Assets are sold through the proposed Bid Procedures.  As

explained in detail above, the Debtors have already taken significant steps to identify potential purchasers.

36. Under Bankruptcy Rules 2002(a) and (c), the Debtors are required to notify creditors of the proposed sale of the Debtors' Assets, including a disclosure of the time and place of an auction, the terms and conditions of a sale, and the deadline for filing any objections. The Debtors submit that the notice procedures herein comply fully with Bankruptcy Rule 2002 and are reasonably calculated to provide timely and adequate notice of the sale by auction to the Debtors' creditors and other interested parties, as well as to those parties who have expressed an interest, or may express an interest, in bidding on the Assets. The proposed time frame between the filing of this Motion, the commencement of the bidding process and the Auction will provide interested purchasers sufficient time to participate in the Auction.

**C.     Description of Stalking Horse Agreement and Bidder Incentives**

36. As part of the Bid Procedures Order, the Debtors are also requesting authority to enter, if applicable, into a Stalking Horse Agreement and to offer the Bidder Incentives to such Stalking Horse Bidder to encourage interested parties to submit bids. Under the Bid Procedures, the Debtors may, in their discretion, exercised in good faith and in consultation with the Consultation Parties, execute a Stalking Horse Agreement with a Qualified Bidder that submits a Qualified Bid for all or substantially all of the Debtors' assets. In addition, to serve as the Stalking Horse Bid, such bid must satisfy the criteria for a Topping Bid and otherwise meet the requirements of being a "Qualified Bid" (i.e., the bid is formal, binding and

unconditional and is not subject to any due diligence or financing contingency and is irrevocable until the closing of the Sale, among other things).

37.     The Bidder Incentives are designed to incentivize potential bidders to make an initial binding bid for all or substantially all of the Assets and establish a floor price for the Auction. If approved by this Court, the Debtors would be authorized to offer a Stalking Horse Purchaser a Breakup Fee of up to 3.0% of the cash consideration offered by such Stalking Horse Purchaser and an Expense Reimbursement of up to $500,000. These Bidder Incentives would only be payable in the event the Stalking Horse Bidder is overbid at the Auction and the Debtors close a transaction with the overbidder. Any such overbid must be in an amount greater than the Stalking Horse Bid, including the applicable Bidder Incentives, and include sufficient cash consideration to pay the Breakup Fee and Expense Reimbursement in full.

**D.     Authority to Offer Proposed Bidder Incentives in Connection With Entry Into a Potential Stalking Horse Agreement**

38.     The Debtors submit that the Breakup Fee and Expense Reimbursement are a normal and oftentimes necessary component of sales outside the ordinary course of business under sections 363 and/or 1123 of the Bankruptcy Code.  In particular, such protections encourage a potential purchaser to invest the requisite time, money, and effort to conduct due diligence and sale negotiations with a debtor despite the inherent risks and uncertainties of the chapter 11 process.  *See, e.g., In re Comdisco, Inc.*, Case No. 01 24795 (RB) (Bankr. N.D. Ill. Aug. 9, 2002) (approving a termination fee as, inter alia, an actual and necessary cost and expense of preserving the debtor's estate, of substantial benefit to the debtor's estate and a

24

necessary inducement for, and a condition to, the proposed purchaser's entry into the purchase

agreement); *Integrated Resources*, 147 B.R. at 660 (noting that fees may be legitimately

necessary to convince a "white knight" to offer an initial bid by providing some form of

compensation for the expenses such bidder incurs and the risks such bidder faces by having its

offer held open, subject to higher and better offers); *In re Hupp Indus.*, 140 B.R. 191, 194

(Bankr. N.D. Ohio 1997) (without any reimbursement, "bidders would be reluctant to make an

initial bid for fear that their first bid will be shopped around for a higher bid from another bidder

who would capitalize on the initial bidder's. . . due diligence"); *In re Marrose Corp.*, 1992 WL

33848, at *5 (Bankr. S.D.N.Y. 1992) (stating that "agreements to provide reimbursement of fees

and expenses are meant to compensate the potential acquirer who serves as a catalyst or 'stalking

horse' which attracts more favorable offers"); *In re 995 Fifth Ave. Assocs.*, 96 B.R. 24, 28

(Bankr. S.D.N.Y. 1989) (finding that bidding incentives may be "legitimately necessary to

convince a white knight to enter the bidding by providing some form of compensation for the

risks it is undertaking") (citations omitted).

       39.     A proposed bidding incentive, such as the Breakup Fee and Expense

Reimbursement, should be approved when it is in the best interests of the estate. *See In re S.N.A.*

*Nut Co.*, 186 B.R. 98, 104 (Bankr. N.D. Ill. 1995); *see also In re America West Airlines, Inc.*,

166 B.R. 908 (Bankr. D. Ariz. 1994); *In re Hupp Indus., Inc.*, 140 B.R. 191 (Bankr. N.D. Ohio

1992). Typically, this requires that the bidding incentive provide some benefit to the debtor's

estate. *Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.)*, 181

F.3d 527, 533 (3d Cir. 1999) (holding even though bidding incentives are measured against a

business judgment standard in non-bankruptcy transactions the administrative expense

provisions of Bankruptcy Code section 503(b) govern in the bankruptcy context).

40.    In *O'Brien Environmental Energy*, the United States Court of Appeals for

the Third Circuit found that whether breakup fees and expenses could be paid to Calpine Corp.

as a "stalking horse" depended on whether such fees were necessary to preserve the value of the

estate.  *See* 181 F.3d at 536.  The court determined that Calpine's right to break up fees and

expenses depended on whether it provided a benefit to the debtor's estate by promoting

competitive bidding or researching the value of the assets at issue to increase the likelihood that

the selling price reflected the true value of the company.  *Id.* at 537.  The Debtors believe that

approval of the Breakup Fee and Expense Reimbursement will create such a competitive bidding

process.

41.    The Debtors believe that the proposed Breakup Fee and Expense

Reimbursement are fair and reasonably compensate the Stalking Horse Purchaser for taking

actions that will benefit the Debtors' estates.  The Breakup Fee and Expense Reimbursement

compensate the Stalking Horse Purchaser for diligence and professional fees incurred in

negotiating the terms of the Purchase Agreement on an expedited timeline.

42.    The Debtors do not believe that the Breakup Fee and Expense

Reimbursement will have a chilling effect on the sale process.  Rather, the Stalking Horse

Purchaser will increase the likelihood that the best possible price for the Assets will be received,

by permitting other qualified bidders to rely on the diligence performed by the Stalking Horse

Purchaser, and moreover, by allowing qualified bidders to utilize the Stalking Horse Agreement

(if one is executed) as a platform for negotiations and modifications in the context of a competitive bidding process.

43.     Accordingly, the Bidder Incentives satisfy the requirements for approval in this Circuit and should be approved.

## REQUEST FOR APPROVAL OF THE

## ASSUMPTION AND ASSIGNMENT PROCEDURES

**A.      Description of Assumption and Assignment Procedures**

44.     As part of the Sale, the Debtors may assume and assign certain of their executory contracts and unexpired leases to one or more Purchasers (the "Assumed/Assigned Executory Contracts").  The Debtors propose that the following Assumption and Assignment Procedures govern the assumption and assignment of the Assumed/Assigned Executory Contracts in connection with the Sale of Assets to the Successful Bidder(s):

(a)     If a Topping Bid is received, no later than three (3) days after the Auction, the Debtors will file a schedule (the "Cure Schedule") identifying (i) the Assumed/Assigned Executory Contracts, potentially to be assumed and assigned to a buyer in the event of a Sale and (ii) the amount, if any, the Debtors believe is necessary to cure all monetary defaults under such agreement pursuant to section 365 of the Bankruptcy Code (the "Cure Costs").  If no Topping Bid is received, the Cure Schedule will be filed as a Plan Supplement.

(b)     Upon the filing of the Cure Schedule, the Debtors will serve the Cure Schedule and a notice of filing of the Cure Schedule (the "Cure Notice") on each of the nondebtor counterparties listed on the Cure Schedule by first class mail. The Cure Notice will state that the Debtors are or may be seeking the sale, assumption and assignment of the Assumed/Assigned Executory Contracts and include (i) a description of each executory contract and unexpired lease that may be assumed and assigned in connection with the Sale and (ii) the Assumption/Assignment Objection Deadline (as defined below).

(c)     Counterparties to proposed Assumed/Assigned Executory Contracts must file objections to the proposed assumption and assignment thereof ("Assumption/Assignment Objection") no later than five (5) days before the Confirmation Hearing (the "Assumption/Assignment Objection Deadline").

27

(d)     Each Assumption/Assignment Objection must be filed with the Court and served on the following parties so as to be received no later than the Assumption/Assignment Objection Deadline: (a) the Debtors: c/o Ruby Tuesday, Inc., 333 E. Broadway Ave., Maryville, TN 37804 (Attn: Shawn Lederman (SLederman@rubytuesdav.com)): (b) counsel to the Debtors: Pachulski, Stang, Ziehl & Jones LLP, 919 N Market St # 1700, Wilmington, DE 19801 (Attn: Malhar S. Pagay, Esq. (mpagay@pszjlaw.com) and James E. O'Neill, Esq. (joneill@pszjlaw.com)); (c) counsel to any statutory committee appointed in these cases; and (d) the Office of the United States Trustee, District of Delaware, J. Caleb Boggs Federal Building, 844 King Street, Suite 2207, Wilmington, Delaware 19801 (Attn: Linda Richenderfer).

(e)     If no objections are received with respect to any Assumed/Assigned Executory Contract, then the Cure Cost set forth in the Cure Schedule for such agreement will be binding upon the nondebtor counterparty to such agreement for all purposes and will constitute a final determination of the Cure Cost required to be paid by the applicable Debtor in connection with the assumption and assignment of such agreement. In addition, all counterparties to the Assumed/Assigned Executory Contracts who fail to file an objection before the Assumption/Assignment Objection Deadline, will be (i) forever barred from objecting to the Cure Costs or adequate assurance of future performance with respect to the Assumed/Assigned Executory Contracts, and the Debtors and the applicable purchaser(s) will be entitled to rely solely upon the Cure Cost set forth in the Cure Schedule; (ii) deemed to have consented to the assumption and assignment; and (iii) forever barred and estopped from asserting or claiming against the applicable Debtor(s) or the applicable purchaser(s) that any additional amounts are due or other defaults exist, that conditions to assignment must be satisfied or that there is any other objection or defense to the assumptions or assignment of the applicable Assumed/Assigned Executory Contracts.

(f)     At any time prior to the Confirmation Hearing, the Successful Bidder(s) may amend the Cure Schedule to remove any executory contract or unexpired lease therefrom.[10]  The nondebtor party or parties to any such excluded contract or lease will be notified of such exclusion by written notice mailed within one (1) business day after such determination.

(g)     Where a nondebtor counterparty to an Assumed/Assigned Executory Contract files a Assumption/Assignment Objection asserting a cure amount higher than the proposed Cure Cost (the "Disputed Cure Amount"), then (i) to the extent that the parties are able to consensually resolve the Disputed Cure Amount prior to the Confirmation Hearing, and subject to the applicable purchaser's consent to such resolution, the Debtors will promptly inform the Creditors' Committee of the proposed resolution or (ii) to the extent the parties are unable to consensually resolve the dispute prior to the Confirmation Hearing, the amount to be paid under section 365 of the Bankruptcy Code with respect to such Disputed Cure Amount will be determined at the Confirmation Hearing or at such other date and time as may be fixed by the Court. The Debtors intend to

[10] If the conditions for the Sale are not satisfied and the Debtors pursue the Stand-Alone Reorganization, it is anticipated that all of the Debtors' executory contracts and unexpired leases will be assumed except for those executory contracts and unexpired leases set forth on a schedule (the "Plan Rejection Schedule") filed in connection with the Plan. The Plan Rejection Schedule (if necessary) will be filed with the Court in accordance with the Plan and served on the non-debtor counterparties to the executory contracts and unexpired leases.

cooperate with counterparties to Assumed/Assigned Executory Contracts to attempt to reconcile any differences with respect to a particular Cure Cost. At any time prior to or after the Court's ruling on the Disputed Cure Amount, the Debtors may remove such contract or lease from the list of Assumed/Assigned Executory Contracts.

45.      The Debtors request that any party failing to object to the proposed transactions be deemed to consent to the treatment of its executory contract and/or unexpired lease under section 365 of the Bankruptcy Code.  Moreover, the Debtors request that each such party be deemed to consent to the assumption and assignment of its executory contract and/or unexpired lease notwithstanding any anti-alienation provision or other restriction on assignment in such contract or lease. See 11 U.S.C. § 365(c)(1)(B), (e)(2)(A)(ii), (f).

**B.      Approval of Assumption and Assignment Procedures and the Cure Notice**

46.      Section 365(a) of the Bankruptcy Code provides that, subject to the court's approval, a trustee "may assume or reject any executory contracts or unexpired leases of the debtor." 11 U.S.C. § 365(a).  Upon finding that a trustee has exercised its sound business judgment in determining to assume an executory contract or unexpired lease, courts will approve the assumption under section 365(a) of the Bankruptcy Code.  *See Nostas Assocs. v. Costich (In re Klein Sleep Prods., Inc.)*, 78 F.3d 18, 25 (2d Cir. 1996); *see also Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.)*, 4 F.3d 1095, 1099 (2d Cir. 1993).

47.      Pursuant to section 365(f)(2) of the Bankruptcy Code, a trustee may assign an executory contract or unexpired lease of nonresidential real property if:

> (A) the trustee assumes such contract or lease in accordance with the provisions of this section; and
>
> (B) adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease.

11  U.S.C. § 365(f)(2).

48.     The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction." *See Carlisle Homes, Inc. v. Arrari (In re Carlisle Homes, Inc.)*, 103 B.R. 524, 538 (Bankr. D.N.J. 1989); *see also In re Natco Indus., Inc.*, 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (adequate assurance of future performance does not mean absolute assurance that debtor will thrive and pay rent); *In re Bon Ton Rest. & Pastry Shop, Inc.*, 53 B.R. 789, 803 (Bankr. N.D. Ill. 1985) ("Although no single solution will satisfy every case, the required assurance will fall considerably short of an absolute guarantee of performance.").

49.     Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned.  *In re Bygaph, Inc.*, 56 B.R. 596, 605-6 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance is present when prospective assignee of lease has financial resources and expressed willingness to devote sufficient funding to business to give it strong likelihood of succeeding; chief determinant of adequate assurance is whether rent will be paid).

50.     The Debtors and the Successful Bidder(s) will present evidence at the Confirmation Hearing to prove the financial credibility, willingness, and ability of the Successful Bidder(s) to perform under the Assumed/Assigned Executory Contracts.  The Court and other interested parties therefore will have the opportunity to evaluate the ability of any Successful Bidder(s) to provide adequate assurance of future performance under the Assumed/Assigned Executory Contracts, as required by section 365(b)(1)(C) of the Bankruptcy Code.

51.    In addition, the Debtors submit that the procedures set forth herein are appropriate, reasonably calculated to provide notice to any affected party, and afford the affected party to opportunity to exercise any rights affected by the Motion, and consistent with section 365 of the Bankruptcy Code.  To the extent that any defaults exist under any Assumed/Assigned Executory Contracts, any such defaults will be cured.  Except as otherwise limited by section 365 of the Bankruptcy Code, any provision in the Assumed/Assigned Executory Contracts that would restrict, condition, or prohibit an assignment of such contracts will be deemed unenforceable pursuant to section 365(f)(1) of the Bankruptcy Code.

52.    Accordingly, the Debtors submit that the procedures for effectuating the assumption and assignment of the Assumed/Assigned Executory Contracts as set forth herein, including the proposed form of Cure Notice, are appropriate and should be approved.

**<u>NOTICE OF THE AUCTION AND CONFIRMATION HEARING</u>**

53.    Because the Debtors are seeking approval of the Sale pursuant to the Plan, the Debtors will provide notice of the deadlines relevant to the Bid Procedures and Sale pursuant to the notice of the hearing on confirmation of the Plan (the "<u>Auction / Sale and Confirmation Hearing Notice</u>").  The Auction / Sale and Confirmation Hearing Notice will include, among other things, the Bid Deadline; the date, time and place of the Auction and the Confirmation Hearing; and the deadline for objecting to confirmation of the Plan once they are set by the Court, and, will therefore comply with Bankruptcy Rule 2002(c).  For the avoidance of doubt, the Debtors shall not be prohibited from closing the Sale if the Plan is not confirmed by the Court.

DOCS_LA:332723.5 76136/001

54.     The Auction / Sale and Confirmation Hearing Notice will be served on all parties required by Bankruptcy Rule 2002, including: (a) the U.S. Trustee; (b) counsel to any statutory committee appointed in these cases; (c) counsel to Goldman Sachs Specialty Lending Group, L.P.; (d) all persons or entities that have filed proofs of claim in the Debtors' cases that have not been previously disallowed by order of this Court and have been processed by the Debtors' claims agent prior to the mailing of the Disclosure Statement Notice; (e) all persons or entities listed in the Debtors' respective Schedules of Assets and Liabilities, and any amendments thereto; (f) the Securities and Exchange Commission; (g) all other parties in interest that have filed requests for notice pursuant to Bankruptcy Rule 2002 in the Debtors' chapter 11 cases; (h) any other known holders or potential holders of claims against the Debtors; (i) all entities known to have expressed an interest in bidding on the Assets; (j) all known counterparties to the Debtors' executory contracts and unexpired leases; (k) the United States Attorney's office; (l) all state attorneys general in states in which the Assets are located; (h) the Internal Revenue Service; (m) for each state in which the Assets are located, the applicable taxing authorities; and (n) environmental and certain other regulatory authorities in the states or applicable jurisdictions in which the Debtors' assets are located.

## NO PRIOR REQUEST

55.     No prior request for the relief sought in this Motion has been made to this or any other court.

## NOTICE

32

56.     Notice of this Motion will be provided to the following parties, or, in lieu

thereof, their counsel, if known:  (a) the Office of the United States Trustee; (b) the Committee;

(c) counsel to Goldman Sachs Specialty Lending Group, L.P. (as administrative and collateral

agent); and (d) any party that has requested notice pursuant to Bankruptcy Rule 2002

(collectively, the "Notice Parties"). The Debtors submit that no further notice is necessary.

WHEREFORE, the Debtors respectfully request that the Court enter an order,

substantially in the form attached hereto as **Exhibit A**, granting the relief requested herein and

such other and further relief as this Court deems appropriate.

Dated:  November 6, 2020                 PACHULSKI STANG ZIEHL & JONES LLP

*/s/ James E. O'Neill*
Richard M. Pachulski (CA Bar No. 90073)
Malhar S. Pagay (CA Bar No. 189289)
James E. O'Neill (Bar No. 4042)
Victoria A. Newmark (CA Bar No. 183581)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware  19899-8705 (Courier 19801)
Telephone:  302-652-4100
Facsimile:  302-652-4400
Email: rpachulski@pszjlaw.com
          mpagay@pszjlaw.com
          joneill@pszjlaw.com
          vnewmark@pszjlaw.com

Counsel for Debtors and Debtors in Possession