<pre>
 1              UNITED STATES BANKRUPTCY COURT
                    DISTRICT OF DELAWARE
 2
                                 .  Chapter 11
 3  IN RE:                       .
                                 .  Case No. 20-12456 (JTD)
 4  RTI HOLDING COMPANY, LLC,    .
    et al.,                      .
 5                               .
                                 .  Courtroom No. 5
 6                               .  824 North Market Street
                                 .  Wilmington, Delaware 19801
 7                               .
                      Debtors.   .  November 12, 2020
 8  . . . . . . . . . . . . . . .   2:00 P.M.

 9                    TRANSCRIPT OF HEARING
            BEFORE THE HONORABLE JOHN T. DORSEY
10                UNITED STATES BANKRUPTCY JUDGE

11  APPEARANCES:

12  For the Debtors:        Richard Pachulski, Esquire
                            Malhar Pagay, Esquire
13                          PACHULSKI STANG ZIEHL & JONES
                            919 North Market Street
14                          Wilmington, Delaware 19801

15                          - and -

16                          Keith Andress, Esquire
                            BAKER DONELSON
17                          420 20th Street North
                            Birmingham, Alabama 35203
18

19
    Audio Operator:         Jason Spencer
20
    Transcription Company:  Reliable
21                          1007 N. Orange Street
                            Wilmington, Delaware 19801
22                          (302)654-8080
                            Email:  gmatthews@reliable-co.com
23

24  Proceedings recorded by electronic sound recording, transcript
    produced by transcription service.
25
</pre>

```
 1   APPEARANCES (Continued):

 2   For U.S. Trustee:          Linda Richenderfer, Esquire
                                OFFICE OF UNITED STATES TRUSTEE
 3                              844 King Street
                                Wilmington, Delaware 19801
 4
     For Plan Participants:     Al Holifield, Esquire
 5                              HOLIFIELD JANICH PLLC
                                11907 Kingston Pike
 6                              Knoxville, Tennessee 37934

 7
     For Ad Hoc Group:          Howard Cohen, Esquire
 8                              Robert Malone, Esquire
                                GIBBONS
 9                              300 Delaware Avenue
                                Wilmington, Delaware 19801
10
     For Compass Group USA:     Derek Abbott, Esquire
11                              MORRIS NICHOLS ARSHT & TUNNELL
                                1201 North Market Street
12                              Wilmington, Delaware 19801

13                              - and -

14
                                Summer Speight, Esquire
15                              Scott Vaughn, Esquire
                                MCGUIRE WOODS
16                              800 East Canal Street
                                Richmond, Virginia 23219
17
     For Goldman Sachs:         Sean O'Neal, Esquire
18                              CLEARY GOTTLIEB STEEN HAMILTON LLP
                                111 West 19th Street
19                              New York, New York 10011

20
     For Official Committee
21   Of Unsecured Creditors:    Robert Schmidt, Esquire
                                KRAMER LEVIN NAFTALIS FRANKEL LLP
22                              1177 Avenue of the Americas
                                New York, New York 10036
23

24

25
```

INDEX

#7) Debtors' Motion to Approve Procedures for De Minimis Asset Transactions and Abandonment of De Minimis Assets [Filed 10/23/20] (Docket No. 185).

#9) Debtors' Motion for Entry of an Order Pursuant to Sections 105(A) and 503(B) of the Bankruptcy Code Abating Rents Under Unexpired Leases of Nonresidential Real Property for Restaurants Affected by Government Regulations [Filed 10/16/20] (Docket No. 145).

#10) Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing Debtors to (A) Obtain Postpetition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), and 364(e) of the Bankruptcy Code and (B) Use Cash Collateral Pursuant to 11 U.S.C. § 363, (II) Granting Adequate Protection Pursuant to 11 U.S.C. §§ 361, 362, 363, and 364, and (III) Scheduling Final Hearing [Filed 10/8/20] (Docket No. 51).

#11) Ruby Tuesday, Inc.'s Motion for an Order Authorizing Ruby Tuesday, Inc. to Exercise Its Ownership Rights Over Trust Assets Currently Held in a "Rabbi Trust" for Ruby Tuesday, Inc.'s Non-Qualified Executive Supplemental Pension Plan and Management Retirement Plan [Filed 10/15/20] (Docket No. 138).

#12) Ruby Tuesday, Inc.'s Motion for an Order Authorizing Ruby Tuesday, Inc. to Exercise Its Ownership Rights Over Trust Assets Currently Held in a "Rabbi Trust" for Ruby Tuesday, Inc.'s Non-Qualified "Defined Contribution" - Deferred Compensation Plans [Filed 10/15/20] (Docket No. 140).

DEBTORS' WITNESS(s)

**SHAWN LEDERMAN**

     Cross Examination by Mr. Holifield     44

     Cross Examination by Ms. Speight     65

| EXHIBITS: | ID | Rec'd |
|---|---|---|
| Debtors' A-F    ESPP MRP Motion | | 37 |
| Debtors' A-C    DCP Motion | | 37 |
| Declaration of Shawn Lederman | | 43 |
| Declaration of Russell Mothershed | | 74 |

1     (Proceedings commenced at 2:01 p.m.)

2          THE COURT:

3          THE COURT:  Thank you.  Good afternoon, everyone.

4  This is Judge Dorsey.  We're on the record in RTI Holding

5  Company LLC, case number 20-12456.

6          Looks like we have a full agenda for today.

7  Before we begin, let me just -- I don't know if I did this in

8  this case before or not, but because we have a large number

9  of people on the phone rather than everybody talking over one

10  another when I ask if someone wants to be heard, if you would

11  please use the raise your hand feature, the Zoom.  I will be

12  able to see you and recognize you.  That's the easiest way to

13  do it.

14          If you are in the waiting room, I see there's a

15  number of people in there who are not using their full name.

16  If you're not using a full name and you're not on the

17  CourtCall list, we do not let you into the Zoom meeting

18  because of some folks who have gotten into some of these

19  meetings and tried to create some disruptions.  So we need to

20  know who you are and compare you to the CourtCall list before

21  we let you in.

22          And with that, I will go ahead and turn it over to

23  debtors' counsel.

24          MS. RICHENDERFER:  Your Honor, this is Linda

25  Richenderfer.  I hate to interrupt, but I know I'm on the

1   CourtCall list, and I haven't figured out yet how to figure

2   yet how to put my last name up on my Zoom, and I'm not in

3   right now.

4           THE COURT:  What is -- you're under Linda.  I see

5   Linda.

6           MS. RICHENDERFER:  Yes.  There I am.  Okay.  Thank

7   you, Your Honor.  I'm sorry --

8           THE COURT:  Okay.

9           MS. RICHENDERFER:  I had to find a techy to help

10  me with that last name thing.  Okay. Thank you, Your Honor.

11          THE COURT:  All right.  Thank you, Ms.

12  Richenderfer.

13          Mr. Pachulski.

14          MR. PACHULSKI:  Thank you so much, Your Honor.

15  Richard Pachulski of Pachulski Stang Ziehl & Jones on behalf

16  of the debtors and debtors-in-possession.

17          We would propose today, Your Honor, to begin with

18  the Rabbi Trust related motions, the two motions that were

19  filed.

20          THE COURT:  Okay.

21          MR. PACHULSKI:  I know there was an issue raised

22  by the ad hoc group of participants.  I didn't know if you

23  wanted to address that first or if I should just move

24  forward.

25          THE COURT:  Yes, I did say I would hear the

1  parties on that issue about going forward today, first.  So

2  let me go ahead and hear you on that issue.

3          MR. HOLIFIELD:  Your Honor, this is Al Holifield

4  and I think my Zoom has me listed -- it doesn't have me

5  listed as James A.  But if you have an Al Holifield, could

6  you let me in, please, sir?

7          THE COURT:  Yeah, I see you.  I'll let you in.

8          MR. HOLIFIELD:  Thanks.

9          THE COURT:  I understand that the plan

10  participants have an objection going forward today, so let me

11  hear from them first.

12          MR. COHEN:  Good afternoon, Your Honor.  This is

13  Howard Cohen of Gibbons PC and I will be yielding the call to

14  my colleague, Robert Malone, to address this point.

15          THE COURT:  Okay.  Mr. Malone.

16          And whoever is typing, if you could please mute

17  your phone, please.  Thank you.

18          Mr. Malone, are you there?

19          MR. MALONE:   Yes, I am.

20          Your Honor, yes.

21          On the 5th of November, the ad hoc participants

22  filed their objection.  And one of those things that we

23  brought to the court's attention in our objection and to

24  debtors' counsel, committee counsel, was that we believe that

25  the issues at hand here should proceed in the first instance

1  by way of an adversary proceeding.

2       One of the things that they've been looking to do

3  is get a determination of whether or not this is, in fact,

4  may be property of the estate and that should proceed by way

5  of an adversary proceeding, whether there's a turnover or

6  not.

7       The other issue that we have said is that the

8  court is not inclined to have this proceed as an adversary

9  proceeding which we feel that it should because there's a lot

10  of issues that have to be determined and there are other

11  parties that are probably missing from today's hearing.

12       We're in the midst of putting together an

13  adversary proceeding.  As the court knows, there was already

14  an interpleader action filed in the Eleventh District of

15  Alabama by Regions Bank that still sits there.  Some of those

16  issues are as far as what's to be decided in this court or

17  perhaps even a district court.

18       But if the court is not inclined even with respect

19  to having a hearing by way of an adversary proceeding, this

20  is -- and I don't think anyone can object to the fact that

21  this is a contested matter.  And under Bankruptcy Rule 9014,

22  the Part VII, we kick in as far as the rules as far as

23  discovery in this case.

24       I believe we've notified everybody by the fact

25  that we filed that.  That was on the 5th.  I believe their

1 objections came back or, at least, responses came back from

2 both the debtor and the committee on, I believe, it was

3 Tuesday. Wednesday we reached out to try to do a meet and

4 confer to set up an aggressive, if we have to be on an

5 aggressive timetable.  But there are a lot of things that

6 people are putting forward in their papers if (indiscernible)

7 facts and that they're undisputed facts.

8         We beg to differ, Your Honor.  There's a lot of

9 facts here that I think can only be determined with respect

10 to having a full board discovery with respect to exchange of

11 documents and witnesses that can allow Mr. Holifield to

12 address those witnesses and people that he believes he needs.

13         As to some of the statements that were made and,

14 again, we're following the court's directive yesterday as far

15 as trying to meet and confer.  We sent to you an unbiased

16 exchange of those emails.  It seems that the debtor decided

17 around 4:35 to file a brief on those issues.  But let me

18 address a couple of things in there.

19         Number one, the discovery that was served upon

20 them, formal or otherwise, came to us at 4:30 or so the day

21 before our objection was due.  It was not complete.  And

22 because it's not complete, some of the things that Mr.

23 Holifield will bring to your attention as to the ERISA, we

24 can't really proceed without that information.

25         We believe that this is a very fact sensitive

1  case.  Everybody has put together a list of (indiscernible).

2  Oh, and in this case, they did this, they did this, they did

3  this.  These are all fact sensitive.  It turns a lot on the

4  documents at hand and in this case, we believe that the trust

5  documents here are different than other trust documents in

6  some of the other cases that debtors' counsel and committee

7  counsel may be alluding to.

8        There's a real material issue here with respect to

9  was there or was there not a termination of the plan.  Was

10  the debtor insolvent or not insolvent?  These are fact

11  sensitive issues and we believe that even if the court puts

12  us on a very aggressive timetable, we have to be afforded

13  procedural and accepted and due process so that we can have a

14  full board record with respect to the issues at hand.

15        It does turn on a lot of facts here, Your Honor.

16  For example, if you read the papers that were submitted by

17  the debtors' counsel throughout the case and I think it's in

18  the first day declaration, they said that the plan was by

19  board resolution terminated on the 1st of March of 2019.

20        There seems to be conflicting statements made by

21  the creditors committee with respect to when they think there

22  was or was not a termination.  Whether or not there are

23  assets in this trust and whether it's funded.

24        These are things that are fact sensitive and not

25  some matter of law.  This is not something that can be

1 handled in a summary fashion without adducing testimony and

2 also having documents that we can look at.

3 One of the things, I think, that Mr. Holifield

4 will -- and I'll turn over the podium to him with respect to

5 some specific examples of what he needs. We haven't gotten

6 it or we still need to do it. And we think in order to have

7 a proper hearing here, we have to be afforded. This is a

8 plenary hearing -- the necessary discovery to proceed.

9 I'll turn to Mr. Holifield and let him answer with

10 respect to the specifics that he's missing.

11 THE COURT: Well let me ask you first, Mr. Malone,

12 in the contested matter you're entitled to discovery. Did

13 you file formal discovery request?

14 MR. MALONE: We didn't file formal. We did --

15 before we were involved, I believe Mr. Holifield may have

16 made those requests.

17 THE COURT: Did you request a deposition of

18 (indiscernible)?

19 MR. MALONE: We have not been able to take any

20 discovery. Your Honor, we filed our papers last Thursday. We

21 waited to receive what the response would be from the

22 committee and the debtor and that's when we made our --

23 requested M&S, why we asked for the meet and confer with

24 them. And that's the reason why no discovery has taken

25 place.

1    We're on the kind of track of less than five days

2 for any kind of request for discovery here.  We're willing to

3 --

4    THE COURT:  When was the motion, when were the

5 motions filed?

6    MR. MALONE:  I believe they may have been -- this

7 is before my involvement so I think they were filed, perhaps,

8 a month ago.  I'm not exactly sure the exact date.  Mr.

9 Holifield may know because some of the conversations that Mr.

10 O'Neal alludes to, I was not party to.

11    THE COURT:  All right, so a month ago and the plan

12 participants knew even before that time that those motions

13 were coming, right, and were going to --

14    MR. MALONE:  Well, I don't know if that's exactly

15 true because one of the issues here is before we got involved

16 as counsel, Mr. Holifield was still putting together a group

17 of people and it continued to grow over the time before we

18 filed our formal 2019 statement.

19    So I don't know how organized they were before my

20 involvement.  Again, I would have to defer to Mr. Holifield

21 to answer some of these questions that you're asking me, Your

22 Honor, because I do not have firsthand knowledge.

23    THE COURT:  All right.  And you mentioned to one

24 of the facts as whether or not the debtors were solvent are

25 solvent or not, is that really a legitimate question at this

1  point?

2          MR. MALONE:  Well it seems to be a question that

3  rises and it does trigger with respect to the documents.  One

4  of the things that we say is that this was terminated over a

5  year ago and that the assets should have come out of the

6  trust on the 1st of March of 2020.  It's our position that

7  these assets are not even property of the debtors' estate for

8  distribution in this case.

9          So I think some of the issues have to, you know,

10 with respect to what we feel is discovery is the issue of

11 when they were insolvent that would have even triggered the

12 transfer of these assets or that they would seem to be

13 available to the creditors here.

14         THE COURT:  Well what if I were to accept as true

15 the fact that the plan was terminated prepetition, the fact

16 that the plan participants did not receive notice of the

17 termination or did not receive notice of the change of

18 control that triggered the termination and were actually

19 misled into not asking for distributions under the plan?  Can

20 we not still go forward on the issue of whether or not these

21 assets are property of the debtors' estate?

22         MR. MALONE:  I don't believe so, Your Honor.

23 Again, I would ask us to defer to Mr. Holifield who is an

24 ERISA attorney who could properly answer that question

25 better.

1          THE COURT:  Okay.  Mr. Holifield?

2          MR. HOLIFIELD:  Yes.  Your Honor, to answer your

3   question directly is generally speaking that my trust is

4   subject to the claims of credit.  But there are exceptions to

5   the general rule as the Washington Mutual case points out.

6          And one quick thing we would point out here is, is

7   the debtor here says the plans were terminated March 1 of '19

8   and they were intended to be distributed March 1 of 2020.

9          THE COURT:  Mr. Holifield, are you on the Zoom

10  call?  I can't see you.

11         MR. HOLIFIELD:  I'm right here.  Yes, I'm here.

12         It was the intent to distribute -- can you see me

13  now?

14         THE COURT:  I cannot.  Why don't you raise your

15  hand?  That would put you in the top left corner of my screen

16  and I will be able to see you.

17         MR. HOLIFIELD:  I'm waving my hand.  I don't know.

18         THE CLERK:  Unless the audio is not on.

19         MR. HOLIFIELD:  I can see myself, Your Honor.

20  Where's the raise your hand feature?

21         THE COURT:  If you go down to participant, at the

22  bottom of your Zoom screen; do you see that?  Click on that

23  and it will bring up a dial log box and you'll be able to use

24  the raise your hand.

25         MR. HOLIFIELD:  The raise hand -- got it.

1      THE COURT:  There is now.  Okay.  I did see you
2  before.  You might have been on page 2 or 3 of what I have
3  here on my screen.  Thank you.

4      MR. HOLIFIELD:  And so, but March 1st, 2020 was a
5  day that the plan says shall be distributed at the earliest
6  day.  So at that time, it's our position that the assets
7  became legally and equitably entitled to the -- our clients.

8      And, in particular, Your Honor, the plan says not
9  only does this is what the trust says that prior to a
10 distribution, Your Honor, that all rights, there is no lien
11 or rights in the interest of the participants.  But that
12 changes, Your Honor, into the situation here because it says
13 prior to the distribution in 8(a) -- I'm going to read to you
14 verbatim.

15     THE COURT:  Well hold on, Mr. Holifield, we're
16 getting into the argument which my question is, if I assume
17 your facts are true that the plan is terminated and the
18 participants were entitled to distribution as of March 2020
19 and they were deceived into not asking for those
20 distributions, we can then get into the argument about
21 whether or not under the plan and the applicable case law
22 those -- the plan participants were entitled to receive those
23 proceeds.  Can't we, without --

24     MR. HOLIFIELD:  Correct.

25     THE COURT:  Okay.  That's my point.

1          MR. HOLIFIELD:  (indiscernible), Your Honor.  I'm

2     sorry.  If discovery is the UCC, the committee is arguing

3     that on March 1, 2020 under their theory, that the company

4     was not insolvent which may come into an issue.  And they say

5     upon information of the lease which is -- and we're saying

6     that RTI, at that point in time, was not insolvent.

7          There's an issue of discovery that I could come

8     out right there.  Furthermore, none of us are seeing this

9     termination board resolution.  It has yet to be produced in

10    this case, terminating any of these plans which is the focal

11    point of this case.

12         And so, there's a lot of discovery out there.  We

13    sent discovery requests on October 27th. We received the

14    documents the day before our brief with some but we're still

15    missing five or six categories of documents that we have not

16    received yet.

17         And so, and certainly, I think Your Honor would

18    agree if we get those documents 4:30 or five o'clock the day

19    before our brief is due, it's really hard to review all those

20    documents and prepare our response the next day.

21         THE COURT:  Okay. Thank you, Mr. Holifield.

22         Let me go back to debtors. What's your position?

23         MR. PACHULSKI:  Your Honor, let me -- our position

24    is we expect to go forward, obviously, subject to Your

25    Honor's agreement, but I do want to go through some history

1  because I think it's important because I think Your Honor

2  noted very carefully during the first day motions the

3  importance of the Rabbi Trust.

4         You asked very specifically of me what happens if

5  we win and what happens if we lose.  And I was -- I think I

6  was very forthright and said if we win, we believe we can

7  reorganize and, if we lose, we have a massive problem and

8  probably cannot.

9         Mr. Holifield, obviously, heard that, because he

10  called me very -- and we had said we'd have a hearing on

11  November 5th because we wanted to get this sooner than later.

12  Mr. Holifield called me and said we need more time.  I said

13  okay.  What do you need?  How about if we set it for November

14  12th.  I'm not crazy about it, but, you know, I don't want to

15  jam anybody and he said November 12th would be fine.

16         Could you file your motion right away?  I said

17  yes.  I called my partner, Malhar Pagay, and we got the

18  motion filed.

19         There was never a request for any discovery, in

20  terms of deposition.  There was a request for the -- for some

21  documents.  We produced those documents in approximately a

22  week.  Many of them were completely irrelevant, but we

23  produced what we could.  We never got a call saying you

24  didn't produce the documents, or we need additional

25  documents, or we need a couple extra days to respond because

1   you got us the documents.

2           It's the first I've heard that that was a problem.

3   They didn't even tell us that in the last day or two, so we

4   didn't know any of it.  And which -- it feels to me almost

5   like litigation by ambush.  We'll tell you when we need to

6   tell you.

7           Now if you go to their pleading that they filed on

8   the 5th, they don't describe all this discovery that they

9   need.  They describe two things.

10          On page 20 of their opposition, one, they ask

11  whether the deferred compensation plan had been terminated.

12  It hasn't, but it's not really relevant even if it had.  And,

13  second, they said in a footnote, it's the last thing on their

14  brief.  We may have to do discovery on insolvency.

15          Now, Your Honor, we're putting on our client with

16  respect to the insolvency issue.  They could have asked to

17  depose him or they could have had their own expert.  None of

18  this was -- so all this, they need this massive discovery I

19  don't even understand it.  It's not in their pleading.

20          They haven't said any of it.  It's almost like

21  we'll just keep coming up with things and see if we can delay

22  and force you into a position that you're now going to be

23  against the wall in terms of the reorganization.

24          And not to get into it, but I will during my

25  argument, Your Honor.  Washington Mutual which is literally

1   the only case involving a Rabbit Trust that they have cited,

2   they have completely mis-cited it.  Judge Walrath was very

3   clear, and those facts were egregious, Your Honor, which I'll

4   also get into.

5        Dramatically more egregious than anything that

6   could possibly be argued in this case.  And the judge, the

7   saying you could have a constructive trust under bankruptcy

8   law was very clear you couldn't have a constructive trust in

9   this -- in the Washington Mutual case and by example in this

10  particular case.

11       So I'm not sure what we're going to do.  We're

12  just going to get a bunch of discovery requests.  We think

13  they will be irrelevant.  The termination issue that Mr.

14  Holifield has actually stated, and I don't pretend to be an

15  ERISA expert, and I've got to know more about ERISA than I

16  ever wanted to through this process, but Mr. Holifield

17  doesn't even recite what he does in is pleading in 9.3 which

18  is the company's determination in consideration of Internal

19  Revenue Code 409(a), whether they could even make a

20  distribution which they could not, also going to be the

21  testimony today.

22       So, we need to go forward because it doesn't just

23  relate to the reorganization. It also relates to the DIP.  It

24  also relates to what the landlords are asking for because

25  they want to know that we actually have an entity that can be

1  reorganized and we're negotiating now with literally over a

2  hundred different landlords.

3          So, we had no idea that this was an issue until

4  two days ago when we asked, based on the rules, to try to

5  stipulate to what documents would be admitted into evidence.

6  And we were told, on my God, we didn't know there was going

7  to be an evidentiary hearing.

8          Well, of course, Your Honor, they have Delaware

9  counsel.  Every district has different rules.  Delaware is

10  very clear that the motion creates the -- we have a contested

11  matter.  They want discovery.  They could have asked.  We

12  would have made people available. We know how the rules are

13  played.  We don't like when people don't cooperate with us

14  and we are very sensitive about cooperating with the other

15  side.

16          But there is nothing they've said that we didn't

17  do that they asked for, including asking a continuance of a

18  motion that hadn't even been filed yet, Your Honor.  So, we

19  would like to proceed today.  This is really important to

20  this case.  It's the crux of the case and I don't think it

21  would be fundamentally fair not to go forward based on what

22  has happened to date with respect to the participants and the

23  failure to disclose the need for discovery, even in their

24  objection.

25          THE COURT:  Okay.

1          MR. MALONE: Your Honor, can I respond?

2          THE COURT: Go ahead, Mr. Malone.

3          MR. MALONE: Number one, we did make a request for

4 discovery as Mr. Holifield say on October 27th and it was not

5 a complete one. I don't know what conversations may or may

6 not have been had between Mr. Pachulski, either Mr. Dunden

7 (ph) or our financial advisor or Mr. Holifield, but I do know

8 it's incomplete. That's first.

9          Number two, I understand the fact that we need to

10 get this issue resolved and it can't go on for months or

11 weeks or years. But today is not crucial and there's no

12 showing of any prejudice to the debtor that we must be heard

13 today and that we can't be afforded and expedited. And I

14 think the discovery, if we're only going to handle as a

15 contested matter, the discovery, I think, we can give it to

16 them and we can resolve that probably within the next 24

17 hours.

18          With respect to some of the things he said, we're

19 going to have testimony. They haven't even filed their

20 statement of financial affairs and schedules. So when you

21 talk about oh, we're an open book, and all the information is

22 out there, respectfully, it's not.

23          We're in a situation here that we still believe

24 this still should have all been brought by way of an

25 adversary proceeding. And if you're looking at the Regions'

1  complaint, paragraph 122, they allege the trust issue -- it

2  doesn't follow the model Rabbi Trust forms on points of

3  calling the question whether it is, in fact, a more

4  restrictive form of trust which creates uncertain as to its

5  interpretation.

6  They misinterpret even what they said as far as

7  the interpleader.  They try to say, oh they don't care about

8  the (indiscernible).  No, they felt it was a real issue when

9  that was filed, so there's fact here that, I think, need to

10  be flushed out in order for everybody to have a full borne

11  record going forward.  This isn't one.

12  We were here -- if we go through the discovery

13  that there are distinctions.  Every trust has different

14  permutations of documents.  It's not like one form Rabbi

15  Trust fits all.  There's going to be issues here.  There's

16  issues that I think that, you know, if we're given -- and if

17  you want to (indiscernible), as I said, on the very

18  aggressive timetable, they don't need this money tomorrow.

19  It's clear from their budget.  They probably don't

20  need it until week five or six.  They have enough money.

21  There's also the issue of whether they can even use the money

22  even if they get use of it for the benefit for anyone but the

23  general unsecured creditors if, in fact, that becomes a

24  determination.

25  But the bottom-line here is this is not a today

1  issue. We're not trying to "sandbag" anyone.  We did not get

2  a complete and robust document production.  As I said, we

3  came into this case late because, again, Mr. Holifield was

4  trying to scramble the people together.  And as far as making

5  requests, we did everything we could in good faith.  We

6  reached out to them.

7        It's been crystal clear in the opening of our

8  objection that we feel that this should be an adversary

9  proceeding.  And we can if it's not an adversary proceeding

10  that under Rule 9014, Part VII kicks in and we should be

11  afforded the discovery.

12        So it wasn't something that Mr. Pachulski learned

13  for the first time on November 10th.  And I find that to be

14  disingenuous to say that that was, in fact, what happened.

15  We tried in a good faith way yesterday to try to work out a

16  meet and confer to see if we could even go on in an

17  abbreviated (indiscernible).  We got nowhere.

18        I didn't even get the chance to speak to him on

19  the phone.  If Your Honor looked at the email.  We could have

20  maybe saved everybody a lot of time today and said, look

21  you're going to have discovery but we're only giving you a

22  week.  You're going to have to take two deps a day or

23  whatever it is, but we're not being afforded that

24  opportunity.  We're not being afforded the opportunity to

25  develop a full record.

1      We come into this case later on then the Pachulski
2  firm does with respect to knowing the facts and everything
3  else here.  There are facts and there are facts that I think
4  are in dispute.  But we're not going to be able to even go
5  through that unless we're able to get the discovery that's
6  missing.

7      I know having spoken to Mr. Dunden who's on the
8  phone and I see his picture down there, we had a very robust
9  list of information and a lot of that has not been produced.
10 Perhaps, we get through all that, perhaps -- I don't think
11 there's going to be a ton of depositions, but there's going
12 to be a few.  And I think we can do it on a very expedited
13 schedule so that we're not having to decide it today in a
14 summary fashion, but allows everybody the opportunity and we
15 have a hearing within -- even if it's in two weeks.  They
16 don't need the money until two weeks.

17     With respect to Goldman Sachs, what they're so
18 certain that they're all going to win on this and Goldman
19 should be willing to put up the money right now and say,
20 we'll get paid back after you guys win, debtor, because, you
21 know, we think this is a slam dunk.

22     I don't hear anyone making that kind of offer.
23 You got people who, you know, lives are dependent upon this
24 money.  And we're all going to take care of it in a one felt
25 swoop in a summary fashion without affording their counsel

1   the opportunity to be heard and make a full record.  Whether

2   this decision stays in this court or whether this decision

3   goes up to the district court.

4           I also note that they put in their papers that

5   they want to waive a stay if they win today.  I mean I think

6   that's a very aggressive thing when you're talking about the

7   lives of over a hundred people that Mr. Holifield is

8   representing with respect to this trust.

9           This isn't all political, maybe top hat.  There

10  are people within this plan that may or may not be considered

11  that.  There's some retirees.  There's some people who are

12  still working.  But I think it's not a lot to ask when you're

13  balancing the equities of whether or not to give an

14  adjournment today against, I need the money.  I don't need it

15  today, but I'm telling you I need it today versus if you make

16  decisions today, it's going to affect people's livelihood who

17  have not been able to develop the record and having the

18  opportunity to really be heard on the issues before this

19  court.

20          THE COURT:  Thank you, Mr. Malone.

21          MR. ABBOTT:  Your Honor, Derek Abbott.  May I be

22  heard briefly?

23          THE COURT:  Yes, Mr. Abbott, go ahead.

24          MR. ABBOTT:  Thank you, Your Honor.

25          Your Honor, I represent Compass USA which did file

1   a joinder, and I'd like to ask the court to hear briefly from

2   my co-counsel at McGuireWoods, Summer Speight, and Scott

3   Vaughn.  I believe Ms. Speight would like to address the

4   court on why they think that discovery may be relevant or why

5   this is then, perhaps as suggested by Mr. Pachulski.

6               THE COURT:  Okay.

7               MS. SPEIGHT:  Hi, Your Honor.  Can you hear me?

8               THE COURT:  I can, but I cannot see you.  Where

9   are you?

10              MS. SPEIGHT:  I will raise my hand.

11              THE COURT:  There you go.

12              MS. SPEIGHT:  All right.  Good afternoon, Your

13  Honor.  Thanks a lot for allowing me to be heard.

14              I'm here for Compass.  And we filed a joinder and

15  the participants' objection that was filed.  And I just

16  wanted to highlight one thing.

17              I'm an ERISA lawyer and generally top hat plans no

18  question they're subject to general creditors.  And this

19  would be something that is a bankruptcy (indiscernible)

20  resolve on a motion that is turn over the trust.

21              But as the trustee recognized this Rabbi Trust,

22  this trust fund was set up in a very unusual manner that

23  really causes the question where the funds belong. Are these

24  funds truly the debtors' fund that are now subject to all

25  general creditors, including the participants or have these

1  funds, are they now primarily owed to the participants?

2         And we wanted to point out, Your Honor, the one

3  sentence in the trust agreement that makes this very unusual

4  is in Section 8 of the trust agreement and it recognizes that

5  participants have preferred claims on funds. They have a

6  beneficial ownership in the funds at the time for

7  distribution.

8         You don't have any preferred claim or any

9  beneficial ownership until the distribution has been made.

10 This is what Washington Mutual case said. This trust

11 agreement is unusual and that it talks about things in terms

12 of the time of distribution. And that's why all this

13 discovery as to the termination and when benefits should have

14 been paid out is necessary for Your Honor to make that

15 decision on who these funds belong to.

16        And, again, Regions acknowledged that it's

17 uncertain, even their own reading of the trust agreement.

18 It's uncertain to them whether their obligations are to the

19 debtors or if their primary obligation lies is the paying out

20 the funds to the participants because the time for

21 distribution has come and passed.

22        THE COURT: Thank you, Ms. Speight.

23        Mr. Pachulski, I see you have your hand raised.

24        MR. PACHULSKI: Thank you so much, Your Honor.

25        I want to make two points because this is some of

1  the frustration I have.

2          Number one, Compass did not file anything until

3  approximately 4:30 Eastern yesterday.  So as far as I'm

4  concerned one of the issues I was going to raise at the time

5  of argument is whether they can argue at all.

6          Here's what counsel does not tell you, Your Honor.

7  And this is part of the argument that we'll have today is

8  8(a), I think there are, at least, three different arguments

9  against what counsel just said about McGuire.  But one of

10 them is she forget to mention 9.3(b) which says the company

11 decides when there is a distribution based on 409(a).  409(a)

12 says you cannot make a distribution until, at least, one year

13 and up to two years from the time of a termination

14 resolution, effectively.

15          That would have taken you to March 1 of 2020.

16 409(a) also is very clear that you do not make the

17 distribution if the company has financial issues.  You just

18 don't make it at that point. Part of the testimony we will

19 have today is that that distribution could not have even been

20 made even if counsel's reading of the trust along with the

21 plan were correct, which we're not convinced she is, but I'll

22 pretend for the moment she is.

23          The distribution could not have been made, but

24 Your Honor, the thing that is most disturbing here is I've

25 never heard of Compass until 4:30 yesterday.  Mr. Holifield

1  asked for time, which we gave him. There's never been a
2  formal discovery request. The objection, we complied, there
3  has never been a criticism until this hearing of what we
4  produced. And the fact of the matter is, Your Honor, their
5  pleading did not even say they were going to need discovery,
6  other than insolvency which is somewhat ironic in this case
7  and potentially on the termination of the deferred comp plan.

8         So, and counsel also says, oh you can wait. Well,
9  first of all, it could take a week. Second of all, they
10 could be fights over the stay. And the DIP lender has made
11 it clear that at some point, sooner than later, they will
12 pull the plug because we will not be able to make milestones.

13        So, I don't understand. Mr. Malone has made all
14 these comments but wouldn't you have tried some discovery?
15 Wouldn't you have mentioned in your pleading? Wouldn't you
16 have had formal discovery requests? Wouldn't Compass have
17 filed this in a timely manner which they absolutely did not
18 do?

19        And so, with all of that in mind, Your Honor, I
20 think we can win today. I think we can prove our case and we
21 came prepared and now we're being told we're going to have
22 all this discovery but no one can quite articulate what it is
23 other than the termination and coming here today. We're
24 assuming that it was -- that the resolution was in March of
25 2019 because that is what happened.

1     We're not denying it.  There wasn't one for the

2  DCB, but there was one for the ESPP and the MRP Trust.  So,

3  other than just trying to delay and then telling us don't

4  worry about it, it's all going to be fine.  We're going to

5  have discovery disputes because we're going to get bombarded

6  with now formal discovery that is completely irrelevant in

7  this case.

8     And while people can look at the "model Rabbi

9  Trust" the fact of the matter is these are top hat plans that

10 are required, required to be unfunded and required if we have

11 a Rabbi Trust that the general unsecured creditors have a

12 right to those funds, *pari passu* with the participants if

13 they have claims.

14     So I don't know what we're actually arguing about,

15 other than we'd like to go forward.  We may not win.  But we

16 prepared for today. We're prepared to put on our witness.

17 They have a right to cross examine.  If they have witnesses,

18 we will cross examine, if we deem it appropriate.  But I

19 don't know how long they want to wait, but this isn't going

20 to happen overnight.  And the body will die before we have a

21 chance to give it any medicine in this particular instance

22 because of what's happened.

23     It's just wrong based on what has happened in this

24 case, Your Honor, where I now have to defend against someone

25 who decided yesterday late for instance to participate, who

1  brings up a new issue. But if Your Honor says, respond to it.

2  I'm prepared to.  I had to spend most of the night getting up

3  to speed on the issue, but that's what we have to do.  So,

4  yes, we would like to go forward.

5          And we think it's fundamentally unfair how the

6  participants have acted in this case when we have done

7  everything they asked us to do, when they asked us to do,

8  other than, so it's clear, I was prepared to speak to Mr.

9  Malone yesterday, but I told him very honestly in the email

10  that Your Honor said, we're not moving the date, just because

11  they feel like it when they didn't even ask for the

12  continuance in their opposition.

13          They didn't ask for anything other than they

14  responded and said we might need discovery on two issues,

15  which if they had asked us for them, we would have given it

16  to them. So with that, Your Honor, I know you've heard more

17  than enough, including some of the arguments that would be

18  made today with respect to the motion.  We would like to go

19  forward today, and we believe we are prepared to do it and we

20  properly noted and gave extra time so the other side would

21  have time to respond.

22          THE COURT:  All right, thank you.

23          MR. MALONE:  Your Honor, there still hasn't been

24  any showing of prejudice or even one week or two weeks.  They

25  told us about the witness, I think, yesterday, 24 hours.

1 First time I heard they were going to put a witness on.

2 I think when we file an objection, it points out

3 that we feel it should proceed by either adversary proceeding

4 or as a contested hearing. We're letting people know we need

5 to have discovery.

6 I know for a fact and I'll let Mr. Dunden or Mr.

7 Holifield answer, they did make requests of discovery and we

8 didn't get it. We only got parts of discovery and we got it

9 a half hour or the day -- 4:30 on the day before we're

10 scrambling to file our objection.

11 So I don't see the prejudice. I haven't heard it

12 from Mr. Pachulski that one week or two weeks is going to

13 provide any kind of prejudice on a very important issue here.

14 That, as I said, I will endeavor -- I don't think I slept

15 much at all last night. I have no problem working over the

16 weekend and everything else to get this thing done.

17 I fully understand what the debtor is saying. I'm

18 not making light of it, but I don't think anyone can make

19 light of having this done in such a summarily fashion without

20 the ability to bring forward to the court the facts that we

21 think are all in dispute here. This is almost like a summary

22 judgment hearing that everybody says, well there's nothing in

23 dispute. There's a lot in dispute.

24 Thank you.

25 THE COURT: Mr. Schmidt, I see you raised your

1  hand, then I'm going to -- we're going to get to this.

2          MR. SCHMIDT:  Thank you, Your Honor.  Can you hear

3  me?

4          THE COURT:  I can. Thank you.

5          MR. SCHMIDT:  Thank you.

6          Your Honor, Robert Schmidt from Kramer Levin on

7  behalf of the official creditors committee.

8          I was hoping not to have to chime in on this

9  preliminary dispute.  But I will just note from day one of

10  this case, Mr. Pachulski made crystal clear that the Rabbi

11  Trust dispute and issues was the linchpin to the case.  And

12  we have certainly become convinced since we have been

13  involved that that is the case.

14          We spent the last twenty-four plus hours of

15  negotiating hope for resolutions of the DIP.  You'll hear

16  more about that later and we agreed the existence of the

17  Rabbi Trust assets was critical to the analysis and to the

18  ultimate resolution of the issues on the DIP.

19          We don't see any reason not to go forward.  This

20  has been out there for several weeks now.  And we believe the

21  court should hear argument.  Thank you.

22          THE COURT:  Thank you, Mr. Schmidt.

23          All right, I am not convinced that this matter

24  needed to proceed by and have (indiscernible).  I agree with

25  my colleague on the Eastern District of Virginia Bankruptcy

1  Court that in this context since the trustee is not objecting

2  to the relief and the trustee is the one who holds the

3  property, there's no need to proceed by adversary and can

4  proceed by motion in the form of a contested matter.

5        It's also found compelling the decision in Corna

6  vs. Downing which is the Ninth Circuit Bankruptcy Appellate

7  Panel came to the same conclusion in that case that it was

8  not necessary to proceed by adversary proceeding and that due

9  process rights of participants are protected in the context

10 of the contested matter.

11       That brings us to whether or not we're going to

12 proceed by today on the contested matter.  Everything I've

13 heard so far, I've heard that there's discovery that needs to

14 happen, discovery needs to happen, discovery needs to happen,

15 but I haven't heard how any of that may or may not affect the

16 outcome of the decision that I have to make.

17       And, Mr. Malone, I think you actually raised this

18 issue about summary judgment.  Summary judgment is something

19 that is available in the context of a contested matter under

20 9014.  So we're going to proceed today.  I'm going to hear

21 whatever testimony is presented.  If the plan participants

22 can convince me that there is some material issue of fact

23 that could change the outcome then I will consider whether or

24 not to deny relief today and open up discovery to allow it to

25 go forward.

1          But, at this point, I think it was clear from the

2    beginning of this case, and I noted it on the first day

3    hearing that this issue with regard to the Rabbi Trust was

4    going to be coming forward.

5          The motion was filed a month ago.  Plan

6    participants knew from that point on that they were going to

7    be objecting to the relief requested.  And they had the right

8    to take discovery.  They chose to take some limited informal

9    discovery but did not engage in formal discovery.

10          And I cannot just say, at this point, the day

11   before the hearing is supposed to go forward that, and the

12   day of the hearing, ask me for a continuance because we

13   didn't get the opportunity to take the discovery that we

14   wanted, when you haven't shown me that you actually tried to

15   take that discovery.

16          So, at this point, we're going to go forward.  As

17   I said, if the plan participants can convince me that there

18   is some material issue of fact that needs to be decided, I

19   will not grant the relief today.  But if we can proceed on

20   the evidence that is presented today and that evidence shows

21   me that relief can be granted, then I will make a ruling at

22   that time, after I hear the evidence and the arguments.

23          So with that, Mr. Pachulski, are we going forward

24   on this motion first on the agenda?

25          MR. PACHULSKI:  Yes, Your Honor.  I think it does

1  relate to, for instance, the DIP and, to some degree, some of

2  the matters that are going to be continued.  But, yes, we

3  would go forward with respect to the motion associated with

4  the plans and the Rabbi Trust.

5          THE COURT:  Okay.  I don't think I need opening

6  statements since I've heard quite a bit already about what

7  the facts of the case are, what the issues are, so why don't

8  you call your first witness, Mr. Pachulski.

9          MR. PACHULSKI:  Before doing that, Your Honor, I

10 do want to -- again, I can do it after the witness or but one

11 of the two questions relates to the witness.

12         We're prepared to effectively put into evidence

13 the various trust and the plans.  I believe that Mr.

14 Holifield or Mr. Malone, it may have been Mr. Holifield had

15 agreed to that in terms -- but I don't want to be

16 presumptuous and not put it into evidence and then have an

17 objection.

18         So I just want to make sure that it's going to be

19 my partner, Mr. Pagay, who's going to make the proffer on

20 behalf of Shawn Lederman is our primary witness.  And he

21 would go through and explain the business record issue.

22         But rather than waste people's time, I just want

23 to make sure that everybody is okay that those records will

24 actually be allowed into evidence.

25         THE COURT:  Well what exhibits are you

1  specifically asking to be admitted?

2          MR. PACHULSKI:  Your Honor, they are -- if I can

3  take a moment or I'll have a habit -- because Mr. Pagay is

4  taking the lead on the witness.  But I believe, if I can take

5  one second. . .

6          They would be Exhibits A through F of the what I

7  refer to as the ESPP MRP motion.  And they would be Exhibits

8  A through C of the DCP motion.

9          I also believe that -- so those are the ones that

10 we are specifically requesting to be admitted into evidence;

11 otherwise, Mr. Lederman will testify with respect to those,

12 so that they can be admitted.

13         THE COURT:  All right, Mr. Holifield, is there an

14 objection?

15         MR. HOLIFIELD:  No objection, Your Honor.

16         THE COURT:  All right, those exhibits are admitted

17 without objection.

18      (Debtors Exhibits A through F and A through C, received

19 into evidence)

20         THE COURT:  And I still am hearing typing on the

21 call.  If you can please mute your phone if you're not

22 speaking, I'd appreciate it.  Thank you.

23         All right, let's proceed with the witness.

24         MR. HOLIFIELD:  That would be fine, Your Honor.

25         MR. PAGAY:  Your Honor, Malhar Pagay for the

1  debtors. Can you hear me okay?

2          THE COURT:  I can.  Thank you.

3          MR. PAGAY:  Thank you, Your Honor.

4          I'll be going forward with Mr. Lederman's proffer

5  as Mr. Pachulski noted.  To the extent there's any cross, we

6  have the debtors' special ERISA labor and employment

7  litigation counsel who can handle any evidentiary objections

8  that arise from any cross but, with that, I'll proceed.

9          Your Honor, this is Shawn Lederman.  If you recall

10  to testify, he would testify that he serves as the debtors'

11  chief executive officer and has been a member of Ruby Tuesday

12  ex-board of directors since September 2017.

13          He's also a principal of NRD Capital Management,

14  LLC.  He has over twenty years of private equity finance and

15  consulting experience and strategic planning, corporate

16  revitalization, turnarounds, and mergers and acquisitions.

17          Mr. Lederman holds an MBA with distinction from

18  NYU Stern School of Business and a Bachelor of Science in

19  Finance and International Management from Boston University.

20          Mr. Lederman previously has provided testimony in

21  the support admitted in connection with these cases in

22  support of the debtors' first day motions, their motion to

23  defer rent payment, and the debtors' motion to approve

24  debtor-in-possession financing.

25          In the (indiscernible) due course of providing

1  services to the debtors as their chief executive officer, he

2  has been and is familiar with the assets, liabilities, and

3  business operations of the debtors, and has been personally

4  involved with reviewing and ascertaining the debtors'

5  financial condition and, now (indiscernible) liquidity,

6  overall financial condition and the preparation and

7  negotiation of the debtors' budget.

8          As part of his responsibilities, he has reviewed,

9  is familiar with, and relies upon the debtors' business

10  records, including, without limitation, as they relate to the

11  debtors' business operations, corporate relationships,

12  financial condition, and employee and benefits matters.

13          His testimony today is based on his personal

14  knowledge of the debtors' finances, operations, programs and

15  employee matters, his review of information prepared and

16  collected by the debtors' employees and advisors for the

17  debtors' books and records for his opinion based on his

18  experience, knowledge and information concerning the debtors'

19  financial condition and business operations.

20          In making statements based on his review of

21  documents or information prepared or collected by the

22  debtors' advisors or employees, he relies on the

23  (indiscernible) recorded, prepared and (indiscernible)

24  documentation and information.

25          He would testify, Your Honor, that the debtors

1  operate 236 casual dining restaurants in twenty-five states

2  and that from the week ended March 5th, 2019 to the week

3  ended March 3rd, 2020 the debtors' cash position dropped by

4  approximately $23.35 million dollars from a balance of around

5  $40.98 million to $17.36 million.

6  At that time, Your Honor, the debtors were not in

7  a position to make payments to beneficiaries under their top

8  hat unfunded benefit plan, due, in part, to a minimum cash

9  requirement of $10 million dollars under the terms of the

10  debtors' credit agreement with the senior secured lenders and

11  other liquidity coverage.

12  Even if payments to beneficiaries had been

13  permitted by the debtors' senior secured lenders, between

14  March 20th of this year in the petition date, the decline of

15  the debtors' overall financial condition during that period,

16  would not have allowed their business to survive if

17  distributions to plan participants had been made.

18  For example, in reviewing the company's books and

19  records, he would testify that he determined that within

20  probably through April 2020, the unfunded amount under the

21  ESPP MRP plan was between around $10.4 and $10.6 million

22  dollars.

23  MR. HOLIFIELD:  Your Honor, can I make an

24  objection?  I'm looking at their witness list and Shawn

25  Lederman is not on the witness list today.  Just for the

1  record, I'd like to have an objection.

2      MR. PAGAY:  Your Honor, if I could --

3      THE COURT:  Is Mr. Pagay [*sic*] on the witness

4  list?

5      MR. PAGAY:  I'm sorry.  Are you addressing me or

6  Mr. Pachulski?

7      THE COURT:  I meant Mr. Pagay -- was Mr. Lederman

8  on the witness list?

9      MR. PAGAY:  He was added to an amended agenda

10  notice in response to receiving the Compass reply late

11  yesterday.  It had been Mr. Sugi Hadiwijaya with respect to

12  just the narrow insolvency issue.  But when Compass made

13  certain allegations, it made sense to switch to Mr. Lederman

14  who could answer -- to address all the issues, not just the

15  solvency issue in light of the Compass late objection.

16      THE COURT:  All right, go ahead.

17      MR. PAGAY:  Thank you, Your Honor.

18      The continuing downturn in the financial health of

19  the debtors was exacerbated by the impact of the coronavirus

20  pandemic beginning in March 2020.

21      At that time, all the states in which we

22  (indiscernible) county and municipality in which the debtors'

23  restaurants operate issued governmental regulations,

24  recommendations or orders as a result of the COVID-19 crisis

25  that impaired economic activity and directly affected the

1  debtors' operations.

2         Mr. Lederman would further testify that

3  notwithstanding the debtors' best efforts to operate their

4  business, through six months in government regulations,

5  imposed as a response to the COVID-19 pandemic, and to seek

6  financing and explore restructuring alternatives as of the

7  week ended September 1, 2020, approximately $15.67 million of

8  the debtors' $18.1 million in payables were overdue.  Of that

9  amount over $10.73 million was over ninety-days past due.

10  The debtors were not paying their senior secured lenders in

11  the ordinary course.

12         The debtors also owed landlords of non-operating

13  locations an additional $18.6 million on account of unpaid

14  lease obligations.  At the time, the debtors were also

15  defendants in various lawsuits brought by creditors seeking

16  payment of outstanding debts, including litigation by

17  landlords arising from the debtors' non-payment of rent and

18  (indiscernible) shareholders that pays the lawsuit in which

19  the alleged was $10 million dollars in additional

20  obligations.

21         Mr. Lederman would testify that the debtors lacked

22  sufficient funds to pay any of these obligations.  By the

23  time the debtors commenced their bankruptcy cases on October

24  7, 2020, the debtors' cash balance had dwindled to around

25  $5.4 million dollars.

1          Accordingly, Mr. Lederman would testify that at or

2    around September 2, 2020, the date of the debtors' notices of

3    insolvency to the Rabbi Trust trustee, the debtors were not

4    able to pay their debts they became due in the ordinary

5    course of their business.

6          Mr. Lederman believes that Ruby Tuesday's decision

7    to exercise its ownership rights and to utilize the trust

8    assets as described in the motions is an exercise of the

9    debtors' sound business judgment is undertaken in good faith

10   and is in the best interest of the debtors, their bankruptcy

11   estates, and creditors.

12         That concludes the proffer, Your Honor.

13         MR. HOLIFIELD:  We would like to not accept the

14   proffer and get the witness on the stand, if he's here.

15         THE COURT:  Well, I'm going to accept the proffer

16   but you can cross-examine the witness.

17       (Declaration/Proffer of Shawn Lederman, received into

18   evidence)

19         THE COURT:  Mr. Lederman, are you on the Zoom?

20         MR. LEDERMAN:  Yes, Your Honor.

21         THE COURT:  Can you use the raise your hand so I

22   can put you up into the upper corner please?

23         MR. LEDERMAN:  Yes.

24         THE COURT:  You need to turn on your video, Mr.

25   Lederman.

1      MR. LEDERMAN:  I apologize.  It keeps freezing.

2      MR. HOLIFIELD:  Mr. Lederman, can you hear me?

3      THE COURT:  Wait a minute.  I still don't see Mr.

4  Lederman.  Where are you?  There you are.  Okay.

5      Go ahead, Mr. Holifield.

6                    CROSS EXAMINATION

7  BY MR. HOLIFIELD:

8  Q     The assets that are in the trust, are they considered

9  assets that Ruby's has access to?

10 A     Could you clarify the question?  Are you saying in the

11 context of a bankruptcy or . . .

12 Q     Prior to the bankruptcy, at any time prior to October

13 7th, 2020, could anybody at Ruby Tuesday's access the assets

14 within the Rabbi Trust?

15 A     No.

16 Q     And so, if I understood the proffer, it's your position

17 that March 21, 2020 you weren't in a position to make

18 payments as intended under the termination limit because the

19 assets of the trust, right, that you couldn't because of

20 Ruby's finance situation, correct?

21 A     Correct.

22 Q     In fact --

23     THE COURT:  Mr. Lederman -- hold on, Mr. Lederman.

24 I apologize.  I made a mistake here.  I have not put you

25 under oath.  And you need to do that.

1          And you are frozen too.  I'm not sure.  We tried -

2  - we got to get your video working so that we can. . .

3          MR. LEDERMAN:  I apologize, Your Honor.  My video

4  keeps freezing.

5          THE COURT:  Now you are -- let me ask my ecro to

6  highlight Mr. Lederman so we can see him full screen.

7          There we go.  And you are still freezing, Mr.

8  Lederman.

9          MR. LEDERMAN:  This is every time I look away.  My

10  apologies.

11          THE COURT:  Well, Mr. Lederman, can you raise your

12  right -- I have to be able to see you to be able to allow you

13  to testify.  And if your video is not working, this is going

14  to be problematic because you're frozen again.  You're frozen

15  again.

16          All right, we're going to have to take a recess

17  for fifteen minutes to see if debtors' counsel can get Mr.

18  Lederman's video working.  Because I'm going to tell you if I

19  cannot see him on video and his video is frozen, I can't see

20  him, that means he cannot testify.  So we need to get that

21  fixed.

22          Mr. Andress, I see you raised your hand.

23          You're on mute, Mr. Andress.

24          I still can't hear you.  Are you on CourtCall?

25  Unmute the phone.

1          MR. ANDRESS:  Thank you, Your Honor.

2          I'm not done this before so I'm speaking through

3   the phone not Zoom.

4          THE COURT:  Yes, you're speaking through the

5   phone, not Zoom.

6          MR. ANDRESS:  Okay.  Thank you, Your Honor.

7          THE COURT:  Did you have something to say before

8   we recess?

9          MR. ANDRESS:  No, I was just.  I was trying to get

10  unmuted to make the necessary objections during the

11  testimony, so I had the computer -- I couldn't get unmuted on

12  Zoom, but I now understand that I do it through the phone, so

13  all good.

14         THE COURT:  Okay.  All right, let's recess until

15  3:15 and see if we can get Mr. Lederman's video working;

16  otherwise, we're going to have a problem, so we stand in

17  recess until 3:15.

18         MR. LEDERMAN:  Thank you, Your Honor.

19       (Recess at 3:00 p.m.)

20       (Proceedings resumed at 3:15 p.m.)

21         THE COURT:  Your video looks much better, Mr.

22  Lederman.  So, I think we should be good to go.

23         So, again, I apologize for not putting you under

24  oath before you started your cross-examination.  So, let me

25

1  do that now and then I will have Mr. Holifield start over

2  again.

3           Mr. Lederman, could you state your full name for

4  the record and spell your last name please?

5           MR. LEDERMAN:  Sure.  Shawn Lederman, last name is

6  L-E-D-E-R-M-A-N.

7                  SHAWN LEDERMAN, WITNESS, SWORN

8           THE COURT:  Mr. Holifield?

9           MR. HOLIFIELD:  Thank you, Your Honor.

10                      CROSS EXAMINATION

11 BY MR. HOLIFIELD:

12 Q    Mr. Lederman, just to make sure we get everything back

13 on the record officially, I think your testimony earlier was

14 that the assets that are within the trust, the Rabbi Trust,

15 are not able to be obtained or (indiscernible) RTI part of

16 bankruptcy.  Is that your testimony?

17 A    Yes.  Can you hear me okay?

18 Q    Yes.

19 A    So the answer to your question is yes; however, I would

20 modify that comment or clarify it to say that when you say

21 "use" they may not use it, it was my understanding, for their

22 operating purposes, but they would use it or they would be

23 able to use it in satisfaction of pension claims.

24 Q    How long have you been employed by the debtor?

25 A    Since June of 2019.

1  Q    So you were not there when the amended, the resolution

2 was passed to terminate the plan?

3  A    I may have been around. I had spent time at the debtor,

4 but not in my current capacity.

5  Q    In March 1st of 2020 is it your position that RTI was

6 not able to fulfill the obligation that it created when it

7 terminated the non-qualified deferred comp plans and make

8 those distributions?

9  A    Can you clarify that question, I'm sorry, just so I

10 understand.  The obligations, are you referring to the plan,

11 itself, or obligations in normal course?

12  Q    The plan itself, to make the distributions. I will get

13 more specific.

14  A    Sure.

15  Q    If I use the term the ESPP plan, the executive

16 supplemental plan, is that familiar to you?

17  A    Yes.

18  Q    And if I use the term RP for the (indiscernible)?

19  A    Yes.

20  Q    So in March 1st of 2020 do you agree that the proposed

21 resolution, as presented in the pleadings of Ruby's, that was

22 the date that it was to start distributions under those

23 plans.  Is that correct?

24  A    No.

25  Q    That is not what your pleadings say?

1   A     What I'm saying is that I believe there is a period of

2   time that the company could elect after that date to fulfill

3   those obligations, as Mr. Pachulski said earlier.

4   Q     Are you familiar with the ESP plan document?

5   A     Generally.

6   Q     And this said in such event that type of accelerated

7   payment, payment shall be made at the early stage permitted.

8   Would that surprise you?

9          MR. ANDRESS:  Your Honor, this is Keith Andress.

10  I object to a legal conclusion.  The witness interpreting a

11  legal document is for the court.

12         THE COURT:  Well I will let him testify as to what

13  his understanding of the document is, if he has one, but it

14  is a legal conclusion.

15         MR. HOLIFIELD:  I'll rephrase the question, Your

16  Honor.

17  BY MR. HOLIFIELD:

18  Q     Is it your understanding that the plan document

19  provides that the payment shall be made at the early stage

20  permitted under such (indiscernible)?

21  A     My conversations with that have been really limited to

22  counsel's review.  So, I don't think I would be qualified to

23  make that conclusion.

24         THE COURT:  All right.  Before we go further,

25  whoever is typing please mute your phone.  If I hear it again

1  I'm going to find out who it is and I will disconnect you

2  from the call.  This is the third time I've asked.  Thank

3  you.

4           Go ahead, Mr. Holifield.

5  BY MR. HOLIFIELD:

6  Q    The assets on March 1st, 2020 is it your position that

7  Ruby's financially could not make the distribution under the

8  --

9           (Phone interference)

10          THE COURT:  Who is speaking?  Operator, can you

11 identify you is speaking over the speaker here?

12          OPERATOR:  I've been trying to isolate the line.

13 I apologize, Your Honor, I'm unable to see who that is.

14          THE COURT:  Could you try to do that and if you

15 identify them please disconnect them from the call.

16          OPERATOR:  Certainly.

17          THE COURT:  Thank you.

18          Go ahead, Mr. Holifield.

19 BY MR. HOLIFIELD:

20 Q    On March 1st, 2020, in your opinion or your

21 understanding, did Ruby's have the assets to make the

22 distribution to the participants under the MRP and ESPP

23 claims pursuant to the resolution?

24 A    No.  (Indiscernible) assets, but I think what Mr. Pagay

25 had mentioned was that it would not have left us in a

1  position to continue to operate the business and we would

2  have been in violation of our credit agreement because we

3  would have been below liquidity that was required of the

4  credit agreement.

5  Q     Mr. Lederman, is it your understanding that the Rabbi

6  assets are used in the liquidity equation with the bank?

7  A     No, sir.

8  Q     So when you say that those were used in a liquidity

9  equation to make a distribution that is simply not true,

10  isn't that correct?

11  A     The answer that I was giving you was I was evaluating

12  the -- the question that I thought you asked, and if I

13  misunderstood we could restate, would you have the assets to

14  distribute  the plan participant -- excuse me, the

15  liabilities were in excess of the assets under the plan.  So,

16  my understanding is that there was a deficiency and if the

17  deficiency were to then require cash from the company that

18  was the portion that I was referring to under the minimum

19  liquidity covenant.

20  Q     There was nothing preventing you from making

21  distribution from the assets that were in the trust at that

22  time.  Is that true?

23  A     I am not clear on how the -- my understanding of that

24  was that you had to make the -- in order to terminate the --

25

1   well, the answer to your question is my understanding was

2   that you have to make the distributions in full.

3   Q    And your understanding is based upon what?

4   A    Conversations with counsel.

5   Q    Were those conversations in March of 2020 or in recent

6   weeks?

7           MR. ANDRESS:  Your Honor, I object;

8   attorney/client privilege.

9           THE COURT:  Well he can testify as to when he had

10  the conversations, but don't say anything else, Mr. Lederman.

11          THE WITNESS:  Sure.  Yeah, I don't recall the

12  exact timing of those conversations.

13  BY MR. HOLIFIELD:

14  Q    Wasn't there approximately 27 million or more in assets

15  at that time in the trust?

16  A    Correct.

17  Q    And that would have covered a substantial portion of

18  the distribution at that time?

19  A    Yes.  I believe that the assets available under the

20  non-qualified plans that you referred to is closer to 22

21  million if I'm not mistaken.

22  Q    You're correct.  I was including -- my bad, I was

23  including the deferred (indiscernible).  I think those are --

24  just to make the record clear I think those are what is

25

1  reflected as of October of 2020 in your bankruptcy filing.

2  Would it have been more back in March of 2020?

3  A     Not that I would be aware of, no.

4  Q     Have you had a chance to review any of the financial

5  statements to give your testimony here today?

6  A     I'm sorry, could you repeat the question?  I could not

7  hear you.

8  Q     Have you reviewed any financial statements to make your

9  testimony?

10  A     Yes.

11  Q     What did you review?

12  A     I reviewed the list of pension assets that we had,

13  which was a summary produced internally, for the plan.  So,

14  how many assets were available under each of the two plans

15  that you referred to as well as the liabilities.  I also

16  reviewed the statement of accounts payable.  That was

17  referenced in my proffer.  I reviewed an email related to the

18  amount of lease obligations that were outstanding.  That was

19  discussed in my proffer as well.

20  Q     Did you review any statements of financial affairs?

21  A     Are you referring to the SOFA's?

22  Q     Yes.

23  A     Yes.

24  Q     Did you review any schedules of assets and liabilities?

25  A     Yes.

1  Q    Did you review any monthly operating reports in
2  particular around March 1st, 2020?
3  A    I do not believe we had any monthly operating reports
4  around -- no is the answer to your question, sorry.
5  Q    Did you review the document request that was sent by me
6  to counsel of what we asked for?
7  A    No.  I don't believe so.
8  Q    Did you have any involvement in gathering those
9  documents in response to our request?
10 A    I may have directed questions surrounding those
11 requests to the people who could best provide that
12 information.
13       MR. ANDRESS:  Your Honor, this is, again,
14 attorney/client privilege.  So, we object to this line of
15 questioning.
16       THE COURT:  Overruled.  To the extent he directed
17 people to look for documents I don't think that is
18 privileged.
19 BY MR. HOLIFIELD:
20 Q    Do you remember asking any individuals to provide, and
21 we'll take this one at a time, monthly operating reports to
22 respond to groups' discovery requests?
23 A    I am not aware of that request, no.
24 Q    Are you aware of asking anybody to produce statements
25 of financial affairs to the ad hoc committee group?

1  A     I do not believe so, no.  Again, I don't believe I saw

2  any request come directly to me related to the -- I think

3  that it may have -- like items have been requested generally,

4  but I don't know that I saw the actual requests that you are

5  referring to.

6  Q     Did you -- were you asked to provide any schedules of

7  assets or liabilities or direct anyone to respond to any

8  discovery requests?

9  A     We were asked, as the debtor, to prepare SOFA's and

10 schedules which we did.  I believe those were filed with the

11 court, but I don't know if that was responsive specifically

12 to your request.

13 Q     I am reading from a list of documents we didn't get.

14 That is why I am asking you that.

15 A     Yeah.  They may not have been filed yet.  I said --

16 what I referred to in the SOFA's and schedules that we had

17 prepared them, but, again, the "we" was on my side that we

18 were, obviously, working with our professionals.

19 Q     And so are you familiar with the terms of the

20 retirement trust?  I will get more specific, the 1992 trust

21 for the MRP and the ESPP plan?

22 A     Generally speaking I am aware of the plans and the

23 trust documents, but I haven't read them in detail or at

24 least not recently.

25

1  Q    Is it your understanding that at the time of

2  distribution under that plan that the participants have a

3  vested preferred claim interest in the assets of the plan?

4           MR. ANDRESS:  Objection, Your Honor; legal

5  conclusion.

6           THE COURT:  Sustained.

7           MR. HOLIFIELD:  Your Honor, I --

8  BY MR. HOLIFIELD:

9  Q    Is it your understanding that the plan -- the trust

10 that you said you read, you have a general understanding of,

11 that it provides that at the time of (indiscernible) the

12 participants had legal interest in the plan?

13          MR. ANDRESS:  Your Honor, same objection.  This

14 witness's understanding of a legal document is not helpful to

15 the court.  This is, again, just another way of asking for a

16 legal conclusion.

17          THE COURT:  Sustained.  It's not really helpful,

18 Mr. Holifield, to ask him to interpret legal documents.  That

19 is what the lawyers do.

20          MR. HOLIFIELD:  Your Honor, I was just trying to

21 get his understanding.

22          THE COURT:  His understanding is irrelevant.

23 BY MR. HOLIFIELD:

24

25

1  Q    Did RTI or Ruby's notify Regions Bank -- let me ask
2  you, is the first time that Regions Bank was notified by RTI
3  that it was insolvent was September 2nd, 2020?
4  A    I believe on or around that date we had reached out to
5  them specifically about the insolvency and we had produced a
6  letter that we sent to them as well.
7  Q    And at no time prior to that date did you do that?
8  A    Did I do what?  I'm sorry.
9  Q    At no time prior to that did you ever notify the
10 trustee that you were insolvent.  Is that true?
11 A    I do not believe so, not formally.
12 Q    Do you know what assets were being held by Regions
13 Bank?
14 A    I believe they were (indiscernible) policies or life
15 insurance policies that were being held by Regions in that
16 Rabbi Trust.
17 Q    Do you know who owned the policies?
18 A    No.
19 Q    Do you know who the beneficiary of the policies were?
20 A    I believe there were names on the policies, but I'm not
21 clear on the ownership of the policies.
22
23 Q    Were the names of participants?
24 A    I don't recall.
25 Q    Do you recall an August 1st letter being sent out to

1  participants?

2  A    I don't recall an August 1st letter being sent.  Is

3  that from us you're requesting or from somewhere else?

4  Q    It was a letter, and Zoom makes this very hard, that's

5  stipulated to.  It's in the filings attached to, I believe,

6  your pleading attached to the declaration of Russ Mothershed,

7  but it's a letter from Ruby Tuesday dated August 1st, 2020

8  saying,

9        "Dear plan participants…"

10       And it's signed by Ruby Tuesday's human resource

11  department.  Are you familiar with this letter?

12  A    Yes.  I would have reviewed that letter I'm sure, yes.

13  I would have to look at it again specifically to refresh my

14  memory, but that sounds right.

15  Q    Well what is your understanding in that letter of

16  stating on August 1st, 2020 that Ruby Tuesday, I'm reading

17  from the letter, intends to resume benefit payments as soon

18  as practicable once the company's financial help is no longer

19  at issue?

20  A    Can you rephrase that question?  I'm sorry.

21  Q    What was your understanding about the conversations

22  that occur that generated this sentence in foreign

23  participants that Ruby Tuesday's intends to resume benefit

24  payments as soon as practicable once the company's financial

25  health is no longer at issue?

1    A    Sure.  I think that the comment was made in the context

2    of that we would be unable to continue making payments at

3    this time.

4    Q    So it's fair to say that RTI was not considering itself

5    or considering itself insolvent at that time?

6              MR. ANDRESS:  Objection; legal conclusion.

7              THE COURT:  Overruled.

8              THE WITNESS:  I think the same situation would

9    apply.  The balances of the overdue AP that were offered in

10   my proffer had clearly been accumulating for weeks and

11   months.  So, I don't think that we would have been in any

12   better shape in September, you know, to have made those

13   payments then we would have necessarily at a later time in

14   October or today.

15   BY MR. HOLIFIELD:

16   Q    Does RTI make the payments under the terms of these

17   plans?

18   A    I believe that the payments have made historically from

19   either the assets of the trust or the company.

20   Q    And who would make them if the payments came from the

21   trust?

22   A    Say that again?  I'm sorry.

23   Q    Who would have made the payment for the MRP and the

24   ESPP plans if it came from the trust?

25   A    I wouldn't know the specific individuals that made the

1  payments.

2  Q    Would Regions make those payments as the trustee?

3  A    Again, I don't know.  To the extent that the payments

4  were made from the trust, perhaps, yes.  I just don't the

5  sequence of events and how that works.

6  Q    Did you have any communications or conversations with

7  Regions about the terms of the trust?

8  A    I believe I may have emailed them about the

9  communications that we discussed, that you had asked me

10  about. I don't recall that we specifically asked about any

11  terms of the trust though.

12  Q    Did Regions ever discuss -- I'm reading from their

13  complete, did they ever discuss this issue with you?

14  A    Sure.

15  Q    It is not clear whether the trustee's primary

16  obligation of the trust agreement runs in favor of the

17  grantor of the trust RPI, as plan sponsor to help meet the

18  obligations to all general creditors, or whether the primary

19  obligation of the trustees to pay participants were in pay

20  status.  Do you recall any recollections about that

21  provision?

22  A    No.

23          MR. ANDRESS:  Your Honor, this witness can't

24  testify to Regions mental impressions.  Objection.

25          THE COURT:  Well to the extent Regions may have

1  communicated that to him he can answer the question.

2         THE WITNESS:  Sorry.  Can you restate the

3  question?

4  BY MR. HOLIFIELD:

5  Q    I'm reading from Paragraph 124 of the interpleader.

6  I'm asking did Regions ever discuss this issue with you?

7  A    With me?

8  Q    Yes.

9  A    Not to my recollection, no.

10 Q    Do you know if they had that conversation with anybody

11 at RTI?

12 A    Yeah, I don't know.  It doesn't sound like a familiar

13 topic to me.  They may have, but I think it would have been

14 through -- again, I don't know the ins and outs, but with

15 counsel.  I don't know what I should or shouldn't say around

16 that piece of what is privileged.  And, obviously, I don't

17 want to violate that, but I want to be responsive.

18 Q    And just to clarify, part of your testimony earlier

19 that was part of your proffered testimony --

20 A    Yes.

21 Q    -- was based on the statement of financial affairs and

22 the schedules of assets and liabilities of RTI.  Is that

23 correct?

24 A    Again, I'm having a little bit of a hard time hearing

25 you. I apologize.

1  Q      Sorry.  Does this help a little bit?

2  A      Yes.  Thank you.

3  Q      Your proffered testimony that you offered is that based

4  on the statement of financial affairs and schedules of assets

5  and liabilities that you -- your proffered testimony was it

6  based on those documents?

7  A      No.  It was based on the information that I referenced

8  earlier that I reviewed in preparation for that.

9  Q      But I thought I recall you were stating that you

10  referenced those documents, that you reviewed those?

11  A      I reviewed them in preparation because I know they're

12  required for the court and for this proceeding -- let me

13  clear, for the bankruptcy court.  So knowing that they had to

14  be filed, obviously, records of the debtors I want to make

15  sure I review them before they go out.  So, I have to spend

16  time reviewing and help prepare those.

17  Q      But they weren't the --

18  A      I have not -- my testimony were the documents that I

19  referred to before.

20  Q      And what -- do you have any documents in front of you?

21  A      I do not have those documents in front of me.

22  Q      Just so I'm clear, I'm sorry I must be confused.  What

23  documents did you rely on as part of your proffered

24  testimony?

25  A      So, I reviewed the accounts payable schedule that I

1  referred to in my proffer.  I reviewed balance sheets of the

2  company to see cash positions and the change of cash over the

3  times that were referenced in my proffer.  I also reviewed

4  pension schedules that I referred to as well that had the

5  assets and the liabilities on them.  Those were prepared for

6  like internal purposes from our accounting group.  That is

7  what I went back to look at.  And I reviewed the email that I

8  referred to that discussed the obligations due to landlords

9  for closed locations.

10  Q    You said balance sheet.  Is that another word for

11  schedules of assets and liabilities?

12  A    No.  I'm referring to the balance sheet that we used --

13  well, it would contain a schedule of assets and liabilities,

14  yes.

15         MR. HOLIFIELD:  Okay.  Your Honor, to the extent

16  that any testimony Mr. Lederman faced today on schedules of

17  assets and liabilities or statements of financial affairs we

18  would just objection because those documents were not

19  produced to us.

20         THE COURT:  I think he testified that he did not

21  rely on the SOFA's or the schedule of assets and liabilities.

22         MR. HOLIFIELD:  I thought -- my bad, Your Honor,

23  but I thought he just said he relied on the schedules of

24  assets and liabilities on the balance sheet.

25         THE COURT:  No.  I think he said the balance sheet

1  would contain the list of assets and liabilities.

2  BY MR. HOLIFIELD:

3  Q     Would the balance sheet contain anything else besides

4  the schedule of assets and liabilities?

5  A     So the balance sheet I referred to is the financial

6  statements that the company prepares for both internal as

7  well as external stakeholders such as lender communications.

8  So those were the schedules that I reviewed in preparation of

9  the proffer and today.  I was not referring to the SOFA's and

10 the schedules.

11 Q     Thanks for clarifying.

12 A     Yeah.  Again, the SOFA's and schedules haven't been

13 filed yet. I believe we're still reviewing drafts, but you

14 had asked if I had reviewed them.

15 Q     Now if I heard -- if I understood your testimony you

16 said you became employed with RTI in June of 2019?

17 A     I was -- I became the CEO of Ruby Tuesday in June of

18 2019.

19 Q     Were you employed with NRD prior to that?

20 A     Yeah.  So, I am employed by NRD and I work for Ruby

21 Tuesday, and I work for Ruby Tuesday under a succumbent

22 agreement.  My full-time role as been as the CEO of Ruby

23 Tuesday since June of 2019.

24 Q     In December of 2017?

25 A     In December of 2017 I was added to the board of

1   directors when we acquired the company, when NRD acquired the

2   company.

3   Q    And that transaction, NRD purchased RTI and brought it

4   off from a publicly traded company to a privately held

5   company by NRD.  Is that correct?

6   A    Yes.

7   Q    The draft SOFA's that you reviewed did you rely on any

8   of those based on your testimony today?

9   A    I did not rely on them for my testimony today, no.

10  Q    Are you aware that payments under the MRP and ESPP

11  plans continued after March 1st, 2020?

12  A    I am not aware or unaware of that.  They may have.  I

13  didn't go back to look.

14          MR. HOLIFIELD:  Your Honor, I have no further

15  questions at this time.

16          THE COURT:  Thank you, Mr. Holifield.

17          Anybody else wish to cross-examine?

18          MS. SPEIGHT:  Your Honor, this is Summer Speight.

19  I would like to ask a few questions please.  Summer Speight

20  from McGuireWoods.

21          THE COURT:  Go ahead.

22                      CROSS EXAMINATION

23  BY MS. SPEIGHT:

24  Q    Mr. Lederman, can you hear me?

25  A    Yes.

1  Q    All right.  Thank you.

2       I just want to clarify a few things to make sure I

3  understood your testimony correctly and the proffer

4  correctly.

5       I understand that the ESPP was terminated by board

6  resolutions effective March 1st, 2019.  Is that correct?

7  A    I believe that is correct.

8  Q    And that is true as well for the MRP.  It was

9  terminated by board resolution March 1st, 2019?

10 A    Again, yes, I believe that is correct as well.

11 Q    Okay.  Have you reviewed that board resolution?

12 A    I may have.  I don't recall.

13 Q    What is your understanding of -- well, let me ask you

14 this.  Was the ESPP amended, to your knowledge, in connection

15 with that termination?

16 A    I am not aware of any amendments made in connection

17 with that.

18 Q    And what about the MRP, are you aware of any amendment

19 made to the MRP in connection with the plan termination?

20 A    I am not aware of any amendments made there either.

21 Q    And is it your understanding that RTI intended to

22 terminate the plans and make final lump sum distributions as

23 allowed under 409(a)?

24           MR. ANDRESS:  Objection; legal conclusion.

25           THE COURT:  Sustained.

1  BY MS. SPEIGHT:

2  Q     In connection with this plan termination do you know if

3  payments were to continue in an annuity format or in a lump

4  sum format?

5  A     I am not aware of a conversation around that.

6  Q     I believe you testified earlier that you are employed

7  by NRD.  Is that correct?

8  A     Correct.  Yes.

9  Q     When NRD acquired RTI, a publicly traded company, are

10 you aware of whether the shareholders, the voting stock

11 holders had to vote in order to allow that acquisition to

12 happen?

13 A     Yes.

14        MR. ANDRESS:  Objection; relevance and legal

15 conclusion.

16        THE COURT:  I think he's already answered the

17 question.  I am wondering what the relevance of that question

18 is, but go ahead.

19        MS. SPEIGHT:  That is relevant under the terms of

20 the trust agreement as to whether a change in control

21 happened, Your Honor.

22 BY MS. SPEIGHT:

23 Q     I believe you said yes, a vote had to happen by the

24 shareholders of RTI?

25 A     Yes, I did say that.

1     MR. ANDRESS:  Same objection.

2  BY MS. SPEIGHT:

3  Q     After NRD acquired RTI do you have any knowledge of

4  whether Regions, the trustee, was put on knowledge of that

5  acquisition?

6  A     It was a public record, but I am not aware of whether

7  they were or they were not.

8  Q     Okay.  And within thirty days of that acquisition are

9  you aware of any efforts by RTI to fund the trust fund to 100

10  percent of the (indiscernible) value of unpaid benefits?

11  A     No.

12  Q     And in a year after NRD's acquisition of RTI were you

13  aware of any efforts by RTI to fund the trust fund 100

14  percent at the end of each calendar year?

15  A     No.

16  Q     Are you -- I believe you said that you are familiar

17  with the trust agreement which is Exhibit D, I believe.

18  A     Generally.

19  Q     Do you have this exhibit in front of you?

20  A     I do not.

21  Q     Are you aware of any requirement in the trust agreement

22  to notify the trust of a change in control?

23     MR. ANDRESS:  Objection, Your Honor; legal

24  conclusion.

25     THE COURT:  Overruled.  You can answer that one.

1  She's only asking if he's aware.

2  　　　　　THE WITNESS:  I am not aware of that.

3  BY MS. SPEIGHT:

4  Q    All right.  Would you agree with me that had the fund -

5  - had RTI funded the trust fund 100 percent of the value of

6  unpaid benefits after the change in control and then taken

7  steps to do so at the end of each calendar year that as of

8  March 1st, 2019 when RTI terminated the plan there would have

9  been enough money or value in the trust fund to pay out all

10  the unpaid benefits to the participants.

11  A    Yeah.  I couldn't speculate to that whether it would or

12  wouldn't be the case.

13  Q    Okay.  If the trust fund was 100 percent funded, had

14  100 percent of the actuarial value equivalent of unpaid

15  benefits as of March 1st, 2019 when the plan was terminated

16  would you agree that there is enough value in the trust fund

17  to pay the participants for their unpaid claims?

18  　　　　　MR. ANDRESS:  Objection, Your Honor.

19  　　　　　THE COURT:  I'm sorry, what was the objection?

20  　　　　　MR. ANDRESS:  Your Honor, I'm sorry.  This is

21  Keith Andress.  We object to speculation and improper

22  hypothetical of this witness.  Further, the relevance as to

23  whether the plan had sufficient assets to pay the

24  participants versus the unsecured creditors.  It's an

25  inaccurate question.

1          THE COURT:  Overruled.

2          THE WITNESS:  Can you ask the question again?

3          MS. SPEIGHT:  Yes.

4   BY MS. SPEIGHT:

5   Q    If, as of March 1st, 2019, when the plan was terminated

6   RTI had funded the trust fund 100 percent of the value of

7   actuarially -- I'm sorry, the actuarial value equivalent of

8   unpaid benefits would you agree that the fund would contain

9   enough to pay out the participants unpaid benefits?

10  A    Again, I don't have -- I mentioned I had a general

11  knowledge of the plans and how they work.  So, I wouldn't be

12  able to answer that question as to how that would work.

13  Q    Okay.  I take it you have the same answer for, again,

14  had the trust been 100 percent funded by RTI as of March 1st,

15  2020 would the fund have enough money to pay-out the unpaid

16  benefits for the participants?

17  A    Yeah.  I am unclear of how that would work.

18  Q    Okay.  I understand that you -- I think you said you

19  were (indiscernible) June 2019?

20  A    Correct.

21  Q    What was your position prior to that? I know you were

22  with NRD, but I am not sure you said your position.

23  A    Well my position was I was a principal at NRD.  I was -

24  - to be clear, I was also on the board of Ruby Tuesday at

25  that time.

1  Q    Okay.  Did you take part at the board resolution to
2  terminate the plan in March of 2019?
3  A    I don't recall.  Do you remember which board you're
4  referring to?
5  Q    I think it's the board of directors.  I can pull up the
6  exact language used in RTI's pleading.  It says the RTI board
7  of directors terminated -- yeah, this is Paragraph 10 of the
8  debtors' pleading.  The ESPP and the MRP were terminated
9  effective March 1st, 2019 by resolution of RTI's board of
10 directors.
11 A    I don't recall.  It's been a while.  So, I don't recall
12 exactly what we reviewed there.  If that was a consent signed
13 by Ruby Tuesday's board of directors then I would have
14 reviewed it at that time.
15 Q    Okay.  So, you were on Ruby Tuesday's board of
16 directors as of March 1st, 2019?
17 A    Correct.
18 Q    Okay.  Why did Ruby Tuesday's decide to terminate the
19 plan on March 1st, 2019?
20 A    I believe the decision to terminate was to understand
21 if there was a path to resolution of the pension obligations.
22 Q    What do you mean by that, a path for resolution?
23 A    My understanding was it was the first step to allow us
24 to proceed in that direction that if we were to work with the
25 pension on some resolution that we would have had, the

1  company would have had to terminate the plan first.

2  Q    And when you're -- I mean, you're using pension

3  obligations you're talking about the obligations under the

4  ESPP and MRP?

5  A    Yes.

6  Q    Okay.  At that time when you all terminated were you

7  having issues making payments?

8  A    I don't recall.  Again, I was the CEO in June so I

9  didn't have the same level of detail in March of 2019.

10  Q    Okay.  The debtors' filing in this case that's the same

11  paragraph, Paragraph 10, I think Docket 138, it says final

12  distributions were anticipated to be made to the ESPP and MRP

13  participants after March 1st, 2020 and before March 2rd, 2021

14  subject to, and I will paraphrase, 409(a) regulations.

15      When that pleading uses the term final distribution is

16  that lump sum distribution?

17  A    Again, I don't know.

18  Q    Okay.  So when this came up for a board vote want is

19  your understanding of what you were voting on?

20  A    We would have been voting on the termination of those

21  pension plans, the ESPP and the MRP that you described.

22  Q    And you are not aware of -- you don't recall when you

23  were voting on changing the payment structure from like an

24  annuity payment to a lump sum payment?

25  A    I don't recall I that was the intention of that.

1  Q    And if the point was to figure out if there is a path

2  to resolution for these pension obligations would the board

3  have voted to make the payment due in the next two years, all

4  payments in a lump sum due in the next two years?

5  A    Again, I don't know what the board would have decided

6  at that time had the presentation been made the board would

7  have evaluated the facts and circumstances and worked with

8  managment to understand the best course of action.

9  Q    Do you recall, and again I know this was back March

10  1st, 2019, what you reviewed before signing the resolution?

11  A    No, I do not.

12         MS. SPEIGHT:  Thank you.  I have no further

13  questions, Your Honor.

14         THE COURT:  Thank you.  Anyone else wish to cross?

15     (No verbal response)

16         THE COURT:  Redirect?

17         MR. ANDRESS:  No, Your Honor.

18         THE COURT:  Okay.  Thank you, Mr. Lederman.  You

19  are excused.

20         THE WITNESS:  Thank you.

21         THE COURT:  You can remain on the call if you

22  would like.

23         THE WITNESS:  Okay.  Thank you.

24     (Witness excused)

25         THE COURT:  Does the debtor have any further

1  evidence?

2           MR. PACHULSKI:  No, Your Honor.  We're prepared to

3  proceed on the argument.  We do not have any other witnesses.

4           THE COURT:  All right.  Do the objectors have any

5  witnesses or evidence?

6           MR. HOLIFIELD:  Yes, Your Honor.  We have Russ

7  Mothershed.  We will submit the declaration on behalf of the

8  ad hoc committee.

9           THE COURT:  Okay.  Are you moving in his

10 declaration?

11          MR. HOLIFIELD:  Yes, Your Honor.

12          THE COURT:  Is there any objection?

13          MR. PACHULSKI:  Your Honor, this is Richard

14 Pachulski of Pachulski Stang Ziehl & Jones.

15          Mr. Andress is going to take the lead on this, but

16 my understanding is he does have an objection.

17          THE COURT:  Okay.  Mr. Andress?

18          MR. ANDRESS:  Your Honor, we object to the

19 relevance of Mr. Mothershed's affidavit.  This does not

20 change any of the facts under the law stated in Washington

21 Mutual as to whether the trust assets can be used by the

22 general creditors for insolvency purposes.

23          THE COURT:  I'm going to overrule it.  I will

24 allow Mr. Mothershed's declaration into evidence.

25          (Declaration of Russell Mothershed, received into

1  evidence)

2              THE COURT:  Do you wish to cross-examine?

3              MR. ANDRESS:  No, Your Honor.

4              THE COURT:  Okay.  Declaration is in evidence.

5        Mr. Holifield, anything else?

6              MR. HOLIFIELD:  No, Your Honor.

7              THE COURT:  All right. We're ready to begin with

8  argument.  Let me hear from debtor's counsel.

9              MR. PACHULSKI:  Thank you, Your Honor.

10       I do have one very quick question in beginning my

11 arguments, Your Honor.  I was going to raise it, but, again,

12 I decided to leave the argument.  Compass did not file

13 anything until yesterday at 4:30.  They have added some

14 arguments and if Your Honor believes that I should respond to

15 those I will, if Your Honor believes, as I do, that it was

16 very late then I am not going to, but I do want to start

17 with, at least, understanding what the rules are so that I

18 can deal with it appropriately.

19             THE COURT:  Well let me ask what standing does

20 Compass have.  I don't understand what their position is vis-

21 à-vis the plan participants or the plan.  Let me hear from

22 them just to what standing they claim to have.

23             MS. SPEIGHT:  Yes, Your Honor.  This is Summer

24 Speight, McGuireWoods, for Compass.

25             Compass acquired a predecessor company that was

1  spun-off from Morrison which acquired RTI and became RTI.

2  And as part of that, that was back in -- the spinoff was back

3  in 1996.  As part of that spinoff there was an employee

4  matters agreement that agreed how these top-hat plans that

5  RTI had would continue in how liabilities would be shared and

6  distributed.

7         All of the companies that were spun-off created

8  mirror top-hat plans and there was an agreement that the

9  three separate companies would assume liabilities for the

10 employees that went onto their payroll pre-spinoff -- I'm

11 sorry, post spinoff.

12        There is a section of the agreement, though, that

13 says that in the event of an insolvency of one of the parties

14 under various terms or conditions are met then the other

15 party spun-off would have liability for pre-spinoff accrued

16 benefits.  The accrued 1996 benefits.  So, Compass is here to

17 protect its interests in the event that participants come

18 after Compass for pre-1996 accrued benefits.

19        THE COURT:  All right.

20        MS. SPEIGHT:  I don't know if Your Honor is ready

21 for me to move onto respond to the filing that was yesterday

22 or not.

23        THE COURT:  Yes.  Why so late?

24        MS. SPEIGHT:  We -- Compass (indiscernible) motion

25 and, you know, once we became aware of the motion we were

1  trying to figure out how best to proceed whether initiate our

2  own adversary proceeding or join in the objection.  We

3  decided to join in the objection to make sure we were heard

4  today and Compass's interests are protected.

5          We -- again, I am not sure what new arguments the

6  debtors think we made.  I think we emphasized some things

7  that the participants had already argued and we joined in

8  that objection and then emphasized some of the arguments that

9  they had made.  Again, I don't think we added anything new.

10  The debtors were aware of that objection at the time the

11  participants filed their objection.

12          THE COURT:  When did you become aware of the

13  motion?

14          MS. SPEIGHT:  I am not positive because -- I

15  believe someone else at my firm was aware of it before I was,

16  but I think I think it was late October.  I would have to get

17  more information for you about when my firm became aware of

18  it versus me.

19          THE COURT:  Late October was a while ago and did

20  you notify the debtors at all that you intended to make an

21  objection?

22          MS. SPEIGHT:  No, I did not.

23          THE COURT:  All right.  Mr. Vaughn, I see you

24  raised your hand.  Do you have something to add?

25          MR. VAUGHN:  Yes.  Just to confirm what Ms.

1    Speight said that, yes, it was late October when we became

2    aware of the motion.  Nothing further to add, Your Honor.

3              THE COURT:  All right.  Mr. Pachulski, you said

4    you are prepared to answer the argument that they have

5    raised.  I am concerned about the fact that they waited so

6    long without even notifying the debtor that they intended to

7    take some action, whether it was file an adversary or object

8    to the motion, but why don't we go ahead and hear the

9    argument and then I will make a determination after that

10   whether or not I think the debtors were prejudiced in any

11   way.

12             MR. PACHULSKI:  That will be fine, Your Honor.

13   Again, I'm not even sure that they have standing if they're

14   worried about a future lawsuit.  They don't get anything out

15   of this plan, but Your Honor will make the determination.  I

16   wanted to raise it.  I apologize.  I should have raised it

17   before, but I am not trying to take people's rights away

18   except now hearing that they're a potential defendant,

19   depending on your ruling, leads me to believe I should have

20   done it earlier.  I will live with it and, obviously, Your

21   Honor will make the ultimate determination.

22             THE COURT:  Okay.

23             MR. PACHULSKI:  So I will begin, Your Honor, and I

24   do very much thank Your Honor for giving me that opportunity.

25             People have been using certain acronyms which I

1   will also be doing.  The executive supplemental pension plan

2   I will be using the acronym ESPP.  For the management

3   retirement plan I will use MRP as others have.  And with

4   respect to the defined contribution deferred compensation

5   plan I will use DCP.

6           Your Honor, I want to first explain how I intend

7   to proceed.  In terms of the order that I will proceed in

8   making my presentation.

9           First, I will state what it is that we're

10  requesting from the court.  Second, what I believe to be the

11  undisputed facts.  Third, state what the participants'

12  objections are to the motion.  Fourth, the debtors' response

13  --

14      (Phone interference)

15          THE COURT:  Someone is speaking who is not muted.

16  Please mute your phone is you are not speaking.

17          Sorry, Mr. Pachulski, go ahead.

18          MR. PACHULSKI:  No problem.  Thank you so much,

19  Your Honor.

20          In terms of the request, Your Honor, there are

21  three items that we are requesting on behalf of the debtor.

22  One is to authorize the exercise over the debtors' ownership

23  rights of the property in the trust.  Second, to have the

24  trustees liquidate and transfer RTI's assets from the trust.

25  We believe that that can be done in three to seven days based

1  on the type of assets and the trustee.  Third, to authorize

2  termination of the trust and authorize discharge of Wells

3  Fargo's and Regions Bank's obligations to their respective

4  trust.

5          Next, Your Honor, I'd like to spend a moment on

6  what are the undisputed facts.  I don't think anyone disputes

7  that the ESPP, the MRP and the DCP are unfunded plans that

8  are not required to meet most of the ERISA and IRC provisions

9  that are imposed on qualified plans.  These plans are

10  typically provided to the most senior executives as was the

11  case with respect to Ruby Tuesday.

12          Second, while not required, there were separate

13  Rabbi Trusts created for the ESPP and MRP plans with respect

14  to the trust that has Regions Bank as trustee and the DCP

15  which has a Rabbi Trust maintained by Wells Fargo

16  institutional retirement trust.

17          Third, undisputed fact both Regions Bank and Wells

18  Fargo have no objection to the motion, but rather simply want

19  a court of competent jurisdiction, in this case Your Honor's

20  court, to provide them direction as to what to do wiht the

21  assets contained in the respective trusts.

22          In fact, Your Honor, Section 8(a) of the Rabbi

23  Trust related to the ESPP and the MRP has similar language to

24  Section (xi)(a) of the DCP trust agreement which in both

25  cases state the fund assets shall be treated as general

1  assets of the plan sponsor and shall remain subject to claims

2  of the general creditors of the plan sponsor under applicable

3  state and federal law.  Nothing in the trust agreement shall

4  effect the rights of any participant as general creditor of

5  the plan sponsor.

6        Both trusts go onto state in the event the plan

7  sponsor becomes insolvent each participant shall be

8  (indiscernible) to waive any priority the participant may

9  have under law as an employee with respect to any claim

10 against the plan sponsor and the trust beyond the right the

11 participant would have as a general creditor of the plan

12 sponsor.

13       Next undisputed fact the ESPP and the MRP Rabbi

14 related trusts and the DCP Rabbi related trust also have

15 similar language in Paragraph 8(c) of the ESPP MRP Rabbi

16 Trust and Section (xi)(c) of the DCP Trust which provide

17 insolvency shall mean the inability of the plan sponsor to

18 pay its debts as they become due in the usual course of its

19 business or that the liabilities of the plan sponsor are in

20 excess of its assets.

21       Also, as reflected, Your Honor, in Section 1 of

22 the ESPP the plan shall remain maintained on an unfunded

23 basis.  The plan provides each plan sponsor to pay their

24 respective benefits and administrative costs from its general

25 assets.  The establishment of the plan shall not convey rates

1   to participants or any other person which are greater than

2   those of the general creditors of the plan sponsor.  All of

3   that important to demonstrate that it's unfunded and that the

4   general creditors of the plan sponsor are effectively pari

5   passu with any of the creditors, any of the participant

6   creditors.

7            The participants, the ad hoc participants raised

8   several objections or four in particular, Your Honor.

9            One, and I believe Your Honor has ruled on this,

10  unless Your Honor would like me to address it, was that the

11  funds in the Rabbi Trust or the request for the funds can

12  only be done through an adversary proceeding and not by

13  motion.  At this point, unless Your Honor asks me to, I will

14  assume that that issue has been resolved.

15           THE COURT:  Yes.  I've already ruled on that

16  issue.

17           MR. PACHULSKI:  Thank you so much, Your Honor.

18           The second issue is an argument that the rabbi

19  trust assets are excluded from Ruby Tuesday's are bankruptcy

20  estates under Section 541(b)(7)(a) and (b) of the Bankruptcy

21  Code.

22           The third issue is the plan trustee's hold the

23  asset in a constructive trust for the benefit of plan

24  participants and are, therefore, not property of the estate.

25           And, fourth, the plan participants are entitled

1  for covered benefits due them under the plans under ERISA

2  Section 502(a)(1)(b).

3       Now, that is what I was prepared to move forward

4  with yesterday.  The issue that Compass has raised is

5  language in 8(a), which you also have to look at 8(a) of the

6  trust, relating to what might happen, and it's very unclear

7  from the language, in the event there is to be -- and I'll

8  read it directly in a few moments -- a distribution from the

9  trust and how that could affect the potential rights of the

10  participants, and that'll be the if fifth issue that I'll

11  address.

12       So, I will immediately skip over, Your Honor, the

13  issue that I prepared for, with respect to the motion, and go

14  straight to the fact that the rabbi trust assets are not

15  excluded from the RTI are bankruptcy estate under

16  Section 541(b)(7)(a) and (b).  Now, frankly, Your Honor,

17  541(7)(a) and (b) both provide that there's an exclusion in

18  terms of property of the estate for amounts withheld by the

19  employee, from the wages of employees for payment as

20  contributions to an employee benefit plan that is subject to

21  Title 1 of Employment Retirement Income Security Act of 1974.

22       In the present case, the trust assets are general

23  assets of the company and are not generated from the wages of

24  employees for payment of contributions to an employee benefit

25  plan.  As I stated previously, Your Honor, the plans are all

1   unfunded and any payments come from the company's general

2   assets; in contrast, a funded plan are from assets segregated

3   from the general assets of the employer so that the assets

4   are not available to general creditors in the employer

5   becomes insolvent.

6           With respect to 541(b)(7), Your Honor, the

7   participants do not cite a single case in their favor and,

8   frankly, concede that every case that has come out relating

9   to 541(b)(7) are against them in relation to the rabbi trust

10  issue.  For example, Your Honor, Lehman Brothers rightly

11  states -- this is quoting from the decision -- that:

12          "If Section 541(b)(7) did, in fact, remove the

13  contributions to unfunded top hat plans from the reach of

14  creditors, it would effectively down the tax-exempt status of

15  such contributions of setting the function and tax structure

16  of top hat plans.  The purpose of top hat plans -- income tax

17  deferral -- depends on the deferred compensation remaining

18  subject to the claims of unsecured creditors.  Nothing in the

19  language of the statute or the legislative history of BAPCPA

20  supports the conclusion that Section 541(b)(7) was intended

21  to treat top hat plans in bankruptcy in a manner inconsistent

22  with the requirements of the Internal Revenue Code for

23  deferred taxation, and the Court declines to do so."

24          But very clearly, Your Honor, the 541(b)(7), in no

25  way, supports anything that the ad hoc participants or even

1  Compass could possibly argue in terms of the trust assets not

2  being property of the estates.

3         The next issue that is raised are that the

4  trump -- excuse me -- that the rabbi trust assets are not

5  held in constructive trust for the participants.  That's our

6  position.

7         The position that has been made by the ad hocs, I

8  believe, potentially even Compass, is that the rabbi trust

9  assets are actually held in constructive trust.

10         Now, Your Honor, in reviewing the objection that

11  was made by the ad hocs, and even by Compass, there is no

12  citation that they believe is in their favor, except,

13  arguably, to the rabbi trust at -- relating to the rabbi

14  trust assets relating to the Washington Mutual case decided

15  by Bankruptcy Judge Walrath in this district.  The irony,

16  Your Honor, is the case is in total support of the debtors'

17  position and the participants completely misstate the finds

18  in the Washington Mutual case.

19         Now, Your Honor, citing specifically, the

20  participants state on Page 18 of the objection:

21         "However, the Court finally determined that a

22  constructive trust in that matter must fail because there was

23  no identifiable trust raised separate from the general assets

24  of the debtor and which to oppose a constructive trust."

25         The participants go on to state in their pleading,

1  Your Honor, quote:

2          "Contrary to Washington Mutual, here, there's a

3  distinguishable separate raise that constitutes the trust

4  assets.  The COLI policies are segregated from the general

5  assets of RTI and have been under the custodial care and

6  Regions."

7          Now, Your Honor, the objector's argument about a

8  separate raise is completely misguided.  In Washington

9  Mutual, the plans had rabbi trusts associated with them that

10  was holding $69 million, exactly what we have in our specific

11  case.  The only difference between Washington Mutual and the

12  debtors in this case, instead of the ESPP- and MRP-related

13  trusts holding primarily cash, they hold COLI policies.

14          Now, Your Honor, most importantly, the

15  participants do not cite what I want to read to the Court

16  what the Washington Mutual says, starting on Page 502.  The

17  cite itself is 450 B.R. 490.  What's citing on 502, Your

18  Honor, because this is critical to a lot of what we're

19  talking about today:

20          "The plan participants further contend that the

21  employees in those cases did not request a distribution until

22  after their company became insolvent, while in this case, the

23  plan proponents [sic] made a demand for their funds almost a

24  year before the debtors filed bankruptcy."

25          MacKenzie and Silicon Graphics are cited in the

1 case.

2 The Court concludes that this is irrelevant. The

3 holding of the cases cited by the debtors is that because a

4 top hat plan is unfunded and, consequently, any funds that

5 the debtors may have put aside in the (indiscernible) trust

6 to meet their obligations are owned by the debtor. There can

7 be no funds or other property that, in good conscience,

8 belonged to the plan proponents or -- excuse me -- plan

9 participants for tracing purposes. It is only by the actual

10 payment of the benefits to the plan participants that the

11 funds could be identifiably theirs, which is exactly what we

12 have in this case, Your Honor.

13 In this case, because of the essential requirement

14 that the top hat plans be unfunded, there is no nexus for

15 property identifiably belonging to the plan participants and

16 which a constructive trust can be placed to remedy the

17 refusal of the debtors to pay their benefits, therefore, the

18 Court concludes that the plan participants' claim for

19 constructive trust must fail.

20 Now, Your Honor, to be clear, the Washington

21 Mutual decision's facts, notwithstanding the judge's order,

22 which is on all fours with us, was dramatically worse than

23 anything we could possibly have in this case. In that

24 particular case, Your Honor, and it was clear in residing the

25 tone of the decision that Judge Walrath was not pleased with

1 the facts themselves, but the facts were that there were at

2 least two people who had sought money out of the trust, that

3 they were entitled to.

4 That in Washington Mutual, excuses were made for

5 over a year before the bankruptcy. One of them was, they

6 were evaluating certain Tax Code changes in 2004 -- now we're

7 into 2007. Judge Walrath thought by 2007 they should have

8 figured it out.

9 But what made it worse is that Washington Mutual,

10 not that long before the bankruptcy, had actually amended

11 other plans to allow people to take their money out, but not

12 the two people who actually wanted their money. Judge

13 Walrath said that conduct was, frankly, inequitable against

14 those participants in the Washington Mutual case.

15 So, notwithstanding all of the facts -- and the

16 judge said you can have -- Judge Walrath said you can have a

17 constructive trust in a bankruptcy case, but in that

18 particular case, as is the case with every rabbi trust, the

19 assets are for the general unsecured creditors. They're

20 not -- there isn't the nexus that is required, and that is

21 not stated at all in the pleadings that were filed by the ad

22 hoc group.

23 Now, the next issue, Your Honor --

24 THE COURT: Let me ask you a question,

25 Mr. Pachulski.

1          The Washington Mutual case didn't involve a trust

2    that included COLI life insurance policies.  How does that

3    affect the analysis here?

4          MR. PACHULSKI:  It doesn't at all, Your Honor,

5    because the whole point was that the rabbi -- it doesn't

6    really matter whether it's cash or not; it relates to what is

7    in the trust.  What is in that trust is what is the case.  It

8    doesn't really matter.

9          I mean, you can have a constructive trust over

10   cash, Your Honor, just as you can have a constructive trust

11   over the policies.  So, the asset -- there's no case that

12   says that the asset base makes any difference whatsoever.

13   It's the fact of the inclusion of the assets in the rabbi

14   trust, not the specific assets, Your Honor.

15         THE COURT:  Well, Mr. Lederman was asked on cross-

16   examination who owned the COLI policy.  He couldn't answer

17   that question.  He didn't know.

18         MR. PACHULSKI:  Well, who owns the COLI policy --

19   the COLI policies are in the trust.  I think what was asked

20   was who the beneficiaries might have been, I mean, who you

21   may have had insured.

22         I don't think there was in dispute that the COLI

23   policies are being held by Regions as part of the trust.  It

24   would be no different than if Regions held the cash.  So, I

25   don't think that that would make any difference whatsoever,

1  Your Honor.

2  I have seen no case that says that there would be

3  any difference and whether it be in Washington Mutual or any

4  other case, Your Honor, so I don't think it makes a

5  difference.

6  THE COURT:  Okay.  Thank you.

7  MR. PACHULSKI:  Thank you.

8  The next argument, Your Honor, is the

9  participants' ability to recover benefits due them under the

10  plans under ERISA, Section 502(a)(1)(b).

11  In that respect, Your Honor, 502(a)(1)(b)

12  specifically deal with that there are certain causes of

13  action that participants will have.  We're not disputing that

14  the participants may have a cause of action and an unsecured

15  claim, but it does not create any direct benefit or

16  constructive trust or anything similar and there's no case

17  that says it.  So, ERISA Section 502(a)(1)(b) seems, in this

18  case, to be nothing more than a throw-in.

19  So, I want to now move on to the response to

20  Compass Group's -- though, it was a late filing -- to their

21  issue.  And in doing that, Your Honor, it relates to both,

22  Section 9.3(a) of the supplemental -- the ESPP plan and it

23  also relates, Your Honor, to Section 8(a) of the trust

24  itself.

25  If you take a moment -- I apologize, Your Honor.

1  I'm just taking a moment to get there.

2  (Pause)

3  MR. PACHULSKI: The argument that has been made is

4  even though the claims of creditors in 8(a) is very specific

5  that it for the benefit of general unsecured creditors, there

6  is language which there's no -- and Your Honor would

7  ultimately have to make the determination -- that says:

8  No participants shall have a preferred claim or --

9  and on or any beneficial ownership in the fund prior to the

10  time for distribution, which for instance -- it cited

11  Washington Mutual as, the fact that you actually make the

12  distribution -- to the participant under the terms of a plan

13  or the terms of this trust agreement.

14  Now, the argument that is being made is that

15  because in March of 2019, that there was a determination that

16  a distribution would have to be made, that somehow -- even

17  though this doesn't say you get a preferred claim or a

18  beneficial interest; it says that you can't claim any one

19  until that time -- that by March 1 of 2020, there should have

20  been a distribution.

21  Now, even if you take, if you don't rely on

22  Washington Mutual or that the determination would be that the

23  time for distribution is actually when the distribution is

24  made, what you would then do is go to 9.3(b) of the plan,

25  which has actually been cited by the ad hocs and Compass.

1 And 9.3(b) of the plan is very clear, Your Honor, it says:

2          Notwithstanding the provisions of Section 9.3(a),

3 the company may cause each plan sponsor to pay a lump sum

4 actuarial equivalent value of any retirement benefits due to

5 participants upon a termination, but only if the company

6 determines -- and it's the company that makes the

7 determination, Your Honor -- in this case, Ruby Tuesday --

8 that such payment of retirement benefits will not constitute

9 impermissible acceleration of payments under one of the

10 exceptions provided under Treasury Regulation Section 1.409A,

11 and it goes on -- but it's the 409A that I've recited

12 before -- or any successor guidance.  In such an event,

13 payments shall be made at the earliest day permitted under

14 such guidance.

15          Now, Your Honor, dealing with the guidance, to

16 make a distribution, as under 409A, you must be able to have

17 all of the following five things occur:  first, determination

18 and liquidation does not occur approximate to a downturn in

19 the financial health of the employer -- I will discuss that

20 in a second, Your Honor; second, all related non-qualified

21 deferred compensation plan that required to be aggregated

22 with the plan being terminated and liquidated must also be

23 terminated; third, no payouts may occur within 12 months of

24 the board action to irrevocably terminate the plan, so, under

25 the argument that you could not even terminate it and make

1  the distribution prior to May -- I'm sorry -- March of 2020;

2  fourth, all payments must be made within 24 months, following

3  approval by the Board of the plan termination -- that would,

4  of course, not have happened until March of 2021, which the

5  bankruptcy was filed before then; and the fourth [sic]

6  relates to adoption of a similar type of deferred

7  compensation plan, which really isn't relevant in this case.

8           Now, what do we have?

9           First, it has to be, assuming you meet -- it has

10  to be a termination and liquidation does not occur

11  approximate to a downturn in the financial health of the

12  employer.  If that isn't the case, you can make it in the 12

13  to 24 months, but otherwise, you can't make it.  And as

14  reflected in 9.3(b), the decision is about -- made by the

15  company.  They have to make the decision.

16           So, what evidence do we have, Your Honor, that Mr.

17  Lederman testified to?

18           The cash from March of 2019 to March of 2020 had

19  dropped to $17.63 million.  There had been a drop of, I

20  believe, $23 million.  There was a deficit in the plan to

21  make the distributions of $10 million.  The further testimony

22  is you would be violative of the bank covenants.  The fourth

23  is the business would not have survived.  It was paid out.

24           There's no question, Your Honor, that the

25  distributions could not have taken place in March of 2020.

1  Even if you argue that 9.3(b) says you make it at the

2  earliest possible time, based on the guidance -- and Mr.

3  Lederman very clearly testified that they could not have made

4  that distribution without destroying the company, aside from

5  the problems it had between March of 2019 and March of 2020.

6        What you also had was a pandemic, which is right

7  when the pandemic started.  It would have been violative of

8  409A and it would have been manifestly impermissible.

9        Now, then, the only other issue that has been

10  raised or is raised is the insolvency.  Now, there are the

11  two tests, Your Honor.  One is not able to pay debts as they

12  come due in the usual course of business and the second is

13  the assets liability.

14        In fairness, Your Honor, the debtors came to the

15  conclusion that while there's no question that the debts

16  exceed the assets, the cost of hiring an investment banker

17  and doing the analysis would have been prohibitive.  So, in

18  essence, we are relying on the company was not able to pay

19  its debts as they come due in the usual course of business.

20        What are the facts?

21        The facts, as Mr. Lederman testified to is that

22  15.67 million of the 18.1 million of AP that was in existence

23  as of the time the insolvency notice was given, that that

24  amount was overdue.  Over 80 percent was overdue and of that,

25  over 50 percent or 10.73 million was over 90 days old.

1          Second, the company had been liquidating -- had

2    just been shutting down locations.  And with just the shut-

3    down locations, we're getting the cure amounts for the non-

4    shutdowns.  Mr. Lederman testified that the landlords were

5    owed 18.6 million on account of unpaid lease obligations.

6    They couldn't be paid.

7          There were also, as Mr. Lederman testified,

8    several outstanding lawsuits, including one by one claimant,

9    some prior shareholders who claimed $10 million and

10   approximately -- within a month of that notice going out, you

11   had $5.4 million of cash which couldn't pay a fraction of the

12   liabilities that were on the books without even taking into

13   account the lender debts that weren't being paid, the secured

14   lender.

15         So, Your Honor, what we have demonstrated, we

16   believe, is that the Ruby Tuesday entities were clearly

17   insolvent at the time that the notice was given and that we

18   had rabbi trusts that were set up to protect the tax benefits

19   of the granted nothing more to keep their tax benefits, but

20   an equal treatment of unsecured creditors in the trust in the

21   event of an insolvency.

22         And based on all of that, Your Honor, based on the

23   clarity of the facts, based on the case law, we would ask

24   that the Court grant the relief requested by the debtors.

25         Other than that, Your Honor, if Your Honor has any

1  further questions, I would be happy to answer, but I wanted

2  to at least present the case, as best I could, as to why we

3  should get the benefit, being the company, of the rabbi trust

4  assets immediately.

5          THE COURT:  Thank you, Mr. Pachulski.

6          I don't have any questions at this time.

7          Is there anyone else who wishes to speak in favor

8  of granting the motions?

9          Mr. Schmidt?

10          MR. SCHMIDT:  Thank you, Your Honor.

11          Robert Schmidt, Kramer Levin, on behalf of the

12  committee.  I'm also joined by my partner, Bradley O'Neill.

13  I guess we felt that this case needed another "O'Neill"

14  involved.

15      (Laughter)

16          MR. SCHMIDT:  Your Honor, I'll be very brief.

17          The committee filed the reply in support of the

18  motion, which is at Docket ID 370.  We've heard, and believe

19  the Court is aware, that a resolution of this issue is of

20  critical importance to the case.

21          I won't re-hash the arguments made by Mr.

22  Pachulski, but suffice it to say, the committee agrees that

23  the plans and the trust agreements and the underlying assets

24  are property of the estate and that the trust assets are

25  general assets of the debtors, subject to creditor claims,

1 that the plan participants have no priority claim to those

2 assets, and that the plan participants are general unsecured

3 creditors of these debtors in the event of this bankruptcy

4 and insolvency.

5       Your Honor, the committee is not unsympathetic to

6 the participants, but like any other general unsecured

7 creditor, they have the opportunity to pursue and prosecute

8 claims in these cases.  And, ironically, they may be amongst

9 the committee's larger constituencies going forward if the

10 Court were to grant these motions.

11       Your Honor, we will reserve time in the event we

12 need to respond to anything raised by the ad hoc group.

13 We'll stand-down at this time.

14       THE COURT:  Thank you.

15       Let me hear from the plan participants -- well,

16 let me ask first if anyone else wants to speak in favor of

17 the -- I should have done that.

18    (No verbal response)

19       THE COURT:  Okay.  Let's turn it over to plan

20 participants.

21       MR. HOLIFIELD:  Your Honor, this is Al Holifield,

22 again.

23       As -- we have filed the pleadings.  We would first

24 start off with, we believe they have failed to meet their

25 burden of evidence to adduce what they're asking for in this

1   case.  They've relied on a surprise witness that was produced

2   less than 24 hours earlier to us and they relied on facts in

3   the record that are not -- that we asked for in production

4   and were not given, and on that basis, we would ask you to

5   deny it.  And I can go into the further reasons, legally, why

6   I need to, if you're so inclined.

7        The same abbreviations I will refer to is -- but

8   RTI is seeking to take essentially 27 million in

9   participants' assets.  They're trying to take it by motion

10  and, you know, when the issues have been controverted and

11  without discovery, without due rights, process in this case.

12       But notwithstanding that, here's what we can agree

13  on today -- and I will take issue with some of the positions

14  of RTI about what we do agree on -- but we do agree on a lot.

15  The plan is an (indiscernible) plan.  We do agree that, you

16  know, Regions is the trustee of the 1992 trust, which

17  contained the assets for the MRP and the ESP.  We agree that

18  the trusts contain COLI policies.

19       There's been no evidence in this case who owns

20  those assets, who's the beneficiaries of those assets, or

21  anything else testified to here today.

22       It's interesting that Wells Fargo is not here

23  today; the trustee that holds 5 million has not been heard

24  from today regarding the non-qualified deferred comp plan.

25       We do know that the assets are held in trust and,

1   Your Honor, we do know that the general rule, which has been

2   cited and presumed here, I might say, that rabbi assets are

3   automatically presumed to be the general assets of the

4   creditors in these situations and case law clearly doesn't

5   support that always, and, secondly, the plan document and the

6   trust here do not.  And it's clear that the participants have

7   a legal vested interest in the trust assets as of

8   March 1, 2020.

9          We will begin with Mr. Lederman's testimony today.

10  He testified that he's aware that NRB purchased Ruby's in

11  2017 and took it from a publicly traded company to a

12  privately held company and that there's the change in control

13  provisions, which are in the trust document.  There was a

14  change in control.

15         The sections in the trust document clearly

16  require, at that point in time, to fully fund the trust.

17  It's in Section 5 of the trust, the plan sponsors, the funded

18  provision.

19         The debtor did not do that.  Had they abided by

20  their duties, this plan would be fully funded as of

21  March 1, 2020.  That's what Compass counsel was questioning

22  Mr. Lederman about.

23         RTI made a decision at a board meeting,

24  March 1, 2019, way before any of these issues happened, that

25  they were going to terminate and accelerate the payment.  If

1  you read their pleadings, Your Honor, there's no other way --

2  and even though Mr. Lederman couldn't bring himself to say

3  it -- but if you're going to -- final distributions were

4  anticipated to be made after March 1, 2020, and before 2021,

5  and their annuities.  You're accelerating the payment.  So,

6  we're under the acceleration that was under 409A that

7  Mr. Pachulski referred to.

8          In Section 9.3(b) of the plan document

9  specifically refers to the specific section that

10  Mr. Pachulski cited, and it says:

11          In such event, payments shall -- not could be

12  considered, may be -- shall be made at the earliest date

13  permitted under such guidance.

14          Well, they gave you the date, Your Honor:  it's

15  March 1, 2020.  They told you what date they believed was the

16  earliest date it could be made.

17          Now, let's look under the plan trust.  Now, this

18  is where the case differs from WaMu up on this point.

19  Section 8(a), Your Honor, of the trust specifically states:

20          No participant shall have a preferred claim or any

21  beneficial ownership in the fund -- I'm going to stop there,

22  that sounds bad for our side; it's the rest of the sentence

23  that gives us the right to the funds -- prior to the time for

24  distribution to the participants under the terms of the plan

25  or under the terms of the trust.

1          <u>WaMu</u> required the distribution, Your Honor -- this

2     doesn't.  It says the time for distribution.  The time was

3     March 1, 2020.

4          So, what they're saying is as of March 1, 2020,

5     the time had occurred.  We do have a preferred claim.  We do

6     have beneficial ownership of the assets at that time.  They

7     are no longer the assets of RTI and that changes the

8     circumstances and the outcome of the <u>WaMu</u> decision in favor

9     of us obtaining these assets.

10          Now, the UCC and Mr. Pachulski both had presented

11     arguments and the UCC uses the phrase "upon information and

12     belief," Your Honor, which goes to our argument that we need

13     discovery, because they start argument about, well, this

14     approximate turn of the downturn of Ruby's, and that's one of

15     the exceptions of the five exceptions in that 409A regulation

16     that can prevent the distribution of these assets.

17          But it's interesting that -- we strongly disagree

18     with a couple of things.  One, Mr. Pachulski said we agreed

19     that we don't dispute that they're unfunded status -- we

20     do -- we say they're funded as of March 1, 2020.

21          The second thing is he said that, well,

22     Mr. Lederman talked about the covenants, but he also

23     backtracked when I asked him specifically, Are the covenants,

24     the financial covenants, a factor?  Do they look at the rabbi

25     assets?

1       And the answer is, no, they do not.

2       And so, to say that they could not have

3  prevented -- I mean distributed those assets at that time or

4  that changed the ownership, pursuant to the document or the

5  trust, is just contrary to Ruby's plan document, Ruby's trust

6  agreement.

7       And so, the answer is, those assets belonged to

8  the participants at that time and, yes, they should be taxed

9  on it.  They should have been distributed.

10      You know, why didn't Ruby's tell the participants

11  about these assets or about this provision?  Why didn't they

12  tell the trustee?

13      Those are all great questions -- maybe questions

14  for discovery one day -- but Ruby's went on, and to say that

15  they are insolvent or in this bad trouble, let's look at what

16  Ruby's did to contradict the testimony today.  Did they stop

17  making payments on the plan in March?

18      No.  They continued to make payments through March

19  and April and May and June and July.  No word to any

20  participant whatsoever about the amendment or about any

21  financial issue.

22      So, another thing, is Ruby's couldn't even attach

23  those assets in March if they wanted to use them.  There's no

24  declaring of insolvency under the terms of the plan.  If you

25  read the terms of the trust and get to the assets, Ruby

1  needed to send a letter to the trustee, which it did not do

2  until September 2nd of 2020.

3          So, what else do we go look at?  Well, let's read

4  this first letter that they sent to participants where they

5  say, Ruby intends to resume benefit payments as soon as

6  practicable, when the company's financial health is no longer

7  at issue.

8          So, at that time, and all this (indiscernible),

9  they still continued to make payments and still no notice of

10  insolvency or anything that they could not make a payment

11  pursuant to the plan, and these were dealing with the assets,

12  Your Honor, pursuant, again, to the terms of the trust, the

13  terms of the plan, belonged to the participants.

14          And so the one thing that makes this case even

15  more clear, Your Honor, is, you know, Mr. Pachulski's client,

16  RTI, wants the assets.  We want to keep the assets.  These

17  are 100 participants whose retirement depends upon these

18  assets that were promised by RTI.

19          So, let's look at the independent person in this

20  litigation; let's look at Regions.  Is Regions saying that

21  this is not a rabbi trust?  Is Regions saying that we should

22  do -- Regions filed an interpleader action and said, verbatim

23  from Paragraph 124 of their independent complaint:

24          "It is not clear whether the trustee's primary

25  obligation under the trust agreement runs in favor of the

1  grantor or RTI, as plan sponsor, to help meet this obligation

2  to all general creditors, but whether the primary obligation

3  of the trustee is to pay participants."

4          The trustee, Your Honor, didn't know the

5  understanding how the trust was to work.  And there's no more

6  clear point when we're saying that we believe those assets --

7  I think the trustee is trying to address the same issue, Your

8  Honor, in their action.

9          Now, the relief talked about the termination of

10  the trust, Your Honor.  I'm not aware of that in their

11  pleadings today.  So, that is new relief that I'm not aware

12  of.

13          And, Your Honor, just for the record, I think WaMu

14  was a contested matter that actually had witnesses and trials

15  on those issues and even had findings of facts and

16  conclusions of law after all that.  I think if this Court is

17  inclined to rule against us, certainly, you'd give us the

18  same opportunity that the participants had in WaMu, because

19  this case is significantly stronger than the participants in

20  WaMu.

21          And so, Your Honor, with those findings, I

22  think -- well, one other issue, Your Honor.  Let's talk

23  about -- there's one issue that I think is an open issue and

24  that's the 541(b)(7) argument under the deferred comp plan.

25  If the read the plain language of this plan of that section:

1        Any amount withheld by an employer from the wages

2    of employees -- which that plan was, a deferred comp -- to an

3    employee benefit plan, subject to Title 1 of ERISA, is

4    subject to that plan.

5        That is, you know, historically, the 401(k) plan.

6    And the question is -- in the Second Circuit in the <u>Lehman</u>

7    case, Your Honor, about that very provision, and I think this

8    Court would be a little bit ahead of the game if it rules,

9    knowing that that issue is on appeal, because no circuit

10   court has issued an upon on that matter that I'm aware of.

11   If I'm mistaken, please let me know.

12       But I think that issue, at a minimum, should be

13   stayed to the Second Circuit, rules on that issue about the

14   deferred comp.  So, Your Honor, with those issues, I conclude

15   my argument unless you have some questions for me.

16           THE COURT:  Thank you, Mr. Holifield.

17           Ms. Speight?

18           MR. SPEIGHT:  Yes, Your Honor.

19       The first thing I'd like to do is just address the

20   argument that we raised, Compass raised for the first time,

21   the language in Section 9.3 of the ESPP.  And that was

22   repeated by us in our filing, but the participants' objection

23   made that same argument in Paragraph 16 of their objection.

24       And if you'll forgive me, my headset has died, so

25   I'm going to have to switch to my phone.

1          All right.  Your Honor, can you hear me?

2          THE COURT:  I can, thank you.

3          MR. SPEIGHT:  All right.  So, as a point to

4  respond to, there's no prejudice here in our filing

5  yesterday.  We reiterated the same argument that the

6  participants made in their objection and that was in

7  Paragraph 17 of Docket Number 337.

8          And as I see this case, the thing that you have to

9  decide, Your Honor, is whether that section, 9.3, of the

10  plan, which requires that payments be made at the earliest

11  date permitted, under 409A, what -- you have to decide what

12  that earliest date was.  And that is the factual dispute that

13  is before the Court and I don't think that you have enough

14  information to make that at this time.

15          The trust agreement itself is unusual.  This is

16  not your standard top hat plan where until the money is in

17  the participants' hands, it is, at all times, subject to

18  general creditors.  This case is, this trust amendment

19  provides that as soon as it is payable to the participants,

20  at the time it is payable, that is when the participants have

21  a beneficial interest in fund, and they have a preferred

22  claim.  That language is in the trust agreement and that's an

23  undisputed fact that that's there and that's something that

24  you need to consider.

25          So, the question is, at what time was the fund

1  payable to the participants?

2  And on March 1st, 2019, by board resolution, they

3  decided to not only terminate the plan, but to accelerate the

4  payments, and I'm getting that from Paragraph 10 of the

5  debtors' motion.  They could have terminated the plan and

6  left payments the same, so that to the extent it was an

7  annuity payment, the annuities would just continue.

8  The Board didn't do that.  They decided

9  under 409A, to accelerate the payments.  And at that time

10  when they made that decision, there had to have been a

11  decision that 409A allowed them to accelerate payments and

12  that they would comply with 409A by making that decision and

13  accelerating payments.

14  And I think you have disputed facts as to whether

15  that was discussed.  The witness didn't really remember the

16  plan termination, didn't know what was discussed, didn't know

17  what was reviewed, didn't know what was considered, didn't

18  even really understand whether they were making this decision

19  to accelerate the payments.  So, that is a dispute right

20  there.

21  But a company is not going to decide to accelerate

22  payments under 409A unless they have already decided they've

23  met those obligations.  So, you know, I think this fact is in

24  dispute, but we would argue that as of March 1st, 2019, the

25  company made a decision in documents that we haven't seen or

1 we haven't had the benefit of seeing, that 409A was

2 satisfied. And at that time, the decision to terminate and

3 liquidate the assets was not approximate to a downturn in

4 business.

5 And the other thing I just want to briefly point

6 out is the trust agreement, it's very unique in what happens

7 after a change in control. And here, I think you have enough

8 evidence from the testimony of the witness, to decide that

9 under the trust agreement, a change of control happened

10 in 2017.

11 And the definition of change of control is in the

12 trust agreement Exhibit B, Paragraph 13(d), and all that's

13 required is that 80 percent of the voting stock have to,

14 basically, vote to make the change in control happen.

15 Once the change in control happens, the fund

16 switches and there's all kinds of protections for the fund to

17 the participants' favor. And just a few examples of that,

18 the plan sponsor no longer has a right to appoint an

19 investment manager. That opportunity is taken away and the

20 trustee does that. That's in Section 3(c) of the trust.

21 The plan sponsor can no longer change the trustee

22 or the trustee's agent; instead, any change has to be

23 approved by a majority vote of the participants. That's in

24 Section 6(b) and 11(c) of the trustee agreement.

25 And then most importantly, the trust cannot be

1  terminated, and the trust cannot be amended without a

2  majority vote of the participants once a change in control

3  happens.  That's 12 of the trust agreement, Section 12.

4          And also, when this change of control happens, the

5  fund was supposed to be -- the trust was supposed to be 100

6  percent funded, which means as of March 1st, 2019, when they

7  terminated, that money would be sitting there, ready to be

8  paid out as soon as possible, which would have been

9  March 1st, 2020.

10         Again, I think there's a factual dispute as to

11  when the earliest payment could have been made and under the

12  terms of the trust agreement, that date, as soon as that

13  distribution was payable, that's when the plan was no longer

14  an unfunded plan; it was a funded plan that belonged to the

15  participants, not the creditors.

16         Unless you have any questions for me, Your Honor,

17  that's all I have.

18         THE COURT:  Thank you, Ms. Speight.  No questions.

19         Anyone else wish to speak against the motion?

20    (No verbal response)

21         THE COURT:  No?

22         Mr. Pachulski, back to you.

23         You're on mute, Mr. Pachulski.

24         MR. PACHULSKI:  Oh, I apologize, Your Honor.

25         You had asked the question about the COLI versus

1  the cash.  In the <u>Collins & Aikman Corp.</u> decision, is similar

2  relating to the rabbi trust, the Court in that

3  (indiscernible) the case effectively held that the holding

4  life insurance policies in a rabbi trust are property of the

5  estate.  So, I think, again, whether it's cash or COLI

6  insurance policies, really doesn't make a difference.

7          Now, let me go through each of the arguments that

8  have been made, and a lots been thrown out here, so I'm going

9  to do my best job as possible to kind of respond to all of

10 it.  First of all, with respect to meeting our burden, I

11 think we've totally met our burden.

12          And just so it's clear, and I may go to what

13 counsel had said on behalf of Compass, because Mr. Holifield

14 said the, quote, "surprise witness," the quote, "surprise

15 witness," Mr. Lederman, was not going to be the witness until

16 we got Compass.

17          The reason that Mr. Lederman became an issue is

18 what Compass says is that counsel for the ad hocs had

19 referred to 9.3(b).  They did.  I don't disagree with that.

20 But they simply said, Oh, you have to make a distribution.

21          It's no different than the change of control and

22 it's no different than what happened in <u>Washington Mutual</u>.

23 There were a variety of breaches in <u>Washington Mutual</u>, not

24 the least of which was people had demanded their monies, were

25 entitled to it, and they didn't get paid.

1          Even if there was a change of control and even if
2  the money should have been funded, there may be a breach and
3  the participants may have a claim, but that doesn't give them
4  any greater rights than any other general unsecured
5  creditors.
6          And if you just look at 9.3(b) on its own, which
7  basic -- which I can explain and, in which case, the company
8  did not breach, frankly, but if you read 9.3(b) without
9  anything else, and even if you came to the conclusion that
10 it's a breach, it's just a breach.
11         Washington Mutual says that doesn't, in and of
12 itself, do anything else.
13         What Compass did was it then tagged on 8(a) by
14 basically saying, 9.3(b) says you had to make the
15 distribution and because you had to make the distribution, we
16 argue that under 8(a), that that means that somehow, even
17 though 8(a) is totally ambiguous -- and you can have all the
18 testimony in the world; it won't make a difference -- but --
19 and it becomes irrelevant, as I'm going to state.  It says:
20         No participant shall have a preferred claim on or
21 any beneficial ownership in the fund prior to the time for
22 distribution to the participant under the terms of a plan or
23 under the terms of the trust agreement.
24         So, to even make that determination, even if you
25 take the argument that counsel has made in its best light for

1  the participants, you have to go from 8.8(a) to 9.3(b).  So,

2  instead of 9.3(b), which may have been a breach, they're

3  basically saying, because of 8(a), it's not just a breach,

4  but it allows us to turn an unfunded plan into a funded plan.

5  There's no case law that says that, but let's take it to its

6  logical conclusion, because under best case, it doesn't help

7  them.

8           Here is why, Your Honor -- so, that is the change

9  and that's why we had the witness -- 9.3(b) is extremely

10  clear, no dispute, that you have to look at 409A and you

11  have -- and the company, the company has to make that

12  determination.  Until the company makes this determination,

13  even under the ready of 8(a), even under the ad hoc

14  participants' reading, it's not prior to the distribution,

15  because the company has to say we're prepared to distribute

16  at the earliest possible time.

17           The company could not do that, because as

18  Mr. Lederman testified, the company had not complied with the

19  provision that said the termination and the liquidation.  The

20  board resolution just says go ahead and do it, it doesn't

21  cause the termination and liquidation.  It says go through

22  the process, which means you can make payouts 12 to 24

23  months.

24           But when you do that, when you liquidate, when the

25  benefits are due, there must be a determination by the

1  company that the termination and liquidation does not occur

2  approximate to a downturn in the financial health of the

3  employer.

4       This company was on fumes and what little it had

5  left was destroyed because of the pandemic, which is why we

6  went from a company that had 450 locations to 236 locations

7  within a few months.  Starting in 2019, the company started

8  to decline.

9       So, their argument isn't just 9.3(b), because

10 that, I could defeat easily.  It's like Washington Mutual;

11 just layer on some more defaults.

12      They're saying that 9.3(b), because 8(a) gave them

13 greater rights, which it did not, because 9.3(b) is

14 absolutely clear.  It's the company making the determination,

15 not the trustee, not even the Court, but the company making a

16 determination that they can comply with 409A, which Mr.

17 Lederman stated very clearly, could not have happened by

18 March of 2020.

19      Now, there are an assortment of arguments that

20 have additionally been made.  There's an argument that it

21 became funded in 2020; again, that argument is because

22 somehow, magically, even though they could not have

23 distributed in March of 2020, that somehow that just created

24 a distribution.  That is not what 8(a) says.

25      Also, Your Honor, they say, well, they continued

1  making payments, so that must have been -- it showed they

2  could do it.

3          No, Your Honor, they couldn't have made a payment

4  of $33 million, which is basically what it would have taken.

5  Yes, they wanted to continue complying.  They wanted to not

6  turn off the retirees.

7          All of us are very sensitive in this case.

8  Either 7300 employees will lose something --

9          THE COURT:  Hello?  Mr. Pachulski?

10          MR. PACHULSKI:  I'm sorry?

11          THE COURT:  Operator, am I on the line?

12          MR. PACHULSKI:  Your Honor, I'm not sure who's

13  speaking.  I apologize.

14          Your Honor, was someone speaking?  I apologize.

15          THE OPERATOR:  This is the CourtCall operator.  It

16  appears that Judge Dorsey is disconnected.  We'll wait for

17  the judge to reconnect on our system.

18          MR. PACHULSKI:  Okay.

19      (Pause)

20          THE COURT:  Somehow, I got disconnected from

21  CourtCall.

22          So, are you all -- can you all hear me now?

23          MR. PACHULSKI:  Yes, Your Honor, I do hear you.

24          THE COURT:  Okay.  All right.

25          So, you were talking about the relationship

1   between 9.3(b), 8(a), and 409A when I got cut off.

2           MR. PACHULSKI:  Okay.  So, did you hear, at least,

3   my response as to why Mr. Holifield referred to the surprise

4   witness, Your Honor?

5           THE COURT:  I did, yes.

6           MR. PACHULSKI:  Okay.  So, the new issue related

7   to, if it was 9.3, counsel have argued that the change of

8   control, we breached.  Let's assume we did.  Under Washington

9   Mutual, there were several breaches.  Let's presume that's

10  the case.

11          That doesn't change the fact that you still have

12  to comply with 9.3(b), 8(a), and 409A, okay.

13          If there was not the 8(a), if the argument didn't

14  come up yesterday, 9.3(b) would be irrelevant, because on the

15  one hand, we don't think it would have been a breach, but

16  even if it's a breach, under Washington Mutual, it wouldn't

17  have made any difference.

18          But let's take what they said in their best light.

19  They say that under 8(a) -- even though I don't believe the

20  language says it, but let's just use it for a moment -- that

21  somehow the participants get a beneficial interest or

22  preferred status -- and what is the language? -- prior to the

23  time of the distribution.

24          At the time of distribution can only be determined

25  by 9.3(b); 9.3(b), even if you were going to use their

1    language -- and we believe under <u>Washington Mutual</u> or because

2    of the language itself it doesn't get them anywhere, but

3    let's pretend it does -- under 9.3(b), the company has to

4    make a determination that they can make the distribution

5    under the guidance set up by 409A.

6           409A clearly states that to make a distribution,

7    there must be the termination and liquidation does not occur

8    approximate to a downturn in the financial health of the

9    employer.

10           There's no argument, based on Mr. Lederman's

11    testimony, that there was a significant downturn between

12    March of 2019 and March of 2020.  They were out

13    $23 million -- they lost $23 million in that period in

14    cash -- but the company had dramatically downsized.

15           The lenders had certain covenants.  There was a

16    ten-million-dollar deficiency.  Even arguing if there was a

17    breach under a change of control, it's no different, again,

18    from <u>Washington Mutual</u>.

19           So, the bottom line, Your Honor, is they could not

20    have made the distribution out of the rabbi trust.  Under any

21    determination, it could not have been turned from unfunded to

22    funded in 2020 because it wasn't prior to a distribution.

23    The company had decided under 9.3(b), they could not make

24    that distribution and whether they could have ever made it.

25           So, the argument is, but see, they could make it

1   because they sent this letter August 1, 2020.  The letter is

2   very clear, Your Honor, the letter says, we hope to make it

3   again.  We hope our business turns around.

4          Everybody hopes their business turned around

5   during the pandemic.  That wasn't a commitment.  That was a

6   letter that anyone would say who feels sorry for it --

7       (Pause)

8          THE OPERATOR:  And, Your Honor, you're

9   reconnected.

10         THE COURT:  Thank you.  I don't know what's going

11  on, but I keep getting cut off from the CourtCall,

12  Mr. Pachulski.  So, keep an eye on me while you're speaking

13  so that if something comes up again, I can give you the "hi"

14  sign and let you know.

15         MR. PACHULSKI:  I apologize, Your Honor.

16         THE COURT:  It's not your fault.  It's something

17  with the technology.  I don't know what's going on.

18         MR. PACHULSKI:  Your Honor, were you able to hear

19  what I had stated about the August 1, 2020 letter?

20         THE COURT:  Yes.

21         MR. PACHULSKI:  Okay.  Where I was going to move

22  on from there was that I don't think that there -- just

23  because the company had made the determination to make

24  payments post-March of 2020, to retirees off the company's

25  assets effectively, really demonstrates anything, other than

1  they were trying to do as much as they could to take out --

2  to take away some of the pain that the retirees were going to

3  have in this particular case.

4      But simply put, Your Honor -- well, before I go to

5  a conclusion --  is, the 5041A7 [sic], I mean -- I'm sorry --

6  with respect to the Lehman thing being on appeal, there's no

7  case.  The Bill Heard case, other cases have cited that that

8  does not work for unfunded plans, so I don't think that this

9  is really applicable.

10      But the main argument that they've tried to make,

11  which, again, came up yesterday, was the interrelationship

12  between 8(a), 9.3(b), and 409A, and using the language as the

13  absolute best case for the participants, because of the

14  condition of the business, because the company has to make

15  the determination under 9.3(b), that there was no mechanism

16  at that time to allow that distribution to be made, so it

17  could not be as of March 1, 2020, that even in the best

18  reading of 8(a), that would be prior to the distribution.

19      If anything, I think that means, not that

20  dissimilar from Washington Mutual, it's when the distribution

21  is actually made, not to just prior to the distribution being

22  made which may be days, as compared to years.

23      So, we believe that we provided the evidence.

24  Mr. Lederman has reflected that compliance with 9.3(b), that

25  the company couldn't have done it based on the -- based on

1    IRC 409A guidance; that the company was insolvent; that these

2    are assets both, cash and COLIs, which are deemed property of

3    the estate, based on case law such as Collins & Aikman, and

4    we would ask that Your Honor rule that the rabbi trust assets

5    should be turned over.

6              And the issue, just leaving the last one, where

7    counsel says, Well, see, not even Regions knew what the issue

8    was; that's why you have interpleader complaints.

9              Their view is we're not going take the position

10   it's the plan sponsor.  We're not going to take the view it's

11   the participants.  We don't know; we're going to interplead

12   it.

13             That's why we're here today, Your Honor, for Your

14   Honor to make the determination.  We believe that between

15   Washington Mutual, the various plan and trust documents, that

16   there is no more need for any more discovery, that we win as

17   a matter of law, and based on the facts that were provided,

18   the evidence provided by Mr. Lederman.

19             And for that, we would ask Your Honor to grant us

20   the relief today.  Thank you, Your Honor.

21             THE COURT:  Thank you, Mr. Pachulski.

22             Mr. Schmidt, any rebuttal?

23             MR. SCHMIDT:  Nothing further from the committee,

24   Your Honor.  We just echo the position of the debtor and

25   request that the Court approve the release of the funds.

1  Thank you.

2            THE COURT:  Thank you.

3            All right.  Well, I'm going to need to think about

4  this for a little bit.  I know I can't wait too long because

5  this is an issue that needs to get decided fairly quickly.

6  The problem is my calendar is completely booked.

7            I could do two o'clock on Monday, the 16th.  If we

8  can get back on by then, I'll have a ruling for you on this

9  issue and then we can finish up the rest of the agenda, if

10 that works for everyone.

11           MR. PACHULSKI:  That's fine, Your Honor.

12           So, 11:00 eastern, Your Honor -- I mean, 2:00

13 eastern?

14           THE COURT:  2:00 eastern, yes.

15           MR. PACHULSKI:  That would be fine, Your Honor,

16 for the debtors.

17           THE COURT:  Okay.

18           MR. PACHULSKI:  Thank you very much.

19           THE COURT:  Does that work for everybody else?

20           Mr. Holifield, is that okay?

21           MR. HOLIFIELD:  Your Honor, is there any way we

22 could move it to 1:30?

23           I have a 2:30 call regarding a class action.  It

24 would involve moving a lot of parties -- attorneys' schedules

25 to reschedule that, if there's any way.

1          THE COURT:  Okay.  We'll move it to 1:30 --

2          MR. HOLIFIELD:  Thank you, Your Honor.  I

3  appreciate it.

4          THE COURT:  -- just for the reading of the ruling.

5          I don't know if you need to be on for the rest of

6  the agenda.

7          MR. HOLIFIELD:  Okay.  Thank you, Your Honor.  I

8  appreciate that.

9          THE COURT:  Okay.  So, 1:30, Monday.  We'll

10  continue then.  By then, I'll have your ruling for you on

11  this issue and we'll finish up the rest of the agenda.  All

12  right.

13          MR. PACHULSKI:  That'll be great, Your Honor.

14          If I may ask one very quick thing -- I apologize,

15  Your Honor, Richard Pachulski, of Pachulski Stang, again --

16  my partner, Max Litvak is on, who's really in control of the

17  debtor-in-possession financing.  I just want to make sure

18  that we're not violating a milestone or there's some issue

19  that either Sean O'Neal or someone else raises.

20          So, I think we're okay, but I don't want to leave

21  anything to chance.  If we could just get an answer for

22  either Mr. O'Neal or Mr. Rollins, who represents the lenders,

23  or my partner, Max Litvak, who's dealing with the DIP.  I

24  think we're fine, I just wanted to make sure.

25          THE COURT:  Okay.  Mr. O'Neal raised his hand.

1  We'll let him go first.

2          MR. O'NEAL:  Good afternoon, Your Honor.

3          I presume you're referring to this Mr. O'Neal,

4  because I did raise my hand.

5          We have no objection, and thank you, Your Honor,

6  for your patience and for scheduling it so quickly on Monday.

7          THE COURT:  Okay.  All right.

8          Anything else before we adjourn?

9          MR. LITVAK:  Your Honor --

10          THE COURT:  Oh, I've got Mr. Litvak.

11          MR. LITVAK:  Yeah, it is Max Litvak with Pachulski

12  Stang.

13          I do actually -- both Mr. Pachulski and I actually

14  have a hearing in front of Judge Shannon at 1:30 p.m. eastern

15  time on Monday, and so I was just wondering if, perhaps, we

16  could get a separate setting on the DIP motion, just because

17  I don't think -- one of us needs to attend that other

18  hearing.

19          THE COURT:  Well, after Monday I have four -- at

20  least three hearings every day for the rest of the week, so

21  my calendar is kind of booked.

22          How long -- I know there are objections to the DIP

23  and I don't know if however I rule on this may or may not

24  help the DIP -- I don't know -- so I don't know how long of a

25  time you're going to need for the DIP, I guess, is what I'm

1  asking.

2              MR. PACHULSKI:  Your Honor --

3              MR. LITVAK:  Yeah, well, the good news, Your

4  Honor --

5              I'm sorry, go ahead, Mr. Pachulski.

6              MR. PACHULSKI:  What I was going to say, Max,

7  is -- and, Your Honor, maybe Mr. Litvak has a better view

8  than I do -- it's a, among other things, it's a disclosure

9  statement hearing and status conference before Judge Shannon

10 and I don't know if it's possible.

11             Because I know I want to be on this and Mr. Litvak

12 has to be on the DIP, frankly.  He could probably deal with

13 the other hearing before Judge Shannon.  We may be able to

14 check with Judge Shannon if he would have a problem.

15             Because I don't know that there are going to be

16 that many participants, if we could get to them and maybe

17 move the hearing a couple of hours.  So, that would

18 definitely work.

19             I don't know.  Mr. Litvak may have a better sense

20 than I, because he's closer to that case, though we're both

21 working on it, but I'd like to accommodate Your Honor in any

22 way we could, and we may be able to check with Judge Shannon

23 if we can work through that issue.

24             THE COURT:  Well, I mean I can do it -- I have an

25 all-day evidentiary hearing on Monday, so I'm sticking you

1  into the middle of that.  I'm going to have to take a break

2  when you come back so that I can deal with this one.

3          It may work better if I move it to later in the

4  afternoon if that works for everybody, say four o'clock.

5          MR. PACHULSKI:  That would work for me, and I

6  think for Mr. Litvak, that would be great.  I don't know if

7  anybody else has problem with that --

8          MR. HOLIFIELD:  That works for me, Your Honor.

9          THE COURT:  Okay.  Mr. O'Neal, you had your hand

10 up, Mr. Sean O'Neal.

11         MR. O'NEAL:  Yes, Your Honor.  I did want you to

12 know that does work for us, but I also wanted you to know,

13 just in the interest of efficiency for your own time, we have

14 reached an agreement in principle with the creditors

15 committee on the DIP, and so I did want you to know that so

16 you didn't spend a lot of time preparing for a contested

17 hearing, with respect to the creditors committee.

18         THE COURT:  Okay.  Thank you, I appreciate that.

19         All right.  So, we'll then make it four o'clock,

20 Monday, November 16th, for the continuation of the hearing.

21         COUNSEL:  Thank you, Your Honor.

22         THE COURT:  All right.  Thank you.

23         All right.  Have a good evening.  We're adjourned.

24     (Proceedings concluded at 5:18 p.m.)

25

1          CERTIFICATE

2

3     I, MARY ZAJACZKOWSKI, certify that the foregoing is a

4 correct transcript from the electronic sound recording of the

5 proceedings in the above-entitled matter.

6

7 /s/Mary Zajaczkowski          November 13, 2020
  Mary Zajaczkowski, CET**D-531

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25