## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

----------------------------------------------------------- X
         :

In re:          :     Chapter 11
         :

RTI Holding Company, LLC, *et al.* [1]  :     Case No. 20-12456 (JTD)
         :

        Debtors.    :     (Jointly Administered)

                             **Re: D.I. 354**

----------------------------------------------------------- X

## OBJECTION OF THE OFFICIAL COMMITTEE
## OF UNSECURED CREDITORS TO
## DISCLOSURE STATEMENT FOR DEBTORS' CHAPTER 11 PLAN

The Official Committee of Unsecured Creditors (the "Committee") of the debtors and debtors-in-possession (collectively, the "Debtors" or the "Company") in the above-captioned chapter 11 cases (the "Chapter 11 Cases") hereby objects to the disclosure statement (the "Disclosure Statement") [Dkt. No. 354] for Debtors' chapter 11 plan (the "Plan") [Dkt. No. 353]. [2] In support of this objection, the Committee respectfully represents as follows:

---

[1] The Debtors in these chapter 11 cases and the last four digits of each Debtor's U.S. tax identification number are as follows: RTI Holding Company, LLC (4966); Ruby Tuesday, Inc. (5239); Ruby Tuesday, LLC (1391); RTBD, LLC (6505); RT of Carroll County, LLC (8836); RT Denver Franchise, L.P. (2621); RT Detroit Franchise, LLC (8738); RT Distributing, LLC (6096); RT Finance, LLC (7242); RT FL Gift Cards, Inc. (2189); RT Florida Equity, LLC (7159); RT Franchise Acquisition, LLC (1438); RT of Fruitland, Inc. (1103); RT Indianapolis Franchise, LLC (6016); RT Jonesboro Club (2726); RT KCMO Franchise, LLC (7020); RT Kentucky Restaurant Holdings, LLC (7435); RT Las Vegas Franchise, LLC (4969); RT Long Island Franchise, LLC (4072); RT of Maryland, LLC (7395); RT Michiana Franchise, LLC (8739); RT Michigan Franchise, LLC (8760); RT Minneapolis Franchise, LLC (2746); RT Minneapolis Holdings, LLC (7189); RT New England Franchise, LLC (4970); RT New Hampshire Restaurant Holdings, LLC (7438); RT New York Franchise, LLC (1154); RT Omaha Franchise, LLC (7442); RT Omaha Holdings, LLC (8647); RT One Percent Holdings, LLC (6689); RT One Percent Holdings II, LLC (2817); RT Orlando Franchise, LP (5105); RT Restaurant Services, LLC (7283); RT South Florida Franchise, LP (3535); RT Southwest Franchise, LLC (9715); RT St. Louis Franchise, LLC (6010); RT Tampa Franchise, LP (5290); RT Western Missouri Franchise, LLC (6082); RT West Palm Beach Franchise, LP (0359); RTTA, LP (0035); RTT Texas, Inc. (2461); RTTT, LLC (9194); Ruby Tuesday of Allegany County, Inc. (8011); Ruby Tuesday of Bryant, Inc. (6703); Ruby Tuesday of Columbia, Inc. (4091); Ruby Tuesday of Frederick, Inc. (4249); Ruby Tuesday of Linthicum, Inc. (8716); Ruby Tuesday of Marley Station, Inc. (1641); Ruby Tuesday of Pocomoke City, Inc. (0472); Ruby Tuesday of Russellville, Inc. (1601); and Ruby Tuesday of Salisbury, Inc. (5432). The Debtors' mailing address is 333 East Broadway Ave., Maryville, TN 37804.

[2] Capitalized terms used herein but not otherwise defined shall have the definitions ascribed to them in the Plan.

## PRELIMINARY STATEMENT

1.      The Disclosure Statement should not be approved in its current form because it does not provide the information necessary to allow creditors to evaluate the key terms of the Plan or to make an informed voting decision about their treatment.  At the most basic level, the Disclosure Statement fails to provide general unsecured creditors with the core information about the treatment of their claims; it contains no estimate of the amount of their recoveries, the currency in which those recoveries will paid, or when they are likely to be received.  It also fails to include key financial information (including projections, liquidation and valuation analysis).

2.      Furthermore, although the Plan provides for broad releases of estate claims against the Debtors' insiders, the Disclosure Statement fails to provide any information concerning whether the Debtors have investigated these claims, an appraisal of their merits and potential value of such claims, or to describe what contributions the insiders have made that could support such releases.  Similarly, although the Plan purports to waive avoidance actions against certain continuing trade creditors, it provides no detail as to when creditors will know if they will be included in that release.  Without additional disclosures in these areas, unsecured creditors lack sufficient information to make an informed decision regarding their treatment under the Plan, and thus, whether they should accept or reject the Plan.

3.      Moreover, the Plan contemplates that exit financing will be provided but the Disclosure Statement is not clear whether any party, including TCW (defined below), has committed to do so.

4.      The Committee will continue to seek to work with the Lenders and the Debtors to reach a holistic resolution of these cases that will allow for a fair recovery to all general unsecured creditors while enabling a going concern business through either a sale or a reorganization.  Absent

that happening prior to solicitation, the Disclosure Statement should include language provided by the Committee that indicates whether or not the Committee supports the Plan.

## **BACKGROUND**

5.      The Debtors filed their chapter 11 petitions on October 7, 2020 (the "Petition Date").

6.      On November 7, 2020, the Debtors filed their initial Plan and Disclosure Statement. On November 25, 2020, the Debtors filed the motion to approve the Disclosure Statement (the "Disclosure Statement Motion") [Dkt. No. 612].  The hearing is currently scheduled for December 18, 2020.

7.      As filed, the Plan does not provide *any* treatment for general unsecured creditors. Rather, the Plan simply provides a blank, stating that each general unsecured creditor "shall receive its Pro Rata share of [___]."  Plan, Article III.C.  The Disclosure Statement offers no further information about the amount or nature of unsecured creditor recoveries.

8.      Furthermore, Article X.B of the Plan provides that the Debtors, "shall be deemed to forever release, waive, void, extinguish and discharge each other, their *Related Persons*, and their respective property from any and all Claims, Equity Interests, obligations, debts, rights, suits, damages, Causes of Action, remedies, judgments, defenses, counterclaims, and liabilities of any nature whatsoever, including any derivative Claims asserted or which could be asserted on behalf of a Debtor, a Reorganized Debtor and/or RT Lodge Company."  "Related Persons" is defined to include the equity holders (who are controlling insiders of the Debtors), including NRD Partners II, L.P. ("NRD").  The Disclosure Statement merely quotes or paraphrases this language, but provides no further information related to this sweeping third party release of claims against, among others, controlling insiders.

9.      The Plan also provides for a limited waiver of avoidance actions.  Specifically, the Plan provides that the "Debtors shall be deemed to waive and release all Avoidance Actions against such persons and entities of the Reorganized Debtors as of the Effective Date that shall continue to provide goods, services and/or financing to RT Asset Company on and after the Effective Date on terms that, with respect to the provision of goods and/or services, are no less favorable than the terms offered to the Debtors on the Petition Date and, with respect to the provision of financing, are satisfactory, in each case as determined by the Debtors and the Prepetition Secured Creditors . . . in the exercise of their reasonable business judgment." Plan, Article X.I.  Again, the Disclosure Statement provides no further information about this claim waiver and when creditors will know if they are included, why other creditors are excluded and if the Debtors intend to pursue Avoidance Actions against creditors not included.

10.      Lastly, the Disclosure Statement contemplates that the Debtors will receive exit financing (the "Exit Financing"), which may be provided by TCW Direct Lending LLC, TCW Skyline Lending, L.P., and TCW Brazos Fund LLC (collectively, "TCW").  The Debtors' restructuring support agreement (the "RSA") also provides: "Exit Facility to be agreed in principle prior to balloting on the Plan and will be subject to usual and customary conditions, including, without limitation, achievement of Milestones and satisfaction of DIP Facility covenants."  As of the date of filing this objection, the Committee is not aware of any commitment or even a term sheet that describes any such Exit Financing, and the Disclosure Statement, of course, contains no detail about it.

## I.      The Disclosure Statement Lacks "Adequate Information" And Cannot Be Approved.

11.      Under section 1125(b) of the Bankruptcy Code, acceptance or rejection of a plan may not be solicited unless a disclosure statement containing "adequate information" is transmitted to each creditor and equity holder before solicitation.  "Adequate information" is defined, in

- 4 -

relevant part, as information sufficient to enable "a hypothetical investor of the relevant class to make an informed judgment about the plan." 11 U.S.C. § 1125(a)(1).

      A.    <u>The Disclosure Statement Does Not Provide For a Treatment For Unsecured Creditors</u>.

12.    The Third Circuit has explained that given how heavily creditors rely on disclosure statements, the court "cannot overemphasize the debtor's obligation to provide sufficient data to satisfy the [Bankruptcy] Code standard of adequate information." *In re Oneida Motor Freight, Inc.,* 848 F.2d 414, 417 (3d Cir. 1988). Courts should assess whether the disclosure statement contains "adequate information" from the perspective of the claims or interest holders voting on the plan. *See In re Phoenix Petroleum Co.*, 278 B.R. 385, 393 (Bankr. E.D. Pa. 2001).

13.    At a minimum, disclosure statements must contain "simple and clear language delineating the consequences of the proposed plan on [creditors'] claims and the possible . . . alternatives so that [creditors] can intelligently accept or reject the Plan." *In re Copy Crafters Quickprint, Inc.*, 92 B.R. 973, 981 (Bankr. N.D.N.Y. 1988). Thus, the disclosure statement "must clearly and succinctly inform the average unsecured creditor what it is going to get, when it is going to get it, and what contingencies there are to getting its distribution." *In re Ferretti*, 128 B.R. 16, 19 (Bankr. D.N.H. 1991).

14.    Despite the clear directive of these cases – and of common sense – the Disclosure Statement manifestly fails to provide adequate information to allow unsecured creditors to understand what they will receive under the Plan and the basis for such treatment and therefore whether to vote for or against it. Where there should be a description of the nature of unsecured creditor distributions and an estimate of their value, the Debtors offer only a blank, stating that each general unsecured creditor "shall receive its Pro Rata share of [___]." In addition, the Debtors have not provided an estimate of the amount of general unsecured claims, or of the value of

potential estate claims, or a liquidation analysis.  Unsecured creditors cannot be expected to vote on a Plan without knowing how their claims are being treated and what they are estimated to get. As the Court has heard at several recent hearings, there are significant unencumbered assets in these cases which can provide meaningful recovery to general unsecured creditors.  Further detail is warranted on the value of the assets that were unencumbered prior to the Petition Date, remain unencumbered during the bankruptcy, and the value and disposition of these assets under the Plan.

15.    Even if the Debtors revise the Disclosure Statement to provide that creditors will receive what they are entitled to under a "statutory waterfall" pursuant to a sale, such information is insufficient in helping creditors assess whether to vote for or against the Plan.  First, the RSA provides for a reorganization and not a sale.  Second, even if there is a sale, as noted above, there are material unencumbered assets (including the Rabbi Trust cash).  Regardless of whether or not there is a sale, the Court should require the Debtors to provide estimates of all unencumbered assets and identify the assumptions underlying their estimates.  The Court should also require the Debtors to provide financial projections, a valuation analysis or a sources and uses of cash at emergence.

16.    The Disclosure Statement should also explain that the Committee is not supportive of a Plan that does not provide an appropriate baseline recovery to unsecured creditors.

B.    <u>The Disclosure Statement Provides No Information About the Releases and Avoidance Action Waivers</u>.

17.    As discussed above, the Plan as proposed provides for the estates to grant releases to "Related Persons" of the Debtors, who are defined to include the Debtors' current and former insiders, including NRD.  The Disclosure Statement fails, however, to provide any information about the claims that they propose to release under the Plan, which would otherwise be available to the estates and their creditors.  *See In re Washington Mutual, Inc.*, 442 B.R. 314, 360 (Bankr.

D. Del. 2011) ("In a case where claims are being released under the chapter 11 plan . . . the released claims must be considered as part of the analysis in deciding whether creditors fare at least as well under chapter 11 plan as they would in a chapter 7 liquidation.").

18.     Similarly, the Third Circuit requires that third parties receiving releases under a plan have made a substantial contribution to the estates.  *See, e.g.*, *id*. at 348 (no releases for parties who "have not contributed cash or anything else of a tangible value to the Plan or to creditors nor provided an extraordinary service that would constitute a substantial contribution to the Plan or case").

19.     Despite these clear requirements, the Disclosure Statement fails to provide any information regarding the estate claims that the Plan will release, the value of those claims, or the substantial contribution allegedly made by each Related Person, including NRD, in exchange for the release.

20.     Prepetition, the Debtors entered into a merger agreement with affiliates of NRD, which resulted in NRD holding equity in the Debtors (the "Merger").  Concurrently, the Debtors entered into a Real Estate Sale Contract (the "Sale Agreement") with an affiliate of NRD.  Under the terms of the Sale Agreement, the NRD affiliate purchased 178 real properties from the Debtors and simultaneously sold the same properties to five strategic buyers (collectively, the "Sale/Leaseback Purchasers"), and such Sale/Leaseback Purchasers, as landlords, leased all of the real properties back to the Debtors, as tenant.  The Committee has submitted two informal document requests to the Debtors and NRD to diligence the Merger, among other NRD transactions.  While the Debtors have produced some documents, the Committee awaits production of additional documents from both Debtors and from NRD.  Although it is not disclosed, moreover, the Committee understands that the Debtors did a high-level review of the transactions involving

- 7 -

NRD - but the independent directors did not (deferring such investigation to the Committee). While the Committee is therefore conducting an independent investigation into claims against NRD and its affiliates, in its present form, the Disclosure Statement patently fails to provide unsecured creditors with sufficient information to make an informed decision about whether these releases are a reasonable treatment of estate claims or whether the Debtors are proposing a giveaway to their controlling insiders of value that could flow to unsecured creditors through the Plan. At a minimum, the Disclosure Statement should be amended to include more detail on the relationship and prior transactions with NRD, and the fact that the Committee is actively investigating this relationship and is not supportive of a release to NRD without a contribution from them at this time.

21.     In addition to the Debtor release, the Plan also contemplates a broad third-party release. The Plan excludes from the definition of "Releasing Party" holders of claims who elect on their ballot to opt-out of granting the releases. However, the ballots fail to provide affirmative steps for creditors to opt-out of the releases. The Committee reserves all rights as to whether the opt-out release as drafted is appropriate here but at a minimum, the Debtors must revise the ballots to indicate a method to opt-out of the release. The Committee submits that the definition of Releasing Parties should be revised to explicitly state that: (i) if holders vote in favor of the Plan, they still have an opportunity to opt-out of the releases and (ii) holders are not a Releasing Party if they are eligible to vote on the Plan or opt-out of the releases but do not return anything. See *Emerge Energy Services LP*, Case No. 19-11563 [Dkt. No. 671] ("it cannot be said with certainty that those failing to return a ballot or Opt-Out Form did so intentionally to give the third-party release, and that is what the Court must find under the law to approve a third-party release").

- 8 -

22.     Additionally, the Plan's exculpation provision is too broad as it provides exculpation for prepetition acts.  This is contrary to Third Circuit precedent, which provides that exculpation only covers "actions in the bankruptcy case."  *In re PWS Holding Corp.*, 228 F.3d 224, 246 (3d Cir. 2000).  The Committee has sent the Debtors proposed revisions to remove prepetition transactions.

23.     The Plan also provides for the waiver of certain avoidance actions against certain creditors that continue to provide goods and services post-petition on terms no worse than they did prepetition.  The Disclosure Statement provides no estimate of the amount of these claims, the parties against who they may be asserted, if the Debtors intend to pursue Avoidance Actions against other unsecured creditors who are not included in this waiver and who would receive the benefit of such recoveries (if any).  Based on this deficient information, unsecured creditors simply cannot make an informed voting decision.

24.     The Plan also provides for releases of all other claims against the Lenders which could be asserted on behalf of the Debtors.  However, certain of these claims must be preserved until at least the end of the Committee's Challenge Period, which is currently December 31, 2020.  For example, the Committee understands that there may be a perfection issue relating to the RT Lodge (which the Plan values at $5.3 million).  The Disclosure Statement should note the potential perfection issues and that the releases may not be appropriate, pending the conclusion of the Challenge Period.

C.     <u>The Disclosure Statement Does Not Provide Adequate Information About Exit Financing</u>.

25.     While the Disclosure Statement contemplates that the Exit Financing may be provided by TCW, there is no clear indication if the Exit Financing is fully committed or agreed and no specific (or even general) details are included.  Exit Financing is a critical piece for any

- 9 -

successful reorganization under a Plan, and the Court should not approve solicitation of the Plan that may very well never come to fruition (particularly when the RSA contemplated such financing would be committed by this time).

        D.    <u>Other Provisions in the Plan and Disclosure Statement Should be Revised Prior to Solicitation</u>.

26.      As drafted, the Plan contemplates that, unless there is a Topping Bid, (i) Goldman Sachs (as a holder in Class 3A) will receive a cash payment, adjustment equity in RT Asset Company and 100% of the equity interests in RT Lodge Company and (ii) TCW (as a holder in Class 3B) will receive a cash payment and 100% of the equity interests in RT Asset Company (less adjustment equity to Goldman Sachs  and subject to dilution on account of warrants (that also would go to TCW as an exit lender) and the MIP.  The Plan provides a stated value for RT Lodge (that is a factor in the calculation of the adjustment equity to Goldman Sachs) and amount for the respective cash payments.  However, the Disclosure Statement does not explain the basis for these values.  The Plan also provides for warrants up to 25% of the new common stock to TCW as equity lender and a MIP for up to 15% of the new common stock.  The Disclosure Statement does not explain the basis for these awards or underlying value of these amounts, which – unless a consensual resolution is reached – could be a source of consideration for general unsecured creditors.

27.      The Plan also contemplates substantive consolidation for Plan purposes.  While the Committee understands that the lion's share of assets and liabilities reside at Ruby Tuesday Inc., the Disclosure Statement should explain the basis for this consolidation and if any unsecured creditors are detrimentally affected by this provision.

28.    Lastly, there are various other provisions in the Plan that the Committee believes should be revised (e.g., relating to consultation and consent rights and distribution mechanics). The Committee is coordinating with the Debtors to resolve these open issues.

## RESERVATION OF RIGHTS

29.    The Committee is continuing to review and analyze the proposed chapter 11 Plan and reserves all rights on the Plan.  In addition, the Committee expects that the Debtors may file an amended version of the Disclosure Statement and Plan prior to the Disclosure Statement hearing and reserves all rights on such amended documents.

## CONCLUSION

30.    Therefore, the Committee respectfully requests that the Court deny approval of the Disclosure Statement Motion, absent the revisions required to cure the deficiencies set forth herein, and grant such further relief as the Court deems just and proper.


[*Remainder of page deliberately left blank.*]

61820/0001-21848239v1

Dated:   December 11, 2020

**COLE SCHOTZ P.C.**

*/s/ G. David Dean*
G. David Dean (No. 6403)
Justin R. Alberto (No. 5126)
Andrew J. Roth-Moore (No. 5988)
500 Delaware Avenue, Suite 1410
Telephone: (302) 652-3131
Facsimile: (302) 652-3117
ddean@coleschotz.com
jalberto@coleschotz.com
aroth-moore@coleschotz.com

-and-

**KRAMER LEVIN NAFTALIS & FRANKEL LLP**
Adam C. Rogoff, Esquire (admitted pro hac vice)
Robert T. Schmidt, Esquire (admitted pro hac vice)
P. Bradley O'Neill, Esquire (admitted pro hac vice)
1177 Avenue of the Americas
New York, New York 10036
Telephone: (212) 715-9100
Facsimile: (212) 715-8000
Email: arogoff@kramerlevin.com
        rschmidt@kramerlevin.com
        boneill@kramerlevin.com

*Counsel to the Official*
*Committee of Unsecured Creditors*