IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>RTI HOLDING COMPANY, LLC,[1]<br><br>　　　　　　　　　Debtors. | Chapter 11<br><br>Case No. 20-12456 (JTD)<br><br>(Jointly Administered) |

**DEBTORS' MOTION FOR ORDER (I) APPROVING PRIVATE SALE OF CERTAIN NON-CORE ASSETS (REAL PROPERTY LOCATED IN MARYVILLE, TENNESSEE) FREE AND CLEAR OF LIENS, CLAIMS AND INTERESTS THEREUNDER AND (II) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors in possession (the "<u>Debtors</u>") move the Court for the entry of an order, pursuant to sections 105, 363, 1107 and 1108 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>") and rules 2002, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>") (a) approving the private sale (the "<u>Sale</u>") of the land, easements, appurtenances and improvements located at 333 E. Broadway Avenue, Maryville, Tennessee 37804 and E. Harper Avenue, Maryville, Tennessee 37804 (collectively,

---

[1] The Debtors in these chapter 11 cases and the last four digits of each Debtor's U.S. tax identification number are as follows: RTI Holding Company, LLC (4966); Ruby Tuesday, Inc. (5239); Ruby Tuesday, LLC (1391); RTBD, LLC (6505); RT of Carroll County, LLC (8836); RT Denver Franchise, L.P. (2621); RT Detroit Franchise, LLC (8738); RT Distributing, LLC (6096); RT Finance, LLC (7242); RT FL Gift Cards, Inc. (2189); RT Florida Equity, LLC (7159); RT Franchise Acquisition, LLC (1438); RT of Fruitland, Inc. (1103); RT Indianapolis Franchise, LLC (6016); RT Jonesboro Club (2726); RT KCMO Franchise, LLC (7020); RT Kentucky Restaurant Holdings, LLC (7435); RT Las Vegas Franchise, LLC (4969); RT Long Island Franchise, LLC (4072); RT of Maryland, LLC (7395); RT Michiana Franchise, LLC (8739); RT Michigan Franchise, LLC (8760); RT Minneapolis Franchise, LLC (2746); RT Minneapolis Holdings, LLC (7189); RT New England Franchise, LLC (4970); RT New Hampshire Restaurant Holdings, LLC (7438);  RT New York Franchise, LLC (1154); RT Omaha Franchise, LLC (7442); RT Omaha Holdings, LLC (8647); RT One Percent Holdings, LLC (6689); RT One Percent Holdings II, LLC (2817); RT Orlando Franchise, LP (5105); RT Restaurant Services, LLC (7283); RT South Florida Franchise, LP (3535); RT Southwest Franchise, LLC (9715); RT St. Louis Franchise, LLC (6010); RT Tampa Franchise, LP (5290); RT Western Missouri Franchise, LLC (6082); RT West Palm Beach Franchise, LP (0359); RTTA, LP (0035); RTT Texas, Inc. (2461); RTTT, LLC (9194); Ruby Tuesday of Allegany County, Inc. (8011); Ruby Tuesday of Bryant, Inc. (6703); Ruby Tuesday of Columbia, Inc. (4091); Ruby Tuesday of Frederick, Inc. (4249); Ruby Tuesday of Linthicum, Inc. (8716); Ruby Tuesday of Marley Station, Inc. (1641); Ruby Tuesday of Pocomoke City, Inc. (0472); Ruby Tuesday of Russellville, Inc. (1601); and  Ruby Tuesday of Salisbury, Inc. (5432). The Debtors' mailing address is 333 East Broadway Ave., Maryville, TN 37804.

the "Assets") as described in and subject to the terms and conditions of that certain Purchase and Sale Agreement, dated as of December 2, 2020, a copy of which is annexed to this Motion as its **Exhibit A** (the "Purchase Agreement") between Ruby Tuesday, Inc., a Georgia corporation (the "Seller"), which is one of the Debtors, and Massey Properties, LLC, a Tennessee limited liability company (the "Buyer"), free and clear of liens, claims, encumbrances, and interests ("Interests"); and (b) granting related relief.  In support of this motion (the "Motion"), the Debtors respectfully represent as follows:

**Introduction**

1. By this Motion, the Debtors seek authorization for the Sale of the Assets outside the ordinary course of the Debtors' business.  The Assets to be sold by this private sale are non-core and, as described in more detail below, not included in the ongoing sale process for substantially all the business assets of the Debtors.[2]  The Sale will generate approximately $2,600,000.00 (the "Purchase Price") for the estates and their creditors.  For these reasons, as further discussed below, the Debtors believe that the relief sought in the Motion is a reasonable exercise of the Debtors' business judgment, is in the best interests of the estates, and should be granted.

**Jurisdiction and Venue**

2. The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the

---

[2] The Assets do not include certain furniture, fixtures and equipment ("FF&E") that the Debtors and Reorganized Debtors (as such term is defined in the proposed *Debtors' Chapter 11 Plan* filed on November 6, 2020 [D.I. 353]) may need on a going-forward basis, and all FF&E that they do not need and which remain on the premises at the closing of the Sale shall be sold to the Buyer as part of the Assets.

2

*Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated February 29, 2012.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2), and the Debtors confirm that their consent pursuant to Rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "<u>Local Rules</u>") to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

3. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

4. The statutory predicates for the relief sought herein are sections 105, 363, 1107 and 1108 of the Bankruptcy Code, Bankruptcy Rules 2002(a)(2), 6004, and 9014 and Local Rules 2002-1(b), 6004-1 and 9006-1.

**Background**

5. On October 7, 2020 (the "<u>Petition Date</u>"), the Debtors commenced these cases (the "<u>Cases</u>") by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code.  The Debtors have continued in the possession of their property and have continued to operate and manage their business as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  On October 26, 2020, the Office of United States Trustee appointed an Official Committee of Unsecured Creditors in these Cases.  No trustee or examiner has been appointed in these Cases.

6. The Debtors develop, operate, and franchise casual dining restaurants in the United States, Guam, and five foreign countries under the Ruby Tuesday® brand.  The company-

owned and operated restaurants (i.e., non-franchise) are concentrated primarily in the Southeast, Northeast, Mid-Atlantic and Midwest regions of the United States.

7. The factual background regarding the Debtors, including their current and historical business operations and the events precipitating the chapter 11 filings, is set forth in detail in the *Declaration of Shawn Lederman, Chief Executive Officer, in Support of First Day Pleadings* [D.I. 3] (the "First Day Declaration"), which is fully incorporated herein by reference.[3]

### The Debtors' Marketing Efforts

8. The Debtors made efforts to separately sell non-core, obsolete property not currently used in their operations, which includes the Assets. Prepetition, the Assets located at (a) 333 E. Broadway Avenue, Maryville, Tennessee 37804 had been used as the Debtors' headquarters building (the "Headquarters Building") and (b) E. Harper Avenue, Maryville, Tennessee 37804 had been used as parking lot (the "Parking Lot"). Under the terms of the Purchase Agreement, the Debtors may occupy and pay the Buyer agreed upon amounts of rent for their existing space in the Headquarters Building for up to six months under a separate agreement (the "Post-Closing Occupancy Agreement")[4] while they move their offices to currently rented space in a different local building. Renasant Bank leases the Parking Lot from the Debtors and leases space in the Headquarters Building as well and such leases will transfer to the Buyer at

---

[3] Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the First Day Declaration.

[4] Under the Post-Closing Occupancy Agreement, the Seller would pay no rent during the first four months of the post-closing occupancy period; however, it would pay $15,000 per month to the Buyer to defray any operating costs the Buyer may incur. If the Seller remains in the premises for the fifth and/or sixth month of the post-closing occupancy period, it would pay the Buyer $25,000 per month as rent and defray any operating costs the Buyer may incur. If the Seller continues to occupy the space after the end of the six month period, it would be obligated to pay $1,000 per day of rent and operating expenses.

closing.[5] Therefore, the Assets are no longer needed for the Debtors' business after the six month lease period expires (or earlier if the Debtors move before the six month lease period expires).

9. In the Spring of 2019, the Seller hired real estate broker Patrick Luther of SRS Real Estate Partners ("SRS") to assist the Seller with the sale of the Assets, but the two very low offers received by SRS were not accepted by the Seller. In November 2019, the Seller replaced its initial broker SRS with Jay Cobble of broker Providence Commercial Real Estate (the "Seller's Broker"). For its marketing efforts, the Seller's Broker: (a) listed the Assets on Loopnet/Costar, resulting in 25,286 views from 5,648 unique prospects resulting in 569 clicks; (b) offered the Assets for sale on the multiple listing service (MLS), which resulted in 216 views as of December 9, 2020; and (c) emailed a "Featured Lease Listing" to 2,990 contacts, of which 685 emails were opened with 109 resulting clicks. During January through and including July 2020, five potential buyers inquired about purchasing the Assets,[6] and the Seller (through the Seller's Broker) received low offers and/or offers with unacceptable timing. On July 1, 2020, the Seller's Broker received an offer from the Buyer, which was and is assisted by broker Berkshire Hathaway HomeServices Dean-Smith Realty (the "Buyer's Broker"). Negotiations ensued between the Seller and Seller's Broker on the one hand and the Buyer and Buyer's Broker on the other. On October 8, 2020, the Buyer raised its offer to the Purchase Price and (as stated above) as of December 2, 2020, the Seller and Buyer signed the Purchase Agreement for the Purchase Price.

---

[5] In its section 7(e), the Purchase Agreement identifies such lease as an unrecorded Lease Agreement, dated May 1, 2012, by and between Seller, as landlord, and Renasant Bank, as tenant, as amended.

[6] One toured but made no offer, a second toured and made a verbal offer with no follow-up and a third signed a non-disclosure agreement but did not make an offer. A fourth made offers, then withdrew its "final offer," then made a materially lower offer. Finally, the Buyer made offers (as discussed above), and its offer of the Purchase Price was accepted by the Seller.

10. Under section 12 of the Purchase Agreement, the Seller agreed to cease actively marketing the Assets after the date of mutual execution and delivery of the Purchase Agreement as of December 2, 2020, subject to the terms of such section, which include that the proposed sale is subject to higher and better Competing Bids (as such term is defined in such section of the Purchase Agreement).

**The Sale**

11. As stated above, the Purchase Price would be $2,600,000, net of Seller's Broker's commission of 5% of the Purchase Price (the "Seller's Broker's Commission"), with the Seller's Broker paying the Buyer's Broker 2% of the Purchase Price from its Seller's Broker's Commission of 5%. Pursuant to section 14 of the Purchase Agreement, the Seller would sell the Assets to the Buyer on an "as is," "where is" and "with all faults" basis, subject to certain Warranties (as defined in such section). In section 8(b) of the Purchase Agreement, the Buyer acknowledges that the Seller must obtain its lenders' approval. In sections 8(c), 10(a)(iii) and 23(d) of the Purchase Agreement, the parties agree that the Sale is subject to the approval of the Court, and that exclusive jurisdiction remains in this Court post-sale. Under such section 8(c), either party may terminate the Purchase Agreement if this Court does not approve the Sale within 30 days of the filing of this Motion.[7]

12. In connection with the Purchase Agreement, the Buyer has submitted an earnest money deposit of $25,000.00. The Buyer is not an officer, director, shareholder, or other insider of the Debtor. As of the date hereof, the only liens on the Assets of which the Debtors are aware are the liens of Goldman Sachs Special Lending Group, L.P. as administrative agent under

---

[7] See section 16(b) of the Purchase Agreement as well.

that certain Credit and Guaranty Agreement, dated as of December 21, 2017 (as amended,

supplemented or otherwise modified, or otherwise modified from time to time ("GSSLG").

## Relief Requested

13. By this Motion, the Debtors seek an order (a) authorizing the Debtors to perform under the Purchase Agreement[8] (b) approving the Sale of the Assets free and clear of Interests; and (c) granting the Debtors authority to pay the Seller's Broker's Commission to the Seller's Broker.[9]

## Authority for the Requested Relief

**A.    The Proposed Sale of the Assets Should be Approved
       Under Sections 363(b) and 365 of the Bankruptcy Code**

14. The Court should enter an order granting the relief requested herein because it represents a sound exercise of the Debtors' business judgment pursuant to sections 363(b)(l) and 365 of the Bankruptcy Code and is appropriate under section 105(a) of the Bankruptcy Code.

15. Section 363(b) of the Bankruptcy Code provides, in relevant part, that a debtor, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Although section 363 of the Bankruptcy Code does not set forth a standard for determining when a sale or disposition of property of the estate should be authorized, courts in the Third Circuit generally authorize sales of a debtor's assets if such sale is based upon the sound business judgment of the debtor. *Meyers v. Martin (In*

---

[8] In compliance with Local Rule 6004-1 and for the convenience of the reader, the salient terms of the transaction as currently set forth in the Purchase Agreement have been summarized and are attached hereto as **Exhibit B**.

[9] The Debtors will file a separate retention application to retain the broker.

*re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996); *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999); *In re Del. & Hudson Ry. Co.*, 124 B.R. 169, 176 (D. Del. 1991).

16. Specifically, courts in this district have held consistently that the sale of estate assets outside the ordinary course of business is appropriate if: (a) there is a sound business purpose for the sale; (b) the proposed sale price is fair; (c) the debtor has provided interested parties with adequate and reasonable notice; and (d) the buyer has acted in good faith. *See, e.g.*, *In re Exaeris, Inc.*, 380 B.R. 741, 744 (Bankr. D. Del. 2008); *In re Decora Indus., Inc.*, No. 00−4459, 2002 WL 32332749, at *7−8 (D. Del. May 20, 2002).

17. Moreover, if a valid business justification exists for the sale of property of the estate, a debtor's decision to sell property out of the ordinary course of business enjoys a strong presumption "that in making a business decision the directors . . . acted on an informed basis, in good faith and in an honest belief that the action taken was in the best interests of the company." *In re Integrated Res., Inc.*, 147 B.R. 650, 656 (Bankr. S.D.N.Y. 1992) (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)); *see also In re Bridgeport Hldgs., Inc.*, 388 B.R. 548, 567 (Bankr. D. Del. 2008) (stating that directors enjoy a presumption of honesty and good faith with respect to negotiating and approving a transaction involving a sale of assets). Parties objecting to the debtor's decision to sell property of the estate must make a showing of "bad faith, self-interest or gross negligence." *Integrated Res.*, 147 B.R. at 656; s*ee also In re Johns Manville Corp.*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986) ("Where the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct."). Accordingly, if a debtor's actions

satisfy the business judgment rule, then the transaction in question should be approved under section 363(b)(1) of the Bankruptcy Code.

18.     Here, the Debtors respectfully submit that sound business reasons support its decision to enter into the Purchase Agreement.  In light of the extensive marketing efforts, the Debtors respectfully submit that it is reasonably likely that no bidder will submit a bid exceeding the amount offered by the Buyer in the Purchase Agreement.

19.     Accordingly, the Debtors, in their sound business judgment, believe that Sale of the Assets to the Buyer is in the best interests of their estates and that the proposed transaction should be approved by the Court pursuant to section 363(b) of the Bankruptcy Code.

**B.     The Court Should Authorize the Sale of the Assets Free and Clear of Liens, Claims, Encumbrances, and Other Interests Pursuant to Section 363(f) of the Bankruptcy Code**

20.     The Debtors also seek to sell the Assets free and clear of all liens, claims, encumbrances, and other interests pursuant to section 363(f) of the Bankruptcy Code.  Section 363(f) of the Bankruptcy Code authorizes a debtor to sell assets free and clear of any interest in such property if:

(1)     applicable nonbankruptcy law permits sale of such property free and clear of such interest;

(2)     such entity consents;

(3)     such interest is a lien and the price at which such property is sold is greater than the aggregate value of all liens on such property;

(4)     such interest is in bona fide dispute; or

(5)     such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).  Because section 363(f) of the Bankruptcy Code is drafted in the disjunctive,

satisfaction of any one of its five requirements is sufficient to permit the sale of the Assets "free and clear" of liens and interests. *In re Kellstrom Indus., Inc.*, 282 B.R. 787, 793 (Bankr. D. Del. 2002); *Decora Indus., Inc.*, 2002 WL 32332749, at *7; *In re Elliot*, 94 B.R. 343, 345 (E.D. Pa. 1988). The Court also may authorize the sale of a debtor's assets free and clear of any liens pursuant to section 105 of the Bankruptcy Code, even if section 363(f) does not apply. *See In re Trans World Airlines, Inc.*, No. 01−0056 (PJW), 2001 WL 1820325, at *3 (Bankr. D. Del. Mar. 27, 2001).

21. As discussed above, the only liens on the Assets of which the Debtors are aware are the liens of GSSLG. In any event, the Debtors submit that the Sale free and clear of every Interest will satisfy at least one of the five conditions of section 363(f) of the Bankruptcy Code, and that any such Interest will be adequately protected by either being paid in full at the time of closing, or by having it attach to the net proceeds of the Sale. Thus, a Sale free of Interests is permitted. All proceeds of the Sale will be used or paid in accordance with the *Final Order (I) Authorizing Debtors to (A) Obtain Postpetition Financing Pursuant to 11 U. S .C. §§ 105, 361, 362, 364(v)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e) and (B) Use Cash Collateral Pursuant to 11 U. S. C. §§ 363 and (II) Granting Adequate Protection Pursuant to 11 U. S. C. §§ 362, 362, 363, and 364 [Docket No. 558]* (the "Final DIP Order").

**C.   The Court Should Grant the Buyer the Full Protections Afforded to a Good Faith Buyer Pursuant to Section 363(m) of the Bankruptcy Code**

22. Section 363(m) of the Bankruptcy Code provides, in relevant part:

> The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the

> appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m).  Section 363(m) of the Bankruptcy Code thus protects a purchaser of assets sold pursuant to section 363 of the Bankruptcy Code from the risk that it will lose its interest in the purchased assets if the order allowing the sale is reversed on appeal.  Although the Bankruptcy Code does not define "good faith purchaser," the Third Circuit has stated that a good faith purchaser is "one who purchases in 'good faith' and for 'value.'"  *In re Abbotts Dairies*, 788 F.2d 143, 147 (3d Cir. 1986).  To constitute a lack of good faith, a party's conduct in connection with the sale usually must amount to "fraud, collusion between the purchaser and other bidders or the trustee or an attempt to take grossly unfair advantage of other bidders."  *Id.* (citing *In re Rock Indus. Mach. Corp.*, 572 F.2d 1195, 1198 (7th Cir. 1978)).

        23.     Here, there is no fraud or collusion between the Buyer or any of its affiliates and the Debtors.  Before the execution of the Purchase Agreement, the Debtors and the Buyer engaged in extensive arm's-length discussions to reach a deal.  The Debtors and the Buyer were represented by separate counsel in connection with the negotiation and documentation of the Purchase Agreement.  Accordingly, the Debtors requests that the Court determine that the Buyer has negotiated and acted at all times in good faith and, as a result, is entitled to the full protections of a good faith purchaser under section 363(m) of the Bankruptcy Code, and that the Purchase Agreement does not constitute an avoidable transaction pursuant to section 363(n) of the Bankruptcy Code.

## D.     A Private Sale of the Assets is Appropriate Under Bankruptcy Rule 6004

24. Bankruptcy Rule 6004(f) and Local Rule 6004-1(b)(iv)(D) permit a debtor to conduct a private sale pursuant to section 363.  Specifically, Bankruptcy Rule 6004(f) provides that "[a]ll sales not in the ordinary course of business may be by private sale or by public auction."  Fed. R. Bankr. P. 6004(f)(1) (emphasis added); s*ee also In re Alisa P'ship*, 15 B.R. 802, 802 (Bankr. D. Del 1981) (holding that manner of sale is within the debtor's discretion); *In re Bakalis*, 220 B.R. 525, 531−32 (Bankr. E.D.N.Y. 1998) (stating that debtor has authority to conduct public or private sales of estate property).

25. Accordingly, in light of Bankruptcy Rule 6004(f) and case law regarding section 363 sales, a debtor may conduct a private sale if a good business reason exists.  *See, e.g.*, *In re Pritam Realty, Inc.*, 233 B.R. 619 (D.P.R. 1999) (upholding the bankruptcy court's approval of a private sale conducted by a chapter 11 debtor); *In re Condere Corp.*, 228 B.R. 615, 629 (Bankr. S.D. Miss. 1998) (authorizing private sale of debtors' tire company where "[d]ebtor has shown a sufficient business justification for the sale of the assets to the [p]urchaser"); *In re Embrace Sys. Corp.*, 178 B.R. 112, 123 (Bankr. W.D. Mich. 1995) ("A large measure of discretion is available to a bankruptcy court in determining whether a private sale should be approved.  The court should exercise its discretion based upon the facts and circumstances of the proposed sale."); *In re Wieboldt Stores, Inc.*, 92 B.R. 309 (N.D. Ill. 1988) (affirming right of chapter 11 debtor to transfer assets by private sale).

26. Indeed, courts in this and other districts have approved private sales of estate property pursuant to section 363(b)(1) when there has been a valid business reason for not conducting an auction.  *See, e.g.*, *Buffets Holdings, Inc.*, No. 08−10141 (MFW) (Bankr. D. Del.

Feb. 3, 2009) (approving the private sale of real property for approximately $2.4 million); *In re W.R. Grace & Co.*, No. 01−01139 (JKF) (Bankr. D. Del. Dec. 18, 2008) (approving the private sale of real property for approximately $3.8 million); *In re Wellman, Inc.*, No. 08−10595 (SMB) (Bankr. S.D.N.Y. Oct. 6, 2008) (approving private sale of industrial complex capable of converting recycled carpet *into* nylon engineered resins for $17.9 million); *In re W.R. Grace & Co.*, No. 01−01139 (JKF) (Bankr. D. Del. July 23, 2007) (authorizing private sale of business line which designs and manufactures materials used in catalytic converters to remove pollutants produced by engines for approximately $22 million); *In re Solutia, Inc.*, No. 03−17949 (SCC) (Bankr S.D.N.Y. Dec. 28, 2006) (approving private sale of real property for approximately $7.1 million).[10]

27.     The Debtors submit that the proposed private sale of the Assets to the Buyer in accordance with the Purchase Agreement is appropriate in light of the facts and circumstances of this chapter 11 case.  As detailed above, the Debtors through the Seller's Broker marketed the Assets to a broad and a targeted group of potential purchasers.  The Buyer emerged from this process as providing the highest and best bid for the Assets.  Given the proposed Purchase Price for the Assets and the competitive bidding process already undertaken by the Debtors, the probability that a competing bidder will actually emerge with an offer higher or better to top the bid does not justify the costs associated with approval of bidding procedures and the scheduling of an auction by this Court.

---

[10] Because of the voluminous nature of the orders cited herein, such orders have not been attached to this Motion. Copies of these orders are available upon request of the Debtors' counsel.

28. The transaction with the Buyer allows the Debtors to maximize the value of the Assets. Because a private sale is specifically authorized under Bankruptcy Rule 6004 and the Debtors believe that the Buyer's offer is the highest and best offer for the Assets (indeed, the Debtors do not believe any other offer could be obtained on better terms), the Debtors request that the Court approve the proposed private sale of the Assets to the Buyer in accordance with the Purchase Agreement.

**Waiver of Bankruptcy Rule 6004**

29. To implement the foregoing successfully, the Debtors seek a waiver of the fourteen (14) day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h), to the extent these rules are applicable. As described above, the relief that the Debtors seek in this Motion is necessary for the Debtors to generate revenues for their estates and repay in part their prepetition secured lenders. Accordingly, the Debtors respectfully request that the Court waive the fourteen (14) day stay imposed by Bankruptcy Rule 6004(h), so that the Debtors may perform their obligations timely under the Purchase Agreement.

**Notice**

30. Notice of this Motion shall be provided to: (a) the Office of the United States Trustee for the District of Delaware; (b) counsel to the Committee; (c) the Debtors' postpetition and prepetition secured creditors; (d) the Buyer; (e) all parties who have expressed a written interest in acquiring the Assets; (f) all known holders of liens, claims, and other encumbrances secured by the assets constituting the Assets; (g) all applicable federal, state, and local taxing authorities, including the Internal Revenue Service; and (h) any party that has

requested notice pursuant to Bankruptcy Rule 2002.  The Debtors respectfully submit that, in light of the nature of the relief requested, no other or further notice need be given.

### No Prior Request

31. No prior motion for relief requested herein has been made to this or any other court.

WHEREFORE, the Debtors respectfully request that the Court enter an order, substantially in the form**s** attached hereto as **Exhibit C** (a) granting the relief requested herein, and (b) granting such other relief as is just and proper.

| | |
|---|---|
| Dated: December 14, 2020<br>Wilmington, Delaware | PACHULSKI STANG ZIEHL & JONES LLP<br><br>*/s/ James E. O'Neill*<br>Richard M. Pachulski (CA Bar No. 90073)<br>Malhar S. Pagay (CA Bar No. 189289)<br>James E. O'Neill (Bar No. 4042)<br>Victoria A. Newmark (CA Bar No. 183581)<br>919 North Market Street, 17th Floor<br>P.O. Box 8705<br>Wilmington, Delaware  19899-8705 (Courier 19801)<br>Telephone:  302-652-4100<br>Facsimile:   302-652-4400<br>email:  rpachulski@pszjlaw.com<br>            mpagay@pszjlaw.com<br>            joneill@pszjlaw.com<br>            vnewmark@pszjlaw.com<br><br>Counsel to the Debtors and Debtors in Possession |

DOCS_LA:334323.4 76136/002