# EXHIBIT A

**(Purchase Agreement)**

## PURCHASE AND SALE AGREEMENT

### MARYVILLE, TN – RT# 4045

**THIS PURCHASE AND SALE AGREEMENT** (this "**Agreement**") is made and entered into as of December 2, 2020 (the "**Effective Date**") by and between **RUBY TUESDAY, INC.**, a Georgia corporation ("**Seller**") and **MASSEY PROPERTIES, LLC**, a Tennessee limited liability company ("**Purchaser**"). (Seller and Purchaser are referred to herein sometimes as a "**party**" or the "**parties**").

### RECITALS:

**A.** Seller is the owner of that certain real property (the "**Land**") located at 333 E. Broadway Avenue, Maryville, Tennessee and E. Harper Avenue, Maryville, Tennessee, as more particularly described in **Exhibit "A"** attached hereto and incorporated herein by reference, together with all improvements located upon the Land, including, but not limited to, any buildings, improvements, fixtures and parking facilities which may be erected upon the Land (the "**Improvements**", and, together with the Land, the "**Property**"); provided, however, that, prior to end of the Post Closing Occupancy Period (as defined in Section 1 below), Seller may, but shall not be obligated to, remove machinery, equipment, furniture, furnishings, supplies, materials and other tangible personal property owned by Seller and located at the Land ("**FF&E**") and such shall be excluded from the sale and the Improvements and the Property. Should Seller not remove any FF&E then Seller shall not have any further obligations with respect thereto.

**B.** Purchaser desires to purchase the Property from Seller, and Seller is willing to sell the Property to Purchaser, based the terms contained in this Agreement.

**NOW THEREFORE,** in consideration of the mutual covenants hereinafter stated and for other good and valuable consideration, the receipt and sufficiency of which are acknowledged, the parties hereby agree as follows:

1. **Transaction.** In accordance with and subject to the terms and conditions of this Agreement, the following shall occur contemporaneously at Closing (as defined in Section 8(a) below): (a) Seller shall sell and convey to Purchaser, and Purchaser shall purchase and accept from Seller, the Property; and (b) Purchaser shall allow Seller to occupy that portion of the Property not otherwise leased to Renasant Bank (the "**Temporary Occupancy Space**") for a period of up to six (6) months following the Closing (the "**Post Closing Occupancy Period**") pursuant to the Post-Closing Occupancy Agreement (as defined in Section 4 below).

2. **Purchase Price.** The purchase price for the Property shall be TWO MILLION SIX HUNDRED THOUSAND AND NO/100 DOLLARS ($2,600,000.00) (the "**Purchase Price**"), to be paid at Closing by wire transfer of immediately available funds to Seller, subject to prorations, adjustments and credits as specified in this Agreement.

3. **Earnest Money.** Within three (3) Business Days (as defined in Section 23(h) below) following the Effective Date, Purchaser shall deposit with Tennessee Valley Title – Knoxville (sometimes referred to as "**Escrow Agent**" or "**Title Company**") the sum of TWENTY-FIVE THOUSAND and No/100 Dollars ($25,000.00) as earnest money (the "**Earnest Money**") to be held in escrow pursuant to the terms of this Agreement. Immediately upon deposit, the Earnest Money shall be deemed non-refundable, except as specifically provided herein (including in the event of an uncured Seller default or failure of a condition precedent to Closing benefitting Purchaser). Except as specifically provided herein, all interest and other income earned on the Earnest Money, if any, shall be disbursed in the same manner as the Earnest Money. Notwithstanding anything to the contrary contained in this Agreement, if Purchaser is entitled to a return of the Earnest Money under this Agreement, then Escrow Agent shall deliver ONE HUNDRED and No/100 Dollars ($100.00) of the Earnest Money to Seller, as good and sufficient independent consideration for entering into this Agreement, and the balance of the Earnest Money to Purchaser.

4.   **Post-Closing Occupancy.** Purchaser acknowledges that Seller may continue to occupy the Temporary Occupancy Space during the Post-Closing Occupancy Period. Purchaser and Seller have agreed to enter into a Post-Closing Occupancy Agreement at Closing in substantially the form attached as **Exhibit D** (the "**Post-Closing Occupancy Agreement**"). Notwithstanding anything to the contrary contained in this Agreement, Seller may, in its sole and absolute discretion, cease occupying the Property and move out prior to the Scheduled Closing Date (as defined in Section 8(b) below) in which event: (i) notwithstanding anything to the contrary contained in this Agreement, Seller shall not be responsible for the loss of or damage to any personal property due to theft, vandalism, fire, flood, acts of God or acts of terrorism; (ii) the Bill of Sale (as defined in Section 11(b) below) shall be delivered at Closing; and (iii) possession and occupancy of the Property shall be delivered to Purchaser at Closing, subject to the Permitted Exceptions (as defined in Section 7(e) below) (including, without limitation, the Bank Lease (as defined in Section 7(e) below).

5.   **Due Diligence Documents.** Within five (5) calendar days after the Effective Date, Seller shall furnish or make available to Purchaser the Due Diligence Documents (as defined below), to the extent not previously furnished and readily available in Seller's possession. "**Due Diligence Documents**" means the most-recent existing copies of environmental and engineering studies, existing title insurance documents, surveys, site plans and other documentation reasonably relevant to Purchaser's evaluation of the Property. All such materials shall be delivered without representation or warranty by Seller, except that, to Seller's actual knowledge, all such materials are complete and unaltered copies of such materials as received by Seller. Seller may elect to deliver the Due Diligence Documents to Purchaser via electronic mail or other electronic method, such as an online data room, including Dropbox or similar internet-based file storage program.

6.   **Inspection by Purchaser.**

(a)   Seller hereby grants to Purchaser and Purchaser's employees, agents, consultants and contractors (collectively, and together with anyone entering the Property on behalf of, or with the consent of, Purchaser "**Purchaser's Representatives**"), the right to enter the Property, except for the portion of the Property leased to Renasant Bank, from the Effective Date through the Closing Date or earlier termination of this Agreement, in order to, at Purchaser's sole cost and expense, perform non-invasive, non-intrusive inspections (including a so-called Phase I audit) and/or any other reasonable non-invasive, non-intrusive investigations, tests, searches, reviews, studies or examinations into the status of the Property as Purchaser desires. Purchaser shall have access to the Property, except for the portion of the Property leased to Renasant Bank, at such reasonable business hours as Seller shall reasonably designate and only following one (1) Business Day prior notice to Seller. Purchaser must obtain Seller's advance written approval (which approval may be granted or withheld in Seller's sole and absolute discretion) for the performance, scope and method, described with reasonable specificity, of: (i) a so-called Phase II environmental inspection and any other intrusive or invasive testing or inspection; and/or (ii) any testing or inspection which could alter the physical condition of any portion of the Property. Purchaser shall promptly deliver to Seller all information produced or procured by Purchaser including, without limitation, any new survey or updated survey that Purchaser has obtained; provided, however, that Purchaser shall only provide copies of environmental studies, reports and other findings if expressly requested by Seller in writing. The information delivered by Purchaser to Seller is referred to as the "**Buyer Information**". Purchaser shall keep all information obtained as part of its inspections, examinations or investigations confidential pursuant to the terms of Section 6(d) below. Notwithstanding Purchaser's obligation to deliver copies of all reports to Seller, Purchaser shall still be responsible to pay all costs of its reports. Purchaser shall immediately restore the Property to a condition that is at least as good as its previous condition immediately following any entry, test or inspection. Purchaser acknowledges that the Property is a fully functional office building. Purchaser shall ensure that its activities and the activities of Purchaser's Representatives do not unreasonably interfere with or disrupt the operations, activities and/or employees of Seller. Purchaser expressly acknowledges and agrees that, notwithstanding anything to the contrary in this Agreement, Purchaser's obligations under this Agreement shall in no way be conditioned or contingent upon the results of any inspections, examinations or investigations undertaken or to be undertaken by Purchaser with respect

to the Property.

(b)    Purchaser shall be liable for all damage and/or injury to any person or property resulting from, relating to, and/or arising out of Purchaser's entry and/or activities (and/or the entry and/or activities of Purchaser's Representatives) on the Property and Purchaser shall keep the Property free and clear of any liens arising from work performed by or on behalf of Purchaser (and/or Purchaser's Representatives) in connection with its inspection activities. Purchaser indemnifies, defends and holds harmless Seller, Seller's affiliates and their respective members, directors, officers, shareholders, interest holders, employees, advisors, agents, attorneys and managers and their respective successors and assigns (individually an "**Indemnitee**", and, collectively, the "**Indemnitees**") from and against any and all claims, suits, actions, causes of action, orders, judgments, decrees, losses, liabilities, damages, costs and expenses (whether direct, indirect, consequential or punitive and including, without limitation, Attorney's Fees (as defined below)) of any kind or nature whatsoever arising from any personal injury, loss of life, damage to property and/or any other matter whatsoever arising out of, relating to and/or due to Purchaser's entry onto and/or activities onto the Property (and/or entry onto and/or activities onto the Property of Purchaser's Representatives). If any liens are filed against the Property as a result of Purchaser's activities (and/or the activities of Purchaser's Representatives), Purchaser shall cause such liens to be removed, satisfied or transferred to bond within ten (10) days after Purchaser receives notice of such liens. If Purchaser fails to do so, in addition to any other rights and/or remedies of Seller, Seller may cause the same to be removed, satisfied, or transferred to bond and Purchaser shall be responsible for Seller's costs associated therewith (including, without limitation, Attorney's Fees) and shall reimburse Seller therefor within five (5) Business Days after Seller's written demand therefor. Notwithstanding anything contained herein to the contrary, Purchaser shall not be obligated to indemnify Seller for pre-existing hazardous substances discovered or released during any inspections, examinations or investigations, unless the same result from Purchaser's and/or Purchaser's Representatives' negligence or willful misconduct. As used in this Agreement, the term "**Attorney's Fees**" means and includes fees, costs and disbursements of in-house and outside attorneys and paralegals, at a reasonable per-hour rate, prior to trial, at trial, on appeal and/or as part of a bankruptcy proceeding, whether or not litigation is commenced, and all court costs. The provisions of this Section 6(b) shall survive the Closing or any termination of this Agreement.

(c)    Before Purchaser or any of Purchaser's Representatives may enter the Property, Purchaser must provide Seller with a certificate of insurance naming Seller (and any other person/entity designated by Seller) as an additional insured, issued by an insurance company licensed in the State in which the Property is located and otherwise satisfactory to Seller and with insurance limits in a minimum amount of ONE MILLION and No/100 DOLLARS ($1,000,000.00) per occurrence and TWO MILLION and No/100 Dollars ($2,000,000.00) in the aggregate, on an occurrence basis, covering commercial general liability (including, without limitation, contractual liability) and automobile liability.

(d)    Purchaser shall not disclose any information about the environmental condition of the Property to, or otherwise contact, any governmental authority regarding environmental matters that come to Purchaser's attention in the course of its inspections, examinations or investigations without the prior written consent of Seller in its sole and absolute discretion, unless otherwise required by law. In the event such disclosure is required by law, Purchaser shall notify Seller prior to making any such disclosure and shall allow Seller to elect to satisfy such obligation by Seller making the required disclosure. Routine searches of government data bases or other typical inquiries made by an environmental consultant in the course of a Phase 1 audit are not subject to the restriction set forth in this Section 6(d).

7.    **Title Commitment and Survey.**

(a)    Within fifteen (15) days after the Effective Date, Purchaser, at its sole cost and expense, shall obtain a commitment for the issuance of an owner's title insurance policy (the "**Title Commitment**") issued by the Title Company and shall deliver to Seller a written statement (the "**Title Objection Notice**") of any title objections ("**Title Objections**") together with a copy of the Title Commitment and the exception documents. Within five (5) calendar days after Seller's receipt of Purchaser's Title Objection Notice (the "**Seller Response Period**"), Seller shall notify Purchaser whether

3

Seller shall attempt to cause any Title Objections to be removed from title, insured over and/or cured (by endorsement, by "writing over" or in another manner reasonably satisfactory to Purchaser). Seller's failure to provide such notice to Purchaser within the Seller Response Period as to the action Seller shall take with respect to any Title Objection shall be deemed an election by Seller to not attempt to cause any Title Objections to be removed from title, insured over and/or cured. If Purchaser fails to timely give Seller the Title Objection Notice, Purchaser shall be deemed to have accepted the Title Commitment and any matters therein are deemed approved and to be Permitted Exceptions (as defined in <u>Section 7(e)</u> below).

(b)     Within fifteen (15) days after the Effective Date, Purchaser may at its sole cost and expense, obtain a current survey of the Property (the "**Survey**") and, if obtained, shall deliver the Survey to Seller along with a written statement (the "**Survey Objection Notice**") of any survey objections ("**Survey Objections**"). The Survey shall be prepared by a surveyor or engineer licensed in the State where the Property is located and shall be certified to Purchaser, Seller and Title Company. Within five (5) calendar days of Seller's receipt of Purchaser's Survey Objection Notice Seller shall notify Purchaser whether Seller shall attempt to cause any Survey Objections to be removed from title, insured over and/or cured (by endorsement, by "writing over" or in another manner reasonably satisfactory to Purchaser). Seller's failure to provide such notice to Purchaser within the required period as to the action Seller shall take with respect to any Survey Objection shall be deemed an election by Seller to not attempt to cause any Survey Objections to be removed from title, insured over and/or cured. If Purchaser fails to timely give Seller the Survey Objection Notice, Purchaser shall be deemed to have accepted the Survey and any matters therein are deemed approved and to be Permitted Exceptions.

(c)     Purchaser expressly acknowledges and agrees that, notwithstanding anything to the contrary in this Agreement, Purchaser's obligations under this Agreement shall in no way be conditioned or contingent upon the results of any review of and/or objections to the Title Commitment and/or the Survey.

(d)     Notwithstanding anything to the contrary contained in this Agreement, Seller has no obligation to take any steps, bring any action, and/or incur any costs, efforts and/or expenses whatsoever regarding any Title Objections and/or Survey Objections; provided, however, that, prior to Closing, Seller agrees to cure (either by satisfaction in full, by bonding off or otherwise) any mortgages, tax liens, mechanics liens and other monetary liens, which were created by Seller and which encumber the Property.

(e)     As used herein, the defined term "**Permitted Exception(s)**" means all of the following: (i) zoning, building and land use laws, ordinances, rules and regulations applicable to the Property; (ii) the lien of taxes and assessments on the Property not yet due and payable; (iii) legal highways and rights of way; (iv) all covenants, conditions, restrictions, easements and other matters disclosed by the Survey or enumerated in "Schedule B – Section II" of the Title Commitment; (v) the Post-Closing Occupancy Agreement; and (vi) that certain unrecorded Lease Agreement, dated May 1, 2012, by and between Seller, as landlord and Renasant Bank, as tenant, as amended (the "**Bank Lease**");

8.    <u>Closing.</u>

(a)     The closing of the purchase and sale of the Property (the "**Closing**") shall take place on or before the later of the: (i) thirtieth (30th) calendar day after the Effective Date; and (ii) as soon as practicable after (a) the Objection Period (as described in <u>Section 10 (a) (iii)</u> below) expires without any objections filed or (b) all filed objections have been withdrawn or resolved and (c) Seller has received Lender Approval (as defined and described in <u>Section 8(b)</u> below (the "**Scheduled Closing Date**"); provided, however, that if either party is entitled to take any action hereunder within a specified time period that would expire after the Scheduled Closing Date, then the Scheduled Closing Date shall be extended until the end of such time period. Escrow Agent shall serve as the closing agent and shall be responsible for preparing the closing statement and customary transfer documents in accordance with and subject to the terms and conditions of this Agreement. The date on which the Closing occurs is referred to as the "**Closing Date**". The closing may be conducted by either party in mail away format with immediately available funds and closing documents (as described in <u>Section 11</u> below) delivered to Escrow Agent, in escrow, on or

before the Scheduled Closing Date.

(b) PURCHASER ACKNOWLEDGES THAT SELLER MUST OBTAIN APPROVAL FROM ITS LENDER FOR THE TRANSACTION CONTEMPLATED HEREIN (THE "**LENDER APPROVAL**"). PROMPTLY FOLLOWING RECEIPT OF THE LENDER'S APPROVAL, SELLER SHALL PROVIDE PURCHASER NOTICE THEREOF. IF SELLER FAILS TO DELIVER SUCH NOTICE WITHIN FOURTEEN (14) DAYS AFTER THE EFFECTIVE DATE, EITHER PARTY SHALL HAVE THE RIGHT TO TERMINATE THIS AGREEMENT BY DELIVERING WRITTEN NOTICE THEREOF TO THE OTHER PROVIDED SUCH NOTICE IS DELIVERED PRIOR TO RECEIPT OF THE LENDER'S APPROVAL. IN THE EVENT OF SUCH TERMINATION, ESCROW AGENT SHALL DISBURSE THE EARNEST MONEY IN ACCORDANCE WITH THE PROVISIONS HEREIN TO PURCHASER AND THE PARTIES SHALL HAVE NO FURTHER RIGHTS, DUTIES OR OBLIGATIONS UNDER THIS AGREEMENT, OTHER THAN THOSE WHICH ARE EXPRESSLY PROVIDED IN THIS AGREEMENT TO SURVIVE THE TERMINATION OF THIS AGREEMENT.

(c) SELLER HAS FILED A VOLUNTARY CASE (THE "**CASE**") UNDER CHAPTER 11 OF THE BANKRUPTCY CODE IN THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE (THE "**BANKRUPTCY COURT**") UNDER CASE NO. 20-12456(JTD). AS SOON AS PRACTICABLE AFTER THE EFFECTIVE DATE OF THIS AGREEMENT SELLER SHALL FILE WITH THE COURT IN THIS ACTION A MOTION TO SELL THE PROPERTY IN ACCORDANCE WITH THE TERMS OF THIS AGREEMENT. UPON THE BANKRUPTCY COURT'S ENTRY OF AN ORDER IN FORM AND CONTENT SATISFACTORY TO SELLER AUTHORIZING SELLER TO PROCEED WITH SUCH TRANSACTION (THE "**BANKRUPTCY COURT APPROVAL**"), SELLER SHALL PROMPTLY PROVIDE PURCHASER AND TITLE COMPANY NOTICE THEREOF. EITHER PARTY MAY TERMINATE THIS AGREEMENT BY WRITTEN NOTICE TO THE OTHER IF: (I) THE BANKRUPTCY COURT DISAPPROVES OR REJECTS SELLER'S MOTION TO SELL THE PROPERTY IN ACCORDANCE WITH THE TERMS OF THIS   AGREEMENT; OR (II) THE BANKRUPTCY COURT FAILS TO ISSUE THE BANKRUPTCY COURT APPROVAL WITHIN THIRTY (30) DAYS AFTER THE FILING OF THE ABOVE REFERENCED MOTION BY SELLER; PROVIDED, HOWEVER, THAT IF THE BANKRUPTCY COURT FAILS TO ISSUE THE BANKRUPTCY COURT APPROVAL WITHIN SUCH THIRTY (30) DAY PERIOD AND SELLER IS USING GOOD FAITH EFFORTS TO OBTAIN THE BANKRUPTCY COURT APPROVAL, SELLER MAY EXTEND THE THIRTY (30) DAY PERIOD FOR AN ADDITIONAL THIRTY (30) DAYS BY WRITTEN NOTICE TO PURCHASER. IN THE EVENT OF SUCH TERMINATION, ESCROW AGENT SHALL DISBURSE THE EARNEST MONEY IN ACCORDANCE WITH THE PROVISIONS HEREIN TO PURCHASER AND THE PARTIES SHALL HAVE NO FURTHER RIGHTS, DUTIES OR OBLIGATIONS UNDER THIS AGREEMENT, OTHER THAN THOSE WHICH ARE EXPRESSLY PROVIDED IN THIS AGREEMENT TO SURVIVE THE TERMINATION OF THIS AGREEMENT.

9.    **Closing Costs, Credits and Prorations.**

(a)    At Closing, Seller shall pay (i) the fees of any counsel representing it in connection with this transaction and (ii) one-half (1/2) of any escrow fees charged by Escrow Agent to hold the Earnest Money.

(b)    Purchaser shall pay all other Closing costs, including, without limitation (i) any and all state and county transfer taxes, deed recording fees, documentary stamp taxes, property owners' association transfer or resale assessments and all other taxes and fees imposed on account of the recordation of the Deed (as defined in Section 11(b) below) and/or the transfer of the Property, (ii) the fees of any counsel representing Purchaser in connection with this transaction, (iii) one-half (1/2) of any escrow fees charged by Escrow Agent to hold the Earnest Money, (iv) recording fees, (v) the premium for the owner's title policy, if any, and the Title Commitment costs as well as the premium for any and all endorsements to the owner's title policy and any lender's title policies (provided, however, that Purchaser acknowledges and agrees that this Agreement is not contingent upon Purchaser obtaining financing), (vi) the cost of

Purchaser's inspections, examinations or investigations of the Property, and (vii) any costs associated with the Survey.

(c)    All expenses in connection with the operation of the Property shall be apportioned, as of 11:59 p.m. (local time in the location of the Land) on the day prior to the Closing Date. Prorated and credited items shall include, without limitation, the following:

(i)    **Taxes.** General, special, ad valorem and other property taxes and assessments imposed by any governmental authority and any association assessments, fees and dues (collectively, the "**Taxes**") for the then-current calendar year shall be prorated. If the Closing Date occurs prior to the receipt by Seller of all tax bills for the calendar year, Purchaser and Seller shall prorate Taxes for such calendar year based on the previous year and a post-closing "true-up" shall take place once all tax bills for the calendar year are received. Purchaser shall pay all increases in Taxes due to the change in ownership or use of the Property and the same shall not be prorated. Notwithstanding anything contained herein to the contrary, Seller shall be responsible for paying (and/or reimbursing Purchaser for) the personal property taxes for the period during which Seller occupies the Property (prior to and during the Post-Closing Occupancy Period). At Closing, funds, in an amount equal to one-half (1/2) of the full year's personal property taxes as shown on the 2020 personal property tax bill(s), shall be withheld from Seller's net proceeds and held in escrow. Upon vacating the Property, the parties shall determine Seller's proportionate share of personal property taxes for the 2021 calendar year and direct the escrow agent to disburse such amount to Purchaser and the balance of the escrowed funds (if any) to Seller. If Seller vacates the Property prior to the issuance of all personal property tax bills for the 2021 calendar year, then Seller's proportionate share shall be based on the 2020 personal property tax bills. Purchaser shall be responsible for and shall timely pay the amount, if any, by which the 2021 personal property taxes payable by Seller exceed the amount escrowed by Seller and Seller shall not be responsible to Purchaser therefor. Purchaser shall timely remit the entire amount of the 2021 personal property taxes to the appropriate governmental authority(ies).

(ii)    **Utilities.** All utility bills for the Property shall be prorated as of the Closing Date. In the event Seller has not received utility bills through the Closing Date, utilities shall be prorated based on the most recent bills and a post-closing "true-up" shall take place within ninety (90) days after the Closing. Seller shall be responsible for obtaining its own refund or credits for previously paid deposits with respect to the Property.

(iii)    **Additional Items.** Any other operating expenses or other items pertaining to the Property which are customarily prorated between a purchaser and a seller in comparable commercial transactions in the area which the Property is located shall be prorated according to local custom.

10.    **Conditions to Closing.**

(a)    Seller's and Purchaser's obligations to consummate the transactions contemplated by this Agreement are conditioned upon fulfillment of the following conditions, each of which may be waived by the party whose obligation to close is conditioned on the fulfillment of such condition:

(i)    All of the representations and warranties of the other party shall be true and correct in all material respects, subject to permitted changes in facts or circumstances pursuant to this Agreement, both as of the date of this Agreement and as of the Closing Date.

(ii)    All other conditions precedent to each party's obligation to consummate the transactions contemplated by this Agreement shall have been satisfied on or before the Closing Date.

(iii)    Seller shall have filed a notice of this Agreement in the Bankruptcy Court and either (i) no objections to this Agreement shall have been filed in the Case during the twenty-one (21) calendar day period immediately following the filing of such notice or any other such objection period as set forth in the Bankruptcy Court Approval (the "**Objection Period**") as evidenced by a copy of the docket in the Case, or (ii) any objections filed within Objection Period shall have been resolved and withdrawn.

(iv)    Seller shall have received Lender Approval as described in <u>Section 8(b)</u> herein.

**(b)**    If either of the conditions under <u>Sections 10(a)(i) and/or (ii)</u> above benefiting a party (the "**Benefitted Party**") have not been satisfied by the Scheduled Closing Date, then the Benefitted Party may, by written notice delivered to the other party on or before the Scheduled Closing Date, elect (as its sole right and remedy) to: (i) close without any reduction in the Purchase Price; (ii) terminate this Agreement, so long as the Benefitted Party is not in default under this Agreement beyond any applicable cure period; or (iii) extend the Scheduled Closing Date by up to ten (10) days to allow the other party to satisfy the conditions. If the Benefitted Party elects to extend the Scheduled Closing Date and either of the conditions under <u>Sections 10(a)(i) and/or (ii)</u> above remain unsatisfied at the end of such extension period, the Benefitted Party may, by written notice delivered to the other party on or before the Scheduled Closing Date, elect (as its sole right and remedy) to: (i) close without any reduction in the Purchase Price; or (ii) terminate this Agreement, so long as the Benefitted Party is not in default under this Agreement beyond any applicable cure period. If Purchaser is in default or fails to timely deliver a termination or extension notice, Purchaser shall be deemed to have elected to close without any reduction in the Purchase Price. Upon an election of termination, so long as the non-terminating party is not in default under this Agreement beyond any applicable cure period, Escrow Agent shall disburse the Earnest Money to the Benefitted Party in accordance with the provisions herein and Seller and Purchaser shall have no further rights and obligations hereunder except those which expressly survive termination of this Agreement.

**(c)**    As to <u>Sections 10(a)(iii) and/or (iv)</u> above, each of Seller and Purchaser shall be a Benefitted Party and either Seller or Purchaser may terminate this Agreement due to a failure of either of such conditions to be satisfied. If this Agreement is terminated due to a failure of either of such conditions to be satisfied, Escrow Agent shall disburse the Earnest Money to Purchaser (provided Purchaser is not in default under this Agreement) in accordance with the provisions herein and Seller and Purchaser shall have no further rights and obligations hereunder except those which expressly survive termination of this Agreement.

**(d)**    Notwithstanding anything to the contrary contained herein, if either of the conditions under <u>Sections 10(a)(i) and/or (ii)</u> above have not been satisfied due to a default by Purchaser or Seller beyond any applicable cure period, then Purchaser's and Seller's respective rights, remedies and obligation shall be determined in accordance with <u>Section 16</u> herein.

**11.    <u>Closing</u>**

**(a)**    The Closing shall be held by escrow deliveries to Escrow Agent and the closing of escrow shall be on or before the Scheduled Closing Date.

**(b)**    On or before 10:00 am on the Scheduled Closing Date, Seller shall deposit the following items into escrow with Escrow Agent, duly executed and notarized where necessary:

(i)    An original special warranty deed (the "**Deed**") to the Property, which is substantially in the form and content attached hereto as <u>**Exhibit "B"**</u> and is duly executed by Seller and acknowledged, conveying the Property to Purchaser along with an Order by the Bankruptcy Court having jurisdiction over Seller in its bankruptcy in form reasonably acceptable to the Title Company authorizing the Closing of the sale of the Property pursuant to this Agreement;

(ii)    An original bill of sale (the "**Bill of Sale**") in substantially the form attached as <u>**Exhibit C**</u>; provided, however, such Bill of Sale shall not be given to Purchaser until the end of the Post-Closing Occupancy Period as such period is set forth in the Post-Closing Occupancy Agreement referred to in <u>Section 4</u>, above.

(iii)    An original counterpart of the Post-Closing Occupancy Agreement;

7

    **(iv)** An affidavit stating that Seller is not a "foreign person" as defined in the Federal Foreign Investment in Real Property Tax Act of 1980 and the 1984 Tax Reform Act, in form and content reasonably satisfactory to Seller and Title Company;

    **(v)** A counterpart of a settlement statement setting forth amounts paid by or on behalf of or credited to Purchaser and Seller;

    **(vi)** Such evidence as the Title Company may reasonably require as to the authority of the person or persons executing documents on behalf of Seller;

    **(vii)** A title insurance affidavit, if required by the Title Company, duly executed by Seller, in form and content reasonably satisfactorily to Seller and Title Company and sufficient to allow the Title Company to remove the standard exceptions (other than the survey exception) from the Title Commitment;

    **(ix)** Duplicate originals of an assignment and assumption of the Bank Lease, executed by Seller;

    **(x)** Such additional documents as shall be reasonably requested by the Title Company and/or required to consummate the transactions contemplated by this Agreement and not disapproved by the Bankruptcy Court; and

    **(xi)** Such additional documents as shall be reasonably requested by the Bankruptcy Court.

  At Closing, Seller shall deliver to Purchaser possession of the Property subject to the Permitted Exceptions (including, without limitation, the Post-Closing Occupancy Agreement and the Bank Lease).

    **(c)** On or before 10:00 am on the Scheduled Closing Date, Purchaser shall deliver into escrow with Escrow Agent the following items, duly executed and notarized where necessary:

    **(i)** The full amount of the Purchase Price, less the Earnest Money and as adjusted by prorations and credits, in immediately available Federal funds wire transferred to Escrow Agent's account and instructions to Escrow Agent to immediately release the full amount to Seller upon Seller's satisfaction of Seller's closing obligations;

    **(ii)** An original counterpart of the Post-Closing Occupancy Agreement;

    **(iii)** A counterpart of the settlement statement signed by Purchaser;

    **(iv)** An Internal Revenue Code Form W-9 signed by Purchaser;

    **(v)** Duplicate originals of an assignment and assumption of the Bank Lease, executed by Purchaser;

    **(vi)** Such evidence as the Title Company may reasonably require as to the authority of the person or persons executing documents on behalf of Purchaser;

    **(vii)** Such additional documents as shall be reasonably requested by the Title Company and/or required to consummate the transactions contemplated by this Agreement and not disapproved by the Bankruptcy Court; and

    **(viii)** Such additional documents as shall be reasonably requested by the Bankruptcy Court.

12.     **Competing Offer.**   SELLER AGREES THAT UPON MUTUAL EXECUTION AND DELIVERY OF THIS AGREEMENT, SELLER SHALL CEASE ACTIVELY MARKETING THE PROPERTY FOR SALE TO OTHER THIRD PARTIES AND SOLICITING THIRD PARTY OFFERS; PROVIDED, HOWEVER, SELLER'S ACTIONS IN FURTHERANCE OF OBTAINING BANKRUPTCY COURT APPROVAL SHALL NOT BE DEEMED TO CONSTITUTE MARKETING IN VIOLATION OF THE FOREGOING COVENANT. WITHOUT LIMITING THE FOREGOING, BUT NOTWITHSTANDING ANYTHING ELSE TO THE CONTRARY IN THIS AGREEMENT, PURCHASER HEREBY ACKNOWLEDGES AND AGREES THAT THIS AGREEMENT AND THE TRANSACTION CONTEMPLATED HEREIN (A) ARE SUBJECT TO HIGHER OR BETTER COMPETING BIDS FOR THE PROPERTY THAT MAY BE MADE AT OR IN FRONT OF THE BANKRUPTCY COURT HEARING ON SELLER'S MOTION FOR BANKRUPTCY COURT APPROVAL TAKING INTO CONSIDERATION ALL OF THE TERMS OF THIS AGREEMENT (EACH A "COMPETING BID"), (B) SELLER MAY ELECT, WITH BANKRUPTCY COURT APPROVAL, TO SELL THE PROPERTY TO THE MAKER OF A HIGHER OR BETTER COMPETING BID, AND (C) THE CONSUMMATION OF ANY SUCH SALE OF THE PROPERTY TO A COMPETING BIDDER SHALL VOID THIS AGREEMENT AND, OTHER THAN THE OBLIGATION TO CAUSE THE EARNEST MONEY DEPOSIT TO BE RETURNED TO PURCHASER, SELLER SHALL HAVE NO FURTHER OBLIGATIONS TO PURCHASER OR ANY OTHER PARTY UNDER OR IN CONNECTION WITH THIS AGREEMENT.

13.     **Representations and Warranties.**

     13.1     **Representations and Covenants.** Seller represents to Purchaser that the following statements are true and correct as of the Effective Date of this Agreement and covenants (subject to the limitation provided below) that the same shall be true and correct on the Closing Date:

     (a)     **Authority.** Seller is duly organized and validly exists as the type of entity and under the laws of the State of Georgia and is qualified to do business in the State of Tennessee. Seller has the right and authority to enter into this Agreement and to transfer the Property pursuant to this Agreement subject to Seller obtaining the Bankruptcy Court Approval as described in Section 8(c) above and Seller's Lender Approval as described in Section 8(b) above. The person signing this Agreement on behalf of Seller is authorized to do so subject to Seller obtaining the Bankruptcy Court Approval as described in Section 8(c) above and Seller's Lender Approval as described in Section 8(b) above. The execution and delivery of this Agreement or any other document in connection with the transactions contemplated by this Agreement shall not violate any provision of Seller's organizational documents and/or any regulations and/or laws to or by which Seller is bound (subject to Seller obtaining the Bankruptcy Court Approval as described in Section 8(c) above and Seller's Lender Approval as described in Section 8(b) above). This Agreement has been duly authorized, executed and delivered by Seller, is a valid and binding obligation of Seller and is enforceable against Seller in accordance with its terms subject to Seller obtaining Bankruptcy Court Approval as described in Section 8(c) above and Seller's Lender Approval as described in Section 8(b) above.

     (b)     **Pending Actions.** There is no agreement to which Seller is a party or, to Seller's knowledge, without inquiry, that is binding on Seller which is in conflict with this Agreement. To Seller's knowledge, without inquiry, except for the Case referenced in Section 8(c) above, there is no action or proceeding pending or threatened against Seller or relating to the Property, which challenges or impairs Seller's ability to execute or perform its obligations under this Agreement.

     (c)     **Condemnation.** To Seller's knowledge, without inquiry, no condemnation proceedings are pending against the Property, nor has any written notice from a governmental authority threatening condemnation been received.

     (d)     **FIRPTA.** Seller is not a "foreign person" within the meaning of Section 1445(f)(3) of the Internal Revenue Code of 1986.

9

(e)   **Environmental**. To Seller's knowledge, without inquiry, Seller has not caused the Property to be in violation of, and Seller has received no written notice from a governmental authority with jurisdiction over the Property that the Property is in violation of, any Environmental Law. For purposes hereof, (i) **"Environmental Law"** means any Federal, state, local or administrative agency law, rule, regulations, ordinance or order relating to Hazardous Materials (as defined herein), including, without limitation, the Comprehensive Environmental Response, Compensation and Liability act of 1980, as amended (42 U.S.C. Section 9601 et. seq.) and the Resource Conservation and Recovery Act of 1976, as amended (42 U.S.C. Section 6901 et seq.); and (ii) **"Hazardous Material"** means any substance, chemical, waste or other material listed as "hazardous" or "toxic" under any Environmental Law, including, without limitations, petroleum and petroleum by products.

If, at any time after the Effective Date but prior to the Closing Date, Seller learns of any facts or circumstances that would render any of the representations contained in this Section 13.1 to be materially untrue, then Seller shall promptly notify Purchaser in writing of all such facts and circumstances and Purchaser shall have the right to elect to either: (a) terminate this Agreement, so long as Purchaser is not in default under this Agreement; or (b) waive any claim against Seller arising out of or related to the information disclosed and continue to Closing without any reduction in the Purchase Price and/or other consideration from Seller, in which case the representation shall be deemed modified as necessary to conform with the additional information disclosed to Purchaser. Upon such termination, Escrow Agent shall disburse the Earnest Money to Purchaser in accordance with the provisions herein and Seller and Purchaser shall have no further rights and obligations hereunder except those which expressly survive termination of this Agreement. If Purchaser is in default or fails to timely give Seller the aforesaid notice, Purchaser shall be deemed to have elected clause (b) above. Notwithstanding anything to the contrary contained herein, if any of the foregoing representations are materially untrue due to a default by Seller, then Purchaser's rights, remedies and obligation shall be determined in accordance with Section 16 herein.

13.2   **Seller's Covenants**. Seller covenants with Purchaser, from the Effective Date until the Closing or earlier termination of this Agreement, as follows, subject to any requirements of the Bankruptcy Court or otherwise by virtue of Seller being a debtor in bankruptcy.

(a)   **Operation of Property**. Seller shall, subject to restrictions imposed by the Bankruptcy Court or otherwise by virtue of Seller being a debtor in bankruptcy, operate and maintain the Property in a manner generally consistent with the manner in which Seller has operated and maintained the Property prior to the Effective Date, ordinary wear and tear, casualty and condemnation excepted.

(b)   **Provide Copies of Notices**. Seller shall furnish Purchaser with a copy of all notices received by Seller from any governmental authority or other party of any alleged violation of any law, statute, ordinance, regulation or order of any governmental or public authority relating to the Property within five (5) Business Days following Seller's receipt thereof.

(c)   **Execution of New Contracts.** After the Effective Date, except for any contract or agreement that is necessary for Seller to continue to occupy the Property, Seller shall not, without Purchaser's prior written consent in each instance, not to be unreasonably withheld, conditioned and/or delayed, enter into any contract or agreement that shall be an obligation affecting the Property or binding on Purchaser after the Closing and which is not terminable upon ninety (90) days' notice or less, unless required by Seller's lender or the Bankruptcy Court.

13.3   **Purchaser's Representations**. Purchaser represents to Seller that the following statements are true and correct on the Effective Date and covenants (subject to the limitation provided below) that the same shall be true and correct on the Closing Date:

(a)   **Purchaser's Authority**. Purchaser is duly organized and validly exists as the type of entity and under the laws of the State of Tennessee and is qualified to do business in the State in which the Property is located. Purchaser has the right and authority to enter into this Agreement. The person signing this

Agreement on behalf of Purchaser is authorized to do so. The execution and delivery of this Agreement or any other document in connection with the transactions contemplated by this Agreement shall not violate any provision of Purchaser's organizational documents and/or any regulations and/or laws to or by which Purchaser is bound. This Agreement has been duly authorized, executed and delivered by Purchaser, is a valid and binding obligation of Purchaser and is enforceable against Purchaser in accordance with its terms.

(b)    **Conflicts and Pending Actions**. There is no contract and/or other agreement to which Purchaser is a party or that is binding on Purchaser which is in conflict with and/or which would be violated by this Agreement. To Purchaser's knowledge, there is no action or proceeding pending or threatened against Purchaser which challenges or impairs Purchaser's ability to execute and/or perform its obligations under this Agreement.

(c)    **Financial Status**. Purchaser has adequate financial resources to purchase the Property. Purchaser if solvent, has not made an assignment for the benefit of creditors and has not filed any bankruptcy, reorganization, arrangement, insolvency or liquidation proceedings, nor has any such proceeding been instituted by or against Purchaser.

(d)    **Patriot Act; Anti-Corruption**. Purchaser's funds are derived from legitimate business activities that do not violate any applicable law and are from lawful and permissible sources. Purchaser is not a, and is not acting directly or indirectly for or on behalf of any, person, group, entity or nation with whom Seller is prohibited or restricted from engaging in this transaction due to any United States governmental embargos, sanctions, or terrorism or money laundering laws, including, without limitation, due to Purchaser or any party that has ownership in or control over Purchaser being (i) subject to United States government embargos or sanctions, (ii) in violation of terrorism or money laundering laws, or (iii) listed on a published United States government list or subject to any law, order, rule or regulation that is enforced or administered by the Office of Foreign Assets Control (e.g., Specially Designated Nationals and Blocked Persons List maintained by the Office of Foreign Assets Control or other lists of similar import) and Purchaser is not engaged in this transaction, directly or indirectly, on behalf of, or instigating or facilitating this transaction, directly or indirectly, on behalf of any such person, group, entity or nation.

If, at any time after the Effective Date but prior to the Closing Date, Purchaser learns of any facts or circumstances that would render any of the representations contained in this Section 13.3 to be untrue, then Purchaser shall promptly notify Seller in writing of all such facts and circumstances and Seller shall have the right to elect to either (a) terminate this Agreement; or (b) waive any claim against Purchaser arising out of or related to the information disclosed and proceed with the transaction, in which case the representation shall be deemed modified as necessary to conform with the additional information disclosed to Seller. Upon such termination, Escrow Agent shall disburse the Earnest Money to Seller in accordance with the provisions herein and Seller and Purchaser shall have no further rights and obligations hereunder except those which expressly survive termination of this Agreement. Notwithstanding anything to the contrary contained herein, if any of the foregoing representations are untrue due to a default by Purchaser, then Seller's rights, remedies and obligation shall be determined in accordance with Section 16 herein.

14.    **Sale of Property "As-Is"**. TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW AND EXCEPT FOR SELLER'S REPRESENTATIONS AND WARRANTIES AS SET FORTH HEREIN AND ANY WARRANTY CONTAINED IN THE DEED TO BE PROVIDED BY SELLER AT CLOSING (COLLECTIVELY, THE "**WARRANTIES**"), THIS SALE IS MADE AND SHALL BE MADE WITHOUT REPRESENTATION, COVENANT, OR WARRANTY OF ANY KIND (WHETHER EXPRESS, IMPLIED, OR, TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, STATUTORY) BY SELLER AND ALL SUCH REPRESENTATIONS, COVENANTS AND WARRANTIES ARE HEREBY DISCLAIMED. AS A MATERIAL PART OF THE CONSIDERATION FOR THIS AGREEMENT, PURCHASER AGREES TO ACCEPT THE PROPERTY AT CLOSING ON AN "AS-IS" AND "WHERE IS" BASIS, WITH ALL FAULTS AND ANY AND ALL LATENT AND PATENT DEFECTS AND WITHOUT ANY REPRESENTATION OR WARRANTY, ALL OF WHICH SELLER HEREBY DISCLAIMS, EXCEPT FOR THE WARRANTIES. WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, SELLER MAKES NO EXPRESS OR IMPLIED WARRANTY

OF SUITABILITY OR FITNESS OF THE PROPERTY FOR ANY PURPOSE OR USE OR AS TO THE MERCHANTABILITY, TITLE, VALUE, QUALITY, QUANTITY, CONDITION OR SALABILITY OF THE PROPERTY. NOTWITHSTANDING ANYTHING CONTAINED IN THIS AGREEMENT TO THE CONTRARY, PURCHASER AGREES THAT, BY CLOSING, PURCHASER WARRANTS AND REPRESENTS THAT PURCHASER HAS EXAMINED (OR HAD THE OPPORTUNITY TO EXAMINE) AND APPROVE ALL THINGS CONCERNING THE PROPERTY WHICH PURCHASER DEEMS MATERIAL INCLUDING, BUT NOT LIMITED TO, TOPOGRAPHY, GEOLOGY, CONDITION OF THE SOIL, ENVIRONMENTAL CONDITION OF THE PROPERTY, CONDITION OF TITLE TO THE PROPERTY, DIMENSIONS, AVAILABILITY AND CAPACITY OF UTILITIES AND SANITARY FACILITIES (INCLUDING, WITHOUT LIMITATION, WATER AND SEWER CONNECTIONS), ANY RESTRICTIONS RELATED TO THE DEVELOPMENT AND/OR USE OF THE PROPERTY, SUITABILITY FOR AND FEASIBILITY OF INTENDED USE AND ANY OTHER USE, ZONING, THE APPLICABILITY OF ANY GOVERNMENTAL REQUIREMENTS INCLUDING, BUT NOT LIMITED TO, ENVIRONMENTAL REQUIREMENTS, ANY APPLICABLE GOVERNMENTAL GENERAL PLANS AND THE AVAILABILITY OF PERMITS, APPROVALS AND OTHER ENTITLEMENTS FROM GOVERNMENTAL AUTHORITIES HAVING JURISDICTION OVER SELLER, PURCHASER, OR THE PROPERTY. The provisions of this Section 14 shall survive the Closing or any termination of this Agreement.

**15.    Casualty and Condemnation.**

(a)    Seller assumes all risks and liability for damage to or injury occurring to the Property by fire, storm, accident or any other casualty or cause ("**Damage**") until Closing. If, between the Effective Date and the Closing Date, the Property suffers any Damage, then Seller shall, promptly after discovering that the Property has experienced Damage, notify Purchaser of such Damage. Subject to the requirements of the Bankruptcy Court, Seller may elect, by written notice delivered to Purchaser within fourteen (14) days after becoming aware the Damage has occurred, to repair and/or restore the portions of the Property to the condition existing immediately prior to the occurrence of the Damage ("**Repair the Property**"), in which event the parties shall continue to Closing as provided in this Agreement. If Seller elects to Repair the Property and such repair cannot reasonably be completed prior to the Scheduled Closing Date, Seller shall have the right to extend the Scheduled Closing Date until such repairs are completed. If Seller fails to notify Purchaser of such election to Repair the Property, Seller shall be deemed to have elected not to Repair the Property. Within fifteen (15) days after the earlier to occur of: (i) receipt of such notice from Seller that Seller will not Repair the Property; and (ii) the expiration of the aforesaid fourteen (14) day period, Purchaser shall notify Seller of its election to either to: (a) terminate this Agreement, in which event the Earnest Money shall be promptly refunded to Purchaser in accordance with the provisions herein and Seller and Purchaser shall have no further rights and obligations hereunder except those which expressly survive termination of this Agreement, or (b) continue to Closing without any reduction in the Purchase Price and/or other consideration from Seller. Failure to timely notify Seller of its election to terminate this Agreement shall be deemed Purchaser's election to continue to Closing. The Scheduled Closing Date may be extended as necessary to permit Purchaser the full fifteen (15) days.

(b)    If, at any time prior to Closing, a governmental authority initiates action to take the Property or a material portion thereof by eminent domain proceedings, then Seller shall promptly notify Purchaser. Purchaser may elect, by written notice delivered to Seller within fifteen (15) days after receipt of such notice, either to (a) terminate this Agreement, in which event the Earnest Money shall be promptly refunded to Purchaser in accordance with the provisions herein and the parties shall have no further rights and obligations hereunder, except as expressly set forth herein, or (b) continue to Closing without any reduction in the Purchase Price. Failure to timely notify Seller of its election to terminate this Agreement shall be deemed Purchaser's election to continue to Closing. Should Purchaser elect (or be deemed to have elected) clause (b), then any award from the condemning authority shall be assigned to Purchaser up to the amount of the Purchase Price. The scheduled Closing Date may be extended as necessary to permit Purchaser the full fifteen (15) days set forth above.

**16.    Default.**

(a) **Default by Purchaser**. If the sale of the Property under this Agreement does not occur because of Purchaser's default under this Agreement, Seller may terminate this Agreement and receive the Earnest Money as liquidated damages (and not as a penalty) for such failure to close, it being agreed between the parties that the actual damages to Seller in the event of a failure to close by Purchaser are impractical to ascertain and the amount of the Earnest Money is a reasonable estimate.

(b) **Default by Seller**. If the sale of the Property under this Agreement does not occur because of Seller's default under this Agreement, then Purchaser may, at its option: (i) declare Seller in default under this Agreement and terminate this Agreement by written notice delivered to Seller, in which event the Earnest Money shall be promptly refunded to Purchaser in accordance with the provisions herein and Seller and Purchaser shall have no further rights and obligations hereunder except those which expressly survive termination of this Agreement; or (ii) in lieu of terminating this Agreement, enforce specific performance of this Agreement provided Purchaser institutes an action for specific performance within sixty (60) days following the default by Seller and the expiration of any cure period. Purchaser hereby waives any other rights and remedies in respect of any such default. Notwithstanding anything contained herein to the contrary, if there is a failure to satisfy any Purchaser's condition to Closing, which is not a result of a failure of Seller to perform under the terms of this Agreement, such event or circumstance shall not be deemed a default by Seller, but shall entitle Purchaser to the sole and exclusive remedy of terminating this Agreement, in which event the Earnest Money shall be promptly refunded to Purchaser in accordance with the provisions herein and Seller and Purchaser shall have no further rights and obligations hereunder except those which expressly survive termination of this Agreement. Notwithstanding anything to the contrary contained herein, Purchaser shall not be entitled to a return of the Earnest Money if Purchaser is in default. The failure or refusal of Seller's lender and/or the Bankruptcy Court to approve this Agreement and/or the Closing shall constitute a failure to satisfy one (1) of Purchaser's condition to Closing and not a default by Seller or a breach of this Agreement but shall entitle Purchaser to the sole and exclusive remedy of terminating this Agreement, in which event the Earnest Money shall be promptly refunded to Purchaser in accordance with the provisions herein and Seller and Purchaser shall have no further rights and obligations hereunder except those which expressly survive termination of this Agreement.

(c) **Notice of Default**. Prior to declaring a default and exercising the remedies described herein, the non-defaulting party shall issue notice of default to the defaulting party pursuant to Section 19 herein describing the event or condition of default in sufficient detail to enable a reasonable person to determine the action necessary to cure the default. The defaulting party shall have five (5) Business Days from receipt of the notice in which to cure the default. If the default has not been cured within the foregoing five (5) Business Day period, the non-defaulting party may exercise the remedies described above. Notwithstanding anything contained herein to the contrary, the notice required and period to cure under this Section 16(c) for any failure of Purchaser or Seller (as applicable) to deliver the Earnest Money or to complete the Closing on the Scheduled Closing Date shall be two (2) Business Days.

(c) **Survival**. The provisions of this Section 16 shall survive the Closing or termination of this Agreement.

17. **Escrow Agent**.

(a) Escrow Agent shall invest the Earnest Money in a non-interest bearing account at a commercial bank whose deposits are insured by the Federal Deposit Insurance Corporation. Escrow Agent shall notify Seller, no later than one (1) Business Day after Escrow Agent's receipt thereof, that Escrow Agent has received the Earnest Money in immediately available funds and is holding the same in accordance with the terms of this Agreement. However, Escrow Agent shall invest the Earnest Money only in such accounts as will allow Escrow Agent to disburse the Earnest Money upon no more than one (1) Business Days' notice.

(b) If the Closing takes place under this Agreement, Escrow Agent shall deliver the Earnest Money to, or upon the instructions of, Seller on the Closing Date.

13

(c)    In the event that Purchaser or Seller claims the Earnest Money pursuant to the provisions of this Agreement, other than with respect to the Closing, such party claiming the Earnest Money shall deliver written notice of such claim to Escrow Agent and to the other such party (i.e., Purchaser or Seller, whichever did not claim the Earnest Money pursuant to such notice) and, unless such other party, within ten (10) days thereafter, notifies Escrow Agent of any objection to such requested disbursement of the Earnest Money, Escrow Agent shall disburse the Earnest Money to the party demanding the same, subject to the provisions of this Section 17, and Escrow Agent shall thereupon be released and discharged from any further duty or obligation hereunder.

(d)    It is agreed that the duties of Escrow Agent are herein specifically provided and are purely ministerial in nature and that Escrow Agent shall incur no liability whatsoever except for its willful misconduct or negligence, so long as Escrow Agent is acting in good faith. Seller and Purchaser do each hereby release Escrow Agent from any liability for any error of judgment or for any act done or omitted to be done by Escrow Agent in the good faith performance of its duties hereunder and do each hereby indemnify Escrow Agent against and agree to hold, save and defend Escrow Agent harmless from, any costs, liabilities and expenses incurred by Escrow Agent in serving as Escrow Agent hereunder and in faithfully discharging its duties and obligations hereunder except for its willful misconduct or negligence.

(e)    All interest and other income earned on the Earnest Money held by Escrow Agent hereunder shall be reported for income tax purposes as earnings of Purchaser.

(f)    Escrow Agent has executed this Agreement solely for the purpose of acknowledging and agreeing to the provisions of this Section 17. Escrow Agent's consent to any modification or amendment of this Agreement other than this Section 17 shall not be required.

18.    **Brokers' Commission.** Purchaser and Seller acknowledge and agree that no real estate agent or broker is involved in this transaction other than Jay Cobble with Providence Commercial Real Estate ("**Seller's Broker**"), and (b) Berkshire Hathaway HomeServices Dean-Smith Realty ("**Purchaser's Broker**"). Seller's Broker and Purchaser's Broker are referred to, separately and collectively, as the "**Brokers**". If and only if Purchaser acquires the Property pursuant to this Agreement and subject to Bankruptcy Court Approval, Seller shall pay the Brokers a commission at the Closing in accordance with the terms of the Addendum attached hereto and made a part hereof. Seller and Purchaser shall each indemnify, defend and hold harmless the other from and against any all claims, suits, actions, causes of action, orders, judgments, decrees, losses, liabilities, damages, costs and expenses (whether direct, indirect, consequential or punitive and including, without limitation, Attorney's Fees) of any kind or nature whatsoever arising from claim for any real estate sales commission, finder's fee, consulting fee, or other compensation in connection with the sale contemplated hereby and arising out of any act or agreement of such party.

19.    **Notices.** Any notice or document required or permitted to be delivered under this Agreement (other than closing documents) shall be given in writing and delivered by hand or overnight courier (such as United Parcel Service or Federal Express), sent by United States registered or certified mail, return receipt requested, postage prepaid, or transmitted by e-mail and addressed to each party at its address as set forth below or at such other address as the parties have theretofore specified by written notice delivered in accordance herewith. Notice is considered given and received: (i) on the date of hand or courier delivery or refusal of acceptance; (ii) the next Business Day after deposit with overnight courier for next Business Day delivery; (iii) two (2) Business Days after deposit in the United States mail; or (iv) the same day (or next-following Business Day if sent after 5:00 pm on a Business Day or at any time on a day that is not a Business Day) when sent by confirmed e-mail, provided that any notice by e-mail must also be sent no later than the next Business Day by one (1) of the other approved methods of delivery. Attorneys may provide notices and other communications on behalf of their clients.

If to Seller:        Ruby Tuesday, Inc.
                         333 East Broadway Avenue

Maryville, Tennessee 37804
Telephone: (865) 379-5759
Attention: Brian Esser-General Counsel and VP
Email: besser@rubytuesday.com

With a copy to:    Ruby Tuesday, Inc.
333 East Broadway Avenue
Maryville, Tennessee 37804
Telephone: (407) 241-3418
Attention: Debbie Windham-Director of Real Estate
Email: dwindham@rubytuesday.com

With a copy to:    Milgrim Law Group
3216 Corrine Drive
Orlando, Florida 32803
Telephone: (407) 790-4966
Attention: Edward G. Milgrim, Esq.
Email: edwardmilgrim@milgrimlaw.com

If to Purchaser:    Massey Properties, LLC
3204 Regal Drive
Alcoa, Tennessee 37701
Telephone: (865) 382-5362
Attention: Mark Grayson
Email: mgrayson@masseugroup.net

Escrow Agent:    Tennessee Valley Title Insurance Co.
800 S. Gay Street, Suite 1700
Knoxville, Tennessee 37929
Telephone: (865) 523-6254
Attn: Joseph H. Huie, Esq.
Email: jhuie@tnvalleytitle.com

20.    **Publicity.** Purchaser and Seller each hereby covenants and agrees that: (a) prior to Closing, Seller and/or Purchaser shall not issue any press release or public statement with respect to any of the transactions contemplated by this Agreement without the prior consent of the other, except to the extent required by applicable law, and (b) after the Closing, any such press release or public statement issued by Purchaser or Seller shall be subject to the review and approval of the other (which approval shall not be unreasonably withheld, conditioned or delayed), except to the extent required by applicable law. Notwithstanding anything in this Section 20 or any other Section of this Agreement to the contrary, Purchaser and Seller and their affiliates shall have the right to make any disclosures or filings (i) required by applicable law or any rule or regulation promulgated by the Securities and Exchange Commission, and (ii) to rating agencies, existing or potential investors, or existing or potential lenders as may be necessary in the disclosing party's reasonable judgment; provided that, the disclosing party ensures that such confidential information is afforded confidential treatment, and nothing in this Section 20 or any other Section of this Agreement shall prohibit, restrict, or condition in any way whatsoever such disclosures or filings by Purchaser or Seller and their affiliates in compliance with applicable law. Notwithstanding anything provided in this Agreement to the contrary, nothing herein shall prohibit Seller from taking any action that is required or appropriate in order to pursue or fulfill the requirements of the Bankruptcy Court Approval.

21.    **Confidentiality.** Purchaser and Seller each acknowledges that any and all information that either party has heretofore furnished or hereafter furnishes to the other party with respect to the Property, the transactions contemplated by this Agreement or other non-public proprietary or confidential information of the parties has been and shall be furnished on the condition that the receiving party maintains the confidentiality thereof. Accordingly, Purchaser and Seller shall not disclose, and shall prohibit their

15

respective Agents, representatives and any parties identified in clause (i) below from disclosing, to any other Person without the prior written consent of the disclosing party: (a) the material terms of this Agreement and the Post-Closing Occupancy Agreement; (b) any of the information in respect of the Property, including, but not limited to, the Due Diligence Documents and any information heretofore or hereafter obtained by Purchaser or its Agents or representatives in connection with Purchaser's due diligence investigations of the Property; and (c) any other non-public proprietary or confidential information of the disclosing party (written, oral or by other means). In the event the Closing does not occur or this Agreement is terminated, each party shall, upon request from the other, promptly return to the other all documents containing any of such information without retaining any copy thereof or extract therefrom, including (but not limited to) the return of the Due Diligence Documents by Purchaser to Seller. Notwithstanding anything to the contrary hereinabove set forth, either party may disclose such information (i) on a need-to-know basis to the Title Company, to receiving party's Agents, accountants, attorneys and contractors, to its potential lenders and subsequent purchasers, and to members of professional firms serving it or its potential lenders provided that the disclosing party uses reasonable efforts to ensure that such confidential information is afforded confidential treatment, and (ii) as any governmental authority may require in order to comply with applicable law or a court order. Notwithstanding the foregoing, the foregoing confidentiality obligation shall not apply to any such information that (1) is or becomes generally available to the public other than as a result of a breach of this Agreement; (2) is obtained by receiving party or its trustee, partner, member, shareholder, equity owner, director, manager, officer, employee, consultant, contractor, agent, or affiliates (collectively, "**Agents**") on a non-confidential basis from a third-party that, to receiving party's knowledge, is not or was not legally or contractually restricted from disclosing such information, excluding any information received by the receiving party under clause (b) above; (3) was in receiving party's or its Agent's possession prior to disclosing party's disclosure hereunder; or (4) was or is independently developed by receiving party or its Agents without using any such confidential information, excluding any information received by the receiving party under clause (b) above. Notwithstanding the foregoing, if the Closing does not occur, there shall be no restriction on Seller's disclosure of the Buyer Information. The terms of this Section 21 shall survive the termination of this Agreement and the transfer of title to the Property. Notwithstanding anything provided in this Agreement to the contrary, nothing herein shall prohibit Seller from taking any action that is required or appropriate in order to pursue or fulfill the requirements of the Bankruptcy Court Approval.

22.      **Assignment.** Purchaser may not assign this Agreement and/or its rights and/or obligations under this Agreement without first obtaining Seller's written approval, which approval may be given or withheld in Seller's sole and absolute discretion. Notwithstanding the foregoing, Purchaser shall have the right, subject to any requirements imposed by the Bankruptcy Court or otherwise by virtue of Seller being a debtor in bankruptcy, to assign this Agreement and all of its rights hereunder to any corporation, limited liability company, partnership or other entity Purchaser may elect, and any such assignee ("**Assignee**") shall be entitled to all of the rights and powers of Purchaser hereunder, provided that Purchaser: (i) gives Seller written notice of such assignment at least five (5) Business Days prior to the Scheduled Closing Date; (ii) delivers to Seller at or prior to Closing an instrument evidencing such assignment; and (iii) Purchaser is the sole owner of and has sole control of Assignee. Notwithstanding that Assignee assumes all of Purchaser's obligations under this Agreement in writing, Purchaser shall remain principally liable for all obligations under this Agreement through Closing.

23.      **Miscellaneous.**

        **(a)**      Time is of the essence of this Agreement.

        **(b)**      This Agreement shall be binding upon and shall inure to the benefit of Seller and Purchaser, their respective successors and permitted assigns.

        **(c)**      Nothing herein contained shall be deemed or construed by the parties hereto, nor by any third party, as creating the relationship of principal and agent or of partnership or of joint venture between the parties hereto, it being understood and agreed that no provision contained herein, nor any acts of the parties hereto shall be deemed to create the relationship between the parties hereto other than the

relationship of seller and purchaser.

(d)    THE PARTIES AGREE THAT THE BANKRUPTCY COURT PRESIDING OVER THE COURT CASE REFERENCED IN SECTION 8(c) HEREIN SHALL HAVE EXCLUSIVE JURISDICTION OVER ALL DISPUTES AND OTHER MATTERS RELATING TO (i) THE INTERPRETATION AND ENFORCEMENT OF THIS AGREEMENT OR ANY ANCILLARY DOCUMENT EXECUTED PURSUANT HERETO; AND/OR (ii) THE PROPERTY, AND THE PARTIES EXPRESSLY CONSENT TO AND AGREE NOT TO CONTEST SUCH EXCLUSIVE JURISDICTION. The provisions of this Section 23(d) shall survive the Closing or termination of this Agreement.

(e)    This Agreement contains the sole and entire agreement of the parties hereto concerning the subject matter hereof, and supersedes all prior and contemporaneous understandings, agreements, representations, and warranties, both written and oral, with respect to the subject matter. No representations, inducements, promises or agreements, oral or otherwise, not expressly set forth herein shall be of any force or effect. Without limiting the generality of the foregoing, this Agreement alone fully and completely expresses the agreement between the parties, and it is specifically understood that no oral representation is binding on Purchaser or Seller.

(f)    No modification, waiver, amendment, discharge or change of this Agreement, except as otherwise provided herein, shall be valid unless the same is in writing and signed by the party against which the enforcement of such modification, waiver, amendment, discharge or change is sought.

(g)    The principle that an agreement should be construed against the party drafting the agreement shall not apply to this Agreement as both parties hereto have contributed substantially in the negotiation and drafting of this Agreement. The captions of this Agreement are inserted for convenience of reference only and do not define, describe, extend or limit the scope or the intent of this Agreement of any term or provision hereof. All personal pronouns used in this Agreement, whether used in the masculine, feminine, or neuter gender, shall include all other genders. The singular shall include the plural and vice versa.

(h)    In the event any date on which a party is required to act or give notice falls on day that is not a Business Day, then the deadline for such performance or notice shall be deemed to be the next Business Day. "**Business Day**" means any day other than a Saturday, Sunday or legal holiday during which commercial banks are closed in Maryville, Tennessee.

(i)    This Agreement may be executed in counterparts, each of which shall be deemed an original and all of which shall constitute one and the same instrument. Any signatures transmitted electronically (i.e., by e-mail) shall be deemed valid and binding upon receipt.

(j)    Neither this Agreement nor any memorandum or disclosure thereof shall be recorded without the prior written consent of all parties to this Agreement.

(k)    Each of the parties hereto reserves the right to waive, in whole or in part, any provision hereof which is for its benefit.

(l)    All obligations of Purchaser under this Agreement are joint and several.

(m)    THE PARTIES KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE THEIR RIGHT TO A JURY TRIAL IN CONNECTION WITH THIS AGREEMENT, THE TRANSACTION CONTEMPLATED UNDER THE AGREEMENT OR ANY COURSE OF DEALINGS OR ACTIONS BY THE PARTIES RELATING TO THIS AGREEMENT. THIS WAIVER IS A MATERIAL INDUCEMENT FOR SELLER TO EXECUTE THIS AGREEMENT AND SURVIVES CLOSING UNDER OR TERMINATION OF THIS AGREEMENT. The provisions of this Section 23(m) shall survive the Closing or termination of this Agreement.

(n)    The captions in this Agreement are inserted for convenience of reference only and in no way define, describe or limit the scope or intent of this Agreement or any of the provisions hereof.

(o)    The following Exhibits are attached hereto and made a part hereof.

"A"    Legal description
"B"    Form of Deed
"C"    Form of Bill of Sale
"D"    Post-Closing Occupancy Agreement

(p)    Should either Seller or Purchaser employ an attorney (whether or not an action is filed), or file an action, to enforce this Agreement, the prevailing party is entitled to recover, in addition to the remedies and/or damages, Attorneys' Fees incurred in connection therewith. The term "**prevailing party**" shall mean that party whose positions substantially prevail. The provisions of this Section 23(p) shall survive the Closing or termination of this Agreement.

(q)    Except as expressly provided in this Agreement, all rights of Purchaser shall merge into the Deed and other instruments delivered by Seller at Closing and shall not survive Closing. Notwithstanding anything contained herein to the contrary, the representations and warranties of Seller contained in this Agreement shall not survive Closing.

(r)    No part of this Agreement, any memorandum of agreement or any notice relating to the Agreement may be recorded in any public records.

(t)    No member, director, officer, shareholder, employee, advisor, agent, attorney or manager in or of Seller (each, a "**Seller Party**") has any personal liability, directly or indirectly, under this Agreement. Purchaser and Purchaser's successors and assigns and all other interested parties are entitled only to, and shall only, look to Seller's interest in the Property (and the proceeds thereof) for the payment of any claim or for any performance and Purchaser waives all other rights relating thereto. These limitations are in addition to and not in limitation of any other Seller limitation of liability. The provisions of this Section 23(t) shall survive the Closing or termination of this Agreement.

**[Signatures on Following Page]**

*This is the signature page to that certain Purchase and Sale Agreement concerning certain real property known for street address purposes as* 333 E. Broadway Avenue, Maryville, Tennessee and E. Harper Avenue.

**IN WITNESS WHEREOF**, the undersigned have caused this Purchase and Sale Agreement to be executed as of the Effective Date.

**Seller:**

**RUBY TUESDAY, INC.**, a Georgia corporation

By: Stephanie Medley (Dec 3, 2020 19:33 EST)
    Stephanie Burke Medley
    Chief Strategy Officer

*This is the signature page to that certain Purchase and Sale Agreement concerning certain real property known for street address purposes as* 333 E. Broadway Avenue, Maryville, Tennessee and E. Harper Avenue.

**IN WITNESS WHEREOF,** the undersigned have caused this Purchase and Sale Agreement to be executed as of the Effective Date.

Purchaser:

**MASSEY PROPERTIES, LLC.**
a Tennessee limited liability company

By: _C. Randy Massey_

Printed Name: _C. Randy Massey_

Title: _Chief Manager_

## ACCEPTANCE BY ESCROW AGENT

The undersigned hereby agrees to serve as Escrow Agent in accordance with the terms and conditions of the foregoing Purchase and Sale Agreement and acknowledges receipt of the Earnest Money as defined in Section 3.

Date: _____ _____, 2020

_____

By:_____
Name:_____
Title:_____

S-3

**EXHIBIT "A"**

**LEGAL DESCRIPTION**

**EXHIBIT "B"**

**FORM OF SPECIAL WARRANTY DEED**

This instrument prepared by:                    After recording return to:

_____                         _____
_____                         _____
_____                         _____

Address New Owner:                              Send Tax Bills To:

_____                         _____
_____                         _____
_____                         _____

Tax Map __, Parcel ____

**SPECIAL WARRANTY DEED**

THIS INDENTURE, made and entered into this ____ day of _____, 2020 by and between RUBY TUESDAY, INC., a Georgia corporation, whose address is 333 East Broadway Avenue, Maryville, TN 37804 ("Grantor"), and _____, whose address is _____ ("Grantee").

WITNESSETH: That for the consideration hereinafter expressed, the Grantor has bargained and sold and does hereby bargain, sell, convey and confirm unto the Grantee the following described real property located, situated and being in the City of _____, County of _____, State of Tennessee, more particularly described on **EXHIBIT A** attached hereto and made a part hereof ("**Property**")

Also, subject to 20__ taxes and general and special assessments, any and all recorded easements, reservations, restrictions, encroachments and encumbrances, matters which would be shown by an accurate survey, underground and overhead cables, lines and utility services, and all existing zoning ordinances, laws, codes, statutes and subdivision regulations and other governmental laws, rules, codes, statutes and regulations limiting or restricting the use to which the Property may be put.

**TO HAVE AND TO HOLD** the Property, as above described, with all and singular the rights, privileges, appurtenances and immunities thereto belonging or in anywise appertaining unto Grantee, and Grantee's successors and assigns forever.

Grantor hereby covenanting that  except for the above listed items, said Property is free and clear from any encumbrance done or suffered by Grantor other than those listed in the Register's Office in _____ County, Tennessee, that certain unrecorded Post-Closing Occupancy Agreement by and between Grantor and Grantee of even date herewith and that certain unrecorded Lease Agreement, dated May 1, 2012, by and between Seller, as landlord and Renasant Bank, as tenant, as amended [**additional unrecorded items may be added**]; and that Grantor will WARRANT AND DEFEND the title to the Property unto Grantee

and unto Grantee's successors and assigns forever, against the lawful claims and demands of all persons claiming under Grantor except as hereinbefore stated, but not further or otherwise.

Any reference to recorded instruments is reference to the Register's Office in said County.

THE CONSIDERATION for this conveyance is TEN AND 00/100 Dollars ($10.00) and other good and valuable considerations, the receipt and legal sufficiency of which is hereby acknowledged.

IN WITNESS WHEREOF, Grantor has executed this Special Warranty Deed as of the date first written above.

**GRANTOR:**

**RUBY TUESDAY, INC.,**
a Georgia corporation

By: _____
Name: _____
Title: _____

[CORPORATE SEAL]

STATE OF _____ )
COUNTY OF _____ )

On this _____ day of _____, 20__, before me personally appeared _____, to me personally known, who, being by me sworn, did say that he/she is _____ of RUBY TUESDAY, INC., a Georgia corporation, and that the seal affixed to the foregoing instrument is the corporate seal of said corporation, and that the foregoing instrument was signed and sealed on behalf of said entity by the authority of the corporation, and said _____ acknowledged said instrument to be the free act and deed of said entity.

IN TESTIMONY WHEREOF, I have hereunto set my hand and affixed my official seal in the County and State aforesaid, the day and year first above written.

Notary Public: _____
Name: _____
My commission expires_____

OATH OF VALUE

I hereby swear or affirm that the actual consideration or true value for this transfer, whichever is greater, is $_____.

_____
_____, Affiant

Sworn to and subscribed before me this _____ day of _____, 20__.

IN TESTIMONY WHEREOF, I have hereunto set my hand and affixed my official seal in the County and State aforesaid, the day and year first above written.

Notary Public: _____
Name _____
My commission expires_____

C-1

## EXHIBIT "C"

## FORM OF BILL OF SALE

**KNOW ALL MEN BY THESE PRESENTS,** that the undersigned, **RUBY TUESDAY, INC.,** a Georgia corporation ("Seller") for good and valuable consideration, to it in hand paid by _____, a _____ ("Purchaser"), the receipt and sufficiency of which is hereby acknowledged, by these presents does grant, bargain, sell, transfer, assign and deliver to Purchaser all of the personal property (the "**Personal Property**") owned by the undersigned and located on that certain tract or parcel of real property in the City of _____ _____ County, _____, having a physical address of _____ as more particularly described in **Exhibit A** attached hereto and incorporated herein by this reference, free and clear of all liens and encumbrances.

TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW AND EXCEPT FOR SELLER'S REPRESENTATIONS AND WARRANTIES AS SET FORTH HEREIN THAT THE PERSONAL PROPERTY IS FREE AND CLEAR OF ALL LIENS AND ENCUMBRANCES (THE "WARRANTIES"), THIS BILL OF SALE AND THE TRANSFER CONTEMPLATED HEREBY ARE MADE AND SHALL BE MADE WITHOUT REPRESENTATION, COVENANT, OR WARRANTY OF ANY KIND (WHETHER EXPRESS, IMPLIED, OR, TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, STATUTORY) BY SELLER AND ALL SUCH REPRESENTATIONS, COVENANTS AND WARRANTIES ARE HEREBY DISCLAIMED. AS A MATERIAL PART OF THE CONSIDERATION FOR THIS BILL OF SALE, PURCHASER AGREES TO ACCEPT THE PERSONAL PROPERTY ON AN "AS-IS" AND "WHERE IS" BASIS, WITH ALL FAULTS AND ANY AND ALL LATENT AND PATENT DEFECTS AND WITHOUT ANY REPRESENTATION OR WARRANTY, ALL OF WHICH SELLER HEREBY DISCLAIMS, EXCEPT FOR THE WARRANTIES. WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, SELLER MAKES NO EXPRESS OR IMPLIED WARRANTY OF SUITABILITY OR FITNESS OF THE PERSONAL PROPERTY FOR ANY PURPOSE OR USE OR AS TO THE MERCHANTABILITY, TITLE, VALUE, QUALITY, QUANTITY, CONDITION OR SALABILITY OF THE PERSONAL PROPERTY.

**SELLER:**

RUBY TUESDAY, INC.,
a Georgia corporation

Witness: _____

Witness: _____

By: _____
Its: _____

**EXHIBIT D**

**POST-CLOSING OCCUPANCY AGREEMENT**

**THIS POST-CLOSING OCCUPANCY AGREEMENT** (this "**Agreement**") is made as of the _____ day of _____, 2020 (the "**Effective Date**") by and between MASSEY PROPERTIES, LLC, a Tennessee limited liability company, whose address is _____ ("**Purchaser**") and RUBY TUESDAY, INC., a Georgia corporation, whose address is 333 East Broadway Avenue, Maryville, TN 37804 ("**Seller**").

**W I T N E S S E T H:**

**WHEREAS,** pursuant to that certain Agreement of Purchase and Sale by and between Seller and Purchaser effectively dated _____ (the "**PSA**"), Seller has agreed to sell to Purchaser and Purchaser has agreed to purchase from Seller that certain parcel of real property being in _____ located at _____ (the "**Property**"); and

**WHEREAS,** pursuant to the PSA, the parties agreed that Seller may continue to occupy the Temporary Occupancy Space (as defined in the PSA) after the Closing Date (as defined in the PSA), for a period not to exceed six (6) months; and

**WHEREAS,** Purchaser and Seller desire to enter into this Agreement to memorialize their agreements.

**NOW, THEREFORE,** in consideration of the mutual covenants contained herein, the sum of Ten ($10.00) Dollars paid by each party to the other, and other good and valuable consideration, the receipt and sufficiency of which the parties hereby acknowledge Purchaser and Seller agree as follows:

1.      The foregoing recitals are true and correct and are incorporated herein by reference. Capitalized terms not otherwise defined herein shall have the meanings set forth in the PSA.

2.      Purchaser hereby grants Seller the right to occupy the Temporary Occupancy Space up to the date (the "**Outside Date**") which is the sixth (6th) monthly anniversary of the Closing Date (the period during which Purchaser occupies the Temporary Occupancy Space after the Closing Date being referred to as the "**Post-Closing Occupancy Period**") in accordance with the following terms and conditions:

        (a)      Seller shall not be required to pay any rental fees to Purchaser during the first four (4) months of the Post-Closing Occupancy Period. During the first four (4) months of the Post Closing Occupancy Period Seller shall pay $15,000.00 per month to help Purchaser defray any operating costs Purchaser may incur.

        (b)      If Seller wants to occupy the Temporary Occupancy Space after the date which is the fourth (4th) monthly anniversary of the Closing Date (through the date which is the fifth (5th) monthly anniversary of the Closing Date), Seller must notify Purchaser, in writing, no later than the date which is the third (3rd) monthly anniversary of the Closing Date.

        (c)      If Seller wants to occupy the Temporary Occupancy Space after the date which is the fifth (5th) monthly anniversary of the Closing Date (through the date which is the sixth (6th) monthly anniversary of the Closing Date), Seller must notify Purchaser, in writing, no later than the date which is the fourth (4th) monthly anniversary of the Closing Date.

        (d)      If Seller remains in possession of the Property during the fifth (5th) and sixth (6th) months after Closing, then Seller shall pay Purchaser $25,000.00 per month as a rental fee and to help Purchaser defray any operating costs Purchaser may incur.

(e)     Seller's payments to Purchaser shall be pro-rated for any partial month and shall be due and payable on the 5th day of each month until such time as Seller vacates the Property. Notwithstanding anything contained herein to the contrary, if Seller pays for an entire month in which Seller vacates the Temporary Occupancy Space prior to the end of that month, Purchaser shall promptly reimburse Seller for the number of days in which Seller had not occupied the Temporary Occupancy Space.

(f)     Seller shall maintain in full force and effect at all times during the Post-Closing Occupancy Period the following, paying as the same become due all premiums therefor: (i) Commercial General Liability Insurance with minimum limits of Two Million and 00/100 Dollars ($2,000,000) written on an occurrence form basis; (ii) Workers' Compensation Insurance as required by applicable laws, and Employer's Liability Insurance with minimum limits of One Million and 00/100 Dollars ($1,000,000); and (iii) Property Insurance covering machinery, equipment, furniture, furnishings, supplies, materials and other tangible personal property with minimum limits of Two Million and 00/100 Dollars ($2,000,000) written on an occurrence form basis. The liability insurance shall name Purchaser as an additional insured.

(g)     Notwithstanding anything contained herein to the contrary, Seller may, at any time, terminate this Agreement by giving Purchaser written notice of termination at least ten (10) days prior to the date Seller shall vacate the Temporary Occupancy Space (such termination notice to include the termination date on which Seller shall vacate the Temporary Occupancy Space).

(h)     On or before the expiration of the Outside Date, Seller shall vacate the Property and surrender and deliver exclusive possession of the Property to Purchaser in broom clean condition and otherwise in the condition on the Closing Date, ordinary wear and tear, casualty and condemnation excepted and Purchaser shall accept possession from Seller of the Property.

(i)     On or before the expiration of the Outside Date Seller may remove its machinery, equipment, furniture, furnishings, supplies, materials and other tangible personal property in accordance with the PSA, provided that Tenant repairs any damage caused by such removal.

3.     Purchaser shall maintain in full force and effect at all times during the Post-Closing Occupancy Period the following, paying as the same become due all premiums therefor: (i) Commercial General Liability Insurance with minimum limits of Five Million and 00/100 Dollars ($5,000,000) written on an occurrence form basis; (ii) Workers' Compensation Insurance as required by applicable laws, and Employer's Liability Insurance with minimum limits of One Million and 00/100 Dollars ($1,000,000); and (iii) Property Insurance covering the Property with minimum limits of Five Million and 00/100 Dollars ($5,000,000) written on an occurrence form basis. The liability insurance shall name Seller as an additional insured.

4.     During the Post-Closing Occupancy Period, Purchaser shall, at Purchaser's expense, operate (including, without limitation, providing services such as, but not limited to, HVAC, elevator, utilities, cleaning, janitorial and trash removal) and maintain the Property in a manner generally consistent with the manner in which Seller operated and maintained the Property prior to the Effective Date, (including, but not limited to, parking lot maintenance and repair and landscaping maintenance, service and repair) ordinary wear and tear, casualty and condemnation excepted. Purchaser shall make all arrangements for, and pay or cause to be paid when due all charges for, property taxes and all utility and services furnished to the Property (including, without limitation, the Premises, including, but not limited to, electricity, water, and sanitary sewer services). Notwithstanding anything contained herein to the contrary, during the Post-Closing Occupancy Period Seller shall be responsible for the payment of telephone, telecommunications, cable television and internet charges it incurs.

5.     Seller, for itself and its successors and assigns, hereby releases Purchaser from any and all claims, demands and liabilities whatsoever arising out of or in connection with this Agreement and the occupancy

(and the activities performed during said occupancy) permitted hereby unless such are caused by Purchaser, its agents or representatives. Seller, for itself and its successors and assigns, further agrees to defend, indemnify and hold harmless Purchaser from and against any and all claims, losses, demands and liabilities whatsoever, including, without limitation, reasonable attorney's fees, arising out of or in connection with the occupancy (and the activities performed during said occupancy) permitted hereby unless such are caused by Purchaser, its agents or representatives.

6.    If Seller remains in possession of the Temporary Occupancy Space after the Outside Date, then Seller shall be deemed to be occupying the Temporary Occupancy Space as a month-to-month tenant only, at a daily rental of $1,000.00. Seller and Purchaser acknowledge and agree that it would be extremely difficult, if not impossible, to ascertain with certainty the damages which might be sustained by Purchase due to Seller's failure to timely vacate the Temporary Occupancy Space and, consequently, Seller and Purchaser have agreed upon the foregoing amount as fair and reasonable compensation to Seller. Seller's obligations under this Section 6 to pay all such liquidated damages shall not be considered a penalty pursuant to applicable laws. Notwithstanding the foregoing, the Outside Date shall be automatically extended on a day-for-day basis for each day for each day Seller is delayed in vacating the Temporary Occupancy Space due to a cause or causes beyond its reasonable control.

7.    This Agreement shall be governed by, interpreted and construed in accordance with the laws of the state in which the Property is located. THE PARTIES AGREE THAT THE BANKRUPTCY COURT PRESIDING OVER THE COURT CASE REFERENCED IN SECTION 8(c) OF THE PSA SHALL HAVE EXCLUSIVE JURISDICTION OVER ALL DISPUTES AND OTHER MATTERS RELATING TO (i) THE INTERPRETATION AND ENFORCEMENT OF THIS AGREEMENT OR ANY ANCILLARY DOCUMENT EXECUTED PURSUANT HERETO; AND/OR (ii) THE PROPERTY, AND THE PARTIES EXPRESSLY CONSENT TO AND AGREE NOT TO CONTEST SUCH EXCLUSIVE JURISDICTION. THIS CONSENT IS A MATERIAL INDUCEMENT FOR SELLER TO EXECUTE THIS AGREEMENT AND SURVIVES CLOSING UNDER OR TERMINATION OF THIS AGREEMENT.

8.    If any term or provision of this Agreement is held invalid or unenforceable to any extent, the remaining terms, conditions and covenants of this Agreement shall not be affected thereby and each of the terms, covenants and conditions of this Agreement shall be valid and enforceable to the fullest extent permitted by law.

9.    Time is of the essence under this agreement (subject to extension of the Outside Date as provided in Section 6 above). Notwithstanding the previous statement, whenever in this Agreement any period of time so stated would end upon a Saturday, Sunday or legal holiday, such period shall be deemed to end upon the next day following which is not a Saturday, Sunday or legal holiday.

10.    Any notice or document required or permitted to be delivered under this Agreement shall be governed by the notice provision of the PSA.

11.    This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which shall constitute one and the same instrument. Moreover, delivery of said counterparts of this Agreement may be effectuated electronically for the purposes of this Agreement.

12.    Both parties agree that this Seller's occupancy of the Property under the terms of this Post-Closing Occupancy Agreement is not intended to, nor does it create, a relationship of Landlord and Tenant between the Purchaser and Seller.

(Signatures on next page)

C-1

*This is the signature page to that certain Post-Closing Occupancy Agreement concerning certain real property known for street address purposes as* 333 E. Broadway Avenue, Maryville, Tennessee and E. Harper Avenue.

**IN WITNESS WHEREOF**, the undersigned have caused this Purchase and Sale Agreement to be executed as of the Effective Date.

<div style="margin-left:40%">

**Seller:**

**RUBY TUESDAY, INC.**, a Georgia corporation


By: _____
    Stephanie Burke Medley
    Chief Strategy Officer

</div>

*This is the signature page to that certain Post-Closing Occupancy Agreement concerning certain real property known for street address purposes as 333 E. Broadway Avenue, Maryville, Tennessee and E. Harper Avenue.*

**IN WITNESS WHEREOF**, the undersigned have caused this Purchase and Sale Agreement to be executed as of the Effective Date.

**Purchaser:**

**MASSEY PROPERTIES, LLC.**
a Tennessee limited liability company


By: _____

Printed Name: _____

Title: _____

D-5

## ADDENDUM TO AGREEMENT OF PURCHASE AND SALE

### MARYVILLE, TN – RT# 4045

### JOINDER BY BROKER

Subject to Bankruptcy Court Approval and any requirements imposed by the Bankruptcy Court or otherwise by virtue of Seller being a debtor in bankruptcy, in consideration of the mutual covenants and agreements herein contained and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, **Providence Commercial Real Estate** ("Seller's Broker") and **Berkshire Hathaway HomeServices Dean-Smith Realty** ("Purchaser's Broker") join in the referenced Agreement for the sole purpose of acknowledging and agreeing as follows: (a) a brokerage fee (the "**Brokers' Commission**") shall be paid by Seller to Seller's Broker pursuant to the terms of a separate agreement between Seller and Seller's Broker ("**Seller's Broker's Commission**") only upon the successful Closing of the transaction contemplated by the Agreement (the "**Sale**") and Seller's receipt of the Purchase Price; (b) Seller's Broker shall pay Purchaser's Broker a brokerage fee in the amount of two percent (2%) of the Purchase Price ("**Purchaser's Broker's Commission**") pursuant to the terms of a separate agreement between Seller's Broker and Purchaser's Broker only upon the successful Closing of the transaction contemplated by the Agreement; (c) the Seller's Broker's Commission and the Purchaser's Broker's Commission shall fully compensate Seller's Broker and Purchaser's Broker for their services in connection with the Sale and Seller's Broker and Purchaser's Broker are entitled to no further compensation or fees in connection with the Sale; (d) should the Sale not successfully close in accordance with the terms of the Agreement, for any reason, no compensation, reimbursement, fee or commission of any nature shall be due to Seller's Broker and Purchaser's Broker; and (e) any subsequent amendment to the Agreement by Seller and Purchaser which modifies the Purchase Price shall automatically modify the Seller's Broker's Commission and Purchaser's Broker's Commission accordingly without the further consent of Seller's Broker or Purchaser's Broker being required. Seller's Broker and Purchaser's Broker each represent and warrant to Seller and Purchaser that Seller's Broker and Purchaser's Broker have no knowledge of any other party who has or may have any claim for a broker's, finder's or other fee relative to the Sale. All capitalized terms used and not defined in this Joinder shall have the meanings set forth in the Agreement.

Executed as of the dates set forth below.

**PROVIDENCE COMMERCIAL REAL ESTATE**

**BERKSHIRE HATHAWAY HOMESERVICES DEAN-SMITH REALTY**

By: _____
Name: _____
Title: _____
Date: _____, 2020

By: _____
Name: _____
Title: _____
Date: _____, 2020

# 4045 RSC PSA

**Final Audit Report**                                                     2020-12-04

| | |
|---|---|
| Created: | 2020-12-02 |
| By: | Clara Heaton (cheaton@rubytuesday.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAA5Ge0Q1eKXn8veen1qmRTCvtRGEqooH_u |

## "4045 RSC PSA" History

Document created by Clara Heaton (cheaton@rubytuesday.com)
2020-12-02 - 5:19:24 PM GMT- IP address: 12.52.182.20

Document emailed to Stephanie Medley (smedley@rubytuesday.com) for signature
2020-12-02 - 5:20:34 PM GMT

Email viewed by Stephanie Medley (smedley@rubytuesday.com)
2020-12-02 - 5:21:54 PM GMT- IP address: 104.47.57.254

Document e-signed by Stephanie Medley (smedley@rubytuesday.com)
Signature Date: 2020-12-04 - 0:33:08 AM GMT - Time Source: server- IP address: 104.49.244.163

Agreement completed.
2020-12-04 - 0:33:08 AM GMT