## **EXHIBIT B**

## **RESTRUCTURING SUPPORT AGREEMENT**

**EXECUTION VERSION**

*RTI Holding Company, LLC, et al.,*

RESTRUCTURING SUPPORT AGREEMENT

OCTOBER 8, 2020

THIS RESTRUCTURING SUPPORT AGREEMENT AND THE DOCUMENTS ATTACHED HERETO COLLECTIVELY DESCRIBE A PROPOSED RESTRUCTURING OF THE COMPANY PARTIES THAT WILL BE EFFECTUATED THROUGH FILING CHAPTER 11 CASES IN THE BANKRUPTCY COURT.

THIS RESTRUCTURING SUPPORT AGREEMENT IS NOT AN OFFER OR A SOLICITATION WITH RESPECT TO ANY SECURITIES OF THE COMPANY PARTIES. ANY SUCH OFFER OR SOLICITATION SHALL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE.

THIS RESTRUCTURING SUPPORT AGREEMENT IS THE PRODUCT OF SETTLEMENT DISCUSSIONS AMONG THE PARTIES THERETO. ACCORDINGLY, THIS RESTRUCTURING SUPPORT AGREEMENT IS PROTECTED BY RULE 408 OF THE FEDERAL RULES OF EVIDENCE AND ANY OTHER APPLICABLE STATUTES OR DOCTRINES PROTECTING THE USE OR DISCLOSURE OF CONFIDENTIAL SETTLEMENT DISCUSSIONS. ADDITIONALLY, THIS AGREEMENT AND ANY INFORMATION CONTAINED HEREIN OR PROVIDED IN OR IN FURTHERANCE OF DISCUSSIONS RELATED HERETO, CONSTITUTE NON-PUBLIC INFORMATION REGARDING THE "CREDIT PARTIES" IN CONNECTION WITH SECTION 10.17 OF THE CREDIT AND GUARANTY AGREEMENT (AS DEFINED BELOW), PROVIDED, HOWEVER, THAT NOTWITHSTANDING THE TERMS OF THAT PROVISION, THE PARTIES TO THE CREDIT AND GUARANTY AGREEMENT SHALL NOT MAKE ANY "TRADE ANNOUNCEMENTS" IN RESPECT OF THIS AGREEMENT. UNTIL PUBLICLY DISCLOSED BY THE COMPANY PARTIES IN CONNECTION WITH THEIR CHAPTER 11 CASES, THIS AGREEMENT SHALL REMAIN STRICTLY CONFIDENTIAL AND MAY NOT BE SHARED WITH ANY OTHER PARTY OR PERSON WITHOUT THE WRITTEN CONSENT OF THE COMPANY PARTIES AND THE CONSENTING LENDERS.

THIS RESTRUCTURING SUPPORT AGREEMENT DOES NOT PURPORT TO SUMMARIZE ALL OF THE TERMS, CONDITIONS, REPRESENTATIONS, WARRANTIES, AND OTHER PROVISIONS WITH RESPECT TO THE TRANSACTIONS DESCRIBED HEREIN, WHICH TRANSACTIONS WILL BE SUBJECT TO THE COMPLETION OF DEFINITIVE DOCUMENTS INCORPORATING THE TERMS SET FORTH HEREIN AND THE CLOSING OF ANY TRANSACTION SHALL BE SUBJECT TO THE TERMS AND CONDITIONS SET FORTH IN SUCH DEFINITIVE DOCUMENTS AND THE APPROVAL RIGHTS OF THE PARTIES SET FORTH HEREIN AND IN SUCH DEFINITIVE DOCUMENTS.

This RESTRUCTURING SUPPORT AGREEMENT (including all exhibits, annexes, and schedules hereto in accordance with Section 15.2, this "**Agreement**") is made and entered into as of October 8, 2020 (the "**Execution Date**"), by and among the following parties (each of the following described in sub-clauses (i) through (iv) of this preamble, the "**Party**," and collectively, the "**Parties**"):[1]

    i.        RTI Holding Company, LLC, a company incorporated under the Laws of Delaware ("**Holdings**"), and each of its affiliates listed on **Exhibit A** to this Agreement (the Entities in this clause (i), each a "**Company Party**," and collectively, the "**Company Parties**");

    ii.      Goldman Sachs Specialty Lending Group, L.P. ("**GS**"), as administrative agent and a lender under that the Credit and Guaranty Agreement;

    iii.    TCW Direct Lending LLC, TCW Skyline Lending, L.P., and TCW Brazos Fund LLC (collectively, "**TCW**"), as lenders under the Credit and Guaranty Agreement; and

    iv.    each entity that becomes a Joining Party (the Entities in the sub-clauses (ii) through (iv), the "**Consenting Lenders**").

### *RECITALS*

**WHEREAS**, the Company Parties and the Consenting Lenders have in good faith and at arms' length negotiated or been apprised of certain restructuring and recapitalization transactions with respect to the Company Parties' capital structure on the terms set forth in this Agreement and as specified in the term sheet attached as **Exhibit B** hereto (the "**Term Sheet**" and, such transactions as described in this Agreement and the Term Sheet, the "**Restructuring Transactions**");

**WHEREAS**, the Company Parties intend to implement the Restructuring Transactions in accordance with the terms set forth in this Agreement by commencing voluntary cases under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court,**" and the cases commenced, the "**Chapter 11 Cases**"), in accordance with the terms and conditions set forth herein and in the Term Sheet;

**WHEREAS**, the Parties have agreed to take certain actions in support of the Restructuring Transactions on the terms and conditions set forth in this Agreement and the Term Sheet;

**NOW, THEREFORE**, in consideration of the covenants and agreements contained herein, and for other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each Party, intending to be legally bound hereby, agrees as follows:

---

[1]    Capitalized terms used but not defined in the preamble and recitals to this Agreement have the meanings ascribed to them in Section 1.

*AGREEMENT*

**Section 1.**    *Definitions and Interpretation.*

1.1.    Definitions. The following terms shall have the following definitions:

"**363 Option**" has the meaning set forth in the Term Sheet.

"**Additional Independent Director**" has the meaning set forth in the Term Sheet.

"**Affiliate**" shall have the meaning set forth in section 101(2) of the Bankruptcy Code.

"**Agent**" means GS as an administrative agent, collateral agent, or other agent or similar entity under the Credit Agreement Documents and DIP Financing Documents.

"**Agreement**" has the meaning set forth in the preamble to this Agreement and, for the avoidance of doubt, includes all the exhibits, annexes, and schedules hereto in accordance with Section 15.2 (including the Term Sheet, which is expressly incorporated herein and made a part of this Agreement).

"**Agreement Effective Date**" means the date on which the conditions set forth in Section 2 have been satisfied or waived by the appropriate Party or Parties in accordance with this Agreement.

"**Agreement Effective Period**" means, with respect to a Party, the period from the Agreement Effective Date to the Termination Date applicable to that Party.

"**Alternative Transaction**" has the meaning set forth in the Term Sheet.

"**Asset Sale**" has the meaning set forth in the Term Sheet.

"**Bankruptcy Code**" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as amended.

"**Bankruptcy Court**" has the meaning set forth in the recitals to this Agreement.

"**Board**" means the Board of Directors of Ruby Tuesday, Inc.

"**Business Day**" means any day other than a Saturday, Sunday, or other day on which commercial banks are authorized to close under the Laws of, or are in fact closed in, the State of New York.

"**Chapter 11 Cases**" has the meaning set forth in the recitals to this Agreement.

"**Claim**" has the meaning ascribed to it in section 101(5) of the Bankruptcy Code.

"**Cleary Gottlieb**" means Cleary Gottlieb Steen & Hamilton LLP, counsel to GS, as Consenting Lender, Agent and lender under the DIP Facility.

"**Company**" means Holdings and all of its Affiliates.

"**Company Parties**" has the meaning set forth in the preamble to this Agreement.

"**Confirmation Order**" means the confirmation order with respect to the Plan, in form and substance reasonably acceptable to the Requisite Lenders.

"**Consenting Lenders**" has the meaning set forth in the preamble to this Agreement.

"**Consenting Lenders Fees and Expenses**" has the meaning set forth in Section 15.19.

"**Credit Agreement Documents**" means, collectively, the Credit and Guaranty Agreement and all other agreements, documents, and instruments related thereto, including any guarantee agreements, forbearance agreements, pledge and collateral agreements, intercreditor agreements, subordination agreements, fee letters, and other security documents.

"**Credit and Guaranty Agreement**" means that certain Credit and Guaranty Agreement, as amended, supplemented, or otherwise modified from time to time, dated as of December 21, 2017, by and among certain Company Parties and Consenting Lenders.

"**Debtors**" means the Company Parties that commence the Chapter 11 Cases.

"**Definitive Documents**" means the documents listed in Section 3.1.

"**DIP Claim**" means any Claim on account of the Obligations under the DIP Financing Documents, including but not limited to any fees and expenses provided thereunder.

"**DIP Credit Agreement**" means that certain Debtor In Possession Credit and Guaranty Agreement, as amended, supplemented, or otherwise modified from time to time, dated as of October 9, 2020, by and among certain Company Parties and Consenting Lenders.

"**DIP Facility**" has the meaning set forth in the Term Sheet.

"**DIP Financing Motion**" means a motion pursuant to sections 363 and 364 of the Bankruptcy Code to authorize the Debtors to obtain the DIP Facility (on an interim and final basis).

"**DIP Financing Documents**" means definitive documentation related to the DIP Facility (including the DIP Credit Agreement and related loan documents) that is in form and substance satisfactory to both the Company Parties and Requisite Lenders and is consistent with the Term Sheet.

"**DIP Orders**" means orders approving the DIP Financing Motion (on an interim and final basis), in form and substance reasonably acceptable to both the Company Parties and Requisite Lenders.

"**Disclosure Statement**" means the related disclosure statement with respect to the Plan.

"**Disclosure Statement Order**" means the order of the Bankruptcy Court approving the Disclosure Statement pursuant to Section 1125 of the Bankruptcy Code, in form and substance reasonably acceptable to both the Company Parties and Requisite Lenders.

"**Entity**" shall have the meaning set forth in section 101(15) of the Bankruptcy Code.

"**Equity Interests**" means, collectively, the shares (or any class thereof), common stock, preferred stock, limited liability company interests, and any other equity, ownership, or profits interests of any Company Party.

"**Execution Date**" has the meaning set forth in the preamble to this Agreement.

"**Exit Facility**" has the meaning set forth in the Term Sheet.

"**Exit Financing Documents**" means definitive documentation related to the Exit Facility (including a financing agreement and related loan documents) that is in form and substance satisfactory to the Requisite Lenders and is consistent with the Term Sheet.

"**FocalPoint**" means FocalPoint Securities, LLC, investment banker to the Company Parties.

"**Governance Documents**" means the organizational and governance documents for Reorganized Debtors and their subsidiaries and affiliates, including certificates of incorporation, certificates of formation or certificates of limited partnership (or equivalent organizational documents), bylaws, limited liability company agreements (or equivalent governing documents), as applicable.

"**Grant Thornton**" means Grant Thornton LLP, restructuring and financial advisor to the Agent.

"**GS**" has the meaning set forth in the preamble to this Agreement.

"**Holdings**" has the meaning set forth in the preamble to this Agreement.

"**Hunton**" means Hunton Andrews Kurth LLP, counsel to GS, as Agent and lender under the DIP Facility.

"**Joinder**" means a joinder to this Agreement substantially in the form attached hereto as **Exhibit C**.

"**Joining Party**" means any person or Entity that receives or acquires a portion of the Pre-Petition Secured Debt Claims pursuant to a sale or other Transfer by a Consenting Lender who shall execute and deliver a Joinder and be bound by all of the terms of this Agreement (as the same may be hereafter modified from time to time).

"**Law**" means any federal, state, local, or foreign law (including common law), statute, code, ordinance, rule, regulation, order, ruling, or judgment, in each case, that is validly adopted, promulgated, issued, or entered by a governmental authority of competent jurisdiction (including the Bankruptcy Court).

"**Milestones**" means the milestones set forth in the Term Sheet.

"**Obligations**" means those obligations outstanding under the Credit Agreement Documents or the DIP Financing Documents.

"**Parties**" has the meaning set forth in the preamble to this Agreement.

"**Paul Hastings**" means Paul Hastings LLP, counsel to TCW, as Consenting Lender, lender under the DIP Facility, and lender under the Exit Facility.

"**Petition Date**" means the first date any of the Company Parties commences a Chapter 11 proceeding.

"**Plan**" means the joint plan of reorganization filed by the Debtors under chapter 11 of the Bankruptcy Code that embodies the Restructuring Transactions in accordance with the terms of this Agreement and the Term Sheet, in form and substance reasonably acceptable to the Requisite Lenders.

"**Plan Effective Date**" means the date on which all conditions precedent to the effectiveness of the Plan have been satisfied or waived in accordance with the terms of the Plan, and the Plan is substantially consummated according to its terms.

"**Plan Milestones**" means certain milestones set forth in the Term Sheet as the "Plan Milestones."

"**Plan Supplement**" means the compilation of documents and forms of documents, schedules, and exhibits to the Plan that will be filed by the Debtors with the Bankruptcy Court and shall be in form and substance reasonably acceptable to the Requisite Lenders.

"**Pre-Petition Secured Debt Claims**" means any Claim on account of the Obligations under the Credit Agreement Documents, including all principal, interest, default interest, call premium, yield maintenance, or any fees and expenses provided thereunder; *provided, however*, the Company (a) expressly preserves its rights to contest the allowance of any call premium and yield maintenance premium under the Credit and Guaranty Agreement, (b) shall not be required under the DIP Facility to stipulate the allowance of such premiums, and (c) agrees that any credit bid by the Consenting Lenders may include the principal amount of obligations under the Credit and Guaranty Agreement, plus all accrued interest; *provided, further,* that GS and TCW shall each waive the call premium and yield maintenance on the Plan Effective Date in the event that the Pre-Petition Secured Debt Claims receive the treatment described under the header "Treatment of Pre-Petition Secured Debt Claims" in the Term Sheet.

"**Reorganized Debtors**" means the Debtors, as reorganized pursuant to and under the Restructuring Transactions or any successor thereto.

"**Requisite Lenders**" means one or more Consenting Lenders representing more than 50% of the aggregate Pre-Petition Secured Debt Claims; provided, however, in the event any Consenting Lender (or group of Affiliated Consenting Lenders) holds more than 35% of the total Pre-Petition Secured Debt Claims, the vote of such Consenting Lender (or group of Affiliated Consenting Lenders) shall be required for Requisite Lenders (but only for so long as such threshold is satisfied).

"**Restructuring Transactions**" has the meaning set forth in the recitals to this Agreement.

"**RT Asset Company**" has the meaning set forth in the Term Sheet

"**RT Lodge**" has the meaning set forth in the Term Sheet.

"**RT Lodge Company**" has the meaning set forth in the Term Sheet, provided, however, on the Effective Date the RT Lodge Company shall, at the direction of GS and TCW, designate any assets that are not directly related to and useful to the operations of RT Lodge to another Reorganized Debtor or newly formed company to serve as parent company to the Reorganized Debtors.

"**Sale Milestones**" means certain milestones set forth in the Term Sheet as the "Sale Milestones."

"**Solicitation Materials**" means all solicitation materials in respect of the Plan together with the Disclosure Statement, which Solicitation Materials shall be in accordance with this Agreement and the Definitive Documents and shall be in form and substance reasonably acceptable to both the Company Parties and Requisite Lenders.

"**TCW**" has the meaning set forth in the preamble to this Agreement.

"**Term Sheet**" has the meaning set forth in the recitals to this Agreement.

"**Termination Date**" means the date on which termination of this Agreement as to a Party is effective in accordance with Section 11.

"**Transfer**" means to sell, resell, reallocate, use, pledge, assign, transfer, hypothecate, participate, donate or otherwise encumber or dispose of, directly or indirectly (including through derivatives, options, swaps, pledges, forward sales or other transactions).

1.2.    Interpretation.  For purposes of this Agreement:

(a)    in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender;

(b)    capitalized terms defined only in the plural or singular form shall nonetheless have their defined meanings when used in the opposite form;

(c)    unless otherwise specified, any reference herein to an existing document, schedule, or exhibit shall mean such document, schedule, or exhibit, as it may have been or may be amended, restated, amended and restated, supplemented, or otherwise modified or replaced from time to time in accordance with this Agreement; *provided* that any capitalized terms herein which are defined with reference to another agreement, are defined with reference to such other agreement as of the date of this Agreement, without giving effect to any termination of such other agreement or amendments to such capitalized terms in any such other agreement following the date hereof;

(d)    unless otherwise specified, all references herein to "Sections" are references to Sections of this Agreement;

(e)    the words "herein," "hereof," and "hereto" refer to this Agreement in its entirety rather than to any particular portion of this Agreement;

(f)    captions and headings to Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of this Agreement;

(g)    references to "shareholders," "directors," and/or "officers" shall also include "members" and/or "managers," as applicable, as such terms are defined under the applicable limited liability company Laws;

(h)    the use of "include" or "including" is without limitation, whether stated or not;

(i)    the phrase "counsel to the Consenting Lenders" refers in this Agreement to each counsel specified in Section 15.10 other than counsel to the Company Parties;

(j)    unless otherwise specified herein, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; and

(k)    in the event of any inconsistency between this Agreement and the Term Sheet, this Agreement shall govern.

**Section 2.    *Effectiveness of this Agreement*.**  This Agreement shall become effective and binding upon each of the Parties according to its terms as of 12:00 a.m., prevailing Eastern Standard Time, on the Agreement Effective Date, which is the date on which all of the following conditions have been satisfied or waived in accordance with this Agreement:

(a)    each of the Company Parties shall have executed and delivered counterpart signature pages of this Agreement to counsel to each of the Parties; and

(b)    each of the Consenting Lenders shall have executed and delivered counterpart signature pages of this Agreement to counsel to each of the Parties.

**Section 3.    *Definitive Documents*.**

**3.1.**    The Definitive Documents governing the Restructuring Transactions shall include the following:

(a) this Agreement;

(b) all documents implementing and achieving the Restructuring Transactions, including any documents in connection with any "first day" or "second day" pleadings and all orders sought pursuant thereto;

(c) the Plan;

(d) the Confirmation Order;

(e) the Disclosure Statement;

(f) the Solicitation Materials;

(g) the Disclosure Statement Order;

(h) the DIP Financing Documents;

(i) the Exit Financing Documents;

(j) all documents in connection with the 363 Option;

(k) the Governance Documents;

(l) the Plan Supplement;

(m) such other definitive documentation relating to a recapitalization or restructuring of the Company Parties as is necessary or desirable to consummate the Restructuring Transactions; and

(n) any other material exhibits, schedules, amendments, modifications, supplements, appendices or other documents and/or agreements relating to any of the foregoing.

**3.2.** The Definitive Documents (and any amendments, modifications or supplements thereto) not executed or in a form attached to this Agreement as of the Execution Date remain subject to negotiation and completion subject to the consent rights in Section 3.3 below. Upon completion, the Definitive Documents and every other document, deed, agreement, filing, notification, letter or instrument related to the Restructuring Transactions shall contain terms, conditions, representations, warranties, and covenants consistent with the terms of this Agreement, as it may be modified, amended, or supplemented in accordance with Section 12.

**3.3.** <u>Consent Rights Regarding Definitive Documents</u>. Each of the Definitive Documents not executed or in a form attached to this Agreement as of the Execution Date shall otherwise be consistent with this Agreement in all respects and otherwise in form and substance reasonably acceptable to both the Company Parties and the Requisite Lenders, except that any of the Definitive Documents with respect to the Exit Financing Documents and Governance Documents shall not require the consent of the Company Parties.

**Section 4.** *Commitments of the Consenting Lenders.*

**4.1.** <u>General Commitments, Forbearances, and Waivers</u>.

(a) During the Agreement Effective Period, each Consenting Lender agrees, in respect of all of its Pre-Petition Secured Debt Claims, as applicable, pursuant to this Agreement to use commercially reasonable efforts to

(i) support the Restructuring Transactions as contemplated by, and within the timeframes outlined in, this Agreement and in the Definitive Documents and vote and exercise any powers or rights available to it (including in any board, shareholders', or creditors' meeting or in any process requiring voting or approval to which they are legally entitled to participate, including, without limitation, confirmation of the Plan) in each case in favor of any matter requiring approval to the extent necessary to implement the Restructuring Transactions;

(ii) oppose and object to the efforts of any person seeking to object to, delay, impede, or take any other action to interfere with the acceptance, implementation, or consummation of the Restructuring Transactions to the extent such opposition or objection is reasonably necessary or desirable to facilitate implementation of the Restructuring Transactions;

(iii) take all steps reasonably necessary and desirable to consummate the Restructuring Transactions in accordance with this Agreement;

(iv)    forbear from exercising remedies on account of its Collateral (as defined in the Credit Agreement Documents) other than as contemplated by this Agreement or as otherwise permitted by the DIP Orders and the Definitive Documents; *provided* that the forbearance set forth in this Section 4.1(a)(iv) shall not constitute a waiver of any rights to credit bid for any Collateral or any rights with respect to any default or event of default under the Credit Agreement Documents and shall not bar the Consenting Lenders from filing a proof of claim or taking action to establish the amount of such claim; upon termination of this Agreement, the agreement of the Consenting Lenders to forbear from exercising rights and remedies in accordance with this Section 4.1(a)(iv) shall immediately terminate without the requirement of any demand, presentment or protest of any kind, all of which the Company Parties hereby waive; *provided*, however, that if the Chapter 11 Cases are pending at the time of such termination, Consenting Lenders must first obtain relief from the automatic stay from the Bankruptcy Court and such other approvals as may be required before exercising any such rights and remedies, except that such relief is not required for lenders under the DIP Facility to exercise their rights and remedies pursuant to the DIP Financing Documents subject to paragraph 18 of the DIP Orders;

(v)    give any notice, order, instruction, or direction to the Agent necessary to give effect to the Restructuring Transactions, so long as the Consenting Lenders are not required to incur any out-of-pocket costs or provide any indemnity in connection therewith; and

(vi)    negotiate in good faith and use commercially reasonable efforts to execute and implement the Definitive Documents that are consistent with this Agreement to which it is required to be a party.

(b)    During the Agreement Effective Period, each Consenting Lender agrees, in respect of all of its Pre-Petition Secured Debt Claims and DIP Claims, if applicable, that it shall not directly or indirectly:

(i)    object to, delay, impede, or take any action that is reasonably likely to interfere with acceptance, implementation, or consummation of the Restructuring Transactions;

(ii)    initiate, solicit interest in, negotiate, propose, file, support or vote for any Alternative Transaction, or direct any other person to do any of the foregoing, *provided*, however, that nothing herein will preclude a Consenting Lender from having discussions with any holder of Equity Interests in Holdings with respect to a potential new money investment in RT Asset Company;

(iii)    file, or direct any other person to file, any motion, pleading, or other document with the Bankruptcy Court or any other court (including any modifications or amendments thereof) that, in whole or in part, is materially inconsistent with this Agreement or the Plan;

(iv)    initiate, or have initiated on its behalf, or direct any other person to initiate, any litigation or proceeding of any kind with respect to the Chapter 11 Cases, this Agreement, or the other Restructuring Transactions contemplated herein against the Company Parties or the other Parties other than to enforce this Agreement or any Definitive Document or as otherwise permitted under this Agreement;

(v)     exercise, or direct any other person to exercise, any right or remedy for the enforcement, collection, or recovery of any of its Claims against or interests in the Company Parties other than to enforce this Agreement or any Definitive Document or as otherwise permitted under this Agreement; or

(vi)     object to, delay, impede, or take any other action, or direct any other person to take any action to interfere with the Company Parties' ownership and possession of their assets, wherever located, or interfere with the automatic stay arising under section 362 of the Bankruptcy Code; *provided,* however, that nothing in this Agreement shall limit the right of any party hereto to exercise any right or remedy provided under this Agreement, the Confirmation Order or any other Definitive Document.

(c)     The Consenting Lenders' obligations under this Agreement shall be subject to the entry of DIP Orders in form and substance acceptable to the Requisite Lenders which shall be consistent in all respects with the Term Sheet, including authorization by the Bankruptcy Court for the use of cash proceeds from any Asset Sales during the Chapter 11 Cases first for repayment of the Pre-Petition Secured Debt Claims, and following repayment of the Pre-Petition Secured Debt Claims in full, repayment of the DIP Facility.

**4.2.**     Commitments with Respect to Chapter 11 Cases.

(a)     During the Agreement Effective Period, each Consenting Lender agrees to provide the DIP Facility, consistent with the terms set forth in the Term Sheet, subject to customary conditions precedents and other terms and conditions, and consent to use of cash collateral, subject to the DIP Orders, *provided* that the DIP Orders will, among other things,

(i)     impose covenants:

(1) requiring continued retention of the Additional Independent Director and FocalPoint;

(2) requiring the engagement, and continued retention, of Hilco Real Estate, LLC (the "**Lease Restructuring Advisor**");

(3) requiring agreed-upon reporting by the Company;

(4) requiring compliance with the Plan Milestones and Sale Milestones;

(5) prohibiting use of cash except as permitted by a budget, including variances, to be approved by the Requisite Lenders;

(6) granting the Consenting Lenders reasonable access to information and diligence; and

(7) requiring payment of the Consenting Lenders' reasonable fees and expenses without court approval, *provided* that the Company is provided with a general description of the services performed and summary of the timekeepers and hours expended); and

(ii)     terminate the DIP Facility upon termination of this Agreement, consistent with Section 11 of this Agreement.

(b)     During the Agreement Effective Period, each Consenting Lender agrees that it shall, subject to receipt by such Consenting Lender, whether before or after the commencement of the Chapter 11 Cases, of the Solicitation Materials:

(i)     vote each of its Pre-Petition Secured Debt Claims to accept the Plan by delivering its duly executed and completed ballot accepting the Plan on a timely basis following the commencement of the solicitation of the Plan and its actual receipt of the Solicitation Materials and the ballot;

(ii)     to the extent it is permitted to elect whether to opt out of the releases set forth in the Plan, elect not to opt out of the releases set forth in the Plan by timely delivering its duly executed and completed ballot(s) indicating such election; and

(iii)     not change, withdraw, amend, or revoke (or cause to be changed, withdrawn, amended, or revoked) any vote or election referred to in clauses (i) and (ii) above.

(c)     During the Agreement Effective Period, each Consenting Lender, in respect of each of its Pre-Petition Secured Debt Claims and DIP Claims, will support, and will not directly or indirectly object to, delay, impede, or take any other action (including, without limitation, directing any third party to take any action) that is reasonably likely to interfere with any motion or other pleading or document filed by a Company Party in the Bankruptcy Court that is consistent with this Agreement and the Consenting Lenders' rights hereunder; *provided*; however, that nothing in this Agreement shall limit the right of any party hereto to exercise any right or remedy provided under this Agreement, the Confirmation Order or any other Definitive Document.

(d)     Each Consenting Lender agrees to enter into good faith negotiations to provide the Exit Facility consistent with the terms set forth in the Term Sheet, on or before the date that Plan ballots are solicited, *provided,* however, that GS's obligation under the Exit Facility is limited to serving as an issuer of letters of credit, consistent with the Term Sheet.

(e)     Notwithstanding any other provision of this Agreement, nothing in this Agreement shall require the Agent or Consenting Lenders to incur any expenses, liabilities, or other obligations, or agree to any commitments, undertakings, concessions, indemnities, or other arrangements that could result in expenses, liabilities, or other obligations to the Agent, any Consenting Lender or its Affiliates in each case that is not reimbursable under this Agreement.

**Section 5.     *Additional Provisions Regarding the Consenting Lenders' Commitments.*** Notwithstanding anything contained in this Agreement, and notwithstanding any delivery of a consent or vote to accept the Plan by any Consenting Lenders, or acceptance of the Plan by any class of creditors, nothing in this Agreement shall:

(a)     affect the ability of any Consenting Lender to consult with any other Consenting Lender, the Company Parties, or any other party in interest in the Chapter 11 Cases (including any official committee and the United States Trustee), provided that such consultation shall not be in furtherance of any transaction subject to avoidance pursuant to section 363(n) of the Bankruptcy Code.  For the avoidance doubt, the Consenting Lenders may not communicate with any potential bidders for any assets of the Company Parties, *provided*, however, that nothing herein will preclude a Consenting Lender from having

discussions with any holder of Equity Interests in Holdings with respect to a potential new money investment in RT Asset Company;

(b)    impair or waive the rights of any Consenting Lender to assert or raise any objection permitted under this Agreement in connection with the Restructuring Transactions;

(c)    prevent any Consenting Lender from enforcing this Agreement or contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement;

(d)    obligate a Consenting Lender to deliver a vote to support the Plan or prohibit a Consenting Lender from withdrawing such vote, in each case from and after the Termination Date (other than a Termination Date as a result of the occurrence of the Plan Effective Date); *provided* that, upon the withdrawal of any such vote after the Termination Date (other than a Termination Date as a result of the occurrence of the Plan Effective Date), such vote shall be deemed void ab initio, and such Consenting Lender shall have the opportunity to change its vote;

(e)    (i) prevent any Consenting Lender from taking any action that is required by applicable Law, (ii) require any Consenting Lender to take any action that is prohibited by applicable Law or to waive or forego the benefit of any applicable legal privilege, or (iii) require any Consenting Lender to incur any expenses, liabilities, or other obligations, or agree to any commitments, undertakings, concessions, indemnities, or other arrangements that could result in expenses, liabilities, or other obligations unless reimbursable under this Agreement;

(f)    prevent any Consenting Lender by reason of this Agreement or the Restructuring Transactions from making, seeking, or receiving any regulatory filings, notifications, consents, determinations, authorizations, permits, approvals, licenses, or the like;

(g)    impair or waive the rights of any Consenting Lender to assert or raise any objection not prohibited under this Agreement;

(h)    prohibit any Consenting Lender from taking any action that is not inconsistent with this Agreement;

(i)    be construed to prohibit any Consenting Lender from appearing as a party in interest in any matter to be adjudicated in a Chapter 11 Case, so long as such appearance and positions advocated in connection therewith are not inconsistent with this Agreement and are not for the purpose of delaying, interfering, impeding, or taking any other action to delay, interfere, or impede, directly or indirectly, the Restructuring Transactions; or

(j)    limit the right of GS to credit bid more than $5.1 million of the Pre-Petition Secured Debt Claims for the RT Lodge.

**Section 6.    *Commitments of the Company Parties.***

**6.1.    Affirmative Commitments.**    During the Agreement Effective Period, the Company Parties agree to:

(a)    (i) continue to retain the Additional Independent Director; (ii) maintain a Board consisting of five (5) directors, including at least two (2) independent directors, and

(iii) require the affirmative vote of at least one (1) independent director for the Board or the Company to take any actions relating to any matters involving the Company's executive compensation, restructuring or any transaction(s) with Affiliates;

(b)    engage and continue to retain FocalPoint to, among other things:

(i)    solicit an alternative Exit Facility;

(ii)    assist the Company in (1) evaluating, structuring, negotiating and implementing the terms (including pricing) and conditions of any transactions contemplated in the Term Sheet; (2) preparing, revising, or updating marketing materials; (3) contacting potential purchasers to solicit their interest and provide them with the confidential information memorandum under a non-disclosure agreement; (4) compiling and disseminating due diligence materials to prospective purchasers and maintaining a secure data vault for review of due diligence materials; (5) participating in due diligence visits, meetings, and consultations between the Company and interested potential purchasers, and coordinating and tracking distribution of all information related to potential transactions contemplated in the Term Sheet with such parties; (6) evaluating offers and indications of interest; and (7) attending auctions, and to the extent required, providing affidavits in support with respect to such transactions contemplated in the Term Sheet.

(c)    engage and continue to retain the Lease Restructuring Advisor;

(d)    use commercially reasonable efforts to implement Asset Sales during the Chapter 11 Cases, the cash proceeds of which shall be used first to immediately pay down the Pre-Petition Secured Debt Claims in full, and following repayment of the Pre-Petition Secured Debt Claims in full, to pay down the DIP Facility, utilizing the release prices described in schedule 6.9(d) to the DIP Credit Agreement;

(e)    propose the Plan and support and take all steps reasonably necessary and desirable to consummate the Restructuring Transactions in accordance with this Agreement, including (i) using commercially reasonable efforts to satisfy Milestones, (ii) paying in cash, in full, cure amounts for assumed executory contracts and unexpired leases, and (iii) to the extent RT Lodge is not sold during the Chapter 11 Cases, at the direction of GS and TCW, designating and assigning all assets and assumed executory contracts and unexpired leases that are not directly related to and useful to the operations of RT Lodge to another Reorganized Debtor or newly formed company to serve as parent company to the Reorganized Debtors;

(f)    to the extent any legal or structural impediment arises that would prevent, hinder, or delay the consummation of the Restructuring Transactions contemplated herein, support and take all steps reasonably necessary and desirable to address and resolve any such impediment;

(g)    use commercially reasonable efforts to obtain any and all required governmental, regulatory (including self-regulatory) and/or third-party approvals for the Restructuring Transactions;

(h)    negotiate in good faith and execute and deliver the Definitive Documents and any other required agreements to effectuate and consummate the Restructuring Transactions as contemplated by this Agreement;

(i)     actively oppose and object to the efforts of any person seeking to object to, delay, impede, or take any other action to interfere with the acceptance, implementation, or consummation of the Restructuring Transactions (including, if applicable, the filing of timely filed objections or written responses) to the extent such opposition or objection is reasonably necessary or desirable to facilitate implementation of the Restructuring Transactions;

(j)     consult and negotiate in good faith with the Consenting Lenders and their advisors regarding the execution and implementation of the Restructuring Transactions including regarding (i) any executory contract or lease assumption and rejection strategy, (ii) the selection of executory contracts and unexpired leases to be assumed and assigned, and (iii) any key employee retention or incentive plans, executive bonuses or related payments, all of which shall be reasonably acceptable to the Requisite Lenders;

(k)     upon reasonable request of the Consenting Lenders, inform the advisors to the Consenting Lenders as to (i) the status and progress of the Restructuring Transactions, including progress in relation to the negotiations of the Definitive Documents, and (ii) the status of obtaining any necessary or desirable authorizations (including any consents) from each Consenting Lender, any competent judicial body, governmental authority, banking, taxation, supervisory, or regulatory body, or any stock exchange;

(l)     upon reasonable request of TCW and GS, provide due diligence information pertaining to the Company Parties, including with respect to (i) liquor licenses and other operational related requests, (ii) site visits to properties of the Company Parties, and (iii) such other requests as may arise in connection with the Restructuring Transactions;

(m)     upon reasonable request of GS, provide due diligence information pertaining to the RT Lodge and RT Lodge Company, including providing GS representatives access to the RT Lodge site and records reasonably requested to complete third party environmental, zoning, title and property condition diligence, *provided* however that such records shall not include documents or information from, or communications with, any other potential buyer of the RT Lodge and/or RT Lodge Company (and the Company shall not provide any documents or information from, or communication with, GS to any other potential buyer of the RT Lodge and/or RT Lodge Company);

(n)     comply with all budget and information-related obligations in this Agreement, the DIP Orders or the Definitive Documents, subject to customary cure and variance provisions including complying with any agreed-upon reporting requirements and prohibiting use of cash except as permitted by a budget to be approved by the Requisite Lenders;

(o)     inform Cleary Gottlieb, Hunton, and Paul Hastings no later than one (1) Business Day after becoming aware of: (i) any written proposal with respect to an Alternative Transaction (the notice of which, for the avoidance of doubt, is not required to include the terms of such proposal), (ii) a breach of this Agreement (including a breach by any Company Party), and (iii) any representation or statement made by or deemed to be made by any of the Company Parties under this Agreement that is or proves to have been materially incorrect or misleading in any respect when made or deemed to be made;

(p)     after the Petition Date, provide Cleary Gottlieb, Hunton, and Paul Hastings a review period of (i) at least three (3) calendar days prior to the date when the Company intends to file any Definitive Document which the Requisite Lenders have a consent right under Section 3.3 of this Agreement, and (ii) at least one (1) Business Day prior to the date

when the Company intends to file any material pleadings that are not Definitive Documents with the Bankruptcy Court and consider in good faith Requisite Lenders' comments; *provided* that the drafts of such Definitive Documents and material pleadings provided to Cleary Gottlieb, Hunton, and Paul Hastings shall be in a reasonable form;

(q)    use commercially reasonable efforts to maintain their good standing under the Laws of the state or other jurisdiction in which they are incorporated or organized;

(r)    provide the Consenting Lenders with a schedule of all the Company's existing employee bonus obligations, employee retention plans, employee incentive plans, or other similar obligations on the Agreement Effective Date; and

(s)    pay the Consenting Lenders' Fees and Expenses in accordance with Section 15.19 of this Agreement.

**6.2.**    <u>Negative Commitments</u>.  During the Agreement Effective Period, each of the Company Parties shall not directly or indirectly, including through itself or any of its representatives:

(a)    object to, delay, impede, or take any other action to interfere with acceptance, implementation, or consummation of the Restructuring Transactions;

(b)    initiate, solicit, negotiate, propose, file or support any Alternative Transactions and take any action that is inconsistent with, or is intended to frustrate or impede approval, implementation and consummation of the Restructuring Transactions described in, this Agreement or the Definitive Documents or would have the effect of frustrating or impeding approval, implementation and consummation of the Restructuring Transactions described in this Agreement or the Plan;

(c)    propose or file a plan or any proposal that provides recovery to any holder of Equity Interest in Holdings on account of such Equity Interest or to any holder of Claims including intercompany claims on account of such Claims in a manner that is not reasonably acceptable to the Consenting Lenders;

(d)    modify either the Plan or the Definitive Documents, in whole or in part, in a manner that is inconsistent with this Agreement or other Definitive Documents;

(e)    file any motion, pleading, or Definitive Documents with the Bankruptcy Court or any other court (including any modifications or amendments thereof) that, in whole or in part, is not materially consistent with this Agreement or other Definitive Documents;

(f)    adopt any new executive compensation or retention plans, bonuses or make any related payments without prior consent of the Agent at the direction of the Requisite Lenders, which consent shall not be unreasonably withheld; or

(g)    (i) make or declare any dividends, distributions, or other payments on account of its equity or membership interests, applicable, (ii) directly or indirectly make or procure any payments to the holders of the Equity Interests or any of their respective Affiliates, or (iii) make any Transfers (whether by dividend, distribution, or otherwise) to any direct or indirect parent entity or shareholder of the Company or any of their respective Affiliates; provided however, that the Company Parties may pay director fees, Chief Executive Officer and Chief Operating Officer compensation (pursuant to Secondment Agreements) as

permitted by the budget, and make payments described in clauses (ii) and (iii) to the extent permitted by the DIP Financing Documents.

**Section 7.**    ***Transfers of Pre-Petition Secured Debt Claims***

**7.1.**    During the Agreement Effective Period, no Consenting Lenders shall Transfer any ownership in any Pre-Petition Secured Debt Claims unless (i) the transferee executes and delivers to counsel to the Company Parties and to Cleary Gottlieb, Hunton, and Paul Hastings, at or before the time of the proposed Transfer, a Joinder or (ii) the transferee is a Consenting Lender or an Affiliate thereof, it being understood and agreed that any such Transferred Claims shall automatically be deemed to be subject to the terms of this Agreement, and the transferee provides notice of such Transfer (including the amount and type of any Pre-Petition Secured Debt Claims Transferred) to counsel to the Company Parties and to Cleary Gottlieb, Hunton, and Paul Hastings by the close of business on the second Business Day following such Transfer; provided, however, a Consenting Lender may not Transfer any Pre-Petition Secured Debt Claim to a Company Party or an Affiliate thereof.

**7.2.**    Upon compliance with the requirements of Section 7.1, the transferor shall be deemed to relinquish its rights (and be released from its obligations) under this Agreement to the extent of the rights and obligations in respect of such Transferred Pre-Petition Secured Debt Claims. Any Transfer in violation of Section 7.1 shall be void ab initio.

**7.3.**    This Agreement shall in no way be construed to preclude the Consenting Lenders from acquiring additional Pre-Petition Secured Debt Claims or other Claims or interests in any Pre-Petition Secured Debt Claims or other Claims or interests; *provided* that (a) such additional Pre-Petition Secured Debt Claims shall automatically and immediately upon acquisition by a Consenting Lender be deemed subject to the terms of this Agreement (regardless of when or whether notice of such acquisition is given to counsel to the Company Parties or to Cleary Gottlieb, Hunton, and Paul Hastings) and (b) such Consenting Lender must provide notice of any acquisition of Pre-Petition Secured Debt Claims (including the amount and type of such acquisition) to counsel to the Company Parties within two (2) Business Days of such acquisition.

**Section 8.**    ***Representations and Warranties of Consenting Lenders***.

Each Consenting Lender severally, and not jointly, represents and warrants that, as of the date such Consenting Lender executes and delivers this Agreement and as of the Plan Effective Date:

(a)    it is the beneficial or record owner of the face amount of the Pre-Petition Secured Debt Claims;

(b)    it has the full power and authority to act on behalf of, vote and consent to matters concerning, such Pre-Petition Secured Debt Claims;

(c)    such Pre-Petition Secured Debt Claims are free and clear of any pledge, lien, security interest, charge, claim, equity, option, proxy, voting restriction, right of first refusal, or other limitation on disposition, Transfer, or encumbrances of any kind, that would adversely affect in any way such Consenting Lender's ability to perform any of its obligations under this Agreement at the time such obligations are required to be performed; and

(d)      it has the full power to vote, approve changes to all of its Pre-Petition Secured Debt Claims referable to it as contemplated by this Agreement subject to applicable Law.

**Section 9.      *Representations and Warranties of Company Parties*.**

Each Company Party severally, and not jointly, represents and warrants that, as of the date such Company Party executes and delivers this Agreement and as of the Plan Effective Date:

(a)      to the best of its knowledge having made all reasonable inquiries, no order has been made, petition presented, or resolution passed for the winding up of or appointment of a liquidator, receiver, administrative receiver, administrator, compulsory manager, or other similar officer in respect of it or any other Company Party or affiliate or subsidiary of any Company Party, and no analogous procedure has been commenced in any jurisdiction; provided, however, that this Section 9(a) does not apply to any proceeding commenced in connection with filing the Chapter 11 Cases;

(b)      within the 365 days preceding the execution of this Agreement, no Company Party has made any dividend, distribution, or other payment (other than ordinary course expense reimbursement) to any holder of Equity Interests or any of their respective Affiliates on account of its equity, other than as has been disclosed in writing to the advisors for the Consenting Lenders prior to the execution of this Agreement; and

(c)      except as expressly provided for in this Agreement, it has not entered into any arrangement (including with any Affiliate or an individual creditor thereunder, irrespective of whether it is or is to become a Consenting Lenders or other stakeholders) with respect to a Restructuring Transaction on terms that are inconsistent with the Term Sheet.

**Section 10.      *Mutual Representations, Warranties, and Covenants*.**

Each of the Parties represents, warrants, and covenants to each other Party, as of the date such Party executed and delivers this Agreement and on the Plan Effective Date:

(a)      it is validly existing and in good standing (or the equivalent thereof) under the Laws of the state or jurisdiction of its organization, and this Agreement is a legal, valid, and binding obligation of such Party, enforceable against it in accordance with its terms, except as enforcement may be limited by applicable Laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability;

(b)      except as expressly provided in this Agreement, the Term Sheet, the Plan, the Confirmation Order, and the Bankruptcy Code, no consent or approval is required by any governmental authority, banking, taxation, supervisory, or regulatory body or any stock exchange, third party, or any other person or entity in order for it to effectuate the Restructuring Transactions contemplated by, and perform its respective obligations under, this Agreement, other than any such consent or approval which has been obtained, provided, or otherwise satisfied prior to the Agreement Effective Date and which consent or approval has not been subsequently revoked;

(c)      the entry into and performance by it of, and the transactions contemplated by, this Agreement do not, and will not, conflict in any material respect with any Law or regulation applicable to it or with any of its articles of association, memorandum of association or other constitutional documents;

(d)     except as expressly provided in this Agreement, it has (or will have, at the relevant time) all requisite corporate or other power and authority to enter into, execute, and deliver this Agreement and to effectuate the Restructuring Transactions contemplated by, and perform its respective obligations under, this Agreement; and

(e)     except as expressly provided by this Agreement, it is not party to any restructuring or similar agreements or arrangements with the other Parties to this Agreement that have not been disclosed to all Parties to this Agreement.

**Section 11.**    *Termination Events.*

**11.1.**    <u>Consenting Lender Termination Events</u>.  This Agreement may be terminated by the Agent at the direction of the Requisite Lenders upon three (3) Business Days' notice to the Company Parties in accordance with Section 15.10 hereof upon the occurrence of the following events, unless waived, and in each case, the date of termination of this Agreement shall constitute the Maturity Date of the DIP Facility in accordance with section 8.1 of the DIP Credit Agreement and in such case all outstanding amounts under the DIP Facility shall be immediately due:

(a)     the Company's failure to meet a Milestone, which has not been extended or waived in a manner consistent with this Agreement;

(b)     the breach in any material respect by a Company Party of any of the undertakings, representations, warranties, or covenants of the Company Parties set forth in this Agreement, including a breach of budget covenant that is not a permitted variance, unless such breach is cured within three (3) Business Days following the Agent's notice of such breach;

(c)     the making public, modification, amendment, or filing of any Definitive Documents without the consent of the Requisite Lenders in accordance with this Agreement;

(d)     any Company Party's (i) withdrawal of the Plan, (ii) public announcement of its intention not to support the Restructuring Transactions, or (iii) filing, public announcement, or execution of a definitive written agreement with respect to an Alternative Transaction that is not otherwise agreed by the Parties;

(e)     the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any final, non-appealable ruling or order that (i) would reasonably be expected to prevent the consummation of a material portion of the Restructuring Transactions and (ii) remains in effect for ten (10) Business Days after the Agent at the direction of the Requisite Lenders transmits a written notice in accordance with Section 15.10 hereof detailing any such issuance; *provided* that this termination right may not be exercised by any Consenting Lender that sought or requested such ruling or order in contravention of any obligation set out in this Agreement;

(f)     the entry of an order by the Bankruptcy Court, or the filing of a motion or application by any Company Party seeking an order (without the prior written consent of the Consenting Lenders), (i) converting one or more of the Chapter 11 Cases of Company Parties to cases under chapter 7 of the Bankruptcy Code, (ii) appointing an examiner with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code or a trustee in one or more of the Chapter 11 Cases of Company Parties, (iii) dismissing one or

more of the Chapter 11 Cases, (iv) terminating exclusivity under section 1121 of the Bankruptcy Code, or (v) rejecting this Agreement;

(g)    the occurrence of any event of default under the DIP Financing Documents;

(h)    the occurrence of the Maturity Date (as defined in the DIP Financing Documents) without the Plan having been substantially consummated;

(i)    the entry of the DIP Orders that are not reasonably acceptable to the Consenting Lenders;

(j)    the Debtors' attempt to enter or entry into any priming post-petition loan other than in accordance with this Agreement;

(k)    if (i) any DIP Order is reversed, stayed, dismissed, vacated, reconsidered, modified, or amended in a manner that is inconsistent with this Agreement and without the consent of the Requisite Lenders or (ii) a motion for reconsideration, reargument, or rehearing with respect to any such order has been filed and the Company Parties have failed to object timely to such motion;

(l)    if the Bankruptcy Court enters an order denying confirmation of the Plan;

(m)    if (i) the Confirmation Order is reversed, stayed, dismissed, vacated, reconsidered, modified, or amended in a manner that is inconsistent with this Agreement and without the consent of the Requisite Lenders or (ii) a motion for reconsideration, reargument, or rehearing with respect to any such order has been filed and the Company Parties have failed to object timely to such motion;

(n)    the filing of a motion, application, or adversary proceeding, by any Company Party (or if any Company Party supports any such motion, application or adversary proceeding filed or commenced by any third party) or any third party challenging the validity, enforceability, perfection, or priority of, or seeking avoidance or subordination of, any portion of the Consenting Lenders' liens, claims or any transactions with the Consenting Lenders or asserting any other cause of action against the Consenting Lenders;

(o)    the entry of an order that grants relief terminating, annulling, or materially modifying the automatic stay (as set forth in section 362 of the Bankruptcy Code) with regard to any material asset that, to the extent such relief were granted, would have a material adverse effect on the consummation of the Restructuring Transactions and on any Company Party's ability to operate its business in the ordinary course;

(p)    if, without the prior consent of the Requisite Lenders, any Company Party (i) voluntarily commences any case or files any petition seeking bankruptcy, winding up, dissolution, liquidation, administration, moratorium, reorganization, or other relief under any federal, state, or foreign bankruptcy, insolvency, administrative receivership, or similar law now or hereafter in effect, other than the Chapter 11 Cases, except as contemplated by this Agreement; (ii) consents to the institution of, or fails to contest in a timely and appropriate manner, any involuntary proceeding or petition described in the preceding subsection (i); (iii) files an answer admitting the material allegations of a petition filed against it in any such proceeding; (iv) applies for or consents to the appointment of a receiver, administrator, administrative receiver, trustee, custodian, sequestrator, conservator, or similar official with

respect to any Company Party or for a substantial part of such Company Party's assets; (v) makes a general assignment or arrangement for the benefit of creditors; or (vi) takes any corporate action for the purpose of authorizing any of the foregoing;

(q)      the delivery of a notice by the Company Parties pursuant to Section 11.2(b) hereof;

(r)      failure by the Company Parties to pay the fees and expenses set forth   in Section 15.19 of this Agreement as and when required, subject to applicable Law; *provided*, however, that the Plan Effective Date shall not occur until and unless the fees and expenses set forth in Section 15.19 have been paid in full;

(s)      any Company Party files any motion or pleading with the Bankruptcy Court that is inconsistent in any material respect with this Agreement, unless such motion is withdrawn within three (3) Business Days following the Agent's notice that such motion or pleading is inconsistent with this Agreement;

(t)      any Asset Sale(s) without consent of the Agent at the direction of the Requisite Lenders, unless such sale (i) does not require the consent of the Requisite Lenders because it satisfies the standards set forth in section 6.9(e) of the DIP Credit Agreement, or (ii) provides for a binding commitment to pay and pays the Consenting Lenders at or above an agreed-upon release price in cash at closing; or

(u)      the Debtors' approval of any management incentive plans or executive employment arrangements without consent of the Agent, which consent shall not be unreasonably withheld.

**11.2.**   <u>Company Party Termination Events</u>.  Any Company Party may terminate this Agreement as to all Parties upon three Business Days' notice to all Parties in accordance with Section 15.10 hereof of the occurrence of any of the following events, unless waived, and in each case, other than Section 11.2(d) below, the date of termination of this Agreement shall constitute the Maturity Date of the DIP Facility in accordance with section 8.1 of the DIP Credit Agreement and in such case all outstanding amounts under the DIP Facility shall be immediately due:

(a)      the breach in any material respect by the Consenting Lenders of any provision set forth in this Agreement, unless such breach is cured within three (3) Business Days following the Company Party's notice of such breach;

(b)      the Board reasonably determines in good faith based on the advice of outside counsel that continued performance under this Agreement would be inconsistent with the exercise of its fiduciary duties under applicable law; *provided* that the Company provides notice of such determination to the Consenting Creditors within three (3) Business Days after the date thereof;

(c)      the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any final, non-appealable ruling or order that (i) enjoins the consummation of a material portion of the Restructuring Transactions and (ii) remains in effect for ten (10) Business Days after such terminating Company Party transmits a written notice in accordance with Section 15.10 hereof detailing any such issuance; *provided* that this termination right shall not apply to or be exercised by any Company Party that sought or

requested such ruling or order in contravention of any obligation or restriction set out in this Agreement; or

      (d)    the commitment to provide the Exit Facility is not finalized on or before the date that ballots with respect to the Plan are solicited.

      **11.3.**  <u>Mutual Termination</u>.  This Agreement, and the obligations of all Parties hereunder, may be terminated by mutual written agreement among all of the following: (a) the Consenting Lenders and (b) the Company Parties.

      **11.4.**  <u>Automatic Termination</u>.  This Agreement shall terminate automatically without any further required action or notice immediately after the occurrence of the Plan Effective Date.

      **11.5.**  <u>Effect of Termination</u>.  Upon the occurrence of a Termination Date as to a Party, this Agreement shall be of no further force and effect as to such Party and each Party subject to such termination shall be released from its commitments, undertakings, and agreements under or related to this Agreement and shall have the rights and remedies that it would have had, had it not entered into this Agreement, and shall be entitled to take all actions, whether with respect to the Restructuring Transactions or otherwise, that it would have been entitled to take had it not entered into this Agreement, including with respect to any and all Claims or causes of action.  Upon the occurrence of a Termination Date prior to the Plan Effective Date any and all consents or ballots tendered by the Parties subject to such termination before a Termination Date shall be deemed, for all purposes, to be null and void from the first instance and shall not be considered or otherwise used in any manner by the Parties in connection with the Restructuring Transactions and this Agreement or otherwise; *provided*, however, any Consenting Lender withdrawing or changing its vote pursuant to this Section 11.5 shall promptly provide written notice of such withdrawal or change to each other Party to this Agreement and, if such withdrawal or change occurs on or after the Petition Date, file notice of such withdrawal or change with the Bankruptcy Court.  Nothing in this Agreement shall be construed as prohibiting a Company Party or any of the Consenting Lenders from contesting whether any such termination is in accordance with its terms or to seek enforcement of any rights under this Agreement that arose or existed before a Termination Date.  Except as expressly provided in this Agreement, nothing herein is intended to, or does, in any manner waive, limit, impair, or restrict (a) any right of any Company Party or the ability of any Company Party to protect and reserve its rights (including rights under this Agreement), remedies, and interests, including its claims against any Consenting Lender, and (b) any right of any Consenting Lender, or the ability of any Consenting Lender, to protect and preserve its rights (including rights under this Agreement), remedies, and interests, including its claims against any Company Party or Consenting Lender.  No purported termination of this Agreement shall be effective under this Section 11.5 or otherwise if the Party seeking to terminate this Agreement is in material breach of this Agreement, except a termination pursuant to Sections 11.1(e), 11.1(f), 11.1(g), 11.1(k), 11.1(m), 11.1(n), 11.2(o), 11.1(r) or 11.1(u).  For the avoidance of doubt, the automatic stay arising pursuant to section 362 of the Bankruptcy Code shall be deemed waived or modified for purposes of delivering any notices or exercising any rights hereunder subject to paragraph 18 of the DIP Orders.

**Section 12.**    *Amendments and Waivers.*

(a)    This Agreement may not be modified, amended, or supplemented, and no condition or requirement of this Agreement may be waived, in any manner except in accordance with this Section 12.

(b)    This Agreement may be modified, amended, or supplemented, or a condition or requirement of this Agreement may be waived, in a writing (email being sufficient) signed by (i) each Company Party and (ii) each Consenting Lender.

(c)    Any proposed modification, amendment, waiver or supplement that does not comply with this Section 12 shall be ineffective and void ab initio.

(d)    The waiver by any Party of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach.  No failure on the part of any Party to exercise, and no delay in exercising, any right, power or remedy under this Agreement shall operate as a waiver of any such right, power or remedy or any provision of this Agreement, nor shall any single or partial exercise of such right, power or remedy by such Party preclude any other or further exercise of such right, power or remedy or the exercise of any other right, power or remedy. All remedies under this Agreement are cumulative and are not exclusive of any other remedies provided by Law.

**Section 13.**    *Releases.*  The Plan shall provide for releases by the Company Parties and Consenting Lenders in respect of any causes of action or other Claims, except for those related to fraud, against the Debtors' former or current officers and directors or holders of Equity Interests, which shall be effective only upon the Plan Effective Date.

**Section 14.**    *Reserved.*

**Section 15.**    *Miscellaneous.*

**15.1.**    <u>Acknowledgement</u>.    Notwithstanding any other provision herein, this Agreement is not and shall not be deemed to be an offer with respect to any securities or solicitation of votes for the acceptance of a plan of reorganization for purposes of sections 1125 and 1126 of the Bankruptcy Code or otherwise.  Any such offer or solicitation will be made only in compliance with all applicable securities Laws, provisions of the Bankruptcy Code, and/or other applicable Law.

**15.2.**    <u>Exhibits Incorporated by Reference; Conflicts</u>.  Each of the exhibits, annexes, signatures pages, and schedules attached hereto is expressly incorporated herein and made a part of this Agreement, and all references to this Agreement shall include such exhibits, annexes, and schedules.  In the event of any inconsistency between this Agreement (without reference to the exhibits, annexes, and schedules hereto) and the exhibits, annexes, and schedules hereto, this Agreement (without reference to the exhibits, annexes, and schedules thereto) shall govern.

**15.3.**    <u>Further Assurances</u>.  Subject to the other terms of this Agreement, the Parties agree to execute and deliver such other instruments and perform such acts, in addition to the matters herein specified, as may be reasonably appropriate or necessary, or as may be required by order of the Bankruptcy Court, from time to time, to effectuate the Restructuring

Transactions, as applicable; *provided* however that this Section 15.3 shall not limit the right of any party hereto to exercise any right or remedy provided for in this Agreement (including the approval rights set forth in Section 3.3).

**15.4.**   Complete Agreement.   Except as otherwise explicitly provided herein, this Agreement constitutes the entire agreement among the Parties with respect to the subject matter hereof and supersedes all prior agreements, oral or written, among the Parties with respect thereto, other than any confidentiality agreement between a Company Party and a Consenting Lender.

**15.5.**   GOVERNING LAW; SUBMISSION TO JURISDICTION; SELECTION OF FORUM.   THIS AGREEMENT IS TO BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED IN SUCH STATE, WITHOUT GIVING EFFECT TO THE CONFLICT OF LAWS PRINCIPLES THEREOF.   Notwithstanding the foregoing, upon the commencement of the Chapter 11 Cases, each of the Parties hereby agrees that, if the Chapter 11 Cases are pending, the Bankruptcy Court shall have exclusive jurisdiction over all matters arising out of or in connection with this Agreement.  Each Party hereto agrees that it shall bring any action or proceeding in respect of any claim arising out of or related to this Agreement, to the extent possible, in the Bankruptcy Court, and solely in connection with claims arising under this Agreement: (a) irrevocably submits to the exclusive jurisdiction of the Bankruptcy Court; (b) waives any objection to laying venue in any such action or proceeding in the Bankruptcy Court; and (c) waives any objection that the Bankruptcy Court is an inconvenient forum or does not have jurisdiction over any Party hereto.

**15.6.**   TRIAL BY JURY WAIVER.   EACH PARTY HERETO IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

**15.7.**   Execution of Agreement.   This Agreement may be executed and delivered in any number of counterparts and by way of electronic signature and delivery, each such counterpart, when executed and delivered, shall be deemed an original, and all of which together shall constitute the same agreement.   Except as expressly provided in this Agreement, each individual executing this Agreement on behalf of a Party has been duly authorized and empowered to execute and deliver this Agreement on behalf of said Party.

**15.8.**   Rules of Construction.   This Agreement is the product of negotiations among the Company Parties and the Consenting Lenders, and in the enforcement or interpretation hereof, is to be interpreted in a neutral manner, and any presumption with regard to interpretation for or against any Party by reason of that Party having drafted or caused to be drafted this Agreement, or any portion hereof, shall not be effective in regard to the interpretation hereof.   The Company Parties and the Consenting Lenders were each represented by counsel during the negotiations and drafting of this Agreement and continue to be represented by counsel.

**15.9.**   Successors and Assigns; Third Parties.   This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors and permitted assigns, as applicable.   Other than with respect to the persons, advisors or other Entities released or otherwise referenced in Section 13 (and solely to the extent set forth in said Section 13), there

are no third party beneficiaries under this Agreement, and the rights or obligations of any Party under this Agreement may not be assigned, delegated, or Transferred to any other person or entity except as set forth in Section 7 of this Agreement.

**15.10.** Notices.   All notices hereunder shall be deemed given if in writing and delivered, by electronic mail, courier, or registered or certified mail (return receipt requested), to the following addresses (or at such other addresses as shall be specified by like notice):

(a)      if to a Company Party, to:

Ruby Tuesday, Inc.
333 East Broadway Avenue
Maryville, TN 37804

with a copy to:

Pachulski Stang Ziehl & Jones LLP
10100 Santa Monica Blvd. 13th Floor
Los Angeles, CA 90067-4003
Attention:  Richard Pachulski and Malhar S. Pagay
E-mail address: rpachulski@pszjlaw.com and mpagay@pszjlaw.com

(b)      if to a Consenting Lender or the Agent, at the addresses or e-mail addresses set forth below:

(i)      Goldman Sachs Specialty Lending Group, L.P., as a Consenting Lender and Agent under the Credit and Guaranty Agreement and the DIP Financing Documents:

Goldman Sachs Specialty Lending Group, L.P.
2001 Ross Avenue, Suite 2800
Dallas, Texas  75201
Attention: Ruby Tuesday Account Manager
Email:  gs-slg-notices@gs.com

with a copy (which shall not constitute notice) to:

Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza
New York, New York 10006
Attention:  Sean O'Neal and Jane VanLare
E-mail address: soneal@cgsh.com and jvanlare@cgsh.com

Hunton Andrews Kurth LLP
Bank of America Plaza, Suite 4100
600 Peachtree Street, N.E.
Atlanta, Georgia  30308-2216
Attention:  Greta T. Griffith
Email: ggriffith@HuntonAK.com

(ii)    TCW Direct Lending LLC, TCW Skyline Lending, L.P., TCW Brazos Fund LLC,  each as a Consenting Lender:

> TCW Direct Lending LLC
> 200 Clarendon Street, 51st Floor
> Boston, Massachusetts  02116
> Attention: Michael Anello, Ruby Tuesday Account Manager
> Email: michael.anello@tcw.com

> With a copy (which shall not constitute notice) to:

> Paul Hastings LLP
> 515 South Flower Street Twenty-Fifth Floor
> Los Angeles, CA 90071
> Attention:  Justin Rawlins
> Email: justinrawlins@paulhastings.com

Any notice given by delivery, mail, or courier shall be effective when received.

**15.11.**  <u>Enforceability of Agreement</u>.  The Parties hereby acknowledge and agree: (a) that the provision of any notice or exercise of termination rights under this Agreement is not prohibited by the automatic stay provisions of the Bankruptcy Code; (b) that they waive any right to assert that the exercise of any notice or termination rights under this Agreement is subject to the automatic stay provisions of the Bankruptcy Code and expressly stipulates and consents hereunder to the prospective modification of the automatic stay provisions of the Bankruptcy Code for purposes of exercising notice and termination rights under this Agreement, to the extent the Bankruptcy Court determines that such relief is required; (c) that they shall not take a position to the contrary of this Section 15.11 in the Bankruptcy Court or any other court of competent jurisdiction; and (d) they will not initiate, or assert in, any litigation or other legal proceeding that this Section 15.11 is illegal, invalid, or unenforceable, in whole or in part.

**15.12.**  <u>Waiver</u>.  If the Restructuring Transactions are not consummated, or if this Agreement is terminated for any reason other than pursuant to Section 11.4 hereof, the Parties fully reserve any and all of their rights.  Pursuant to Federal Rule of Evidence 408 and any other applicable rules of evidence, this Agreement and all negotiations relating hereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms or the payment of damages to which a Party may be entitled under this Agreement.

**15.13.**  <u>Specific Performance</u>.  It is understood and agreed by the Parties that money damages would be an insufficient remedy for any breach of this Agreement by any Party, and each non-breaching Party shall be entitled to specific performance and injunctive or other equitable relief (without the posting of any bond and without proof of actual damages) as a remedy of any such breach, including an order of the Bankruptcy Court or other court of competent jurisdiction requiring any Party to comply promptly with any of its obligations hereunder.

**15.14.**  <u>Several, Not Joint, Claims</u>.  Except where otherwise specified, the agreements, representations, warranties, and obligations of the Parties under this Agreement are, in all respects, several and not joint.

**15.15.**  Reserved.

**15.16.**  Remedies Cumulative.  All rights, powers, and remedies provided under this Agreement or otherwise available in respect hereof at Law or in equity shall be cumulative and not alternative, and the exercise of any right, power, or remedy thereof by any Party shall not preclude the simultaneous or later exercise of any other such right, power, or remedy by such Party.

**15.17.**  Capacities of Consenting Lenders.  Each Consenting Lender has entered into this agreement on account of all Pre-Petition Secured Debt Claims that it holds (directly or through discretionary accounts that it manages or advises) and, except where otherwise specified in this Agreement, shall take or refrain from taking all actions that it is obligated to take or refrain from taking under this Agreement with respect to all such Pre-Petition Secured Debt Claims.

**15.18.**  Email Consents.  Where a written consent, acceptance, approval, or waiver is required pursuant to or contemplated by this Agreement, pursuant to Section 3.2, Section 3.3, Section 12, or otherwise, including a written approval by the Company Parties or the Agent or any of the Consenting Lenders, such written consent, acceptance, approval, or waiver shall be deemed to have occurred if, by agreement between counsel to the Parties submitting and receiving such consent, acceptance, approval, or waiver, it is conveyed in writing (including electronic mail) between each such counsel without representations or warranties of any kind on behalf of such counsel.

**15.19.**  Fees and Expenses.  Regardless of whether the Restructuring Transactions are consummated, the Company Parties shall pay in cash, in accordance with the DIP Orders, all reasonable fees and expenses of (a) Cleary Gottlieb, Hunton, and Paul Hastings, as counsel to certain of the Agent, Consenting Lenders, and lenders under the DIP Facility, as applicable, and any local counsel of the Agent, Consenting Lenders, and lenders under the DIP Facility, (b) Grant Thornton, as financial advisor to the Agent, and (c) any consultants or other professionals retained by the Consenting Lenders represented by Cleary Gottlieb, Hunton, and Paul Hastings in connection with the Restructuring Transactions with the consent of the Company Parties (not to be unreasonably withheld or delayed), in each case, in accordance with the engagement letters of such consultant or professional signed by the Consenting Lenders, excluding any completion fees contemplated therein, and in each case, without further order of, or application to, the Bankruptcy Court (collectively, the "**Consenting Lenders Fees and Expenses**"); *provided* that the Company is given a general description of services performed and summary of the timekeepers and hours expended.  The Consenting Lenders Fees and Expenses shall not include fees and expenses directly associated with the Governance Documents and the Exit Financing Documents, including any exhibits, schedules, amendments, modifications, supplements, and appendices related thereto, *provided* that the foregoing exclusion is not intended to, and shall not in any manner, limit the customary expense reimbursement provisions to be included in the "Exit Financing Documents" themselves.

**15.20.**  Publicity.  The Company Parties shall use commercially reasonable efforts to submit to counsel to the Consenting Lenders or their advisors all press releases, public filings, public announcements, or other communications with any news media, in each case, to be made by the Company Parties relating to this Agreement or the transactions contemplated hereby and any amendments thereof at least one (1) Business Day (it being understood that such period may be shortened to the extent there are exigent circumstances that require such

public communication to be made to comply with applicable Law) in advance of release, and will take such counsel's view with respect to such communications into account. Nothing contained herein shall be deemed to waive, amend or modify the terms of any confidentiality agreement with a Party.

**15.21.** Survival. Notwithstanding any termination of this Agreement in accordance with its terms, the agreements and obligations of the Parties in Section 15 shall survive such termination and shall continue in full force and effect.

**15.22.** Damages. Notwithstanding anything to the contrary in this Agreement, none of the Parties shall claim or seek to recover from any other Party on the basis of anything in this Agreement any punitive, special, indirect or consequential damages or damages for lost profits.

**15.23.** Relationship Among Parties. Notwithstanding anything to the contrary herein, the duties and obligations of the Consenting Lenders under this Agreement shall be several, not joint. None of the Consenting Lenders shall have any fiduciary duty, any duty of trust or confidence in any form, or other duties or responsibilities to each other, any Company Party, or any of the Company Party's respective creditors or other stakeholders, and there are no commitments among or between the Consenting Lenders, in each case except as expressly set forth in this Agreement.

**15.24.** The Company and Consenting Lenders have participated jointly in the negotiation and drafting of this Agreement and, in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as jointly drafted by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any provision of this Agreement.

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement on the day and year first above written.

[Signature Pages Follow]

**Company Parties' Signature Page to
the Restructuring Support Agreement**

RTI HOLDING COMPANY, LLC

By: _____

Name: _____

Title: _____


RUBY TUESDAY, INC.,
on behalf of itself and its direct and indirect subsidiaries

By: _____

Name: _____

Title: _____

**Consenting Lenders Signature Page to**
**the Restructuring Support Agreement**

GOLDMAN SACHS SPECIALTY LENDING GROUP, L.P.

By: _____

Name: _____
Greg Watts

Title: _____
Senior Vice President


TCW DIRECT LENDING LLC


By: _____

Name: _____

Title: _____


TCW SKYLINE LENDING, L.P.


By: _____

Name: _____

Title: _____


TCW BRAZOS FUND LLC


By: _____

Name: _____

Title: _____

**Consenting Lenders Signature Page to
the Restructuring Support Agreement**

GOLDMAN SACHS SPECIALTY LENDING GROUP, L.P.

By:    _____

Name:  _____

Title:  _____

TCW DIRECT LENDING LLC

By:    *Suzanne Grosso*

Name:   **Suzanne Grosso**

Title:   **Managing Director**

TCW SKYLINE LENDING, L.P.

By:    *Suzanne Grosso*

Name:   **Suzanne Grosso**

Title:   **Managing Director**

TCW BRAZOS FUND LLC

By:    *Suzanne Grosso*

Name:   **Suzanne Grosso**

Title:   **Managing Director**

## EXHIBIT A

### Company Parties

RUBY TUESDAY, INC.,
RTI HOLDING COMPANY, LLC,
RT DENVER FRANCHISE, L.P.
RT DETROIT FRANCHISE, LLC
RT DISTRIBUTING, LLC
RT FINANCE, INC.
RT FL GIFT CARDS, INC.
RT FLORIDA EQUITY, LLC
RT FRANCHISE ACQUISITION, LLC
RT INDIANAPOLIS FRANCHISE, LLC
RT JONESBORO CLUB
RT KCMO FRANCHISE, LLC
RT KENTUCKY RESTAURANT
HOLDINGS, LLC
RT LAS VEGAS FRANCHISE, LLC
RT LONG ISLAND FRANCHISE, LLC
RT MICHIANA FRANCHISE, LLC
RT MICHIGAN FRANCHISE, LLC
RT MINNEAPOLIS FRANCHISE, LLC
RT MINNEAPOLIS HOLDINGS, LLC
RT NEW ENGLAND FRANCHISE, LLC
RT NEW HAMPSHIRE RESTAURANT
HOLDINGS, LLC
RT NEW YORK FRANCHISE, LLC
RT OMAHA FRANCHISE, LLC
RT OMAHA HOLDINGS, LLC
RT ONE PERCENT HOLDINGS II, LLC
RT ONE PERCENT HOLDINGS, LLC
RT ORLANDO FRANCHISE, L.P.
RT RESTAURANT SERVICES, LLC
RT SOUTH FLORIDA FRANCHISE, L.P.
RT SOUTHWEST FRANCHISE, LLC
RT ST.  LOUIS FRANCHISE, LLC
RT WEST PALM BEACH FRANCHISE,
L.P.
RT WESTERN MISSOURI FRANCHISE,
LLC
RTBD, INC.
RTT TEXAS, INC.
RTTA, LP
RTTT, LLC
RUBY TUESDAY OF BRYANT, INC.
RUBY TUESDAY OF RUSSELLVILLE,
INC.
RUBY TUESDAY, LLC
RUBY TUESDAY OF ALLEGANY
COUNTY, INC.
RUBY TUESDAY OF COLUMBIA, INC.
RUBY TUESDAY OF FREDERICK, INC.
RUBY TUESDAY OF LINTHICUM, INC.

RUBY TUESDAY OF MARLEY STATION,
INC.
RUBY TUESDAY OF POCOMOKE CITY,
INC.
RUBY TUESDAY OF SALISBURY, INC.
RT OF CARROLL COUNTY, LLC
RT OF FRUITLAND, INC.
RT OF MARYLAND, LLC

## **EXHIBIT B**

**Term Sheet**

*Execution Version*

## RTI HOLDING COMPANY, LLC

## TERMS OF RESTRUCTURING SUPPORT AGREEMENT

This term sheet (this "Term Sheet") summarizes certain business terms and conditions of certain transactions (the "Restructuring") for the restructuring of the debt obligations and equity ownership of RTI Holding Company, LLC ("HoldCo") and its direct and indirect subsidiaries (together, the "Company" or the "Debtors"), certain of which anticipate filing voluntary petitions under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") to commence cases (the "Chapter 11 Cases") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court").

By executing this Term Sheet, each Party (as defined below) agrees to the terms and conditions described herein, subject to execution and delivery of a Restructuring Support Agreement (as set forth below) on or prior to the earlier of the Petition Date (as defined below) and September 25, 2020, which shall be in all respect consistent with the terms and conditions described herein.

This Term Sheet is the product of settlement discussions among the Parties thereto. Accordingly, this Term Sheet and the information contained herein are entitled to protection from any use or disclosure to any party or person pursuant to Rule 408 of the Federal Rules of Evidence and any other applicable rule, statute, or doctrine of similar import protecting the use or disclosure of confidential settlement discussions. Additionally, this Term Sheet and any information contained herein or provided in or in furtherance of discussions related hereto, constitute non-public information regarding the "Credit Parties" in connection with section 10.17 of that certain Credit and Guaranty Agreement, among the Secured Creditors (as defined below), Company and other parties, dated as of December 21, 2017 (the "Credit Agreement"), provided, however, that notwithstanding the terms of that provision, the parties to the Credit Agreement shall not make any "Trade Announcements" in respect of this Term Sheet.[1] Until publicly disclosed by the Debtors in connection with the Chapter 11 Cases, this Term Sheet shall remain strictly confidential and may not be shared with any other party or person without the written consent of the Company and the Secured Creditors.

The regulatory, tax, accounting, and other legal and financial matters and effects related to the Restructuring or any related restructuring or similar transaction have not, as of the date hereof, been fully evaluated, and such evaluation may affect the terms and structure of the Restructuring. Any such evaluation may affect the terms and structure of the Restructuring and/or certain related transactions.

THIS TERM SHEET DOES NOT CONSTITUTE (NOR SHALL IT BE CONSTRUED AS) AN OFFER WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OR REJECTIONS AS TO ANY PLAN, IT BEING UNDERSTOOD THAT SUCH AN OFFER OR SOLICITATION, IF ANY, WILL ONLY BE MADE IN COMPLIANCE WITH APPLICABLE LAW.

---

[1]   The terms "Credit Parties" and "Trade Announcements" are as defined in the Credit Agreement.

| General Overview | The Restructuring will be consummated through the Company's commencement of Chapter 11 Cases in the Bankruptcy Court pursuant to a chapter 11 plan supported by the Company and the Secured Creditors (the "Plan") on a pre-arranged basis, backed by a simultaneous sale process, the 363 Option (as defined below).<br><br>The distributions to be made under the Plan are described in further detail below. |
|---|---|
| Restructuring Support Agreement | A binding Restructuring Support Agreement ("RSA") containing terms consistent with this Term Sheet (as further updated upon agreement) shall be executed by Goldman Sachs Specialty Lending Group, L.P., ("GS" or the "Agent") and TCW Direct Lending LLC, a Delaware limited liability company, TCW Skyline Lending, L.P., a Delaware limited partnership, and TCW Brazos Fund LLC (collectively, "TCW," together with GS, the "Secured Creditors"), on the one hand, and the Company, on the other hand. The Company and the Secured Creditors are referred to as the "Parties" herein.<br><br>Under the Plan, the RSA shall constitute a comprehensive agreement under which the Parties have consensually resolved or agreed not to pursue claims, objections, litigation, or other disputes that otherwise likely would arise and required to be resolved in the Chapter 11 Cases. |
| Company Obligations under RSA | The Company shall agree to:<br><br>a) Prior to the Petition Date, appoint one (1) additional independent director acceptable to the Secured Creditors and the Company (the "Additional Independent Director"). The number of directors on the Board shall be increased to five (5), including three (3) insider directors and two (2) independent directors.  The affirmative vote of one (1) independent director will be necessary for the Board of Directors to take any actions relating to any matters involving the Company's executive compensation, restructuring or any affiliated transaction;<br><br>b) Engage FocalPoint Securities, LLC ("FocalPoint") to solicit an alternative Exit Facility (as defined below);<br><br>c) Use commercially reasonable efforts to implement Asset Sales (as defined in the Credit Agreement) during the Chapter 11 Cases and negotiate in good faith with the Secured Creditors to establish reasonable release prices;<br><br>d) Propose the Plan and, other than as provided by the "Fiduciary Out" below, not support, whether directly or indirectly, any alternative plan or other disposition of the Company or any of its assets except as set forth in this Term |

|  | Sheet; |
|---|---|
|  | e) No later than one (1) business day after receipt, inform the Secured Creditors of any proposals for any Alternative Transaction (as defined below); |
|  | f) Comply with all Budget (as defined below) and information covenants subject to customary cure and variance provisions; |
|  | g) Use commercially reasonable efforts to satisfy Milestones (as set forth below); |
|  | h) Promptly provide due diligence information pertaining to the RT Lodge and RT Lodge Company (as defined below) upon GS's reasonable request, including providing GS representatives access to the RT Lodge site and records reasonably requested to complete third party environmental, zoning, title and property condition diligence, provided, however, that such records shall not include documents or information from, or communications with, any other potential buyer of the RT Lodge and/or RT Lodge Company (and the Company shall not provide any documents or information from, or communication with, GS to any other potential buyer of the RT Lodge and/or RT Lodge Company); |
|  | i) Provide pleadings in the Chapter 11 proceedings at least one (1) business day prior to filing and consider in good faith Secured Creditors' comments; |
|  | j) Consult with Secured Creditors in good faith regarding lease assumption and rejection strategy, which shall be reasonably acceptable to Secured Creditors; and |
|  | k) Consult with Secured Creditors in good faith regarding any key employee retention or incentive plans, executive bonuses or any related payments, which shall be reasonably acceptable to Secured Creditors. |
|  | Any cash proceeds from the Asset Sales during the Chapter 11 Cases shall be used first to immediately pay down the Secured Creditors' pre-petition debt under the Credit Agreement (the "Pre-Petition Secured Debt Claims"), and following repayment of the Pre-Petition Secured Debt Claims in full, immediately pay down the DIP Facility (as such term is defined below). |
| **Secured Creditors' Obligations under RSA** | Under the RSA, the Secured Creditors shall agree to: |
|  | a) Vote to accept, and not object to, the Plan and not support any alternative plan or other disposition of the Company or any of its assets except as set forth in this Term Sheet; |

<table>
<tr><td></td><td>

b) The DIP Facility (defined herein) and consent to use of cash collateral, subject to the terms of an agreed upon order to be entered by the Bankruptcy Court approving such use of cash collateral (the "DIP Order"), provided that the DIP Order will, among other things:

(i) impose covenants:

    (A) requiring continued retention of the Additional Independent Director and FocalPoint;

    (B) agreed-upon reporting by the Company;

    (C) the Plan Milestones and Sale Milestones;

    (D) prohibiting use of cash except as permitted by a budget to be approved by the Secured Creditors (the "Budget");

    (E) granting the Secured Creditors reasonable access to information and diligence; and

    (F) requiring payment of the Agent's and TCW's reasonable fees and expenses without court approval (provided that the Company is given a general description of the services performed and summary of the timekeepers and hours expended); and

(ii) terminate upon termination of the RSA.

c) Commit to fund the DIP Facility and Exit Facility, each subject to customary conditions precedent and other terms and conditions as further described below.

The Secured Creditors' obligations under the RSA shall be subject to the entry of the DIP Order (whether interim or final) approving the DIP Facility in form and substance reasonably acceptable to the Secured Creditors which shall be consistent in all respect with this Term Sheet, including authorization by the Bankruptcy Court for the use of cash proceeds from any Asset Sales during the Chapter 11 Cases first for repayment of the Pre-Petition Secured Debt Claims, and following repayment of the Pre-Petition Secured Debt Claims in full, the DIP Facility.

</td></tr>
<tr><td>**Termination of the RSA**</td><td>

Agent may terminate the RSA upon three (3) business days' notice of the occurrence of one or more of the following events:

a) Company's failure to satisfy any Milestones (as set forth below);

b) Appointment of Chapter 11 Trustee, conversion of the Company's Chapter 11 cases to Chapter 7 cases, or dismissal of the Company's Chapter 11 cases;

</td></tr>
</table>

4

| | |
|---|---|
| | c)    Termination of Plan exclusivity;<br><br>d)    Breach of Budget covenant that is not a permitted variance;<br><br>e)    Commencement of any actions by the Company or any third party to challenge any liens of Secured Creditors or any transactions with the Secured Creditors;<br><br>f)    Company's attempt to enter or entry into priming DIP loan other than in accordance with this Term Sheet;<br><br>g)    Asset Sales without consent of the Agent (at the direction of the Requisite Lenders (as defined in the Credit Agreement)), unless such sale (i) does not require the consent of the Secured Creditors because it satisfies the standards set forth in Section 2(a) of that certain Consent Letter, dated as of August 14, 2020, by and among the Company, the Agent and the Secured Creditors, or (ii) provides for a binding commitment to pay and pays the Secured Creditors at or above an agreed-upon release price in cash at closing; or<br><br>h)    Approval of any management incentive plans or executive employment arrangements without consent of the Agent, which consent shall not be unreasonably withheld.<br><br>"Fiduciary Out": The Company may terminate the RSA, if it determines, based on the advice of outside advisors, that termination of the RSA is required under any fiduciary duties the Company owes to creditors or other stakeholders; provided that the Company must provide notice to the Secured Creditors at least three (3) business days prior to the exercise of the foregoing termination right. |
| **Milestones** | <u>General Milestones</u><br><br>a)    No later than thirty (30) days after execution of RSA, the Company shall file Chapter 11 petitions with the Bankruptcy Court (such date, the "<u>Petition Date</u>").<br><br>b)    No later than thirty (30) days after execution of RSA, the Company will deliver an acceptable business plan, including the identity of leases to be rejected, to the Secured Creditors, which business plan is acceptable to the Secured Creditors.<br><br>c)    No later than three (3) business days after Petition Date, the Bankruptcy Court shall have entered an agreed-upon interim DIP Order.<br><br>d)    No later than thirty (30) days after Petition Date, the Bankruptcy Court shall have entered the final order |

approving the DIP Facility.

Plan Milestones

a) No later than three (3) business days after Petition Date, the Company shall file the Plan and Disclosure Statement in form and substance reasonably acceptable to the Secured Creditors.

b) No later than forty-five (45) days after Petition Date, the Disclosure Statement shall be approved by the Bankruptcy Court, with a voting deadline that is no later than thirty (30) days after such approval.

c) No later than (i) one hundred five (105) days after the Petition Date, or (ii) one hundred twenty (120) days after the Petition Date in the event that a Topping Bid (as defined below) is selected at the auction (as set forth below), the Plan shall be confirmed (such date described in the foregoing clauses (i) and (ii), the "Outside Date"), and

d) No later than thirty (30) days after confirmation of the Plan, the Plan shall become effective (the "Effective Date"); provided that the Parties will consider in good faith any reasonable request by the Debtors for an extension of such time.

Sale Milestones

a) Not later than three (3) business days after the Petition Date, file an application to retain FocalPoint as investment banker to:

   a. assist the Company in evaluating, structuring, negotiating and implementing the terms (including pricing) and conditions of any proposed transaction, including any proposed section 363 sale or chapter 11 plan (each, a "Transaction" and each, other than the Plan, an "Alternative Transaction");

   b. assist the Company in preparing, revising, or updating marketing materials;

   c. prepare, revise, or update a list or lists of potential purchasers;

   d. contact potential purchasers to solicit their interest in any Transaction and to provide them with the confidential information memorandum under a confidential disclosure agreement;

   e. compile and disseminate due diligence materials to prospective purchasers and maintain a secure data

<table>
<tr>
<td></td>
<td>

vault for review of due diligence materials;

   f.  participate in due diligence visits, meetings and consultations between the Company and interested potential purchasers, and coordinate and track distribution of all information related to a Transaction with such parties;

   g.  assist the Company with evaluating offers, indications of interest, negotiating agreements and definitive contracts; and

   h.  attend auctions and, to the extent required, provide affidavits in support, in any U.S. Bankruptcy Court with respect to any matters in connection with or arising out of the foregoing.

b) Not later than thirty (30) days after the Petition Date, obtain an order approving FocalPoint as investment banker.

c) The Company shall, no later than three (3) days after the Petition Date, file a motion to approve the procedures governing the sale and marketing process for the sale of the Company's assets (the "<u>Bidding Procedures</u>") to be heard on shortened time fourteen (14) days later, which motion shall in form and substance be acceptable to the Secured Creditors.

d) No later than twenty (20) days after Petition Date, the Bankruptcy Court shall have entered an order approving the Bidding Procedures, which order shall in form and substance be reasonably acceptable to the Secured Creditors.

e) No earlier than sixty (60) days and no later than one hundred five (105) days after the Petition Date, the Company shall hold an auction, if a Topping Bid is received by the Company.

f) (i) No later than three (3) days after the auction, the Topping Bid, if any, selected at the auction shall be approved by the Bankruptcy Court, and (ii) no later than sixty (60) days after the Bankruptcy Court approves such Topping Bid, the sale will close and the proceeds of such sale shall be used to pay the Secured Creditors until such time as they are paid in full.

</td>
</tr>
<tr>
<td>

**Reorganized Debtors' Capital Structure**

</td>
<td>

On the Effective Date of the Plan, the operations of the Company as Reorganized Debtors will be bifurcated as follows:

(a) all operating assets of the Company, including related assumed contracts, operating and dark fee real estate (other than RT Lodge),

</td>
</tr>
</table>

|  | headquarters, and Ruby Tuesday intellectual property, and assumed obligations (such assets, the "<u>RT Assets,</u>" and the entity holding such assets, the "<u>RT Asset Company</u>"), and |
|--|--|
|  | (b) the equity of Ruby Tuesday, Inc. and the assets of Ruby Tuesday, Inc. to the extent such assets are useful to the operations of the RT Lodge, including a perpetual royalty free trademark license and leasehold interests, and assumed obligations (such assets, the "<u>RT Lodge</u>", and the entity holding such assets, the "<u>RT Lodge Company</u>"), unless the RT Lodge has been sold prior to the Effective Date. |
| **Treatment of Pre-Petition Secured Debt Claims[2]** | Under the Plan, TCW shall receive, on account of its Pre-Petition Secured Debt Claims (other than any draws or any repayment of obligations related to the Letters of Credit as defined in the Credit Agreement and exclusive of any post-petition interest on account of such Pre-Petition Secured Debt Claims): |
|  | (i) one hundred percent (100%) of equity in the RT Asset Company less the GS Adjustment Equity (defined below), subject to dilution on account of the warrants (as set forth below) and the MIP (defined below), and |
|  | (ii) the lesser of (a) $9.5 million in cash from the proceeds of the Exit Facility and (b) the amount of Pre-Petition Secured Debt Claims beneficially owned by TCW that remains outstanding as of the Effective Date (such amount in clause (ii)(b) the "<u>TCW Share</u>") (the "<u>TCW Cash Payment</u>"). |
|  | Under the Plan, GS shall receive, on account of its Pre-Petition Secured Debt Claims (other than any draws or any repayment of obligations related to the Letters of Credit and exclusive of any post-petition interest on account of such Pre-Petition Secured Debt Claims): |
|  | (i) at the election of GS, which shall be made on or before October 9, 2020, either (x) one hundred percent (100%) of the equity in the RT Lodge Company (which shall be valued at $5.1 million for purposes of the Plan), or (y) the net cash proceeds of the sale of the RT Lodge (the "<u>Lodge Consideration</u>"); |
|  | (ii) the lesser of (a) $8 million in cash from the proceeds of the Exit Facility and (b) the amount of Pre-Petition Secured Debt Claims beneficially owned by GS as of the Effective |

---

[2]      Structure and amounts remain under discussion.  The amount of the Secured Creditors' claim is being calculated but is estimated to be in the principal amount of approximately $32.2 million.  The information contained in this Term Sheet regarding such amounts is illustrative only.

Date (such amount described in clause (ii)(b), the "GS Share") (the "GS Cash Payment"); and

(iii) GS Adjustment Equity (defined below).

Any reimbursement obligations of the Company related to the Letters of Credit shall constitute post-petition obligations under the DIP Facility that shall be *pari passu* with the DIP Facility in right of payment and shall be secured by the same liens that secure other obligations under the DIP Facility.

No waivers of default interest, call premium or yield maintenance, all of which will be included in the total amount of the secured claim; provided however that GS and TCW shall each waive the call premium and yield maintenance (in the aggregate approximate amount of $4.5 million) on the Effective Date of the Plan.

"Net Sale Proceeds" means the net cash sale proceeds from Asset Sales received on and after Petition Date to the Effective Date of the Plan.

"GS Adjustment Equity" means (I) (the GS Share minus the GS Cash Payment minus the Lodge Consideration) divided by (II) the sum of (i) the TCW Share minus the TCW Cash Payment plus (ii) the GS Share minus the GS Cash Payment minus the Lodge Consideration.  To the extent the GS Share is less than zero, (I) above shall be deemed zero.

| | |
|---|---|
| **Treatment of Administrative Expenses and Claims Required to be Paid on Effective Date** | Holders of administrative expenses and claims required under the Plan to be paid at the Effective Date shall be paid from available cash.  Such claims include, but are not limited to: (i) cure amounts required to be paid in connection with the assumption of executory contracts or unexpired leases, (ii) any allowed claims entitled to priority under Section 503(b)(9) of the Bankruptcy Code, which are anticipated to be approximately $500,000, and (iii) any allowed administrative expenses of which the Debtors have not paid as of the Effective Date. |
| **Treatment of General Unsecured Claims** | To be determined. |
| **Releases** | The Plan shall provide for releases of the Secured Creditors' and the Debtors' causes of action or other claims against the Debtors' former or current officers and directors or interest holders, which shall be effective only upon the Effective Date of the Plan. |
| **363 Option** | Under the 363 Option, the RT Assets shall be sold to the extent a Topping Bid is made and selected by the Debtors.  A "Topping Bid" means the highest and best bid (or bids) submitted by one or more third parties other than the Secured Creditors; provided that such bid (or bids) must provide for cash deposits of no less than |

| | |
|---|---|
| | 10% of the purchase price and provide for cash consideration at closing that is sufficient to pay all DIP Facility claims and Pre-Petition Secured Debt Claims in cash in full on the closing date.<br><br>The Secured Creditors reserve the right to credit bid the entire amount of all obligations under the Credit Agreement, including without limitation, all principal interest, fees, expenses, call premiums, yield maintenance and other fees and charges; provided, however, the Company expressly preserves its rights to contest the allowance of any call premium and yield maintenance premium under the Credit Agreement and shall not be required under the DIP Facility to stipulate the allowance of such premiums. The Company agrees that any credit bid by the Secured Creditors may include the principal amount of obligations under the Credit Agreement, plus all accrued interest. |
| **DIP Facility** | Secured Creditors to provide a priming DIP Facility, with superpriority liens and superpriority administrative expense claims, in an amount of up to $17.5 million (including a $10 million subfacility for any draws under the Existing Letters of Credit), upon terms and conditions to be determined, including without limitation:<br><br>a)  Each Secured Creditor to fund 50% of the total DIP Facility;<br><br>b)  Maturity date on the earliest of i) the Effective Date of the Plan, ii) event of default under the DIP Facility, including termination of the RSA (whether as a result of the exercise of the Fiduciary Out or otherwise) and failure to achieve any Milestone herein, and iii) thirty (30) days after the Outside Date or such later date as agreed under clause (d) under the header "Plan Milestones"; and<br><br>c)  L +1000bps; 2bps up front, 2bps backend.<br><br>Identification of collateral to be discussed.  DIP Facility to have superpriority administrative claim against all assets of the Debtors.<br><br>The DIP Facility shall be repaid in full on or prior to the Effective Date from available cash.<br><br>$2 million to be advanced prior to the Petition Date (on the same terms as the Credit Agreement).<br><br>Interim DIP Facility amount of $4 million inclusive of $2 million pre-Petition Date advance. |
| **Exit Facility** | TCW to provide Exit Facility on terms and conditions to be determined, but including without limitation:<br><br>a)  $10 million first-out revolving LC facility (with GS as the |

10

|  | issuing bank); |
|--|--|
|  | b) A term facility equal to the lesser of (i) $30 million less 90% of the Net Sale Proceeds, if any, in excess of $2.5 million (excluding any sale proceeds from the RT Lodge) and (ii) 1.2x the agreed Broker's Opinion of Value of the Debtors' real property; |
|  | c) Opening liquidity of $12.5 million; |
|  | d) L+1200 bps (up to 600 bps PIK); |
|  | e) No upfront fees; |
|  | f) 103/102/101; |
|  | g) 4 year term; and |
|  | h) Penny warrants equal to twenty-five percent (25%) of the equity in RT Asset Company, to be shared pro rata among the lenders under the Exit Facility as of the Effective Date. |
|  | Exit Facility to be agreed in principle prior to balloting on the Plan and will be subject to usual and customary conditions, including, without limitation, achievement of Milestones and satisfaction of DIP Facility covenants. |
|  | GS is willing to act as LC issuer but will not commit to Exit Facility and needs to be taken out in 12 months following the Effective Date; existing cash collateralization rights to remain in place. |
| **Management Incentive Plan** | Reorganized Company to implement a new management incentive plan, including any awards and terms thereunder ("MIP"), reserving up to fifteen percent (15%) of equity in the RT Asset Company, which may be in the form of profits interests, restricted equity and/or other forms of incentive-based equity.   Indicative terms to include, without limitation: |
|  | a) 3 year vest; |
|  | b) 7.5% allocated day one to management; and |
|  | c) 7.5% set aside for future allocations. |

IN WITNESS WHEREOF, each of the Parties has caused this Term Sheet to be executed and delivered as of September 18, 2020.

GOLDMAN SACHS SPECIALTY LENDING GROUP, L.P.

By: _____

Name:  Greg Watts

Title:  Senior Vice President

TCW DIRECT LENDING LLC

By: _____

Name: _____

Title: _____

TCW SKYLINE LENDING, L.P.

By: _____

Name: _____

Title: _____

TCW BRAZOS FUND LLC

By: _____

Name: _____

Title: _____

[Signature Page to the Term Sheet]

IN WITNESS WHEREOF, each of the Parties has caused this Term Sheet to be executed and delivered as of September 18, 2020.

GOLDMAN SACHS SPECIALTY LENDING GROUP, L.P.

By: _____

Name: _____

Title: _____

TCW DIRECT LENDING LLC

By: *Suzanne Grosso*

Name: Suzanne Grosso

Title: Managing Director

TCW SKYLINE LENDING, L.P.

By: *Suzanne Grosso*

Name: Suzanne Grosso

Title: Managing Director

TCW BRAZOS FUND LLC

By: *Suzanne Grosso*

Name: Suzanne Grosso

Title: Managing Director

RTI HOLDING COMPANY, LLC

By: _____

Name: _____ Aziz Hashim

Title: _____ Manager

RUBY TUESDAY, INC.,
on behalf of itself and its direct and indirect subsidiaries

By: _____

Name: _____ Aziz Hashim

Title: _____ President

[Signature Page to the Term Sheet]

## EXHIBIT C

### Joinder

The undersigned ("**Transferee**") hereby acknowledges that it has read and understands the Restructuring Support Agreement, dated as of _____ (the "**Agreement**"),[1] by and among the Company Parties and the Consenting Lenders, including the transferor to the Transferee of the Pre-Petition Secured Debt Claims (each such transferor, a "**Transferor**"), and agrees to be bound by the terms and conditions thereof to the extent the Transferor was thereby bound, and shall be deemed a "Consenting Lender" under the terms of the Agreement.

The Transferee specifically agrees to be bound by the terms and conditions of the Agreement and makes all representations and warranties contained therein as of the date of the Transfer, including the agreement to be bound by the vote of the Transferor if such vote was cast before the effectiveness of the Transfer discussed herein.

Date Executed:


_____
Name:
Title:
Address:
E-mail address(es):


CLAIMS
$ _____

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Agreement.