IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| RTI HOLDING COMPANY, LLC,[1] | ) | Case No. 20-12456 (JTD) |
| | ) | (Jointly Administered) |
| Debtors. | ) | |

## DEBTORS' OBJECTION FOR VOTING PURPOSES TO PROOFS OF CLAIM NOS. 10425 and 10426 FILED BY LAWRENCE N. LEBOW

The above-captioned debtors and debtors in possession (the "Debtors") hereby

object (the "Objection"), pursuant to sections 105(a), 502(b), 510(b), 1122(a) and 1126(g) of title

11 of the United States Code, 11 U.S.C. §§ 101, et seq. (the "Bankruptcy Code"), and Rules

3007 and 3018(a) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), to

Proofs of Claim numbered 10425 and 10426 (collectively, the "Claims") filed by Lawrence N.

---

[1] The Debtors in these chapter 11 cases and the last four digits of each Debtor's U.S. tax identification number are as follows: RTI Holding Company, LLC (4966); Ruby Tuesday, Inc. (5239); Ruby Tuesday, LLC (1391); RTBD, LLC (6505); RT of Carroll County, LLC (8836); RT Denver Franchise, L.P. (2621); RT Detroit Franchise, LLC (8738); RT Distributing, LLC (6096); RT Finance, LLC (7242); RT FL Gift Cards, Inc. (2189); RT Florida Equity, LLC (7159); RT Franchise Acquisition, LLC (1438); RT of Fruitland, Inc. (1103); RT Indianapolis Franchise, LLC (6016); RT Jonesboro Club (2726); RT KCMO Franchise, LLC (7020); RT Kentucky Restaurant Holdings, LLC (7435); RT Las Vegas Franchise, LLC (4969); RT Long Island Franchise, LLC (4072); RT of Maryland, LLC (7395); RT Michiana Franchise, LLC (8739); RT Michigan Franchise, LLC (8760); RT Minneapolis Franchise, LLC (2746); RT Minneapolis Holdings, LLC (7189); RT New England Franchise, LLC (4970); RT New Hampshire Restaurant Holdings, LLC (7438); RT New York Franchise, LLC (1154); RT Omaha Franchise, LLC (7442); RT Omaha Holdings, LLC (8647); RT One Percent Holdings, LLC (6689); RT One Percent Holdings II, LLC (2817); RT Orlando Franchise, LP (5105); RT Restaurant Services, LLC (7283); RT South Florida Franchise, LP (3535); RT Southwest Franchise, LLC (9715); RT St. Louis Franchise, LLC (6010); RT Tampa Franchise, LP (5290); RT Western Missouri Franchise, LLC (6082); RT West Palm Beach Franchise, LP (0359); RTTA, LP (0035); RTT Texas, Inc. (2461); RTTT, LLC (9194); Ruby Tuesday of Allegany County, Inc. (8011); Ruby Tuesday of Bryant, Inc. (6703); Ruby Tuesday of Columbia, Inc. (4091); Ruby Tuesday of Frederick, Inc. (4249); Ruby Tuesday of Linthicum, Inc. (8716); Ruby Tuesday of Marley Station, Inc. (1641); Ruby Tuesday of Pocomoke City, Inc. (0472); Ruby Tuesday of Russellville, Inc. (1601); and Ruby Tuesday of Salisbury, Inc. (5432). The Debtors' mailing address is 333 East Broadway Ave., Maryville, TN 37804.

Lebow (the "Claimant"), and in support thereof, state the following:

**Preliminary Statement**

1.     As the United States Court of Appeals for the Third Circuit recognized in *Baroda Hill Inv. v. Telegroup, Inc. (In re Telegroup, Inc.)*, 281 F.3d 133, 142 (3d Cir. 2001), section 510(b) of the Bankruptcy Code was enacted specifically to prohibit a shareholder from "bootstrapping" its alleged equity losses into a higher priority general unsecured claim. This objection is necessary to prohibit such bootstrapping and to ensure the proper classification of claims of dissenting shareholders as subordinated to the priority of common stock under the Debtors' chapter 11 plan.

2.     Claimant is a shareholder of Debtor Ruby Tuesday, Inc. ("RTI"), a Georgia corporation, that exercised its rights under applicable state law, prepetition, to dissent from the 2017 merger (the "Merger") of RTI with a subsidiary of Debtor RTI Holding Company, LLC ("Holding").  As a consequence, RTI named Claimant and other dissenting pre-Merger shareholders as defendants in a Georgia state court action for a determination of the fair value of their respective shares, which action was stayed pretrial by the Georgia state court following the commencement of these cases.  Each of Claimant's two  proofs of claim assert a nonpriority general unsecured claim related to his rights under Georgia law as a pre-Merger shareholder.

3.     All of the dissenters' claims (including the Claims) are classified in Class 7 of the *Debtors' Amended Chapter 11 Plan* [Docket No. 761] (the "Plan").  In such Class, these claims are subordinated via the Plan pursuant to Bankruptcy Code section 510(b) to the priority level of common stock in RTI, and will not receive a Plan distribution.[2]  By this Objection, the

---

[2] A plan may subordinate a claim without the need to commence a separate adversary proceeding.  *See In re Peregrine Systems, Inc*., 2004 Bankr. LEXIS 346, at *4 and 7 (Bankr. D. Del. Mar. 30, 2004) (addressing motion to subordinate claims, held that claim under merger agreement tied to stock

Debtors seek an order stating that the Claims are indeed properly classified as subordinated Class 7 Claims for voting purposes.[3]  In the alternative, pursuant to the terms of the Solicitation Procedures Order (as defined below) the Debtors seek (a) disallowance of such Claims for voting purposes in accordance with certain provisions of the voting and tabulation procedures established in the Solicitation Procedures Order; or (b) the temporary allowance of each of the Claims as Class 4 general unsecured claims in the amount of $1.00 under such procedures.

## Jurisdiction and Statutory Authority

4.     This Court has jurisdiction over this Objection pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  The predicates for the relief sought herein are sections 105(a), 502(b), 510(b), 1122(a) and 1126(g) of the Bankruptcy Code, Bankruptcy Rules 3007 and 3018(a) and the *Order (I) Approving Disclosure Statement; (II) Scheduling Confirmation Hearing; (III) Approving Form and Manner of Notice of Confirmation Hearing; (IV) Establishing Procedures for Solicitation and Tabulation of Votes to Accept or Reject Plan, Including (A) Approving Form and Contents of Solicitation Package,*

---

transaction was properly classified in Class 9 of the confirmed chapter 11 plan because it was subordinated pursuant to Bankruptcy Code section 510(b)), citing *In re Alta+Cast, LLC*, 301 B.R. 150, 155 (Bankr. D. Del. 2003) for similar facts (motion to subordinate claim) and conclusion that subordination was warranted addressing a Bankruptcy Rule that requires an adversary proceeding "to subordinate any allowed claim or interest, except when a … chapter 11… plan provides for subordination."  Fed. R. Bankr. Proc. 7001(8).  Similarly, subordination may be the subject of an objection to claim:

> An adversary proceeding is only required for claim subordination if subordination is not provided for under a chapter 11 plan.  In this case, the Debtors' plan has provided for a class of subordinated claims. Therefore, an adversary proceeding is not required to reach the issue of claim subordination, and the Court will consider it in the context of the Debtors' Objection to Tranquility's claim.

*In re Washington Mutual, Inc*., 462 B.R. 137, 145 (Bankr. D. Del. 2011).

[3] Therefore, the dissenters (including Claimant) are deemed to have rejected the Plan under Bankruptcy Code section 1126(g).

*(B) Establishing Record Date and Approving Procedures for Distribution of Solicitation*

*Packages, (C) Approving Forms of Ballots, (D) Establishing Voting Deadline for Receipt of*

*Ballots, and (E) Approving Procedures for Vote Tabulations; (V) Establishing Deadline and*

*Procedures for Filing Objections to Confirmation of Plan; and (VI) Granting Related Relief*

[Docket No. 759] (the "Solicitation Procedures Order").

**Background**

5.    Prior to December 21, 2017 (the "Merger Date"), RTI was a public

company with its common stock trading on the New York Stock Exchange.  On October 15,

2017, the board of directors of RTI unanimously approved a Merger Agreement (as such term is

defined in footnote 4 herein)[4] with RTI Holding Company, LLC ("Holding") and Holding's then

merger subsidiary RTI Merger Sub, LLC:

> The Board of Directors' approval was the culmination of more
> than a year-long process during with [sic] the Merging Corporation
> [i.e., RTI] evaluated numerous strategic opportunities and received
> formal proposals from eleven different bidders.  The merger
> agreement approved by the Board of Directors was an arms [sic]-
> length transaction that resulted from extensive and protracted
> negotiations.  It provided for each outstanding shareholder of Ruby
> Tuesday at the time of the merger to receive $2.40 per share.

---

[4] The Execution Version of the Agreement and Plan of Merger dated as of October 16, 2017 among Ruby
Tuesday, Inc., RTI Holding Company, LLC and RTI Merger Sub, LLC (the "Merger Agreement") is
attached to the Schedule 14A Proxy Statement Pursuant to Section 14(a) of the Securities Exchange Act
of 1934 filed on November 20, 2017 (the "Proxy Statement") with the Securities and Exchange
Commission ("SEC").   The  Proxy Statement with the annexed Merger Agreement is available at:
https://www.sec.gov/Archives/edgar/data/0000068270/000119312517347719/d474183ddefm14a.htm#toc
As set forth in a concurrently-filed request for judicial notice ("Request for Judicial Notice"), the Debtors
request that this Court take judicial notice of RTI's publicly-available filings with the SEC, which are
available on the SEC's EDGAR filings and form webpage at www.sec.gov/edgar.  Fed. R. Bankr. P.
9017, incorporating Fed. R. Evid. 201.  See *New Century Trs Holdings, Inc. v. New Century Trs
Holdings, Inc.*, 502 B.R. 416, 424 (Bankr. D. Del. 2013) ("A court may take judicial notice of a properly
authenticated public disclosure document filed with the SEC.  *In re NAHC, Inc. Securities Litigation*, 306
F.3d 1314, 1331 (3d Cir. 2002) citing *Oran v. Stafford*, 226 F.3d 275, 289 (3d Cir. 2000).").  A true and
correct copy of a relevant excerpt from the Proxy Statement is attached as **Exhibit "1"** to the Request for
Judicial Notice.

Petition for Appraisal and Other Relief (the "Appraisal Petition"), Georgia Superior Court

(Fulton County) (the "Georgia Court"), *Ruby Tuesday, Inc. v. Cede & Co.*, No. 2018-cv-304101

(the "Dissenters Action") ¶ 13 at 3.[5]  On October 16, 2017, RTI and the other parties to it

executed the Merger Agreement.  *Id.* ¶ 12 at 3.  Under the terms of the Merger Agreement, RTI

would become a privately owned company.

6.     On November 20, 2017, RTI sent its shareholders, including Claimant, its

Proxy Statement (defined below) soliciting a shareholder vote for the proposed merger,

describing why its board of directors thought $2.40 per share was fair and included a fairness

opinion from RTI's financial advisor UBS Securities LLC.  *Id.* ¶ 14 at 4.  The Proxy Statement

also stated that shareholders would be entitled to dissenter's rights per the attached relevant

provisions of the Georgia Code.  *Id.* ¶ 15 at 4.

7.     On February 1, 2018, Claimant rejected RTI's offer and made a demand

for payment for his 180,100 shares of common stock at a price of $2.88 per share (now $4.00 per

share, as set forth in the Claims)[6] and deposited its certificates as required by Georgia statute,

O.C.G.A § 14-2-1322(a) and (b)(1).  [7] See *Id.*  ¶¶ 22 at 5 and ¶29 at 6-7; *Defendants Answer to*

---

[5] The Debtors respectfully request that the Court take judicial notice of publicly-available filings in the Dissenters Action.  Fed. R. Bankr. P. 9017, incorporating Fed. R. Evid. 201.  *See Cooley v. DiVechhio*, 307 Fed. Appx. 611, 614 (3d Cir. 2009) ("Based upon our review of the state court docket, which is public … [w]e may take judicial notice…").  A true and correct copy of the Appraisal Petition is attached as **Exhibit "2"** to the Request for Judicial Notice.

[6] The Debtor objects to the Claimant's increased demand from $2.88 per share in its notice under Section 14-2-1327 of the Georgia Code to $4.00 per share in his Claims, which increase is arguably untimely under subsection (b) of such section of the Georgia Code

[7] In the Appraisal Petition, RTI stated that: "32.  In fact, none of the respondent's demands provided any basis for the share price or demands."  *Id.* ¶ 32 at 7.  Significantly, in its Answer, "Defendants admit this averment insofar as they refer to LAWNRENCE [sic] N. LEBOW, JONATHAN LEBOW and MIRIAM D. ROTH."  *Id.* ¶ 32 at 7.
.

*Petition for Appraisal and Other Relief*, Dissenters Action (the "<u>Answer</u>") ¶¶ 22, 24, 25, 26, 29, 32 and 35 at 5-7.[8]

8.       On February 2, 2018, RTI timely sent an offer of payment (of $2.40 per share plus interest) as required by Georgia statute. *Id*. ¶¶ 24-28 at 5-6. See O.C.G.A § 14-2-1323. Claimant rejected RTI's offer of fair value. *Id.* ¶ 29 at 6.

9.       On April 19, 2018, as required by the Georgia Code, RTI commenced the Dissenters Action by filing and serving the Appraisal Petition. *See* O.C.G.A § 14-2-1330(a)("If a demand for payment under Code Section 14-2-1327 remains unsettled, the corporation shall commence a proceeding within 60 days after receiving the payment demand and petition the court to determine the fair value of the shares and accrued interest."). The Appraisal Petition sought an order of the Georgia Court: (a) determining the fair value of Claimant's and other respondents' shares to be the merger price of $2.40 per share and (b) awarding a "fair and equitable interest rate, and assess the cost and expenses, including reasonable attorneys' and experts' fees, in favor of RTI and against the respondents who the Georgia Court determines acted arbitrarily, veraciously or not in good faith." Appraisal Petition at 8.

10.     On May 7, 2018, Claimant filed its Answer.

11.     The Dissenters Action was stayed by the Georgia state court before trial.

12.     On October 7, 2020 (the "<u>Petition Date</u>"), the Debtors filed their voluntary chapter 11 petitions. The Debtors continue to operate their businesses and manage their affairs as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. On

---

[8] A true and correct copy of the Answer is attached as **Exhibit "3"** to the Request for Judicial Notice.

October 26, 2020, the Office of United States Trustee appointed an official committee of unsecured creditors (the "Creditors' Committee") in these cases. No trustee or examiner has been appointed in the cases.

13.     On December 21, 2020, the Court entered the Solicitation Procedures Order, pursuant to which the Court approved (a) certain procedures to be followed in connection with voting on the Plan and (b) the *Disclosure Statement for Debtors' Amended Chapter 11 Plan* [Docket No. 759] (the "Disclosure Statement").

### The Claims

14.     The claims bar date (the "Bar Date") in these cases is December 17, 2020, by order of this Court entered on October 22, 2020 [Docket No. 181]. Prior to the Bar Date, on November 11, 2020, Claimant filed its three nonpriority general unsecured Claims subject to objection herein:

a.  Claim 10426, in the amount of $1,249,509.60, calculated using the $2.40 per share of Merger consideration that Claimant would have been entitled to on account of 520,629 shares as of the Merger Date had it not dissented. No supporting documentation is attached to this Claim;[9] and

b.  Claim 10425, in the amount of $2,015,958.44, based on Claimant's assertion of a fair value of $4.00 per share plus interest and attorneys' fees for a total of $3,265,468.04, less the $1,249,509.60 of Merger consideration at $2.40 per share claimed in Claim

---

[9] A true and correct copy of Claim 10426 is attached as **Exhibit "4"** to the Request for Judicial Notice.

10426.  No supporting documentation is attached to this Claim[10].

**Request for Relief**

15.     The Debtors object to the Claims for voting purposes because, notwithstanding Claimant's assertion that it holds general unsecured claims (which are included in Class 4 in the Plan), the Claims are, instead, Class 7 Claims subordinated under Bankruptcy Code section 510(b) to the priority of RTI common stock and will receive no distribution under the Plan.

16.     Alternatively, the Debtors object to each of the Claims for voting purposes under the voting and tabulation procedures in the Solicitation Procedures Order as discussed below.  Alternatively, as a last resort, the Debtors request that the Claims be collectively or separately voted (as the Court may determine) in the amount of $1.00 and counted in Class 4 per such voting and tabulation procedures.  While the Debtors do not object to the Claims herein for any purpose other than voting, they retain their rights and powers, and those of their estates and successors in interest, to object to the Claims for any and all other purposes, including, without limitation, on the basis that their amounts are overstated.

**Basis for Relief Requested**

**A.     The Claims May Be Disallowed for Voting Purposes**

17.     A creditor is entitled to vote to accept or reject a chapter 11 plan if its claim is "allowed under section 502" of the Bankruptcy Code.  11 U.S.C. § 1121(a).  Section 502(a) of the Bankruptcy Code provides that a proof of claim "is deemed allowed, unless a party in interest objects." 11 U.S.C. § 502(a).  Pursuant to section 502(b) of the Bankruptcy Code, if an

---

[10] A true and correct copy of Claim 10425 is attached as **Exhibit "5"** to the Request for Judicial Notice.

objection to a claim is made, the court, after notice and a hearing, must determine the amount of the claim fixed as of the date of the filing of the petition. 11 U.S.C. § 502(b).

18.     Holders of claims and interests are only permitted to vote on a plan to the extent that their claims are "allowed." *See* 11 U.S.C. § 1126(a). Bankruptcy Rule 3018(a) provides that "[n]otwithstanding objection to a claim or interest, the court after notice and hearing may temporarily allow the claim or interest in an amount which the court deems proper for the purpose of accepting or rejecting a plan." Fed. R. Bankr. P. 3018(a). The determination whether to temporarily allow a claim for voting purposes lies within the discretion of the bankruptcy court.

19.     Courts recognize that Bankruptcy Rule 3018(a) also permits a party in interest to seek to disallow a claim for voting purposes. Indeed, as noted by one bankruptcy court, "[t]he court has broad authority to determine whether to allow or disallow a claim for purposes of voting" under Bankruptcy Rule 3018(a). *In re Mangia Pizza Invs., L.P.*, 480 B.R. 669, 679 (Bankr. W.D. Tex. 2012); *see also In re Zolner*, 173 B.R. 629, 633 (Bankr. N.D. Ill. 1994) (noting that a court must exercise its discretion to allow or disallow claims under Bankruptcy Rule 3018(a) "based on reasoned analysis"); *In re Goldstein*, 114 B.R. 430, 433 (Bankr. E.D. Pa. 1990) (same); *Collier on Bankruptcy* ¶ 9-3018[5] (16th ed. rev. 2020) ("The court, however, regardless of the circumstances, has the discretion to allow or disallow all or part of the claim for voting purposes.") (citations omitted: hereinafter *Collier*)..

**B.     The Claims Are Unsupported and, Consequently, Invalid**

20.     The Claims do not have *prima facie* validity because they fail to attach any evidence in support of the claim. Fed. R. Bankr. Proc. 3001(c)(1) ("when a claim is based on a writing, a copy of the writing shall be filed with the proof of claim."). *See Sass v. Barclays*

*Bank PLC (In re American Home Mortgage Holdings)*, 501 B.R. 44, 62 (Bankr. D. Del. 2013)

("Pursuant to Federal Rule of Bankruptcy 3001, where a proof of claim does not provide the

facts and documents necessary to support the claim, it is not entitled to the presumption of *prima*

*facie* validity.") (citing *In re All-American Auxiliary Ass'n*, 95 B.R. 540, 544 (Bankr. S.D. Ohio

1989)).

        21.     In the absence of any supporting documentation, the Claims lack the

presumption of validity and may be disallowed in their entireties on this basis alone.

## C.    Claimant Bears the Burden of Substantiating the Claims

        22.     A claimant has the ultimate burden of persuasion when an objection to its

claim has been filed, the objector has only the initial burden to produce evidence sufficient to

negate the *prima facie* validity of the filed claim.  *In re Allegheny Int'l, Inc*., 954 F.2d 167, 173-

74 (3d Cir. 1992); *Chatlos Syst. v. Kaplan (In re TIE/Communications)*, 163 B.R. 435, 440-41

(Bankr. D. Del.  1994).

        23.     RTI produced such sufficient evidence when it (a) filed its *Schedules of*

*Assets and Liabilities* [Docket No. 521 at 1708 of 1871 (PDF at 1769 of 2109)], in which it listed

Claimant's scheduled claim as a disputed, unliquidated, and contingent nonpriority general

unsecured claim for "Dissenters' Shareholder Rights Dispute" in an unknown amount; and (b)

provided evidence in support of this Objection.  Therefore, the burden is now on Claimant to

substantiate the Claims for all purposes including for temporary allowance for voting on the

Plan.

## D.    The Claims Are Subject to Subordination Under Section 510(b) of the Bankruptcy Code

        24.     Bankruptcy Code section 510(b) provides:

For the purpose of distribution under this title, a claim arising from rescission of a purchase or sale of a security of the debtor or of an affiliate of the debtor, for damages arising from the purchase or sale of such a security, or for reimbursement or contribution allowed under section 502 on account of such a claim, shall be subordinated to all claims or interests that are senior to or equal the claim or interest represented by such security, except that if such security is common stock, such claim has the same priority as common stock.

11 U.S.C. § 510(b).

25.     Regarding such section, the treatise *Collier* states:

Section 510(b) provides for the mandatory subordination of claims "arising from" a securities transaction.  Courts have viewed this language as ambiguous, generally interpreting the provision broadly to include a wide variety of causes of actions arising out of securities transactions.  Under this broad reading, the claim need not flow directly from the securities transaction or arise contemporaneously with the purchase or sale of a security, but will be viewed as "arising from" a securities transaction if the transaction is part of the causal link leading to the injury.  For example, the Court of Appeals for the Third Circuit has held that a claim arising from the failure to register shares, clearly occurring after the securities transaction had been completed, must be subordinated under section 510(b).

4 *Collier* ¶ 510.04[3], (citing, among others, *Telegroup*, 281 F.3d at 142 ("More important than the timing of the actionable conduct, from a policy standpoint it is the fact that the claims in this case seek to recover a portion of claimants' equity investment.  In enacting § 510(b) Congress intended to prevent disaffected equity investors from recouping their investment losses in parity with general unsecured creditors in the event of bankruptcy.").

26.     Notably, in *Telegroup*, the Third Circuit stated that

[I]t is, in our view, more natural, as a textual matter to read '**arising from**' as requiring **some nexus or causal relationship** between the claims and the purchase of the securities, but not as a limiting nexus to claims alleging illegality in the purchase itself.

11

In particular the text of § 510(b) is reasonably read to encompass the claims in this case since the claims would not have arisen **but for** the purchase of Telegroup's stock and allege a breach of a provision of the stock purchase agreement.

*Id*. at 138 (emphasis added), discussed in *Frankun v. International Wireless Commc'ns (In re International Wireless Commc'ns)*, 68 F. App'x. 275, 278 (3d Cir. Apr. 16, 2003). Accordingly, courts have determined that claims arising from shareholders' rights of appraisal or other determinations regarding the value of shares are properly subordinated under Bankruptcy Code section 510(b).

27.     For example, in *Official Committee of Unsecured Creditors v. FLI Deep Marine LLC (In re FLI Deep Marine Holdings)*, the claimants were minority shareholders that refused an offer for their shares in a merger who were also parties to stayed Delaware Chancery Court litigation challenging the price offered as being below fair value. 2011 Bankr. LEXIS 579 (Bankr. S.D. Tex. Jan. 19, 2011). The United States Bankruptcy Court for the Southern District of Texas granted the debtor's motion for summary judgment, stating:

The Defendants sought appraisal rights for their shares but the Debtors filed for bankruptcy before that process got very far **Through the Delaware Litigation, the Defendants sought to exercise their statutory appraisal rights for the shares**. …

These claims are causally linked to Defendants' status as DMTI's shareholders. Given the circuit court precedent [e.g., *Telegroup*] and § 510(b)'s underlying policies, **the Court finds mandatory subordination is required**.

2011 Bankr. LEXIS 579, at *19-21 (emphasis added).

28.     Similarly, in *Liquidating Trust of U.S. Wireless Corp. v. Wax (In re U.S. Wireless Corp.)*, the United States Bankruptcy Court for the District of Delaware stated that:

This finding required the arbitrator to **determine the value of the stock** and various other equity interests Wax would have received

12

if U.S. Wireless had not breached the employment agreement. **The damages Wax received were based on this determination**

Based on the claims asserted by Wax at state court and upon which the arbitrator based Wax's recovery, **it is clear that Wax's claim is for damages arising from the purchase or sale of the Equity Package**. **Accordingly, the Court is required to subordinate Wax's claim under section 510(b) of the Bankruptcy Code**.

384 B.R. 713, 727-28 (Bankr. D. Del. 2008) (emphasis added).[11]  Thus, case law shows that courts have rebuffed attempts by disgruntled equity holders to place form over substance and have repeatedly and consistently subordinated such claims to the level of prepetition equity.

29.     In the present case, "but for" Claimant's purchase of the pre-Merger shares, it would not have had shareholder fair value appraisal rights under Georgia law.  Also, there is a clear "nexus and causal connection" between such rights and Claimant's ownership of such shares.  Claimant is a minority shareholder that refused the Debtor's offer of $2.40 per share as "fair value" in a merger, and it is a party to a stayed prepetition action seeking a determination of whether fair value for Claimant's shares is the offered price or a higher amount.

30.     Also, an examination of applicable state law reaffirms the inextricable link between the Claims and Claimant's status as a shareholder.[12]

---

[11] *See also Peregrine Sys.* 2004 Bankr. LEXIS 346 at *7 ("[Claimant's] alleged $ 15 million claim is based on the fact that he entered into the merger agreement, through which he allegedly lost money. Regardless of the fact that he now contends he was defrauded into making the exchange, **in reality his complaint is tied to the stock transaction** ... For these reasons, proof of claim number 1126 shall be classified in Class 9 and subordinated pursuant to § 510(b).") (emphasis added);  *In re Kaiser Group Int'l.*, 260 B.R. 684, 688-89 (Bankr. D. Del. 2001)("*Kaiser*"), *aff'd sub nom Pippen v. In re Kaiser Group Int'l Inc. (In re Kaiser Group Int'l Inc.)*, 2001 U.S. Dist. LEXIS 25574 (D. Del. Nov. 29, 2001) ("Nor is the Merger Agreement in any sense of the word a 'debt' instrument …. For the foregoing reasons, we conclude that the claims of the ICT Shareholders are for damages arising from the purchase of stock of the Debtors. Consequently, they are subordinated to the claims of creditors pursuant to section 510(b)").
[12] Former Bankruptcy Judge Kevin J. Carey of this Court  recognized that:

The 'basic federal rule' in bankruptcy is that state law governs the substance of claims… 'Creditors' entitlements in bankruptcy arise from the underlying substantive law creating the debtor's obligation, subject to any qualifying or contrary provision of the Bankruptcy Code.  In other

31.     The Claims at issue here are Georgia statutory claims.  The Georgia Code provides a process pursuant to which a merging Georgia corporation (such as RTI) sends a notice to its shareholders regarding their right to dissent and demand fair value for their shares.  *See* O.C.G.A §§ 14-2-1320 and 1322.  To dissent, a shareholder must make a timely written demand for payment of its stated fair value amount and deposit its certificated shares, if the company contests such amount, the company must bring an action in Georgia state court for an appraisal of fair value, which may result in a judgment for the dissenter in the amount of fair value determined by the court.[13]  O.C.G.A §§ 14-2-1327 and 1330.

32.     Under the Georgia Code, a dissenting shareholder's shares are <u>not</u> cancelled as of the merger.  Instead, the dissenter retains its rights as a shareholder subject to modifications made by the terms of the merger.  Section 14-2-1323(b) makes clear that  "[a] record shareholder who demands payment and deposits his shares under subsection (a) of this Code section retains all other rights as a shareholder until these rights are cancelled or modified by the taking of the proposed corporate action [e.g., a merger]."  O.C.G.A § 14-2-1323; *see* Comment to section 14-2-1323 ("A shareholder who deposits his shares retains all other rights of a shareholder until those rights are modified by effectuation of the proposed corporate action.").[14]

---

words, the amount and validity of claims are determined by state law to the extent that law does not conflict with the Bankruptcy Code.

*In re B456 Systems, Inc.*, 2017 Bankr. LEXIS 4399, at *54 (Bankr. D. Del. Dec. 22, 2017), quoting *Raleigh v. Illinois Dept. of Revenue*, 530 U.S. 15, 20, 120 S.Ct. 1951, 1955 (2000), quoting *Butner v. U.S.*, 440 U.S. 48, 57, 99 S.Ct. 914 (1979).

[13] *See generally*, B. Byrd, "Dissenters' Rights:  Litigating 'Fair Value'", https://cdn.ymaws.com/www.atlantabar.org/resource/resmgr/section_newsletters/Litigation/Ben_Byrd_article_-_dissenter.pdf.

[14] The determination that dissenters' shares remain extant is consistent with the purpose for depositing the shares at the time a given dissenter's fair value demand is made.  The official comment to O.C.G.A. § 14-2-1323 explains the reason for depositing shares for one purpose only:

33.     The Georgia Code also provides that the action brought in a Georgia court is a "nonjury equitable valuation" in which "[e]ach dissenter made a party to the proceeding is entitled to judgment for the amount which the court finds to be the fair value of the shares, plus interest to the date of judgment." O.C.G.A § 14-2-1330. Such section also states that the Georgia court action has "the effect of an action quasi *in rem* against their shares," which indicates that dissenters' deposited shares are not cancelled while the action is pending. *Id*.

34.     Here, the dissenters' shares, including those belonging to Claimant, were not cancelled by the terms of the Merger:

> [E]ach share of Ruby Tuesday common stock the holder of which has properly demanded dissenters' rights in accordance with Georgia law **will not be canceled and converted into the right to receive the merger consideration** unless and until such holder fails to perfect or withdraws or otherwise loses its dissenters' right. If any holder of Ruby Tuesday common stock that demands dissenters' rights properly perfects such rights, such holder will be entitled to the fair value of such shares as determined by the superior court of Georgia plus interest, if any, on the amount determined to be the fair value…

(Emphasis added).[15]

35.     Also, the conclusion that dissenters' shares have not been cancelled is consistent with the terms of the Merger Agreement which provide that except for dissenter shares

---

> The deposit of share certificates is necessary to prevent dissenters from giving themselves a 30-day option to take payment if the market price of the shares goes down, but sell their shares on the open market if the price goes up. If this kind of speculation were possible, all sophisticated investors might be expected to file demands that they would not intend to carry through unless the price should fall.

Comment to section 14-2-1323; s*ee VSI Enterprises, Inc. v. Edwards*, 238 Ga. App. 369, 372, 518 S.E.2d 765, 769 (Ga. App. 1999) ("the intent of the legislature for the tender of the stock certificate was to prevent a specific abuse"; it prevents "a dissenter from using the dissent as a way to hedge against the market by restricting transfer from the date of the demand.").

the shares of other shareholders are cancelled and converted into a right to payment. Section

2.02(a) of the Merger Agreement states:

> Except as otherwise provided in Section 2.02(b) or Section 2.04, each share of Company Stock outstanding immediately prior to the Effective Time shall be converted into the right to receive $2.40 in cash, without interest (the "<u>Merger Consideration</u>"). As of the Effective Time, all such shares of Company Stock shall no longer be outstanding and shall automatically be canceled and retired and shall cease to exist, and shall thereafter represent only the right to receive the Merger Consideration to be paid in accordance with Section 2.03, without interest.

Merger Agreement § 2.02(a). Section 2.04 of the Merger Agreement addressed the shares of

dissenters, stating in pertinent part that:

> shares of Company Stock outstanding immediately prior to the Effective Time and held by a holder who has not voted in favor of the Merger or consented thereto in writing and who is entitled to demand and has demanded and properly exercised appraisal rights for such shares in accordance with the GBCC [Georgia Business Corporation Code ("<u>GBCC</u>")] shall not be converted into the right to receive the Merger Consideration, but instead shall only be entitled to such rights as are granted by the GBCC, unless such holder fails to perfect, withdraws or otherwise loses the right to appraisal.

*Id.* § 2.04.

        36.      Finally, the nature of the relief sought by Claimant in the Dissenters

Action that forms the basis for the Claims is the *sine qua non* of equity ownership. Claimant

seeks the valuation of its interests in RTI arising under Georgia law, which "provide[s] an

opportunity for shareholders who think that they are entitled to a higher share price to dissent

from the merger and obtain 'fair value' of their shares". Appraisal Petition ¶ 15 at 4. The

Claims relate to RTI's offer to purchase Claimant's shares at the Merger price, instead of at the

---

[15] A true and correct copy of a relevant excerpt of the Proxy Statement is attached as **Exhibit "1"** to the Request for Judicial Notice.

higher purchase price demanded by Claimant.[16]  In essence, the Claims are for the "damages" Claimant believes it suffered if RTI were permitted to purchase Claimant's shares at the Merger price.[17]  A valuation in excess of the price at which Claimant originally acquired such shares represents Claimant's "upside" while value less than such amount would represent Claimant's loss on the investment.[18]

### E.      Claimant Is Not Entitled to Vote Because It Is Deemed to Reject the Plan

      37.      The Claims, along with other dissenters' claims, are classified in Class 7 of the Plan in which they are treated as having the priority of RTI common stock under Bankruptcy Code section 510(b), and so will not receive a distribution.  All holders of dissenters' claims are therefore deemed to have rejected the Plan under Bankruptcy Code section 1126(g).

      38.      By contrast, for purposes of subordination under Bankruptcy Code section 510(b), Claimant has, under Georgia law and the Merger Agreement, retained ownership of its pre-Merger shares pending the entry of a judgment for fair value by the Georgia court. Claimant's demand for a fair value payment amount under the Georgia statute is analogous to a contract party's claim for breach of a stock purchase agreement when it has not been paid what it believes it is owed.  Such claims are to be subordinated under section 510(b). *See International Wireless,* 68 F. App'x. at 278; *Telegroup*, 281 F.3d at 142 (claimant should not be permitted to

---

[16] *See* Answer ¶ 29 at 6.
[17] *See Urdan v. WR Capital Partners, LLC*, 219 Del. Ch. LEXIS 313, at *31-32 (Del. Ch. Aug. 19, 2019) ("Like the right to assert a derivative claim, the right to assert a direct claim is a property right associated with the shares… the ability to assert a direct claim and the ability to benefit from any remedy pass with the shares.").

"bootstrap" its equity into a claim that competes with creditors; *followed* by *Deep Marine*, 2011

Bankr. LEXIS 579 at *25 (section 510(b) subordination of Delaware litigation claims that

included the right of appraisal of pre-merger shares: "[T]he fact that claims in the case seek to

recover a portion of the claimants' equity investment is the most important policy rationale.");[19]

*Northeast Carpenters Annuity Fund v. Spectrum Alliance, LP (In re Spectrum Alliance, L.P.)*,

609 B.R. 11, 14 (E.D. Pa. 2019).

       39.    With respect to the Debtors' Plan, the Claims should not compete with the

claims of Class 4 general unsecured creditors, but instead should be subordinated in Class 7

under Bankruptcy Code section 510(b).  Therefore, the Claims should be disallowed for voting

purposes or, alternatively, temporarily allowed in Class 7 in which case Claimant is deemed to

have rejected the Plan.

## F.    Claimant Is Not Entitled to Vote Under the Voting and Tabulation Procedures

       40.    Paragraph 21(b) of the Solicitation Procedures Order states:

> Claims shall not be split for purposes of voting; thus, each creditor
> must vote the full amount of its Claim(s) within each class to either
> accept or reject the Plan.  If a creditor attempts to split such vote
> on their Ballot, such Ballot will not be counted for voting.

---

[18] *International Wireless Communications Holdings*, 68 Fed. Appx. at 278 ("Just as shareholders accept gladly the upside potential of increases in their shares' value (whatever the reason), they should also assume the risk of decline in value for whatever reason, including (but not limited to) fraud in the issuance, by having their claims subordinated – shorthand for the result that because they purchased stock, they are at the end of the line in bankruptcy distribution priority."). *Cf. Kaiser*, 260 B.R. at 689 ("Even during the restricted period, the ICT Shareholders retained the 'upside' in any value of the Debtor's stock.  The Merger Agreement provided that if the stock price went above the Merger Value during the restricted period, the ICT Shareholders would require the Debtors to buy the stock from them or arrange its sale.  Thus, they retained their essential rights as shareholders at all times.").

[19] Stating further:  'When an investor seeks *pari passu* treatment with the other creditors, he disregards the absolute priority rule, and attempts to establish a contrary principle that threatens to swallow up this fundamental rule of bankruptcy law.'  'When a claimant elects to take an equity stake in the debtor, he becomes bound by the choice to trade the relative safety of fixed return for the 'upside potential of shareholder status.'' *Id.*

Solicitation Procedures Order ¶ 21(b). Claimant has divided his claim arising from the Dissenter

Action into two Claims: 10425 and 10426. Claim 10425 by its terms splits the claimed total

amount of $3,265,468.04 into two claims, one for $2,015,958.44 (Claim 10425) and one for

$1,249,509.60 (Claim 10426). If the Claims are determined to be within Class 4 and each were

allowed for voting purposes, then Claimant would unfairly have three votes for numerosity

purposes when it is (at most) entitled to one. By applying the terms of paragraph 21(b), the

Claims must be disallowed for voting purposes because they have been improperly split.

### G. Alternatively, the Claims Should Be Voted in the Amount of $1.00 Under the Voting and Tabulation Procedures

41. Paragraph 20(b) of the Solicitation Procedures Order provides that:

> If a Claim for which a Proof of Claim has been timely filed is
> wholly contingent, unliquidated or disputed, undetermined or
> unknown in amount such claim shall be temporarily allowed in the
> amount of $1.00 for voting purposes only, but not for purposes of
> allowance or distribution.

The Claims are unliquidated and wholly disputed. Therefore, if any of them were allowed

temporarily in Class 4 for voting purposes, collectively or separately, the Claims should be voted

in amount of $1.00 under such paragraph 20(b).

### General Reservation of Rights

42. This Objection is without prejudice to the rights of the Debtors to raise

amended or additional objections to the Claims or any other claim, and the Debtors expressly

reserve all substantive or procedural objections that they may have, including, without limitation,

in reply to any response submitted by Claimant. Should one or more of the grounds of objection

stated in this Objection be dismissed, the Debtors reserve their rights to object on other stated grounds or on any other grounds that they discover during the pendency of these cases.

43.     Except as expressly provided herein, nothing in this Objection nor any actions taken pursuant to such relief is intended or should be construed as: (a) an admission as to the validity of any prepetition claim against any Debtor; (b) a waiver of any party's right to dispute any prepetition claim on any grounds; (c) a promise or requirement to pay any prepetition claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Objection or any order granting the relief requested by this Objection; (e) a request or authorization to assume any prepetition agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) a waiver of any Debtor's rights under the Bankruptcy Code or any other applicable law; or (g) a waiver of the Debtors' rights to file counterclaims against the holders of the Claims or any other claim.

44.     The Debtors further reserve the right to object in the future to the allowance of the Claims for distribution under the Plan.

### Notice

45.     The Debtors will serve copies of this Objection on:  (a) Claimant, (b) the Office of the United States Trustee, (c) counsel to the Creditors Committee, and (d) all parties who have requested notices in these cases pursuant to Bankruptcy Rule 2002.  The Debtors respectfully submit that, in light of the nature of the relief requested herein, that no further notice need be given.

### No Previous Request

46.     No previous request for the relief sought herein has been made to this or to any other Court.

## Conclusion

WHEREFORE, the Debtors respectfully request that the Court enter its order, in substantially in the form attached hereto as **Exhibit A**, (i) sustaining the Objection; (ii) disallowing the Claims for purposes of voting on the Plan; and (iii) granting the Debtors such other and further relief as is just and proper.

Dated:   January 5, 2021              PACHULSKI STANG ZIEHL & JONES LLP
         Wilmington, Delaware

*/s/ James E. O'Neill*
Richard M. Pachulski (CA Bar No. 90073)
Malhar S. Pagay (CA Bar No. 189289)
James E. O'Neill (Bar No. 4042)
Victoria A. Newmark (CA Bar No. 183581)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE  19899-8705 (Courier 19801)
Telephone:  302-652-4100
Facsimile:   302-652-4400
Email: rpachulski@pszjlaw.com
          mpagay@pszjlaw.com
          joneill@pszjlaw.com
          vnewmark@pszjlaw.com

*Counsel to the Debtors and Debtors in Possession*

DOCS_LA:334957.2 76136/002