# **<u>EXHIBIT A</u>**

**EXECUTION DRAFT**

## G R O U N D   L E A S E

**THIS GROUND LEASE** ("Lease"), made by and between **STAFFORD RT, LLC**, a Georgia limited liability company ("Lessor" ), whose mailing address is 1805 U.S. Highway 82 West, P.O. Box 269, Tifton, Georgia 31793 and **RUBY TUESDAY, INC.**, a Georgia corporation ("hereinafter called "Ruby Tuesday"), whose mailing address is 150 West Church Avenue, Maryville, Tennessee 37801.

* or "Lessee"

## W I T N E S S E T H :

1.  **PREMISES:**

In consideration of the rents, covenants and agreements hereinafter set forth, Lessor does hereby demise and lease to Ruby Tuesday, and Ruby Tuesday does hereby take and hire from Lessor, the Real Property situated in Tifton, County of Tift, and State of Georgia, containing approximately 1.332 usable acres of land, and any and all improvements which now are or which shall be situated on said real property (the "Real Property") together with all rights, easements and appurtenances thereunto belonging or appertaining (collectively referred to herein as the "Leased Premises"), said Leased Premises being those more fully described in **Exhibit "A"** attached hereto and made a part hereof by reference.

Lessor and Ruby Tuesday mutually agree that the drawings or description attached hereto as **Exhibit "A"** constitutes the Leased Premises to the best of their knowledge, but that the same do not constitute a legal description of the Leased Premises. Lessor and Ruby Tuesday further agree that upon the completion of the survey and, if applicable, plan of subdivision, pursuant to Subsection C of Section 8 hereof, this Lease shall be amended by attaching the description of the Leased Premises from said survey as **Exhibit "A-1"** which **Exhibit "A-1"** shall be deemed to be the legal description of the Leased Premises for the purposes of this Lease.

Reference is made to the site plan attached as **Exhibit "B"** hereto and incorporated herein by reference ("Site Plan"). Lessor does hereby grant and convey to Ruby Tuesday, for the term of the Lease and any extensions and renewals thereof, and for the period of time during which Ruby Tuesday is not in material breach of this Lease (after the expiration of all applicable notice and cure periods), for the benefit of the Leased Premises, a perpetual, non-exclusive, uninterrupted right, privilege and easement, which right, privilege and easement shall be appurtenant to and pass with the title to the Leased Premises, for the purposes of (a) pedestrian and vehicular ingress and egress and parking of vehicles over, under, across and through drive lanes, drive aisles, the fifteen (15) specific parking spaces depicted as "Ruby Tuesday Off-Site Parking Spaces" on the Site Plan ("Ruby Tuesday Off-Site Parking Spaces"), and other common areas as they exist now and from time to time on the Lessor's Larger Tract, as defined in Section 17A hereinbelow; (b) erecting, maintaining and placing a sign on the portion of Lessor's Larger Tract identified as "Ruby Tuesday Sign Area" on **Exhibit "B-1"** attached hereto and incorporated herein by reference ("Ruby Tuesday Sign Area") together with the right to go on Lessor's Larger Tract to install, construct, operate and maintain perpetually a sign with the necessary electric lights, electric lines, poles, footings and attachments in the Ruby Tuesday Sign Area, pursuant to the Sign Lease ("Sign Lease") attached as **Exhibit "C"**, attached hereto and incorporated herein by reference, to be executed by the landlord therein simultaneously with this Lease; (c) the right and an easement to construct, maintain and use for pedestrian and vehicular ingress and egress the curb cut adjacent to the portion of Lessor's Larger Tract depicted as "Wendy's Tract" ("Wendy's Tract") on the Site Plan; (d) the right and an easement to construct, maintain, relocate, enlarge, use and tap into any and all utility lines (including storm drainage facilities) located on Lessor's Larger Tract necessary to serve the improvements to be located on the Leased Premises, to the extent that same are required by Ruby Tuesday; and (e)construction of the Ruby Tuesday Off-Site Parking Spaces. Reference is made to the portion of the area depicted on the Site Plan as "Ruby Tuesday Exclusive Parking Area" ("Ruby Tuesday Exclusive Parking Area").

Anything herein to the contrary notwithstanding, (a) Ruby Tuesday must repair any damages to Lessor's Larger Tract attributable to Ruby Tuesday's entry and/or activities

thereupon; and (b) Lessor may close access to the bridge currently located between the Leased Premises and the adjacent Holiday Inn Hotel, without the consent of Ruby Tuesday.

Lessor does hereby reserve and retain only for the benefit of the Wendy's Tract, and not for the benefit of the balance of Lessor's Larger Tract a non-exclusive, perpetual easement, right and privilege, which easement, right and privilege shall be appurtenant to and run with the title to Lessor's Larger Tract, over, across and through the portion of the Leased Premises on which drive aisles and drive lanes and parking spaces exist from time to time for the purposes of vehicular ingress and egress and parking of vehicles; provided, however, that (i) no parking easement is provided for herein on any portion of the Ruby Tuesday Exclusive Parking Area, and (ii) no easement is granted for parking of vehicles or queuing of vehicles in or around the car wash or any of the other businesses operating on Lessor's Larger Tract now or in the future, to the extent that same blocks the access ways leading to the business operating on the Leased Premises. Ruby Tuesday agrees to use the five (5) parking spaces closest to the car wash, as shown on the Site Plan, as employee parking, and place "Ruby Tuesday Employee Parking Only" signs or similar signs in said parking spaces.

Lessor does also hereby reserve and retain for the benefit of Lessor's Larger Tract a non-exclusive, perpetual easement, right and privilege, which easement, right and privilege shall be appurtenant to and run with the title to Lessor's Larger Tract over, across and through the portion of the Leased Premises on which storm drainage lines currently exist and over the balance of the Leased Premises for the purpose of allowing storm water produced on Lessor's Larger Tract to sheet drain over and drain through the infrastructure currently located on the Leased Premises.

## 2. TERM:

### A. **Original Term**

The original term of this Lease shall be for a period commencing on the Commencement Date as defined in Section 3 below and ending on January 31 following the twentieth (20th) full calendar year following such Commencement Date. "Lease Year" shall be defined as each successive period of twelve (12) consecutive calendar months commencing on the first day of January of each year during the term hereof and ending on December 31 of each year of the term hereof. If the Commencement Date is other than January 1 of any calendar year, the period between the Commencement Date and December 31 of that year shall be the "First Partial Lease Year." Ruby Tuesday's obligation to pay rent shall commence on the Commencement Date. Within thirty (30) days after the Commencement Date and the date the original term expires, and dates have been established, the parties shall execute and deliver an acceptable written document setting forth such dates.

### B. **First Renewal Term**

Upon the expiration of the original term, the term of this Lease shall automatically renew for a period of five (5) years, except in the event Ruby Tuesday gives Lessor a cancellation notice. Such cancellation notice may be given by Ruby Tuesday at any time but in any event must be given at least ninety (90) days prior to the expiration of the original term.

In the event that Ruby Tuesday does not cancel the renewal term of this Lease, this Lease shall be renewed at the rental set forth in Section 4 hereof, and upon the same other terms and conditions as are applicable to the original term, except that the renewal shall begin on the date of expiration of the original term and shall continue for a period of five (5) years thereafter.

### C. **Second and Subsequent Renewal Terms**

In the event Ruby Tuesday does not cancel the renewal term of this Lease and this Lease shall renew for the first renewal term as provided herein, this Lease may be renewed by Ruby Tuesday for three (3) additional periods of five (5) years each at the rental as set forth in Section 4 hereof and upon the same other terms and conditions as are applicable to the first renewal term except that such subsequent renewal terms shall begin on the date of expiration of the previous renewal term and shall continue for a period of five (5) years thereafter. In order to avoid the automatic renewal of this Lease for an additional five year term beginning after the completion of the first, second, and third renewal terms, the same ninety (90) day cancellation notice

provisions, as provided in B above regarding the first renewal term, shall apply.

3. **COMMENCEMENT DATE:**

The Commencement Date of this Lease shall be the earlier of the following: (a) Ruby Tuesday's completion of the improvements to be constructed by Ruby Tuesday and the opening to the public for business of a Ruby Tuesday restaurant; or (b) one hundred fifty (150) days after all of the following have occurred: (i) Ruby Tuesday shall have obtained all permits, licenses, variances and approvals referred to in Subsection B of Section 8 below; (ii) this Lease and the Memorandum of Lease referred to in Section 37 below have been executed by Lessor and delivered to Ruby Tuesday; (iii) all title matters pursuant to Section 16 below have been satisfied by Lessor, or waived in writing by Ruby Tuesday; (iv) Lessor has obtained and delivered to Ruby Tuesday such fully executed estoppel certificates and non-disturbance and attornment agreements as are required to be delivered to Ruby Tuesday pursuant to Sections 26 and 27 below; (v) Lessor shall have delivered the Premises to Ruby Tuesday with all of Lessor's Work as set forth in Sections 7, 8 and 23 completed; and (vi) the conditions set forth in Subsections B, C and D of Section 8 herein have been satisfied, or waived in writing by Ruby Tuesday; provided, however, that said one hundred fifty (150)-day period shall be extended by the amount of time attributable to any delays due to causes beyond Ruby Tuesday's control, including but not limited to, acts of God, strikes, lockouts or unavailability of materials. Upon the execution of this Lease, Ruby Tuesday shall have the right to enter upon the Leased Premises for the limited purposes of surveying the Leased Premises and conducting such soil tests as Ruby Tuesday deems necessary. Notwithstanding anything contained in the foregoing, upon satisfaction of the Commencement Date contingencies referred to in subsection (b) hereof, Ruby Tuesday shall have possession of the Leased Premises.

4. **RENTAL:**

Ruby Tuesday shall pay to Lessor at Lessor's address shown above, or at such other address or by electronic funds transfer, pursuant to instructions as Lessor may from time to time designate in writing, a fixed annual rental in the amounts as shown on **Exhibit "D"** hereto and incorporated herein by reference, payable in equal consecutive monthly installments of one-twelfth (1/12) of said annual rental. Each such monthly installment shall be due and payable in advance on the first day of each calendar month during the original term of this Lease and any renewal term. If the Commencement Date does not fall on the first day of a calendar month, then the first payment shall be for only the portion of the first month attributable to the term of the Lease prorated on a daily basis. The rental for the First Partial Lease Year shall be the product obtained by multiplying **SIXTY-SEVEN THOUSAND AND 00/100THS DOLLARS ($67,000.00)** by a fraction, the numerator of which is the number of days in the First Partial Lease Year and the denominator of which is three hundred sixty-five (365). The monthly installments of rent for the First Partial Lease Year shall be the total rental for the First Partial Lease Year less any initial partial month prorated rent paid or to be paid for the first partial month of the First Partial Lease Year divided by the number of whole months contained within said First Partial Lease Year.

5. **TAXES AND ASSESSMENTS:**

Lessor shall pay all real estate taxes, including penalties and interest for tax years preceding the Commencement Date of this Lease. Lessor shall also pay all special assessments which are a lien on the Real Property on the Commencement Date of this Lease, whether or not such assessments are past due, then due or are thereafter to become due and any assessments or charges which are for improvements then installed, or which are then known but which will be payable in whole or in part after the Commencement Date.

Ruby Tuesday agrees to pay to the appropriate governmental agencies all other real property taxes, assessments, impositions, or all other claims or charges (herein collectively called the "taxes") which may constitute or may be reduced to a lien upon the Real Property, including but not limited to, water charges and sewer charges, before the same shall become delinquent. All such payments for the first and last year of the original term or any renewal terms shall be prorated between Lessor and Ruby Tuesday so that Ruby Tuesday shall be responsible for that portion of the taxes which is attributable to the original term and any renewal term. Ruby Tuesday's tax obligation shall commence on the Commencement Date hereof. In the event there

is included in the taxes any special assessment or assessment which may be paid in installments, unless otherwise directed by written notice from Ruby Tuesday, Lessor shall advise the appropriate governmental agency of its intention to elect payments in installments thereof, and Ruby Tuesday shall pay such installments as shall be due and payable during the original term or any renewal term, regardless of when such installment was assessed.

In the event the Real Property is a portion of a larger tract, Lessor agrees to use its best efforts to have the Real Property designated as a separate parcel for taxing purposes so that the assessed valuation of the land and buildings shall relate only to the land constituting the Real Property and to the buildings and improvements constructed on the Real Property.

In the event the Real Property is a portion of a larger tract and the Lessor is unable to have the Real Property designated as a separate parcel for taxing purposes, so that taxes are assessed upon the larger tract of which the Real Property is a portion, Ruby Tuesday agrees to pay that portion of the taxes which is reasonably attributable to the Real Property, determined as follows:

i. In the event the taxes are identified or apportioned by the taxing authorities or are identifiable or apportionable based on valuation or other information furnished by the taxing authority so that the portion of the taxes attributable to the value of the land can be distinguished from the portion of the taxes attributable to the value of the buildings, then as to that portion of the taxes attributable to the value of the land, Ruby Tuesday will pay a percentage of such portion of the taxes determined by dividing the area of the Real Property by the total area of the larger tract, and as to the portion of the taxes attributable to the value of the buildings, Ruby Tuesday will pay the percentage of such portion of the taxes determined by dividing the gross floor area of the Ruby Tuesday restaurant by the gross floor area of all buildings located on the larger tract.

ii. In the event the taxes are not identified or apportioned by the taxing authority and are not identifiable or apportionable based on valuation or other information furnished by the taxing authority so that the portion of the taxes attributable to the value of the land cannot be distinguished from the portion of the taxes attributable to the value of the buildings, then as to all taxes, Ruby Tuesday will pay a percentage of the taxes determined by dividing the area of the Real Property by the total area of the larger tract.

Lessor will notify Ruby Tuesday in writing of any taxes which Ruby Tuesday is required to pay in accordance with the provisions of this Section. Such notification shall be furnished to Ruby Tuesday not less than thirty (30) days before the date such taxes are due or not less than five (5) days after receipt of the tax bill by Lessor, whichever date is later, and shall be accompanied by a copy of the tax bill. Any taxes which Ruby Tuesday is required to pay shall be paid by it no later than the date on which such taxes are due unless the notification by Lessor is received by Ruby Tuesday less than thirty (30) days before the date on which such taxes are due, in which event Ruby Tuesday shall pay such taxes within twenty (20) days after the date of such notification, and Lessor shall be responsible for the payment of any penalties, interest or other charges imposed upon delinquent payment of taxes. In the event the Real Property is a portion of a larger tract, then the written notification by Lessor to Ruby Tuesday of such taxes shall set forth (1) the total taxes on the larger tract accompanied by a copy of the tax bill; (2) whether the total taxes on the larger tract are identifiable or apportionable between land and buildings and if so, the amount of taxes attributable to the land and the amount of taxes attributable to buildings; and (3) Ruby Tuesday's portion of the total taxes together with a statement showing how Ruby Tuesday's portion was calculated in accordance with this Section.

If Ruby Tuesday fails to pay any taxes which it is required to pay within the time period provided above, Lessor may, at its option, pay said taxes, together with any and all penalties and said amount shall become immediately due and payable as additional rent.

Ruby Tuesday shall have the right in its own name, or in Lessor's name where appropriate, but at its own cost and expense, to contest by appropriate proceedings the amount or legality of any taxes which it is obligated to pay hereunder and make application for the reduction thereof, or any assessment upon which the same may be based, and the Lessor agrees, at the request of Ruby Tuesday, to execute or join in the execution of any instruments or documents necessary in connection with such contest or application. If Ruby Tuesday shall contest such tax

assessment, or other imposition, provided the payment of such taxes may legally be held in abeyance, the time within which Ruby Tuesday shall be required to pay the same shall be extended until such contest or application shall have been finally determined, except that Ruby Tuesday shall be responsible for any penalty imposed by the taxing authority resulting from the late payment of taxes due to said contest.

In no event shall Ruby Tuesday be liable for payment of any income, estate or inheritance taxes imposed upon Lessor or the estate of Lessor. Ruby Tuesday shall not pay any income, franchise, excise, sales, taxes assessed by any taxing authority on the rental income received by the Lessor, or excess profits tax levied upon, required to be collected by, or assessed against Lessor.

## 6.  INSURANCE:

Ruby Tuesday hereby covenants and agrees at all times during the original term of this Lease and any renewal term to maintain and keep in force comprehensive general liability insurance against all claims for personal injury, death, or property damage occurring on the Leased Premises with minimum limits of liability of One Million ($1,000,000) Dollars per person, One Million ($1,000,000) Dollars per occurrence and One Million ($1,000,000) Dollars property damage. Ruby Tuesday shall also maintain and keep in force during the original term of this Lease business interruption insurance in such amounts as Ruby Tuesday may reasonably deem appropriate. Ruby Tuesday shall furnish certificates of insurance evidencing payment thereof to Lessor as the same shall be requested in writing from time to time by Lessor. All policies of insurance shall name Lessor and Stafford Development Company as additional insureds.

Ruby Tuesday may effectuate the above insurance coverages through a program of self-insurance, provided Ruby Tuesday maintains a net worth (excluding all intangible assets) in excess of $150,000,000.00 exclusive of (i) intercompany and non-trade receivables, (ii) intangible assets including without limitation patents, trademarks, service marks, goodwill, etc., and (iii) construction in progress.

Ruby Tuesday will indemnify Lessor and save it harmless from and against any and all claims, actions, damages, liability and expense in connection with loss of life, personal injury and/or damage to property arising from or out of the common facilities of the Leased Premises, or the use thereof by Lessor or any of its servants, agents, customers or invitees, or occasioned wholly or in part by any act or omission of Ruby Tuesday, its agents, contractors or employees, except for claims or the portion thereof caused by Lessor, its servants, agents customers, or invitees.

## 7.  UTILITIES AND UTILITY EASEMENTS:

Lessor warrants that all water, sanitary services, storm sewers, electricity, gas, oil and other required utilities (herein collectively referred to as "utilities") are available for connection, and are adequate for Ruby Tuesday's needs. Ruby Tuesday shall have the right to grant easements over, upon and under the Leased Premises for utilities, sewers, ingress and egress, and similar purposes to service the development thereof and the improvements thereon; and Lessor agrees, from time to time upon request by Ruby Tuesday, without any compensation being paid therefor, to join in the granting of such easements and to take any other action necessary to effectuate the same. Ruby Tuesday shall pay all tap, connection, impact, environmental and like charges necessary to bring all utilities to the Leased Premises and which are necessary for Ruby Tuesday to connect to and use all utility services. All traffic impact fees or such other charges and fees which are based in part upon Ruby Tuesday's lease and use of the Leased Premises and associated traffic and in part on use of Lessor's Larger Tract and associated traffic shall be split equitably between Lessor and Ruby Tuesday based on the percentage that each party's usage and traffic was responsible for said charges or fees.

In the event the utilities do not run directly to the Leased Premises from adjacent publicly dedicated streets, Lessor shall also obtain, deliver and record all easements necessary to permit Ruby Tuesday's use, maintenance, repair and replacement of all required utilities. Such easements shall be paramount to any lien on the servient property and shall be in such form and content acceptable to Ruby Tuesday.

8.  **CONSTRUCTION OF IMPROVEMENTS**:

A. **Plans and Elevations**

Lessor acknowledges that it has seen and is familiar with the type of building and related improvements constructed by Ruby Tuesday. Ruby Tuesday shall submit to Lessor a site plan within sixty (60) days of full execution of this Lease. Ruby Tuesday shall submit prototypical plans and elevation drawings for the building to the Lessor prior to or simultaneously with submittal of same to Tift County for permits. Lessor shall not unreasonably withhold its approval of said site plan and detailed plans and elevation drawings (collectively "Plans"). Failure of Lessor to disapprove any of the Plans within five (5) days of Ruby Tuesday submitting said Plans to Lessor shall constitute Lessor's approval of the Plans so submitted. It shall be unreasonable for Lessor to not approve any site plan which is substantially the same as the Site Plan.

Additionally, no reconfiguration of the Wendy's Tract shall be permitted without the written approval of the proposed site plan reconfiguration by Ruby Tuesday, said approval not to be unreasonably withheld, conditioned or delayed. It shall be unreasonable for Ruby Tuesday to not approve any such reconfiguration if the reconfiguration has little or no impact on access to and from, or parking for, the business operating on the Leased Premises.

B. **Zoning, Licenses and Permits**

Lessor represents and warrants that the use of the Leased Premises for a Ruby Tuesday restaurant with adjacent parking is a permitted use under the zoning classification and that Lessor has no knowledge of anything that would prohibit Ruby Tuesday from obtaining all licenses and permits, including, but not limited to, those pertaining to building, occupancy and beer and wine, which are necessary to Ruby Tuesday's business.

Lessor acknowledges that this Lease is contingent upon Ruby Tuesday obtaining all necessary permits, licenses (including, but not limited to, beer and wine licenses for on-premises consumption), variances, easements and approvals pertaining to the building, occupancy, signs, parking, curb cuts, driveways (including ingress and egress to public thoroughfares), zoning, environmental controls, and any other governmental permits which, in the sole judgment of Ruby Tuesday, are necessary to permit it to construct and operate a Ruby Tuesday restaurant with adjacent parking upon the Leased Premises, all at a cost acceptable to Ruby Tuesday. All of said permits, licenses, variances and approvals must be validly and irrevocably granted on terms and conditions and at a cost satisfactory to Ruby Tuesday without qualification, except such qualification as shall be acceptable to Ruby Tuesday, and no longer subject to appeal. Lessor agrees to execute any applications or other documents requested by Ruby Tuesday in order to obtain any permits, licenses, variances and approvals, at no cost or expense to Lessor. Further, this Lease is contingent upon all construction and related costs being acceptable to Ruby Tuesday. Subject to possible extension pursuant to the last paragraph of this Section 8B, in the event any of the contingencies contained in this Lease have not been satisfied within one hundred twenty (120) days from the date on which this Lease is fully executed (said one hundred twenty (120) day period is hereinafter referred to as the "Contingency Period"), then this Lease shall be void at the option of Ruby Tuesday and both parties shall be relieved from any obligations and/or liabilities hereunder, and all deposits and payments made hereunder by Ruby Tuesday shall be refunded to Ruby Tuesday. Unless agreed to otherwise in writing by Ruby Tuesday and Lessor, the failure by Ruby Tuesday to timely cancel and void this Lease pursuant to this paragraph shall constitute a waiver by Ruby Tuesday of any unsatisfied contingency contained in this Lease.

Lessor is in the process of obtaining and shall vigorously pursue obtaining a no further action necessary letter, and simultaneously with or within five (5) days from the full execution of this Lease, Lessor shall execute the environmental indemnity attached as **Exhibit "F"** hereto and incorporated herein by reference, both for the benefit of Ruby Tuesday.

Ruby Tuesday acknowledges that in Tift County, Georgia it is only possible to obtain a license for beer and wine but not liquor.

Notwithstanding anything contained herein to the contrary, Ruby Tuesday may extend the Contingency Period unilaterally by thirty (30) days provided that Ruby Tuesday has begun its application process for all of its necessary permits by the date which is ninety (90) days after the

full execution of this Lease and, thereafter, has been diligently pursuing same until completion.

C. **Survey, Soil Tests and Environmental Tests**

i. Following the effective date of this Lease, Ruby Tuesday, at it own expense, may order a current certified survey of the Leased Premises.

ii. At Ruby Tuesday's expense, Ruby Tuesday may obtain borings and/or soil bearing tests and other tests to determine the suitability of the Leased Premises for building foundations and other improvements which Ruby Tuesday may wish to make, provided, however, that said tests shall be so conducted as not to damage the Leased Premises. If the survey, borings and/or soil bearing tests disclose any condition which, in Ruby Tuesday's judgment, would render the Leased Premises unusable by Ruby Tuesday for the construction and operation of a Ruby Tuesday restaurant with adjacent parking, then by written notice given to Lessor prior to the expiration of the Contingency Period, Ruby Tuesday may terminate this Lease, and both parties shall be relieved from any obligations and/or liabilities hereunder, and all deposits and payments made hereunder by Ruby Tuesday to Lessor shall be refunded to Ruby Tuesday.

D. **Construction**

Other than the work described in Section 23, clause (ii) hereinbelow, Ruby Tuesday shall complete the remaining demolition of the existing building located on the Leased Premises including removal of slabs and footings. Ruby Tuesday shall fill, grade and compact the Leased Premises in such a manner as is adequate for the construction of the buildings which Ruby Tuesday intends to construct on the Leased Premises and otherwise adequate for Ruby Tuesday's intended use. During the course of construction, Ruby Tuesday will relocate the flag pole and the water and air station shown on the Site Plan to the new locations for same, as shown on the Site Plan.

Within ten (10) days of Lessor and Ruby Tuesday executing this Lease, Ruby Tuesday shall deliver into escrow with Chicago Title Insurance Company ("Chicago Title") the sum of **EIGHT THOUSAND EIGHT HUNDRED FIFTY AND 00/100THS DOLLARS ($8,850.00)** ("Funds") as reimbursement for Lessor having demolished the improvements previously located on the Leased Premises. Ruby Tuesday shall direct Chicago Title to hold the Funds pending the end of the Contingency Period, as may be extended. At the end of the Contingency Period, the Funds shall be (i) paid to Lessor, if Ruby Tuesday has not terminated this Lease, or (ii) refunded to Ruby Tuesday, if Ruby Tuesday has terminated this Lease.

9. **ALTERATIONS:**

During the original term or any renewal term of this Lease, Ruby Tuesday may make alterations, additions and improvements to the Leased Premises without the consent of Lessor, and Ruby Tuesday shall have the right to erect and install such other or additional improvements, and equipment on the Leased Premises as Ruby Tuesday may, in its sole judgment, deem desirable for conducting its business thereon or for such other business as Ruby Tuesday may deem advisable; provided, however, that Lessor's consent (which shall not be unreasonably withheld, conditioned or delayed) shall be required for any structural exterior alterations to the Leased Premises.

10. **CASUALTY LOSS:**

If the building or other improvements located on the Leased Premises should be damaged by fire or other casualty so that in the reasonable judgment of Ruby Tuesday the business conducted on the Leased Premises could not be conducted in a normal manner until the buildings and/or improvements are repaired or reconstructed, then Ruby Tuesday may, at its option, either (i) repair or reconstruct the buildings and/or improvements, or (ii) within ninety (90) days after the date of the fire or other casualty return possession of the Leased Premises to Lessor with all buildings removed from the surface of the Leased Premises and after such return of possession of the Leased Premises to the Lessor, all obligations of Ruby Tuesday under this Lease shall terminate. In the event Ruby Tuesday elects (i) to repair or reconstruct the buildings and/or improvements, then (a) Ruby Tuesday must notify Lessor in writing of its intent to do so within

sixty (60) days from the date of casualty; and (b) the reconstruction must be performed in a timely manner, be completed within one hundred eighty (180) days of said notification, and be performed in a professional, good and workmanlike manner; and (c) this Lease shall continue in force and effect except that for so long as the business conducted on the Leased Premises is discontinued by reason of the fire or other casualty (but not for more than eight (8) months) the rent payable under Section 4 hereof shall abate and provided further that the term of the lease then in effect shall be extended for a period equal to the period of rent abatement. Additionally, if the business operating on the Leased Premises must close for any environmental reason not caused by Ruby Tuesday, then this Lease shall continue in force and effect except that for so long as the business conducted on the Leased Premises is discontinued (but not for more than eight (8) months) the rent payable under Section 4 hereof shall abate and provided further that the term of the lease then in effect shall be extended for a period equal to the period of rent abatement.

If the buildings or other improvements located on the Leased Premises should be damaged by fire or other casualty but the damage is sufficiently limited that in the reasonable judgment of Ruby Tuesday the business conducted on the Leased Premises can continue to be conducted in a normal manner while the buildings and improvements are being repaired, then Ruby Tuesday shall repair the buildings and/or improvements and this Lease shall continue in force and effect.

In the event that Ruby Tuesday shall perform the repairs and/or reconstruction required by this Section 10, in accordance with all of the terms and conditions thereof, then Ruby Tuesday shall be entitled to receive the entire insurance proceeds payable as a result of any damage to the buildings or improvements on the Leased Premises occurring during the term of this Lease or any renewal term.

11.   **LIENS PERMITTED:**

A.   **Security Interest in Fixtures Permitted**

Ruby Tuesday shall have the right at any time to grant a security interest in any goods and property of every type and description owned by Ruby Tuesday, and installed or kept on the Leased Premises. Lessor hereby consents to any such security interest and disclaims any interest of any kind in any goods and property installed or kept on the Leased Premises. Lessor agrees that it will, within ten (10) days after any written request by Ruby Tuesday, confirm the foregoing consent and disclaimer in writing.

B.   **Leasehold Mortgages Permitted**

Ruby Tuesday may at any time mortgage, encumber, pledge or assign as security its right, title and interest in and to the leasehold estate created hereby (provided, however, such mortgages and other liens or encumbrances combined shall not exceed the then fair market value of the aggregate of the Leased Premises, and structures and improvements made by Ruby Tuesday to the Leased Premises, except in the event that said encumbrance is a part of a comprehensive loan package secured by other collateral, in addition to the Leased Premises). Ruby Tuesday shall give to Lessor a notice (hereinafter referred to as a "Mortgage Notice") containing the name and address of a lender (hereinafter referred to as a "Mortgage Lender") to which the leasehold estate created hereby has been or will be mortgaged, encumbered, pledged or assigned as security, and the amount of the loan. Upon written request from Ruby Tuesday or any Mortgage Lender identified in a Mortgage Notice, Lessor will acknowledge, in writing, the receipt of any Mortgage Notice which it has received.

Whenever Lessor shall give any notice to Ruby Tuesday pursuant to the Lease, Lessor shall also give to any Mortgage Lender at the address of such Mortgage Lender, a duplicate copy of such notice. The address of the Mortgage Lender shall be the address specified in the Mortgage Notice unless changed by subsequent written notice given by the Mortgage Lender to Lessor. No notice shall be effective unless it is given to all Mortgage Lenders. If at any time a Mortgage Lender shall give to Lessor a written notice that it has released its lien on the leasehold estate created hereby, such lender shall cease to be a Mortgage Lender for purposes hereof and no further notices need be given to it.

If Ruby Tuesday shall not cure or remedy any default or breach of covenant by Ruby

Tuesday under this Lease within the period provided for such cure or remedy, Lessor shall thereupon give notice to that effect to all Mortgage Lenders, which shall thereupon be entitled to exercise any one or more of the following rights:

i. To cure or remedy, or cause to be cured or remedied, within a period of time equal to the period of time allowed by Ruby Tuesday, such default or breach of covenant and Lessor shall accept such cure or remedy; and/or

ii. to acquire by foreclosure or otherwise the leasehold estate created hereby and assume the obligations of Ruby Tuesday under this Lease, including those in default, and, in such event, Lessor shall not exercise its right of termination with respect to such default; and/or

iii. to require Lessor to terminate this Lease by reason of such default and enter into a new lease with the Mortgage Lender for the balance of the lease term at the same rental and upon the same terms, covenants and conditions as contained in this Lease.

In addition to the foregoing rights, a Mortgage Lender may, at any time permitted under its loan documents, foreclose or otherwise realize upon its lien on the leasehold estate created hereby and Lessor will recognize the person, firm or corporation acquiring the leasehold estate created hereby as the lessee hereunder with all of the rights and estate of Ruby Tuesday, provided such person, firm or corporation agrees to assume and be bound by all of the terms, covenants and conditions hereof.

Lessor further agrees that any Mortgage Lender, in order to protect its interest in the leasehold estate created hereby, may exercise any right of renewal granted in Section 2 hereof to Ruby Tuesday and if such right of renewal is not also exercised by Ruby Tuesday, then during such renewal term as exercised by Mortgage Lender, Lessor will recognize the Mortgage Lender as the lessee hereunder with all of the rights and obligations of Ruby Tuesday.

Anything in this Lease to the contrary notwithstanding, the exercise by a Mortgage Lender of its right to foreclose, otherwise acquire, or realize upon its lien the leasehold estate created hereby shall not relieve Ruby Tuesday of its obligations to Lessor under this Lease.

## 12.   LIENS NOT PERMITTED:

Ruby Tuesday shall not, at any time, suffer or permit the attachment to the Leased Premises of any lien for work done or materials furnished in connection with the improvement, maintenance, repair and/or alteration of the Leased Premises by Ruby Tuesday, its employees, or contractors. If any such lien attaches to the Leased Premises and is not discharged or released within sixty (60) days from the earlier of the date (i) of receipt by Ruby Tuesday of written notice of same from Lessor, or (ii) Ruby Tuesday has actual knowledge that said lien has been filed in the public deed records, Lessor may, at its option, pay to the lien claimant the amount of such lien and notify Ruby Tuesday of such payment, in which event such amount shall be immediately due and payable by Ruby Tuesday and shall bear interest at the rate of twelve percent (12%) per annum; provided, however, that if Ruby Tuesday desires to contest said lien, Ruby Tuesday shall furnish to Lessor a bond written by a surety company licensed to do business in the state in which the Leased Premises are located or other security satisfactory to Lessor for an amount at least equal to twice the amount of the lien for the Lessor's protection against all loss or expense, including actual, reasonable attorneys' fees, on account of such asserted lien during the period of contest.

Nothing in this  Lease, nor any approval by Lessor of any of Lessee's construction or contractors, shall be deemed or construed in any way as constituting a request by Lessor, express or implied, to any contractor, sub-contractor, laborer or materialmen for the performance of any labor or the furnishing of any materials for the use or benefit of Lessor. Furthermore, no such contractor, sub-contractor, laborer or materialmen shall have a right to lien the interest of Lessor in the Leased Premises, it being understood that such parties are performing services for and on behalf of Ruby Tuesday and shall have lien rights only against Lessee's leasehold interest under this Lease.

13. **USE AND OCCUPANCY:**

Ruby Tuesday shall use and occupy the Leased Premises in a careful, safe and proper manner, and will not occupy or use said premises or permit the same to be occupied or used for any purpose or business which is unlawful and will, at Ruby Tuesday's sole cost and expense, comply with all lawful requirements of all valid laws, ordinances, rules and regulations of all governmental authorities pertaining to the use and occupancy of the Leased Premises including, without limitation, and to the extent applicable, (i) all federal, state, county, municipal and other governmental statutes, laws, rules, orders, regulations and ordinances affecting the Leased Premises or any part thereof, or the use thereof, including those which require Repairs (as defined in Section 14 hereinbelow); (ii) all rules, orders and regulations of the National Board of Fire Underwriters or other body exercising similar functions and responsibilities in connection with the prevention of fire or the correction of hazardous conditions which apply to the Leased Premises; and (iii) the requirements of all policies of commercial general liability, fire and other insurance which at any time may be in force with respect to the Leased Premises (items (i), (ii), (iii) collectively referred to as "Laws and Regulations"). Ruby Tuesday may contest the validity of any Laws and Regulations by appropriate legal proceedings conducted in good faith and with due diligence, provided Ruby Tuesday shall: (i) give Lessor prior written notice of such contest; (ii) Ruby Tuesday shall first make all contested payments (under protest if it desires) unless such proceeding shall suspend the collection thereof from either Ruby Tuesday, Lessor, the rent payable to Lessor, or the Leased Premises; (iii) no part of the Leased Premises or any interest therein or the rent under this Lease shall be subjected thereby to sale, forfeiture, foreclosure, or interference; (iv) Lessor shall not be exposed thereby to any civil or criminal liability for failure to comply with any such Laws and Regulations, and the Leased Premises shall not be subject to the imposition of any lien as a result of such contest; and (v) Ruby Tuesday shall have furnished any security required in such proceeding to ensure payment of any disputed tax, charge, lien or compliance with any Laws and Regulations. Ruby Tuesday agrees that it shall pay and save Lessor harmless from and against, any and all losses, judgments, decrees, and costs (including all actual attorneys' fees) in connection with any such contest. Ruby Tuesday shall, promptly after the final determination of every contest, fully pay and discharge the amounts which shall be levied, assessed, charged, or imposed or be determined to be payable therein, together with all penalties, fines, interest, costs, and expenses resulting therefrom and will promptly comply with any Laws and Regulations under which compliance is required.

The Leased Premises during the term of this Lease shall not be used for a fast-food restaurant operation (i.e. a restaurant with no waiters providing table service) selling primarily hamburgers, nor for a hotel or motel, nor for a convenience store. In addition, in no event shall any portion of the Leased Premises be utilized for:

   A. an adult type bookstore (or other establishment selling or exhibiting pornographic material);

   B. a massage parlor;

   C. a mortuary;

   D. a mobile home or trailer court, labor camp, junkyard, or stockyard;

   E. a landfill, garbage dump or other facility for the dumping, disposing, incineration or reduction of garbage (but excluding typical dumpsters for the holding of trash from the operation of a restaurant pending pickup/removal by a sanitation company);

   F. any use which is illegal, excessively dangerous, or constitutes a nuisance;

   G. a full-service casual dining restaurant featuring steak as its primary menu item and similar to Longhorn Steakhouse, Outback, Lonestar, Logan's, Roadhouse Grill, Texas Roadhouse, or Tumbleweed, but excluding from this restriction value-oriented restaurants featuring steak as their primary menu item similar to Bonanza, Golden Corral, Ryan's or Western Sizzler; or

   H. a gourmet coffee shop or restaurant similar to Starbucks, Seattle's Best, The Beanery or an establishment that sells:

      a. whole or freshly ground coffee beans for offsite use and consumption (excepting from this restriction grocery stores);

      b. espresso, espresso based coffee drinks or coffee-based drinks (excepting

1    from this restriction restaurants that sell such drinks for on site
2    consumption);

3    c.  tea or tea based drinks (excepting from this restriction restaurants that sell
4     such drinks for on site consumption);

5    d.  gourmet brand-identified brewed coffee (excepting from this restriction
6     restaurants that sell such drinks for on site consumption); and

7    e.  blended beverages, including without limitation, those containing ice,
8     coffee, express, tea, milk, cream, juice and/or fruit (excepting from this
9     restriction restaurants that sell such drinks for on site consumption).

10

11  In the event that, once the business operated by Ruby Tuesday on the Leased Premises
12 opens to the public, said business ceases to operate and remains closed to the public for six (6)
13 consecutive months (except such time as said business may be closed in connection with
14 remodeling, renovation, repairs following a casualty or repairs following condemnation), then,
15 Lessor shall have the right to recapture the Leased Premises in accordance with the terms hereof.
16 In the event Lessor determines it will recapture the Leased Premises, Lessor shall provide notice
17 to Ruby Tuesday, which notice shall specify a termination date (the "Termination Date"). The
18 Termination Date shall be between 30 and 60 days following the notice to Ruby Tuesday from
19 Lessor. The Lease shall terminate on the Termination Date with the same force and effect as if
20 such date were the last day of the term of the Lease or the then-effective extension option period.
21 Both Lessor and Ruby Tuesday shall be relieved of their respective obligations under this Lease
22 as of the Termination Date. If the Termination Date is subsequent to the date which is exactly
23 two (2) years from the effective date of this Lease, then, when Lessor terminates this Lease
24 pursuant to the provisions of this Section 13, Lessor shall pay to Ruby Tuesday, on or prior to the
25 Termination Date, the unamortized net book value of the improvements placed and remaining on
26 the Leased Premises by Ruby Tuesday, as determined in accordance with generally accepted
27 accounting principles ("GAAP") prior to any Statement of Financial Accounting Standards 121,
28 as may be amended or replaced, write down, and based on the GAAP amortization policy used
29 by Ruby Tuesday. At the option of Lessor, said tenant improvements shall remain in the Leased
30 Premises and shall become the property of Lessor, except for those matters containing
31 proprietary marks of Ruby Tuesday.

32

33  **14.**  **MAINTENANCE AND SURRENDER OF PREMISES:**

34

35  At all times during the term of this Lease, including any renewals and extensions thereof,
36 Ruby Tuesday, at its sole cost and expense, shall keep the Leased Premises in good order,
37 condition, and repair, ordinary wear and tear excepted, in a clean, attractive, sanitary,
38 non-hazardous and safe condition, and shall promptly make or cause to be made any and all
39 necessary or appropriate maintenance and repairs (herein collectively referred to as "Repairs").
40 All Repairs shall be at least equal in quality and class to the original work. Lessor shall not be
41 required to make any Repairs in, on, or to the Leased Premises during the term hereof, and
42 Lessor and Ruby Tuesday acknowledge that Ruby Tuesday is in control of the Leased Premises.

43

44  Ruby Tuesday will deliver up and surrender possession of the Leased Premises to Lessor
45 upon the expiration of this Lease, any renewal or extension hereof, or its termination in any way
46 in good condition, normal wear and tear excepted, provided, however, that Ruby Tuesday shall,
47 provided Ruby Tuesday is not in material breach of this Lease, have the right to remove all trade
48 fixtures and equipment therefrom, as further provided in Section 22 hereof; provided, however,
49 that in no event shall Ruby Tuesday be prohibited from removing any items from the Leased
50 Premises containing Ruby Tuesday's logo, trademark or any other proprietary or identifying
51 marks.

52

53  Subject to Section 9, Ruby Tuesday shall also have the right, at Ruby Tuesday's expense,
54 to make changes in the appearance of the improvements located on the Leased Premises, so as to
55 alter the appearance from the appearance of the standard Ruby Tuesday restaurant. Such changes
56 may include painting all or part of the improvements so as to change the scheme and changing
57 the slope and appearance of the fascia on the building.

58

59  Notwithstanding the amount of any work done by Ruby Tuesday under the preceding
60 paragraph, Lessor agrees that, unless the slope and appearance of the fascia have been modified
61 by Ruby Tuesday prior to Ruby Tuesday returning to Lessor possession of the building

constructed by Ruby Tuesday on the Leased Premises, Lessor shall, prior to the time Lessor or any subsequent tenant commences to conduct business in said building, adequately modify or cause any such subsequent tenant to modify the building's fascia by changing the slope of the fascia or by removing the fascia, such that the building would not be mistaken for an operating restaurant owned or operated by Ruby Tuesday or by any of its licensed franchisees.

15.   **DEFAULT BY RUBY TUESDAY:**

A.      Each of the following shall constitute an event of default (an "Event of Default") by Ruby Tuesday under the Lease:

1. The failure of Ruby Tuesday to pay as and when due any payment of rent or additional rent required under this Lease and such failure continues for a period of ten (10) days after written notice thereof from Lessor;

2. The failure of Ruby Tuesday to pay as and when due any item of real estate taxes, insurance premiums or utility payments required of Ruby Tuesday to be paid under this Lease and such failure continues for a period of twenty (20) days after written notice thereof from Lessor;

3. The failure of Ruby Tuesday to pay or perform as and when due any of the other agreements, obligations, covenants and conditions of this Lease to be kept, observed or performed by lessee and such failure continues for more than thirty (30) days after written notice thereof from Lessor. The preceding sentence notwithstanding, if the Event of Default described in this item A. 3. cannot, with due diligence, be cured prior to the expiration of such 30 day cure period, and if Ruby Tuesday commences within such cure period to eliminate the cause of such Event of Default and proceeds diligently thereafter and with reasonable dispatch to take all steps and do all work required to cure such Event of Default, then the cure period shall be extended during the pendency of such cure efforts;

4. The filing of a petition by or against Ruby Tuesday for adjudication as a bankrupt or for reorganization or an arrangement under any laws of the United States or of any state pertaining to bankruptcy, and such petition is not dismissed or discharged within sixty (60) days after the later of the date of filing thereof or the date Lessee is served therewith;

5. The commencement of any action or proceeding for (a) the dissolution or liquidation of Ruby Tuesday, whether instituted by or against Ruby Tuesday, or (b) the appointment of a receiver or trustee for all or substantially all of the property of Ruby Tuesday, if such action or proceeding is not dismissed or discharged within sixty (60) days after the later of the date of filing thereof or the date Ruby Tuesday is served therewith; and

6. Lessee's leasehold interest shall be levied on or taken or attempted to be taken by execution, attachment or other process of law, and such action is not dismissed within sixty (60) days after such levy, taking, or filing;

7. Ruby Tuesday's making a general assignment for the benefit of creditors and such action or proceeding is not dismissed or discharged within thirty (30) days after the date thereof.

B.      Upon the occurrence of an Event of Default, Lessor shall have the right, then or at any time thereafter and while such default or defaults shall continue, to give Ruby Tuesday written notice of Lessor's intention to terminate this Lease on a date specified in such notice, which date shall not be less than five (5) days after the date of giving of such notice, and on the date specified in such notice (the "Termination Date"), Ruby Tuesday's right to possession of the Leased Premises shall cease and Ruby Tuesday shall peaceably and quietly yield to and surrender to Lessor the Leased Premises, and this Lease shall thereupon be terminated and all of the right, title, and interest of Ruby Tuesday hereunder and in the Leased Premises shall wholly cease and expire in the same manner and with the same force and effect as if the Termination Date was the date originally specified in this Lease for the expiration of this Lease and the term of the Lease. Ruby Tuesday shall then immediately quit and surrender the Leased Premises to Lessor, but Ruby Tuesday shall remain liable to Lessor as hereinafter provided.

1. In the event of any termination of this Lease as so stated in B. above, or as otherwise permitted by law, or if an Event of Default shall continue beyond the expiration of

any grace or cure period provided herein and Lessor shall have elected not to terminate the Lease, Lessor may enter upon the premises and have, repossess and enjoy the same by appropriate legal proceedings. In any such event neither Ruby Tuesday nor any person claiming through or under Ruby Tuesday by virtue of any statue or of any order of any court shall be entitled to possession or to remain in possession of the Leased Premises, but shall forthwith quit and surrender the Leased Premises.

2. In case of any such termination, reentry, dispossession by summary proceedings, ejectment, or otherwise, any rent and all other charges which are then due and payable up to the time of such termination, reentry or dispossession but which is then unpaid shall be required to be paid by Ruby Tuesday to Lessor, and Ruby Tuesday shall also pay to Lessor all expenses which Lessor may then or thereafter incur for legal expenses, reasonable and actual attorney's fees, brokerage fees, and all other reasonable costs paid or incurred by Lessor for restoring the Leased Premises to good order and condition, for altering, decorating, repairing and otherwise preparing the same for reletting, for maintaining the Premises and improvements until such reletting, and for reletting the same. In exercising its rights hereunder, Lessor shall have a good faith duty to mitigate its damages.

C.     Lessor's remedies for an Event of Default are intended to be cumulative, and the election by Lessor to pursue one or more available remedies shall not preclude Lessor from electing to pursue any other remedy provided in this Lease, at law, or in equity. Lessor may, by written notice to Ruby Tuesday, at its option but subject to the terms hereof, elect to do and perform any one or more of the following in addition to, and not in limitation of, any other remedy or right permitted Lessor by law, equity, or by this Lease:

1. Relet all or any portion or portions of the Leased Premises for any term and upon such conditions as Lessor deems proper in its reasonable discretion, and receive the rent therefore, and Ruby Tuesday shall pay Lessor any deficiency that may arise by reason of such reletting on demand. However, Ruby Tuesday shall not be entitled to any surplus so arising, except as a credit against Lessor's costs and expenses described in this Section 15 and assessed to Ruby Tuesday. Ruby Tuesday shall reimburse Lessor for all reasonable costs, expenses and reasonable attorneys' fees of Lessor incurred in connection with the default of Ruby Tuesday; termination of this Lease; eviction of Ruby Tuesday; reletting the Leased Premises and preparing the Leased Premises for the new tenant or tenants, including but not limited to commissions; and/or

2. Do whatever Ruby Tuesday is obligated to do by the provisions of this Lease. Ruby Tuesday agrees to reimburse Lessor immediately upon demand for any reasonable costs and expenses, including but not limited to reasonable attorneys' fees, which Lessor may incur in thus effecting compliance with this Lease on behalf of Ruby Tuesday.

No act or thing done by Lessor or Lessor's agents or contractors during the term of this Lease shall be deemed an acceptance of a surrender of the Leased Premises, and no agreement to accept a surrender of the Leased Premises shall be valid, unless the same be made in writing and executed by a duly authorized officer of Lessor. Any waiver of or redress for any violation of any covenant or condition contained in this Lease or any Event of Default shall not prevent a subsequent act or event, which otherwise constitutes a violation or default, from having all the force and effect of an original violation or default. In case it should be necessary or proper for Lessor to bring any action under this Lease, or to consult, or place this Lease or any amount payable by Ruby Tuesday hereunder, with an attorney concerning or for the enforcement of any of Lessor's rights hereunder, then Ruby Tuesday shall, in each and any such case, pay Lessor its reasonable and actual attorneys' fees.

Ruby Tuesday, for itself and any and all persons claiming through or under Ruby Tuesday, including its creditors, upon the termination of this Lease in accordance with the terms hereof, or in the event of entry of judgment for the recovery of the possession of the Leased Premises in any action or proceeding, or if Lessor shall enter the Leased Premises by process of law, hereby waives any right of redemption provided or permitted by any statute, law, or decision now or hereafter in force, and does hereby waive, surrender and give up all privileges which Ruby Tuesday may or might have under and by reason of any present or future law or decision, to redeem the Premises.

## 16.   WARRANTY OF TITLE BY LESSOR:

### A.   Warranty

Lessor hereby warrants, represents and covenants to Ruby Tuesday that: (a) at the time of the execution by Lessor of this Lease and until this Lease or other instrument giving constructive notice of this Lease is recorded, Lessor is the sole owner in fee simple absolute of the Leased Premises and the parties consenting to specific provisions of this Lease are all of the owners in fee simple absolute of Lessor's Larger Tract, and have the right to grant or consent to any easements referred to in this Lease; (b) at the time of the execution by Lessor of this Lease and until this Lease or other instrument giving constructive notice of this Lease is recorded, Lessor has good and marketable fee simple title to the Leased Premises free and clear of all liens and encumbrances except taxes not yet due and payable and other exceptions to title which have been approved in writing by Ruby Tuesday; (c) Lessor does warrant and will defend the title to the Leased Premises and any easements referred to in this Lease, and will indemnify Ruby Tuesday against any damage and expense which Ruby Tuesday may suffer by reason of any lien, encumbrance, restriction or defect in the title or description herein of the premises; (d) Lessor has full right and power to execute this Lease and to lease the Leased Premises and to deliver the easements referred to in this Lease for the term provided in this Lease; (e) the road located behind the Leased Premises as depicted on **Exhibit "G"**, attached hereto and incorporated herein by reference has been deeded to the City of Tifton; and (f) the Sign Lease has been properly signed by all of the appropriate parties and delivered to Ruby Tuesday. In case Lessor or said consenting parties do not have the title and rights aforesaid, then in such event, in addition to any other rights of Ruby Tuesday, this Lease shall, at the option of Ruby Tuesday, become null and void, and no rent for the remainder of the term aforesaid shall become due to the Lessor, its legal representatives or assigns, and all advance rents and other payments shall be returned by the Lessor to Ruby Tuesday.

### B.   Title Searches/Investigations

Ruby Tuesday may elect to carry-out such title searches and other investigations as it deems appropriate to ascertain the state of the Lessor's title and the accuracy of the warranty set out in Section 16 A. hereinabove. In pursuance of same, Ruby Tuesday may obtain, at the expense of Ruby Tuesday, a title insurance policy, with endorsements, issued by a title insurance company ("title insurance company") acceptable to Ruby Tuesday. Lessor agrees to cooperate with Ruby Tuesday in obtaining said policy by delivering, within seven (7) days after notification by Ruby Tuesday or its agent of the name and address of the title insurance company which will furnish the policy, to said title insurance company at such address all title information in Lessor's possession relating to the Leased Premises and thereafter any additional documents as may be required reasonably by the title insurance company to issue its policy of title insurance. Said title insurance policy must insure Ruby Tuesday in the amount of **TWO MILLION AND 00/100THS DOLLARS ($2,000,000.00)** that good and marketable title to the Leased Premises is vested in the Lessor, without exception for any matters including matters which would be disclosed by a survey and inspection and is vested in the Lessor free and clear of all liens and encumbrances except taxes not yet due and payable and other exceptions to title which have been approved in writing by Ruby Tuesday and insure that the leasehold estate created by this Lease is vested in Ruby Tuesday, without exceptions and free and clear of all liens and encumbrances except as aforesaid. In the event that such searches and investigations reveal any liens, encumbrances or exceptions to title other than those specified above or any state of title other than that specified above, or in the event said title insurance policy is not obtainable or shows, or if issued would show, any liens, encumbrances or exceptions to title other than those specified above or any state of title other than that specified above, Ruby Tuesday and/or the title insurance company shall provide Lessor with written notice of those title matters which Ruby Tuesday finds objectionable. In the event Lessor fails to satisfy Ruby Tuesday's title objections on or before the expiration of the Contingency Period, then Ruby Tuesday, at its sole option, may: (a) at Lessor's expense, take any steps necessary to cure such defects in or exceptions to title; provided, however, Lessor's maximum expense hereunder shall not exceed **TWENTY THOUSAND AND 00/100THS DOLLARS ($20,000.00)**; and/or (b) by written notice to Lessor, give Lessor between thirty (30) and ninety (90) days of additional time to satisfy said title objections, and/or (c) by notice to Lessor, terminate this Lease, in which event this Lease shall be null and void and of no further force and effect, and any monies paid by Ruby Tuesday, whether for rent or other security or deposit, shall be forthwith refunded to Ruby Tuesday and Ruby

Tuesday shall be released from any obligations under the terms of this Lease.

## 17.   LEASED PREMISES AS PART OF A LARGER TRACT:

### A.   General Covenants

The Leased Premises are part of a larger tract of land which is described on **Exhibit "H"** hereto (hereinafter "Lessor's Larger Tract"). Lessor agrees that no fences or other obstructions prohibiting access to and from the Leased Premises and Lessor's Larger Tract shall be constructed during the original term of the Lease and any renewal term; that Ruby Tuesday, its employees, customers and invitees shall have access rights on Lessor's Larger Tract; that there are sufficient parking spaces on Lessor's Larger Tract, including the Leased Premises to meet the requirements of any laws, ordinances and regulations; that Ruby Tuesday, its employees, customers and invitees shall have a nonexclusive easement for ingress and egress in, on and over Lessor's Larger Tract to and from all streets, alleys and across ways adjacent to said Lessor's Larger Tract; and that no buildings, signs, or other improvements (including, but not limited to, landscaping) shall be constructed upon Lessor's Larger Tract which will reduce the visibility of Ruby Tuesday's signs or of the Leased Premises from any access streets.  Lessor agrees to keep the Lessor's Larger Tract in good maintenance and repair and in a safe, clean and sanitary condition.  The cost of maintaining and repairing Lessor's Larger Tract and keeping it in a safe, clean and sanitary condition shall be borne solely by Lessor.  All repairs, alterations and maintenance of Lessor's Larger Tract shall be solely the cost of the Lessor and Ruby Tuesday shall not be liable for any portion of the cost of repairs, alterations and maintenance of Lessor's Larger Tract without Ruby Tuesday's prior written consent.

### B.   Interference With Leased Premises

Notwithstanding any rights, reservations and controls resident in the Lessor in this Lease, or any exhibits thereto, Lessor shall do nothing under this Lease which will (1) unreasonably limit the access to Ruby Tuesday's place of business, including, but not limited to, customer accesses and service court areas as shown on the Site Plan; (2) unreasonably interfere with Ruby Tuesday's business; (3) reduce the ratio of parking spaces specified in this Lease or any exhibit thereto; or (4) in any manner interfere with Ruby Tuesday's exterior facade, including, but not limited to, exterior walls, awnings, signs, entrances, and decorative work.

### C.   Temporary Closing of Lessor's Larger Tract

Any temporary closing of the common areas of the Lessor's Larger Tract by the Lessor shall not interfere with customer access to Ruby Tuesday's Leased Premises.  In addition, any temporary closing of the Lessor's Larger Tract by the Lessor to prevent the acquisition of public rights shall not extend past the minimum period of time required by the State law to prevent the acquisition of such public rights, or Ruby Tuesday shall be allowed to abate the payment of Rent required hereunder for each day in excess of the minimum period of closing required by law.

### D.   Lessor's Insurance

Lessor agrees to carry, or cause to be carried, during the term, renewals or extensions hereof, public liability insurance on the common areas of the Lessor's Larger Tract, providing coverage of not less than Two Million ($2,000,000) Dollars against liability for injury or death, and furnish to Ruby Tuesday a certificate evidencing such coverage.

Lessor will indemnify Ruby Tuesday and save it harmless from and against any and all claims, actions, damages, liability and expense in connection with loss of life, personal injury and/or damage to property arising from or out of the common facilities, of Lessor's Larger Tract, or the use thereof by Ruby Tuesday or any of its servants, agents, customers or invitees, or occasioned wholly or in part by any act or omission of Lessor, its agents, contractors or employees, or from the use or occupancy of other portions of the Lessor's Larger Tract by other tenants, except for claims or the portion thereof caused by Ruby Tuesday, its servants, agents, customers or invitees.

At all times during the term of this Lease, Lessor shall pay all premiums for and maintain in effect, with a responsible insurance company or companies, policies of insurance for the

benefit of Lessor and Ruby Tuesday, as their respective interest may appear, insurance covering all of Lessor's Larger Tract and improvements which are part of the Lessor's Larger Tract, including all tenant spaces, without limitation, to the extent of 100% of full replacement of such property against all casualties included in the classification, Fire and Extended Coverage, Vandalism and Malicious Mischief, and including sprinkler leakage and glass coverage. Lessor shall provide Ruby Tuesday with certificates of such insurance. In the event Lessor fails to carry the insurance provided for herein, such failure shall not operate to excuse the Lessor from performing any obligations as if such insurance had been carried by Lessor.

E. **Ruby Tuesday Signs**

Ruby Tuesday shall have the option to erect a pylon-type sign on the Leased Premises at a location to be selected by Ruby Tuesday. In addition, Ruby Tuesday shall have the right to place its sign in the Ruby Tuesday Sign Easement Area, pursuant to the Sign Lease, and to place its desired signage on its building on the Leased Premises.

F. **Lessor's Lighting of Lessor's Larger Tract**

Lessor agrees to keep the parking area adjacent to the Leased Premises on the Holiday Inn side of the Leased Premises lit as is appropriate for the Holiday Inn's 24 hour per day operations.

G. **No Conflict With Other Documents**

The Lessor represents and warrants that at the time of the execution of this Lease during the term hereof, or any extensions hereof, that no cross-easement and/or reciprocal construction operating and easement agreements and/or the Lessor's Certificate of Occupancy and/or any other operating agreement and/or any other lease made by this Lessor for the Lessor's Larger Tract, and/or any other document, shall conflict in any respect with the terms of this Lease.

H. **Storage Trailers**

Ruby Tuesday shall be permitted to place two (2) storage trailers outside the Leased Premises on the Lessor's Larger Tract during Ruby Tuesday's construction period.

I. **Hazardous Materials**

Except as specifically enumerated in the Phase I and the Phase II, the Leased Premises, the Lessor's Larger Tract, and other property involved in this Lease do not contain any asbestos, ureaformaldehyde foamed-in-place insulation, polychlorinated biphenyl ("PCBs"), or any other hazardous, dangerous or toxic materials or other substances, the use, possession, release or disposal of which is regulated by any law, regulation, code or ordinance, including, without limitation, Comprehensive Environmental Response, Compensation and Liability Act, as amended, and the various properties referred to above have not been used for the production, processing, burial, storage (including inground storage tanks), disposal, or release of hazardous materials as referred to herein. Lessor shall save Ruby Tuesday harmless from and for any and all expenses, lawsuits, government investigations, costs of removal, attorney's fees, and the like, associated in any manner whatsoever with the conditions outlined herein. Lessor shall bear all costs associated with removal, construction, reconstruction and the like in the event materials described herein are discovered at any time prior or during the term of this Lease.

The above paragraph notwithstanding, Lessor is not responsible for nor does Lessor make any representations regarding such materials being present above ground within the structures currently in place above ground on the Leased Premises. Further, Lessor shall not be responsible for any such materials or damages or costs related thereto or arising therefrom which are attributable to the activities of Ruby Tuesday, its agents, contractors, invitees, and employees, which such costs and damages shall be the sole responsibility of Ruby Tuesday.

The parties acknowledge that there are monitoring wells located on the Leased Premises. Lessor is responsible for the continued monitoring of the wells. Ruby Tuesday shall replace, relocate or repair any of the monitoring wells damaged or rendered permanently inaccessible by reason of construction of the Ruby Tuesday restaurant on the Leased Premises.

J. **Lessor's Maintenance**

The Lessor shall maintain the common areas of the Lessor's Larger Tract in a manner consistent with the standards of a first class regional Shopping Center.

18.   **QUIET ENJOYMENT:**

Lessor hereby covenants and agrees that if Ruby Tuesday shall not then be in default beyond any period for the cure thereof, Ruby Tuesday shall, at all times during the original term of this Lease and any renewal term, have peaceable and quiet enjoyment and possession of the Leased Premises without any manner of let or hindrance from the Lessor or any other person, firm or corporation.

19.   **ENVIRONMENTAL MATTERS:**

A. **Definitions**

For the purposes hereof, the following definitions shall apply:

i. "Law or Regulation" means and includes the Comprehensive Environmental Response Compensation and Liability Act ("CERCLA" or the Federal Superfund Act) as amended by the Superfund Amendments and Reauthorization Act of 1986 ("SARA") 42 U.S.C., Sections 9601-9675; the Federal Resource Conservation and Recovery Act of 1876 ("RCRA"); the Clean Water Act, 33 U.S.C., Section 1321, et seq.; the Clean Air Act, 42 U.S.C., Section 7401, et seq., all as the same may be from time to time amended and any other federal, state, county, municipal, local or other statute, law, ordinance or regulation which may relate to or deal with human health or the environment, including, without limitation, all regulations promulgated by a regulatory body pursuant to any such statute, law or ordinance.

ii. "Hazardous Substance or Materials" means asbestos, ureaformaldehyde, polychlorinated biphenyls, nuclear fuel or materials, chemical waste, radioactive materials, explosives, known carcinogens, petroleum products or other dangerous, toxic, or hazardous pollutant, contaminant, chemical, material or substance defined as hazardous or as a pollutant or contaminant in, or the release or disposal of which is regulated by, any Law or Regulation.

B. **Representations and Warranties**

i. Except as set forth in the Phase I and in the Phase II, to the best of Lessor's knowledge, Lessor represents and warrants that:

(1)        Intentionally omitted.

(2)        Intentionally omitted.

(3)        Other than as disclosed by the environmental reports listed in Subsection (5) hereinbelow, there are no past or present investigations, administrative proceedings, litigation, regulatory hearings or other action proposed, threatened or pending, alleging non-compliance with or violation of any Law or Regulation or relating to any required environmental permits, and Lessor has not, nor has any third party on behalf of, or in privity with, Lessor, violated any Law or Regulation.

(4)        The Leased Premises are not listed in the United States Environmental Protection Agency's National Priorities List of Hazardous Waste Sites nor any other list, schedule, log, inventory or record of hazardous waste sites maintained by any state, federal or local agency.

(5)        Lessor has disclosed to Ruby Tuesday all reports and investigations commissioned by Lessor and relating to Hazardous Substances and the Leased Premises. The reports and information disclosed by Lessor to Ruby Tuesday include the following:

(a)    Corrective Action Plan, Part A, dated 8/30/2002 prepared for Swifty Serve Convenience Stores, Inc. by Cobb Environmental & Technical Services, 779B Holley Hill Drive, Tupelo, MS 38801.

(b)    Limited Phase II Environmental Site Assessment Report dated 5/16/03 prepared for Stafford Properties, Inc by Georgia Oilmen's Services, Inc. 300 Corporate Center Court, Stockbridge, GA 30281.

(c)    Corrective Action Plan-Part A Addendum dated 7/15/03 prepared for Stafford RT LLC by Georgia Oilmen's Services, Inc. 300 Corporate Center Court, Stockbridge, GA 30281.

(d)    Closure Report dated 10/10/03 prepared for Stafford RT LLC by Georgia Oilmen's Services, Inc. 300 Corporate Center Court, Stockbridge, GA 30281.

(6)    There are not now any above ground or underground storage tanks located in or under the Leased Premises. The Leased Premises have never been used as a landfill.

(7)    Intentionally omitted.

ii. All representations and warranties herein contained shall be deemed to be continuing and shall survive the expiration or early termination of the Lease.

iii. If any representation or warranty herein contained shall be, or be found to be, false, inaccurate or misleading, then, provided such breach of representation or warranty substantially interferes with Ruby Tuesday's use and enjoyment of the Leased Premises, Ruby Tuesday shall be entitled to terminate this Lease, or to recover as damages, in addition to all other damages legally recoverable, all costs and expenses incurred in correcting or remedying such error including all costs of defending any regulatory or governmental action resulting from such error including, without limitation, attorneys and experts fees and disbursements.

## 20.    PAYMENTS:

Lessor hereby covenants and agrees that, in the event Lessor shall fail to make the payments on any taxes or other payments on the Leased Premises which Lessor is required to pay, Ruby Tuesday may, but shall not be required to, make such tax payments or such other payments or do such acts and things as may be necessary to keep the taxes on the Leased Premises from being in default, and all such sums expended by Ruby Tuesday shall become immediately due and payable to Ruby Tuesday by Lessor. When due, said sums shall bear interest at the rate of twelve (12%) percent per annum and may be offset by Ruby Tuesday against future rentals.

## 21.    DEFAULT BY LESSOR:

If Lessor shall breach any warranty or fail to perform any covenant required to be performed by Lessor under the terms of this Lease and such breach or failure shall continue for a period of thirty (30) days after receipt by Lessor of written notice thereof from Ruby Tuesday or if Lessor shall fail to pay any sums due to Ruby Tuesday hereunder, and such failure shall continue for a period of thirty (30) days after receipt by Lessor of written notice thereof from Ruby Tuesday, then Ruby Tuesday may, in addition to any of Ruby Tuesday's other rights set forth elsewhere in this Lease, (a) cure any default or breach of warranty of Lessor hereunder, and perform any covenants which Lessor has failed to perform, and any sums expended by Ruby Tuesday in curing such default or breach of warranty and performing such covenants shall be paid by Lessor to Ruby Tuesday immediately upon demand, shall bear interest at the rate of twelve (12%) percent per annum from the date of demand, and may be offset by Ruby Tuesday against future rentals; (b) bring suit to recover from Lessor all sums due Ruby Tuesday from Lessor together with interest at the rate of twelve (12%) percent per annum thereon; and/or (c) for a material breach which interferes with Ruby Tuesday's use and enjoyment of the Leased

Premises, declare this Lease to be terminated, in which event Ruby Tuesday shall have no further liability hereunder.

The preceding paragraph notwithstanding, if the default by Lessor described in this paragraph cannot, with due diligence, be cured prior to the expiration of such 30 day cure period, and if Lessor commences within such cure period to eliminate the cause of such default and proceeds diligently thereafter and with reasonable dispatch to take all steps and do all work required to cure such default, then the cure period shall be extended during the pendency of such cure efforts.

22.    **TITLE TO BUILDINGS, IMPROVEMENTS, FIXTURES AND EQUIPMENT:**

Trade fixtures shall be defined in this Lease to include, without limitation, and by way of illustration only, kitchen plumbing fixtures (except sanitary plumbing fixtures), counters, stainless steel equipment, kitchen equipment, such as ranges, display cases, refrigeration equipment, including the machinery installed in the walk-in cooler built into the Leased Premises, Ruby Tuesday's decorative items, air conditioning equipment, heating equipment, boilers, cashiers' stands, tables, chairs, benches, booths, decorative, special lighting fixtures, pictures, mirrors, decorative wall items, room partitions, Ruby Tuesday's decorative items in the dining areas, such as chandeliers, wall ornaments, stained, beveled and leaded glass, special doors and special lighting fixtures, and all such other fixtures or equipment as Ruby Tuesday may, from time to time, place in or upon the Leased Premises. Any or all of Ruby Tuesday's trade fixtures may, at Ruby Tuesday's option, be removed from the Leased Premises from time to time and may, at Ruby Tuesday's or Lessor's option, be removed upon the expiration of this Lease provided Ruby Tuesday is not in material breach of this Lease; except that in no event shall Ruby Tuesday be prohibited from removing any items from the Leased Premises containing Ruby Tuesday's logo, trademark or any other proprietary or identifying marks.

Title to the building and all other improvements on the Leased Premises and any repairs, alterations, additions or improvements to said building or improvements shall be vested in and remain in Ruby Tuesday's at all times during the original term of this Lease and any renewal or extension thereof. Upon the expiration of this Lease, any extension or renewal hereof, or its termination in any way, title to the building and any improvements shall automatically pass to and become vested in the Lessor and Ruby Tuesday shall, upon request of Lessor, execute such quit claim deed, bill of sale, or assignment as may be necessary to evidence the transfer of such title to Lessor.

23.    INTENTIONALLY OMITTED

24.    **BROKERS:**

Lessor represents and warrants that all brokerage charges, if any, in connection with this Lease shall be paid by Lessor. Specifically, Lessor agrees to pay Chaliff Properties the sum of **THIRTY-FIVE THOUSAND AND 00/100THS DOLLARS ($35,000.00)**, payable as follows: fifty percent (50%) at the end of the Contingency Period; balance due upon the Commencement Date and payment of first installment of rent. Lessor shall indemnify and hold Ruby Tuesday harmless for any claims made against Ruby Tuesday by any broker acting or claiming to act on behalf of Lessor. Ruby Tuesday shall indemnify and hold Lessor harmless for any claims made against Lessor by any broker acting or claiming to act on behalf of Ruby Tuesday over and above the above specified $35,000.00 payable to Chaliff Properties. The indemnifications and hold harmless provisions of this paragraph include, but are not limited to, court costs, reasonable attorney fees and other professional fees and expenses, including the cost of any appeals.

25. **APPROPRIATION:**

If all or any part of the Leased Premises shall be appropriated or condemned by any public or quasi-public authority in the exercise of its right of condemnation or eminent domain, both Ruby Tuesday and Lessor shall have the right to prosecute a claim for an award and to share in the proceeds of any and all awards based upon their respective interests as hereafter set forth. If all the Leased Premises shall be appropriated or condemned, this Lease shall terminate as of the time when possession shall be required by such public or quasi-public authority. Lessor shall be entitled to receive that portion of any and all awards necessary to compensate it for the present

value of the rents which it would have received in the future and for the present value of its reversionary interest, and notwithstanding the termination of this Lease, Ruby Tuesday shall be entitled to that portion of any and all awards necessary to compensate it for the value of its improvements to the Leased Premises, the value of its leasehold estate and the damages which it may sustain as a result of termination of the Lease prior to the end of the term, including any renewal terms.

In the event that a part of the Leased Premises shall be taken or condemned and that: (a) the part so taken includes the building on the Leased Premises or any part thereof, or (b) the part so taken shall remove from the Leased Premises and the Ruby Tuesday Exclusive Parking Area, taken as a whole, twenty-five (25%) percent or more of the total parking area thereof or more than five (5) parking spaces for automobiles, whichever is greater, or (c) such partial taking shall substantially limit access to the Leased Premises in a way that materially affects Ruby Tuesday's intended use and enjoyment thereof, or (d) such partial taking shall result in cutting off direct access from the Leased Premises to any adjacent public street or highway, or the permanent closing or relocation of any street adjoining the Leased Premises to which there is direct access to and from the Leased Premises materially impairs or adversely affects Ruby Tuesday's use of the Leased Premises and the Lessor is unable to promptly provide Ruby Tuesday with a suitable alternate means of access, in Ruby Tuesday's sole opinion, then and in any such event, Ruby Tuesday may, at any time either prior to or within a period of sixty (60) days after the date when the condemning authority shall require possession of the part of the Leased Premises taken or condemned, elect to terminate this Lease. In the event Ruby Tuesday elects to terminate this Lease, Lessor shall be entitled to receive that portion of any and all awards necessary to compensate it for the present value of the rents which it would have received in the future and for the present value of its reversionary interest, and notwithstanding the termination of this Lease, Ruby Tuesday shall be entitled to that portion of any and all awards necessary to compensate it for the value of its improvements to the Leased Premises, the value of its leasehold estate and the damages which it may sustain as a result of termination of the Lease prior to the end of the term, including any renewal terms. In the event that Ruby Tuesday shall not elect to terminate this Lease or in the event that a part of the Leased Premises shall be taken or condemned under circumstances under which Ruby Tuesday will have no such election, then and in either event, Ruby Tuesday shall receive so much of any and all awards as is necessary to pay for repairs to and alterations of the improvements on the Leased Premises for the purpose of restoring the same to an economic architectural unit, susceptible to the same use as that which was in effect immediately prior to such taking, and Lessor shall receive the balance, if any, of any awards. In the event that this Lease shall not terminate after any part of the Leased Premises is taken or condemned, there shall be a reduction in rental equal to the lesser of (a) the percentage to the ground area of the Leased Premises which is taken or condemned or (b) the percentage by which the gross sales made by Ruby Tuesday at the Leased Premises during the one year following the date on which the condemning authority takes possession of part of the premises are less than the gross sales during the one year immediately preceding the date of possession by the condemning authority.

In the event that ingress to and/or egress from the Leased Premises are, in a way that materially affects Ruby Tuesday's intended use and enjoyment thereof, blocked or partially blocked as a result of any road construction or other improvements, Lessor agrees to waive all of Ruby Tuesday's obligations during such period of construction or improvement, provided that Ruby Tuesday shall not be relieved from its obligation to pay taxes and other charges and to keep the premises insured.

## 26.   SUBORDINATION AND NON-DISTURBANCE:

### A.   Future Mortgages/Deeds of Trust

This Lease shall, at the election of the Lessor, be superior or be subject and subordinate to the lien of any mortgage and/or deed of trust which Lessor may hereafter place upon the premises provided that (1) if there are no defaults hereunder on the part of Ruby Tuesday the right of possession of Ruby Tuesday to the Leased Premises and Ruby Tuesday's rights arising out of this Lease shall not be affected or disturbed by the mortgagee or trustee or beneficiary under the mortgage and/or deed of trust in the exercise of any of its rights under the mortgage, deed of trust or the notes secured thereby; (2) Ruby Tuesday shall not in any foreclosure or other proceeding under the mortgage or deed of trust nor in any other way be deprived of its rights under this

Lease, nor shall this Lease be terminated or affected by any foreclosure or sale or any proceeding under any mortgage or deed of trust; and (3) the mortgagee, trustee and/or beneficiary execute and deliver to Ruby Tuesday an Agreement of Attornment and Non-Disturbance in form acceptable to Ruby Tuesday prior to the execution of the mortgage or deed of trust. Lessor agrees that in the event of any foreclosure of the mortgage or deed of trust, Ruby Tuesday shall have the right to withhold the payment of any rentals due hereunder and pay the same directly to the mortgagee or trustee in satisfaction of said indebtedness.

### B. Presently Existing Mortgages/Deeds of Trust

Prior to the expiration of the Contingency Period, Lessor, at Lessor's sole cost and expense, shall provide Ruby Tuesday with non-disturbance and attornment agreements in a form which is acceptable to Ruby Tuesday, executed by all entities or parties  presently holding mortgages, deeds of trust or other liens upon the Leased Premises.

### 27.   ESTOPPEL INSTRUMENTS:

At any time and from time to time upon the written request of either of the parties hereto or any Mortgage Lender, Lessor or Ruby Tuesday, as the case may be, shall deliver to the party requesting the same a certificate executed in recordable form stating (i) whether or not this Lease is in full force and effect, (ii) whether or not any rights to renew the term of this Lease have been exercised and the date on which this Lease will terminate, (iii) whether or not this Lease has been modified or amended in any way and attaching a copy of such modification or amendment, (iv) whether or not there are any existing defaults under this Lease to the knowledge of the party executing the certificate, and specifying the nature of such defaults, if any, (v) the status of rent payments and (vi) any other facts regarding the operation of the Lease which the Mortgage Lender may reasonably request.

### 28.   ASSIGNMENT, SUBLETTING AND FRANCHISING BY RUBY TUESDAY:

Ruby Tuesday shall have the right to assign this Lease or let or underlet the whole or any part of the Leased Premises without the consent of Lessor, provided that Ruby Tuesday remains liable on this Lease.  Notwithstanding any provision to the contrary, Ruby Tuesday shall be released from its obligations under this Lease if the assignee of this Lease has a tangible net worth of at least $150 Million Dollars based upon a recent audited financial statement exclusive of (i) intercompany and non-trade receivables, (ii) intangible assets including without limitation patents, trademarks, service marks, goodwill, etc., and (iii) construction in progress.

Notwithstanding anything contained in this Lease, Ruby Tuesday is expressly authorized, without the consent of the Lessor, to sublet the Leased Premises to an authorized franchisee, provided such subletting is specifically subject to the terms of this Lease and further provided Ruby Tuesday remains liable for the performance of the terms of this Lease and provided the franchisee expressly assumes all obligations of the Lease. Ruby Tuesday agrees to notify Lessor as to the name of the franchisee within ten (10) days after any such subletting.

### 29.   INJUNCTION:

In addition to all other remedies, Lessor and Ruby Tuesday are entitled to the restraint by injunction of all violations, actual, attempted or threatened of any covenant, condition or provision of this Lease.

### 30.   ATTORNEY'S FEES:

In the event of any suit, action or proceeding at law or in equity, by either of the parties hereto against the other by reason of any manner or thing arising out of this Lease, the prevailing party shall recover, not only its legal costs, but a reasonable attorney's fee (to be figured by the Court) for the maintenance or defense of said action or suit, as the case may be.

### 31.   FORCE MAJEURE:

Lessor and/or Ruby Tuesday shall be excused for the period of any delay and shall not be deemed in default with respect to the performance of any of the terms, covenants, and conditions

of this Lease when prevented from so doing by cause or causes beyond the Lessor's and/or Ruby Tuesday's control, which shall include, without limitation, all labor disputes, governmental regulations or controls, fire or other casualty, inability to obtain any material, services, acts of God, or any other cause, whether similar or dissimilar to the foregoing, not within the control of the Lessor and/or Ruby Tuesday. This paragraph shall not excuse the failure to pay rent or other monetary debts pursuant to this Lease as and when due.

## 32. <u>NON-MERGER</u>:

During the term of this Lease, the leasehold estate of Ruby Tuesday shall not merge with the fee simple or other estate in the Leased Premises but shall always remain separate and distinct, notwithstanding the union of all or any part of said estate either in the Lessor or Ruby Tuesday, or in a third party by purchase or otherwise, unless and until all persons having an interest therein, including a leasehold mortgagee, shall join in a written instrument consenting to or effecting such merger.

## 33. <u>RIGHT OF FIRST REFUSAL</u>:

From and after the effective date and during the term of this Lease hereof, Ruby Tuesday shall have the right of first refusal and Lessor shall not sell, transfer or otherwise dispose of all or part of Lessor's interest in the Leased Premises until and unless Lessor shall have: (a) obtained a bona fide offer therefor; (b) given notice to Ruby Tuesday, which notice shall contain (i) the name of the offeror, (ii) the address of the offeror, (iii) all of the terms and conditions of such bona fide offer, and (iv) a true and accurate copy of the actual bona fide offer ("Lessor's Notice"); and (c) offered to sell, transfer or otherwise dispose of such interest to Ruby Tuesday at the same price and, except as hereinafter provided, upon the same terms and conditions contained in said bona fide offer.

If Ruby Tuesday shall either give notice of rejection of said offer to it or fail to give notice of acceptance of the same within thirty (30) days after the date of receipt of Lessor's Notice, Lessor's interest in the Leased Premises may, during the ninety (90) days thereafter, be sold, transferred or otherwise disposed of to the original offeror at the same price and upon the same terms and conditions contained in said bona fide offer as disclosed in writing to Ruby Tuesday.

In the event Ruby Tuesday rejects said offer or fails to accept the same, this Lease and all of its terms and conditions (including this right of first refusal) shall nevertheless remain in full force and effect and Lessor and any purchaser or purchasers of the Leased Premises shall be bound thereby.

Failure of Ruby Tuesday to exercise this right of first refusal on one or more occasions shall not affect Ruby Tuesday's right to exercise it on any subsequent occasion. Any sale or transfer of the Leased Premises, or any part thereof, other than in strict compliance with the terms of this section shall be absolutely null and void and of no effect as to Ruby Tuesday, and Ruby Tuesday shall be entitled to purchase the Leased Premises from the purchaser upon the same terms and conditions and at the same price specified in said bona fide offer, provided Ruby Tuesday notifies Lessor of its election thirty (30) days after receipt of Lessor's Notice which complies with the requirements hereof. Payment of rental to such purchaser or otherwise treating such purchaser as the Lessor shall not be deemed to be a waiver of any right of first refusal or any other right or privilege of Ruby Tuesday and shall not create an estoppel with respect thereto.

Any sale or transfer of Lessor's interest in the Leased Premises, or any part thereof, or of any larger parcel of which the Leased Premises may be a part, shall be expressly made subject to all of the terms, covenants and conditions of this Lease. Notwithstanding anything contained herein to the contrary, in the event said offer provides for the sale and purchase of Lessor's interest in the Leased Premises and other property, Ruby Tuesday shall be required to purchase all of the property contained in said offer, in the event it desires to exercise its right of first refusal hereunder.

In the event Ruby Tuesday exercises its right of first refusal then, notwithstanding the terms of the offer (a) Lessor shall convey title by limited warranty deed approved by Ruby Tuesday and the title company; (b) title to the Leased Premises shall be free and clear of any liens

and encumbrances except the lien for current taxes which are not delinquent at the time of closing and such other exceptions to title as have been agreed to in writing by Ruby Tuesday, (c) title to the Leased Premises shall otherwise comply with the terms of this Lease as they pertain to condition of title, and (d) any easements or other rights benefiting the Leased Premises at the time of closing shall be made perpetual and shall be included in the deed or in a separate recordable instrument approved by Ruby Tuesday and the title insurance company insuring its interest.

The closing for re-purchase by Ruby Tuesday must occur by the earlier of (a) ninety (90) days after Ruby Tuesday receives Lessor's Notice from Lessor, or (b) sixty (60) days after Ruby Tuesday notifies Lessor of its intent to exercise its rights hereunder and repurchase the Leased Premises.

Notwithstanding anything contained herein to the contrary, Ruby Tuesday shall have no right of first refusal hereunder in the case of a transfer of the fee simple interest of the Leased Premises between or among entities controlled (at least fifty percent [50%] ownership) by Stafford RT, LLC, a Georgia limited liability company or Stafford Development Company.

## 34.   INTENTIONALLY OMITTED

## 35.   NON-WAIVER:

The failure of the Lessor or Ruby Tuesday to enforce any of the right given to it under this Lease by reason of the violation of any of the covenants in this Lease to be performed by Ruby Tuesday or Lessor shall not be construed as a waiver of the rights of the Lessor or Ruby Tuesday to exercise any such rights as to any subsequent violations of such covenants, or as a waiver of any of the rights given to the Lessor or Ruby Tuesday by reason of the violation of any of the other covenants of this Lease.

## 36.   HOLDING OVER:

In the event Ruby Tuesday remains in possession of the Leased Premises after the expiration of this Lease and without the execution of a new Lease, Ruby Tuesday shall be deemed to be occupying the Leased Premises as a tenant from month to month at a rental equal to two (2) times the monthly rental provided for herein and otherwise subject to all the conditions, provisions and obligations of this Lease insofar as they are applicable to month to month tenancy.

## 37.   RECORDABLE LEASE:

Lessor agrees that upon request from Ruby Tuesday and prior to the expiration of the Contingency Period, Lessor will promptly execute and deliver to Ruby Tuesday a memorandum or short form lease (hereinafter "Memorandum of Lease") in the same form and content as the Memorandum of Ground Lease attached as **Exhibit "I"** hereto, prepared by Ruby Tuesday, to be recorded in the public office in which records relating to the Leased Premises are kept and take such other and further reasonable action as may be reasonably necessary to give all persons now or hereafter interested in title to the Leased Premises notice of the existence of this Lease, including such terms and provisions as Ruby Tuesday deems appropriate, provided, however, that unless specifically requested by Ruby Tuesday, no copy of this Lease or other instrument shall be filed for record which sets forth the rental provisions contained herein. Specifically, the Lessor agrees to execute such reasonable further documentation which may be reasonably required to insure that the renewal rights and rights of first refusal granted hereunder are recorded on title. The parties hereto agree that the legal descriptions used in this Memorandum of Lease shall, at the option of Ruby Tuesday, be those prepared by the surveyor pursuant to Section 8(C) hereinabove. Ruby Tuesday shall pay all costs charged by the state and county to record this Memorandum of Lease.

Notwithstanding anything contained herein to the contrary, the parties agree that the Memorandum of Lease attached as **Exhibit "J"** hereto is acceptable to the parties.

## 38.   CONSTRUCTION OF LEASE:

Words of any gender used in this Lease shall be held to include any other gender, and

words in the singular number shall be held to include the plural, when the sense requires. Wherever used herein, the words "Lessor" and "Ruby Tuesday" shall be deemed to include the heirs, personal representatives, legal representatives, successors, sublessees and assigns of said parties, unless the context excludes such construction.

### 39.   INVALIDITY OF PROVISIONS:

If any term or provision of this Lease or the application thereof to any person or circumstances shall to any extent, be invalid or unenforceable, the remainder of this Lease, or the application of such term or provision to persons whose circumstances are other than those as to which it is held invalid or unenforceable, shall not be affected thereby.

### 40.   SERVICE OF NOTICE:

Notices hereunder shall be in writing signed by the party serving the same and shall be sent by Registered or Certified U. S. Mail, Return Receipt Requested, postage prepaid, or by private express mail service, and (a) if intended for Lessor, shall be addressed to:

>           Stafford RT, LLC
>           1805 U.S. Highway 82 West
>           P.O. Box 269
>           Tifton, Georgia  31793
>           Attn:  President
>
>           with a copy to:
>           Stafford Properties, Inc.
>           80 West Wieuca Street
>           Suite 302
>           Atlanta, Georgia  30342
>           Attn:  Mike Puckett

and (b) if intended for Ruby Tuesday, shall be addressed to:

>           Ruby Tuesday, Inc.
>           Attention:  Legal Department
>           150 West Church Avenue
>           Maryville, Tennessee 37801

or to such other addresses as either party may have furnished to the other from time to time as a place for the service of Notice. Any Notice so mailed shall be deemed to have been "given" as of the time said Notice is received or refused.

### 41.   LESSOR REPRESENTATIONS:

The Lessor hereby warrants, represents and acknowledges the following:

A.  Lessor is a duly constituted and validly existing Georgia limited liability company and has the full power to carry out the transactions contemplated by this Lease.

B.  All partnership or corporate and other proceedings required to be taken on the part of Lessor to authorize Lessor to execute and deliver this Lease and to consummate the transaction contemplated have been duly and validly taken.

C.  Intentionally omitted.

D.  The execution, delivery and performance of the Lease will not conflict in any way with the applicable partnership or corporate documents, and will not conflict or result in a breach or default under any note, lease, mortgage, indenture, contract or commitment to which Lessor is a party or by which Lessor may be bound.

E.  The title to the real property upon which the Lessor's Larger Tract and the Leased Premises are located are vested in the Lessor and the Lessor's Larger Tract and the Leased

Premises as described in the Lease are properly zoned for the construction and operation of the business contemplated by Ruby Tuesday under this Lease.

F.  Intentionally omitted.

G.  There are no documents of record superior to the Lease other than those described in **Exhibit "J"**, attached hereto and made a part hereof. Prior to the end of the Contingency Period, Lessor agrees to execute the Termination Agreement attached as **Exhibit "K"** hereto.

H.  There are no pending or threatened lawsuits of any nature which in any way affect title to the real property upon which the Lessor's Larger Tract and the Leased Premises are located, affect in any way the organization or solvency of the Lessor, or in any way affect the validity and enforceabilty of this Lease, or in any way affect the rights of Ruby Tuesday under the terms of this Lease.

I.  It is not necessary, under applicable law, that the Lease and/or a Short Form Lease be recorded for the Lease to be effective.

J.  This Lease does not violate or conflict in any material way with (such as, but not limited to, provisions relating to exclusives, sale of food, sale of alcoholic beverages, exterior signage, hours of operation, or the like) the terms of any other Lease applicable to the Lessor's Larger Tract or the terms of any reciprocal operating agreement, cross easement agreement, restrictive covenants, or any other document.

K.  Intentionally omitted.

**42.   INTENTIONALLY OMITTED**

**43.   ESTATE IN LAND:**

It is the intention of the Lessor to create, in favor of Ruby Tuesday, a leasehold estate in land, which estate shall be vested in Ruby Tuesday from the date of execution hereof and shall continue for the full original term and all renewal terms of this Lease.  Said estate in land shall be subject to divestment only by reason of Ruby Tuesday's election not to exercise its right of renewal or by reason of the earlier termination of this Lease by one of the parties hereto in accordance with the provisions of this Lease.

**44.   SURVIVAL OF LEASE COVENANTS:**

The terms, conditions and covenants of this Lease shall be binding upon and shall inure to the benefit of each of the parties hereto, their heirs, personal representatives, legal representatives, successors or assigns, and shall run with the land.

**45.   HEADINGS:**

It is understood and agreed that the headings are inserted only as a matter of convenience and for reference, and in no way define, limit or describe the scope or intent of this Lease, nor in any way affect this Lease.

**46.   ENTIRE AGREEMENT:**

This Lease contains the entire agreement between the parties and any agreement hereafter made shall be ineffective to change, modify or discharge it in whole or in part unless such agreement is in writing and signed by the party against whom enforcement of the change, modification or discharge is sought.

**47.   COUNTERPARTS:**

This Lease may be executed simultaneously in several counterparts, each of which will be deemed an original, but all of which together will constitute one in the same instrument.

48. **EFFECTIVE DATE OF LEASE:**

The effective date of this Lease shall be considered to be the date of the last execution hereof as shown with the signatures below.

49. **HOLIDAY; NON-BUSINESS DAY; OR BUSINESS DAY:**

If any date set forth in this Lease is to occur on a holiday or other non-business day, or if any period of time set forth in this Lease expires on a holiday or non-business day, then such expiration date shall be extended to the next business day thereafter. As used in this paragraph and in this Lease, the terms "holiday," "non-business day," and "business day" shall have the following meanings:

      i.    "holiday" shall mean those dates upon which nationally chartered banks of the United States of America are not open for business;

      ii.    "non-business day" shall mean holidays and Saturday and Sunday; and

      iii.    "business day" shall mean any day that is not either a holiday or a non-business day.

50. **INTENTIONALLY OMITTED**

| | |
|---|---|
| Exhibit "A" | **Depiction of Leased Premises** |
| Exhibit "A-1" | **Legal Description of Leased Premises** |
| Exhibit "B" | **Site Plan** |
| Exhibit "B-1" | **Depiction of Ruby Tuesday Sign Area** |
| Exhibit "C" | **Sign Lease** |
| Exhibit "D" | **Rent Schedule** |
| Exhibit "E" | **Intentionally Omitted** |
| Exhibit "F" | **Agreement (environmental indemnity)** |
| Exhibit "G" | **Road** |
| Exhibit "H" | **Legal Description of Lessor's Larger Tract** |
| Exhibit "I" | **Memorandum of Ground Lease** |
| Exhibit "J" | **Documents Superior to the Lease** |
| Exhibit "K" | **Termination of Easement** |

**SIGNATURES ON PAGE 27**

**IN WITNESS WHEREOF,** the parties have caused this Lease to be executed on the date appearing together with their signatures below.

WITNESSES:

**LESSOR:**

**STAFFORD RT, LLC**
a Georgia limited liability company

By:  **Stafford Development Company**
    a Georgia corporation
    Its:  Managing Member

By: _____
    **DENEAN STAFFORD**
    **President and CEO**

ATTEST:

By: _____
    Its: _____

Date: _12-/8-03_

WITNESSES:

a _____

By: _____
    Its: _____

ATTEST:

By: _____
    Its: _____

Date: _____

**RUBY TUESDAY:**

WITNESSES:

**RUBY TUESDAY, INC.**
a Georgia corporation

_____

_____

By: _____
    Its: _____

ATTEST:

By: _____
    Its: _____

Date: _____

(Acknowledgments on Pages 28 and 29)

## ACKNOWLEDGMENTS

STATE OF _Georgia_

COUNTY OF _Tift_

The undersigned, a Notary Public in and for the above state and county, hereby certifies that on the __18th__ day of __December__ 20 _03_, before me personally appeared **DENEAN STAFFORD**, the President and CEO, of **STAFFORD DEVELOPMENT COMPANY, a Georgia corporation, which is the Managing Member of STAFFORD RT, LLC, a Georgia** limited liability company, who was known to me as the person and officer described in and who executed the foregoing instrument on behalf of said corporation, and who acknowledged that he held the position or title set forth in the instrument and certificate, that they signed the instrument on behalf of the corporation by proper authority, and that the instrument was the act of the corporation for the purposes therein stated.

**IN WITNESS WHEREOF,** I have hereunto set my hand and affixed my official seal on the day and year last aforesaid.

_Rhonda Kent_
Notary Public

[SEAL]

My Commission Expires: __12/4/04__

**IN WITNESS WHEREOF,** the parties have caused this Lease to be executed on the date appearing together with their signatures below.

LESSOR:

WITNESSES:                      **STAFFORD RT, LLC**
                                a Georgia limited liability company

_____         By:  **Stafford Development Company**
                                     a Georgia corporation
_____              Its:  Managing Member


                                By: _____
                                    **DENEAN STAFFORD**
                                    **President and CEO**

                                ATTEST:


                                By: _____
                                    Its:_____

                                    Date: _____


WITNESSES:                      _____
                                a _____

_____         By: _____
                                    Its:_____
_____

                                ATTEST:


                                By: _____
                                    Its:_____

                                    Date: _____


WITNESSES:                      **RUBY TUESDAY:**

*Frances D Bailey*              **RUBY TUESDAY, INC.**
                                a Georgia corporation
*Joslyn Christian*
                                By: _____
                                    Its:  Chief Executive Officer


                                ATTEST:

                                By: _____
                                    Its/  Assistant Secretary

                                    Date: January *15* , 2004


(Acknowledgments on Pages 28 and 29)

STATE OF TENNESSEE

COUNTY OF BLOUNT

    I, the undersigned Notary Public, in and for said county and said state, hereby certify that ____*____ and ____**____, whose names as ____***____ and Assistant Secretary, respectively, of **RUBY TUESDAY, INC.**, a Georgia corporation, are signed to the foregoing instrument and who are known to me, acknowledged before me on this day, that being informed of the contents of said instrument, they, as such officers and with full authority, executed the same voluntarily for and as the act of said corporation on the day the same bears date.

    Given under my hand and official seal, this the *15* day of ___January___, 20*04*.

\*    Samuel E. Beall, III
\*\*   Walter G. Cole, Jr.
\*\*\*  Chief Executive Officer

_Sue B. Coley_
Notary Public

[SEAL]

My Commission Expires: ___11-01-04___

SUE B. COLEY
NOTARY
PUBLIC
AT
LARGE
BLOUNT CO., TENN.

# EXHIBIT "A" TO GROUND LEASE

## DEPICTION OF LEASED PREMISES



<u>EXHIBIT "A-1"</u>

**LEGAL DESCRIPTION**

ALL THAT TRACT OR PARCEL OF LAND LYING AND BEING IN LAND LOTS 307 AND 308 OF THE 6TH DISTRICT, TIFT COUNTY, GEORGIA, BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

COMMENCING AT THE INTERSECTION OF THE NORTHEASTERN RIGHT-OF-WAY OF MCCORMICK DRIVE (80-FOOT RIGHT-OF-WAY) AND THE SOUTHEASTERN RIGHT-OF-WAY OF U.S. HIGHWAY 82 (100-FOOT RIGHT-OF-WAY); FROM SAID POINT OF COMMENCEMENT THENCE TRAVELING ALONG SAID SOUTHEASTERN RIGHT-OF-WAY NORTH 62 DEGREES 25 MINUTES 3 SECONDS EAST, 745.37 FEET TO A POINT LOCATED ON SAID SOUTHEASTERN RIGHT-OF-WAY BEING THE **TRUE POINT OF BEGINNING**; FROM SAID **TRUE POINT OF BEGINNING**, THENCE CONTINUING ALONG SAID SOUTHEASTERN RIGHT-OF-WAY THE FOLLOWING COURSES AND DISTANCES:

1. NORTH 62 DEGREES 25 MINUTES 3 SECONDS EAST, 71.07 FEET;
2. SOUTH 27 DEGREES 34 MINUTES 57 SECONDS EAST, 10 FEET;
3. NORTH 62 DEGREES 25 MINUTES 3 SECONDS EAST, 10 FEET;
4. NORTH 27 DEGREES 34 MINUTES 57 SECONDS WEST, 10 FEET; AND
5. NORTH 62 DEGREES 25 MINUTES 3 SECONDS EAST, 169.20 FEET;

THENCE LEAVING SAID SOUTHEASTERN RIGHT-OF-WAY AND TRAVELING THE FOLLOWING COURSES AND DISTANCES:

1. SOUTH 27 DEGREES 34 MINUTES 57 SECONDS EAST, 48.42 FEET;
2. SOUTH 80 DEGREES 6 MINUTES 26 SECONDS EAST, 16.32 FEET;
3. SOUTH 9 DEGREES 53 MINUTES 34 SECONDS WEST, 52.33 FEET;
4. SOUTH 3 DEGREES 9 MINUTES 15 SECONDS EAST, 74.96 FEET;
5. NORTH 80 DEGREES 17 MINUTES 40 SECONDS EAST, 24.04 FEET; AND
6. SOUTH 9 DEGREES 42 MINUTES 20 SECONDS EAST, 283.19 FEET TO A POINT LOCATED ON THE NORTHERN RIGHT-OF-WAY OF BOO'S DRIVE (60-FOOT RIGHT-OF-WAY);

THENCE TRAVELING ALONG SAID NORTHERN RIGHT-OF-WAY SOUTH 82 DEGREES 35 MINUTES 55 SECONDS WEST, 73.12 FEET TO A POINT LOCATED ON SAID NORTHERN RIGHT-OF-WAY; THENCE LEAVING SAID NORTHERN RIGHT-OF-WAY AND TRAVELING THE FOLLOWING COURSES AND DISTANCES:

1. NORTH 6 DEGREES 49 MINUTES 32 SECONDS WEST, 98.15 FEET;
2. NORTH 28 DEGREES 10 MINUTES 55 SECONDS WEST, 200.98 FEET;
3. SOUTH 82 DEGREES 35 MINUTES 55 SECONDS WEST, 134.93 FEET;
4. NORTH 27 DEGREES 35 MINUTES 25 SECONDS WEST, 34.94 FEET;
5. NORTH 62 DEGREES 24 MINUTES 35 SECONDS EAST, 26.71 FEET; AND
6. NORTH 28 DEGREES 9 MINUTES 7 SECONDS WEST, 45.56 FEET TO A POINT LOCATED ON THE SOUTHEASTERN RIGHT-OF-WAY OF U.S. HIGHWAY 82, BEING THE **TRUE POINT OF BEGINNING.**

SAID PROPERTY CONTAINING 1.332 ACRES AND BEING DEPICTED AS TRACT 1 ON THAT CERTAIN SURVEY FOR STAFFORD RT, PREPARED BY HAMPTON & ASSOCIATES SURVEYING COMPANY, BEARING THE SEAL OF DARREL HAMPTON, G.R.L.S. NO. 2161, DATED SEPTEMBER 26, 2003, SAID SURVEY BEING INCORPORATED HEREIN AND MADE A PART HEREOF BY REFERENCE.

---

[26] USER\Client\492\743\Exhibit A-1 - leased premises legal.doc

# EXHIBIT "B"

## SITE PLAN



1of8

## EXHIBIT "B"

SITE PLAN



RUBY TUESDAY OFF-SITE
PARKING SPACES

EXHIBIT "B"

SITE PLAN



| NO. | REVISIONS | BY | DATE | NO. | REVISIONS | BY | |
|---|---|---|---|---|---|---|---|
| 4 | UPDATED PROPERTY | DM | 11/21/03 | | | | |
| 3 | PARKING SPACE EXCLUSIVE CLARIFICATION | DM | 10/24/03 | | | | |
| 2 | UPDATED PROPERTY | DM | 10/13/03 | | | | |
| 1 | ADDED ROAD BY OTHERS / ADDITIONAL PARKING | DM | 04/09/03 | 5 | RELOCATED HANDICAP PARKING | DM | 12 |

3 of 8



EXHIBIT "B"
SITE PLAN

LESSOR'S LARGER TRACT



EXHIBIT "B"
SITE PLAN

N

WENDY'S TRACT

56f8

# EXHIBIT "B"

## SITE PLAN



5' PARKING
SPACES CLOSEST
TO CAR WASH

| 4 | UPDATED PROPERTY | DMI | 11/24/03 | | | |
| 3 | PARKING SPACE EXCLUSIVE CLARIFICATION | DMI | 10/28/03 | | | |
| 2 | UPDATED PROPERTY | DMI | 10/13/03 | | | |
| 1 | ADDED ROAD BY OTHERS / ADDITIONAL PARKING | DMI | 04/01/03 | 5 | RELOCATED HANDICAP PARKING | DMI |
| NO. | REVISIONS | BY | DATE | NO. | REVISIONS | BY |

6of8



CURRENT LOCATION OF
WATER & AIR STATION
& FLAGPOLE

### EXHIBIT "B"

### SITE PLAN



| 4 | UPDATED PROPERTY | DM | 8/24/03 | | | | |
| 3 | PARKING SPACE EXCLUSIVE CLARIFICATION | DM | 10/24/03 | | | | |
| 2 | UPDATED PROPERTY | DM | 10/6/03 | | | | |
| 1 | ADDED ROAD BY OTHERS / ADDITIONAL PARKING | DM | 04/01/03 | 5 | RELOCATED HANDICAP PARKING | DM | 12 |
| NO. | REVISIONS | BY | DATE | NO. | REVISIONS | BY | |

7of8



LOCATION OF RELOCATED
WATER & AIR STATION
& FLAGPOLE

**EXHIBIT "B"**

## SITE PLAN



| NO. | REVISIONS | BY | DATE | NO. | REVISIONS | BY | |
|-----|-----------|-----|------|-----|-----------|-----|---|
| 4 | UPDATED PROPERTY | DMM | 11/21/03 | | | | |
| 3 | PARKING SPACE EXCLUSIVE CLARIFICATION | DMM | 10/20/03 | | | | |
| 2 | UPDATED PROPERTY | DMM | 10/16/03 | | | | |
| 1 | ADDED ROAD BY OTHERS / ADDITIONAL PARKING | DMM | 04/01/03 | 5 | RELOCATED HANDICAP PARKING | DMM | 12 |

8 of 8

## EXHIBIT "B-1" TO GROUND LEASE

### DEPICTION OF RUBY TUESDAY SIGN AREA

1
.2
3
4



1
2
3
4

**EXHIBIT "B-1" TO GROUND LEASE**

**DEPICTION OF RUBY TUESDAY SIGN AREA**

## LEGAL DESCRIPTION

All that tract or parcel of land lying and being in Land Lot 308 of the 6th District, City of Tifton, Tift County, Georgia, being more particularly described as follows:

Commencing at a point at the intersection of the northeastern right-of-way of McCormick Drive (an 80-foot right-of-way) and the southeastern right-of-way of U.S. Highway 82 (a 100-foot right-of-way); from said point of commencement, thence traveling along the southeastern right-of-way of U.S. Highway 82 the following courses and distances: North 62 degrees 25 minutes 3 seconds East, 745.37 feet; North 62 degrees 25 minutes 3 seconds East, 71.07 feet; South 27 degrees 34 minutes 57 seconds East, 10 feet; North 62 degrees 25 minutes 3 seconds East, 10 feet; North 27 degrees 34 minutes 57 seconds West, 10 feet; North 62 degrees 25 minutes 3 seconds East, 169.20 feet; North 62 degrees 25 minutes 3 seconds East, 43.19 feet; North 62 degrees 25 minutes 6 seconds East, 186 feet; South 27 degrees 35 minutes 25 seconds East, 10 feet; and North 78 degrees 32 minutes 32 seconds East, 255.53 to a point at the intersection of the southeastern right-of-way of U.S. Highway 82 and the western right-of-way of Interstate Highway 75; thence traveling along the western right-of-way of Interstate Highway 75 the following courses and distances: South 10 degrees 4 minutes 20 seconds East, 351.76 feet and South 36 degrees 23 minutes 38 seconds East, 241.04 feet to the TRUE POINT OF BEGINNING.

From said TRUE POINT OF BEGINNING, continuing along said western right-of-way Interstate Highway 75 South 36 degrees 23 minutes 53 seconds East, 21.37 feet; thence leaving said right-of-way and traveling South 74 degrees 15 minutes 8 seconds West, 66.51 feet to a point; thence traveling North 15 degrees 45 minutes 9 seconds West, 20 feet to a point; thence traveling North 74 degrees 15 minutes 27 seconds East, 58.97 feet to a point located on the western right-of-way of Interstate Highway 75 being the TRUE POINT OF BEGINNING.

Said property being depicted as Tract 3 containing 0.029 acres as more particularly depicted on that certain Survey for Stafford RT, prepared by Hampton & Associates Surveying Co., bearing the seal of Derrell Hampton, G.R.L.S. No. 2161, dated December 17, 2003, said survey being incorporated herein and made a part hereof by reference.

## EXHIBIT "C" TO GROUND LEASE

### SIGN LEASE

This **SIGN LEASE** ("Lease") entered into by and between **STAFFORD DEVELOPMENT COMPANY, a Georgia corporation, successor by corporate merger to Interstate Inns, Inc.**, whose address is 1805 U.S. Highway 82 West, P.O. Box 269, Tifton, Georgia 31793 ("Lessor") and **RUBY TUESDAY, INC.**, a Georgia corporation, whose address is 150 West Church Avenue, Maryville, Tennessee 37801 ("Lessee"), this ___ day of _____, 2003.

### W I T N E S S E T H

WHEREAS, Lessor is the owner of that certain parcel of land described on the attached **Exhibit "A"**, which parcel shall be referred to herein as the Leased Premises; and

WHEREAS, Lessee desires to lease the Leased Premises from Lessor for the purposes of placing, operating, and maintaining a sign ("Sign") advertising its restaurant on an adjacent parcel ("Restaurant").

NOW, THEREFORE, for and in consideration of the mutual covenants and obligations contained herein, the receipt and sufficiency of which are hereby acknowledged, Lessor hereby leases to Lessee, and Lessee hereby leases from Lessor, the Leased Premises, together with the right to access, operate and maintain the Sign, pursuant to the terms and conditions set forth herein, at Lessee's sole cost and expense.

Lessor does hereby grant and convey to Ruby Tuesday, for the term of the Lease and any extensions and renewals thereof, for the benefit of the Leased Premises, a perpetual, non-exclusive, uninterrupted right, privilege and easement, which right, privilege and easement shall be appurtenant to and pass with the title to the Leased Premises, for the purposes of (a) pedestrian and vehicular ingress and egress and (b) the right and an easement to construct, maintain, relocate, enlarge, use and tap into any and all utility lines necessary to serve the Sign, over and across the portion of Lessor's adjacent land depicted as "Access and Utility Easement Area" on **Exhibit "B"**.

The term of the Lease shall be identical to the term of that certain Ground Lease from Stafford RT, LLC to Lessee, dated _____, for the lease of the Restaurant ("Prime Lease"). If the Prime Lease shall terminate for any reason, then this Sign Lease shall also terminate as of the same date. Any extension, renewal, or exercise of any option period of, or with regard to, the Prime Lease shall also work to extend this Sign Lease for any identical period.

If the Sign is not permitted or is ordered removed by any applicable governmental agency's rule, regulation or ordinance ("Government") and Lessee is required to remove it ("Removal"), then (a) if the Removal is required by the Government during the first year of this Lease, Lessor shall remove the Sign (including the pole and pylons, but not the base) at Lessor's expense; and (b) if the Removal is required by the Government after the first year of this Lease, then Lessee shall remove the Sign at Lessee's expense (including the pole and pylons, but not the base).

Annual rental throughout the term and any extension thereof shall be $1.00 per year, payable annually in advance to Lessor at Tifton, Georgia or such other address designated in writing by Lessor.

As between Lessor and Lessee, all structures, equipment and materials placed on the Leased Premises shall remain the property of the Lessor, except the sign itself which bears the name of Lessee, its successors or assigns, which shall remain the property of Lessee, its successors or assigns. Lessee is granted the right to remove its property, if any, from the Leased Premises within ninety (90) days after the expiration of this Lease or any renewal or extension thereof. Lessee may not enlarge the sign, change the height or width of or remove the structures currently installed on the leased Premises to support the sign or otherwise alter the Leased

Premises (excepting the installation of the sign itself at the top of the currently installed pole and alteration to the face of the sign only if and to the extent required for Lessee to obtain its sign permits) without the written consent of Lessor, in Lessor's sole and unfettered discretion.

In the event of a condemnation or casualty affecting the Leased Premises during the term hereof, Lessee shall have the right, but not the obligation, to terminate this Lease, at which point all rights and obligations hereunder, including the obligation to pay rent, shall immediately cease and terminate.

Following the execution of this Lease, Lessee shall have the right to terminate the Lease at any time prior to the commencement of the next renewal term by providing written notice of such intentions.

Lessor represents and warrants that Lessor is the owner of the fee simple interest in the Leased Premises, and has the authority to enter into this Lease; provided, however, that Lessor makes no representation with regard to whether the Lessee's sign will be permitted by the Government.

Lessee shall be responsible at its sole cost and expense to provide any required utility services to the Leased Premises and shall maintain the Leased Premises in an attractive and first class condition.

Should any provision hereof be declared invalid by a legislative, administrative or judicial body of competent jurisdiction, the other provisions hereof shall remain in full force and effect and shall be unaffected by same.

The parties agree to cooperate in negotiating, executing, and recording in the public deed records of Tift County, Georgia a memorandum of this Sign Lease.

All notices and approvals required or permitted hereunder shall be served by either certified mail, return receipt requested, or by hand delivery, or by a nationally recognized overnight delivery service, such as Fed Ex, to a party at the last known address of its principal place of business or

| | |
|---|---|
| If to Lessor: | Stafford Development Company |
| | 1805 U.S. Highway 82 West |
| | P.O. Box 269 |
| | Tifton, Georgia 31793 |
| | Attn: President |
| With copy to: | Stafford Properties, Inc. |
| | 80 West Wieuca Street |
| | Suite 302 |
| | Atlanta, Georgia 30342 |
| | Attn: Mike Puckett |
| If to Lessee: | Ruby Tuesday, Inc. |
| | 150 West Church Avenue |
| | Maryville, Tennessee 37801 |
| | Attn: Real Estate Legal |

This Lease may not be assigned by Lessee to any other party except as part of a permitted assignment of the Prime Lease.

This Lease shall be construed under the laws of the State of Georgia .

**(SIGNATURES ON PAGE ____)**

IN WITNESS WHEREOF, the undersigned hereby sets its hand and seal, on the ___ day of _____, 2003.

LESSOR:

WITNESSES:                    STAFFORD DEVELOPMENT COMPANY
                              a Georgia corporation, successor by corporate
_____      merger to Interstate Inns, Inc.

_____

                              By: _____
                                   DENEAN STAFFORD
                                   President and CEO

                              ATTEST:
                              By: _____
                              Its:_____

                              Date: _____


                              RUBY TUESDAY:

WITNESSES:                    RUBY TUESDAY, INC.
                              a Georgia corporation
_____

_____      By: _____
                              Its:_____

                              ATTEST:

                              By: _____
                              Its:_____

                              Date: _____

List of Exhibits:

Exhibit "A"  -  Depiction of Leased Premises
Exhibit "B"  -  Depiction of Access and Utility Easement Area

1
2
3

# EXHIBIT "A" TO SIGN LEASE

## Depiction of Leased Premises



## EXHIBIT "A" TO SIGN LEASE

### LEGAL DESCRIPTION

All that tract or parcel of land lying and being in Land Lot 308 of the 6th District, City of Tifton, Tift County, Georgia, being more particularly described as follows:

Commencing at a point at the intersection of the northeastern right-of-way of McCormick Drive (an 80-foot right-of-way) and the southeastern right-of-way of U.S. Highway 82 (a 100-foot right-of-way); from said point of commencement, thence traveling along the southeastern right-of-way of U.S. Highway 82 the following courses and distances: North 62 degrees 25 minutes 3 seconds East, 745.37 feet; North 62 degrees 25 minutes 3 seconds East, 71.07 feet; South 27 degrees 34 minutes 57 seconds East, 10 feet; North 62 degrees 25 minutes 3 seconds East, 10 feet; North 27 degrees 34 minutes 57 seconds West, 10 feet; North 62 degrees 25 minutes 3 seconds East, 169.20 feet; North 62 degrees 25 minutes 3 seconds East, 43.19 feet; North 62 degrees 25 minutes 6 seconds East, 186 feet; South 27 degrees 35 minutes 25 seconds East, 10 feet; and North 78 degrees 32 minutes 32 seconds East, 255.53 to a point at the intersection of the southeastern right-of-way of U.S. Highway 82 and the western right-of-way of Interstate Highway 75; thence traveling along the western right-of-way of Interstate Highway 75 the following courses and distances: South 10 degrees 4 minutes 20 seconds East, 351.76 feet and South 36 degrees 23 minutes 38 seconds East, 241.04 feet to the TRUE POINT OF BEGINNING.

From said TRUE POINT OF BEGINNING, continuing along said western right-of-way Interstate Highway 75 South 36 degrees 23 minutes 53 seconds East, 21.37 feet; thence leaving said right-of-way and traveling South 74 degrees 15 minutes 8 seconds West, 66.51 feet to a point; thence traveling North 15 degrees 45 minutes 9 seconds West, 20 feet to a point; thence traveling North 74 degrees 15 minutes 27 seconds East, 58.97 feet to a point located on the western right-of-way of Interstate Highway 75 being the TRUE POINT OF BEGINNING.

Said property being depicted as Tract 3 containing 0.029 acres as more particularly depicted on that certain Survey for Stafford RT, prepared by Hampton & Associates Surveying Co., bearing the seal of Derrell Hampton, G.R.L.S. No. 2161, dated December 17, 2003, said survey being incorporated herein and made a part hereof by reference.

# EXHIBIT "B" TO SIGN LEASE

### Depiction of Access and Utility Easement Area



## JOINDER TO SIGN LEASE

**SOUTHTRUST BANK,** an Alabama corporation ("Lender"), being the current holder of a mortgage ("Mortgage") on the Access and Utility Easement Area (as such term is defined by the foregoing Sign Lease ("Lease"), said Mortgage being evidenced for record by that certain Deed to Secure Debt ("Deed") filed in Deed Book 893, Page 222, in the Office of the Clerk of the Superior Court of Tift County, Georgia, hereby consents to the Access and Utility Easement rights conveyed in the foregoing Lease. Lender agrees that should Lender foreclose on the Mortgage and/or otherwise come into possession of Access and Utility Easement Area by foreclosure or deed in lieu of foreclosure or otherwise, then Lender shall be bound by and comply with the easement rights contained in the foregoing Lease.

**SOUTHTRUST BANK**
an Alabama corporation

By: _____
Print Name: _____
Its: _____

[CORPORATE SEAL]

ATTEST: _____
Print Name: _____
Its: _____

Signed, sealed and delivered
in the presence of:

_____
UNOFFICIAL WITNESS

_____
NOTARY PUBLIC

My Commission Expires: _____

(Affix Notarial Seal)

**EXHIBIT "D" TO GROUND LEASE**

**RENT SCHEDULE**

| LEASE YEARS | ANNUAL RENTAL | MONTHLY RENTAL |
|---|---|---|
| Years 1-10 | $ 67,000.00 | $5,583.33 |
| Years 1-20 | $ 73,700.00 | $6,141.67 |
| Years 21-25 (1st Option) | $ 81,070.00 | $6,755.83 |
| Years 26-30 (2nd Option) | $ 87,150.00 | $7,262.50 |
| Years 31-35 (3rd Option) | $ 93,685.00 | $7,807.10 |
| Years 36-40 (4th Option) | $100,711.00 | $8,392.58 |

1

## EXHIBIT "E" TO GROUND LEASE

2
3

### INTENTIONALLY OMITTED

**EXHIBIT "F" TO GROUND LEASE**


**AGREEMENT**

This Agreement is made as of the ___ day of _____, 2003, by and among Ruby Tuesday, Inc., a Georgia corporation; Stafford RT, LLC, a Georgia limited liability company ("SRT"); and Stafford Development Company, a Georgia corporation ("Stafford").

WHEREAS, SRT is the owner of real property located at 1306 U.S. Highway 82 West in Tifton, Georgia as is described in the attached Exhibit "A" (the "Property"); and

WHEREAS, petroleum products or substances containing petroleum constituents have been detected on the Property, including without limitation one or more of: benzene, toluene, ethylbenzene and xylenes; and

WHEREAS, Ruby Tuesday, Inc. will not lease the Property unless SRT enters into this Agreement and unless Stafford guarantees SRT's performance hereunder; and

WHEREAS, the parties desire to cooperate for their mutual benefit and to allow Ruby Tuesday, Inc. and its successors-in-title to secure the full benefits of its leasehold ownership, use, and occupation of the Property;

NOW THEREFORE, in consideration of the promises and mutual covenants and agreements hereinafter set forth, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and with Stafford and SRT acknowledging that Ruby Tuesday, Inc. has and will rely upon this Agreement in agreeing to lease the Property, the parties do hereby agree as follows:

## ARTICLE I
## DEFINITIONS

For purposes of this Agreement the following terms shall have the following meanings:

"Constituents" means petroleum products and materials containing petroleum constituents, released at the Property, and which include, without limitation, benzene, toluene, ethylbenzene, xylenes and MTBE.

"Environmental Claim" means any claim for personal injury, property damage, or reimbursement of costs for assessment, monitoring, cleanup or waste disposal (including consultants,' laboratories,' attorneys' and experts' fees) relating to the Constituents made, asserted or prosecuted by or on behalf of a third party, including, without limitation, any governmental entity, employee, former employee, tenants, invitees, customers, adjacent or impacted property owner or lessee, or their respective legal representatives, heirs, executors, successors and assigns.

"Environmental Cleanup Liability" means any direct, non-consequential, out-of-pocket cost or expense incurred to assess, monitor, contain, remove, remedy, treat, clean up or abate any Constituents and any environmental media impacted by the Constituents, including soil and groundwater impacted by the Constituents, but only if and to the extent required by Environmental Law, or regulatory enforcement officials acting under or pursuant to any Environmental Law, including, without limitation:

    (a) Any direct, non-consequential, out-of-pocket cost or expense for investigation, study, assessment, cost recovery by governmental agencies, or on-going monitoring of the Property in connection therewith; and

    (b) Any direct, non-consequential, out-of-pocket cost, expense, loss or damage incurred with respect to the Property as a result of actions or measures necessary to implement or effectuate any assessment, monitoring, containment, removal, remedying,

treatment, cleanup, waste disposal or abatement.

    (c) Any direct, non-consequential, out-of-pocket cost or expense for disposal of Constituents or soil, groundwater or other environmental media impacted by the Constituents during development activities.

Environmental Cleanup Liability shall include, without limitation, the reasonable and actual direct, non-consequential, out-of-pocket fees of attorneys, consultants, engineers, geologists, laboratories and other experts. Environmental Cleanup Liability shall also include any penalties or fines imposed by any federal, state, or local government agency with respect to the Constituents. Environmental Cleanup Liability shall also include any liens against the Property relating to the Constituents and any failure or defect in title to the Property occasioned by the migration or presence of the Constituents or failure of SRT to comply with any Environmental Law. Environmental Cleanup Liability shall not include any of the above referenced costs, claims, and expenses to the extent same are solely attributable to the acts or omissions of Ruby Tuesday, Inc., its agents, contractors, employees, customers, vendors, invitees, and licensees, in material violation of any provision of the lease to which this Agreement is attached as Exhibit "F" (the "Lease") or any provision of applicable Environmental Law.

"Environmental Law" means any applicable federal, state, or local statute, ordinance, rule, regulation, order, consent decree, judgment or common-law doctrine (including, without limitation, nuisance or trespass), and interpretation thereof, as amended, and provisions and conditions of permits, licenses and other operating authorizations relating to pollution or protection of human health, welfare or the environment, including natural resources or which may affect or regulate the Constituents, as amended, which are now or may hereafter become in effect.

"Indemnitee" or "Indemnitees" means Ruby Tuesday, Inc. as well as its officers, directors, employees, agents, representatives, successors, assigns, and successors-in-title with respect to all or any portion of the Property. "Indemnitee" or "Indemnitees" shall also include any lender taking title to, or a security interest in, the leasehold estate of Ruby Tuesday, Inc., its successors and assigns, relating to the Property, or any portion thereof, or the improvements on the Property.

"SRT" means Stafford RT, LLC, a Georgia limited liability company, and its successors and assigns.

"Stafford" means Stafford Development Company, a Georgia Corporation, and its successors and assigns.

# ARTICLE II
# INDEMNIFICATION

A. During the term of the lease, including any renewals or permitted extensions thereof, and for a period of one (1) year following the termination or expiration of the lease, SRT shall reimburse, defend, indemnify and hold harmless Indemnitees from and against the following arising out of or in any way related to the Constituents:

   1. Environmental Cleanup Liability;

   2. Environmental Claims; and

   3. Fines and penalties assess, levied or asserted against Indemnitees as a result of a violation or alleged violation of any Environmental Law arising from the Constituents or the acts or omissions of SRT.

B. Indemnitees shall notify SRT prior to giving any notice required by any Environmental Law relating to the Constituents. Failure by Indemnitees to give timely notice under this part shall not relieve SRT of any obligations under this Agreement, unless the Environmental Claim or Environmental Cleanup liability arises out of the Indemnitees failure to timely give such notice.

C. This Agreement is between the parties hereto only, and nothing contained in this Agreement shall be construed as an admission of liability by any party to any other person or entity. No third party beneficiaries are intended or created hereby.

# ARTICLE III
# DISCHARGE OF ENVIRONMENTAL CLAIMS

A. In the event that Indemnitee notifies SRT of any claim that is subject to an indemnification obligation under Article II, SRT shall, within thirty (30) days from the date of receipt of notice, acknowledge and assume the liability asserted. During the thirty (30) day period, Indemnitee shall take no action nor incur any expense with respect to the claim, except to the extent that such action or expense is: (1) legally required; or (2) reasonably necessary under the circumstances to prevent imminent and substantial endangerment to human health or the environment.

B. SRT shall have the right and obligation to control, manage and direct all discussions, proceedings and activities regarding the satisfaction or discharge of any claim which is assumed by SRT or any liability or obligation that such a claim seeks to impose on SRT.

C. Each Indemnitee shall have the right, at its own expense, to consult with SRT, through counsel or otherwise, with respect to all meetings and proceedings with adverse parties or governmental authorities and with respect to all activities pertaining to any matter related to this Agreement. SRT shall consult with Indemnitees prior to initiating or participating in any meeting or proceeding in which decisions or discussions reasonably anticipated to involve Environmental Law issues which could be materially adverse to Indemnitees, or which may materially interfere with Indemnitees intended use of its leasehold estate in the Property, may be made. This right of consultation shall not apply to privileged confidential meetings or documents or those documents subject to the attorney's work product doctrine. Each Indemnitee, or its designated representatives, shall have the right to participate in such meetings or proceedings.

# ARTICLE IV
# REMEDIATION OF SOIL AND GROUNDWATER CONTAMINATION

A. If and to the extent required under the Environmental Laws applicable to USTs, as enforced by the Georgia Environmental Protection Division ("EPD"), SRT shall remediate any Constituents on the Property or any adjacent or other impacted property ("adjacent property") in accordance with EPD direction and approval and in

accordance with the Georgia Underground Storage Tank ("UST") Management Act and Regulations, and any other applicable Environmental Law. It shall be SRT's responsibility to obtain all necessary permits, approvals or authorizations necessary to carry out SRT's obligations hereunder.

B. If and to the extent required to resolve any nuisance or trespass claim brought or made against Indemnitee by any person or entity, SRT shall remediate any Constituents on the Property or any adjacent or other impacted property ("adjacent property") to the extent required by Environmental Law including, but not limited to, a binding and non-appealable court order.

C. If and to the extent required under the Environmental Laws applicable to USTs, as enforced by the EPD, SRT shall initiate corrective action in accordance with any Corrective Action Plan ("CAP") submitted by SRT to and approved by the Georgia EPD. If the approved CAP so requires, SRT shall remediate any groundwater contamination related to the Constituents at the Property in excess of the Georgia In-stream Water Quality Standards established in Chapter 391-3-6-.03 of the Official Rules and Regulation of the State of Georgia or other standard as may be established in the future by EPD.

D. If and to the extent required under the Environmental Laws applicable to USTs, as enforced by the EPD, SRT shall comply with any and all requirements or conditions EPD may impose as conditions precedent to CAP approval, if any, and shall carry out the CAP promptly upon approval of the CAP by EPD. SRT shall commence work required by the CAP no later than thirty (30) days after EPD approves the plan, and perform work in accordance with the schedule contained within the CAP. SRT shall promptly submit to Indemnitees copies of all reports or notices that SRT submits to EPD in the course of preparing and complying with the CAP, and shall notify Indemnitees when SRT has completed all of its obligations under the CAP.

E. SRT shall make reassemble efforts to promptly repair any and all damage to the Property and any improvements located thereon occasioned by activities relating to this Agreement, and shall make reassemble efforts to restore the Property to its former condition, normal wear and tear excepted. Any monitoring wells on the Property shall be closed in accordance with applicable regulations promptly upon completion of SRT's remediation/assessment/monitoring obligations hereunder.

F. SRT shall reimburse, defend, indemnify, and hold harmless Indemnitees and their lenders from and against all claims, demands, actions, and causes of action of any kind whatsoever arising out of or relating to any negligent act or omission by SRT, or any employee, contractor, subcontractor, or any other person or entity working on behalf of SRT, when performing work under this Article IV.

## ARTICLE V
### ACCESS AND COOPERATION

A. SRT acknowledges that Ruby Tuesday, Inc. intends to lease the Property and to develop the Property pursuant to the terms and conditions of the Lease, which development may include, without limitation, the construction of a restaurant.

B. In order to assist the parties in fulfilling their respective obligations under this Agreement, Indemnitees will afford SRT and its employees, agents, and contractors, upon reasonable notice, and subject to the rights of tenants, if any, reasonable access to the Property including, but not limited to, the right to enter upon, photograph, investigate, drill wells, take soil borings, remediate, monitor and test; provided that, such access may be conditioned or restricted as may be reasonably necessary to protect the development and operation of the Property (including showing the improvements on the Property for sub-lease), to ensure the safety of personnel (including employees, tenants, invitees, licensees, and customers) and facilities or to protect confidential or privileged information. SRT shall use reasonable efforts to minimize any interference with Indemnities free and ready access and use of and to the Property pursuant to the terms of the Lease.

C. If SRT conducts a cleanup, it shall sign as the generator, all manifests and shipping documents relating to transportation, disposal or recycling of Constituents and/or contaminated media, whether from site investigation, or remediation.

**ARTICLE VI**
**MISCELLANEOUS**

A. SRT agrees that this Agreement shall inure to the benefit of and may be enforced by Indemnitees, their successors, assigns, and any successors-in-title to all or any portion of the leasehold estate conveyed to Ruby Tuesday, Inc. pursuant to the Lease, including any lender holding any lien, mortgage, security deed or other interest in the leasehold estate, the improvements on the Property, or any portion thereof, to secure the repayment of a debt. This Agreement shall be enforceable jointly and severally against SRT and any related party of SRT to which SRT transfers or assigns both the Lease and its obligations hereunder.

B. Stafford hereby acknowledges and agrees that this Agreement is to the direct benefit of Stafford, as managing member of SRT. Stafford hereby irrevocably and unconditionally guarantees the due and prompt performance of all obligations of SRT under this Agreement, and further agrees that upon any breach by SRT of any of its obligations under this Agreement, Stafford shall, upon demand from any Indemnitee, promptly pay any amounts due from SRT under this Agreement and promptly perform, or cause SRT to promptly perform, any obligations thereunder. In the performance of SRT's obligations hereunder, Stafford shall assume all the rights and responsibilities of SRT under this Agreement. This guaranty shall be effective upon the effective date of this Agreement and shall survive termination of this Agreement. Stafford acknowledges and agrees that it has received adequate consideration for this Agreement, that Ruby Tuesday, Inc. has relied and will rely on the covenants and agreements herein and that the execution and delivery of this Agreement is an essential condition but for which Ruby Tuesday, Inc. would not agree to lease the Property.

C. SRT's obligations hereunder shall in no way be impaired, reduced or released by reason of any Indemnitee's omission or delay to exercise any right described herein, unless SRT is prejudiced by such delay.

D. This Agreement is the sole agreement between the parties regarding the subject matter of this agreement.

E. Any and all notices, requests, transmittals, demands or other communications permitted or required to be made under this Agreement shall be in writing, signed by the party giving such notice or other communication, and shall be delivered personally, or sent by registered or certified mail, to the other party at the address set out below, or at such other address as may be supplied in writing. The addresses set out below may be changed by providing notices as provided herein. Nothing in this paragraph shall be construed to require any notice from any Indemnitee to SRT not otherwise specifically provided for under this Agreement.

| If to Ruby Tuesday, Inc.: | If to Stafford RT, LLC or Stafford Development Company: |
|---|---|
| Walter G. Cole Jr., Esq. | Steve Edwards, COO |
| Ruby Tuesday, Inc. | Stafford Development Company |
| 150 West Church Avenue | 1805 U.S. Hwy. 82 West |
| Maryville, Tennessee 37801 | P.O. Box 269 |
| (865) 379-5700 | Tifton, Georgia  31793 |
| | (229) 386-0552 |
| cc: Joan B. Sasine, Esq. | cc: John C. Spinrad, Esq. |
| Powell, Goldstein, Frazer & Murphy LLP | Arnall Golden Gregory LLP |
| 191 Peachtree Street, 16th floor | 1201 West Peachtree Street, Suite 2800 |
| Atlanta, Georgia 30303 | Atlanta, Georgia 30309-3450 |
| (404) 572-6647 | (404) 873-8666 |

F. This Agreement and the legal relations of the parties shall be governed by the laws of the State of Georgia applicable to agreements negotiated, executed, delivered, and fully

1   performed in such State.
2
3        G.  All provisions of this Agreement are severable and invalidity or unenforceability of
4   any provision shall not affect or impair the validity or enforceability of the remaining provisions
5   of this Agreement.
6
7
8                    [SIGNATURES BEGIN ON FOLLOWING PAGE]

IN WITNESS WHEREOF, this Agreement has been executed on the date written above.

As to Stafford RT, LLC                          **SRT:**
Signed, sealed and delivered
in the presence of:                             STAFFORD RT, LLC, a Georgia
                                                limited liability company

_____
Witness                                         By:    Stafford Development Company,
                                                       a Georgia corporation, it's
                                                       managing member

_____
Notary Public
State Of Georgia                                By:_____
County Of Tift                                         DeNean Stafford, President

My Commission Expires:_

_____                                [CORPORATE SEAL]

[NOTARIAL SEAL]




                    [SIGNATURES CONTINUED ON FOLLOWING PAGE]

```
 1   As to Ruby Tuesday, Inc.              INDEMNITEE:
 2   Signed, sealed and delivered
 3   in the presence of:                   RUBY TUESDAY, INC
 4
 5   _____
 6   Witness
 7                                         By:_____
 8                                         Print Name:_____
 9   _____          Title:_____
10   Notary Public
11   State Of _____
12   County Of _____                 [CORPORATE SEAL]
13
14   My Commission Expires:_
15   _____
16
17   [NOTARIAL SEAL]
18
19
20
21
22              [SIGNATURES CONTINUED ON FOLLOWING PAGE]
23
24
```

As to Stafford Development Company
Signed, sealed and delivered
in the presence of:
COMPANY,

_____
Witness

_____
Notary Public
State Of  Georgia
County Of Tift

My Commission Expires:

_____

[NOTARIAL SEAL]

**STAFFORD:**

STAFFORD DEVELOPMENT

a Georgia corporation

By:_____
DeNean Stafford, President

[CORPORATE SEAL]

EXHIBIT "G"
THE ROAD

1
2
3

## EXHIBIT "H" TO GROUND LEASE

## LEGAL DESCRIPTION OF LESSOR'S LARGER TRACT

### DESCRIPTION OF LAND

ALL THAT TRACT OR PARCEL OF LAND lying and being located in the City of Tifton in Land Lots 307 and 308 of the 6th Land District of Tift County, Georgia, and being more particularly described as follows:

COMMENCE AT THE INTERSECTION of the South right of way line of U.S. Highway 82 (a 100 foot right of way) with the East right of way line of McCormick Drive (an 80 foot right of way); thence leaving the East right of way line of McCormick Drive running North 62 degrees 25 minutes 03 seconds East along the South right of way line of U.S. Highway 82 a distance of 530.19 feet to a point and the TRUE POINT OF BEGINNING; thence continuing along the South right of way line of U.S. Highway 82 running North 62 degrees 25 minutes 03 seconds East a distance of 292.65 feet to a point; thence leaving the South right of way line of U.S. Highway 82 running South 01 degrees 54 minutes 06 seconds East a distance of 111.86 feet to a point; thence running North 82 degrees 35 minutes 55 seconds East a distance of 300.00 feet to a point; thence running South 01 degrees 54 minutes 05 seconds East a distance of 218.86 feet to a point; thence running South 82 degrees 35 minutes 55 seconds West a distance of 19.00 feet to a point; thence running South 10 degrees 38 minutes 05 seconds East a distance of 40.00 feet to a point; thence running South 79 degrees 12 minutes 38 seconds West a distance of 289.25 feet to a point; thence running south 62 degrees 23 minutes 35 seconds West a distance of 129.00 feet to a point; thence running North 26 degrees 46 minutes10 seconds West a distance of 137.91 feet to a point; thence running North 26 degrees 53 minutes 42 seconds West a distance of 210.00 feet to a point on the South right of way line of U.S. Highway 82 and the TRUE POINT OF BEGINNING.

Said tract or parcel of land contains 3.509 acres as shown on that certain plat of survey prepared for Stafford Foods, Inc., Bank of America, N.A. and Lawyers Title Insurance Corporation, prepared by Hampton & Associates Surveying Co., and bearing the signature and seal of Derrell Hampton, GRLS No. 2161, dated January 27, 2000, last revised.

LESS AND EXCEPT

000694 Bk:00792 Pg:0202
REC'D TIFT CO. CLERK'S OFFICE
Date:02/09/2000
GWEN C. PATE, CLERK

1
2
3

## EXHIBIT "H" TO GROUND LEASE

## LEGAL DESCRIPTION OF LESSOR'S LARGER TRACT

**ALL THAT TRACT** or parcel of land being 5.786 acres in Land Lot 308 in the 6th Land District of Tift County, Georgia, and a portion in the City of Tifton, more fully described as follows:

COMMENCE at the intersection of the west Land Lot line of Land Lot 308 and the South right-of-way line of U.S. Highway 82; thence run North 62 degrees 25 minutes 03 seconds East 216.00 feet to the POINT OF BEGINNING; thence North 62 degrees 25 minutes 03 seconds East 186.00 feet to a point; thence South 27 degrees 34 minutes 57 seconds East 10.00 feet to a point; thence North 78 degrees 32 minutes 36 seconds East 255.53 feet to a point and the west right of way line of Interstate 75; thence South 10 degrees 04 minutes 24 seconds East 351.76 feet along the west right of way line of Interstate 75 to a point; thence South 36 degrees 23 minutes 35 seconds East 241.04 feet to a point on the west right of way line of Interstate 75; thence South 74 degrees 15 minutes 06 seconds West 58.97 feet to a point; thence South 15 degrees 44 minutes 54 seconds East 20.00 feet to a point; thence North 74 degrees 15 minutes 06 seconds East 66.51 feet to a point on the west right of way line of Interstate 75; thence South 36 degrees 23 minutes 35 seconds East 16.29 feet to a point; thence South 22 degrees 07 minutes 35 seconds East 18.99 feet to a point on the west right of way line of Interstate 75; thence South 81 degrees 35 minutes 22 seconds WEST 534.48 feet to a point; thence North 10 degrees 38 minutes 05 seconds West 146.59 feet to a point; thence North 82 degrees 35 minutes 55 seconds East 19.00 feet to a point; thence North 01 degree 54 minutes 05 seconds West 218.88 feet to a point; thence North 32 degrees 22 minutes 05 seconds West 205.02 feet to the POINT OF BEGINNING.

011756 Bk:00893 Pg:0248/
REC'D TIFT CO. CLERK'S OFFICE
Date:10/03/2001
GWEN C. PATE, CLERK

1
2
3

## EXHIBIT "H" TO GROUND LEASE

## LEGAL DESCRIPTION OF LESSOR'S LARGER TRACT

### LEGAL DESCRIPTION

All that tract or parcel of land lying and being in Land Lot 308 of the 6th District, City of Tifton, Tift County, Georgia, being more particularly described as follows:

Commencing at a point at the intersection of the northeastern right-of-way of McCormick Drive (an 80-foot right-of-way) and the southeastern right-of-way of U.S. Highway 82 (a 100-foot right-of-way); from said point of commencement, thence traveling along the southeastern right-of-way of U.S. Highway 82 the following courses and distances: North 62 degrees 25 minutes 3 seconds East, 745.37 feet; North 62 degrees 25 minutes 3 seconds East, 71.07 feet; South 27 degrees 34 minutes 57 seconds East, 10 feet; North 62 degrees 25 minutes 3 seconds East, 10 feet; North 27 degrees 34 minutes 57 seconds West, 10 feet; North 62 degrees 25 minutes 3 seconds East, 169.20 feet; North 62 degrees 25 minutes 3 seconds East, 43.19 feet; North 62 degrees 25 minutes 6 seconds East, 186 feet; South 27 degrees 35 minutes 25 seconds East, 10 feet; and North 78 degrees 32 minutes 32 seconds East, 255.53 to a point at the intersection of the southeastern right-of-way of U.S. Highway 82 and the western right-of-way of Interstate Highway 75; thence traveling along the western right-of-way of Interstate Highway 75 the following courses and distances: South 10 degrees 4 minutes 20 seconds East, 351.76 feet and South 36 degrees 23 minutes 38 seconds East, 241.04 feet to the TRUE POINT OF BEGINNING.

From said TRUE POINT OF BEGINNING, continuing along said western right-of-way Interstate Highway 75 South 36 degrees 23 minutes 53 seconds East, 21.37 feet; thence leaving said right-of-way and traveling South 74 degrees 15 minutes 8 seconds West, 66.51 feet to a point; thence traveling North 15 degrees 45 minutes 9 seconds West, 20 feet to a point; thence traveling North 74 degrees 15 minutes 27 seconds East, 58.97 feet to a point located on the western right-of-way of Interstate Highway 75 being the TRUE POINT OF BEGINNING.

Said property being depicted as Tract 3 containing 0.029 acres as more particularly depicted on that certain Survey for Stafford RT, prepared by Hampton & Associates Surveying Co., bearing the seal of Derrell Hampton, G.R.L.S. No. 2161, dated December 17, 2003, said survey being incorporated herein and made a part hereof by reference.

1
2
3

## EXHIBIT "H" TO GROUND LEASE

## LEGAL DESCRIPTION OF LESSOR'S LARGER TRACT

### LESS AND EXCEPT

### LEGAL DESCRIPTION

ALL THAT TRACT OR PARCEL OF LAND LYING AND BEING IN LAND LOTS 307 AND 308 OF THE 6TH DISTRICT, TIFT COUNTY, GEORGIA, BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

COMMENCING AT THE INTERSECTION OF THE NORTHEASTERN RIGHT-OF-WAY OF MCCORMICK DRIVE (80-FOOT RIGHT-OF-WAY) AND THE SOUTHEASTERN RIGHT-OF-WAY OF U.S. HIGHWAY 82 (100-FOOT RIGHT-OF-WAY); FROM SAID POINT OF COMMENCEMENT THENCE TRAVELING ALONG SAID SOUTHEASTERN RIGHT-OF-WAY NORTH 62 DEGREES 25 MINUTES 3 SECONDS EAST, 745.37 FEET TO A POINT LOCATED ON SAID SOUTHEASTERN RIGHT-OF-WAY BEING THE **TRUE POINT OF BEGINNING**; FROM SAID **TRUE POINT OF BEGINNING**, THENCE CONTINUING ALONG SAID SOUTHEASTERN RIGHT-OF-WAY THE FOLLOWING COURSES AND DISTANCES:

1. NORTH 62 DEGREES 25 MINUTES 3 SECONDS EAST, 71.07 FEET;
2. SOUTH 27 DEGREES 34 MINUTES 57 SECONDS EAST, 10 FEET;
3. NORTH 62 DEGREES 25 MINUTES 3 SECONDS EAST, 10 FEET;
4. NORTH 27 DEGREES 34 MINUTES 57 SECONDS WEST, 10 FEET; AND
5. NORTH 62 DEGREES 25 MINUTES 3 SECONDS EAST, 169.20 FEET;

THENCE LEAVING SAID SOUTHEASTERN RIGHT-OF-WAY AND TRAVELING THE FOLLOWING COURSES AND DISTANCES:

1. SOUTH 27 DEGREES 34 MINUTES 57 SECONDS EAST, 48.42 FEET;
2. SOUTH 80 DEGREES 6 MINUTES 26 SECONDS EAST, 16.32 FEET;
3. SOUTH 9 DEGREES 53 MINUTES 34 SECONDS WEST, 52.33 FEET;
4. SOUTH 3 DEGREES 9 MINUTES 15 SECONDS EAST, 74.96 FEET;
5. NORTH 80 DEGREES 17 MINUTES 40 SECONDS EAST, 24.04 FEET; AND
6. SOUTH 9 DEGREES 42 MINUTES 20 SECONDS EAST, 283.19 FEET TO A POINT LOCATED ON THE NORTHERN RIGHT-OF-WAY OF BOO'S DRIVE (60-FOOT RIGHT-OF-WAY);

THENCE TRAVELING ALONG SAID NORTHERN RIGHT-OF-WAY SOUTH 82 DEGREES 35 MINUTES 55 SECONDS WEST, 73.12 FEET TO A POINT LOCATED ON SAID NORTHERN RIGHT-OF-WAY; THENCE LEAVING SAID NORTHERN RIGHT-OF-WAY AND TRAVELING THE FOLLOWING COURSES AND DISTANCES:

1. NORTH 6 DEGREES 49 MINUTES 32 SECONDS WEST, 98.15 FEET;
2. NORTH 28 DEGREES 10 MINUTES 55 SECONDS WEST, 200.98 FEET;
3. SOUTH 82 DEGREES 35 MINUTES 55 SECONDS WEST, 134.93 FEET;
4. NORTH 27 DEGREES 35 MINUTES 25 SECONDS WEST, 34.94 FEET;
5. NORTH 62 DEGREES 24 MINUTES 35 SECONDS EAST, 26.71 FEET; AND
6. NORTH 28 DEGREES 9 MINUTES 7 SECONDS WEST, 45.56 FEET TO A POINT LOCATED ON THE SOUTHEASTERN RIGHT-OF-WAY OF U.S. HIGHWAY 82, BEING THE **TRUE POINT OF BEGINNING**.

SAID PROPERTY CONTAINING 1.332 ACRES AND BEING DEPICTED AS TRACT 1 ON THAT CERTAIN SURVEY FOR STAFFORD RT, PREPARED BY HAMPTON & ASSOCIATES SURVEYING COMPANY, BEARING THE SEAL OF DARREL HAMPTON, G.R.L.S. NO. 2161, DATED SEPTEMBER 26, 2003, SAID SURVEY BEING INCORPORATED HEREIN AND MADE A PART HEREOF BY REFERENCE.

---

## EXHIBIT "I" TO GROUND LEASE

## MEMORANDUM OF GROUND LEASE

THIS INSTRUMENT PREPARED BY:

WILLIAM J. LIEBERBAUM
2255 CUMBERLAND PARKWAY
BUILDING 1300
ATLANTA, GEORGIA 30339

## MEMORANDUM OF GROUND LEASE

THIS MEMORANDUM OF GROUND LEASE is made as of the _____ day of _____, 2003 by and between RUBY TUESDAY, INC., a Georgia corporation, whose mailing address is 150 West Church Avenue, Maryville, Tennessee 37801, Attention: Legal Department (hereinafter called "Lessee" or "Ruby Tuesday"), and STAFFORD RT, LLC, a Georgia limited liability company, who mailing address is 1805 U.S. Highway 82 West, P.O. Box 269, Tifton, Georgia 31793, and "Lessor".

In consideration of the sum of TEN DOLLARS and other valuable consideration, including that recited in that certain Ground Lease executed by the parties hereto on the _____ day of _____, 2003 ("Lease"), Lessor hereby demises and lets to Lessee and Lessee leases from Lessor that certain property situated in the City of Tifton, County of Tift, State of Georgia, said Leased Premises being described on **Exhibit "A"** hereto (hereinafter referred to as the "Leased Premises"), which said **Exhibit "A"** is by this reference incorporated herein and made a part hereof.

Reference is made to the site plan attached as **Exhibit "B"** hereto and incorporated herein by reference ("Site Plan"). Lessor does hereby grant and convey to Ruby Tuesday, for the term of the Lease and any extensions and renewals thereof, and for the period of time during which Ruby Tuesday is not in material breach of this Lease (after the expiration of all applicable notice and cure periods), for the benefit of the Leased Premises, a perpetual, non-exclusive, uninterrupted right, privilege and easement, which right, privilege and easement shall be appurtenant to and pass with the title to the Leased Premises, for the purposes of (a) pedestrian and vehicular ingress and egress and parking of vehicles over, under, across and through drive lanes, drive aisles, the fifteen (15) specific parking spaces depicted as "Ruby Tuesday Off-site Parking Spaces" on the Site Plan ("Ruby Tuesday Off-site Parking Spaces"), walkways and other common areas as they exist now and from time to time on the Lessor's Larger Tract, as defined in Section 17A hereinbelow; (b) erecting, maintaining and placing a sign on the portion of Lessor's Larger Tract identified as "Ruby Tuesday Sign Area" on **Exhibit "B-1"** attached hereto and incorporated herein by reference ("Ruby Tuesday Sign Area") together with the right to go on Lessor's Larger Tract to install, construct, operate and maintain perpetually a sign with the necessary electric lights, electric lines, poles, footings and attachments in the Ruby Tuesday Sign Area, pursuant to the Sign Lease ("Sign Lease") attached as **Exhibit "C"**, attached hereto and incorporated herein by reference, to be executed by the landlord therein simultaneously with this Lease; (c) the right and an easement to construct, maintain and use for pedestrian and vehicular ingress and egress the curb cut adjacent to the portion of Lessor's Larger Tract depicted as "Wendy's Tract" ("Wendy's Tract") on the Site Plan; (d) the right and an easement to construct, maintain, relocate, enlarge, use and tap into any and all utility lines (including storm drainage facilities) necessary to serve the improvements to be located on the Leased Premises, to the extent that same are required by Ruby Tuesday; and (e) construction of the Ruby Tuesday Off-Site Parking Spaces. Reference is made to the portion of the area depicted on the Site Plan as "Ruby Tuesday Exclusive Parking Area" ("Ruby Tuesday Exclusive Parking Area").

Lessor does hereby reserve and retain only for the benefit of the Wendy's Tract, and not for the benefit of the balance of Lessor's Larger Tract a non-exclusive, perpetual easement, right and privilege, which easement, right and privilege shall be appurtenant to and run with the title to Lessor's Larger Tract, over, across and through the portion of the Leased Premises on which

drive aisles and drive lanes and parking spaces exist from time to time for the purposes of vehicular ingress and egress and parking of vehicles; provided, however, that (i) no parking easement is provided for herein on any portion of the Ruby Tuesday Exclusive Parking Area, and (ii) no easement is granted for parking of vehicles or queuing of vehicles in or around the car wash or any of the other businesses operating on Lessor's Larger Tract now or in the future, to the extent that same blocks the access ways leading to the business operating on the Leased Premises. Ruby Tuesday agrees to use the five (5) parking spaces closest to the car wash, as shown on the Site Plan, as employee parking, and place "Ruby Tuesday Employee Parking Only" signs or similar signs in said parking spaces.

Lessor does also hereby reserve and retain for the benefit of Lessor's Larger Tract a non-exclusive, perpetual easement, right and privilege, which easement, right and privilege shall be appurtenant to and run with the title to Lessor's Larger Tract over, across and through the portion of the Leased Premises on which storm drainage lines currently exist and over the balance of the Leased Premises for the purpose of allowing storm water produced on Lessor's Larger Tract to sheet drain over and drain through the infrastructure currently located on the Leased Premises.

To have and to hold the Leased Premises for an original term ending at midnight on January 31 of the year following the twentieth (20th) full calendar year after the Commencement Date, as defined in the Lease, together with the options of renewal and extension for four (4) additional and consecutive terms of five (5) years each. The parties hereto shall execute a notice setting forth the date of commencement of the original term hereof as expeditiously as practical after the Commencement Date is established.

Section 17 of the Lease provides, in pertinent part, as follows:

1. **General Covenants**. The Leased Premises are part of a larger tract of land which is described on **Exhibit "H"** hereto (hereinafter "Lessor's Larger Tract"). Lessor agrees that no fences or other obstructions prohibiting access to and from the Leased Premises and Lessor's Larger Tract shall be constructed during the original term of the Lease and any renewal term; that Ruby Tuesday, its employees, customers and invitees shall have access rights on Lessor's Larger Tract; that there are sufficient parking spaces on Lessor's Larger Tract, including the Leased Premises to meet the requirements of any laws, ordinances and regulations; that Ruby Tuesday, its employees, customers and invitees shall have a nonexclusive easement for ingress and egress in, on and over Lessor's Larger Tract to and from all streets, alleys and across ways adjacent to said Lessor's Larger Tract; and that no buildings, signs, or other improvements (including, but not limited to, landscaping) shall be constructed upon Lessor's Larger Tract which will reduce the visibility of Ruby Tuesday's signs or of the Leased Premises from any access streets. Lessor agrees to keep the Lessor's Larger Tract in good maintenance and repair and in a safe, clean and sanitary condition. The cost of maintaining and repairing Lessor's Larger Tract and keeping it in a safe, clean and sanitary condition shall be borne solely by Lessor. All repairs, alterations and maintenance of Lessor's Larger Tract shall be solely the cost of the Lessor and Ruby Tuesday shall not be liable for any portion of the cost of repairs, alterations and mainte-nance of Lessor's Larger Tract without Ruby Tuesday's prior written consent.

2. **Interference With Leased Premises**. Notwithstanding any rights, reservations and controls resident in the Lessor in this Lease, or any exhibits thereto, Lessor shall do nothing under this Lease which will (1) unreasonably limit the access to Ruby Tuesday's place of business, including, but not limited to, customer accesses and service court areas as shown on the Site Plan; (2) unreasonably interfere with Ruby Tuesday's business; (3) reduce the ratio of parking spaces specified in this Lease or any exhibit thereto; or (4) in any manner interfere with Ruby Tuesday's exterior facade, including, but not limited to, exterior walls, awnings, signs, en-trances, and decorative work.

3. **Temporary Closing of Lessor's Larger Tract**. Any temporary closing of the common areas of the Lessor's Larger Tract by the Lessor shall not interfere with customer access to Ruby Tuesday's Leased Premises. In addition, any temporary closing of the Lessor's Larger Tract by the Lessor to prevent the acquisition of

public rights shall not extend past the minimum period of time required by the State law to prevent the acquisition of such public rights, or Ruby Tuesday shall be allowed to abate the payment of Rent required hereunder for each day in excess of the minimum period of closing required by law.

4. **Ruby Tuesday Signs**. Ruby Tuesday shall have the option to erect a pylon-type sign on the Leased Premises at a location to be selected by Ruby Tuesday. In addition, Ruby Tuesday shall have the right to place its sign in the Ruby Tuesday Sign Easement Area, pursuant to the Sign Lease, and to place its desired signage on its building on the Leased Premises.

5. **Lessor's Lighting of Lessor's Larger Tract**. Lessor agrees to keep the parking area adjacent to the Leased Premises on the Holiday Inn side of the Leased Premises lit as is appropriate for the Holiday Inn's 24 hour per day operations.

6. **Storage Trailers**.   Ruby Tuesday shall be permitted to place two (2) storage trailers outside the Leased Premises on the Lessor's Larger Tract during Ruby Tuesday's construction period.

The Lease also provides for a right of first refusal, as follows:

From and after the effective date and during the term of this Lease hereof, Ruby Tuesday shall have the right of first refusal and Lessor shall not sell, transfer or otherwise dispose of all or part of Lessor's interest in the Leased Premises until and unless Lessor shall have: (a) obtained a bona fide offer therefor; (b) given notice to Ruby Tuesday, which notice shall contain (i) the name of the offeror, (ii) the address of the offeror, (iii) all of the terms and conditions of such bona fide offer, and (iv) a true and accurate copy of the actual bona fide offer ("Lessor's Notice"); and (c) offered to sell, transfer or otherwise dispose of such interest to Ruby Tuesday at the same price and, except as hereinafter provided, upon the same terms and conditions contained in said bona fide offer.

The specific terms of said right of first refusal are more particularly set forth in the Lease.

The terms, covenants and conditions hereof and of the Lease shall inure to and be binding upon the Lessor and Lessee and their respective successors and assigns.

All of the terms and provisions of the Lease are by reference incorporated herein. Nothing contained herein is intended to or does change or modify any of the terms or provisions of the Lease or the rights, duties, obligations, conditions and agreements created thereby, all of which remain in full force and effect. In the event of any conflict or inconsistency between the terms of this Memorandum of Ground Lease and the terms of the Lease, the Lease shall govern and control for all purposes. All capitalized terms and words of art which are used but not defined herein shall have the same respective meaning designated for such terms and words of art in the Lease.

**Exhibits "A", "A-1", "B", "B-1", "C" and "H"** to the Lease are duplicated and attached hereto and incorporated herein by reference.

The effective date of this Memorandum of Ground Lease shall be considered to be the date of the last execution hereof as reflected by the dates appearing below the signatures of the parties.

Nothing contained herein shall relieve either party of the obligations or deprive either party of the benefits contained in the Lease.

**IN WITNESS WHEREOF**, the parties have caused this Memorandum of Ground Lease to be executed on the date appearing together with their signatures below.

**LESSOR:**

Signed, sealed and delivered
in the presence of:

**STAFFORD RT, LLC**
**a Georgia limited liability company**

1   _____         By:  **Stafford Development Company**
2   Unofficial Witness                   **a Georgia corporation**
3                                        **Its:  Managing Member**
4   _____
5   Notary Public                   By:  _____
6                                        **DENEAN STAFFORD**
7   My Commission Expires: _____   **President and CEO**
8
9
10

1    **IN WITNESS WHEREOF,** the parties have caused this Memorandum of Ground Lease to
2    be executed on the date appearing together with their signatures below.
3
4                                                              **LESSEE:**
5    Signed, sealed and delivered
6    in the presence of:                                      **RUBY TUESDAY, INC.**
7              **a Georgia corporation**
8    _____
9    Unofficial Witness                              By:    _____
10
11                                                   Its:   _____
12   _____
13   Notary Public
14
15   My Commission Expires: _____

## EXHIBIT "A" TO MEMORANDUM OF GROUND LEASE

## DEPICTION OF LEASED PREMISES



| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 4 | UPDATED PROPERTY | DHT | 11/21/03 | | | | | |
| 3 | PARKING SPACE EXCLUSIVE CLARIFICATION | DHT | 10/28/03 | | | | | |
| 2 | UPDATED PROPERTY | DHT | 10/13/03 | | | | | |
| 1 | ADDED ROAD BY OTHERS / ADDITIONAL PARKING | DHT | 04/01/03 | 5 | RELOCATED HANDICAP PARKING | DHT | |
| NO. | REVISIONS | BY | DATE | NO. | REVISIONS | BY | |

### EXHIBIT "A-1"

### LEGAL DESCRIPTION

ALL THAT TRACT OR PARCEL OF LAND LYING AND BEING IN LAND LOTS 307 AND 308 OF THE 6TH DISTRICT, TIFT COUNTY, GEORGIA, BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

COMMENCING AT THE INTERSECTION OF THE NORTHEASTERN RIGHT-OF-WAY OF MCCORMICK DRIVE (80-FOOT RIGHT-OF-WAY) AND THE SOUTHEASTERN RIGHT-OF-WAY OF U.S. HIGHWAY 82 (100-FOOT RIGHT-OF-WAY); FROM SAID POINT OF COMMENCEMENT THENCE TRAVELING ALONG SAID SOUTHEASTERN RIGHT-OF-WAY NORTH 62 DEGREES 25 MINUTES 3 SECONDS EAST, 745.37 FEET TO A POINT LOCATED ON SAID SOUTHEASTERN RIGHT-OF-WAY BEING THE **TRUE POINT OF BEGINNING**; FROM SAID **TRUE POINT OF BEGINNING**, THENCE CONTINUING ALONG SAID SOUTHEASTERN RIGHT-OF-WAY THE FOLLOWING COURSES AND DISTANCES:

1.  NORTH 62 DEGREES 25 MINUTES 3 SECONDS EAST, 71.07 FEET;
2.  SOUTH 27 DEGREES 34 MINUTES 57 SECONDS EAST, 10 FEET;
3.  NORTH 62 DEGREES 25 MINUTES 3 SECONDS EAST, 10 FEET;
4.  NORTH 27 DEGREES 34 MINUTES 57 SECONDS WEST, 10 FEET; AND
5.  NORTH 62 DEGREES 25 MINUTES 3 SECONDS EAST, 169.20 FEET;

THENCE LEAVING SAID SOUTHEASTERN RIGHT-OF-WAY AND TRAVELING THE FOLLOWING COURSES AND DISTANCES:

1.  SOUTH 27 DEGREES 34 MINUTES 57 SECONDS EAST, 48.42 FEET;
2.  SOUTH 80 DEGREES 6 MINUTES 26 SECONDS EAST, 16.32 FEET;
3.  SOUTH 9 DEGREES 53 MINUTES 34 SECONDS WEST, 52.33 FEET;
4.  SOUTH 3 DEGREES 9 MINUTES 15 SECONDS EAST, 74.96 FEET;
5.  NORTH 80 DEGREES 17 MINUTES 40 SECONDS EAST, 24.04 FEET; AND
6.  SOUTH 9 DEGREES 42 MINUTES 20 SECONDS EAST, 283.19 FEET TO A POINT LOCATED ON THE NORTHERN RIGHT-OF-WAY OF BOO'S DRIVE (60-FOOT RIGHT-OF-WAY);

THENCE TRAVELING ALONG SAID NORTHERN RIGHT-OF-WAY SOUTH 82 DEGREES 35 MINUTES 55 SECONDS WEST, 73.12 FEET TO A POINT LOCATED ON SAID NORTHERN RIGHT-OF-WAY; THENCE LEAVING SAID NORTHERN RIGHT-OF-WAY AND TRAVELING THE FOLLOWING COURSES AND DISTANCES:

1.  NORTH 6 DEGREES 49 MINUTES 32 SECONDS WEST, 98.15 FEET;
2.  NORTH 28 DEGREES 10 MINUTES 55 SECONDS WEST, 200.98 FEET;
3.  SOUTH 82 DEGREES 35 MINUTES 55 SECONDS WEST, 134.93 FEET;
4.  NORTH 27 DEGREES 35 MINUTES 25 SECONDS WEST, 34.94 FEET;
5.  NORTH 62 DEGREES 24 MINUTES 35 SECONDS EAST, 26.71 FEET; AND
6.  NORTH 28 DEGREES 9 MINUTES 7 SECONDS WEST, 45.56 FEET TO A POINT LOCATED ON THE SOUTHEASTERN RIGHT-OF-WAY OF U.S. HIGHWAY 82, BEING THE **TRUE POINT OF BEGINNING**.

SAID PROPERTY CONTAINING 1.332 ACRES AND BEING DEPICTED AS TRACT 1 ON THAT CERTAIN SURVEY FOR STAFFORD RT, PREPARED BY HAMPTON & ASSOCIATES SURVEYING COMPANY, BEARING THE SEAL OF DARREL HAMPTON, G.R.L.S. NO. 2161, DATED SEPTEMBER 26, 2003, SAID SURVEY BEING INCORPORATED HEREIN AND MADE A PART HEREOF BY REFERENCE.

---

[26] USER\Client\492\743\Exhibit A-1 - leased premises legal.doc

# EXHIBIT "B"

## SITE PLAN



## EXHIBIT "B"

### SITE PLAN



RUBY TUESDAY OFF-SITE
PARKING SPACES

EXHIBIT "B"

SITE PLAN



| 4 | UPDATED PROPERTY | DMM | 11/21/03 | | | | | |
|---|---|---|---|---|---|---|---|---|
| 3 | PARKING SPACE EXCLUSIVE CLARIFICATION | DMM | 10/29/03 | | | | | |
| 2 | UPDATED PROPERTY | DMM | 10/15/03 | | | | | |
| 1 | ADDED ROAD BY OTHERS / ADDITIONAL PARKING | DMM | 04/11/03 | 5 | RELOCATED HANDICAP PARKING | DMM | |
| NO. | REVISIONS | BY | DATE | NO. | REVISIONS | BY | |

3 of 8



EXHIBIT "B"
SITE PLAN

LESSOR'S LARGER TRACT

40f8



EXHIBIT "B"
SITE PLAN

N

WENDY'S TRACT

56£8

## EXHIBIT "B"

### SITE PLAN



5 PARKING
SPACES CLOSEST
TO CAR WASH

| NO. | REVISIONS | BY | DATE | NO. | REVISIONS | BY | |
|-----|-----------|-----|------|-----|-----------|-----|---|
| 4 | UPDATED PROPERTY | DMT | 11/21/03 | | | | |
| 3 | PARKING SPACE EXCLUSIVE CLARIFICATION | DMT | 10/28/03 | | | | |
| 2 | UPDATED PROPERTY | DMT | 10/15/03 | | | | |
| 1 | ADDED ROAD BY OTHERS / ADDITIONAL PARKING | DMT | 04/00/03 | 5 | RELOCATED HANDICAP PARKING | DMT | |

6of8

CURRENT LOCATION OF
WATER & AIR STATION
& FLAGPOLE

# EXHIBIT "B"

### SITE PLAN



| 4 | UPDATED PROPERTY | DMT | 11/24/03 | | | | |
| 3 | PARKING SPACE EXCLUSIVE CLARIFICATION | DMT | 10/24/03 | | | | |
| 2 | UPDATED PROPERTY | DMT | 10/8/03 | | | | |
| 1 | ADDED ROAD BY OTHERS / ADDITIONAL PARKING | DMT | 04/01/03 | 5 | RELOCATED HANDICAP PARKING | DMT | 12 |
| NO. | REVISIONS | BY | DATE | NO. | REVISIONS | BY | |

7of8

LOCATION OF RELOCATED
WATER & AIR STATION
& FLAGPOLE

**EXHIBIT "B"**

SITE PLAN



| NO. | REVISIONS | BY | DATE | NO. | REVISIONS | BY | |
|---|---|---|---|---|---|---|---|
| 4 | UPDATED PROPERTY | DM1 | 8/28/03 | | | | |
| 3 | PARKING SPACE EXCLUSIVE CLARIFICATION | DM1 | 10/28/03 | | | | |
| 2 | UPDATED PROPERTY | DM1 | 6/6/03 | | | | |
| 1 | ADDED ROAD BY OTHERS / ADDITIONAL PARKING | DM1 | 04/01/03 | 5 | RELOCATED HANDICAP PARKING | DM1 | |

8of8

1
2
3

## EXHIBIT "B-1" TO MEMORANDUM OF GROUND LEASE

### DEPICTION OF RUBY TUESDAY SIGN AREA



1
2
3

## EXHIBIT "B-1" TO MEMORANDUM OF GROUND LEASE

## DEPICTION OF RUBY TUESDAY SIGN AREA

### LEGAL DESCRIPTION

All that tract or parcel of land lying and being in Land Lot 308 of the 6th District, City of Tifton, Tift County, Georgia, being more particularly described as follows:

Commencing at a point at the intersection of the northeastern right-of-way of McCormick Drive (an 80-foot right-of-way) and the southeastern right-of-way of U.S. Highway 82 (a 100-foot right-of-way); from said point of commencement, thence traveling along the southeastern right-of-way of U.S. Highway 82 the following courses and distances: North 62 degrees 25 minutes 3 seconds East, 745.37 feet; North 62 degrees 25 minutes 3 seconds East, 71.07 feet; South 27 degrees 34 minutes 57 seconds East, 10 feet; North 62 degrees 25 minutes 3 seconds East, 10 feet; North 27 degrees 34 minutes 57 seconds West, 10 feet; North 62 degrees 25 minutes 3 seconds East, 169.20 feet; North 62 degrees 25 minutes 3 seconds East, 43.19 feet; North 62 degrees 25 minutes 6 seconds East, 186 feet; South 27 degrees 35 minutes 25 seconds East, 10 feet; and North 78 degrees 32 minutes 32 seconds East, 255.53 to a point at the intersection of the southeastern right-of-way of U.S. Highway 82 and the western right-of-way of Interstate Highway 75; thence traveling along the western right-of-way of Interstate Highway 75 the following courses and distances: South 10 degrees 4 minutes 20 seconds East, 351.76 feet and South 36 degrees 23 minutes 38 seconds East, 241.04 feet to the TRUE POINT OF BEGINNING.

From said TRUE POINT OF BEGINNING, continuing along said western right-of-way Interstate Highway 75 South 36 degrees 23 minutes 53 seconds East, 21.37 feet; thence leaving said right-of-way and traveling South 74 degrees 15 minutes 8 seconds West, 66.51 feet to a point; thence traveling North 15 degrees 45 minutes 9 seconds West, 20 feet to a point; thence traveling North 74 degrees 15 minutes 27 seconds East, 58.97 feet to a point located on the western right-of-way of Interstate Highway 75 being the TRUE POINT OF BEGINNING.

Said property being depicted as Tract 3 containing 0.029 acres as more particularly depicted on that certain Survey for Stafford RT, prepared by Hampton & Associates Surveying Co., bearing the seal of Derrell Hampton, G.R.L.S. No. 2161, dated December 17, 2003, said survey being incorporated herein and made a part hereof by reference.

[26] USER\Client\492\743\Legal Description.doc                    Page 1

EXHIBIT "C" TO MEMORANDUM OF GROUND LEASE

## SIGN LEASE

This **SIGN LEASE** ("Lease") entered into by and between **STAFFORD DEVELOPMENT COMPANY**, a Georgia corporation, successor by corporate merger to Interstate Inns, Inc., whose address is 1805 U.S. Highway 82 West, P.O. Box 269, Tifton, Georgia 31793 ("Lessor") and **RUBY TUESDAY, INC.**, a Georgia corporation, whose address is 150 West Church Avenue, Maryville, Tennessee 37801 ("Lessee"), this ___ day of _____, 2003.

## W I T N E S S E T H

**WHEREAS**, Lessor is the owner of that certain parcel of land described on the attached **Exhibit "A"**, which parcel shall be referred to herein as the Leased Premises; and

**WHEREAS**, Lessee desires to lease the Leased Premises from Lessor for the purposes of placing, operating, and maintaining a sign ("Sign") advertising its restaurant on an adjacent parcel ("Restaurant").

**NOW, THEREFORE**, for and in consideration of the mutual covenants and obligations contained herein, the receipt and sufficiency of which are hereby acknowledged, Lessor hereby leases to Lessee, and Lessee hereby leases from Lessor, the Leased Premises, together with the right to access, operate and maintain the Sign, pursuant to the terms and conditions set forth herein, at Lessee's sole cost and expense.

Lessor does hereby grant and convey to Ruby Tuesday, for the term of the Lease and any extensions and renewals thereof, for the benefit of the Leased Premises, a perpetual, non-exclusive, uninterrupted right, privilege and easement, which right, privilege and easement shall be appurtenant to and pass with the title to the Leased Premises, for the purposes of (a) pedestrian and vehicular ingress and egress and (b) the right and an easement to construct, maintain, relocate, enlarge, use and tap into any and all utility lines necessary to serve the Sign, over and across the portion of Lessor's adjacent land depicted as "Access and Utility Easement Area" on **Exhibit "B"**.

The term of the Lease shall be identical to the term of that certain Ground Lease from Stafford RT, LLC to Lessee, dated _____, for the lease of the Restaurant ("Prime Lease"). If the Prime Lease shall terminate for any reason, then this Sign Lease shall also terminate as of the same date. Any extension, renewal, or exercise of any option period of, or with regard to, the Prime Lease shall also work to extend this Sign Lease for any identical period.

If the Sign is not permitted or is ordered removed by any applicable governmental agency's rule, regulation or ordinance ("Government") and Lessee is required to remove it ("Removal"), then (a) if the Removal is required by the Government during the first year of this Lease, Lessor shall remove the Sign (including the pole and pylons, but not the base) at Lessor's expense; and (b) if the Removal is required by the Government after the first year of this Lease, then Lessee shall remove the Sign at Lessee's expense (including the pole and pylons, but not the base).

Annual rental throughout the term and any extension thereof shall be $1.00 per year, payable annually in advance to Lessor at Tifton, Georgia or such other address designated in writing by Lessor.

As between Lessor and Lessee, all structures, equipment and materials placed on the Leased Premises shall remain the property of the Lessor, except the sign itself which bears the name of Lessee, its successors or assigns, which shall remain the property of Lessee, its successors or assigns. Lessee is granted the right to remove its property, if any, from the Leased Premises within ninety (90) days after the expiration of this Lease or any renewal or extension thereof. Lessee may not enlarge the sign, change the height or width of or remove

the structures currently installed on the leased Premises to support the sign or otherwise alter the Leased Premises (excepting the installation of the sign itself at the top of the currently installed pole and alteration to the face of the sign only if and to the extent required for Lessee to obtain its sign permits) without the written consent of Lessor, in Lessor's sole and unfettered discretion.

In the event of a condemnation or casualty affecting the Leased Premises during the term hereof, Lessee shall have the right, but not the obligation, to terminate this Lease, at which point all rights and obligations hereunder, including the obligation to pay rent, shall immediately cease and terminate.

Following the execution of this Lease, Lessee shall have the right to terminate the Lease at any time prior to the commencement of the next renewal term by providing written notice of such intentions.

Lessor represents and warrants that Lessor is the owner of the fee simple interest in the Leased Premises, and has the authority to enter into this Lease; provided, however, that Lessor makes no representation with regard to whether the Lessee's sign will be permitted by the Government.

Lessee shall be responsible at its sole cost and expense to provide any required utility services to the Leased Premises and shall maintain the Leased Premises in an attractive and first class condition.

Should any provision hereof be declared invalid by a legislative, administrative or judicial body of competent jurisdiction, the other provisions hereof shall remain in full force and effect and shall be unaffected by same.

The parties agree to cooperate in negotiating, executing, and recording in the public deed records of Tift County, Georgia a memorandum of this Sign Lease.

All notices and approvals required or permitted hereunder shall be served by either certified mail, return receipt requested, or by hand delivery, or by a nationally recognized overnight delivery service, such as Fed Ex, to a party at the last known address of its principal place of business or

| | |
|---|---|
| If to Lessor: | Stafford Development Company<br>1805 U.S. Highway 82 West<br>P.O. Box 269<br>Tifton, Georgia 31793<br>Attn: President |
| With copy to: | Stafford Properties, Inc.<br>80 West Wieuca Street<br>Suite 302<br>Atlanta, Georgia 30342<br>Attn: Mike Puckett |
| If to Lessee: | Ruby Tuesday, Inc.<br>150 West Church Avenue<br>Maryville, Tennessee 37801<br>Attn Legal: Legal Real Estate |

This Lease may not be assigned by Lessee to any other party except as part of a permitted assignment of the Prime Lease.

This Lease shall be construed under the laws of the State of Georgia .

IN WITNESS WHEREOF, the undersigned hereby sets its hand and seal, on the ___ day of _____, 2003.

                              LESSOR:

WITNESSES:                    STAFFORD DEVELOPMENT COMPANY
                              a Georgia corporation, successor by corporate
                                  merger to Interstate Inns, Inc.

_____


_____


                              By: _____
                                  **DENEAN STAFFORD**
                                  **President and CEO**


                              ATTEST:
                              By: _____
                              Its:

                              Date:



                              RUBY TUESDAY:

WITNESSES:                    RUBY TUESDAY, INC.
                              a Georgia corporation

_____

                              By: _____
_____       Its:


                              ATTEST:

                              By: _____
                              Its:

                              Date:



List of Exhibits:

Exhibit "A"  -  Depiction of Leased Premises
Exhibit "B"  -  Depiction of Access and Utility Easement Area

## EXHIBIT "A" TO SIGN LEASE

### Depiction of Leased Premises



# EXHIBIT "A" TO SIGN LEASE

## LEGAL DESCRIPTION

All that tract or parcel of land lying and being in Land Lot 308 of the 6th District, City of Tifton, Tift County, Georgia, being more particularly described as follows:

Commencing at a point at the intersection of the northeastern right-of-way of McCormick Drive (an 80-foot right-of-way) and the southeastern right-of-way of U.S. Highway 82 (a 100-foot right-of-way); from said point of commencement, thence traveling along the southeastern right-of-way of U.S. Highway 82 the following courses and distances: North 62 degrees 25 minutes 3 seconds East, 745.37 feet; North 62 degrees 25 minutes 3 seconds East, 71.07 feet; South 27 degrees 34 minutes 57 seconds East, 10 feet; North 62 degrees 25 minutes 3 seconds East, 10 feet; North 27 degrees 34 minutes 57 seconds West, 10 feet; North 62 degrees 25 minutes 3 seconds East, 169.20 feet; North 62 degrees 25 minutes 3 seconds East, 43.19 feet; North 62 degrees 25 minutes 6 seconds East, 186 feet; South 27 degrees 35 minutes 25 seconds East, 10 feet; and North 78 degrees 32 minutes 32 seconds East, 255.53 to a point at the intersection of the southeastern right-of-way of U.S. Highway 82 and the western right-of-way of Interstate Highway 75; thence traveling along the western right-of-way of Interstate Highway 75 the following courses and distances: South 10 degrees 4 minutes 20 seconds East, 351.76 feet and South 36 degrees 23 minutes 38 seconds East, 241.04 feet to the TRUE POINT OF BEGINNING.

From said TRUE POINT OF BEGINNING, continuing along said western right-of-way Interstate Highway 75 South 36 degrees 23 minutes 53 seconds East, 21.37 feet; thence leaving said right-of-way and traveling South 74 degrees 15 minutes 8 seconds West, 66.51 feet to a point; thence traveling North 15 degrees 45 minutes 9 seconds West, 20 feet to a point; thence traveling North 74 degrees 15 minutes 27 seconds East, 58.97 feet to a point located on the western right-of-way of Interstate Highway 75 being the TRUE POINT OF BEGINNING.

Said property being depicted as Tract 3 containing 0.029 acres as more particularly depicted on that certain Survey for Stafford RT, prepared by Hampton & Associates Surveying Co., bearing the seal of Derrell Hampton, G.R.L.S. No. 2161, dated December 17, 2003, said survey being incorporated herein and made a part hereof by reference.

---

# EXHIBIT "B" TO SIGN LEASE

Depiction of Access and Utility Easement Area



## JOINDER TO SIGN LEASE

**SOUTHTRUST BANK,** an Alabama corporation ("Lender"), being the current holder of a mortgage ("Mortgage") on the Access and Utility Easement Area (as such term is defined by the foregoing Sign Lease ("Lease"), said Mortgage being evidenced for record by that certain Deed to Secure Debt ("Deed") filed in Deed Book 893, Page 222, in the Office of the Clerk of the Superior Court of Tift County, Georgia, hereby consents to the Access and Utility Easement rights conveyed in the foregoing Lease. Lender agrees that should Lender foreclose on the Mortgage and/or otherwise come into possession of Access and Utility Easement Area by foreclosure or deed in lieu of foreclosure or otherwise, then Lender shall be bound by and comply with the easement rights contained in the foregoing Lease.

**SOUTHTRUST BANK**
an Alabama corporation

**By:** _____

**Print Name:** _____

**Its:** _____

[CORPORATE SEAL]

**ATTEST:** _____

**Print Name:** _____

**Its:** _____

Signed, sealed and delivered
in the presence of:

_____

UNOFFICIAL WITNESS

_____

NOTARY PUBLIC

My Commission Expires: _____

(Affix Notarial Seal)

EXHIBIT "H" TO MEMORANDUM OF GROUND LEASE

LEGAL DESCRIPTION OF LESSOR'S LARGER TRACT

1
2
3
4
5

## DESCRIPTION OF LAND

ALL THAT TRACT OR PARCEL OF LAND lying and being located in the City of Tifton in Land Lots 307 and 308 of the 6th Land District of Tift County, Georgia, and being more particularly described as follows:

COMMENCE AT THE INTERSECTION of the South right of way line of U.S. Highway 82 (a 100 foot right of way) with the East right of way line of McCormick Drive (an 80 foot right of way); thence leaving the East right of way line of McCormick Drive running North 62 degrees 25 minutes 03 seconds East along the South right of way line of U.S. Highway 82 a distance of 530.19 feet to a point and the TRUE POINT OF BEGINNING; thence continuing along the South right of way line of U.S. Highway 82 running North 62 degrees 25 minutes 03 seconds East a distance of 292.65 feet to a point; thence leaving the South right of way line of U.S. Highway 82 running South 01 degrees 54 minutes 06 seconds East a distance of 111.86 feet to a point; thence running North 82 degrees 35 minutes 55 seconds East a distance of 300.00 feet to a point; thence running South 01 degrees 54 minutes 05 seconds East a distance of 218.86 feet to a point; thence running South 82 degrees 35 minutes 55 seconds West a distance of 19.00 feet to a point; thence running South 10 degrees 38 minutes 05 seconds East a distance of 40.00 feet to a point; thence running South 79 degrees 12 minutes 38 seconds West a distance of 289.25 feet to a point; thence running south 62 degrees 23 minutes 35 seconds West a distance of 129.00 feet to a point; thence running North 26 degrees 46 minutes 10 seconds West a distance of 137.91 feet to a point; thence running North 26 degrees 53 minutes 42 seconds West a distance of 210.00 feet to a point on the South right of way line of U.S. Highway 82 and the TRUE POINT OF BEGINNING.

Said tract or parcel of land contains 3.509 acres as shown on that certain plat of survey prepared for Stafford Foods, Inc, Bank of America, N.A. and Lawyers Title Insurance Corporation, prepared by Hampton & Associates Surveying Co., and bearing the signature and seal of Derrell Hampton, GRLS No. 2161, dated January 27, 2000, last revised _____

LESS AND EXCEPT

000694 Bk:00792 Pg:0202
REC'D TIFT CO. CLERK'S OFFICE
Date:02/09/2000
GWEN C. PATE, CLERK

1
2
3
4
5

# EXHIBIT "H" TO MEMORANDUM OF GROUND LEASE

## LEGAL DESCRIPTION OF LESSOR'S LARGER TRACT

ALL THAT TRACT or parcel of land being 5.786 acres in Land Lot 308 in the 6th Land District of Tift County, Georgia, and a portion in the City of Tifton, more fully described as follows:

COMMENCE at the intersection of the west Land Lot line of Land Lot 308 and the South right-of-way line of U.S. Highway 82; thence run North 62 degrees 25 minutes 03 seconds East 216.00 feet to the POINT OF BEGINNING; thence North 62 degrees 25 minutes 03 seconds East 186.00 feet to a point; thence South 27 degrees 34 minutes 57 seconds East 10.00 feet to a point; thence North 78 degrees 32 minutes 36 seconds East 255.53 feet to a point and the west right-of-way line of Interstate 75; thence South 10 degrees 04 minutes 24 seconds East 351.76 feet along the west right of way line of Interstate 75 to a point; thence South 36 degrees 23 minutes 35 seconds East 241.04 feet to a point on the west right of way line of Interstate 75; thence South 74 degrees 15 minutes 06 seconds West 58.97 feet to a point; thence South 15 degrees 44 minutes 54 seconds East 20.00 feet to a point; thence North 74 degrees 15 minutes 06 seconds East 66.51 feet to a point on the west right of way line of Interstate 75; thence South 36 degrees 23 minutes 35 seconds East 16.29 feet to a point; thence South 22 degrees 07 minutes 35 seconds East 18.99 feet to a point on the west right of way line of Interstate 75; thence South 81 degrees 35 minutes 22 seconds WEST 534.48 feet to a point; thence North 10 degrees 38 minutes 05 seconds West 146.59 feet to a point; thence North 82 degrees 35 minutes 55 seconds East 19.00 feet to a point; thence North 01 degree 54 minutes 05 seconds West 218.86 feet to a point; thence North 32 degrees 22 minutes 05 seconds West 205.02 feet to the POINT OF BEGINNING.

011756 Bk:00893 Pg:0248
REC'D TIFT CO. CLERK'S OFFICE
Date:10/03/2001
GWEN C. PATE, CLERK

1    EXHIBIT "H" TO MEMORANDUM OF GROUND LEASE
2
3    LEGAL DESCRIPTION OF LESSOR'S LARGER TRACT
4

## LEGAL DESCRIPTION

All that tract or parcel of land lying and being in Land Lot 308 of the 6th District, City of Tifton, Tift County, Georgia, being more particularly described as follows:

Commencing at a point at the intersection of the northeastern right-of-way of McCormick Drive (an 80-foot right-of-way) and the southeastern right-of-way of U.S. Highway 82 (a 100-foot right-of-way); from said point of commencement, thence traveling along the southeastern right-of-way of U.S. Highway 82 the following courses and distances: North 62 degrees 25 minutes 3 seconds East, 745.37 feet; North 62 degrees 25 minutes 3 seconds East, 71.07 feet; South 27 degrees 34 minutes 57 seconds East, 10 feet; North 62 degrees 25 minutes 3 seconds East, 10 feet; North 27 degrees 34 minutes 57 seconds West, 10 feet; North 62 degrees 25 minutes 3 seconds East, 169.20 feet; North 62 degrees 25 minutes 3 seconds East, 43.19 feet; North 62 degrees 25 minutes 6 seconds East, 186 feet; South 27 degrees 35 minutes 25 seconds East, 10 feet; and North 78 degrees 32 minutes 32 seconds East, 255.53 to a point at the intersection of the southeastern right-of-way of U.S. Highway 82 and the western right-of-way of Interstate Highway 75; thence traveling along the western right-of-way of Interstate Highway 75 the following courses and distances: South 10 degrees 4 minutes 20 seconds East, 351.76 feet and South 36 degrees 23 minutes 38 seconds East, 241.04 feet to the TRUE POINT OF BEGINNING.

From said TRUE POINT OF BEGINNING, continuing along said western right-of-way Interstate Highway 75 South 36 degrees 23 minutes 53 seconds East, 21.37 feet; thence leaving said right-of-way and traveling South 74 degrees 15 minutes 8 seconds West, 66.51 feet to a point; thence traveling North 15 degrees 45 minutes 9 seconds West, 20 feet to a point; thence traveling North 74 degrees 15 minutes 27 seconds East, 58.97 feet to a point located on the western right-of-way of Interstate Highway 75 being the TRUE POINT OF BEGINNING.

Said property being depicted as Tract 3 containing 0.029 acres as more particularly depicted on that certain Survey for Stafford RT, prepared by Hampton & Associates Surveying Co., bearing the seal of Derrell Hampton, G.R.L.S. No. 2161, dated December 17, 2003, said survey being incorporated herein and made a part hereof by reference.

1
2
3
4
5

# EXHIBIT "H" TO MEMORANDUM OF GROUND LEASE

## LEGAL DESCRIPTION OF LESSOR'S LARGER TRACT

### LESS AND EXCEPT

### LEGAL DESCRIPTION

ALL THAT TRACT OR PARCEL OF LAND LYING AND BEING IN LAND LOTS 307 AND 308 OF THE 6TH DISTRICT, TIFT COUNTY, GEORGIA, BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

COMMENCING AT THE INTERSECTION OF THE NORTHEASTERN RIGHT-OF-WAY OF MCCORMICK DRIVE (80-FOOT RIGHT-OF-WAY) AND THE SOUTHEASTERN RIGHT-OF-WAY OF U.S. HIGHWAY 82 (100-FOOT RIGHT-OF-WAY); FROM SAID POINT OF COMMENCEMENT THENCE TRAVELING ALONG SAID SOUTHEASTERN RIGHT-OF-WAY NORTH 62 DEGREES 25 MINUTES 3 SECONDS EAST, 745.37 FEET TO A POINT LOCATED ON SAID SOUTHEASTERN RIGHT-OF-WAY BEING THE **TRUE POINT OF BEGINNING**; FROM SAID **TRUE POINT OF BEGINNING**, THENCE CONTINUING ALONG SAID SOUTHEASTERN RIGHT-OF-WAY THE FOLLOWING COURSES AND DISTANCES:

1.   NORTH 62 DEGREES 25 MINUTES 3 SECONDS EAST, 71.07 FEET;
2.   SOUTH 27 DEGREES 34 MINUTES 57 SECONDS EAST, 10 FEET;
3.   NORTH 62 DEGREES 25 MINUTES 3 SECONDS EAST, 10 FEET;
4.   NORTH 27 DEGREES 34 MINUTES 57 SECONDS EAST, 10 FEET; AND
5.   NORTH 62 DEGREES 25 MINUTES 3 SECONDS EAST, 169.20 FEET;

THENCE LEAVING SAID SOUTHEASTERN RIGHT-OF-WAY AND TRAVELING THE FOLLOWING COURSES AND DISTANCES:

1.   SOUTH 27 DEGREES 34 MINUTES 57 SECONDS EAST, 48.42 FEET;
2.   SOUTH 80 DEGREES 6 MINUTES 26 SECONDS EAST, 16.32 FEET;
3.   SOUTH 9 DEGREES 53 MINUTES 34 SECONDS WEST, 52.33 FEET;
4.   SOUTH 3 DEGREES 9 MINUTES 15 SECONDS EAST, 74.96 FEET;
5.   NORTH 80 DEGREES 17 MINUTES 40 SECONDS EAST, 24.04 FEET; AND
6.   SOUTH 9 DEGREES 42 MINUTES 20 SECONDS EAST, 283.19 FEET TO A POINT LOCATED ON THE NORTHERN RIGHT-OF-WAY OF BOO'S DRIVE (60-FOOT RIGHT-OF-WAY);

THENCE TRAVELING ALONG SAID NORTHERN RIGHT-OF-WAY SOUTH 82 DEGREES 35 MINUTES 55 SECONDS WEST, 73.12 FEET TO A POINT LOCATED ON SAID NORTHERN RIGHT-OF-WAY; THENCE LEAVING SAID NORTHERN RIGHT-OF-WAY AND TRAVELING THE FOLLOWING COURSES AND DISTANCES:

1.   NORTH 6 DEGREES 49 MINUTES 32 SECONDS WEST, 98.15 FEET;
2.   NORTH 28 DEGREES 10 MINUTES 55 SECONDS WEST, 200.98 FEET;
3.   SOUTH 82 DEGREES 35 MINUTES 55 SECONDS WEST, 134.93 FEET;
4.   NORTH 27 DEGREES 35 MINUTES 25 SECONDS WEST, 34.94 FEET;
5.   NORTH 62 DEGREES 24 MINUTES 35 SECONDS EAST, 26.71 FEET; AND
6.   NORTH 28 DEGREES 9 MINUTES 7 SECONDS WEST, 45.56 FEET TO A POINT LOCATED ON THE SOUTHEASTERN RIGHT-OF-WAY OF U.S. HIGHWAY 82, BEING THE **TRUE POINT OF BEGINNING**.

SAID PROPERTY CONTAINING 1.332 ACRES AND BEING DEPICTED AS TRACT 1 ON THAT CERTAIN SURVEY FOR STAFFORD RT, PREPARED BY HAMPTON & ASSOCIATES SURVEYING COMPANY, BEARING THE SEAL OF DARREL HAMPTON, G.R.L.S. NO. 2161, DATED SEPTEMBER 26, 2003, SAID SURVEY BEING INCORPORATED HEREIN AND MADE A PART HEREOF BY REFERENCE.

---

[26] USER\Client\492\743\Exhibit A-1 - leased premises legal.doc        Page 1

## JOINDER TO MEMORANDUM OF GROUND LEASE

TIFTON INNS, LLC ("Adjacent Land Owner"), being the current owner of the portion of Lessor's Larger Tract more particularly described on **Schedule 1** to this Joinder, hereby consents to the foregoing Ground Lease ("Lease"), to the extent that said Ground Lease affects or encumbers the property described in **Schedule 1** hereto. Adjacent Land Owner agrees that Adjacent Land Owner's fee simple interest in and to said Lessor's Larger Tract shall be subject and subordinate to the rights of the lessee under the Lease.

IN WITNESS WHEREOF, the undersigned hereby sets its hand and seal on the _____ day of _____, 2003.

TIFTON INNS, LLC
a Georgia limited liability company


By: Stafford Development Company
a Georgia corporation
Its: Managing Member


By: _____
DENEAN STAFFORD
President and CEO

1

## SCHEDULE 1 TO TIFTON INNS, LLC JOINDER

## JOINDER TO MEMORANDUM OF GROUND LEASE

**SOUTHTRUST BANK**, an Alabama corporation ("Lender"), being the current holder of a mortgage ("Mortgage") on portion of the Lessor's Larger Tract (as such term is defined by the foregoing Memorandum of Ground Lease) described on Schedule 1 hereto, said Mortgage being evidenced for record by that certain Deed to Secure Debt and Security Agreement ("Deed") filed in Deed Book 893, Page 222, in the Office of the Clerk of the Superior Court of Tift County, Georgia, hereby consents to the foregoing Memorandum of Ground Lease. Lender agrees that should Lender foreclose on the Mortgage and/or otherwise come into possession of the portion of Lessor's Larger Tract described on Schedule 1 by foreclosure or deed in lieu of foreclosure or otherwise, then Lender shall be bound by and comply with all of the terms, conditions, easements and obligations created and contained in the foregoing Memorandum of Ground Lease.

**SOUTHTRUST BANK**
an Alabama corporation

By: _____
**Print Name:** _____
Its: _____

**[CORPORATE SEAL]**

**ATTEST:** _____
**Print Name:** _____
Its: _____

Signed, sealed and delivered
in the presence of:

_____
UNOFFICIAL WITNESS

_____
NOTARY PUBLIC

My Commission Expires: _____

(Affix Notarial Seal)

1                   <u>SCHEDULE 1 TO SOUTHTRUST BANK JOINDER</u>

## JOINDER TO MEMORANDUM OF GROUND LEASE

**STAFFORD FOODS, INC.** ("Owner"), being the current owner of the portion of Lessor's Larger Tract more particularly described on **Schedule 1** to this Joinder, hereby consents to the foregoing Memorandum of Ground Lease ("Memorandum"), to the extent that said Memorandum affects or encumbers the property described on **Schedule 1** hereto. Owner agrees that Owner's fee simple estate in and to the property described on **Schedule 1** shall be subject and subordinate to the rights of the lessee under the Memorandum in and to Lessor's Larger Tract.

**IN WITNESS WHEREOF**, the undersigned hereby sets its hand and seal on the _____ day of _____, 2003.

STAFFORD FOODS, INC.

By: _____

Its: _____

1
2

## SCHEDULE 1 TO STAFFORD FOODS, INC. JOINDER

## JOINDER TO MEMORANDUM OF GROUND LEASE

BANK OF AMERICA, N.A., a national banking association ("Lender"), being the current holder of a mortgage ("Mortgage") on that portion of the Lessor's Larger Tract (as such term is defined by the foregoing Memorandum of Ground Lease) described on Schedule 1 hereto, said Mortgage being evidenced for record by that certain Deed to Secure Debt, Assignment and Security Agreement ("Deed") filed in Deed Book 792, Page 182, in the Office of the Clerk of the Superior Court of Tift County, Georgia, hereby consents to the foregoing Memorandum of Ground Lease. Lender agrees that should Lender foreclose on the Mortgage and/or otherwise come into possession of the portion of Lessor's Larger Tract described on Schedule 1 by foreclosure or deed in lieu of foreclosure or otherwise, then Lender shall be bound by and comply with all of the terms, conditions, easements and obligations created and contained in the foregoing Memorandum of Ground Lease.

BANK OF AMERICA, N.A.
a national banking association

By: _____
Print Name: _Michael H. Harpe_
Its: _SVP_

[CORPORATE SEAL]

ATTEST: _____
Print Name: _KRISTIN GANAS_
Its: _BANKING OFFICER_

Signed, sealed and delivered
in the presence of:

_____
UNOFFICIAL WITNESS

_____
NOTARY PUBLIC

My Commission Expires: _Oct 17 2004_

(Affix Notarial Seal)

DEANNA M. WILSON
NOTARY
My Comm. Exp.
Oct. 17, 2004
PUBLIC
LOWNDES COUNTY, GA

SCHEDULE I TO BANK OF AMERICA, N.A. JOINDER



EXHIBIT "A"

DESCRIPTION OF LAND

ALL THAT TRACT OR PARCEL OF LAND lying and being located in the City of [illegible], on Land Loop 307 and 308 of the 6th Land District of Hill County, Georgia, and being more particularly described as follows:

COMMENCE AT THE INTERSECTION of the South right of way line of U.S. Highway 82 (a 100 foot right of way) with the East right of way line of McDonald Drive (an 80 foot right of way); thence leaving the East right of way line of McDonald Drive and running North 62 degrees 25 minutes 03 seconds East along the South right of way line of U.S. Highway 82 a distance of [illegible] feet to a point and the TRUE POINT OF BEGINNING; thence continuing along the South right of way line of U.S. Highway 82 running North 62 degrees 25 minutes 03 seconds East a distance of [illegible] feet to a point; thence leaving the South right of way line of U.S. Highway 82 running South 01 degree 54 minutes 06 seconds East a distance of [illegible] feet to a point; thence running South 35 minutes 55 seconds East a distance of 300.00 feet to a point; thence running South 82 degree 35 minutes 55 second West a distance of 19.00 feet to a point; thence running South 10 degrees 36 minutes 00 seconds East a distance of 40.00 feet to a point; thence running South 79 degrees 12 minutes 36 seconds West a distance of [illegible] feet to a point; thence running North 62 degrees [illegible] minutes 35 seconds West a distance of 130.00 feet to a point; thence running North 26 degrees 46 minutes 10 seconds West a distance of [illegible] feet to a point; thence running North 26 degrees 53 minutes 42 seconds West a distance of 210.00 feet to a point on the South right of way line of U.S. Highway 82 and the TRUE POINT OF BEGINNING.

Said tract or parcel of land being located 3,550 acres as shown on that certain plat of survey prepared for [illegible], Inc., Bank of America, N.A., and LaSalle Bank National Corporation, prepared by Hampton & Associates Surveying Co., and bearing the signature and seal of Darrell Hampton, GRLS No. 2161, dated January 27, 2000, last revised.

LESS AND EXCEPT

000691 BK:00792R PG:0202
REC:01/27/2000, CLERK'S OFFICE
GWEN C. PATE, CLERK

 **LESS AND EXCEPT**

## LEGAL DESCRIPTION

ALL THAT TRACT OR PARCEL OF LAND LYING AND BEING IN LAND LOTS 307 AND 308 OF THE 6TH DISTRICT, TIFT COUNTY, GEORGIA, BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

COMMENCING AT THE INTERSECTION OF THE NORTHEASTERN RIGHT-OF-WAY OF MCCORMICK DRIVE (80-FOOT RIGHT-OF-WAY) AND THE SOUTHEASTERN RIGHT-OF-WAY OF U.S. HIGHWAY 82 (100-FOOT RIGHT-OF-WAY); FROM SAID POINT OF COMMENCEMENT THENCE TRAVELING ALONG SAID SOUTHEASTERN RIGHT-OF-WAY NORTH 62 DEGREES 25 MINUTES 3 SECONDS EAST, 745.37 FEET TO A POINT LOCATED ON SAID SOUTHEASTERN RIGHT-OF-WAY BEING THE **TRUE POINT OF BEGINNING**; FROM SAID **TRUE POINT OF BEGINNING**, THENCE CONTINUING ALONG SAID SOUTHEASTERN RIGHT-OF-WAY THE FOLLOWING COURSES AND DISTANCES:

1. NORTH 62 DEGREES 25 MINUTES 3 SECONDS EAST, 71.07 FEET;
2. SOUTH 27 DEGREES 34 MINUTES 57 SECONDS EAST, 10 FEET;
3. NORTH 62 DEGREES 25 MINUTES 3 SECONDS EAST, 10 FEET;
4. NORTH 27 DEGREES 34 MINUTES 57 SECONDS WEST, 10 FEET; AND
5. NORTH 62 DEGREES 25 MINUTES 3 SECONDS EAST, 169.20 FEET;

THENCE LEAVING SAID SOUTHEASTERN RIGHT-OF-WAY AND TRAVELING THE FOLLOWING COURSES AND DISTANCES:

1. SOUTH 27 DEGREES 34 MINUTES 57 SECONDS EAST, 48.42 FEET;
2. SOUTH 80 DEGREES 6 MINUTES 26 SECONDS EAST, 16.32 FEET;
3. SOUTH 9 DEGREES 53 MINUTES 34 SECONDS WEST, 52.33 FEET;
4. SOUTH 3 DEGREES 9 MINUTES 15 SECONDS EAST, 74.96 FEET;
5. NORTH 80 DEGREES 17 MINUTES 40 SECONDS EAST, 24.04 FEET; AND
6. SOUTH 9 DEGREES 42 MINUTES 20 SECONDS EAST, 283.19 FEET TO A POINT LOCATED ON THE NORTHERN RIGHT-OF-WAY OF BOO'S DRIVE (60-FOOT RIGHT-OF-WAY);

THENCE TRAVELING ALONG SAID NORTHERN RIGHT-OF-WAY SOUTH 82 DEGREES 35 MINUTES 55 SECONDS WEST, 73.12 FEET TO A POINT LOCATED ON SAID NORTHERN RIGHT-OF-WAY; THENCE LEAVING SAID NORTHERN RIGHT-OF-WAY AND TRAVELING THE FOLLOWING COURSES AND DISTANCES:

1. NORTH 6 DEGREES 49 MINUTES 32 SECONDS WEST, 98.15 FEET;
2. NORTH 28 DEGREES 10 MINUTES 55 SECONDS WEST, 200.98 FEET;
3. SOUTH 82 DEGREES 35 MINUTES 55 SECONDS WEST, 134.93 FEET;
4. NORTH 27 DEGREES 35 MINUTES 25 SECONDS WEST, 34.94 FEET;
5. NORTH 62 DEGREES 24 MINUTES 35 SECONDS EAST, 26.71 FEET; AND
6. NORTH 28 DEGREES 9 MINUTES 7 SECONDS WEST, 45.56 FEET TO A POINT LOCATED ON THE SOUTHEASTERN RIGHT-OF-WAY OF U.S. HIGHWAY 82, BEING THE **TRUE POINT OF BEGINNING**.

SAID PROPERTY CONTAINING 1.332 ACRES AND BEING DEPICTED AS TRACT 1 ON THAT CERTAIN SURVEY FOR STAFFORD RT, PREPARED BY HAMPTON & ASSOCIATES SURVEYING COMPANY, BEARING THE SEAL OF DARREL HAMPTON, G.R.L.S. NO. 2161, DATED SEPTEMBER 26, 2003, SAID SURVEY BEING INCORPORATED HEREIN AND MADE A PART HEREOF BY REFERENCE.

---

[26] USER\Client\492\743\Exhibit A-1 – leased premises legal.doc        Page 1



1
2
3

## EXHIBIT "J" TO GROUND LEASE

### DOCUMENTS SUPERIOR TO THE LEASE

EXHIBIT "K" TO GROUND LEASE

TERMINATION OF EASEMENT

---

THIS INSTRUMENT PREPARED BY:

**WILLIAM J. LIEBERBAUM**
**2255 CUMBERLAND PARKWAY**
**BUILDING 1300**
**ATLANTA, GEORGIA 30339**

## TERMINATION OF EASEMENT

This **TERMINATION OF EASEMENT** ("Agreement") entered into by and among **STAFFORD RT, LLC,** a Georgia limited liability company, whose address is 1805 U.S. Highway 82 West, P.O. Box 269, Tifton, Georgia 31793 ("Stafford"), **TIFTON INN, LLC,** a Georgia limited liability company, whose address is 1805 U.S. Highway 82 West, P.O. Box 269, Tifton, Georgia 31793 ("Tifton"), **STAFFORD DEVELOPMENT COMPANY** ("SDC"), a Georgia corporation, successor by corporate merger to Interstate Inns, Inc., whose address is 1805 U.S. Highway 82 West, P.O. Box 269, Tifton, Georgia 31793, and **RUBY TUESDAY, INC.,** a Georgia corporation, whose address is 150 West Church Avenue, Maryville, Tennessee 37801 ("Ruby Tuesday").

WHEREAS, Interstate Inns, Inc., Standard Oil Company and W.M. Forshee and Mrs. Esther Forshee entered into that certain Easements Agreement ("Original Easement Agreement") dated March 25, 1967, recorded at Deed Book 103, page 593 in the Office of the Clerk of the Superior Court of Tift County, Georgia; and

WHEREAS, Interstate Inns, Inc. and Standard Oil Company entered into that certain Sign Easement ("Original Sign Easement") dated March 25, 1967, recorded at Deed Book 103, page 229 in the aforesaid records; and

WHEREAS, SDC, Stafford and Tifton are the current owners of all of the land benefited and burdened by the Original Easement Agreement and the Original Sign Easement; and

---

[28] client\492\743\termination of easement          492.743

WHEREAS, Ruby Tuesday is the current ground lessee, under that certain Ground Lease ("Ruby Tuesday Lease") from Stafford to Ruby Tuesday, dated _____, 2003 and evidenced for record by that certain Memorandum of Ground Lease by and between the same parties dated _____, 2003, filed _____, 2003 and recorded at Deed Book _____, page _____ in the aforesaid records; and

WHEREAS, Ruby Tuesday is also the lessee under that certain Sign Lease ("Ruby Tuesday Sign Lease") by and between SDC and Ruby Tuesday, dated _____, 2003, recorded at Deed Book _____, page _____ in the aforesaid records; and

WHEREAS, the demised premises under the Ruby Tuesday Lease and the demised premises under the Ruby Tuesday Sign Lease are a portion of the property which is subject to the Original Easement Agreement and the Original Sign Easement; and

WHEREAS, the parties wish to terminate the Original Easement Agreement and the Original Sign Easement.

NOW, THEREFORE, for and in consideration of Ten Dollars ($10.00) and other valuable consideration, the receipt and sufficiency of which is hereby acknowledged by all the parties, the parties hereby acknowledge and agree that the Original Easement Agreement and the Original Sign Easement are hereby terminated and of no further force and effect.

This Agreement shall be construed under the laws of the State of Georgia.

**SIGNATURES ON PAGES 3 AND 4**

---

[28] client\492\743\termination of easement          492.743

**IN WITNESS WHEREOF,** the parties have caused this Agreement to be executed on the date appearing together with their signatures below.

Signed, sealed and delivered
in the presence of:

RUBY TUESDAY, INC.
a Georgia corporation

_____
Unofficial Witness

By:   _____

Its:   _____

_____
Notary Public

My Commission Expires:   _____

Signed, sealed and delivered
in the presence of:

STAFFORD DEVELOPMENT
COMPANY
a Georgia corporation, successor
by corporate merger to Interstate
Inns, Inc.

_____
Unofficial Witness

By:   _____
      **DENEAN STAFFORD**
      **President and CEO**

_____
Notary Public

My Commission expires:   _____

(Affix Notarial Seal here)

[28] client\492\743\termination of easement          492.743

Page 76

## JOINDER TO GROUND LEASE

**TIFTON INNS, LLC** ("Adjacent Land Owner"), being the current owner of the portion of Lessor's Larger Tract more particularly described on **Schedule 1** to this Joinder, hereby consents to the foregoing Ground Lease ("Lease"), to the extent that said Ground Lease affects or encumbers the property described in **Schedule 1** hereto.  Adjacent Land Owner agrees that Adjacent Land Owner's fee simple interest in and to said Lessor's Larger Tract shall be subject and subordinate to the rights of the lessee under the Lease.

**IN WITNESS WHEREOF**, the undersigned hereby sets its hand and seal on the _____ day of _____, 2003.

**TIFTON INNS, LLC**
**a Georgia limited liability company**


**By:  Stafford Development Company**
    **a Georgia corporation**
**Its:  Managing Member**


By: _____
       **DENEAN STAFFORD**
       **President and CEO**

Signed, sealed and delivered
in the presence of:

_____
UNOFFICIAL WITNESS

_____
NOTARY PUBLIC

My Commission Expires: ___12|4|04_____

(Affix Notarial Seal)

1    **SCHEDULE 1 TO TIFTON INNS, LLC JOINDER**

ALL THAT TRACT or parcel of land being

5.786 acres in Land Lot 308 in the 6th Land District of Tift County, Georgia, and a portion in the City of Tifton, more fully described as follows:

COMMENCE at the intersection of the west Land Lot line of Land Lot 308 and the South right-of-way line of U.S. Highway 82; thence run North 62 degrees 25 minutes 03 seconds East 216.00 feet to the POINT OF BEGINNING; thence North 62 degrees 25 minutes 03 seconds East 186.00 feet to a point; thence South 27 degrees 34 minutes 57 seconds East 10.00 feet to a point; thence North 78 degrees 32 minutes 36 seconds East 255.53 feet to a point and the west right of way line of Interstate 75; thence South 10 degrees 04 minutes 24 seconds East 351.76 feet along the west right of way line of Interstate 75 to a point; thence South 36 degrees 23 minutes 35 seconds East 241.04 feet to a point on the west right of way line of Interstate 75; thence South 74 degrees 15 minutes 06 seconds West 58.97 feet to a point; thence South 15 degrees 44 minutes 54 seconds East 20.00 feet to a point; thence North 74 degrees 15 minutes 06 seconds East 66.51 feet to a point on the west right of way line of Interstate 75; thence South 36 degrees 23 minutes 35 seconds East 16.29 feet to a point; thence South 22 degrees 07 minutes 35 seconds East 18.99 feet to a point on the west right of way line of Interstate 75; thence South 81 degrees 35 minutes 22 seconds WEST 534.48 feet to a point; thence North 10 degrees 38 minutes 05 seconds West 146.59 feet to a point; thence North 82 degrees 35 minutes 55 seconds East 19.00 feet to a point; thence North 01 degree 54 minutes 05 seconds West 218.86 feet to a point; thence North 32 degrees 22 minutes 05 seconds West 205.02 feet to the POINT OF BEGINNING.

011756  Bk:00893 Pg:0248
REC'D TIFT CO. CLERK'S OFFICE
Date:10/03/2001
GWEN C. PATE, CLERK

## JOINDER TO GROUND LEASE

SOUTHTRUST BANK, an Alabama corporation ("Lender"), being the current holder of a mortgage ("Mortgage") on portion of the Lessor's Larger Tract (as such term is defined by the foregoing Ground Lease ["Lease"]) described on Schedule 1 hereto, said Mortgage being evidenced for record by that certain Deed to Secure Debt and Security Agreement ("Deed") filed in Deed Book 893, Page 222, in the Office of the Clerk of the Superior Court of Tift County, Georgia, hereby consents to the foregoing Lease. Lender agrees that should Lender foreclose on the Mortgage and/or otherwise come into possession of the portion of Lessor's Larger Tract described on Schedule 1 by foreclosure or deed in lieu of foreclosure or otherwise, then Lender shall be bound by and comply with all of the terms, conditions, easements and obligations created and contained in the foregoing Lease.

SOUTHTRUST BANK
an Alabama corporation

By: _____
Print Name: James C. Edesole
Its: Vice President

[CORPORATE SEAL]

ATTEST: _____
Print Name: Tobi D. Preciado
Its: Commercial Officer

Signed, sealed and delivered
in the presence of:

Eileen D. Robinson
UNOFFICIAL WITNESS

_____
NOTARY PUBLIC

My Commission Expires: 11/24/07

(Affix Notarial Seal)

STEPHANIE HENRY
NOTARY
My Comm. Exp.
Nov. 24, 2007
PUBLIC
DEKALB COUNTY, GEORGIA

1
2

## SCHEDULE 1 TO SOUTHTRUST BANK JOINDER



ALL THAT TRACT or parcel of land being

5.786 acres in Land Lot 308 in the 6th Land District of Tift County, Georgia, and a portion in the City of Tifton, more fully described as follows:

COMMENCE at the intersection of the west Land Lot line of Land Lot 308 and the South right-of-way line of U.S. Highway 82; thence run North 62 degrees 25 minutes 03 seconds East 216.00 feet to the POINT OF BEGINNING; thence North 62 degrees 25 minutes 03 seconds East 186.00 feet to a point; thence South 27 degrees 34 minutes 57 seconds East 10.00 feet to a point; thence North 78 degrees 32 minutes 36 seconds East 255.53 feet to a point and the west right of way line of Interstate 75; thence South 10 degrees 04 minutes 24 seconds East 351.76 feet along the west right of way line of Interstate 75 to a point; thence South 36 degrees 23 minutes 35 seconds East 241.04 feet to a point on the west right of way line of Interstate 75; thence South 74 degrees 15 minutes 06 seconds West 58.97 feet to a point; thence South 15 degrees 44 minutes 54 seconds East 20.00 feet to a point; thence North 74 degrees 15 minutes 06 seconds East 66.51 feet to a point on the west right of way line of Interstate 75; thence South 36 degrees 23 minutes 35 seconds East 16.29 feet to a point; thence South 22 degrees 07 minutes 35 seconds East 18.99 feet to a point on the west right of way line of Interstate 75; thence South 81 degrees 35 minutes 22 seconds WEST 534.48 feet to a point; thence North 10 degrees 38 minutes 05 seconds West 146.59 feet to a point; thence North 82 degrees 35 minutes 55 seconds East 19.00 feet to a point; thence North 01 degree 54 minutes 05 seconds West 218.86 feet to a point; thence North 32 degrees 22 minutes 05 seconds West 205.02 feet to the POINT OF BEGINNING.

011756 Bk:00893 Pg:0248
REC'D TIFT CO. CLERK'S OFFICE
Date:10/03/2001
GWEN C. PATE, CLERK

## JOINDER TO GROUND LEASE

**STAFFORD FOODS, INC.** ("Owner"), being the current owner of the portion of Lessor's Larger Tract more particularly described on **Schedule 1** to this Joinder, hereby consents to the foregoing Ground Lease ("Ground Lease"), to the extent that said Ground Lease affects or encumbers the property described on **Schedule 1** hereto. Owner agrees that Owner's fee simple estate in and to the property described on **Schedule 1** shall be subject and subordinate to the rights of the lessee under the Ground Lease in and to Lessor's Larger Tract.

**IN WITNESS WHEREOF,** the undersigned hereby sets its hand and seal on the _____ day of _____, 2003.

STAFFORD FOODS, INC.

By: _____

Its: _____

Signed, sealed and delivered
in the presence of:

_____
UNOFFICIAL WITNESS

_____
NOTARY PUBLIC

My Commission Expires: _____

(Affix Notarial Seal)

1
2

## SCHEDULE 1 TO STAFFORD FOODS, INC. JOINDER

### EXHIBIT "A"

#### DESCRIPTION OF LAND

ALL THAT TRACT OR PARCEL OF LAND lying and being located in the City of Tifton in Land Lots 307 and 308 of the 6th Land District of Tift County, Georgia, and being more particularly described as follows:

COMMENCE AT THE INTERSECTION of the South right of way line of U.S. Highway 82 (a 100 foot right of way) with the East right of way line of McCormick Drive (an 80 foot right of way); thence leaving the East right of way line of McCormick Drive running North 62 degrees 25 minutes 03 seconds East along the South right of way line of U.S. Highway 82 a distance of 530.19 feet to a point and the TRUE POINT OF BEGINNING; thence continuing along the South right of way line of U.S. Highway 82 running North 62 degrees 25 minutes 03 seconds East a distance of 292.65 feet to a point; thence leaving the South right of way line of U.S. Highway 82 running South 01 degrees 54 minutes 06 seconds East a distance of 111.86 feet to a point; thence running North 82 degrees 35 minutes 55 seconds East a distance of 300.00 feet to a point; thence running South 01 degrees 54 minutes 05 seconds East a distance of 218.86 feet to a point; thence running South 82 degrees 35 minutes 55 seconds West a distance of 19.00 feet to a point; thence running South 10 degrees 38 minutes 05 seconds East a distance of 40.00 feet to a point; thence running South 79 degrees 12 minutes 38 seconds East a distance of 289.25 feet to a point; thence running south 62 degrees 23 minutes 35 seconds West a distance of 129.00 feet to a point; thence running North 26 degrees 46 minutes 10 seconds West a distance of 137.91 feet to a point; thence running North 26 degrees 53 minutes 42 seconds West a distance of 210.00 feet to a point on the South right of way line of U.S. Highway 82 and the TRUE POINT OF BEGINNING.

Said tract or parcel of land contains 3.509 acres as shown on that certain plat of survey prepared for Stafford Foods, Inc, Bank of America, N.A. and Lawyers Title Insurance Corporation, prepared by Hampton & Associates Surveying Co., and bearing the signature and seal of Derrell Hampton, GRLS No. 2161, dated January 27, 2000, last revised.

LESS AND EXCEPT

000694 Bk:00792 Pg:0802
REC'D TIFT CO. CLERK'S OFFICE
Date:02/09/2000
GWEN C. PATE, CLERK

1
2

## SCHEDULE 1 TO STAFFORD FOODS, INC. JOINDER

████████  **LESS AND EXCEPT**

#### LEGAL DESCRIPTION

ALL THAT TRACT OR PARCEL OF LAND LYING AND BEING IN LAND LOTS 307 AND 308 OF THE 6TH DISTRICT, TIFT COUNTY, GEORGIA, BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

COMMENCING AT THE INTERSECTION OF THE NORTHEASTERN RIGHT-OF-WAY OF MCCORMICK DRIVE (80-FOOT RIGHT-OF-WAY) AND THE SOUTHEASTERN RIGHT-OF-WAY OF U.S. HIGHWAY 82 (100-FOOT RIGHT-OF-WAY); FROM SAID POINT OF COMMENCEMENT THENCE TRAVELING ALONG SAID SOUTHEASTERN RIGHT-OF-WAY NORTH 62 DEGREES 25 MINUTES 3 SECONDS EAST, 745.37 FEET TO A POINT LOCATED ON SAID SOUTHEASTERN RIGHT-OF-WAY BEING THE **TRUE POINT OF BEGINNING**; FROM SAID **TRUE POINT OF BEGINNING**, THENCE CONTINUING ALONG SAID SOUTHEASTERN RIGHT-OF-WAY THE FOLLOWING COURSES AND DISTANCES:

1. NORTH 62 DEGREES 25 MINUTES 3 SECONDS EAST, 71.07 FEET;
2. SOUTH 27 DEGREES 34 MINUTES 57 SECONDS EAST, 10 FEET;
3. NORTH 62 DEGREES 25 MINUTES 3 SECONDS EAST, 10 FEET;
4. NORTH 27 DEGREES 34 MINUTES 57 SECONDS WEST, 10 FEET; AND
5. NORTH 62 DEGREES 25 MINUTES 3 SECONDS EAST, 169.20 FEET;

THENCE LEAVING SAID SOUTHEASTERN RIGHT-OF-WAY AND TRAVELING THE FOLLOWING COURSES AND DISTANCES:

1. SOUTH 27 DEGREES 34 MINUTES 57 SECONDS EAST, 48.42 FEET;
2. SOUTH 80 DEGREES 6 MINUTES 26 SECONDS EAST, 16.32 FEET;
3. SOUTH 9 DEGREES 53 MINUTES 34 SECONDS WEST, 52.33 FEET;
4. SOUTH 3 DEGREES 9 MINUTES 15 SECONDS EAST, 74.96 FEET;
5. NORTH 80 DEGREES 17 MINUTES 40 SECONDS EAST, 24.04 FEET; AND
6. SOUTH 9 DEGREES 42 MINUTES 20 SECONDS EAST, 283.19 FEET TO A POINT LOCATED ON THE NORTHERN RIGHT-OF-WAY OF BOO'S DRIVE (60-FOOT RIGHT-OF-WAY);

THENCE TRAVELING ALONG SAID NORTHERN RIGHT-OF-WAY SOUTH 82 DEGREES 35 MINUTES 55 SECONDS WEST, 73.12 FEET TO A POINT LOCATED ON SAID NORTHERN RIGHT-OF-WAY; THENCE LEAVING SAID NORTHERN RIGHT-OF-WAY AND TRAVELING THE FOLLOWING COURSES AND DISTANCES:

1. NORTH 6 DEGREES 49 MINUTES 32 SECONDS WEST, 98.15 FEET;
2. NORTH 28 DEGREES 10 MINUTES 55 SECONDS WEST, 200.98 FEET;
3. SOUTH 82 DEGREES 35 MINUTES 55 SECONDS WEST, 134.93 FEET;
4. NORTH 27 DEGREES 35 MINUTES 25 SECONDS WEST, 34.94 FEET;
5. NORTH 62 DEGREES 24 MINUTES 35 SECONDS EAST, 26.71 FEET; AND
6. NORTH 28 DEGREES 9 MINUTES 7 SECONDS WEST, 45.56 FEET TO A POINT LOCATED ON THE SOUTHEASTERN RIGHT-OF-WAY OF U.S. HIGHWAY 82, BEING THE **TRUE POINT OF BEGINNING**.

SAID PROPERTY CONTAINING 1.332 ACRES AND BEING DEPICTED AS TRACT 1 ON THAT CERTAIN SURVEY FOR STAFFORD RT, PREPARED BY HAMPTON & ASSOCIATES SURVEYING COMPANY, BEARING THE SEAL OF DARREL HAMPTON, G.R.L.S. NO. 2161, DATED SEPTEMBER 26, 2003, SAID SURVEY BEING INCORPORATED HEREIN AND MADE A PART HEREOF BY REFERENCE.

---



[28] client\492\743\Lease-Execution Draft          491 742