## Exhibit 1

Amended Organizational Documents of RT Asset Company

## MANAGEMENT SERVICES AGREEMENT

THIS MANAGEMENT SERVICES AGREEMENT (this "*Agreement*") is entered into as of [●], 2021, by and among TCW Asset Management Company LLC, a Delaware limited liability company ("*TCW*"), [RT Asset Company Holdings LLC, a Delaware limited liability company] (the "*Company*"), and any parties who sign the signature page to this Agreement as Guarantors on the date hereof or from time to time ("*Guarantors*").

## PRELIMINARY STATEMENTS

The Company desires to receive financial and management consulting services from TCW and to obtain the benefit of the experience of TCW in business and financial management generally. TCW is willing to provide financial and management consulting services to the Company and the compensation arrangements set forth in this Agreement are designed to compensate TCW for these services.

## AGREEMENTS

NOW, THEREFORE, in consideration of the foregoing and the respective representations, warranties, covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, TCW and the Company hereby agree as follows:

1.      Engagement. The Company hereby engages TCW on a non-exclusive basis as a financial and management consultant, and TCW hereby agrees to provide financial and management consulting services to the Company, on the terms and subject to the conditions set forth below.

2.      Services of TCW. During the Term (as herein defined), TCW hereby agrees to consult on a non-exclusive basis with the manager of the Company and the executive management team of the Company and its subsidiaries on such business and financial matters of a strategic nature as may be reasonably requested from time to time by the Company, including strategic business and financial matters related to: (a) strategic growth opportunities; (b) operational and business strategies; (c) annual budgeting and forecasting; (d) mergers, acquisitions and divestitures; (e) debt and equity financings; and (f) similar matters. For the avoidance of doubt, nothing herein has or will obligate TCW to provide, and TCW has not agreed to, and will not, provide, investment advisory services with respect to securities.

3.      Personnel. TCW shall provide and devote to the performance of its services under this Agreement such members, officers and employees of TCW as TCW deems appropriate in its sole discretion for the furnishing of the services contemplated hereby.

4.      Annual Management Fee. In consideration of the benefits and services the Company and its subsidiaries will receive hereunder, the Company agrees to pay TCW, so long as no Event of Default (as defined in that certain Credit and Guaranty Agreement dated [●], 2021 by and among [RT Asset Company], as a Borrower, TCW Asset Management Company LLC, as Administrative Agent and Collateral Agent, and the other parties thereto (the "**Exit Facility Credit Agreement**")) shall have occurred and be continuing or would result therefrom, an annual management fee in an aggregate amount not to exceed $500,000 per fiscal year (the "*Management Fee*"), payable in advance in equal quarterly installments on the first day of each calendar quarter during the Term, commencing on [●], 2021, by, unless otherwise directed by TCW, wire transfer of immediately available funds to TCW or any designee as directed by TCW from time to time; provided, that notwithstanding the foregoing, the Management Fee may accrue but shall only be payable in cash after the date that (A) the Company's TTM EBITDA (as defined in the Exit Facility Credit Agreement), as reported in a Compliance Certificate (as defined in the Exit Facility Credit Agreement) delivered to the Agent (as defined in the Exit Facility Credit Agreement) is greater than or equal to $10,000,000 and (B) the Consolidated Liquidity (as defined in the Exit Facility

Credit Agreement) is greater than $12,500,000; provided further, that, any such Management Fees that would have been permitted to be paid under this Section 4 but for the occurrence and continuation of such Event of Default shall continue to accrue following the occurrence and during the continuation of such Event of Default and may, to the extent otherwise permitted to be paid under the Exit Facility Credit Agreement, be paid to TCW following the cure or waiver of such Event of Default. The Management Fee shall be prorated for any partial periods.

5.　　　Subsequent Transaction Fees. Upon the consummation of each (i) acquisition of any business or entity (whether by acquisition of assets or equity, by merger or otherwise) by the Company, any of its subsidiaries or Affiliates (each a "***Company Entity***" and collectively, the "***Company Entities***"), (ii) disposition of the assets or equity of (or any merger, consolidation, recapitalization, sale of assets or capital stock or other equity interests or otherwise, involving) any Company Entity, in the case of clauses (i) and (ii), except for acquisitions or sales of inventory or equipment in the ordinary course of business consistent with past practice and (iii) amendment, waiver or other modification to, or refinancing or recapitalization of, the Credit Agreements (or any subsequent financing arrangement), the Company agrees to pay TCW, or its designee, a transaction fee in cash in an amount equal to (x) one percent (1%) of the enterprise value of the target (in the case of a transaction under clause (i)), (y) one percent (1%) of the enterprise value of the divested assets or entities (in the case of a transaction under clause (ii)) or (z) one percent (1%) of the incremental amount of debt financing (in the case of a transaction under clause (iii)).

6.　　　Expenses. The Company shall promptly reimburse any member of the TCW Group (as defined in Section 9) for all reasonable travel expenses, legal fees, expenses for third-party financial monitoring tools, and other out-of-pocket fees and expenses as have been or may be incurred by any member of the TCW Group in connection with the rendering of any services hereunder.

7.　　　Prohibited Payments. Notwithstanding anything else in this Agreement to the contrary, neither the Company nor any Guarantor shall be permitted to make or cause to be made any payments of Management Fees to TCW or any of its designees (if any) under this Agreement, if any "Event of Default" (as defined in any Credit Agreement (as defined below)) shall have occurred and be continuing, or if a payment of the Management Fee would result in an Event of Default under the terms of any Credit Agreement (a "***Blocked Payment***"). Any Blocked Payment shall (i) accrue and be owing to TCW and (ii) be paid to the fullest extent possible when the payment thereof is permitted by all such Credit Agreements (it being understood that any such payment shall be in addition to the then current annual management fees). Notwithstanding the foregoing, nothing in this Section 7 will prevent the Company or one or more of the Guarantors from reimbursing TCW for expenses in accordance with Section 6.

8.　　　Term. This Agreement shall commence on the date hereof and shall terminate on the fourth (4th) anniversary of such date (the "***Initial Term***"). The Initial Term (or any extension thereof) shall automatically renew for successive one (1) year periods, unless, at least ninety (90) days prior to the end of the Initial Term (or any extension thereof), either party hereto delivers written notice to the other party that it has elected not to so extend the Initial Term (or any extension thereof). For purposes of this Agreement, the Initial Term, together with any extension thereof in accordance with the immediately preceding sentence, shall be referred to herein as the "***Term***." Notwithstanding the foregoing, this Agreement shall terminate upon the closing of a sale to an independent third party of all or substantially all of the assets or capital stock of the Company and its subsidiaries, determined on a consolidated basis (whether by merger, consolidation, recapitalization, sale of assets or capital stock or other equity interests or otherwise). Notwithstanding the foregoing, TCW may (in its sole discretion) elect in writing to terminate this Agreement for any or no reason at any time. No termination of this Agreement, whether pursuant to this Section 8 or otherwise, shall affect the Company's obligations with respect to the fees, costs and expenses incurred by TCW in rendering services hereunder and not reimbursed by the Company as of the effective date of such termination.

2

9.      Liability. None of TCW, any of its Affiliates, or any of its or their respective investment entities, partners, investors, equityholders, members, managers, directors, officers, employees, agents or representatives (collectively, including TCW, the "*TCW Group*") shall be liable to any Company Entity, any of their respective Affiliates, or any of the investment entities, partners, investors, equityholders, members, managers, directors, officers, employees, agents or representatives of any of the foregoing, for any loss, liability, damage or expense arising out of or in connection with the performance of services contemplated by this Agreement, unless such loss, liability, damage or expense shall be determined by final non-appealable judgment to be a direct result of the actual fraud of TCW in the performance of TCW's obligations hereunder. TCW makes no representations or warranties, express or implied, in respect of the services to be provided by TCW hereunder. The duties of TCW shall be confined to those expressly set forth herein, and no implied duties are assumed or may be asserted against any member of the TCW Group hereunder. This Section 9 shall remain in full force and effect regardless of any termination or the completion of TCW's services under this Agreement or the termination of this Agreement.

10.      Indemnification. The Company agrees to indemnify and hold harmless, and shall cause each of its subsidiaries to indemnify and hold harmless, the TCW Group against and from any and all losses, liabilities, suits, claims, costs, damages and expenses (including without limitation attorneys' fees) arising from or in connection with TCW's performance hereunder or any action of any member of the TCW Group in connection herewith, and the Company shall advance or cause to be advanced, expenses, including legal fees and disbursements, for which any member of the TCW Group would be entitled by this Agreement to be indemnified (collectively, "*Claims*"). The Company shall, and shall cause each Company Entity and each of their respective Affiliates to, defend at its own cost and expense any and all suits and actions (just or unjust) that may be brought against any Company Entity, any of its Affiliates or any member of the TCW Group or in which any member of the TCW Group may be impleaded with others upon any Claims, or upon any other matter, directly or indirectly, related to or arising out of this Agreement or the performance hereof by any member of the TCW Group, except that if such damage shall be determined by final non-appealable judgment to be a direct result of the actual fraud of a member of the TCW Group, TCW shall reimburse the Company for its allocable share of the costs of defense incurred by the Company. This Section 10 shall remain in full force and effect regardless of any termination or the completion of TCW's services under this Agreement or the termination of this Agreement. The parties hereto hereby agree (i) that the Company and its subsidiaries shall be the indemnitors of first resort (i.e., their obligations to provide indemnification and/or advance expenses to any member of the TCW Group (each, a "*Fund Indemnitee*") under this Agreement are primary, and any obligation of any member of the TCW Group to provide indemnification and/or advance expenses for the same liabilities or expenses incurred by a Fund Indemnitee are secondary), (ii) that the Company and its subsidiaries shall be required to provide indemnification and advance expenses to Fund Indemnitees to the fullest extent required by the terms of this Agreement without regard to any rights such Fund Indemnitee may have against any member of the TCW Group and (iii) that each of the Company and its subsidiaries irrevocably waives, relinquishes and releases the TCW Group from any and all claims against any member of the TCW Group for contribution, subrogation or any other recovery of any kind in respect thereof.  The parties hereto further agree that no payment or advancement by any member of the TCW Group on behalf of a Fund Indemnitee with respect to any claim for which a Fund Indemnitee has sought or may seek indemnification and/or advancement of expenses from the Company or any subsidiary shall affect the foregoing, and each member of the TCW Group shall have a right of contribution and/or to be subrogated to the extent of such payment or advancement by any member of the TCW Group to all of the rights of recovery a Fund Indemnitee may have against the Company or any subsidiary under this Agreement.  The Company and its subsidiaries shall use commercially reasonable efforts to cause their insurance providers, if any, to satisfy any claims against the Fund Indemnitees arising out of their service as officers, directors, managers, employees and/or fiduciaries of the Company and its subsidiaries to the fullest extent of the coverage provided, notwithstanding any other indemnities or insurance available to

3

any Fund Indemnitee from any member of the TCW Group. The parties hereto agree that all members of the TCW Group and Fund Indemnitees are express intended third party beneficiaries of this Agreement.

11.    <u>TCW as an Independent Contractor</u>. TCW and the Company agree that TCW shall perform services hereunder as an independent contractor, retaining control over and responsibility for its own operations and personnel. Neither TCW nor any member of the TCW Group shall be considered employees or agents of the Company as a result of this Agreement nor shall any of them have authority to contract in the name of or bind the  Company, except as expressly agreed to in writing by the Company.

12.    <u>Guaranty</u>. Subject to <u>Section 24</u>, each Guarantor hereby unconditionally guaranties, on a joint and several basis, the full and prompt payment and performance of all of the covenants, terms, conditions, obligations and liabilities of the Company. Each Guarantor hereby waives diligence, presentment, demand of payment, protest or notice with respect to such Guarantor's obligations under this Agreement and all demands whatsoever, and covenants that this guaranty will not be discharged, except by complete performance of all obligations and liabilities contained in this Agreement. Subject to <u>Section 24</u>, each Guarantor acknowledges and agrees that TCW may, at its sole election, proceed directly against any Guarantor to collect and recover the full amount or any portion of any and all amounts due under this Agreement without first proceeding against the Company.

13.    <u>Outside Activities</u>. The Company and each Guarantor hereby acknowledges and agrees that one or more of the members of the TCW Group have had, and from time to time may have, outside activities or interests that conflict or may conflict with the best interests of a Company Entity or their respective Affiliates (collectively, "***Outside Activities***"), including without limitation investment opportunities or investments in, ownership of, or participation in entities that are or could be complementary to, or competitive with, a Company Entity or their respective Affiliates or for which a Company Entity or their respective Affiliates could have an expectancy, interest or desire to engage. The Company and each Guarantor hereby approves and consents to all such Outside Activities, and none of the members of the TCW Group shall have any liability to any Company Entity or any of their respective Affiliates for breach of any duty (contractual or otherwise), including without limitation any fiduciary duties (which, for the avoidance of doubt and with respect to any further reference to fiduciary duties herein, have been expressly waived, to the fullest extent permitted by law, under the limited liability company agreement of the Company and each of the parties hereto by affixing its signature hereto), by reason of any such activities or of such party's participation therein. The members of the TCW Group shall not have any duty to communicate or offer any opportunity or the existence of any Outside Activities to any Company Entity or any of their respective Affiliates, and the members of the TCW Group shall not have any duty to refrain therefrom (directly, indirectly or through any assignee or transferee). In the event that a member of the TCW Group acquires knowledge of a potential transaction or matter that may be a corporate opportunity for any Company Entity or any of their respective Affiliates, on the one hand, and a member of the TCW Group, on the other hand, or any other person or entity, such member of the TCW Group shall not have any duty (contractual or otherwise), including without limitation any fiduciary duties, to communicate, present or offer such corporate opportunity to any Company Entity or any of their respective Affiliates and, notwithstanding any provision of this Agreement to the contrary, shall not be liable to any Company Entity or any of their respective Affiliates for breach of any duty (contractual or otherwise), including without limitation any fiduciary duties, by reason of the fact that such member of the TCW Group directly or indirectly pursued or acquired such opportunity for itself, directed such opportunity to another person or entity, or did not present or communicate such opportunity to a Company Entity or any of their respective Affiliates, even though such corporate opportunity may be of a character that, if presented to a Company Entity or any of their respective Affiliates, could be taken by a Company Entity or any of their respective Affiliates, as applicable. The Company and each Guarantor hereby renounces any interest, right, or expectancy in, or in

4

being offered an opportunity to participate in, any such opportunity not offered to it by the members of the TCW Group to the fullest extent not prohibited by law.

14.    <u>Notices</u>. Any notice provided for in this Agreement must be in writing and must be either personally delivered, mailed by first class mail (postage prepaid and return receipt requested), sent by reputable overnight courier (charges prepaid), or sent by confirmed email to the recipient at the address indicated on <u>Schedule I</u>, or to such other persons and/or at such other addresses as may be designated by a party by written notice served in accordance with the provisions of this <u>Section 14</u>.

15.    <u>Entire Agreement; Modification</u>. This Agreement (a) contains the complete and entire understanding and agreement of TCW and the Company and any other party hereto with respect to the subject matter hereof; and (b) supersedes all prior and contemporaneous understandings, conditions and agreements, oral or written, express or implied, respecting the engagement of TCW in connection with the subject matter hereof. This Agreement may be amended, modified and waived only with the prior written consent of the Company and TCW.

16.    <u>Severability</u>. If any provision of this Agreement is held to be invalid or unenforceable, such provision shall be automatically reformed and construed so as to be valid, operative and enforceable to the maximum extent permitted by law or equity while most nearly preserving its original intent. The invalidity of any part of this Agreement shall not render invalid the remaining provisions of this Agreement and, to that extent, the provisions of this Agreement shall be deemed to be severable.

17.    <u>Waiver of Breach</u>. The waiver by either party of a breach of any provision of this Agreement by the other party shall not operate or be construed as a waiver of any subsequent breach of that provision or any other provision hereof.

18.    <u>Assignment</u>. Neither TCW nor the Company may assign its rights or obligations under this Agreement without the express written consent of the other, except that TCW may assign its rights and obligations to an Affiliate of TCW without the written consent of the Company, in which case the assignor shall not be liable for the performance of any assignee.

19.    <u>Successors</u>. This Agreement and all the obligations and benefits hereunder shall inure to the successor and permitted assigns of the parties.

20.    <u>Counterparts</u>. This Agreement may be executed and delivered by each party hereto in separate counterparts, each of which when so executed and delivered shall be deemed an original and both of which taken together shall constitute one and the same agreement.

21.    <u>Delivery by Facsimile or Electronic Transmission</u>. This Agreement and any amendments hereto, to the extent signed and delivered by means of a facsimile machine or other electronic transmission, shall be treated in all manner and respects as an original contract and shall be considered to have the same binding legal effects as if it were the original signed version thereof delivered in person.

22.    <u>Choice of Law; Consent to Jurisdiction</u>. This Agreement shall be governed by, and construed and enforced in accordance with, the internal laws of the State of Delaware applicable to contracts made and performed in that State, without giving effect to the principles of conflicts of law. Any dispute arising from or relating to the relative rights of the parties hereto and all other questions concerning the construction, validity and interpretation of this Agreement and the exhibits hereto shall be brought exclusively in the United States District Courts sitting in the State of Delaware and the appellate courts having jurisdiction of appeals in such courts (the "***Delaware Federal Court***"), and, solely with respect to any such action, each party hereto (a) irrevocably submits to the exclusive jurisdiction of the Chosen Courts, (b) waives any objection to laying venue in any such action in the Chosen Courts, (c) waives any objection that the Chosen Courts are an inconvenient forum or do not have jurisdiction over

5

any party hereto and (d) agrees that service of process upon such party in any such action shall be effective if notice is given in accordance with <u>Section 14</u>.

23.    <u>WAIVER OF JURY TRIAL</u>. AS A SPECIFICALLY BARGAINED FOR INDUCEMENT FOR EACH OF THE PARTIES HERETO TO ENTER INTO THIS AGREEMENT (AFTER HAVING THE OPPORTUNITY TO CONSULT WITH COUNSEL), EACH PARTY HERETO EXPRESSLY WAIVES THE RIGHT TO TRIAL BY JURY IN ANY LAWSUIT OR PROCEEDING RELATING TO OR ARISING IN ANY WAY FROM THIS AGREEMENT OR THE MATTERS CONTEMPLATED HEREBY.

24.    <u>Subordination</u>. The obligations of the Company and Guarantors hereunder are subject to the terms of the Exit Facility Credit Agreement and any other credit agreement, loan agreement, metal leasing agreement, indenture, promissory note, guaranty or other debt instrument (collectively with any related subordination agreements, and as such agreements and instruments may be amended, supplemented, restated or otherwise modified from time to time, the "***Credit Agreements***") pursuant to which any Company Entity incurs, borrows, extends, renews, guarantees or refinances any indebtedness for borrowed money or other extensions of credit with any institutional lender. No term or provision of this Agreement shall, directly or indirectly, be amended, modified or changed without the prior written consent of each Agent and Lessor (in each case as defined in each of the Credit Agreements) if the effect thereof, either individually or in the aggregate, could reasonably be expected to be materially adverse to the interests of the Lenders and Lessor (in each case as defined in each of the Credit Agreements).

25.    <u>Affiliates</u>. For purposes of this Agreement, (a) an "***Affiliate***" of any particular individual or entity means any other individual or entity controlling, controlled by or under common control with such particular individual or entity, where "***control***" means the possession, directly or indirectly, of the power to direct the management and policies of an individual or entity whether through the ownership of voting securities, by contract or otherwise; (b) no member of the TCW Group will be deemed an Affiliate of any Company Entity; and (c) no Company Entity will be deemed an Affiliate of any member of the TCW Group.

26.    <u>Review by the Company and Guarantors</u>. The Company and each Guarantor acknowledges that this Agreement and all the terms hereof, including <u>Sections 10</u> and <u>13</u>, are critical to and a condition of the willingness of certain Affiliates of TCW to enter into an investment in the Company (the "***Investment***") and TCW's willingness to enter into this Agreement. The Company and each Guarantor represent and warrant to TCW that its board of directors or managers (or similar governing body) has reviewed the terms of this Agreement, including <u>Sections 10</u> and <u>13</u>, and approved, consented to and ratified all provisions contained therein. The Company and each Guarantor agrees to take, and cause its direct and indirect subsidiaries and affiliates to take, all action requested by TCW such that TCW receives the full benefit contemplated by the terms hereof (including those set forth and contemplated by <u>Sections 10</u> and <u>13</u>).

27.    <u>Third-Party Beneficiaries</u>. It is acknowledged and agreed by the parties hereto that the execution of this Agreement is an integral part of the Investment and the parties hereto further acknowledge and agree that the members of the TCW Group shall be express and intended third-party beneficiaries of this Agreement and the parties' obligations hereunder. Without limiting the generality of the foregoing, the members of the TCW Group shall have the right to enforce the obligations of a party named herein to the same extent that such rights are accorded a named party herein. Except as provided above, nothing in this Agreement, express or implied, shall confer upon any person or entity, other than the parties, their authorized successors and assigns, and the members of the TCW Group, any rights or remedies under or by reason of this Agreement.

6

*[remainder of page intentionally left blank]*

LEGAL_US_W # 106680462.4

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered on the date and year first above written.

**TCW:**

**TCW ASSET MANAGEMENT COMPANY LLC**

By: _____
Name: _____
Title: _____

**COMPANY:**

**[RT ASSET COMPANY HOLDINGS LLC]**

By: _____
Name: _____
Title: _____

**<u>GUARANTORS</u>:**[1]

**[●]**

By: _____
Name: _____
Title: _____

**[●]**

By: _____
Name: _____
Title: _____

**[●]**

By: _____
Name: _____
Title: _____

---

[1] <u>Note to Draft</u>:  To be updated.

Signature Page to Management Services Agreement

SCHEDULE I

Notice Addresses

<u>TCW</u>:

TCW Asset Management Company LLC
200 Clarendon Street, 51st Floor
Boston, MA 02116
Attention:  Ryan Carroll
Email:  ryan.carroll@tcw.com

<u>COMPANY</u>:

[RT Asset Company Holdings] LLC
c/o TCW Asset Management Company LLC
[●]
[●]
Attention:  Ryan Carroll
Email:  ryan.carroll@tcw.com

<u>GUARANTORS</u>:

[●]
c/o TCW Asset Management Company LLC
[●]
[●]
Attention:  Ryan Carroll
Email:  ryan.carroll@tcw.com

---

**[RT ASSET COMPANY HOLDINGS LLC]**

---

**LIMITED LIABILITY COMPANY AGREEMENT**
**Dated as of [_____], 2021**

THE UNITS ISSUED PURSUANT TO THIS LIMITED LIABILITY COMPANY AGREEMENT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR UNDER ANY OTHER APPLICABLE SECURITIES LAWS.  SUCH UNITS MAY NOT BE SOLD, TRANSFERRED, ASSIGNED, PLEDGED OR OTHERWISE DISPOSED OF AT ANY TIME WITHOUT EFFECTIVE REGISTRATION UNDER SUCH ACT AND LAWS OR AN EXEMPTION THEREFROM, AND COMPLIANCE WITH THE OTHER RESTRICTIONS ON TRANSFERABILITY SET FORTH HEREIN.

CERTAIN UNITS MAY ALSO BE SUBJECT TO VESTING PROVISIONS, REPURCHASE OPTIONS, REDEMPTION RIGHTS, ADDITIONAL RESTRICTIONS ON TRANSFER, OFFSET RIGHTS AND FORFEITURE PROVISIONS SET FORTH HEREIN AND/OR IN A SEPARATE AGREEMENT WITH THE INITIAL HOLDER OF SUCH UNITS.  A COPY OF SUCH AGREEMENT MAY BE OBTAINED BY THE HOLDER OF SUCH UNITS UPON WRITTEN REQUEST TO THE COMPANY AND WITHOUT CHARGE.

## TABLE OF CONTENTS

**Page**

ARTICLE I DEFINITIONS ................................................................................................1

ARTICLE II ORGANIZATIONAL MATTERS.................................................................7
    Section 2.1    Formation of LLC..............................................................7
    Section 2.2    Limited Liability Company Agreement................................7
    Section 2.3    Name..................................................................................7
    Section 2.4    Purpose..............................................................................7
    Section 2.5    Registered Office and Registered Agent.............................7
    Section 2.6    Term..................................................................................7
    Section 2.7    No State-Law Partnership..................................................7

ARTICLE III UNITS, CAPITAL CONTRIBUTIONS AND CAPITAL ACCOUNTS ...........8
    Section 3.1    Units..................................................................................8
    Section 3.2    Issuance of Additional Equity Securities ............................8
    Section 3.3    Incentive Units..................................................................8
    Section 3.4    Capital Accounts...............................................................9
    Section 3.5    No Withdrawal of Capital or Right to Distributions...........10
    Section 3.6    Loans From Unitholders ....................... **Error! Bookmark not defined.**
    Section 3.7    Preemptive Rights.............................................................10

ARTICLE IV DISTRIBUTIONS AND ALLOCATIONS ...................................................11
    Section 4.1    Distributions. ....................................................................11
    Section 4.2    Allocations........................................................................12
    Section 4.3    Indemnification and Reimbursement for Payments on Behalf of a Unitholder ......................................................................13

ARTICLE V MANAGEMENT............................................................................................13
    Section 5.1    General Powers.................................................................13
    Section 5.2    Board Composition; Compensation....................................14
    Section 5.3    Board Actions ...................................................................14
    Section 5.4    Delegation of Authority; Officers.......................................16
    Section 5.5    Member Authority; Member Actions; Meetings. ................17

ARTICLE VI LIMITATIONS OF LIABILITY AND INDEMNIFICATION ....................18
    Section 6.1    Liabilities of the Company ................................................18
    Section 6.2    No Duties ..........................................................................18
    Section 6.3    Waiver of Liability............................................................18
    Section 6.4    Indemnification..................................................................19
    Section 6.5    Other Business Interests....................................................19
    Section 6.6    Effect on Other Agreements ..............................................20

ARTICLE VII ACCOUNTING AND REPORTS................................................................20
    Section 7.1    Allocations and Accounting...............................................20
    Section 7.2    Tax Returns.......................................................................20
    Section 7.3    Information Rights.............................................................20

ARTICLE VIII TAX MATTERS.........................................................................................21
    Section 8.1    Preparation of Tax Returns ...............................................21
    Section 8.2    Tax Elections ....................................................................21
    Section 8.3    Tax Controversies.............................................................21

# TABLE OF CONTENTS
(continued)

Page

ARTICLE IX TRANSFER OF UNITS .............................................................................21
    Section 9.1    Restrictions. .................................................................................21
    Section 9.2    Approved Sale; Drag Along Obligations. ...................................21
    Section 9.3    Right of First Refusal................................**Error! Bookmark not defined.**
    Section 9.4    Tag-Along Rights. ......................................................................23
    Section 9.5    Repurchase Options. ...................................................................24
    Section 9.6    Failure to Comply ......................................................................25
    Section 9.7    Effect of Transfer.......................................................................25
    Section 9.8    Additional Restrictions on Transfer............................................26
    Section 9.9    Transfer Fees and Expenses .......................................................26
    Section 9.10    Void Transfers ...........................................................................27

ARTICLE X ADMISSION OF MEMBERS ......................................................................27
    Section 10.1    Substituted Members ..................................................................27
    Section 10.2    Additional Members ..................................................................27

ARTICLE XI WITHDRAWAL AND RESIGNATION OF UNITHOLDERS ....................27
    Section 11.1    Withdrawal and Resignation of Unitholders ...............................27

ARTICLE XII DISSOLUTION AND LIQUIDATION .....................................................27
    Section 12.1    Events of Dissolution.................................................................27
    Section 12.2    Procedure for Winding Up and Dissolution.................................28
    Section 12.3    Deferment .................................................................................28
    Section 12.4    Deficit Capital Accounts ............................................................28
    Section 12.5    No Further Claim .......................................................................28
    Section 12.6    Termination and Cancellation of Certificate................................28

ARTICLE XIII GENERAL PROVISIONS ........................................................................29
    Section 13.1    Power of Attorney .....................................................................29
    Section 13.2    Amendment and Waiver .............................................................29
    Section 13.3    Public Announcements; Confidentiality ......................................29
    Section 13.4    Title to the Company Assets; No Right of Partition .....................30
    Section 13.5    Remedies. ..................................................................................30
    Section 13.6    Successors and Assigns ..............................................................30
    Section 13.7    Severability ...............................................................................30
    Section 13.8    Counterparts; Binding Agreement ...............................................30
    Section 13.9    Descriptive Headings; Interpretation ..........................................30
    Section 13.10    Applicable Law; Waiver of Jury Trial .........................................31
    Section 13.11    Addresses and Notices ...............................................................31
    Section 13.12    Third Parties ..............................................................................31
    Section 13.13    Further Action ...........................................................................31
    Section 13.14    Offset .......................................................................................31
    Section 13.15    Entire Agreement.......................................................................32
    Section 13.16    Reserved ...................................................................................32
    Section 13.17    Survival.....................................................................................32
    Section 13.18    Waiver of Jury Trial...................................................................32

LEGAL_US_W # 106671617.8

**[RT ASSET COMPANY HOLDINGS] LLC**
**LIMITED LIABILITY COMPANY AGREEMENT**

THIS LIMITED LIABILITY COMPANY AGREEMENT of [RT Asset Company Holdings] LLC (the "**Company**") is entered into as of [_____], 2021 by and among the Company and each of the Members.  Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in Article I.

WHEREAS, in connection with the implementation of the Debtors' Amended Chapter 11 Plan of Reorganization dated December 21, 2020 (the "**Plan**"), the Members are entering into this Agreement.

NOW, THEREFORE, in consideration of the mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Company and the Members, intending to be legally bound, hereby agree as follows:

## ARTICLE I

## DEFINITIONS

Capitalized terms used but not otherwise defined herein shall have the following meanings:

"**Additional Member**" means a Person admitted to the Company as a Member pursuant to Section 10.2.

"**Admission Date**" has the meaning set forth in Section 9.6(a).

"**Affiliate**" of any particular Person means any other Person controlling, controlled by or under common control with such particular Person, where "**control**" means the possession, directly or indirectly, of the power to direct the management and policies of a Person whether through the ownership of voting securities, by contract or otherwise.

"**Agreement**" means this Limited Liability Company Agreement, as it may be amended, modified and/or waived from time to time in accordance with the terms hereof.

"**Approved Sale**" has the meaning set forth in Section 9.2(a).

"**Assignee**" means a Person to whom Units have been Transferred in accordance with the terms of this Agreement and the other agreements contemplated hereby, as applicable, but who has not become a Member pursuant to Article X.

"**Board**" means the Board of Managers of the Company, which shall have the power and authority described in this Agreement.

"**Book Value**" means, with respect to any asset, the asset's adjusted basis for federal income tax purposes, except as follows:  (a) The initial book value of any asset contributed by a Member to the Company shall be the gross fair market value of such asset (not reduced by any associated liabilities), as agreed to by the contributing Member and the Voting Members; (b) the book value of the property of the Company shall be adjusted to equal its gross fair market value, as determined by the Voting Members, as of the following times: (a) the acquisition of an additional membership interests in the Company by any new or existing Member in exchange for more than a *de minimis* Capital Contribution; (b) the distribution

1

by the Company to a Member of more than a *de minimis* amount of property as consideration for a membership interest in the Company; and (c) the liquidation of the Company within the meaning of Treasury Regulations Section 1.704-1(b)(2)(ii)(g); and (c) the book value of any property distributed to a Member shall be adjusted to equal the gross fair market value of such asset on the date of distribution as determined by the Voting Members.

"**Capital Account**" means the capital account maintained for a Unitholder pursuant to Section 3.4 and the other applicable provisions of this Agreement.

"**Capital Contributions**" means any cash, cash equivalents, promissory obligations or the Fair Market Value of other property which a Unitholder contributes or is deemed by the Voting Members to have contributed to the Company with respect to any Unit pursuant to Section 3.1 or Section 3.4.

"**Catch-Up Distribution**" means Distributions that would have been paid in respect of a Class P Unit had the Participation Threshold been zero dollars ($0) at the time of issuance of such Class P Unit.

"**Certificate**" means the Company's Certificate of Formation as filed with the Secretary of State of Delaware, as the same may be amended from time to time.

"**Class A Unit**" means a Unit having the rights and obligations specified with respect to a Class A Unit in this Agreement.

"**Class P Unit**" means a Unit having the rights and obligations specified with respect to a Class P Voting Unit in this Agreement.

"**Code**" means the United States Internal Revenue Code of 1986, as amended. Such term shall be deemed to include any future amendments to the Code and any corresponding provisions of succeeding Code provisions (whether or not such amendments and corresponding provisions are mandatory or discretionary).

"**Company**" has the meaning set forth in the first paragraph of this Agreement.

"**Delaware Act**" means the Delaware Limited Liability Company Act, 6 Del.L. § 18-101, et seq., as it may be amended from time to time, and any successor thereto.

"**Distribution**" means each distribution made by the Company to a Unitholder, with respect to such Person's Units, whether in cash, property or securities; provided that, for the avoidance of doubt, none of the following shall be deemed to be a Distribution hereunder: (i) any redemption or repurchase by the Company of any Equity Securities, (ii) any recapitalization, exchange or conversion of any Equity Securities, (iii) any subdivision (by unit split or otherwise) or any combination (by reverse unit split or otherwise) of any Equity Securities (iv) the repayment of any loans made to the Company or any of its Subsidiaries by any Unitholder or Affiliate thereof and (v) any payments or reimbursement of expenses in connection with goods or services rendered to the Company or any of its Subsidiaries by any Unitholder or Affiliate thereof, including pursuant to the Management Agreement.

"**Drag Transaction**" has the meaning set forth in Section 9.2(b).

"**Drag-Along Notice**" has the meaning set forth in Section 9.2(d).

"**Drag-Along Participant**" has the meaning set forth in Section 9.2(a).

2

"**Drag-Along Transferring Members**" has the meaning set forth in <u>Section 9.2(a)</u>.

"**Electing Members**" has the meaning set forth in <u>Section 9.3(a)</u>.

"**Equity Agreement**" means an agreement that from time to time may be required by the Voting Members approving any grant or purchase of any Units, including the Warrant.

"**Equity Securities**" means (i) Units or other equity interests in the Company, (ii) obligations, evidences of indebtedness or other securities or interests convertible or exchangeable into Units or other equity interests in the Company, and (iii) warrants, options or other rights to purchase or otherwise acquire Units or other equity interests in the Company.

"**Fair Market Value**" of any asset shall mean the fair value thereof as of the date of valuation as determined by the Voting Members in good faith on the basis of an orderly sale to a willing, unaffiliated buyer in an arm's-length transaction occurring on the date of valuation, taking into account all factors determinative of value as the Voting Members deems relevant (and giving effect to any transfer taxes payable and discounts for lack of liquidity or control in connection with such sale).

"**Fiscal Year**" means the 12-month period ending on December 31, or such other annual accounting period as may be established by the Voting Members.

"**GAAP**" means U.S. generally accepted accounting principles in effect from time to time.

"**Indemnified Person**" has the meaning set forth in <u>Section 6.4(a)</u>.

"**Independent Managers**" has the meaning set forth in <u>Section 5.2(a)(i)</u>.

"**Independent Third Party**" means any Person, other than a Person which immediately prior to a contemplated transaction or series of related transactions is, together with such Person's Affiliates, a "beneficial owner" (as such term is defined in Rule 13d 3 and Rule 13d 5 promulgated under the Securities Exchange Act) of more than twenty percent (20%) of the voting power of the outstanding voting securities of the Company.

"**Initial Minority Member**" means [Goldman Sachs Specialty Lending Group, L.P.].

"**Manager**" means the individuals named in <u>Section 5.2(a)</u> or otherwise appointed by the Voting Members in accordance with the terms of this Agreement, who, for purposes of the Delaware Act, will be deemed a "**manager**" (as defined in the Delaware Act), but will be subject to the rights, obligations and limitations set forth in this Agreement.

"**Member**" means each of the Persons listed on the Unit Ownership Ledger attached hereto and any Person admitted to the Company as a Substituted Member [or Additional Member]; but in each case only for so long as such Person is shown on the Company's books and records as the owner of one or more Units.  The Members shall constitute the "members" (as defined in the Delaware Act) of the Company.

"**Member Group**" means with respect to any Person that is an employee, independent contractor or director or manager of the Company or any of its Subsidiaries, (i) such Person, (ii) any family member or Affiliate of such Person, (iii) any entity in which such Person or any family member or Affiliate of such Person owns an interest, (iv) a trust whose beneficiaries include such Person and/or any family

3

member of such Person, (v) any designee of such Person that becomes a Unitholder (including any individual retirement account holding on such Person's behalf) and (vi) the direct and indirect Permitted Transferees of each Person identified in subsections (i) through (v).

"**Officers**" means each person designated as an officer of the Company to whom authority and duties have been delegated by the Voting Members in accordance with this Agreement.

"**Participating Class P Unit**" means a Class P Unit the Participation Threshold of which is zero prior to the Distribution in question or becomes zero pursuant to the adjustments described in Section 3.3(c) in connection with the Distribution in question.

"**Participating Member**" has the meaning set forth in Section 3.6(a).

"**Participation Notice**" has the meaning set forth in Section 3.6(a).

"**Partnership Representative**" has the meaning set forth in Section 6223 of the Code (and any corresponding provision of foreign, state and local income tax law applicable to the Company).

"**Permitted Transferee**" means Affiliates of the Voting Members. For the avoidance of doubt, there are no Permitted Transferees with respect to Class P Units.

"**Person**" means an individual, a partnership, a corporation, a limited liability company, an association, a joint stock company, a trust, a joint venture, an unincorporated organization, association or other entity or a governmental entity.

"**Plan**" has the meaning set forth in the Recitals.

"**Preemptive Rights Notice**" has the meaning set forth in Section 3.6(a).

"**Profits**" or "**Losses**" (including any "Profits" or "Losses" included therein) means, for each period taken into account, an amount equal to the Company's taxable income or taxable loss for such period, determined in accordance with federal income tax principles, adjusted to the extent the Voting Members reasonably determine in good faith that such adjustment is necessary to comply with the requirements of Section 704(b) of the Code and Treasury Regulations Section 1.704-1(b).

"**Purchaser Note**" has the meaning set forth in Section 9.4(b).

"**Related Employee**" means, with respect to a Unitholder who is not an employee or independent contractor of the Company or any of its Subsidiaries, any individual who is an employee or independent contractor of the Company or any of its Subsidiaries that is a family member, beneficiary, partner, trustee or direct or indirect equity owner of such Unitholder.

"**Related Party Agreement**" means any agreement, arrangement or understanding between the Company or any of its Subsidiaries, on the one hand, and any Unitholder or any Affiliate of a Unitholder or a Manager, Officer or employee of the Company, on the other hand.

"**Repurchase Notice Date**" has the meaning set forth in Section 9.4(a).

"**Repurchase Price**" has the meaning set forth in Section 9.4(a).

4

"**Repurchase Sellers**" has the meaning set forth in Section 9.4(a).

"**Repurchase Units**" has the meaning set forth in Section 9.4(a).

"**Sale of the Company**" means either (i) the sale, lease, transfer, conveyance or other disposition, in one transaction or a series of related transactions, of all or substantially all of the assets of the Company and its Subsidiaries, taken as a whole, to an Independent Third Party or (ii) a transaction or series of related transactions (including by way of merger, consolidation, recapitalization, reorganization or sale of securities) the result of which is that the Unitholders immediately prior to such transaction, together with such Unitholders' Affiliates, are after giving effect to such transaction no longer, in the aggregate, the "beneficial owners" (as such term is defined in Rule 13d-3 and Rule 13d-5 promulgated under the Securities Exchange Act), directly or indirectly through one or more intermediaries, of more than 50% of the voting power of the outstanding voting securities of the Company.

"**Securities Act**" means the Securities Act of 1933, as amended, and applicable rules and regulations thereunder, and any successor to such statute, rules or regulations.

"**Sponsor Managers**" has the meaning set forth in Section 5.2(a)(i).

"**Subsidiary**" means, with respect to any Person, any corporation, limited liability company, partnership, association or business entity of which (i) if a corporation, a majority of the total voting power of shares of stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof, or (ii) if a limited liability company, partnership, association or other business entity (other than a corporation), a majority of partnership or other similar ownership interests thereof is at the time owned or controlled, directly or indirectly, by any Person or one or more Subsidiaries of that Person or a combination thereof. For purposes hereof and without limitation, a Person or Persons shall be deemed to have a majority ownership interest in a limited liability company, partnership, association or other business entity (other than a corporation) if such Person or Persons shall be allocated a majority of limited liability company, partnership, association or other business entity gains or losses or shall be or control the manager, managing member, managing director (or a board comprised of any of the foregoing) or general partner of such limited liability company, partnership, association or other business entity.  For purposes hereof, references to a "Subsidiary" of any Person shall be given effect only at such times that such Person has one or more Subsidiaries, and, unless otherwise indicated, the term "Subsidiary" refers to a Subsidiary of the Company. For the avoidance of doubt, with respect to the Company, Production Co is a Subsidiary.

"**Substituted Member**" means a Person that is admitted as a Member to the Company pursuant to Section 10.1.

"**Tag Transaction**" has the meaning set forth in Section 9.3(c).

"**Tax Distribution**" has the meaning set forth in Section 4.1(c).

"**Taxable Year**" means the Company's accounting period for U.S. federal income tax purposes determined pursuant to Section 8.2.

"**TCW**" means, collectively, TCW Direct Lending LLC, TCW Skyline Lending, L.P., and TCW Brazos Fund LLC.

"**TCW Parties**" has the meaning set forth in <u>Section 6.5(a)</u>.

"**Total Equity Value**" means the aggregate proceeds which would be received by the Unitholders if: (i) the assets of the Company as a going concern were sold at their Fair Market Value; (ii) the Company satisfied and paid in full all of its obligations and liabilities (including all taxes, costs and expenses incurred in connection with such transaction and any amounts reserved by the Board with respect to any contingent or other liabilities); and (iii) such net sale proceeds were then distributed in accordance with <u>Section 4.1</u>, all as determined by the Board in good faith.

"**Transfer**" means any direct or indirect sale, transfer, assignment, pledge, mortgage, exchange, hypothecation, grant of a security interest or other disposition or encumbrance of an interest (whether with or without consideration, whether voluntarily or involuntarily or by operation of law) or the acts thereof or an offer or agreement to do the foregoing.  The terms "**Transferee**," "**Transferor**," "**Transferred**," and other forms of the word "**Transfer**" shall have correlative meanings.

"**Transfer Notice**" has the meaning set forth in <u>Section 9.3(a)</u>.

"**Transferring Party**" has the meaning set forth in <u>Section 9.3(a)</u>.

"**Treasury Regulations**" means the income tax regulations promulgated under the Code and effective as of the date hereof.  Such term, if elected by the Voting Members in their sole discretion, shall be deemed to include any future amendments to such regulations and any corresponding provisions of succeeding regulations (whether or not such amendments and corresponding provisions are mandatory or discretionary).

"**Unit**" means a unit of the Company held by a Member or an Assignee representing a fractional part of the interests in Profits and Losses and Distributions of the Company and shall include Class A Units and Class P Units; <u>provided</u> that any class, group or series of Units issued shall have the relative rights, powers and obligations set forth in this Agreement.

"**Unit Ownership Ledger**" has the meaning set forth in <u>Section 3.1(b)</u>.

"**Unitholder**" means any owner of one or more Units as reflected on the Company's books and records.  Any owner who holds one or more Units but is not also a Member shall not be entitled to exercise any rights of a Member with respect to such Units, except as otherwise provided by non-waivable provisions of applicable law.

"**Unvested Units**" means, with respect to any Units that are subject to vesting pursuant to the applicable Equity Agreement pursuant to which they were issued, any Units other than Vested Units.

"**Vested Units**" means any Units that are not subject to vesting or, with respect to Units that are subject to vesting pursuant to the applicable Equity Agreement pursuant to which they were issued, any Units that have vested in accordance with the terms of the applicable Equity Agreement pursuant to which they were issued.

"**Voting Members**" means all Members other than the Members holding Class P Units.

# ARTICLE II

## ORGANIZATIONAL MATTERS

**Section 2.1**    **Formation of LLC**.  The Company was formed on [●] pursuant to the provisions of the Delaware Act.

**Section 2.2**    **Limited Liability Company Agreement**.    The rights, powers, duties, obligations and liabilities of the Members and Unitholders shall be determined pursuant to the Delaware Act and this Agreement.  To the extent that the rights, powers, duties, obligations and liabilities of any Member or Unitholder are different by reason of any provision of this Agreement than they would be in the absence of such provision, this Agreement shall, to the fullest extent permitted by the Delaware Act, control.  Notwithstanding anything to the contrary contained herein, Section 18-210 of the Delaware Act and Section 18-305(a) of the Delaware Act shall not apply to or be incorporated into this Agreement and each Unitholder hereby expressly waives any and all rights under such Sections of the Delaware Act to the fullest extent permitted by the Delaware Act.

**Section 2.3**    **Name**.  The name of the Company shall be "[RT Asset Company Holdings LLC]".  The Members may change the name of the Company at any time and from time to time by the prior written consent of a majority of the issued and outstanding Units (excluding the Class P Units).  The Company's business may be conducted under its name and/or any other name or names deemed advisable by the Members.

**Section 2.4**    **Purpose**.  The Company is formed for the purpose of engaging in any lawful acts or activities for which limited liability companies may be organized under the Delaware Act and engaging in any and all activities necessary or incidental to the foregoing.

**Section 2.5**    **Registered Office and Registered Agent**.  The address of the registered office of the Company in the State of Delaware shall be the office of the initial registered agent named in the Certificate or such other office (which need not be a place of business of the Company) as any Manager may designate from time to time in the manner provided by applicable law, and the registered agent for service of process on the Company in the State of Delaware at such registered office shall be the registered agent named in the Certificate or such Person or Persons as any Manager may designate from time to time in the manner provided by applicable law.

**Section 2.6**    **Term**.  The term of the Company commenced upon the filing of the Certificate in accordance with the Delaware Act and shall continue in existence until the Company shall be terminated and dissolved in accordance with the provisions of Article XII.

**Section 2.7**    **No State-Law Partnership**.  The Unitholders intend that the Company not be a partnership (including a limited partnership) or joint venture, and that no Unitholder be a partner or joint venturer of any other Unitholder by virtue of this Agreement, for any purposes other than as set forth in the last sentence of this Section 2.7, and neither this Agreement nor any other document entered into by the Company or any Unitholder relating to the subject matter hereof shall be construed to suggest otherwise.  The Unitholders intend that the Company shall be treated as a partnership for U.S. federal and, if applicable, state or local income tax purposes, and that each Unitholder and the Company shall file all tax returns and shall otherwise take all tax and financial reporting positions in a manner consistent with such treatment.

7

## ARTICLE III

## UNITS, CAPITAL CONTRIBUTIONS AND CAPITAL ACCOUNTS

**Section 3.1**     <u>Units.</u>

(a)     <u>Authorized Units</u>.  The total Units and the number of Units of each class or series which the Company has authority to issue shall be determined by the Board from time to time (which determination the Board shall cause to be reflected on the Unit Ownership Ledger).  The Units shall initially not be certificated, provided that a majority of the Voting Members may in their discretion cause the Company to issue certificates representing Units from time to time.  The Company may issue and reserve fractional Units.  The ownership by a Member of Units shall entitle such Member to allocations of Profits and Losses and other items and Distributions of cash and other property as set forth in <u>Article IV</u> hereof.

(b)     <u>Unit Ownership Ledger</u>.  The Company shall create and maintain a ledger (the "**Unit Ownership Ledger**"), a copy of which as in effect on the date hereof is attached hereto as <u>Schedule A</u>, setting forth the name and address of each Unitholder, the number of each class of Units held of record by each such Unitholder, and the amount of the Capital Contribution made (or deemed to be made) with respect to such Units.  No Unitholder shall be required to make any capital contributions to the Company with respect to such Unitholder's Units.  Upon any change in the number or ownership of issued and outstanding Units (whether upon an issuance of Units, a Transfer of Units, a cancellation of Units or otherwise), the Company shall amend and update the Unit Ownership Ledger.  Absent manifest error, the ownership interests recorded on the Unit Ownership Ledger shall be conclusive record of the Units that have been issued and are outstanding.  Any reference in this Agreement to the Unit Ownership Ledger shall be deemed a reference to the Unit Ownership Ledger as amended and in effect from time to time.

**Section 3.2**     <u>Issuance of Additional Equity Securities</u>.  The Board shall have the right at any time and from time to time to cause the Company to create and/or issue Equity Securities (including other classes, groups or series thereof having such relative rights, powers, and/or obligations as may from time to time be established by the Board, including rights, powers, and/or obligations different from, senior to or more favorable than existing classes, groups and series of Equity Securities), in which event, notwithstanding anything herein to the contrary, the Board shall have the power to amend this Agreement and/or the Unit Ownership Ledger to reflect such creation and/or additional issuances and dilution and to make any such other amendments as deemed necessary or desirable (in the sole discretion of the Board) to reflect such creation and/or additional issuances and dilution (including amending this Agreement to increase the authorized number of Equity Securities of any class, group or series, to create and authorize a new class, group or series of Equity Securities and to add the terms of such new class, group or series of Equity Securities including economic and governance rights which may be different from, senior to or more favorable than the other existing Equity Securities), in each case without the approval or consent of any other Person.

**Section 3.3**     <u>Incentive Units</u>.

(a)     <u>Grant of Units</u>.  The Board shall have the right at any time and from time to time to cause the Company to issue Class P Units to existing or new employees, officers, managers, directors, consultants or other service providers of the Company or any of its Subsidiaries pursuant to Equity Agreements approved by the Board, which Equity Agreements shall contain such provisions as the Board shall determine in its sole discretion.  This <u>Section 3.3</u>, together with the Equity Agreements pursuant to which the Class P Units are issued, are intended to qualify as a written compensatory benefit plan or

8

compensation contract within the meaning of Rule 701 of the Securities Act and the issuance of Class P Units pursuant hereto is intended to qualify for the exemption from registration under the Securities Act provided by Rule 701; <u>provided</u> that the foregoing shall not restrict or limit the Company's ability to issue any Class P Units pursuant to any other exemption from registration under the Securities Act available to the Company.

(b)    <u>Participation Threshold</u>.  As of the date of each issuance of Class P Units, the Board shall establish an initial "Participation Threshold" amount with respect to each Class P Unit granted on such date.  Unless otherwise determined by the Board, the Participation Threshold with respect to each such Class P Unit granted on such date shall be equal to the amount (as determined by the Board in its sole discretion) that would be distributed with respect to a Class A Unit pursuant to <u>Section 4.1(a)</u> if the Company distributed an amount equal to the Total Equity Value to the Unitholders in accordance with <u>Section 4.1(a)</u>.The purchase price of each Class P Unit, if any, shall be as determined by the Board.  The Board may designate a series number for Class P Units that have the same Participation Threshold, which Participation Threshold may differ from the Participation Thresholds of other series of Class P Units not included in such subset.

(c)    <u>Adjustment of Participation Threshold</u>.  In the event of any Distribution on the Units pursuant to <u>Section 4.1(a)</u>, the Participation Threshold of each Class P Unit outstanding at the time of such Distribution shall be reduced (but not below zero) by an amount equal to the amount distributed to a Unit in connection with such Distribution.

(d)    <u>Adjustments to Reflect Economic Intent</u>.  The Board may in its sole discretion adjust the operations of this Agreement (including this <u>Section 3.3</u> and <u>Section 4.1</u>), any Equity Agreement, the number of outstanding Class P Units (by split or combination) and/or the Participation Threshold of any Class P Units to achieve the economic results intended by this Agreement with respect to the Class P Units, including (i) that the amount that would be distributed with respect to a Class P Unit if there were a liquidation and winding-up of the Company shall be the same immediately before and immediately after events that do not result in a Distribution with respect to the Class A Units, including an issuance of new Units, a subdivision or combination of Units, a repurchase, redemption or forfeiture of Units or additional Capital Contributions with respect to issued and outstanding Units, and (ii) that the Class P Units are "profits interests" under Revenue  Procedure 93-27, 1993-2, C.B. 343 for United States federal income tax purposes.

**Section 3.4    Capital Accounts**.  The Company shall maintain a separate Capital Account for each Unitholder according to the rules of Treasury Regulation Section 1.704-1(b)(2)(iv) and 1.704-2. Subject to the preceding sentence, each Unitholder's Capital Account will initially equal the deemed contribution of cash by such Unitholder to the Company, and throughout the term of the Company will be (a) increased by the amount of (i) Profits and gains allocated to such Unitholder and (ii) any cash subsequently contributed by such Unitholder to the Company and (b) decreased by the amount of (i) Losses and deductions allocated to such Unitholder and (ii) the amount of distributions in cash and the Fair Market Value of distributions of property (net of liabilities secured by the property that the Unitholder is considered to assume or take subject to) distributed to such Unitholder.  The original Capital Account established for each Substituted Member shall be in the same amount as the Capital Account of the Member (or portion thereof) to which such Substituted Member succeeds at the time such Substituted Member is admitted as a Member of the Company.  The Capital Account of any Member whose interest in the Company shall be increased or decreased by means of (a) the Transfer to such Member of all or part of the Units of another Member or (b) the repurchase or forfeiture of Units shall be appropriately adjusted to reflect such Transfer or repurchase or forfeiture.  Any reference in this Agreement to a Capital Contribution of or Distribution to a Member that has succeeded any other Member shall include any

9

Capital Contributions or Distributions previously made by or to the former Member on account of the Units of such former Member Transferred to such Member. No Unitholder shall be required to pay to any other Unitholder or the Company any deficit or negative balance which may exist from time to time in such Unitholder's Capital Account (including upon and after dissolution of the Company). Except as otherwise expressly provided herein, no Unitholder shall be entitled to receive interest from the Company in respect of any positive balance in its Capital Account, and no Unitholder shall be liable to pay interest to the Company or any Unitholder in respect of any negative balance in its Capital Account.

**Section 3.5** **No Withdrawal of Capital or Right to Distributions**. Except as otherwise expressly provided herein, no Person shall be entitled to withdraw any part of such Person's Capital Contributions or Capital Account or to receive any Distribution from the Company.

**Section 3.6** **Preemptive Rights.**

(a) If at any time, or from time to time, the Company issues or sells any Equity Securities, the Company shall notify in writing each Member that holds at least 2% of the Units (excluding Class P Units) issued and outstanding of such issuance or sale either before, or within fifteen (15) days after, such issuance or sale (a "**Preemptive Rights Notice**"), which notice shall contain a reasonably detailed description of the terms of the issuance or sale, including the purchase price and manner of payment (or the basis for determining the purchase price). In order to exercise its right to participate in such issuance or sale, within twenty (20) days after receipt of a Preemptive Rights Notice, a Member must notify the Company in writing (a "**Participation Notice**") that such Member will purchase Equity Securities on the terms set forth in the Preemptive Rights Notice (such a Member, a "**Participating Member**"). The Equity Securities which each Participating Member will be entitled to purchase under this Section 3.6 will equal (x) the aggregate number of Equity Securities sold or to be sold by the Company in such issuance, multiplied by (y) a fraction, the numerator of which is the number of Class A Units owned by such Participating Member and the denominator of which is the aggregate number of Class A Units and Class P Units which are Vested Units which are outstanding. Each Participating Member shall be required to purchase, and the Company shall be required to issue, such Participating Member's ratable portion (as determined above) of the types and classes of securities owned by them prior to such issuance or sale. Notwithstanding anything to the contrary contained herein, any Member who is not an "accredited investor" as defined in Regulation D promulgated under the Securities Act shall have no rights under this Section 3.6. A Member may not assign or otherwise transfer any of its rights pursuant to this Section 3.6.

(b) If a Member has not delivered a Participation Notice within the time period specified in Section 3.6(a) above, this Section 3.6 will not apply with respect to such Member with respect to any issuance or sale of Equity Securities described in the Preemptive Rights Notice completed prior to or within the one hundred eighty (180) day period after the date of the Preemptive Rights Notice at a price not less than and on terms and conditions not materially more favorable to the purchaser(s) than those contained in the Preemptive Rights Notice.

(c) Any Participation Notice given by a Participating Member pursuant to this Section 3.6, when taken together with any Preemptive Rights Notice given by the Company, will constitute a binding legal agreement on the terms and conditions therein set forth, subject to the satisfaction of any contingencies described in the Preemptive Rights Notice.

(d) Notwithstanding anything herein to the contrary, the preemptive rights granted in this Section 3.6 shall not apply to any of the following: (i) Equity Securities set forth on the Unit Ownership Ledger as of the date hereof; (ii) Equity Securities issued in connection with lease financings, bank credit arrangements or similar transactions; (iii) Equity Securities issued in an acquisition by the Company or

10

any of its Subsidiaries as consideration for the securities or assets acquired by the Company or such Subsidiary in connection therewith; (iv) Equity Securities issued upon exercise, conversion or exchange of (A) other Equity Securities which were issued in compliance with Section 3.6, including Equity Securities issued in accordance with the Plan or (B) Equity Securities which were issued in an issuance which is exempt from Section 3.6; (v) Equity Securities issued in connection with any transactions involving the Company or any of its Subsidiaries and other Persons that are deemed "strategic" transactions by the Voting Members (including Equity Securities issued in connection with joint ventures and similar arrangements); or (vi) Equity Securities issued in connection with any Unit split, Unit dividend or recapitalization of the Company in which holders of the same class of Units participate on a pro rata basis.

(e)    If the Board reasonably determines that the Company requires capital in an amount of time that requires circumventing the offering of preemptive rights under this Section 3.6, the Company may offer and sell Equity Securities subject to the preemptive rights under this Section 3.6 without first offering such Equity Securities to each Member or complying with the procedures of this Section 3.6, so long as each Member receives prompt written notice of such sales and thereafter are given the opportunity to purchase his, her or its respective pro rata share of such Equity Securities within forty-five (45) days after the close of such sale and in any event no later than fourteen (14) days from receipt of the notice referred to herein on substantially the same terms and conditions as such sale, however, the price of the Equity Securities shall be identical to the price paid in such offer and sale.

## ARTICLE IV

## DISTRIBUTIONS AND ALLOCATIONS

**Section 4.1    Distributions.**

(a)    _Priority_.  The Company may (but shall not be obligated to) make Distributions at such time, in such amounts and in such form (including in-kind property) as determined by the Voting Members in their sole discretion. Each such Distribution shall be made ratably among the holders of Class A Units and Participating Class P Units held by each such holder immediately prior to such Distribution; provided, however, with respect to Participating Class P Units, if the award agreement effecting the issuance of a Class P Unit provides for Catch-Up Distributions, Distributions shall first be paid ratably in respect of all such Class P Units until, with respect to any Class P Unit, the holder thereof has been fully paid such holder's Catch-Up Distributions. For the avoidance of doubt, if the Participation Threshold of a Class P Unit is not zero immediately prior to a Distribution, but will become zero pursuant to the adjustments described in Section 3.3(c) in connection with such Distribution, then such Class P Unit shall participate in such Distribution as a Participating Class P Unit only after an amount equal to such Participation Threshold has first been distributed with respect to each Class A Unit; provided, however, that, except in connection with a liquidation, the aggregate cash amount of any Distribution of cash shall be such that following the Distribution the Company shall have reasonably adequate cash reserves, and in any event no less than an aggregate amount of twelve million five hundred thousand dollars ($12,500,000) to fund the Company's normal business operations. Notwithstanding the foregoing, (i) the portion of any Distribution that would otherwise be made with respect to any Unvested Unit shall not be distributed with respect to such Unvested Unit and shall instead be distributed solely with respect to Vested Units pursuant to the foregoing applied as though no Unvested Units were outstanding, (ii) if one or more amounts are not distributed with respect to an Unvested Unit pursuant to clause (i) of this sentence and such Unvested Unit subsequently vests, then all Distributions pursuant to this Section 4.1(a) made following the vesting of such Unit shall be made such that, on a cumulative basis, the Distributions with respect to such Unit under such Section equal the Distributions that would have been made with

11

respect to such Unit under such clauses if it had been a Vested Unit beginning on the date of its original issue, and (C) if such Unvested Unit is repurchased or forfeited (or otherwise becomes incapable of vesting) then such Unvested Unit shall not be entitled to retain any Distributions.

(b)    In Kind Distributions.  At any time, and from time to time, in the sole discretion of the Voting Members, the Company may distribute to its Unitholders securities or other property held by the Company.  To the extent the Voting Members determine to distribute such property, the property will be distributed among the Unitholders in the same proportions as cash equal to the Fair Market Value of such property would be distributed among the Unitholders pursuant to the other provisions of Section 4.1 above.

(c)    Tax Distributions. The Voting Members may, subject to applicable covenants and restrictions contained in the Company's loan agreements, cause the Company to distribute to the Unitholders with respect to each Taxable Year of the Company (other than any Taxable Year, or portion thereof, starting on or following the date on which there is a Sale of the Company) an amount of cash (a "**Tax Distribution**") that, in the good faith judgment of the Voting Members, equals (i) the amount of taxable income, if any, allocable to the Unitholders in respect of such Taxable Year (net of taxable losses and tax credits allocated to the Unitholders in respect of prior Taxable Years and not previously taken into account under this clause), multiplied by (ii) the applicable tax rate for such Taxable Year.   Tax Distributions shall be treated as advances of any amounts otherwise distributable pursuant to Section 4.1(a) (determined as if no Tax Distributions had been made). This Section 4.1(c) is not intended to change the aggregate amount that would be distributed with respect to any Unit over the term of the Company if this Section 4.1(c) was not part of this Agreement and shall be interpreted consistently with such intent.

Section 4.2    Allocations.

(a)    Book Allocations.  Except as otherwise required by Section 704(b) of the Code and the Regulations thereunder, Profits and Losses for any Taxable Year of the Company (or other allocation period) shall be allocated among the Unitholders in such a manner as to reduce or eliminate, to the extent possible, any difference, as of the end of such Taxable Year (or other allocation period), between (a) the sum of (i) the Capital Account of each Unitholder, (ii) such Unitholder's share of partnership minimum gain determined pursuant to Treasury Regulation Section 1.704-2(d), and (iii) such Unitholder's partner nonrecourse debt minimum gain (as defined in Treasury Regulation Section l.704-2(i)(3)) and (b) the respective net amounts, positive or negative, which would be distributed to such Unitholder or for which such Unitholder would be liable to the Company under the Delaware Act, determined as if the Company were to (i) liquidate the assets of the Company for an amount equal to their Book Value and (ii) distribute the proceeds of liquidation pursuant to Section 12.2.

Section 704 of the Code and the Treasury Regulations thereunder, including but not limited to the provisions of such Treasury Regulations addressing "qualified income offset," "minimum gain charge back" requirements and allocations of deductions attributable to "non-recourse debt" and "partner non-recourse debt," are hereby incorporated by reference and made part of this Agreement.

Notwithstanding anything to the contrary in this Section 4.2(a), the Voting Members shall be authorized to modify the allocations to cause the allocations to be in accordance with the Unitholders respective economic interest and distribution rights, provided that the allocation provisions contained in this Section 4.2 are intended to be in compliance with Section 704(b) and the Treasury Regulations thereunder and shall be interpreted and applied in a manner consistent therewith.

12

(b)    <u>Tax Allocations</u>.

(i)    Subject to <u>Section 4.2(b)(ii)</u> below, for each Taxable Year of the Company, items of Company income, gain, loss, deduction and expense, shall be allocated, for federal, state and local income tax purposes, among the Unitholders in the same manner as Profits (and the items thereof) or Losses (and the items thereof) of which such items are components were allocated pursuant to <u>Section 4.2(a)</u>.

(ii)    In accordance with Section 704(c) of the Code and the Treasury Regulations thereunder, income, gain, loss, and deduction with respect to any property contributed to the capital of the Company shall, solely for tax purposes, be allocated among the Unitholders so as to take account of any variation between the adjusted basis of such property to the Company for federal income tax purposes and its fair market value at the time of contribution. In the event the Book Value of any Company asset is adjusted pursuant to Treasury Regulation Section 1.704-1(b)(2)(iv)(f), subsequent allocations of income, gain, loss and deduction with respect to such asset shall take into account any variation between the adjusted basis of such asset for federal income tax purposes and its Book Value in the same manner as under Section 704(c) of the Code and the Treasury Regulations thereunder. The Voting Members shall determine the method for any allocations pursuant to this <u>Section 4.2(b)(ii)</u>.

(c)    Allocations pursuant to this <u>Section 4.2(b)</u> are solely for purposes of federal, state, and local taxes and shall not affect, or in any way be taken into account in computing, any Unitholder's Capital Account or share of Profits, Losses, other items, or distributions pursuant to any provision of this Agreement.

**Section 4.3    <u>Indemnification and Reimbursement for Payments on Behalf of a Unitholder</u>**.  If the Company is required by law to make any payment to a governmental entity that is specifically attributable to a Unitholder or a Unitholder's status as such (including, but not limited to, U.S. federal, state or local, withholding taxes (including any withholding taxes imposed on amounts paid to the Company), state personal property taxes, state unincorporated business taxes and any taxes imposed on the Company by Section 6225 of the Code), then except to the extent such amount reduces a Distribution to such Unitholder (in which case such amount shall be deemed Distributed to such Unitholder for all purposes under this Agreement) such Unitholder shall indemnify and contribute to the Company in full for the entire amount paid including interest, penalties and related expenses and any item of deduction resulting from any such amounts at the Company level shall be specifically allocated to such Unitholder.  At the election of the Voting Members, any subsequent Distribution to a Unitholder that has an unpaid indemnification obligation under this <u>Section 4.3</u> may be reduced by an amount required to satisfy such indemnification obligation or any part thereof and any such reduction shall be deemed Distributed to such Unitholder for all purposes under this Agreement.

## ARTICLE V

## MANAGEMENT

**Section 5.1    <u>General Powers</u>**.  Except for situations in which the approval of the Members or any specific class of Members is expressly required by the terms of this Agreement, (i) all management powers over the business and affairs of the Company shall be exclusively vested in the Board, (ii) the Board shall have full, exclusive, and complete discretion, power and authority to manage, control, administer and operate the business and affairs of the Company, and to make all decisions affecting such business and affairs, and (iii) the Board shall have the power to bind or take any action on behalf of the Company, or to exercise in its sole discretion any rights and powers (including the rights and powers to

13

take certain actions, give or withhold certain consents or approvals, or make certain determinations, opinions, judgments, or other decisions) granted to the Company under this Agreement, or any other agreement, instrument, or other document to which the Company is a party or by virtue of its holding the equity interests of any Subsidiary or other Person.  No single member of the Board (acting in his or her capacity as such) shall have any authority to bind the Company with respect to any matter except pursuant to a resolution expressly authorizing such action which resolution is duly adopted by the Board by the affirmative vote required for such matter pursuant to this Agreement.  Unless otherwise expressly provided herein, any action, approval or determination that may or shall be taken or made by the Board shall be taken or made by the Board in its sole discretion.

Section 5.2    **Board Composition; Compensation.**

(a)    The Board shall initially consist of five (5) Managers. The Managers shall be appointed as follows until the first anniversary of the date hereof:

(i)    four (4) Managers shall be designated by TCW (the "**Sponsor Managers**"), two (2) of whom shall not be employees of TCW (such Sponsor Managers, the "**Independent Managers**"); initially, the Sponsor Managers shall be: (1) [Ryan Carrol], (2) [Rick Miller], (3) [Mitchell Lowe] and (4) [Matthew White], with (3) and (4) being the Independent Managers; and

(ii)    one (1) Manager shall be the individual serving as the Chief Executive Officer of the business of the Company from time to time, who shall initially be Shawn Lederman (who, for the avoidance of doubt, shall cease to be a Manager upon ceasing to serve as Chief Executive Officer).

(b)    After the first anniversary of the date hereof, only one (1) Sponsor Manager shall be required to be an Independent Manager.

(c)    Managers shall serve until their resignation, death, removal or the election of their successor in accordance with the terms hereof.  The removal from the Board of any Sponsor Manager shall only be at the written request of the Member entitled to designate such Sponsor Manager under Section 5.2(a). A Manager may resign by delivering his or her written resignation to the Company at the Company's principal office addressed to the Board.  Such resignation shall be effective upon receipt unless it is specified to be effective at some other time or upon the happening of some other event.  The acceptance of a resignation shall not be necessary to make it effective, unless expressly so provided in the resignation.

(d)    The Company shall pay each of the Independent Managers $20,000 per quarter.

Section 5.3    **Board Actions**.

(a)    Notwithstanding any other provision of this Agreement, the Board shall take all necessary action to cause the Company not to take, and the Company shall not take, and where applicable shall take all necessary action to cause the Company's Subsidiaries not to take, without the prior written consent of a majority of the Units (excluding Class P Units) issued and outstanding, any of the following actions:

(i)    enter into, amend or terminate any (1) employment agreement or arrangement with any employee or any engagement with any contractor (except in the ordinary course of business), (2) agreements regarding compensation (including salary, bonus, deferred compensation or otherwise) or benefits of any employee (except in the ordinary course of business), (3) any equity-based compensation

14

plan, (4) any benefit, severance or other similar plan or (5) any annual bonus plan or any management equity plan;

(ii)    appoint or remove the Company's auditors or make any changes to the accounting methods or policies of the Company (other than as required by GAAP);

(iii)    acquire any business entity or business assets relevant to the business of the Company (except in the ordinary course of business);

(iv)    sell, lease, transfer or otherwise dispose of all or substantially all of the assets of the Company;

(v)    any merger, consolidation, combination or other similar business transaction involving the Company or any of its Subsidiaries, except for the merger of any Subsidiary of the Company with and into the Company;

(vi)    the authorization, sale, issuance or repurchase of Units or other Equity Securities relating to any securities of the Company or any of its Subsidiaries;

(vii)    remove or replace a the Chief Executive Officer or any other Officer or an employee of the Company or any of its Subsidiaries (except in the ordinary course of business);

(viii)    amend, restate, modify or supplement this Agreement;

(ix)    enter into, amend, restate, modify or supplement, waive or terminate any Related Party Agreement;

(x)    incur any indebtedness or materially amend, restate, modify or supplement any agreement related to any indebtedness of the Company or any of its Subsidiaries;

(xi)    make any loan or investment, including in the capital stock, capital shares or other securities of another Person, other than in a Subsidiary;

(xii)    any voluntary liquidation, bankruptcy, dissolution, recapitalization, reorganization, or assignment to its creditors, or any similar transaction;

(xiii)    enter into any material commercial arrangement;

(xiv)    in respect of the Company, make any expenditure in an amount greater than five hundred thousand dollars ($500,000); or

(xv)    any other action requiring the discretion, determination, approval, consent or other similar affirmation of the Voting Members referred to in this Agreement.

For the avoidance of doubt, the prior written consent of a majority of the Units (excluding Class P Units) issued and outstanding shall not be required in respect of any sales by the Company of the Company's owned real property interests.

(b)    Notwithstanding any other provision in this Agreement, for as long as the Initial Minority Member and its Permitted Transferees own at least two percent (2%) of all Units (excluding Class P

15

Units) issued and outstanding, the Company shall not enter into any agreements with TCW unless any such agreement is entered into on an arm's length basis without the Initial Minority Member's consent.

(c)     Each Manager shall have one (1) vote on all matters submitted to the Board or any committee thereof (whether the consideration of such matter is taken at a meeting or by written consent or otherwise). The affirmative vote (whether by proxy or otherwise) of the Managers holding at least a majority of the votes of all Managers then serving on the Board (i.e., excluding vacancies on the Board) shall be the act of the Board. Except as otherwise provided by the Board when establishing any committee, the affirmative vote (whether by proxy or otherwise) of the Managers then serving on such committee holding at least a majority of the votes of all Managers then serving on such committee shall be the act of such committee. Meetings of the Board and any committee thereof shall be held at the principal office of the Company or at such other place (whether virtual or physical) as may be determined by the Board or such committee. Regular meetings of the Board shall be held on such dates and at such times as shall be determined by the Board. Special meetings of the Board may be called by any Manager and special meetings of any committee may be called by any Manager on such committee. Notice of each special meeting of the Board or committee stating the date, place and time of such meeting shall be given to each Manager (in the case of a Board meeting) or each Manager on such committee (in the case of a committee meeting) by hand, telephone, electronic mail, telecopy, overnight courier or the U.S. mail at least twenty-four (24) hours prior to such meeting. Notice may be waived before or after a meeting or by attendance without protest at such meeting. The actions taken by the Board or any committee at any meeting (as opposed to by written consent), however called and noticed, shall be as valid as though taken at a meeting duly held after regular call and notice if (but not until), either before, at or after the meeting, the Managers as to whom it was improperly held sign a written waiver of notice or a consent to the holding of such meeting or an approval of the minutes thereof. The actions by the Board or any committee thereof may be taken by written consent (without a meeting, without notice and without a vote) so long as such consent is signed by at least the Managers holding the number of votes that would be necessary to authorize or take such action at a meeting in which all Managers then serving on the Board or such committee were present and voted, as the case may be. Any action taken pursuant to such written consent of the Board or such committee shall have the same force and effect as if taken by the Board or such committee at a meeting thereof. A meeting of the Board or any committee may be held by telephone conference or similar communications equipment by means of which all individuals participating in the meeting can be heard. The Board and any committee may adopt such other procedures governing meetings and the conduct of business at such meetings as it shall deem appropriate.

### Section 5.4     Delegation of Authority; Officers.

(a)     The Board may, from time to time, delegate to one or more Persons (including any Member, Manager or Officer and including through the creation and establishment of one or more other committees) such authority and duties as the Board may deem advisable. Any delegation pursuant to this <u>Section 5.4(a)</u> may be revoked at any time by the Board.

(b)     From time to time, one or more persons may (but need not) be designated and appointed as an Officer of the Company by the Board. Any Officers so designated shall have such authority and perform all such duties that do not require consent of the Board, or as the Board may, from time to time, delegate to them. The Board may assign titles to particular Officers (including Chairman, Chief Executive Officer, President, Chief Financial Officer, Chief Operating Officer, Vice President, Executive Vice President, Secretary, Assistant Secretary, Treasurer, or Assistant Treasurer). Unless the Board otherwise decides, if the title is one commonly used for officers of a business corporation formed under the Delaware General Corporation Law, the assignment of such title shall constitute the delegation to such Officer of the authority and duties that are normally associated with that office, subject to (i) any specific

16

delegation or limitation of authority and duties made to such Officer by the Board, and (ii) any the specific limitations set forth herein. Each Officer shall hold office until such Officer's successor shall be duly designated or until such Officer's death or until such Officer shall resign or shall have been removed in the manner hereinafter provided. Any number of offices may be held by the same individual. The salaries or other compensation, if any, of the Officers of the Company shall be fixed from time to time by the Board.

(c)      Any Officer may resign as such at any time. Such resignation shall take effect at the time specified therein, or if no time be specified, at the time of its receipt by all of the Managers. The acceptance of a resignation shall not be necessary to make it effective. Any Officer may be removed as such, either with or without cause, by the Board in its sole discretion at any time. Designation of an Officer shall not of itself create contract rights and the Company shall not (i) enter into any employment agreements with any Officer or any other employees or (ii) provide any employment benefits to any Officer or any other employee. The Company will reimburse Officers for business class travel and lodging, and other reasonable expenses incurred in connection with the discharge of such individual's duties. Any vacancy occurring in any office of the Company may be filled by the Board and shall remain vacant until filled by the Board.

### Section 5.5    Member Authority; Member Actions; Meetings.

(a)      <u>Member Authority</u>. No Unitholder or Member in its capacity as such has the authority or power to act for or on behalf of the Company in any manner or way, to bind the Company, or do any act that would be (or could be construed as) binding on the Company, in any manner or way, or to make any expenditures on behalf of the Company, unless such specific authority and power has been expressly granted to and not revoked from such Unitholder or Member by the Voting Members or the express provisions of this Agreement, and the Unitholders and Members hereby consent to the exercise by the Voting Members of the powers conferred on them by law and this Agreement.

(b)      <u>Member Actions; Meetings</u>. Except as expressly and specifically provided in this Agreement, or as otherwise required by non-waivable provisions of applicable law, the Members shall have no right to vote or approve any matter. For situations for which the approval of the Members generally (rather than the approval of the Board or a particular group of Members) is specifically and expressly required by this Agreement or by non-waivable provisions of applicable law, the Members shall act through meetings and written consents as described in this <u>Section 5.5(b)</u>. Except as otherwise expressly and specifically provided herein or as otherwise required by non-waivable provisions of applicable law, (i) the Members holding Class P Units shall have no voting rights with respect to such Class P Units and (ii) the Members holding Class A Units shall be entitled to one vote per Class A Unit, respectively, held on all matters to be voted on by the Members. The actions by the Members permitted hereunder may be taken at a special meeting called by any Voting Member on at least 24 hours' prior written notice to the other Members entitled to vote or consent thereon, which notice shall state the purpose or purposes for which such meeting is being called. The actions by the Members entitled to vote or consent may be taken by written consent (without a meeting, without notice and without a vote) so long as such consent is signed by the Members holding not less than the minimum number of Units that would be necessary to authorize or take such action at a meeting at which all Members entitled to vote thereon were present and voted. Any action taken pursuant to such written consent of the Members shall have the same force and effect as if taken by the Members at a meeting thereof. A meeting of the Members entitled to vote or consent may be held by telephone conference or similar communications equipment by means of which all individuals participating in the meeting can be heard.

17

## ARTICLE VI

## LIMITATIONS OF LIABILITY AND INDEMNIFICATION

**Section 6.1** **Liabilities of the Company**. Except as otherwise provided by non-waivable provisions of the Delaware Act, the debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the Company, and no Unitholder, Member or Manager shall be obligated personally for any such debt, obligation or liability of the Company solely by reason of being a Unitholder, Member or Manager of the Company. The failure of the Company to observe any formalities or requirements relating to the exercise of its powers or management of its business and affairs under this Agreement or the Delaware Act shall not be grounds for imposing personal liability on the Unitholders, Members or Manager for debts, obligations and liabilities of the Company.

**Section 6.2** **No Duties**. To the extent that, at law or in equity, a Unitholder, Member, Manager or Officer, in each case, in their capacity as such, has any duty (including any fiduciary duty) to the Company, a Unitholder, a Member or any other Person that is party to or otherwise bound by this Agreement, all such duties are hereby eliminated, and each of the Company, Unitholders, Members and such other Persons hereby waives such duties (including any fiduciary duties), to the fullest extent permitted by the Delaware Act and all other applicable laws. In addition, each of the Unitholders, Members and any other Person that is party to or otherwise bound by this Agreement acknowledges and agrees that (a) it shall not (and shall not assist any Person attempting to), directly or indirectly, derivatively or otherwise, make any claim with respect to or seek to enforce any duty (including any fiduciary duty) which any Person may have to any Subsidiary of the Company in their capacity as a director, manager, officer or equity holder of such Subsidiary and (b) the Company, acting directly or indirectly through its control of any Subsidiary, shall have the sole and exclusive right to make any such claim or seek any such enforcement.

**Section 6.3** **Waiver of Liability**. No present or former Unitholder, Member, Manager or Officer or any of their respective Affiliates or any equity holder, partner, director, manager, officer, employee, agent or representative of any of the foregoing shall be liable to the Company or any of its Subsidiaries or to any Member or Unitholder for any act or omission performed or omitted by such Unitholder, Member, Manager or Officer in their capacity as such; provided that (a) such limitation of liability shall not apply to the extent the act or omission was attributable to such Person's fraud, bad faith or knowing violation of law (in each case, as determined by a final judgment, order or decree of an arbitrator or a court of competent jurisdiction (which is not appealable or with respect to which the time for appeal therefrom has expired and no appeal has been perfected)) and (b) for the avoidance of doubt, such limitation of liability shall not apply with respect to any breaches of any representations, warranties or covenants by any such Person contained herein or in any other agreement with the Company or any of its Subsidiaries. With respect to any action taken or decision or determination made by the Board (or committee thereof or any Manager), the Voting Members or any Officer in their capacity as such, it shall be presumed that the Board (or committee thereof or any Manager), the Voting Members or such Officer acted in good faith and in compliance with this Agreement and the Delaware Act, and any Person bringing, pleading or prosecuting any claim with respect to any action taken or decision or determination made by the Board (or committee thereof or any Manager), the Voting Members or any Officer in their capacity as such shall have the burden of overcoming such presumption by clear and convincing evidence; provided that, for the avoidance of doubt, this sentence shall not be deemed to increase or place any duty (including any fiduciary duty) on the Board (or committee thereof or any Manager), the Voting Members or any Officer.

18

Section 6.4    **Indemnification.**

(a)    Generally.  The Company hereby agrees to indemnify and hold harmless any Person (each an "**Indemnified Person**") to the fullest extent permitted under the Delaware Act, as the same now exists or may hereafter be amended, substituted or replaced (but, in the case of any such amendment, substitution or replacement only to the extent that such amendment, substitution or replacement permits the Company to provide broader indemnification rights than the Company is providing immediately prior to such amendment, substitution or replacement), against all proceedings, claims, actions, liabilities, losses, damages, costs or expenses (including reasonable attorney fees and expenses, judgments, fines, excise taxes or penalties) incurred or suffered by such Person by reason of the fact that such Person is or was a Unitholder or Member or is or was serving as a Manager or Officer of the Company or is or was serving at the request of the Company as a managing member, manager, officer, director, principal, member, employee, agent or representative of another Person; provided that (unless approved by the Board) no Indemnified Person shall be indemnified (a) with respect to proceedings, claims or actions (i) initiated or brought voluntarily by or on behalf of such Indemnified Person and not by way of defense or (ii) brought against such Indemnified Person in response to a proceeding, claim or action initiated or brought voluntarily by or on behalf of such Indemnified Person against the Company or any of its Subsidiaries, (b) for any amounts paid in settlement of a claim effected without the prior written consent of the Company to such settlement, (c) to the extent such proceedings, claims, actions, liabilities, losses, damages, costs or expenses arise from such Person's fraud, bad faith or knowing violation of law as determined by a final judgment, order or decree of an arbitrator or a court of competent jurisdiction (which is not appealable or with respect to which the time for appeal therefrom has expired and no appeal has been perfected) or (d) for the avoidance of doubt, with respect to any breaches of any representations, warranties or covenants by any such Person contained herein or in any other agreement with the Company or any of its Subsidiaries. Expenses, including reasonable attorneys' fees and expenses, incurred by any such Indemnified Person in defending a proceeding may be paid by the Company in advance of the final disposition of such proceeding, including any appeal therefrom, upon approval by the Board and receipt of an undertaking by or on behalf of such Indemnified Person (in form and substance acceptable to the Board) to repay such amount if it shall ultimately be determined that such Indemnified Person is not entitled to be indemnified by the Company.  If this Section 6.4 or any portion hereof shall be invalidated on any ground by any court of competent jurisdiction, then the Company shall nevertheless indemnify and hold harmless each Indemnified Person pursuant to this Section 6.4 to the fullest extent permitted by any applicable portion of this Section 6.4 that shall not have been invalidated.

(b)    Employees and Agents. The Company, in the sole discretion of the Board, may indemnify and advance expenses to an employee or agent of the Company or any of its Subsidiaries to the same extent and subject to the same conditions under which it is obligated to indemnify and advance expenses to an Indemnified Person under Section 6.4(a).

(c)    D&O Insurance. To the fullest extent permitted by the Delaware Act or any other applicable law, the Company, upon approval by the Board, may purchase insurance on behalf of any Manager or Officer.

Section 6.5    **Other Business Interests.**

(a)    Without limiting any other provision set forth herein, the Company, Unitholders and Members expressly acknowledge and agree that (i) TCW and its Affiliates, employees, officers, directors, managers and equity holders (collectively, the "**TCW Parties**") are permitted to, and may presently or in the future directly or indirectly conduct any business, investment or activities whatsoever (including one that may be competitive with or complementary to the businesses of the Company and its Subsidiaries)

19

through entities other than the Company and its Subsidiaries, (ii) no TCW Party shall have any obligation to inform any of the Company, the Members or Unitholders of any business or investment opportunity, whether or not such opportunity is within the scope of the business of the Company and its Subsidiaries or any anticipated or potential extension or expansion thereof, (iii) none of the Company and its Subsidiaries, the Members or Unitholders shall have any right in or to such other business interests, investments or activities or the income or proceeds derived therefrom and (iv) the Company (on behalf of itself and its Subsidiaries) and each Member and Unitholder waives any rights he, she or it might otherwise have to share or participate in the business interests, investments or activities of TCW Parties.

(b)      Notwithstanding anything to the contrary set forth herein, each Voting Member shall present, and if applicable, shall cause all of its Related Employees to present, all business or investment opportunities to the Company of which any of the foregoing become aware which are, or may be, within the scope of the business or investment objectives of the Company and its Subsidiaries or any anticipated or potential extension or expansion thereof, or are otherwise competitive with or complementary to the Company and its Subsidiaries, and no Voting Member or Related Employee of a Voting Member shall pursue or participate in any such opportunity without the prior written consent of the Company.

**Section 6.6      Effect on Other Agreements**.  This Article VI shall not in any way affect, limit or modify any Person's liabilities, obligations, duties or responsibilities under any employment agreement, retention agreement, consulting agreement, confidentiality agreement, noncompete agreement, nonsolicit agreement, senior management agreement or any other agreement with respect to the provision of services to the Company and/or any of its Subsidiaries.

## ARTICLE VII

## ACCOUNTING AND REPORTS

**Section 7.1      Allocations and Accounting**.  All matters concerning (a) the determination of the relative amount of allocations and distributions among the Unitholders pursuant to Article III and Article IV not specifically and expressly provided by the terms of this Agreement, and (b) accounting procedures and determinations, and other determinations not specifically and expressly provided by the terms of this Agreement, shall be determined by the Board, whose determination shall be final and conclusive absent manifest clerical error.

**Section 7.2      Tax Returns**.  The Company shall use commercially reasonable efforts to deliver or cause to be delivered, as soon as practicable after the end of each Fiscal Year, to each Person who was a Unitholder at any time during such Fiscal Year all information necessary for the preparation of such Person's United States federal and state income tax returns.

**Section 7.3      Information Rights**.  The Company shall use commercially reasonable efforts to deliver to each Voting Member so long as such member owns at least 2% of all Units (excluding Class P Units) issued and outstanding:

(a)      within 120 days after the end of each Fiscal Year, audited consolidated statements of income and cash flows of the Company and its Subsidiaries for such Fiscal Year, and audited consolidated balance sheets of the Company and its Subsidiaries as of the end of such Fiscal Year, all prepared in accordance with GAAP; and

(b)      within 45 days after the end of each fiscal quarter, unaudited consolidated statements of income and cash flows of the Company and its Subsidiaries for such fiscal quarter, and unaudited

20

consolidated balance sheets of the Company and its Subsidiaries as of the end of such fiscal quarter, all prepared in accordance with GAAP.

## ARTICLE VIII

## TAX MATTERS

**Section 8.1    Preparation of Tax Returns**.  The Company shall arrange for the preparation and timely filing of all tax returns required to be filed by the Company, including making the elections described in Section 8.2.  Each Unitholder shall furnish to the Company all pertinent information in its possession relating to the Company's operations that is necessary to enable the Company's income tax returns to be prepared and filed.  The Taxable Year shall be the Fiscal Year unless determined otherwise by the Board.

**Section 8.2    Tax Elections**.  Unless otherwise provided for herein, the Partnership Representative is hereby authorized to make any tax elections for the Company in its sole discretion.  Each Unitholder will upon request supply any information necessary to give proper effect to such election.

**Section 8.3    Tax Controversies**.  TCW shall be the Partnership Representative and, as such, shall be authorized and required to represent the Company (at the Company's expense) in connection with all examinations of the Company's affairs by tax authorities, including resulting administrative and judicial proceedings, and to expend the Company's funds for professional services and reasonably incurred in connection therewith.  Each Unitholder agrees to reasonably cooperate with the Company and to do or refrain from doing any or all things reasonably requested by the Company with respect to the conduct of such proceedings.  The Company shall reimburse the Partnership Representative for all expenses incurred in that capacity.

## ARTICLE IX

## TRANSFER OF UNITS

**Section 9.1    Restrictions.**

Any Member may Transfer any Units (except Class P Units) to any Person, whether or not a Permitted Transferee, provided that such person executes appropriate instruments of transfer and a joinder agreement (in form and substance satisfactory to the Company in its sole discretion)  agreeing to be bound by and subject to the terms of this Agreement. Notwithstanding anything to the contrary herein, no Member may Transfer any Units to any competitor. For the avoidance of doubt, a "competitor" includes any Financial Sponsor that owns twenty-five (25%) or more of the equity in a competitor.

**Section 9.2    Approved Sale; Drag Along Obligations.**

(a)    If at any time a Sale of the Company is approved by the Board and a majority of the issued and outstanding Units (excluding the Class P Units) elect in writing to have such transaction governed by this Section 9.2 (as so approved, an "**Approved Sale**"), then if requested by the Members Transferring Units or other Equity Securities (the "**Drag-Along Transferring Members**"), each other Member (together with their Affiliates and the Drag-Along Transferring Members, a "**Drag-Along Participants**") shall be required to sell all of the Units and other Equity Securities held by him, her or it. If the Approved Sale is structured as a (x) merger or consolidation, each Unitholder shall waive any

21

dissenters rights, appraisal rights or similar rights in connection with such merger or consolidation or (y) sale of Units, each Drag-Along Participants shall agree to sell all of his, her or its Units and other Equity Securities on the terms and conditions approved by the Board and the prior written consent of a majority of the issued and outstanding Units (excluding the Class P Units). Each Drag-Along Participant shall take all actions in connection with the consummation of the Approved Sale as may be requested by the Drag-Along Transferring Members, including becoming party to a purchase and sale agreement, merger and/or other agreements related to the Approved Sale which may provide for any of the following (among other things): (i) representations and warranties; (ii) indemnification obligations; (iii) earn-outs and working capital, cash, debt and similar adjustments to purchase price; (iv) escrows, holdbacks and similar arrangements to support indemnification obligations and adjustments to purchase price, in each of the cases of clauses (ii), (iii) and (iv) on a pro rata basis (determined based on his, her or its share of the final dollar amount of the proceeds allocated in such Approved Sale) other than any such obligations that relate specifically to a particular Unitholder, such as indemnification with respect to representations and warranties given by an Unitholder regarding such Unitholder's title to Units or such Unitholder's authority, which shall be the sole responsibility of such Unitholder; (v) general release of claims against the Company and its Subsidiaries (subject to reasonable and customary exceptions such as rights to compensation, indemnification and professional liability insurance coverage); (vi) pro rata contribution to support the obligations of the Company or any of its Subsidiaries under any transaction agreement or any Voting Member or any of his, her or its Affiliates under any guaranty or similar agreement or arrangement related to the transaction whereby any Voting Member or any of his, her or its Affiliates agree to be liable for obligations of the Company or any of its Subsidiaries or otherwise in excess of their pro rata share of Equity Securities; (vii) the appointment of a Voting Member seller representative, with customary authority to act on behalf of all Unitholders, including (A) disputing or refraining from disputing, on behalf of each of the Unitholders any amounts to be received by the Unitholders, or any claim made by the counterparty to such transaction agreement, (B) negotiating and compromising, on behalf of each of the Unitholders, any dispute that may arise under, and exercise or refrain from exercising any remedies available under, such transaction agreement, (C) executing, on behalf of each of the Unitholders, any settlement agreement, release or other document with respect to such dispute or remedy (so long as any such settlement or release by any of the Unitholders includes a release of all Unitholders), and (D) determining the amount of, and holding, such reserves (to satisfy known or potential post-closing purchase price adjustments, indemnification claims, defense costs or any fees, costs and expenses incurred in connection with the Approved Sale or by the seller representative in performing its obligations under the transaction agreement) as the seller representative reasonably and in good faith deems appropriate; <u>provided</u> that, in each case, the seller representative shall not take any action adverse to any of the Unitholders unless such action is also taken proportionately with respect to all other Unitholders, as the case may be (determined based on his, her or its share of the final dollar amount of the proceeds allocated in such Approved Sale). Each Unitholder Transferring Units pursuant to this <u>Section 9.2</u>, including the Drag-Along Transferring Members and Drag-Along Participants, shall bear his, her or its pro rata share (determined in the reverse order of distribution priorities set forth in <u>Section 4.1(a)</u> of this Agreement) of the expenses incurred by the Unitholders in connection with such Transfer if such expenses were expressly approved in writing by the Board.

(b)    The obligations of the Unitholders under this <u>Section 9.2</u> with respect to an Approved Sale are subject to the satisfaction of the condition that the consideration to be paid by the acquiror with respect to each Unit shall be allocated among each Unit as though the aggregate amount of all such consideration was distributed from the Company in accordance with <u>Section 4.1(a)</u> (assuming, for purposes of this determination, that the Units sold in such Approved Sale are the only Units then outstanding). Each Unitholder shall take all actions in connection with the distribution of the aggregate consideration from any transaction described in clause (ii) of the definition of a Sale of the Company as may be requested by the Voting Members to effect such allocation. In connection with the transactions

22

contemplated by Section 9.2(a) (the "**Drag Transaction**"), each Drag-Along Participant agrees to make representations regarding capacity, due authorization, no conflict, ownership and title to his, her or its interests in the Company, as applicable, and shall not be required to make any other representations regarding the Company or give any general indemnities; provided, however, that any representation made by a Drag-Along Participant shall relate only to such Drag-Along Participant and his, her or its Units and not to the Company or its business, the other Drag-Along Participants.

(c)     The fees and expenses, other than those payable to any Member or any of their respective Affiliates, incurred in connection with a Drag Transaction and for the benefit of all Members (it being understood that costs incurred by or on behalf of a Member for his, her or its sole benefit will not be considered to be for the benefit of all Members), to the extent not paid or reimbursed by the Company or the Transferee or acquiring Person, shall be shared by all of the Members ratably, based on the consideration received by each Member; provided, that no Member shall be obligated to make any out-of-pocket expenditure prior to the consummation of the Drag Transaction (excluding modest expenditures for postage, copies, etc.).

(d)     The Drag-Along Transferring Members shall provide written notice (the "**Drag-Along Notice**") to each Drag-Along Participant of any proposed Drag Transaction as soon as practicable following the exercise of the rights provided in this Section 9.2. The Drag-Along Notice shall set forth the consideration to be paid by the purchaser for the Units and other Equity Securities, if any, and the material terms of the proposed transaction.

(e)     If any holders of Units of any class are given an option as to the form and amount of consideration to be received, all holders of Units of such class will be given the same option.

(f)     Upon the consummation of the Drag Transaction, the acquiring Person shall remit directly to the Drag-Along Participant, by wire transfer if available and if requested by the Drag-Along Participant, the consideration for the Units and/or other Equity Securities sold pursuant thereto.

### Section 9.3     Tag-Along Rights.

(a)     With the exception of Transfers to Permitted Transferees or in accordance with Section 9.2, at least twenty (20) days prior to, and no earlier than sixty (60) days prior to any Transfer of Units by a majority of the Voting Members, each Voting Member making such Transfer (the "**Transferring Parties**") shall deliver a written notice (the "**Transfer Notice**") to the Company and each of the other Members who own at least two percent (2%) of all Units (excluding Class P Units) issued and outstanding, specifying in reasonable detail the identity of the prospective Transferee(s), the number of Units to be Transferred and, to the extent known, the terms and conditions of the Transfer. The Unitholders may elect to participate in the contemplated Transfer by delivering written notice to the Transferring Party within ten (10) days after delivery of the Transfer Notice (such period, the "**Election Period**", and the Members so electing, the "**Electing Members**"). The Transferring Parties and any Electing Members shall each be entitled to sell in the contemplated Transfer (or to the Transferring Party in lieu thereof pursuant to Section 9.3(b)), at the same price and on the same terms (including becoming party to a purchase and sale agreement related to the Transfer with such terms and conditions as the Transferring Party shall approve), a number of Units, equal to the product of (i) the quotient determined by dividing (A) the number of Class A Units owned by such Person by (B) the aggregate number of Class A Units owned by the Transferring Parties and all Electing Members and (ii) the number of Class A Units to be Transferred by the Transferring Party as set forth in the Transfer Notice. Any Electing Member may elect to sell in any Transfer contemplated under this Section 9.3 a lesser number of Class A Units than such Electing Member is entitled to sell hereunder, in which case the Transferring Party shall have

23

the right to sell an additional number of Class A Units in such Transfer equal to the number that such Electing Member has elected not to sell.  Each Member Transferring Units pursuant to this <u>Section 9.3</u> shall pay its pro rata share (determined based on his, her or its share of the final dollar amount of the proceeds allocated in such Transfer) of the expenses incurred by the Transferring Party in connection with such Transfer.

(b)    With respect to any Transfer subject to <u>Section 9.3(a)</u>, the Transferring Party shall not Transfer any of its Units to any prospective Transferee if such prospective Transferee declines to allow the participation of the Electing Members to the extent required by this <u>Section 9.3</u>, unless, in lieu of such participation, the Transferring Party or its Affiliates purchase the number of Units from each Electing Member which such Electing Member would have been entitled to sell under <u>Section 9.3(a)</u> for the price and on the terms such Electing Member would have been entitled to under <u>Section 9.3(a)</u>.

(c)    In connection with the transactions contemplated by <u>Section 9.3(a)</u> (the "**Tag Transaction**"), each Transferring Party and Electing Member agrees to make representations regarding capacity, due authorization, no conflict, ownership and title to his, her or its interests in the Company, as applicable, and shall not be required to make any other representations regarding the Company or give any general indemnities; <u>provided</u>, <u>however</u>, that any representation made by a Transferring Party or Electing Member shall relate only to such Transferring Party or Electing Member and, as applicable, his, her or its Units and not to the Company or its business, the other Transferring Parties or Electing Members.

(d)    The Transferring Party may Transfer the Units specified in the Transfer Notice (less the number of Class A Units which Electing Members have elected to sell in accordance with the terms hereof) at a price and on terms not materially more favorable to the Transferee(s) thereof than specified in the Transfer Notice during the 180-day period immediately following the Election Period.  Any Transferring Party's Units not Transferred within such 180-day period shall be subject to the provisions of this <u>Section 9.3</u> upon subsequent Transfer.

Section 9.4    <u>Repurchase Options.</u>

(a)    Upon death or permanent disability of a Member, or the termination of a Unitholder's employment with the Company or its Affiliates (excluding role transfers within or between the Company and its Subsidiaries), the Company shall have the right, but not the obligation, to purchase all or any portion of the Units (the "**Repurchase Units**") held by the Member or any member of such Person's Member Group (the "**Repurchase Sellers**") at a price per Unit equal to the Repurchase Price for each such Unit by delivering a written notice of such election to the Repurchase Sellers within ninety (90) days after such death or permanent disability (the date of such written notice, the "**Repurchase Notice Date**"). The "**Repurchase Price**" shall mean:  (i) for each Class A Unit, its Fair Market Value on the Repurchase Notice Date, and (ii) for each Class P Unit, its Fair Market Value on the Repurchase Notice Date.

(b)    If the Company elects to purchase any Repurchase Units pursuant to this <u>Section 9.4</u>, the Repurchase Price may be paid by the Company, at the Company's option, (i) by check or wire transfer of immediately available funds, (ii) by setoff or recoupment against any amounts owed by any Repurchase Seller to the Company or its Subsidiaries, (iii) by delivery of one or more Purchaser Notes or (iv) by any combination of the foregoing.  "**Purchaser Note**" shall mean an unsecured subordinated promissory note issued by the Company with a term no greater than five (5) years and bearing interest at a fixed rate equal to the "prime rate" as published in *The Wall Street Journal* on the Repurchase Notice Date.  The applicable Repurchase Seller and its successors and assigns will, from time to time, execute such

24

subordination agreements as are requested by any current and future lenders of the Company or any of its Subsidiaries.

(c)      The Company will designate in writing to the Repurchase Sellers, the time, date and place of any purchase under this Section 9.4, provided that such purchase shall occur within thirty (30) days of the date of the election by the Company to consummate such transaction.  At the closing of a purchase pursuant to this Section 9.4, each Repurchase Seller shall make such representations and warranties relating to the sale, transfer and ownership of such Repurchase Units and execute and deliver such other documents and instruments, as the Company may reasonably request, including, but not limited to, a representation and warranty that each such Repurchase Seller is conveying to the Company all of the Repurchase Units free and clear of all liens, claims and encumbrances, except for those liens, claims and encumbrances set forth in this Agreement.  If approved by the Board, the Company may assign to the Members its rights hereunder to purchase Repurchase Units.

(d)      If the Company elects to repurchase any Repurchase Units pursuant to this Section 9.4 and recognizes income as the result of the distribution of cash by any Subsidiary of the Company in connection with such repurchase, then any such income shall be specifically allocated for purposes of Article IV to the Repurchase Seller holding such Repurchase Units prior to the repurchase until the portion of such Repurchase Seller's Capital Account associated with such Repurchase Unit determined following such allocation equals the Repurchase Price for such Repurchase Units, with any remaining income allocated in accordance with the general rule set forth in Article IV.  Notwithstanding anything to the contrary in this Agreement, if the Company elects to repurchase any Repurchase Units pursuant to this Section 9.4, (i) the Company may, at its option, consummate such repurchase, in whole or in part, by distributing to the Repurchase Sellers securities issued by a Subsidiary of the Company with a value equal to the Repurchase Price of such Repurchase Units, and immediately following such distribution causing the Subsidiary that issued the distributed securities to repurchase such securities from the Repurchase Sellers for consideration (in such form as may be permitted under Section 9.4(b) and on the terms set forth in this Section 9.4) equal to the Repurchase Price of such Repurchase Units, and (ii) the Company and the Repurchase Sellers agree to treat any such distribution as a distribution of securities of the Subsidiary under Code § 731(a).

Section 9.5      **Failure to Comply**.  If a Unitholder fails for any reason to comply with any of the provisions of Sections 9.2, 9.2(f) or 9.4, as applicable, the Company may, at its sole option, in addition to all other remedies it may have, terminate or Transfer all of the applicable Person's rights in and to the applicable Units and amend this Agreement, including the Unit Ownership Ledger, to reflect such termination or Transfer, in which event, the applicable Unitholder shall no longer be a Member or Unitholder and, upon delivery of such documentation as may be reasonably required by the Board, be entitled only to receive the consideration required pursuant to Sections 9.2, 9.2(f) or 9.4, as applicable.

Section 9.6      **Effect of Transfer.**

(a)      Termination of Rights.  Any Member who shall Transfer any Units or other interest in the Company shall cease to be a Member with respect to such Units or other interest and shall no longer have any rights or privileges of a Member with respect to such Units or other interest; provided that, notwithstanding the foregoing, unless and until the Assignee is admitted as a Substituted Member in accordance with the provisions of Article X (the "**Admission Date**"), (i) such Transferring Member shall retain all of the duties, liabilities and obligations of a Unitholder with respect to such Units or other interest and (ii) all or any portion of the rights and privileges of such Member with respect to such Units or other interest for any period of time prior to the Admission Date may be reinstated by the Board. Nothing contained herein shall relieve any Unitholder who Transfers any Units or other interest in the

25

Company from any liability of such Unitholder to the Company or the other Unitholders with respect to such Units or other interest that may exist on the Admission Date or that is otherwise specified in the Delaware Act and incorporated into this Agreement or for any liability to the Company or any other Person or for any breaches of any representations, warranties or covenants by such Unitholder (in its capacity as such) contained herein or in the other agreements with the Company or any of its Subsidiaries or Affiliates.

(b)    Assignee's Rights. A Transfer of Units permitted hereunder shall be effective as of the date of assignment and compliance with the conditions to such Transfer and such Transfer shall be shown on the books and records of the Company.  Profits and Losses and other items shall be allocated between the Transferor and the Assignee according to Section 706 of the Code.  Distributions made before the effective date of such Transfer shall be paid to the Transferor, and Distributions made after such date shall be paid to the Assignee.  Unless and until an Assignee becomes a Member pursuant to Article X hereof, the Assignee shall not be entitled to any of the rights or privileges granted to a Member hereunder or under applicable law, other than the rights and privileges specifically granted to Assignees pursuant to this Agreement; provided that, without relieving the Transferring Unitholder from any such limitations or obligations, such Assignee shall be bound by any limitations and obligations of a Unitholder contained herein by which a Member or other Unitholder would be bound on account of the ownership of Units by the Assignee (including the obligations set forth in Article IX).

(c)    Deemed Agreement.  Any Person who acquires in any manner whatsoever any Units or other interest in the Company, irrespective of whether such Person has accepted and adopted in writing the terms and provisions of this Agreement, shall be deemed by the acceptance of the benefits of the acquisition thereof to have agreed to be subject to and bound by all of the terms and conditions of this Agreement that any predecessor in such Units or other interest in the Company was subject to or by which such predecessor was bound.

### Section 9.7    Additional Restrictions on Transfer.

(a)    Execution of Counterpart.  Except in connection with an Approved Sale, each Transferee of Units or other interests in the Company shall, as a condition prior to such Transfer, execute and deliver to the Company a joinder or counterpart to this Agreement in form and substance acceptable to the Manager pursuant to which such Transferee shall agree to be bound by the provisions of this Agreement.

(b)    Notice.  In connection with the Transfer of any Units, the holder of such Units will deliver written notice to the Company describing in reasonable detail the Transfer or proposed Transfer.

(c)    Legal Opinion.  No Transfer of Units or any other interest in the Company may be made unless in the opinion of counsel, satisfactory in form and substance to the Manager (which opinion requirement may be waived by the Manager), such Transfer would not violate any U.S. federal securities laws or any state or provincial securities or "blue sky" laws (including any investor suitability standards) applicable to the Company or the interest to be Transferred, or cause the Company to be required to register as an "Investment Company" under the U.S. Investment Company Act of 1940, as amended.  Such opinion of counsel shall be delivered in writing to the Company prior to the date of the Transfer.

### Section 9.8    Transfer Fees and Expenses.  Except as expressly provided in Sections 9.2 and 9.2(f), the Transferor and Transferee of any Units or other interest in the Company shall be jointly and severally obligated to reimburse the Company for all reasonable expenses (including attorneys' fees and expenses) incurred by the Company in connection with any Transfer or proposed Transfer, whether or not consummated.

26

Section 9.9    **Void Transfers**.  Any Transfer by any Unitholder of any Units or other interest in the Company in contravention of this Agreement or which would cause the Company to not be treated as a partnership for U.S. federal income tax purposes shall be void and ineffectual and shall not bind or be recognized by the Company or any other party.  No purported Assignee in a Transfer deemed void and ineffectual pursuant to this Section 9.9 shall have any right to any Profits, Losses or Distributions of the Company.

## ARTICLE X

## ADMISSION OF MEMBERS

Section 10.1    **Substituted Members**.    In connection with any Transfer of Units by a Unitholder permitted under the terms of this Agreement, the Equity Agreements (if applicable), and any other agreements contemplated hereby and thereby, the Transferee shall become a Substituted Member on the later of (a) the effective date of such Transfer, and (b) the date on which such Transferee is approved as a Substituted Member by the Board, and such admission shall be shown on the books and records of the Company.

Section 10.2    **Additional Members**.    A Person may be admitted to the Company as an Additional Member only as contemplated under Section 3.1(b) and only upon furnishing to the Company (a) a counterpart or joinder to this Agreement, in form satisfactory to the Manager, binding such Person to all the terms and conditions of this Agreement, including the power of attorney granted in Section 13.1, and (b) such other documents or instruments as may be deemed necessary or appropriate by the Manager to effect such Person's admission as a Member.  Such admission shall become effective on the date on which the Board determines that such conditions have been satisfied and when any such admission is shown on the books and records of the Company.

## ARTICLE XI

## WITHDRAWAL AND RESIGNATION OF UNITHOLDERS

Section 11.1    **Withdrawal and Resignation of Unitholders**.  Unitholders shall have the power and right to withdraw or otherwise resign from the Company prior to the dissolution and winding up of the Company pursuant to Article XII and upon such withdrawal or other resignation by a Unitholder's, such Unitholder's Units shall be cancelled and deleted from the Unit Ownership Ledger.

## ARTICLE XII

## DISSOLUTION AND LIQUIDATION

Section 12.1    **Events of Dissolution**.    The Company shall be dissolved only upon the happening of any of the following events:

(a)       the Board consents to and approves the dissolution of the Company;

(b)       a judicial dissolution of the Company pursuant to Section 18-802 of the Delaware Act; or

(c)       the liquidation or sale of all or substantially all of the assets of the Company and its Subsidiaries, whether in a single transaction or in a series of related transactions, and the distribution of the net proceeds therefrom.

27

No other event, including the retirement, withdrawal, insolvency, liquidation, dissolution, insanity, resignation, expulsion, bankruptcy, death, incapacity or adjudication of incompetency of a Unitholder shall cause the dissolution of the Company.

**Section 12.2     Procedure for Winding Up and Dissolution**.

(a)     If the Company is dissolved, Board shall appoint and authorize a representative to act as the liquidator who shall immediately and diligently wind up the affairs of the Company and provide notices of such dissolution to the Members and will engage in no further business other than that which is necessary to perform existing obligations.  The Board may appoint one or more Voting Members as liquidator.

(b)     On the winding up of the Company, the assets of the Company shall be distributed, first, to creditors of the Company, including Unitholders who are creditors, in satisfaction of the liabilities of the Company, and then to the Unitholders in accordance with Section 4.1(a) and the Delaware Act.

(c)     As promptly as possible after final liquidation, but in no event later than thirty (30) days after the final liquidation, the liquidator shall cause a proper accounting to be made by a recognized firm of certified public accountants of the Company's and its Subsidiaries' assets, liabilities and operations through the last day of the calendar month in which the liquidation is completed.

(d)     The liquidator shall cause the notice described in the Delaware Act to be mailed to each known creditor of and claimant against the Company in the manner described thereunder.

**Section 12.3     Deferment**.  Notwithstanding anything to the contrary in this Article XII, but subject to the order of priorities set forth herein, if upon dissolution of the Company the liquidator determines that an immediate sale of part or all of the Company's assets would be impractical or would cause undue loss (or would otherwise not be beneficial) to the Members, the liquidator may, in its sole discretion defer for a reasonable amount of time the liquidation of any assets except those necessary to satisfy the Company's liabilities.

**Section 12.4     Deficit Capital Accounts**.  Notwithstanding anything to the contrary contained in this Agreement, and notwithstanding any custom or rule of law to the contrary, to the extent that the deficit, if any, in the Capital Account of any Member results from or is attributable to deductions and losses of the Company (including non-cash items such as depreciation), or distributions of money pursuant to this Agreement to all Members in proportion to their ownership of Units at dissolution such deficit shall not be an asset of the Company and such Members shall not be obligated to contribute such amount to the Company to bring the balance of such Member's capital account to zero.

**Section 12.5     No Further Claim**.  Upon dissolution, each Member will look solely to the assets of the Company for the return of his, her or its capital, and if the Company's property remaining after payment or discharge of the debts, obligations and liabilities of the Company, including debts, obligations and liabilities owed to one or more Members is insufficient to return the aggregate Capital Contributions of each Member, such Members will have no recourse against the Company, the Board or any other Member.

**Section 12.6     Termination and Cancellation of Certificate**.  On completion of the distribution of the Company's assets as provided herein, the Company shall be terminated, and a representative appointed and authorized by the Board (or such other Person or Persons as the Delaware Act may require or permit) shall file a certificate of cancellation with the Secretary of State of Delaware,

cancel any other filings made pursuant to this Agreement that are or should be canceled and take such other actions as may be necessary to terminate the Company.  The Company shall be deemed to continue in existence for all purposes of this Agreement until it is terminated pursuant to this <u>Section 12.6</u>.

## ARTICLE XIII

## GENERAL PROVISIONS

**Section 13.1    Power of Attorney**.  Each Unitholder hereby constitutes and appoints such Person authorized and appointed by the Board from time to time and the liquidators, if any and as applicable, and their respective designees, with full power of substitution, as his, her or its true and lawful agent and attorney-in-fact, with full power and authority in his, her or its name, place and stead, to execute, swear to, acknowledge, deliver, file and record in the appropriate public offices (to the same extent such Person could take such action) (a) this Agreement, all certificates and other instruments and all amendments hereof or thereof in accordance with the terms hereof which the Board deems appropriate or necessary to form, qualify, or continue the qualification of, the Company as a limited liability company in the State of Delaware and in all other jurisdictions in which the Company may conduct business or own property or as otherwise permitted herein; (b) all instruments, agreements, amendments or other documents which the Manager deems appropriate or necessary to reflect any amendment, change, modification or restatement of this Agreement in accordance with its terms; (c) all conveyances and other instruments or documents which the Manager and/or the liquidators deems appropriate or necessary to reflect the dissolution and liquidation of the Company pursuant to the terms of this Agreement, including a certificate of cancellation; (d) all instruments relating to the admission, withdrawal or substitution of any Unitholder pursuant to <u>Article X</u> or <u>Article XI</u> and (e) all agreements, documents, certificates or further assurances which may be required pursuant to <u>Sections 9.2</u>, <u>9.2(f)</u> or <u>9.4</u>.  The foregoing power of attorney is irrevocable and coupled with an interest, and shall survive the death, disability, incapacity, dissolution, bankruptcy, insolvency or termination of any Unitholder and the Transfer of all or any portion of its Units and shall extend to such Unitholder's heirs, successors, assigns and personal representatives.

**Section 13.2    Amendment and Waiver**.  This Agreement may be amended, or any provision of this Agreement may be waived, by the Board in writing, except that (a) no amendment to this Agreement shall be effective if such amendment would alter or change the powers, preferences, or special rights of one class of Units so as to materially adversely affect them and not similarly alter or change the powers, preferences or special rights of any other class of Units, without the approval of the holders of a majority of the Units of such class and (b) the Company may update the Unit Ownership Ledger from time to time without any action of Board or any Unitholder to reflect any issuance, Transfer or other disposition of Equity Securities consummated in accordance with the terms hereof.  No failure of any Person hereto to exercise any right or remedy given to such Person under this Agreement or otherwise available to such Person or to insist upon strict compliance by any other Person with its obligations hereunder, and no custom or practice in variance with the terms hereof, shall constitute a waiver of any Person's right to demand exact compliance with the terms hereof.  Any written waiver shall be limited to those items specifically waived therein and shall not be deemed to waive any future breaches or violations or other non-specified breaches or violations unless, and to the extent, expressly set forth therein.

**Section 13.3    Public Announcements; Confidentiality**.  No Unitholder or Related Employee shall make any press release, public announcement or filing with respect to the Company or any of its Subsidiaries without the prior consent of the Board.  Each Unitholder and Related Employee shall keep secret and retain in the strictest confidence, and shall not, without the prior written consent of the Board, disclose to any third party or use for the benefit of itself or any third party any confidential or proprietary

29

information relating to the Company or any of its Subsidiaries, except (i) to the extent necessary for the fulfillment of his or her duties as an employee or independent contractor or manager of the Company or any of its Subsidiaries, (ii) as required by applicable law, (iii) to the extent necessary for the preparation of tax returns and financial statements, (iv) as part of the normal reporting, rating or review procedure, or in connection with the normal fundraising, marketing, informational or reporting activities of the Company, and (v) to any bona fide prospective purchaser in a potential Approved Sale.

Section 13.4    **Title to the Company Assets; No Right of Partition**.  The Company's assets shall be deemed to be owned by the Company as an entity, and no Unitholder, individually or collectively, shall have any ownership interest in such assets or any portion thereof.  No Unitholder shall have the right to seek or obtain partition by court decree or operation of law of any property of the Company, or the right to own or use particular or individual assets of the Company.

Section 13.5    **Remedies**.  Each party hereto acknowledges that a breach or threatened breach by such party of any of its obligations under this Agreement would give rise to irreparable harm to the other parties, for which monetary damages would not be an adequate remedy, and hereby agrees that in the event of a breach or a threatened breach by such party of any such obligations, each of the other parties hereto shall, in addition to any and all other rights and remedies that may be available to them in respect of such breach, be entitled to equitable relief, including a temporary restraining order, an injunction, specific performance and any other relief that may be available from a court of competent jurisdiction (without any requirement to post bond).  The rights and remedies under this Agreement are cumulative and are in addition to and not in substitution for any other rights and remedies available at law or in equity or otherwise.  Each party hereto shall be responsible for any breach of or other action in conflict with this Agreement by any Affiliate or Related Employee of such party.

Section 13.6    **Successors and Assigns**.  All covenants and agreements contained in this Agreement shall bind and inure to the benefit of the parties hereto and their respective heirs, executors, administrators, successors, legal representatives and permitted assigns, whether so expressed or not.

Section 13.7    **Severability**.  Whenever possible, each provision of this Agreement will be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement is held to be invalid, illegal or unenforceable in any respect under any applicable law in any jurisdiction, such invalidity, illegality or unenforceability will not affect any other provision or the effectiveness or validity of any provision in any other jurisdiction, and this Agreement will be reformed, construed and enforced in such jurisdiction as if such invalid, illegal or unenforceable provision had never been contained herein or if such term or provision could be drawn more narrowly so as not to be illegal, invalid, prohibited or unenforceable in such jurisdiction, it shall be so narrowly drawn, as to such jurisdiction, without invalidating the remaining terms and provisions of this Agreement or affecting the legality, validity or enforceability of such term or provision in any other jurisdiction.

Section 13.8    **Counterparts; Binding Agreement**.  This Agreement may be executed in two or more separate counterparts, including via electronic transmission in portable document format (.pdf) or comparable electronic transmission of signature pages and electronic signatures, any one of which need not contain the signatures of more than one party, but each of which shall be deemed to be an original and all of which together shall constitute one and the same agreement binding on all the parties hereto, including each Person who from time to time becomes a party to this Agreement by executing a counterpart of or joinder to this Agreement.

Section 13.9    **Descriptive Headings; Interpretation**.  The descriptive headings of this Agreement are inserted for convenience only and do not constitute a substantive part of this Agreement.

Whenever required by the context, any pronoun used in this Agreement shall include the corresponding masculine, feminine or neuter forms, and the singular form of nouns, pronouns and verbs shall include the plural and vice versa. The use of the words "including", "includes" and "include" in this Agreement shall be by way of example rather than by limitation. Reference to any agreement, document or instrument means such agreement, document or instrument as amended or otherwise modified from time to time in accordance with the terms thereof, and if applicable hereof. Whenever required by the context, references to a Fiscal Year shall refer to a portion thereof. The parties hereto have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties hereto, and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Agreement.

Section 13.10    **Applicable Law; Waiver of Jury Trial**. THIS AGREEMENT IS GOVERNED BY AND SHALL BE CONSTRUED IN ACCORDANCE WITH THE LAW OF THE STATE OF DELAWARE, EXCLUDING ANY CONFLICT OF LAWS RULE OR PRINCIPLE THAT MIGHT REFER THE GOVERNANCE OR THE CONSTRUCTION OF THIS AGREEMENT TO THE LAW OF ANOTHER JURISDICTION. AS A SPECIFICALLY BARGAINED FOR INDUCEMENT FOR EACH OF THE PARTIES HERETO TO ENTER INTO THIS AGREEMENT (AFTER HAVING THE OPPORTUNITY TO CONSULT WITH COUNSEL), EACH OF THE PARTIES HERETO (INCLUDING EACH MEMBER) IRREVOCABLY WAIVES ALL RIGHT TO A TRIAL BY JURY IN ANY SUIT, ACTION OR OTHER PROCEEDING INSTITUTED BY OR AGAINST SUCH PARTY IN RESPECT OF ITS, HIS OR HER OBLIGATIONS HEREUNDER.

Section 13.11    **Addresses and Notices**. All notices, demands or other communications to be given or delivered under or by reason of the provisions of this Agreement shall be in writing and shall be deemed to have been given or made when (a) delivered personally to the recipient, (b) delivered by means of electronic mail if transmitted before 5:00 p.m. Pacific standard time on a business day, and otherwise on the next business day, or (c) one business day after being sent to the recipient by reputable overnight courier service (charges prepaid). Such notices, demands and other communications shall be sent to the address for such recipient set forth in the Company's books and records, or to such other address or to the attention of such other person as the recipient party has specified by prior written notice to the sending party. Any notice to the Board shall be deemed given if delivered to the last known address of the Company.

Section 13.12    **Third Parties**. Nothing herein expressed or implied is intended or shall be construed to confer upon or give to any Person, other than the parties to this Agreement and their respective successors, heirs and permitted assigns, any rights or remedies under or by reason of this Agreement; provided that the Indemnified Persons shall be express third party beneficiaries of Section[s] 6.4 [and 6.5, as applicable,] entitled to enforce such provisions directly (together with any other provision hereof necessary for such enforcement).

Section 13.13    **Further Action**. The parties hereto agree to execute and deliver all documents, provide all information and take or refrain from taking such actions as may be necessary or appropriate to achieve the purposes of this Agreement.

Section 13.14    **Offset**. Notwithstanding anything to the contrary contained herein, any amount which any Unitholder is entitled to receive hereunder may be reduced by the amount equal to any amount owed by such Unitholder or any Related Employee thereof to the Company or an Affiliate of the Company, as applicable, and such amount shall instead be paid to the Company or such Affiliate on behalf of such Unitholder or Related Employee, as applicable, and, in the case of amounts otherwise

31

distributable under <u>Section 4.1</u>, the full amount that would otherwise be distributed shall be debited from the Unitholder's Capital Account.

Section 13.15 **Entire Agreement**.  This Agreement embodies the complete agreement and understanding among the parties with respect to the subject matter herein and supersedes and preempts any prior understandings, agreements or representations by or among the parties hereto, their Affiliates and their respective officers, partners, managers and representatives, whether written or oral, which related to the subject matter hereof in any way (including any future rights to buy or sell Units).

Section 13.16 **Reserved**.

Section 13.17 **Survival**.  <u>Section 3.1(b)</u>, <u>Section 4.3</u>, <u>Section 6.1</u>, <u>Section 6.2</u>, <u>Section 6.3</u>, <u>Section 6.4</u>, <u>Section 6.5</u>, <u>Section 13.3</u> and <u>Section 13.12</u> shall survive and continue in full force in accordance with its terms notwithstanding any termination of this Agreement or the dissolution of the Company.

Section 13.18 **Waiver of Jury Trial**.    TO THE EXTENT NOT PROHIBITED BY APPLICABLE LAW THAT CANNOT BE WAIVED, THE PARTIES HERETO HEREBY WAIVE, AND COVENANT THAT THEY WILL NOT ASSERT (WHETHER AS PLAINTIFF, DEFENDANT OR OTHERWISE), ANY RIGHT TO TRIAL BY JURY IN ANY ACTION ARISING IN WHOLE OR IN PART UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ANY OF THE TRANSACTIONS CONTEMPLATED HEREUNDER, WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE. THE PARTIES HERETO AGREE THAT ANY OF THEM MAY FILE A COPY OF THIS SECTION WITH ANY COURT AS WRITTEN EVIDENCE OF THE KNOWING, VOLUNTARY AND BARGAINED-FOR AGREEMENT AMONG THE PARTIES HERETO IRREVOCABLY TO WAIVE ITS RIGHT TO TRIAL BY JURY IN ANY PROCEEDING WHATSOEVER BETWEEN THEM RELATING TO THIS AGREEMENT OR ANY OF THE TRANSACTIONS CONTEMPLATED HEREUNDER WILL INSTEAD BE TRIED IN A COURT OF COMPETENT JURISDICTION BY A JUDGE SITTING WITHOUT A JURY.

*[Remainder of this Page Left Blank Intentionally; Signature Page Follows]*

IN WITNESS WHEREOF, the undersigned have executed this Limited Liability Company Agreement effective as of the date first written above.

<u>**COMPANY**</u>:

**[RT ASSET COMPANY HOLDINGS] LLC**

**MANAGER: [●]**

---
Name: [●]
Title: [●]
<u>**M**</u>
<u>**MEMBERS:**</u>

**[TCW DIRECT LENDING LLC**
**TCW SKYLINE LENDING, L.P.**
**TCW BRAZOS FUND LLC]**

---
Name: [●]
Title: [●]

**[GOLDMAN SACHS SPECIALTY LENDING GROUP, L.P.]**

---
Name: [●]
Title: [●]

IN WITNESS WHEREOF, the undersigned have executed this Limited Liability Company Agreement effective as of the date first written above.

**<u>MEMBERS</u>:**

_____
Name: [●]

_____
Name: [●]

_____
Name: [●]

_____
Name: [●]

_____
Name: [●]

_____
Name: [●]

_____
Name: [●]

**Schedule A**

**<u>Unit Ownership Ledger</u>**

[See attached]

As of: [_____, 2021]

Page 1 of 2

## [RT ASSET COMPANY HOLDINGS] LLC

### UNIT OWNERSHIP LEDGER

**Class A Units**

| *Name* | *Address* | *Number of Class A Units Held* | *Capital Contribution* |
|---|---|---|---|
| [TCW] | [●] | [●] | $[●] |
| [GS] | [●] | [●] | $[●] |
| [●] | [●] | [●] | $[●] |
| [●] | [●] | [●] | $[●] |

**[RT ASSET COMPANY HOLDINGS] LLC**

**UNIT OWNERSHIP LEDGER**

**Class P Units**

| *Name* | *Address* | *Number of Class P Units Held* | *Capital Contribution* |
|---|---|---|---|
| Shawn Lederman | [●] | [●] | $[●] |
| Stephanie Medley | [●] | [●] | $[●] |
| Ellen Clarry | [●] | [●] | $[●] |
| Jennifer Boyd Harmon | [●] | [●] | $[●] |
| Darrin White | [●] | [●] | $[●] |