## Exhibit 2

Exit Loan Agreement

PH Draft 1/21/2021

CREDIT AND GUARANTY AGREEMENT

dated as of [_____]

among

[_____],
as a Borrower,

CERTAIN SUBSIDIARIES OF [_____].
PARTY HERETO FROM TIME TO TIME,
each as a Borrower,

[_____],
as Borrower Representative,

CERTAIN OTHER CREDIT PARTIES
PARTY HERETO FROM TIME TO TIME,
each as a Guarantor,

THE LENDERS PARTY HERETO FROM TIME TO TIME,
as Lenders,

and

TCW ASSET MANAGEMENT COMPANY LLC,
as Administrative Agent and Collateral Agent.

_____

$[_____] Senior Secured Credit Facility
_____

## TABLE OF CONTENTS

**Page**

SECTION 1.    DEFINITIONS AND INTERPRETATION ........................................................... 2
    1.1.    Definitions .................................................................................................... 2
    1.2.    Accounting Terms........................................................................................ 35
    1.3.    Interpretation, etc ....................................................................................... 35
    1.4.    Divisions ...................................................................................................... 35

SECTION 2.    LOANS AND LETTERS OF CREDIT ............................................................. 36
    2.1.    Term Loans. ................................................................................................. 36
    2.2.    Letter of Credit Loans. ............................................................................... 36
    2.3.    Letters of Credit and Purchase of Participations Therein. .................... 36
    2.4.    Pro Rata Shares; Availability of Funds. ................................................... 40
    2.5.    Use of Proceeds. .......................................................................................... 40
    2.6.    Evidence of Debt; Register; Notes. ............................................................ 41
    2.7.    Interest on Loans......................................................................................... 41
    2.8.    Conversion/Continuation. .......................................................................... 43
    2.9.    Default Interest ........................................................................................... 43
    2.10.    Fees. ............................................................................................................. 44
    2.11.    Scheduled Payments. .................................................................................. 45
    2.12.    Voluntary Prepayments/Commitment Reductions................................. 46
    2.13.    Mandatory Prepayments/Commitment Reductions. .............................. 47
    2.14.    Application of Prepayments/Reductions................................................... 48
    2.15.    General Provisions Regarding Payments. ................................................ 49
    2.16.    Ratable Sharing .......................................................................................... 50
    2.17.    Special Provisions Applicable to LIBOR Rate Loans. ........................... 51
    2.18.    Increased Costs; Capital Adequacy. ........................................................ 52
    2.19.    Taxes; Withholding, etc. ............................................................................ 53
    2.20.    Obligation to Mitigate ................................................................................ 56
    2.21.    Defaulting Lenders ..................................................................................... 57
    2.22.    Removal or Replacement of a Lender ...................................................... 57
    2.23.    Appointment of Borrower Representative ............................................... 58
    2.24.    Reallocation ................................................................................................ 59

SECTION 3.    CONDITIONS PRECEDENT .......................................................................... 59
    3.1.    Closing Date ................................................................................................ 59
    3.2.    Conditions to Each Credit Extension. ...................................................... 63

SECTION 4.    REPRESENTATIONS AND WARRANTIES................................................ 63

4.1.    Organization; Requisite Power and Authority; Qualification; Chief Executive Office ................................................................................................................. 64

4.2.    Capital Stock and Ownership ..................................................................... 64

4.3.    Due Authorization ...................................................................................... 64

4.4.    No Conflict .................................................................................................. 64

4.5.    Governmental Consents .............................................................................. 64

4.6.    Binding Obligation ...................................................................................... 65

4.7.    [Reserved] ................................................................................................... 65

4.8.    Projections .................................................................................................. 65

4.9.    No Material Adverse Effect ........................................................................ 65

4.10.   Insurance ..................................................................................................... 65

4.11.   Adverse Proceedings, etc ............................................................................ 65

4.12.   Payment of Taxes ........................................................................................ 65

4.13.   Properties. ................................................................................................... 66

4.14.   Environmental Matters ................................................................................ 66

4.15.   No Defaults .................................................................................................. 67

4.16.   Material Contracts; Franchise Agreements; Liquor Subsidiary Contracts. ..................... 67

4.17.   Governmental Regulation ............................................................................ 67

4.18.   Use of Proceeds; Margin Stock ................................................................... 67

4.19.   Employee Matters ........................................................................................ 67

4.20.   Employee Benefit Plans ............................................................................... 68

4.21.   Certain Fees ................................................................................................. 68

4.22.   Solvency. ...................................................................................................... 68

4.23.   Confirmation Order ...................................................................................... 69

4.24.   Compliance with Statutes, etc ..................................................................... 69

4.25.   Disclosure .................................................................................................... 69

4.26.   Sanctions; Anti-Terrorism and Anti-Corruption Laws. .............................. 69

4.27.   Information Security Requirements; Personal Information .......................... 70

4.28.   Food Safety ................................................................................................. 70

4.29.   Intellectual Property .................................................................................... 70

4.30.   Accounts ...................................................................................................... 71

SECTION 5.    AFFIRMATIVE COVENANTS ....................................................... 71

5.1.    Financial Statements and Other Reports ..................................................... 71

5.2.    Existence ...................................................................................................... 75

5.3.    Payment of Taxes and Claims ...................................................................... 75

ii

5.4.   Maintenance of Properties ................................................................................. 75

5.5.   Insurance .......................................................................................................... 76

5.6.   Inspections ........................................................................................................ 76

5.7.   Lenders Meetings .............................................................................................. 76

5.8.   Compliance with Laws ...................................................................................... 77

5.9.   Environmental .................................................................................................. 77

5.10.  Subsidiaries ...................................................................................................... 78

5.11.  Additional Real Estate Assets .......................................................................... 78

5.12.  Information Security Requirements; Personal Information ............................. 78

5.13.  Further Assurances ........................................................................................... 79

5.14.  Miscellaneous Business Covenants ................................................................. 79

5.15.  Post-Closing Matters ........................................................................................ 80

5.16.  Compliance Protocols ...................................................................................... 80

5.17.  Use of Proceeds ............................................................................................... 80

SECTION 6.    NEGATIVE COVENANTS ............................................................................. 80

6.1.   Indebtedness ..................................................................................................... 81

6.2.   Liens .................................................................................................................. 82

6.3.   Equitable Lien ................................................................................................... 83

6.4.   No Further Negative Pledges ........................................................................... 83

6.5.   Restricted Junior Payments .............................................................................. 83

6.6.   Restrictions on Subsidiary Distributions ......................................................... 84

6.7.   Investments ....................................................................................................... 84

6.8.   Financial Covenants .......................................................................................... 85

6.9.   Fundamental Changes; Disposition of Assets; Acquisitions ........................... 85

6.10.  Disposal of Subsidiary Interests ...................................................................... 86

6.11.  Sales and Lease Backs ...................................................................................... 86

6.12.  Transactions with Shareholders and Affiliates ................................................ 87

6.13.  Conduct of Business ......................................................................................... 87

6.14.  Permitted Activities of Holdings and the Wicomico County Subsidiaries. ..................... 87

6.15.  Fiscal Year ........................................................................................................ 88

6.16.  Deposit Accounts .............................................................................................. 88

6.17.  Amendments to Organizational Agreements, Material Contracts and Liquor
       Subsidiary Contracts ......................................................................................... 88

6.18.  Prepayments of Certain Indebtedness .............................................................. 88

6.19.  Compliance With Anti-Terrorism Laws, Anti-Corruption Laws and Sanctions ............ 88

6.20.    Disqualified Stock .............................................................................................. 89

SECTION 7.    GUARANTY .......................................................................................... 89

7.1.    Guaranty of the Obligations ....................................................................... 89

7.2.    Contribution by Guarantors ........................................................................ 89

7.3.    Payment by Guarantors ............................................................................... 90

7.4.    Liability of Guarantors Absolute ............................................................... 90

7.5.    Waivers by Guarantors ............................................................................... 91

7.6.    Guarantors' Rights of Subrogation, Contribution, etc ............................... 92

7.7.    Subordination of Other Obligations ........................................................... 93

7.8.    Continuing Guaranty ................................................................................... 93

7.9.    Authority of any Credit Party ..................................................................... 93

7.10.    Financial Condition of Borrowers .............................................................. 93

7.11.    Bankruptcy, etc. .......................................................................................... 93

7.12.    Discharge of Guaranty Upon Sale of Guarantor ........................................ 94

SECTION 8.    EVENTS OF DEFAULT ....................................................................... 94

8.1.    Events of Default ......................................................................................... 94

8.2.    Rights and Remedies; Consent to Receiver ............................................... 97

8.3.    Cooperation of Credit Parties ..................................................................... 98

8.4.    Curative Capital. .......................................................................................... 99

SECTION 9.    AGENTS .............................................................................................. 100

9.1.    Appointment of Agents ............................................................................. 100

9.2.    Powers and Duties ..................................................................................... 100

9.3.    General Immunity. ..................................................................................... 100

9.4.    Agents Entitled to Act as Lender .............................................................. 101

9.5.    Lenders' Representations, Warranties and Acknowledgment. .................. 101

9.6.    Right to Indemnity .................................................................................... 102

9.7.    Successor Administrative Agent and Collateral Agent ............................. 102

9.8.    Collateral Documents and Guaranty. ........................................................ 103

9.9.    Administrative Agent May File Bankruptcy Disclosure and Proofs of Claim. ............. 104

SECTION 10.    MISCELLANEOUS ........................................................................... 104

10.1.    Notices. ..................................................................................................... 104

10.2.    Expenses .................................................................................................... 106

10.3.    Indemnity. .................................................................................................. 106

10.4.    Set-Off ....................................................................................................... 107

10.5.    Amendments and Waivers. ........................................................................ 107

| 10.6. | Successors and Assigns; Participations. | 109 |
| 10.7. | Independence of Covenants | 111 |
| 10.8. | Survival of Representations, Warranties and Agreements | 112 |
| 10.9. | No Waiver; Remedies Cumulative | 112 |
| 10.10. | Marshalling; Payments Set Aside | 112 |
| 10.11. | Severability | 112 |
| 10.12. | Obligations Several; Actions in Concert | 112 |
| 10.13. | Headings | 113 |
| 10.14. | APPLICABLE LAW | 113 |
| 10.15. | CONSENT TO JURISDICTION | 113 |
| 10.16. | WAIVER OF JURY TRIAL | 114 |
| 10.17. | Confidentiality | 114 |
| 10.18. | Usury Savings Clause | 115 |
| 10.19. | Counterparts | 115 |
| 10.20. | Effectiveness | 116 |
| 10.21. | Patriot Act | 116 |
| 10.22. | Additional Provisions Regarding Letters of Credit | 116 |
| SECTION 11. | CROSS-GUARANTY OF BORROWERS | 117 |
| 11.1. | Cross-Guaranty | 117 |
| 11.2. | Waivers by Borrowers | 117 |
| 11.3. | Benefit of Guaranty | 118 |
| 11.4. | Waiver of Subrogation, Etc. | 118 |
| 11.5. | Election of Remedies | 118 |
| 11.6. | Limitation | 118 |
| 11.7. | Contribution with Respect to Guaranty Obligations. | 119 |
| 11.8. | Liability Cumulative | 119 |

LEGAL_US_W # 105221370.13

| **APPENDICES:** | A | Term Loan Commitments |
| | B | Notice Addresses |

| **SCHEDULES:** | 1.1(a) | Existing Letters of Credit |
| | 1.1(b) | Hilco BOV |
| | 4.1 | Jurisdictions of Organization |
| | 4.2 | Capital Stock and Ownership |
| | 4.10 | Insurance |
| | 4.13 | Real Estate Assets |
| | 4.16 | (a) Material Contracts; (b) Franchise Agreements; (c) Liquor Subsidiary Contracts |
| | 4.20 | ERISA Events |
| | 4.30 | Accounts |
| | 5.15 | Post-Closing Matters |
| | 6.1 | Certain Indebtedness |
| | 6.2 | Certain Liens |
| | 6.7 | Certain Investments |

| **EXHIBITS:** | A-1 | Funding Notice |
| | A-2 | Conversion/Continuation Notice |
| | A-3 | Issuance Notice |
| | B | Term Loan Note |
| | C | Compliance Certificate |
| | D | Assignment Agreement |
| | E | [Reserved] |
| | F | Collateral Access Agreement |
| | G-1 | Closing Date Certificate |
| | G-2 | Solvency Certificate |
| | H | Counterpart Agreement |
| | I | Credit Card Notification Letter |
| | J-1 | U.S. Tax Compliance Certificate (Non-Partnership Lenders) |
| | J-2 | U.S. Tax Compliance Certificate (Non-Partnership Participants) |
| | J-3 | U.S. Tax Compliance Certificate (Partnership Participants) |
| | J-4 | U.S. Tax Compliance Certificate (Partnership Lenders) |

LEGAL_US_W # 105221370.13

## CREDIT AND GUARANTY AGREEMENT

This **CREDIT AND GUARANTY AGREEMENT**, dated as of [_____], is entered into by and among [_____], a [_____] ("**Ruby**"), as a Borrower, certain Subsidiaries of Ruby party hereto from time to time, as Borrowers, [_____], a [_____] ("**Holdings**"), as Borrower Representative, Holdings and certain Subsidiaries of Ruby, as Guarantors[1], the Lenders party hereto from time to time, **TCW ASSET MANAGEMENT COMPANY LLC** ("**TCW**"), as administrative agent ("**Administrative Agent**") and collateral agent ("**Collateral Agent**"), and [**GOLDMAN SACHS BANK USA** ("**GS Bank**")], as the initial issuer of the Letters of Credit.

## RECITALS:

**WHEREAS**, capitalized terms used in the Preamble and these Recitals and not otherwise defined shall have the respective meanings set forth for such terms in Section 1.1;

**WHEREAS**, on October 7, 2020 (the "**Petition Date**"), Borrowers and Guarantors filed voluntary petitions and initiated proceedings under Chapter 11 of the Bankruptcy Code (collectively, the "**Cases**") with the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**"), and have continued in possession of their respective assets and in the management of their respective businesses pursuant to Sections 1107 and 1108 of the Bankruptcy Code;

**WHEREAS**, following the Petition Date, Borrowers and Guarantors entered into a $18,500,000 Debtor-in-Possession Credit and Guaranty Agreement, dated as of October 9, 2020 (as amended, modified or supplemented from time to time, the "**DIP Credit Agreement**"), by and among Borrowers, Guarantors, the lenders party thereto (collectively, the "**DIP Lenders**"), GS Bank, as Issuing Bank (as defined therein) and Goldman Sachs Specialty Lending Group, L.P., as administrative agent and collateral agent (in such capacities, the "**DIP Agent**"), pursuant to which Borrowers and Guarantors executed and delivered various Credit Documents, as defined therein (collectively with the DIP Credit Agreement, the "**DIP Credit Documents**") which, among other things, guaranteed and secured the obligations of all of the Borrowers and Guarantors under the DIP Credit Agreement;

**WHEREAS**, Borrowers and Guarantors are party to that certain Restructuring Support Agreement, dated as of October 8, 2020 (the "**RSA**"), among Borrowers, Guarantors, the Pre-Petition Lenders (as such term is defined in the DIP Credit Agreement) and the Pre-Petition Agent (as such term is defined in the DIP Credit Agreement);

**WHEREAS**, on November 6, 2020, Borrowers and Guarantors filed initial versions of the Bankruptcy Plan (as hereinafter defined) and Disclosure Statement (as hereinafter defined) with the Bankruptcy Court in the Cases, which documents were amended by filings with the Bankruptcy Court on December 21, 2020 [Docket Nos. 761 and 762];

**WHEREAS**, in connection with the confirmation and implementation of the Bankruptcy Plan, the Credit Parties have requested that the Lenders provide them with (i) a senior secured credit facility to Borrowers, consisting of an aggregate principal amount of Term Loans not to exceed $[_____][2], the proceeds of which shall be used in accordance with Section 2.5 and (ii) a $[9,600,000] senior secured

---

[1] **NTD** – structure of Borrowers and Guarantors to be determined pending post-BK reorganization.

[2] **NTD -** to be equal to the lesser of (i) $30,000,000 less 90% of the Net Sale Proceeds (as defined in Exhibit B to the RSA), if any, in excess of $2,500,000 (excluding any sale proceeds from the RT Lodge (as defined in Exhibit B to the RSA)) and (ii) 1.2x the opinion of the value of the owned store real estate (for the avoidance of doubt, this shall exclude the corporate headquarters) of the Credit Parties as set forth in the 2017 appraisals.

letter of credit facility to be used solely for the reimbursement to Issuing Bank for any draws with respect to Letters of Credit;

**WHEREAS**, in connection therewith, (i) each Borrower has agreed to secure all of its respective Obligations by granting to Collateral Agent, for the benefit of Secured Parties, a First Priority Lien on substantially all of its respective assets, including a pledge of 100% of the Capital Stock of each of its respective Subsidiaries, and (ii) each Guarantor has agreed to guarantee the Obligations of the other Credit Parties and to secure all of its respective Obligations by granting to Collateral Agent, for the benefit of Secured Parties, a First Priority Lien on substantially all of its respective assets, including a pledge of 100% of the Capital Stock of each of its respective Subsidiaries (including, with respect to Holdings, Ruby); and

**WHEREAS**, the Credit Parties' business is a mutual and collective enterprise, and the Credit Parties believe that the consolidation of the Loans and other accommodations under this Agreement will enhance Borrowers' aggregate borrowing powers and facilitate the administration of their relationship with the Agents and Lenders, all to the Credit Parties' respective individual and mutual advantage.

**NOW, THEREFORE**, in consideration of the premises and the agreements, provisions and covenants herein contained, the parties hereto agree as follows:

## SECTION 1.    DEFINITIONS AND INTERPRETATION

**1.1.    Definitions**.    The following terms used herein, including in the Preamble, Recitals, Appendices, Schedules and Exhibits, shall have the following meanings:

**"13-Week Forecast"** as defined in <u>Section 5.1(k)</u>.

**"Adjusted LIBOR Rate"** means, for any Interest Rate Determination Date with respect to an Interest Period for a LIBOR Rate Loan, the rate equal to the greater of (x) 1.25% per annum, and (y) the interest rate per annum for the Interest Period determined by Administrative Agent (rounded upwards, if necessary, to the nearest 1/100th of 1% per annum) to be the rate which appears on the Bloomberg screen page which displays the ICE Benchmark Administration Limited's (ICE) fixing of the London Interbank Offered Rate (or on such other substitute Bloomberg page that displays rates at which U.S. dollar deposits are offered by leading banks in the London interbank deposit market), or the rate which is quoted by another source selected by Administrative Agent as an authorized information vendor for the purpose of displaying rates at which U.S. dollar deposits are offered by leading banks in the London interbank deposit market (a "<u>LIBOR Alternate Source</u>"), at approximately 11:00 a.m., London time, two (2) Business Days prior to the commencement of each such Interest Period as the London interbank offered rate for U.S. Dollars for an amount comparable to such LIBOR Rate Loan (or if there shall at any time, for any reason, no longer exist such Bloomberg screen page (or any substitute page) or any LIBOR Alternate Source, the comparable replacement rate equal to the average offered quotation rate from three (3) leading banks in the London interbank deposit market satisfactory to Administrative Agent at such time for U.S. Dollars for an amount comparable to such LIBOR Rate Loan (which determination shall be conclusive absent manifest error)).

**"Administrative Agent"** as defined in the Preamble.

**"Adverse Proceeding"** means any action, suit, proceeding (whether administrative, judicial or otherwise), governmental investigation or arbitration (whether or not purportedly on behalf of any Credit Party or any of its Subsidiaries) at law or in equity, or before or by any Governmental Authority, domestic or foreign (including any Environmental Claims), whether pending or, to the

2

knowledge of any Credit Party or any of its Subsidiaries, threatened against or affecting any Credit Party or any of its Subsidiaries or any property of any Credit Party or any of its Subsidiaries, excluding the Cases (but including, for the avoidance of doubt, any such action, suit, proceeding, governmental investigation or arbitration arising after the Petition Date, as well as any adversary proceedings or other actions in the Cases).

"**Affiliate**" means, as applied to any Person, any other Person directly or indirectly controlling, controlled by, or under common control with such Person, including the possession, directly or indirectly, of the power to vote, appoint directors (or similar governing body), direct or cause the direction of the management and policies of such Person, whether through voting Securities, or by contract or otherwise.  For the purposes of this definition, "control" (including, with correlative meanings, the terms "controlling," "controlled by" and "under common control with"), as applied to any Person, means the possession, directly or indirectly, of the power to vote 5% or more of the Securities having ordinary voting power for the election of directors (or similar governing body) of such Person.

"**Agent**" means each of Administrative Agent and Collateral Agent.

"**Aggregate Amounts Due**" as defined in Section 2.16.

"**Aggregate Payments**" as defined in Section 7.2.

"**Agreement**" means this Credit and Guaranty Agreement, dated as of the Closing Date, as amended, restated, supplemented or otherwise modified from time to time.

"**Allocable Amount**" as defined in Section 11.7.

"**Anti-Corruption Laws**" means any requirement of law, regulation, or ordinance concerning or relating to bribery or anti-corruption, including the United States Foreign Corrupt Practices Act of 1977 and U.K. Bribery Act of 2010, in each case, as now and hereafter in effect, or any successor statute thereto.

"**Anti-Terrorism Law**" means any requirement of law, regulation, or ordinance related to money laundering, any predicate crime to money laundering, financing terrorism, or any financial record keeping and reporting requirements related thereto, including the Patriot Act, the Currency and Foreign Transactions Reporting Act (also known as the "Bank Secrecy Act," 31 U.S.C. §§5311-5330 and 12 U.S.C. §§1818(s), 1820(b) and 1951-1959), the Trading With the Enemy Act (50 U.S.C. §1 et seq., as amended), Executive Order 13224 (effective September 24, 2001) and each of the foreign assets control regulations of the United States Treasury Department (31 C.F.R., Subtitle B, Chapter V, as amended), in each case, as now and hereafter in effect, or any successor statutes.

"**Applicable Margin**" means (a) with respect to Loans that are LIBOR Rate Loans, a percentage, per annum, equal to 12.00% and (b) with respect to Loans that are Base Rate Loans, a percentage, per annum, equal to 11.00%.

"**Applicable Premium**" means

(a)    during the period commencing on the Closing Date and ending immediately prior to the first anniversary of the Closing Date, an amount equal to 3.0% times the principal amount of the Term Loans being paid on such date;

3

(b)        during the period commencing on the first anniversary of the Closing Date and ending immediately prior to the second anniversary of the Closing Date, an amount equal to 2.0% <u>times</u> the principal amount of the Term Loans being paid on such date;

(c)        during the period commencing on the second anniversary of the Closing Date and ending immediately prior to the third anniversary of the Closing Date, an amount equal to 1.0% <u>times</u> the principal amount of the Term Loans being paid on such date; and

(d)        thereafter, zero.

"**Applicable Premium Trigger Event**" means:

(a)        any payment by any Credit Party of all, or any part, of the principal balance of the Term Loans for any reason, including, without limitation, any optional prepayment or mandatory prepayment, but excluding any quarterly installment of principal pursuant to <u>Section 2.11</u>, whether before or after (1) the occurrence of an Event of Default, or (2) the commencement of any Insolvency Proceeding, and notwithstanding any acceleration (for any reason) of the Obligations;

(b)        the acceleration of the Obligations for any reason, including, without limitation, acceleration in accordance with <u>Section 8.2</u> and <u>Section 8.3</u>, including as a result of the commencement of an Insolvency Proceeding;

(c)        the satisfaction, release, payment, restructuring, reorganization, replacement, reinstatement, defeasance or compromise of any of the Obligations in any Insolvency Proceeding, foreclosure (whether by power of judicial proceeding or otherwise) or deed in lieu of foreclosure or the making of a distribution of any kind in any Insolvency Proceeding to any Agent, for the account of the Lenders, in full or partial satisfaction of the Obligations; or

(d)        the termination of this Agreement for any reason.

"**Approved Electronic Communication**" as defined in <u>Section 10.1(b)</u>.

"**Asset Sale**" means a sale, lease or sublease (as lessor or sublessor), sale and leaseback, assignment, conveyance, transfer, license or other disposition to, or any exchange of property with, any Person (other than another Credit Party which is not Holdings), in one transaction or a series of transactions, of all or any part of any Credit Party's or any of its Subsidiaries' businesses, assets or properties of any kind, whether real, personal, or mixed and whether tangible or intangible, whether now owned or hereafter acquired, including the Capital Stock of any Credit Party or any of its Subsidiaries, other than inventory sold or leased in the ordinary course of business.  For purposes of clarification, "**Asset Sale**" shall include (a) the sale or other disposition for value of any contracts (including, for the avoidance of doubt, any assignment(s) or potential assignment(s) of any applicable purchase options and similar rights by the Credit Parties under any leases or similar agreements), (b) the early termination or modification of any contract resulting in the receipt by any Credit Party or any of its Subsidiaries of a Cash payment or other consideration in exchange for such event (other than payments in the ordinary course for accrued and unpaid amounts due through the date of termination or modification), and (c) Permitted Sale Leaseback Transactions.

"**Assignment Agreement**" means an assignment and assumption agreement substantially in the form of Exhibit D, with such amendments or modifications as may be approved by Administrative Agent.

LEGAL_US_W # 105221370.13

"**Authorized Officer**" means, as applied to any Person, any individual holding the position of chairman of the board (if an officer), chief executive officer, president or one of its vice presidents (or the equivalent thereof), and such Person's chief financial officer or treasurer.

"**Bankruptcy Code**" means Title 11 of the United States Code entitled "Bankruptcy," as now and hereafter in effect, or any successor statute.

"**Bankruptcy Court**" as defined in the Recitals hereto.

"**Bankruptcy Plan**" means the Debtors' Chapter 11 Plan that was filed with the Bankruptcy Court on December 21, 2020 (as may be amended from time to time).

"**Base Rate**" means, for any day, a rate per annum equal to the greatest of (a) the Prime Rate in effect on such day, (b) the Federal Funds Effective Rate in effect on such day, plus 0.50%, and (c) 2.25% per annum.  Any change in the Base Rate due to a change in the Prime Rate or the Federal Funds Effective Rate shall be effective on the effective day of such change in the Prime Rate or the Federal Funds Effective Rate, respectively.

"**Base Rate Loan**" means a Loan bearing interest at a rate determined by reference to the Base Rate.

"**Beneficiary**" means each Agent, Issuing Bank and Lender.

"**Blocked Person**" as defined in <u>Section 4.26</u>.

"**Board of Directors**" means, as to any Person, the board of directors (or comparable managers) of such Person, or any committee thereof duly authorized to act on behalf of the board of directors (or comparable managers).

"**Borrower**" means Ruby and each Subsidiary of Ruby indicated on the signature pages hereto as a "Borrower."  For the avoidance of doubt, the term "Borrower" shall also include any entity joined as a Borrower to this Agreement and the other Credit Documents after the Closing Date pursuant to <u>Section 5.10</u>.

"**Borrower Representative**" means Holdings, as Borrower Representative pursuant to <u>Section 2.23</u>.

"**Business Day**" means (a) any day excluding Saturday, Sunday and any day which is a legal holiday under the laws of the State of New York or is a day on which banking institutions located in either such state are authorized or required by law or other governmental action to close, and (b) with respect to all notices, determinations, fundings and payments in connection with the Adjusted LIBOR Rate or any LIBOR Rate Loans, any day which is a Business Day described in clause (a) of this definition and which is also a day for trading by and between banks in Dollar deposits in the London interbank market.

"**Capital Lease**" means, as applied to any Person, any lease of any property (whether real, personal or mixed) by that Person (a) as lessee that, in conformity with GAAP, is or should be accounted for as a capital lease on the balance sheet of that Person or (b) as lessee which is a transaction of a type commonly known as a "synthetic lease" (i.e., a transaction that is treated as an operating lease for accounting purposes but with respect to which payments of rent are intended to be treated as payments of principal and interest on a loan for federal income Tax purposes).

5

"**Capital Stock**" means, with respect to a Person, any and all shares, options, interests, participations or other equivalents (however designated) of or in such Person, whether voting or nonvoting, including capital stock of a corporation, any and all equivalent ownership or profit interests or units in such Person (other than a corporation), including partnership interests and membership interests, and any and all warrants, rights or options to purchase or other arrangements or rights to acquire any of the foregoing.

"**Cases**" as defined in the Recitals hereto.

"**Cash**" means money, currency or a credit balance in any demand or Deposit Account; provided, however, notwithstanding anything to the contrary contained herein, for purposes of calculating compliance with the requirements of <u>Sections 1.1</u> and <u>6</u> "**Cash**" shall exclude any amounts that would not be considered "cash" under GAAP or "cash" as recorded on the books of the Credit Parties.

"**Cash Equivalents**" means, as at any date of determination, (a) marketable securities (i) issued or directly and unconditionally guaranteed as to interest and principal by the United States government or (ii) issued by any agency of the United States the obligations of which are backed by the full faith and credit of the United States, in each case maturing within one (1) year after such date; (b) marketable direct obligations issued by any state of the United States or any political subdivision of any such state or any public instrumentality thereof, in each case maturing within one (1) year after such date and having, at the time of the acquisition thereof, a rating of at least A-1 from S&P or at least P-1 from Moody's; (c) commercial paper maturing no more than one (1) year from the date of creation thereof and having, at the time of the acquisition thereof, a rating of at least A-1 from S&P or at least P-1 from Moody's; (d) certificates of deposit or bankers' acceptances maturing within one (1) year after such date and issued or accepted by any Lender or by any commercial bank organized under the laws of the United States or any state thereof or the District of Columbia that (i) is at least "adequately capitalized" (as defined in the regulations of its primary federal banking regulator) and (ii) has Tier 1 capital (as defined in such regulations) of not less than $100,000,000; and (e) shares of any money market mutual fund that (i) has substantially all of its assets invested continuously in the types of investments referred to in clauses (a) and (b) of this definition, (ii) has net assets of not less than $500,000,000 and (iii) has the highest rating obtainable from either S&P or Moody's.

"**Cash Interest**" as defined in <u>Section 2.7(f)</u>.

"**Change in Law**" means the occurrence after the date of this Agreement of: (a) the adoption or effectiveness of any law, rule, regulation, judicial ruling, judgment or treaty, (b) any change in any law, rule, regulation, judicial ruling, judgment or treaty or in the administration, interpretation, implementation or application by any Governmental Authority of any law, rule, regulation, guideline or treaty, or (c) the making or issuance by any Governmental Authority of any request, rule, guideline or directive, whether or not having the force of law; provided, that notwithstanding anything in this Agreement to the contrary, (i) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith, and (ii) all requests, rules, guidelines or directives concerning capital adequacy promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities shall, in each case, be deemed to be a "Change in Law," regardless of the date enacted, adopted or issued.

"**Change of Control**" means:

(a)    the Sponsor fails to own and control, directly or indirectly, at least a majority of the economic and voting interests in the Capital Stock of Holdings,

LEGAL_US_W # 105221370.13

(b)      any "person" or "group" (within the meaning of Sections 13(d) and 14(d) of the Exchange Act), other than the Sponsor, (i) shall become the beneficial owner (as defined in Rule 13d-3 under the Exchange Act), directly or indirectly, of a majority or more on a fully diluted basis of the economic and/or voting interests in the Capital Stock of Holdings or (ii) shall have obtained the power (whether or not exercised) to appoint, replace or remove the manager of Holdings,

(c)      a majority of the members of the Board of Directors of Ruby do not constitute Continuing Directors, or

(d)      Holdings fails to own and control, directly or indirectly, 100% of the Capital Stock of each of its Subsidiaries (other than the Maryland Liquor Subsidiaries), in each case, other than in a transaction permitted by this Agreement.

"**Closed Restaurants**" means those Restaurants identified as Closed Restaurants after the Closing Date solely to the extent such additional Restaurants have actually, permanently ceased operations following a determination by an Authorized Officer of Holdings exercising good faith business judgment as of the time of any such future reference to the term "Closed Restaurants".

"**Closing Date**" means [_____].

"**Closing Date Certificate**" means a certificate of an Authorized Officer of Holdings substantially in the form of Exhibit G-1.

"**Closing Date Employment Agreements**" means those certain employment agreements of various executives of Holdings and Borrowers that are entered into as of the Closing Date.

"**Collateral**" means, collectively, all of the real, personal and mixed property of the Credit Parties in which Liens are granted or purported to be granted pursuant to the Collateral Documents as security for the Obligations.

"**Collateral Access Agreement**" means a collateral access agreement substantially in the form of Exhibit F with such amendments or modifications as may be approved by Collateral Agent.

"**Collateral Agent**" as defined in the Preamble.

"**Collateral Assignment of Contracts**" means that certain Collateral Assignment of Contracts, dated as of the Closing Date, with respect to the collateral assignment of the Liquor Subsidiary Contracts related to the use of liquor licenses in the operation of Restaurant(s) in Maryland.

"**Collateral Document**" means any of the Pledge and Security Agreement, any Collateral Questionnaire, any control agreements with respect to the Controlled Accounts, the Mortgages, the Collateral Access Agreements, if any, the Power of Attorney, the Credit Card Notification Letters, each Collateral Assignment of Contracts and all other instruments, documents and agreements delivered by any Credit Party pursuant to this Agreement or any of the other Credit Documents in order to grant or purport to grant to Collateral Agent, for the benefit of Secured Parties, a Lien on any real, personal or mixed property of that Credit Party as security for the Obligations.

"**Collateral Questionnaire**" means a certificate of an Authorized Officer of each Credit Party, in form satisfactory to Collateral Agent, that provides information with respect to the real, personal and mixed property of such Credit Party.

7

"**Commitment**" means, as the context requires, any Term Loan Commitment or Letter of Credit Loan Commitment.

"**Commodity Exchange Act**" means the Commodity Exchange Act (7 U.S.C. § 1 et seq.), as amended from time to time, and any successor statute.

"**Compliance Certificate**" means a certificate of the chief financial officer of Borrower Representative (or other senior executive officer of Borrower Representative or Ruby who has financial expertise and is familiar with the terms and conditions of this Agreement and the financial statements and financial condition of Holdings and its Subsidiaries) substantially in the form of Exhibit C.

"**Confirmation Order**" means an order, in form and substance satisfactory to the Administrative Agent, entered by the Bankruptcy Court confirming the Bankruptcy Plan.

"**Connection Income Taxes**" means Other Connection Taxes that are imposed on or measured by net income (however denominated) or that are franchise Taxes or branch profits Taxes.

"**Consolidated Adjusted EBITDA**" means, for any period, an amount determined for Holdings and its Subsidiaries on a consolidated basis, equal to:

(a)     Consolidated Net Income,

(b)     increased, in each instance (solely to the extent deducted from Consolidated Net Income, and without duplication) by:

(i)      Consolidated Interest Expense,

(ii)     provisions for Taxes based on income and Permitted Tax Distributions,

(iii)    total depreciation expense,

(iv)    total amortization expense,

(v)     other non-Cash items reducing Consolidated Net Income (solely to the extent they do not represent an accrual or reserve for a future Cash item, or amortization of a prepaid Cash item that was paid in a prior period),

(vi)    non-Cash compensation expense actually incurred in such period resulting from equity compensation plans, grants of stock appreciation rights, stock options or restricted stock,

(vii)   Permitted Management Fees in such period,

(viii)  Transaction Costs in such period,

(ix)    Severance Costs in such period in an aggregate amount not to exceed $1,000,000 for any trailing twelve (12) Fiscal Month period,

(x)     to the extent included in Consolidated Net Income, lease reserve expense and lease reserve adjustments incurred in connection with Closed Restaurants,

LEGAL_US_W # 105221370.13

(xi)    one-time brokerage fees in connection with: (A) Permitted Fee Owned Property Sales in an aggregate amount not to exceed five percent (5%) of the gross Cash payments received by any Credit Party or any of its Subsidiaries from such Asset Sale, and (B) the sale of liquor licenses in an aggregate amount not to exceed ten percent (10%) of the gross Cash payments received by any Credit Party or any of its Subsidiaries from such Asset Sale,

(xii)    fees and expenses to outside directors of Ruby or Holdings (or any parent entity thereof) who are not Affiliates of the Credit Parties in an aggregate amount not to exceed $250,000 per Fiscal Year, and

(xiii)    other amounts (A) approved by Administrative Agent, not to exceed $500,000 in any trailing twelve (12) Fiscal Month period, or (B) approved by Requisite Lenders;

(c)    decreased, in each instance (solely to the extent included in the calculation of Consolidated Net income and without duplication) by:

(i)    other non-Cash items increasing Consolidated Net Income in such period (solely to the extent it represents a reversal of an accrual or reserve for a potential Cash item in any prior period),

(ii)    interest income for such period, and

(iii)    non-operating income related to proceeds from the Cash value of life insurance contracts.

Notwithstanding anything herein to the contrary, no items (including, without limitation, any charges, expenses or losses (including, without limitation any one-time expenses or lost revenue or lost profits)) directly or indirectly arising out of, or attributable to, COVID-19 or its related effects or any other epidemiological conditions (such as downturns in the financial markets or pandemics) shall be added back to, or included in the calculation of, Consolidated Adjusted EBITDA.

"**Consolidated Capital Expenditures**" means, for any period, the aggregate of all expenditures of Holdings and its Subsidiaries during such period determined on a consolidated basis that, in accordance with GAAP, are or should be included in "purchase of property and equipment or which should otherwise be capitalized" or similar items reflected in the consolidated statement of cash flows of Holdings and its Subsidiaries.

"**Consolidated Cash Interest Expense**" means, for any period, Consolidated Interest Expense for such period based upon GAAP, excluding any paid-in-kind interest and amortization of deferred financing costs.

"**Consolidated Fixed Charges**" means, for any period of determination with respect to Holdings and its Subsidiaries on a consolidated basis, the sum, without duplication, of:

(a)    Consolidated Cash Interest Expense for such period, plus

(b)    scheduled repayments of principal during such period of Consolidated Total Debt, plus

(c)    consolidated rent expenses for such period, inclusive of rent paid or payable on account of Closed Restaurants, plus

9

(d)      Permitted Lease Settlement Payments paid or payable during such period (other than amounts funded with Permitted Stock Issuances), <u>plus</u>

(e)      Severance Costs paid or payable during such period (other than amounts funded with Permitted Stock Issuances), <u>plus</u>

(f)      amounts paid or payable during such period for deferred Taxes (including interest) on Asset Sales sold under any installment sale.

"**Consolidated Interest Expense**" means, for any period, total interest expense (including that portion attributable to Capital Leases in accordance with GAAP and capitalized interest) of Holdings and its Subsidiaries on a consolidated basis with respect to all outstanding Consolidated Total Debt, including all commissions, discounts and other fees and charges owed with respect to letters of credit (including Letters of Credit hereunder), but excluding any amounts referred to in <u>Section 2.10</u> (including the Fee Letter) payable on or before the Closing Date.

"**Consolidated Liquidity**" means, as at any date of determination with respect to Holdings and its Subsidiaries, subject to <u>Section 5.15</u>, an amount equal to the Unrestricted Cash of the Credit Parties in a Controlled Account.

"**Consolidated Net Income**" means, for any period, with respect to Holdings and its Subsidiaries on a consolidated basis, and without duplication, an amount equal to:

(a)      the net income (or loss) for such period of Holdings and its Subsidiaries on a consolidated basis for such period determined in conformity with GAAP, <u>minus</u>

(b)      the income (or loss) for such period of any Person (other than a Subsidiary of Holdings) in which any other Person has a joint interest, <u>minus</u>

(c)      the income (or loss) for such period of any Person accrued prior to the date it becomes a Subsidiary of Holdings, <u>minus</u>

(d)      the income for such period of any Subsidiary of Holdings to the extent that the declaration or payment of dividends or distributions is not permitted for any reason, <u>minus</u>

(e)      gains or losses for such period attributable to Asset Sales or returned surplus assets of any pension plan, <u>minus</u>

(f)      minority equity interest expense for such period, <u>minus</u>

(g)      franchise royalties, fees or other income from Foreign Subsidiaries or operations of such Persons for such period, <u>minus</u>

(h)      net extraordinary gains or losses for such period.

"**Consolidated Total Debt**" means, as at any date of determination with respect to Holdings and its Subsidiaries, the aggregate of all Indebtedness (including, for clarity, Capital Leases, and issued Letters of Credit, but excluding trade credit obligations, unamortized original issuance discounts, unamortized deferred financing costs, fair value accounting amounts, operating lease obligations, obligations associated with implementing new accounting principles (including implementation of ASC

LEGAL_US_W # 105221370.13

842), and lease guarantees to the extent permitted to be incurred hereunder) and SLB Operating Lease Obligations.

"**Continuing Director**" means (a) any member of the Board of Directors who was a director (or comparable manager) of Ruby on the Closing Date, and (b) any individual who becomes a member of the Board of Directors after the Closing Date if such individual was approved, appointed or nominated for election to the Board of Directors by either the Sponsor or a majority of the Continuing Directors.

"**Contractual Obligation**" means, as applied to any Person, any provision of any Security issued by that Person or of any indenture, mortgage, deed of trust, contract, undertaking, agreement or other instrument to which that Person is a party or by which it or any of its properties is bound or to which it or any of its properties is subject.

"**Contributing Guarantors**" as defined in Section 7.2.

"**Controlled Account**" means a Deposit Account or a securities account of a Credit Party which is subject to the control of Collateral Agent, for the benefit of the Secured Parties, in accordance with the terms of the Pledge and Security Agreement, the terms hereof and the terms of a satisfactory control agreement.

"**Controlled Entity**" means any Credit Party's Controlled Affiliates.  As used in this definition, "**Controlled**" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting Securities, by contract or otherwise.

"**Conversion/Continuation Date**" means the effective date of a continuation or conversion, as the case may be, as set forth in the applicable Conversion/Continuation Notice.

"**Conversion/Continuation Notice**" means a conversion/continuation notice substantially in the form of Exhibit A–2.

"**Counterpart Agreement**" means a counterpart agreement substantially in the form of Exhibit H delivered by Borrower Representative and each New Subsidiary pursuant to Section 5.10.

"**COVID-19**" means the global infectious disease pandemic caused by the novel coronavirus first identified in December 2019.

"**Credit Card Notification Letter**" means a credit card notification letter substantially in the form of Exhibit I, between each Credit Party and its Credit Card Processors, with such amendments or modifications as may be approved by Administrative Agent.

"**Credit Card Processor**" means any servicing agent, processing agent, factor or financial intermediary who facilities, services, processes or manages the credit authorization, billing transfer and/or payment procedures with respect to such Credit Party's sales transactions involving credit card, debit card or other electronic funds transfer (EFT) purchases.

"**Credit Date**" means the date of a Credit Extension.

"**Credit Document**" means any of this Agreement, the Notes, if any, the Collateral Documents, the Fee Letter, the Closing Date Certificate, any documents or certificates executed by a

Credit Party in favor of Issuing Bank relating to the Letters of Credit or any Letter of Credit, the Warrants, and all other documents, instruments or agreements executed and delivered by a Credit Party or any other Person for the benefit of any Agent, Issuing Bank or any Lender in connection herewith.

"**Credit Extension**" means the making of a Loan or the issuance or deemed issuance of each Letter of Credit hereunder on or after the Closing Date.

"**Credit Party**" means each Borrower and each Guarantor.

"**Curative Capital**" means the net amount of (i) common or preferred (other than Disqualified Stock) equity contributions or (ii) Subordinated Indebtedness, in either case, made or advanced, as applicable, to Holdings in immediately available funds which Holdings contributes as additional common equity contributions or Subordinated Indebtedness to Borrowers in immediately available funds and which is designated "Curative Capital" by Borrowers under Section 8.4 of this Agreement at the time it is contributed.

"**Debtor Relief Laws**" means the Bankruptcy Code, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief laws of each applicable jurisdiction from time to time in effect and affecting the rights of creditors generally.

"**Declined Proceeds**" has the meaning specified in Section 2.13(i).

"**Default**" means a condition or event that, after notice or lapse of time or both, would constitute an Event of Default.

"**Default Excess**" means, with respect to any Defaulting Lender, the excess, if any, of such Defaulting Lender's Pro Rata Share of the aggregate outstanding principal amount of Loans of all Lenders (calculated as if all Defaulting Lenders (other than such Defaulting Lender) had funded all of their respective Defaulted Loans) over the aggregate outstanding principal amount of all Loans of such Defaulting Lender.

"**Default Period**" means, with respect to any Defaulting Lender, the period commencing on the date of the applicable Funding Default, violation of Section **Error! Reference source not found.** or other circumstances set forth in Section 2.21, and ending on the earliest of the following dates: (a) the date on which all Commitments are cancelled or terminated and/or the Obligations are declared or become immediately due and payable; (b) the date on which (i) the Default Excess with respect to such Defaulting Lender shall have been reduced to zero (whether by the funding by such Defaulting Lender of any Defaulted Loans of such Defaulting Lender or by the non-pro rata application of any voluntary or mandatory prepayments of the Loans in accordance with the terms of Section 2.12 or Section 2.13 or by a combination thereof) and (ii) such Defaulting Lender shall have delivered to Borrower Representative and Administrative Agent a written reaffirmation of its intention to honor its obligations hereunder with respect to its Commitments; (c) the date on which Borrower Representative, Administrative Agent and the Requisite Lenders waive all Funding Defaults of such Defaulting Lender in writing; and (d) the date on which Administrative Agent shall have waived all violations of Section **Error! Reference source not found.** by such Defaulting Lender in writing.

"**Default Rate**" means any interest payable pursuant to Section 2.9.

"**Defaulted Loan**" as defined in Section 2.21.

LEGAL_US_W # 105221370.13

"**Defaulting Lender**" as defined in <u>Section 2.21</u>.

"**Deposit Account**" means a demand, time, savings, passbook or like account with a bank, savings and loan association, credit union or like organization, other than an account evidenced by a negotiable certificate of deposit.

"**DIP Facility**" means the credit facility contemplated by the DIP Credit Agreement and other Credit Documents.

"**Disclosure Statement**" means the Disclosure Statement with respect to the Bankruptcy Plan filed on December 21, 2020.

"**Disqualified Stock**" means any Capital Stock issued by a Credit Party which would not satisfy the conditions set forth in the definition of "Permitted Stock Issuances".

"**Dollars**" and the sign "**$**" mean the lawful money of the United States.

"**Domestic Subsidiary**" means any Subsidiary of Holdings formed or organized under the laws of the United States, any state thereof or the District of Columbia.

"**Eligible Assignee**" means (a) any Lender, any Affiliate (other than a natural person) of a Lender or any Related Fund of a Lender, other than a Defaulting Lender; and (b) (i) any commercial bank, finance company, insurance company, or other financial institution or fund that is engaged in making, purchasing, or otherwise investing in commercial loans in the ordinary course of its business and (ii) any other Person (other than (1) a natural Person or (2) any Credit Party or any Subsidiary thereof), in each case, approved by (x) Borrower Representative (so long as no Default or Event of Default has occurred and is continuing) and (y) Administrative Agent (in each case, as such approval shall not be unreasonably withheld, conditioned or delayed).

"**Employee Benefit Plan**" means any "employee benefit plan" as defined in Section 3(3) of ERISA which is (or within the previous six (6) years was) sponsored, maintained or contributed to by, or required to be contributed by, any Credit Party, any of its Subsidiaries or, with respect to any such plan that is subject to Title IV of ERISA or Sections 412 and 430 of the Internal Revenue Code, any of their respective ERISA Affiliates.

"**Environmental Claim**" means any investigation, notice, notice of violation, claim, action, suit, proceeding, demand, abatement order or other order or directive (conditional or otherwise), by any Governmental Authority or any other Person, arising (a) pursuant to or in connection with any actual or alleged violation of any Environmental Law; (b) in connection with any Hazardous Material or any actual or alleged Hazardous Materials Activity; or (c) in connection with any actual or alleged damage, injury, threat or harm to health, safety, natural resources or the environment.

"**Environmental Laws**" means any and all foreign or domestic, federal or state (or any subdivision of either of them), statutes, ordinances, orders, rules, regulations, judgments, Governmental Authorizations, or any other requirements of Governmental Authorities relating to (a) environmental matters, including those relating to any Hazardous Materials Activity; (b) the generation, use, storage, transportation or disposal of Hazardous Materials; or (c) occupational safety and health, industrial hygiene, land use or the protection of human, plant or animal health or welfare, in any manner applicable to any Credit Party or any of its Subsidiaries or any Facility.

"**Equity Documents**" means, collectively, (i) the limited liability company operating agreement of [RT Asset Company Holdings LLC], dated [X], 2021 and (ii) such other agreements, documents and instruments as are necessary or advisable to establish, organize and otherwise arrange [RT Asset Company Holdings LLC]'s direct and indirect Subsidiaries.

"**Equity Transaction**" means the execution and delivery of the Equity Documents and the consummation of the transactions contemplated thereby.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended from time to time, and any successor thereto.

"**ERISA Affiliate**" means, as applied to any Person, (a) any corporation which is a member of a controlled group of corporations within the meaning of Section 414(b) of the Internal Revenue Code of which that Person is a member; (b) any trade or business (whether or not incorporated) which is a member of a group of trades or businesses under common control within the meaning of Section 414(c) of the Internal Revenue Code of which that Person is a member; and (c) solely for purposes of provisions relating to Section 412 of the Internal Revenue Code, any member of an affiliated service group within the meaning of Section 414(m) or (o) of the Internal Revenue Code of which that Person, any corporation described in clause (a) of this definition or any trade or business described in clause (b) of this definition is a member.  Any former ERISA Affiliate of any Credit Party or any of its Subsidiaries shall continue to be considered an ERISA Affiliate of such Credit Party or any such Subsidiary within the meaning of this definition with respect to the period such entity was an ERISA Affiliate of such Credit Party or such Subsidiary and with respect to liabilities arising after such period for which such Credit Party or such Subsidiary could be liable under the Internal Revenue Code or ERISA.

"**ERISA Event**" means, from and after the Closing Date, except as identified on Schedule 4.20, (a) a "reportable event" within the meaning of Section 4043 of ERISA and the regulations issued thereunder with respect to any Pension Plan (excluding those for which the provision for thirty (30) days' notice to the PBGC has been waived by regulation); (b) the failure to meet the minimum funding standard of Section 412 of the Internal Revenue Code with respect to any Pension Plan (whether or not waived in accordance with Section 412(c) of the Internal Revenue Code) or the failure to make by its due date a required installment under Section 430(j) of the Internal Revenue Code with respect to any Pension Plan or if applicable, the failure to make any required contribution to a Multiemployer Plan; (c) the provision by the administrator of any Pension Plan pursuant to Section 4041(a)(2) of ERISA of a notice of intent to terminate such plan in a distress termination described in Section 4041(c) of ERISA; (d) the withdrawal by any Credit Party or any of its Subsidiaries or any of their respective ERISA Affiliates from any Pension Plan with two or more contributing sponsors or the termination of any such Pension Plan resulting in material liability to any Credit Party or any of its Subsidiaries or any of their respective ERISA Affiliates pursuant to Section 4063 or 4064 of ERISA; (e) the institution by the PBGC of proceedings to terminate any Pension Plan or to appoint a trustee to administer any Pension Plan; (f) the imposition of liability on any Credit Party or any of its Subsidiaries or any of their respective ERISA Affiliates pursuant to Section 4062(e) or 4069 of ERISA or by reason of the application of Section 4212(c) of ERISA; (g) if applicable, the withdrawal of any Credit Party or any of its Subsidiaries or any of their respective ERISA Affiliates in a complete or partial withdrawal (within the meaning of Sections 4203 and 4205 of ERISA) from any Multiemployer Plan if there is any potential liability therefor, or the receipt by any Credit Party or any of its Subsidiaries or any of their respective Affiliates of notice from any Multiemployer Plan that is in reorganization or insolvency pursuant to Section 4241 or 4245 of ERISA, or that it intends to terminate or has terminated under Section 4041A or 4042 of ERISA; (h) the occurrence of an act or omission which could reasonably be expected to give rise to the imposition on any Credit Party, any of its Subsidiaries or any of their respective ERISA Affiliates of material fines, penalties, Taxes or related charges under Chapter 43 of the Internal Revenue Code or under Section 409,

14

Section 502(c), (i) or (l), or Section 4071 of ERISA in respect of any Employee Benefit Plan; (i) the assertion of a claim (other than routine claims for benefits or claims filed by the PBGC prior to the Closing Date) against any Employee Benefit Plan other than a Multiemployer Plan or the assets thereof, or against any Credit Party, any of its Subsidiaries or any of their respective ERISA Affiliates in connection with any Employee Benefit Plan, which could reasonably be expected to result in a material liability to a Credit Party; (j) receipt from the Internal Revenue Service of notice of the failure of any Pension Plan (or any other Employee Benefit Plan intended to be qualified under Section 401(a) of the Internal Revenue Code) to qualify under Section 401(a) of the Internal Revenue Code, or the failure of any trust forming part of any Pension Plan to qualify for exemption from taxation under Section 501(a) of the Internal Revenue Code; or (k) the imposition of a Lien pursuant to Section 430(k) of the Internal Revenue Code or pursuant to Section 303(k) of ERISA with respect to any Pension Plan. Notwithstanding the foregoing, to the extent the Morrison Restaurants Inc. Retirement Plan is terminated, such event shall not constitute an ERISA Event.

"**Event of Default**" means each of the conditions or events set forth in <u>Section 8.1</u>.

"**Exchange Act**" means the Securities Exchange Act of 1934, as amended from time to time, and any successor statute.

"**Excluded Account**" means (a) employee benefits or zero balance accounts maintained by the Credit Parties, as long as, in the case of payroll accounts, the total amount on deposit at any time does not exceed the current amount of payroll obligations of the Credit Parties, (b) any Deposit Account of a Credit Party which holds Cash collateral with respect to third party letters of credit, in each case, to the extent the pledge of such Cash is permitted hereunder and (c) Deposit Accounts and Securities Accounts with an aggregate amount on deposit therein of not more than $350,000 for more than three (3) consecutive Business Days at any one time for all such Deposit Accounts or Securities Accounts.

"**Excluded Taxes**" means any of the following Taxes imposed on or with respect to a Recipient or required to be withheld or deducted from a payment to a Recipient, (a) Taxes imposed on or measured by net income (however denominated), franchise Taxes, and branch profits Taxes, in each case, (i) imposed as a result of such Recipient being organized under the laws of, or having its principal office or, in the case of any Lender, its applicable lending office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes, (b) in the case of a Lender, U.S. federal withholding Taxes imposed on amounts payable to or for the account of such Lender with respect to an applicable interest in a Loan or Commitment pursuant to a law in effect on the date on which (i) such Lender acquires such interest in the Loan or Commitment (other than pursuant to an assignment request by the Borrower under <u>Section **Error! Reference source not found.**</u>) or (ii) such Lender changes its lending office, except in each case to the extent that, pursuant to <u>Section 2.19</u>, amounts with respect to such Taxes were payable either to such Lender's assignor immediately before such Lender became a party hereto or to such Lender immediately before it changed its lending office, (c) Taxes attributable to such Recipient's failure to comply with <u>Section 2.19(f)</u>, and (d) any withholding Taxes imposed under FATCA.

"**Existing Letters of Credit**" means those letters of credit issued and outstanding as of the Closing Date, as the same are deemed to be issued under <u>Section 2.3</u> and are listed on <u>Schedule **Error! Reference source not found.**</u>.

"**Existing Subordinated SLB Note**" means that certain Floating Rate Bond due 2037, dated as of December 21, 2017, by SFI in favor of Holdings as in effect on the Closing Date.

15

"**Facility**" means any real property (including all buildings, fixtures or other improvements located thereon) now, hereafter or heretofore owned, leased, operated or used by any Credit Party or any of its Subsidiaries or any of their respective predecessors or Affiliates.

"**Fair Share**" as defined in Section 7.2.

"**Fair Share Contribution Amount**" as defined in Section 7.2.

"**FATCA**" means Sections 1471 through 1474 of the Internal Revenue Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof, any agreements entered into pursuant to Section 1471(b)(1) of the Internal Revenue Code and any fiscal or regulatory legislation, rules or practices adopted pursuant to any intergovernmental agreement, treaty or convention among Governmental Authorities and implementing such Sections of the Internal Revenue Code.

"**Federal Funds Effective Rate**" means for any day, the rate per annum (expressed, as a decimal, rounded upwards, if necessary, to the next higher 1/100 of 1%) equal to the weighted average of the rates on overnight federal funds transactions with members of the Federal Reserve System arranged by federal funds brokers on such day, as published by the Federal Reserve Bank of New York on the Business Day next succeeding such day; provided, (a) if such day is not a Business Day, the Federal Funds Effective Rate for such day shall be such rate on such transactions on the next preceding Business Day as so published on the next succeeding Business Day and (b) if no such rate is so published on such next succeeding Business Day, the Federal Funds Effective Rate for such day shall be the average rate charged to TCW or any other Lender selected by Administrative Agent on such day on such transactions as determined by Administrative Agent.

"**Fee Letter**" means that certain Fee Letter, dated as of the date hereof, by and among Borrower Representative and Administrative Agent.

"**Financial Officer Certification**" means, with respect to the financial statements for which such certification is required, the certification of the chief financial officer of Borrower Representative (or other senior executive officer of Borrower Representative or Ruby who has financial expertise and is familiar with the terms and conditions of this Agreement and the financial statements and financial condition of Holdings and its Subsidiaries) that such financial statements fairly present, in all material respects, the financial condition of Holdings and its Subsidiaries as at the dates indicated and the results of their operations and their cash flows for the periods indicated, subject to changes resulting from audit and normal year-end adjustments.

"**Financial Plan**" as defined in Section 5.1(k).

"**First Priority**" means, with respect to any Lien created or purported to be created in any Collateral pursuant to any Collateral Document, that such Lien is the only Lien to which such Collateral is subject, other than any Permitted Lien.

"**Fiscal Month**" means the consecutive five (5) week periods in the case of fiscal months one (1), four (4), seven (7) and ten (10) (and in the case solely of Fiscal Year 2022, fiscal month twelve (12)) beginning on the first Wednesday closest to June 1, September 1, December 1 and March 1, respectively, and the consecutive four (4) week periods in the case of all other Fiscal Months, conforming to a 5-4-4 fiscal calendar as adopted by the Credit Parties and in effect as of the Closing Date.

16

"**Fiscal Quarter**" means a consecutive three Fiscal Month period ending on the first Tuesday closest to September 1, December 1, March 1 and June 1 in the cases of Fiscal Quarters one (1), two (2), three (3) and four (4), respectively.

"**Fiscal Year**" means a consecutive fifty-three week period ending on the first Tuesday closest to June 1 in calendar year 2022, and a consecutive fifty-two week period ending on the first Tuesday closest to June 1 in each other calendar year.

"**Fixed Charge Coverage Ratio**" means, for any applicable period of determination with respect to Holdings and its Subsidiaries on a consolidated basis, the ratio of (a) the sum of (i) Consolidated Adjusted EBITDA for such period, plus (ii) consolidated rent expenses paid in Cash in such period, less (iii) Permitted Management Fees paid to Sponsor during such period to the extent permitted to be paid hereunder, less (iv) Maintenance Capital Expenditures made during such period, less (v) Cash income Taxes paid during such period (including Permitted Tax Distributions), to: (b) Consolidated Fixed Charges for such period.

"**Flood Hazard Property**" means any Real Estate Asset subject to a Mortgage in favor of Collateral Agent, for the benefit of the Secured Parties, and located in an area designated by the Federal Emergency Management Agency as having special flood or mud slide hazards.

"**Food Safety Laws**" means all requirements of law or Governmental Authorization relating to food and related products, including the Federal Food, Drug and Cosmetic Act, the Food Security Act of 1985, the Federal Trade Commission Act, the Fair Packaging and Labeling Act, the Consumer Product Safety Commission Act, the Poison Prevention Packaging Act, the Food Safety Modernization Act, 21 CFR § Part 111, and any other applicable comparable U.S. State statutes and all regulations promulgated under each of the foregoing.

"**Forecast Reporting Period**" means the period of time from the Closing Date through and including the first date on which the Consolidated Liquidity exceeds $15,000,000 at all times for eight (8) consecutive weeks.

"**Foreign Lender**" means any Lender that is not a U.S. Person.

"**Foreign Subsidiary**" means any Subsidiary of Holdings that is not a Domestic Subsidiary.

"**Franchise Agreements**" means (a) all franchise agreements and other similar agreements entered into by Ruby or any other Credit Party, as the franchisor, and a third party franchisee, and (b) all development agreements, entered into by Ruby or any other Credit Party, as any of the same may from time to time be amended, restated, supplemented or otherwise modified from time to time.

"**Funding Default**" as defined in Section 2.21.

"**Funding Guarantors**" as defined in Section 7.2.

"**Funding Notice**" means a notice substantially in the form of Exhibit A-1.

"**GAAP**" means, subject to the limitations on the application thereof set forth in Section 1.2, United States generally accepted accounting principles in effect as of the date of determination thereof.

17

**"Governmental Acts"** means any act or omission, whether rightful or wrongful, of any present or future de jure or de facto Governmental Authority.

**"Governmental Authority"** means the government of the United States or any other nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court (including the Bankruptcy Court), central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national bodies such as the European Union or the European Central Bank).

**"Governmental Authorization"** means any permit, license, authorization, plan, directive, consent order or consent decree of or from any Governmental Authority.

**"Grantor"** as defined in the Pledge and Security Agreement.

**"GS Bank"** as defined in the Preamble.

**"Guaranteed Obligations"** as defined in Section 7.1.

**"Guarantor"** means Holdings, Borrowers (solely with respect to the Obligations of the Subsidiaries of Holdings (other than Borrowers)) and each other Subsidiary of Holdings (other than the Wicomico County Subsidiaries).

**"Guarantor Payment"** as defined in Section 11.7.

**"Guarantor Subsidiary"** means each Guarantor other than Holdings.

**"Guaranty"** means the guaranty of each Guarantor set forth in Section 7.

**"Hazardous Materials"** means any chemical, material or substance, exposure to which is prohibited, limited or regulated under any Environmental Law, including hazardous or toxic substances and petroleum in any form.

**"Hazardous Materials Activity"** means any past, current, proposed or threatened activity, event or occurrence involving any Hazardous Materials, including the use, manufacture, possession, storage, holding, presence, existence, location, Release, threatened Release, discharge, placement, generation, transportation, processing, construction, treatment, abatement, removal, remediation, disposal, disposition or handling of any Hazardous Materials, and any corrective action or response action with respect to any of the foregoing.

**"Highest Lawful Rate"** means the maximum lawful interest rate, if any, that at any time or from time to time may be contracted for, charged, or received under the laws applicable to any Lender which are presently in effect or, to the extent allowed by law, under such applicable laws which may hereafter be in effect and which allow a higher maximum nonusurious interest rate than applicable laws now allow.

**"Holdings"** as defined in the Preamble.

**"Indebtedness"** as applied to any Person, means, without duplication, (a) all indebtedness for borrowed money; (b) that portion of obligations with respect to Capital Leases that is properly classified as a liability on a balance sheet in conformity with GAAP; (c) notes payable and drafts

LEGAL_US_W # 105221370.13

accepted representing extensions of credit whether or not representing obligations for borrowed money; (d) any obligation owed for all or any part of the deferred purchase price of property or services (excluding any such obligations incurred under ERISA); (e) all indebtedness secured by any Lien on any property or asset owned or held by that Person regardless of whether the indebtedness secured thereby shall have been assumed by that Person or is nonrecourse to the credit of that Person; (f) the face amount of any letter of credit (including any Letter of Credit or Existing Letter of Credit) issued for the account of that Person or as to which that Person is otherwise liable for reimbursement of drawings; (g) the direct or indirect guaranty, endorsement (otherwise than for collection or deposit in the ordinary course of business), co-making, discounting with recourse or sale with recourse by such Person of the obligation of another; (h) any obligation of such Person the primary purpose or intent of which is to provide assurance to an obligee that the obligation of the obligor thereof will be paid or discharged, or any agreement relating thereto will be complied with, or the holders thereof will be protected (in whole or in part) against loss in respect thereof; (i) any liability of such Person for an obligation of another through any agreement (contingent or otherwise) (x) to purchase, repurchase or otherwise acquire such obligation or any security therefor, or to provide funds for the payment or discharge of such obligation (whether in the form of loans, advances, stock purchases, capital contributions or otherwise) or (y) to maintain the solvency or any balance sheet item, level of income or financial condition of another if, in the case of any agreement described under clause (x) or (y) of this clause (i), the primary purpose or intent thereof is as described in clause (h) of this definition; (j) all obligations of such Person in respect of any exchange traded or over the counter derivative transaction, whether entered into for hedging or speculative purposes; and (k) all Disqualified Stock issued by such Person.

**"Indemnified Liabilities"** means, collectively, any and all liabilities, obligations, losses, damages (including natural resource damages), penalties, claims (including Environmental Claims), costs (including the costs of any investigation, study, sampling, testing, abatement, cleanup, removal, remediation or other response action necessary to remove, remediate, clean up or abate any Hazardous Materials Activity), expenses and disbursements of any kind or nature whatsoever (including Taxes), the reasonable fees and disbursements of counsel for Indemnitees in connection with any investigative, administrative or judicial proceeding commenced or threatened by any Person, whether or not any such Indemnitee shall be designated as a party or a potential party thereto, and any fees or expenses incurred by Indemnitees in enforcing this indemnity, whether direct, indirect or consequential and whether based on any federal, state or foreign laws, statutes, rules or regulations (including securities and commercial laws, statutes, rules or regulations and Environmental Laws), on common law or equitable cause or on contract or otherwise, that may be imposed on, incurred by, or asserted against any such Indemnitee, in any manner relating to or arising out of (a) this Agreement or any of the other Credit Documents or the transactions contemplated hereby or thereby (including the Lenders' agreement to make Credit Extensions or the use or intended use of the proceeds thereof, or any enforcement of any of the Credit Documents (including any sale of, collection from, or other realization upon any of the Collateral or the enforcement of the Guaranty)); or (b) any Environmental Claim or any Hazardous Materials Activity relating to or arising from, directly or indirectly, any past or present activity, operation, land ownership, or practice of any Credit Party or any of its Subsidiaries.

**"Indemnified Taxes"** means (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of the Borrower under any Credit Document and (b) to the extent not otherwise described in (a), Other Taxes.

**"Indemnitee"** as defined in Section 10.3.

**"Indemnitee Agent Party"** as defined in Section 9.6.

"**Insolvency Proceeding**" means any proceeding commenced by or against any Person under any provision of the Bankruptcy Code or under any other state or federal bankruptcy or insolvency law, assignments for the benefit of creditors, formal or informal moratoria, compositions, extensions generally with creditors, or proceedings seeking reorganization, arrangement, or other similar relief, other than the Cases.

"**Intellectual Property**" as defined in the Pledge and Security Agreement.

"**Interest Payment Date**" means with respect to (a) any Base Rate Loan, (i) the last day of each Fiscal Month commencing on the first such date to occur after the Closing Date and (ii) the Maturity Date; and (b) any LIBOR Rate Loan, (i) the last day of each Interest Period applicable to such Loan and (ii) the Maturity Date.

"**Interest Period**" means, in connection with a LIBOR Rate Loan, an interest period of one month (a) initially, commencing on the Credit Date or Conversion/Continuation Date thereof, as the case may be; and (b) thereafter, commencing on the day on which the immediately preceding Interest Period expires; provided, (i) if an Interest Period would otherwise expire on a day that is not a Business Day, such Interest Period shall expire on the next succeeding Business Day unless no further Business Day occurs in such month, in which case such Interest Period shall expire on the immediately preceding Business Day; (ii) any Interest Period that begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period) shall, subject to clause (iii) of this definition, end on the last Business Day of a calendar month; and (iii) no Interest Period with respect to the Loans or any portion thereof shall extend beyond the Maturity Date.

"**Interest Rate Determination Date**" means, with respect to any Interest Period, the date that is two (2) Business Days prior to the first day of such Interest Period.

"**Internal Revenue Code**" means the U.S. Internal Revenue Code of 1986, as amended.

"**Investment**" means (a) any direct or indirect purchase or other acquisition by Holdings or any of its Subsidiaries of, or of a beneficial interest in, any of the Securities of any other Person; (b) any direct or indirect redemption, retirement, purchase or other acquisition for value, by any Subsidiary of Holdings from any Person, of any Capital Stock of such Person; and (c) any direct or indirect loan, advance (other than advances to employees for moving, entertainment and travel expenses, drawing accounts and similar expenditures in the ordinary course of business) or capital contributions by Holdings or any of its Subsidiaries to any other Person, including all Indebtedness and accounts receivable from that other Person that are not current assets or did not arise from sales to that other Person in the ordinary course of business.  The amount of any Investment shall be the original cost of such Investment, plus the cost of all additions thereto, without any adjustments for increases or decreases in value, or write ups, write downs or write offs with respect to such Investment.

"**Issuance Notice**" means an Issuance Notice substantially in the form of Exhibit A-3.

["**Issuing Bank**" means, initially, GS Bank, and thereafter any additional letter of credit issuer selected by the Borrower and consented to by the Administrative Agent; provided, that GS Bank shall not be required to (i) serve as the Issuing Bank or (ii) issue any Letter of Credit that expires, in each case, after the one-year anniversary of the Closing Date, without its consent.]

**"Joint Venture"** means a joint venture, partnership or other similar arrangement, whether in corporate, partnership or other legal form; provided, in no event shall any corporate Subsidiary of any Person be considered to be a Joint Venture to which such Person is a party.

**"Lease Settlement Payments"** means, for any period of determination with respect to Holdings and its Subsidiaries on a consolidated basis, any amounts paid or payable to a landlord during such period in connection with the early cancellation or termination of a lease with respect to a Closed Restaurant.

**"Lender"** means each financial institution listed on the signature pages hereto as a Lender and any other Person that becomes a party hereto pursuant to an Assignment Agreement.

**"Letter of Credit"** means an Existing Letter of Credit or a standby letter of credit issued or to be issued by Issuing Bank pursuant to this Agreement, in each case, in form and substance satisfactory to Administrative Agent and Issuing Bank

**"Letter of Credit Cash Collateralization"** means (a) providing cash collateral (pursuant to documentation reasonably satisfactory to the Issuing Bank, including provisions that specify that all commissions, fees, charges and expenses provided for in this Agreement (including any fronting fees) will continue to accrue while the Letters of Credit are outstanding) to be held by the Issuing Bank and given to secure that portion of the Obligations related to outstanding Letters of Credit, in an amount equal to 105.0% of the then applicable Letter of Credit Usage, (b) delivering to the Issuing Bank documentation executed by all beneficiaries under the Letters of Credit, in form and substance reasonably satisfactory to the Issuing Bank, terminating all of such beneficiaries' rights under the Letters of Credit, or (c) providing to the Issuing Bank a standby letter of credit, in form and substance reasonably satisfactory to the Issuing Bank, from a commercial bank acceptable to the Issuing Bank (in its sole discretion) naming Issuing Bank as the beneficiary thereof, for the purpose of securing that portion of the Obligations related to outstanding Letters of Credit, in an amount equal to 105.0% of the then applicable Letter of Credit Usage (it being understood that all commissions, fees, charges and expenses provided for in this Agreement (including any fronting fees) will continue to accrue while the Letters of Credit are outstanding and that any such amounts that accrue must be additional amounts that can be drawn under any such standby letter of credit).

**"Letter of Credit Fees"** means the fees payable to the Lenders and Issuing Bank, as the case may be, in connection with the Letters of Credit and Letter of Credit Loans, as set forth in Section 2.10(b)(i) and Section 2.10(c).

**"Letter of Credit Loan Commitment"** means the commitment of a Lender to make or otherwise fund any Letter of Credit Loan and to acquire participations in Letters of Credit and **"Letter of Credit Loan Commitments"** means such commitments of all Lenders in the aggregate. The amount of each Lender's Letter of Credit Loan Commitment, if any, is set forth on Appendix **Error! Reference source not found.** or in the applicable Assignment Agreement, subject to any adjustment or reduction pursuant to the terms and conditions hereof. The aggregate amount of the Letter of Credit Loan Commitments as of the Closing Date is $[9,600,000].

**"Letter of Credit Loan Exposure"** means, with respect to any Lender as of any date of determination, (a) prior to the termination of the Letter of Credit Loan Commitments, such Lender's Letter of Credit Loan Commitment; and (b) after the termination of the Letter of Credit Loan Commitments, (i) the sum of the aggregate outstanding principal amount of the Letter of Credit Loans of such Lender, (ii) in the case of Issuing Bank, the aggregate Letter of Credit Usage in respect of all Letters of Credit issued by such Lender (net of any participations by Lenders in such Letters of Credit), and

(iii) the aggregate amount of all participations by such Lender in any outstanding Letters of Credit or any unreimbursed drawing under any Letter of Credit.

"**Letter of Credit Loans**" means a loan made by a Lender to Borrowers pursuant to Section 2.2.

"**Letter of Credit Usage**" means, as at any date of determination, the sum of (a) the maximum aggregate amount which is, or at any time thereafter may become, available for drawing under all Letters of Credit then outstanding, and (b) the aggregate amount of all drawings under Letters of Credit honored by Issuing Bank and not theretofore reimbursed by or on behalf of Borrowers.

"**Letter of Direction**" means a letter of direction, dated as of the Closing Date, in form and substance reasonably satisfactory to Administrative Agent, executed and delivered by Borrowers and Administrative Agent.

"**LIBOR Rate Loan**" means a Loan bearing interest at a rate determined by reference to the Adjusted LIBOR Rate.

"**Lien**" means (a) any lien, mortgage, pledge, assignment, security interest, right of set off, charge or encumbrance of any kind (including any agreement to give any of the foregoing, any conditional sale or other title retention agreement, and any lease in the nature thereof) and any option, trust or other preferential arrangement having the practical effect of any of the foregoing, (b) in the case of Securities, any purchase option, call or similar right of a third party with respect to such Securities, and (c) easements, rights of way, restrictions, encroachments, and other defects or irregularities in title, in each case which interfere in any material respect with the ordinary conduct of the business of any Credit Party or any of its Subsidiaries.

"**Liquor Subsidiary Contracts**" means all management agreements, option agreements, voting proxies, indemnification agreements and other agreements entered into by any Credit Party and/or any Subsidiary of a Credit Party (or a shareholder thereof) related to the use of liquor licenses in the operation of a Restaurant or group of Restaurants, as any of the same may from time to time be amended, restated, supplemented or otherwise modified from time to time in accordance with the terms hereof.

"**Loan**" means, as the context requires, a Term Loan or Letter of Credit Loan.

"**Maintenance Capital Expenditures**" means, for any period of determination with respect to Holdings and its Subsidiaries, the Consolidated Capital Expenditures made during such period in the ordinary course of business of the Credit Parties for general corporate purposes or the maintenance and repair of existing Restaurants, as the same are properly capitalized in accordance with GAAP, and in the case of leased Restaurants, in accordance and compliance with any requirements or restrictions of the applicable lease agreements.

"**Management Agreement**" means [that certain Management Services Agreement, dated as of the date hereof, by and among TCW Asset Management Company LLC, a Delaware limited liability company, [Holdings], and the guarantor parties thereto.]

"**Margin Stock**" as defined in Regulation U of the Board of Governors of the Federal Reserve System, as in effect from time to time.

"**Maryland Liquor Subsidiaries**" means (a) (i) Ruby Tuesday of Allegany County, Inc., a Maryland corporation, (ii) Ruby Tuesday of Columbia, Inc., a Maryland corporation, (iii) Ruby Tuesday

of Linthicum, Inc., a Maryland corporation, (iv) Ruby Tuesday of Marley Station, Inc., a Maryland corporation, (v) Ruby Tuesday of Frederick, Inc., a Maryland corporation, (vi) Ruby Tuesday of Pocomoke City, Inc., a Maryland corporation, (vii) RT of Maryland, LLC, a Maryland limited liability company, and (viii) RT of Carroll County, LLC, a Maryland limited liability company, and (b) the Wicomico County Subsidiaries.

"**Material Adverse Effect**" means a material adverse effect on and/or material adverse developments with respect to (a) the business operations, properties, assets, condition (financial or otherwise) or prospects of Holdings and its Subsidiaries taken as a whole; (b) the ability of any Credit Party to fully and timely perform its Obligations; (c) the legality, validity, binding effect, or enforceability against a Credit Party of a Credit Document to which it is a party; or (d) the rights, remedies and benefits available to, or conferred upon, any Agent and any Lender or any Secured Party under any Credit Document.  For the avoidance of doubt, the Cases shall not constitute a Material Adverse Effect.

"**Material Contract**" means (a) that certain Master Distribution Agreement by and between Ruby Tuesday, Inc. and Performance Food Group, dated November 15, 2006, as in effect on the Closing Date, together with any amendments, renewals or replacements thereof in accordance with the terms hereof[3], (b) the Closing Date Employment Agreements, (c) any master lease or similar agreement which relates to twenty (20) or more restaurant locations of the Credit Parties, together with any renewals or replacements thereof, and (d) any individual or related series of Franchise Agreements which relate to ten (10) or more restaurant locations of the Credit Parties, together with any amendments, renewals or replacements thereof in accordance with the terms hereof.

"**Material Real Estate**" means (a) all fee owned real property of the Credit Parties owned as of the Closing Date, (b) the leasehold of the Credit Parties with respect to the Restaurant located at 120 International Boulevard in Elizabeth, NJ, and (c) all fee owned real property acquired by a Credit Party after the Closing Date with a fair market value in excess of $500,000.

"**Maturity Date**" means the earlier to occur of: (a) [_____][4] and (b) the date that all Loans shall become due and payable in full hereunder, whether by acceleration or otherwise.

"**Maximum PIK Interest Portion**" means an amount per annum equal 6.00 percentage points.

"**Moody's**" means Moody's Investor Services, Inc. and any successor thereto.

"**Mortgage**" means a mortgage, deed of trust, deed to secure debt or similar agreement in form and substance reasonably satisfactory to Collateral Agent evidencing the Lien in favor of Collateral Agent on a Material Real Estate, as amended, restated, supplemented or otherwise modified from time to time.

"**Mortgage Deliverables**" means, with respect to any Material Real Estate:

(a)      fully-executed and notarized Mortgages, in proper form for recording in all appropriate places in all applicable jurisdictions with respect to such Material Real Estate;

---

[3] **NTD -** to discuss transition support agreement in connection with the RT Lodge.

[4] **NTD -** to be the date that is 4 years from the Closing Date.

LEGAL_US_W # 105221370.13

(b)     the payment of all fees and Taxes related to the filing and/or recording of any Mortgage Deliverable;

(c)     (i) ALTA mortgagee title insurance policies or unconditional commitments therefor issued by one or more title companies reasonably satisfactory to Collateral Agent with respect to such Material Real Estate along with endorsements thereto (each, a **"Title Policy"**) and in amounts satisfactory to Collateral Agent, that contain no Liens on the Material Real Estate except for Permitted Liens, (ii) evidence satisfactory to Collateral Agent that such Credit Party has paid to the title company or to the appropriate Governmental Authorities all expenses and premiums of the title company and all other sums required in connection with the issuance of each Title Policy and all recording and stamp Taxes (including mortgage recording and intangible Taxes) payable in connection with recording the Mortgages for such Material Real Estate in the appropriate real estate records, and (iii) all certificates, filings, and affidavits required by the title company to issue each Title Policy;

(d)     evidence of flood insurance with respect to each Flood Hazard Property that is located in a community that participates in the National Flood Insurance Program, in each case in compliance with any applicable regulations of the Board of Governors of the Federal Reserve System, in form and substance reasonably satisfactory to Collateral Agent;

(e)     other than with respect to Material Real Estate owned as of the Closing Date, ALTA/NSPS surveys of such Material Real Estate satisfactory to Collateral Agent and sufficient to issue the Title Policy showing no survey defects, except for Permitted Liens, certified to Collateral Agent;

(f)     other than with respect to Material Real Estate owned as of the Closing Date, a Phase I Report for such Material Real Estate, together with other information reasonably requested by Administrative Agent regarding environmental matters relating to such Material Real Estate;

(g)     other than with respect to Material Real Estate owned as of the Closing Date, a zoning report prepared by one or more consulting firms reasonably satisfactory to Administrative Agent for such Material Real Estate sufficient to issue the Title Policy;

(h)     other than with respect to Material Real Estate owned as of the Closing Date, a local counsel opinion addressing, among other things, enforceability, recordability, and creation and perfection of liens in form and substance reasonably satisfactory to Collateral Agent; and

(i)     such other agreements or instruments as may reasonably be requested by Collateral Agent in connection therewith.

**"Multiemployer Plan"** means any Employee Benefit Plan which is a "multiemployer plan" as defined in Section 3(37) of ERISA.

**"Net Asset Sale Proceeds"** means, with respect to any Asset Sale, an amount equal to: (a) gross Cash payments received by any Credit Party or any of its Subsidiaries from such Asset Sale, <u>minus</u> (b) (i) all associated costs incurred in connection with such Asset Sale, including legal, underwriting discounts, brokerage fees and commissions with respect to such Asset Sale, (ii) payment of the outstanding principal amount of, premium or penalty, if any, and interest on any Permitted Debt (other than the Loans) that is secured by a Permitted Lien on the Capital Stock or assets in question and that is required to be repaid under the terms thereof as a result of such Asset Sale, and (iii) Cash Taxes directly owed or owing with respect to such Asset Sale after factoring all actual and expected deductions available on a consolidated basis and based on the reasonable good faith determination of the Credit Parties.  For the avoidance of doubt, the term "**Net Asset Sale Proceeds**" is not intended to include, and shall not

include, (y) on-going royalty payments, franchise fees or license fees received in the ordinary course of business by a Credit Party pursuant to a Franchise Agreement or license agreement and (z) on-going rent payments received in the ordinary course of business by a Credit Party pursuant to any lease or sublease under which Ruby or any of its Subsidiaries is the lessor or sub-lessor.

"**Net Insurance/Condemnation Proceeds**" means an amount equal to:  (a) any gross Cash payments or proceeds received by any Credit Party or any of its Subsidiaries (i) under any casualty insurance policies (excluding any business interruption or life insurance policies held in trust for the exclusive benefit of pension plan participant obligations) or (ii) as a result of the taking of any assets of any Credit Party by any Person pursuant to the power of eminent domain, condemnation or otherwise, or pursuant to a sale of any such assets to a purchaser with such power under threat of such a taking; minus (b) all associated costs incurred in connection with the adjustment or settlement of any claims of any Credit Party in respect thereof, including (i) legal, underwriting discounts, brokerage fees and commissions in connection with the adjustment or settlement of any claims of any Credit Party in respect thereof, (ii) payment of the outstanding principal amount of, premium or penalty, if any, and interest on any Permitted Debt (other than the Loans) that is secured by a Permitted Lien on the Capital Stock or assets in question and that is required to be repaid under the terms thereof in connection with the adjustment or settlement of any claims of any Credit Party in respect thereof, and (iii) Cash Taxes directly owed or owing in connection with the adjustment or settlement of any claims of any Credit Party in respect thereof after factoring all actual and expected deductions available on a consolidated basis and based on the reasonable good faith determination of the Credit Parties.

"**New Subsidiary**" as defined in the definition of "New Subsidiary Deliverables."

"**New Subsidiary Deliverables**" means, with respect to any Subsidiary required to be joined under Section 5.10 (each, a "**New Subsidiary**"):

(a)        each of the deliverables described in Section 3.1(b) with respect to such New Subsidiary;

(b)        in order to create in favor of Collateral Agent, for the benefit of Secured Parties, a valid, perfected First Priority security interest in the personal property Collateral of such New Subsidiary, each of the following:

(i)        evidence satisfactory to Collateral Agent of the compliance by such New Subsidiary and each Credit Party of its obligations under the Pledge and Security Agreement and the other Collateral Documents (including their obligations to authorize or execute, as the case may be, and deliver UCC financing statements, originals of securities, instruments and chattel paper and any agreements governing Deposit Accounts and/or Securities Accounts as provided therein);

(ii)        a completed Collateral Questionnaire dated the date of the applicable Counterpart Agreement and executed by an Authorized Officer of such New Subsidiary and Borrower Representative, together with all attachments contemplated thereby, including (A) the results of a recent search, by a Person satisfactory to Collateral Agent, of all effective UCC financing statements (or equivalent filings) made with respect to any personal or mixed property of such New Subsidiary in the appropriate jurisdictions (as determined by Collateral Agent), together with copies of all such filings disclosed by such search, and (B) UCC termination statements (or similar documents) duly executed by all applicable Persons for filing in all applicable jurisdictions as may be necessary to terminate any effective UCC financing statements

(or equivalent filings) disclosed in such search (other than any such financing statements in respect of Permitted Liens); and

(iii)    evidence that each applicable Person shall have, as applicable (A) taken or caused to be taken any other action, executed and delivered or caused to be executed and delivered (1) any other agreement, document and instrument in accordance with Section 5.11 and (2) any intercompany note evidencing Indebtedness permitted to be incurred pursuant to Section 6.1(c) and (B) made or caused to be made any other filing and recording (other than as set forth herein) reasonably required by Collateral Agent in accordance with the applicable Collateral Documents;

(c)    to the extent requested by Administrative Agent, Lenders and their respective counsel shall have received copies of the favorable written opinions of counsel (which counsel shall be satisfactory to Collateral Agent) to such New Subsidiary as to such other matters as Administrative Agent may reasonably request (including, for the avoidance of doubt, with respect to the creation and perfection of the security interests in favor of Collateral Agent in such New Subsidiary's Collateral), dated as of the date of the applicable Counterpart Agreement and otherwise in form and substance satisfactory to Administrative Agent;

(d)    Collateral Agent shall have received a certificate from the Credit Parties' insurance broker or other evidence satisfactory to it that all insurance required to be maintained pursuant to Section 5.5 is in full force and effect, together with endorsements naming the Collateral Agent, for the benefit of Secured Parties, as additional insured and loss payee thereunder to the extent required under Section 5.5, in each case, with respect to such New Subsidiary;

(e)    supplements to Schedules 4.1 and 4.2 reflecting such New Subsidiary; and

(f)    the Credit Parties and such New Subsidiary shall comply with Section 5.11, as applicable, with respect to any of such New Subsidiary's Material Real Estates.

"**Note**" means a Term Loan Note.

"**Notice**" means, as the context requires, a Funding Notice, an Issuance Notice, or a Conversion/Continuation Notice.

"**Obligations**" means all loans (including the Term Loans), debts, principal, interest (including any interest that accrues after the commencement of an Insolvency Proceeding, regardless of whether allowed or allowable in whole or in part as a claim in any such Insolvency Proceeding), premiums, liabilities, obligations (including indemnification obligations), reimbursement obligations with respect to the Letters of Credit, fees, the Applicable Premium, fees and expenses (including any fees or expenses that accrue after the commencement of an Insolvency Proceeding, regardless of whether allowed or allowable in whole or in part as a claim in any such Insolvency Proceeding), guaranties, and all covenants and duties of any other kind and description owing by any Credit Party arising out of, under, pursuant to, in connection with, or evidenced by this Agreement, the Warrants, or any of the other Credit Documents and irrespective of whether for the payment of money, whether direct or indirect, absolute or contingent, due or to become due, now existing or hereafter arising, and including all interest not paid when due and all other expenses or other amounts that any Credit Party is required to pay or reimburse by the Credit Documents or by law or otherwise in connection with the Credit Documents. Without limiting the generality of the foregoing, the Obligations of Borrowers under the Credit Documents include the obligation to pay (a) the principal of the Term Loans, (b) interest accrued on the Term Loans, (c) expenses and costs of the Agents and Lenders payable under this Agreement or any of the other Credit

Documents, (d) fees payable under this Agreement or any of the other Credit Documents, (e) the Applicable Premium, and (f) indemnities and other amounts payable by any Credit Party under any Credit Document.  Any reference in this Agreement or in the Credit Documents to the Obligations shall include all or any portion thereof and any extensions, modifications, renewals, or alterations thereof, both prior and subsequent to any Insolvency Proceeding.  For the avoidance of doubt, any reference herein or in any other Credit Document to the satisfaction, repayment, or payment in full of the Obligations (or words of like import) shall include (i) all costs and expenses payable by the Credit Parties to Issuing Bank pursuant to the Credit Documents and that have accrued and are unpaid regardless of whether demand has been made therefor, and (ii) in the case of contingent reimbursement obligations with respect to Letters of Credit, providing Letter of Credit Cash Collateralization with respect thereto, if required under the terms of this Agreement.

**"Obligee Guarantor"** as defined in <u>Section 7.7</u>.

**"Operating Report"** means, for any applicable period with respect to Holdings and its Subsidiaries, a report containing commentary, summaries and reports by management pertaining to the material aspects of:  same-store-sales, traffic and average ticket metrics, general and administrative headcount by function, Restaurant beginning and ending unit counts with reconciliations from units closed and refranchised in such period, changes to senior executive management, progress of cost savings and other strategic initiatives, in all respects in form and substance reasonably satisfactory to Administrative Agent.

**"Organizational Documents"** means (a) with respect to any corporation, its certificate or articles of incorporation or organization, as amended, its bylaws, as amended and any stockholders' or similar agreements, as amended; (b) with respect to any limited partnership, its certificate of limited partnership, as amended, and its partnership agreement, as amended; (c) with respect to any general partnership, its partnership agreement, as amended; and (d) with respect to any limited liability company, its articles of organization, as amended, and its operating agreement, as amended.  In the event any term or condition of this Agreement or any other Credit Document requires any Organizational Document to be certified by a secretary of state or similar governmental official, the reference to any such **"Organizational Document"** shall only be to a document of a type customarily certified by such governmental official.

**"Other Connection Taxes"** means, with respect to any Recipient, Taxes imposed as a result of a present or former connection between such Recipient and the jurisdiction imposing such Tax (other than connections arising from such Recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Credit Document, or sold or assigned an interest in any Loan or Credit Document).

**"Other Taxes"** means all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Credit Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment (other than an assignment made pursuant to <u>Section **Error! Reference source not found.**</u>).

**"Participant Register"** as defined in <u>Section 10.6(h)</u>.

**"Patriot Act"** means Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA Patriot Act of 2001).

"**PBGC**" means the Pension Benefit Guaranty Corporation or any successor thereto.

"**Pension Plan**" means any Employee Benefit Plan, other than a Multiemployer Plan, which is subject to Section 412 or 430 of the Internal Revenue Code or Title IV of ERISA.

"**Permitted Debt**" means the Indebtedness of the Credit Parties permitted pursuant to Section 6.1.

"**Permitted Fee Owned Property Sale**" means an Asset Sale with respect to fee owned Real Estate Assets of the Credit Parties; provided, that:

(a)      no Event of Default has occurred and is continuing at the time of consummation of such Asset Sale (or would be caused thereby);

(b)      the terms and conditions of such Asset Sale (i) shall be arms-length, including "as-is" or similar limited representations from the seller Credit Party, (ii) shall not impose any residual obligations on the seller Credit Party (contingent or otherwise) other than fundamental indemnification obligations, and (iii) shall be for at least the fair market value of the applicable property as determined in the good faith judgment of the seller Credit Party in light of the facts and circumstances at the time of such Asset Sale, including any land use or zoning restrictions and all matters of record as listed in the Title Policy for such Real Estate for Sale;

(c)      the purchaser in any such Asset Sale is not an Affiliate of any Credit Party;

(d)      the total consideration paid to the seller Credit Party in connection with such Asset Sale shall consist of 100% Cash or Cash Equivalents;

(e)      the Cash purchase price for such Real Estate Asset shall equal or exceed (I) 75.0% of the "Hilco BOV" set forth on Schedule 1.1(b) with respect to such Real Estate Asset or (II) 95.0% of the "Hilco BOV" set forth on Schedule 1.1(b) with respect to all such Real Estate Assets in the aggregate (other than any such Real Estate Asset that was sold pursuant to an Asset Sale with the consent of Agent under Section 6.9(i)),

(f)      the Net Asset Sale Proceeds of any such Asset Sale are applied by the Credit Parties in accordance with Section 2.13(a).

"**Permitted Lease Settlement Payments**" means, for any date or period of determination with respect to Holdings and its Subsidiaries, those Lease Settlement Payments which are either: (1) approved by the Administrative Agent, and/or (2) satisfy all of the following criteria:

(a)      no Event of Default shall have occurred or be continuing at the time of such Lease Settlement Payment (or would be caused thereby);

(b)      the amount of any such individual or series of related Lease Settlement Payments (other than Lease Settlement Payments with proceeds from Permitted Stock Issuances) made by the Credit Parties shall not exceed 25% of the future rent obligations for such Closed Restaurant through the applicable maturity of such lease (excluding unexercised extension options); and

(c)      after giving effect to such Lease Settlement Payment, Consolidated Liquidity shall not be less than $20,000,000.

"**Permitted Liens**" means each of the Liens permitted pursuant to <u>Section 6.2</u>.

"**Permitted Management Fees**" means payments to the Sponsor pursuant to the Management Agreement (a) in respect of indemnity obligations and reimbursement of reasonable fees and expenses payable thereunder, (b) [in respect of subsequent transaction fees described in [Section _] of the Management Agreement (as in effect on the Closing Date), which such subsequent transaction fees shall not exceed the amounts set forth in [Section _] of the Management Agreement (as in effect on the Closing Date)], and (c) (i) so long as no Event of Default shall have occurred and be continuing or would result therefrom and (ii) in respect of management, consulting, advisory or other fees in an aggregate amount not to exceed $500,000 in any Fiscal Year; <u>provided</u>, that such amounts described in this clause (c) may accrue but shall only be payable in cash after the date that (A) TTM EBITDA, as reported in a Compliance Certificate delivered to the Administrative Agent, is greater than or equal to $10,000,000 and (B) Consolidated Liquidity is greater than $12,500,000; <u>provided further</u>, that any such amounts described in this clause (c) that would have been permitted to be paid hereunder but for the occurrence and continuation of such Event of Default shall continue to accrue following the occurrence and during the continuation of such Event of Default and may, to the extent otherwise permitted to be paid hereunder, be paid to the Sponsor following the cure or waiver of such Event of Default.

"**Permitted Sale Leaseback Transactions**" means (a) any sale leaseback transaction consummated after the Closing Date for which all of the following conditions are satisfied: (i) no Default or Event of Default then exists (or would be caused thereby), (ii) the sale of the applicable Real Estate Asset constitutes a Permitted Fee Owned Property Sale, (iii) the ratio (expressed as a percentage) of the annual base GAAP rent under the applicable lease (inclusive of any percentage rent based on performance) to the purchase price paid with respect to the applicable Real Estate Asset is equal to or less than 8.50%, (iv) annual rent under the applicable lease does not exceed 7.50% of the applicable Restaurant's trailing twelve (12) Fiscal Months net sales, (v) the applicable lease is on arms' length market terms, (vi) there is no cross-default to any other lease of a Credit Party; or (b) otherwise under terms and conditions and pursuant to agreements reasonably satisfactory to the Administrative Agent.

"**Permitted Stock Issuances**" means the issuance of Capital Stock by Holdings following the Closing Date (a) pursuant to the Warrants or (b) in exchange for Cash, the proceeds of which are contributed to Ruby; <u>provided</u>, in any case under this <u>clause (b)</u>, any such issuance (A) has no mandatory redemption features; (B) has no requirements for payment of Cash dividends prior to the date that is six (6) months after the Maturity Date; (C) is not secured by assets of Holdings or its Subsidiaries; (D) is not convertible or exchangeable into any Indebtedness of Holdings or its Subsidiaries; (E) no Event of Default shall have occurred or be continuing at the time of such issuance (or be caused thereby); (F) does not result in a Change of Control; and (G) is not issued in connection with an initial public offering.

"**Permitted Tax Distributions**" means [•].[5]

"**Person**" means and includes natural persons, corporations, limited partnerships, general partnerships, limited liability companies, limited liability partnerships, joint stock companies, Joint Ventures, associations, companies, trusts, banks, trust companies, land trusts, business trusts or other organizations, whether or not legal entities, and Governmental Authorities.

"**Personal Information**" means any information relating to an identified or identifiable individual, to the extent regulated under laws applicable to the Credit Parties and their Subsidiaries, including name; postal address; email address or other online contact information (such as an online user

---

[5] **NTD** – subject to confirmation of structure.

ID); telephone number; date of birth; social security number (or its equivalent); driver's license number (or other government-issued identification number); employee identification number; electronic signature; account information (including financial account information); payment card data (including primary account number, expiration date, service code, magnetic stripe data or equivalent on a chip, CAV2/CVC2/CVV2/CID and PIN number); place of birth; education or academic record; resume or other job applicant information; access code, password, security question and answer; shared secret or security token used for authentication; credit report information; birth or marriage certificate; medical information; health insurance information; biometric data; regardless of the media in which it is contained.  For the avoidance of doubt, as used in this Agreement, the term "Personal Information" shall not include anonymous, aggregated or de-identified information.

"**Petition Date**" as defined in the Recitals hereto.

"**Phase I Report**" means, with respect to any Facility, a report that (a) conforms to the ASTM Standard Practice for Environmental Site Assessments: Phase I Environmental Site Assessment Process, E-1527; (b) was conducted no more than twelve (12) months prior to the date such report is required to be delivered hereunder, by one or more environmental consulting firms reasonably satisfactory to Administrative Agent; (c) includes a visual assessment of asbestos containing materials at such Facility; (d) is accompanied by (i) an estimate of the reasonable worst-case cost of investigating and remediating any Hazardous Materials Activity identified in the Phase I Report as giving rise to an actual or potential material violation of any Environmental Law or as presenting a material risk of giving rise to a material Environmental Claim and (ii) a current compliance review setting forth an assessment of such Facility's current compliance with Environmental Laws and an estimate of the cost of rectifying any non-compliance with current Environmental Laws identified therein.

"**PIK Interest**" as defined in <u>Section 2.7(f)</u>.

"**PIK Interest Election**" as defined in <u>Section 2.7(f)</u>.

"**Pledge and Security Agreement**" means that certain Pledge and Security Agreement, dated as of the Closing Date, by and among the Credit Parties and Collateral Agent, as amended, restated, supplemented or otherwise modified from time to time.

"**Pre-Petition Credit Agreement**" means that certain Credit and Guaranty Agreement, dated as of December 21, 2017 (as amended, modified or supplemented from time to time prior to the Petition Date) among Borrowers, Guarantors, the lenders party thereto (collectively, the "**Pre-Petition Lenders**"), GS Bank, as Issuing Bank (as defined therein) and Goldman Sachs Specialty Lending Group, L.P., as administrative agent and collateral agent (in such capacities, the "**Pre-Petition Agent**"), pursuant to which Borrowers and Guarantors executed and delivered various Credit Documents, as defined therein (collectively with the Pre-Petition Credit Agreement, the "**Pre-Petition Credit Documents**").

"**Prime Rate**" means the rate of interest quoted in *The Wall Street Journal*, "Money Rates" section as the prime rate (currently defined as the base rate on corporate loans posted by at least 70% of the ten (10) largest United States banks), as in effect from time to time.  The Prime Rate is a reference rate and does not necessarily represent the lowest or best rate actually charged to any customer. Any Agent or Lender may make commercial loans or other loans at rates of interest at, above or below the Prime Rate.

"**Principal Office**" means, for each of Administrative Agent and Issuing Bank, such Person's "Principal Office" as set forth on <u>Appendix B</u>, or such other office as such Person may from time to time designate in writing to Borrower Representative, Administrative Agent and each Lender;

<u>provided</u>, <u>however</u>, for the purpose of making any payment on the Obligations or any other amount due hereunder or any other Credit Document, the Principal Office of Administrative Agent shall be 200 West Street, New York, New York  10282 (or such other location within the City and State of New York as Administrative Agent may from time to time designate in writing to Borrower Representative and each Lender).

**"Pro Rata Share"** means (a) with respect to all payments, computations and other matters relating to the Term Loan of any Lender, the percentage obtained by <u>dividing</u> (i) the Term Loan Exposure of such Lender, <u>by</u> (ii) the aggregate Term Loan Exposure of all Lenders; and (b) with respect to all payments, computations and other matters relating to the Letter of Credit Loan Commitment or Letter of Credit Loans of any Lender, the percentage obtained by <u>dividing</u> (i) the Letter of Credit Loan Exposure of such Lender, <u>by</u> (ii) the aggregate Letter of Credit Loan Exposure of all Lenders.  For all other purposes with respect to each Lender, **"Pro Rata Share"** means the percentage obtained by <u>dividing</u> (x) an amount equal to the sum of the Term Loan Exposure and the Letter of Credit Loan Exposure of such Lender, <u>by</u> (y) an amount equal to the sum of the aggregate Term Loan Exposure and the aggregate Letter of Credit Loan Exposure of all Lenders.

"**Projections**" as defined in <u>Section 4.8</u>.

**"Real Estate Asset"** means, at any time of determination, any interest (fee, leasehold, license or otherwise) then owned or otherwise held by any Credit Party in any real property.

**"Recipient"** means (a) any Agent, (b) any Lender, or (c) any Issuing Bank, as applicable.

**"Register"** as defined in <u>Section 2.6(b)</u>.

**"Reimbursement Date"** as defined in <u>Section 2.3(d)</u>.

**"Related Fund"** means, with respect to any Lender that is an investment fund, (a) any other investment fund that invests in commercial loans and that is managed or advised by the same investment advisor as such Lender or by an Affiliate of such investment advisor and (b) any finance company, insurance company or other financial institution which temporarily warehouses loans for any Lender or any Person described in <u>clause (a)</u> of this definition.

**"Release"** means any release, spill, emission, leaking, pumping, pouring, injection, escaping, deposit, disposal, discharge, dispersal, dumping, leaching or migration of any Hazardous Material into the indoor or outdoor environment (including the abandonment or disposal of any barrels, containers or other closed receptacles containing any Hazardous Material), including the movement of any Hazardous Material through the air, soil, surface water or groundwater.

**"Replacement Lender"** as defined in <u>Section 2.22</u>.

**"Requisite Lenders"** means one or more Lenders having or holding Term Loan Exposure and/or Letter of Credit Loan Exposure and representing more than 50% of the sum of (a) the aggregate Term Loan Exposure of all Lenders and (b) the aggregate Letter of Credit Loan Exposure of all Lenders.

"**Restaurant**" means a Ruby Tuesday restaurant owned and operated by a Credit Party.

**"Restricted Junior Payments"** means (a) any direct or indirect dividend or other distribution on account of any Capital Stock of any Credit Party; (b) any direct or indirect redemption,

retirement, sinking fund or similar payment, purchase or other acquisition of any shares of Capital Stock of any Credit Party; (c) any payment made to retire or obtain surrender of any outstanding warrants, options or other rights to acquire shares of any Credit Party; (d) management, consulting or similar fees paid or payable to Sponsor or its Affiliates; and (e) any payment or prepayment of principal, premium, interest, fee, or redemption, repurchase, retirement, defeasance, sinking fund or similar payment with respect to Subordinated Indebtedness.

"**RSA**" as defined in the Recitals hereto.

"**Ruby**" as defined in the Preamble hereto.

"**S&P**" means Standard & Poor's Ratings Group, a division of The McGraw Hill Corporation, and any successor thereto.

"**Sanctioned Country**" means, at any time, a country, territory or region that is, or whose government is, the subject or target of any Sanctions.

"**Sanctioned Person**" means, at any time, any Person with whom dealings are restricted or prohibited under Sanctions, including (a) any Person listed in any Sanctions-related list of designated Persons maintained by the United States (including by OFAC, the United States Department of the Treasury, or the United States Department of State), or by the United Nations Security Council, the European Union or any EU member state, Her Majesty's Treasury of the United Kingdom or any other relevant sanctions authority; (b) any Person located, operating, organized or resident in a Sanctioned Country; or (c) any Person owned or controlled, directly or indirectly, by any such Person described in clause (a) or (b) of this definition.

"**Sanctions**" means sanctions or trade embargoes enacted, imposed, administered or enforced from time to time by (a) the United States government, including those administered by the United States Department of the Treasury's Office of Foreign Assets Control (OFAC), United States Department of State, or United States Department of Commerce; (b) the United Nations Security Council, the European Union or any of its member states, Her Majesty's Treasury of the United Kingdom; (c) Canada (or any provincial government); or (d) any other relevant sanctions authority.

"**Secured Parties**" means each Agent, Lender and Issuing Bank and shall include, all former Agents, Lenders and Issuing Banks to the extent that any Obligations owing to such Persons were incurred while such Persons were Agents, Lenders or Issuing Banks and such Obligations have not been indefeasibly paid or satisfied in full in Cash.

"**Securities**" means any stock, shares, partnership interests, voting trust certificates, certificates of interest or participation in any profit sharing agreement or arrangement, options, warrants, bonds, debentures, notes, or other evidences of indebtedness, secured or unsecured, convertible, subordinated or otherwise, or in general any instruments commonly known as "securities" or any certificates of interest, shares or participations in temporary or interim certificates for the purchase or acquisition of, or any right to subscribe to, purchase or acquire, any of the foregoing.

"**Securities Act**" means the Securities Act of 1933, as amended from time to time, and any successor statute.

"**Severance Costs**" means, for any period of determination with respect to Holdings and its Subsidiaries on a consolidated basis, non-recurring expenses paid to former or future employees

(excluding Restaurant-level employees) in accordance with any such employee's applicable employment agreement or any board approved severance plan.

"**SLB Operating Lease Obligations**" means any Indebtedness incurred by the Credit Parties arising out of a sale-leaseback transaction consummated prior to the Petition Date that was subsequently re-characterized from an operating lease to a Capital Lease in accordance with GAAP prior to the Petition Date.

"**SFI**" means Strategic Financial Intermediation II LLC, a Delaware limited liability company.

"**Solvency Certificate**" means a certificate of the chief financial officer of Borrower Representative (or other senior executive officer of Borrower Representative or Ruby who has financial expertise and is familiar with the terms and conditions of this Agreement and the financial statements and financial condition of Holdings and its Subsidiaries) substantially in the form of Exhibit G-2.

"**Solvent**" when used with respect to any Credit Party, means at any time and as of such date of determination, both (i) (A) the sum of such Credit Party's debt (including contingent liabilities) does not exceed the present fair saleable value of such Credit Party's present assets; (B) such Credit Party's capital is not unreasonably small in relation to its business as contemplated on the Closing Date and reflected in the Projections or with respect to any transaction contemplated or undertaken after the Closing Date; and (C) such Person has not incurred and does not intend to incur, or believe (nor should it reasonably believe) that it will incur, debts beyond its ability to pay such debts as they become due (whether at maturity or otherwise); and (ii) such Person is "solvent" within the meaning given that term and similar terms under applicable laws relating to fraudulent transfers and conveyances. For purposes of this definition, the amount of any contingent liability at any time shall be computed as the amount that, in light of all of the facts and circumstances existing at such time, represents the amount that can reasonably be expected to become an actual or matured liability (irrespective of whether such contingent liabilities meet the criteria for accrual under Statement of Financial Accounting Standard No. 5).

"**Sponsor**" means the TCW Direct Lending Group and affiliated funds managed by the TCW Direct Lending Group.

"**Subordinated Indebtedness**" means any Indebtedness or other obligations of Holdings or any of its Subsidiaries which is subordinated to the Obligations as to right and time of payment and as to other rights and remedies thereunder and having such other terms as are, in each case, satisfactory to Administrative Agent.

"**Subsidiary**" means, with respect to any Person, any corporation, partnership, limited liability company, association, joint venture or other business entity of which more than 50% of the total voting power of shares of Capital Stock entitled (without regard to the occurrence of any contingency) to vote in the election of the Person or Persons (whether directors, managers, trustees or other Persons performing similar functions) having the power to direct or cause the direction of the management and policies thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof; provided, in determining the percentage of ownership interests of any Person controlled by another Person, no ownership interest in the nature of a "qualifying share" of the former Person shall be deemed to be outstanding.

"**Taxes**" means all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"**TCW**" means, individually and collectively, TCW Direct Lending LLC, a Delaware limited liability company, TCW Skyline Lending, L.P., a Delaware limited partnership, and TCW Brazos Fund LLC, a Delaware limited liability company.

"**Term Loan**" means a term loan made by a Lender to Borrowers pursuant to Section 2.1(a).

"**Term Loan Commitment**" means the commitment of a Lender to make or otherwise fund Term Loans (the "**Term Loan Commitment**").  "**Term Loan Commitments**" means such commitments of all Lenders in the aggregate.  The amount of each Lender's Term Loan Commitment is set forth on Appendix A or in the applicable Assignment Agreement, subject to any adjustment or reduction pursuant to the terms and conditions hereof.  The aggregate amount of the Term Loan Commitments as of the Closing Date is $[_____]⁶.

"**Term Loan Exposure**" means, with respect to any Lender, as of any date of determination, the outstanding principal amount of the Term Loans of such Lender; provided, at any time prior to the making of the Term Loans, the Term Loan Exposure of any Lender shall be equal to such Lender's Term Loan Commitment.

 "**Term Loan Note**" means a promissory note evidencing a Term Loan Commitment and/or Term Loans in the form of Exhibit B, as amended, restated, supplemented or otherwise modified from time to time.

"**Terminated Lender**" as defined in Section 2.21.

"**Title Policy**" as defined in definition of "Mortgage Deliverables".

"**Trade Announcements**" as defined in Section 10.17.

"**Transaction**" means, collectively, (a) the funding of the Loans on the Closing Date, (b) the transactions contemplated by the Bankruptcy Plan and the Confirmation Order, (c) the Equity Transaction and (d) the payment of the fees and expenses incurred in connection with any of the foregoing.

"**Transaction Costs**" means the aggregate amount of fees, costs and expenses paid or payable by the Credit Parties in connection with Transaction or incidental thereto, including in connection with the Credit Documents and the Warrants, in each case, which are approved by Administrative Agent.

"**TTM EBITDA**" means, as of any date of determination, Consolidated Adjusted EBITDA of Borrowers determined on a consolidated basis in accordance with GAAP, for the 12-month period most recently ended.

"**Type of Loan**" means a Base Rate Loan or a LIBOR Rate Loan.

"**UCC**" means the Uniform Commercial Code as in effect from time to time in the State of New York or, when the context implies, the Uniform Commercial Code as in effect from time to time in any other applicable jurisdiction.

"**United States**" means the United States of America.

---

⁶ **NTD** – see footnote 2.

"**Unrestricted Cash**" means, with respect to any Credit Party as of any date of determination, (a) the Cash and Cash Equivalents on hand of such Credit Party, minus (b) the sum of (i) (ii) any Cash deposited into escrow or set aside as a reserve in connection with any transaction permitted hereunder, and any amounts held by the issuer of a bond or third party letter of credit, in any case, to the extent permitted hereunder, to Cash collateralize the obligations of a Credit Party with respect to such bond or letter of credit, in any case, to the extent such cash collateralization is required hereunder, and (iii) any other Cash or Cash Equivalents of such Credit Party that have been pledged to a third party (other than the Secured Parties).

"**U.S. Person**" means any Person that is a "United States person" as defined in Section 7701(a)(30) of the Internal Revenue Code.

"**U.S. Tax Compliance Certificate**" has the meaning specified in Section 2.19(f).

"**Variance Report Date**" means, for each week (ending on Tuesday), the date which is on or before the second Business Day of such week (Thursday or the following Business Day if such Thursday is not a Business Day).

"**Warrants**" means that certain Warrant dated [___], 2021, and issued by [RT Asset Company Holdings LLC] in favor of [TCW].

"**Wicomico County Subsidiaries**" means each of RT of Fruitland, Inc., a Maryland corporation, and Ruby Tuesday of Salisbury, Inc., a Maryland corporation.

"**Withholding Agent**" means the Borrower and the Administrative Agent.

1.2.    **Accounting Terms**.  Except as otherwise expressly provided herein, all accounting terms not otherwise defined herein shall have the meanings assigned to them in conformity with GAAP. Financial statements and other information required to be delivered by Borrower Representative to Administrative Agent and the Lenders pursuant to Sections 5.1(a), 5.1(b), and 5.1(c) shall be prepared in accordance with GAAP as in effect at the time of such preparation (and delivered together with the reconciliation statements provided for in Section 5.1(e), if applicable).

1.3.    **Interpretation, etc**.  Any of the terms defined herein may, unless the context otherwise requires, be used in the singular or the plural, depending on the reference.  References herein to the "Preamble" or any "Recital," "Section," "Appendix," "Schedule" or "Exhibit" shall be to the preamble or a recital, a section, an appendix, a schedule or an exhibit, as the case may be, hereof unless otherwise specifically provided.  The use herein of the word "include" or "including," when following any general statement, term or matter, shall not be construed to limit such statement, term or matter to the specific items or matters set forth immediately following such word or to similar items or matters, whether or not no limiting language (such as "without limitation" or "but not limited to" or words of similar import) is used with reference thereto, but rather shall be deemed to refer to all other items or matters that fall within the broadest possible scope of such general statement, term or matter.  Any reference to any law, statute, rule or regulation of any Governmental Authority shall be deemed to refer to such law, statute, rule or regulation, as amended, renewed, extended or replaced from time to time.

1.4.    **Divisions**.  For all purposes under the Credit Documents, in connection with any division or plan of division under Delaware law (or any comparable event under a different jurisdiction's laws): (a) if any asset, right, obligation or liability of any Person becomes the asset, right, obligation or liability of a different Person, then it shall be deemed to have been transferred from the original Person to the

subsequent Person, and (b) if any new Person comes into existence, such new Person shall be deemed to have been organized on the first date of its existence by the holders of its equity interests at such time.

## SECTION 2.    LOANS AND LETTERS OF CREDIT

### 2.1.    Term Loans.

(a)    <u>Term Loan Commitments</u>.  Subject to the terms and conditions hereof and for the limited purposes set forth herein, each Lender severally agrees to make, on the Closing Date, a Term Loan to Borrowers in an aggregate amount equal to such Lender's Term Loan Commitment.  Borrowers may only make one borrowing under the Term Loan Commitments which shall be on the Closing Date.  Any amount borrowed under this <u>Section 2.1(a)</u> and subsequently repaid or prepaid may not be re-borrowed.  Subject to <u>Sections 2.11(a)</u>, <u>2.12</u> and <u>2.13</u> all amounts owed under this <u>Section 2.1(a)</u> with respect to the Term Loans shall be paid in full in Cash no later than the Maturity Date.  Each Lender's Term Loan Commitment shall terminate immediately and without further action by any Person on the Closing Date after giving effect to the funding of such Lender's Term Loan Commitment on such date.

(b)    <u>Borrowing Mechanics for Term Loans</u>.

(i)    Borrower Representative shall deliver to Administrative Agent a fully-executed Funding Notice no later than three (3) Business Days prior to the Closing Date (or such shorter period agreed by the Administrative Agent).  Promptly upon receipt by Administrative Agent of such Funding Notice, Administrative Agent shall notify each Lender of the proposed borrowing.

(ii)    Each Lender shall make its Term Loan available to Administrative Agent not later than 12:00 p.m. (New York City time) on the Closing Date, by wire transfer of same day funds in Dollars, at Administrative Agent's Principal Office.  Upon satisfaction or waiver of the conditions precedent specified herein, Administrative Agent shall make the proceeds of the Term Loans available to Borrowers on the Closing Date by causing an amount of same day funds in Dollars equal to the proceeds of all such Loans received by Administrative Agent from Lenders to be credited to the account of Borrower Representative at Administrative Agent's Principal Office or to such other account as may be designated in writing to Administrative Agent by Borrower Representative.

### 2.2.    Letter of Credit Loans.  Letter of Credit Loans in an amount not to exceed $[9,600,000] at any time outstanding shall be funded to the Issuing Bank to purchase participations in Letters of Credit solely in the manner and at the times set forth in <u>Section 2.3</u>.  Letter of Credit Loans may be repaid and re-advanced in accordance with the terms hereof prior to the Maturity Date to support unreimbursed draws of Letters of Credit.  The Letter of Credit Loan Commitments shall expire automatically on the Maturity Date and may be reduced, from time to time, in accordance with <u>Section 2.12(b)</u>.

### 2.3.    Letters of Credit and Purchase of Participations Therein.

(a)    <u>Existing Letters of Credit</u>.  Subject to the terms and conditions hereof, any Existing Letters of Credit shall be deemed to be issued by Issuing Bank under the terms of this Agreement and shall no longer constitute obligations under the DIP Credit Documents.

(b)    <u>New Letters of Credit and Notice of Issuance</u>.

(i)    Subject to the terms and conditions hereof, Issuing Bank agrees to issue Letters of Credit for the account of Borrowers in an aggregate amount not to exceed the Letter of Credit Loan Commitment; <u>provided</u> (i) each Letter of Credit shall be denominated in Dollars; (ii) the stated

amount of each Letter of Credit shall not be less than $5,000; (iii) after giving effect to such issuance, in no event shall the Letter of Credit Usage exceed the Letter of Credit Loan Commitment; (iv) in no event shall more than ten (10) Letters of Credit be outstanding hereunder at any time; and (v) in no event shall any Letter of Credit have an expiration date later than the earlier of (A) five (5) Business Days prior to the Maturity Date, and (B) the date which is one (1) year from the date of issuance of such Letter of Credit; provided, that any Letter of Credit with a term not exceeding one (1) year may provide for its renewal for additional periods not exceeding one (1) year as long as (I) each of Borrower Representative and Issuing Bank have the option to prevent such renewal before the expiration of such term or any such period and (II) neither Issuing Bank nor any Borrower shall permit any such renewal to extend such expiration date beyond any date set forth in this clause (v); provided, further, Issuing Bank, with the consent of Collateral Agent, in their sole discretion, may agree to extend such Letter of Credit beyond such date upon Borrower Representative either (x) Cash collateralizing such Letter of Credit in full or (y) backstopping such Letter of Credit, in each case, to the satisfaction of Issuing Bank and Collateral Agent; provided, further, that Issuing Bank shall not extend any such Letter of Credit if it has received written notice that an Event of Default has occurred and is continuing at the time Issuing Bank must elect to allow such extension; provided, further, in the event a Funding Default exists, Issuing Bank shall not be required to issue any Letter of Credit unless Issuing Bank has entered into arrangements satisfactory to it to eliminate Issuing Bank's risk with respect to the participation in Letters of Credit of the Defaulting Lender, including (1) such Defaulting Lender has been replaced in accordance with Section 2.22 or Section 10.6 and (2) such Defaulting Lender's Pro Rata Share of the Letter of Credit Usage has been fully Cash collateralized.  For the avoidance of doubt and subject, in any case, to the terms and conditions hereof, Borrowers may obtain Letters of Credit to replace Letters of Credit that have expired, that have been cancelled or that have been drawn upon and reimbursed in accordance with the terms hereof.

(ii)    Whenever Borrowers desire the issuance of a Letter of Credit, Borrower Representative shall deliver to Administrative Agent an Issuance Notice no later than 12:00 p.m. (New York City time) at least three (3) Business Days or such shorter period as may be agreed to by Issuing Bank in any particular instance, in advance of the proposed date of issuance.  Upon satisfaction or waiver of the conditions set forth in Section 3.2, Issuing Bank shall issue the requested Letter of Credit only in accordance with Issuing Bank's standard operating procedures and otherwise in form and substance reasonably satisfactory to Issuing Bank; provided, that for purposes of clarity, notwithstanding anything in this Agreement to the contrary, Issuing Bank shall not be under any obligation to issue any Letter of Credit if the issuance of such Letter of Credit would violate or otherwise contravene any policy or policies of the Issuing Bank applicable to Letters of Credit or letters of credit, generally.  Upon the issuance of any Letter of Credit or amendment or modification to a Letter of Credit, Issuing Bank shall promptly notify each Lender of such issuance, which notice shall be accompanied by a copy of such Letter of Credit or amendment or modification to a Letter of Credit and the amount of such Lender's respective participation in such Letter of Credit pursuant to Section (e). Following the delivery of a copy of any Letter of Credit (or amendment or modification) to Lenders in accordance with the immediately preceding sentence, upon the request of Borrower Representative, the Issuing Bank will also deliver a copy of such Letter of Credit (or amendment or modification) to Borrower Representative.

(c)    Responsibility of Issuing Bank With Respect to Requests for Drawings and Payments.  In determining whether to honor any drawing under any Letter of Credit by the beneficiary thereof, Issuing Bank shall be responsible only to examine the documents delivered under such Letter of Credit with reasonable care so as to ascertain whether they appear on their face to be in accordance with the terms and conditions of such Letter of Credit.  As between any Credit Party and Issuing Bank, the Credit Parties assume all risks of the acts and omissions of, or misuse of the Letters of Credit issued by Issuing Bank, by the respective beneficiaries of such Letters of Credit.  In furtherance and not in limitation of the foregoing, Issuing Bank shall not be responsible for:  (i) the form, validity, sufficiency, accuracy, genuineness or legal effect of any document submitted by any party in connection with the

application for and issuance of any such Letter of Credit, even if it should in fact prove to be in any or all respects invalid, insufficient, inaccurate, fraudulent or forged; (ii) the validity or sufficiency of any instrument transferring or assigning or purporting to transfer or assign any such Letter of Credit or the rights or benefits thereunder or proceeds thereof, in whole or in part, which may prove to be invalid or ineffective for any reason; (iii) failure of the beneficiary of any such Letter of Credit to comply fully with any conditions required in order to draw upon such Letter of Credit; (iv) errors, omissions, interruptions or delays in transmission or delivery of any messages, by mail, cable, telegraph, telex or otherwise, whether or not they be in cipher; (v) errors in interpretation of technical terms; (vi) any loss or delay in the transmission or otherwise of any document required in order to make a drawing under any such Letter of Credit or of the proceeds thereof; (vii) the misapplication by the beneficiary of any such Letter of Credit of the proceeds of any drawing under such Letter of Credit; or (viii) any consequences arising from causes beyond the control of Issuing Bank, including any Governmental Acts; none of the above shall affect or impair, or prevent the vesting of, any of Issuing Bank's rights or powers hereunder.  Without limiting the foregoing and in furtherance thereof, any action taken or omitted by Issuing Bank under or in connection with the Letters of Credit or any documents and certificates delivered thereunder, if taken or omitted in good faith, shall not give rise to any liability on the part of Issuing Bank to any Credit Party. Notwithstanding anything to the contrary contained in this Section 2.3(c), the Credit Parties shall retain any and all rights it may have against Issuing Bank for any liability arising solely out of the bad faith, gross negligence, or willful misconduct of Issuing Bank, as determined by a court of competent jurisdiction in a final, non-appealable order.

(d)     Reimbursement by Borrowers of Amounts Drawn or Paid Under Letters of Credit.  In the event Issuing Bank has determined to honor a drawing under a Letter of Credit, it shall immediately notify Borrower Representative and Administrative Agent, and Borrowers shall reimburse Issuing Bank on or before the Business Day immediately following the date on which such drawing is honored (the **"Reimbursement Date"**) in an amount in Dollars and in same day funds equal to the amount of such honored drawing; provided, anything contained herein to the contrary notwithstanding, (i) unless Borrower Representative shall have notified Administrative Agent and Issuing Bank prior to 10:00 a.m. (New York City time) on the date such drawing is honored that Borrowers intend to reimburse Issuing Bank for the amount of such honored drawing with funds other than the proceeds of Letter of Credit Loans, Borrowers shall be deemed to have given a timely Funding Notice to Administrative Agent requesting Lenders to make Letter of Credit Loans that are Base Rate Loans on the Reimbursement Date in an amount in Dollars equal to the amount of such honored drawing, and (ii) Lenders shall, on the Reimbursement Date, make Letter of Credit Loans that are Base Rate Loans in the amount of such honored drawing, the proceeds of which shall be applied directly by Administrative Agent to reimburse Issuing Bank for the amount of such honored drawing; provided, further, if for any reason proceeds of Letter of Credit Loans are not received by Issuing Bank on the Reimbursement Date in an amount equal to the amount of such honored drawing, Borrowers shall reimburse Issuing Bank, on demand, in an amount in same day funds equal to the excess of the amount of such honored drawing over the aggregate amount of such Letter of Credit Loans, if any, which are so received.  Nothing in this Section 2.3(d) shall be deemed to relieve any Lender from its obligation to make Letter of Credit Loans on the terms and conditions set forth herein, and Administrative Agent and Borrowers shall retain any and all rights Borrowers may have against any Lender resulting from the failure of such Lender to make such Letter of Credit Loans under this Section 2.3(d).

(e)     Lenders' Purchase of Participations in Letters of Credit.  Immediately upon the issuance or deemed issuance of each Letter of Credit, each Lender having a Letter of Credit Loan Commitment shall be deemed to have purchased, and hereby agrees to irrevocably purchase, from Issuing Bank a participation in each Letter of Credit and any drawings honored thereunder in an amount equal to such Lender's Pro Rata Share (with respect to the Letter of Credit Loan Commitments) of the maximum amount which is or at any time may become available to be drawn thereunder.  In the event that

Borrowers shall fail for any reason to reimburse Issuing Bank as provided in <u>Section 2.3(d)</u>, Issuing Bank shall promptly notify each Lender having a Letter of Credit Loan Commitment of the unreimbursed amount of such honored drawing and a Letter of Credit Loan will automatically be deemed requested by the Credit Parties, and shall be made by each Lender, based on such Lender's Pro Rata Share of the Letter of Credit Loan Commitments. Each Lender shall thereafter make available to Issuing Bank an amount equal to its respective Letter of Credit Loan, in Dollars and in same day funds, at the office of Issuing Bank specified in such notice, not later than 12:00 p.m. (New York City time) on the first business day (under the laws of the jurisdiction in which such office of Issuing Bank is located) after the date notified by Issuing Bank. In the event that any Lender fails to make available to Issuing Bank on such business day the amount of such Lender's Letter of Credit Loan as provided in this <u>Section 2.3(e)</u>, Issuing Bank shall be entitled to recover such amount on demand from such Lender together with interest thereon for three (3) Business Days at the rate customarily used by Issuing Bank for the correction of errors among banks and thereafter at the Base Rate. Nothing in this <u>Section 2.3(e)</u> shall be deemed to prejudice the right of any Lender having a Letter of Credit Loan Commitment to recover from Issuing Bank any amounts made available by such Lender to Issuing Bank pursuant to this <u>Section 2.3</u> in the event that it is determined that the payment with respect to a Letter of Credit in respect of which payment was made by such Lender constituted bad faith, gross negligence or willful misconduct on the part of Issuing Bank, as determined by a court of competent jurisdiction in a final, non-appealable order. In the event Issuing Bank shall have been reimbursed by other Lenders pursuant to this <u>Section 2.3(e)</u> for all or any portion of any drawing honored by Issuing Bank under a Letter of Credit, such Issuing Bank shall distribute to each Lender having a Letter of Credit Loan Commitment which has paid all amounts payable by it under this <u>Section 2.3(e)</u> with respect to such honored drawing such Lender's Pro Rata Share of all payments subsequently received by Issuing Bank from Borrowers in reimbursement of such honored drawing when such payments are received. Any such distribution shall be made to a Lender at its primary address set forth below its name on <u>Appendix B</u> or at such other address as such Lender may request.

(f)      <u>Obligations Absolute</u>. The obligation of Borrowers to reimburse Issuing Bank for drawings honored under the Letters of Credit issued by it and to repay any Letter of Credit Loans made by Lenders pursuant to <u>Section 2.3(d)</u> and the obligations of Lenders under <u>Section 2.3(e)</u> shall be unconditional and irrevocable and shall be paid strictly in accordance with the terms hereof under all circumstances including any of the following circumstances: (i) any lack of validity or enforceability of any Letter of Credit; (ii) the existence of any claim, set off, defense or other right which any Credit Party or any Lender may have at any time against a beneficiary or any transferee of any Letter of Credit (or any Persons for whom any such transferee may be acting), Issuing Bank, Lender or any other Person or, in the case of a Lender, against a Credit Party, whether in connection herewith, the transactions contemplated herein or any unrelated transaction (including any underlying transaction between any Credit Party or one of its Subsidiaries and the beneficiary for which any Letter of Credit was procured); (iii) any draft or other document presented under any Letter of Credit proving to be forged, fraudulent, invalid or insufficient in any respect or any statement therein being untrue or inaccurate in any respect; (iv) payment by Issuing Bank under any Letter of Credit against presentation of a draft or other document which does not substantially comply with the terms of such Letter of Credit; (v) any adverse change in the business, operations, properties, assets, condition (financial or otherwise) or prospects of Holdings or any of its Subsidiaries; (vi) any breach hereof or any other Credit Document by any party thereto; (vii) any other circumstance or happening whatsoever, whether or not similar to any of the foregoing; or (viii) the fact that a Default or an Event of Default shall have occurred and be continuing; <u>provided</u>, in each case, that payment by Issuing Bank under the applicable Letter of Credit shall not have constituted bad faith, gross negligence or willful misconduct of Issuing Bank under the circumstances in question, as determined by a court of competent jurisdiction in a final, non-appealable order.

(g)      <u>Indemnification</u>. Without duplication of any obligation of any Credit Party under <u>Section 10.2</u> or <u>10.3</u>, in addition to amounts payable as provided herein, each Credit Party hereby agrees

to protect, indemnify, pay and save harmless Issuing Bank from and against any and all claims, demands, liabilities, damages, losses, costs, charges and expenses (including reasonable fees, expenses and disbursements of counsel and allocated costs of internal counsel) which Issuing Bank may incur or be subject to as a consequence, direct or indirect, of (i) the issuance of any Letter of Credit by Issuing Bank, other than as a result of (A) the bad faith, gross negligence or willful misconduct of Issuing Bank, as determined by a court of competent jurisdiction in a final, non-appealable order, or (B) the wrongful dishonor by Issuing Bank of a proper demand for payment made under any Letter of Credit issued by it, or (ii) the failure of Issuing Bank to honor a drawing under any such Letter of Credit as a result of any Governmental Act.

**2.4.      Pro Rata Shares; Availability of Funds.**

(a)      <u>Pro Rata Shares</u>.  All Loans shall be made, and all participations required to be purchased, by the Lenders simultaneously and proportionately to their respective Pro Rata Shares, it being understood that no Lender shall be responsible for any default by any other Lender in such other Lender's obligation to make a Loan requested hereunder or purchase a participation required hereby nor shall any Commitment of any Lender be increased or decreased as a result of a default by any other Lender in such other Lender's obligation to make a Loan requested hereunder or purchase a participation required hereby other than as set forth in <u>Section 2.24</u>.

(b)      <u>Availability of Funds</u>.  Unless Administrative Agent shall have been notified by any Lender prior to the applicable Credit Date that such Lender does not intend to make available to Administrative Agent the amount of such Lender's Loan requested on such Credit Date, Administrative Agent may assume that such Lender has made such amount available to Administrative Agent on such Credit Date and Administrative Agent may, in its sole discretion, but shall not be obligated to, make available to or on behalf of Borrowers a corresponding amount on such Credit Date.  If such corresponding amount is not in fact made available to Administrative Agent by such Lender, Administrative Agent shall be entitled to recover such corresponding amount on demand from such Lender together with interest thereon, for each day from such Credit Date until the date such amount is paid to Administrative Agent, at the customary rate set by Administrative Agent for the correction of errors among banks for three (3) Business Days and thereafter at the Base Rate.  If such Lender does not pay such corresponding amount forthwith upon Administrative Agent's demand therefor, Administrative Agent shall promptly notify Borrower Representative and Borrowers shall immediately pay such corresponding amount to Administrative Agent together with interest thereon, for each day from such Credit Date until the date such amount is paid to Administrative Agent, at the rate payable hereunder for Base Rate Loans.  Nothing in this <u>Section 2.4(b)</u> shall be deemed to relieve any Lender from its obligation to fulfill its Commitments hereunder or to prejudice any rights that Borrowers may have against any Lender as a result of any default by such Lender hereunder.

**2.5.      Use of Proceeds.**

(a)      The proceeds of the Term Loan made on the Closing Date shall be used and applied (a) to fund cash to the balance sheet of the Borrower, (b) to repay obligations and other indebtedness outstanding under the Pre-Petition Credit Agreement and the other Pre-Petition Credit Documents, (c) to pay fees, costs, and expenses in connection with the Transaction in accordance with this Agreement and the Bankruptcy Plan, and (d) for general corporate purposes of the Credit Parties.

(b)      No portion of the proceeds of any Credit Extension shall be used in any manner that causes or might cause such Credit Extension or the application of such proceeds to violate Regulation T, Regulation U or Regulation X of the Board of Governors of the Federal Reserve System, as in effect from time to time, or any other regulation thereof or to violate the Exchange Act.

**2.6.    Evidence of Debt; Register; Notes.**

(a)    <u>Evidence of Debt</u>.  Each Lender shall maintain on its internal records an account or accounts evidencing the Obligations of Borrowers to such Lender, including the amounts of the Loans made by it and each repayment and prepayment in respect thereof.  Any such recordation shall be conclusive and binding on Borrowers, absent manifest error; <u>provided</u>, that such Lender's failure to make any such recordation, or any error in such recordation, shall not affect any Lender's Commitments or Borrowers Obligations in respect of any applicable Loans; <u>provided</u>, <u>further</u>, in the event of any inconsistency between the Register and any Lender's records, the recordations in the Register shall govern.

(b)    <u>Register</u>.  Administrative Agent, acting for this purpose as a non-fiduciary agent of the Credit Parties, shall maintain at its Principal Office a register for the recordation of the names and addresses of Lenders and the Commitments and Loans of each Lender from time to time (the **"Register"**).  The Register shall be available for inspection by Borrower Representative or any Lender at any reasonable time and from time to time upon reasonable prior notice.  Administrative Agent shall record in the Register the Commitments and the Loans, and each repayment or prepayment in respect of the principal amount of the Loans, and any such recordation shall be conclusive and binding on Borrowers and each Lender, absent manifest error; <u>provided</u>, failure to make any such recordation, or any error in such recordation, shall not affect any Lender's Commitments or Borrowers' Obligations in respect of any Loan.  Each Borrower hereby designates the entity serving as Administrative Agent to serve as such Borrower's agent solely for purposes of maintaining the Register as provided in this <u>Section 2.6(b)</u> and each Borrower hereby agrees that, to the extent such entity serves in such capacity, the entity serving as Administrative Agent and its officers, directors, employees, agents and affiliates shall constitute "Indemnitees."

(c)    <u>Notes</u>.  If so requested by any Lender by written notice to Borrower Representative (with a copy to Administrative Agent) at least two (2) Business Days prior to the Closing Date, or at any time thereafter, Borrowers shall execute and deliver to such Lender (and/or, if applicable and if so specified in such notice, to any Person who is an assignee of such Lender pursuant to <u>Section 10.6</u>) on the Closing Date (or, if such notice is delivered after the Closing Date, promptly after Borrower Representative's receipt of such notice) a Note or Notes to evidence such Lender's Term Loan Commitment and Term Loans.

**2.7.    Interest on Loans.**

(a)    Except as otherwise set forth herein, the Loans shall bear interest on the unpaid principal amount thereof from the date made through repayment (whether by acceleration or otherwise) thereof as follows:

(i)    if a Base Rate Loan, at the Base Rate, <u>plus</u> the Applicable Margin; or

(ii)    if a LIBOR Rate Loan, at the Adjusted LIBOR Rate, <u>plus</u> the Applicable Margin.

Notwithstanding anything to the contrary contained herein in no event shall (A) the Adjusted LIBOR Rate be less than 1.25% per annum or (B) the Base Rate be less than 2.25% per annum.

(b)    The basis for determining the interest rate with respect to any Loan shall be selected by Borrower Representative and notified to Administrative Agent and Lenders pursuant to the applicable Notice; provided, that all Letter of Credit Loans shall be Base Rate Loans.  If on any day a

Loan is outstanding with respect to which a Notice has not been delivered to Administrative Agent in accordance with the terms hereof specifying the applicable basis for determining the interest rate, then for that day such Loan shall be a Base Rate Loan.

(c)     In connection with LIBOR Rate Loans there shall be no more than five (5) Interest Periods outstanding at any time.  In the event Borrower Representative fails to specify between a Base Rate Loan or a LIBOR Rate Loan in the applicable Notice, such Loan (if outstanding as a LIBOR Rate Loan) will be automatically converted into a Base Rate Loan on the last day of the then current Interest Period for such Loan (or if outstanding as a Base Rate Loan will remain as, or (if not then outstanding) will be made as, a Base Rate Loan).  As soon as practicable after 10:00 a.m. (New York City time) on each Interest Rate Determination Date, Administrative Agent shall determine (which determination shall, absent manifest error, be final, conclusive and binding upon all parties) the interest rate that shall apply to the LIBOR Rate Loans for which an interest rate is then being determined for the applicable Interest Period and shall promptly give notice thereof (in writing or by telephone confirmed in writing) to Borrower Representative and each Lender.

(d)     Interest shall be computed on the basis of a 360-day year, in each case for the actual number of days elapsed in the period during which it accrues.  In computing interest on any Loan, the date of the making of such Loan or the first day of an Interest Period applicable to such Loan or, with respect to a Base Rate Loan being converted from a LIBOR Rate Loan, the date of conversion of such LIBOR Rate Loan to such Base Rate Loan, as the case may be, shall be included, and the date of payment of such Loan or the expiration date of an Interest Period applicable to such Loan or, with respect to a Base Rate Loan being converted to a LIBOR Rate Loan, the date of conversion of such Base Rate Loan to such LIBOR Rate Loan, as the case may be, shall be excluded; provided, if a Loan is repaid on the same day on which it is made, one (1) day's interest shall be paid on that Loan.

(e)     Except as otherwise set forth herein, interest on each Loan shall be payable in Cash and in arrears (subject to clause (f) below) (A) on and to each Interest Payment Date applicable to that Loan, (B) upon any prepayment of that Loan, whether voluntary or mandatory, to the extent accrued on the amount being prepaid, and (C) on the Maturity Date.

(f)     Notwithstanding anything to the contrary contained herein or in any of the other Credit Documents, the Borrowers may, at their option, elect (any such election, a "PIK Interest Election") by written notice to the Administrative Agent delivered at least seven (7) Business Days prior to each applicable interest period start date, to pay a portion (not to exceed the Maximum PIK Interest Portion and which such portions shall be in increments of 2.00 percentage points) of the interest owing on such Interest Payment Date in-kind by adding such amount to the principal amount of the then outstanding Term Loans ("PIK Interest") (whereupon from and after any such date such capitalized amounts shall also accrue interest in accordance with the terms of this Agreement), and to pay the remaining portion of the interest then owing in cash ("Cash Interest").  In the event that a PIK Interest Election is not timely delivered to the Administrative Agent with respect to any Interest Payment Date, Borrowers shall be deemed to have elected to pay 100% of such interest in the form of Cash Interest.

(g)     Borrowers agree to pay to Issuing Bank, with respect to drawings honored under any Letter of Credit, interest on the amount paid by Issuing Bank in respect of each such honored drawing from the date such drawing is honored to but excluding the date such amount is reimbursed by or on behalf of Borrowers at a rate equal to (i) for the period from the date such drawing is honored to but excluding the applicable Reimbursement Date, the rate of interest otherwise payable hereunder with respect to Base Rate Loans, and (ii) thereafter, a rate which is the lesser of (A) 2.00% per annum in excess of the rate of interest otherwise payable hereunder with respect to Base Rate Loans, and (B) the Highest Lawful Rate.

(h)    Interest payable pursuant to <u>Section 2.7(g)</u> shall be computed on the basis of a 360 day year for the actual number of days elapsed in the period during which it accrues, and shall be payable on demand or, if no demand is made, on the date on which the related drawing under a Letter of Credit is reimbursed in full.  Promptly upon receipt by Issuing Bank of any payment of interest pursuant to <u>Section 2.7(g)</u>, Issuing Bank shall distribute to each Lender, out of the interest received by Issuing Bank in respect of the period from the date such drawing is honored to but excluding the date on which Issuing Bank is reimbursed for the amount of such drawing (including any such reimbursement out of the proceeds of any Letter of Credit Loans), the amount that such Lender would have been entitled to receive in respect of the Letter of Credit Fees that would have been payable in respect of such Letter of Credit for such period if no drawing had been honored under such Letter of Credit.  In the event Issuing Bank shall have been reimbursed by Lenders for all or any portion of such honored drawing, Issuing Bank shall distribute to each Lender which has paid all amounts payable by it under <u>Section 2.3(e)</u> with respect to such honored drawing such Lender's Pro Rata Share of any interest received by Issuing Bank in respect of that portion of such honored drawing so reimbursed by Lenders for the period from the date on which Issuing Bank was so reimbursed by Lenders to but excluding the date on which such portion of such honored drawing is reimbursed by Borrowers.

**2.8.    Conversion/Continuation.**

(a)    Subject to <u>Section 2.17</u> and so long as no Default or Event of Default shall have occurred and then be continuing, Borrowers shall have the option:

(i)    to convert at any time all or any part of any Term Loan equal to $1,000,000 and integral multiples of $100,000 in excess of that amount from one Type of Loan to another Type of Loan; <u>provided</u>, a LIBOR Rate Loan may only be converted on the expiration of the Interest Period applicable to such LIBOR Rate Loan unless Borrowers shall pay all amounts due under <u>Section 2.17</u> in connection with any such conversion; or

(ii)    upon the expiration of any Interest Period applicable to any LIBOR Rate Loan, to continue all or any portion of such Loan equal to $1,000,000 and integral multiples of $100,000 in excess of that amount as a LIBOR Rate Loan.

(b)    Borrower Representative shall deliver a Conversion/Continuation Notice to Administrative Agent no later than 10:00 a.m. (New York City time) at least one (1) Business Day in advance of the proposed conversion date (in the case of a conversion to a Base Rate Loan) and at least three (3) Business Days in advance of the proposed Conversion/Continuation Date (in the case of a conversion to, or a continuation of, a LIBOR Rate Loan).  Except as otherwise provided herein, a Conversion/Continuation Notice for conversion to, or continuation of, any LIBOR Rate Loans (or telephonic notice in lieu thereof) shall be irrevocable on and after the related Interest Rate Determination Date, and Borrowers shall be bound to effect a conversion or continuation in accordance therewith.

**2.9.    Default Interest**.  Upon the occurrence of an Event of Default, at the election of Administrative Agent or the Requisite Lenders (or automatically upon the occurrence of an Event of Default described in <u>Section 8.1(f)</u> or <u>Section 8.1(g)</u>), the principal amount of all Loans outstanding and, to the extent permitted by applicable law, any interest payments on the Loans or any fees or other amounts owed hereunder (including post-petition interest in any proceeding under the Bankruptcy Code or other applicable bankruptcy laws), shall thereafter bear interest payable on demand at a rate that is 2.0% per annum in excess of the interest rate otherwise payable hereunder with respect to the applicable Loans (or, in the case of any such fees and other amounts, at a rate which is 2.0% per annum in excess of the interest rate otherwise payable hereunder for Base Rate Loans); <u>provided</u>, any LIBOR Rate Loans may be converted to Base Rate Loans at the election of Administrative Agent at any time after the

43

occurrence of such Event of Default (irrespective of whether the Interest Period in effect at the time of such conversion has expired) and thereupon shall become Base Rate Loans and shall thereafter bear interest payable upon demand at a rate which is 2.0% per annum in excess of the interest rate otherwise payable hereunder for Base Rate Loans.  Payment or acceptance of the increased rates of interest provided for in this Section 2.9 is not a permitted alternative to timely payment and shall not constitute a waiver of any Event of Default or otherwise prejudice or limit any rights or remedies of Administrative Agent or any Lender.  For the purposes of clarity, all Letter of Credit Fees shall be increased by 2.0% per annum at any time the Default Rate is in effect.

> **2.10.    Fees.**

(a)    **Fee Letter**.    Borrowers agree to pay the Agents such other fees in the amounts and at the times separately agreed upon in the Fee Letter.

(b)    **Letter of Credit Loan Commitment and Related Fees**.  Borrowers agree to pay to the Lenders having Letter of Credit Loan Exposure:

(i)    commitment fees equal to (A) the average of the daily difference between (I) the aggregate Letter of Credit Loan Commitments then in effect and (II) the Letter of Credit Usage at such time; multiplied by (B) 0.50% per annum; and

(ii)    Letter of Credit Fees equal to 12.00% per annum on the face amount of all issued Letters of Credit shall be payable monthly in arrears and shared proportionately by the Lenders having Letter of Credit Loan Commitments.

All fees referred to in this Section 2.10(b) shall be paid to Administrative Agent as set forth in Section 2.15(a) and, upon receipt, Administrative Agent shall promptly distribute to each applicable Lender its Pro Rata Share thereof.  Further, all fees referred to in this Section 2.10(b) shall be calculated on the basis of a 360-day year and the actual number of days elapsed and shall be payable in Cash and monthly in arrears on the last day of such month, commencing on the first such date to occur after the Closing Date, and on the Maturity Date.

(c)    **Letter of Credit Fronting Fees**.  Borrowers agree to pay directly to Issuing Bank for its own account the following Letter of Credit Fees:

(i)    a fronting fee equal to (A) the average aggregate daily maximum amount available to be drawn under all Letters of Credit (determined as of the close of business on any date of determination), multiplied by (B) 0.25%, per annum; and

(ii)    such documentary and processing charges for any transfer or payment of a Letter of Credit as are in accordance with Issuing Bank's standard schedule for such charges and as in effect at the time of such transfer or payment, as the case may be.

(d)    **[Reserved**.]

(e)    **Applicable Premium.**

(i)    Upon the occurrence of an Applicable Premium Trigger Event, Borrowers shall pay to Administrative Agent, for the account of the Lenders in accordance with their Pro Rata Shares, the Applicable Premium.

LEGAL_US_W # 105221370.13

(ii)    Without limiting the generality of the foregoing, it is understood and agreed that if the Obligations are accelerated for any reason, including because of default, sale, disposition or encumbrance (including that by operation of law or otherwise), the commencement of any Insolvency Proceeding or other proceeding pursuant to any applicable Debtor Relief Law and/or automatic acceleration as a result of Section 8.1(f) or Section 8.1(g), as applicable, the Applicable Premium, determined as of the date of acceleration will also be due and payable as though said Indebtedness was voluntarily prepaid as of such date and shall constitute part of the Obligations, in view of the impracticability and extreme difficulty of ascertaining actual damages and by mutual agreement of the parties as to a reasonable calculation of each Lender's lost profits as a result thereof.  Any Applicable Premium payable in accordance with this Section 2.10(e) shall be presumed to be equal to the liquidated damages sustained by the Lenders as the result of the occurrence of the Applicable Premium Trigger Event and the Credit Parties agree that it is reasonable under the circumstances currently existing.  The Applicable Premium shall also be payable in the event the Obligations are satisfied or released by foreclosure (whether by power of judicial proceeding), deed in lieu of foreclosure or by any other means. TO THE MAXIMUM EXTENT PERMITTED BY LAW, THE CREDIT PARTIES EXPRESSLY WAIVE THE PROVISIONS OF ANY PRESENT OR FUTURE STATUTE OR LAW THAT PROHIBITS OR MAY PROHIBIT THE COLLECTION OF THE FOREGOING APPLICABLE PREMIUM IN CONNECTION WITH ANY ACCELERATION.

(iii)    The Credit Parties expressly agree that:  (A) the Applicable Premium is reasonable and are the product of an arm's length transaction between sophisticated business people, ably represented by counsel; (B) the Applicable Premium shall be payable notwithstanding the then prevailing market rates at the time payment is made; (C) there has been a course of conduct between the Lenders and the Credit Parties giving specific consideration in this transaction for such agreement to pay the Applicable Premium; (D) the Credit Parties shall be estopped hereafter from claiming differently than as agreed to in this paragraph; (E) their agreement to pay the Applicable Premium is a material inducement to Lenders to provide the Commitments and make the Loans, and (F) the Applicable Premium represents a good faith, reasonable estimate and calculation of the lost profits or damages of Administrative Agent and the Lenders and that it would be impractical and extremely difficult to ascertain the actual amount of damages to Administrative Agent and the Lenders or profits lost by Administrative Agent and the Lenders as a result of an Applicable Premium Trigger Event.

(iv)    Nothing contained in this Section 2.10(e) shall permit any prepayment of the Loans not otherwise permitted by the terms of this Agreement or any other Credit Document.

**2.11.    Scheduled Payments.**

(a)    Term Loans.  The principal amount of the Term Loans shall be repaid on the following dates and in the following amounts:

| Date | Installment Amount |
|---|---|
| March 31, 2021 | 0.25% of the initial principal amount of the Term Loans |
| June 30, 2021 | 0.25% of the initial principal amount of the Term Loans |
| September 30, 2021 | 0.25% of the initial principal amount of the Term Loans |
| December 31, 2021 | 0.25% of the initial principal |

45

| | amount of the Term Loans |
|---|---|
| March 31, 2022 | 0.625% of the initial principal amount of the Term Loans |
| June 30, 2022 | 0.625% of the initial principal amount of the Term Loans |
| September 30, 2022 | 0.625% of the initial principal amount of the Term Loans |
| December 31, 2022 | 0.625% of the initial principal amount of the Term Loans |
| March 31, 2023 and on the last Business Day of each Fiscal Quarter thereafter | 1.25% of the initial principal amount of the Term Loans |

If any of the above dates in this Section 2.11(a) do not fall on a Business Day, the corresponding payment shall be made on the Business Day immediately preceding such date. The outstanding unpaid principal balance and all accrued and unpaid interest on the Term Loans and the Letter of Credit Loans shall be due and payable on the earlier of (a) the Maturity Date, and (b) the date of the acceleration of the Term Loans in accordance with the terms hereof. Any principal amount of the Term Loans that is repaid or prepaid may not be reborrowed. All principal of, interest on, and other amounts payable in respect of the Term Loans shall constitute Obligations hereunder.

(b)    Letters of Credit. No Letter of Credit shall remain outstanding after the Maturity Date unless, with the consent of Collateral Agent and Issuing Bank, Letter of Credit Cash Collateralization has been provided with respect to such outstanding Letters of Credit.

**2.12.    Voluntary Prepayments/Commitment Reductions.**

(a)    Voluntary Prepayments.

(i)    Any time and from time to time:

(A)    with respect to Base Rate Loans, Borrowers may prepay any such Loans on any Business Day in whole or in part, in an aggregate minimum amount of $1,000,000 and integral multiples of $100,000 in excess of that amount; and

(B)    with respect to LIBOR Rate Loans, Borrowers may prepay any such Loans on any Business Day in whole or in part (together with any amounts due pursuant to Section 2.17(c)) in an aggregate minimum amount of $1,000,000 and integral multiples of $100,000 in excess of that amount;

(ii)    all such prepayments shall be made:

(A)    upon not less than one (1) Business Day's prior written or telephonic notice in the case of Base Rate Loans; and

(B)    upon not less than three (3) Business Days' prior written or telephonic notice in the case of LIBOR Rate Loans;

46

in each case, given to Administrative Agent by 12:00 p.m. (New York City time) on the date required and, if given by telephone, promptly confirmed in writing to Administrative Agent (and Administrative Agent will promptly transmit such telephonic or original notice for Term Loans by telefacsimile or telephone to each Lender).  Upon the giving of any such notice, the principal amount of the Loans specified in such notice shall become due and payable on the prepayment date specified therein.  Any such voluntary prepayment made pursuant to this Section 2.12(a) shall be (w) applied as specified in Section 2.14(a), (x) accompanied by any amounts due under Section 2.17(c) in connection therewith, (y) accompanied by the payment of accrued interest to the date of such payment on the amount prepaid, and (z) accompanied by the payment of the Applicable Premium, if applicable.

(b)     Voluntary Commitment Reductions.

(i)     Borrowers may, upon not less than three (3) Business Days' prior written or telephonic notice confirmed in writing to Administrative Agent (which original written or telephonic notice Administrative Agent will promptly transmit by telefacsimile or telephone to each applicable Lender), at any time and from time to time terminate in whole or permanently reduce in part the Letter of Credit Loan Commitments in an amount up to the amount by which the Letter of Credit Loan Commitments exceed the Letter of Credit Usage at the time of such proposed termination or reduction; provided, any such partial reduction of the Letter of Credit Loan Commitments shall be in an aggregate minimum amount of $1,000,000 and integral multiples of $100,000 in excess of that amount.

(ii)     Borrower Representative's notice to Administrative Agent shall designate the date (which shall be a Business Day) of such termination or reduction and the amount of any partial reduction, and such termination or reduction of the Letter of Credit Loan Commitments shall be effective on the date specified in Borrower Representative's notice and shall reduce the Letter of Credit Loan Commitment of each Lender proportionately to its Pro Rata Share thereof.

**2.13.    Mandatory Prepayments/Commitment Reductions.**

(a)     Asset Sales.  No later than the third Business Day following the date of receipt by any Credit Party of any Net Asset Sale Proceeds (other than (x) Net Asset Sale Proceeds from Permitted Sale Leaseback Transactions and/or (y) Net Asset Sale Proceeds from any other Asset Sales for which the total aggregate amount of such Net Asset Sale Proceeds is an amount less than $50,000 during any twelve (12) trailing Fiscal Month period), the Credit Parties shall prepay the Loans and/or the Commitments shall be permanently reduced as set forth in Section 2.14(a) in an aggregate amount equal to 100% of such Net Asset Sale Proceeds.

(b)     Insurance/Condemnation Proceeds.  No later than the third Business Day following the date of receipt by any Credit Party, or Administrative Agent as loss payee, of any Net Insurance/Condemnation Proceeds in excess of $50,000, the Credit Parties shall prepay the Loans and/or the Commitments shall be permanently reduced as set forth in Section 2.14(a) in an aggregate amount equal to 100% of such Net Insurance/Condemnation Proceeds.

(c)     Issuance of Equity Securities.  On the date of receipt by any Credit Party of any Cash proceeds from a capital contribution to, or the issuance of any Capital Stock of, such Credit Party or any of its Subsidiaries (other than Capital Stock issued (i) pursuant to any employee stock or stock option compensation, (ii) Permitted Stock Issuances and (iii) in the form of Curative Capital), Borrowers shall prepay the Loans and/or the Commitments shall be permanently reduced as set forth in Section 2.14(a) in an aggregate amount equal to 100% of such proceeds, net of underwriting discounts and commissions and other reasonable costs and expenses associated therewith, including reasonable legal fees and expenses.

(d)      Issuance of Debt.  On the date of receipt by any Credit Party or any of its Subsidiaries of any Cash proceeds from the incurrence of any Indebtedness of any Credit Party or any of its Subsidiaries (other than with respect to any Indebtedness permitted to be incurred pursuant to Section 6.1), Borrowers shall prepay the Loans and/or the Commitments shall be permanently reduced as set forth in Section 2.14(a) in an aggregate amount equal to 100% of such proceeds, net of underwriting discounts and commissions and other reasonable costs and expenses associated therewith, including reasonable legal fees and expenses.

(e)      Permitted Sale Leaseback Transactions.  No later than the third Business Day following receipt by any Credit Party or any of its Subsidiaries of any Net Asset Sale Proceeds from Permitted Sale Leaseback Transactions, the Credit Parties shall prepay the Loans and/or the Commitments shall be permanently reduced as set forth in Section 2.14(a) in the amount equal to 100% of such Net Asset Sale Proceeds.

(f)      Curative Capital.  No later than the third Business Day following receipt by any Credit Party or any of its Subsidiaries of the proceeds of any Curative Capital pursuant to Section 8.4, the Credit Parties shall prepay the Loans and/or the Commitments shall be permanently reduced as set forth in Section 2.14(a) in the amount equal to 100% of such proceeds of Curative Capital which are received by the Credit Parties to comply with the financial covenants set forth in clauses (b) or (c) of Section 6.8.

(g)      [Intentionally Reserved.]

(h)      Tax Refunds.  No later than the third Business Day following receipt by any Credit Party or any of its Subsidiaries of any Tax refunds in excess of $500,000, Borrowers shall prepay Loans and/or the Commitments shall be reduced as set forth in Section 2.14(a) in the amount of such excess.

(i)      Prepayment Certificate and Declined Proceeds.  At least three (3) Business Days prior to any prepayment of the Loans and/or reduction of the Commitments pursuant to Section 2.12 and Section 2.13, Borrower Representative shall deliver to Administrative Agent a certificate of an Authorized Officer of Borrower Representative demonstrating the calculation of the amount of the applicable net proceeds or other amounts and compensation owing to Lenders hereunder.  In the event that Borrower Representative shall subsequently determine that the actual amount received exceeded the amount set forth in such certificate, Borrowers shall promptly make an additional prepayment of the Loans and/or the Commitments shall be permanently reduced in an amount equal to such excess, and Borrower Representative shall concurrently therewith deliver to Administrative Agent a certificate of an Authorized Officer of Borrower Representative demonstrating the derivation of such excess.  Each Lender shall have the right to elect, by notice to the Administrative Agent at or prior to the time and in the manner specified by the Administrative Agent, to decline all (but not a portion) of its pro rata share of such mandatory prepayment other than with respect to a mandatory prepayment pursuant to clause (d) above (such declined amounts, the "Declined Proceeds"), in which case such Declined Proceeds may be retained by the Credit Parties.

## 2.14.    Application of Prepayments/Reductions.

(a)      Application of Voluntary and Mandatory Prepayments.    Any voluntary prepayments of the Term Loan pursuant to Section 2.12, and any mandatory prepayment of any Loan pursuant to Section 2.13 shall, in each case, be applied as follows:

(i)      first, to the payment of all fees and all expenses specified in Section 10.2, to the full extent thereof;

(ii)    second, to the payment of any fees (including the Applicable Premium) and accrued interest (other than Default Rate interest), if any;

(iii)    third, to the payment of any accrued interest at the Default Rate;

(iv)    fourth, (A) in the case of voluntary prepayments of the Term Loan pursuant to Section 2.12(a), to prepay the remaining scheduled installments of principal of the Term Loans as directed by the Borrower Representative or, in the absence of such direction, on a pro rata basis (for the avoidance of doubt, any amount that is due and payable on the Maturity Date shall constitute an installment) and (B) in the case of mandatory prepayments of the Term Loan pursuant to Section 2.13, to prepay the remaining scheduled installments of principal of the Term Loans in the inverse order of maturity (for the avoidance of doubt, any amount that is due and payable on the Maturity Date shall constitute an installment);

(v)    fifth, to provide Letter of Credit Cash Collateralization with respect to the Letters of Credit and to permanently reduce the Letter of Credit Loan Commitments by the amount of such Letter of Credit Cash Collateralization; and

(vi)    sixth, to pay any other Obligations then outstanding to the full extent thereof.

(b)    Application of Prepayments of Loans to Base Rate Loans and LIBOR Rate Loans.  Any prepayment of the Loans shall be applied first to Base Rate Loans to the full extent thereof before application to LIBOR Rate Loans, in each case in a manner which minimizes the amount of any payments required to be made by Borrower Representative pursuant to Section 2.17(c).

**2.15.    General Provisions Regarding Payments.**

(a)    All payments by Borrowers of principal, interest, fees and other Obligations shall be made by wire transfer not later than 2:00 p.m. (New York City time) on the date specified for payment under this Agreement to the account designated by Administrative Agent from time to time maintained by Administrative Agent or its Affiliates for the account of the Lenders or Administrative Agent, as the case may be, in Dollars in immediately available funds.  Any payment received after 2:00 p.m. (New York City time) shall be deemed received on the next Business Day.  All payments in respect of the principal amount of any Loan shall be accompanied by payment of accrued interest on, and any fees and costs required to be paid with respect to, the principal amount being repaid or prepaid.

(b)    Administrative Agent shall promptly distribute to each Lender at such address and/or account as such Lender shall indicate in writing, such Lender's applicable Pro Rata Share of all payments and prepayments of principal and interest due hereunder, together with all other amounts due with respect thereto, including all fees payable with respect thereto, to the extent received by Administrative Agent.

(c)    Notwithstanding the foregoing provisions hereof, if any Conversion/Continuation Notice is withdrawn as to any Lender or if any Lender makes Base Rate Loans in lieu of its Pro Rata Share of any LIBOR Rate Loans, Administrative Agent shall give effect thereto in apportioning payments received thereafter.

(d)    Subject to the provisos set forth in the definition of "Interest Period," whenever any payment to be made hereunder shall be stated to be due on a day that is not a Business Day, such

payment shall be made on the next succeeding Business Day and such extension of time shall be included in the computation of the payment of interest hereunder or of the commitment fees hereunder.

(e)    Administrative Agent shall deem any payment by or on behalf of Borrowers hereunder that is not made in same day funds prior to 2:00 p.m. (New York City time) to be a non-conforming payment.  Any such payment shall not be deemed to have been received by Administrative Agent until the later of (i) the time such funds become available funds, and (ii) the applicable next Business Day.  Administrative Agent shall give prompt telephonic notice to Borrower Representative and each applicable Lender (confirmed in writing) if any payment is non-conforming.  Any non-conforming payment may constitute or become a Default or Event of Default in accordance with the terms of Section 8.1(a).  Interest shall continue to accrue on any principal as to which a non-conforming payment is made until such funds become available funds (but in no event less than the period from the date of such payment to the next succeeding applicable Business Day) at the Default Rate determined pursuant to Section 2.9 from the date such amount was due and payable until the date such amount is paid in full in Cash.

(f)    If an Event of Default shall have occurred and not otherwise been waived, and the Obligations have become due and payable in full in Cash hereunder, whether by acceleration, maturity or otherwise, all payments or proceeds received by any Agent hereunder or under any Collateral Document in respect of any of the Obligations, including all proceeds received by any Agent in respect of any sale, any collection from, or other realization upon all or any part of the Collateral, shall be applied in full or in part as follows:  first, subject to Section 10.22(c), to the payment of all costs and expenses of such sale, collection or other realization, including reasonable compensation to each Agent and its agents and counsel, and all other expenses, liabilities and advances made or incurred by any Agent in connection therewith, and all amounts for which any Agent is entitled to indemnification hereunder or under any Collateral Document (in its capacity as an Agent and not as a Lender) and all advances made by any Agent under any Collateral Document for the account of the applicable Grantor, and to the payment of all costs and expenses paid or incurred by any Agent in connection with the exercise of any right or remedy hereunder or under any Collateral Document, all in accordance with the terms hereof or thereof (such amounts under the foregoing clauses (x) and (y) to be paid pro rata with other amounts owing under this clause "first"); second, to the extent of any excess of such proceeds, to the payment of the principal, accrued and unpaid interest (including interest accrued at the Default Rate) and fees (including the Applicable Premium) owing with respect to the Loans, for the ratable benefit of the Lenders; third, to the extent of any excess of such proceeds, to the payment of all other Obligations for the ratable benefit of the Lenders; and fourth, to the extent of any excess of such proceeds, to the payment to or upon the order of such Grantor or to whosoever may be lawfully entitled to receive the same or as a court of competent jurisdiction may direct.

2.16.    **Ratable Sharing**.  Lenders hereby agree among themselves that, except as otherwise provided in the Collateral Documents with respect to amounts realized from the exercise of rights with respect to Liens on the Collateral, if any of them shall, whether by voluntary payment (other than a voluntary prepayment of Loans made and applied in accordance with the terms hereof), through the exercise of any right of set off or banker's lien, by counterclaim or cross action or by the enforcement of any right under the Credit Documents or otherwise, or as adequate protection of a deposit treated as Cash collateral under the Bankruptcy Code, receive payment or reduction of a proportion of the aggregate amount of principal, interest, amounts payable in respect of Letters of Credit, fees and other amounts then due and owing to such Lender hereunder or under the other Credit Documents (collectively, the **"Aggregate Amounts Due"** to such Lender) which is greater than the proportion received by any other Lender in respect of the Aggregate Amounts Due to such other Lender, then the Lender receiving such proportionately greater payment shall (a) notify Administrative Agent and each other Lender of the receipt of such payment and (b) apply a portion of such payment to purchase participations (which it shall

be deemed to have purchased from each seller of a participation simultaneously upon the receipt by such seller of its portion of such payment) in the Aggregate Amounts Due to the other Lenders so that all such recoveries of Aggregate Amounts Due shall be shared by all Lenders in proportion to the Aggregate Amounts Due to them; provided, if all or part of such proportionately greater payment received by such purchasing Lender is thereafter recovered from such Lender upon the bankruptcy or reorganization of any Credit Party or otherwise, those purchases shall be rescinded and the purchase prices paid for such participations shall be returned to such purchasing Lender ratably to the extent of such recovery, but without interest. Each Credit Party expressly consents to the foregoing arrangement and agrees that any holder of a participation so purchased may exercise any and all rights of banker's lien, set off or counterclaim with respect to any and all monies owing by a Credit Party to that holder with respect thereto as fully as if that holder were owed the amount of the participation held by that holder.

### 2.17. Special Provisions Applicable to LIBOR Rate Loans.

(a)    The Adjusted LIBOR Rate may be adjusted by Administrative Agent on a prospective basis to take into account any additional or increased costs to any Lender of maintaining or obtaining any eurodollar deposits or increased costs, in each case, due to changes in applicable law, including any Changes in Law and changes in the reserve requirements imposed by the Board of Governors, which additional or increased costs would increase the cost of funding or maintaining loans bearing interest at the Adjusted LIBOR Rate. In any such event, the affected Lender shall give Borrower Representative written notice of such a determination and adjustment.

(b)    In the event that (i) any change in market conditions or any Change in Law shall at any time after the date hereof, in the reasonable opinion of any Lender, make it unlawful or impractical for such Lender to fund or maintain Loans with interest based on the Adjusted LIBOR Rate or to continue such funding or maintaining, or to determine or charge interest rates based on the Adjusted LIBOR Rate, or (ii) such Lender determines that the interest rate hereunder based on the Adjusted LIBOR Rate will not adequately and fairly reflect the cost to such Lender of maintaining or funding any Loans based upon the Adjusted LIBOR Rate, such Lender shall give written notice of such changed circumstances to Administrative Agent and Borrower Representative and (y) such Loans shall thereafter bear interest at a per annum rate equal to the Base Rate plus the Applicable Margin, and (z) interest based on the Adjusted LIBOR Rate shall not be available until such Lender determines that it is again available.

(c)    **LIBOR Replacement.**

(i)    Notwithstanding anything contained in this Agreement (including Section 10.5) herein to the contrary, in the event that the Administrative Agent shall have reasonably determined that dollar deposits in the principal amounts of the Loan are not generally available in the London interbank market, or that the rates at which such dollar deposits are being offered will not adequately and fairly reflect the cost to the majority of Lenders of making, maintaining or converting loans at the Adjusted LIBOR Rate, that reasonable means do not exist for ascertaining the Adjusted LIBOR Rate, or that there exists, at such time, a comparable successor interbank rate or alternative interbank rate for deposits in Dollars that is, at such time, broadly accepted by the syndicated loan market in the United States in lieu of the Adjusted LIBOR Rate, then the Administrative Agent and the Borrowers shall enter into an amendment to this Agreement to reflect such alternate rate of interest and such other related changes to this Agreement as may be, at such time, broadly accepted by the syndicated loan market in the United States, in each case without any action or consent by any Lender or any other Person.

(ii)    Solely if no such broadly accepted comparable successor interbank rate exists at such time, notwithstanding anything to the contrary contained in this Agreement (including

Section 10.5), the Administrative Agent (in consultation with the Borrower Representative) may amend this Agreement to implement a successor or alternative index rate as the Administrative Agent may determine in its reasonable discretion and such other related changes to this Agreement as may be reasonably applicable (provided that such successor or alternative index rate and such other related changes shall be substantially consistent with such successor or alternative index rate and such other related changes used for other similarly situated borrowers of the Administrative Agent and its Affiliates), and such amendment shall become effective without any further action or consent the Lenders or any other party to this Agreement so long as the Lenders and Borrowers shall have received at least five Business Days' prior written notice thereof and the Administrative Agent shall not have received, within five Business Days of the date of such notice to the Lenders and Borrowers, a written notice from the Requisite Lenders stating that the Requisite Lenders object to such amendment. Until an alternate rate of interest shall be determined in accordance with the paragraphs above, no Loans may be made as, or converted to, LIBOR Rate Loans.

(d)    **No Requirement of Matched Funding**.  Anything to the contrary contained herein notwithstanding, neither Agent, nor any Lender, is required actually to acquire eurodollar deposits to fund or otherwise match fund any Obligation which bears interest based on the Adjusted LIBOR Rate.

### 2.18.    Increased Costs; Capital Adequacy.

(a)    Compensation For Increased Costs and Taxes.  Subject to the provisions of Section 2.19 (which shall be controlling with respect to the matters covered thereby), in the event that any Recipient shall determine (which determination shall, absent manifest error, be final and conclusive and binding upon all parties hereto) that any law, treaty or governmental rule, regulation or order, or any change therein or in the interpretation, administration or application thereof (including the introduction of any new law, treaty or governmental rule, regulation or order), or any determination of a Governmental Authority, in each case that becomes effective after the date hereof, or compliance by such Lender with any guideline, request or directive issued or made after the date hereof by any Governmental Authority (whether or not having the force of law):  (i) subjects such Recipient (or its applicable lending office) to any additional Tax (other than any Connection Income Taxes, Taxes described in clauses (b) through (d) of the definition of Excluded Taxes, or Indemnified Taxes) with respect to this Agreement or any of the other Credit Documents or any of its obligations hereunder or thereunder or any payments to such Lender (or its applicable lending office) of principal, interest, fees or any other amount payable hereunder; (ii) imposes, modifies or holds applicable any reserve (including any marginal, emergency, supplemental, special or other reserve), special deposit, compulsory loan, FDIC insurance or similar requirement against assets held by, or deposits or other liabilities in or for the account of, or advances or loans by, or other credit extended by, or any other acquisition of funds by, any office of such Lender (other than any such reserve or other requirements with respect to LIBOR Rate Loans that are reflected in the definition of "Adjusted LIBOR Rate"); or (iii) imposes any other condition (other than with respect to a Tax matter) on or affecting such Lender (or its applicable lending office) or its obligations hereunder or the London interbank market; and the result of any of the foregoing is to increase the cost to such Lender of agreeing to make, making or maintaining Loans hereunder or to reduce any amount received or receivable by such Lender (or its applicable lending office) with respect thereto; then, in any such case, Borrowers shall promptly pay to such Lender, upon receipt of the statement referred to in the next sentence, such additional amount or amounts (in the form of an increased rate of, or a different method of calculating, interest or otherwise as such Lender in its sole discretion shall determine) as may be necessary to compensate such Lender for any such increased cost or reduction in amounts received or receivable hereunder.    Such Lender shall deliver to Borrower Representative (with a copy to Administrative Agent) a written statement, setting forth in reasonable detail the basis for calculating the additional amounts owed to such Lender under this Section 2.18(a), which statement shall be conclusive and binding upon all parties hereto absent manifest error.

(b)    _Capital Adequacy Adjustment_.  In the event that any Lender (which term shall include Issuing Bank for purposes of this Section 2.18(b)) shall have determined (which determination shall, absent manifest error, be final and conclusive and binding upon all parties hereto) that (i) the adoption, effectiveness, phase in or applicability of any law, rule or regulation (or any provision thereof) regarding capital adequacy, or any change therein or in the interpretation or administration thereof by any Governmental Authority charged with the interpretation or administration thereof, or (ii) compliance by such Lender (or its applicable lending office) or any company controlling such Lender with any guideline, request or directive regarding capital adequacy (whether or not having the force of law) of any such Governmental Authority, in each case after the Closing Date, has or would have the effect of reducing the rate of return on the capital of such Lender or any company controlling such Lender as a consequence of, or with reference to, such Lender's Loans, Commitments or Letters of Credit, or participations therein or other obligations hereunder with respect to the Loans or Letters of Credit to a level below that which such Lender or such controlling company could have achieved but for such adoption, effectiveness, phase in, applicability, change or compliance (taking into consideration the policies of such Lender or such controlling company with regard to capital adequacy), then from time to time, within ten (10) Business Days after receipt by Borrower Representative from such Lender of the statement referred to in the next sentence, Borrowers shall pay to such Lender such additional amount or amounts as will compensate such Lender or such controlling company on an after Tax basis for such reduction.  Such Lender shall deliver to Borrower Representative (with a copy to Administrative Agent) a written statement, setting forth in reasonable detail the basis for calculating the additional amounts owed to Lender under this Section 2.18(b), which statement shall be conclusive and binding upon all parties hereto absent manifest error.  For the avoidance of doubt, clauses (i) and (ii) of this Section 2.18(b) shall apply to all requests, rules, guidelines or directives concerning liquidity and capital adequacy issued by any United States regulatory authority (A) under or in connection with the implementation of the Dodd-Frank Wall Street Reform and Consumer Protection Act and (B) in connection with the implementation of the recommendations of the Bank for International Settlements or the Basel Committee on Banking Regulations and Supervisory Practices (or any successor or similar authority), regardless of the date adopted, issued, promulgated or implemented (which determination shall, absent manifest error, be final and conclusive and binding upon all parties hereto).

(c)    _Dodd-Frank/Basel III_.  For the avoidance of doubt, this Section 2.18 shall apply to all requests, rules, guidelines or directives concerning liquidity and capital adequacy issued by any United States regulatory authority (A) under or in connection with the implementation of the Dodd-Frank Wall Street Reform and Consumer Protection Act and (B) in connection with the implementation of the recommendations of the Bank for International Settlements or the Basel Committee on Banking Regulations and Supervisory Practices (or any successor or similar authority), regardless of the date adopted, issued, promulgated or implemented (which determination shall, absent manifest error, be final and conclusive and binding upon all parties hereto).

**2.19.    Taxes; Withholding, etc.**

(a)    _Payments to Be Free and Clear_.  Any and all payments by or on account of any obligation of the Borrower under any Credit Document shall be made without deduction or withholding for any Taxes, except as required by applicable law.

(b)    _Withholding of Taxes_.  If any applicable law (as determined in the good faith discretion of an applicable Withholding Agent) requires the deduction or withholding of any Tax from any such payment by a Withholding Agent, then the applicable Withholding Agent shall be entitled to make such deduction or withholding and shall timely pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with applicable law and, if such Tax is an Indemnified Tax, then the sum payable by the Borrower shall be increased as necessary so that after such deduction or

withholding has been made (including such deductions and withholdings applicable to additional sums payable under this Section) the applicable Recipient receives an amount equal to the sum it would have received had no such deduction or withholding been made.

(c)    Payment of Other Taxes by Borrower.  The Borrower shall timely pay to the relevant Governmental Authority in accordance with applicable law, or at the option of the Administrative Agent timely reimburse it for the payment of, any Other Taxes.

(d)    Indemnification by Borrower.  The Borrower shall indemnify each Recipient, within 10 days after demand therefor, for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section) payable or paid by such Recipient or required to be withheld or deducted from a payment to such Recipient and any reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to the Borrower by a Lender (with a copy to the Administrative Agent), or by the Administrative Agent on its own behalf or on behalf of a Lender, shall be conclusive absent manifest error.

(e)    Evidence of Payments.  As soon as practicable after any payment of Taxes by the Borrower to a Governmental Authority pursuant to this Section, the Borrower shall deliver to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing payment of such Other Taxes, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent.

(f)    Status of Lenders.

(i)    Any Lender that is entitled to an exemption from or reduction of withholding Tax with respect to payments made under any Credit Document shall deliver to the Borrower and the Administrative Agent, at the time or times reasonably requested by the Borrower or the Administrative Agent, such properly completed and executed documentation reasonably requested by the Borrower or the Administrative Agent as will permit such payments to be made without withholding or at a reduced rate of withholding.  In addition, any Lender, if reasonably requested by the Borrower or the Administrative Agent, shall deliver such other documentation prescribed by applicable law or reasonably requested by the Borrower or the Administrative Agent as will enable the Borrower or the Administrative Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements.  Notwithstanding anything to the contrary in the preceding two sentences, the completion, execution and submission of such documentation (other than such documentation set forth in paragraphs (f)(ii)(A), (ii)(B) and (ii)(D) of this Section) shall not be required if in the Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender.

(ii)    Without limiting the generality of the foregoing:

(A)    any Lender that is a U.S. Person shall deliver to the Borrower and the Administrative Agent on or about the date on which such Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), executed copies of IRS Form W-9 certifying that such Lender is exempt from U.S. federal backup withholding tax;

54

(B)     any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or about the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), whichever of the following is applicable:

(1)     in the case of a Foreign Lender claiming the benefits of an income tax treaty to which the United States is a party (x) with respect to payments of interest under any Credit Document, executed copies of IRS Form W-8BEN or IRS Form W-8BEN-E establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "interest" article of such tax treaty and (y) with respect to any other applicable payments under any Credit Document, IRS Form W-8BEN or IRS Form W-8BEN-E establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "business profits" or "other income" article of such tax treaty;

(2)     executed copies of IRS Form W-8ECI;

(3)     in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Internal Revenue Code, (x) a certificate substantially in the form of Exhibit J-1 to the effect that such Foreign Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the Internal Revenue Code, a "10 percent shareholder" of the Borrower within the meaning of Section 871(h)(3)(B) of the Internal Revenue Code, or a "controlled foreign corporation" related to the Borrower as described in Section 881(c)(3)(C) of the Internal Revenue Code (a "U.S. Tax Compliance Certificate") and (y) executed copies of IRS Form W-8BEN or IRS Form W 8BEN-E; or

(4)     to the extent a Foreign Lender is not the beneficial owner, executed copies of IRS Form W-8IMY, accompanied by IRS Form W-8ECI, IRS Form W-8BEN, IRS Form W 8BEN-E, a U.S. Tax Compliance Certificate substantially in the form of Exhibit J-2 or Exhibit J-3, IRS Form W-9, and/or other certification documents from each beneficial owner, as applicable; provided that if the Foreign Lender is a partnership and one or more direct or indirect partners of such Foreign Lender are claiming the portfolio interest exemption, such Foreign Lender may provide a U.S. Tax Compliance Certificate substantially in the form of Exhibit J-4 on behalf of each such direct and indirect partner;

(C)     any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or about the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), executed copies of any other form prescribed by applicable law as a basis for claiming exemption from or a reduction in U.S. federal withholding Tax, duly completed, together with such supplementary documentation as may be prescribed by applicable law to permit the Borrower or the Administrative Agent to determine the withholding or deduction required to be made; and

(D)     if a payment made to a Lender under any Credit Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Internal Revenue Code, as applicable), such Lender shall

55

deliver to the Borrower and the Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrower or the Administrative Agent such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Internal Revenue Code) and such additional documentation reasonably requested by the Borrower or the Administrative Agent as may be necessary for the Borrower and the Administrative Agent to comply with their obligations under FATCA and to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount, if any, to deduct and withhold from such payment.  Solely for purposes of this clause (D), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

Each Lender agrees that if any form or certification it previously delivered expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify the Borrower and the Administrative Agent in writing of its legal inability to do so.

(g)    Indemnification by the Lenders.  Each Lender shall severally indemnify the Administrative Agent, within 10 days after demand therefor, for (i) any Indemnified Taxes attributable to such Lender (but only to the extent that the Borrower has not already indemnified the Administrative Agent for such Indemnified Taxes and without limiting the obligation of the Borrower to do so), (ii) any Taxes attributable to such Lender's failure to comply with the provisions of Section **Error! Reference source not found.** relating to the maintenance of a Participant Register and (iii) any Excluded Taxes attributable to such Lender, in each case, that are payable or paid by the Administrative Agent in connection with any Credit Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error.  Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under any Credit Document or otherwise payable by the Administrative Agent to the Lender from any other source against any amount due to the Administrative Agent under this paragraph.

**2.20.    Obligation to Mitigate**.  Each Lender (which term shall include Issuing Bank for purposes of this Section 2.20) agrees that, as promptly as practicable after the officer of such Lender responsible for administering its Loans or Letters of Credit, as the case may be, becomes aware of the occurrence of an event or the existence of a condition that would affect such Lender or that would entitle such Lender to receive payments under Section 2.17, 2.18 or 2.19, it will, to the extent not inconsistent with the internal policies of such Lender and any applicable legal or regulatory restrictions, use reasonable efforts to (a) make, issue, fund or maintain its Credit Extensions, including any Affected Loans, through another office of such Lender, or (b) take such other measures as such Lender may deem reasonable, if as a result thereof the circumstances which would cause such Lender to be affected would cease to exist or the additional amounts which would otherwise be required to be paid to such Lender pursuant to Section 2.17, 2.18 or 2.19 would be materially reduced and if, as determined by such Lender in its sole discretion, the making, issuing, funding or maintaining of such Commitments, Loans or Letters of Credit through such other office or in accordance with such other measures, as the case may be, would not otherwise adversely affect such Commitments, Loans or Letters of Credit or the interests of such Lender; provided, such Lender will not be obligated to utilize such other office pursuant to this Section 2.20 unless Borrowers agrees to pay all incremental expenses incurred by such Lender as a result of utilizing such other office as described above.  A certificate as to the amount of any such expenses payable by Borrowers pursuant to this Section 2.20 (setting forth in reasonable detail the basis for requesting such amount) submitted by such Lender to Borrower Representative (with a copy to Administrative Agent) shall be conclusive absent manifest error.

56

**2.21.    Defaulting Lenders**.  Anything contained herein to the contrary notwithstanding, in the event that any Lender (a) violates any provision of Section **Error! Reference source not found.**, (b) other than at the direction or request of any Governmental Authority, defaults in its obligation to fund any Loan or its portion of any unreimbursed payment under Section 2.3(e) (in each case, a "Defaulted Loan" and the failure to so fund a "Funding Default"); (c) has notified Borrower Representative or Administrative Agent that it does not intend to comply with its funding obligations or has made a public statement to that effect with respect to its funding obligations hereunder or under other agreements generally in which it commits to extend credit; (d) has failed, within three (3) Business Days after reasonable request by Administrative Agent, to confirm in a manner satisfactory to Administrative Agent that it will comply with its funding obligations (provided, that such Lender shall cease to be a Defaulting Lender pursuant to this clause (d) upon receipt of such confirmation by Administrative Agent); (e) [reserved], or (f) has, or has a direct or indirect parent company that has, (i) become the subject of a proceeding under the Bankruptcy Code or any other Debtor Relief Law or (ii) had a receiver, conservator, trustee, administrator, assignee for the benefit of creditors or similar Person charged with reorganization or liquidation of its business or a custodian appointed for it (in each case, a "Defaulting Lender") then (A) during any Default Period with respect to such Defaulting Lender, such Defaulting Lender shall be deemed not to be a "Lender" for purposes of voting on any matters (including the granting of any consents or waivers) with respect to any of the Credit Documents; (B) to the extent permitted by applicable law, until such time as the Default Excess, if any, with respect to such Defaulting Lender shall have been reduced to zero, (I) any voluntary prepayment of the Loans shall, if Administrative Agent so directs at the time of making such voluntary prepayment, be applied to the Loans of other Lenders as if such Defaulting Lender had no Loans outstanding and the Letter of Credit Loan Exposure and the outstanding Term Loans of such Defaulting Lender were zero, and (II) any mandatory prepayment of the Loans shall, if Administrative Agent so directs at the time of making such mandatory prepayment, be applied to the Loans of other Lenders (but not to the Loans of such Defaulting Lender) as if such Defaulting Lender had funded all Defaulted Loans of such Defaulting Lender, it being understood and agreed that Borrowers shall be entitled to retain any portion of any mandatory prepayment of the Loans that is not paid to such Defaulting Lender solely as a result of the operation of the provisions of this clause (B); (C) such Defaulting Lender's Letter of Credit Loan Commitments, Letter of Credit Loans and Pro Rata Share of the Letter of Credit Usage shall be excluded for purposes of calculating the commitment fees payable to Lenders in respect of any day during any Default Period with respect to such Defaulting Lender, and such Defaulting Lender shall not be entitled to receive any commitment fee pursuant to Section 2.10 with respect to such Defaulting Lender's Letter of Credit Loan Commitment in respect of any Default Period with respect to such Defaulting Lender; and (D) the outstanding Letter of Credit Loan Commitments and Letter of Credit Usage as at any date of determination shall be calculated as if such Defaulting Lender had funded all Defaulted Loans of such Defaulting Lender.  No Commitment of any Lender shall be increased or otherwise affected, and, except as otherwise expressly provided in this Section 2.21, performance by the Credit Parties of their respective obligations hereunder and the other Credit Documents shall not be excused or otherwise modified as a result of any Funding Default or the operation of this Section 2.21.   The rights and remedies against a Defaulting Lender under this Section 2.21 are in addition to other rights and remedies which Borrowers may have against such Defaulting Lender with respect to any Funding Default and which Administrative Agent or any Lender may have against such Defaulting Lender with respect to any Funding Default or violation of Section **Error! Reference source not found.**.

**2.22.    Removal or Replacement of a Lender**.  Anything contained herein to the contrary notwithstanding, in the event that:  (a) (i) any Lender (an **"Increased Cost Lender"**) shall give notice to Borrower Representative that such Lender is entitled to receive payments under Section 2.18, 2.19 or 2.20, (ii) the circumstances which have affected such Lender or which entitle such Lender to receive such payments shall remain in effect, and (iii) such Lender shall fail to withdraw such notice within five (5) Business Days after Borrower Representative's request for such withdrawal; or (b) (i) any Lender

57

shall become a Defaulting Lender, (ii) the Default Period for such Defaulting Lender shall remain in effect, and (iii) such Defaulting Lender shall fail to cure the default as a result of which it has become a Defaulting Lender within five (5) Business Days after Borrower Representative's request that it cure such default; or (c) in connection with any proposed amendment, modification, termination, waiver or consent with respect to any of the provisions hereof as contemplated by Section 10.5, the consent of Administrative Agent and the Requisite Lenders shall have been obtained but the consent of one or more of such other Lenders (each a **"Non Consenting Lender"**) whose consent is required shall not have been obtained; then, with respect to each such Increased Cost Lender, Defaulting Lender or Non Consenting Lender (the **"Terminated Lender"**), Administrative Agent may (and, in the case of an Increased-Cost Lender with respect to which Borrower Representative has identified a Replacement Lender, Administrative Agent shall, after receiving written request from Borrower Representative, remove such Increased-Cost Lender), by giving written notice to Borrower Representative and any Terminated Lender of its election to do so, elect to cause such Terminated Lender (and such Terminated Lender hereby irrevocably agrees) to assign its outstanding Loans and its Commitments, if any, in full to one or more Eligible Assignees (each, a **"Replacement Lender"**) in accordance with the provisions of Section 10.6 and Terminated Lender shall pay any fees payable thereunder in connection with such assignment; provided, (1) on the date of such assignment, the Replacement Lender shall pay to Terminated Lender an amount equal to the sum of (A) an amount equal to the principal of, and all accrued interest on, all outstanding Loans of the Terminated Lender, (B) an amount equal to all unreimbursed drawings that have been funded by such Terminated Lender, together with all then unpaid interest with respect thereto at such time and (C) an amount equal to all accrued, but theretofore unpaid fees owing to such Terminated Lender pursuant to Section 2.10; (2) on the date of such assignment, Borrowers shall pay any amounts payable to such Terminated Lender pursuant to Section 2.18 or 2.19; and (3) in the event such Terminated Lender is a Non Consenting Lender, each Replacement Lender shall consent, at the time of such assignment, to each matter in respect of which such Terminated Lender was a Non Consenting Lender; provided, Administrative Agent may not make such election with respect to any Terminated Lender that is also an Issuing Bank unless, prior to the effectiveness of such election, Administrative Agent shall have caused each outstanding Letter of Credit issued thereby to be cancelled. In the event that the Terminated Lender fails to execute an Assignment Agreement pursuant to Section 10.6 within five (5) Business Days after receipt by the Terminated Lender of notice of replacement pursuant to this Section 2.22 and presentation to such Terminated Lender of an Assignment Agreement evidencing an assignment pursuant to this Section 2.22, the Terminated Lender shall be deemed to have executed and delivered such Assignment Agreement, and upon the execution and delivery of Assignment Agreement by the Replacement Lender and Administrative Agent, shall be effective for purposes of this Section 2.22 and Section 10.6. Upon the prepayment of all amounts owing to any Terminated Lender and the termination of such Terminated Lender's Commitments, if any, such Terminated Lender shall no longer constitute a "Lender" for purposes hereof; provided, any rights of such Terminated Lender to indemnification hereunder shall survive as to such Terminated Lender.

   **2.23.    Appointment of Borrower Representative**.    Each Credit Party hereby designates Holdings as Borrower Representative hereunder to act on its behalf for the purposes of issuing Notices, giving instructions with respect to the disbursement of the proceeds of the Loans, selecting interest rate options, giving and receiving all other notices and consents hereunder or under any of the other Credit Documents and taking all other actions (including in respect of compliance with covenants and amendments to the Credit Documents) on behalf of any Credit Party or Credit Parties under the Credit Documents. Borrower Representative hereby accepts such appointment as Borrower Representative. Each Agent and each Lender may regard any notice or other communication pursuant to any Credit Document from Borrower Representative as a notice or communication from all Credit Parties, and may give any notice or communication required or permitted to be given to any Credit Party or Credit Parties hereunder to Borrower Representative on behalf of such Credit Party or Credit Parties. Each Credit Party agrees that each notice, election, representation and warranty, covenant, agreement and undertaking made

on its behalf by Borrower Representative shall be deemed for all purposes to have been made by such Credit Party and shall be binding upon and enforceable against such Credit Party to the same extent as if the same had been made directly by such Credit Party.

**2.24.    Reallocation.** If any Lender with Letter of Credit Loan Exposure is a Defaulting Lender, all or a portion of such Defaulting Lender's Letter of Credit obligations (unless such Lender is the Issuing Bank that issued such Letter of Credit) shall, at Administrative Agent's election at any time or upon Issuing Bank's written request delivered to Administrative Agent (in each case, whether before or after the occurrence of any Default or Event of Default), be reallocated to and assumed by the Lenders with Letter of Credit Loan Exposure that are not Defaulting Lenders in accordance with their Pro Rata Share of the Letter of Credit Loan Exposure (calculated as if the Defaulting Lender's Pro Rata Share was reduced to zero and each other Lender's Pro Rata had been increased proportionately); <u>provided</u>, that no such Lender with Letter of Credit Loan Exposure shall be reallocated any such amounts or be required to fund any amounts that would cause the sum of its outstanding Letter of Credit Loan Exposure to exceed its Letter of Credit Loan Commitment.

## SECTION 3.    CONDITIONS PRECEDENT

**3.1.    Closing Date**. The obligation of each Lender or Issuing Bank, as applicable, to make a Credit Extension on the Closing Date is subject to the satisfaction, or waiver in accordance with <u>Section 10.5</u>, of the following conditions on or before the Closing Date:

(a)    <u>Credit Documents</u>.    Administrative Agent shall have received each of the following documents, duly executed and delivered, and each such document shall be in full force and effect:

(i)    this Agreement,

(ii)    the Notes, if any,

(iii)    the Fee Letter,

(iv)    the Pledge and Security Agreement,

(v)    the Intellectual Property Security Agreements, in proper form for filing or recording in all appropriate places in all applicable jurisdictions,

(vi)    a Collateral Questionnaire,

(vii)    the Warrants,

(viii)    the Equity Documents,

(ix)    the Closing Date Certificate,

(x)    the Letter of Direction,

(xi)    each other Collateral Document (other than as specified in Schedule 5.15), and

(xii)    each other Credit Document (other than as specified in <u>Schedule 5.15</u>),

in each case, executed and delivered by each applicable Credit Party and any other applicable Persons party thereto.

(b)     Organizational Documents; Incumbency.   Administrative Agent shall have received (i) sufficient copies of each Organizational Document executed and delivered by each Credit Party, as applicable, and, to the extent applicable, certified as of a recent date by the appropriate governmental official, for each Lender, each dated the Closing Date or a recent date prior thereto; (ii) signature and incumbency certificates of the officers of such Person executing the Credit Documents to which it is a party; (iii) resolutions of the Board of Directors (or similar governing body) of each Credit Party approving and authorizing the execution, delivery and performance of this Agreement and the other Credit Documents to which it is a party or by which it or its assets may be bound as of the Closing Date, certified as of the Closing Date by its secretary or an assistant secretary as being in full force and effect without modification or amendment; and (iv) a good standing certificate from the applicable Governmental Authority of each Credit Party's jurisdiction of incorporation, organization or formation and in each jurisdiction in which it is qualified as a foreign corporation or other entity to do business (except to the extent that the failure to be so qualified could not reasonably be expected to have a Material Adverse Effect), each dated a recent date prior to the Closing Date.

(c)     Organizational and Capital Structure.   The organizational structure and capital structure of Holdings and its Subsidiaries shall be as set forth on Schedule 4.2.   The organizational structure, the capital structure, other debt instruments, corporate governance, and governing documents of Holdings and its Subsidiaries, and the tax effects resulting from the Bankruptcy Plan and the Transactions shall be satisfactory to the Administrative Agent in all respects.

(d)     Confirmation Order and Bankruptcy Plan.   The Bankruptcy Plan and all other related documentation (i) shall be satisfactory to Administrative Agent in all respects, (ii) shall have been confirmed by the Confirmation Order, which (A) a certified copy of such Confirmation Order shall have been received by Administrative Agent and such Confirmation shall have been as duly entered by the Bankruptcy Court and entered onto the docket of the clerk of the Bankruptcy Court, following due notice to such creditors and other parties-in-interest as required by the Bankruptcy Court and (B) such Confirmation Order shall be in full force and effect, unstayed, final and non-appealable, except to the extent such requirements have been waived or deemed otherwise satisfied by the parties, subject to the consent of Administrative Agent and Issuing Bank, and shall not have been modified or amended without the written consent of the Administrative Agent, reversed or vacated, (iii) all conditions precedent to the effectiveness of the Bankruptcy Plan as set forth therein shall have been satisfied or waived (the waiver thereof having been approved by the Administrative Agent), (iv) the Bankruptcy Plan shall have become effective in accordance with its terms and all conditions precedent to the effectiveness of the Bankruptcy Plan shall have been satisfied or waived with the prior written consent of the Administrative Agent, and (v) the transactions contemplated by the Bankruptcy Plan to occur on the effective date of the Bankruptcy Plan shall have been substantially consummated (as defined in Section 1101(2) of the Bankruptcy Code) on the Closing Date substantially contemporaneously with the initial funding hereunder in accordance with the terms of the Bankruptcy Plan and in compliance with applicable law and Bankruptcy Court and regulatory approvals.

(e)     DIP Facility.   Pursuant to the terms of the Bankruptcy Plan, each Credit Party and its Subsidiaries shall have (i) executed and delivered to Administrative Agent payoff letters and all other documents or instruments necessary to release all Liens securing the DIP Facility and to satisfy the obligations of each Credit Party and its Subsidiaries under the DIP Facility being repaid on the Closing Date; and (ii) made arrangements satisfactory to Administrative Agent with respect to any letters of credit outstanding thereunder.

LEGAL_US_W # 105221370.13

(f)    Existing Subordinated SLB Note.  Pursuant to the terms of the Bankruptcy Plan and the Confirmation Order, the obligations of each Credit Party and its Subsidiaries under the Existing Subordinated SLB Note shall have been extinguished on the Closing Date and all Liens securing the Existing Subordinated SLB Note, if any, shall have been released;

(g)    No Litigation.  There shall not exist any action, suit, investigation, litigation, proceeding, hearing or other legal or regulatory developments, pending or threatened in any court (including the Bankruptcy Court) or before any arbitrator or Governmental Authority, which matter is not subject to the automatic stay, discharge or other injunction in the Bankruptcy Plan or otherwise arising in the Cases and that, in the reasonable opinion of Administrative Agent, singly or in the aggregate, materially impairs the transactions contemplated by the Credit Documents.

(h)    Completion of Proceedings.  All partnership, corporate and other proceedings taken or to be taken in connection with the transactions contemplated hereby and all documents incidental thereto not previously found acceptable by Administrative Agent and its counsel shall be reasonably satisfactory in form and substance to Administrative Agent and its counsel in all material respects, and Administrative Agent and its counsel shall have received all such counterpart originals or certified copies of such documents as Administrative Agent may reasonably request.

(i)    Governmental Authorizations and Consents; Absence of Order.  No court of competent jurisdiction shall have issued any injunction, restraining order or other order with respect to the Confirmation Order which otherwise prohibits the consummation of the Transaction or the other transactions described herein, or modifies the Transaction, and no governmental or other action or proceeding shall have been commenced, seeking any injunction, restraining order or other order which seeks to void or otherwise modify the Transaction or the other transactions described herein.  There shall be no order, injunction or decree of any Governmental Authority restraining or prohibiting the funding of the Credit Extensions contemplated hereby.

(j)    Consolidated Liquidity.  After giving effect to the Transaction, Consolidated Liquidity shall not be less than $12,500,000.

(k)    Personal Property Collateral.  In order to create in favor of Collateral Agent, for the benefit of Secured Parties, a valid, perfected First Priority security interest in the personal property Collateral, Collateral Agent shall have received:

(i)    evidence satisfactory to Collateral Agent of the compliance by each Credit Party with their obligations under the Pledge and Security Agreement and the other Collateral Documents (including their obligations to authorize or execute, as the case may be, and deliver UCC financing statements, originals of securities, instruments and chattel paper);

(ii)    customary lien and other searches with respect to the Credit Parties in appropriate jurisdictions; and

(iii)    evidence that each Credit Party shall have taken or caused to be taken any other action, executed and delivered or caused to be executed and delivered any other agreement, document and instrument and made or caused to be made any other filing and recording reasonably required by Collateral Agent.

(l)    Projections.  The Administrative Agent shall have received the Projections.

(m)    <u>Evidence of Insurance</u>.  Collateral Agent shall have received a certificate from Borrower Representative's insurance broker or other evidence reasonably satisfactory to it that all insurance required to be maintained pursuant to <u>Section 5.5</u> is in full force and effect.

(n)    <u>Fees and Expenses</u>.  Borrowers shall have paid to Administrative Agent (i) the fees payable on the Closing Date referred to in <u>Section 2.10</u> (including the Fee Letter), (ii) all expenses of (A) Administrative Agent and each Lender and (B) DIP Agent and each DIP Lender, in each case, incurred prior to the Closing Date (including attorneys' fees), and (iii) all other fees and expenses owing to Administrative Agent, Collateral Agent, and the Lenders pursuant to the Credit Documents and the RSA.

(o)    <u>No Material Adverse Effect</u>.  Since the date of entry of the Confirmation Order, no event, circumstance or change shall have occurred that has caused or evidences, either in any case or in the aggregate, a Material Adverse Effect.

(p)    <u>Solvency Certificate</u>.  Administrative Agent shall have received a Solvency Certificate, dated as of the Closing Date, and addressed to the Agents and Lenders, certifying that Ruby and the other Credit Parties on a consolidated basis, on a pro forma basis, after giving effect to the Transaction, including the discharge entered pursuant to confirmation of the Bankruptcy Plan, and the incurrence of the Indebtedness contemplated hereby, will be Solvent.

(q)    <u>Management Incentive Program</u>.  A new management incentive program on terms reasonably acceptable to Administrative Agent, the Lenders, and Issuing Bank, shall have been established and shall be in full force and effect.

(r)    <u>Closing Date Employment Agreements</u>.  Administrative Agent shall have received duly executed and delivered copies of the Closing Date Employment Agreements, and each such document shall be in full force and effect.

(s)    <u>Management Agreement</u>.  Administrative Agent shall have received a duly executed and delivered copy of the Management Agreement, and such document shall be in full force and effect.

(t)    <u>Equity Transaction</u>.    (i) the Equity Documents (including schedules, exhibits and annexes thereto) shall be in form and substance satisfactory to Administrative Agent and (ii) Administrative Agent shall have received evidence, in form and substance satisfactory to it, that the Equity Transaction shall have been consummated on or prior to the Closing Date in accordance with the Equity Documents and all applicable requirements of law, and no terms of the Equity Documents (other than any immaterial terms or conditions) shall have been waived without the consent of Administrative Agent.

(u)    <u>Warrants</u>.    Administrative Agent shall have received evidence of the issuance of the Warrants in accordance with the Equity Documents, which such evidence of the issuance shall be in form and substance satisfactory to Administrative Agent.

(v)    <u>Credit Card Notification Letters</u>.  The Collateral Agent shall have received a Credit Card Notification Letter with respect to each Credit Card Processor, in form and substance satisfactory to Collateral Agent, duly executed and delivered by the applicable Credit Party, Collateral Agent, and the applicable Credit Card Processor.

(w)    <u>Cure Costs</u>.    All cure costs in respect of assumed executory contracts and unexpired leases shall have been paid in full from available cash in accordance with the terms of the Bankruptcy Plan.

**3.2.    Conditions to Each Credit Extension.**

(a)    <u>Conditions Precedent</u>.    The obligation of each Lender to make any Credit Extension on any Credit Date, including the Closing Date, is subject to the satisfaction, or waiver in accordance with <u>Section 10.5</u>, of the following conditions precedent; <u>provided</u>, that, for the avoidance of doubt, a failure to satisfy any of the foregoing conditions precedent shall not relieve the Lenders from their obligations to fund Letter of Credit Loans to the Issuing Bank in accordance with <u>Section 2.3</u>:

(i)    Administrative Agent shall have received a fully-executed and delivered Funding Notice or Issuance Notice, as the case may be;

(ii)    after making the Credit Extensions on such Credit Date, any requested Term Loan under <u>Section 2.1(a)</u> shall not exceed the remaining available Commitments then in effect;

(iii)    as of such Credit Date, the representations and warranties contained herein and in the other Credit Documents shall be true and correct in all material respects on and as of that Credit Date to the same extent as though made on and as of that date (unless such representation and warranty is qualified as to materiality or Material Adverse Effect, in which case, such representation and warranty shall be true and correct in all respects), except to the extent such representations and warranties specifically relate to an earlier date, in which case such representations and warranties shall have been true and correct in all material respects on and as of such earlier date (unless such representation and warranty is qualified as to materiality or Material Adverse Effect, in which case, such representation and warranty shall be true and correct in all respects);

(iv)    as of such Credit Date, no event shall have occurred and be continuing or would result from the consummation of the applicable Credit Extension that would constitute a Default or an Event of Default; and

(v)    on or before the date of issuance of any Letter of Credit, Administrative Agent shall have received all other information required by the applicable Issuance Notice, and such other documents or information as Issuing Bank may reasonably require in connection with the issuance of such letter of Credit.

(b)    <u>Notices</u>.    Any Notice shall be executed by an Authorized Officer of Borrower Representative in a writing delivered to Administrative Agent.  In lieu of delivering a Notice, Borrower Representative may give Administrative Agent telephonic notice by the required time of any proposed borrowing, proposed issuance, conversion or continuation, as the case may be; <u>provided</u>, each such notice shall be promptly confirmed in writing by delivery of the applicable Notice to Administrative Agent on or before the applicable date of borrowing, proposed issuance, conversion or continuation.  Neither Administrative Agent nor any Lender shall incur any liability to Borrower Representative or any other Credit Party in acting upon any telephonic notice referred to above that Administrative Agent believes in good faith to have been given by a duly authorized officer or other Person authorized on behalf of Borrower Representative or for otherwise acting in good faith.

**SECTION 4.    REPRESENTATIONS AND WARRANTIES**

In order to induce the Agents and Lenders and Issuing Bank to enter into this Agreement and to make each Credit Extension to be made thereby, each Credit Party represents and warrants to each Agent and Lender and Issuing Bank, on the Closing Date and on each Credit Date, that the following statements are true and correct:

**4.1.    Organization; Requisite Power and Authority; Qualification; Chief Executive Office**.  Each Credit Party (a) is duly organized, validly existing and in good standing under the laws of its jurisdiction of organization as identified in Schedule 4.1, (b) has all requisite power and authority to own and operate its properties, to carry on its business as now conducted and as proposed to be conducted, to enter into the Credit Documents to which it is a party and to carry out the transactions contemplated thereby, and (c) is qualified to do business and in good standing in every jurisdiction where its assets are located and wherever necessary to carry out its business and operations, except in jurisdictions where the failure to be so qualified or in good standing has not had, and could not be reasonably expected to have, a Material Adverse Effect.  The chief executive office of each Credit Party and its Subsidiaries for the past five (5) years is set forth on Schedule 4.1.

**4.2.    Capital Stock and Ownership**.  The Capital Stock of each Credit Party has been duly authorized and validly issued and is fully paid and non-assessable.  Except as set forth on Schedule 4.2, as of the date hereof, there is no existing option, warrant, call, right, commitment or other agreement to which any Credit Party or any of its Subsidiaries is a party requiring, and there is no membership interest or other Capital Stock of any Credit Party outstanding which upon conversion or exchange would require, the issuance by any Credit Party of any additional membership interests or other Capital Stock of any Credit Party or other Securities convertible into, exchangeable for or evidencing the right to subscribe for or purchase, a membership interest or other Capital Stock of any Credit Party.  Schedule 4.2 correctly sets forth the ownership interest of each Credit Party and its Subsidiaries (including, for the avoidance of doubt, each of the Maryland Liquor Subsidiaries) as of the Closing Date.

**4.3.    Due Authorization**.  The execution, delivery and performance of the Credit Documents have been duly authorized by all necessary action on the part of each Credit Party that is a party thereto.

**4.4.    No Conflict**.  The execution, delivery and performance by the Credit Parties of the Credit Documents to which they are parties and the consummation of the transactions contemplated by the Credit Documents do not and will not (a) violate any provision of any law or any governmental rule or regulation applicable to any Credit Party, any of the Organizational Documents of any Credit Party, or any order, judgment or decree of any court or other agency of government binding on any Credit Party; (b) conflict with, result in a breach of or constitute (with due notice or lapse of time or both) a default under (i) any Material Contract or (ii) any other material Contractual Obligation of any Credit Party, in each case under this clause (b), except as could not be reasonably expected to have a Material Adverse Effect; (c) result in or require the creation or imposition of any Lien upon any of the properties or assets of any Credit Party (other than any Liens created under any of the Credit Documents in favor of Collateral Agent, on behalf of Secured Parties); or (d) require any approval of stockholders, members or partners or any approval or consent of any Person under any Contractual Obligation of any Credit Party, except for such approvals or consents which will be obtained on or before the Closing Date and disclosed in writing to Lenders.

**4.5.    Governmental Consents**.  The execution, delivery and performance by the Credit Parties of the Credit Documents to which they are parties and the consummation of the transactions contemplated by the Credit Documents do not and will not require any registration with, consent or approval of, or notice to, or other action to, with or by, any Governmental Authority, except for filings and recordings with respect to the Collateral to be made or otherwise delivered to Collateral Agent for filing and/or recordation as of the Closing Date.

**4.6.    Binding Obligation**.  Each Credit Document has been duly executed and delivered by each Credit Party that is a party thereto and is the legally valid and binding obligation of such Credit Party, enforceable against such Credit Party in accordance with its respective terms, except as may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability.

**4.7.    [Reserved]**.

**4.8.    Projections**.  On and as of the Closing Date, the projections of Holdings and its Subsidiaries for the period of Fiscal Year 2021 through and including Fiscal Year 2025, including projections for each Fiscal Quarter during the Fiscal Year in which the Closing Date takes place (the **"Projections"**), are based on good faith estimates and assumptions made by the management of Holdings; <u>provided</u>, that the Projections are by their nature subject to significant uncertainties and contingencies, many of which are beyond the control of Sponsor or Holdings, the Projections are not to be viewed as facts and that actual results during the period or periods covered by the Projections may differ from such Projections and that the differences may be material; <u>provided</u>, <u>further</u>, as of the Closing Date, management of Holdings believed that the Projections were reasonable and attainable.

**4.9.    No Material Adverse Effect**.  Since the date of entry of the Confirmation Order, no event, circumstance or change has occurred that has caused or evidences, either in any case or in the aggregate, a Material Adverse Effect.  For the avoidance of doubt, subject to <u>Section</u> **Error! Reference source not found.**, the failure by any Credit Party to meet any internal or published budgets, projections, forecasts or predictions of financial performance for any period shall not on its own be deemed a Material Adverse Effect (it being understood that this sentence shall not prevent a party from asserting that any fact, change, event, occurrence or effect that may have contributed to such failure independently constitutes or contributes to a Material Adverse Effect).

**4.10.    Insurance**.  <u>Schedule 4.10</u> sets forth all material insurance coverages maintained by each Credit Party on the Closing Date, including the names of insurers, policy limits and deductibles.  No Credit Party has received written notice of cancellation or intent not to renew any of such policies, and there has not occurred, and no Credit Party is aware of any occurrence or the existence of any condition (other than general industry-wide conditions) such as could reasonably be expected to cause any of such insurers to cancel any of such insurance coverages, or could be reasonably likely to materially increase the premiums charged to any Credit Party for coverages consistent with the scope and amounts of coverages as in effect on the Closing Date.

**4.11.    Adverse Proceedings, etc**.  There are no Adverse Proceedings, individually or in the aggregate, that could reasonably be expected to have a Material Adverse Effect.  Without otherwise limiting the other provisions hereof, neither Holdings nor any of its Subsidiaries (a) is in violation of any applicable laws (including Environmental Laws and Food Safety Laws) that, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect or (b) is subject to or in default with respect to any final judgments, writs, injunctions, decrees, orders, rules or regulations of any court or any federal, state, municipal or other governmental department, commission, board, bureau, agency or instrumentality, domestic or foreign, that, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

**4.12.    Payment of Taxes**.  Except as otherwise permitted under <u>Section 5.3</u> [or described on Schedule 4.12][7], (a) all federal and state Tax returns and reports and (b) all other material Tax returns and reports, in each case, of each Credit Party and its Subsidiaries required to be filed by any of them have

---

[7] **NTD** – subject to review of Schedule 4.12.

been timely filed, and all Taxes shown on such Tax returns to be due and payable and all other Taxes, assessments, fees and other governmental charges upon each Credit Party and its Subsidiaries and upon their respective properties, assets, income, businesses and franchises which are due and payable have been paid when due and payable. No Credit Party knows of any proposed Tax assessment against any Credit Party or any of its Subsidiaries which is not being actively contested by such Credit Party or such Subsidiary in good faith and by appropriate proceedings; provided, such reserves or other appropriate provisions, if any, as shall be required in conformity with GAAP shall have been made or provided therefor.

**4.13.    Properties.**

(a)    Title. Each Credit Party and its Subsidiaries has (i) good, sufficient and legal title to (in the case of fee interests in real property), (ii) valid leasehold interests in (in the case of leasehold interests in real or personal property), and (iii) good title to (in the case of all other personal property), all of their respective properties and assets in the most recent financial statements delivered pursuant to Section 5.1, in each case except for assets disposed of since the date of such financial statements in the ordinary course of business or as otherwise permitted under Section 6.9. All such properties and assets are free and clear of Liens, other than Permitted Liens.

(b)    Real Estate. As of the Closing Date, Schedule 4.13 contains a true, accurate and complete list of (i) all Real Estate Assets and (ii) all leases, subleases, assignments of leases or licenses affecting each Real Estate Asset of any Credit Party, regardless of whether such Credit Party is the landlord, tenant, licensor or licensee (whether directly or as an assignee or successor in interest) under such lease, sublease, assignment or license. Each agreement described in clause (ii) of the immediately preceding sentence is in full force and effect, and Holdings does not have knowledge of any default that has occurred and is continuing thereunder. Each such agreement constitutes the legally valid and binding obligation of each applicable Credit Party, enforceable against such Credit Party in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium, or similar laws relating to or limiting creditors' rights generally or by equitable principles. To the knowledge of each Credit Party, no other party to such agreement is in default of its obligations thereunder, and no Credit Party (or any other party to such agreement) has at any time delivered any notice of default which remains uncured under any such lease.

**4.14.    Environmental Matters.** Neither Holdings nor any of its Subsidiaries nor any of their respective Facilities or operations are subject to any outstanding written order, consent decree or settlement agreement with any Person relating to any Environmental Law, any Environmental Claim, or any Hazardous Materials Activity that, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect. Neither Holdings nor any of its Subsidiaries has received any letter or request for information under Section 104 of the Comprehensive Environmental Response, Compensation, and Liability Act (42 U.S.C. § 9604) or any comparable state law. There are and, to each of Holdings' and its Subsidiaries' knowledge, have been, no conditions, occurrences, or Hazardous Materials Activities which could reasonably be expected to form the basis of an Environmental Claim against any Credit Party or any of its Subsidiaries that, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect. Neither Holdings nor any of its Subsidiaries and, to such Credit Party's knowledge, no predecessor of any Credit Party or any of its Subsidiaries has filed any notice under any Environmental Law indicating past or present treatment of Hazardous Materials at any Facility, and no Credit Party or any of its Subsidiaries has any operation that involves the transportation, treatment, storage or disposal of hazardous waste, as defined under 40 C.F.R. Parts 260 270 or any state equivalent. Compliance with all current or reasonably foreseeable future requirements pursuant to or under Environmental Laws could not be reasonably expected to have, individually or in the aggregate, a Material Adverse Effect. No event or condition has occurred or is occurring with respect to any Credit

66

Party or any of its Subsidiaries relating to any Environmental Law, any Release of Hazardous Materials, or any Hazardous Materials Activity, which individually or in the aggregate has had, or could reasonably be expected to have, a Material Adverse Effect.

**4.15.  No Defaults**.  Except in connection with the pendency of the Cases, neither Holdings nor any of its Subsidiaries is in default in the performance, observance or fulfillment of any of the obligations, covenants or conditions contained in any of its Contractual Obligations, and no condition exists which, with the giving of notice or the lapse of time or both, could constitute such a default, in each case, except where the consequences, direct or indirect, of such default or defaults, if any, could not reasonably be expected to have a Material Adverse Effect.

**4.16.  Material Contracts; Franchise Agreements; Liquor Subsidiary Contracts.**

(a)     Schedule 4.16(a) contains a true, correct and complete list of all the Material Contracts in effect on the Closing Date.  The Material Contracts described in this Section 4.16, together with any updates provided pursuant to Section 5.1(n), are in full force and effect and no defaults currently exist thereunder (other than as described in Schedule 4.16 or in such updates).

(b)     Schedule 4.16(b) includes a complete and accurate list of each Franchise Agreement to which any Credit Party is a party, with (i) the street address of each franchised unit covered by such Franchise Agreement, (ii) the unit number of each such franchised unit, (iii) the name of the franchisee for each franchised unit, and (iv) the effective date and expiration date of such Franchise Agreement.

(c)     Schedule 4.16(c) includes a complete and accurate list of each Liquor Subsidiary Contract.  Each Liquor Subsidiary Contract is in full force and effect and no Credit Party has any knowledge of any default that has occurred and is continuing thereunder, and each such agreement constitutes the legally valid and binding obligation of each party thereto, enforceable against such party in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws relating to or limiting creditors' rights generally or by equitable principles.

**4.17.  Governmental Regulation**.  Neither Holdings nor any of its Subsidiaries is subject to regulation under the Public Utility Holding Company Act of 2005, the Federal Power Act or the Investment Company Act of 1940 or under any other federal or state statute or regulation which may limit its ability to incur Indebtedness or which may otherwise render all or any portion of the Obligations unenforceable.  Neither Holdings nor any of its Subsidiaries is a "registered investment company" or a company "controlled" by a "registered investment company" or a "principal underwriter" of a "registered investment company" as such terms are defined in the Investment Company Act of 1940.

**4.18.  Use of Proceeds; Margin Stock**.  None of the proceeds of the Loans made to such Credit Party will be used in a manner other than as expressly set forth in Section 2.5.  Neither Holdings nor any of its Subsidiaries is engaged principally, or as one of its important activities, in the business of extending credit for the purpose of purchasing or carrying any Margin Stock.  No part of the proceeds of the Loans made to such Credit Party will be used to purchase or carry any such Margin Stock or to extend credit to others for the purpose of purchasing or carrying any such Margin Stock or for any purpose that violates, or is inconsistent with, the provisions of Regulation T, U or X of the Board of Governors of the Federal Reserve System.

**4.19.  Employee Matters**.  No Credit Party nor any of its Subsidiaries is engaged in any unfair labor practice that could reasonably be expected to have a Material Adverse Effect.  There is (a) no unfair

LEGAL_US_W # 105221370.13

labor practice complaint pending against any Credit Party or any of its Subsidiaries, or to the knowledge of any Credit Party, threatened against any of them before the National Labor Relations Board and no grievance or arbitration proceeding arising out of or under any collective bargaining agreement that is so pending against any Credit Party or any of its Subsidiaries or to the knowledge of any Credit Party, threatened against any of them, (b) no strike or work stoppage in existence or threatened involving any Credit Party or any of its Subsidiaries, and (c) to the knowledge of any Credit Party, no union representation question existing with respect to the employees of any Credit Party or any of its Subsidiaries and, to the knowledge of any Credit Party, no union organization activity that is taking place, except (with respect to any matter specified in clause (a), (b) or (c) of this Section 4.19, either individually or in the aggregate) such as is not reasonably likely to have a Material Adverse Effect.

4.20.   **Employee Benefit Plans**.   To Ruby's knowledge, from and after the Closing Date, except as identified on Schedule 4.20, each Employee Benefit Plan has been maintained and administered in compliance in all material respects with all applicable provisions and requirements of ERISA and the Internal Revenue Code and the regulations and published interpretations promulgated thereunder. Each Employee Benefit Plan maintained by a Credit Party or its Subsidiaries which is intended to qualify under Section 401(a) of the Internal Revenue Code has received a favorable determination letter from the Internal Revenue Service indicating that such Employee Benefit Plan satisfies such qualification requirements or is covered by a favorable opinion or advisory letter upon which the Credit Party or Subsidiary can rely as to the qualification of such Employee Benefit Plan and nothing has occurred subsequent to the issuance of such determination letter (or opinion or advisory letter, as applicable) which would cause such Employee Benefit Plan to lose its qualified status. No material liability to the PBGC (other than required premium payments), the Internal Revenue Service, any Employee Benefit Plan or any trust established under Title IV of ERISA (other than contributions in the ordinary course) has been or is expected to be incurred by any Credit Party, any of its Subsidiaries or any of their ERISA Affiliates. Except as set forth on Schedule 4.20, no ERISA Event has occurred or is reasonably expected to occur. Except as set forth on Schedule 4.20 and to the extent required under Section 4980B of the Internal Revenue Code or similar state laws, no Employee Benefit Plan provides health or welfare benefits (through the purchase of insurance or otherwise) for any retired or former employee of any Credit Party or any of its Subsidiaries. Except as set forth on Schedule 4.20, the present value of the aggregate benefit liabilities under each Pension Plan sponsored, maintained or contributed to by any Credit Party, any of its Subsidiaries or any of their ERISA Affiliates (determined as of the end of the most recent plan year on the basis of the actuarial assumptions specified for funding purposes in the most recent actuarial valuation for such Pension Plan), did not exceed the aggregate current value of the assets of such Pension Plan. As of the Closing Date, no Credit Party has any Multiemployer Plans.

4.21.   **Certain Fees**.   No broker's or finder's fee or commission will be payable with respect hereto or any of the transactions contemplated hereby. All fees and expenses (including fees and expenses payable to advisors) required to be paid or reimbursed by the Credit Parties in connection with the Transaction on or prior to the Closing Date have been paid or reimbursed by the Credit Parties as of the Closing Date.

4.22.   **Solvency**.   As of (a) the Closing Date, Ruby and the other Credit Parties on a consolidated basis, on a pro forma basis, after giving effect to the Transaction, including the discharge entered pursuant to confirmation of the Bankruptcy Plan, and the incurrence of the Indebtedness contemplated hereby, will be Solvent, and (b) as of each other Credit Date, Ruby and the other Credit Parties, on a consolidated basis, on a pro forma basis, after giving effect the incurrence of any Credit Extension by such Credit Party on any date on which this representation and warranty is made, will be, Solvent.

**4.23.    Confirmation Order**.    The Confirmation Order has been entered by the Bankruptcy Court and is effective.

**4.24.    Compliance with Statutes, etc**.    Without limiting the specificity of any other representations and warranties contained herein, each Credit Party and its Subsidiaries is in compliance with all applicable statutes, regulations and orders of, and all applicable restrictions imposed by, all Governmental Authorities, in respect of the conduct of its business and the ownership of its property (including compliance with all applicable (a) Food Safety Laws and (b) Environmental Laws with respect to any Real Estate Asset or governing its business and the requirements of any permits issued under such Environmental Laws with respect to any such Real Estate Asset or the operations of such Credit Party or any of its Subsidiaries), except such noncompliance that, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

**4.25.    Disclosure**.    No representation or warranty of any Credit Party contained in the Disclosure Statement or in any Credit Document or in any other documents, certificates or written statements furnished to Lenders by or on behalf of any Credit Party or any of its Subsidiaries for use in connection with the transactions contemplated hereby contains any untrue statement of a material fact or omits to state a material fact (known to any Credit Party, in the case of any document not furnished by any of them) necessary in order to make the statements contained herein or therein not misleading in light of the circumstances in which the same were made.  Any projections and pro forma financial information contained in such materials are based upon good faith estimates and assumptions believed by the Credit Parties to be reasonable at the time made, it being recognized by Lenders that such projections as to future events are not to be viewed as facts and that actual results during the period or periods covered by any such projections may differ from the projected results.  There are no facts known (or which should upon the reasonable exercise of diligence be known) to any Credit Party (other than matters of a general economic nature) that, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect and that have not been disclosed herein or in such other documents, certificates and statements furnished to Lenders for use in connection with the transactions contemplated hereby.  For the avoidance of doubt, subject to Section 4.8, the failure by any Credit Party to meet any internal or published budgets, projections, forecasts or predictions of financial performance for any period shall not on its own be deemed a Material Adverse Effect (it being understood that this sentence shall not prevent a party from asserting that any fact, change, event, occurrence or effect that may have contributed to such failure independently constitutes or contributes to a Material Adverse Effect).

**4.26.    Sanctions; Anti-Terrorism and Anti-Corruption Laws.**

(a)    None of the Credit Parties nor any of their Affiliates or, to any Credit Party's knowledge, their respective officers, directors, brokers or agents of such Person or Affiliate (i) has violated any Anti-Terrorism Laws or Sanction, (ii) has engaged in any transaction, investment, undertaking or activity that conceals the identity, source or destination of the proceeds from any category of prohibited offenses designed by the Organization for Economic Co-operation and Development's Financial Action Task Force on Money Laundering, (iii) is a Person whose name appears on the list of Specially Designated Nationals and Blocked Persons published by OFAC (an "**OFAC Listed Person**") or is otherwise a Sanctioned Person, (iv) is an agent, department, or instrumentality of, or is otherwise beneficially owned by, controlled by or acting on behalf of, directly or indirectly, (A) any OFAC Listed Person or (B) any other Sanctioned Person or Sanctioned Country, or (v) is otherwise blocked, the subject or target of Sanctions or engaged in any activity in violation of Sanctions or Anti-Terrorism Laws (each OFAC Listed Person, Sanctioned Person, Sanctioned Country and each other Person, entity, organization and government of a country described in clauses (iii), (iv) or (v) of this Section 4.26(a), a "**Blocked Person**").  No Credit Party nor any Controlled Entity has been notified that its name appears or may in the future appear on a list of Persons that engage in investment or other commercial activities in Iran or

69

any other Sanctioned Country. No part of the proceeds from the Loans made hereunder constitutes or will constitute funds obtained on behalf of any Blocked Person or will otherwise be used by Borrowers, directly or indirectly, or lent, contributed or otherwise made available to any Person (x) in connection with any investment in, or any transactions or dealings with, any Blocked Person, (y) to fund any activities or business of or with any Sanctioned Person, or in any Sanctioned Country or (z) otherwise in any manner that would result in a violation of Sanctions by any Person (including any Person participating in the Loans, whether as underwriter, advisor, investor or otherwise).

(b)        None of the Credit Parties nor any of their Affiliates or, to any Credit Party's knowledge, their respective officers, directors, brokers or agents acting or benefiting in any capacity in connection with the Loans (i) deals in or otherwise engages, or has dealt or otherwise engaged, in any transaction related to, any property or interests in property blocked pursuant to any Anti-Terrorism Law or Sanction, (ii) engages in or conspires to, or engaged or conspired to, engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in any Anti-Terrorism Law or Sanction, (iii) has been found in violation of, charged with, or convicted under any Anti-Terrorism Law, (iv) to any Credit Party's knowledge after making due inquiry, is under investigation by any Governmental Authority for possible violation of Anti-Terrorism Laws or any Sanctions, (v) has been assessed civil penalties under any Anti-Terrorism Laws or any Sanctions, or (vi) has had any of its funds seized or forfeited in an action under any Anti-Terrorism Laws.

(c)        No Credit Party nor any of its Affiliates (i) has been charged with, or convicted of bribery or any other anti-corruption related activity under any applicable Anti-Corruption Laws, (ii) to each Credit Party's knowledge after making due inquiry, is under investigation by any Governmental Authority for possible violation of Anti-Corruption Laws, or (iii) has been assessed civil or criminal penalties under any Anti-Corruption Laws. No part of the proceeds of the Loans will be used, directly or indirectly, for any payments to any governmental official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of the Anti-Corruption Laws. Each Credit Party, each of its Subsidiaries and, to their knowledge, each of their respective directors, officers and employees and agents are in compliance with all Anti-Corruption Laws.

**4.27.    Information Security Requirements; Personal Information**.    No privacy or information security enforcement action, investigation, litigation or claim (including under the laws, rules, regulation, directives and governmental requirements set forth in <u>Section 5.12</u>) has been filed against any Credit Party or any of its Subsidiaries.

**4.28.    Food Safety**.    All products designed, developed, manufactured, prepared, assembled, packaged, tested, labeled, distributed, marketed or sold by or on behalf of the Credit Parties that are subject to the jurisdiction of the United States Food and Drug Administration or a comparable Government Authority have been and are being designed, developed, tested, manufactured, prepared, assembled, packaged, distributed, labeled, marketed and sold in compliance in all material respects with all applicable Food Safety Laws, including product approval or clearance, good manufacturing practices, labeling, advertising and promotion, record-keeping, adverse event reporting, and have been and are being tested, investigated, designed, developed, manufactured, prepared, assembled, packaged, labeled, distributed, marketed, and sold in compliance in all material respects with each applicable Food Safety Law.

**4.29.    Intellectual Property**.    Each Credit Party owns, or is licensed (or authorized) to use, all Intellectual Property material to the conduct of its business as currently conducted, except where the consequences, direct or indirect, if any, could not reasonably be expected to have a Material Adverse Effect. To the knowledge of each Credit Party, the operation of such Credit Party's business and the use

of Intellectual Property owned by such Credit Party or licensed by such Credit Party do not infringe, misappropriate, dilute or otherwise violate the Intellectual Property rights of any person. No claim or litigation regarding any Intellectual Property owned by a Credit Party is pending or, to the knowledge of any Credit Party, threatened in writing against any Credit Party or Subsidiary. The Credit Parties have taken (and caused all their Subsidiaries to take) all commercially reasonable steps to maintain, enforce and protect the owned Intellectual Property of the Credit Parties and maintain the Credit Parties' rights in any licensed Intellectual Property, in each case, that is material to the conduct of their business as currently conducted.

     **4.30.**    **Accounts**. Schedule 4.30 sets forth all of the Credit Parties' Deposit Accounts, Securities Accounts and Commodities Accounts, in each case, together with the name of the depositary institution, account number and type of such account or accounts. As used in this Section 4.30, "Deposit Accounts," "Securities Accounts" and "Commodities Accounts" shall have the meaning ascribed thereto in the Pledge and Security Agreement.

## SECTION 5.  AFFIRMATIVE COVENANTS

     Each Credit Party covenants and agrees that so long as any Commitment is in effect and until payment in full in Cash of all Obligations (other than contingent indemnification Obligations for which no claim has been asserted) and cancellation or expiration of all Letters of Credit, each Credit Party shall perform, and shall cause each of its Subsidiaries to perform, all covenants in this Section 5.

     **5.1.**    **Financial Statements and Other Reports**. Unless otherwise provided below, Borrower Representative shall deliver to Administrative Agent and Lenders:

          (a)    Monthly Reports. As soon as available, and in any event within thirty (30) days after the end of each Fiscal Month (including, for the avoidance of doubt, Fiscal Months which began prior to the Closing Date), the consolidated balance sheet of Holdings and its Subsidiaries as at the end of such Fiscal Month and the related consolidated statements of income, consolidated statements of cash flows of Holdings and its Subsidiaries for such Fiscal Month and for the period from the beginning of the then current Fiscal Year to the end of such Fiscal Month, setting forth in each case in comparative form the corresponding figures for the corresponding periods of the previous Fiscal Year and the corresponding figures from the Financial Plan for the current Fiscal Year, all in reasonable detail, in Microsoft Excel format, together with a schedule of reconciliations for any reclassifications with respect to prior Fiscal Months or periods (and, in connection therewith, copies of any restated financial statements for any impacted Fiscal Month or period) a Financial Officer Certification and a same store sales report;

          (b)    Quarterly Financial Statements. As soon as available, and in any event within forty-five (45) days after the end of each Fiscal Quarter of each Fiscal Year (including, for the avoidance of doubt, the Fiscal Quarter which began prior to the Closing Date, and the fourth Fiscal Quarter), the consolidated balance sheets of Holdings and its Subsidiaries as at the end of such Fiscal Quarter and the related consolidated statements of income and cash flows of Holdings and its Subsidiaries for such Fiscal Quarter and for the period from the beginning of the then current Fiscal Year to the end of such Fiscal Quarter, setting forth in each case in comparative form the corresponding figures for the corresponding periods of the previous Fiscal Year and the corresponding figures from the Financial Plan for the current Fiscal Year, all in reasonable detail, in Microsoft Excel format, together with a Financial Officer Certification and an Operating Report;

          (c)    Annual Financial Statements. As soon as available, and in any event within one hundred twenty (120) days after the end of each Fiscal Year (and in the case of the Fiscal Year during which the Closing Date occurs, one hundred fifty (150) days after the end of such Fiscal Year), (i) the

consolidated balance sheets of each Credit Party and its Subsidiaries as at the end of such Fiscal Year and the related consolidated statements of income, stockholders' equity and cash flows of Holdings and its Subsidiaries for such Fiscal Year, setting forth in each case in comparative form the corresponding figures for the previous Fiscal Year, in reasonable detail, together with a Financial Officer Certification with respect thereto; and (ii) with respect to such consolidated financial statements a report thereon of Citrin Cooperman or other independent certified public accountants of recognized national standing selected by Holdings, and reasonably satisfactory to Administrative Agent (which report shall be unqualified as to going concern and scope of audit, and shall state that such consolidated financial statements fairly present, in all material respects, the consolidated financial position of Holdings and its Subsidiaries as at the dates indicated and the results of their operations and their cash flows for the periods indicated in conformity with GAAP applied on a basis consistent with prior years (except as otherwise disclosed in such financial statements) and that the examination by such accountants in connection with such consolidated financial statements has been made in accordance with generally accepted auditing standards), together with a written statement by such independent certified public accountants stating (A) that their audit examination has included a review of the terms of the Credit Documents, (B) whether, in connection therewith, any condition or event that constitutes a Default or an Event of Default has come to their attention and, if such a condition or event has come to their attention, specifying the nature and period of existence thereof, and (C) that nothing has come to their attention that causes them to believe that the information contained in any Compliance Certificate is not correct or that the matters set forth in such Compliance Certificate are not stated in accordance with the terms hereof (such report shall also include (I) a detailed summary of any audit adjustments; (II) a reconciliation of any audit adjustments or reclassifications to the previously provided Fiscal Month or Fiscal Quarter financials; and (III) restated Fiscal Month or Fiscal Quarter financials for any impacted periods);

(d)    Compliance Certificate.  Together with each delivery of financial statements of Holdings and its Subsidiaries pursuant to Sections 5.1(a), 5.1(b), and 5.1(c), a duly executed and completed Compliance Certificate (it being understood and agreed that the Credit Parties shall be required to report and calculate compliance with each of the financial covenants set forth in Section 6.8 in each Compliance Certificate regardless of whether or not such financial covenants are being tested at such time in accordance with the terms of this Agreement);

(e)    Statements of Reconciliation after Change in Accounting Principles.  If, as a result of any change in accounting principles and policies, the consolidated financial statements of each Credit Party and its Subsidiaries delivered pursuant to Section 5.1(a), 5.1(b), or 5.1(c) will differ in any material respect from the consolidated financial statements that would have been delivered pursuant to such subdivisions had no such change in accounting principles and policies been made, then, together with the first delivery of such financial statements after such change, one or more statements of reconciliation for all such prior financial statements in form and substance reasonably satisfactory to Administrative Agent;

(f)    Notice of Material Events.  Promptly upon any officer of any Credit Party obtaining knowledge (i) of any condition or event that constitutes a Default or an Event of Default or that notice has been given to Borrower Representative with respect thereto; (ii) that any Person has given any notice to any Credit Party or any of its Subsidiaries or taken any other action with respect to any event or condition set forth in Section 8.1(b); or (iii) of the occurrence of any event or change that has caused or evidences, either in any case or in the aggregate, a Material Adverse Effect, a certificate of its Authorized Officers specifying the nature and period of existence of such condition, event or change, or specifying the notice given and action taken by any such Person and the nature of such claimed Event of Default, Default, default, event or condition, and what action the Credit Parties have taken, are taking and propose to take with respect thereto;

(g)    <u>Notice of Litigation</u>.  Promptly upon any officer of any Credit Party obtaining knowledge of (i) the filing of, or non-frivolous threat of, any Adverse Proceeding not previously disclosed in writing by the Credit Parties to Lenders, or (ii) any material development in any Adverse Proceeding that, in the case of either <u>clause (i)</u> or <u>(ii)</u> of this sentence if adversely determined, could be reasonably expected to have a Material Adverse Effect, or seeks to enjoin or otherwise prevent the consummation of, or to recover any damages or obtain relief as a result of, the transactions contemplated hereby, written notice thereof together with such other information as may be reasonably available to the Credit Parties to enable Lenders and their counsel to evaluate such matters;

(h)    <u>Labor Matters</u>.  Each Credit Party shall give Administrative Agent prompt notice of (a) any unfair labor practice complaint pending against any Credit Party or any of its Subsidiaries, or to the knowledge of any Credit Party, threatened against any of them before the National Labor Relations Board and any grievance or arbitration forum proceeding arising out of or under any collective bargaining agreement that is so pending against any Credit Party or any of its Subsidiaries or to the knowledge of any Credit Party, threatened against any of them, (b) any strike or work stoppage in existence or threatened involving any Credit Party or any of its Subsidiaries, and (c) any union representation question existing with respect to the employees of any Credit Party or any of its Subsidiaries or any union organization activity that is taking place;

(i)    <u>Notice of Prepayment Events</u>.  Written notice of any Asset Sale, any receipt of Net Insurance/Condemnation Proceeds, any receipt of proceeds from the issuance of Capital Stock and any receipt of a Tax Refund, in each case, which would create the obligation by the Credit Parties to make a mandatory prepayment under <u>Section 2.13</u>.

(j)    <u>ERISA</u>.  (i) Promptly upon becoming aware of the occurrence of or forthcoming occurrence of any ERISA Event, a written notice specifying the nature thereof, what action any Credit Party, any of its Subsidiaries or any of their respective ERISA Affiliates has taken, is taking or proposes to take with respect thereto and, when known, any action taken or threatened by the Internal Revenue Service, the Department of Labor or the PBGC with respect thereto; and (ii) with reasonable promptness, copies of (A) each Schedule B (Actuarial Information) to the annual report (Form 5500 Series) filed by any Credit Party or any of its Subsidiaries with the United States Department of Labor with respect to each Pension Plan; (B) all notices received by any Credit Party, any of its Subsidiaries or any of their respective ERISA Affiliates (if such ERISA Affiliates provides copies of such notice to any Credit Party) from a Multiemployer Plan sponsor concerning an ERISA Event; and (C) copies of such other documents or governmental reports or filings relating to any Employee Benefit Plan as Administrative Agent shall reasonably request;

(k)    <u>Forecast and Financial Plan</u>.

(i)    On or before the Friday of each week during the Forecast Reporting Period, a consolidated rolling thirteen-week cash flow forecast for Holdings and its Subsidiaries (together with a comparison of actual payments to budgeted line items for the prior weekly period and on a cumulative basis since the Petition Date), in Microsoft Excel format and in form satisfactory to the Administrative Agent in its sole discretion (the "**13-Week Forecast**") and (b) each week (ending on Tuesday), on the Variance Report Date, a weekly variance report, in a form reasonably satisfactory to the Administrative Agent, which variance report will show actual sales, collections and disbursements made by the Credit Parties in the immediately preceding week, together with a comparison to the sales, collections and disbursements reflected in the immediately preceding 13-Week Forecast and noting therein all variances, on a line-item basis, from amounts set forth for such period in the 13-Week Forecast, and including explanations for all material variances, the cause of the variance and how the source of such variance is expected to impact the 13-Week Forecast; and

(ii)       As soon as practicable and in any event no later than forty-five (45) days after the beginning of each Fiscal Year, a consolidated plan and financial forecast for such Fiscal Year and each Fiscal Year (or portion thereof) through the Maturity Date (a **"Financial Plan"**), delivered in Microsoft Excel format and including (A) a forecasted consolidated balance sheet and forecasted consolidated statements of income and cash flows of each Credit Party and its Subsidiaries for such Fiscal Year, together with an explanation of the assumptions on which such forecasts are based, (B) forecasted consolidated statements of income and cash flows of each Credit Party and its Subsidiaries for each Fiscal Month of each such Fiscal Year, (C) forecasts demonstrating projected compliance with the requirements of Section 6.8 through the Maturity Date, and (D) forecasts demonstrating adequate liquidity through the Maturity Date, together, in each case, with an explanation of the assumptions on which such forecasts are based all in form and substance reasonably satisfactory to Administrative Agent;

(l)       Insurance Report.  Upon the reasonable request of Administrative Agent, a report in form and substance reasonably satisfactory to Administrative Agent outlining all material insurance coverage maintained as of the date of such report by Holdings and its Subsidiaries and all material insurance coverage planned to be maintained by Holdings and its Subsidiaries in the immediately succeeding Fiscal Year;

(m)       Notice of Change in Board of Directors.  With reasonable promptness, written notice of any change in the Board of Directors (or similar governing body) or executive officers of Holdings or Ruby;

(n)       Notice Regarding Material Contracts.  Promptly, and in any event within five (5) days after (i) any Material Contract of any Credit Party or any of its Subsidiaries is terminated or amended in a manner that is materially adverse to such Credit Party or such Subsidiary, as the case may be, or (ii) any new Material Contract is entered into, a written statement describing such event, with copies of such material amendments or new contracts, delivered to Administrative Agent (to the extent such delivery is permitted by the terms of any such Material Contract, as the case may be; provided, no such prohibition on delivery shall be effective if it were bargained for by such Credit Party or its applicable Subsidiary with the intent of avoiding compliance with this Section 5.1(n)), and an explanation of any actions being taken with respect thereto;

(o)       Environmental Reports and Audits.  As soon as practicable following receipt thereof, copies of all environmental audits and reports with respect to environmental matters at any Facility or which relate to any environmental liabilities of any Credit Party or its Subsidiaries which, in any such case, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect;

(p)       Information Regarding Collateral.  Borrower Representative shall furnish to Collateral Agent at least ten (10) Business Days' prior written notice of any change (i) in any Credit Party's corporate name, (ii) in any Credit Party's identity or corporate structure, or (iii) in any Credit Party's Federal Taxpayer Identification Number.  Each Credit Party agrees not to effect or permit any change referred to in the immediately preceding sentence unless all filings have been made under the UCC or otherwise that are required in order for Collateral Agent to continue at all times following such change to have a valid, legal and perfected security interest in all the Collateral and for the Collateral at all times following such change to have a valid, legal and perfected security interest as contemplated in the Collateral Documents.  Borrower Representative also agrees to promptly notify Collateral Agent if any material portion of the Collateral is damaged or destroyed;

(q)       Annual Collateral Verification.  Each year, at the time of delivery of annual financial statements with respect to the immediately preceding Fiscal Year pursuant to Section 5.1(c),

Borrower Representative shall deliver to Collateral Agent a certificate of an Authorized Officer (i) either confirming that there has been no change in such information since the date of the Collateral Questionnaire delivered on the Closing Date or the date of the most recent certificate delivered pursuant to this Section 5.1(q) and/or identifying such changes and (ii) certifying that all UCC financing statements (including fixtures filings, as applicable) or other appropriate filings, recordings or registrations, have been filed of record in each governmental, municipal or other appropriate office in each jurisdiction identified in the Collateral Questionnaire or pursuant to clause (i) of this Section 5.1(q) to the extent necessary to protect and perfect the security interests under the Collateral Documents for a period of not less than eighteen (18) months after the date of such certificate (except as noted therein with respect to any continuation statements to be filed within such period);

(r)    Tax Returns.  Upon the request of Administrative Agent, copies of each federal income Tax return filed by or on behalf of any Credit Party.

(s)    [Reserved]; and

(t)    Other Information.  Promptly upon their becoming available, copies of such other information and data with respect to any Credit Party or any of its Subsidiaries as from time to time may be reasonably requested by Administrative Agent or any Lender.

5.2.    **Existence**.  Each Credit Party will, and will cause each of its Subsidiaries to, at all times preserve and keep in full force and effect its existence and all rights and franchises, licenses and permits material to its business; provided, no Credit Party or any of its Subsidiaries shall be required to preserve any such existence, right or franchise, licenses and permits if such Person's Board of Directors (or similar governing body) shall determine that the preservation thereof is no longer desirable in the conduct of the business of such Person, and that the loss thereof is not disadvantageous in any material respect to such Person or to Lenders.

5.3.    **Payment of Taxes and Claims**.  Each Credit Party will, and will cause each of its Subsidiaries to, pay all Taxes imposed upon it or any of its properties or assets or in respect of any of its income, businesses or franchises before any penalty or fine accrues thereon, and all claims (including claims for labor, services, materials and supplies) for sums that have become due and payable and that by law have or may become a Lien upon any of its properties or assets, prior to the time when any penalty or fine shall be incurred with respect thereto; provided, no such Tax or claim need be paid if it is being contested in good faith by appropriate proceedings promptly instituted and diligently conducted, so long as (a) adequate reserve or other appropriate provision, as shall be required in conformity with GAAP shall have been made therefor, and (b) in the case of a Tax or claim which has or may become a Lien against any of the Collateral, such contest proceedings conclusively operate to stay the sale of any portion of the Collateral to satisfy such Tax or claim.  No Credit Party will, nor will it permit any of its Subsidiaries to, file or consent to the filing of any consolidated income Tax return with any Person (other than any Credit Party).  In addition, the Credit Parties agree to pay to the relevant Governmental Authority in accordance with applicable law any current or future stamp or documentary Taxes or any other excise or property Taxes, charges or similar levies (including mortgage recording Taxes, transfer Taxes and similar fees) imposed by any Governmental Authority that arise from any payment made hereunder or from the execution, delivery or registration of, or otherwise with respect to, this Agreement.

5.4.    **Maintenance of Properties**.  Each Credit Party shall, and shall cause each of its Subsidiaries to, maintain or cause to be maintained in good repair, working order and condition, ordinary wear and tear excepted, all material properties (including, but not limited to, all Real Estate Assets) used or useful in the business of each Credit Party and its Subsidiaries and from time to time will make or cause to be made all appropriate repairs, renewals and replacements thereof, in any case, except with

respect to any failure to so maintain, repair, renew and replace as could not reasonably be expected to result in a Material Adverse Effect.

      **5.5.**    **Insurance**.  The Credit Parties shall maintain or cause to be maintained, with financially sound and reputable insurers, (a) business interruption insurance, directors and officers insurance reasonably satisfactory to Administrative Agent and (b) casualty insurance, such public liability insurance, third party property damage insurance with respect to liabilities, losses or damage in respect of the assets, properties and businesses of each Credit Party and its Subsidiaries as may customarily be carried or maintained under similar circumstances by Persons of established reputation engaged in similar businesses, in each case in such amounts (giving effect to self-insurance), with such deductibles, covering such risks and otherwise on such terms and conditions as shall be customary for such Persons and otherwise reasonably satisfactory to Administrative Agent.  Without limiting the generality of the foregoing, each Credit Party shall maintain or cause to be maintained (i) flood insurance with respect to each Flood Hazard Property that is located in a community that participates in the National Flood Insurance Program, in each case in compliance with any applicable regulations of the Board of Governors of the Federal Reserve System and (ii) replacement value casualty insurance on the Collateral under such policies of insurance, with such insurance companies, in such amounts, with such deductibles, and covering such risks as are at all times carried or maintained under similar circumstances by Persons of established reputation engaged in similar businesses.  Each such policy of insurance shall (A) name Collateral Agent, on behalf of the Lenders, as an additional insured thereunder as its interests may appear and (B) in the case of each casualty insurance policy, contain a loss payable clause or endorsement, reasonably satisfactory in form and substance to Collateral Agent, that names Collateral Agent, on behalf of the Secured Parties, as the loss payee thereunder and provides for at least thirty (30) days' prior written notice to Collateral Agent of any modification or cancellation of such policy.

      **5.6.**    **Inspections**.  Each Credit Party shall, and shall cause each of its Subsidiaries to, permit any authorized representatives designated by any Agent or any Lender to visit and inspect any of the properties of any Credit Party and any of its respective Subsidiaries, to inspect, copy and take extracts from its and their financial and accounting records and other books and records, to inspect any Collateral, and to discuss its and their affairs, finances and accounts with its and their officers and independent public accountants, all upon reasonable notice and at such reasonable times during normal business hours and as often as may reasonably be requested.  Agents and Lenders shall use their commercially reasonable efforts to ensure any such inspection is conducted in such a manner so as not to interfere unreasonably with the conduct of the business of the Credit Parties and their Subsidiaries.  Furthermore, each Credit Party shall, and shall cause each of its Subsidiaries to, permit Administrative Agent and each of its duly authorized representatives or agents to obtain appraisals of Real Estate Assets at the Borrowers' expense; provided, except to the extent that an Event of Default has occurred and is continuing, that Borrowers shall not be obligated to reimburse Administrative Agent for more than one appraisal of the Real Estate Assets in any calendar year.

      **5.7.**    **Lenders Meetings**.  The Credit Parties shall, upon the request of Administrative Agent or Requisite Lenders with reasonable advance notice, participate (a) in a telephonic or other similar virtual meeting of Administrative Agent and Lenders once during each Fiscal Month (unless an Event of Default shall have occurred in which case, no such limit shall apply) and (b) in an in-person meeting of Administrative Agent and Lenders once during each Fiscal Year (unless an Event of Default shall have occurred in which case, no such limit shall apply) to be held at Borrower Representative's corporate offices (or at such other location as may be agreed to by Borrower Representative and Administrative Agent), in each case, at such time as may be agreed to by Borrower Representative and Administrative Agent.

5.8.    **Compliance with Laws**.  In addition to the other provisions hereof, and without limiting the generality of other provisions of this Agreement, each Credit Party and its Subsidiaries shall comply with all applicable statutes, regulations and orders of, and all applicable restrictions imposed by, all Governmental Authorities, in respect of the conduct of its business and the ownership of its property, including compliance with all applicable (a) Environmental Laws with respect to any Real Estate Asset or governing its business and the requirements of any permits issued under such Environmental Laws with respect to any such Real Estate Asset or the operations of such Credit Party or any of its Subsidiaries, (b) Sanctions, (c) Anti-Corruption Laws, (d) Anti-Terrorism Laws and (e) Food Safety Laws, in the case of <u>clauses (a)</u> through <u>(e)</u> of this sentence, except to the extent that such noncompliance, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

5.9.    **Environmental.**

(a)    <u>Environmental Disclosure</u>.    Borrower Representative shall deliver to Administrative Agent and the Lenders:

(i)    as soon as practicable following receipt thereof, copies of all environmental audits, investigations, analyses and reports of any kind or character, whether prepared by personnel of a Credit Party or any of its Subsidiaries or by independent consultants, Governmental Authorities or any other Persons, with respect to significant environmental matters at any Facility or with respect to any Environmental Claims which, in any such case, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect;

(ii)    promptly upon the occurrence thereof, written notice describing in reasonable detail (A) any Release required to be reported to any federal, state or local governmental or regulatory agency under any applicable Environmental Laws, (B) any remedial action taken by any Credit Party or any other Person in response to (I) any Hazardous Materials Activities the existence of which has a reasonable possibility of resulting in one or more Environmental Claims having, individually or in the aggregate, a Material Adverse Effect or (II) any Environmental Claims that, individually or in the aggregate, have a reasonable possibility of resulting in a Material Adverse Effect, and (C) any Credit Party's discovery of any occurrence or condition on any real property adjoining or in the vicinity of any Facility that could reasonably be expected to cause such Facility or any part thereof to be subject to any material restrictions on the ownership, occupancy, transferability or use thereof under any Environmental Laws;

(iii)    as soon as practicable following the sending or receipt thereof by any Credit Party or any of its Subsidiaries, a copy of any and all written communications with respect to (A) any Environmental Claims that, individually or in the aggregate, have a reasonable possibility of giving rise to a Material Adverse Effect, (B) any Release required to be reported to any Governmental Authority, and (C) any request for information from any Governmental Authority that suggests such agency is investigating whether any Credit Party or any of its Subsidiaries may be potentially responsible for any Hazardous Materials Activity;

(iv)    prompt written notice describing in reasonable detail (A) any proposed acquisition of stock, assets, or property by any Credit Party or any of its Subsidiaries that could reasonably be expected to (I) expose any Credit Party or any of its Subsidiaries to, or result in, Environmental Claims that could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect or (II) affect the ability of any Credit Party or any of its Subsidiaries to maintain in full force and effect all material Governmental Authorizations required under any Environmental Laws for their respective operations and (B) any proposed action to be taken by any Credit Party or any of its Subsidiaries to modify current operations in a manner that could reasonably be expected to subject any

77

Credit Party or any of its Subsidiaries to any additional material obligations or requirements under any Environmental Laws; and

(v)    with reasonable promptness, such other documents and information as from time to time may be reasonably requested by Administrative Agent in relation to any matters disclosed pursuant to this <u>Section 5.9(a)</u>.

(b)    <u>Hazardous Materials Activities, Etc</u>.  Each Credit Party shall promptly take, and shall cause each of its Subsidiaries promptly to take, any and all actions necessary to (i) cure any violation of applicable Environmental Laws by such Credit Party or its Subsidiaries that could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect and (ii) make an appropriate response to any Environmental Claim against such Credit Party or any of its Subsidiaries and discharge any obligations it may have to any Person thereunder where failure to do so could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

**5.10.    Subsidiaries**.  In the event that any Person becomes a Domestic Subsidiary of any Credit Party, the applicable Credit Party shall, within ten (10) Business Days (or such longer period agreed by the Administrative Agent) after such Person becomes a Domestic Subsidiary, (a) cause such Domestic Subsidiary to become a "Borrower" or a "Guarantor" hereunder, in Administrative Agent's sole discretion, and a Grantor under the Pledge and Security Agreement by executing and delivering to Administrative Agent and Collateral Agent a Counterpart Agreement and (b) take all such actions and execute and deliver, or cause to be executed and delivered, all other New Subsidiary Deliverables.  In the event that any Person becomes a Foreign Subsidiary of any Credit Party, each Credit Party shall, or shall cause such Foreign Subsidiary to, deliver, all such documents, instruments, agreements, and certificates as are similar to those described in <u>clause (a)</u> of the definition of "New Subsidiary Deliverables" and take such other actions or shall cause such Foreign Subsidiary to take, all of the actions referred to in the definition of "New Subsidiary Deliverables" necessary to grant and to perfect a First Priority Lien in favor of Collateral Agent, for the benefit of the Secured Parties, under the Pledge and Security Agreement in 100% of all the voting and non-voting Capital Stock of such New Subsidiary.  With respect to each such Subsidiary, Borrower Representative shall promptly deliver to Administrative Agent written notice setting forth with respect to such Person (i) the date on which such Person became a Subsidiary of Ruby, and (ii) all of the data required to be set forth in <u>Schedules 4.1</u> and <u>4.2</u> with respect to all Subsidiaries of Ruby; <u>provided</u>, such written notice shall be deemed to supplement <u>Schedule 4.1</u> and <u>4.2</u> for all purposes hereof.

**5.11.    Additional Real Estate Assets**.  In the event that any Credit Party acquires, leases or licenses a Material Real Estate after the Closing Date, then such Credit Party shall, (i) with respect to any owned Material Real Estate, deliver all Mortgage Deliverables to Administrative Agent within ten (10) Business Days after the acquisition of such Material Real Estate and (ii) with respect to any leased or licensed Real Estate Asset that is the chief executive office, headquarters or other location where material books and records are stored or otherwise located, deliver to Administrative Agent a Collateral Access Agreement executed by the landlord of any such Real Estate Asset within ten (10) Business Days after the acquisition of such Real Estate Asset.  In addition to the foregoing, the Credit Parties shall, at the request of the Administrative Agent, deliver, from time to time, to Administrative Agent such appraisals as are required by law or regulation of Material Real Estates with respect to which Collateral Agent has been granted a Lien.

**5.12.    Information Security Requirements; Personal Information**.  Each Credit Party shall comply and shall cause its Subsidiaries to comply, in all material respects, and to the extent applicable to such Person, with (a) all international, federal, state, provincial and local laws, rules, regulations, directives and governmental requirements currently in effect and as they become effective relating in any

way to the privacy, confidentiality or security of Personal Information, including the Gramm-Leach-Bliley Act, 15 U.S.C. §§ 6801-6827, and all regulations implementing the same; the Health Insurance Portability and Accountability Act of 1996 and all regulations implementing the same; the Fair Credit Reporting Act, 15 U.S.C. § 1681 et seq., as amended by the Fair and Accurate Credit Transactions Act, and all regulations implementing each of the same; the rules and regulations of the National Automated Clearing House Association, information security breach notification laws (such as Cal. Civ. Code §§ 1798.29, 1798.82 through 1798.84); laws imposing minimum information security requirements (such as Cal. Civ. Code § 1798.81.5 and 201 Mass. Code Reg. 17.00); laws requiring the secure disposal of records containing certain Personal Information (such as N.Y. Gen. Bus. Law § 399-H); the European Union Directives governing general data protection (Directive 1995/46/EC) and electronic commerce (Directive 2002/58/EC); the Canadian Personal Information Protection and Electronic Documents Act (PIPEDA) and relevant provincial laws and (b) all applicable industry standards concerning privacy, data protection, confidentiality or information security, including the Payment Card Industry Data Security Standard, in each case, to the extent such laws, rules, regulations, directives and governmental requirements and such industry standards apply to it, its property or its business, in each case of clauses (a) and (b) above, except to the extent that the failure to do so could not reasonably be expected to have a Material Adverse Effect.

**5.13.    Further Assurances**.   At any time or from time to time upon the request of Administrative Agent, each Credit Party shall, at its expense, promptly execute, acknowledge and deliver such further documents and do such other acts and things as Administrative Agent or Collateral Agent may reasonably request in order to effect fully the purposes of the Credit Documents, including providing Lenders with any information reasonably requested pursuant to Section 10.21.  In furtherance and not in limitation of the foregoing, each Credit Party shall take such actions as Administrative Agent or Collateral Agent may reasonably request from time to time to ensure that the Obligations are guaranteed by the Guarantors and are secured by First Priority Liens on the Collateral of each Credit Party and all of the outstanding Capital Stock of Ruby and its Subsidiaries.

**5.14.    Miscellaneous Business Covenants**.  Unless otherwise consented to by Administrative Agent and the Requisite Lenders:

(a)    Non-Consolidation.  Each Credit Party and its Subsidiaries shall (i) maintain entity records and books of account separate from those of any other entity which is an Affiliate of such entity (other than another Credit Party); (ii) not commingle its funds or assets with those of any other entity which is an Affiliate of such entity (other than another Credit Party); and (iii) provide that its Board of Directors (or similar governing body) shall hold all appropriate meetings to authorize and approve such entity's actions, which meetings shall be separate from those of other entities that are not Credit Parties.

(b)    Cash Management Systems.  Each Credit Party and its Subsidiaries shall (i) establish and maintain Cash management systems reasonably satisfactory to Administrative Agent, including with respect to the Controlled Accounts for Deposit Accounts other than Excluded Accounts and (ii) enter into a Credit Card Notification Letter with each of its Credit Card Processors.  For the avoidance of doubt, those Cash management systems implemented and maintained by Ruby and its Subsidiaries as of the Closing Date satisfy this Section 5.14(b) on the Closing Date.

(c)    Communication with Accountants and Other Advisors.  Each Credit Party hereby authorizes Administrative Agent (and each Lender) to communicate with such Credit Party's independent certified public accountants and authorizes and shall instruct those advisors and accountants to communicate (including, in the case of the accountants, the delivery of audit drafts and letters to management) with Administrative Agent (and each Lender) information relating to any Credit Party with respect to the business, results of operations and financial condition of any Credit Party (including the

status of asset sales and lease restructurings, as applicable); provided, however, (i) Administrative Agent (or such Lender) shall provide Borrower Representative with notice at least five (5) Business Days prior to first initiating any such communication and (ii) a representative of Borrower Representative designated by Borrower Representative shall be copied on, privy to, or otherwise included in all such communications.

(d)    Activities of Management.  Each member of the senior management team of each Credit Party shall devote all or substantially all of his or her professional working time, attention, and energies to the management of the businesses of the Credit Parties; provided, in no event will this clause (d) apply to any member of the Board of Directors (or similar governing body) of a Credit Party who is not also a member of the senior management team of such Credit Party.

(e)    Contractual Obligations.  Each Credit Party and its Subsidiaries shall use commercially reasonable efforts to (i) perform, observe and fulfill each the obligations, covenants or conditions contained in any of its Contractual Obligations, including the Material Contracts and Franchise Agreements, other than those Contractual Obligations that the Credit Parties are contesting in good faith and (ii) promptly and diligently exercise each material right it may have in respect of its Contractual Obligations, including under any Material Contract or Franchise Agreement, at its own expense, except in each case of clause (i) and (ii) of this sentence, to the extent that such failure would not reasonably be expected to have a Material Adverse Effect.  For the avoidance of doubt, this clause (e) is not intended to cover, and shall not relate to, this Agreement and the other Credit Documents which shall be governed in all instances by the other provisions hereof and thereof.

**5.15.    Post-Closing Matters**.  The Credit Parties shall satisfy the requirements set forth on Schedule 5.15 on or before the date specified for such requirement or such later date as agreed by Administrative Agent.

**5.16.    Compliance Protocols**.  Each Credit Party shall, and shall cause its Subsidiaries to, in the ordinary course of business and in consultation with appropriate legal counsel, create, maintain, implement and update written policies, procedures and guidelines for its employees (including appropriate training for employees with respect thereto) for its business and operations and compliance in all material respects with the requirements of all applicable laws, rules, regulations and orders of any Governmental Authority with respect to compliance with (a) (i) the laws set forth in Section 5.12 and (ii) Food Safety Laws, and (b) all (i) Sanctions, (ii) Anti-Corruption Laws and (iii) Anti-Terrorism Laws. For the avoidance of doubt, those policies, procedures and guidelines implemented and maintained by Ruby and its Subsidiaries as of the Closing Date, in form and substance provided to Administrative Agent and Lenders prior to the Closing Date, as the same relate to those laws set forth in clause (a) above satisfy this covenant on the Closing Date.

**5.17.    Use of Proceeds**.  The proceeds of the Loans shall be used in accordance with the terms of Section 2.5.

## SECTION 6.    NEGATIVE COVENANTS

Each Credit Party covenants and agrees that, so long as any Commitment is in effect and until payment in full in Cash of all Obligations (other than contingent indemnification Obligations for which no claim has been asserted) and cancellation or expiration of all Letters of Credit, such Credit Party shall perform, and shall cause each of its Subsidiaries to perform, all covenants in this Section 6.

**6.1.    Indebtedness**.  No Credit Party shall, nor shall it permit any of its Subsidiaries to, directly or indirectly, create, incur, assume or guaranty, or otherwise become or remain directly or indirectly liable with respect to any Indebtedness, except:

(a)    the Obligations;

(b)    Indebtedness existing on the Closing Date and listed on <u>Schedule 6.1</u>;

(c)    Indebtedness of any Guarantor Subsidiary to any Borrower or to any other Guarantor Subsidiary, or of any Borrower to any Guarantor Subsidiary; <u>provided</u>, (i) all such Indebtedness shall be evidenced by (x) a promissory note and such promissory note shall, in any case, be subject to a First Priority Lien pursuant to the Pledge and Security Agreement, (ii) all such Indebtedness shall be unsecured and subordinated in right of payment to the payment in full in Cash of the Obligations pursuant to the terms of the applicable promissory notes or an intercompany subordination agreement that in any such case, is satisfactory to Administrative Agent, and (iii) any payment by any such Guarantor Subsidiary under any guaranty of the Obligations shall result in a pro tanto reduction of the amount of any Indebtedness owed by such Subsidiary to Borrower Representative or to any of its Subsidiaries for whose benefit such payment is made;

(d)    to the extent constituting Indebtedness, trade payables incurred in the ordinary course of business consistent with past practices;

(e)    Indebtedness incurred by any Credit Party or any of its Subsidiaries arising from agreements providing for indemnification, adjustment of purchase price or similar obligations, in connection with permitted dispositions of any business, assets or Subsidiary of any Credit Party or any of its Subsidiaries;

(f)    Indebtedness in respect of netting services, overdraft protections and otherwise in connection with Deposit Accounts;

(g)    guaranties by a Credit Party (other than Holdings) of (i) Indebtedness of a another Credit Party with respect, in each case, to Indebtedness otherwise permitted to be incurred pursuant to this <u>Section 6.1</u> or (ii) obligations of suppliers, franchisees, licensees and landlords of any Credit Party, in each case, in the ordinary course of business of the Credit Parties;

(h)    Indebtedness in an aggregate amount not to exceed at any time $1,000,000 with respect to (A) Capital Leases and (B) purchase money Indebtedness; <u>provided</u>, in the case of the immediately preceding <u>clause (A)</u>, any such Indebtedness shall be secured only by the asset subject to such Capital Lease, and, in the case of the immediately preceding <u>clause (B)</u>, that any such Indebtedness shall (i) be secured only by the asset acquired in connection with the incurrence of such Indebtedness and (ii) constitute not less than 100% of the aggregate consideration paid with respect to such asset;

(i)    Indebtedness arising from the honoring by a bank or other financial institution of a check, draft or similar instrument drawn against insufficient funds in the ordinary course of business; <u>provided</u>, such Indebtedness is extinguished within five (5) Business Days of its incurrence;

(j)    unsecured Indebtedness of Ruby and its Subsidiaries arising in connection with corporate credit cards or so-called "p-cards" issued to employees in the ordinary course of business consistent with past practices which in no event exceeds $500,000 in the aggregate at any time;

LEGAL_US_W # 105221370.13

(k)      other unsecured Indebtedness of each Credit Party and its Subsidiaries which is unsecured and subordinated to the Obligations in a manner satisfactory to Administrative Agent in an aggregate amount not to exceed at any time $1,000,000;

(l)      SLB Operating Lease Obligations; and

(m)      Curative Capital.

**6.2.    Liens**.  No Credit Party shall, nor shall it permit any of its Subsidiaries to, directly or indirectly, create, incur, assume or permit to exist any Lien on or with respect to any property or asset of any kind (including any document or instrument in respect of goods or accounts receivable) of any Credit Party or any of its Subsidiaries, whether now owned or hereafter acquired, or any income or profits therefrom, or file or permit the filing of, or permit to remain in effect, any financing statement or other similar notice of any Lien with respect to any such property, asset, income or profits under the UCC of any state or under any similar recording or notice statute, except:

(a)      Liens in favor of Collateral Agent for the benefit of Secured Parties granted pursuant to any Credit Document;

(b)      Liens existing on the Closing Date and described in Schedule 6.2;

(c)      Liens for Taxes (i) not yet due and payable or (ii) if obligations with respect to such Taxes are being contested in good faith by appropriate proceedings promptly instituted and diligently conducted in accordance with Section 5.3 so long as (x) the aggregate amount of such Taxes does not exceed $1,000,000, or (y) such proceedings are resolved within sixty (60) days after the institution thereof;

(d)      statutory Liens of landlords, banks (and rights of set off), of carriers, warehousemen, mechanics, repairmen, workmen and materialmen, and other Liens imposed by law (other than any such Lien imposed pursuant to Section 401(a)(29) or 412(n) of the Internal Revenue Code or by ERISA), in each case, (i) incurred in the ordinary course of business (x) for amounts not yet overdue or (y) for amounts that are overdue and that (in the case of any such amounts overdue for a period in excess of five (5) Business Days) are being contested in good faith by appropriate proceedings, so long as such reserves or other appropriate provisions, if any, as shall be required by GAAP shall have been made for any such contested amounts; and (ii) to the extent permitted under the terms of any applicable Mortgage;

(e)      Liens incurred in the ordinary course of business in connection with workers' compensation, unemployment insurance and other types of social security, and other similar obligations (exclusive of obligations for the payment of borrowed money or other Indebtedness), so long as no foreclosure, sale or similar proceedings have been commenced with respect to any portion of the Collateral on account thereof;

(f)      easements, rights of way, restrictions, encroachments, and other minor defects or irregularities in title, in each case which do not and will not interfere in any material respect with the ordinary conduct of the business of any Credit Party or any of its Subsidiaries;

(g)      any interest or title of a lessor or sublessor under any lease of Real Estate Asset permitted hereunder;

(h)      Liens solely on any Cash earnest money deposits made by any Credit Party or any of its Subsidiaries in connection with any letter of intent or purchase agreement permitted hereunder;

(i)    purported Liens evidenced by the filing of precautionary UCC financing statements relating solely to operating leases of personal property entered into in the ordinary course of business;

(j)    any zoning or similar law or right reserved to or vested in any governmental office or agency to control or regulate the use of any real property;

(k)    non-exclusive licenses of patents, trademarks and other intellectual property rights granted by any Credit Party or any of its Subsidiaries in the ordinary course of business and not interfering in any respect with the ordinary conduct of the business of such Credit Party or such Subsidiary;

(l)    Liens securing Capital Leases or purchase money Indebtedness permitted pursuant to Section 6.1(i); provided, any such Lien shall encumber only the asset acquired with the proceeds of such Indebtedness;

(m)    customary rights of set-off, bankers' Liens, revocation, refund or chargeback under deposit agreements or under UCC or common law of banks or other financial institutions where the Credit Parties deposit in the ordinary course of business; and

(n)    other Liens which secure obligations other than Indebtedness and as to which the aggregate amount of the obligations secured thereby does not exceed $250,000.

**6.3.    Equitable Lien**.  If any Credit Party or any of its Subsidiaries shall create or assume any Lien upon any of its properties or assets, whether now owned or hereafter acquired, other than Permitted Liens, it shall make or cause to be made effective provisions whereby the Obligations will be secured by such Lien equally and ratably with any and all other Indebtedness secured thereby as long as any such Indebtedness shall be so secured; provided, notwithstanding the foregoing, this covenant shall not be construed as a consent by the Requisite Lenders to the creation or assumption of any such Lien not otherwise permitted hereby.

**6.4.    No Further Negative Pledges**.  Except with respect to (a) specific property encumbered to secure payment of particular Indebtedness or to be sold pursuant to an executed agreement with respect to a permitted Asset Sale and (b) restrictions by reason of customary provisions restricting assignments, subletting or other transfers contained in leases, licenses and similar agreements entered into in the ordinary course of business (provided, such restrictions are limited to the property or assets secured by such Liens or the property or assets subject to such leases, licenses or similar agreements, as the case may be) no Credit Party nor any of its Subsidiaries shall enter into any agreement prohibiting the creation or assumption of any Lien upon any of its properties or assets, whether now owned or hereafter acquired.

**6.5.    Restricted Junior Payments**.  No Credit Party shall, nor shall it permit any of its Subsidiaries through any manner or means or through any other Person to, directly or indirectly, declare, order, pay, make or set apart, or agree to declare, order, pay, make or set apart, any sum for any Restricted Junior Payment, except:

(a)    Permitted Management Fees;

(b)    payments by Subsidiaries of a Credit Party (other than Holdings) to such Credit Party;

(c)    Permitted Tax Distributions;

83

(d)    amounts to Holdings not to exceed (i) $250,000 per Fiscal Year to pay administrative expenses and (ii) $250,000 per Fiscal Year to pay Board of Director (or similar governing body) fees and expenses paid to outside directors of Ruby or Holdings (or any parent entity thereof) who are not Affiliates of the Credit Parties; and

(e)    Restricted Junior Payments made on the Closing Date to effectuate the transactions contemplated by the Bankruptcy Plan.

Notwithstanding anything herein to the contrary, no amount shall be permitted to be distributed by any Credit Party to any Person other than a Credit Party to pay, or otherwise in connection with, any Tax resulting from the cancellation or discharge of Indebtedness.

**6.6.    Restrictions on Subsidiary Distributions**.    Except as otherwise permitted under this Agreement, no Credit Party shall, nor shall it permit any of its Subsidiaries to, create or otherwise cause or suffer to exist or become effective any consensual encumbrance or restriction of any kind on the ability of any other Credit Party to (a) pay dividends or make any other distributions on any of such Credit Party's Capital Stock owned by a Credit Party, (b) repay or prepay any Indebtedness owed by such Credit Party to any other Credit Party, (c) make loans or advances to any other Credit Party, or (d) transfer any of its property or assets to any other Credit Party other than restrictions (i) in agreements evidencing Capital Leases and purchase money Indebtedness permitted by Section 6.1 that impose restrictions on the property so acquired, (ii) by reason of customary provisions restricting assignments, subletting or other transfers contained in leases, licenses, joint venture agreements and similar agreements entered into in the ordinary course of business, and (iii) that are or were created by virtue of any transfer of, agreement to transfer or option or right with respect to any property, assets or Capital Stock not otherwise prohibited under this Agreement.

**6.7.    Investments**.    No Credit Party shall, nor shall it permit any of its Subsidiaries to, directly or indirectly, make or own any Investment in any Person, including any Joint Venture and any Foreign Subsidiary, except:

(a)    Investments in Cash and Cash Equivalents;

(b)    equity Investments owned as of the Closing Date in any other Credit Party and Investments made after the Closing Date in any other Credit Party;

(c)    Investments by a Credit Party in a Foreign Subsidiary up to an aggregate amount not to exceed $250,000 during the term hereof;

(d)    Investments existing on the Closing Date and described in Schedule 6.7;

(e)    Investments consisting of deposits, prepayments and other credits to suppliers made in the ordinary course of business and consistent with past practices;

(f)    intercompany loans to the extent permitted under Section 6.1(c);

(g)    (i) Maintenance Capital Expenditures, (ii) capital expenditures for remodeling Restaurants as approved in the Financial Plan, and/or (iii) other capital expenditures approved by the Administrative Agent; and

(h)    other Investments in an aggregate amount not to exceed at any time $250,000.

84

Notwithstanding the foregoing, in no event shall any Credit Party make any Investment which results in or facilitates in any manner any Restricted Junior Payment not otherwise permitted under the terms of Section 6.5.

**6.8.    Financial Covenants.**

(a)    Minimum Consolidated Liquidity.  The Credit Parties shall not permit average daily Consolidated Liquidity to be less than $5,000,000 (i) during the Forecast Reporting Period, as of the last day of each week (with such average calculated for the immediately preceding seven days) and (ii) thereafter, as of the last day of each Fiscal Month (with such average calculated for each day in such Fiscal Month).

(b)    Fixed Charge Coverage Ratio.  The Credit Parties shall not permit the Fixed Charge Coverage Ratio as of the last day of any Fiscal Quarter, beginning with the 2022 June Fiscal Quarter, to be less than the correlative ratio indicated on Schedule 6.8(b) for the applicable Fiscal Quarter.

(c)    Minimum EBITDA.  The Credit Parties shall not permit Consolidated Adjusted EBITDA as at the end of any Fiscal Quarter, beginning with the 2022 June Fiscal Quarter, for the trailing twelve (12) Fiscal Month period then ended to be less than the correlative amount indicated on Schedule 6.8(c) for the applicable Fiscal Quarter.

**6.9.    Fundamental Changes; Disposition of Assets; Acquisitions**.  No Credit Party shall, nor shall it permit any of its Subsidiaries to, (i) enter into any transaction of merger or consolidation, or liquidate, wind up or dissolve itself (or suffer any liquidation or dissolution), or convey, sell, lease or sublease (as lessor or sublessor), (ii) exchange, transfer or otherwise dispose of, in one transaction or a series of transactions, all or any part of its business, assets or property of any kind whatsoever, whether real, personal or mixed and whether tangible or intangible, whether now owned or hereafter acquired, or (iii) acquire by purchase or otherwise (other than purchases or other acquisitions of inventory, materials and equipment and Consolidated Capital Expenditures in the ordinary course of business to the extent otherwise permitted hereunder) the business, property or fixed assets of, or Capital Stock or other evidence of beneficial ownership of, any Person or any division or line of business or other business unit of any Person, except:

(a)    any Credit Party may be merged with or into any other Credit Party (other than Holdings), or be liquidated, wound up or dissolved, or all or any part of its business, property or assets may be conveyed, sold, leased, transferred or otherwise disposed of, in one transaction or a series of transactions, to another Credit Party (other than Holdings); provided, in the case of such a merger involving Ruby, Ruby shall be the continuing or surviving Person;

(b)    sales or other dispositions of assets that do not constitute Asset Sales;

(c)    disposals of obsolete or worn out property;

(d)    the dissolution of a Credit Party (other than Holdings or Ruby) in connection with the permanent, final closure of a Closed Restaurant and/or the transfer of any remaining assets, licenses, agreements or leases used solely in any Closed Restaurant, in any case, solely to the extent the continued operation of such any Restaurant is no longer desirable in the good faith judgment of the senior management of Holdings;

(e)       Permitted Sale Leaseback Transactions so long as the Net Asset Sale Proceeds of any such Permitted Sale Leaseback Transaction are applied by the Credit Parties in accordance with Section 2.13(e);

(f)       Investments made in accordance with Section 6.7;

(g)       Permitted Fee Owned Property Sales;

(h)       Asset Sales of liquor licenses for Closed Restaurants;

(i)       Asset Sales by the Credit Parties of assets other than Real Estate Assets and liquor licenses in an aggregate amount not to exceed $250,000 in the aggregate for all such Asset Sales consummated after the Closing Date so long as each of the following conditions is satisfied:  (i) the Net Asset Sale Proceeds from such Asset Sale are 100% Cash or Cash Equivalents, (ii) the purchaser in any such Asset Sale is not an Affiliate of any Credit Party, (iii) the terms of any such Asset Sale shall (A) be arms-length, including "as is" or similar limited representations from the seller Credit Party, (B) not impose any material residual obligations on the seller Credit Party (contingent or otherwise) other than customary indemnification obligations, and (C) be for at least the fair market value of the applicable asset(s) as determined in the good faith judgement of the seller Credit Party in light of the facts and circumstances at the time of such Asset Sale, and (iv) the Net Asset Sale Proceeds thereof are applied by the Credit Parties in accordance with Section 2.13(a); and

(j)       other Asset Sales which are approved by the Administrative Agent in its sole discretion, in any case, as long as the Net Asset Sale Proceeds thereof are applied by the Credit Parties in accordance with Section 2.13(a).

Subject to compliance with Section 2.13, and at the sole cost and expense of the Credit Parties, promptly upon the written request of Borrower Representative, Collateral Agent shall deliver to the applicable Credit Party, such documents and instruments reasonably necessary to release any Liens securing the interests of the Secured Parties that have attached to any Collateral that has been sold in compliance with this Section 6.9, including the termination of any Mortgage encumbering the Collateral so sold in compliance with this Section 6.9.  For the avoidance of doubt and notwithstanding the foregoing, no Credit Party shall assign any purchase option or similar right arising under any lease or similar agreement, in any case, without the prior written consent of the Requisite Lenders.

**6.10.    Disposal of Subsidiary Interests**.  Except for any sale of all of its interests in the Capital Stock of any of its Subsidiaries in compliance with the provisions of Section 6.9, no Credit Party shall, nor shall it permit any of its Subsidiaries to, (a) directly or indirectly sell, assign, pledge or otherwise encumber or dispose of any Capital Stock of any of its Subsidiaries, except to qualify directors if required by applicable law, or as required under applicable law to permit such Credit Party to secure a liquor license; or (b) permit any of its Subsidiaries directly or indirectly to sell, assign, pledge or otherwise encumber or dispose of any Capital Stock of any of its Subsidiaries, except to another Credit Party (subject to the restrictions on such disposition otherwise imposed hereunder), or to qualify directors if required by applicable law, or as required under applicable law to permit such Credit Party to secure a liquor license.

**6.11.    Sales and Lease Backs**.  Except for Permitted Sale Leaseback Transactions, no Credit Party shall, nor shall it permit any of its Subsidiaries to, directly or indirectly, become or remain liable as lessee or as a guarantor or other surety with respect to any lease of any property (whether real, personal or mixed), whether now owned or hereafter acquired, which such Credit Party (a) has sold or transferred or is to sell or to transfer to any other Person (other than another Credit Party) or (b) intends to use for

86

substantially the same purpose as any other property which has been or is to be sold or transferred by such Credit Party to any Person (other than another Credit Party) in connection with such lease.

      **6.12.**    **Transactions with Shareholders and Affiliates**. No Credit Party shall, nor shall it permit any of its Subsidiaries to, directly or indirectly, enter into or permit to exist any transaction (including the purchase, sale, lease or exchange of any property or the rendering of any service) with any holder of 5% or more of any class of Capital Stock of any Credit Party or any of its Subsidiaries (or any Affiliate of such holder) or with any Affiliate of any Credit Party or of any such holder; provided, however, the Credit Parties and their Subsidiaries may enter into or permit to exist any such transaction if both (a) Administrative Agent and the Requisite Lenders in their reasonable discretion have consented thereto in writing prior to the consummation thereof, and (b) the terms of such transaction are not less favorable to such Credit Party or that Subsidiary, as the case may be, than those that might be obtained at the time from a Person who is not such a holder or Affiliate; provided, further, the foregoing restrictions shall not apply to (i) subject to compliance by Holdings with Section 6.14(a) hereof, any transaction between the Credit Parties; (ii) reasonable and customary fees paid to members of the Board of Directors (or similar governing body), officers and members of senior management of the Credit Parties to the extent otherwise permitted hereunder; (iii) the payment of Permitted Management Fees; and (iv) the Warrants.

      **6.13.**    **Conduct of Business**. No Credit Party shall, nor shall it permit any of its Subsidiaries to, engage in any business other than owning, operating and franchising Ruby Tuesday restaurants and offering virtual restaurant fulfillment services.

      **6.14.**    **Permitted Activities of Holdings and the Wicomico County Subsidiaries.**

          (a)      Holdings shall not (i) incur, directly or indirectly, any Indebtedness or any other obligations or liability whatsoever other than the Obligations; (ii) create or suffer to exist any Lien upon any property or assets now owned or hereafter acquired by it other than (A) the Liens created under the Collateral Documents to which it is a party and (B) Permitted Liens applicable to Holdings; (iii) engage in any business or activity or own any assets other than (A) holding 100% of the Capital Stock of Ruby; (B) performing its obligations and activities incidental thereto under the Credit Documents; and (C) making Restricted Junior Payments and Investments to the extent permitted by this Agreement; (iv) consolidate with or merge with or into, or convey, transfer or lease all or substantially all its assets to, any Person; (v) sell or otherwise dispose of any Capital Stock of any of its Subsidiaries; (vi) create or acquire any Subsidiary or make or own any Investment in any Person other than Ruby; or (vii) fail to hold itself out to the public as a legal entity separate and distinct from all other Persons.

          (b)      Each of the Wicomico County Subsidiaries shall not, and Ruby shall not permit either of the Wicomico County Subsidiaries to, (i) incur, directly or indirectly, any Indebtedness or any other obligation or liability whatsoever other than any Indebtedness existing under its Liquor Subsidiary Contracts; (ii) create or suffer to exist any Lien upon any property or assets now owned or hereafter acquired by it other than Liens disclosed to Administrative Agent on Schedule 6.2; (iii) engage in any business or activity or own any assets other than holding a Maryland liquor license in accordance with applicable law and performing such Wicomico County Subsidiary's obligations and activities incidental thereto and to the extent not inconsistent with the applicable Liquor Subsidiary Contracts; (iv) consolidate with or merge with or into, or convey, transfer or lease all or substantially all its assets to, any Person; (v) sell or otherwise dispose of any Capital Stock of any of its Subsidiaries; (vi) create or acquire any Subsidiary or make or own any Investment in any Person; or (vii) fail to hold itself out to the public as a legal entity separate and distinct from all other Persons.

**6.15.   Fiscal Year**.  No Credit Party shall, nor shall it permit any of its Subsidiaries to change its Fiscal Year end from the first Tuesday ended closest to June 1 of each year.

**6.16.   Deposit Accounts**.  Subject to Section 5.15, no Credit Party shall establish or maintain a Deposit Account or a Securities Account that is not a Controlled Account and no Credit Party shall deposit funds in a Deposit Account or a Securities Account which is not a Controlled Account, in each case, except to the extent permitted, an Excluded Account.  No Credit Party shall (a) grant any other Person (other than another Credit Party) Automated Clearing House (ACH) or similar debit rights to any Controlled Account, (b) allow any Credit Card Processor to transfer money owing to any Credit Party or its Subsidiaries to any account that is not a Controlled Account, or (c) during the continuation of an Event of Default, if requested by Collateral Agent, fail to promptly (but no later than the first Business Day following such request by Collateral Agent) instruct any Credit Card Processor to transfer money owing to the Credit Parties or their Subsidiaries to an account designated by Collateral Agent.  In furtherance of the foregoing, in the event any applicable Excluded Account at any time contains funds in excess of the limits set forth in clause (c) of the definition of the term "Excluded Account", the Credit Parties shall promptly (and in any event within three (3) Business Days of the date that such limits are exceeded) transfer all such excess amounts to a Controlled Account.

**6.17.   Amendments to Organizational Agreements, Material Contracts and Liquor Subsidiary Contracts**.  No Credit Party shall (a) amend or permit any amendments to any Credit Party's or the Wicomico County Subsidiaries' Organizational Documents or (b) amend or permit any amendments to, or terminate or waive any provision of, any Material Contract or Liquor Subsidiary Contract, in each case, if such amendment, termination, or waiver would be adverse to such Credit Party, Holdings and its Subsidiaries (taken as a whole), Administrative Agent or the Lenders (except in the case of the termination of any Material Contract or Liquor Subsidiary Contract, to the extent that such Material Contract or Liquor Subsidiary Contract is replaced with another contract providing substantially the same products and/or services to the Credit Parties on material terms (including pricing) no less favorable, in all material respects, to the Credit Parties than the Material Contract or Liquor Subsidiary Contract so terminated), in any case, without the prior written consent of Administrative Agent.

**6.18.   Prepayments of Certain Indebtedness**.  No Credit Party shall, nor shall it permit any of its Subsidiaries to, directly or indirectly, prepay, redeem, purchase, defease, exchange or repurchase any (i) Permitted Debt (other than amounts owing under the Credit Documents), or (ii) except as approved by the Administrative Agent in its sole discretion, any obligation owing under a lease other than those constituting Permitted Lease Settlement Payments, and no Credit Party shall amend or modify any of the terms of any Permitted Debt or Permitted Liens except for extensions or renewals on terms no less favorable to a Credit Party prior to such extension or renewal.

**6.19.   Compliance With Anti-Terrorism Laws, Anti-Corruption Laws and Sanctions**.  No Credit Party shall, nor shall it permit any of its Subsidiaries to:

(a)      (i) violate any Anti-Terrorism Laws or Anti-Corruption Laws, (ii) engage in any transaction, investment, undertaking or activity that conceals the identity, source or destination of the proceeds from any category of prohibited offenses designated by the Organization for Economic Co-operation and Development's Financial Action Task Force on Money Laundering, (iii) become (including by virtue of being owned or controlled by a Blocked Person), own or control a Blocked Person or any other Sanctioned Person or (iv) knowingly permit any of their respective agents or employees to violate these laws or engage in these actions;

(b)      use, directly or indirectly, the proceeds of the Loans, or lend, contribute or otherwise make available such proceeds to any Person, (x) to fund any activities or business of or with

any Sanctioned Person or Sanctioned Country, or (y) in any other manner that would result in a violation of Sanctions or any Anti-Terrorism Laws or Anti-Corruption Laws by any Person (including any Person participating in the Loans, whether as underwriter, advisor, investor, or otherwise); or

(c)    (i) deal in, or otherwise engage in any transaction related to, any property or interests in property blocked pursuant to any Anti-Terrorism Law or Sanctions, or (ii) engage in or conspire to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempt to violate, any of the prohibitions set forth in any Anti-Terrorism Law or Sanctions, or (iii) knowingly permit any of their respective agents or employees to do any of the foregoing.

**6.20.    Disqualified Stock**.  No Credit Party shall issue any Disqualified Stock.

## SECTION 7.    GUARANTY

**7.1.    Guaranty of the Obligations**.  Subject to the provisions of Section 7.2, Guarantors jointly and severally hereby irrevocably and unconditionally guaranty to Administrative Agent for the ratable benefit of the Beneficiaries the due and punctual payment in full in Cash of all Obligations when the same shall become due, whether at stated maturity, by required prepayment, declaration, acceleration, demand or otherwise (including amounts that would become due but for the operation of the automatic stay under Section 362(a) of the Bankruptcy Code, 11 U.S.C. § 362(a)) (collectively, the **"Guaranteed Obligations"**).

**7.2.    Contribution by Guarantors**.  All Guarantors desire to allocate among themselves (collectively, the **"Contributing Guarantors"**), in a fair and equitable manner, their obligations arising under this Guaranty.  Accordingly, in the event any payment or distribution is made on any date by a Guarantor (a **"Funding Guarantor"**) under this Guaranty such that its Aggregate Payments exceeds its Fair Share as of such date, such Funding Guarantor shall be entitled to a contribution from each of the other Contributing Guarantors in an amount sufficient to cause each Contributing Guarantor's Aggregate Payments to equal its Fair Share as of such date.  **"Fair Share"** means, with respect to a Contributing Guarantor as of any date of determination, an amount equal to (a) the ratio of (i) the Fair Share Contribution Amount with respect to such Contributing Guarantor, to (ii) the aggregate of the Fair Share Contribution Amounts with respect to all Contributing Guarantors; multiplied by (b) the aggregate amount paid or distributed on or before such date by all Funding Guarantors under this Guaranty in respect of the obligations Guaranteed.  **"Fair Share Contribution Amount"** means, with respect to a Contributing Guarantor as of any date of determination, the maximum aggregate amount of the obligations of such Contributing Guarantor under this Guaranty that would not render its obligations hereunder subject to avoidance as a fraudulent transfer or conveyance under Section 548 of Title 11 of the United States Code or any comparable applicable provisions of state law; provided, solely for purposes of calculating the **"Fair Share Contribution Amount"** with respect to any Contributing Guarantor for purposes of this Section 7.2, any assets or liabilities of such Contributing Guarantor arising by virtue of any rights to subrogation, reimbursement or indemnification or any rights to or obligations of contribution hereunder shall not be considered as assets or liabilities of such Contributing Guarantor.  **"Aggregate Payments"** means, with respect to a Contributing Guarantor as of any date of determination, an amount equal to (I) the aggregate amount of all payments and distributions made on or before such date by such Contributing Guarantor in respect of this Guaranty (including in respect of this Section 7.2), minus (II) the aggregate amount of all payments received on or before such date by such Contributing Guarantor from the other Contributing Guarantors as contributions under this Section 7.2.  The amounts payable as contributions hereunder shall be determined as of the date on which the related payment or distribution is made by the applicable Funding Guarantor.  The allocation among Contributing Guarantors of their obligations as set forth in this Section 7.2 shall not be construed in any way to limit the liability of any

89

Contributing Guarantor hereunder.  Each Guarantor is a third party beneficiary to the contribution agreement set forth in this <u>Section 7.2</u>.

**7.3.    Payment by Guarantors**.    Subject to <u>Section 7.2</u>, Guarantors hereby jointly and severally agree, in furtherance of the foregoing and not in limitation of any other right which any Beneficiary may have at law or in equity against any Guarantor by virtue hereof, that upon the failure of Borrowers to pay any of the Guaranteed Obligations when and as the same shall become due, whether at stated maturity, by required prepayment, declaration, acceleration, demand or otherwise (including amounts that would become due but for the operation of the automatic stay under Section 362(a) of the Bankruptcy Code, 11 U.S.C. § 362(a)), Guarantors shall upon demand pay, or cause to be paid, in Cash, to Administrative Agent for the ratable benefit of Beneficiaries, an amount equal to the sum of the unpaid principal amount of all Guaranteed Obligations then due as aforesaid, accrued and unpaid interest on such Guaranteed Obligations (including interest which, but for any Borrower becoming the subject of a case under the Bankruptcy Code, would have accrued on such Guaranteed Obligations, whether or not a claim is allowed against such Borrower for such interest in the related bankruptcy case) and all other Guaranteed Obligations then owed to Beneficiaries as aforesaid.

**7.4.    Liability of Guarantors Absolute**.    Each Guarantor agrees that its obligations hereunder are irrevocable, absolute, independent and unconditional and shall not be affected by any circumstance which constitutes a legal or equitable discharge of a guarantor or surety other than payment in full in Cash of the Guaranteed Obligations (other than contingent indemnification Obligations for which no claim has been made).  In furtherance of the foregoing and without limiting the generality thereof, each Guarantor agrees as follows:

(a)    this Guaranty is a guaranty of payment when due and not of collectability.  This Guaranty is a primary obligation of each Guarantor and not merely a contract of surety;

(b)    Administrative Agent may enforce this Guaranty upon the occurrence of an Event of Default notwithstanding the existence of any dispute between any Borrower and any Beneficiary with respect to the existence of such Event of Default;

(c)    the obligations of each Guarantor hereunder are independent of the obligations of Borrowers and the obligations of any other guarantor (including any other Guarantor) of the obligations of Borrowers, and a separate action or actions may be brought and prosecuted against such Guarantor whether or not any action is brought against Borrowers or any of such other guarantors and whether or not Borrowers are joined in any such action or actions;

(d)    payment by any Guarantor of a portion, but not all, of the Guaranteed Obligations shall in no way limit, affect, modify or abridge any Guarantor's liability for any portion of the Guaranteed Obligations which has not been paid.  Without limiting the generality of the foregoing, if Administrative Agent is awarded a judgment in any suit brought to enforce any Guarantor's covenant to pay a portion of the Guaranteed Obligations, such judgment shall not be deemed to release such Guarantor from its covenant to pay the portion of the Guaranteed Obligations that is not the subject of such suit, and such judgment shall not, except to the extent satisfied by such Guarantor, limit, affect, modify or abridge any other Guarantor's liability hereunder in respect of the Guaranteed Obligations;

(e)    any Beneficiary, upon such terms as it deems appropriate, without notice or demand and without affecting the validity or enforceability hereof or giving rise to any reduction, limitation, impairment, discharge or termination of any Guarantor's liability hereunder, from time to time may (i) renew, extend, accelerate, increase the rate of interest on, or otherwise change the time, place, manner or terms of payment of the Guaranteed Obligations; (ii) settle, compromise, release or discharge,

LEGAL_US_W # 105221370.13

or accept or refuse any offer of performance with respect to, or substitutions for, the Guaranteed Obligations or any agreement relating thereto and/or subordinate the payment of the same to the payment of any other obligations; (iii) request and accept other guaranties of the Guaranteed Obligations and take and hold security for the payment hereof or the Guaranteed Obligations; (iv) release, surrender, exchange, substitute, compromise, settle, rescind, waive, alter, subordinate or modify, with or without consideration, any security for payment of the Guaranteed Obligations, any other guaranties of the Guaranteed Obligations, or any other obligation of any Person (including any other Guarantor) with respect to the Guaranteed Obligations; (v) enforce and apply any security now or hereafter held by or for the benefit of such Beneficiary in respect hereof or the Guaranteed Obligations and direct the order or manner of sale thereof, or exercise any other right or remedy that such Beneficiary may have against any such security, in each case as such Beneficiary in its sole discretion may determine consistent herewith and any applicable security agreement, including foreclosure on any such security pursuant to one or more judicial or nonjudicial sales, whether or not every aspect of any such sale is commercially reasonable, and even though such action operates to impair or extinguish any right of reimbursement or subrogation or other right or remedy of any Guarantor against Borrowers or any security for the Guaranteed Obligations; and (vi) exercise any other rights available to it under the Credit Documents; and

(f)    this Guaranty and the obligations of Guarantors hereunder shall be valid and enforceable and shall not be subject to any reduction, limitation, impairment, discharge or termination for any reason (other than payment in full in Cash of the Guaranteed Obligations (other than contingent indemnification Obligations for which no claim has been made)), including the occurrence of any of the following, whether or not any Guarantor shall have had notice or knowledge of any of them:  (i) any failure or omission to assert or enforce, or agreement or election not to assert or enforce, or the stay or enjoining, by order of court, by operation of law or otherwise, of the exercise or enforcement of, any claim or demand or any right, power or remedy (whether arising under the Credit Documents, at law, in equity or otherwise) with respect to the Guaranteed Obligations or any agreement relating thereto, or with respect to any other guaranty of or security for the payment of the Guaranteed Obligations; (ii) any rescission, waiver, amendment or modification of, or any consent to departure from, any of the terms or provisions (including provisions relating to events of default) hereof, any of the other Credit Documents or any agreement or instrument executed pursuant thereto, or of any other guaranty or security for the Guaranteed Obligations, in each case whether or not in accordance with the terms hereof or such Credit Document or any agreement relating to such other guaranty or security; (iii) the Guaranteed Obligations, or any agreement relating thereto, at any time being found to be illegal, invalid or unenforceable in any respect; (iv) the application of payments received from any source (other than payments received pursuant to the other Credit Documents or from the proceeds of any security for the Guaranteed Obligations, except to the extent such security also serves as collateral for indebtedness other than the Guaranteed Obligations) to the payment of indebtedness other than the Guaranteed Obligations, even though any Beneficiary might have elected to apply such payment to any part or all of the Guaranteed Obligations; (v) any Beneficiary's consent to the change, reorganization or termination of the corporate structure or existence of any Credit Party or any of its Subsidiaries and to any corresponding restructuring of the Guaranteed Obligations; (vi) any failure to perfect or continue perfection of a security interest in any collateral which secures any of the Guaranteed Obligations; (vii) any defenses, set offs or counterclaims which Borrowers may allege or assert against any Beneficiary in respect of the Guaranteed Obligations, including failure of consideration, breach of warranty, payment, statute of frauds, statute of limitations, accord and satisfaction and usury; and (viii) any other act or thing or omission, or delay to do any other act or thing, which may or might in any manner or to any extent vary the risk of any Guarantor as an obligor in respect of the Guaranteed Obligations.

**7.5.    Waivers by Guarantors**.    Each Guarantor hereby waives, for the benefit of Beneficiaries:  (a) any right to require any Beneficiary, as a condition of payment or performance by such Guarantor, to (i) proceed against Borrowers, any other guarantor (including any other Guarantor) of the

Guaranteed Obligations or any other Person, (ii) proceed against or exhaust any security held from Borrowers, any such other guarantor or any other Person, (iii) proceed against or have resort to any balance of any Deposit Account or Securities Account or credit on the books of any Beneficiary in favor of Borrowers or any other Person, or (iv) pursue any other remedy in the power of any Beneficiary whatsoever; (b) any defense arising by reason of the incapacity, lack of authority or any disability or other defense of Borrowers or any other Guarantor, including any defense based on or arising out of the lack of validity or the unenforceability of the Guaranteed Obligations or any agreement or instrument relating thereto or by reason of the cessation of the liability of Borrowers or any other Guarantor from any cause other than payment in full in Cash of the Guaranteed Obligations; (c) any defense based upon any statute or rule of law which provides that the obligation of a surety must be neither larger in amount nor in other respects more burdensome than that of the principal; (d) any defense based upon any Beneficiary's errors or omissions in the administration of the Guaranteed Obligations, except behavior which amounts to bad faith; (e) (i) any principles or provisions of law, statutory or otherwise, which are or might be in conflict with the terms hereof and any legal or equitable discharge of such Guarantor's obligations hereunder, (ii) the benefit of any statute of limitations affecting such Guarantor's liability hereunder or the enforcement hereof, (iii) any rights to set offs, recoupments and counterclaims, and (iv) promptness, diligence and any requirement that any Beneficiary protect, secure, perfect or insure any security interest or lien or any property subject thereto; (f) notices, demands, presentments, protests, notices of protest, notices of dishonor and notices of any action or inaction, including acceptance hereof, notices of default hereunder or any agreement or instrument related thereto, notices of any renewal, extension or modification of the Guaranteed Obligations or any agreement related thereto, notices of any extension of credit to any Borrower and notices of any of the matters referred to in <u>Section 7.4</u> and any right to consent to any thereof; and (g) any defenses or benefits that may be derived from or afforded by law which limit the liability of or exonerate guarantors or sureties, or which may conflict with the terms hereof.

**7.6.    Guarantors' Rights of Subrogation, Contribution, etc**.    Until the Guaranteed Obligations (other than contingent indemnification Obligations for which no claim has been made) shall have been indefeasibly paid in full in Cash and the Commitments shall have terminated and all Letters of Credit shall have expired or been cancelled, each Guarantor hereby waives any claim, right or remedy, direct or indirect, that such Guarantor now has or may hereafter have against any Borrower or any other Guarantor or any of its assets in connection with this Guaranty or the performance by such Guarantor of its obligations hereunder, in each case whether such claim, right or remedy arises in equity, under contract, by statute, under common law or otherwise and including (a) any right of subrogation, reimbursement or indemnification that such Guarantor now has or may hereafter have against any Borrower with respect to the Guaranteed Obligations, (b) any right to enforce, or to participate in, any claim, right or remedy that any Beneficiary now has or may hereafter have against any Borrower, and (c) any benefit of, and any right to participate in, any Collateral or security now or hereafter held by any Beneficiary.    In addition, until the Guaranteed Obligations (other than contingent indemnification Obligations for which no claim has been made) shall have been indefeasibly paid in full in Cash and the Commitments shall have terminated and all Letters of Credit shall have expired or been cancelled, each Guarantor shall withhold exercise of any right of contribution such Guarantor may have against any other guarantor (including any other Guarantor) of the Guaranteed Obligations, including any such right of contribution as contemplated by <u>Section 7.2</u>. Each Guarantor further agrees that, to the extent the waiver or agreement to withhold the exercise of its rights of subrogation, reimbursement, indemnification and contribution as set forth herein is found by a court of competent jurisdiction to be void or voidable for any reason, any rights of subrogation, reimbursement or indemnification such Guarantor may have against Borrowers or against any collateral or security, and any rights of contribution such Guarantor may have against any such other guarantor, shall be junior and subordinate to any rights any Beneficiary may have against Borrowers, to all right, title and interest any Beneficiary may have in any such collateral or security, and to any right any Beneficiary may have against such other guarantor.  If any amount shall be paid to any Guarantor on account of any such subrogation, reimbursement, indemnification or

92

contribution rights at any time when all Guaranteed Obligations shall not have been finally and indefeasibly paid in full in Cash (other than contingent indemnification Obligations for which no claim has been made), such amount shall be held in trust for Administrative Agent on behalf of Beneficiaries and shall forthwith be paid over to Administrative Agent for the benefit of Beneficiaries to be credited and applied against the Guaranteed Obligations, whether matured or unmatured, in accordance with the terms hereof.

7.7.     **Subordination of Other Obligations**.  Any Indebtedness of Borrowers or any Guarantor now or hereafter held by any Guarantor (the **"Obligee Guarantor"**) is hereby subordinated in right of payment to the Guaranteed Obligations, and any such indebtedness collected or received by the Obligee Guarantor after an Event of Default has occurred and is continuing shall be held in trust for Administrative Agent on behalf of Beneficiaries and shall forthwith be paid over to Administrative Agent for the benefit of Beneficiaries to be credited and applied against the Guaranteed Obligations but without affecting, impairing or limiting in any manner the liability of the Obligee Guarantor under any other provision hereof.

7.8.     **Continuing Guaranty**.  This Guaranty is a continuing guaranty and shall remain in effect until all of the Guaranteed Obligations (other than contingent indemnification Obligations for which no claim has been made) shall have been indefeasibly paid in full in Cash and the Commitments shall have terminated and all Letters of Credit shall have expired or been cancelled.  Each Guarantor hereby irrevocably waives any right to revoke this Guaranty as to future transactions giving rise to any Guaranteed Obligations.

7.9.     **Authority of any Credit Party**.  It is not necessary for any Beneficiary to inquire into the capacity or powers of any Credit Party or the officers, directors or agents acting or purporting to act on behalf of any of them.

7.10.     **Financial Condition of Borrowers**.  Any Credit Extension may be made to Borrowers or continued from time to time without notice to or authorization from any Guarantor regardless of the financial or other condition of Borrowers at the time of any such grant or continuation, as the case may be.  No Beneficiary shall have any obligation to disclose or discuss with any Guarantor its assessment, or any Guarantor's assessment, of the financial condition of Borrowers.  Each Guarantor has adequate means to obtain information from Borrowers on a continuing basis concerning the financial condition of Borrowers and their ability to perform its obligations under the Credit Documents, and each Guarantor assumes the responsibility for being and keeping informed of the financial condition of Borrowers and of all circumstances bearing upon the risk of nonpayment of the Guaranteed Obligations.  Each Guarantor hereby waives and relinquishes any duty on the part of any Beneficiary to disclose any matter, fact or thing relating to the business, operations or conditions of Borrowers now known or hereafter known by any Beneficiary.

7.11.     **Bankruptcy, etc.**

(a)     So long as any Guaranteed Obligations remain outstanding, no Guarantor shall, without the prior written consent of Administrative Agent acting pursuant to the instructions of Requisite Lenders, commence or join with any other Person in commencing any bankruptcy, reorganization or insolvency case or proceeding of or against any Borrower or any other Guarantor.  The obligations of Guarantors hereunder shall not be reduced, limited, impaired, discharged, deferred, suspended or terminated by any case or proceeding, voluntary or involuntary, involving the bankruptcy, insolvency, receivership, reorganization, liquidation or arrangement of any Borrower or any other Guarantor or by any defense which any Borrower or any other Guarantor may have by reason of the order, decree or decision of any court or administrative body resulting from any such proceeding.

(b)    Each Guarantor acknowledges and agrees that any interest on any portion of the Guaranteed Obligations which accrues after the commencement of any case or proceeding referred to in Section 7.11(a) (or, if interest on any portion of the Guaranteed Obligations ceases to accrue by operation of law by reason of the commencement of such case or proceeding, such interest as would have accrued on such portion of the Guaranteed Obligations if such case or proceeding had not been commenced) shall be included in the Guaranteed Obligations because it is the intention of Guarantors and Beneficiaries that the Guaranteed Obligations which are guaranteed by Guarantors pursuant hereto should be determined without regard to any rule of law or order which may relieve Borrowers of any portion of such Guaranteed Obligations.    Guarantors shall permit any trustee in bankruptcy, receiver, debtor in possession, assignee for the benefit of creditors or similar Person to pay Administrative Agent, or allow the claim of Administrative Agent in respect of, any such interest accruing after the date on which such case or proceeding is commenced.

(c)    In the event that all or any portion of the Guaranteed Obligations are paid by Borrowers, the obligations of Guarantors hereunder shall continue and remain in full force and effect or be reinstated, as the case may be, in the event that all or any part of such payment(s) are rescinded or recovered directly or indirectly from any Beneficiary as a preference, fraudulent transfer or otherwise, and any such payments which are so rescinded or recovered shall constitute Guaranteed Obligations for all purposes hereunder.

**7.12.    Discharge of Guaranty Upon Sale of Guarantor**.  If all of the Capital Stock of any Guarantor or any of its successors in interest hereunder shall be sold or otherwise disposed of (including by merger or consolidation) in accordance with the terms and conditions hereof, the Guaranty of such Guarantor or such successor in interest, as the case may be, hereunder shall automatically be discharged and released without any further action by any Beneficiary or any other Person effective as of the time of such Asset Sale.

## SECTION 8.    EVENTS OF DEFAULT

**8.1.    Events of Default**.  If any one or more of the following conditions or events shall occur:

(a)    <u>Failure to Make Payments When Due</u>.  Failure by any Credit Party to pay (i) when due the principal of any Loan whether at stated maturity, by acceleration or otherwise; (ii) when due any installment of principal of any Loan, by notice of voluntary prepayment, by mandatory prepayment or otherwise; (iii) within three (3) Business Days of when due, any interest on any Loan or any fee or any premium or other amount due hereunder; or (iv) any amount payable to Issuing Bank in reimbursement of any drawing under a Letter of Credit.

(b)    <u>Default in Other Agreements</u>.  Except with respect to any Indebtedness that is subject to the discharge entered pursuant to the Bankruptcy Plan, (i) failure of any Credit Party or any of its Subsidiaries to pay when due any principal of or interest on or any other amount, including any payment in settlement, payable in respect of one or more items of Indebtedness (other than Indebtedness referred to in Section 8.1(a)) in an individual principal amount of $500,000 or more or with an aggregate principal amount of $1,000,000 or more, in any case, beyond the grace period, if any, provided therefor; or (ii) breach or default by any Credit Party or any of its Subsidiaries with respect to any other material term of (A) one or more items of Indebtedness in the individual or aggregate principal amounts referred to in <u>clause (i)</u> of this Section 8.1(b), or (B) any loan agreement, mortgage, indenture or other agreement relating to such item or items of Indebtedness, in each case beyond the grace period, if any, provided therefor, if the effect of such breach or default is to cause, or to permit the holder or holders of that Indebtedness (or a trustee on behalf of such holder or holders), with or without the passage of time, to cause, that Indebtedness to become or be declared due and payable (or subject to a compulsory repurchase

or other redemption) prior to its stated maturity or the stated maturity of any underlying obligation, as the case may be; or

(c)    Breach of Certain Covenants.  Failure of any Credit Party to perform or comply with any term or condition contained in (i) Section 2.5 (Use of Proceeds), Section 5.1(k) (Financial Statements and Other Reports), Section 5.2 (Existence), Section 5.4 (Maintenance of Properties), Section 5.5 (Insurance), Section 5.6 (Inspections), Section 5.7 (Lenders Meetings), Section 5.8 (Compliance with Laws), Section 5.14(b) (Cash Management Systems), Section 5.15 (Post-Closing Matters), or Section 6; or (ii) Section 5.1 (Financial Statements and Other Reports) (other than Section 5.1(k)) or Section 5.3 (Payment of Taxes and Claims), Section 5.10 (Subsidiaries), Section 5.11 (Additional Real Estate Assets), and such Default under this clause (ii) continues for seven (7) Business Days or more; or

(d)    Breach of Representations, etc.  Any representation, warranty, certification or other statement made or deemed made by any Credit Party in any Credit Document or in any statement or certificate (including any document delivered pursuant to Section 5.1(k)) at any time given by any Credit Party or any of its Subsidiaries in writing pursuant hereto or thereto or in connection herewith or therewith shall be false in any material respect as of the date made or deemed made; or

(e)    Other Defaults Under Credit Documents.  Any Credit Party shall default in the performance of or compliance with any term contained herein or any of the other Credit Documents, other than any such term referred to in any other Section of this Section 8.1, and such default shall not have been remedied or waived within thirty (30) days after the earlier of (i) an officer of such Credit Party becoming aware of such default, or (ii) receipt by Borrower Representative of notice from Administrative Agent or any Lender of such default; or

(f)    Involuntary Bankruptcy; Appointment of Receiver, etc.  (i) Except in connection with the Cases, a court of competent jurisdiction shall enter a decree or order for relief in respect of any Credit Party or any of its Subsidiaries in an involuntary case under the Bankruptcy Code or under any other applicable bankruptcy, insolvency or similar law now or hereafter in effect, which decree or order is not stayed; or any other similar relief shall be granted under any applicable federal or state law; or (ii) an involuntary case shall be commenced against any Credit Party or any of its Subsidiaries under the Bankruptcy Code or under any other applicable bankruptcy, insolvency or similar law now or hereafter in effect; or a decree or order of a court having jurisdiction in the premises for the appointment of a receiver, liquidator, sequestrator, trustee, custodian or other officer having similar powers over any Credit Party or any of its Subsidiaries, or over all or a substantial part of its property, shall have been entered; or there shall have occurred the involuntary appointment of an interim receiver, trustee or other custodian of any Credit Party or any of its Subsidiaries for all or a substantial part of its property; or a warrant of attachment, execution or similar process shall have been issued against any substantial part of the property of any Credit Party or any of its Subsidiaries, and any such event described in this clause (ii) shall continue for sixty (60) days without having been dismissed, bonded or discharged; or

(g)    Voluntary Bankruptcy; Appointment of Receiver, etc.  Except with respect to the Cases, (i) any Credit Party or any of its Subsidiaries shall have an order for relief entered with respect to it or shall commence a voluntary case under the Bankruptcy Code or under any other applicable bankruptcy, insolvency or similar law now or hereafter in effect, or shall consent to the entry of an order for relief in an involuntary case, or to the conversion of an involuntary case to a voluntary case, under any such law, or shall consent to the appointment of or taking possession by a receiver, trustee or other custodian for all or a substantial part of its property; or any Credit Party or any of its Subsidiaries shall make any assignment for the benefit of creditors; or (ii) any Credit Party or any of its Subsidiaries shall be unable, or shall fail generally, or shall admit in writing its inability, to pay its debts as such debts become due; or

95

the Board of Directors (or similar governing body) of any Credit Party or any of its Subsidiaries (or any committee thereof) shall adopt any resolution or otherwise authorize any action to approve any of the actions referred to herein or in <u>Section 8.1(f)</u>; or

(h)    <u>Judgments and Attachments</u>.    Except in connection with any Indebtedness subject to the discharge entered pursuant to the Bankruptcy Plan, any money judgment, order, writ or warrant of attachment or similar process involving an amount in excess of $1,000,000 individually and in the aggregate (in either case to the extent not adequately covered by insurance as to which a solvent and unaffiliated insurance company has acknowledged coverage) shall be entered or filed against any Credit Party or any of its Subsidiaries or any of their respective assets and shall remain undischarged, unvacated, unbonded or unstayed for a period of sixty (60) days (or in any event later than five (5) days prior to the date of any proposed sale thereunder); or

(i)    <u>Dissolution</u>.    Any order, judgment or decree shall be entered against any Credit Party decreeing the dissolution or split up of such Credit Party and such order shall remain undischarged or unstayed for a period in excess of thirty (30) days; or

(j)    <u>Employee Benefit Plans</u>.    (i) From and after the Closing Date, except as identified on <u>Schedule 4.20</u>, there shall occur one or more ERISA Events which individually or in the aggregate results in or might reasonably be expected to result in liability of any Credit Party or any of its Subsidiaries in excess of $1,000,000 during the term hereof; or (ii) there exists any fact or circumstance that reasonably could be expected to result in the imposition of a Lien or security interest under Section 430(k) of the Internal Revenue Code or under Section 303(k) of ERISA; <u>provided</u>, that notwithstanding the foregoing, to the extent the Morrison Restaurants Inc. Retirement Plan is terminated, such event shall not constitute an Event of Default herein; or

(k)    <u>Change of Control</u>.    A Change of Control shall occur; or

(l)    <u>Guaranties, Collateral Documents and other Credit Documents</u>.    At any time after the execution and delivery thereof, (i) the Guaranty for any reason, other than the satisfaction in full in Cash of all Obligations, shall cease to be in full force and effect (other than in accordance with its terms) or shall be declared to be null and void or any Guarantor shall repudiate its obligations thereunder; (ii) this Agreement or any Collateral Document ceases to be in full force and effect (other than by reason of a release of Collateral in accordance with the terms hereof or thereof or the satisfaction in full in Cash of the Obligations in accordance with the terms hereof) or shall be declared null and void, or Collateral Agent shall not have or shall cease to have a valid and perfected Lien in any Collateral purported to be covered by the Collateral Documents with the priority required by the relevant Collateral Document, in each case for any reason other than solely the failure of Collateral Agent or any Secured Party to take any action within its sole control; or (iii) any Credit Party shall contest the validity or enforceability of any Credit Document in writing or deny in writing that it has any further liability, including with respect to future advances by Lenders, under any Credit Document to which it is a party; or

(m)    <u>Subordination Agreements</u>.    The subordination provisions in connection with any Subordination Agreement (or any other Subordinated Indebtedness) or any agreement or instrument governing any Subordinated Indebtedness shall for any reason be revoked or invalidated, or otherwise cease to be in full force and effect, or any Person shall contest in any manner the validity or enforceability thereof or deny that it has further liability or obligation thereunder, or the Obligations for any reason shall not have the priority contemplated with respect to any Subordinated Indebtedness, this Agreement or such subordination provisions.

**THEN**, (I) upon the occurrence of any Event of Default described in Section 8.1(f) or 8.1(g), automatically, and (II) upon the occurrence of any other Event of Default, at the request of (or with the consent of) Requisite Lenders (and in each case under clauses (A) and (B) of this clause (II), upon notice to Borrower Representative by Administrative Agent), (A) the Commitments, if any, of each Lender having such Commitments and the obligation of Issuing Bank to issue any Letter of Credit shall immediately terminate; (B) each of the following shall immediately become due and payable, in each case without presentment, demand, protest or other requirements of any kind, all of which are hereby expressly waived by each Credit Party: (w) the unpaid principal amount of and accrued interest on the Loans, (x) an amount equal to the maximum amount that may at any time be drawn under all Letters of Credit then outstanding (regardless of whether any beneficiary under any such Letter of Credit shall have presented, or shall be entitled at such time to present, the drafts or other documents or certificates required to draw under such Letters of Credit), and (y) all other Obligations; provided, the foregoing shall not affect in any way the obligations of Lenders under Section 2.3(c); (C) Administrative Agent may cause Collateral Agent to enforce any and all Liens and security interests created pursuant to Collateral Documents; and (D) Administrative Agent (including at the request of Issuing Bank) shall direct Borrowers to provide (and Borrowers hereby agree upon receipt of such notice, or upon the occurrence of any Event of Default specified in Sections 8.1(f) to provide) Letter of Credit Cash Collateralization to Administrative Agent, to be held as security for Borrowers' reimbursement Obligations in respect of the Letters of Credit then outstanding under arrangements acceptable to Administrative Agent and Issuing Bank.

      **8.2.**    **Rights and Remedies; Consent to Receiver**.  Upon the occurrence and during the continuation of an Event of Default, Administrative Agent may, and, at the instruction of the Requisite Lenders, shall, in addition to any other rights or remedies provided for hereunder or under any other Credit Document or by applicable law, do any one or more of the following:

      (i)    by written notice to Borrowers, declare the principal of, and any and all accrued and unpaid interest and fees in respect of, the Loans and all other Obligations, whether evidenced by this Agreement or by any of the other Credit Documents to be immediately due and payable, whereupon the same shall become and be immediately due and payable and Borrowers shall be obligated to repay all of such Obligations in full, without presentment, demand, protest, or further notice or other requirements of any kind, all of which are hereby expressly waived by each Borrower;

      (ii)    by written notice to Borrowers, declare the Commitments (if any) terminated, whereupon the Commitments (if any) shall immediately be terminated together with any obligation of any Lender to make Term Loans; and

      (iii)    exercise all other rights and remedies available to Administrative Agent, Collateral Agent, or the Lenders under the Credit Documents, under applicable law, or in equity.

The foregoing to the contrary notwithstanding, upon the occurrence of any Event of Default described in Section 8.1(f) or Section 8.1(g), in addition to the remedies set forth above, without any notice to Borrowers or any other Person or any act by the Lenders, the Commitments (if any) shall automatically terminate and the Obligations, inclusive of the principal of, and any and all accrued and unpaid interest and fees (including the Applicable Premium) in respect of, the Loans and all other Obligations, whether evidenced by this Agreement or by any of the other Credit Documents, shall automatically become and be immediately due and payable and Borrowers shall automatically be obligated to repay all of such Obligations in full, without presentment, demand, protest, or notice or other requirements of any kind, all of which are expressly waived by Holdings and Borrowers.

Without limiting the generality of the foregoing or limiting in any way the rights of the Agents and Lenders under the Credit Documents or otherwise under applicable law, at any time after the occurrence

and during the continuance of an Event of Default, the Agents, at the direction of Requisite Lenders, shall be entitled to apply for and have a receiver, interim receiver or a receiver-manager appointed under state, provincial, federal or foreign law by a court of competent jurisdiction or other proper Governmental Authority in any action taken by the Agents or Lenders to enforce their rights and remedies hereunder and under the other Credit Documents in order to manage, protect, preserve, sell and otherwise dispose of all or any portion of the Collateral and continue the operation of the business of the Credit Parties, or any of them, and their respective Subsidiaries, and to collect all revenues and profits thereof and apply the same to the payment of all expenses and other charges of such receivership, including the compensation of the receiver, interim receiver and receiver-manager, and the payment of the other Obligations until a sale or other disposition of such Collateral shall be finally made and consummated. **TO THE EXTENT PERMITTED BY APPLICABLE LAW, EACH CREDIT PARTY HEREBY IRREVOCABLY CONSENTS TO AND WAIVES ANY RIGHT TO OBJECT TO OR OTHERWISE CONTEST THE APPOINTMENT OF AN INTERIM RECEIVER, RECEIVER OR RECEIVER-MANAGER DURING THE CONTINUANCE OF AN EVENT OF DEFAULT. EACH CREDIT PARTY HEREBY GRANTS SUCH WAIVER AND CONSENT KNOWINGLY AFTER HAVING DISCUSSED THE IMPLICATIONS THEREOF WITH COUNSEL, ACKNOWLEDGES THAT THE UNCONTESTED RIGHT TO HAVE AN INTERIM RECEIVER, RECEIVER AND RECEIVER-MANAGER APPOINTED FOR THE FOREGOING PURPOSES IS CONSIDERED ESSENTIAL BY THE LENDERS IN CONNECTION WITH THE ENFORCEMENT OF THEIR RIGHTS AND REMEDIES HEREUNDER AND UNDER THE OTHER CREDIT DOCUMENTS, AND THE AVAILABILITY OF SUCH APPOINTMENT AS A REMEDY UNDER THE FOREGOING CIRCUMSTANCES WAS A MATERIAL FACTOR IN INDUCING THE LENDERS TO MAKE (AND COMMIT TO MAKE) THE LOANS TO BORROWERS, AND AGREES TO ENTER INTO ANY AND ALL STIPULATIONS IN ANY LEGAL ACTIONS, OR AGREEMENTS OR OTHER INSTRUMENTS IN CONNECTION WITH THE FOREGOING AND TO COOPERATE FULLY WITH THE AGENTS AND LENDERS IN CONNECTION WITH THE ASSUMPTION AND EXERCISE OF CONTROL BY THE INTERIM RECEIVER, RECEIVER OR RECEIVER-MANAGER OVER ALL OR ANY PORTION OF THE COLLATERAL AND PROPERTY OF THE CREDIT PARTIES AND THEIR SUBSIDIARIES. NO RIGHT CONFERRED UPON THE AGENTS OR LENDERS HEREBY OR BY ANY OTHER CREDIT DOCUMENT SHALL BE EXCLUSIVE OF ANY OTHER RIGHT REFERRED TO HEREIN OR THEREIN OR NOW OR HEREAFTER AVAILABLE AT LAW, IN EQUITY, BY STATUTE OR OTHERWISE.**

**8.3.    Cooperation of Credit Parties.**

(a)    If an Event of Default shall have occurred and be continuing, each Credit Party shall, and, if applicable, shall cause each of its Subsidiaries to, take any action which the Agents may reasonably request in the exercise of their rights and remedies under any Credit Document in order to transfer or assign any Collateral to Collateral Agent for the benefit of the Secured Parties or to such one or more third parties as Collateral Agent may designate, or to any combination of the foregoing.

(b)    To enforce the provisions of this <u>Section 8.3</u>, the Agents are empowered to seek from any Governmental Authority, to the extent required, consent to or approval of any involuntary transfer of control of any entity whose Collateral is subject to any Credit Document for the purpose of seeking a bona fide purchaser to whom control ultimately will be transferred. Each Credit Party agrees to, and, if applicable, shall cause each of its Subsidiaries to agree to, cooperate with any such purchaser and with the Agents in the preparation, execution and filing of any forms and providing any information that may be necessary or helpful in obtaining the consent of any Governmental Authority to the assignment to such purchaser of the Collateral.

98

(c)    Without limiting the obligations of any Credit Party hereunder in any respect, each Credit Party further agrees that if an Event of Default shall have occurred and be continuing, it, or any of its Subsidiaries, should fail or refuse for any reason whatsoever, including any refusal to execute and file any completed application necessary or appropriate to obtain any consent from any Governmental Authority necessary or appropriate for the exercise of any right of any Agent hereunder, then such application may be executed and filed on such Credit Party's behalf by the clerk of any court of competent jurisdiction without notice to such Credit Party pursuant to court order.

**8.4.    Curative Capital.**

(a)    Subject to the limitations set forth in clauses (d) and (e) below, Borrowers may cure (and shall be deemed to have cured) an Event of Default arising out of a breach of the financial covenants set forth in clauses (a), (b) or (c) of Section 6.8 (the "Specified Financial Covenants") if they receive the cash proceeds of an investment of Curative Capital on or before the date that is ten Business Days (or three Business Days in the case of a cure of 6.8(a)) after the date that is the earlier to occur of (i) the date on which the Compliance Certificate is delivered to Administrative Agent in respect of the Fiscal Month or Fiscal Quarter, as applicable, with respect to which any such breach occurred (the "Specified Fiscal Period"), and (ii) the date on which the Compliance Certificate is required to be delivered to the Administrative Agent pursuant to Section 5.1(d) in respect of the Specified Fiscal Period (such earlier date, the "Financial Statement Delivery Date").

(b)    In connection with a cure of an Event of Default under this Section 8.4, on or before the Financial Statement Delivery Date for the Specified Fiscal Period, Borrowers shall deliver to the Administrative Agent a certification of an Authorized Officer which contains, or Borrowers shall include in the Compliance Certificate for the Specified Fiscal Period:  (i) an indication that Borrowers will receive proceeds of Curative Capital for the Specified Fiscal Period and a statement setting forth the anticipated amount of such proceeds and (ii) a calculation of the financial results or prospective financial results of Borrowers for the Specified Fiscal Period (including for such purposes the proceeds of the Curative Capital (broken out separately) as deemed Consolidated Adjusted EBITDA or Consolidated Liquidity, as applicable, as if received on such date), which shall confirm that on a *pro forma* basis after taking into account the receipt of the Curative Capital proceeds, Borrowers would have been or will be in compliance with the Specified Financial Covenants for the Specified Fiscal Period.

(c)    Borrowers shall promptly notify Administrative Agent of their receipt of any proceeds of Curative Capital.

(d)    Any investment of Curative Capital shall be in immediately available funds and shall be in an amount that is sufficient to cause Borrowers to be in compliance with the Specified Financial Covenants for the Specified Fiscal Period, calculated for such purpose as if such amount of Curative Capital were additional Consolidated Adjusted EBITDA or Consolidated Liquidity, as applicable, of Borrowers as at such date.

(e)    Notwithstanding anything to the contrary contained herein, regardless of whether an investment of Curative Capital is made prior to the applicable Financial Statement Delivery Date, Borrowers' rights under this Section 8.4 may (i) be exercised not more than 5 times during the term of this Agreement and (ii) not be exercised more than 2 times in any twelve consecutive Fiscal Month period.

(f)    If Borrowers have (i) delivered a certification or a Compliance Certificate conforming to the requirements of Section 8.4(b), and (ii) received proceeds of an investment of Curative Capital in immediately available funds on or before the deadline set forth in Section 8.4(a) and in an

amount that is sufficient to cause Borrowers to be in compliance with the Specified Financial Covenants for the Specified Fiscal Period, any Event of Default that occurs or has occurred and is continuing as a result of a breach of the Specified Financial Covenants for the Specified Fiscal Period shall be deemed cured with no further action required by the Required Lenders.  Prior to satisfaction of the foregoing requirements of this <u>Section 8.4(f)</u>, any Event of Default that occurs or has occurred as a result of a breach of the Specified Financial Covenants shall be deemed to be continuing and, as a result, the Lenders shall have no obligation to make additional loans or otherwise extend additional credit hereunder.

(g)    To the extent that Curative Capital is received and included in the calculation of the Specified Financial Covenants as deemed Consolidated Adjusted EBITDA or Consolidated Liquidity, as applicable, for any Specified Fiscal Period pursuant to this <u>Section 8.4</u>, such Curative Capital shall be deemed to be Consolidated Adjusted EBITDA or Consolidated Liquidity, as applicable, for purposes of determining compliance with the Specified Financial Covenants for subsequent periods that include such Specified Fiscal Period.  Curative Capital shall be disregarded for purposes of determining Consolidated Adjusted EBITDA and Consolidated Liquidity, as applicable, for any pricing, financial covenant based conditions or any baskets with respect to the covenants contained in this Agreement.  In addition, notwithstanding any mandatory prepayment of Obligations pursuant to <u>Section 2.13(f)</u>, any Indebtedness so prepaid shall be deemed to remain outstanding for purposes of determining pro forma or actual compliance with the Specified Financial Covenant or for determining any pricing, financial covenant based conditions or baskets with respect to the covenants contained in this Agreement, in each case in such Specified Fiscal Period.

## SECTION 9.    AGENTS

**9.1.    Appointment of Agents**.  TCW is hereby appointed Administrative Agent and Collateral Agent hereunder and under the other Credit Documents and each Lender hereby authorizes TCW, in such capacity, to act as its agent in accordance with the terms hereof and the other Credit Documents.  Each Agent hereby agrees to act upon the express conditions contained herein and the other Credit Documents, as applicable.  The provisions of this <u>Section 9</u> are solely for the benefit of the Agents and Lenders and no Credit Party shall have any rights as a third party beneficiary of any of the provisions thereof.  In performing its functions and duties hereunder, each Agent shall act solely as an agent of Lenders and does not assume and shall not be deemed to have assumed any obligation towards or relationship of agency or trust with or for any Credit Party or any of its Subsidiaries.

**9.2.    Powers and Duties**.  Each Lender irrevocably authorizes each Agent to take such action on such Lender's behalf and to exercise such powers, rights and remedies hereunder and under the other Credit Documents as are specifically delegated or granted to such Agent by the terms hereof and thereof, together with such powers, rights and remedies as are reasonably incidental thereto.  Each Agent shall have only those duties and responsibilities that are expressly specified herein and the other Credit Documents.  Each Agent may exercise such powers, rights and remedies and perform such duties by or through its agents or employees.  No Agent shall have, by reason hereof or any of the other Credit Documents, a fiduciary relationship in respect of any Secured Party; and nothing herein or any of the other Credit Documents, expressed or implied, is intended to or shall be so construed as to impose upon any Agent any obligations in respect hereof or any of the other Credit Documents except as expressly set forth herein or therein.

**9.3.    General Immunity.**

(a)    <u>No Responsibility for Certain Matters</u>.  No Agent shall be responsible to any Secured Party for the execution, effectiveness, genuineness, validity, enforceability, collectability or sufficiency hereof or any other Credit Document or for any representations, warranties, recitals or

statements made herein or therein or made in any written or oral statements or in any financial or other statements, instruments, reports or certificates or any other documents furnished or made by any Agent to any other Secured Party or by or on behalf of any Credit Party to any Agent or any other Secured Party in connection with the Credit Documents and the transactions contemplated thereby or for the financial condition or business affairs of any Credit Party or any other Person liable for the payment of any Obligations, nor shall any Agent be required to ascertain or inquire as to the performance or observance of any of the terms, conditions, provisions, covenants or agreements contained in any of the Credit Documents or as to the use of the proceeds of the Loans or as to the existence or possible existence of any Event of Default or Default or to make any disclosures with respect to the foregoing. Anything contained herein to the contrary notwithstanding, Administrative Agent shall not have any liability arising from confirmations of the amount of outstanding Loans, Letter of Credit Usage or the component amounts thereof.

(b)    <u>Exculpatory Provisions</u>.  No Agent nor any of its officers, partners, directors, employees or agents shall be liable to any Secured Party for any action taken or omitted by any Agent under or in connection with any of the Credit Documents except to the extent caused by such Agent's gross negligence or willful misconduct, as determined by a court of competent jurisdiction in a final, non-appealable order.  Each Agent shall be entitled to refrain from any act or the taking of any action (including the failure to take an action) in connection herewith or any of the other Credit Documents or from the exercise of any power, discretion or authority vested in it hereunder or thereunder unless and until such Agent shall have received instructions in respect thereof from the Requisite Lenders (or such other Lenders as may be required to give such instructions under <u>Section 10.5</u>) and, upon receipt of such instructions from the Requisite Lenders (or such other Lenders, as the case may be), such Agent shall be entitled to act or (where so instructed) refrain from acting, or to exercise such power, discretion or authority, in accordance with such instructions.  Without prejudice to the generality of the foregoing, (i) each Agent shall be entitled to rely, and shall be fully protected in relying, upon any communication, instrument or document believed by it to be genuine and correct and to have been signed or sent by the proper Person or Persons, and shall be entitled to rely and shall be protected in relying on opinions and judgments of attorneys (who may be attorneys for a Credit Party and its Subsidiaries), accountants, experts and other professional advisors selected by it; and (ii) no Secured Party shall have any right of action whatsoever against any Agent as a result of such Agent acting or (where so instructed) refraining from acting hereunder or any of the other Credit Documents in accordance with the instructions of the Requisite Lenders (or such other Lenders as may be required to give such instructions under <u>Section 10.5</u>).

9.4.    **Agents Entitled to Act as Lender**.  The agency hereby created shall in no way impair or affect any of the rights and powers of, or impose any duties or obligations upon, any Agent in its individual capacity as a Lender hereunder.  With respect to its participation in the Loans and the Letters of Credit, each Agent shall have the same rights and powers hereunder as any other Lender and may exercise the same as if it were not performing the duties and functions delegated to it hereunder, and the term "Lender" shall, unless the context clearly otherwise indicates, include each Agent in its individual capacity.  Any Agent and its Affiliates may accept deposits from, lend money to, own securities of, and generally engage in any kind of banking, trust, financial advisory or other business with any Credit Party or any of its Affiliates as if it were not performing the duties specified herein, and may accept fees and other consideration from the Credit Parties for services in connection herewith and otherwise without having to account for the same to Lenders.  All parties hereto hereby (a) acknowledge that TCW and/or its Affiliates and Related Funds may also invest in, and/or own Capital Stock and Securities of, the Credit Parties and their respective Affiliates and (b) waive any conflict arising therefrom.

9.5.    **Lenders' Representations, Warranties and Acknowledgment.**

(a)    Each Lender represents and warrants that it has made its own independent investigation of the financial condition and affairs of Holdings and its Subsidiaries in connection with Credit Extensions hereunder and that it has made and shall continue to make its own appraisal of the creditworthiness of Holdings and its Subsidiaries.  No Agent shall have any duty or responsibility, either initially or on a continuing basis, to make any such investigation or any such appraisal on behalf of Lenders or to provide any Lender with any credit or other information with respect thereto, whether coming into its possession before the making of the Loans or at any time or times thereafter, and no Agent shall have any responsibility with respect to the accuracy of or the completeness of any information provided to Lenders.

(b)    Each Lender, by delivering its signature page to this Agreement, shall be deemed to have acknowledged receipt of, and consented to and approved, each Credit Document and each other document required to be approved by any Agent, the Requisite Lenders, Issuing Bank or Lenders, as applicable on the Closing Date.

**9.6.    Right to Indemnity**.  Each Lender, in proportion to its Pro Rata Share, severally agrees to indemnify each Agent, their Affiliates and their respective officers, partners, directors, trustees, employees and agents of each Agent (each, an **"Indemnitee Agent Party"**), to the extent that such Indemnitee Agent Party shall not have been reimbursed by any Credit Party, for and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, reasonable and documented expenses (including counsel fees and disbursements) or disbursements of any kind or nature whatsoever which may be imposed on, incurred by or asserted against such Indemnitee Agent Party in exercising its powers, rights and remedies or performing its duties hereunder or under the other Credit Documents or otherwise in its capacity as such Indemnitee Agent Party in any way relating to or arising out of this Agreement or the other Credit Documents, **IN ALL CASES, WHETHER OR NOT CAUSED BY OR ARISING, IN WHOLE OR IN PART, OUT OF THE COMPARATIVE, CONTRIBUTORY, OR SOLE NEGLIGENCE OF SUCH INDEMNITEE AGENT PARTY**; provided, no Lender shall be liable for any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements resulting from such Indemnitee Agent Party's gross negligence or willful misconduct, as determined by a court of competent jurisdiction in a final, non-appealable order.  If any indemnity furnished to any Indemnitee Agent Party for any purpose shall, in the opinion of such Indemnitee Agent Party, be insufficient or become impaired, such Indemnitee Agent Party may call for additional indemnity and cease, or not commence, to do the acts indemnified against until such additional indemnity is furnished; provided, in no event shall this sentence require any Lender to indemnify any Indemnitee Agent Party against any liability, obligation, loss, damage, penalty, action, judgment, suit, cost, expense or disbursement in excess of such Lender's Pro Rata Share thereof; provided, further, this sentence shall not be deemed to require any Lender to indemnify any Indemnitee Agent Party against any liability, obligation, loss, damage, penalty, action, judgment, suit, cost, expense or disbursement described in the proviso in the immediately preceding sentence.

**9.7.    Successor Administrative Agent and Collateral Agent.**

(a)    Administrative Agent and Collateral Agent may resign at any time by giving at least thirty (30) days' prior written notice thereof to the Lenders and Borrower Representative.  Upon any such notice of resignation, the Requisite Lenders shall have the right, upon five (5) Business Days' notice to Borrower Representative, to appoint a successor Administrative Agent and Collateral Agent.  Upon the acceptance of any appointment as Administrative Agent and Collateral Agent hereunder by a successor Administrative Agent and Collateral Agent, that successor Administrative Agent and Collateral Agent shall thereupon succeed to and become vested with all the rights, powers, privileges and duties of the retiring Administrative Agent and Collateral Agent and the retiring Administrative Agent and Collateral

Agent shall promptly (i) transfer to such successor Administrative Agent and Collateral Agent all sums, Securities and other items of Collateral held under the Collateral Documents, together with all records and other documents necessary or appropriate in connection with the performance of the duties of the successor Administrative Agent and Collateral Agent under the Credit Documents, and (ii) execute and deliver to such successor Administrative Agent and Collateral Agent such amendments to financing statements, and take such other actions, as may be necessary or appropriate in connection with the assignment to such successor Administrative Agent and Collateral Agent of the security interests created under the Collateral Documents, whereupon such retiring Administrative Agent and Collateral Agent shall be discharged from its duties and obligations hereunder.  After any retiring Administrative Agent's and Collateral Agent's resignation hereunder as Administrative Agent and Collateral Agent, the provisions of this Section 9 shall inure to its benefit as to any actions taken or omitted to be taken by it while it was Administrative Agent and Collateral Agent hereunder.

(b)     Notwithstanding anything herein to the contrary, any Agent may assign its rights and duties as such to an Affiliate of TCW without the prior written consent of, or prior written notice to, any Credit Party or the Lenders; provided, the Credit Parties and the Lenders may deem and treat such assigning Agent as such for all purposes hereof, unless and until such assigning Agent provides written notice to Borrower Representative and the Lenders of such assignment.  Upon such assignment such Affiliate shall succeed to and become vested with all rights, powers, privileges and duties as the applicable Agent hereunder and under the other Credit Documents.

**9.8.    Collateral Documents and Guaranty.**

(a)     Agents under Collateral Documents and Guaranty.  Each Lender hereby further authorizes Administrative Agent or Collateral Agent, as applicable, on behalf of and for the benefit of the Lenders, to be the agent for and representative of Lenders with respect to the Guaranty, the Collateral and the Collateral Documents.  Subject to Section 10.5, without further written consent or authorization from Lenders, Administrative Agent or Collateral Agent, as applicable may execute any documents or instruments necessary to (i) release any Lien encumbering any item of Collateral that is the subject of a sale or other disposition of assets permitted hereby or to which the Requisite Lenders (or such other Lenders as may be required to give such consent under Section 10.5) have otherwise consented, or (ii) release any Guarantor from the Guaranty pursuant to Section 7.12 or with respect to which the Requisite Lenders (or such other Lenders as may be required to give such consent under Section 10.5) have otherwise consented.

(b)     Right to Realize on Collateral and Enforce Guaranty.  Anything contained in any of the Credit Documents to the contrary notwithstanding, the Credit Parties, Administrative Agent, Collateral Agent and each Lender hereby agree that (i) no Lender shall have any right individually to realize upon any of the Collateral or to enforce the Guaranty, it being understood and agreed that all powers, rights and remedies hereunder may be exercised solely by Administrative Agent, on behalf of the Secured Parties in accordance with the terms hereof and all powers, rights and remedies under the Collateral Documents may be exercised solely by Collateral Agent, and (ii) in the event of a foreclosure by Collateral Agent on any of the Collateral pursuant to a public or private sale, Collateral Agent or any Lender may be the purchaser of any or all of such Collateral at any such sale and Collateral Agent, as agent for and representative of Secured Parties (but not any Lender or Lenders in its or their respective individual capacities unless the Requisite Lenders shall otherwise agree in writing) shall be entitled, for the purpose of bidding and making settlement or payment of the purchase price for all or any portion of the Collateral sold at any such public sale, to use and apply any of the Obligations as a credit on account of the purchase price for any collateral payable by Collateral Agent at such sale.

**9.9.     Administrative Agent May File Bankruptcy Disclosure and Proofs of Claim.**  In case of the pendency of any proceeding under any Debtor Relief Laws relative to any Credit Party other than the Cases, Administrative Agent (irrespective of whether the principal of any Loan or Obligation shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether Administrative Agent shall have made any demand on Borrowers) shall be entitled and empowered (but not obligated) by intervention in such proceeding or otherwise:

(a)     to file a verified statement pursuant to rule 2019 of the Federal Rules of Bankruptcy Procedure that, in its sole opinion, complies with such rule's disclosure requirements for entities representing more than one creditor;

(b)     to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans and all other Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders and Administrative Agent (including any claim for the reasonable compensation, expenses, disbursements and advances of Administrative Agent and its respective agents and counsel and all other amounts due Administrative Agent under his Agreement allowed in such judicial proceeding);

(c)     to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same;

(d)     and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender to make such payments to Administrative Agent and, in the event that Administrative Agent shall consent to the making of such payments directly to the Lenders, to pay to Administrative Agent any amount due for the reasonable compensation, expenses, disbursements and advances of Administrative Agent and its agents and counsel, and any other amounts due Administrative Agent under this Agreement.  To the extent that the payment of any such compensation, expenses, disbursements and advances of Administrative Agent, its agents and counsel, and any other amounts due Administrative Agent under this Agreement out of the estate in any such proceeding, shall be denied for any reason, payment of the same shall be secured by a Lien on, and shall be paid out of, any and all distributions, dividends, money, securities and other properties that the Lenders may be entitled to receive in such proceeding whether in liquidation or under any plan of reorganization or arrangement or otherwise.

Nothing contained herein shall be deemed to authorize Administrative Agent to authorize or consent to or accept or adopt on behalf of any Lender any plan of reorganization, arrangement, adjustment or composition affecting the Obligations or the rights of any Lender or to authorize Administrative Agent to vote in respect of the claim of any Lender in any such proceeding

## SECTION 10.  MISCELLANEOUS

**10.1.     Notices.**

(a)     <u>Notices Generally</u>.  Unless otherwise specifically provided herein, any notice or other communication herein required or permitted to be given to a Credit Party or Agent, shall be sent to such Person's mailing address, telefacsimile number and/or email address(es) (if approved in accordance with the terms hereof) as provided on <u>Appendix B</u> or in the other relevant Credit Document, and in the case of Issuing Bank or any Lender, the mailing address as indicated on <u>Appendix B</u> or otherwise indicated by Administrative Agent and Borrower Representative in writing.  Each notice hereunder shall be in writing and may be personally served or sent by facsimile (excluding any notices to any Agent or any Affiliate of Agent that is a Lender in its capacity as such), United States mail or courier service or

email (if approved in accordance with the terms hereof) and shall be deemed to have been given when (i) delivered in person or by courier service and signed for against receipt thereof, (ii) upon receipt of facsimile, (iii) three (3) Business Days after depositing it in the United States mail with postage prepaid and properly addressed, or (iv) as set forth in <u>clause (b)(i)</u> of this <u>Section 10.1</u> with respect to notices approved in accordance with the terms hereof to be sent by email; <u>provided</u>, (x) no notice to any Agent in its capacity as such shall be effective until received by such Agent and (y) any notice sent to any Agent by email shall also be sent by United States mail or courier service in accordance with the foregoing; <u>provided</u>, <u>further</u>, any such notice or other communication shall, at the request of Administrative Agent, be provided to any sub-agent appointed pursuant to <u>Section 9</u> as designated by Administrative Agent from time to time.  Any party hereto may change its address (including telefacsimile, email address (if approved in accordance with the terms hereof) or telephone number) for notices and other communications hereunder by notice to each of Administrative Agent and Borrower Representative.  At any time a single Person shall be acting as Administrative Agent and Collateral Agent, any notice or communication that shall have been delivered by Borrower Representative to Administrative Agent or to Collateral Agent, as the case may be, shall also be deemed to have been delivered to Collateral Agent and Administrative Agent, respectively.

          (b)     <u>Electronic Communications</u>.

Notices and other communications to any Agent, Issuing Bank, Lender or Credit Party hereunder may be delivered or furnished by email pursuant to procedures approved by Administrative Agent in its sole discretion (each such email communication approved by Administrative Agent, an **"Approved Electronic Communication"**); <u>provided</u>, that, notwithstanding the foregoing, in no event will notices by email be effective to any Agent, Issuing Bank or Lender, or pursuant to <u>Section 2</u>, if any such Person has notified Administrative Agent that it is incapable of receiving notices under such <u>Section 2</u> by email.  Any Agent may, in its sole discretion, agree to accept notices and other communications to it hereunder by email pursuant to procedures approved by it; <u>provided</u>, that approval of such procedures may be limited to particular notices or communications.  In the case of any notices by email permitted in accordance with this Agreement, unless Administrative Agent otherwise prescribes, any notices and other communications permitted to be sent to an email address shall be delivered during normal business hours and deemed received upon the sender's receipt of an acknowledgment from the intended recipient (such as by the "return receipt requested" function, as available, return email or other written acknowledgment, but excluding any automatic reply to such email), except that, if such notice or other communication is not sent prior to noon, local time at the location of the recipient, then such notice or communication shall be deemed not to have been received until the opening of business on the next Business Day for the recipient, at the earliest.

Each Credit Party understands that the distribution of material through an electronic medium is not necessarily secure and that there are confidentiality and other risks associated with such distribution and agrees and assumes the risks associated with such electronic distribution, except to the extent caused by the bad faith, willful misconduct or gross negligence of Administrative Agent, as determined by a final, non-appealable judgment of a court of competent jurisdiction.

Each Credit Party, each Lender, Issuing Bank and each Agent agrees that Administrative Agent may, but shall not be obligated to, store any Approved Electronic Communications in accordance with Administrative Agent's customary document retention procedures and policies.

Any notice of Default or Event of Default may be provided by telephone if confirmed promptly thereafter by delivery of written notice thereof.

**10.2.    Expenses**.  Whether or not the transactions contemplated hereby shall be consummated, the Credit Parties agree to pay promptly (a) all Administrative Agent's actual and reasonable costs and expenses of preparation of the Credit Documents and any consents, amendments, waivers or other modifications thereto; (b) all the reasonable fees, expenses and disbursements of counsel to Agents and Lenders (in the case of each Lender, up to $10,000 per year, unless an Event of Default has occurred and is continuing, in which case such cap will not apply) in connection with the negotiation, preparation, execution and administration of the Credit Documents and any consents, amendments, waivers or other modifications thereto and any other documents or matters requested by any Credit Party; (c) all the actual costs and reasonable expenses of creating and perfecting Liens in favor of Collateral Agent, for the benefit of Secured Parties, including filing and recording fees, expenses and Taxes, stamp or documentary Taxes, search fees, title insurance premiums and reasonable fees, expenses and disbursements of counsel to each Agent and of counsel providing any opinions that any Agent or the Requisite Lenders may request in respect of the Collateral or the Liens created pursuant to the Collateral Documents; (d) all Administrative Agent's actual costs and reasonable fees, expenses for, and disbursements of any of Administrative Agent's, auditors, accountants, consultants or appraisers whether internal or external, and all reasonable attorneys' fees (including allocated costs of internal counsel and expenses and disbursements of outside counsel) incurred by Administrative Agent; (e) all the actual costs and reasonable expenses (including the reasonable fees, expenses and disbursements of any appraisers, consultants, advisors and agents employed or retained by Collateral Agent and its counsel) in connection with the custody or preservation of any of the Collateral; (f) all other actual and reasonable costs and expenses incurred by each Agent and Lender (in the case of each Lender, up to $10,000 per year, unless an Event of Default has occurred and is continuing, in which case such cap will not apply) in connection with the syndication of the Loans and Commitments and the negotiation, preparation and execution of the Credit Documents and any consents, amendments, waivers or other modifications thereto and the transactions contemplated thereby; and (g) after the occurrence of a Default or an Event of Default, all costs and expenses, including reasonable attorneys' fees (including allocated costs of internal counsel) and costs of settlement, incurred by any Agent and Lenders in enforcing any Obligations of or in collecting any payments due from any Credit Party hereunder or under the other Credit Documents by reason of such Default or Event of Default (including in connection with the sale of, collection from, or other realization upon any of the Collateral or the enforcement of the Guaranty) or in connection with any refinancing or restructuring of the credit arrangements provided hereunder in the nature of a "work out" or pursuant to any insolvency or bankruptcy cases or proceedings.

**10.3.    Indemnity.**

(a)    In addition to the payment of expenses pursuant to Section 10.2, whether or not the transactions contemplated hereby shall be consummated, each Credit Party agrees to defend (subject to Indemnitees' selection of counsel), indemnify, pay and hold harmless, each Agent and Lender (including, for purposes of this Section 10.3, Issuing Bank), their Affiliates and their respective officers, partners, directors, trustees, employees and agents of each Agent and each Lender (each, an **"Indemnitee"**), from and against any and all Indemnified Liabilities, **IN ALL CASES, WHETHER OR NOT CAUSED BY OR ARISING, IN WHOLE OR IN PART, OUT OF THE COMPARATIVE, CONTRIBUTORY, OR SOLE NEGLIGENCE OF SUCH INDEMNITEE**; provided, no Credit Party shall have any obligation to any Indemnitee hereunder with respect to any Indemnified Liabilities to the extent such Indemnified Liabilities arise from the bad faith, gross negligence or willful misconduct, as determined by a court of competent jurisdiction in a final, non-appealable order, of that Indemnitee.  To the extent that the undertakings to defend, indemnify, pay and hold harmless set forth in this Section 10.3 may be unenforceable in whole or in part because they are violative of any law or public policy, the applicable Credit Party shall contribute the maximum portion that it is permitted to pay and satisfy under applicable law to the payment and satisfaction of all Indemnified Liabilities incurred by Indemnitees or any of them.  In the event that an Indemnitee becomes involved in any capacity in any action, proceeding

or investigation brought by or against any Person relating to or arising out of any related matter and whether or not the transactions contemplated hereby shall be consummated, each Credit Party agrees that on demand it will reimburse such Indemnitee for its legal and other expenses (including the cost of any investigation and preparation therefor) incurred in connection therewith.

(b)     To the extent permitted by applicable law, no Credit Party shall assert, and each Credit Party hereby waives, any claim against the Agents and the other Secured Parties and their respective Affiliates, directors, employees, attorneys or agents, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) (whether or not the claim therefor is based on contract, tort or duty imposed by any applicable legal requirement) arising out of, in connection with, as a result of, or in any way related to, this Agreement or any Credit Document or any agreement or instrument contemplated hereby or thereby or referred to herein or therein, the transactions contemplated hereby or thereby, any Loan or the use of the proceeds thereof or any act or omission or event occurring in connection therewith, and each Credit Party hereby waives, releases and agrees not to sue upon any such claim or any such damages, whether or not accrued and whether or not known or suspected to exist in its favor.

**10.4.    Set-Off**.  In addition to any rights now or hereafter granted under applicable law and not by way of limitation of any such rights, upon the occurrence of any Event of Default each Lender, Issuing Bank and their respective Affiliates are hereby authorized by each Credit Party at any time or from time to time subject to the consent of Administrative Agent (such consent not to be unreasonably withheld or delayed), without notice to any Credit Party or to any other Person (other than Administrative Agent), any such notice being hereby expressly waived, to set off and to appropriate and to apply any and all deposits (general or special, including Indebtedness evidenced by certificates of deposit, whether matured or unmatured, but not including trust accounts (in whatever currency)) and any other Indebtedness at any time held or owing by such Lender to or for the credit or the account of any Credit Party (in whatever currency) against and on account of the obligations and liabilities of any Credit Party to such Lender or Issuing Bank hereunder, the Letters of Credit and participations therein and under the other Credit Documents, including all claims of any nature or description arising out of or connected hereto, the Letters of Credit and participations therein or with any other Credit Document, irrespective of whether or not (a) such Lender shall have made any demand hereunder, (b) the principal of or the interest on the Loans or any amounts in respect of the Letters of Credit or any other amounts due hereunder shall have become due and payable pursuant to <u>Section 2</u> and although such obligations and liabilities, or any of them, may be contingent or unmatured or (c) such obligation or liability is owed to a branch or office of such Lender or Issuing Bank different from the branch or office holding such deposit or obligation or such Indebtedness.

**10.5.    Amendments and Waivers.**

(a)     <u>Requisite Lenders' Consent</u>.    Subject to <u>Sections 10.5(b)</u> and <u>10.5(c)</u>, no amendment, modification, termination or waiver of any provision of the Credit Documents, or consent to any departure by any Credit Party therefrom, shall in any event be effective without the written concurrence of Administrative Agent and the Requisite Lenders; <u>provided</u>, (y) the Fee Letter may be amended, modified, or rights or privileges thereunder waived, in a writing executed only by the parties thereto and (z) the Warrants may be amended, modified, or rights or privileges thereunder waived, in a writing executed only by Holdings and all holders of the Warrants.

(b)     <u>Affected Lenders' Consent</u>.  Without the written consent of each Lender (other than a Defaulting Lender) that would be affected thereby, no amendment, modification, termination, or consent shall be effective if the effect thereof would:

(i)      extend the Maturity Date;

(ii)      waive, reduce or postpone any scheduled repayment (but not prepayment);

(iii)      extend the stated expiration date of any Letter of Credit;

(iv)      reduce the rate of interest on any Loan (other than any waiver of any increase in the interest rate applicable to any Loan pursuant to Section 2.9) or any fee payable hereunder;

(v)      extend the time for payment of any such interest or fees;

(vi)      reduce the principal amount of any Loan or any reimbursement obligation in respect of any Letter of Credit;

(vii)      amend, modify, terminate or waive any provision of Section 2.14(a), Section 2.15(f), this Section 10.5(b) or Section 10.5(c);

(viii)      amend the definition of "Requisite Lenders" or "Pro Rata Share"; provided, with the consent of Administrative Agent and the Requisite Lenders, additional Credit Extensions may be included in the determination of "Requisite Lenders" or "Pro Rata Share" on substantially the same basis as the Term Loan Commitments, the Term Loans, the Letter of Credit Loan Commitments and the Letter of Credit Loans are included on the Closing Date;

(ix)      release all or substantially all of the Collateral or all or substantially all of the Guarantors from the Guaranty, in each case, except as expressly provided in the Credit Documents; or

(x)      consent to the assignment or transfer by any Credit Party of any of its rights and obligations under any Credit Document.

(c)      Other Consents.  No amendment, modification, termination or waiver of any provision of the Credit Documents, or consent to any departure by any Credit Party therefrom, shall:

(i)      increase any Commitment of any Lender over the amount thereof then in effect without the consent of such Lender; provided, no amendment, modification or waiver of any condition precedent, covenant, Default or Event of Default shall constitute an increase in any Commitment of any Lender;

(ii)      amend, modify, terminate or waive any obligation of Lenders relating to the purchase of participations in Letters of Credit as provided in Section 2.3(e) without the written consent of Administrative Agent and Issuing Bank;

(iii)      amend, modify, terminate or waive any provision of this Agreement without the consent of the Issuing Bank to the extent the consent of the Issuing Bank is required pursuant to Section 10.22(f); or

(iv)      amend, modify, terminate or waive any provision of Section 9 as the same applies to any Agent, or any other provision hereof as the same applies to the rights or obligations of any Agent, in each case without the consent of such Agent.

LEGAL_US_W # 105221370.13

(d)    <u>Execution of Amendments, etc</u>.  Administrative Agent may, but shall have no obligation to, with the concurrence of any Lender, execute amendments, modifications, waivers or consents on behalf of such Lender.  Any waiver or consent shall be effective only in the specific instance and for the specific purpose for which it was given.  No notice to or demand on any Credit Party in any case shall entitle any Credit Party to any other or further notice or demand in similar or other circumstances.  Any amendment, modification, termination, waiver or consent effected in accordance with this <u>Section 10.5</u> shall be binding upon each Lender at the time outstanding, each future Lender and, if signed by a Credit Party, on such Credit Party.

**10.6.    Successors and Assigns; Participations.**

(a)    <u>Generally</u>.  This Agreement shall be binding upon the parties hereto and their respective successors and assigns and shall inure to the benefit of the parties hereto and the successors and assigns of Lenders.  No Credit Party's rights or obligations hereunder nor any interest therein may be assigned or delegated by any Credit Party without the prior written consent of all Lenders.  Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, Indemnitee Agent Parties under <u>Section 9.6</u>, Indemnitees under <u>Section 10.3</u>, their respective successors and assigns permitted hereby and, to the extent expressly contemplated hereby, Affiliates of each of the Agents and Lenders) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)    <u>Register</u>.  The Credit Parties, Administrative Agent and Lenders shall deem and treat the Persons listed as Lenders in the Register as the holders and owners of the corresponding Commitments and Loans listed therein for all purposes hereof, and no assignment or transfer of any such Commitment or Loan shall be effective, in each case, unless and until an Assignment Agreement effecting the assignment or transfer thereof shall have been delivered to and accepted by Administrative Agent and recorded in the Register as provided in <u>Section 10.6(e)</u>.  Prior to such recordation, all amounts owed with respect to the applicable Commitment or Loan shall be owed to the Lender listed in the Register as the owner thereof, and any request, authority or consent of any Person who, at the time of making such request or giving such authority or consent, is listed in the Register as a Lender shall be conclusive and binding on any subsequent holder, assignee or transferee of the corresponding Commitments or Loans.

(c)    <u>Right to Assign</u>.  Each Lender shall have the right at any time to sell, assign or transfer all or a portion of its rights and obligations under this Agreement, including all or a portion of its Commitment or Loans owing to it or other Obligations (<u>provided</u>, <u>however</u>, each such assignment shall be of a uniform, and not varying, percentage of all rights and obligations under and in respect of any Loan and any related Commitments):

to any Person meeting the criteria of <u>clause (a)</u> of the definition of the term of "Eligible Assignee" upon the giving of notice to Administrative Agent; and

to any Person otherwise constituting an Eligible Assignee with the consent of (A) Administrative Agent (not to be unreasonably withheld, conditioned or delayed) and (B) Borrower Representative (not to be unreasonably withheld, conditioned or delayed); <u>provided</u>, that no consent of Borrower Representative shall be required if a Default or Event of Default has occurred and is continuing.  Each such assignment pursuant to this <u>Section 0</u> shall be in an aggregate amount of not less than $1,000,000 (or such lesser amount as may be agreed to by Administrative Agent (not to be unreasonably withheld, conditioned or delayed) and Borrower Representative (not to be unreasonably withheld, conditioned or delayed)); <u>provided</u>, that no consent of Borrower Representative shall be required if a Default or Event of Default has occurred and is continuing.

109

(d)    <u>Mechanics</u>.  The assigning Lender and the assignee thereof shall execute and deliver to Administrative Agent an Assignment Agreement, together with such forms, certificates or other evidence, if any, with respect to Tax withholding matters as the assignee under such Assignment Agreement may be required to deliver to Administrative Agent pursuant to <u>Section 2.19(f)</u>.

(e)    <u>Notice of Assignment</u>.  Upon its receipt and acceptance of a duly executed and completed Assignment Agreement, any forms, certificates or other evidence required by this Agreement in connection therewith, Administrative Agent shall record the information contained in such Assignment Agreement in the Register, shall give prompt notice thereof to Borrower Representative and shall maintain a copy of such Assignment Agreement.

(f)    <u>Representations and Warranties of Assignee</u>.  Each Lender, upon execution and delivery hereof or upon executing and delivering an Assignment Agreement, as the case may be, represents and warrants as of the Closing Date or as of the applicable Effective Date (as defined in the applicable Assignment Agreement) that (i) it is an Eligible Assignee; (ii) it has experience and expertise in the making of or investing in commitments or loans such as the applicable Commitments or Loans, as the case may be; and (iii) it will make or invest in, as the case may be, its Commitments or Loans for its own account in the ordinary course of its business and without a view to distribution of such Commitments or Loans within the meaning of the Securities Act or the Exchange Act or other federal securities laws (it being understood that, subject to the provisions of this <u>Section 10.6</u>, the disposition of such Commitments or Loans or any interests therein shall at all times remain within its exclusive control).

(g)    <u>Effect of Assignment</u>.  Subject to the terms and conditions of this <u>Section 10.6</u>, as of the "Effective Date" specified in the applicable Assignment Agreement:  (i) the assignee thereunder shall have the rights and obligations of a "Lender" hereunder to the extent such rights and obligations hereunder have been assigned to it pursuant to such Assignment Agreement and shall thereafter be a party hereto and a "Lender" for all purposes hereof; (ii) the assigning Lender thereunder shall, to the extent that rights and obligations hereunder have been assigned thereby pursuant to such Assignment Agreement, relinquish its rights (other than any rights which survive the termination hereof under <u>Section 10.8</u>) and be released from its obligations hereunder (and, in the case of an Assignment Agreement covering all or the remaining portion of an assigning Lender's rights and obligations hereunder, such Lender shall cease to be a party hereto; <u>provided</u>, anything contained in any of the Credit Documents to the contrary notwithstanding, (x) Issuing Bank shall continue to have all rights and obligations thereof with respect to such Letters of Credit until the cancellation or expiration of such Letters of Credit and the reimbursement of any amounts drawn thereunder, and (y) such assigning Lender shall continue to be entitled to the benefit of all indemnities hereunder as specified herein with respect to matters arising out of the prior involvement of such assigning Lender as a Lender hereunder); (iii) the Commitments shall be modified to reflect the Commitment of such assignee and any Commitment of such assigning Lender, if any; and (iv) if any such assignment occurs after the issuance of any Note hereunder, the assigning Lender shall, upon the effectiveness of such assignment or as promptly thereafter as practicable, surrender its applicable Notes to Administrative Agent for cancellation, and thereupon Borrowers shall issue and deliver new Notes, if so requested by the assignee and/or assigning Lender, to such assignee and/or to such assigning Lender, with appropriate insertions, to reflect the new Commitments and/or outstanding Loans of the assignee and/or the assigning Lender.

(h)    <u>Participations</u>.  Each Lender shall have the right at any time to sell one or more participations to any Person in all or any part of its Commitments, Loans or in any other Obligation.  The holder of any such participation, other than an Affiliate of the Lender granting such participation, shall not be entitled to require such Lender to take or omit to take any action hereunder except with respect to any amendment, modification or waiver that would (i) extend the final scheduled Maturity Date of any Loan or Letter of Credit in which such participant is participating, or reduce the rate or extend the time of

110

payment of interest or fees thereon (except in connection with a waiver of applicability of any post default increase in interest rates) or reduce the principal amount thereof, or increase the amount of the participant's participation over the amount thereof then in effect (it being understood that a waiver of any Default or Event of Default or of a mandatory reduction in the Commitment shall not constitute a change in the terms of such participation, and that an increase in any Commitment or Loan shall be permitted without the consent of any participant if the participant's participation is not increased as a result thereof); (ii) consent to the assignment or transfer by any Credit Party of any of its rights and obligations under this Agreement; or (iii) release all or substantially all of the Collateral under the Collateral Documents or all or substantially all of the Guarantors from the Guaranty (in each case, except as expressly provided in the Credit Documents) supporting the Loans hereunder in which such participant is participating.  Each Credit Party agrees that each participant shall be entitled to the benefits of Sections 2.17(c), 2.18 and 2.19 to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to clause (c) of this Section 10.6; provided, (A) a participant shall not be entitled to receive any greater payment under Section 2.18 or 2.19 than the applicable Lender would have been entitled to receive with respect to the participation sold to such participant, except to the extent such entitlement to receive a greater payment results from a Change in Law that occurs after the participant acquired the applicable participation, and (B) a participant that would be a Foreign Lender if it were a Lender shall not be entitled to the benefits of Section 2.19 unless Borrower Representative is notified of the participation sold to such participant and such participant agrees, for the benefit of the Credit Parties, to comply with Section 2.19 as though it were a Lender (it being understood that the documentation required under Section 2.19(f) shall be delivered to the participating Lender).  To the extent permitted by law, each participant also shall be entitled to the benefits of Section 10.4 as though it were a Lender, provided such Participant agrees to be subject to Section 2.16 as though it were a Lender.  Any Lender that sells a participation hereunder shall, acting solely for this purpose as an agent of the Credit Parties, maintain a register on which it enters the name and address of each participant and the principal and corresponding interest amount of each participant's interest in the Loans, Commitments or other Obligations (the **"Participant Register"**); provided, no Lender shall be required to disclose or share the information contained in such Participant Register with any Credit Party or any other Person, except as required (x) by law or (y) to satisfy the requirements of Treasury Regulation 5f.103-1(c) or otherwise establish that the Commitments, Loans, and Obligations are in registered form under Sections 163(f), 871(h)(2) and 881(c)(2) of the Internal Revenue Code.  The entries in the Participant Register shall be conclusive in the absence of manifest error.  For the avoidance of doubt, the Administrative Agent (in its capacity as Administrative Agent) shall have no responsibility for maintaining a Participant Register.

(i)    Certain Other Assignments.  In addition to any other assignment permitted pursuant to this Section 10.6, any Lender may assign, pledge and/or grant a security interest in, all or any portion of its Loans, the other Obligations owed by or to such Lender, and its Notes, if any, to secure obligations of such Lender, including any Federal Reserve Bank as collateral security pursuant to Regulation A of the Board of Governors of the Federal Reserve System, as in effect from time to time, and any operating circular issued by such Federal Reserve Bank; provided, no Lender, as between the Credit Parties and such Lender, shall be relieved of any of its obligations hereunder as a result of any such assignment and pledge; provided, further, in no event shall the applicable Federal Reserve Bank, pledgee or trustee be considered to be a "Lender" or be entitled to require the assigning Lender to take or omit to take any action hereunder.

**10.7.    Independence of Covenants**.  All covenants hereunder shall be given independent effect so that if a particular action or condition is not permitted by any of such covenants, the fact that it would be permitted by an exception to, or would otherwise be within the limitations of, another covenant shall not avoid the occurrence of a Default or an Event of Default if such action is taken or condition exists.

LEGAL_US_W # 105221370.13

**10.8.    Survival of Representations, Warranties and Agreements**.    All representations, warranties and agreements made herein shall survive the execution and delivery hereof and the making of any Credit Extension.  Notwithstanding anything herein or implied by law to the contrary, the agreements of each Credit Party set forth in Section 2.17(c) (Compensation for Breakage or Non-Commencement of Interest Periods), Section 2.18 (Increased Costs; Capital Adequacy), Section 2.19 (Taxes; Withholding, etc.), Section 10.2 (Expenses), Section 10.3 (Indemnity), Section 10.4 (Set-Off) and Section 10.10 (Marshalling; Payments Set Aside) and the agreements of Lenders set forth in Section 2.16 (Ratable Sharing), Section 9.3(b) (Exculpatory Provisions) and Section 9.6 (Right to Indemnity) shall survive the payment of the Loans, the cancellation or expiration of the Letters of Credit and the reimbursement of any amounts drawn thereunder, and the termination hereof.

**10.9.    No Waiver; Remedies Cumulative**.  No failure or delay on the part of any Agent or any Lender in the exercise of any power, right or privilege hereunder or under any other Credit Document shall impair such power, right or privilege or be construed to be a waiver of any default or acquiescence therein, nor shall any single or partial exercise of any such power, right or privilege preclude other or further exercise thereof or of any other power, right or privilege.  The rights, powers and remedies given to each Agent and each Lender hereby are cumulative and shall be in addition to and independent of all rights, powers and remedies existing by virtue of any statute or rule of law or in any of the other Credit Documents.  Any forbearance or failure to exercise, and any delay in exercising, any right, power or remedy hereunder shall not impair any such right, power or remedy or be construed to be a waiver thereof, nor shall it preclude the further exercise of any such right, power or remedy.

**10.10.    Marshalling; Payments Set Aside**.  Neither any Agent nor any Lender shall be under any obligation to marshal any assets in favor of any Credit Party or any other Person or against or in payment of any or all of the Obligations.  To the extent that any Credit Party makes a payment or payments to Administrative Agent, Issuing Bank or the Lenders (or to Administrative Agent, on behalf of the Lenders or Issuing Bank), or Administrative Agent, Collateral Agent, Issuing Bank or Lenders enforce any security interests or exercise their rights of setoff, and such payment or payments or the proceeds of such enforcement or setoff or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside and/or required to be repaid to a trustee, receiver or any other party under any bankruptcy law, any other state or federal law, common law or any equitable cause, then, to the extent of such recovery, the obligation or part thereof originally intended to be satisfied, and all Liens, rights and remedies therefor or related thereto, shall be revived and continued in full force and effect as if such payment or payments had not been made or such enforcement or setoff had not occurred.

**10.11.    Severability**.  In case any provision in or obligation hereunder or any other Credit Document shall be invalid, illegal or unenforceable in any jurisdiction, the validity, legality and enforceability of the remaining provisions or obligations, or of such provision or obligation in any other jurisdiction, shall not in any way be affected or impaired thereby.

**10.12.    Obligations Several; Actions in Concert**.  The obligations of the Lenders hereunder are several and no Lender (or Agent) shall be responsible for the obligations or Commitment of any other Lender hereunder.  Nothing contained herein or in any other Credit Document, and no action taken by the Lenders pursuant hereto or thereto, shall be deemed to constitute the Lenders as a partnership, an association, a joint venture or any other kind of entity.  Anything in this Agreement or any other Credit Document to the contrary notwithstanding, each Lender hereby agrees with each other Lender that no Lender shall take any action to protect or enforce its rights arising out of this Agreement or any Note or otherwise with respect to the Obligations without first obtaining the prior written consent of Administrative Agent or the Requisite Lenders (as applicable), it being the intent of the Lenders that any such action to protect or enforce rights under this Agreement and any Note or otherwise with respect to

112

the Obligations shall be taken in concert and at the direction or with the consent of Administrative Agent or the Requisite Lenders (as applicable).

**10.13.   Headings**.  Section headings herein are included herein for convenience of reference only and shall not constitute a part hereof for any other purpose or be given any substantive effect.

**10.14.   APPLICABLE LAW**.   THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO CONFLICT OF LAWS PRINCIPLES (OTHER THAN SECTIONS 5 1401 AND 5 1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW) THEREOF.

**10.15.   CONSENT TO JURISDICTION.**

(a)     ALL JUDICIAL PROCEEDINGS BROUGHT AGAINST ANY CREDIT PARTY ARISING OUT OF OR RELATING HERETO OR ANY OTHER CREDIT DOCUMENT, OR ANY OF THE OBLIGATIONS, MAY BE BROUGHT IN ANY STATE OR FEDERAL COURT OF COMPETENT JURISDICTION IN THE STATE, COUNTY AND CITY OF NEW YORK.  BY EXECUTING AND DELIVERING THIS AGREEMENT, EACH CREDIT PARTY, FOR ITSELF AND IN CONNECTION WITH ITS PROPERTIES, IRREVOCABLY (a) ACCEPTS GENERALLY AND UNCONDITIONALLY THE NONEXCLUSIVE JURISDICTION AND VENUE OF SUCH COURTS; (b) WAIVES ANY DEFENSE OF FORUM NON CONVENIENS; (c) AGREES THAT SERVICE OF ALL PROCESS IN ANY SUCH PROCEEDING IN ANY SUCH COURT MAY BE MADE BY REGISTERED OR CERTIFIED MAIL, RETURN RECEIPT REQUESTED, TO THE APPLICABLE CREDIT PARTY AT ITS ADDRESS PROVIDED IN ACCORDANCE WITH <u>SECTION 10.1(a)</u> IS SUFFICIENT TO CONFER PERSONAL JURISDICTION OVER THE APPLICABLE CREDIT PARTY IN ANY SUCH PROCEEDING IN ANY SUCH COURT, AND OTHERWISE CONSTITUTES EFFECTIVE AND BINDING SERVICE IN EVERY RESPECT; AND (d) AGREES THAT AGENTS AND LENDERS RETAIN THE RIGHT TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR TO BRING PROCEEDINGS AGAINST ANY CREDIT PARTY IN THE COURTS OF ANY OTHER JURISDICTION.

(b)     EACH CREDIT PARTY HEREBY AGREES THAT PROCESS MAY BE SERVED ON IT BY CERTIFIED MAIL, RETURN RECEIPT REQUESTED, TO THE ADDRESSES PERTAINING TO IT AS SPECIFIED IN <u>SECTION 10.1(b)</u>.  ANY AND ALL SERVICE OF PROCESS AND ANY OTHER NOTICE IN ANY SUCH ACTION, SUIT OR PROCEEDING SHALL BE EFFECTIVE AGAINST ANY CREDIT PARTY IF GIVEN BY REGISTERED OR CERTIFIED MAIL, RETURN RECEIPT REQUESTED, OR BY ANY OTHER MEANS OR MAIL WHICH REQUIRES A SIGNED RECEIPT, POSTAGE PREPAID, MAILED AS PROVIDED ABOVE.  IN THE EVENT ANY CREDIT PARTY SHALL NOT MAINTAIN AN OFFICE IN NEW YORK CITY, SUCH CREDIT PARTY SHALL PROMPTLY APPOINT AND MAINTAIN AN AGENT QUALIFIED TO ACT AS AN AGENT FOR SERVICE OF PROCESS WITH RESPECT TO THE COURTS SPECIFIED IN THIS <u>SECTION 10.15</u>, AND ACCEPTABLE TO THE ADMINISTRATIVE AGENT, AS EACH CREDIT PARTY'S AUTHORIZED AGENT TO ACCEPT AND ACKNOWLEDGE ON EACH CREDIT PARTY'S BEHALF SERVICE OF ANY AND ALL PROCESS WHICH MAY BE SERVED IN ANY SUCH ACTION, SUIT OR PROCEEDING; <u>PROVIDED</u>, THAT NOTWITHSTANDING THE FOREGOING, IF THE CASES ARE PENDING AT THE TIME OF THE COMMENCEMENT OF SUCH JUDICIAL PROCEEDING, SUCH PROCEEDING MUST BE COMMENCED IN THE

**BANKRUPTCY COURT, WHICH SHALL HAVE EXCLUSIVE JURISDICTION OVER SUCH PROCEEDING.**

**10.16.  WAIVER OF JURY TRIAL**.   EACH OF THE PARTIES HERETO HEREBY AGREES TO WAIVE ITS RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING HEREUNDER OR UNDER ANY OF THE OTHER CREDIT DOCUMENTS OR ANY DEALINGS BETWEEN THEM RELATING TO THE SUBJECT MATTER OF THIS LOAN TRANSACTION OR THE LENDER/BORROWER RELATIONSHIP THAT IS BEING ESTABLISHED.  THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL ENCOMPASSING OF ANY AND ALL DISPUTES THAT MAY BE FILED IN ANY COURT AND THAT RELATE TO THE SUBJECT MATTER OF THIS TRANSACTION, INCLUDING CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY CLAIMS AND ALL OTHER COMMON LAW AND STATUTORY CLAIMS.  EACH PARTY HERETO ACKNOWLEDGES THAT THIS WAIVER IS A MATERIAL INDUCEMENT TO ENTER INTO A BUSINESS RELATIONSHIP THAT EACH HAS ALREADY RELIED ON THIS WAIVER IN ENTERING INTO THIS AGREEMENT, AND THAT EACH WILL CONTINUE TO RELY ON THIS WAIVER IN ITS RELATED FUTURE DEALINGS.  EACH PARTY HERETO FURTHER WARRANTS AND REPRESENTS THAT IT HAS REVIEWED THIS WAIVER WITH ITS LEGAL COUNSEL AND THAT IT KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL.  THIS WAIVER IS IRREVOCABLE, MEANING THAT IT MAY NOT BE MODIFIED EITHER ORALLY OR IN WRITING (OTHER THAN BY A MUTUAL WRITTEN WAIVER SPECIFICALLY REFERRING TO THIS <u>SECTION 10.16</u> AND EXECUTED BY EACH OF THE PARTIES HERETO), AND THIS WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS OR MODIFICATIONS HERETO OR ANY OF THE OTHER CREDIT DOCUMENTS OR TO ANY OTHER DOCUMENTS OR AGREEMENTS RELATING TO THE LOANS MADE HEREUNDER.  IN THE EVENT OF LITIGATION, THIS AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT.

**10.17.  Confidentiality**.  Each Agent and each Lender shall hold all non-public information regarding the Credit Parties obtained by such Agent or such Lender in connection with this Agreement in accordance with such Agent's and such Lender's customary procedures for handling confidential information of such nature (but no less than commercially reasonable care), it being understood and agreed by the Credit Parties that, in any event, Administrative Agent may disclose such information to the Lenders and each Agent and each Lender may make disclosures of such information (a) to Affiliates of such Lender or such Agent and to their respective officers, directors, members, partners, employees, legal counsel, independent auditors and other agents, experts and advisors (and to other Persons authorized by a Lender or Agent to organize, present or disseminate such information in connection with disclosures otherwise made in accordance with this <u>Section 10.17</u>); (b) as reasonably required by any potential or prospective Eligible Assignee or participant in connection with the contemplated assignment, transfer or participation of any Loans or any participations therein or by any direct or indirect contractual counterparties (or the professional advisors thereto) to any derivative transaction relating to Borrower and its obligations; (c) to any rating agency on a confidential basis when required by it; (d) to any Lender's financing sources; (e) in connection with the exercise of any remedies hereunder or under any other Credit Document or any suit, action or proceeding relating to the Credit Documents or the enforcement of rights thereunder; (f) disclosures made pursuant to the order of any court or administrative agency or in any pending legal or administrative proceeding, or otherwise as required by applicable law or compulsory legal process (in which case such Person agrees to inform Borrower Representative promptly thereof to the extent not prohibited by law); (g) disclosures made upon the request or demand of any regulatory or quasi-regulatory authority purporting to have jurisdiction over such Person or any of its Affiliates; and (h) disclosures with the consent of Borrower Representative; <u>provided</u>, in the case of <u>clauses (b)</u>, <u>(d)</u> and <u>(h)</u> of this sentence, the recipients of such confidential information are advised of and agree to be bound

114

by either the provisions of this <u>Section 10.17</u> or any other provisions at least as restrictive as this <u>Section 10.17</u>. Notwithstanding anything to the contrary set forth herein, any Person required to maintain the confidentiality of information as provided in this <u>Section 10.17</u> shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such information as such Person would accord to its own confidential information, but no less than commercially reasonable care.  Notwithstanding the foregoing, on or after the Closing Date, Administrative Agent may, at its own expense issue news releases and publish "tombstone" advertisements and other announcements relating to this transaction in newspapers, trade journals and other appropriate media (which may include use of logos of one or more of the Credit Parties) (collectively, **"Trade Announcements"**).  No Lender or Credit Party (or any of its Affiliates) shall issue any Trade Announcement except (i) disclosures required by applicable law, regulation, legal process or the rules of the Securities and Exchange Commission or (ii) with the prior approval of Administrative Agent.  Furthermore, the Credit Parties and the Lenders shall not, without the prior written consent of TCW, in each instance, (A) use in advertising, publicity, or otherwise the name of TCW Asset Management Company LLC, any Lender or any of their respective Affiliates, or any partner or employee of TCW Asset Management Company LLC, any Lender or any of their respective Affiliates, or (B) represent that any product or any service provided has been approved or endorsed by TCW Asset Management Company LLC, any Lender, or any of their respective Affiliates.

**10.18.  Usury Savings Clause**.  Notwithstanding any other provision herein, the aggregate interest rate charged or agreed to be paid with respect to any of the Obligations, including all charges or fees in connection therewith deemed in the nature of interest under applicable law shall not exceed the Highest Lawful Rate.  If the rate of interest (determined without regard to the immediately preceding sentence) under this Agreement at any time exceeds the Highest Lawful Rate, the outstanding amount of the Loans made hereunder shall bear interest at the Highest Lawful Rate until the total amount of interest due hereunder equals the amount of interest which would have been due hereunder if the stated rates of interest set forth in this Agreement had at all times been in effect.  In addition, if when the Loans made hereunder are repaid in full in Cash the total interest due hereunder (taking into account the increase provided for above) is less than the total amount of interest which would have been due hereunder if the stated rates of interest set forth in this Agreement had at all times been in effect, then to the extent permitted by law, Borrowers shall pay to Administrative Agent an amount equal to the difference between the amount of interest paid and the amount of interest which would have been paid if the Highest Lawful Rate had at all times been in effect.  Notwithstanding the foregoing, it is the intention of Lenders and Borrowers to conform strictly to any applicable usury laws.  Accordingly, if any Lender contracts for, charges, or receives any consideration which constitutes interest in excess of the Highest Lawful Rate, then any such excess shall be cancelled automatically and, if previously paid, shall at such Lender's option be applied to the outstanding amount of the Loans made hereunder or be refunded to Borrowers.  In determining whether the interest contracted for, charged, or received by Administrative Agent or a Lender exceeds the Highest Lawful Rate, such Person may, to the extent permitted by applicable law, (a) characterize any payment that is not principal as an expense, fee, or premium rather than interest, (b) exclude voluntary prepayments and the effects thereof, and (c) amortize, prorate, allocate, and spread in equal or unequal parts the total amount of interest, throughout the contemplated term of the Obligations hereunder.

**10.19.  Counterparts**.  This Agreement and the other Credit Documents may be executed in any number of counterparts (any of which may be delivered by email or other electronic transmission), each of which when so executed and delivered shall be deemed an original, but all such counterparts together shall constitute but one and the same instrument.  Any party delivering an executed counterpart of this Agreement or any other Credit Document via email or other electronic transmission shall, upon the request by Administrative Agent, also deliver a manually executed original to Administrative Agent or its

counsel, but the failure to do so does not affect the validity, enforceability or binding effect of this Agreement or any other Credit Document.

      **10.20.  Effectiveness**.  This Agreement shall become effective upon the execution of a counterpart hereof by each of the parties hereto and receipt by Borrower Representative and Administrative Agent of written or telephonic notification of such execution and authorization of delivery thereof.  The provisions of this Agreement and the other Credit Documents set forth the entire agreement and understanding between the parties as to the subject matter hereof and thereof and supersede all prior agreements, oral or written, and all other communications between the parties relating to the subject matter hereof and thereof.

      **10.21.  Patriot Act**.  Each Lender and Administrative Agent (for itself and not on behalf of any Lender) hereby notifies the Credit Parties that pursuant to the requirements of the Patriot Act, it is required to obtain, verify and record information that identifies the Credit Parties, which information includes the name and address of the Credit Parties and other information that will allow such Lender or Administrative Agent, as applicable, to identify the Credit Parties in accordance with the Patriot Act.  In addition, Administrative Agent and each Lender shall have the right to periodically conduct due diligence on all Credit Parties, their senior management and key principals and legal and beneficial owners.  Each Credit Party agrees to cooperate in respect of the conduct of such due diligence and further agrees that the reasonable costs and charges for any such due diligence by Agent shall constitute Obligations hereunder and be for the account of Borrowers.

      **10.22.  Additional Provisions Regarding Letters of Credit**.  Notwithstanding anything else to the contrary contained in the Credit Agreement or other Credit Documents, the following provisions shall apply with respect to the Letters of Credit and related matters hereunder:

      (a)  any reference herein or in any other Credit Document to the satisfaction, repayment, or payment in full of the Obligations (or words of like import) shall include (i) all costs and expenses payable by the Credit Parties to Issuing Bank pursuant to the Credit Documents and that have accrued and are unpaid regardless of whether demand has been made therefor, and (ii) in the case of contingent reimbursement obligations with respect to Letters of Credit, providing Letter of Credit Cash Collateralization, if expressly required under the terms of this Agreement;

      (b)  unless the Issuing Bank is also the Administrative Agent, upon the issuance of any Letter of Credit or amendment or modification to a Letter of Credit, the Issuing Bank shall promptly notify each Lender with a Letter of Credit Loan Commitment (with a copy to the Administrative Agent) of such issuance or amendment or modification, which notice shall be accompanied by a copy of such Letter of Credit or amendment or modification to a Letter of Credit;

      (c)  notwithstanding anything to the contrary in <u>Section 2.15(f)</u>, (i) the reasonable and documented out-of-pocket costs, expenses, indemnities, fees and premiums owing to Issuing Bank shall be paid pro rata with those amounts paid "<u>first</u>" thereunder and (ii) prior to any application of proceeds under clause "<u>second</u>" thereof, Letter of Credit Cash Collateralization shall first be provided for all outstanding Letters of Credit;

      (d)  at any time an Event of Default has occurred and is continuing, (i) Issuing Bank shall have the right, upon notice to Borrower Representative and Administrative Agent, to terminate any and all commitments to provide Letters of Credit, and (ii) at the request of Issuing Bank, the Administrative Agent shall direct the Credit Parties (and the Credit Parties hereby agree upon receipt of such direction) to provide to Issuing Bank Letter of Credit Cash Collateralization with respect to all Letters of Credit then outstanding;

116

(e)     Issuing Bank shall be deemed a "Lender" entitled to the full benefit of each of Section 9.6, Section 10.2 and Section 10.3 of the Credit Agreement;

(f)     with respect to Section 10.5 of the Credit Agreement, the consent of Issuing Bank shall be required with respect to any modification, waiver, consent, termination or other change to (i) Section 2.3 or (ii) to the extent any such modification, waiver, consent or termination, in each case, would be adverse in any material respect to Issuing Bank, Section 2.15(f), Section 2.16, Section 4.26 or any other provision directly pertaining to the Issuing Bank or any rights or duties of the Issuing Bank; and

(g)     the prior written consent of Issuing Bank shall be required with respect to any assignments of the Letter of Credit Loan Commitments under Section 10.6 (which consent shall not be unreasonably withheld, conditioned or delayed in the case of any Person meeting the criteria set forth in clause (b)(i) of the definition of "**Eligible Assignee**").

## SECTION 11.  CROSS-GUARANTY OF BORROWERS

**11.1.    Cross-Guaranty**.  Each Borrower hereby agrees that such Borrower is jointly and severally liable for, and hereby absolutely and unconditionally guarantees to Administrative Agent for the ratable benefit of the Beneficiaries, the full and prompt payment (whether at stated maturity, by acceleration or otherwise) and performance of, all Obligations owed or hereafter owing to Agents and Lenders by each other Credit Party.  Each Borrower agrees that its guaranty obligation hereunder is a continuing guaranty of payment and performance and not of collection, that its obligations under this Section 11 shall not be discharged until payment and performance, in full in Cash, of the Obligations (other than contingent indemnification Obligations for which no claim has been made) has occurred, and that its obligations under this Section 11 shall be absolute and unconditional, irrespective of, and unaffected by:

(a)     the genuineness, validity, regularity, enforceability or any future amendment of, or change in, this Agreement, any other Credit Document or any other agreement, document or instrument to which any Credit Party is or may become a party;

(b)     the absence of any action to enforce this Agreement (including this Section 11) or any other Credit Document, or the waiver or consent by any Agent or any Lender with respect to any of the provisions hereof or thereof;

(c)     the existence, value or condition of, or failure to perfect its Lien against, any security for the Obligations or any action, or the absence of any action, by any Beneficiary in respect thereof (including the release of any such security);

(d)     the insolvency of any Credit Party or any other Person; or

(e)     any other action or circumstances that might otherwise constitute a legal or equitable discharge or defense of a surety or guarantor.

Each Borrower shall be regarded, and shall be in the same position, as principal debtor with respect to the Obligations guaranteed hereunder.

**11.2.    Waivers by Borrowers**.  Each Borrower expressly waives all rights it may have now or in the future under any statute, at common law, at law, in equity or otherwise, to compel any Beneficiary to marshal assets or to proceed in respect of the Obligations guaranteed hereunder against any other Credit Party, any other party or against any security for the payment and performance of the Obligations

LEGAL_US_W # 105221370.13

before proceeding against, or as a condition to proceeding against, such Borrower. Borrowers and the Beneficiaries agree that the foregoing waivers are of the essence of the transaction contemplated by this Agreement and the other Credit Documents and that, but for the provisions of this <u>Section 11</u> and such waivers, the Beneficiaries would decline to enter into this Agreement.

**11.3.    Benefit of Guaranty**. Each Borrower agrees that the provisions of this <u>Section 11</u> are for the benefit of the Beneficiaries and their respective successors, transferees, endorsees and assigns, and nothing herein contained shall impair, as between any other Borrower and the Beneficiaries, the obligations of such other Borrower under the Credit Documents.

**11.4.    Waiver of Subrogation, Etc**. Notwithstanding anything to the contrary in this Agreement or in any other Credit Document, and except as set forth in <u>Section 11.7</u>, each Borrower hereby expressly and irrevocably waives any and all rights at law or in equity to subrogation, reimbursement, exoneration, contribution, indemnification or set off and any and all defenses available to a surety, guarantor or accommodation co-obligor until the Obligations (other than contingent indemnification Obligations for which no claim has been made) are indefeasibly paid in full in Cash. Each Borrower acknowledges and agrees that this waiver is intended to benefit the Beneficiaries and shall not limit or otherwise affect such Borrower's liability hereunder or the enforceability of this <u>Section 11.4</u>, and that the Beneficiaries and their respective successors and assigns are intended third party beneficiaries of the waivers and agreements set forth in this <u>Section 11.4</u>.

**11.5.    Election of Remedies**. If any Beneficiary may, under applicable law, proceed to realize its benefits under any of the Credit Documents giving such Beneficiary a Lien upon any Collateral, whether owned by any Borrower or by any other Person, either by judicial foreclosure or by non-judicial sale or enforcement, any Agent or any Lender may, at its sole option, determine which of its remedies or rights it may pursue without affecting any of its rights and remedies under this <u>Section 11</u>. If, in the exercise of any of its rights and remedies, any Beneficiary shall forfeit any of its rights or remedies (including its right to enter a deficiency judgment against any Borrower or any other Person), whether because of any applicable laws pertaining to "election of remedies" or the like, each Borrower hereby consents to such action by any Beneficiary and waives any claim based upon such action, even if such action by any Beneficiary shall result in a full or partial loss of any rights of subrogation that each Borrower might otherwise have had but for such action by any Beneficiary. Any election of remedies that results in the denial or impairment of the right of any Beneficiary to seek a deficiency judgment against any Borrower shall not impair any other Borrower's obligation to pay the full amount of the Obligations. In the event any Agent shall bid at any foreclosure or trustee's sale or at any private sale permitted by law or the Credit Documents, such Agent may bid all or less than the amount of the Obligations and the amount of such bid need not be paid by such Agent but shall be credited against the Obligations. The amount of the successful bid at any such sale, whether an Agent or any other party is the successful bidder, shall be conclusively deemed to be the fair market value of the Collateral and the difference between such bid amount and the remaining balance of the Obligations shall be conclusively deemed to be the amount of the Obligations guaranteed under this <u>Section 11</u>, notwithstanding that any present or future law or court decision or ruling may have the effect of reducing the amount of any deficiency claim to which any Beneficiary might otherwise be entitled but for such bidding at any such sale.

**11.6.    Limitation.** Notwithstanding any provision herein contained to the contrary, each Borrower's liability under this <u>Section 11</u> (which liability is in any event in addition to amounts for which such Borrower is primarily liable under this Agreement) shall be limited to an amount not to exceed as of any date of determination the lesser of:

(a)     the net amount of all Loans advanced or transferred to any other Credit Party under this Agreement and then re loaned or otherwise transferred to, or for the benefit of, such Borrower; and

(b)     the amount that could be claimed by the Beneficiaries from such Borrower under this Section 11 without rendering such claim voidable or avoidable under Section 548 of Chapter 11 of the Bankruptcy Code or under any applicable state Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or similar statute or common law after taking into account, among other things, such Borrower's right of contribution and indemnification from each other Borrower under Section 11.7.

**11.7.    Contribution with Respect to Guaranty Obligations.**

(a)     To the extent that any Borrower shall make a payment under this Section 11 of all or any of the Obligations (other than Loans made to such Borrower for which it is primarily liable) (a **"Guarantor Payment"**) that, taking into account all other Guarantor Payments then previously or concurrently made by any other Borrower, exceeds the amount that such Borrower would otherwise have paid if each Borrower had paid the aggregate Obligations satisfied by such Guarantor Payment in the same proportion that such Borrower's "Allocable Amount" (as defined below) (as determined immediately prior to such Guarantor Payment) bore to the aggregate Allocable Amounts of each of Borrowers as determined immediately prior to the making of such Guarantor Payment, then, following indefeasible payment in full in Cash of the Obligations (other than contingent indemnification Obligations for which no claim has been made) and termination of the Commitments, such Borrower shall be entitled to receive contribution and indemnification payments from, and be reimbursed by, each other Borrower for the amount of such excess, pro rata based upon their respective Allocable Amounts in effect immediately prior to such Guarantor Payment.

(b)     As of any date of determination, the **"Allocable Amount"** of any Borrower shall be equal to the maximum amount of the claim that could then be recovered from such Borrower under this Section 11 without rendering such claim voidable or avoidable under Section 548 of Chapter 11 of the Bankruptcy Code or under any applicable state Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or similar statute or common law.

(c)     This Section 11.7 is intended only to define the relative rights of Borrowers and nothing set forth in this Section 11.7 is intended to or shall impair the obligations of Borrowers, jointly and severally, to pay any amounts as and when the same shall become due and payable in accordance with the terms of this Agreement.  Nothing contained in this Section 11.7 shall limit the liability of any Borrower to pay the Loans made directly or indirectly to such Borrower and accrued interest, fees and expenses with respect thereto for which such Borrower shall be primarily liable.

(d)     The parties hereto acknowledge that the rights of contribution and indemnification hereunder shall constitute assets of Borrowers to which such contribution and indemnification is owing.

(e)     The rights of the indemnifying Borrowers against other Credit Parties under this Section 11.7 shall be exercisable upon the full and indefeasible payment of the Obligations and the termination of the Commitments.

**11.8.    Liability Cumulative**.  The liability of Borrowers under this Section 11 is in addition to and shall be cumulative with all liabilities of each Borrower to the Beneficiaries under this Agreement and the other Credit Documents to which such Borrower is a party or in respect of any Obligations or

119

obligation of the other Borrower, without any limitation as to amount, unless the instrument or agreement evidencing or creating such other liability specifically provides to the contrary.

[Remainder of Page Intentionally Blank]

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be duly executed and delivered by their respective officers thereunto duly authorized as of the date first written above.[8]

[_____],
as a Borrower


By: _____
Name:
Title:


[____],
as a Guarantor and Borrower Representative


By: _____
Name:
Title:

**OTHER BORROWERS:**

**RUBY TUESDAY OF ALLEGANY COUNTY, INC.**
**RUBY TUESDAY OF COLUMBIA, INC.**
**RUBY TUESDAY OF FREDERICK, INC.**
**RUBY TUESDAY OF LINTHICUM, INC.**
**RUBY TUESDAY OF MARLEY STATION, INC.**
**RUBY TUESDAY OF POCOMOKE CITY, INC.**
**RT OF CARROLL COUNTY, LLC**
**RT OF MARYLAND, LLC**


By: _____
Name:
Title:

**OTHER BORROWERS CONTINUED:**

**RT DENVER FRANCHISE, L.P.**
**RT DETROIT FRANCHISE, LLC**
**RT DISTRIBUTING, LLC**
**RT FINANCE, LLC**
**RT FL GIFT CARDS, INC.**
**RT FLORIDA EQUITY, LLC**
**RT FRANCHISE ACQUISITION, LLC**
**RT INDIANAPOLIS FRANCHISE, LLC**
**RT JONESBORO CLUB**
**RT KCMO FRANCHISE, LLC**
**RT KENTUCKY RESTAURANT HOLDINGS, LLC**
**RT LAS VEGAS FRANCHISE, LLC**
**RT LONG ISLAND FRANCHISE, LLC**
**RT MICHIANA FRANCHISE, LLC**
**RT MICHIGAN FRANCHISE, LLC**
**RT MINNEAPOLIS FRANCHISE, LLC**
**RT MINNEAPOLIS HOLDINGS, LLC**
**RT NEW ENGLAND FRANCHISE, LLC**
**RT NEW HAMPSHIRE RESTAURANT HOLDINGS, LLC**
**RT NEW YORK FRANCHISE, LLC**
**RT OMAHA FRANCHISE, LLC**
**RT OMAHA HOLDINGS, LLC**
**RT ONE PERCENT HOLDINGS II, LLC**
**RT ONE PERCENT HOLDINGS, LLC**
**RT ORLANDO FRANCHISE, L.P.**
**RT RESTAURANT SERVICES, LLC**
**RT SOUTH FLORIDA FRANCHISE, L.P.**
**RT SOUTHWEST FRANCHISE, LLC**
**RT ST. LOUIS FRANCHISE, LLC**
**RT TAMPA FRANCHISE, L.P.**
**RT WEST PALM BEACH FRANCHISE, L.P.**
**RT WESTERN MISSOURI FRANCHISE, LLC**
**RTBD, LLC**
**RTT TEXAS, INC.**
**RTTA, LP**
**RTTT, LLC**
**RUBY TUESDAY OF BRYANT, INC.**
**RUBY TUESDAY OF RUSSELLVILLE, INC.**
**RUBY TUESDAY, LLC**

---

[8] **NTD** – signature pages and list of Credit Parties to be updated.

LEGAL_US_W # 105221370.13

By: _____
Name:
Title:

**TCW ASSET MANAGEMENT COMPANY LLC,** as
Administrative Agent and Collateral Agent

By: _____
Name:
Title:

123

**[GOLDMAN SACHS BANK USA,**
as Issuing Bank]

By: _____
Name:
Title:

124

**TCW DIRECT LENDING LLC,**
as a Lender

By:    TCW Asset Management Company LLC,
        its Investment Advisor

By: _____
Name:
Title:


**TCW SKYLINE LENDING, L.P.,**
as a Lender

By:    TCW Asset Management Company LLC,
        its Investment Advisor

By: _____
Name:
Title:


**TCW BRAZOS FUND LLC,**
as a Lender

By:    TCW Asset Management Company LLC,
        its Investment Advisor

By: _____
Name:
Title:

125

**APPENDIX A TO**
**CREDIT AND GUARANTY AGREEMENT**

**Term Loan Commitments**

| Lender | Term Loan Commitment | Pro Rata Share |
|---|---|---|
| TCW Direct Lending LLC | $[_____] | [__]% |
| TCW Skyline Lending, L.P. | $[_____] | [__]% |
| TCW Brazos Fund LLC | $[_____] | [__]% |
| Total | $[_____] | 100.00% |

| Lender | Letter of Credit Loan Commitment | Pro Rata Share |
|---|---|---|
| TCW Direct Lending LLC | $[_____] | [__]% |
| TCW Skyline Lending, L.P. | $[_____] | [__]% |
| TCW Brazos Fund LLC | $[_____] | [__]% |
| Total | $[9,600,000] | 100.00% |

126

**APPENDIX B TO**
**CREDIT AND GUARANTY AGREEMENT**

**Notice Addresses**

**[_____],**
as Borrower Representative

**[_____]**

in each case, with a copy (which shall not constitute notice) to:

      Pachulski Stang Ziehl & Jones LLP
      10100 Santa Monica Blvd., 13th Floor
      Los Angeles, CA 90067
      Attention: Richard M. Pachulski and Malhar S. Pagay
      Email: rpachulski@pszjlaw.com and mpagay@pszjlaw.com

      and

      Cheng Cohen LLC
      363 West Erie Street, Suite 500
      Chicago, Illinois  60654
      Attention:  Amy Cheng
      Email:  amy.cheng@chengcohen.com

LEGAL_US_W # 105221370.13

**TCW ASSET MANAGEMENT COMPANY LLC,**
as Administrative Agent and Collateral Agent

Principal Office:

TCW Asset Management Company LLC
200 Clarendon Street, 51st Floor
Boston, Massachusetts  02116
Attention:        Ruby Tuesday Account Manager
Email:   Michael.Anello@tcw.com

with a copy (which shall not constitute notice) to:

Paul Hastings LLP

515 South Flower Street, 25th Floor
Los Angeles, CA 90071
Attention:  Justin Rawlins
Telephone:  (213) 683-6130
Telecopier:  (213) 996-3130
Email: justinrawlins@paulhastings.com

**[GOLDMAN SACHS BANK USA,**
as Issuing Bank

Principal office:

       Goldman Sachs Bank USA
       2001 Ross Avenue, Suite 2800
       Dallas, Texas  75201
       Attention: Ruby Tuesday Account Manager
       Email:  gs-slg-notices@gs.com

in each case, with a copy (which shall not constitute notice) to:

       Hunton & Williams LLP
       Bank of America Plaza, Suite 4100
       600 Peachtree Street, N.E.
       Atlanta, Georgia  30308-2216
       Attention:  Greta T. Griffith, Esq.
       Telecopier: (404) 888-4190]

LEGAL_US_W # 105221370.13

**TCW DIRECT LENDING LLC**
**TCW SKYLINE LENDING, L.P.**
**TCW BRAZOS FUND LLC,**
each as a Lender

> TCW Direct Lending LLC
> 200 Clarendon Street, 51st Floor
> Boston, Massachusetts  02116
> Attention:      Ruby Tuesday Account Manager
> Email:           Michael.Anello@tcw.com
>
> with a copy (which shall not constitute notice) to:
>
> Paul Hastings LLP
> 515 South Flower Street, 25th Floor
> Los Angeles, CA 90071
> Attention: Justin Rawlins
> Telephone:  (213) 683-6130
> Telecopier:  (213) 996-3130
> E-mail: justinrawlins@paulhastings.com

LEGAL_US_W # 105221370.13