# EXHIBIT 3

# SECOND AMENDMENT

## SECOND AMENDMENT TO LEASE

**THIS SECOND AMENDMENT TO LEASE** (this "**Second Amendment**") is made and entered into effective as _June 26_, 2020 (the "**Second Amendment Effective Date**") by and between **MARYVILLE COLLEGE**, a Tennessee corporation ("**Lessor**") and **RUBY TUESDAY, INC.**, a Georgia corporation ("**Lessee**").

## RECITALS:

**WHEREAS**, Lessor and Lessee are parties to that certain Lease dated September 11, 1997, as amended by that certain First Amendment to Lease, having an effective date of July 1, 2001, and as further amended by that certain Memorandum of Understanding dated May 14, 2018 (collectively, and as the same may be further amended, the "**Lease**"), for the premises commonly known as RT Lodge as more particularly described in the Lease (the "**Premises**"); and

**WHEREAS**, Lessor and Lessee wish to amend the Lease in the respects set forth below.

**NOW THEREFORE**, in consideration of these Recitals, the mutual promises, covenants, and conditions hereinafter set forth and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

## AMENDMENT

1.      The foregoing recitals are true and correct and are incorporated herein by reference. Any capitalized term used and not otherwise defined in this Second Amendment shall have the same meaning as set forth in the Lease. The terms and provisions of this Second Amendment shall be deemed effective from and after the Second Amendment Effective Date.

2.      The following paragraph is added after the first paragraph on page 2 of the Lease:

"Lessee is further granted an easement and right to use those portions of Lessor's property as shaded on that certain survey prepared by Lynch Surveys LLC, dated 5/07/2020, Project No. 4276, attached hereto as **Exhibit "A"** and made a part hereof (the "**Easement Property**") to permit the encroachment of Lessee's existing improvements and for the use, operation, maintenance, repair and replacement of such improvements, together with an easement over an additional twenty (20) feet on all sides of the Easement Property for purposes of ingress and egress to carry out its aforesaid rights. The Easement Property shall be treated as a portion of the leased premises for purposes of Lessee's rights and obligations under this Lease."

3.      Section 1 of the Lease is modified to provide that, notwithstanding anything contained in the Lease to the contrary, the term of the Lease shall be extended until December 31, 2070.

4.      Section 2 of the Lease is modified by adding the following at the end of the first paragraph:

"The rent described in this paragraph shall be known as "**Minimum Rent**"".

In addition to Minimum Rent, for each twelve (12) month period (each a "**Percentage Rent Year**") commencing on October 1, 2022, and expiring on the termination of this Lease, Lessee shall pay to Lessor an amount ("**Percentage Rent**") equal to: (i) the amount, if any, by which Lessee's Gross Receipts (hereinafter defined) exceed the applicable Percentage Rent Breakpoint (hereinafter defined) during such Percentage Rent Year; multiplied by (ii) one percent (1%). Percentage Rent

for each Percentage Rent Year, if any, shall be paid on November 30 following such Percentage Rent Year.

(a)  The term "**Percentage Rent Breakpoint**" shall initially mean Four Million Five Hundred Thousand Dollars ($4,500,000.00). The Percentage Rent Breakpoint shall be increased each five years based on the U.S. Department of Labor Consumer Price Index, All Urban Consumers, All Items, not however to exceed two and one-half percent (2.5%) per year.

(b)  The term "Gross Receipts" shall mean any and all revenues, receipts and income of any kind (whether for cash, charge, credit, barter, exchange or otherwise) paid to or received by Lessee, in, from, on or through the leased premises from whatever source. Each sale or transaction upon installment or credit shall be treated as a sale for the full price in the month during which the sale was made, regardless of whether or when Lessee receives payment therefor. Gross Receipts shall not be deemed cumulative from one Percentage Rent Year to any succeeding Percentage Rent Year; rather, Gross Sales shall be computed separately for each Percentage Rent Year on an accrual basis in accordance with generally accepted accounting principles consistently applied. Without limiting the generality of the term Gross Receipts, Gross Receipts shall include all revenues, receipts and income derived in, from, on or through lodging; rental of exhibition, meeting and conference facilities or equipment; all food and beverages; banquet or group events; mini-bars; merchandise, sundries or other items; parking or valet services; ground transportation services, business services (including, without limitation, audio-visual, technical, production or similar services); recreational or entertainment activities of any kind (whether conducted on or off-site); arcade or other devices, equipment or services for entertainment or amusement; florist services; and all service charges (including, but not limited to, room service), but excluding tips and gratuities (as hereinafter provided). Notwithstanding the foregoing, Gross Receipts shall exclude: (i) condemnation proceeds (other than those received in respect of a temporary taking); (ii) insurance proceeds, other than so-called "rent insurance" proceeds, if Lessee elects to maintain the same; (iii) actual returns of and refunds for room rates/charges, merchandise, food or beverage items from or on behalf of guests; (iv) service charges paid by guests but only to the extent actually paid to employees of the Property as tips and gratuities; (v) sales of used furnishings or other personal property used in the operation of the Property that are not in the ordinary course of business; (vi) commissions actually paid to a travel agent or online booking services for services actually rendered and for occupancy at the Property; (vii) the amount of any taxes collected by Lessee pursuant to Tennessee Statutes which Lessee actually remits to the State of Tennessee or other appropriate Governmental Authority and which are not subsequently rebated or refunded; (viii) interest income earned by Lessee; (ix) revenues derived from the sale of gift cards or gift certificates (however revenues derived from the redemption of gift certificates or gift cards shall be included in Gross Receipts); (x) returns to vendors, shippers or manufacturers; (xi) receipts from sales of alcoholic beverages if applicable governmental requirements prohibit the payment or collection of percentage rent on the sale of alcoholic beverages; (xii) uncollected accounts and bad checks; (xiii) the dollar value of coupons utilized by customers in purchases at the Premises; (xiv) the amount of any sales to Lessee, Ruby Tuesday, Inc., NRD Capital or their respective employees; (xv) deposits received for future events and bookings including, but not limited to, weddings, conferences and meetings (said deposits, however, shall be included in Gross Receipts in the month in which the event actually occurs) or the deposit is forfeited to Lessee;  and (xvi) service charges leveled against sales through the use of credit cards or other similar third party credit services such as Visa , Mastercard or American Express and (xvii) any discounts given by Lessee.

(c)  During the term of this Lease, Lessee shall keep and maintain accurate, complete and up-to-date books and records pertaining to all operations at or with respect to the leased premises (separate from Lessee's other business operations, if any), including books of account reflecting all Gross Receipts ( "**Books and Records**"). The Books and Records shall be kept and maintained in

accordance with (i) generally accepted accounting principles as are at the time applicable and otherwise consistently applied ("**GAAP**").

(**d**) Lessee shall record all sales and other transactions at the time each sale is made. The Books and Records shall include information appropriate for the accurate determination of Percentage Rent. Lessor and its employees, agents or representatives shall have, during normal business hours, access to the Books and Records. The Books and Records shall be kept at the Premises or at Lessee's main offices in the United States. Lessor shall have the right to cause its own or a reputable firm of independent accountants' audit of the Books and Records to be made at any time, at Lessor's cost and expense, but not more often than one time in any calendar year and upon not less than fifteen (15) days prior written notice to Lessee. Such right of inspection and audit may be exercised by Lessor at any time within two (2) years after the end of the Percentage Rent Year to which such Books and Records relate, and Lessee shall maintain all Books and Records for at least such period of time and, if any dispute between the parties with respect to this Lease has arisen and remains unresolved at the expiration of such period of time, for such further period of time until the final resolution of such dispute. If, upon any examination by Lessor or its employees, agents or representatives of the Books and Records, an error shall be revealed which results in there being due to Lessor more Percentage Rent than was actually paid to Lessor, then the amount of any such error regarding Percentage Rent that may be disclosed by such review, together with interest accrued thereon (from the date on which such underpayment should have been made until the amount thereof is paid) at the per annum interest rate which is equal to the lesser of: (i) ten percent (10%); or (ii) the highest rate of interest then allowable pursuant to applicable law during such period, shall be paid by Lessee to Lessor within thirty (30) days after demand. If such error results in there being due to Lessor additional Percentage Rent for any Percentage Rent Year in an amount equal to or exceeding three percent (3%) of the Percentage Rent theretofore paid by Lessee in respect of such Lease Year, then the cost of the examination revealing such error (whether the examination was conducted by Lessor's own employees, or independent agents or representatives of Lessor, or a combination of both) shall also be paid by Lessee to Lessor, within thirty (30) days after demand, but, in no event, more than One Thousand Five Hundred Dollars ($1,500.00) in the aggregate.

(**e**) On or before November 30 of each year (commencing with November 30, 2023) during the term of this Lease and on the thirtieth (30th) day of the month immediately following the date in which this Lease expires, Lessee shall deliver to Lessor a statement of Gross Receipts made during the preceding Percentage Rent Year, certified to be true and correct by the chief financial officer of Lessee or other duly authorized officer of Lessee, together with a copy of Lessee's monthly sales and use tax reports submitted for the preceding Percentage Rent Year.

As used in this Lease, the term "rent" shall include Minimum Rent and Percentage Rent (as applicable)."

5.      The last sentence of <u>Section 3</u> of the Lease is modified to delete the phrase "fifty-year".

6.      <u>Section 3</u> of the Lease grants Lessee the right to construct certain improvements, including, but not limited to, additional parking, subject to the approval of Lessor. Lessor hereby consents to Lessee's construction of additional parking as depicted on **Exhibit "B"** attached hereto and made a part hereof.

7.      The third sentence of <u>Section 11</u> of the Lease is modified to add the following after the phrase "to Samuel E. Beal III or to Blackberry Hotel Company": "or to BNA Associates LLC, a Tennessee limited liability company, RT Lodge LLC, a Tennessee limited liability company, Oliver Hospitality LLC, a Tennessee limited liability company or to an entity controlling, controlled by or under common control with any of the foregoing, provided that such assignment or sublease occurs before the close of business on

December 31, 2021." In addition, Lessor agrees that Lessee may enter into a secured financing transaction which may include, without limitation, a deed of trust with respect to this Lease (provided, such secured financing transaction shall not include Lessor's fee ownership interest in the leased premises, and Lessor does not agree to subordinate or subject its fee ownership interest in any such secured financing transaction)."

8.     The second paragraph of <u>Section 13</u> of the Lease is amended to read as follows:

"In addition to the rights to terminate for the failure of the Lessee to pay rent or to perform other conditions on its part to be kept and performed, the Lessor is granted the right to cancel this Lease, (a) except with respect to a permitted assignment or unless otherwise approved by Lessor, in the event the Lessee is sold, unless such sale is to an entity controlling, controlled by or under common control with Lessee or (b) a "Change of Control" occurs without the prior written consent of Landlord (such consent not to be unreasonably withheld) with respect to Lessee, or (c) if Lessee ceases to use the facility as permitted in this Lease. Such right to terminate shall be contingent upon the Lessor paying the Lessee the cost of all improvements placed on the premises by the Lessee less depreciation based on a thirty-nine (39) year straight line depreciation. For purposes hereof, "Change of Control" shall mean any of the following events: (i) the sale of all or substantially all of the assets of Lessee; (ii) any merger, consolidation, share exchange or recapitalization in which Lessee is not the surviving entity or (iii) any merger, consolidation, share exchange, recapitalization or issuance, sale or transfer of stock or other ownership interests of Lessee in each case as a result of which voting control of the stock or ownership interests of Lessee changes from the current owners of such stock or their immediate families."

9.     The third paragraph of <u>Section 13</u> of the Lease is deleted in its entirety.

10.    The Lease is hereby amended by adding the following as <u>Section 19</u>:

"**FORCE MAJEURE**. If either Lessee or Lessor is delayed or hindered in whole or in part, or prevented from, the performance of any covenant or obligation hereunder as a result of acts of God, fire or other casualty, earthquake, hurricane, flood, epidemic, pandemic, landslide, enemy act, acts of war, acts of terrorism or bioterrorism, riot, intervention by civil or military authorities of government, insurrection or other civil commotion, general unavailability of certain materials, strikes, boycotts, lockouts, labor disputes or work stoppage beyond the reasonable control of such party, or any other occurrence and/or circumstance beyond the reasonable control of such party, then the performance of such covenant or obligation shall be excused for the period of such delay, hindrance or prevention and the period of the performance of such covenant or obligation shall be extended by the number of days equivalent to the number of days of such delay, hindrance or prevention. The party claiming it is delayed, hindered or prevented from performing any obligation or covenant shall promptly notify the other party of any force majeure event."

11.    Upon execution of this Second Amendment, Lessor and Lessee agree to execute and record in the Blount County, Tennessee Register's Office, an Amended and Restated Memorandum of Lease. Lessee shall pay the cost of recording such document.

12.    This Second Amendment may be executed in counterparts, each of which is an original and all of which constitute one and the same instrument. This Second Amendment may also be executed and delivered by electronic delivery of a .pdf file, which shall constitute an original for all purposes.

13.    This Second Amendment shall be governed by and construed pursuant to the laws of the State of Tennessee. If any provision of this Second Amendment or the application thereof to any person or circumstances shall be held invalid, illegal or unenforceable to any extent by a court of competent

jurisdiction, such determination shall not affect the enforceability of the remaining terms and provisions of this Second Amendment. In such event, this Second Amendment shall be construed and interpreted as if such invalid, illegal or unenforceable terms were limited to the extent whereby such terms would be valid, legal and enforceable. If such limitation is not possible, this Second Amendment shall be construed and interpreted as if such invalid, illegal or unenforceable terms were severed and not included in this Second Amendment.

14.     Except as herein expressly modified, all of the provisions of the Lease are hereby ratified and confirmed. This Second Amendment shall be binding upon and shall inure to the benefit of the successors and assigns of the respective parties. Any provisions of the Lease that are inconsistent with any of the provisions set forth herein are hereby deemed to be deleted or modified, as necessary to give effect to the provisions set forth herein. This Second Amendment represents the entire agreement between the parties with respect to the matters set forth herein, and there are no other agreements or arrangements, written or oral, pertaining to the matters set forth herein. No provision of this Second Amendment may be modified, amended or waived except by the execution of a written document signed by each party.

*[THE BALANCE OF THIS PAGE IS INTENTIONALLY LEFTY BLANK]*

**IN WITNESS WHEREOF**, the parties have executed this Second Amendment to Lease as of the dates set forth below.

**LESSOR:**

**MARYVILLE COLLEGE**

By: _William T. Bogart_

Name: _William T. Bogart_

Its: _President_

Date: _June 26_ , 2020

**STATE OF TENNESSEE**

                                SS

**COUNTY OF BLOUNT**

Before me, the undersigned authority, a Notary Public of said state and county, personally appeared _William T. Bogart_ with whom I am personally acquainted, and who, upon oath, acknowledged himself/herself to be the _President_ of MARYVILLE COLLEGE, the within named bargainor, a corporation, and that he/she, as such _President_, being authorized so to do, executed the within instrument for the purposes therein contained by signing the name of the corporation by himself/herself as _President_.

Witness my hand and seal at office this _26_ day of _June_, 2020.

_Lisa Vitale_

NOTARY PUBLIC

My Commission Expires:

_2-28-24_

*[SIGNATURES CONTINUED ON FOLLOWING PAGE]*

6

**[SIGNATURE PAGE CONT'D TO SECOND AMENDMENT TO LEASE]**

**LESSEE:**

**RUBY TUESDAY, INC.**

By: _(signature)_

Name: STEPHANIE BURKE WEDLEY

Its: Chief Strategy Officer

Date: 6/26/2020 , 2020

STATE OF TENNESSEE

                                        SS

COUNTY OF BLOUNT

  Before me, the undersigned authority, a Notary Public of said state and county, personally appeared Stephanie Burke Medley with whom I am personally acquainted, and who, upon oath, acknowledged himself/herself to be the Chief Strategy Off of RUBY TUESDAY, INC., the within named bargainor, a corporation, and that he/she, as such Chief Strategy Officer being authorized so to do, executed the within instrument for the purposes therein contained by signing the name of the corporation by himself/herself as Chief Strategy Officer.

  Witness my hand and seal at office this 26 day of June, 2020.

_(signature)_

NOTARY PUBLIC  Jennifer Lynn Miles

My Commission Expires:

12/2/23

_(notary seal: JENNIFER LYNN MILES, STATE OF TENNESSEE, NOTARY PUBLIC, BLOUNT COUNTY)_

# EXHIBIT A

## LYNCH SURVEY



A-1

