# EXHIBIT 1

## LEASE AGREEMENT

THIS LEASE AGREEMENT (the "Lease") made and entered into as of the _1ˢᵗ_ day of _July_, 2005 (the "Effective Date"), by and between

MULLINS CROSSING, LLC, a Georgia limited liability company

hereinafter together called "Landlord"; and

RUBY TUESDAY, INC., a Georgia corporation

hereinafter called "Tenant":

## W I T N E S S E T H:

In consideration of the mutual covenants and agreements contained herein, the parties hereto agree for themselves, their successors and assigns, as follows:

1.     DESCRIPTION OF PREMISES/CONSTRUCTION OF IMPROVEMENTS. Landlord hereby leases to Tenant, and Tenant hereby accepts and rents from Landlord, that certain tract of land containing approximately 1.13 acres (the "Land") which is more particularly described on Exhibit "A" attached hereto, together with any and all parking areas, driveways, sidewalks and other improvements and facilities located on said Land (the Land and said other improvements and facilities being hereinafter referred to as the "Premises"). The Land is a portion of a larger shopping center development owned by Landlord and commonly known as "Mullins Crossing" in Evans, Columbia County, Georgia (the "Shopping Center").

Landlord hereby reserves from such lease of the Premises (i) the right to grant utility and/or other easements over, under and across the Premises (not to include any portion of the Premises located within the footprint of the building located on the Premises) to the applicable private, public or governmental authorities for purposes of installing, constructing, reconstructing, using, operating, repairing, replacing, maintaining, relocating and removing any utility lines and/or facilities and (ii) the right to grant perpetual, non-exclusive rights of ingress and egress to and from the applicable public and/or private rights of way over and across the driveways located on the Premises, as they exist from time to time (not to include any portion of the Premises located within the footprint of the building located on the Premises) to the applicable private, public or governmental authorities to access the Premises for such purposes; provided, such rights do not unreasonably interfere with Tenant's business located on the Premises.

Any and all improvements to be constructed on the Premises during the term of this Lease shall be constructed in accordance with the OEA (as defined herein) and all applicable laws, ordinances, rules and regulations.

2.     TERM. The term of this Lease shall commence on the date (the "Commencement Date") which is the earlier to occur of (i) the later to occur of (a) one hundred sixty (160) days after the date Tenant obtains a building permit to complete Tenant's initial improvements, or (b) the

2296830.06
LIB: CHARLOTTE

date Landlord completes the portions of the roadways within the Shopping Center shown as hatched on Exhibit B attached hereto and incorporated herein by reference to accommodate vehicular traffic or (ii) the date Tenant opens for business to the public at the Premises and shall end at midnight on the date (the "Expiration Date") which is twenty (20) full years from the Commencement Date (as same may be adjusted as hereinbelow provided). Provided, however, notwithstanding anything to the contrary herein, in the event the Commencement Date has not occurred on or before the date that is 310 days after the Effective Date, Landlord shall be entitled to terminate this Lease by providing written notice to Tenant, but Tenant shall have a one-time right to nullify such termination by providing written notice to Landlord within five (5) days after Landlord delivers its notice of termination to Tenant, in which case the Commencement Date for all purposes hereunder shall be the date Tenant delivers such nullification notice. As used herein, the term "Lease Year" shall mean each consecutive twelve-month period of the Lease term, beginning with the Commencement Date (as same may be adjusted as hereinbelow provided) or any anniversary thereof.

Provided this Lease is still in full force and effect and Tenant is not then in default beyond any applicable cure period under any of the terms, provisions or conditions of this Lease on its part to observe, comply with or fulfill, Tenant shall have the option to renew the term of this Lease for a period of five (5) years next succeeding the initial twenty (20) year term of the Lease. Such period shall be sometimes referred to hereinafter as the "First Option Period." Such option to renew shall be exercised by written notice to Landlord not less than 180 days prior to the end of the then current term. The First Option Period, if exercised by Tenant, shall be on the same terms and conditions as provided in this Lease [except for the options to renew described in this Paragraph 2 and the increase to Minimum Rental described hereinbelow in Paragraph 3(a)].

Provided (i) this Lease is still in full force and effect, (ii) Tenant is not then in default under any of the terms, provisions or conditions of this Lease beyond any applicable cure period on its part to observe, comply with or fulfill and (iii) Tenant shall have properly exercised its right to extend the Lease term for the First Option Period (as described hereinabove in this Paragraph 2), Tenant shall have the option to renew the term of this Lease for a period of five (5) years next succeeding the First Option Period. Such period shall be sometimes referred to hereinafter as the "Second Option Period." Such option to renew shall be exercised by written notice to Landlord not less than 180 days prior to the end of the then current term. The Second Option Period, if exercised by Tenant, shall be on the same terms and conditions as provided in this Lease [except for the options to renew described in this Paragraph 2 and the increase to Minimum Rental described hereinbelow in Paragraph 3(a)].

Provided (i) this Lease is still in full force and effect, (ii) Tenant is not then in default under any of the terms, provisions or conditions of this Lease beyond any applicable cure period on its part to observe, comply with or fulfill and (iii) Tenant shall have properly exercised its right to extend the Lease term for the First Option Period and the Second Option Period (as described hereinabove in this Paragraph 2), Tenant shall have the option to renew the term of this Lease for a period of five (5) years next succeeding the Second Option Period. Such period shall be sometimes referred to hereinafter as the "Third Option Period." Such option to renew shall be exercised by written notice to Landlord not less than 180 days prior to the end of the then current term. The Third Option Period, if exercised by Tenant, shall be on the same terms and conditions as provided

2296830.06
LIB: CHARLOTTE

in this Lease [except for the options to renew described in this Paragraph 2 and the increase to Minimum Rental described hereinbelow in Paragraph 3(a)].

Provided (i) this Lease is still in full force and effect, (ii) Tenant is not then in default under any of the terms, provisions or conditions of this Lease beyond any applicable cure period on its part to observe, comply with or fulfill and (iii) Tenant shall have properly exercised its right to extend the Lease term for the First Option Period, the Second Option Period and the Third Option Period (as described hereinabove in this Paragraph 2), Tenant shall have the option to renew the term of this Lease for a period of five (5) years next succeeding the Third Option Period. Such period shall be sometimes referred to hereinafter as the "Fourth Option Period." Such option to renew shall be exercised by written notice to Landlord not less than 180 days prior to the end of the then current term. The Fourth Option Period, if exercised by Tenant, shall be on the same terms and conditions as provided in this Lease [except for the options to renew described in this Paragraph 2 and the increase to Minimum Rental described hereinbelow in Paragraph 3(a)].

There shall be no options to renew this Lease except as set forth in this Paragraph 2. TIME IS OF THE ESSENCE with regard to the exercise of each of the options to renew hereunder.

3.    RENTAL. During the full term of this Lease, Tenant shall pay to Landlord, without notice, demand, reduction, setoff or any defense, unless expressly set forth herein, a total rental (the "Annual Rental") consisting of the sum total of the following:

(a)    Minimum Rental. Commencing with the Commencement Date and continuing through the termination of this Lease, Tenant shall pay a minimum annual rental (the "Minimum Rental") which is payable in equal monthly installments, each in advance on or before the first day of each month. If the Commencement Date is a date other than the first day of a calendar month, the Minimum Rental shall be prorated daily from such date to the first day of the next calendar month and paid on the Commencement Date. The amount of Minimum Rental to be paid by Tenant relative to each Lease Year shall be as follows:

| LEASE YEAR(S) | MINIMUM RENTAL | MONTHLY PAYMENT |
|---|---|---|
| 1-last day of 5th Lease Year | $98,000.00 | $8,166.67 |
| 6-last day of 10th Lease Year | $107,800.00 | $8,983.33 |
| 11-last day of 15th Lease Year | $118,580.00 | $9,881.67 |
| 16-last day of 20th Lease Year | $130,438.00 | $10,869.83 |
| First Option Period | $143,481.00 | $11,956.75 |
| Second Option Period | $157,829.00 | $13,152.42 |
| Third Option Period | $173,612.00 | $14,467.67 |
| Fourth Option Period | $190,973.00 | $15,914.42 |

0009153.00182

2296830.06
LIB: CHARLOTTE

(b)  <u>Tenant's Payment of Taxes</u>.  Tenant shall pay any and all ad valorem taxes (or any tax hereafter imposed in lieu thereof) regarding the Premises during the entire term. Such taxes shall be paid as provided in subparagraph (d) below.

(c)  <u>Tenant's Payment of Insurance Premiums</u>.  Tenant shall pay for any and all premiums charged for liability and rent loss insurance (together with all endorsements) carried by Landlord relative to the Premises during the entire term. Such insurance premiums shall be paid as provided in subparagraph (d) below.  As set forth in Paragraph 16 below, Tenant shall procure and pay for "all risk" hazard insurance for all improvements located on the Premises.

(d)  <u>Payment of Taxes and Insurance Premiums</u>.  Tenant shall pay to Landlord each month, along with Tenant's installments of Minimum Rental a sum equal to one-twelfth (1/12) of the amount estimated by Landlord (in its reasonable discretion) as the taxes and insurance premiums for each calendar year. Landlord will provide Tenant with Landlord's estimate of such amount for the upcoming calendar year on or before December 15 of each calendar year during the term hereof. If Landlord fails to notify Tenant of Tenant's revised amount by such date, Tenant shall continue to pay the monthly installments of the amount, if any, last payable by Tenant until notified by Landlord of such new estimated amount. No later than April 1 of each calendar year of the term, Landlord shall deliver to Tenant a written statement setting forth the actual amount of taxes and insurance premiums for the preceding calendar year. Tenant shall pay the total amount of any balance due shown on such statement within thirty (30) days after its delivery. In the event the actual costs and expenses for any such year are less than the estimates paid by Tenant for such year , Landlord shall reimburse Tenant for any overage paid and the monthly rental installments for the next period shall be reduced accordingly, but not below the Minimum Rental. For the calendar year in which this Lease commences, such amount shall be prorated from the Commencement Date through December 31 of such year. Further, Tenant shall be responsible for the paying of all taxes and insurance premiums for the calendar year in which this Lease term expires, prorated from January 1 thereof through the Expiration Date. Upon the Expiration Date, Tenant shall pay any unpaid estimated amounts within thirty (30) days after the Expiration Date, which estimate shall be made by Landlord based upon actual and estimated costs for such year.

(e)  <u>OEA Contribution</u>.  In addition to the basic rent and other sums payable hereunder, Tenant shall be responsible for paying to Landlord or Landlord's designee, the sums payable pursuant to Section 4.2.9 of the OEA, which amount shall be payable within thirty (30) days after written request by Landlord.

(f)  <u>Late Payment</u>.  If any monthly installment of Minimum Rental or any other sum due and payable pursuant to this Lease remains due and unpaid ten (10) days after said amount becomes due, Tenant shall pay as additional rent hereunder a late payment charge equal to three percent (3%) of the unpaid rent or other payment. All unpaid rent and other sums of whatever nature owed by Tenant to Landlord under this Lease shall bear interest from the due date thereof until paid at the lesser of fifteen percent (15%) per annum or the maximum interest rate per annum allowed by law. Acceptance by Landlord of any payment from Tenant hereunder in an amount less than that which is currently due shall in no way affect Landlord's rights under this Lease and shall in no way constitute an accord and satisfaction.

4

4.    DELIVERY OF POSSESSION.  Landlord will deliver the Premises to Tenant as of the Commencement Date and Tenant shall accept same "AS IS, WHERE IS AND WITH ALL FAULTS." Prior to the expiration of the Contingency Period, Landlord shall rough grade the Land and install certain utilities inside of the boundary line of the Land, all in accordance with those certain site work plans, a copy of which will be delivered to Tenant within thirty (30) business days after the Effective Date.  Upon completion of such work, a certification to Tenant from Landlord's engineer certifying that such work has been completed in accordance with such plans, which certification shall be conclusive.  Additionally, Landlord shall complete the portions of the roadways within the Shopping Center shown as hatched on Exhibit B attached hereto to accommodate vehicular traffic.

5.    ALTERATIONS AND IMPROVEMENTS BY TENANT.    Tenant shall make no exterior changes respecting the Premises or that can be seen from the exterior of the Premises without complying with the OEA and all applicable laws, ordinances, rules and regulations. All of Tenant's personal property must be new when installed in, or attached to, the Premises.  All alterations, additions or improvements, including, without limitation, all partitions, walls, railings, carpeting, floor and wall coverings and other fixtures (excluding, however, Tenant's trade fixtures as described in the Paragraph entitled "Trade Fixtures and Equipment" below) made by, for, or at the direction of Tenant shall, upon expiration or earlier termination of the Lease, become the property of Landlord, at Landlord's sole election, and shall, at Landlord's sole election, either remain upon the Premises at the expiration or earlier termination of this Lease or be removed by Tenant, at Tenant's sole expense in accordance with the terms and provisions of this Lease.

6.    USE OF PREMISES.

(a)    Tenant shall use and occupy the Premises as a restaurant serving alcoholic beverages and in a careful, safe and proper manner and for no other purpose. Tenant shall comply with all laws, ordinances, orders, regulations or zoning classifications of any lawful governmental authority, agency or other public or private regulatory authority (including insurance underwriters or rating bureaus) having jurisdiction over the Premises. Tenant shall not do any act or follow any practice relating to the Premises which shall constitute a nuisance or detract in any way from the reputation of the Premises as a first-class establishment. Tenant's duties in this regard shall include allowing no noxious or offensive odors, fumes, gases, smoke, dust, steam or vapors, or any loud or disturbing noise or vibrations to originate in or emit from the Premises.  Landlord hereby acknowledges and agrees that normal restaurant odors shall not be considered noxious or offensive.

(b)    Without limiting the generality of (a) above, the Premises shall not be used for the treatment, storage, transportation to or from, use or disposal of toxic or hazardous wastes, materials, or substances, or any other substance that is prohibited, limited or regulated by any governmental or quasi-governmental authority or that, even if not so regulated, could or does pose a hazard to health and safety of the occupants of the Premises or surrounding property.

(c)    Except as set forth in this Lease, Tenant hereby agrees that this Lease is subordinate to all matters of record and that Tenant shall abide by all matters of record in connection with its use of the Premises.

0009153.00182

2296830.06
LIB: CHARLOTTE

(d)     Tenant shall exercise due care in its use and occupancy of the Premises and shall not commit or allow waste to be committed on any portion of the Premises; and at the expiration or earlier termination of this Lease, Tenant shall deliver the Premises to Landlord in good condition, ordinary wear and tear and acts of God alone excepted.

(e)     Nothing contained herein shall require Tenant to continuously operate any business in the Premises. Further, the parties hereby expressly waive any law or the like which would require continuous operation of a business from the Premises.

(f)     Tenant shall save Landlord harmless from any claims, liabilities, penalties, fines, costs, expenses or damages resulting from the failure of Tenant to comply with the provisions of this Paragraph 6. This indemnification shall survive the termination or expiration of this Lease.

(g)     Notwithstanding anything in this Lease to the contrary, in no event shall the Premises or any portion thereof be used for the following purposes: Boston Market, Kenny Roger's, Kentucky Fried Chicken, Popeye's, Church's, Bojangle's, Mrs. Winner's, Tanner's, Chicken Out, Willie May's Chicken, Biscuitville, Zaxby's, Raising Cane's, Chester's, El Pollo Loco or Ranch One.

7.     OTHER TAXES. Tenant shall pay any taxes, documentary stamps or assessments of any nature imposed or assessed upon this Lease, Tenant's occupancy of the Premises or Tenant's trade fixtures, equipment, machinery, inventory, merchandise or other personal property located on the Premises and owned by or in the custody of Tenant as promptly as all such taxes or assessments may become due and payable.

8.     EXTRAHAZARDOUS ACTIVITIES. Tenant shall not do or cause to be done or permit on the Premises anything deemed extrahazardous on account of fire and Tenant shall not use the Premises in any manner which will cause an increase in the premium rate for any insurance in effect on the Premises or a part thereof. If, because of anything done, caused to be done, permitted or omitted by Tenant or its agent(s), contractor(s), employee(s), invitee(s), licenses(s), servant(s) subcontractor(s) or subtenant(s) the premium rate for any kind of insurance procured by Landlord and in effect relative to the Premises or any part thereof shall be raised, Tenant shall pay Landlord on demand the amount of any such increase in premium which Landlord shall pay for such insurance and if Landlord shall demand that Tenant remedy the condition which caused any such increase in an insurance premium rate, Tenant shall remedy such condition within fifteen (15) days after receipt of such demand.

To the best of Landlord's knowledge which is based solely on that certain Phase 1 Environmental Site Assessment dated January 2004, and that certain Asbestos and Lead-Based Paint Survey dated January 15, 2004, each performed by Ground Engineering Solutions, Inc., Landlord represents and warrants that:

A.     There is not located on, in, about, or under the Premises any Hazardous Substance.

B.     The Premises presently are not and never have been utilized for the storage, manufacture, disposal, handling, transportation or use of any Hazardous Substances, or as a landfill.

C.  There are no past or present investigations, administrative proceedings, litigation, regulatory hearings or other action proposed, threatened (to the best of Landlord's knowledge) or pending, alleging non-compliance with or violation of any Law or Regulation or relating to any required environmental permits.

D.  The Premises are not listed in the United States Environmental Protection Agency's National Priorities List of Hazardous Waste Sites nor any other list, schedule, log, inventory or record of hazardous waste sites maintained by any state, federal or local agency.

E.  Landlord has disclosed to Tenant all reports and investigations commissioned by Landlord and relating to Hazardous Substances and the Premises.

F.  There are not now, nor have there ever been, any above ground or underground storage tanks located in or under the Premises. The Premises have never been used as a landfill.

All representations and warranties herein contained shall be deemed to be continuing and shall survive the expiration or early termination of the Lease.

9.  MAINTENANCE, REPAIRS AND REPLACEMENTS. Tenant shall be responsible for the repair, replacement and maintenance in good order and condition of all parts and components of the Premises, including, without limitation, the exterior parking lot, access drives and landscaping improvements on the Premises, the structural elements of the building improvements, the roof, plumbing, wiring, electrical systems, HVAC system, glass and plate glass, equipment and machinery. At the end of the term of this Lease, Tenant shall return the Premises to Landlord in as good condition as they were when received, excepting only normal wear and tear and acts of God and any improvements constructed on the Premises by Tenant in accordance herewith, all of which shall be returned to Landlord in a structurally sound and weather tight condition.

10.  TRADE FIXTURES AND EQUIPMENT. Any trade fixtures installed in the Premises at Tenant's expense shall remain Tenant's personal property and Tenant shall have the right at any time during the term of this Lease to remove such trade fixtures. Upon removal of any trade fixtures, Tenant shall immediately restore the Premises to substantially the same condition as they existed prior to such removal, ordinary wear and tear and acts of God alone excepted. Any trade fixtures not removed by Tenant at the expiration or an earlier termination of the Lease shall become, at Landlord's sole election, either (i) the property of Landlord, in which event Landlord shall be entitled to handle and dispose of same in any manner Landlord deems fit without any liability or obligation to Tenant or any other third party with respect thereto, or (ii) subject to Landlord's removing such property from the Premises and storing same, all at Tenant's expense and without any recourse against Landlord with respect thereto.

Without limiting the generality of the foregoing, the following property shall in no event be deemed to be "trade fixtures" and Tenant shall not remove any such property from the Premises under any circumstances, regardless of whether installed by Landlord or Tenant: (a) any air conditioning, air ventilating or heating fixtures or equipment; (b) any lighting fixtures or

equipment; (c) any dock levelers; (d) any carpeting or other permanent floor coverings; (e) any paneling or other wall coverings; (f) plumbing fixtures and equipment; and (g) permanent shelving. Except as otherwise provided herein, trade fixtures shall be defined in this Lease to include, without limitation, and by way of illustration only, kitchen plumbing fixtures (except sanitary plumbing fixtures), counters, stainless steel equipment, kitchen equipment, such as ranges, display cases, refrigeration equipment, including the machinery installed in the walk-in cooler built into the Premises, Tenant's decorative items, cashiers' stands, tables, chairs, benches, booths, lighting fixtures, pictures, mirrors, decorative wall items, room partitions, Tenant's decorative items in the dining areas, such as chandeliers, wall ornaments, stained, beveled and leaded glass, special doors and special lighting fixtures, and all such other fixtures or equipment as Tenant may, from time to time, place in or upon the Premises.

11.    UTILITIES.  Tenant shall pay for all utilities or services related to the Premises, including, without limitation, electricity, gas, heat, water, sewer, telephone and janitorial services. Landlord shall not be responsible for the stoppage or interruption of utilities services, nor shall Landlord be liable for any damages caused by or from the plumbing and sewer systems unless caused by Landlord's negligence.

12.    DAMAGE OR DESTRUCTION OF PREMISES.  If the Premises are damaged by fire or other casualty, but are not rendered untenantable for Tenant's business, either in whole or in part, Tenant shall promptly commence restoration of such improvements and prosecute the same diligently to completion.   Upon completion of such restoration work, Tenant shall commence restoration and reinstallation of all trade fixtures and equipment on the Premises and shall diligently prosecute the same to completion. In the event of such reconstruction, the Annual Rental shall not be abated.

If by reason of any such casualty the Premises are rendered untenantable in Tenant's business, either in whole or in part, Tenant shall promptly commence restoration of such improvements and prosecute the same diligently to completion (provided neither party has terminated the Lease as provided hereinbelow in this Paragraph 12). Upon completion of such restoration work, Tenant shall commence restoration and reinstallation of all trade fixtures and equipment on the Premises and shall diligently prosecute the same to completion. During such period of restoration work, the Annual Rental shall not be abated.

Provided, however, if by reason of any such casualty, the Premises are rendered untenantable in some material portion during the last two (2) years of the then-current Lease term, and the amount of time required for Tenant to perform its restoration work, using due diligence, is estimated in good faith by Tenant's architect to be in excess of 180 days, then Tenant shall have the right to terminate this Lease by giving written notice of termination within sixty (60) days after the date of casualty, in which case the Annual Rental shall fully abate as of the date of such termination notice and Tenant shall pay over to Landlord or Landlord's mortgagee the portion of Tenant's insurance award applicable to the damages to the improvements on the Premises. Landlord shall have no obligation to rebuild or repair in case of fire or other casualty, and no termination under this Paragraph 12 shall affect any rights of Landlord or Tenant hereunder because of prior defaults of the other party. Tenant shall give Landlord immediate notice of any fire or other casualty in the Premises.

2296830.06
LIB: CHARLOTTE

13.   GOVERNMENTAL ORDERS.   Tenant agrees, at its own expense, to comply promptly with all laws, ordinances and regulations (including without limitation the Americans with Disabilities Act) and with all requirements of any legally constituted public authority that may be in effect from time to time which are related to the Premises and/or Tenant's use or occupancy of the Premises.

14.   MUTUAL WAIVER OF SUBROGATION.   For the purpose of waiver of subrogation, the parties mutually release and waive unto the other all rights to claim damages, costs or expenses for any injury to persons (including death) or property caused by a casualty of any type whatsoever in, on or about the Premises if the amount of such damage, cost or expense has been paid to such damaged party under the terms of any policy of insurance. All insurance policies carried with respect to this Lease, if permitted under applicable law, shall contain a provision whereby the insurer waives, prior to loss, all rights of subrogation against either Landlord or Tenant.

15.   INDEMNIFICATION.

(a)   Tenant shall indemnify and save Landlord harmless against any and all claims, suits, demands, actions, fines, damages, and liabilities, and all costs and expenses thereof (including, without limitation, reasonable attorneys' fees) arising out of injury to persons (including death) or property caused or occasioned wholly or in part by any act(s) or omission(s) of Tenant, its agent(s), contractor(s), employee(s), invitee(s), licensee(s), servant(s), subcontractor(s) or subtenant(s), except if caused by any act(s) or omission(s) on the part of Landlord, its agent(s) or employee(s). Tenant shall give Landlord immediate notice of any such happening causing injury to persons or property.

(b)   Landlord shall indemnify and save Tenant harmless against any and all claims, suits, demands, actions, fines, damages, and liabilities, and all costs and expenses thereof (including, without limitation, reasonable attorneys' fees) arising out of injury to persons (including death) or property if caused or occasioned by any act(s) or omission(s) of Landlord, its agent(s) or employee(s), except if caused by any act(s) or omission(s) on the part of Tenant, its agent(s), contractor(s), employee(s), invitee(s), licensee(s), servant(s), subcontractor(s) or subtenant(s).

16.   INSURANCE.   At all times during the term of this Lease, Tenant shall at its own expense keep in force the following policies of insurance:

(i)   Liability.   Commercial general liability insurance with broad form contractual liability coverage and with coverage limits of not less than Three Million and No/100 Dollars ($3,000,000.00) combined single limit, per occurrence, specifically including liquor liability insurance covering consumption of alcoholic beverages by customers of Tenant, if the sale of alcoholic beverages is permitted in the Premises. Such policy shall insure Tenant's performance of the indemnity provisions of the Lease, but the amount of such insurance shall not limit Tenant's liability nor relieve Tenant of any obligation hereunder. Additionally, such coverage limits shall increase by five percent (5%) on each fifth (5th) anniversary of the Commencement Date.

(ii)   Workers' Compensation.   Workers' compensation insurance in the amount required by the state in which the Premises are located for the benefit of Tenant's employees.

(iii)     Plate Glass. Insurance covering the full replacement cost of all plate glass on the Premises; Tenant may self-insure such risk upon prior approval of Landlord.

(iv)     Equipment. Boiler and machinery insurance on the HVAC system (or any part thereof) serving the Premises.

(v)     Improvements. Property insurance covering any peril generally included in the classification "all risks" covering all (i) building and other real property improvements located on the Premises, (ii) merchandise, (iii) trade fixtures, and (iv) all other personal property owned or leased by Tenant (or for which Tenant is legally liable) and located in the Premises, in an amount not less than 100% of their full replacement cost. Any policy proceeds shall be used for the repair or replacement of the property damaged or destroyed, unless the Lease is terminated under the provisions of Paragraph 12.

All policies of insurance provided for herein shall be issued by insurance companies that have a general policyholder's rating of not less than "A" in the most current available "Best's" insurance reports, and that have been admitted or qualified to do business in the state where the Premises are located by the insurance commission or other highest board, body or official responsible for overseeing the insurance business in such state. Tenant's general liability policy as required in clause (i) above shall contain cross-liability endorsements. All policies of insurance provided for herein (with the exception of workers' compensation insurance) shall name Landlord, Landlord's property manager, Landlord's mortgagees and such other individuals or entities as Landlord may from time to time designate as "additional insureds." Certificates of all insurance required of Tenant hereunder shall be delivered to Landlord at least thirty (30) days prior to the Commencement Date. Tenant shall provide to Landlord, at least thirty (30) days prior to expiration, certificates of insurance to evidence any renewal or additional insurance procured by Tenant. All certificates of insurance delivered to Landlord shall contain an agreement by the company issuing said policy to give Landlord thirty (30) days' advance written notice of any cancellation, lapse, reduction or other adverse change respecting such insurance. All commercial general liability insurance, property damage or other casualty policies shall be written as primary policies, not contributory with or secondary to coverage that Landlord may carry.

17.     LANDLORD'S RIGHT OF ENTRY. Upon reasonable notice, Landlord, and those persons authorized by it, shall have the right to enter the Premises at all reasonable times and upon reasonable notice for the purposes of installing utilities, making inspections or showing the same to prospective purchasers and/or lenders, as well as at any time in the event of emergency involving possible injury to property or persons in or around the Premises. Further, during the last six (6) months of the initial or of any extended term, Landlord and those persons authorized by it shall have the right at reasonable times and upon reasonable notice to show the Premises to prospective tenants.

18.     EMINENT DOMAIN. If any substantial portion of the Premises is taken under the power of eminent domain (including any conveyance made in lieu thereof) or if such taking shall materially impair the normal operation of Tenant's business, then either party shall have the right to terminate this Lease by giving written notice of such termination within thirty (30) days after such taking. If neither party elects to terminate this Lease, Tenant shall promptly commence restoration

of the improvements on the Premises and prosecute the same diligently to completion. Upon completion of such restoration work, Tenant shall commence restoration and reinstallation of all trade fixtures and equipment on the Premises and shall diligently prosecute the same to completion. In the event of such condemnation, the Annual Rental shall be proportionately and equitably reduced given the effect of the condemnation on Tenant's business operations in the Premises.

All compensation awarded for any taking (or the proceeds of a private sale in lieu thereof) shall be the property of Landlord whether such award is for compensation for damages to the Landlord's or Tenant's interest in the Premises, and Tenant hereby assigns all of its interest in any such award to Landlord; provided, however, Landlord shall not have any interest in any separate award made to Tenant for loss of business, moving expense or the taking of Tenant's trade fixtures or equipment if a separate award for such items is made to Tenant and if such separate award does not reduce the award to Landlord.

19.    EVENTS OF DEFAULT AND REMEDIES.

(a)    Upon the occurrence of any one or more of the following events (the "Events of Default," any one an "Event of Default"), the party not in default shall have the right to exercise any rights or remedies available in this Lease, at law or in equity. Events of Default shall be:

(i)    Tenant's failure to pay when due any rental or other sum of money payable hereunder, if such failure is not cured within ten (10) days after written notice thereof (provided, Landlord shall be obligated to give only two (2) such notices per calendar year);

(ii)    Failure by either party to perform any other of the terms, covenants or conditions contained in this Lease if not remedied within thirty (30) days after receipt of written notice thereof, or if such default cannot be remedied within such period, if such party does not within thirty (30) days after written notice thereof commence such act or acts as shall be necessary to remedy the default or does not thereafter complete such act or acts within a reasonable time;

(iii)    Tenant shall become bankrupt or insolvent, or file any debtor proceedings, or file pursuant to any statute a petition in bankruptcy or insolvency or for reorganization, or file a petition for the appointment of a receiver or trustee for all or substantially all of Tenant's assets (if such petition or appointment shall not have been set aside within sixty (60) days from the date of such petition or appointment), or if Tenant makes an assignment for the benefit of creditors, or petitions for or enters into an arrangement; or

(iv)    Tenant allows its leasehold estate to be taken under any writ of execution and such writ is not vacated or set aside within sixty (60) days.

(b)    In addition to its other remedies, Landlord, upon an Event of Default by Tenant, shall have the immediate right, after any applicable cure period expressed herein, to terminate and cancel this Lease and/or to reenter and remove all persons and properties from the Premises and dispose of such property as it deems fit, all without being guilty of trespass or being liable for any

damages caused thereby. If Landlord reenters the Premises, it may either terminate this Lease or, from time to time without terminating this Lease, make such alterations and repairs as may be necessary or appropriate to relet the Premises and relet the Premises upon such terms and conditions as Landlord deems advisable without any responsibility whatsoever to account to Tenant for any surplus rents collected. No retaking of possession of the Premises by Landlord shall be deemed as an election to terminate this Lease unless a written notice of such intention is given by Landlord to Tenant at the time of reentry; but, notwithstanding any such reentry or reletting without termination, Landlord may at any time thereafter elect to terminate for such previous default. In the event of an elected termination by Landlord, whether before or after reentry, Landlord may recover from Tenant damages including the costs of recovering the Premises and Tenant shall remain liable to Landlord for the total Annual Rental (which may at Landlord's election be accelerated to be due and payable in full as of the Event of Default and recoverable as damages in a lump sum, which such accelerated amounts shall be discounted to present value using an imputed interest rate of six percent (6%)) as would have been payable by Tenant hereunder for the remainder of the term less the rentals actually received from any reletting or, at Landlord's election, less the reasonable rental value of the Premises for the remainder of the term. In determining the Annual Rental which would be payable by Tenant subsequent to default, the Annual Rental for each Lease Year of the unexpired term shall be equal to the Annual Rental payable by Tenant for the last Lease Year prior to the default. If any rent owing under this Lease is collected by or through an attorney, Tenant agrees to pay Landlord's reasonable attorneys' fees actually incurred to the extent allowed by applicable law.

20.    SUBORDINATION. This Lease is subject and subordinate to any and all mortgages or deeds of trust now or hereafter placed on the property of which the Premises are a part, provided for any mortgage placed on the property of which the Premises are a part after the Effective Date, Landlord shall deliver to Tenant a subordination non-disturbance and attornment agreement in a commercially reasonable form. Provided, further, in each case the holder of the mortgage or deed of trust shall agree that this Lease shall not be divested by foreclosure or other default proceedings thereunder so long as Tenant shall not be in default under the terms of this Lease beyond any applicable cure period set forth herein. Tenant shall continue its obligations under this Lease in full force and effect notwithstanding any such default proceedings under a mortgage or deed of trust and shall attorn to the mortgagee, trustee or beneficiary of such mortgage or deed of trust, and their successors or assigns, and to the transferee under any foreclosure or default proceedings. Tenant will, upon request by Landlord, execute and deliver to Landlord or to any other person designated by Landlord, any instrument or instruments required to give effect to the provisions of this Paragraph 20.

21.    ASSIGNING AND SUBLETTING.

(a)    Tenant shall not assign, sublet, mortgage, pledge or encumber this Lease, the Premises, or any interest in the whole or in any portion thereof, directly or indirectly, without the prior written consent of Landlord, which consent shall not be unreasonably withheld or delayed. If Tenant makes any such assignment, sublease, mortgage, pledge or encumbrance with Landlord's written consent, Tenant will still remain primarily liable for the performance of all terms of this Lease, and one-half (1/2) of any rental or any fees or charges received by Tenant in excess of the Annual Rental payable to Landlord hereunder shall be also paid to Landlord as further rental under

this Lease. Landlord's consent to one assignment or sublease will not waive the requirement of its consent to any subsequent assignment or sublease as required herein.

(b)    Notwithstanding anything contained in this Lease, Tenant is expressly authorized, without the consent of the Landlord, to assign this Lease or sublet the Premises to an entity which is and remains throughout the Term an affiliate or wholly-owned subsidiary of Tenant, or to a franchisee of Tenant, provided, however, that any such assignment or sublease shall not relieve Tenant from liability for the payment of rent or other sums herein specified, or from the obligation to keep and be bound by the terms, conditions and covenants of this Lease. Any prohibition contained in this Lease or otherwise against assignment or subletting shall not apply in the case of a merger, sale of stock, or sale of all of the assets of Tenant.

(c)    Except for an assignment or sublease pursuant to Paragraph 21(b), to which this Paragraph 21(c) shall not be applicable, Tenant shall reimburse Landlord for any and all out-of-pocket costs incurred by Landlord relating to any assignment or sublease, up to $1,000.00.

(d)    No assignment, sublease, mortgage, pledge or other encumbrance by Tenant, whether consented to or not by Landlord, shall relieve the Tenant named herein from the obligations of Tenant hereunder. The Tenant named herein shall remain primarily liable for all obligations of Tenant hereunder.

22.    TRANSFER OF LANDLORD'S INTEREST. If Landlord shall sell, assign or transfer all or any part of its interest in the Premises or in this Lease to a successor in interest which expressly assumes the obligations of Landlord hereunder, then Landlord shall thereupon be released or discharged from all covenants and obligations hereunder, and Tenant shall look solely to such successor in interest for performance of all of Landlord's obligations. Tenant's obligations under this Lease shall in no manner be affected by Landlord's sale, assignment, or transfer of all or any part of such interest(s) of Landlord, and Tenant shall thereafter attorn and look solely to such successor in interest as the Landlord hereunder.

23.    COVENANT OF QUIET ENJOYMENT. Landlord represents that it has full right and authority to lease the Premises and Tenant shall peacefully and quietly hold and enjoy the Premises for the full term hereof so long as Tenant does not default in the performance of any of the terms hereof.

24.    ESTOPPEL CERTIFICATES. Within fifteen (15) business days after a request by Landlord, Tenant shall deliver a written estoppel certificate in form and content reasonably satisfactory to Landlord and any third party designee of Landlord certifying any facts that are then true with respect to this Lease, including, without limitation, that this Lease is in full force and effect, that no default exists on the part of Landlord or Tenant, that Tenant is in possession, that Tenant has commenced the payment of rent, and that Tenant claims no defenses or offsets with respect to payment of rentals under this Lease. Likewise, within fifteen (15) days after a request by Tenant, Landlord shall deliver to Tenant a similar estoppel certificate covering such matters as are reasonably required by Tenant.

25.    PROTECTION AGAINST LIENS. Tenant shall do all things necessary to prevent the filing of any mechanics', materialmen's or other types of liens whatsoever, against all or any part

of the Premises by reason of any claims made by, against, through or under Tenant. If any such lien is filed against the Premises, Tenant shall either cause the same to be discharged of record within thirty (30) days after filing or, if Tenant in its discretion and in good faith determines that such lien should be contested, it shall furnish such security as may be necessary to prevent any foreclosure proceedings against the Premises during the pendency of such contest. If Tenant shall fail to discharge such lien within said time period or fail to furnish such security, then Landlord may at its election, in addition to any other right or remedy available to it, discharge the lien by paying the amount claimed to be due or by procuring the discharge by giving security or in such other manner as may be allowed by law. If Landlord acts to discharge or secure the lien, Tenant shall immediately reimburse Landlord for all sums paid and all costs and expenses (including reasonable attorneys' fees) incurred by Landlord involving such lien together with interest on the total expenses and costs at the maximum lawful rate.

26. MEMORANDUM OF LEASE. If requested by Tenant, Landlord shall execute a recordable Memorandum or Short Form Lease, prepared at Tenant's expense, specifying the exact term of this Lease and such other terms as the parties shall mutually determine, including but not limited to, Tenant's rights of access, first refusal and its exclusive.

27. FORCE MAJEURE. In the event Landlord or Tenant shall be delayed, hindered or prevented from the performance of any act required hereunder, by reason of governmental restrictions, scarcity of labor or materials, strikes, fire, or any other reasons beyond its reasonable control, the performance of such act shall be excused for the period of delay, and the period for performance of any such act shall be extended as necessary to complete performance after the delay period. However, the provisions of this Paragraph 27 shall in no way be applicable to Tenant's obligations to pay Annual Rental or any other sums, monies, costs, charges or expenses required by this Lease or to maintain any of the insurance required under this Lease.

28. REMEDIES CUMULATIVE -- NONWAIVER. Unless otherwise specified in this Lease, no remedy of Landlord or Tenant shall be considered exclusive of any other remedy, but each shall be distinct, separate and cumulative with other available remedies. Each remedy available under this Lease or at law or in equity may be exercised by Landlord or Tenant from time to time as often as the need may arise. No course of dealing between Landlord and Tenant or any delay or omission of Landlord or Tenant in exercising any right arising from the other party's default shall impair such right or be construed to be a waiver of a default.

29. HOLDING OVER. If Tenant remains in possession of the Premises or any part thereof after the expiration of the term of this Lease, whether with or without Landlord's acquiescence, Tenant shall be deemed only a tenant at will and there shall be no renewal of this Lease without a written agreement signed by both parties specifying such renewal. The "monthly" rental payable by Tenant during any such tenancy at will period shall be one hundred fifty percent (150%) of the monthly installments of Annual Rental payable during the final year immediately preceding such expiration. Tenant shall also remain liable for any and all damages, direct and consequential, suffered by Landlord as a result of any holdover without Landlord's unequivocal written acquiescence.

30. NOTICES. Any notice allowed or required by this Lease shall be deemed to have been sufficiently served if the same shall be in writing and either sent by nationally recognized

overnight courier service or placed in the United States mail, via certified mail or registered mail, return receipt requested, with proper postage prepaid, and addressed as follows:

<div style="margin-left:4em">

AS TO LANDLORD:  c/o Collett & Associates
1228 E. Morehead St., Suite 200
Charlotte, NC 28236-6799

Attention:  Mr. Ry Winston

with a copy to:  Kennedy Covington Lobdell & Hickman, L.L.P.
214 N. Tryon St., 47th Floor
Hearst Tower
Charlotte, NC 28202

Attention:  Mark V. Thigpen

AS TO TENANT:  Ruby Tuesday, Inc.
150 West Church Avenue
Maryville, Tennessee 37801
Attention:  Legal Real Estate Department

</div>

The addresses of Landlord and Tenant and the party, if any, to whose attention a notice or copy of same shall be directed may be changed or added from time to time by either party giving notice to the other in the prescribed manner.

31. LEASING COMMISSION.  Landlord and Tenant represent and warrant each to the other that they have not dealt with any broker(s) or any other person claiming any entitlement to any commission in connection with this transaction except Mullins Land Company (the "Broker"). Landlord and Tenant agree to indemnify and save each other harmless from and against any and all claims, suits, liabilities, costs, judgments and expenses, including reasonable attorneys' fees, for any leasing commissions or other commissions, fees, charges or payments resulting from or arising out of their respective actions in connection with this Lease except as to Broker.  Landlord agrees to be responsible for the leasing commission due Broker pursuant to a separate written agreement between Landlord and Broker, and to hold Tenant harmless respecting same.

32. MISCELLANEOUS.

(a) Evidence of Authority.  Tenant represents that it is in valid existence and good standing and has the authority to enter into this Lease.

(b) Limitation of Landlord's Liability.  If Landlord shall fail to perform any covenant, term or condition of this Lease upon Landlord's part to be performed, and, as a consequence of such default, Tenant shall recover a money judgment against Landlord, such judgment shall be satisfied solely out of the rents received, insurance proceeds, condemnation proceeds and proceeds of sale received upon execution of such judgment levied thereon against the right, title and interest of Landlord in the Premises as the same may then be encumbered; and neither Landlord nor, if Landlord be a partnership, any of the partners comprising Landlord shall

have any personal liability for any deficiency. It is understood and agreed that in no event shall Tenant or any person claiming by or through Tenant have the right to levy execution against any property of Landlord other than its interest in the Premises as hereinbefore expressly provided.

        (c)    Nature and Extent of Agreement. This Lease, together with all exhibits hereto, contains the complete agreement of the parties concerning the subject matter, and there are no oral or written understandings, representations, or agreements pertaining thereto which have not been incorporated herein. This Lease creates only the relationship of landlord and tenant between the parties, and nothing herein shall impose upon either party any powers, obligations or restrictions not expressed herein. This Lease shall be construed and governed by the laws of the state in which the Premises are located.

        (d)    Binding Effect. This Lease shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, successors and assigns.

        (e)    Captions and Headings. The captions and headings in this Lease are for convenience and reference only, and they shall in no way be held to explain, modify, or construe the meaning of the terms of this Lease.

        (f)    Lease Review. The submission of this Lease to Tenant for review does not constitute a reservation of or option for the Premises, and this Lease shall become effective as a contract only upon execution and delivery by Landlord and Tenant.

33.    SEVERABILITY. If any term or provision of this Lease or the application thereof to any person or circumstance shall, to any extent, be invalid or unenforceable, the remainder of this Lease, or the application of such term or provision to persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby, and each term and provision of this Lease shall be valid and enforced to the fullest extent permitted by law notwithstanding the invalidity of any other term or provision hereof.

34.    OEA. Landlord and Tenant acknowledge that this Lease is subject and subordinate to that certain Operation and Easement Agreement recorded in Book 4369 at Page 80 in the public records of Columbia County Georgia (the "OEA") and that Tenant shall comply with all terms and provisions of the OEA.

35.    [Intentionally Deleted]

36.    RECAPTURE. In the event, Tenant is not open and operating to the public as a restaurant for a period of twelve (12) consecutive months, Landlord shall have the right to recapture the Premises and terminate this Lease by delivering written notice to Tenant of Landlord's intent to exercise such rights (the "Recapture Notice") and payment to Tenant of the unamortized book value (using the book value used by Tenant for income tax purposes) of the improvements constructed on the Premises ("Recapture Payment"). The failure of the Landlord to pay, when due, the Recapture Amount to Tenant is a material default under this Lease by the Landlord. Upon Tenant's receipt of the Recapture Notice and Recapture Amount, Tenant agrees to (i) execute a written termination of this Lease; (ii) surrender the Premises to Landlord in accordance with this Lease within thirty (30) days after the date of such termination. Upon Tenant's surrender of possession of the Premises in

16

accordance with this Paragraph, this Lease shall terminate and be of no further force or effect, and neither Landlord or Tenant shall have any further obligations hereunder. Tenant shall have the one-time right to nullify a Recapture Notice by delivering written notice of nullification to Landlord and by opening to the public within fifteen (15) days after the date of the Recapture Notice.

37.    CONTINGENCY PERIOD.

A.    **Zoning, Licenses and Permits**

Landlord acknowledges that this Lease is contingent upon Tenant obtaining during the Contingency Period (as defined below) all necessary permits, licenses (including, but not limited to, liquor, beer and wine licenses for on-premises consumption), variances, easements and approvals pertaining to the building, occupancy, signs, parking, curb cuts, driveways (including ingress and egress to public thoroughfares), zoning, environmental controls, and any other governmental permits which, in the sole judgment of Tenant, are necessary to permit it to construct and operate a Tenant restaurant with adjacent parking upon the Premises, all at a cost acceptable to Tenant. All of said permits, licenses, variances and approvals must be validly and irrevocably granted on terms and conditions and at a cost satisfactory to Tenant without qualification, except such qualification as shall be acceptable to Tenant, and no longer subject to appeal. Landlord agrees to execute any applications or other documents reasonably requested by Tenant and in form and content reasonably acceptable to Landlord in order to obtain any permits, licenses, variances and approvals. Further, this Lease is contingent upon all construction and related costs being acceptable to Tenant which Tenant shall satisfy during the Contingency Period. In the event any of the contingencies contained in this Lease have not been satisfied within ninety (90) days following the Effective Date, (said ninety (90) day period is hereinafter referred to as the "Contingency Period"), then Tenant shall be entitled to terminate this Lease by providing written notice to Landlord prior to the expiration of the Contingency Period, time being of the essence, in which case both parties shall be relieved from any obligations and/or liabilities hereunder except those that expressly survive such termination, and all deposits and payments made hereunder by Tenant shall be refunded to Tenant. In the event Tenant fails to terminate this Lease prior to the expiration of the Contingency Period, Tenant shall be deemed to have waived such termination right and shall be deemed satisfied with all aspects of the Land. Notwithstanding anything contained herein to the contrary, in the event Tenant has submitted to the applicable governmental authorities all information and applications to obtain a building permit (the "Building Permit") for the initial improvements to be constructed on the Premises on or before the date that is ninety (90) days after the Effective Date and the Building Permit has not been issued on or before the expiration of the Contingency Period despite Tenant's good faith, diligent efforts to obtain same, Tenant shall be entitled to an additional thirty (30) days after the expiration of the Contingency Period to obtain the Building Permit. If Tenant, despite complying with the terms of this Lease, has not obtained the Building Permit on or before the expiration of such thirty (30) day period, Tenant shall be entitled to terminate this Lease by providing written notice to Landlord on or before the expiration of such thirty (30) day period. If Tenant fails to provide such termination notice on or before the expiration of such thirty (30) day period, Tenant shall be deemed to have waived such termination right.

B.    **Survey, Soil Tests and Environmental Tests**

i.    Following the Effective Date, Tenant, at its option and sole cost and

expense, shall order a current certified survey of the Premises, bearing a legal description of the Premises, made and prepared by a reputable and competent licensed surveyor showing: (i) the area, dimension and locations of the Real Property to the nearest monuments, streets and alleys on all sides; (ii) spot elevations and bench marks; (iii) the location of all available utilities in adjoining streets, alleys or properties with invert elevations of basins, manholes, etc.; (iv) the location and description of all existing and/or proposed easements referred to in this Lease, and against or appurtenant to the Premises and the Real Property; and (v) the location of all improvements and encroachments.

   ii.  Following the Effective Date, at Tenant's expense, Tenant may obtain borings and/or soil bearing tests and other tests to determine the suitability of the Premises for building foundations and other improvements which Tenant may wish to make, provided, however, that said tests shall be so conducted as not to damage the Premises.

   iii.  Following the Effective Date, Tenant, at its expense, shall order an initial environmental audit (generally referred to as a "Phase I" audit) of the Premises and of any property over which Tenant will have rights, such as easement, parking or the like. Should the initial audit disclose adverse conditions and recommend that additional testing be performed, then a more specific and definitive audit (generally referred to as a "Phase II" audit) may be ordered by Tenant at Tenant's expense.

  For the purpose of this Lease, the phrase "Phase II Environmental Assessment" is defined to mean any further environmental investigation of the Premises beyond the scope of the Phase I Environmental Assessment (as defined in ASJM Standard E 1527-00, as revised from time to time) including intrusive sampling. Landlord shall be notified of the date and time of such Phase II Environmental Assessment at least five (5) business days prior to the occurrence thereof, shall be entitled to have representatives present during such Phase II Environmental Assessment and shall be entitled to take split samples from such testing.

  Immediately following any work, investigations, inspections or entry by Tenant or by any party acting by, through or under Tenant on the Land prior to the expiration of the Contingency Period, Tenant shall, at its sole cost and expense, immediately restore and repair any damage caused by such work, investigations, inspections or by the entry of Tenant or any party acting by, through or under Tenant on the Land or any property adjoining the Land. Tenant shall indemnify and hold Landlord harmless from and against and shall defend Landlord against any and all claims, liabilities, costs, or expenses incurred by Landlord relating in any way to the entry by Tenant or any party acting by, through or under Tenant on the Land or any property adjacent to the Land during the Contingency Period. The provisions of the immediately two (2) preceding sentences shall survive the expiration or earlier termination of this Lease.

  38. **RIGHT OF FIRST OFFER**.  Subject to the terms and provisions hereof, in the event that Landlord desires to make the Property available for sale to bona fide third-party purchasers, Landlord shall notify Tenant (the "Sale Notice") of such desire prior to conveying same to a bona-fide third-party purchaser. In the event Tenant desires to purchase the Property, Tenant shall deliver written notice to Landlord ("Tenant's Notice") within ten (10) business days after Landlord has delivered the Sale Notice to Tenant. For a period of thirty (30) days after the Tenant's Notice is

delivered, Landlord and Tenant shall negotiate in good faith in an attempt to reach agreement regarding the purchase price, the closing date and all other economic terms and conditions relating to the contemplated sale of the Property to Tenant. In the event Landlord and Tenant are unable, despite such parties' good faith efforts, to reach agreement on such terms and provisions within such thirty (30) day period, Tenant's rights set forth in this Paragraph 38 shall expire, and Landlord shall be entitled to market and sell the Property to potential third-party purchasers. Notwithstanding anything contained herein to the contrary, the rights of Tenant set forth in this Paragraph 38 are personal to the Tenant named herein, its subsidiaries and affiliates and are not assignable. Additionally, in no event shall the rights set forth herein be applicable to any sale of the Property by Landlord that is part of any other portion of the Shopping Center (including, without limitation, any other outparcels) or a partial or full portfolio sale by Landlord.

39.    **LANDLORD REPRESENTATIONS:**

The Landlord hereby warrants, represents and acknowledges the following:

A.  Landlord is a duly constituted and validly existing corporation and has the full power to carry out the transactions contemplated by this Lease.

B.  All partnership or corporate and other proceedings required to be taken on the part of Landlord to authorize Landlord to execute and deliver this Lease and to consummate the transaction contemplated have been duly and validly taken.

C.  The execution, delivery and performance of the Lease will not conflict in any way with the applicable partnership or corporate documents, and will not conflict or result in a breach or default under any note, lease, mortgage, indenture, contract or commitment to which Landlord is a party or by which Landlord may be bound.

D.  The title to the real property upon which the Shopping Center and the Premises are located are vested in the Landlord.

E.  There are no pending or, to the best of Landlord's knowledge, threatened lawsuits of any nature which in any way affect title to the real property upon which the Shopping Center and the Premises are located, affect in any way the organization or solvency of the Landlord, or in any way affect the validity and enforceability of this Lease, or in any way affect the rights of Tenant under the terms of this Lease.

F.  This Lease does not violate or conflict in any material way with (such as, but not limited to, provisions relating to exclusives, sale of food, sale of alcoholic beverages, exterior signage, hours of operation, or the like) the terms of any other Lease applicable to the Shopping Center or the terms of any other unrecorded document.

40.    LEASEHOLD FINANCING.

A.    Security Interest in Fixtures Permitted

Tenant shall have the right at any time to grant a security interest in any goods and property of every type and description owned by Tenant, and installed or kept on the Premises. Landlord hereby consents to any such security interest and disclaims any interest of any kind in any goods and property installed or kept on the Premises. Landlord agrees that it will, within ten (10) days after any written request by Tenant, confirm the foregoing consent and disclaimer in writing.

### B.    Leasehold Mortgages Permitted

Tenant may at any time mortgage, encumber, pledge or assign as security its right, title and interest in and to the leasehold estate created hereby. Tenant may, at any time, give to Landlord a notice (hereinafter referred to as a "Mortgage Notice") containing the name and address of a lender (hereinafter referred to as a "Mortgage Lender") to which the leasehold estate created hereby has been or will be mortgaged, encumbered, pledged or assigned as security. Upon written request from Tenant or any Mortgage Lender identified in a Mortgage Notice, Landlord will acknowledge, in writing, the receipt of any Mortgage Notice which it has received.

Whenever Landlord shall give any notice to Tenant pursuant to the Lease, Landlord shall also give to any Mortgage Lender at the address of such Mortgage Lender, a duplicate copy of such notice. The address of the Mortgage Lender shall be the address specified in the Mortgage Notice unless changed by subsequent written notice given by the Mortgage Lender to Landlord upon at least fifteen (15) days notice. No notice shall be effective against a particular Mortgage Lender unless it is given to such Mortgage Lender. If at any time a Mortgage Lender shall give to Landlord a written notice that it has released its lien on the leasehold estate created hereby, such lender shall cease to be a Mortgage Lender for purposes hereof and no further notices need be given to it.

Any Mortgage Lender shall be entitled:

i.    to cure or remedy, or cause to be cured or remedied, within a period of time equal to the period of time allowed by Tenant, such default or breach of covenant and Landlord shall accept such cure or remedy; and/or

ii.    to acquire by foreclosure or otherwise the leasehold estate created hereby and assume the obligations of Tenant under this Lease, including those in default, and, in such event, Landlord shall not exercise its right of termination with respect to such default provided same is cured as provided herein;

In addition to the foregoing rights, a Mortgage Lender may, at any time permitted under its loan documents, foreclose or otherwise realize upon its lien on the leasehold estate created hereby and Landlord will recognize the person, firm or corporation acquiring the leasehold estate created hereby as the lessee hereunder with all of the rights and estate of Tenant, provided such person, firm or corporation agrees to assume and be bound by all of the terms, covenants and conditions hereof.

Landlord further agrees that any Mortgage Lender, in order to protect its interest in the leasehold estate created hereby, may exercise any right of renewal granted in Section 2 hereof to Tenant and if such right of renewal is not also exercised by Tenant, then during such renewal term as exercised by

Mortgage Lender, Landlord will recognize the Mortgage Lender as the lessee hereunder with all of the rights and obligations of Tenant.

41.    CORPORATE APPROVAL. Notwithstanding anything in this Lease to the contrary, Tenant shall have a period of thirty (30) days following the Effective Date of this Lease in which to obtain its internal corporate approval of this Lease ("Corporate Approval"). In the event Tenant does not obtain such corporate approval, either Landlord or Tenant may terminate this Lease by giving written notice of such termination to the other at any time after the expiration of such thirty (30) day period, and in such event, neither party shall have any rights against the other as a result of this Lease except as expressly provided herein.

[SIGNATURES BEGIN ON FOLLOWING PAGE]

0009153.00182

2296830.06
LIB: CHARLOTTE

IN WITNESS WHEREOF, the parties have caused this Lease to be duly executed and sealed pursuant to authority duly given as of the day and year first above written.

"LANDLORD"

MULLINS CROSSING, LLC

By:   MULLINS GP, LLC, a North Carolina limited liability company, its Manager

By: _____
     John Collett, Manager

Date: _____

**[SIGNATURES CONTINUE ON FOLLOWING PAGE]**

0009153.00182

2296830.06
LIB: CHARLOTTE

"TENANT"

RUBY TUESDAY, INC., a Georgia
corporation

By: _____

Name: __Samuel E. Beall, III__

Title: __Chief Executive Officer__

Date: __June *28*, 2005_____

2296830.06
LIB: CHARLOTTE

EXHIBIT A



Exhibit B



Except as expressly set forth in the Lease, Landlord has not made, and by attaching this site plan will not be deemed to have made, any representations or warranties regarding the Shopping Center, layout of the Shopping Center, the tenants or tenant-mix for the Shopping Center or otherwise.



30 S. Meridian Street, Suite 1100
Indianapolis, IN 46204
317-577-5600
FAX 317-577-5605
kiterealty.com

<u>**Via Email**</u>                                                                                                     

## LEASE MODIFICATION

Re:    Lease Agreement (as may be amended, the "<u>Lease</u>"), between KRG EVANS MULLINS OUTLOTS, LLC ("<u>Landlord</u>") and **RUBY TUESDAY, INC.** ("<u>Tenant</u>") for retail space in Mullins Crossing shopping center, Evans, Georgia

Dear Madams and Sirs:

This letter hereby modifies certain provisions of the Lease as a result of the impact of the COVID-19 pandemic as set forth below:

- Base/minimum rent and any CAM, real estate tax, insurance or other pass-through amounts (herein "<u>NNNs</u>") for the months of April 2020 and May 2020, together with any sales or use tax payable thereon, if any, shall be paid as follows:
  - ○ Tenant shall pay twenty-five percent (25%) of base/minimum rent for each of April 2020 and May 2020, together with all NNNs for each of April 2020 and May 2020, on or before July 17, 2020.
  - ○ Tenant shall pay to Landlord the balance of base/minimum rent for April 2020 and May 2020 in six equal consecutive monthly installments (without interest) on the first day of each month commencing October 1, 2020.
- Tenant hereby waives all defenses to the payment of rent based on force majeure, impossibility, impracticability, frustration of purpose, and similar defenses to the extent based on the COVID-19 pandemic and associated government restrictions through January 1, 2021.
- Within fifteen days after the end of each calendar year during the term of the Lease, Tenant shall deliver to Landlord an accurate and complete report of its gross sales or revenues achieved at the Premises for the immediately preceding calendar year, which report shall separately state such revenues for each calendar month during the reporting period, together with a copy of any sales tax return or similar report submitted to the jurisdiction in which the Premises are located for each month during the reporting period.

Except as otherwise modified or amended herein, all other terms and conditions of the Lease shall remain unmodified, unamended, and in full force and effect and the Lease shall continue to be and remain in full force and effect.  The individuals signing this letter on behalf of Tenant and



Landlord, respectively, represent and warrant that he or she has the full power and authority to do so.  The exchange of copies of this letter by electronic mail or by any other electronic means intended to preserve the original graphic and pictorial appearance of a document shall constitute effective execution and delivery of this letter.

Sincerely,

**Landlord**

Name: gregg poetz

Title: Senior Vice President of Leasing

Date: 7/9/2020

AGREED AND ACCEPTED:

**Tenant**

Stephanie Medley (Jul 8, 2020 15:41 EDT)

Name: Stephanie Burke Medley

Title: Chief Strategy Officer

Date: July 8, 2020

# 5005 Evans - Ruby Tuesday - Letter Agreement

**Final Audit Report**                                    2020-07-08

| | |
|---|---|
| Created: | 2020-07-08 |
| By: | Frankie Prince (fprince@rubytuesday.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAAiMA7sJIB-JRvvvLP70pZxBszbXJm4rTW |

## "5005 Evans - Ruby Tuesday - Letter Agreement" History

📄 Document created by Frankie Prince (fprince@rubytuesday.com)
2020-07-08 - 6:58:38 PM GMT- IP address: 75.139.0.62

📧 Document emailed to Brian Esser (besser@rubytuesday.com) for approval
2020-07-08 - 6:59:12 PM GMT

📄 Email viewed by Brian Esser (besser@rubytuesday.com)
2020-07-08 - 7:08:43 PM GMT- IP address: 107.77.198.43

✓ Document approved by Brian Esser (besser@rubytuesday.com)
Approval Date: 2020-07-08 - 7:09:03 PM GMT - Time Source: server- IP address: 107.77.198.43

📧 Document emailed to Stephanie Medley (smedley@rubytuesday.com) for signature
2020-07-08 - 7:09:05 PM GMT

📄 Email viewed by Stephanie Medley (smedley@rubytuesday.com)
2020-07-08 - 7:34:28 PM GMT- IP address: 104.47.58.254

✓ Document e-signed by Stephanie Medley (smedley@rubytuesday.com)
Signature Date: 2020-07-08 - 7:41:30 PM GMT - Time Source: server- IP address: 104.49.244.163

✓ Signed document emailed to Frankie Prince (fprince@rubytuesday.com), Brian Esser
(besser@rubytuesday.com), Stephanie Medley (smedley@rubytuesday.com), and jcates@rubytuesday.com
2020-07-08 - 7:41:30 PM GMT