**IN THE UNITED STATES BANKRUPTCY COURT**

**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| RTI HOLDING COMPANY, LLC,[1] | ) | Case No.: 20-12456 (JTD) |
| | ) | |
| Debtor. | ) | (Jointly Administered) |

**DECLARATION OF SHAWN LEDERMAN,
CHIEF EXECUTIVE OFFICER OF THE DEBTORS, IN SUPPORT OF
CONFIRMATION OF DEBTORS' SECOND AMENDED CHAPTER 11 PLAN**

I, Shawn Lederman, declare under penalty of perjury:

1. I am the Chief Executive Officer of the above-captioned debtors and debtors in possession (collectively, the "Debtors") and have been a member of the Board of Directors of Ruby Tuesday, Inc. ("RTI"), since December 2017. I am generally familiar with the current day-to-day operations, business, and financial affairs of the Debtors, as well as their books and records. I submit this declaration (the "Declaration") in support of the *Debtors' Second Amended Chapter 11 Plan*, filed February 10, 2021 (along with its Plan Supplement

---

[1] The Debtors in these chapter 11 cases and the last four digits of each Debtor's U.S. tax identification number are as follows: RTI Holding Company, LLC (4966); Ruby Tuesday, Inc. (5239); Ruby Tuesday, LLC (1391); RTBD, LLC (6505); RT of Carroll County, LLC (8836); RT Denver Franchise, L.P. (2621); RT Detroit Franchise, LLC (8738); RT Distributing, LLC (6096); RT Finance, LLC (7242); RT FL Gift Cards, Inc. (2189); RT Florida Equity, LLC (7159); RT Franchise Acquisition, LLC (1438); RT of Fruitland, Inc. (1103); RT Indianapolis Franchise, LLC (6016); RT Jonesboro Club (2726); RT KCMO Franchise, LLC (7020); RT Kentucky Restaurant Holdings, LLC (7435); RT Las Vegas Franchise, LLC (4969); RT Long Island Franchise, LLC (4072); RT of Maryland, LLC (7395); RT Michiana Franchise, LLC (8739); RT Michigan Franchise, LLC (8760); RT Minneapolis Franchise, LLC (2746); RT Minneapolis Holdings, LLC (7189); RT New England Franchise, LLC (4970); RT New Hampshire Restaurant Holdings, LLC (7438); RT New York Franchise, LLC (1154); RT Omaha Franchise, LLC (7442); RT Omaha Holdings, LLC (8647); RT One Percent Holdings, LLC (6689); RT One Percent Holdings II, LLC (2817); RT Orlando Franchise, LP (5105); RT Restaurant Services, LLC (7283); RT South Florida Franchise, LP (3535); RT Southwest Franchise, LLC (9715); RT St. Louis Franchise, LLC (6010); RT Tampa Franchise, LP (5290); RT Western Missouri Franchise, LLC (6082); RT West Palm Beach Franchise, LP (0359); RTTA, LP (0035); RTT Texas, Inc. (2461); RTTT, LLC (9194); Ruby Tuesday of Allegany County, Inc. (8011); Ruby Tuesday of Bryant, Inc. (6703); Ruby Tuesday of Columbia, Inc. (4091); Ruby Tuesday of Frederick, Inc. (4249); Ruby Tuesday of Linthicum, Inc. (8716); Ruby Tuesday of Marley Station, Inc. (1641); Ruby Tuesday of Pocomoke City, Inc. (0472); Ruby Tuesday of Russellville, Inc. (1601); and Ruby Tuesday of Salisbury, Inc. (5432). The Debtors' mailing address is 333 East Broadway Ave., Maryville, TN 37804.

[Docket No. 920] and any amendments thereto, the "Plan"). I have also been directly involved in the negotiation of the Plan, and more generally in the Debtors' restructuring process, including financial planning and forecasting.

2. Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge of, among other things, the Debtors, their business records, learned from my review of relevant documents, and information I have received from other members of the Debtors' management or the Debtors' advisors. If I were called upon to testify, I could and would testify competently to the facts set forth herein on that basis. I am authorized to submit this declaration on behalf of the Debtors. Capitalized terms not defined herein have the meanings ascribed to such terms in the Plan.

3. On October 7, 2020 (the "Petition Date"), the Debtors commenced these cases (the "Chapter 11 Cases") by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"). The Debtors have continued in the possession of their property and have continued to operate and manage their business as debtors in possession.

4. The Debtors develop, operate, and franchise casual dining restaurants in the United States, Guam, and five foreign countries under the Ruby Tuesday® brand. The company-owned and operated restaurants (i.e., non-franchise) are concentrated primarily in the Southeast, Northeast, Mid-Atlantic and Midwest regions of the United States. As of the Petition Date, the Debtors operated 236 in 25 states.

5. On November 6, 2020, the Debtors filed their proposed *Debtors' Chapter 11 Plan*. Subsequently, on December 21, 2020, the Debtors filed their *Debtors' Amended*

*Chapter 11 Plan* to address, among other things, certain of the objections received to approval of the Disclosure Statement. Also, on February 9, 2021, the Debtors filed their proposed *Debtor's Second Amended Chapter 11 Plan* to address, among other things, certain of the formal and informal objections and responses received to confirmation of the Plan.

6. The Plan reflects an agreement reached among the Debtors and Prepetition Secured Creditors in their prepetition Restructuring Support Agreement ("RSA")[2] to follow a dual path whereby the Debtors would either emerge from these chapter 11 proceedings under new ownership by the Prepetition Secured Creditors (the "Restructuring'") or sell their assets as a going concern (the "Sale").

7. On February 9, 2021, the Debtors, the Prepetition Agent, Prepetition Secured Creditors, the DIP Lenders, the Creditors' Committee, and the Equity Parent entered into the Plan Settlement Term Sheet, which memorializes a global settlement ("Global Settlement") among such parties. Under such Global Settlement, the Holders of Allowed Class 4 General Unsecured Claims shall receive their Pro Rata distributions of (a) $5,000,000, consisting of (i) payment of $3,000,000 (consisting of an initial $2,000,000 payable within 60 days of the Effective Date, unless extended, plus a Deferred Cash Payment payable by March 31, 2022, unless extended, of $1,000,000, reduced by any Excess Cash Payments received), and (ii) a Note in the principal amount of $2,000,000 reduced by any Excess Cash Payments received; and (b) 33% of the proceeds from the Interchange Claim, which is a claim in a class action lawsuit captioned as *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation*.

---

[2] A true and correct copy of the RSA is annexed to the Disclosure Statement as its Exhibit B [Docket No. 762-2 PDF 1-49].

3

Also, the Plan releases shall include the Creditors' Committee and NRD as Releasing Parties and Released Parties.

8.  No Topping Bids were received prior to the January 14, 2021 at 5:00 p.m. (Prevailing Eastern Time) Bid Deadline established by the Bid Procedures Order, and, therefore, the Debtors are proceeding with the Restructuring, not the Sale. The Debtors will also implement the Global Settlement, as set forth in the Plan.

9.  I believe that the financial restructuring, the operational restructuring and the other transactions reflected in the Plan will position the Reorganized Debtors, RT Asset Company and RT Lodge Company well to succeed post-emergence from bankruptcy. I further believe that with a sustainable business plan and adequate operating liquidity, the Reorganized Debtors will be positioned to compete more effectively in the challenging casual dining industry. A successful reorganization of these estates will also preserve the Reorganized Debtors, RT Asset Company and RT Lodge Company as employers, tenants and customers of their vendors.

10. Based on my experience with the Debtors, I believe that, prior to the Petition Date, creditors of the Debtors treated them as one legal entity and that disentangling the affairs of the Debtors would be difficult and burdensome. I believe that the following facts support such conclusion.

11. For over a decade, the Debtors have utilized a centralized cash management system to collect funds from their operations and pay operating and administrative expenses consolidated from main and secondary concentration accounts maintained by RTI. For example, RTI maintains twelve depository accounts for the collection of cash from operations at all the Debtors' locations. With the exception of a single controlled disbursement account

relating to gift cards, substantially all of the Debtors' accounts payable and payroll obligations are processed through accounts maintained by RTI.

12. The Debtors also historically have prepared and disseminated consolidated financial reports to the public, including to lenders, and stockholders. For example, prior to the prepetition Merger, all SEC reporting that was made available to the public was consolidated. After the Merger, the Debtors' regular financial reporting to their Prepetition Secured Creditors has been on a consolidated basis. Because the Debtors disseminated financial information to the public on a consolidated basis, I am informed and believe that it is highly unlikely that creditors relied on the separate identity of any Debtor in extending credit to such Debtor.

13. As a further indication of the Debtors' entanglement, RTI and its subsidiary Debtors share overhead, management, accounting, and other related functions. Moreover, RTI owns, directly or indirectly, all or a majority of the stock or membership interests in each of the other Debtors (other than Holding) and the Debtors share common officers. Also, the enterprise is guided by a single source of governance – the Board of Directors of RTI. Additionally, all of the Debtors are borrowers of a single indebtedness owed under the Prepetition Credit Facility. Therefore, I believe that the circumstances described above evince a disregard for separateness among the numerous Debtors.

14. The Plan provides for the Debtors' release of the Released Parties, except for the Released Parties' actual fraud, gross negligence, bad faith or willful misconduct (the "<u>Mutual Release</u>"). It also provides for releases by Releasing Parties of the Released Parties, except for actual fraud, gross negligence, bad faith or willful misconduct (the "<u>Claim Holders'</u>

Release"). It additionally provides for exculpation ("Exculpation") of the Exculpated Parties, except for fraud, gross negligence, bad faith or willful misconduct. Collectively, I refer to the Mutual Release, the Claim Holders' Release and the Exculpation as the "Releases and Exculpation."

15. I believe that the Releases and Exculpation represents a valid exercise of the Debtors' business judgment. The pursuit of any such claims against the Released Parties is not in the best interests of the Estates' various constituencies and is fair and equitable. The Plan, including the Releases and Exculpation, was negotiated by sophisticated parties represented by able counsel and financial advisors. The Releases and Exculpation are therefore the result of an arms'-length negotiation and appropriately offers protection to parties that participated in the Debtors' restructuring process.

16. I believe that an identity of interest exists between the Debtors and a majority of the parties to be released as Released Parties. The Released Parties all are critical stakeholders and participants in the Plan process, all share a common goal with the Debtors in seeing the Plan succeed. There is also an identity of interests between the Debtors, Prepetition Secured Creditors and the Equity Parent and their respective Related Persons based on their common goal of confirming the Plan and implementing the compromise and settlement set forth in the RSA and Global Settlement, which are embodied in the Plan.

17. The Mutual Release is predicated on substantial contributions by the parties benefitting from those releases other than the Debtors. In the first instance, the Released Parties include parties that have provided direct benefits to these Chapter 11 Cases through diligently discharging their duties and contributing to the overall success of these Chapter 11

Cases, including by the Prepetition Secured Creditors consent to the Debtors' use of their cash collateral to pay administrative expenses, their agreement to provide the DIP Facility and Exit Facility, as well as their provisions of a meaningful recovery for Class 4 General Unsecured Creditors.  The projected recovery under the Plan for impaired Class 4 (General Unsecured Claims) derives from the RSA and the Global Settlement.  When measured against the uncertain, speculative and unknown value of the released claims or causes at issue, I am informed and believe that such agreements constitute "substantial consideration" supporting the Mutual Release here.

18. The Mutual Release is essential to the Plan itself.  Without the Mutual Release, I believe that the manifest benefits arising under the Plan, including a recovery for Holders of General Unsecured Claims, would not be possible. The settlement embodied in the Plan, including, specifically, the releases therein, was negotiated with the intention that they would comprise a consensual settlement of all issues.  In light of the looming RSA Milestone deadlines, to unwind that progress now would result in delay and substantial costs that could eliminate the ability to provide meaningful recoveries to most of the Debtors' creditors. Therefore, I believe that this factor therefore supports approval of the Mutual Release.

19. Considering the beneficial treatment of Class 4 General Unsecured Claims under the Plan, the Plan provides a substantial recovery to such Class, which is materially greater than the zero recovery expected after a potential conversion of these Chapter 11 Cases to chapter 7.

20. I also believe that the Claim Holders' Release is an essential provision of the Plan and is (a) consensual; (b) in exchange for the good and valuable consideration provided

7

by the Released Parties; (c) a good-faith settlement and compromise of the claims and Causes of Action released by the Claim Holders' Release; (d) mutually beneficial to, and in the best interests of, the Debtors, their Estates, and their stakeholders, and is important to the overall objectives of the Plan to finally resolve certain Claims among or against certain parties in interest in the Chapter 11 Cases; and (e) fair, equitable and reasonable.  The Claim Holders' Release is consensual as the Releasing Parties were given the opportunity to opt out of the Claim Holders' Release on their Ballots (for Class 4 Claim Holders) or by objecting to confirmation of the Plan and opting out in their objection.

21. I believe that the Global Settlement represents a fair and equitable resolution that enhances the return to Class 4 General Unsecured Creditors, eliminates the risk of potential litigation and removes uncertainty regarding certain business opportunities that may be pursued by the Reorganized Debtors.  First, the probability of success in potential litigation by the Creditors' Committee against the Prepetition Secured Creditors or Equity Parent is, at best, uncertain.  Further, there may be delay and difficulty in enforcing any award.  The commencement of litigation by itself would eliminate the commitments in the RSA and delay the Debtors' efforts in emerging from these Chapter 11 Cases. Moreover, in the absence of the Global Settlement, the Debtors' estates (and other parties) would be required to incur significant expense, inconvenience, and delay that would hinder and reduce creditor recoveries.  The Global Settlement is the product of extensive arms'-length, good faith negotiations among multiple stakeholders in the Debtors' bankruptcy cases, and I believe it represents a fair and reasonable compromise of the Claims, Interests and controversies that it resolves.  I believe that entering

into the Global Settlement represents a sound exercise of the Debtors' business judgment and is in the best interests of the Debtors' estates.

22. I am not aware of any regulatory commission that has or will have jurisdiction over the Debtors with respect to any "rate change" provided for in the Plan.

23. The Debtors' management and advisors have analyzed the ability of the Reorganized Debtors, RT Asset Company and RT Lodge Company to meet their obligations under the Plan and to retain sufficient liquidity and capital resources to conduct their business. In connection with the development of the Plan and for the purposes of determining whether the Plan satisfies this feasibility standard, the Debtors analyzed their ability to satisfy their financial obligations while maintaining sufficient liquidity and capital resources. The Debtors developed a business plan and prepared financial projections for fiscal years 2021 through 2026 (the "<u>Financial Projections</u>"). The Financial Projections, together with the assumptions upon which they are based, are attached to the Disclosure Statement as Exhibit E and updated as Exhibit "A" to the Declaration of Richard F. NeJame, filed concurrently with this Declaration. In general, as illustrated by the assumptions of the Financial Projections, with the deleveraged capital structure provided under the Plan and the added funding available under the Exit Facility, I am informed and believe that the Reorganized Debtors will have sufficient cash flow and cash on hand to make all payments required pursuant to the Plan while conducting ongoing business operations. I believe that confirmation of the Plan is, therefore, not likely to be followed soon by the liquidation or further reorganization of the Reorganized Debtors.

24. The principal purpose of the Plan is not avoidance of taxes or avoidance of the requirements of section 5 of the Securities Act of 1933. Instead, as reflected in the

9

Disclosure Statement, the Plan, as amended, reflects the RSA, which is an agreement between the Debtors and Prepetition Secured Creditors to reorganize the Debtors as a going-concern business (as there is no Topping Bid) and outlines a consensual transaction that I believe will permit the Debtors to emerge from chapter 11 as a stronger, well-capitalized enterprise.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: February 9, 2021

*/s/ Shawn Lederman*
Shawn Lederman
Chief Executive Officer