## IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| RTI HOLDING COMPANY, LLC,[1] | ) | Case No.: 20-12456 (JTD) |
| | ) | |
| Debtor. | ) | (Jointly Administered) |

## DECLARATION OF SUGI HADIWIJAYA,
## PARTNER OF CR3 PARTNERS LLC, IN SUPPORT OF
## CONFIRMATION OF DEBTORS' SECOND AMENDED CHAPTER 11 PLAN

I, Sugi Hadiwijaya, declare under penalty of perjury:

1.     I am a partner of CR3 Partners LLC ("CR3"), which has its principal

office at 13355 Noel Road, Suite 2005, Dallas, Texas 75240.  CR3 has been retained as the

Debtors' financial advisor in these Chapter 11 Cases.  I have personally led this engagement for

the firm.

---

[1] The Debtors in these chapter 11 cases and the last four digits of each Debtor's U.S. tax identification number are as follows: RTI Holding Company, LLC (4966); Ruby Tuesday, Inc. (5239); Ruby Tuesday, LLC (1391); RTBD, LLC (6505); RT of Carroll County, LLC (8836); RT Denver Franchise, L.P. (2621); RT Detroit Franchise, LLC (8738); RT Distributing, LLC (6096); RT Finance, LLC (7242); RT FL Gift Cards, Inc. (2189); RT Florida Equity, LLC (7159); RT Franchise Acquisition, LLC (1438); RT of Fruitland, Inc. (1103); RT Indianapolis Franchise, LLC (6016); RT Jonesboro Club (2726); RT KCMO Franchise, LLC (7020); RT Kentucky Restaurant Holdings, LLC (7435); RT Las Vegas Franchise, LLC (4969); RT Long Island Franchise, LLC (4072); RT of Maryland, LLC (7395); RT Michiana Franchise, LLC (8739); RT Michigan Franchise, LLC (8760); RT Minneapolis Franchise, LLC (2746); RT Minneapolis Holdings, LLC (7189); RT New England Franchise, LLC (4970); RT New Hampshire Restaurant Holdings, LLC (7438);  RT New York Franchise, LLC (1154); RT Omaha Franchise, LLC (7442); RT Omaha Holdings, LLC (8647); RT One Percent Holdings, LLC (6689); RT One Percent Holdings II, LLC (2817); RT Orlando Franchise, LP (5105); RT Restaurant Services, LLC (7283); RT South Florida Franchise, LP (3535); RT Southwest Franchise, LLC (9715); RT St. Louis Franchise, LLC (6010); RT Tampa Franchise, LP (5290); RT Western Missouri Franchise, LLC (6082); RT West Palm Beach Franchise, LP (0359); RTTA, LP (0035); RTT Texas, Inc. (2461); RTTT, LLC (9194); Ruby Tuesday of Allegany County, Inc. (8011); Ruby Tuesday of Bryant, Inc. (6703); Ruby Tuesday of Columbia, Inc. (4091); Ruby Tuesday of Frederick, Inc. (4249); Ruby Tuesday of Linthicum, Inc. (8716); Ruby Tuesday of Marley Station, Inc. (1641); Ruby Tuesday of Pocomoke City, Inc. (0472); Ruby Tuesday of Russellville, Inc. (1601); and  Ruby Tuesday of Salisbury, Inc. (5432). The Debtors' mailing address is 333 East Broadway Ave., Maryville, TN 37804.

2.      I am authorized to execute this declaration on behalf of CR3.  Unless otherwise stated in this declaration, I have personal knowledge of the facts set forth herein. This declaration is submitted in support of the *Debtors' Second Amended Chapter 11 Plan*, filed February 10, 2021 (along with its Plan Supplement [Docket No. 920] and any amendments thereto, the "Plan").[2]

3.      I have approximately 20 years of combined experience in financial services and turnaround management, assisting companies with tasks such as cash management, securing of financing, business plan assessment, M&A activities, and financial modeling in multiple industries.  I hold a B.B.A. degree from the University of Texas at Austin, am a Chartered Financial Analyst ("CFA") charter holder and holds certifications as a Certified Insolvency Restructuring Advisor and Certified Distressed Business Valuation.

4.      During the term of CR3's prepetition engagement (which began on August 11, 2020), our work focused primarily on cash forecasting and management, debtor in possession financing and bankruptcy preparation matters such as first day motion and creditor matrix among others.  Since the Petition Date, CR3 has provided services to the Debtors relating to financial analysis; business plan and projection preparation, including four-wall analysis, unit economics, overhead and capital expenditures, lease evaluation in connection with business planning, assisting in preparation of the Plan and related documents, liquidity and cash management (such as cash flow preparation, budget vs. actual variance analysis and debtor in possession financing matters), and consulting on bankruptcy preparation and administration, including assisting in preparation of motions, Schedules and Statements of Financial Affairs,

---

[2] Unless otherwise defined herein, terms shall have the meaning ascribed to them in the Plan.

Monthly Operating Reports, and acting as liaison between counsel and management; among other tasks.

5.      In providing these and other professional services to the Debtors, CR3 has acquired knowledge of the Debtors and their businesses and is familiar with the Debtors' financial affairs, debt structure, business operations, key stakeholders, financing documents and other related material information.  In providing prepetition services to the Debtors, CR3 has worked closely with the Debtors' senior management and their other advisors and has familiarity with the other major stakeholders that will be involved in these chapter 11 cases.

6.      As part of such service, CR3 assisted the Debtors with their preparation of their liquidation analysis (the "Liquidation Analysis") annexed to their Disclosure Statement as its Exhibit D [Docket No. 762-4].  In addition, CR3 assisted the Debtors with their substantive consolidation analysis (the "Substantive Consolidation Analysis").

7.      The Liquidation Analysis is prepared for the purpose of evaluating whether the Plan satisfies the best interests of creditors test under section 1129(a)(7) of the Bankruptcy Code.

8.      The Liquidation Analysis represents an estimate of recovery values and percentages based upon a hypothetical liquidation of the Debtors if a chapter 7 trustee (the "Trustee") were appointed by the Bankruptcy Court to monetize the assets of the bankruptcy estates.  Determining the hypothetical proceeds from a liquidation of assets is a highly uncertain process involving the extensive use of estimates and assumptions that, although considered reasonable by management and their advisors, are inherently subject to significant business,

economic and competitive uncertainties and contingencies beyond control of the Debtors and management.

9.      The Liquidation Analysis also relies, in part, on the Debtors' estimated amount of allowed claims for each class of claimants based upon a review of the Debtors' financial statements and the Debtors' books and records.  CR3's estimate of all allowed claims in the Liquidation Analysis is based on the par value of those claims.  This estimate should not be relied upon for any purpose beyond the Liquidation Analysis, including, without limitation, to determine the allowance of any claim under the Plan or the value of any allowed claim.  The actual amount of allowed claims could be, and likely will be, materially different from the amount of claims estimated in the Liquidation Analysis.

10.     The Liquidation Analysis assumes that the Debtors' business liquidation would be conducted in a chapter 7 environment with the Trustee managing the bankruptcy estates to maximize recovery and is further based on the other key assumptions set forth in the Liquidation Analysis that I believe are reasonable under the circumstances.

11.     In the event of liquidation, the aggregate amount of General Unsecured Claims will likely increase significantly.  For example, employees likely will file claims for wages and other benefits, some of which will be entitled to priority.  Landlords likely would file large claims for both unsecured and priority amounts, which could include lease rejection damages.  Additional claims for rejection damages resulting from the rejection of executory contracts may arise.  The resulting increase in both general unsecured and priority claims could significantly dilute the unsecured claims pool included in this Liquidation Analysis.

4

12.    Based on the assumptions and additional information set forth in the Liquidation Analysis, I believe that:  (a) a chapter 7 liquidation of the Debtors would result in substantial diminution in value to be realized by holders Claims and Interests in these chapter 11 cases; (b) the Impaired Class 3 Prepetition Secured Debt Claims are estimated to recover a materially higher value range under the Plan than they would under a hypothetical chapter 7 liquidation; and (c) the Impaired Class 4 General Unsecured Claims are estimated to receive a recovery under the Plan as compared to no recovery under a hypothetical chapter 7 liquidation.

13.    Based on the Liquidation Analysis, I believe that confirmation of the Plan will provide each holder of a Claim or Interest in an impaired class of creditors who does not accept the Plan with property of a value, as of the effective date of the Plan, that is not less than the amount that such holder would so receive or retain in a hypothetical chapter 7 liquidation.

14.    With respect to the Substantive Consolidation of the Debtors' assets and liabilities for Plan distribution purposes, I believe that, prior to the Petition Date, creditors of the Debtors treated them as a single legal entity and that disentangling the affairs of the Debtors would likely be so burdensome as to be prohibitive and likely would adversely affect creditors.  I believe that the following facts support such conclusion, which I and my colleagues at CR3 have garnered over the course of our representation of the Debtors as their financial advisors.

15.    For over a decade, the Debtors have utilized a centralized cash management system to collect funds from their operations and pay operating and administrative expenses consolidated from main and secondary concentration accounts maintained by RTI.  For example, RTI maintains twelve depository accounts for the collection of cash from operations at all the Debtors' locations.  With the exception of a single controlled disbursement account

DOCS_LA:335573.6 76136/002

relating to gift cards, substantially all of the Debtors' accounts payable and payroll obligations are processed through accounts maintained by RTI.

16.     The Debtors also historically have prepared and disseminated consolidated financial reports to the public, including to lenders, and stockholders.  For example, prior to the prepetition Merger, all SEC reporting that was made available to the public was consolidated.  After the Merger, the Debtors' regular financial reporting to their Prepetition Secured Creditors has been on a consolidated basis.  Because the Debtors disseminated financial information to the public on a consolidated basis, I am informed and believe that it is highly unlikely that creditors relied on the separate identity of any Debtor in extending credit to such Debtor.

17.     I believe that such belief is borne out by the fact that an overwhelming number of Proofs of Claim filed against the Debtors were filed against RTI, not any subsidiary Debtor.  Also, such belief is supported by the fact that the scheduled value of over 90% of the Debtors' property, in the aggregate amount ($130.84 million of $144.80 million), is concentrated in RTI.

18.     As a further indication of the Debtors' entanglement, RTI and its subsidiary Debtors share overhead, management, accounting, and other related functions. Moreover, RTI owns, directly or indirectly, all or a majority of the stock or membership interests in each of the other Debtors (other than Holding) and the Debtors share common officers.  Also, the enterprise is guided by a single source of governance – the Board of Directors of RTI. Additionally, all of the Debtors are borrowers of a single indebtedness owed under the

6

Prepetition Credit Facility.  Therefore, I believe that these circumstances evince a disregard for separateness among the numerous Debtors.

19.    Also, I believe it would be extremely difficult to "unscramble" the Debtors' assets and liabilities.  The DIP Facility and Prepetition Credit Facility are imposed on numerous credit parties, including all the Debtors, and it would be difficult to allocate the indebtedness amount among each of the Debtors.

20.    I believe that substantive consolidation of their Estates is appropriate under applicable law as I understand it and in the best interests of all unsecured creditors, considering the facts in light of the applicable legal standards.  Accordingly, for the reasons set forth above, I believe that substantive consolidation of the Debtors' Estates proposed under the Plan is in the best interests of the Debtors, their estates and their creditors, is necessary to effectuate the terms of the Plan, and is fair and equitable under the circumstances.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated:   February 10, 2021                    */s/ Sugi Hadiwijaya*
                                              Sugi Hadiwijaya

DOCS_LA:335573.6 76136/002