# EXHIBIT 13

# U.S. BANKRUPTCY COURT APPROVED
# MASTER INTERIM SERVICES AGREEMENT

## BETWEEN

## RUBY TUESDAY OPERATIONS, LLC

## ("OWNER")

## AND

## RUBY TUESDAY, INC.

## ("PROVIDER")

Pursuant to that certain *Findings of Fact, Conclusions of Law, and Order Confirming the Debtors' Second Amended Chapter 11 Plan* (the "Confirmation Order") [Docket No. [●]], dated [●], 2021 and entered by the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") in Case No. 20-12456 (JTD), this Master Interim Services Agreement (this "Agreement"), dated as of  [●], 2021, is entered into by and among Owner, on behalf of itself and its affiliates, and Provider, effective as of the Effective Date (as defined in the Plan).[1]

**WHEREAS**, pursuant to the Plan, all of Provider's operating assets other than the RT Lodge and interests in its subsidiaries (other than RTI) shall be transferred to Owner, including Assets (other than the RT Lodge) at substantially all of the Debtors' open and operating restaurants, which restaurants are listed on Schedule 1.1 of this Agreement (each, a "Retained Location" and collectively, the "Retained Locations"), and any Liquor Licenses (as hereinafter defined) for restaurants that are no longer open and operating and that have value, which are listed on Schedule 1.2 of this Agreement (each, a "Closed Location" and collectively, the "Closed Locations") (such Liquor Licenses for Closed Locations being collectively referred to herein as "Marketed Licenses").

**WHEREAS**, each Retained Location is a casual-dining restaurant, which includes the (i) on premise sale and consumption of alcohol, including beer, wine and spirits, where applicable, under the respective local, state and federal liquor licenses held or used by Provider and listed on Schedule 1.3 of this Agreement (each a "Liquor License" and collectively the "Liquor Licenses") and/or (ii) sale of food under the respective Permits in the name of Provider, also listed on Schedule 1.3 (each a "Permit" and collectively the "Permits").

**WHEREAS**, (i) Owner and Provider desire the operation of each of the Retained Locations to continue without interruption until Owner, with respect to each Retained Location, obtains from the relevant state and/or local government regulatory authorities the Liquor Licenses and Permits, as applicable, at such Retained Locations in its name, either through transfer or new application, and (ii) Owner, Provider and other interested parties desire to

---

[1] Capitalized terms used but not defined herein shall have the meanings set forth in the *Debtors' Second Amended Chapter 11 Plan* (the "Plan") [Docket No. [●]].

transfer the Marketed Licenses to third parties as soon as practical, doing so in compliance with applicable state and local liquor laws.

NOW, THEREFORE, for and in consideration of the mutual covenants and other good and valuable consideration as provided herein and in the Plan, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.    The "Term" shall commence on the Effective Date and shall terminate, (i) for each Retained Location, upon the earliest to occur of (a) Owner's receipt via transfer from the Provider or through initial application for license issuance from all applicable Governmental Units of each Liquor License and Permit for said Retained Location, (b) five (5) Business Days after the date that Provider receives written notice of termination from Owner, (c) December 31, 2021 (unless this Agreement is otherwise terminated prior to the earliest of such dates pursuant to the terms hereof or by mutual agreement of the parties) or (d) such later date as may be agreed by the parties, and (ii) for the Closed Locations, upon the earliest to occur of (a) the date that the last remaining Marketed License is transferred to Owner or sold to a third party and the proceeds for all sales of Marketed Licenses are received and distributed to Owner, (b) five (5) Business Days after the date that Provider receives written notice of termination from Owner, (c) December 31, 2021 (unless this Agreement is otherwise terminated prior to the earliest of such dates pursuant to the terms hereof or by mutual agreement of the parties) or (d) such later date as may be agreed by the parties.

2    (a)    During the Term, Provider shall remain the licensed retail vendor of alcohol and/or retail food for the Retained Locations, as applicable, and in such capacity shall manage, control, and operate, pursuant to and subject to the Plan, the Retained Locations to the extent required for each Liquor License and/or Permit, as applicable, to remain effective. Provider hereby appoints Owner as its agent to manage and operate the Retained Locations to the extent permitted by applicable law. Pursuant to its appointment as Provider's agent and subject to the following sentence, on Provider's behalf, Owner shall collect, and be entitled to retain all revenues generated by the Retained Locations during the Term (the "Revenues"), unless not permitted to do so, and shall distribute the Revenues consistent with this Agreement, and shall reimburse Provider, as its fee under this Agreement, (i) any reasonable and documented costs, fees, and expenses and all other liabilities or expenses incurred by Provider in the performance of its obligations under this Agreement or incurred as a result of the operation of the Retained Locations and (ii) the insurance obligations of Provider set forth in Section 5 below (individually, a "Liability" and collectively, the "Liabilities") arising out of, related to, or associated with the Retained Locations during the Term.  Notwithstanding anything contained herein to the contrary, all employees of the Retained Locations shall be employed by the Owner, and Provider shall have no duty or authority to take action as an employer with respect to any such employee or to enter into any contract on behalf of the Owner, without the Owner's prior written consent. In the event that state law requires Provider to collect the Revenues, it shall do so and distribute the receipts consistent with the intent stated in this paragraph.

[(b)    In addition to and in no way limiting the foregoing, during the Term, and solely to the extent required by applicable law, Provider hereby appoints Owner as its agent to manage, control, operate, use and access the depositary bank accounts and merchant services bank accounts designated for liquor revenues (collectively, the "Bank Accounts") for the benefit

2

of Owner in connection with the operation of the Retained Locations. Provider agrees that it shall not have the right to manage, control, operate, use, or access the Bank Accounts and that all proceeds therein are and shall remain the sole and exclusive property of Owner.][2]

      3.     For valuable consideration received, and in order to induce Provider to enter into this Agreement, Owner and Provider covenant and agree as follows, which covenants and agreements shall survive the termination of this Agreement:

      (a)     Provider shall have no duties or responsibilities under this Agreement other than those specified herein and no implied obligations (other than to act in good faith) shall be read into this Agreement;

      (b)     Neither Provider, nor any of its Affiliates, employees, officers, directors, members, representatives, agents, attorneys, direct or indirect equity holders, successors, predecessors or assigns (collectively, the "Provider Released and Indemnified Parties"), will be liable to Owner for, and Owner releases and forever discharges the Provider Released and Indemnified Parties from, any and all claims, liabilities, actions, suits, judgments, losses, injuries, damages, costs or expenses arising out of or connected with any act or omission of any of the Provider Released and Indemnified Parties pursuant to this Agreement or with respect to the performance of Provider's obligations under this Agreement, except for claims to the extent arising primarily out of such Person's gross negligence, fraud, or willful misconduct as finally determined by a court of competent jurisdiction;

      (c)     Other than for such amounts arising primarily out of the gross negligence, fraud or willful misconduct of the Provider Released and Indemnified Parties as finally determined by a court of competent jurisdiction, Owner agrees to indemnify, defend and hold harmless and discharges the Provider Released and Indemnified Parties from and against any and all claims, actions, demands, judgments, losses, costs, expenses, damages and liabilities (including attorneys' fees and other expenses of litigation) arising out of or resulting from such Provider Released and Indemnified Parties' performance of Provider's obligations under this Agreement and/or the operation of the Retained Locations;

      (d)     During the Term, except as provided below and herein, all purchases and services rendered with respect to the operation of the Retained Locations shall be in the name of the Owner, including, without limitation, all utility service and all accounts for the purchase of inventory, to the extent permissible by applicable laws. The foregoing notwithstanding, purchases of alcohol inventory and liquor liability insurance for the Retained Locations shall be made by Owner on behalf of and in the name of Provider as provided below, such purchases to be paid from the Revenues as set forth herein;

      (e)     Nothing in this Agreement or the Plan shall be deemed to be a transfer of any Liquor Licenses or Permits unless and until such transfer is duly approved by all applicable Governmental Units having applicable licensing authority, and each Liquor

---

[2] To be revised as necessary to comply with applicable state law.

License and Permit is issued in the name of Owner or its designee.  Notwithstanding the foregoing, Owner agrees to: (i) pay for all applicable annual license fees and/or license renewal fees due to the licensing authorities as of and after the Effective Date in connection with the maintenance of each Liquor License and Permit; and (ii) provide all funds reasonably necessary to maintain each Liquor License and Permit in full force and effect (including the provision of letters of credit and/or bonds as required by the various Governmental Units);

(f)     During the Term, Provider shall, at the sole cost and expense of Owner, use commercially reasonable efforts to maintain and/or keep all Liquor Licenses and Permits valid and in full force and effect.  If, prior to the issuance or transfer of all Liquor Licenses and Permits, one or more of the Liquor Licenses or Permits are required to be renewed or otherwise require action by the licensee or permittee of record to fulfill any administrative or legal responsibility associated with said Liquor License(s) or Permit(s), Provider agrees to use commercially reasonable efforts to cooperate in good faith with and fulfill any such administrative or legal responsibility, including, but not limited to, facilitation of the filing of state and/or local license renewal applications of any such Liquor License or Permit so as to secure the continued ability to sell and serve alcohol and food at the Retained Locations to the extent allowed by applicable law; provided, however, that Owner shall pay any license fees and expenses required to be paid as part of such renewals or actions (including the provision of letters of credit and/or bonds as required by the various Governmental Units); and

(g)     The parties agree that (i) required notifications shall be submitted to the applicable state and local liquor licensing agencies, at Owner's expense, to report the changes in ownership and management for the Liquor Licenses that are currently held by subsidiaries of Ruby Tuesday, Inc., regardless of whether such Liquor Licenses are issued for Retained Locations or are the Marketed Licenses, (ii) Owner and Provider shall apply the terms of this Agreement equally to the Marketed Licenses until such time as the change of ownership applications for the Marketed Licenses are approved by the applicable state and local liquor licensing and other Governmental Units, and (iii) with regard to the Marketed Licenses, they shall reasonably cooperate with the sale and transfer of the Marketed Licenses to third parties when and as necessary, at Owner's expense, and further agree that the proceeds of the sales of Marketed Licenses shall be distributed to Owner.

4.     Without limiting any other term of this Agreement, Revenues will be used to pay for all alcohol sold and served at the  Retained Locations, as well as for Owner's costs and expenses in operating the Retained Locations and Provider's costs and expenses incurred pursuant to this Agreement; provided, however, if such Revenues are not sufficient to pay for such costs, expenses, liabilities, and obligations with respect to the alcohol sold and served at the Retained Locations, Owner shall pay such amounts from other sources.  All alcohol purchases shall be made in customary fashion and, to the extent required by applicable law, Owner shall pay to Provider a refundable security deposit equal to the value of the alcohol inventory on hand as of the Effective Date, which Provider shall deposit into a checking account maintained by Provider in the name of the holder of the Liquor License and/or Permit, as applicable, and, to the

4

extent permitted by applicable law, such account shall be utilized for the purpose of making any such purchases.

5.    (a)    During the full Term, Owner shall keep in full force and effect: (a) commercial general liability insurance with limits of at least $2,000,000.00 per occurrence for personal injury and death and property damage and product liability, which shall, among other risks, include coverage against all claims arising out of alleged liquor law or dram shop liability, and such commercial general liability policy shall name Provider as additional insureds for so long as the Liquor Licenses and Permits are held or used by Provider; and (b) worker's compensation insurance as required by law. Notwithstanding the foregoing, to the extent required by applicable law, Owner may instead, at its sole discretion, require Provider to keep in full force and effect such insurance policies.

(b)    Owner agrees that all equipment, facilities and personal property necessary for operating the Retained Locations including, without limitation, glassware, dishwashing equipment, dispensing equipment, barware, pouring devices, storage areas and facilities, and cash registers shall be maintained by Owner, and shall be insured by the Owner.

(c)    With respect to any insurance policies required to be obtained and maintained by Provider pursuant to this Agreement:  (a) all costs and expenses with respect to such insurance policies (including any premiums) shall be paid for by Owner, (b) such insurance policies shall be obtained and maintained in accordance with Provider's standard corporate insurance policies, processes and procedures, and (c) such insurance policies shall name Owner as an additional loss payee.

6.    In the event that either party violates: (a) any provision of this Agreement other than those related to Legal Requirements (as defined below) and maintenance of the insurance coverages required pursuant to Section 5 above and such violation remains uncured for five (5) business days after notice thereof to the violating party via email and overnight mail to the notice parties at the addresses listed in the Plan or (b) any Legal Requirement (i) after issuance of a final decision is either not appealed or is upheld on appeal, or (ii) upon the issuance of a second citation alleging a violation of any Legal Requirement prior to a final decision described in clause (i) hereof, where there is a finding of the applicable authority adverse to Owner or Provider, the non-violating party shall have the right to terminate this Agreement immediately after five (5) business days' written notice to the violating party; provided, that if a violation of subparagraph (b)(i) or (b)(ii) above can be cured by payment of a fine or otherwise, the non-violating party may not terminate this Agreement if the violating party cures such violation within the earlier to occur of (x) the time required by law or set forth in the citation, or (y) ten (10) business days after such decision is upheld on appeal, or if no appeal is filed, the last day permitted for filing an appeal. Upon the issuance or transfer to Owner of the required Liquor License or Permits for a Retained Location, Provider shall, at Owner's cost, (A) deliver promptly the original Liquor License(s) or Permit(s), as the case may be, for such Retained Location to Owner or to the pertinent Governmental Unit, (B) notify the pertinent Governmental Unit that it is surrendering the original Liquor License(s) or Permit(s), as the case may be, and desires that they be canceled, and/or (C) take such other action with respect to the pertinent Governmental Unit as it may require to effect and confirm the cancellation of the original Liquor License(s) or Permit(s), as the case may be, and as if it had actually surrendered the original Liquor License(s)

5

or Permit(s); provided, however, that, the foregoing notwithstanding, (i) Owner, upon obtaining a Liquor License from the relevant state and/or local government regulatory authorities either through transfer or new application (the approval of Owner's ownership of any such Liquor License by the relevant state and/or local government regulatory authorities, the "Liquor License Approval"), shall retain to the fullest extent allowed by applicable laws the right to sell and transfer to a legally qualified purchaser such Liquor License pursuant to applicable Legal Requirements, and (ii) upon Owner's written request, and at Owner's cost, Provider shall use commercially reasonable efforts to cooperate with Owner to sell and transfer such Liquor License(s) designated by Owner and held by Provider to one or more third parties identified by Owner to the extent that such sale and transfer is permitted by applicable Legal Requirements, and the proceeds of any such sale and transfer shall inure to Owner. "Legal Requirements" shall mean and include all those laws applicable to maintaining each relevant Liquor License and obtaining its respective Liquor License Approval.

7.      All alcohol to be purchased for service or sale at the Retained Locations shall be purchased in the name of Provider unless Owner or its designee is permitted to make such purchases in its name under applicable law or under the authority of the Bankruptcy Court and Confirmation Order entered thereby.

8.      Owner, in the name of and on behalf of Provider, shall collect all sales tax from the sales of food, beverages and other personal property at the Retained Locations and shall prepare all required sales tax reports and remit the total sales tax due in connection with the operation of each Retained Location for each month or partial month during the Term.

9.      Notwithstanding anything in this Agreement to the contrary, and in addition to any other remedies available at law or equity, Provider has the right, at its option, to offset any amount due from Owner to Provider under the terms and conditions of this Agreement, whether on account of Owner's indemnification obligations or otherwise, against any proceeds received by Provider for the sale of any Marketed Licenses prior to any distribution by Provider of such proceeds to Owner.

10.     Time is of the essence in this Agreement.  Owner agrees to work diligently to secure the Liquor License Approvals at the Retained Locations and all necessary authorizations, consents and approvals to transfer the Permits at the Retained Locations in its name, and Provider agrees to cooperate in good faith with Owner at Owner's sole cost and as reasonably may be necessary.

11. This Agreement shall be construed and interpreted in accordance with the laws of the State of New York.

12.     This Agreement, together with the Plan and Confirmation Order, constitutes and represents the entire understanding and agreement among the parties with respect to the subject matter hereof. In the event and to the extent that there is a conflict between the provisions of this Agreement and the provisions of the Plan, the provisions of this Agreement shall control.  This Agreement can be amended, supplemented or changed, and any provision hereof can be waived, only by written instrument making specific reference to this Agreement signed by the party

6

against whom enforcement of any such amendment, supplement, modification or waiver is sought.

13.     This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and permitted assigns. Nothing in this Agreement shall create or be deemed to create any third party beneficiary rights in any Person or entity not a party except as otherwise expressly provided herein. No assignment of this Agreement or of any rights or obligations hereunder may be made by either Provider or Owner (by operation of law or otherwise) without the prior written consent of the other party and any attempted assignment without the required consent shall be void and without effect. No assignment of any obligations hereunder shall relieve the parties of any such obligations.

14.     Notwithstanding the foregoing, nothing herein is intended to waive, alter or amend any obligations of Owner or Provider under the Plan or Confirmation Order.

15.     Except as otherwise expressly set forth herein, nothing contained herein shall be construed as to constitute the relationship hereby created as an employment, an agency, partnership, or a joint venture, Provider having no authority to make any binding agreement or commitment on behalf of Owner.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

       IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the Effective Date.

**PROVIDER:**

**RUBY TUESDAY, INC.**

**By:** _____

**Name:** _____

**Title:** _____


**OWNER:**

**RUBY TUESDAY OPERATIONS, LLC**

By: _____

Name: _____

Title: _____

## SCHEDULE 1.1
## RETAINED LOCATIONS

**SCHEDULE 1.2**

**LIQUOR LICENSES AT CLOSED LOCATIONS THAT HAVE VALUE &**

**THE ENTITIES THAT HOLD SUCH LICENSES**

**SCHEDULE 1.3**

**ALL PERMITS AND LIQUOR LICENSES**

## **Exhibit A**

**Plan**