EXHIBIT 16

PLEDGE AND SECURITY AGREEMENT

PH Draft 2/19/2021

**PLEDGE AND SECURITY AGREEMENT**

**dated as of February [19], 2021**

**by and among**

**EACH GRANTOR PARTY HERETO**

**as a Grantor**

**and**

**TCW ASSET MANAGEMENT COMPANY LLC**

**as Collateral Agent**

# TABLE OF CONTENTS

Page:

SECTION 1.    DEFINITIONS AND INTERPRETATION...........................................................1
   1.1.  Definitions ........................................................................................................1
   1.2.  Interpretation, etc .............................................................................................7

SECTION 2.    GRANT OF SECURITY .................................................................................8
   2.1.  Grant of Security...............................................................................................8
   2.2.  Certain Limited Exclusions .............................................................................9

SECTION 3.    SECURITY FOR OBLIGATIONS; GRANTORS REMAIN LIABLE .............10
   3.1.  Security for Obligations..................................................................................10
   3.2.  Continuing Liability Under Collateral............................................................10

SECTION 4.    REPRESENTATIONS AND WARRANTIES AND COVENANTS ................11
   4.1.  Generally.........................................................................................................11
   4.2.  Equipment and Inventory................................................................................14
   4.3.  Receivables .....................................................................................................15
   4.4.  Investment Related Property...........................................................................18
   4.5.  Material Contracts...........................................................................................25
   4.6.  Letter of Credit Rights ....................................................................................26
   4.7.  Intellectual Property........................................................................................26
   4.8.  Commercial Tort Claims .................................................................................30
   4.9.  Food Products .................................................................................................31

SECTION 5.    ACCESS; RIGHT OF INSPECTION; FURTHER ASSURANCES;
            ADDITIONAL GRANTORS ...................................................................31
   5.1.  Access; Right of Inspection ............................................................................31
   5.2.  Further Assurances..........................................................................................32
   5.3.  Additional Grantors ........................................................................................33

SECTION 6.    COLLATERAL AGENT APPOINTED ATTORNEY-IN-FACT.......................33
   6.1.  Power of Attorney...........................................................................................33
   6.2.  No Duty on the Part of Collateral Agent or Secured Parties ..........................34

SECTION 7.    REMEDIES ................................................................................................35
   7.1.  Generally.........................................................................................................35
   7.2.  Application of Proceeds...................................................................................36
   7.3.  Sales on Credit ................................................................................................36
   7.4.  Deposit Accounts ............................................................................................36
   7.5.  Investment Related Property...........................................................................37
   7.6.  Intellectual Property........................................................................................37
   7.7.  Cash Proceeds .................................................................................................39

SECTION 8.    COLLATERAL AGENT.................................................................................40

SECTION 9.    CONTINUING SECURITY INTEREST; TRANSFER OF LOANS ..................40

SECTION 10.  STANDARD OF CARE; COLLATERAL AGENT MAY PERFORM ..............41

SECTION 11.  MISCELLANEOUS ..........................................................................................41

SECTION 12.  BANKRUPTCY MATTERS............ **ERROR! BOOKMARK NOT DEFINED.**

**SCHEDULES:**      4.1      General Information
                    4.2      Location of Equipment and Inventory
                    4.4      Investment Related Property
                    4.6      Letters of Credit
                    4.7      Intellectual Property
                    4.8      Commercial Tort Claims

**EXHIBIT:**        A        Pledge Supplement

## PLEDGE AND SECURITY AGREEMENT

This **PLEDGE AND SECURITY AGREEMENT**, dated as of [_____], 2021, is entered into by and among **RT ASSET COMPANY HOLDINGS LLC**, a Delaware limited liability company (**"Holdings"**), [**RUBY TUESDAY OPERATIONS LLC**], a Delaware limited liability company (**"Ruby"**), **EACH OF THE OTHER PERSONS SIGNATORY HERETO UNDER THE HEADING "GRANTOR"** whether as an original signatory hereto or as an Additional Grantor (as herein defined) (each such entity, including Holdings and Ruby, and any Person who becomes an Additional Grantor, collectively, **"Grantors"** and each, individually, a **"Grantor"**), and **TCW ASSET MANAGEMENT COMPANY LLC** (**"TCW"**), as Collateral Agent for the Secured Parties.

## RECITALS:

**WHEREAS**, reference is hereby made to that certain Credit and Guaranty Agreement, dated as of the date hereof (as amended, restated, supplemented or otherwise modified from time to time, the **"Credit Agreement"**), by and among Holdings, as a Guarantor, Ruby, as a Borrower and Borrower Representative, the other Credit Parties party thereto from time to time, the Lenders party thereto from time to time, and TCW, as Administrative Agent and Collateral Agent;

**WHEREAS**, subject to the terms and conditions of the terms and conditions of the Credit Agreement, Issuing Bank may issue one or more Letters of Credit to certain Grantors; and

**WHEREAS**, in consideration of the extensions of credit and other accommodations of the Lenders and Issuing Bank as set forth in the Credit Agreement (including the reimbursement to Issuing Bank for any draws under the Existing Letters of Credit), each Grantor has agreed to secure such Grantor's obligations under the Credit Documents, the Letters of Credit, and the Existing Letters of Credit as set forth herein.

**NOW, THEREFORE**, in consideration of the premises and the agreements, provisions and covenants herein contained, and other good and valuable consideration, the receipt, sufficiency and adequacy of which are hereby acknowledged, the parties hereto agree as follows:

## SECTION 1.    DEFINITIONS AND INTERPRETATION.

**1.1.    Definitions.** The following terms used herein, including in the preamble, recitals, exhibits and schedules hereto, shall have the following meanings:

**"Account Debtor"** means each Person who is obligated on a Receivable or any Supporting Obligation related thereto.

**"Accounts"** means all "accounts" as defined in Article 9 of the UCC.

**"Additional Grantors"** as defined in <u>Section 5.3</u>.

**"Agreement"** means this Pledge and Security Agreement, as amended, restated, supplemented or otherwise modified from time to time.

**"Assigned Agreements"** means all agreements and contracts to which such Grantor is a party as of the date hereof, or to which such Grantor becomes a party after the date hereof, including each Material Contract, as each such agreement may be amended, restated, supplemented or otherwise modified from time to time.

**"Cash Proceeds"** as defined in <u>Section 7.7</u>.

**"Chattel Paper"** means all "chattel paper," "electronic chattel paper" and "tangible chattel paper," as each term is defined in Article 9 of the UCC.

**"Collateral"** as defined in <u>Section 2.1</u>.

**"Collateral Records"** means all books, records, ledger cards, files, correspondence, customer lists, blueprints, technical specifications, manuals, Software, computer printouts, tapes, disks and related data processing Software and similar items that at any time evidence or contain information relating to any of the Collateral or are otherwise necessary or helpful in the collection thereof or realization thereupon.

**"Collateral Support"** means all property (real or personal) assigned, hypothecated, pledged or otherwise securing any Collateral, including any security agreement or other agreement granting a lien or security interest in such real or personal property.

**"Commercial Tort Claims"** means all "commercial tort claims" as defined in Article 9 of the UCC, including all commercial tort claims described on <u>Schedule 4.8</u>.

**"Commodities Accounts"** means all "commodity accounts" as defined in Article 9 of the UCC, including all of the accounts described on <u>Schedule 4.4</u> under the heading "Commodities Accounts."

**"Copyright Licenses"** means any and all agreements that grant or purport to grant any right in or to any Copyrights (whether such Grantor is licensee or licensor thereunder), including each agreement described on <u>Schedule 4.7(B)</u>.

**"Copyrights"** means all United States and foreign copyrights (including Community designs), including copyrights in software and databases, and all "mask works" (as defined under 17 U.S.C. 901 of the U.S. Copyright Act), whether registered or unregistered, and with respect to any and all of the foregoing: (a) all registrations and applications therefor, including the registrations and applications described on <u>Schedule 4.7(A)</u>; (b) all extensions and renewals thereof; (c) all rights corresponding thereto throughout the world; (d) all rights to sue for past, present and future infringements thereof; and (e) all Proceeds of the foregoing, including licenses, royalties, income, payments, claims, damages and proceeds of suit.

**"Credit Agreement"** as defined in the recitals hereto.

**"Deposit Accounts"** means all "deposit accounts" as defined in Article 9 of the UCC, including all of the accounts described on <u>Schedule 4.4</u> under the heading "Deposit Accounts."

2

"**Documents**" means all "documents" as defined in Article 9 of the UCC.

"**Equipment**" means (a) all "equipment" as defined in Article 9 of the UCC, (b) all machinery, manufacturing equipment, data processing equipment, computers, office equipment, furnishings, furniture, appliances, fixtures and tools (in each case, regardless of whether characterized as equipment under the UCC), and (c) all accessions or additions thereto, all parts thereof, whether or not at any time of determination incorporated or installed therein or attached thereto, and all replacements therefor, wherever located, now or hereafter existing, including any fixtures.

"**Farm Products**" means farm products of every kind and nature, including (a) "farm products" (as such term is defined in any Farm Products Law and/or the UCC in any jurisdiction), (b) "perishable agricultural commodities" (as such term is defined in any Farm Products Law), and (c) "meat food products" (as such term is defined in any Farm Products Law).

"**Farm Products Law**" means (a) the Perishable Agricultural Commodities Act, 1930, 7 U.S.C. Section 499a et seq., (b) the Packers and Stockyard Act, 7 U.S.C. § 196 et seq., (c) the Food Security Act of 1985, 7 U.S.C. Section 1631 et seq. (the "FSA") or (d) any other federal, state, or local laws from time to time in effect which regulate any matters pertaining to Farm Products, in each case, as the same now exists or may from time to time hereafter be amended, restated, modified, recodified or supplemented, together with all rules, regulations and interpretations thereunder or related thereto.

"**Farm Products Notice**" means any written notice received by a Grantor pursuant to the applicable provisions of any Farm Products Law, or pursuant to the UCC or any state statutory agricultural or producers' lien laws or any other applicable local laws from (a) any Farm Products Seller or (b) any lender to, or any other Person with a security interest in the assets of, any Farm Products Seller or (c) the Secretary of State (or equivalent official) or other Governmental Authority, from any jurisdiction in which any Farm Products purchased by any Grantor are produced, in any case, advising or notifying such Grantor of the intention of such Farm Products Seller or other Person to preserve the benefits of any trust, Lien or other interest applicable to any assets of such Grantor established in favor of such Farm Products Seller or other Person or claiming a Lien or security interest in and to any Farm Products which may be or have been purchased by such Grantor or any related or other assets of such Grantor.

"**Farm Products Seller**" means, individually and collectively, sellers, producers or suppliers of any Farm Products.

"**FSA**" as defined in the definition of "Farm Products Law."

"**General Intangibles**" means (a) all "general intangibles" as defined in Article 9 of the UCC, including "payment intangibles" as defined in Article 9 of the UCC, and (b) all interest rate or currency protection or hedging arrangements, all tax refunds, all licenses, permits, concessions and authorizations, all Assigned Agreements and all Intellectual Property (in each case, regardless of whether characterized as general intangibles under the UCC).

3

"**Goods**" means (a) all "goods" as defined in Article 9 of the UCC and (b) all Inventory and Equipment (in each case, regardless of whether characterized as goods under the UCC).

"**Grantor**" as defined in the preamble hereto.

"**Instruments**" means all "instruments" as defined in Article 9 of the UCC.

"**Insurance**" means (a) all insurance policies covering any or all of the Collateral (regardless of whether Collateral Agent is the loss payee thereof) and (b) any key man life insurance policies.

"**Intellectual Property**" means the Copyrights, the Copyright Licenses, the Patents, the Patent Licenses, the Trademarks, the Trademark Licenses, the Trade Secrets and the Trade Secret Licenses.

"**Inventory**" means (a) all "inventory" as defined in Article 9 of the UCC; (b) all goods held for sale or lease or to be furnished under contracts of service or so leased or furnished, all raw materials, work in process, finished goods, and materials used or consumed in the manufacture, packing, shipping, advertising, selling, leasing, furnishing or production of such inventory or otherwise used or consumed in any Grantor's business; (c) all goods in which any Grantor has an interest in mass or a joint or other interest or right of any kind; and (d) all goods which are returned to or repossessed by any Grantor, all Software embedded in any goods and all accessions thereto and products thereof (in each case, regardless of whether characterized as inventory under the UCC).

"**Investment Accounts**" means the Securities Accounts, Commodities Accounts and Deposit Accounts.

"**Investment Related Property**" means (a) all "investment property" (as such term is defined in Article 9 of the UCC) and (b) all of the following (regardless of whether classified as investment property under the UCC): Pledged Equity Interests, Pledged Debt, the Investment Accounts and certificates of deposit.

"**Letter of Credit Right**" means "letter-of-credit right" as defined in Article 9 of the UCC.

"**Money**" means all "money" as defined in Article 1 of the UCC.

"**Patent Licenses**" means all agreements that grant or purport to grant any right in or to any Patents (whether such Grantor is licensee or licensor thereunder), including each agreement described on Schedule 4.7(D).

"**Patents**" means all United States and foreign patents and certificates of invention, or similar industrial property rights, and applications for any of the foregoing, including: (a) each patent and patent application described on Schedule 4.7(C); (b) all reissues, divisions, continuations, continuations-in-part, extensions, renewals, and reexaminations thereof;

4

(c) all rights corresponding thereto throughout the world; (d) all inventions and improvements described therein; (e) all rights to sue for past, present and future infringements thereof; (f) all licenses, claims, damages and proceeds of suit arising therefrom; and (g) all Proceeds of the foregoing, including licenses, royalties, income, payments, claims, damages and proceeds of suit.

"**Pledge Supplement**" means any supplement to this Agreement substantially in the form of Exhibit A.

"**Pledged Debt**" means all Indebtedness owed to any Grantor, including all Indebtedness described on Schedule 4.4(A) under the heading "Pledged Debt" issued by the obligors named therein, the instruments evidencing such Indebtedness, and all interest, Cash, instruments and other property or proceeds from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of such Indebtedness.

"**Pledged Equity Interests**" means all Pledged Stock, Pledged LLC Interests, Pledged Partnership Interests and Pledged Trust Interests.

"**Pledged LLC Interests**" means (a) all interests in any limited liability company owned by any Grantor, including all limited liability company interests described on Schedule 4.4(A) under the heading "Pledged LLC Interests"; (b) the certificates, if any, representing such limited liability company interests; (c) any interest of such Grantor on the books and records of such limited liability company or on the books and records of any securities intermediary pertaining to such interest; and (d) all dividends, distributions, Cash, warrants, rights, options, instruments, securities and other property or proceeds from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of such limited liability company interests.

"**Pledged Partnership Interests**" means (a) all interests in any general partnership, limited partnership, limited liability partnership or other partnership, in each case, owned by any Grantor including all partnership interests described on Schedule 4.4(A) under the heading "Pledged Partnership Interests"; (b) the certificates, if any, representing such partnership interests; (c) any interest of such Grantor on the books and records of such partnership or on the books and records of any securities intermediary pertaining to such interest; and (d) all dividends, distributions, Cash, warrants, rights, options, instruments, securities and other property or proceeds from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of such partnership interests.

"**Pledged Stock**" means (a) all shares of capital stock owned by any Grantor, including all shares of capital stock described on Schedule 4.4(A) under the heading "Pledged Stock"; (b) the certificates, if any, representing such shares; (c) any interest of such Grantor in the entries on the books of the issuer of such shares or on the books of any securities intermediary pertaining to such shares; and (d) all dividends, distributions, Cash, warrants, rights, options, instruments, securities and other property or proceeds from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of such shares.

5

**"Pledged Trust Interests"** means (a) all interests in a Delaware business trust or other trust owned by any Grantor, including all trust interests described on <u>Schedule 4.4(A)</u> under the heading "Pledged Trust Interests"; (b) the certificates, if any, representing such trust interests; (c) any interest of any Grantor on the books and records of such trust or on the books and records of any securities intermediary pertaining to such interest; and (d) all dividends, distributions, Cash, warrants, rights, options, instruments, securities and other property or proceeds from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of such trust interests.

**"Proceeds"** means (a) all "proceeds" as defined in Article 9 of the UCC, (b) all payments or distributions made with respect to any Investment Related Property, and (c) whatever is receivable or received when Collateral or proceeds are sold, exchanged, collected or otherwise disposed of, whether such disposition is voluntary or involuntary.

**"Receivables"** means all rights to payment, whether or not earned by performance, for goods or other property sold, leased, licensed, assigned or otherwise disposed of, or services rendered or to be rendered, including all such rights constituting or evidenced by any Account, Chattel Paper, Instrument, General Intangible or Investment Related Property, together with all of any Grantor's rights, if any, in any goods or other property giving rise to such right to payment and all Collateral Support and Supporting Obligations related thereto and all Receivables Records.

**"Receivables Records"** means (a) all documents, instruments or other writings or electronic records or other Records evidencing the Receivables; (b) all books, correspondence, credit or other files, Records, ledger sheets or cards, invoices and other papers relating to Receivables, including all tapes, cards, computer tapes, computer discs, computer runs, record keeping systems and other papers and documents relating to the Receivables, whether in the possession or under the control of any Grantor or any computer bureau or agent from time to time acting for any Grantor or otherwise; (c) all evidences of the filing of financing statements and the registration of other instruments in connection therewith, and amendments, supplements or other modifications thereto, notices to other creditors or secured parties, and certificates, acknowledgments, or other writings, including lien search reports, from filing or other registration officers; (d) all credit information, reports and memoranda relating thereto; and (e) all other written or nonwritten forms of information related in any way to the foregoing or any Receivable.

**"Record"** means "record" as defined in Article 9 of the UCC.

**"Secured Obligations"** as defined in <u>Section 3.1</u>.

**"Securities Accounts"** means all "securities accounts" as defined in Article 8 of the UCC, including all of the accounts described on <u>Schedule 4.4(A)</u> under the heading "Securities Accounts."

**"Securities Entitlements"** means all "securities entitlements" as defined in Article 8 of the UCC.

6

"**Software**" means any and all (a) computer programs, systems, applications and code, including any and all software implementations of algorithms, models and methodologies and any and all source code and object code; (b) databases and compilations, including any and all data and collections of data, whether machine readable, on paper or otherwise; (c) descriptions, flow-charts and other work product used to design, plan, organize and develop any of the foregoing; (d) the technology supporting, and the contents and audiovisual displays of any internet site(s) operated by or on behalf of any Grantor; and (e) all documentation, other works of authorship and media, including user manuals and training materials, relating to or embodying any of the foregoing or on which any of the foregoing is recorded.

"**Supporting Obligation**" means all "supporting obligations" as defined in Article 9 of the UCC.

"**TCW**" as defined in the preamble hereto.

"**Trademark Licenses**" means any and all agreements that grant or purport to grant any right in or to any Trademarks (whether such Grantor is licensee or licensor thereunder), including each agreement described on Schedule 4.7(F).

"**Trademarks**" means all United States, state, territorial, provincial or foreign trademarks, trade names, corporate names, company names, business names, fictitious business names, internet domain names, trade styles, service marks, certification marks, collective marks, logos, other source or business identifiers, designs and general intangibles of a like nature, all registrations and applications for any of the foregoing including: (a) the registrations and applications described on Schedule 4.7(F); (b) all extensions or renewals of any of the foregoing; (c) all of the goodwill of the business connected with the use of and symbolized by the foregoing; (d) the right to sue for past, present and future infringement or dilution of any of the foregoing or for any injury to goodwill; and (e) all Proceeds of the foregoing, including licenses, royalties, income, payments, claims, damages, and proceeds of suit.

"**Trade Secret Licenses**" means any and all agreements that grant or purport to grant any right in or to any Trade Secrets (whether any Grantor is licensee or licensor thereunder), including each agreement described on Schedule 4.7(G).

"**Trade Secrets**" means all trade secrets and all other confidential or proprietary information and know-how now or hereafter owned or used in, or contemplated at any time for use in, the business of any Grantor, whether or not such Trade Secret has been reduced to a writing or other tangible form, including all documents and things embodying, incorporating, or referring in any way to such Trade Secret, including:  (a) the right to sue for past, present and future misappropriation or other violation of any Trade Secret and (b) all Proceeds of the foregoing, including licenses, royalties, income, payments, claims, damages, and proceeds of suit.

1.2.    **Interpretation, etc.**  All capitalized terms used herein (including the preamble and recitals hereto) and not otherwise defined herein shall have the meanings ascribed thereto in the Credit Agreement or, if not defined therein, in the UCC.  References to "Sections,"

7

"Exhibits," "Schedules" and "Supplements" shall be to sections, exhibits, schedules (as amended or supplemented from time to time) and supplements, as the case may be, of this Agreement unless otherwise specifically provided.  Section headings in this Agreement are included herein for convenience of reference only and shall not constitute a part of this Agreement for any other purpose or be given any substantive effect.  Any of the capitalized terms used herein may, unless the context otherwise requires, be used in the singular or the plural, depending on the reference.  The use herein of the word "include" or "including," when following any general statement, term or matter, shall not be construed to limit such statement, term or matter to the specific items or matters set forth immediately following such word or to similar items or matters, whether or not nonlimiting language (such as "without limitation" or "but not limited to" or words of similar import) is used with reference thereto, but rather shall be deemed to refer to all other items or matters that fall within the broadest possible scope of such general statement, term or matter.  If any conflict or inconsistency exists between this Agreement and the Credit Agreement, the Credit Agreement shall govern.  All references herein to provisions of the UCC shall include all successor provisions under any subsequent version or amendment to any Article of the UCC.

## SECTION 2.    GRANT OF SECURITY.

**2.1.    Grant of Security.**  Each Grantor hereby grants to Collateral Agent, for the benefit of the Secured Parties, to secure the Secured Obligations (whether now existing or hereafter arising), a continuing security interest in and lien on all of such Grantor's right, title and interest in, to and under all of the following properties, assets, and rights, and in all similar properties, assets, and rights, of such Grantor, including the following, in each case whether now owned or existing or hereafter acquired or arising and wherever located (collectively, **"Collateral"**):

  (a)  Accounts;

  (b)  Chattel Paper;

  (c)  Commercial Tort Claims;

  (d)  Deposit Accounts;

  (e)  Documents;

  (f)  Equipment;

  (g)  General Intangibles;

  (h)  Goods;

  (i)  Instruments;

  (j)  Insurance;

  (k)  Intellectual Property;

8

      (l)      Inventory;

      (m)      Investment Related Property;

      (n)      Letter of Credit Rights;

      (o)      Money;

      (p)      Receivables and Receivable Records;

      (q)      Securities Accounts;

      (r)      to the extent not otherwise included above, all Collateral Records, Collateral Support and Supporting Obligations relating to any of the foregoing;

      (s)      to the extent not otherwise included above, all leases or licenses with respect to any Real Estate Assets of any Grantor;

      (t)      all Proceeds of liquor licenses;

      (u)      the [Liquor License Transition Agreement]; and

      (v)      to the extent not otherwise included above, all Proceeds, products, accessions, rents and profits of or in respect of any of the foregoing, whether tangible or intangible, including proceeds of insurance or Commercial Tort Claims covering or relating to any or all of the foregoing, and any and all Accounts, Collateral Records, Chattel Paper, Deposit Accounts, Equipment, Fixtures, General Intangibles, Inventory, Investment Related Property, Intellectual Property, Pledged Interests, Securities Accounts, Supporting Obligations, money, or other tangible or intangible property resulting from the sale, lease, license, exchange, collection, or other disposition of any of the foregoing, the proceeds of any award in condemnation with respect to any of the foregoing, any rebates or refunds, whether for taxes or otherwise, and all proceeds of any such proceeds, or any portion thereof or interest therein, and the proceeds thereof, and all proceeds of any loss of, damage to, or destruction of the above, whether insured or not insured, and, to the extent not otherwise included, any indemnity, warranty, or guaranty payable by reason of loss or damage to, or otherwise with respect to any of the foregoing.

      **2.2.**    **Certain Limited Exclusions.**  Notwithstanding anything herein to the contrary, in no event shall the Collateral include or the security interest granted under Section 2.1 attach to any of the following:

      (a)      any lease, license, contract, property rights or agreement to which any Grantor is a party or any of its rights or interests thereunder if and for so long as the grant of such security interest shall constitute or result in (i) the abandonment, invalidation or unenforceability of any right, title or interest of any Grantor therein, (ii) a violation of any anti-transfer or anti-assignment provisions thereof, or a breach or termination pursuant to the terms of, or a default under, any such lease, license, contract, property rights or agreement (other than to the extent that any such term would be rendered ineffective pursuant to Sections 9-406, 9-407, 9-408 or

9

9-409 of the UCC (or any successor provision or provisions) of any relevant jurisdiction or any other applicable law (including the Bankruptcy Code) or principles of equity), or (iii) a violation of any requirement of law applicable thereto prohibiting the creation of a Lien thereon; provided, however, the Collateral shall include and such security interest shall attach immediately at such time as the condition causing such abandonment, invalidation or unenforceability shall be remedied and to the extent severable, shall attach immediately to any portion of such lease, license, contract, property rights or agreement that does not result in any of the consequences specified in clause (i), (ii) or (iii) above;

        (b)    [Intentionally Reserved];

        (c)    any intent-to-use United States trademark application filed in the United States to the extent that, and solely during the period in which, the grant of a security interest therein would impair the validity and enforceability of such intent-to-use trademark application or the trademark that is the subject thereof under applicable law;

        (d)    [Intentionally Reserved]; or

        (e)    Excluded Accounts.

Notwithstanding anything in this Section 2.2 to the contrary, the foregoing exclusions shall not in any way limit, impair or otherwise affect Collateral Agent's continuing Liens upon any rights or interests of any Grantor in (A) monies due or to become due to such Grantor in respect of such lease, license, contract, property rights, agreement, Capital Stock or other interests or (B) any and all Proceeds from the sale, transfer, assignment, license, lease or other dispositions of such lease, license (including, for the avoidance of doubt, liquor licenses), contract, property rights, agreements, Capital Stock or other interests.

## SECTION 3.    SECURITY FOR OBLIGATIONS; GRANTORS REMAIN LIABLE.

    **3.1.    Security for Obligations**.    This Agreement secures, and the Collateral is collateral security for, the prompt and complete payment or performance, as the case may be, in full when due, whether at stated maturity, by required prepayment, declaration, acceleration, demand or otherwise (including the payment of amounts that would become due but for the operation of the automatic stay under Section 362(a) of the Bankruptcy Code, 11 U.S.C. § 362(a) (and any successor provision thereof)), of all Obligations with respect to each Grantor, including the Guaranteed Obligations of each Grantor that is a Guarantor (collectively, the **"Secured Obligations"**).

    **3.2.    Continuing Liability Under Collateral**.    Notwithstanding anything herein to the contrary, (a) each Grantor shall remain liable for all obligations with respect to the Collateral and nothing contained herein is intended to or shall be a delegation of duties to Collateral Agent or any other Secured Party; (b) each Grantor shall remain liable under each of the agreements included in the Collateral, including any agreements relating to Pledged Equity Interests, to perform all of the obligations undertaken by it thereunder all in accordance with and pursuant to the terms and provisions thereof and neither Collateral Agent nor any other Secured Party shall

10

have any obligation or liability under any of such agreements by reason of or arising out of this Agreement or any other document related thereto nor shall Collateral Agent nor any other Secured Party have any obligation to make any inquiry as to the nature or sufficiency of any payment received by it or have any obligation to take any action to collect or enforce any rights under any agreement included in the Collateral, including any agreements relating to Pledged Equity Interests; and (c) the exercise by Collateral Agent of any of its rights and remedies hereunder shall not release any Grantor from any of its duties or obligations under the contracts and agreements included in the Collateral.

## SECTION 4.    REPRESENTATIONS AND WARRANTIES AND COVENANTS.

### 4.1.    Generally.

(a)    <u>Representations and Warranties</u>.    Each Grantor hereby represents and warrants to Collateral Agent and the other Secured Parties, on the Closing Date and on each Credit Date, that:

(i)    it owns the Collateral purported to be owned by it or otherwise has the rights it purports to have in each item of Collateral and, as to all Collateral whether now existing or hereafter acquired, will continue to own or have such rights in each item of the Collateral, in each case, free and clear of any and all Liens, rights or claims of all other Persons, (including Liens arising as a result of such Grantor becoming bound (as a result of merger or otherwise) as debtor under a security agreement entered into by another Person) other than Permitted Liens;

(ii)    it has indicated on <u>Schedule 4.1(A)</u>:  (A) the type of organization of such Grantor, (B) the jurisdiction of organization of such Grantor, (C) its organizational identification number, if any, and (D) the jurisdiction where the chief executive office is located.

(iii)    the full legal name of such Grantor is as set forth on <u>Schedule 4.1(A)</u> and it has not done in the past five (5) years, and does not do, business under any other name (including any trade-name or fictitious business name) except for those names set forth on <u>Schedule 4.1(B)</u>;

(iv)    except as set forth on <u>Schedule 4.1(C)</u>, it has not changed its name, jurisdiction of organization, chief executive office or corporate structure (e.g., by merger, consolidation, change in corporate form or otherwise) within the past five (5) years;

(v)    it has not within the past five (5) years become bound (whether as a result of merger or otherwise) as debtor under a security agreement entered into by another Person, which has not heretofore been terminated other than the agreements identified on <u>Schedule 4.1(D)</u>;

11

(vi)     with respect to each agreement identified on Schedule 4.1(D), it has indicated on Schedule 4.1(A) and Schedule 4.1(B) the information required pursuant to Sections 4.1(a)(ii), (iii) and (iv) with respect to the debtor under each such agreement;

(vii)     (I) upon the filing of all UCC financing statements naming each Grantor as "debtor" and Collateral Agent as "secured party" and describing the Collateral in the filing offices set forth opposite such Grantor's name on Schedule 4.1(E) and other filings delivered by each Grantor; (II) upon delivery of all Instruments, Chattel Paper and certificated Pledged Equity Interests and Pledged Debt; (III) upon sufficient identification of Commercial Tort Claims; (IV) upon execution of a control agreement establishing Collateral Agent's "control" (within the meaning of Section 8 106, 9 106 or 9 104 of the UCC, as applicable) with respect to any Investment Account; (V) upon consent of the issuer with respect to Letter of Credit Rights; and (VI) to the extent not subject to Article 9 of the UCC, upon recordation of the Liens granted hereunder in Patents, Trademarks and Copyrights in the applicable intellectual property registries, including the United States Patent and Trademark Office and the United States Copyright Office, the Liens granted to Collateral Agent hereunder constitute valid and perfected First Priority Liens on all of the Collateral;

(viii)     all actions and consents, including all filings, notices, registrations and recordings necessary or desirable for the exercise by Collateral Agent of the voting or other rights set forth in this Agreement or the exercise of remedies in respect of the Collateral have been made or obtained;

(ix)     other than the financing statements filed in favor of Collateral Agent, no effective UCC financing statement, fixture filing or other instrument similar in effect under any applicable law covering all or any part of the Collateral is on file in any filing or recording office except for (A) financing statements for which proper termination statements have been delivered to Collateral Agent for filing and (B) financing statements filed in connection with Permitted Liens;

(x)     no authorization, approval or other action by, and no notice to or filing with, any Governmental Authority or regulatory body is required for either (A) the pledge or grant by any Grantor of the Liens purported to be created in favor of Collateral Agent hereunder or (B) the exercise by Collateral Agent of any rights or remedies in respect of any Collateral (whether specifically granted or created hereunder or created or provided for by applicable law), except (I) for the filings contemplated by clause (vii) of this Section 4.1(a) and (II) as may be required, in connection with the disposition of any Investment Related Property, by laws generally affecting the offering and sale of Securities;

(xi)     none of the Collateral constitutes, or is the Proceeds of, "farm products" (as defined in the UCC);

12

(xii)    it does not own any "as extracted collateral" (as defined in the UCC) or any timber to be cut; and

(xiii)    it has been duly organized as an entity of the type as set forth opposite such Grantor's name on <u>Schedule 4.1(A)</u> solely under the laws of the jurisdiction as set forth opposite such Grantor's name on <u>Schedule 4.1(A)</u> and remains duly existing as such.  Such Grantor has not filed any certificates of domestication, transfer or continuance in any other jurisdiction.

(b)    <u>Covenants and Agreements</u>.  Each Grantor hereby covenants and agrees with Collateral Agent and the other Secured Parties that:

(i)    except for the Lien created by this Agreement and the other Collateral Documents, it shall not create or suffer to exist any other Lien upon or with respect to any of the Collateral, except Permitted Liens, and such Grantor shall use commercially reasonable efforts to defend the Collateral against all Persons at any time claiming any interest therein;

(ii)    it shall not produce, use or permit any Collateral to be used unlawfully or (A) in violation of any provision of this Agreement or any policy of insurance covering the Collateral or (B) in material violation of any applicable statute, regulation or ordinance;

(iii)    it shall not change such Grantor's (x) name, identity, jurisdiction of organization, corporate structure (e.g. by merger, consolidation, change in corporate form or otherwise) or (y) chief executive office or establish any trade names, unless, it shall have (A) notified Collateral Agent in writing, by executing and delivering to Collateral Agent a completed Pledge Supplement, together with all Supplements to Schedules thereto, at least ten (10) Business Days prior to any such change described in <u>clause (x)</u> of this <u>clause (iii)</u> and at least five (5) Business Days prior to such change or establishment in <u>clause (y)</u> of this <u>clause (iii)</u>, identifying such new proposed change or establishment and providing such other information in connection therewith as Collateral Agent may reasonably request and (B) taken all actions necessary or advisable prior to such change or establishment to permit Collateral Agent, in its sole discretion, to continue at all times following such change or establishment to have a valid, legal and perfected First Priority Lien in the Collateral;

(iv)    it shall maintain the continuous validity, perfection and First Priority status of Collateral Agent's Lien in the Collateral intended to be granted and agreed to hereby;

(v)    upon such Grantor or any officer of such Grantor obtaining knowledge thereof, it shall promptly notify Collateral Agent in writing of any event that may have a Material Adverse Effect on the value of the Collateral in the aggregate, the ability of any Grantor or Collateral Agent to dispose of any

13

material Collateral, or the rights and remedies of Collateral Agent in relation thereto, including the levy of any legal process against the Collateral;

(vi)    it shall not take or permit any action which could impair Collateral Agent's rights in the Collateral in any material respect; and

(vii)    it shall not sell, transfer or assign (by operation of law or otherwise) any Collateral except to the extent permitted by the Credit Agreement.

**4.2.    Equipment and Inventory.**

(a)    <u>Representations and Warranties</u>.  Each Grantor hereby represents and warrants to Collateral Agent and the other Secured Parties, on the Closing Date and on each Credit Date, that:

(i)    all of the Equipment and Inventory (other than Equipment and Inventory in transit or out for repair in the ordinary course of business, vehicles and equipment in the possession of employees in the ordinary course of business, and other Equipment and Inventory that is substantially immaterial or out of use by such Grantor) included in the Collateral is located only at the locations specified in <u>Schedule 4.2</u>;

(ii)    any Goods now or hereafter produced by any Grantor included in the Collateral have been and will be produced in compliance with the requirements of the Fair Labor Standards Act, as amended, except as could not reasonably be expected to have a Material Adverse Effect; and

(iii)    except where the Grantors have complied with <u>Section 4.2(b)(iv)</u> below, none of the Inventory or Equipment is in the possession of an issuer of a negotiable document (as defined in Section 7-104 of the UCC) therefor or otherwise in the possession of a bailee or a warehouseman.

(b)    <u>Covenants and Agreements</u>.  Each Grantor hereby covenants and agrees with Collateral Agent and the other Secured Parties that:

(i)    it shall keep the Equipment and Inventory (other than Equipment and Inventory in transit to or from a location specified on <u>Schedule 4.2</u>, out for repair and vehicles and equipment in the possession of employees, in each case, in the ordinary course of business, or Equipment and Inventory that is substantially immaterial or out of use by such Grantor) and any Documents evidencing any such Equipment and Inventory in the locations specified on <u>Schedule 4.2</u>, unless it shall have (A) notified Collateral Agent in writing, by executing and delivering to Collateral Agent a completed Pledge Supplement, together with all Supplements to Schedules thereto, at least ten (10) Business Days prior to any change in locations, identifying such new locations and providing such other information in connection therewith as Collateral Agent may reasonably request and (B) taken

14

all actions necessary or advisable to maintain the continuous validity, perfection and the same or better priority of Collateral Agent's Lien in the Collateral intended to be granted and agreed to hereby, or to enable Collateral Agent to exercise and enforce its rights and remedies hereunder, with respect to such Equipment and Inventory; provided, for the avoidance of doubt, it shall not be deemed a breach of the foregoing covenant to move Equipment and Inventory among the various locations listed on Schedule 4.2.

(ii)    it shall keep correct and accurate records of the Equipment and Inventory in all material respects as is customarily maintained under similar circumstances by Persons of established reputation engaged in similar business, and in any event in conformity with GAAP;

(iii)    other than in connection with a Permitted Lien, it shall not deliver any Document evidencing any Equipment and Inventory to any Person other than the issuer of such Document to claim the Goods evidenced therefor or Collateral Agent;

(iv)    if any Equipment or Inventory (other than Equipment and Inventory in transit to or from a location specified on Schedule 4.2, out for repair and vehicles and equipment in the possession of employees, in each case, in the ordinary course of business, and other Equipment and Inventory that is substantially immaterial or out of use by such Grantor) is in possession or control of any third party, each Grantor shall upon the reasonable request of Collateral Agent, notify such third party of Collateral Agent's Lien and obtaining a Collateral Access Agreement or other acknowledgment from the third party that it is holding the Equipment and/or Inventory for the benefit of Collateral Agent, in form and substance satisfactory to the Collateral Agent; and

(v)    with respect to any item of Equipment which is covered by a certificate of title under a statute of any jurisdiction under the law of which indication of a Lien on such certificate is required as a condition of perfection thereof, upon the reasonable request of Collateral Agent, (A) provide information with respect to any such Equipment, (B) execute and file with the registrar of motor vehicles or other appropriate authority in such jurisdiction an application or other document requesting the notation or other indication of the Lien created hereunder on such certificate of title, and (C) deliver to Collateral Agent copies of all such applications or other documents filed and originals of all such certificates of title issued indicating the Lien created hereunder in the items of Equipment covered thereby.

**4.3.    Receivables.**

(a)    <u>Representations and Warranties</u>.    Each Grantor hereby represents and warrants to Collateral Agent and the other Secured Parties, on the Closing Date and on each Credit Date, that:

15

(i)      each Receivable, in all material respects (A) is and will be the legal, valid and binding obligation of the Account Debtor in respect thereof, representing an unsatisfied obligation of such Account Debtor; (B) is and will be enforceable in accordance with its terms; (C) is not and will not be subject to any setoffs, defenses, taxes, counterclaims (except with respect to refunds, returns and allowances in the ordinary course of business with respect to damaged merchandise); and (D) is and will be in compliance with all applicable laws, whether federal, state, local or foreign;

(ii)      none of the Account Debtors in respect of any Receivable is the government of the United States, any agency or instrumentality thereof, any state or municipality or any foreign sovereign.

(iii)      no Receivable in excess of $250,000 requires the consent of the Account Debtor in respect thereof in connection with the pledge hereunder, except any consent which has been obtained; and

(iv)      no Receivable is evidenced by, or constitutes, an Instrument or Chattel Paper which has not been delivered to, or otherwise subjected to the control of, Collateral Agent to the extent required by, and in accordance with, Section 4.3(c).

(b)      <u>Covenants and Agreements</u>:  Each Grantor hereby covenants and agrees with Collateral Agent and the other Secured Parties that:

(i)      it shall keep and maintain at its own cost and expense records of the Receivables, which shall be complete, correct and accurate in all material respects, including records of all payments received and all credits granted on the Receivables, all merchandise returned and all other dealings therewith;

(ii)      it shall mark conspicuously, in form and manner reasonably satisfactory to Collateral Agent, all Chattel Paper and Instruments (other than any delivered to Collateral Agent as set forth herein) with an appropriate reference to the fact that Collateral Agent has a Lien therein;

(iii)      it shall perform in all material respects all of its obligations with respect to the Receivables;

(iv)      it shall not amend, modify, terminate or waive any provision of any Receivable, other than the settlement of bad debt in the ordinary course of business, or any other amendment, modification, termination or waiver of a Receivable that does not exceed $250,000 in value.  Other than in the ordinary course of business as generally conducted by it on and prior to the Closing Date, and except as otherwise provided in <u>Section 4.3(b)(v)</u>, upon an Event of Default, such Grantor shall not (A) grant any extension or renewal of the time of payment of any Receivable; (B) compromise or settle any dispute, claim or legal

16

proceeding with respect to any Receivable for less than the total unpaid balance thereof; (C) release, wholly or partially, any Person liable for the payment thereof; or (D) allow any credit or discount thereon;

(v)     except as otherwise set forth in this Section 4.3(b)(v), each Grantor shall continue to collect all amounts due or to become due to such Grantor under the Receivables and any Supporting Obligation and use commercially reasonable efforts to exercise each material right it may have under any Receivable any Supporting Obligation or Collateral Support, in each case, at its own expense.  In addition, at any time upon the occurrence and during the continuation of an Event of Default, Collateral Agent may:  (A) direct the Account Debtors under any Receivables to make payment of all amounts due or to become due to such Grantor thereunder directly to Collateral Agent; (B) notify, or require any Grantor to notify, any Account Debtor of Collateral Agent's Lien in any Receivables and any Supporting Obligation and, in addition, notify each Person maintaining a lockbox or similar arrangement to which Account Debtors under any Receivables have been directed to make payment to remit all amounts representing collections on checks and other payment items from time to time sent to or deposited in such lockbox or other arrangement directly to Collateral Agent; and (C) enforce, at the expense of such Grantor, collection of any such Receivables and to adjust, settle or compromise the amount or payment thereof, in the same manner and to the same extent as such Grantor might have done.  If Collateral Agent notifies any Grantor that it has elected to collect the Receivables in accordance with the immediately preceding sentence, any payments of Receivables received by such Grantor shall be forthwith (and in any event within two (2) Business Days) deposited by such Grantor in the exact form received, duly indorsed by such Grantor to Collateral Agent if required, in any account designated by Collateral Agent, and until so turned over, all amounts and proceeds (including checks and other instruments) received by such Grantor in respect of the Receivables, any Supporting Obligation or Collateral Support shall be received in trust for the benefit of Collateral Agent hereunder and shall be segregated from other funds of such Grantor and such Grantor shall not adjust, settle or compromise the amount or payment of any Receivable, or release wholly or partly any Account Debtor or obligor thereof, or allow any credit or discount thereon;

(vi)     it shall use its commercially reasonable efforts to keep in full force and effect any Supporting Obligation or Collateral Support relating to any Receivable; and

(vii)     in respect of any Receivables, the Account Debtor of which is the government of the United States, any agency or instrumentality thereof, any state or municipality or any foreign sovereign, upon the occurrence and during the continuation of an Event of Default, upon the written request of Collateral Agent, such Grantor shall execute and deliver any documentation and take any other action reasonably requested by Collateral Agent in writing to comply with the Assignment of Claims Act of 1940, as amended, 31 U.S.C. § 3727, 41 U.S.C. §

17

15, any applicable rules, regulations and interpretations issued pursuant thereto, and any amendments to any of the foregoing, or any equivalent or similar state, municipal or foreign statute or law.

(c)    <u>Delivery and Control of Receivables</u>.  With respect to any Receivables that are evidenced by or constitute Chattel Paper or Instruments, each Grantor shall cause each originally executed copy thereof to be delivered to Collateral Agent (or its agent or designee) appropriately indorsed to Collateral Agent or indorsed in blank:  (i) with respect to any such Receivables in existence on the Closing Date, subject to <u>Section 5.15</u> of the Credit Agreement, on or prior to the Closing Date and (ii) with respect to any such Receivables hereafter arising, within ten (10) days of such Grantor acquiring rights therein.  With respect to any Receivables which would constitute "electronic chattel paper" under Article 9 of the UCC, each Grantor shall take all steps necessary to give Collateral Agent control over such Receivables (within the meaning of Section 9-105 of the UCC):  (A) with respect to any Receivables in existence on the Closing Date, subject to <u>Section 5.15</u> of the Credit Agreement, on or prior to the Closing Date and (B) with respect to any such Receivables hereafter arising, within ten (10) days of such Grantor acquiring rights therein.  Any Receivable not otherwise required to be delivered or subjected to the control of Collateral Agent in accordance with this <u>Section 4.3(c)</u> shall be delivered or subjected to such control upon request of Collateral Agent.

## 4.4.    **Investment Related Property.**

### 4.4.1.    **Investment Related Property Generally.**

(a)    <u>Covenants and Agreements</u>.  Each Grantor hereby covenants and agrees with Collateral Agent and the other Secured Parties that:

(i)    in the event it acquires rights in any Investment Related Property after the date hereof, it shall deliver to Collateral Agent a completed Pledge Supplement, together with all Supplements to Schedules thereto, reflecting such new Investment Related Property and all other Investment Related Property. Notwithstanding the foregoing, the Lien of Collateral Agent shall attach to all Investment Related Property immediately upon any Grantor's acquisition of rights therein and shall not be affected by the failure of any Grantor to deliver a supplement to <u>Schedule 4.4</u> as required hereby;

(ii)    except as set forth in the next sentence, in the event such Grantor receives any dividends, interest or distributions on any Investment Related Property, or any Securities or other property upon the merger, consolidation, liquidation or dissolution of any issuer of any Investment Related Property, then (A) such dividends, interest or distributions and Securities or other property shall be included in the definition of Collateral without further action and (B) such Grantor shall immediately take all steps, if any, necessary or advisable to ensure the validity, perfection, priority and, if applicable, control of Collateral Agent over such Investment Related Property (including delivery thereof to Collateral Agent) and pending any such action such Grantor shall be deemed to hold such

18

dividends, interest, distributions, Securities or other property in trust for the benefit of Collateral Agent and shall segregate such dividends, interest, distributions, Securities or other property from all other property of such Grantor. Notwithstanding the foregoing, so long as no Event of Default shall have occurred and be continuing, Collateral Agent authorizes each Grantor to retain all ordinary Cash dividends and distributions paid in the normal course of the business of the issuer and consistent with the past practice of the issuer and all scheduled payments of interest, in each case, solely to the extent the same is expressly permitted by the terms and provisions of the Credit Agreement;

(iii)    each Grantor consents to the grant by each other Grantor of a Lien in all Investment Related Property to Collateral Agent.

(b)    <u>Delivery and Control</u>. Each Grantor hereby covenants and agrees with Collateral Agent and the other Secured Parties that:

(i)    with respect to any Pledged Equity Interests it shall comply with the provisions of this <u>Section 4.4.1(b)</u> on or before the Closing Date and with respect to any Investment Related Property hereafter acquired by such Grantor it shall comply with the provisions of this <u>Section 4.4.1(b)</u> immediately upon acquiring rights therein, in each case in form and substance satisfactory to Collateral Agent.  With respect to any Investment Related Property that is represented by a certificate or that is an "instrument" (other than any Investment Related Property credited to a Securities Account) it shall cause such certificate or instrument to be delivered to Collateral Agent, indorsed in blank by an "effective indorsement" (as defined in Section 8-107 of the UCC), regardless of whether such certificate constitutes a "certificated security" for purposes of the UCC. With respect to any Investment Related Property that is an "uncertificated security" for purposes of the UCC (other than any "uncertificated securities" credited to a Securities Account), upon the request of Collateral Agent, such Grantor shall cause the issuer of such uncertificated security to either (A) register Collateral Agent as the registered owner thereof on the books and records of the issuer or (B) execute an agreement in form and substance satisfactory to Collateral Agent, pursuant to which such issuer agrees to comply with Collateral Agent's instructions with respect to such uncertificated security without further consent by such Grantor; and

(ii)    with respect to any Pledged LLC Interests or any Pledged Partnership Interests, no Grantor shall permit Article 8 of the UCC to govern and shall not permit such Pledged LLC Interests and Pledged Partnership Interests to be certificated or otherwise evidenced by a "security certificate" (as defined in Article 8 of the UCC), unless, in each case, such Grantor complies with the applicable provisions of this <u>Section 4.4.1</u>.

(c)      Voting and Distributions.  Each Grantor hereby covenants and agrees with Collateral Agent and the other Secured Parties that:

(i)       so long as no Event of Default shall have occurred and be continuing, except as otherwise set forth under the covenants and agreements relating to Investment Related Property in this Agreement or in the Credit Agreement, each Grantor shall be entitled to exercise or refrain from exercising any and all voting and other consensual rights pertaining to the Investment Related Property or any part thereof for any purpose not inconsistent with the terms of this Agreement or the Credit Agreement; provided, such Grantor shall give Collateral Agent at least two (2) Business Days prior written notice of the manner in which it intends to exercise, or the reasons for refraining from exercising, any such right; it being understood, however, that neither the voting by such Grantor of any Pledged Equity Interest for, or such Grantor's consent to, the election of directors (or similar governing body) at a regularly scheduled annual or other meeting of stockholders, members or partners or with respect to incidental matters at any such meeting, nor such Grantor's consent to or approval of any action otherwise permitted under this Agreement and the Credit Agreement, shall be deemed inconsistent with the terms of this Agreement or the Credit Agreement within the meaning of this Section 4.4.1(c)(i), and no notice of any such voting or consent need be given to Collateral Agent; and

(ii)      upon the occurrence and during the continuation of an Event of Default:

(A)      all rights of each Grantor to exercise or refrain from exercising the voting and other consensual rights which it would otherwise be entitled to exercise pursuant to this Agreement shall cease and all such rights shall thereupon become vested in Collateral Agent who shall thereupon have the sole right to exercise such voting and other consensual rights; and

(B)      in order to permit Collateral Agent to exercise the voting and other consensual rights which it may be entitled to exercise pursuant to this Agreement and to receive all dividends and other distributions which it may be entitled to receive hereunder:  (I) each Grantor shall promptly execute and deliver (or cause to be executed and delivered) to Collateral Agent all proxies, dividend payment orders and other instruments as Collateral Agent may from time to time reasonably request and (II) each Grantor acknowledges that Collateral Agent may utilize the power of attorney set forth in Section 6.1.

### 4.4.2. Pledged Equity Interests.

(a)    <u>Representations and Warranties</u>.   Each Grantor hereby represents and warrants to Collateral Agent and the other Secured Parties, on the Closing Date and on each Credit Date, that:

(i)    <u>Schedule 4.4(A)</u> sets forth under the headings "Pledged Stock," "Pledged LLC Interests," "Pledged Partnership Interests" and "Pledged Trust Interests," respectively, all of the Pledged Stock, Pledged LLC Interests, Pledged Partnership Interests and Pledged Trust Interests owned by any Grantor and such Pledged Equity Interests constitute the percentage of issued and outstanding shares of stock, percentage of membership interests, percentage of partnership interests or percentage of beneficial interest of the respective issuers thereof indicated on such Schedule;

(ii)    except as set forth on <u>Schedule 4.4(X)</u>, it has not acquired any Capital Stock or Securities of another entity or all or substantially all of the assets of another entity, or merged with another entity, within the past five (5) years;

(iii)    it is the record and beneficial owner of the Pledged Equity Interests free and clear of all Liens (other than as created under this Agreement), rights or claims of other Persons and there are no outstanding warrants, options or other rights to purchase, or shareholder, voting trust or similar agreements outstanding with respect to, or property that is convertible into, or that requires the issuance or sale of, any Pledged Equity Interests;

(iv)    without limiting the generality of any of the foregoing, no consent of any Person including any other general or limited partner, any other member of a limited liability company, any other shareholder or any other trust beneficiary is necessary or desirable in connection with the creation, perfection or First Priority status of the Lien of Collateral Agent in any Pledged Equity Interests or the exercise by Collateral Agent of the voting or other rights set forth in this Agreement or the exercise of remedies in respect thereof;

(v)    none of the Pledged LLC Interests nor Pledged Partnership Interests are or represent interests in issuers that (A) are registered as investment companies, or (B) are dealt in or traded on securities exchanges or markets; and

(vi)    except as otherwise set forth on <u>Schedule 4.4(A)</u>, none of the Pledged LLC Interests or Pledged Partnership Interests are or represent interests in issuers that have opted to treat such interests as securities under Article 8 of the UCC.

21

(b)    <u>Covenants and Agreements</u>.  Each Grantor hereby covenants and agrees with Collateral Agent and the other Secured Parties that:

(i)    other than as expressly permitted under the Credit Agreement, without the prior written consent of Collateral Agent, it shall not vote to enable or take any other action to (A) amend or terminate any partnership agreement, limited liability company agreement, certificate of incorporation, by-laws or other Organizational Documents in any way that materially and adversely changes the rights of such Grantor with respect to any Investment Related Property or adversely affects the validity, perfection or priority of Collateral Agent's Lien; (B) permit any issuer of any Pledged Equity Interest to issue any additional Capital Stock or Securities of any nature or to issue securities convertible into or granting the right of purchase or exchange for any Capital Stock or Securities of any nature of such issuer; (C) permit any issuer of any Pledged Equity Interest to dispose of all or a material portion of their assets; (D) waive any default under or breach of any terms of Organizational Documents relating to the issuer of any Pledged Equity Interest or the terms of any Pledged Debt in any manner adverse to the rights of the Secured Parties; or (E) cause any issuer of any Pledged Partnership Interests or Pledged LLC Interests which are not securities (for purposes of the UCC) on the date hereof to elect or otherwise take any action to cause such Pledged Partnership Interests or Pledged LLC Interests to be treated as securities for purposes of the UCC; <u>provided</u>, <u>however</u>, notwithstanding the foregoing, if any issuer of any Pledged Partnership Interests or Pledged LLC Interests takes any such action in violation of the foregoing in this <u>clause (E)</u>, such Grantor shall promptly notify Collateral Agent in writing of any such election or action and, in such event, shall take all steps necessary or advisable to establish Collateral Agent's "control" thereof;

(ii)    it shall comply with all of its obligations under any partnership agreement or limited liability company agreement relating to Pledged Partnership Interests or Pledged LLC Interests and shall enforce all of its rights with respect to any Investment Related Property, except to the extent that such failure would not be adverse to the interests of the Secured Parties;

(iii)    without the prior written consent of Collateral Agent, it shall not vote to enable or take any other action to permit any issuer of any Pledged Equity Interest to merge or consolidate unless (A) such issuer creates a Lien that is perfected by a filed financing statement (that is not effective solely under Section 9-508 of the UCC) in collateral in which such new debtor has or acquires rights and (B) all the outstanding Capital Stock or Securities of the surviving or resulting corporation, limited liability company, partnership or other entity is, upon such merger or consolidation, pledged hereunder and no Cash, Securities or other property is distributed in respect of the outstanding equity interests of any other constituent Grantor; <u>provided</u>, if the surviving or resulting Grantors upon any such merger or consolidation involving an issuer which is a Foreign

22

Subsidiary, then such Grantor shall only be required to pledge equity interests in accordance with Section 2.2;

(iv)    each Grantor (A) consents to the grant by any holder of its Capital Stock granting a Lien in its Capital Stock to Collateral Agent hereunder and (B) otherwise consents to the grant by each other Grantor of a Lien in all Investment Related Property to Collateral Agent hereunder and, without limiting the foregoing, consents to the transfer of any Pledged Partnership Interest and any Pledged LLC Interest to Collateral Agent or its nominee upon an Event of Default and to the substitution of Collateral Agent or its nominee as a partner in any partnership or as a member in any limited liability company with all the rights and powers related thereto;

(v)    each Grantor grants to the Collateral Agent this irrevocable proxy, to exercise any and all voting and other consensual rights pertaining to the Pledged Equity Interests or any part thereof from time to time following the occurrence and during the continuance of an Event of Default, in each case in any manner the Collateral Agent deems advisable in its sole discretion for or against any or all matters submitted, or which may be submitted, to a vote of shareholders (including holders of any Equity Interests issued by any Credit Party), partners or members, as the case may be, and to exercise all other rights, powers, privileges and remedies to which any such shareholders (including holders of any Equity Interests issued by any Credit Party), partners or members would be entitled (including, without limitation, giving or withholding written consents of holders of Equity Interests of any Person, calling special meetings of the holders of the Equity Interests of any Person and voting at such meetings). The irrevocable proxy granted hereby is effective automatically upon the occurrence of an Event of Default without the necessity that any further action (including, without limitation, that any transfer of any of the Pledged Equity Interests occur or be recorded on the books and records of the relevant Credit Party) be taken by any Person (including the relevant issuer of any Pledged Equity Interest or any officer or agent thereof), is coupled with an interest and shall be irrevocable, shall survive the bankruptcy, dissolution or winding up of any relevant Grantor, and shall terminate only at such time as the Secured Obligations shall have been paid in full in cash and all Commitments shall have been terminated.

### 4.4.3.  Pledged Debt.

(a)    Representations and Warranties.  Each Grantor hereby represents and warrants to Collateral Agent and the other Secured Parties, on the Closing Date and each Credit Date, that Schedule 4.4 sets forth under the heading "Pledged Debt" all of the Pledged Debt owned by any Grantor and all of such Pledged Debt has been duly authorized, authenticated or issued, and delivered and is the legal, valid and binding obligation of the issuers thereof and is not in default and constitutes all of the issued and outstanding inter-company Indebtedness.

(b)     Covenants and Agreements.   Each Grantor hereby covenants and agrees with Collateral Agent and the other Secured Parties that it shall notify Collateral Agent of any default under any Pledged Debt that has caused, either in any individual case or in the aggregate, a Material Adverse Effect.

### 4.4.4.  Investment Accounts.

(a)     Representations and Warranties.   Each Grantor hereby represents and warrants to Collateral Agent and the other Secured Parties, on the Closing Date and each Credit Date, that:

(i)     Schedule 4.4 sets forth under the headings "Securities Accounts" and "Commodities Accounts," respectively, all of the Securities Accounts and Commodities Accounts in which each Grantor has an interest.  Each Grantor is the sole entitlement holder of each such Securities Account and Commodity Account, and such Grantor has not consented to, and is not otherwise aware of, any Person (other than Collateral Agent pursuant to this Agreement) having "control" (within the meanings of Sections 8-106 and 9-106 of the UCC) over, or any other interest in, any such Securities Account or Commodity Account or securities or other property credited thereto;

(ii)     Schedule 4.4 sets forth under the headings "Deposit Accounts" all of the Deposit Accounts in which each Grantor has an interest.  Each Grantor is the sole account holder of each such Deposit Account and such Grantor has not consented to, and is not otherwise aware of, any Person (other than Collateral Agent pursuant to this Agreement and the bank or other depositary institution at which such Deposit Account is maintained) having "control" (within the meaning of Section 9-104 of the UCC) over, or any other interest in, any such Deposit Account or any money or other property deposited therein; and

(iii)     each Grantor has taken all actions necessary or desirable, including those specified in Section 4.4.4(c), to:  (A) establish Collateral Agent's "control" (within the meanings of Sections 8-106 and 9-106 of the UCC) over any portion of the Investment Related Property constituting certificated securities, uncertificated securities, Securities Accounts, Securities Entitlements or Commodities Accounts, (B) establish Collateral Agent's "control" (within the meaning of Section 9-104 of the UCC) over all Deposit Accounts (other than Excluded Accounts), and (C) deliver all Instruments to Collateral Agent.

(b)     Covenant and Agreement.   Each Grantor hereby covenants and agrees with Collateral Agent and the other Secured Parties that it shall not close or terminate any Investment Account (other than an Excluded Account) without the prior consent of Collateral Agent, unless a successor or replacement account has been established with the consent of Collateral Agent with respect to which successor or replacement account a control agreement acceptable to Collateral Agent has been entered into by the appropriate Grantor, Collateral Agent

24

and securities intermediary or depository institution at which such successor or replacement account is to be maintained in accordance with the provisions of <u>Section 4.4.4(c)</u>.

(c)    <u>Delivery and Control</u>.  Each Grantor hereby covenants and agrees with Collateral Agent and the other Secured Parties that:

(i)    with respect to any Investment Related Property consisting of Securities Accounts or Securities Entitlements, it shall cause each securities intermediary maintaining such Securities Account or Securities Entitlement to enter into an agreement in form and substance satisfactory to Collateral Agent) pursuant to which it shall agree to comply with Collateral Agent's "entitlement orders" without further consent by such Grantor.  With respect to any Investment Related Property that is a Deposit Account (other than an Excluded Account), it shall cause each depository institution maintaining such account to enter into an agreement in form and substance satisfactory to Collateral Agent), pursuant to which Collateral Agent shall have "control" (within the meaning of Section 9-104 of the UCC) over each such Deposit Account.  Each Grantor shall enter into such control agreement or agreements with respect to:  (A) any Securities Accounts, Securities Entitlements or Deposit Accounts that exist on the date hereof (other than Excluded Accounts), as of or prior to the date hereof (other than Excluded Accounts) and (B) any Securities Accounts, Securities Entitlements or Deposit Accounts that are created or acquired after the Closing Date, as of or prior to the deposit or transfer of any such Securities Entitlements or funds, whether constituting moneys or investments, into such Securities Accounts or Deposit Accounts; and

(ii)    if any issuer of any Investment Related Property is located in a jurisdiction outside of the United States, each Grantor shall take such additional actions, including causing the issuer to register the pledge on its books and records or making such filings or recordings, in each case as may be necessary or advisable, under the laws of such issuer's jurisdiction to insure the validity, perfection and priority of the Lien of Collateral Agent.  Upon the occurrence of an Event of Default, Collateral Agent shall have the right, without notice to any Grantor, to transfer all or a portion of the Investment Related Property to its name or the name of its nominee or agent.  In addition, Collateral Agent shall have the right at any time, without notice to any Grantor, to exchange any certificates or instruments representing any Investment Related Property for certificates or instruments of smaller or larger denominations.

**4.5.    Material Contracts.**

(a)    <u>Representations and Warranties</u>.  Each Grantor hereby represents and warrants to Collateral Agent and the other Secured Parties, on the Closing Date and on each Credit Date, that no Material Contract prohibits assignment or requires consent of or notice to any Person in connection with the assignment to Collateral Agent hereunder, except such as has been given or made.

25

(b)    Covenants and Agreements.  Each Grantor hereby covenants and agrees with Collateral Agent and the other Secured Parties that:

(i)    in addition to any rights under the section of this Agreement relating to Receivables, after the occurrence and during the continuance of an Event of Default, Collateral Agent may at any time notify, or require any Grantor to so notify, the counterparty on any Material Contract of the Lien of Collateral Agent therein  and request that the counterparty to make all payments under the Material Contracts directly to Collateral Agent;

(ii)    each Grantor shall deliver promptly to Collateral Agent a copy of each demand, notice or document received by it relating in any way to any Material Contract that is materially adverse to such Grantor;

(iii)    it shall use its commercially reasonable efforts to keep in full force and effect any Supporting Obligation or Collateral Support relating to any Material Contract; and

(iv)    it shall use commercially reasonable efforts to ensure that no Material Contract entered after the date hereof contains a provision that could reasonably be expected to in any way materially impair or prevent the creation of a Lien in such Grantor's rights and interests in such Material Contract.

**4.6.    Letter of Credit Rights.**

(a)    Representations and Warranties.  Each Grantor hereby represents and warrants to Collateral Agent and the other Secured Parties, on the Closing Date and on each Credit Date, that (i) all letters of credit to which such Grantor has rights as a beneficiary are described on Schedule 4.6 and (ii) it has obtained the consent of each issuer of any letter of credit to the assignment of the proceeds of the letter of credit to Collateral Agent.

(b)    Covenants and Agreements.  Each Grantor hereby covenants and agrees with Collateral Agent and the other Secured Parties that with respect to any letter of credit hereafter arising it shall obtain the consent of the issuer thereof to the assignment of the proceeds of the letter of credit to Collateral Agent and shall deliver to Collateral Agent a completed Pledge Supplement, together with all Supplements to Schedules thereto. Notwithstanding the foregoing, the Lien of Collateral Agent shall attach to all Letter of Credit Rights immediately upon any Grantor's acquisition of rights therein and shall not be affected by the failure of any Grantor to deliver a supplement to Schedule 4.4 as required hereby.

**4.7.    Intellectual Property.**

(a)    Representations and Warranties.  Except as disclosed in Schedule 4.7(H), each Grantor hereby represents and warrants to Collateral Agent and the other Secured Parties, on the Closing Date and on each Credit Date, that:

26

(i)     Schedule 4.7 sets forth a true and complete list of (A) all United States, state and foreign registrations of and applications for Patents, Trademarks, and Copyrights owned by each Grantor and (B) all Patent Licenses, Trademark Licenses, Trade Secret Licenses and Copyright Licenses (where such Grantor is a licensee, including Software licenses) material to the business of such Grantor;

(ii)    it is the sole and exclusive owner of the entire right, title, and interest in and to all Intellectual Property described on Schedule 4.7, and owns or has the valid right to use all other Intellectual Property used in or necessary to conduct its business, free and clear of all Liens, claims, encumbrances and licenses, except for Permitted Liens, Liens created under this Agreement and the licenses set forth on Schedule 4.7(B), (D), (F) and (G);

(iii)   all Intellectual Property described on Schedule 4.7 is subsisting and has not been adjudged invalid or unenforceable, in whole or in part, and each Grantor has performed all acts and has paid all renewal, maintenance, and other fees and taxes required to maintain each and every registration and application of Copyrights, Patents and Trademarks in full force and effect;

(iv)    all Intellectual Property described on Schedule 4.7 is valid and enforceable; no holding, decision, or judgment has been rendered in any action or proceeding before any court or administrative authority challenging the validity of, such Grantor's right to register, or such Grantor's rights to own or use, any Intellectual Property and no such action or proceeding is pending or, to such Grantor's knowledge, threatened;

(v)     all registrations and applications for Copyrights, Patents and Trademarks of any Grantor are standing in the name of such Grantor, and none of such Trademarks, Patents, Copyrights or Trade Secrets has been licensed by any Grantor to any Affiliate or third party, except as disclosed in Schedules 4.7(B), (D), (F) and (G) (as each may be amended or supplemented from time to time);

(vi)    to the extent necessary as a legal prerequisite for enforcing a Grantor's rights in Intellectual Property, each Grantor has been using appropriate statutory notices or markings of registration in connection with its use of registered Trademarks, proper marking practices in connection with the use of Patents, and appropriate notice of copyright in connection with the publication of Copyrights material to the business of such Grantor;

(vii)   [intentionally reserved];

(viii)  to such Grantor's knowledge, the conduct of such Grantor's business does not infringe upon or otherwise violate any Trademark, Patent, Copyright, Trade Secret or other intellectual property right owned or controlled by a third party; no claim has been made that the use of any Intellectual Property

27

owned or used by Grantor (or any of its respective licensees) violates the asserted rights of any third party;

(ix)    to such Grantor's knowledge, no third party is (a) infringing upon or otherwise violating any rights in any Intellectual Property owned or used by such Grantor, or any of its respective licensees, that is material to the business of such Grantor or (b) breaching or violating any contract with any Grantor relating to any Intellectual Property owned or used by such Grantor that is material to the business of such Grantor;

(x)    no settlement or consents, covenants not to sue, nonassertion assurances, or releases have been entered into by Grantor or to which Grantor is bound that adversely affect Grantor's rights to own or use any Intellectual Property;

(xi)    each Grantor has not made a previous assignment, sale, transfer or agreement constituting a present or future assignment, sale, transfer or agreement of any Intellectual Property that has not been terminated or released.  There is no effective financing statement or other document or instrument now executed, or on file or recorded in any public office, granting a Lien in or otherwise encumbering any part of the Intellectual Property, other than in favor of Collateral Agent; and

(xii)    to the knowledge of each Grantor, no past or present employee or contractor of any such Grantor or Subsidiary has claimed any ownership interest, license, or permission in or to any such Grantor's Intellectual Property rights.

(b)    Covenants and Agreements.  Each Grantor hereby covenants and agrees with Collateral Agent and the other Secured Parties as follows:

(i)    it shall not do any act or omit to do any act to cause any of the Intellectual Property which is material to the business of such Grantor to lapse, be deemed abandoned, dedicated to the public, or unenforceable by a court of competent jurisdiction and/or the United States Patent and Trademark Office, or cause a court of competent jurisdiction to hold that such Grantor has failed to provide statutory notice to preclude a claim for past damages, or which would adversely affect the validity, grant, or enforceability of the Lien granted therein;

(ii)    it shall not, with respect to any Trademarks which are material to the business of any Grantor, cease the use of any of such Trademarks;

(iii)    it shall, within thirty (30) days of the creation or acquisition of any registerable work which is material to the business of Grantor, apply to register the Copyright in the United States Copyright Office, other than such registrable works for which such Grantor shall have determined, in its reasonable business judgment, that it is not prudent to file a registration for such a Copyright in the

28

United States Copyright Office, including for any training materials, employee or franchise manuals, operations manuals and similar internal documents; provided, should any Grantor determine to file a Copyright in any such materials, it shall comply with all of its other obligations under Sections 4.7(b)(vii) and (viii);

(iv)    it shall promptly notify Collateral Agent if it knows or has reason to know that any item of the Intellectual Property that is material to the business of any Grantor may become (A) abandoned or dedicated to the public or placed in the public domain,  (B) invalid or unenforceable, or (C) subject to any adverse determination or development (including the institution of proceedings) in any action or proceeding in the United States Patent and Trademark Office, the United States Copyright Office, any state registry, any foreign counterpart of the foregoing, or any court;

(v)    it shall take all commercially reasonable steps in the United States Patent and Trademark Office, the United States Copyright Office, any state registry or any foreign counterpart of the foregoing, to pursue any application and maintain any registration of each Trademark, Patent, and Copyright owned by any Grantor and material to its business which is now or shall become included in the Intellectual Property including those items on Schedules 4.7(A), (C) and (E);

(vi)    in the event that any Intellectual Property that is owned by or exclusively licensed to any Grantor, and is material to the business of such Grantor, is infringed, misappropriated, or diluted by a third party, such Grantor shall promptly take commercially reasonable actions to stop such infringement, misappropriation, or dilution and protect its rights in such Intellectual Property;

(vii)    it shall promptly (but in no event more than thirty (30) days after filing under clause (i) below or registration under clause (ii) below, as applicable) report to Collateral Agent (i) the filing of any application to register any Intellectual Property with the United States Patent and Trademark Office, the United States Copyright Office, or any state registry or foreign counterpart of the foregoing (whether such application is filed by such Grantor or through any agent, employee, licensee, or designee thereof) and (ii) the registration of any Intellectual Property by any such office, in each case by executing and delivering to Collateral Agent a completed Pledge Supplement, together with all Supplements to Schedules thereto;

(viii)    it shall, promptly upon the request of Collateral Agent, execute and deliver to Collateral Agent any document required to acknowledge, confirm, register, record, or perfect Collateral Agent's interest in any part of the Intellectual Property that constitutes Collateral, whether now owned or hereafter acquired.  Except with the prior consent of Collateral Agent or as permitted under the Credit Agreement, each Grantor shall not execute, and there will not be on file in any public office, any financing statement or other document or instruments with respect to the Intellectual Property of any Grantor, except financing

29

statements or other documents or instruments filed or to be filed in favor of Collateral Agent and each Grantor shall not sell, assign, transfer, license, grant any option, or create or suffer to exist any Lien upon or with respect to the Intellectual Property, except for Permitted Liens and the Lien created by and under this Agreement and the other Credit Documents;

(ix)    it shall hereafter use best efforts so as not to permit the inclusion in any contract to which it hereafter becomes a party of any provision that could or might in any way materially impair or prevent the creation of a Lien in, or the assignment of, such Grantor's rights and interests in any property included within the definitions of any Intellectual Property acquired under such contracts;

(x)    it shall take all commercially reasonable steps to protect the secrecy of all Trade Secrets of any Grantor, including entering into confidentiality agreements with employees and labeling and restricting access to secret information and documents;

(xi)    [intentionally reserved]; and

(xii)    it shall continue to collect, at its own expense, all amounts due or to become due to such Grantor in respect of the Intellectual Property or any portion thereof.  In connection with such collections, each Grantor may take (and, at Collateral Agent's reasonable request, shall take) such action as such Grantor or Collateral Agent may deem reasonably necessary or advisable to enforce collection of such amounts.  Notwithstanding the foregoing, Collateral Agent shall have the right at any time, to notify, or require any Grantor to notify, any obligors with respect to any such amounts of the existence of the Lien created hereby.

**4.8.    Commercial Tort Claims.**

(a)    <u>Representations and Warranties</u>.  Each Grantor hereby represents and warrants to Collateral Agent and the other Secured Parties, on the Closing Date and on each Credit Date, that <u>Schedule 4.8</u> sets forth all Commercial Tort Claims of each Grantor, to the knowledge of such Grantor as of the Closing Date.

(b)    <u>Covenants and Agreements</u>.  Each Grantor hereby covenants and agrees with Collateral Agent and the other Secured Parties that with respect to any Commercial Tort Claim hereafter arising it shall deliver to Collateral Agent a completed Pledge Supplement, together with all Supplements to Schedules thereto, identifying such new Commercial Tort Claims in excess of $250,000 individually, or in the aggregate with respect to any single class action suit to which multiple Grantors may have rights as a claimant. Notwithstanding the foregoing, the Lien of Collateral Agent shall attach to all Commercial Tort Claims immediately upon any Grantor's acquisition of rights therein and shall not be affected by the failure of any Grantor to deliver a supplement to <u>Schedule 4.4</u> as required hereby.

30

**4.9.    Food Products**.

(a)    <u>Representations and Warranties</u>. Each Grantor hereby represents and warrants to Collateral Agent and the other Secured Parties, on the Closing Date and on each Credit Date, that, other than as disclosed to Collateral Agent prior to the Closing Date or such Credit Date, as applicable, no such Grantor has, within the one (1) year period prior to the Closing Date or such Credit Date, as applicable, received any Farm Products Notice.

(b)    <u>Covenants and Agreements</u>. Each Grantor hereby covenants and agrees with Collateral Agent and the other Secured Parties that:

(i)    such Grantor shall pay, on or prior to the date required for payment with respect thereto, the amount of any outstanding invoices for the purchase of Farm Products, unless the same is being contested in good faith and by appropriate proceedings and such reserved or other appropriate provisions, if any, as shall be required in conformity with GAAP shall have been made or provided, and except for such delays or failures which are immaterial to the continued business operations of such Grantor;

(ii)    such Grantor shall take all other actions as may be reasonably required, if any, to ensure that any Farm Product (in any form) is purchased free and clear of any Lien, trust or other claim in favor of any Farm Products Seller or any secured party with respect to the assets of any Farm Products Seller other than Permitted Liens;

(iii)    such Grantor shall provide to the Collateral Agent, within seven (7) Business Days of receipt by such Grantor, a copy of (i) any Farm Products Notice or amendment to a previous Farm Products Notice, and (ii) any master lists of effective financing statements delivered to any Credit Party or any Subsidiary pursuant to the FSA;

(iv)    such Grantor shall pay, in the event that such Grantor receives a Farm Products Notice, the related invoice within seven (7) Business Days of receipt of such Farm Products Notice, unless such amounts are being contested in good faith; and

(v)    Grantors shall, upon the Collateral Agent's reasonable request, deliver to the Collateral Agent a true, correct and complete list of Persons from whom any Grantor purchases any Farm Products or any other perishable commodity and the outstanding amounts owed by such Grantor to such Person.

**SECTION 5.    ACCESS;  RIGHT  OF  INSPECTION;  FURTHER  ASSURANCES; ADDITIONAL GRANTORS.**

**5.1.    Access; Right of Inspection.**  Collateral Agent shall at all times have full and free access during normal business hours to the extent provided in the Credit Agreement to all

31

the books, correspondence and records of each Grantor, and Collateral Agent and its representatives may examine the same, take extracts therefrom and make photocopies thereof, and each Grantor agrees to render to Collateral Agent, at such Grantor's cost and expense, such clerical and other assistance as may be reasonably requested with respect thereto; provided, Collateral Agent shall use commercially reasonable efforts to ensure any such inspection is conducted in such a manner so not to unreasonably interfere with the conduct of the business of such Grantor.  Collateral Agent and its representatives shall at all times also have the right to enter any premises of any Grantor and inspect any property of such Grantor where any of the Collateral of such Grantor granted pursuant to this Agreement is located for the purpose of inspecting the same, observing its use or otherwise protecting its interests therein.

**5.2.    Further Assurances.**

(a)    Each Grantor agrees that from time to time, at the expense of such Grantor, it shall promptly execute and deliver all further instruments and documents, and take all further action, that may be necessary or desirable, or that Collateral Agent may reasonably request, in order to create and/or maintain the validity, perfection or priority of and protect any Lien granted or purported to be granted hereby or to enable Collateral Agent to exercise and enforce its rights and remedies hereunder with respect to any Collateral.  Without limiting the generality of the foregoing, each Grantor shall:

(i)    file or authorize the filing of such financing or continuation statements, or amendments thereto, and execute and deliver such other agreements, instruments, endorsements, powers of attorney or notices, as may be necessary or desirable, or as Collateral Agent may reasonably request, in order to perfect and preserve the Liens granted or purported to be granted hereby;

(ii)    take all actions necessary to ensure the recordation of appropriate evidence of the Liens granted hereunder in the Intellectual Property constituting Collateral with any intellectual property registry in which said Intellectual Property is registered or in which an application for registration is pending, including the United States Patent and Trademark Office, the United States Copyright Office, the various Secretaries of State, and the foreign counterparts of any of the foregoing;

(iii)    at any reasonable time, upon reasonable request by Collateral Agent prior to an Event of Default and at any time upon the occurrence and during the continuance of an Event of Default, allow inspection of the Collateral by Collateral Agent, or Persons designated by Collateral Agent; and

(iv)    at Collateral Agent's reasonable request, appear in and defend any action or proceeding that may affect such Grantor's title to or Collateral Agent's Lien in all or any part of the Collateral.

(b)    Each Grantor hereby authorizes Collateral Agent to file a Record or Records, including financing or continuation statements, and amendments thereto, in any

jurisdictions and with any filing offices as Collateral Agent may determine, in its sole discretion, are necessary or advisable to perfect the Lien granted to Collateral Agent herein.  Such financing statements may describe the Collateral in the same manner as described herein or may contain an indication or description of collateral that describes such property in any other manner as Collateral Agent may determine, in its sole discretion, is necessary, advisable or prudent to ensure the perfection of the Lien in the Collateral granted to Collateral Agent herein, including describing such property as "all assets" or "all personal property, whether now owned or hereafter acquired."  Each Grantor shall furnish to Collateral Agent from time to time statements and schedules further identifying and describing the Collateral and such other reports in connection with the Collateral as Collateral Agent may reasonably request, all in reasonable detail.

(c)     Each Grantor hereby authorizes Collateral Agent to amend Schedule 4.7 to include reference to any right, title or interest in any existing Intellectual Property Collateral or any Intellectual Property Collateral acquired or developed by any Grantor after the execution hereof or to delete any reference to any right, title or interest in any Intellectual Property in which any Grantor no longer has or claims any right, title or interest.

**5.3.     Additional Grantors.**   From time to time subsequent to the date hereof, additional Persons may become parties hereto as additional Grantors (each, an **"Additional Grantor"**), by executing a Counterpart Agreement.  Upon delivery of any such Counterpart Agreement to Collateral Agent, notice of which is hereby waived by Grantors, each Additional Grantor shall be a Grantor and shall be as fully a party hereto as if Additional Grantor were an original signatory hereto.  Each Grantor expressly agrees that its obligations arising hereunder shall not be affected or diminished by the addition or release of any other Grantor hereunder, nor by any election of Collateral Agent not to cause any Subsidiary of any Grantor to become an Additional Grantor hereunder.  This Agreement shall be fully effective as to any Grantor that is or becomes a party hereto regardless of whether any other Person becomes or fails to become or ceases to be a Grantor hereunder.

**SECTION 6.     COLLATERAL AGENT APPOINTED ATTORNEY-IN-FACT.**

**6.1.     Power of Attorney.**   Each Grantor hereby irrevocably appoints Collateral Agent (such appointment being coupled with an interest) as such Grantor's attorney-in-fact, with full authority in the place and stead of such Grantor and in the name of such Grantor, Collateral Agent or otherwise, from time to time in Collateral Agent's discretion to take any action and to execute any instrument that Collateral Agent may deem reasonably necessary or advisable to accomplish the purposes of this Agreement, including the following:

(a)     upon the occurrence and during the continuance of any Event of Default, to obtain and adjust insurance required to be maintained by such Grantor or paid to Collateral Agent pursuant to the Credit Agreement;

(b)     upon the occurrence and during the continuance of any Event of Default, to ask for, demand, collect, sue for, recover, compound, receive and give acquittance and receipts for moneys due and to become due under or in respect of any of the Collateral;

33

(c)        upon the occurrence and during the continuance of any Event of Default, to receive, endorse and collect any drafts or other instruments, documents and chattel paper in connection with <u>clause (b)</u> of this <u>Section 6.1</u>;

(d)        upon the occurrence and during the continuance of any Event of Default, to file any claims or take any action or institute any proceedings that Collateral Agent may deem necessary or desirable for the collection of any of the Collateral or otherwise to enforce the rights of Collateral Agent with respect to any of the Collateral;

(e)        to prepare and file any UCC financing statements against such Grantor as debtor;

(f)        to prepare, sign, and file for recordation in any intellectual property registry, appropriate evidence of the Lien granted herein in the Intellectual Property Collateral in the name of such Grantor as assignor or debtor;

(g)        to take or cause to be taken all actions necessary to perform or comply or cause performance or compliance with the terms of this Agreement, including access to pay or discharge taxes or Liens (other than Permitted Liens) levied or placed upon or threatened against the Collateral, the legality or validity thereof and the amounts necessary to discharge the same to be determined by Collateral Agent in its sole discretion, any such payments made by Collateral Agent to become obligations of such Grantor to Collateral Agent, due and payable immediately and without demand; and

(h)        (i) upon the occurrence and during the continuance of an Event of Default, generally to sell, transfer, pledge, make any agreement with respect to or otherwise deal with any of the Collateral as fully and completely as though Collateral Agent were the absolute owner thereof for all purposes and (ii) to do, at Collateral Agent's option and such Grantor's expense, at any time or from time to time, all acts and things that Collateral Agent deems reasonably necessary to protect, preserve or realize upon the Collateral and Collateral Agent's Lien therein in order to effect the intent of this Agreement, all as fully and effectively as such Grantor might do.

**6.2.    No Duty on the Part of Collateral Agent or Secured Parties.**  The powers conferred on Collateral Agent hereunder are solely to protect the interests of the Secured Parties in the Collateral and shall not impose any duty upon Collateral Agent or any other Secured Party to exercise any such powers.  Collateral Agent and the Secured Parties shall be accountable only for amounts that they actually receive as a result of the exercise of such powers, and neither they nor any of their respective officers, directors, employees or agents shall be responsible to any Grantor for any act or failure to act hereunder, except for their own gross negligence, bad faith or willful misconduct as determined by a final, non-appealable judgment of a court of competent jurisdiction.

## SECTION 7.    REMEDIES.

### 7.1.    Generally.

(a)    If any Event of Default shall have occurred and be continuing, Collateral Agent may exercise in respect of the Collateral, in addition to all other rights and remedies set forth herein or otherwise available to it at law or in equity, all the rights and remedies of Collateral Agent on default under the UCC (whether or not the UCC applies to the affected Collateral) to collect, enforce or satisfy any Secured Obligations then owing, whether by acceleration or otherwise, and also may pursue any of the following separately, successively or simultaneously:

(i)    require any Grantor to, and each Grantor hereby agrees that it shall at its expense and promptly upon request of Collateral Agent forthwith, assemble all or part of the Collateral as directed by Collateral Agent and make it available to Collateral Agent at a place to be designated by Collateral Agent that is reasonably convenient to the parties hereto;

(ii)    enter onto the property where any Collateral is located and take possession thereof with or without judicial process;

(iii)    prior to the disposition of the Collateral, store, process, repair or recondition the Collateral or otherwise prepare the Collateral for disposition in any manner to the extent Collateral Agent deems appropriate; and

(iv)    without notice except as specified below or under the UCC, sell, assign, lease, license (on an exclusive or nonexclusive basis) or otherwise dispose of the Collateral or any part thereof in one or more parcels at public or private sale, at any of Collateral Agent's offices or elsewhere, for Cash, on credit or for future delivery, at such time or times and at such price or prices and upon such other terms as Collateral Agent may deem commercially reasonable.

(b)    Collateral Agent or any other Secured Party may be the purchaser of any or all of the Collateral at any public or private (to the extent that the portion of the Collateral being privately sold is of a kind that is customarily sold on a recognized market or the subject of widely distributed standard price quotations) sale in accordance with the UCC and Collateral Agent, as collateral agent for and representative of the Secured Parties, shall be entitled, for the purpose of bidding and making settlement or payment of the purchase price for all or any portion of the Collateral sold at any such sale made in accordance with the UCC, to use and apply any of the Secured Obligations as a credit on account of the purchase price for any Collateral payable by Collateral Agent at such sale. Each purchaser at any such sale shall hold the property sold absolutely free from any claim or right on the part of any Grantor, and each Grantor hereby waives (to the extent permitted by applicable law) all rights of redemption, stay and/or appraisal which it now has or may at any time in the future have under any rule of law or statute now existing or hereafter enacted. Each Grantor agrees that, to the extent notice of sale shall be required by law, at least ten (10) days' notice to such Grantor of the time and place of any public

35

sale or the time after which any private sale is to be made shall constitute reasonable notification. Collateral Agent shall not be obligated to make any sale of Collateral regardless of notice of sale having been given.  Collateral Agent may adjourn any public or private sale from time to time by announcement at the time and place fixed therefor, and such sale may, without further notice, be made at the time and place to which it was so adjourned.  Each Grantor agrees that it would not be commercially unreasonable for Collateral Agent to dispose of the Collateral or any portion thereof by using internet sites that provide for the auction of assets of the types included in the Collateral or that have the reasonable capability of doing so, or that match buyers and sellers of assets.  Each Grantor hereby waives any claims against Collateral Agent arising by reason of the fact that the price at which any Collateral may have been sold at such a private sale was less than the price which might have been obtained at a public sale, even if Collateral Agent accepts the first offer received and does not offer such Collateral to more than one offeree.  If the proceeds of any sale or other disposition of the Collateral are insufficient to pay all the Secured Obligations, Grantors shall be liable for the deficiency and the fees of any attorneys employed by Collateral Agent to collect such deficiency.  Each Grantor further agrees that a breach of any of the covenants contained in this <u>Section 7.1</u> will cause irreparable injury to Collateral Agent, that Collateral Agent has no adequate remedy at law in respect of such breach and, as a consequence, that each and every covenant contained in this <u>Section 7.1</u> shall be specifically enforceable against such Grantor, and such Grantor hereby waives and agrees not to assert any defenses against an action for specific performance of such covenants except for a defense that no default has occurred giving rise to the Secured Obligations becoming due and payable prior to their stated maturities.  Nothing in this <u>Section 7.1</u> shall in any way alter the rights of Collateral Agent hereunder.

(c)     Collateral Agent may sell the Collateral without giving any warranties as to the Collateral.  Collateral Agent may specifically disclaim or modify any warranties of title or the like.   This procedure will not be considered to adversely affect the commercial reasonableness of any sale of the Collateral.

(d)     Collateral Agent shall have no obligation to marshal any of the Collateral.

**7.2.   Application of Proceeds.**   Except as expressly set forth elsewhere in this Agreement, all proceeds received by Collateral Agent in respect of any sale, any collection from, or other realization upon all or any part of the Collateral shall be applied in full or in part by Collateral Agent against the Secured Obligations as set forth in the Credit Agreement.

**7.3.   Sales on Credit.**   If Collateral Agent sells any of the Collateral upon credit, Grantors will be credited only with payments actually made by the purchaser thereof and received by Collateral Agent and applied to indebtedness of the purchaser thereof.  In the event the purchaser fails to pay for the Collateral, Collateral Agent may resell the Collateral and Grantors shall be credited with proceeds of the sale.

**7.4.   Deposit Accounts.**   If any Event of Default shall have occurred and be continuing, Collateral Agent may apply the balance from any Controlled Account or instruct the bank at which any such Controlled Account is maintained to pay the balance of any Controlled

36

Account to or for the benefit of Collateral Agent, in each case, in accordance with the terms of and subject to the conditions set forth in the Credit Agreement.

7.5. **Investment Related Property.**  Each Grantor recognizes that, by reason of certain prohibitions contained in the Securities Act and applicable state securities laws, Collateral Agent may be compelled, with respect to any sale of all or any part of the Investment Related Property conducted without prior registration or qualification of such Investment Related Property under the Securities Act and/or such state securities laws, to limit purchasers to those who will agree, among other things, to acquire the Investment Related Property for their own account, for investment and not with a view to the distribution or resale thereof.  Each Grantor acknowledges that any such private sale may be at prices and on terms less favorable than those obtainable through a public sale without such restrictions (including a public offering made pursuant to a registration statement under the Securities Act) and, notwithstanding such circumstances, each Grantor agrees that any such private sale shall be deemed to have been made in a commercially reasonable manner and that Collateral Agent shall have no obligation to engage in public sales and no obligation to delay the sale of any Investment Related Property for the period of time necessary to permit the issuer thereof to register it for a form of public sale requiring registration under the Securities Act or under applicable state securities laws, even if such issuer would, or should, agree to so register it.  If Collateral Agent determines to exercise its right to sell any or all of the Investment Related Property, upon written request, each Grantor shall and shall cause each issuer of any Pledged Equity Interests to be sold hereunder from time to time to furnish to Collateral Agent all such information as Collateral Agent may request in order to determine the number and nature of interest, shares or other instruments included in the Investment Related Property which may be sold by Collateral Agent in exempt transactions under the Securities Act and the rules and regulations of the Securities and Exchange Commission thereunder, as the same are from time to time in effect.

7.6. **Intellectual Property.**

(a)  Anything contained herein to the contrary notwithstanding, upon the occurrence and during the continuation of an Event of Default:

(i)  Collateral Agent shall have the right (but not the obligation) to bring suit or otherwise commence any action or proceeding in the name of any Grantor, Collateral Agent or otherwise, in Collateral Agent's sole discretion, to enforce any Intellectual Property, in which event such Grantor shall, at the request of Collateral Agent, do any and all lawful acts and execute any and all documents required by Collateral Agent in aid of such enforcement and such Grantor shall promptly, upon demand, reimburse and indemnify Collateral Agent as set forth in Sections 10.2 and 10.3 of the Credit Agreement in connection with the exercise of its rights under this Section 7.6, and, to the extent that Collateral Agent shall elect not to bring suit to enforce any Intellectual Property as set forth in this Section 7.6, each Grantor agrees to use all reasonable measures, whether by action, suit, proceeding or otherwise, to prevent the infringement or other violation of any of such Grantor's rights in the Intellectual Property by any other Person and for that purpose agrees to diligently maintain any action, suit or

37

proceeding against any Person so infringing as shall be necessary to prevent such infringement or violation;

(ii)     upon written demand from Collateral Agent, each Grantor shall grant, assign, convey or otherwise transfer to Collateral Agent or such Collateral Agent's designee all of such Grantor's right, title and interest in and to the Intellectual Property and shall execute and deliver to Collateral Agent such documents as are necessary or appropriate to carry out the intent and purposes of this Agreement;

(iii)     each Grantor agrees that such an assignment and/or recording shall be applied to reduce the Secured Obligations outstanding only to the extent that Collateral Agent (or any other Secured Party) receives Cash proceeds in respect of the sale of, or other realization upon, the Intellectual Property;

(iv)     within five (5) Business Days after written notice from Collateral Agent, each Grantor shall make available to Collateral Agent, to the extent within such Grantor's power and authority, such personnel in such Grantor's employ on the date of such Event of Default as Collateral Agent may reasonably designate, by name, title or job responsibility, to permit such Grantor to continue, directly or indirectly, to produce, advertise and sell the products and services sold or delivered by such Grantor under or in connection with the Trademarks and Trademark Licenses, such Persons to be available to perform their prior functions on Collateral Agent's behalf and to be compensated by Collateral Agent at such Grantor's expense on a per diem, pro-rata basis consistent with the salary and benefit structure applicable to each as of the date of such Event of Default; and

(v)     Collateral Agent shall have the right to notify, or require each Grantor to notify, any obligors with respect to amounts due or to become due to such Grantor in respect of the Intellectual Property, of the existence of the Lien created herein, to direct such obligors to make payment of all such amounts directly to Collateral Agent, and, upon such notification and at the expense of such Grantor, to enforce collection of any such amounts and to adjust, settle or compromise the amount or payment thereof, in the same manner and to the same extent as such Grantor might have done;

(A)     all amounts and proceeds (including checks and other instruments) received by any Grantor in respect of amounts due to such Grantor in respect of the Collateral or any portion thereof shall be received in trust for the benefit of Collateral Agent hereunder, shall be segregated from other funds of such Grantor and shall be forthwith paid over or delivered to Collateral Agent in the same form as so received (with any necessary endorsement) to be held as cash Collateral and applied as provided by Section 7.7; and

38

(B)       no Grantor shall adjust, settle or compromise the amount or payment of any such amount or release wholly or partly any obligor with respect thereto or allow any credit or discount thereon.

(b)       If (i) an Event of Default shall have occurred and, by reason of cure, waiver, modification, amendment or otherwise, no longer be continuing; (ii) no other Event of Default shall have occurred and be continuing; (iii) an assignment or other transfer to Collateral Agent of any rights, title and interests in and to the Intellectual Property shall have been previously made and shall have become absolute and effective; and (iv) the Secured Obligations shall not have become immediately due and payable, upon the written request of any Grantor, Collateral Agent shall promptly execute and deliver to such Grantor, at such Grantor's sole cost and expense, such assignments or other transfer as may be necessary to reassign to such Grantor any and all such rights, title and interests as may have been assigned to Collateral Agent as aforesaid, subject to any disposition thereof that may have been made by Collateral Agent; provided, after giving effect to such reassignment, Collateral Agent's Lien granted pursuant to this Agreement, as well as all other rights and remedies of Collateral Agent granted hereunder, shall continue to be in full force and effect; provided, further, the rights, title and interests so reassigned shall be free and clear of any other Liens granted by or on behalf of Collateral Agent and the Secured Parties.

(c)       Solely for the purpose of enabling Collateral Agent to exercise rights and remedies under this Section 7 and at such time as Collateral Agent shall be lawfully entitled to exercise such rights and remedies, each Grantor hereby grants to Collateral Agent, to the extent it has the right to do so, an irrevocable, nonexclusive license (exercisable without payment of royalty or other compensation to such Grantor), subject, in the case of Trademarks, to sufficient rights to quality control and inspection in favor of such Grantor to avoid the risk of invalidation of said Trademarks, to use, operate under, license, or sublicense any Intellectual Property now owned or hereafter acquired by such Grantor, and wherever the same may be located.

**7.7.    Cash Proceeds.**  Subject to the rights of Collateral Agent specified in Section 4.3 with respect to payments of Receivables, except as otherwise set forth in the Credit Agreement, if an Event of Default has occurred and is continuing, all proceeds of any Collateral received by any Grantor consisting of Cash, checks and other non-Cash items (collectively, **"Cash Proceeds"**) shall be held by such Grantor in trust for Collateral Agent, segregated from other funds of such Grantor, and shall, forthwith upon receipt by such Grantor, unless otherwise provided pursuant to Section 4.4.1(a)(ii), be turned over to Collateral Agent in the exact form received by such Grantor (duly indorsed by such Grantor to Collateral Agent, if required) and held by Collateral Agent.  Except as otherwise set forth in the Credit Agreement, if an Event of Default has occurred and is continuing, any Cash Proceeds received by Collateral Agent (whether from a Grantor or otherwise) may, in the sole discretion of Collateral Agent, (b) be held by Collateral Agent for the ratable benefit of the Secured Parties, as collateral security for the Secured Obligations (whether matured or unmatured) and/or (b) then or at any time thereafter may be applied by Collateral Agent against the Secured Obligations in accordance with the Credit Agreement.

39

## SECTION 8.    COLLATERAL AGENT.

Collateral Agent has been appointed to act as "Collateral Agent" hereunder by the Lenders pursuant to the Credit Agreement and, by their acceptance of the benefits hereof, the other Secured Parties.  Collateral Agent shall be obligated, and shall have the right hereunder, to make demands, to give notices, to exercise or refrain from exercising any rights, and to take or refrain from taking any action (including the release or substitution of Collateral), solely in accordance with this Agreement and the other Credit Documents.   In furtherance of the foregoing provisions of this Section 8, each Secured Party, by its acceptance of the benefits hereof, agrees that it shall have no right individually to realize upon any of the Collateral hereunder, it being understood and agreed by such Secured Party that all rights and remedies hereunder may be exercised solely by Collateral Agent for the benefit of Secured Parties in accordance with the terms of this Agreement.  Collateral Agent may resign, and a successor be appointed, in accordance with the Credit Agreement.   After any retiring Collateral Agent's resignation hereunder as Collateral Agent, the provisions of this Agreement shall inure to its benefit as to any actions taken or omitted to be taken by it under this Agreement while it was Collateral Agent hereunder.

## SECTION 9.    CONTINUING SECURITY INTEREST; TRANSFER OF LOANS.

This Agreement shall create a continuing security interest in the Collateral and shall remain in full force and effect until (a) the payment in full in Cash of all Secured Obligations (other than Letters of Credit that are fully Cash collateralized), (b) the cancellation or termination of the Commitments and (c) the cancellation, expiration or the full Cash collateralization, of all outstanding Letters of Credit (if any), be binding upon each Grantor, its successors and assigns, and inure, together with the rights and remedies of Collateral Agent hereunder, to the benefit of Collateral Agent and its successors, transferees and permitted assigns. Without limiting the generality of the foregoing, but subject to the terms of the Credit Agreement, any Lender may assign or otherwise transfer any Loans held by it to any other Person, and such other Person shall thereupon become vested with all the benefits in respect thereof granted to Lenders herein or otherwise.  Upon the payment in full in Cash of all Secured Obligations (other than Letters of Credit that are fully Cash collateralized), the cancellation or termination of the Commitments and the cancellation, expiration or the full Cash collateralization of all outstanding Letters of Credit (if any), the Liens granted hereby shall automatically terminate hereunder and of record and all rights to the Collateral shall revert to Grantors.  Upon any such termination Collateral Agent shall, at Grantors' expense, execute and deliver to Grantors or otherwise authorize the filing of such documents as Grantors shall reasonably request in writing, including financing statement amendments to evidence such termination, in each case, such documents to be in form and substance satisfactory to Collateral Agent and without representation or warranty by, or recourse to, Collateral Agent.  Upon any disposition of property permitted by the Credit Agreement, the Liens granted herein shall be deemed to be automatically released and such property shall automatically revert to the applicable Grantor with no further action on the part of any Person. Collateral Agent shall, at Grantor's expense, execute and deliver or otherwise authorize the filing of such documents as Grantors shall reasonably request in writing, in form and substance reasonably satisfactory to Collateral Agent and without representation or warranty by, or

40

recourse to, Collateral Agent, including financing statement amendments to evidence such release.

## SECTION 10.    STANDARD OF CARE; COLLATERAL AGENT MAY PERFORM.

The powers conferred on Collateral Agent hereunder are solely to protect its interest in the Collateral and shall not impose any duty upon it to exercise any such powers.  Except for the exercise of reasonable care in the custody of any Collateral in its possession and the accounting for moneys actually received by it hereunder, Collateral Agent shall have no duty as to any Collateral or as to the taking of any necessary steps to preserve rights against prior parties or any other rights pertaining to any Collateral.  Collateral Agent shall be deemed to have exercised reasonable care in the custody and preservation of Collateral in its possession if such Collateral is accorded treatment substantially equal to that which Collateral Agent accords its own property. Neither Collateral Agent nor any of its directors, officers, employees or agents shall be liable for failure to demand, collect or realize upon all or any part of the Collateral or for any delay in doing so or shall be under any obligation to sell or otherwise dispose of any Collateral upon the request of any Grantor or otherwise.  If any Grantor fails to perform any agreement contained herein, Collateral Agent may itself perform, or cause performance of, such agreement, and the expenses of Collateral Agent incurred in connection therewith shall be payable by each Grantor under Section 10.2 of the Credit Agreement.

## SECTION 11.    MISCELLANEOUS.

Any notice required or permitted to be given under this Agreement shall be given in accordance with Section 10.1 of the Credit Agreement.  No failure or delay on the part of Collateral Agent in the exercise of any power, right or privilege hereunder or under any other Credit Document shall impair such power, right or privilege or be construed to be a waiver of any default or acquiescence therein, nor shall any single or partial exercise of any such power, right or privilege preclude other or further exercise thereof or of any other power, right or privilege.    All rights and remedies existing under this Agreement and the other Credit Documents are cumulative to, and not exclusive of, any rights or remedies otherwise available. In case any provision in or obligation under this Agreement shall be invalid, illegal or unenforceable in any jurisdiction, the validity, legality and enforceability of the remaining provisions or obligations, or of such provision or obligation in any other jurisdiction, shall not in any way be affected or impaired thereby.  All covenants hereunder shall be given independent effect so that if a particular action or condition is not permitted by any of such covenants, the fact that it would be permitted by an exception to, or would otherwise be within the limitations of, another covenant shall not avoid the occurrence of a Default or an Event of Default if such action is taken or condition exists.  This Agreement shall be binding upon and inure to the benefit of Collateral Agent and Grantors and their respective successors and permitted assigns.  No Grantor shall, without the prior written consent of Collateral Agent given in accordance with the Credit Agreement and the other Credit Documents, assign any right, duty or obligation hereunder.  This Agreement and the other Credit Documents embody the entire agreement and understanding between Grantors and Collateral Agent and supersede all prior agreements and understandings between such parties relating to the subject matter hereof and thereof.  Accordingly, the Credit Documents may not be contradicted by evidence of prior, contemporaneous or subsequent oral

41

agreements of the parties. There are no unwritten oral agreements between the parties. This Agreement may be executed in any number of counterparts (any of which may be delivered by email or other electronic transmission), each of which when so executed and delivered shall be deemed an original, but all such counterparts together shall constitute but one and the same instrument. Any party delivering an executed counterpart this Agreement via email or other electronic transmission shall, upon the request by Administrative Agent, also deliver a manually executed original to Administrative Agent or its counsel, but the failure to do so does not affect the validity, enforceability or binding effect of this Agreement.

**THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO CONFLICT OF LAWS PRINCIPLES (OTHER THAN SECTIONS 5-1401 AND 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW) THEREOF, EXCEPT TO THE EXTENT THAT THE VALIDITY OR PERFECTION OF THE SECURITY INTEREST OR THE REMEDIES HEREUNDER IN RESPECT OF ANY COLLATERAL ARE GOVERNED BY THE LAW OF A JURISDICTION OTHER THAN THE STATE OF NEW YORK.**

[Remainder of Page Intentionally Blank]

42

**IN WITNESS WHEREOF**, each Grantor and Collateral Agent have caused this Agreement to be duly executed and delivered by their respective officers thereunto duly authorized as of the date first written above.

**GRANTORS:**

**[___]**


By:_____
Name:
Title:


**[___]**


By:_____
Name:
Title:

**COLLATERAL AGENT:**

**TCW ASSET MANAGEMENT COMPANY LLC**


By:_____
Name:
Title:

**SCHEDULE 4.1 TO
PLEDGE AND SECURITY AGREEMENT**

## GENERAL INFORMATION

(S)    Full legal name, type of organization, jurisdiction of organization, chief executive office and organizational identification number of each Grantor:

| Full Legal Name | Type of Organization | Jurisdiction of Organization | Chief Executive Office | Organization I.D.# |
|---|---|---|---|---|
| | | | | |
| | | | | |

(T)    Other names (including any trade-name or fictitious business name) under which each Grantor has conducted business for the past five (5) years:

| Full Legal Name | Trade Name or Fictitious Business Name |
|---|---|
| | |
| | |

(U)    Changes in name, identity, jurisdiction of organization, corporate structure or chief executive office within past five (5) years:

| Name of Grantor | Date of Change | Description of Change |
|---|---|---|
| | | |
| | | |

(V)    Agreements pursuant to which any Grantor is found as debtor within past five (5) years, which have not been terminated:

| Name of Grantor | Description of Agreement |
|---|---|
| | |
| | |

(W)    Financing statements:

| Name of Grantor | Filing Jurisdiction(s) |
|---|---|
| | |
| | |

Schedule 4.1-1

**SCHEDULE 4.2 TO**
**PLEDGE AND SECURITY AGREEMENT**

| Name of Grantor | Location of Equipment and Inventory |
|---|---|
|  |  |

Schedule 4.2-1

SCHEDULE 4.4 TO
PLEDGE AND SECURITY AGREEMENT

INVESTMENT RELATED PROPERTY

(A)

Pledged Stock:

| Grantor | Stock Issuer | Class of Stock | Certificated (Y/N) | Stock Certificate No. | Par Value | No. of Pledged Stock | % of Outstanding Stock of the Stock Issuer |
|---|---|---|---|---|---|---|---|
| | | | | | | | |
| | | | | | | | |

Pledged LLC Interests:

| Grantor | Limited Liability Company | Class of Membership Interests | Certificated (Y/N) | Certificate No. (if any) | No. of Pledged Units | % of Outstanding LLC Interests of the Limited Liability Company |
|---|---|---|---|---|---|---|
| | | | | | | |

Pledged Partnership Interests:

| Grantor | Partnership | Type of Partnership Interests (e.g., general or limited) | Certificated (Y/N) | Certificate No. (if any) | % of Outstanding Partnership Interests of the Partnership |
|---|---|---|---|---|---|
| | | | | | |

Pledged Trust Interests:

| Grantor | Trust | Class of | Certificated | Certificate | % of |
|---|---|---|---|---|---|

Schedule 4.6-1

| | | Trust Interests | (Y/N) | No. (if any) | Outstanding Trust Interests of the Trust |
|---|---|---|---|---|---|
| | | | | | |

Pledged Debt:

| Grantor | Issuer | Original Principal Amount | Outstanding Principal Balance | Issue Date | Maturity Date |
|---|---|---|---|---|---|
| | | | | | |

Securities Accounts:

| Grantor | Share of Securities Intermediary | Account Number | Account Name |
|---|---|---|---|
| | | | |

Commodities Accounts:

| Grantor | Name of Commodities Intermediary | Account Number | Account Name |
|---|---|---|---|
| | | | |

Deposit Accounts:

| Grantor | Name of Depositary Bank | Account Number | Account Name |
|---|---|---|---|
| | | | |

(X)    Acquisitions of any Capital Stock or Securities of another entity or all or substantially all of the assets of another entity, or any merger with another entity, within the past five (5) years:

| Name of Grantor | Date of Acquisition | Description of Acquisition |
|---|---|---|

Schedule 4.6-2

**SCHEDULE 4.6 TO**
**PLEDGE AND SECURITY AGREEMENT**

| Name of Grantor | Description of Letters of Credit |
|---|---|
|  |  |

Schedule 4.6-3

**SCHEDULE 4.7 TO**
**PLEDGE AND SECURITY AGREEMENT**

**INTELLECTUAL PROPERTY**

(A)    Copyrights

(B)    Copyright Licenses

(C)    Patents

(D)    Patent Licenses

(E)    Trademarks

(F)    Trademark Licenses

(G)    Trade Secret Licenses

(H)    Intellectual Property exceptions

Schedule 4.7-1

**SCHEDULE 4.8 TO**
**PLEDGE AND SECURITY AGREEMENT**

| Name of Grantor | Commercial Tort Claims |
|---|---|
|  |  |

Schedule 4.8-1

**EXHIBIT A TO**
**PLEDGE AND SECURITY AGREEMENT**

**PLEDGE SUPPLEMENT**

This **PLEDGE SUPPLEMENT**, dated **[mm/dd/yy]**, is delivered by **[NAME OF GRANTOR]**, a **[_____]** (**"Grantor"**), pursuant to the Pledge and Security Agreement, dated as of February [19], 2021 (as amended, restated, supplemented or otherwise modified from time to time, the **"Security Agreement"**), among **RT ASSET COMPANY HOLDINGS LLC**, a Delaware limited liability company, as a Grantor, **[RUBY TUESDAY OPERATIONS LLC]**, a Delaware limited liability company, as a Grantor, the other Grantors party thereto from time to time, and **TCW ASSET MANAGEMENT COMPANY LLC**, as Collateral Agent.  Capitalized terms used herein not otherwise defined herein shall have the meanings ascribed thereto in the Security Agreement.

Grantor hereby confirms the grant to Collateral Agent set forth in the Security Agreement. Grantor represents and warrants to Collateral Agent and the other Secured Parties that the attached Supplements to Schedules accurately and completely set forth all additional information required pursuant to the Security Agreement and hereby agrees that such Supplements to Schedules shall constitute part of the Schedules to the Security Agreement.

**IN WITNESS WHEREOF,** Grantor has caused this Pledge Supplement to be duly executed and delivered by its duly authorized officer as of **[mm/dd/yy]**.

**[NAME OF GRANTOR]**

By:_____
Name:
Title:

Exhibit A-1

**SUPPLEMENT TO SCHEDULE 4.1 TO
PLEDGE AND SECURITY AGREEMENT**

Additional information:

(A)    Full legal name, type of organization, jurisdiction of organization, chief executive office and organizational identification number of each Grantor:

| Full Legal Name | Type of Organization | Jurisdiction of Organization | Chief Executive Office | Organization I.D.# |
|---|---|---|---|---|
|  |  |  |  |  |

(I)    Other names (including any trade-name or fictitious business name) under which each Grantor has conducted business for the past five (5) years:

| Full Legal Name | Trade Name or Fictitious Business Name |
|---|---|
|  |  |

(J)    Changes in name, jurisdiction of organization, chief executive office and corporate structure within past five (5) years:

| Name of Grantor | Date of Change | Description of Change |
|---|---|---|
|  |  |  |

(K)    Agreements pursuant to which any Grantor is found as debtor within past five (5) years, which have not been terminated:

| Name of Grantor | Description of Agreement |
|---|---|
|  |  |

(L)    Financing statements:

| Name of Grantor | Filing Jurisdiction(s) |
|---|---|
|  |  |

Exhibit A-2

**SUPPLEMENT TO SCHEDULE 4.2 TO
PLEDGE AND SECURITY AGREEMENT**

Additional information:

| Name of Grantor | Location of Equipment and Inventory |
|---|---|
|  |  |

**SUPPLEMENT TO SCHEDULE 4.4 TO**
**PLEDGE AND SECURITY AGREEMENT**

Additional information:

(A)

Pledged Stock:

Pledged Partnership Interests:

Pledged LLC Interests:

Pledged Trust Interests:

Pledged Debt:

Securities Account:

Commodities Accounts:

Deposit Accounts:

(B)     Acquisitions of any Capital Stock or Securities of another entity or all or substantially all of the assets of another entity, or any merger with another entity, within the past five (5) years:

| Name of Grantor | Date of Acquisition | Description of Acquisition |
|---|---|---|
|  |  |  |
|  |  |  |

Exhibit A-4

**SUPPLEMENT TO SCHEDULE 4.6 TO
PLEDGE AND SECURITY AGREEMENT**

Additional information:

| Name of Grantor | Description of Letters of Credit |
|---|---|
|  |  |

**SUPPLEMENT TO SCHEDULE 4.7 TO**
**PLEDGE AND SECURITY AGREEMENT**

Additional information:

(A)    Copyrights

(B)    Copyright Licenses

(C)    Patents

(D)    Patent Licenses

(E)    Trademarks

(F)    Trademark Licenses

(G)    Trade Secret Licenses

(H)    Intellectual Property exceptions

Exhibit A-6

**SUPPLEMENT TO SCHEDULE 4.8 TO
PLEDGE AND SECURITY AGREEMENT**

Additional information:

| Name of Grantor | Commercial Tort Claims |
|---|---|
|  |  |

TCW/Ruby – Pledge and Security Agreement
LEGAL_US_W # 106543539.3