## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | Chapter 11 |
| RTI HOLDING COMPANY, LLC,[1] | Case No. 20-12456 (JTD) |
| Debtors. | (Jointly Administered) |

**Hearing Date: February 11, 2021, 2:30 p.m. (prevailing Eastern Time)**
**Objection Deadline: January 29, 2021, 5:00 pm (prevailing Eastern Time)**

## MEMORANDUM OF LAW IN SUPPORT OF
## CONFIRMATION OF DEBTORS' SECOND AMENDED
## CHAPTER 11 PLAN, AND IN REPLY TO PLAN-RELATED OBJECTIONS

PACHULSKI STANG ZIEHL & JONES LLP
Richard M. Pachulski (CA Bar No. 90073)
Malhar S. Pagay (CA Bar No. 189289)
James E. O'Neill (DE Bar No. 4042)
919 North Market Street, 17th Floor
Wilmington, DE  19899-8705 (Courier 19801)
Telephone: 302/652-4100
Facsimile:  302/652-4400
E-mail:    rpachulski@pszjlaw.com
           mpagay@pszjlaw.com
           joneill@pszjlaw.com
Counsel for the Debtors and Debtors in Possession

---

[1] The Debtors in these chapter 11 cases and the last four digits of each Debtor's U.S. tax identification number are as follows: RTI Holding Company, LLC (4966); Ruby Tuesday, Inc. (5239); Ruby Tuesday, LLC (1391); RTBD, LLC (6505); RT of Carroll County, LLC (8836); RT Denver Franchise, L.P. (2621); RT Detroit Franchise, LLC (8738); RT Distributing, LLC (6096); RT Finance, LLC (7242); RT FL Gift Cards, Inc. (2189); RT Florida Equity, LLC (7159); RT Franchise Acquisition, LLC (1438); RT of Fruitland, Inc. (1103); RT Indianapolis Franchise, LLC (6016); RT Jonesboro Club (2726); RT KCMO Franchise, LLC (7020); RT Kentucky Restaurant Holdings, LLC (7435); RT Las Vegas Franchise, LLC (4969); RT Long Island Franchise, LLC (4072); RT of Maryland, LLC (7395); RT Michiana Franchise, LLC (8739); RT Michigan Franchise, LLC (8760); RT Minneapolis Franchise, LLC (2746); RT Minneapolis Holdings, LLC (7189); RT New England Franchise, LLC (4970); RT New Hampshire Restaurant Holdings, LLC (7438);  RT New York Franchise, LLC (1154); RT Omaha Franchise, LLC (7442); RT Omaha Holdings, LLC (8647); RT One Percent Holdings, LLC (6689); RT One Percent Holdings II, LLC (2817); RT Orlando Franchise, LP (5105); RT Restaurant Services, LLC (7283); RT South Florida Franchise, LP (3535); RT Southwest Franchise, LLC (9715); RT St. Louis Franchise, LLC (6010); RT Tampa Franchise, LP (5290); RT Western Missouri Franchise, LLC (6082); RT West Palm Beach Franchise, LP (0359); RTTA, LP (0035); RTT Texas, Inc. (2461); RTTT, LLC (9194); Ruby Tuesday of Allegany County, Inc. (8011); Ruby Tuesday of Bryant, Inc. (6703); Ruby Tuesday of Columbia, Inc. (4091); Ruby Tuesday of Frederick, Inc. (4249); Ruby Tuesday of Linthicum, Inc. (8716); Ruby Tuesday of Marley Station, Inc. (1641); Ruby Tuesday of Pocomoke City, Inc. (0472); Ruby Tuesday of Russellville, Inc. (1601); and Ruby Tuesday of Salisbury, Inc. (5432). The Debtors' mailing address is 333 East Broadway Ave., Maryville, TN 37804.

# TABLE OF CONTENTS

**Page**

I. ........................................................................................................................ 3

PRELIMINARY STATEMENT ........................................................................ 3

II. ....................................................................................................................... 5

PENDING OBJECTIONS ................................................................................. 5

III. ...................................................................................................................... 6

BACKGROUND ............................................................................................... 6

IV. ...................................................................................................................... 9

MODIFICATION OF THE PLAN ..................................................................... 9

V. ....................................................................................................................... 10

THE PLAN SATISFIES EACH OF THE REQUIREMENTS FOR CONFIRMATION
UNDER THE BANKRUPTCY CODE ............................................................... 10

    A.    The Plan Satisfies Bankruptcy Code Section 1129(a)(1) ..................... 11

        (1)    The Plan Meets the Requirements of Bankruptcy Code Section 1122...... 11

        (2)    The Plan Meets the Requirements of Bankruptcy Code Section 1123(a) ...... 12

        (3)    Substantive Consolidation Is Appropriate Under Bankruptcy Code Section 1123(a)(5)(C)...... 14

    B.    The Plan Complies With the Discretionary Provisions of Bankruptcy Code Section 1123(b)...... 19

    C.    The Debtors Have Satisfied Bankruptcy Code Section 1129(a)(2)...... 30

        (1)    The Debtors Have Complied With the Requirements of Bankruptcy Code Section 1125 ...... 31

        (2)    The Debtors Have Complied With the Requirements of Bankruptcy Rules 3017(d) and 3018(c)...... 31

        (3)    Bankruptcy Code Section 1126 (c) and (d) and Bankruptcy Rule 3018(a) Were Satisfied ...... 33

    D.    The Plan Has Been Proposed in Good Faith (Bankruptcy Code Section 1129(a)(3) ...... 34

    E.    Payments for Services and Expenses (Bankruptcy Code Section 1129(a)(4) ...... 35

    F.    Directors and Officers (Bankruptcy Code Section 1129(a)(5))...... 35

    G.    Rate Changes (Bankruptcy Code Section 1129(a)(6)...... 36

    H.    The Plan Satisfies the "Best Interests" Test (Bankruptcy Code Section 1129(a)(7) ...... 36

    I.    Acceptance by Classes (Bankruptcy Code Section 1129(a)(8) ...... 37

    J.    Treatment of Priority Claims (Bankruptcy Code Section 1129(a)(9)...... 37

    K.    Acceptance by at Least One Impaired Class (Bankruptcy Code Section 1129(a)(10) ...... 38

    L.    The Plan Is Feasible (Bankruptcy Code Section 1129(a)(11) ...... 39

|   | M. | Payment of Certain Fees (Bankruptcy Code Section 1129(a)(12) | 41 |
|   | N. | Continuation of the Debtors' Obligations to Pay Retiree Benefits (Bankruptcy Code Section 1129(a)(13) | 41 |
|   | O. | The "Cramdown" Requirements of Bankruptcy Code Section 1129(b)(1) | 42 |
|   | P. | The Plan's Purpose Is Consistent With the Bankruptcy Code (Bankruptcy Code Section 1129(d) | 46 |
|   | Q. | Good Cause Exists to Waive the Stay of the Confirmation Order | 46 |
| VI. | | | 47 |
| DEBTORS' RESPONSES TO CONFIRMATION OBJECTIONS | | | 47 |
|   | A. | Adams Family Trust Objection | 47 |
|   | B. | Bowie Central Appraisal District (CAD), Texas's Objection [Docket No. 981] | 49 |
|   | C. | Objection of Various Landlords [Docket No. 981] and National Retail Landlord Group [Docket No. 1014] | 49 |
| VII. | | | 52 |
| CONCLUSION | | | 52 |

## <u>TABLE OF AUTHORITIES</u>

**Page**

**Cases**

*Aetna Cas. & Sur. Co. v. Clerk of the U.S. Bankr. Ct. (In re Chateaugay Corp.)*
  89 F.3d 942 (2d Cir. 1996) ........................................................................... 12

*Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*
  526 U.S. 434 (1999) ..................................................................................... 38

*Chase Manhattan Mortgage & Realty Trust v. Bergman (In re Bergman)*
  585 F.2d 1171 (2d Cir. 1978) ....................................................................... 41

*Clarkson v. Cooke Sale & Serv. Co. (In re Clarkson)*
  767 F.2d 417 (8th Cir. 1985) ........................................................................ 41

*FDIC  v. Colonial Realty Co.*
  966 F.2d 57 (2d Cir. 1992) ............................................................................ 15

*Frito-Lay, Inc. v. LTV Steel Co. (In re Chateaugay Corp.)*
  10 F.3d 944 (2d Cir. 1993) ........................................................................... 12

*In re Abbott Dairies of Pennsylvania*
  788 F.2d 143 (3d Cir. 1986) .......................................................................... 36

*In re Abeinsa Holding, Inc.*
  562 B.R. 265 (Bankr. D. Del. 2016) ................................................... 15, 16, 28

*In re Adelphia Communications Corp.*
  368 B.R. 140 (Bankr. S.D.N.Y. 2007) ......................................................... 12

*In re American Trailer & Storage*
  419 B.R. 412 (Bankr. W.D. Mo. 2009) ......................................................... 10

*In re Armstrong World Indus., Inc.*
  348 B.R. 136 (Bankr. D. Del. 2006) ......................................................... 38, 45

*In re Buttonwood Partners, Ltd.*
  111 B.R. 57 (Bankr. S.D.N.Y. 1990) ........................................................... 45

*In re Exide Techs.,*
  303 B.R. 48 (Bankr. D. Del. 2003) ............................................................... 23

*In re Flintkote Co.*
  486 B.R. 99 (Bankr. D. Del. 2012) ............................................................... 42

*In re Genesis Health Ventures, Inc.*
  266 B.R. 591 (Bankr. D. Del. 2001) ....................................................... 11, 38

*In re Genesis Health Ventures, Inc.*
  402 F.3d 416 (3d  Cir. 2005)......................................................................... 15

*In re Global Ocean Carriers Ltd.*
  251 B.R. 31 (Bankr. D. Del. 2000), ............................................................. 47

*In re Greate Bay Hotel & Casino, Inc.*
  251 B.R. 213 (Bankr. D.N.J. 2000) ............................................................. 11

*In re Jersey City Med. Ctr.*
  817 F.2d 1055 (3d Cir. 1987).........................................................................12

*In re Lapworth*
No. 97-34529DWS, 1998 Bankr. LEXIS 1383, at *10 (Bankr. E.D. Pa. Nov. 2, 1998).......... 32

*In re Lason, Inc.*
300 B.R. 227 (Bankr. D. Del. 2003) ................................................................................. 38

*In re Lisanti Foods, Inc.*
329 B.R. 491(Bankr. D.N.J. 2005) ........................................................... 14, 16, 37

*In re Lisanti Foods, Inc.*
2006 U.S. Dist. LEXIS 76844 (D.N.J. Oct. 11, 2006), *aff'd* 241 F. App'x 1, 2..................... 16

*In re Martin*, 91 F.3d 389 (3d Cir. 1996 ......................................................................... 31

*In re MPM Silicones, LLC*
531 B.R. (S.D.N.Y. 2015).................................................................................................. 46

*In re Neshaminy Office Bldg. Assoc.*
62 B.R. 798 (E.D. Pa. 1986) ............................................................................................ 31

*In re New Century TRS Holdings, Inc.*
390 B.R. 140 (Bankr. D. Del. 2008) ................................................................................ 14

*In re Orlando Investors, L.P.*
103 B.R. 593 (Bankr. E.D. Pa. 1989) .............................................................................. 41

*In re Owens Corning*
419 F.3d 195 (3d Cir. 2005)....................................................................................... 14, 15

*In re P.J. Keating Co.*
168 B.R. 464 (Bankr. D. Mass. 1994) .............................................................................. 45

*In re Prussia Assocs.*
322 B.R. 572 (Bankr. E.D. Pa. 2005) .............................................................................. 42

*In re PWS Holding Corp.*
228 F.3d 224 (3d Cir. 2000)...................................................................................... 32, 36

*In re Rubicon, US REIT, Inc.*
434 B.R. 168 (BLS) (Bankr. D. Del. 2010) ..................................................................... 30

*In re Sound Radio, Inc.*
93 B.R. 849 (Bankr. D.N.J. 1988) ................................................................................... 36

*In re Stations Holdings Co.*
No. 02-10882, 2002 Bankr. LEXIS 1617, at *10 (Bankr. D. Del. Sep. 30, 2002) ................. 37

*In re Stone & Webster, Inc.*
286 B.R. 532 (Bankr. D. Del. 2002) .......................................................................... 14, 15

*In re TCI 2 Holdings, LLC*
428 B.R. 117 (Bankr. D.N.J. 2010) ................................................................................. 45

*In re Texaco Inc.*
84 B.R. 893 (Bankr. S.D.N.Y. 1988)............................................................................... 33

*In re Tribune Co.*
464 B.R. 126 (Bankr. D. Del. 2011) .......................................................................... 23, 42

*In re U.S. Fidelis, Inc.*
481 B.R. 503 (Bankr. E.D. Mo. 2012).............................................................................. 10

*In re Union Meeting Partners*
165 B.R. 553 (Bankr. E.D. Pa. 1994), *aff'd mem.*, 52 F.3d 317 (3d Cir. 1995) ...................... 11

iv

*In re W.R. Grace & Co.*
  475 B.R. 34 (D. Del. 2012) ........................................................................... 36, 41

*In re W.T. Grant and Co.*
  699 F.2d 599 (2d Cir. 1983), cert. denied, 464 U.S. 22 (1983) .............................. 31

*In re Woodbridge Group of Companies, LLC*
  592 B.R. 761 (Bankr. D. Del. 2018) ................................................................. 15

*In re Zenith Elecs. Corp.*
  241 B.R. 92 (Bankr. D. Del 1999) ............................................................... 23, 44

*Ion Media Networks v. Cyrus Select Opp. Master Fund (In re Ion Media Networks)*
  419 B.R. 585 (Bankr. S.D.N.Y. 2009) ............................................................. 46

*John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assocs.*
  987 F.2d 154 (3d Cir. 1993) ........................................................................ 44

*Kane v. Johns-Manville Corp. (In re Johns-Manville Corp.)*
  843 F.2d 636 (2d Cir. 1988) .............................................................. 12, 41, 44

*Official Comm. v. Michelson (In re Michelson)*
  141 B.R. 715 (Bankr. E.D. Cal. 1992) ............................................................ 33

*Peltz v. Worldnet Corp. (In re USN Communs.)*
  280 B.R. 573 (Bankr. D. Del. 2002) ............................................................... 10

*Teamsters Nat'l Freight Indus. Negotiating Comm. v. U.S. Truck Co. (In re U.S. Truck Co.)*
  800 F.2d 581 (6th Cir. 1986) ...................................................................... 12

*U.S. v. Noland*
  517 U.S. 535 (1996) ................................................................................. 50

*Will v. Nw. Univ. (In re Nutraquest, Inc.)*
  434 F.3d 639 (3d Cir. 2006) ........................................................................ 31

## Statutes

11 U.S.C. § 101(37) ..................................................................................... 52
11 U.S.C. § 345 .......................................................................................... 47
11 U.S.C. § 365(c)(1)(A) ............................................................................... 54
11 U.S.C. § 365(f)(2)(B) ............................................................................... 54
11 U.S.C. § 502 .......................................................................................... 34
11 U.S.C. § 503 ..................................................................................... 10, 47
11 U.S.C. § 506(b) ...................................................................................... 51
11 U.S.C. § 507(a) ...................................................................................... 51
11 U.S.C. § 507(a)(2) .............................................................................. 13, 40
11 U.S.C. § 507(a)(3) ................................................................................... 13
11 U.S.C. § 507(a)(8) ................................................................................... 13
11 U.S.C. § 511 .......................................................................................... 51
11 U.S.C. § 1107 ........................................................................................ 47
11 U.S.C. § 1107(a) ...................................................................................... 6
11 U.S.C. § 1108 ..................................................................................... 6, 47
11 U.S.C. § 1114 ........................................................................................ 43
11 U.S.C. § 1122(a) ..................................................................................... 12
11 U.S.C. § 1123 ............................................................................... 12, 22, 56

11 U.S.C. § 1123(a) .................................................................................................. 13
11 U.S.C. § 1123(a)(4) ............................................................................................. 13
11 U.S.C. § 1123(a)(5) ............................................................................................. 14
11 U.S.C. § 1123(a)(5)(B) .................................................................................. 14, 56
11 U.S.C. § 1123(a)(5)(C) ........................................................................................ 14
11 U.S.C. § 1123(a)(5)(D) ........................................................................................ 56
11 U.S.C. § 1123(a)(5)(J) ......................................................................................... 56
11 U.S.C. § 1123(a)(6) ............................................................................................. 19
11 U.S.C. § 1123(a)(7) ............................................................................................. 19
11 U.S.C. § 1123(b) ............................................................................................ 19, 20
11 U.S.C. § 1123(b)(1) ............................................................................................. 19
11 U.S.C. § 1123(b)(2) ............................................................................................. 20
11 U.S.C. § 1123(b)(3)(A) ................................................................................... 22, 31
11 U.S.C. § 1126(d) ................................................................................................. 35
11 U.S.C. § 1126(f) ............................................................................................. 34, 39
11 U.S.C. § 1126(g) ................................................................................................. 34
11 U.S.C. § 1127(a) ................................................................................................. 10
11 U.S.C. § 1129 ..................................................................................................... 11
11 U.S.C. § 1129(a)(11) ........................................................................................... 41
11 U.S.C. § 1129(a)(14) ........................................................................................... 43
11 U.S.C. § 1129(a)(15) ........................................................................................... 43
11 U.S.C. § 1129(a)(16) ........................................................................................... 43
11 U.S.C. § 1129(a)(3) ....................................................................................... 36, 53
11 U.S.C. § 1129(a)(7) ....................................................................................... 38, 39
11 U.S.C. § 1129(b)(2)(B)(ii) ................................................................................... 46
11 U.S.C. § 1129(b)(2)(C)(ii) ................................................................................... 46
11 U.S.C. § 1129(d) ................................................................................................. 48
28 U.S.C. § 157 ....................................................................................................... 10
28 U.S.C. § 157(b) ................................................................................................... 10
28 U.S.C. § 1334 ..................................................................................................... 10
28 U.S.C. § 1408 ..................................................................................................... 10
28 U.S.C. § 1930 ..................................................................................................... 43

## Other Authorities

*Collier on Bankruptcy*, ¶ 1129.03[1] (15th rev. ed. 2005) .......................................... 42

Dorothy Coco, Third-Party Bankruptcy Releases:  An Analysis of Consent
    Through the Lenses of Due Process and Contract Law, 88 Fordham L. Rev. 231 (2019) ....... 28

H.R. Rep. No. 95-595, at 412 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5962, 6368 (1977) .. 12, 33

S. Rep. No. 95-989, at 126 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5913 (1978) ...... 12, 33

Securities Act of 1933, 15 U.S.C. § 77(e) ................................................................. 48

## Rules

Fed. R. Bankr. P. 3019 ............................................................................................. 10
Fed. R. Bankr. P. 3020 ............................................................................................. 49
Fed. R. Bankr. P. 3020(e) ........................................................................................ 48
Fed. R. Bankr. P. 6004 ............................................................................................. 49
Fed. R. Bankr. P. 6004(h) ........................................................................................ 48

Fed. R. Bankr. P. 6006 .................................................................................... 49

Fed. R. Bankr. P. 6006(d) ............................................................................... 48

Fed. R. Bankr. P. 9017 .................................................................................... 11

Fed. R. Bankr. P. 9019 .............................................................................. 21, 22

Fed. R. Evid. 201 ...................................................................................... 11, 38

DOCS_LA:334735.30 76136/002

The above-captioned debtors and debtors in possession (collectively,

the "Debtors") submit this memorandum of law (the "Memorandum") in support of confirmation

of the *Debtors' Second Amended Chapter 11 Plan* [Docket No. 1093], together with the Plan

Supplement, as amended or modified from time to time, the "Plan"),[2] and in reply to objections

to the *Debtors' Amended Chapter 11 Plan, filed December 21, 2020* [Docket No. 761].

This Memorandum, confirmation of the Plan, and entry of the Proposed

Confirmation Order are supported by, *inter alia*, the following documents:

(i)     *Final Order (I) Authorizing Debtors to (A) Obtain Postpetition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), and 365(e) and (B) Use Cash Collateral Pursuant to 11 U.S.C. § 363 and (II) Granting Adequate Protection Pursuant to 11 U.S.C. §§ 361, 362, 363 and 365*, entered November 18, 2020 [Docket No. 558] (the "Final DIP Order");

(ii)    *Order (A) Approving Bid Procedures for the Sale of the Debtors' Assets; (B) Approving Certain Bidder Incentives in Connection With the Debtors' Entry Into a Stalking Horse Agreement, if Any and (C) Approving Procedures for the Assumption and Assignment of Executory Contracts and Unexpired Leases*, entered November 20, 2020 [Docket No. 585] (the "Bid Procedures Order");

(iii)   *Notice to Counterparties to Executory Contracts and Unexpired Leases That May Be Assumed and Assigned*, filed December 14, 2020 [Docket No. 723] (the "Cure Notice");

(iv)    *Order (I) Approving Disclosure Statement; (II) Scheduling Confirmation Hearing; (III) Approving Form and Manner of Notice of Confirmation Hearing; (IV) Establishing Procedures for Solicitation and Tabulation of Votes to Accept or Reject Plan, Including (A) Approving Form and Contents of Solicitation Package, (B) Establishing Record Date and Approving Procedures for Distribution of Solicitation Packages, (C) Approving Forms of Ballots, (D) Establishing Voting Deadline for Receipt of Ballots, and (E) Approving Procedures for Vote Tabulations; (V) Establishing Deadline and Procedures for Filing Objections to Confirmation of Plan; and (VI) Granting Related Relief*, entered December 21, 2020 [Docket No. 759] (the "Solicitation Procedures Order");

(v)     *Disclosure Statement for Debtors' Amended Chapter 11 Plan*, filed December 21, 2020 [Docket No. 762] (the "Disclosure Statement");

---

[2] Capitalized terms not otherwise defined will have the same meaning ascribed to them in the Plan.

(vi)     *Notice of Filing of Proof of Publication of the New York Times With Respect to Notice of (A) Hearing to Consider Confirmation of Debtors' Amended Chapter 11 Plan; (B) Deadline for Voting to Accept or Reject Plan; and (C) Related Matters*, filed January 13, 2021 [Docket No. 857] (the "Proof of Publication");

(vii)    *Notice of Non-Receipt of Topping Bid and Cancellation of Auction*, filed January 18, 2021 [Docket No. 886];

(viii)   *Plan Supplement to Debtors' Amended Chapter 11 Plan*, filed January 22, 2021 [Docket No. 920] (the "Plan Supplement");

(ix)     *Notice of Filing of Amended Exhibit 4 to Plan Supplement,* filed February 4, 2021 [Docket No. 1069] (the "Plan Supplement Amended Exhibit 4");

(x)      *Affidavit of Emily Young of Epiq Corporate Restructuring, LLC Regarding Voting and Tabulation of Ballots Cast on Debtors' Amended Chapter 11 Plan*, filed February 9, 2021 [Docket No. 1090] (the "Tabulation Affidavit");

(xi)     *Debtors' Second Amended Chapter 11 Plan*, *as Modified*, dated February 10, 2021 [Docket No. 1093];

(xii)    *Declaration of Shawn Lederman, Chief Executive Officer of the Debtors,  in Support of Confirmation of the Debtors' Second Amended Chapter 11 Plan*, filed February 10, 2021 [Docket No. 1095] (the "Lederman Declaration");

(xiii)   *Declaration of Sugi Hadiwijaya, Partner of CR3 Partners LLC, in Support of Confirmation of Debtor's Second Amended Chapter 11 Plan*, filed February 10, 2021 [Docket No. 1096] (the "Hadiwijaya Declaration");

(xiv)    *Declaration of Richard F. NeJame, Managing Director of FocalPoint Securities, LLC, in Support of Confirmation of Debtor's Second Amended Chapter 11 Plan*, filed on February 10, 2021 [Docket No. 1097] (the "NeJame Declaration");

(xv)     *Notice of Filing of Blackline of Debtors' Second Amended Chapter 11 Plan*, filed February 10, 2021 [Docket No. 1094];

(xvi)    *Amended Notice to Counterparties to Executory Contracts and Unexpired Leases That May Be Assumed and Assigned*, filed February 10, 2021 [Docket No. 1092] (the "Amended Cure Notice")];

(xvii)   *Notice of Filing of Proposed Findings of Fact, Conclusions of Law, and Order Confirming the Debtors' Second Amended Chapter 11 Plan*, filed February 10, 2021 [Docket No. 1099] (the "Proposed Confirmation Order");

(xviii)  *Amended Plan Supplement*, filed February 11, 2021 [Docket No. 1108] (the "Amended Plan Supplement"); and

(xix)    The affidavits or other proofs of service of notices with respect to the Confirmation Hearing, cure amounts ("Cure Amounts") of Executory Contracts and Unexpired Leases to be assumed, and solicitation of voting on the Plan (the "Solicitation Service Filings").

# I.

# PRELIMINARY STATEMENT

1.        The Debtors commenced their chapter 11 bankruptcy cases in the midst of a global pandemic that has resulted in tremendous loss of life and significant economic damage, including the evisceration of the restaurant industry.   In an effort to restructure their business operations during this time of uncertainty, the Debtors and Prepetition Secured Creditors entered into a Restructuring Support Agreement ("RSA"), the terms of which were memorialized in the Plan.  The Plan contemplated a dual path whereby the Debtors would either emerge from these chapter 11 proceedings under new ownership by the Prepetition Secured Creditors (the "Restructuring') or sell their assets as a going concern (the "Sale").

2.        No Topping Bids were received prior to the Bid Deadline established by the Bid Procedures Order, January 14, 2021 at 5:00 p.m. (Prevailing Eastern Time), and, therefore, the Debtors are proceeding with their Restructuring.

3.        The Debtors, the Prepetition Agent, Prepetition Secured Creditors, the DIP Lenders, the Creditors' Committee, and the Equity Parent have negotiated the terms of a Plan settlement term sheet (the "Plan Settlement Term Sheet")[3] that modifies the terms of the Debtors' Restructuring for the benefit of general unsecured creditors.  It memorializes a global settlement ("Global Settlement") among such parties.  Under such Global Settlement, the

---

[3] The Plan Settlement Term Sheet is attached hereto as **Exhibit "A"**.

Holders of Class 4 General Unsecured Claims shall receive their Pro Rata shares of

(a) $5,000,000, consisting of (i) payment of $3,000,000 (consisting of an initial $2,000,000

payable within 60 days of the Effective Date, unless extended, plus a Deferred Cash Payment

payable by March 31, 2022, unless extended, of $1,000,000, reduced by any Excess Cash

Payments received) and (ii) a Note in the principal amount of $2,000,000, reduced by any Excess

Cash Payments received; and (b) 33% of the proceeds from the Interchange Claim, which is a

claim in a class action lawsuit captioned as *In re Payment Card Interchange Fee and Merchant*

*Discount Antitrust Litigation*.

        4.      Pursuant to the Solicitation Procedures Order, the Debtors solicited the

votes of Holders of Claims in the two classes of impaired claims that would receive distributions

under the Plan:  (a) Class 3, which consists of the Allowed Claims of the Prepetition Secured

Creditors in their own subclasses, the holders of which have voted unanimously in favor of the

Plan; and (b) Class 4, which consists of Allowed General Unsecured Claims, the Holders of

more than one half in number but less than two-thirds in amount have voted in favor of the Plan,

and therefore will be crammed down.  The Debtors believe that the Plan qualifies for

confirmation under all applicable provisions of chapter 11 of the Bankruptcy Code.

        5.      Also, the Debtors believe that the financial and operational restructuring

and the other transactions reflected in the Plan will position the Reorganized Debtors, RT Asset

Company and RT Lodge Company well to succeed post-emergence from bankruptcy.  With a

sustainable business plan and adequate operating liquidity, they will be positioned to compete

more effectively in the challenging casual-dining industry.  A successful reorganization of these

estates will also preserve the post-Effective Date entities as employers, tenants, and customers of their vendors.

## II.

## **PENDING OBJECTIONS**

6.     The Debtors have resolved certain Plan objections informally or by agreeing to a Plan term modification and/or provision in the Proposed Confirmation Order. Accordingly, to the best of the Debtors' knowledge, the chart set forth below reflects the only non-cure amount-related formal objections pending as of this time that have not been resolved. The Debtors will continue to work to resolve pending formal objections prior to the Confirmation Hearing and will update the Court further as appropriate.

| Date | Docket No. | Objection |
|------|------------|-----------|
| 12/15/2020 | 731 | *Bowie CAD, Texas's Objection to Debtors Chapter 11 Plan* |
| 1/29/2021 | 981 | *Limited Objection and Reservation of Rights to Article VII (Procedures Concerning Contingent, Unliquidated and Disputed Claims) of Debtors Amended Chapter 11 Plan,* filed by Adams Family Trust |
| 1/29/21 | 993 | *Limited Objection of Various Landlords to Debtors' Amended Chapter 11 Plan* |
| 2/1/21 | 1014 | *Objection Of National Retail Property, LP; Aston Properties, Inc.; Benderson Development Company, LLC; Brookfield Properties Retail, Inc.;Tanger Outlet Center, Inc.; Win Properties, Inc.; Regency Centers, LP; and Realty Income Corp.'s to Proposed Cure Amounts and Assumption and Assignment of Certain Leases Pursuant to Debtors' Joint Chapter 11 Plan of Reorganization* |

7.     The Debtors have reached resolutions with numerous landlords regarding their cure-related objections to the Plan. The Debtors will endeavor to continue to resolve as

many of these objections as possible in advance of the Confirmation Hearing.  Disputes

regarding cure amounts will not be addressed at the Confirmation Hearing.  Instead, any

remaining disputes regarding cure amounts are subject to the procedure outlined in section VI.E.

of the Plan, which provides for a thirty (30) day period following confirmation within which to

resolve such disputes and, if unresolved, the parties may request a hearing before the Court on

fourteen (14) days' notice.

## III.

## BACKGROUND

8.      On October 7, 2020 (the "Petition Date"), the Debtors commenced these

cases (the "Chapter 11 Cases") by filing voluntary petitions for relief under chapter 11 of the

Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the

"Bankruptcy Court").  The Debtors have continued in the possession of their property and have

continued to operate and manage their business as debtors in possession pursuant to sections

1107(a) and 1108 of the Bankruptcy Code.  On October 26, 2020, the Office of United States

Trustee (the "U.S. Trustee") appointed an Official Committee of Unsecured Creditors (the

"Creditors' Committee") in these Chapter 11 Cases.  No trustee or examiner has been appointed

in these Chapter 11 Cases.

9.      The Debtors develop, operate, and franchise casual dining restaurants in

the United States, Guam, and five foreign countries under the Ruby Tuesday® brand.  The

Company-owned and operated restaurants (i.e., nonfranchise) are concentrated primarily in the

Southeast, Northeast, Mid-Atlantic and Midwest regions of the United States.

6

10.     The factual background regarding the Debtors, including their current and historical business operations and the events precipitating the Chapter 11 Cases, is set forth in detail in (a) the *Declaration of Shawn Lederman, Chief Executive Officer, in Support of First Day Pleadings*, filed October 7, 2020 [Docket No. 3] (the "<u>First Day Declaration</u>"); and (b) the Disclosure Statement.

11.     On November 6, 2020, the Debtors filed their proposed *Chapter 11 Plan* [Docket No. 353].  Subsequently, on December 21, 2020, the Debtors filed their *Debtors' Amended Chapter 11 Plan* [Docket No. 761] to address, among other things, certain of the objections received to approval of the Disclosure Statement.  Also, on February 10, 2021, the Debtors filed their proposed Second Amended Chapter 11 Plan to address, among other things, certain of the objections received to confirmation of the Plan and to incorporate provisions of the Global Settlement.

12.     Pursuant to the RSA and the Plan, in a Restructuring, the operations of the Debtors will be bifurcated.  Specifically, RTI's operating assets (other than RT Lodge) will be transferred to RT Asset Company, which shall be wholly-owned after the Effective Date by TCW, a Prepetition Secured Creditor and DIP Lender, subject to dilution.  Also, pursuant to the Plan, RTI will become the RT Lodge Company, which shall be wholly owned after the Effective Date by GS, also a Prepetition Secured Creditor and DIP Lender.

13.     The Restructuring embodied in the Plan "backstopped" a marketing process that reached a crossroads on January 14, 2021–the deadline by which interested parties were required to submit bids to acquire the Debtors' Assets.[4]  *See* Lederman Declaration ¶ 8;

---

[4] *See* Bid Procedures Order ¶ 6 at 5.

7

NeJame Declaration ¶ 7.  If the Debtors had received one or more bids that constituted a "Topping Bid"–i.e., bid(s) sufficient to satisfy the Debtors' obligations to their Prepetition Secured Lenders and DIP Lenders in full[5]–the Debtors were authorized by the Bid Procedures Order to conduct an Auction to determine a Successful Bidder to whom they would have sold substantially all of their Assets.  If the Debtors did not receive a timely Topping Bid, they were required to pursue Restructuring Transactions with GS and TCW.[6]   No Topping Bids were received prior to the Bid Deadline.  *See* Lederman Declaration ¶ 8; NeJame Declaration ¶ 7.

14.     The Plan provides for nine Classes of Claims against and/or Equity Interests in the Debtors and provides the treatment described in the Plan, *see* Plan Article III, summarized in the following table:

**Summary of Classification and Treatment of Classified Claims and Equity Interests**

| Class | Claim | Status | Voting Rights |
|-------|-------|--------|---------------|
| 1 | Non-Tax Priority Claims | Unimpaired | Deemed to Accept |
| 2 | Miscellaneous Secured Claims | Unimpaired | Deemed to Accept |
| 3 | Prepetition Secured Debt Claims | Impaired | Entitled to Vote |
| 4 | General Unsecured Claims | Impaired | Entitled to Vote |
| 5 | Preserved Intercompany Claims | Unimpaired | Deemed to Accept |
| 6 | Extinguished Intercompany Claims | Impaired | Deemed to Reject |
| 7 | Dissenters Claims | Impaired | Deemed to Reject |
| 8 | Equity Interests in Holding | Impaired | Deemed to Reject |
| 9 | Intercompany Interests | Unimpaired | Deemed to Accept |

15.     Pursuant to the Solicitation Procedures Order, the Debtors solicited the votes of Holders of Claims in the two classes of impaired claims that would receive distributions under the Plan:  (a) Class 3, which consists of the Allowed Claims of the Prepetition Secured

---

[5] *See* Bid Procedures Order ¶ 15 at 9 and its attached *Bid Procedures for Sale of Substantially All of the Debtors' Assets* [Docket No. 585-1].
[6] *See* Plan section III.C.3.

Creditors in their own subclasses, the holders of which have voted unanimously in favor of the

Plan; and (b) Class 4, which consists of Allowed General Unsecured Claims, the Holders of

more than one half in number but less than two-thirds in amount have voted in favor of the Plan.

The Debtors assert the Plan qualifies for confirmation under all applicable provisions of chapter

11 of the Bankruptcy Code.

## IV.

## <u>MODIFICATION OF THE PLAN</u>

16.    To address formal and informal comments and objections and otherwise

correct the Plan, the Debtors filed the Plan, as further amended, as well as a "redline" reflecting

the changed pages of the Plan.  In addition, certain agreed upon language has been included in

the proposed Confirmation Order to reflect resolutions with parties who have informally or

formally objected to certain provisions of the Plan.

17.    These modifications to the Plan and revisions to the Proposed

Confirmation Order do not adversely impact the treatment of creditors.  Indeed, the incorporation

of the Global Settlement dramatically increases the projected return to general unsecured

creditors.  Accordingly, no additional solicitation or disclosure is required on account of the

modifications, and the modifications should be deemed accepted by all holders of claims who

have previously accepted the Plan.[7]

---

[7] A plan proponent may modify its plan at any time before confirmation if the modified plan meets the requirements of Bankruptcy Code sections 1122 and 1123.  *See* 11 U.S.C. § 1127(a).  Once filed, "the plan as modified becomes the plan." *Id.*  Pursuant to Bankruptcy Rule 3019, courts consistently have held that a proposed modification to a previously accepted plan will be deemed accepted where the proposed modification is not material or does not adversely affect the way creditors and stakeholders are treated.  Fed. R. Bankr. P. 3019; *see, e.g., Peltz v. Worldnet Corp. (In re USN Communs.)*, 280 B.R. 573, 596 (Bankr. D. Del. 2002); *In re Tropicana Entm't, LLC*, No. 08-10856 (KJC) (Bankr. D. Del. May 5, 2009), Docket No. 2001; *In re U.S. Fidelis, Inc.*, 481 B.R. 503, 524 (Bankr. E.D. Mo. 2012) ("[T]he change was so minor that it is not a materially adverse change. Accordingly, pursuant to Bankruptcy Rule 3019, such modifications do not require additional disclosure under § 1125 of the Bankruptcy Code or

9

# V.

## THE PLAN SATISFIES EACH OF THE REQUIREMENTS FOR CONFIRMATION UNDER THE BANKRUPTCY CODE

18.     The Bankruptcy Court has exclusive jurisdiction to determine whether the

Plan complies with the applicable provisions of the Bankruptcy Code and should be confirmed.

The Bankruptcy Court has jurisdiction over the Chapter 11 Cases pursuant to 28 U.S.C. §§ 157

and 1334 and the *Amended Standing Order of Reference* from the United States District Court

for the District of Delaware, dated February 29, 2012.  Venue is proper pursuant to 28 U.S.C.

§§ 1408 and 1409.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)

and the Bankruptcy Court may enter a final order consistent with Article III of the United States

Constitution.

19.     The Plan complies with all relevant sections of the Bankruptcy Code and

the Bankruptcy Rules relating to confirmation.  The Debtors bear the burden of proof on

elements necessary for confirmation.  *See In re Greate Bay Hotel & Casino, Inc.*, 251 B.R. 213,

221 (Bankr. D.N.J. 2000) (plan proponents bear burden of establishing compliance with

Bankruptcy Code section 1129).  The standard of proof required is the "preponderance of the

evidence" standard.  *See In re Union Meeting Partners*, 165 B.R. 553, 574 n.17 (Bankr. E.D. Pa.

1994), *aff'd mem.*, 52 F.3d 317 (3d Cir. 1995) (adopting preponderance standard with respect to

Bankruptcy Code section 1129 requirements); *In re Genesis Health Ventures, Inc.*, 266 B.R. 591,

---

resolicitation of votes under § 1126 of the Bankruptcy Code, nor do they require that holders of Claims or Interests be afforded an opportunity to change previously cast acceptances or rejections of the Plan."); *In re American Trailer & Storage*, 419 B.R. 412, 419 (Bankr. W.D. Mo. 2009) ("If modifications made to a plan prior to confirmation (but after the ballots have been counted) are minor, impact only a creditor who has been fully involved, and do not adversely impact any other creditor, then it is not necessary to solicit new acceptances").

DOCS_LA:334735.30 76136/002

616 n. 23 (Bankr. D. Del. 2001) ("the proponent must show that a plan is fair and equitable by a preponderance of the evidence").

20.     As set forth more specifically below, the Plan complies with each requirement of Bankruptcy Code sections 1123 and 1129.  In connection herewith, the Debtors request that the Bankruptcy Court take judicial notice of the docket of the Chapter 11 Cases maintained by the Clerk of the Bankruptcy Court, including, without limitation, all pleadings and other documents filed and orders entered thereon, *see* Fed. R. Bankr. P. 9017 (incorporating Fed. R. Evid. 201), as well as all evidence proffered or adduced and all arguments made at the hearings held before the Bankruptcy Court during the pendency of the Chapter 11 Cases.

## A.     The Plan Satisfies Bankruptcy Code Section 1129(a)(1)

21.     Bankruptcy Code section 1129(a)(1) provides that a plan may be confirmed only if "[t]he plan complies with the applicable provisions of this title."  11 U.S.C. § 1129(a)(1)  The legislative history of Bankruptcy Code section 1129(a)(1) indicates that the primary focus of this requirement is to ensure that the plan complies with Bankruptcy Code sections 1122 and 1123, which govern classification of claims and interests and the contents of a plan, respectively.[8]  The Plan complies with these provisions in all respects.

### (1)     The Plan Meets the Requirements of Bankruptcy Code Section 1122

22.     The Plan satisfies Bankruptcy Code section 1122, which provides that "a plan may place a claim or interest in a particular Class only if such claim or interest is substantially similar to the other claims or interests of such class."  11 U.S.C. § 1122(a).  This

---

[8] *See* S. Rep. No. 95-989, at 126 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5913 (1978); H.R. Rep. No. 95-595, at 412 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5962, 6368 (1977); *see also Kane v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 843 F.2d 636, 648-49 (2d Cir. 1988).

subsection does not require that similar claims be classified together, only that claims grouped together in a class should be similar.  *Teamsters Nat'l Freight Indus. Negotiating Comm. v. U.S. Truck Co. (In re U.S. Truck Co.)*, 800 F.2d 581, 585 (6th Cir. 1986).  Plan proponents have significant flexibility in placing similar claims into different classes under Bankruptcy Code section 1122, provided there is a rational basis to do so and it is not done to gerrymander a consenting impaired class.[9]

23.     The Plan provides for a total of nine Classes of Claims and Equity Interests and provides the treatment described in the Plan.  *See* Plan Article III.  As the foregoing descriptions of the Classes reflect, valid reasons exist for classifying the various Classes of Claims and Equity Interests in the manner provided in the Plan.  Accordingly, the Plan properly classifies Claims and Equity Interests, satisfying the requirements of Bankruptcy Code section 1122.

(2)     **The Plan Meets the Requirements of Bankruptcy Code Section 1123(a)**

24.     Bankruptcy Code section 1123(a) sets forth seven requirements with which every chapter 11 plan must comply and this Plan fully complies.  First, paragraph (1) of Bankruptcy Code section 1123(a) requires that a plan designate classes of claims, other than claims with the priority specified in Bankruptcy Code section 507(a)(2), (3) and (8).  The Plan

---

[9] *See In re Jersey City Med. Ctr.*, 817 F.2d 1055, 1060-61 (3d Cir. 1987) (observing that separate classes of claims must be reasonable and allowing a plan proponent to group similar claims in different classes."); *Frito-Lay, Inc. v. LTV Steel Co. (In re Chateaugay Corp.)*, 10 F.3d 944, 956-57 (2d Cir. 1993) (finding separate classification appropriate because classification scheme had a rational basis; separate classification based on bankruptcy court-approved settlement); *Aetna Cas. & Sur. Co. v. Clerk of the U.S. Bankr. Ct. (In re Chateaugay Corp.)*, 89 F.3d 942, 950 (2d Cir. 1996) (classification proper since the plan did not classify similar claims separately to gerrymander an impaired assenting class); *In re Adelphia Communications Corp.*, 368 B.R. 140, 246–47 (Bankr. S.D.N.Y. 2007) ("When considering assertions of gerrymandering, courts in the Second Circuit have inquired whether a plan proponent has classified substantially similar claims in separate classes for the sole purpose of obtaining at least one impaired assenting class.").

12

satisfies this requirement by designating classes of Claims and Equity Interests, and by not classifying Administrative Expense Claims (entitled to priority under Bankruptcy Code section 507(a)(2)) or Priority Tax Claims (entitled to priority under Bankruptcy Code section 507(a)(8)). *See* Plan Article III. Separately, the Plan specifies the statutorily required treatment for Administrative Expense Claims and Priority Tax Claims. *See* 11 U.S.C. § 1129(a)(9) and Plan Article II.

25.    Second and Third, paragraphs (2) and (3) of Bankruptcy Code section 1123(a) require that a plan specify those classes or interests that are not impaired and specify those classes of claim or interests that are impaired. The Plan satisfies this requirement by specifying that Classes 1, 2, 5 and 9 are unimpaired and specifying that Classes 3, 4, 6, 7 and 8 are impaired. *See* Plan Article III.

26.    Fourth, Bankruptcy Code section 1123(a)(4) requires that a plan provide the same treatment for each claim in a particular class, unless the holder of a claim in that class agrees to less favorable treatment for such claim. The Plan satisfies this requirement by providing identical treatment for all Holders of Claims or Equity Interests within each Class unless a holder of a Claim in that Class agrees or agreed to less favorable treatment for such Claim. *See* Plan Article III (subclasses in Class III are treated differently by consent of the Holders of the Prepetition Secured Claims, *see* Plan section III.C.3.).

27.    Fifth, Bankruptcy Code section 1123(a)(5) requires that a plan provide adequate means for its implementation. The Plan satisfies this requirement by setting forth the means of its implementation in, among other provisions, Plan Articles V, VI, VII and VIII and *Plan Supplement* Exhibit 7 [Docket No. 920-7]. *See* 11 U.S.C. § 1123(a)(5)(B) ("transfer of all

13

or any part of the property of the estate to one or more entities, whether organized before or after

the confirmation of such plan" and (J) ("issuance of securities . . . of any entity referred to in

subsection (B) . . . of this paragraph . . . in exchange for claims . . ., or for any other appropriate

purpose").

    (3)    **Substantive Consolidation Is Appropriate Under Bankruptcy Code
Section 1123(a)(5)(C)**

        28.    In particular, Plan section V.I. (Substantive Consolidation for Plan

Purposes) provides for the "merger or consolidation of the debtor with one or more persons" per

Bankruptcy Code section 1123(a)(5)(C):[10]

> The Plan serves as a motion by the Debtors seeking entry, pursuant
> to section 105 of the Bankruptcy Code,[11] of an order authorizing,
> on the Effective Date, the substantive consolidation of the Estates
> of all of the Debtors for purposes of classifying and treating all
> Claims under the Plan, including for voting, confirmation, and
> distribution purposes only. . . . [A]ll Assets and liabilities of the
> Debtors shall be treated as though they were merged into a single
> estate solely for purposes of treatment of and distributions on
> Claims. . . . [A]ny joint and/or several liability of any Debtor with
> respect to any other Debtor, shall be treated as one collective
> obligation of the Debtors.

        29.    The United States Court of Appeals for the Third Circuit has held that

substantive consolidation is warranted where there was a prepetition disregard of corporate

---

[10] *See* 11 U.S.C. § 1123(a)(5)(C); *In re Stone & Webster, Inc.*, 286 B.R. 532, 542 (Bankr. D. Del. 2002)
("substantive consolidation such as that proposed by the Plan is, by reason of § 1123(a)(5)(C), clearly an allowable
provision in a Chapter 11 plan.").
[11] *See, e.g., In re New Century TRS Holdings, Inc.*, 390 B.R. 140, 159 (Bankr. D. Del. 2008) ("[s]ubstantive
consolidation is a construct of federal common law that emanates from equity.") (citing *In re Owens Corning*, 419
F.3d 195, 205 (3d Cir. 2005); *In re Lisanti Foods, Inc.*, 329 B.R. 491, 497 (Bankr. D.N.J. 2005) ("[t]he power to
order substantive consolidation of bankruptcy estates is within the Bankruptcy Court's equitable powers under § 105
of the Code.") (citing *FDIC  v. Colonial Realty Co.*, 966 F.2d 57, 59 (2d Cir. 1992)); *Stone & Webster,* 286 B.R. at
539.

separateness or postpetition scrambling of assets and liabilities.[12]   In doing so, the Third Circuit

explained that, unlike the substantive consolidation tests in other circuits, the Third Circuit has

no set list of factors that it uses in determining if substantive consolidation is appropriate; rather,

"what must be proven (absent consent) concerning the entities for whom substantive

consolidation is sought is that (a) prepetition they disregarded separateness so significantly their

creditors relied on the breakdown of entity borders and treated them as one legal entity, or

(b) postpetition their assets and liabilities are so scrambled that separating them is prohibitive

and hurts all creditors."[13]

        30.     With respect to the first element of disregarded separateness, courts have

concluded that substantive consolidation is appropriate where the factual record shows that all

debtors (a) have the same officers, same directors, and same shareholders; (b) conduct the same

general business operations under very similar names; (c) conduct intercompany dealings

without the usual corporate formalities; (d) do not charge each other for all services they render

to one another; and (e) move profits between and among other debtors.[14]   These courts have also

noted that substantive consolidation may be appropriate where debtors are viewed as a single

---

[12] *Owens Corning*, 419 F.3d at 205 ("Substantive consolidation . . . emanates from equity [and] 'treats separate legal entities as if they were merged into a single survivor  left with  all  the cumulative assets and liabilities'") (quoting *In re Genesis Health Ventures, Inc.*, 402 F.3d 416, 423 (3d  Cir.  2005)).  *See In re Woodbridge Group of Companies, LLC*, 592 B.R. 761, 778  (Bankr. D. Del. 2018)  ("The record before me supports the conclusion that substantive consolidation in the Plan is appropriate under the principles and holding of *Owens Corning*."); *In re Abeinsa Holding, Inc.*, 562 B.R. 265, 281 (Bankr. D. Del. 2016) ("I agree with the Debtors that individual plans are not a viable option, in part, because otherwise there would be no $23 million New Value Consideration provided by the Parent (via the New Money Financing Providers) under the global financial restructuring.").
[13] 419 F.3d. at 210-11.
[14] *In re Lisanti Foods, Inc.*, 241 F. App'x 1, 2-3 (3d Cir. 2007).

entity for the purposes of secured lending, and unsecured creditors view the debtors as a single entity when extending credit terms.[15]

31.    Prior to the Petition Date, creditors of the Debtors treated the Debtors as one legal entity; that disentangling the affairs of the Debtors would likely be so burdensome as to be prohibitive and likely would adversely affect creditors.  The following facts support such conclusion.

32.    For over a decade, the Debtors have utilized a centralized cash-management system to collect funds from their operations and pay operating and administrative expenses consolidated from main and secondary concentration accounts maintained by RTI.  For example, RTI maintains twelve depository accounts for the collection of cash from operations at all the Debtors' locations.  With the exception of a single controlled disbursement account relating to gift cards, substantially all of the Debtors' accounts payable and payroll obligations are processed through accounts maintained by RTI.  First Day Declaration ¶¶ 75-78.[16]

33.    The Debtors also historically have prepared and disseminated consolidated financial reports to the public, including to lenders, and stockholders.  For example, prior to the prepetition Merger (as defined in First Day Declaration ¶ 16), all SEC reporting that was made available to the public was consolidated.  After the Merger, the Debtors' regular financial

---

[15] *Id*. at 3. *See also Abeinsa Holding*, 562 B.R. at 280 n.2 citing *In re Lisanti Foods, Inc*., 2006 U.S. Dist. LEXIS 76844 (D.N.J. Oct. 11, 2006), *aff'd* 241 F. App'x 1, 2 ("holding that substantive consolidation was appropriate under *Owens Corning* when 'creditors did not render credit to each individual debtor, but rather as a combined entity.").

[16] Paragraph 75 on page 31 of the First Day Declaration states in pertinent part:  "In the ordinary course of business, the Debtors operate a cash management system (the 'Cash Management System') involving twelve (12) depository accounts for the collection of cash from operations at their 236 restaurants, eight (8) disbursement accounts for payable and payroll obligations, and ten (10) other bank accounts that are critical to continue the efficient operation and administration of their business."

reporting to their Prepetition Secured Creditors has been on a consolidated basis.  Because the

Debtors disseminated financial information to the public on a consolidated basis, it is highly

unlikely that creditors relied on the separate identity of any Debtor in extending credit to such

Debtor.  Lederman Declaration ¶ 12; Hadiwijaya Declaration ¶ 16.

34.    This is borne out by the fact that an overwhelming number of Proofs of

Claim filed against the Debtors were filed against RTI, not any subsidiary Debtor.  Hadiwijaya

Declaration ¶ 17.

35.    As a further indication of the Debtors' entanglement, RTI and its

subsidiary Debtors share overhead, management, accounting, and other related functions.  First

Day Declaration ¶¶ 9 and 18; *see id.* ¶ 33 at 16.

36.    Moreover, RTI owns, directly or indirectly, all or a majority of the stock

or membership interests in each of the other Debtors (other than Holding) and the Debtors share

common officers.  First Day Declaration ¶¶ 15 and 17.

37.    The enterprise is guided by a single source of governance—the Board of

Directors of RTI.  *Se*e Lederman Declaration ¶ 13; and Hadiwijaya Declaration ¶ 18.

38.    All of the Debtors are borrowers of a single indebtedness owed under the

Prepetition Credit Facility.  First Day Declaration ¶¶ 20-23.[17]

39.    Therefore, the circumstances described above (and in the respective

declarations cited) evidence a disregard for separateness among the numerous Debtors.

---

[17] Paragraph 23 on pages 12-13 of the First Day Declaration states in pertinent part:  "The Prepetition Credit Facility is secured by (a) a guarantee by each of the Debtors of the obligations of each of the other Debtors, (b) a first priority security interest in substantially all the assets of the Debtors, (c) a first priority pledge on 100% of the equity securities of each domestic subsidiary of the Debtors and 65% of the equity securities of each foreign subsidiary of the Debtors, and (d) a mortgage on certain owned real properties of the Debtors."

40.    Also, it would be extremely difficult to "unscramble" the Debtors' assets and liabilities.  The DIP Facility and Prepetition Credit Facility are imposed on numerous credit parties, including all the Debtors, and it would be difficult to allocate the indebtedness amount among each of the Debtors.

41.    The Debtors believe that substantive consolidation of their Estates is appropriate under applicable law and in the best interests of all unsecured creditors, considering the facts in light of the applicable legal standards.  *See* Hadiwijaya Declaration ¶ 20. Accordingly, for the reasons set forth above, the Debtors believe that substantive consolidation of the Debtors' Estates proposed under the Plan is in the best interests of the Debtors, their estates, and their creditors; is necessary to effectuate the terms of the Plan; and is fair and equitable under the circumstances.

42.    The requirement of Bankruptcy Code section 1123(a)(6) that a plan impose certain restrictions on a corporate debtor's equity securities is satisfied by this Plan providing expressly for compliance with such section, if and to the extent applicable.  *See* Plan section V.K.

43.    Seventh and finally, Bankruptcy Code section 1123(a)(7) requires that a plan contain only provisions that are consistent with the interests of creditors, equity security holders, and public policy with respect to the manner of selection of any officer, director, or trustee under a plan and any successor thereto.  The Plan satisfies this requirement by describing the composition and/or manner of selection of the Board in the Plan Supplement and any amendments thereto.  *See e.g.* Plan § V.L.; Plan Supplement Exhibit 5 [Docket No. 920-5].

B.      **The Plan Complies With the Discretionary Provisions of Bankruptcy Code
        Section 1123(b)**

44.     Bankruptcy Code section 1123(b) sets forth various discretionary

provisions that may be incorporated into a chapter 11 plan.  Among other things, Bankruptcy

Code section 1123(b) provides that a plan may:  (a) impair or leave unimpaired any class of

claims or interests, (b) provide for the assumption or rejection of executory contracts and

unexpired leases, (c) provide for the settlement or adjustment of any claim or interest belonging

to the debtor or the estates, and (d) include any other appropriate provision not inconsistent with

the applicable provisions of chapter 11.  11 U.S.C. § 1123(b)(1).

45.     The Plan is consistent with Bankruptcy Code section 1123(b).

Specifically, under Article III of the Plan, Classes 1, 2, 5 and 9 are unimpaired because the Plan

provides the holders of such claims with the treatment required under the Bankruptcy Code.  On

the other hand, Classes 3, 4, 6, 7 and 8 are impaired because the Plan modifies the rights of the

Holders of Claims and Interests within such Classes.  In addition, pursuant to Bankruptcy Code

section 1123(b)(2), Plan section VI.A. at 47 provides for the assumption of certain Executory

Contracts and Unexpired Leases.

46.     The Plan's discretionary provisions additionally include certain discharge,

release, exculpation, and injunction provisions.  First, Plan section X.A. provides that the Plan

constitutes a compromise and settlement, and provides the Debtors with a discharge of debts

under Bankruptcy Code sections 524 and 1141(d)(1)(A).  Second, Plan section X.B. provides for

the Debtors' release of the Released Parties, except for the Released Parties' actual fraud, gross

negligence, bad faith, or willful misconduct (the "Mutual Release").  Third, Plan section X.C.

19

provides for releases by Releasing Parties of the Released Parties, except for actual fraud, gross negligence, bad faith, or willful misconduct (the "Claim Holders' Release"). Fourth, Plan section X.D. provides for exculpation of the Exculpated Parties, except for fraud, gross negligence, bad faith, or willful misconduct. As addressed further below, these provisions are appropriate and consistent with the applicable provisions of chapter 11.

(i)     The Mutual Releases Are Appropriate

47.     A "settlement or adjustment of any claim or interest belonging to the debtor or to the estate" may be included in a plan pursuant to Bankruptcy Code section 1123(b)(3)(A), making permissible the Mutual Release in Plan section X.B. of the Plan. 11 U.S.C. § 1123(b)(3)(A); *see* Disclosure Statement section VI.G.1 ("Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good faith and integrated compromise and global settlement of all Claims and Equity Interests and controversies resolved pursuant to the Plan.").

48.     Courts in this jurisdiction typically assess the propriety of a debtor release in the context of a chapter 11 plan in light of five "*Zenith* factors":

(a) an identity of interest between the debtor and the third party, such that a suit against the third party is, in essence, a suit against the debtor or will deplete assets of the estate;

(b) substantial contribution by the third party to the plan;

(c) the essential nature of the release to the debtor's plan;

(d) an agreement by a substantial majority of creditors to support the plan and the release; and

(e) provision in the plan for payment of all or substantially all of the claims of the creditors and interest holders under the plan.

*In re Zenith Elecs. Corp.*, 241 B.R. 92, 110 (Bankr. D. Del 1999).  No factor is dispositive, nor is

a proponent required to establish each factor required for the release to be approved.  *See In re*

*Washington Mutual., Inc.,* 442 B.R. 314, 346 (Bankr. D. Del. 2011) ("These factors . . . simply

provide guidance in the [c]ourt's determination of fairness."); *In re Exide Techs*., 303 B.R. 48,

72 (Bankr. D. Del. 2003) (finding that factors are not exclusive or conjunctive requirements).

      49.    As to the *Zenith* factors, first, an identity of interest exists between the

Debtors and a majority of the parties to be released as Released Parties. The Released Parties all

are critical stakeholders and participants in the Plan process, all share a common goal with the

Debtors in seeing the Plan succeed, and certain of the Released Parties (the Prepetition Secured

Creditors) are parties to the RSA.  There is also an identity of interests between the Debtors,

Prepetition Secured Creditors and the Equity Parent and their respective Related Persons based

on their "common goal of confirming [the Plan] and implementing the [settlement]."  *See In re*

*Tribune Co*., 464 B.R. 126, 187 (Bankr. D. Del. 2011) (noting that an identity of interest between

the debtors and the settling parties where such parties "share[d] the common goal of confirming

the DCL Plan and implementing the DCL Plan Settlement"), *modified*, 464 B.R. 208 (Bankr. D.

Del. 2011); *see also Zenith*, 241 B.R. at 110 (concluding that certain released parties who "were

instrumental in formulating the Plan" shared an identity of interest with the debtor "in seeing that

the Plan succeed and the company reorganize").

      50.    Second, the Mutual Release is predicated on substantial contributions by

the parties benefitting from those releases other than the Debtors.  In the first instance, the

Released Parties include parties that have provided direct benefits to these Chapter 11 Cases

through diligently discharging their duties and contributing to the overall success of these

Chapter 11 Cases, including by the Prepetition Secured Creditors consenting to the Debtors' use of their cash collateral to pay administrative expenses, their agreement to provide the DIP Facility and Exit Facility, as well as helping enable a meaningful recovery for Class 4 General Unsecured Creditors.  When measured against the uncertain, speculative, and unknown value of the released claims or causes at issue, such agreements constitute "substantial consideration" supporting the Mutual Release here.  *See* Lederman Declaration ¶ 17.

51.     Third, the Mutual Release is essential to the Plan itself.  The settlement embodied in the Plan, including, specifically, the releases therein, was negotiated with the intention that the releases would comprise a consensual settlement of all issues.  In light of the looming RSA Milestone deadlines, to unwind that progress now would result in delay and substantial costs that could eliminate the ability to provide meaningful recoveries to most of the Debtors' creditors.  This factor therefore supports approval of the Mutual Release.

52.     Fourth, considering the materially beneficial treatment of Class 4 General Unsecured Claims under the Plan, the Plan provides a substantial recovery to such Class, which is materially greater than the zero recovery expected after a potential conversion of these Chapter 11 Cases to chapter 7.  Disclosure Statement section V.B.1. and Exhibit D.

53.     The Mutual Release should therefore be approved.

**(ii)**     The Claim Holders' Release Is Appropriate

54.     Plan section I.C.141 defines "Releasing Party" as including "each Holder of a Claim that votes to accept or reject this Plan and does not elect on their ballot to opt out of granting the releases set forth in ARTICLE X.C; . . . .  For the avoidance of doubt, a Holder of a Claim shall constitute a Releasing Party unless it affirmatively opts out of granting the releases

22

by indicating on and returning its ballot." Such term "Releasing Party" also includes Holders of Unimpaired Claims. *Id.*

55. Plan section X.C. provides that: "each of the Releasing Parties shall, and shall be deemed to, conclusively, absolutely, unconditionally, irrevocably, and forever release, waive, void, extinguish, and discharge each Released Party," with exceptions for "actual fraud, gross negligence, bad faith or willful misconduct. . .".

56. Plan section I.C.141 defines "Releasing Party" as including "each Holder of a Claim that votes to accept or reject this Plan and does not elect on their ballot to opt out of granting the releases set forth in ARTICLE X.C.; . . . . For the avoidance of doubt, a Holder of a Claim shall constitute a Releasing Party unless it affirmatively opts out of granting the releases by indicating on and returning its ballot." Such term also includes Holders of Unimpaired Claims. *Id.*

57. Here, the Holders of Class 4 General Unsecured Claims were timely served with clear, written notice of the Claim Holders' Release and their opportunity to opt out of it by checking a box on their *Ballot to Accept or Reject Debtors' Amended Chapter 11 Plan* (the "Class 4 Ballot"):

> **Item 2. Release.** The undersigned, the holder of a Class 4 General Unsecured Claim hereby elects to opt out of the Releases set forth in the Plan (which relevant provisions are attached hereto for your reference), and further described in the Voting Information and Instructions for Completing the Ballot (check if applicable):
>
> ☐ Opt Out of the Release Provisions
>
> **If you do not wish to be a Releasing Party, you must return the ballot and check the opt-out box of the release. Otherwise, you will be deemed a Releasing Party**

23

58.     Also, a copy of the Claim Holders Release sections of the Plan was annexed to the Class 4 Ballots, with the following statement preceding them:

> Item 2.  Release.   The Holder may be deemed to have agreed to the release set forth in Article X.C. of the Plan, which is set forth below for your reference with a related injunction; provided that, notwithstanding the foregoing, a Person is not a "Releasing Party" if such Person affirmatively elects to opt-out of the releases provided for in the Plan, which, for a Holder may only occur by timely submitting a ballot and opting out of such releases as set forth in the definition of "Releasing Party."

59.     Also, the voting instructions accompanying the Class 4 Ballot stated:

> 3. The Plan contains Releases.  If you do not wish to be a Releasing Party, you must return the Ballot and check the opt-out box of the release.

60.     Additionally, such Claim Holders received notice of the Claim Holders' Release and their opportunity to object to confirmation of the Plan in the *Notice of (A) Hearing to Consider Confirmation of the Debtors' Amended Chapter 11 Plan; (B) Deadline for Voting to Accept or Reject the Plan; and (C) Related Matters* [Docket No. 763] (the "<u>Confirmation Hearing Notice</u>"):

> The Bankruptcy Court has established **January 29, 2021, at 5:00 p.m.** (Prevailing Eastern Time), as the last date and time for filing and serving objections to confirmation of the Plan (the "<u>Plan Objection Deadline</u>").
>                        ***
> **<u>The Plan contains the proposed injunction and release provisions set forth in Annex A hereto</u>**.

As well, the Holders of Class 4 General Unsecured Claims were timely served with notice of such release and the opportunity to "opt out" in the Disclosure Statement and Plan.  Disclosure Statement section IV.L.3; Plan section X.C.

61.     In addition, Holders of Unimpaired Claims that were deemed to accept the

Plan and Holders of Impaired Claims that were deemed to have rejected the Plan were served

with notice of the releases and their opportunity to object to confirmation of the Plan in the

*Notice of Non-Voting Status With Respect to Classes Deemed to Accept or Reject Debtors'*

*Amended Chapter 11 Plan* (the "<u>Non-Voting Status Notice</u>"):

> PLEASE TAKE FURTHER NOTICE that Article X of the Plan
> contains injunction and release provisions, which are set forth on
> **Annex A** for your reference.
> ***
>
> PLEASE TAKE FURTHER NOTICE that the Bankruptcy Court
> has established January 29, 2021, at 5:00 p.m. (Eastern Time), as
> the last date and time for filing and serving objections to
> confirmation of the Plan (the "<u>Plan Objection Deadline</u>").

Also, the non-voting claimants were timely served with notice of the Claims Holders' Release in

the Confirmation Hearing Notice, the Disclosure Statement and the Plan.[18]

62.     Bankruptcy Judges in this District have authorized opt-out releases in plan

confirmation orders of the sort proposed here. *In re Insys Therapeutics Inc.*, Case

No. 19-11292 (KG) (Bankr. D. Del. Jan. 16, 2020), Docket No. 1115, ¶ MM at 21-23  ("Thus,

(i) those holders of Claims voting to accept the Plan were given due and adequate notice that

they would be granting the releases by acting in such a manner, and (ii) all other holders of

Claims and Interests were given due and adequate notice that they would be granting the releases

by failing to complete and return their opt out election either on the Ballot or the Opt Out

Election Form."); *In re Remington Outdoor Co.*, No. 18-10684 (BLS) (Bankr. D. Del. Mar. 25,

---

[18] Holders of Class 3 Prepetition Secured Claims were also timely served with notice and an opportunity to object to confirmation of the Plan in their ballots, the Confirmation Hearing Notice, the Disclosure Statement ,and the Plan. All Holders of such Claims consented to the Claim Holders' Release upon returning their ballots, in which they unanimously voted in favor of the Plan.

2018) (approving releases);[19] *In re General Wireless Operations, Inc. d/b/a Radioshack*,

No. 17-10506 (BLS), (Bankr. D. Del. Oct. 26, 2017), Docket No. 1117, ¶ MM ("The releases

granted by non-Debtors under the Plan for the benefit of the Released Parties are consensual

because they are provided only by the holders of Claims or Interests in the Voting Classes or the

Non-Voting Classes, whether entitled to vote on the Plan or not, who did not check the box on

the applicable ballot or notice indicating that they opt out of granting the releases provided in the

Plan."); *In re Abeinsa Holding, Inc.*, 562 B.R. 265, 285 (KJC) (Bankr. D. Del. 2016 (confirming

plan where ballot had an opt-out from the plan release); *In re Molycorp, Inc.,* No. 15-11357

(CSS) (Bankr. D. Del. Jan. 8, 2016) Docket No. 1050, Hr'g Tr. at 67:16-19 ( "Also on

affirmative conduct, you don't need affirmative conduct to get a third-party release, at least not

in Courtroom Number 6, on the fifth floor. Opt-out releases are fine, so I'll overrule that

objection."); *In re Indianapolis Downs, LLC*, 486 B.R. 286, 306 (BLS) (Bankr. D. Del. 2013)

("In this case, the third party releases in question bind certain unimpaired creditors who are

deemed to accept the Plan: these creditors are being paid in full and have therefore received

consideration for the releases.  As for those impaired creditors who abstained from voting on the

Plan, or who voted to reject the Plan and did not otherwise opt out of the releases, the record

reflects these parties were provided detailed instructions on how to opt out, and had the

opportunity to do so by marking their ballots.  Under these circumstances, the Third Party

Releases may be properly characterized as consensual and will be approved."); *In re Cloud Peak

Energy*, No. 19-11047 (KG) (Bankr. D. Del. Dec. 5, 2019), Docket No. 868, ¶ 114 at 53 ("Third

---

[19] Transcript of relevant hearing discussed in Dorothy Coco, <u>Third-Party Bankruptcy Releases:  An Analysis of Consent Through the Lenses of Due Process and Contract Law</u>, 88 Fordham L. Rev. 231, 260-61 and notes therein (2019) (in *Remington*, Judge Shannon "construed silence as acceptance, so long as the parties that were not employees received the ballot and did not specifically opt out.").

Party Release Opt Out Procedures.  The procedures for applicable parties to elect to opt out of

granting Third-Party Releases, the opt-out sections of the Ballots and the Notice of Non-Voting

Status, as the case may be, and the notice of such opt-out procedures set forth in the Combined

Hearing Notice, the Ballots and the Notice of Non-Voting Status are hereby approved in all

respects.").

63.     The Debtors request that the opt-out releases be approved, as they are

consistent with the majority view in this District.

**(iii)**     <u>The Exculpation Provision Is Appropriate</u>

64.     The Plan's exculpation provision complies with and satisfies the

requirements of applicable law.  Under the Plan, an Exculpated Party is, in its capacity as such,

each Debtor, the Creditors' Committee and its members (in such capacity only), a successor of

the foregoing, and each person that from the Petition Date through Consummation of the Plan is

an officer, director, managing member, or estate-retained (including ordinary-course)

professional.  Plan section I.C.69.

65.     Also, consistent with a bankruptcy court's good-faith finding, it is

appropriate to exculpate the parties involved in formulating the plan and to protect them from

collateral attacks.  *See* 11 U.S.C. § 1129(a)(3) (discussed above).  As Judge Shannon stated in

*Indianapolis Downs*, "a creditors' committee, its members, and estate professionals may be

exculpated under a plan for their actions in the bankruptcy case except for willful misconduct or

gross negligence" 486 B.R. at 306 (quoting *Washington Mutual.,* 442 B.R. at 350).

66.     Exculpation may also cover prepetition acts and omissions, particularly

prepetition conduct that relates to case-related issues and events.  Here, for instance, the Debtors

27

and the Prepetition Secured Lenders negotiated and formulated, prepetition, an RSA term sheet and RSA that provides terms for the Plan, as well as the DIP Facility and Exit Facility. Therefore, not granting exculpation for prepetition conduct related to the RSA term sheet and RSA would permit a challenger to make an "end run" around exculpation for acts and omissions regarding the Plan, DIP Facility, and Exit Facility postpetition.[20]

67.     In fact, bankruptcy judges in this district have frequently approved exculpation grants for prepetition activity.  For instance, as recently on June 26, 2020 in *In re RAVN Air Group,* No. 20-10755 (BLS) (Bankr. D. Del.), Docket No. 400, Confirmation Order ¶ 51 at 34-35, over an objection, Judge Shannon approved exculpation for a "prepetition or postpetition act or omission in connection with, relating to, or arising out of the Chapter 11 Cases . . . .").  *See In re Rubicon, US REIT, Inc.*, 434 B.R. 168, 189 (BLS) (Bankr. D. Del. 2010) (approving prepetition exculpation in confirmation order).[21]

68.     The Debtors accordingly request that Plan's exculpation provision be approved, because it is consistent with the holdings in cases from this District, as cited herein.

**(iv)**     The Global Settlement Should Be Approved

69.     Under Bankruptcy Code section 1123(b)(3)(A), a bankruptcy court may approve the compromise of a claim as part of a plan of reorganization. The United States Court

---

[20] A similar argument would apply to prepackaged plans and preplanned cases.

[21] *See In re Orexigen Therapeutics, Inc.*, No. 18-10518 (KG) (Bankr. D. Del. May 17, 2019), Docket No. 1113, Plan Art. VI, § 6.1 at 25; *In re Woodbridge Group of Companies*, No. 17-12560 (KJC) (Bankr. D. Del. October 26, 2018), Docket No. 2903, Confirmation Order ¶ 42 at 33; *In re General Wireless Operations Inc. dba Radio Sha*ck, No. 17-10506 (BLS) (Bankr. D. Del. October 26, 2017, Docket No. 1117, Plan Art. VIII F. at 56; *In re Seal123 Inc. f/k/a The Wet Seal, Inc.*, No. 15-10081(CSS) 23 (Bankr. D. Del. October 30, 2015), Docket No. 1111, Confirmation Order ¶ 35 at 23; *In re PMGI Holdings*, No. 13-12404 (CSS) (Bankr. D. Del. December 16, 2013), Docket No. 359, Confirmation Order ¶ 40(f) at 44; *In re Otelco, Inc.*, No. 13-10593 (MFW) (Bankr. D. Del May 6, 2013), Docket No. 171, Plan Art. VIII § 8.4 (e) at 32; *In re Trico Marine Services, Inc.*, No. 10-12653 (BLS), (Bankr. D. Del. August 2, 2011), Docket No. 1506, Confirmation Order ¶ 88 at 37.

28

of Appeals for the Third Circuit has enumerated four factors that should be considered in

determining whether a settlement should be approved:  "(1) the probability of success in

litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved and

the expense, inconvenience and delay necessarily attending it; and (4) the paramount interest of

the creditors." *In re Martin*, 91 F.3d at 393;  *accord Will v. Nw. Univ. (In re Nutraquest, Inc.),*

434 F.3d 639, 644 (3d Cir. 2006).

70.    The decision to approve a settlement "is within the sound discretion of the

bankruptcy court." *In re World Health Alternatives, Inc.*, 344 B.R. 291, 296 (Bankr. D. Del.

2006); *see also In re Neshaminy Office Bldg. Assoc.*, 62 B.R. 798, 803 (E.D. Pa. 1986), cited

with approval in *Meyers v. Martin (In re Martin)*, 91 F.3d 389 (3d Cir. 1996). The bankruptcy

court should not substitute its judgment for that of the trustee or debtor in possession. *See In re*

*Neshaminy Office Bldg. Assoc.*, 62 B.R. at 803.  The court is not to decide the numerous

questions of law or fact raised by litigation, but rather should canvas the issues to see whether the

settlement falls below the lowest point in the range of reasonableness.  *See In re W.T. Grant and*

*Co.*, 699 F.2d 599, 608 (2d Cir. 1983), cert. denied, 464 U.S. 22 (1983); *see also In re World*

*Health Alternatives, Inc.*, 344 B.R. at 296 (stating that "the court does not have to be convinced

that the settlement is the best possible compromise.  Rather, the court must conclude that the

settlement is within the reasonable range of litigation possibilities.") (internal citations and

quotations omitted).

71.    The Global Settlement represents a fair and equitable resolution that

enhances the return to Class 4 General Unsecured Creditors, eliminates the risk of potential

litigation and removes uncertainty regarding certain business opportunities that may be pursued

29

by the Reorganized Debtors.  First, the probability of success in potential litigation by the

Creditors' Committee against the Prepetition Secured Creditors or Equity Parent is, at best,

uncertain.  Further, there may be delay and difficulty in enforcing any award.  The

commencement of litigation by itself would eliminate the commitments in the RSA and delay the

Debtors' efforts in emerging from these Chapter 11 Cases. Moreover, in the absence of the

Global Settlement, the Debtors' estates (and other parties) would be required to incur significant

expense, inconvenience, and delay that would hinder and reduce creditor recoveries.  The Global

Settlement is the product of extensive arms'-length, good faith negotiations among multiple

stakeholders in the Debtors' bankruptcy cases, and is a fair and reasonable compromise of the

Claims, Interests and controversies that it resolves.  Accordingly, entering into the Global

Settlement represents a sound exercise of the Debtors' business judgment and is in the best

interests of the Debtors' estates.

## C.    The Debtors Have Satisfied Bankruptcy Code Section 1129(a)(2)

72.    Bankruptcy Code section 1129(a)(2) requires the proponent of a plan to

comply with "applicable provisions of the Bankruptcy Code."  11 U.S.C. § 1129(a)(2)  The

principal purpose of Bankruptcy Code section 1129(a)(2) is to ensure that a plan proponent has

complied with the disclosure and solicitation requirements of Bankruptcy Code sections 1125

and 1126.[22]  Additionally, the Debtors are proper debtors under Bankruptcy Code section 109.

---

[22] *See In re PWS Holdings Corp.*, 228 F.3d 224, 248 (3d Cir. 2000) (Bankruptcy Code § 1129(a)(2) requires plan proponent to comply with adequate disclosure requirements of Bankruptcy Code § 1125); *see also In re Lapworth*, No. 97-34529DWS, 1998 Bankr. LEXIS 1383, at *10 (Bankr. E.D. Pa. Nov. 2, 1998) ("The legislative history of § 1129(a)(2) specifically identifies compliance with the disclosure requirements of § 1125 as a requirement of § 1129(a)(2)."); *Official Comm. v. Michelson (In re Michelson)*, 141 B.R. 715, 719 (Bankr. E.D. Cal. 1992) ("Compliance with the disclosure and solicitation requirements is the paradigmatic example of what the Congress had in mind when it enacted section 1129(a)(2)."); *In re Texaco Inc.*, 84 B.R. 893, 906-07 (Bankr. S.D.N.Y. 1988) (stating that the "principal purpose of Section 1129(a)(2) is to assure that the proponents have complied with the

(1)    **The Debtors Have Complied With the Requirements of Bankruptcy Code Section 1125**

73.    The Debtors have complied with Bankruptcy Code section 1125.  On December 21, 2020, the Court entered the Solicitation Procedures Order approving the Disclosure Statement as containing "adequate information" of a kind and in sufficient detail to enable hypothetical, reasonable investors typical of the Debtors' creditors to make an informed judgment whether to accept or reject the Plan.

(2)    **The Debtors Have Complied With the Requirements of Bankruptcy Rules 3017(d) and 3018(c)**

74.    Bankruptcy Rules 3017 and 3018 require, in relevant part, that a debtor transmit its plan and disclosure statement to all affected creditors and equity security holders, that it adopt effective procedures for the transmission of its plan and disclosure statement to beneficial owners of securities, and that it afford creditors and equity security holders a reasonable period of time in which to accept or reject the proposed plan.  Bankruptcy Rule 3017(d) requires that, unless a court orders otherwise, a debtor must transmit to all creditors, equity security holders, and the United States Trustee: the plan, or a court-approved summary of the plan; the disclosure statement approved by the court; notice of the time within which acceptances and rejections of such plan may be filed; and such other information as the court may direct including any opinion of the court approving the disclosure statement or a court approved summary of the opinion.  Bankruptcy Rule 3017 also requires that the debtor give notice of the time fixed for filing objections to the proposed disclosure statement and for the

---

requirements of section 1125 in the solicitation of acceptances to the plan"); S. Rep. No. 95-989, at 126 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5912 (1978) ("Paragraph (2) of [section 1129(a)] requires that the proponent of the plan comply with the applicable provisions of chapter 11, such as section 1125 regarding disclosure."); H.R. Rep. No. 95-595, at 412 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6368 (1977).

hearing on confirmation to all creditors and equity security holders and that a debtor mail a ballot to each creditor and equity security holder entitled to vote on the plan.  Bankruptcy Rule 3018(c) governs the form of ballot for accepting or rejecting a plan, providing in relevant part that an "acceptance or rejection shall be in writing, identify the plan or plans accepted or rejected, be signed by the creditor or equity security holder or an authorized agent and conform to the appropriate Official Form."  The Debtors respectfully submit that they have met all such requirements.

75.     Only Classes 3 and 4 are entitled to vote under Bankruptcy Code section 1126.  Although "[t]he holder of a claim or interest allowed under section 502 of [the Bankruptcy Code] may accept or reject a plan," 11 U.S.C. § 1126(a), "a class that is not impaired under a plan, and each holder of a claim or interest in such class, are conclusively presumed to have accepted the plan," *id.* 11 U.S.C. § 1126(f)), and "a class is deemed not to have accepted a plan if such plan provides that the claims or interests of such class do not entitle the holders of such claims or interests to receive or retain any property under the plan on account of such claims or interests.  11 U.S.C. § 1126(g).  Classes 1, 2, 5 and 9 are unimpaired under the Plan, and thus are deemed to have accepted the Plan.  Classes 6, 7 and 8 are impaired under the Plan, but do not vote and are deemed to have rejected the Plan because they will receive no distributions under the Plan.

76.     As evidenced by the Tabulation Affidavit, the Debtors have satisfied Bankruptcy Rules 3017 and 3018 by following the procedures in the Solicitation Procedures Order for noticing matters with respect to confirmation of the Plan and soliciting acceptances of the Plan.  The Disclosure Statement, Ballots (approved as to form by the Solicitation Procedures

Order), and Confirmation Hearing Notice provided clear notice of the deadline to submit the

Ballots, which the Court established as January 29, 2021, at 5:00 p.m. (Prevailing Eastern Time).

*See* Solicitation Procedures Order ¶ 19.b at 11.  The Debtors did not solicit acceptances or

rejections of the Plan from any Claim or Interest Holder before the approval of the Disclosure

Statement by the Bankruptcy Court.

(3)     **Bankruptcy Code Section 1126 (c) and (d) and Bankruptcy Rule 3018(a) Were Satisfied**

77.     As to tabulating votes for impaired classes, subject to designation of

claims under Bankruptcy Code section 1126(e), a plan is accepted (a) by a class of claims if at

least two-thirds in dollar amount and one-half in number of holders of allowed claims voted in

the class vote to accept the plan and (b) by a class of interests if at least two-thirds in amount of

allowed claims voted in the class vote to accept the plan.  *See* 11 U.S.C. § 1126(c) and (d).  Also,

Bankruptcy Rule 3018(a) and (c) and the Solicitation Procedures Order establish that Holders

entitled to vote are those as of the Record Date of December 18, 2020, at 5:00 pm. (Prevailing

Eastern Time), who must vote in an appropriate manner on an appropriate form.

78.     The Tabulation Affidavit and its exhibits provide complete transparency

as to the voting and tabulation procedures.  It reflects the Debtors' compliance in reaching the

determinations reflected therein and with the requirements of Bankruptcy Code section 1126(c)

and (d) and Bankruptcy Rule 3018(a) and (c), and indicates that Class 3 voted to accept the Plan.

In light of the evidence adduced above, reflecting that the Debtors' solicitation satisfies the

requirements of Bankruptcy Code sections 1125 and 1126 and Bankruptcy Rules 3017(d) and

33

(e), and 3018(a) and (c), the Debtors request that the Court grant the protections provided under

Bankruptcy Code section 1125(e).

**D.      The Plan Has Been Proposed in Good Faith (Bankruptcy Code Section 1129(a)(3)**

79.      Bankruptcy Code section 1129(a)(3) requires that a plan be proposed in

good faith and not by any means forbidden by law.  Although the term "good faith" is not

defined in the Bankruptcy Code, courts have determined that "[f]or purposes of determining

good faith under section 1129(a)(3) . . . the important point of inquiry is the plan itself and

whether such a plan will fairly achieve a result consistent with the objectives of the Bankruptcy

Code." *In re PWS Holding Corp.*, 228 F.3d 224, 242 (3d Cir. 2000) (quoting *In re Abbott*

*Dairies of Pennsylvania*, 788 F.2d 143, 150 n.5 (3d Cir. 1986)).  The requirement of good faith

must be viewed in light of the totality of the circumstances surrounding the proposal of a chapter

11 plan.  *In re W.R. Grace & Co.*, 475 B.R. 34, 87 (D. Del. 2012).  In determining whether the

plan will succeed and accomplish goals consistent with the Bankruptcy Code, courts look to the

terms of the plan itself.[23]

80.      The Plan, which is the offspring of the RSA and extensive negotiations

between the Debtors and the Prepetition Secured Creditors, has been proposed in good faith.  It

has the support of impaired voting Class 3 and implements a result that is in keeping with – and,

indeed, central to – the goals of the Bankruptcy Code.  The Plan also includes provisions of a

Global Settlement among the major constituencies in the Chapter 11 Cases.  The Plan is designed

to maximize the assets available for distribution and to distribute them equitably.  The Plan

---

[23] *See In re Sound Radio, Inc.*, 93 B.R. 849, 853 (Bankr. D.N.J. 1988) (concluding that the good-faith test provides
courts with significant flexibility and is focused on examination of the plan itself, rather than external factors), *aff'd
in part and remanded in part on other grounds*, 103 B.R. 521 (D.N.J. 1989), *aff'd*, 908 F.2d 964 (3d Cir. 1990).

contains only provisions that are consistent with the Bankruptcy Code.  In light of the foregoing, the Plan complies with Bankruptcy Code section 1129(a)(3).

E.      **Payments for Services and Expenses (Bankruptcy Code Section 1129(a)(4)**

81.     Bankruptcy Code section 1129(a)(4) requires that the Debtors not make any payment for services, costs, or expenses in connection with these cases unless such payments are disclosed and subject to bankruptcy court approval as reasonable.  Any payment made or to be made by the Debtors under the Plan for services or for costs and expenses of the Debtors' professionals in connection with the Chapter 11 Cases, or in connection with the Plan and incident to these Chapter 11 Cases, is subject to the approval of the Court as reasonable, or has already been approved by prior Court order, thereby satisfying Bankruptcy Code section 1129(a)(4), as applicable.  *See* Plan section II. B.

F.      **Directors and Officers (Bankruptcy Code Section 1129(a)(5))**

82.     Bankruptcy Code section 1129(a)(5) requires that the Debtors disclose the identity and affiliations of the individuals proposed to serve after confirmation as a director or officer and that the identity and nature of any insider compensation be disclosed.  The Debtors have complied with Bankruptcy Code section 1129(a)(5).   *See, e.g.*, Plan § V.L.; Exhibit 5 to the *Plan Supplement* [Docket No. 920-5 at PDF1-3].

83.     The Debtors submit that the foregoing provisions are "consistent with the interests of creditors and equity security holders and with public policy."  Therefore, the Bankruptcy Code section 1129(a)(5) requirements are satisfied.[24]

---

[24] *See, e.g.*, *In re Armstrong World Indus., Inc.*, 348 B.R. 136, 165 (Bankr. D. Del. 2006) (holding that the disclosure of the identities and, with respect to insiders, the nature of compensation, of persons to serve as directors and officers on the effective date was sufficient under Bankruptcy Code § 1129(a)(5) of the Bankruptcy Code).

DOCS_LA:334735.30 76136/002

G.  **Rate Changes (Bankruptcy Code Section 1129(a)(6)**

84.  Bankruptcy Code section 1129(a)(6) permits confirmation only if any

regulatory commission that has or will have jurisdiction over a debtor after confirmation has

approved any rate change provided for in the plan.  Bankruptcy Code section 1129(a)(6) is

inapplicable in these cases.

H.  **The Plan Satisfies the "Best Interests" Test (Bankruptcy Code Section 1129(a)(7)**

85.  The "best interests of creditors" test of Bankruptcy Code section

1129(a)(7) requires that, with respect to each impaired class of claims or interests, each

individual holder of a claim or interest has either accepted the plan or will receive or retain

property having a present value, as of the effective date of the plan, of not less than what such

holder would receive if the debtor were liquidated under chapter 7 of the Bankruptcy Code at

that time.  The best interests of creditors test is generally satisfied through a comparison of the

estimated recoveries for a debtor's stakeholders in a hypothetical chapter 7 liquidation of that

debtor's estate against the estimated recoveries under that debtor's plan of reorganization.[25]

86.  Under Bankruptcy Code section 1129(a)(7), the best interests of creditors

test applies only to non-accepting holders of impaired claims or interests.  For the reasons

discussed in Disclosure Statement section V.B.1. and, as reflected in the Liquidation Analysis

attached as Exhibit D thereto, it is clear that the best interests of creditors test is satisfied as to all

Holders of Claims and Interests in impaired Classes under the Plan.  The Liquidation Analysis

---

[25] *See In re Lason, Inc.*, 300 B.R. 227, 232 (Bankr. D. Del. 2003) ("Section 1129(a)(7)(A) requires a determination whether 'a prompt chapter 7 liquidation would provide a better return to particular creditors or interest holders than a chapter 11 reorganization'." (quoting *In re Sierra-Cal*, 201 B.R. 168, 171-72 (Bankr. E.D. Cal. 1997)); *see also Genesis Health Ventures*, 266 B.R. at 610–11.

36

reflects that the distribution each Holder of a Claim or Equity Interest is projected to receive or retain under the Plan is not less than the distribution that such Holder is projected and estimated to receive if the Chapter 11 Cases were converted to chapter 7 of the Bankruptcy Code. *See* Hadiwijaya Declaration ¶¶ 6 to 13. Because the non-accepting Holders would not receive any greater recovery in a chapter 7 liquidation than under the Plan, the Plan satisfies the "best interests" of creditors test.

## I.    Acceptance by Classes (Bankruptcy Code Section 1129(a)(8)

87.    Section 1129(a)(8) of the Bankruptcy Code requires that each class of claims or interests must either accept a plan or be unimpaired under a plan. As set forth above, Classes 1 and 2 are unimpaired, their members were not entitled to vote, and those Classes are deemed to have accepted the Plan pursuant to the conclusive presumption mandated by Bankruptcy Code section 1126(f). Also, as reflected in the Tabulation Affidavit and based on votes tabulated in accordance with Bankruptcy Code section 1126(c) and (d) and Bankruptcy Rule 3018 (a) and (c), the Plan has been accepted by Class 3.

## J.    Treatment of Priority Claims (Bankruptcy Code Section 1129(a)(9)

88.    Bankruptcy Code section 1129(a)(9) contains a number of requirements concerning the payment of priority claims. First, Bankruptcy Code section 1129(a)(9)(A) requires, inter alia, that claims of a kind specified in Bankruptcy Code section 507(a)(2), which gives first priority to certain administrative expenses, be paid in full in cash on the effective date of a plan. Second, Bankruptcy Code section 1129(a)(9)(B) requires that claims of a kind specified in Bankruptcy Code section 507(a)(1), (4), (5), (6) and (7) receive cash or, if the class

37

accepts the plan, deferred cash payments equal to the allowed amount of such claims on the

effective date.  Third and finally, Bankruptcy Code section 1129(a)(9)(C) requires that the holder

of a claim of a kind specified in Bankruptcy Code section 507(a)(8) of the Bankruptcy Code—

priority tax claims—must receive regular installment payments in cash of the total value equal to

the allowed amount of such claim over a period ending not later than five years after the petition

date that is treatment no less favorable than provided under the plan for any other non-priority,

unsecured claim (other than claims in any administrative convenience class).

89.    The Plan satisfies Bankruptcy Code section 1129(a)(9) because it provides

that:  (a) any unpaid Administrative Expense Claims (as to which Bankruptcy Code section

1129(a)(9)(A) applies), once Allowed, will be paid in full on the Effective Date or as soon as

practicable thereafter unless the Holder has agreed to less favorable treatment (*see* Plan

section II.A., B., and C.); (b) Allowed Non-Priority Tax Claims receive treatment mirroring that

permissible under Bankruptcy Code section 1129(a)(9)(B) (*see* Plan section III.C.1.); and

(c) Allowed Priority Tax Claims receive treatment mirroring that permissible under Bankruptcy

Code section 1129(a)(9)(C) (*see* Plan section II.D.).

**K.**    **Acceptance by at Least One Impaired Class (Bankruptcy Code Section 1129(a)(10)**

90.    Bankruptcy Code section 1129(a)(10) requires as a condition of

confirmation that if a class of claims is impaired under the plan, at least one class of claims that

is impaired under the plan has accepted the plan, determined without including any acceptance of

the plan by any insider.  The voting members of Class 3, exclusive of any claims of Insiders (as

defined in the Bankruptcy Code), have voted in favor of the Plan.  Therefore, the requirements of

Bankruptcy Code section 1129(a)(10) have been satisfied.

**L.**      **The Plan Is Feasible (Bankruptcy Code Section 1129(a)(11)**

91.      Bankruptcy Code section 1129 (a)(11) provides that a plan may be

confirmed only if "[c]onfirmation of the plan is not likely to be followed by the liquidation, or

the need for further financial reorganization, of the debtors or any successor to the debtors under

the plan, unless such liquidation or reorganization is proposed in the plan."  11 U.S.C.

section 1129(a)(11).

92.      Courts generally have held that the determination of the feasibility

requirement contemplates "'the probability of actual performance of the provisions of the

plan.'"[26] Only a reasonable assurance of success is required.[27]

93.      Bankruptcy Code section 1129(a)(11) requires that the Bankruptcy Court

find that confirmation is not likely to be followed by the liquidation of the Reorganized Debtors

RT Asset Company or RT Lodge Company, or by the need for further financial reorganization,

unless the plan contemplates such liquidation.  For purposes of demonstrating that the Plan meets

this "feasibility" standard, the Debtors have analyzed the ability of the Reorganized Debtors, RT

---

[26] *Clarkson v. Cooke Sale & Serv. Co. (In re Clarkson)*, 767 F.2d 417, 420 (8th Cir. 1985) (quoting *Chase Manhattan Mortgage & Realty Trust v. Bergman (In re Bergman)*, 585 F.2d 1171, 1179 (2d Cir. 1978)).  " The test is whether the things which are to be done after confirmation can be done as a practical matter under the facts.'"  *Id.*; *see also In re Orlando Investors, L.P.*, 103 B.R. 593, 600 (Bankr. E.D. Pa. 1989) ("Feasibility does not require that substantial consummation of the plan be guaranteed; rather the plan proponent must demonstrate that there be a reasonable assurance of compliance with plan terms.").

[27] *Johns-Manville Corp.*, 843 F.2d at 649 ("[T]he feasibility standard is whether the plan offers a reasonable assurance of success.  Success need not be guaranteed."); *W.R. Grace & Co.*, 475 B.R. at 115 (same); *In re Flintkote Co.*, 486 B.R. 99, 139 (Bankr. D. Del. 2012) (same).  Further, "'a relatively low threshold of proof will satisfy § 1129(a)(11) so long as adequate evidence supports a finding of feasibility.'"  *In re Prussia Assocs.*, 322 B.R. 572, 584 (Bankr. E.D. Pa. 2005) (quoting *Collier on Bankruptcy*, ¶ 1129.03[1] (15th rev. ed. 2005)); *In re Tribune Co.*, 464 B.R. 126, 185 (Bankr. D. Del.), *modified*, 464 B.R. 208 (Bankr. D. Del. 2011).

39

Asset Company and RT Lodge Company to meet their obligations under the Plan and to retain sufficient liquidity and capital resources to conduct their business.

94.     The Plan meets the feasibility requirement set forth in Bankruptcy Code section 1129(a)(11).  In connection with the development of the Plan and for the purposes of determining whether the Plan satisfies this feasibility standard, the Debtors analyzed their ability to satisfy their financial obligations while maintaining sufficient liquidity and capital resources. The Debtors developed a business plan and prepared financial projections for fiscal years 2021 through 2026 (the "Financial Projections").  The Financial Projections, together with the assumptions upon which they are based, are attached to the Disclosure Statement as Exhibit E. In general, as illustrated by the assumptions of the Financial Projections, with the deleveraged capital structure provided under the Plan and the added funding available under the Exit Facility, the Reorganized Debtors will have sufficient cash flow and cash on hand to make all payments required pursuant to the Plan while conducting ongoing business operations.

95.     The forecast attached as Exhibit A to the NeJame Declaration indicates an anticipated increase in the company's end-of-fiscal year cash position, from over $6.6 million at the end of this fiscal year and $10.5 million at the end of the fiscal year 2022, with continued growth through the projected period.  NeJame Dec., Ex. A.

96.     Confirmation and Consummation is, therefore, not likely to be followed by the liquidation or further reorganization of the Reorganized Debtors.  Accordingly, the Plan satisfies the feasibility requirement of Bankruptcy Code section 1129(a)(11).

**M.**    **Payment of Certain Fees (Bankruptcy Code Section 1129(a)(12)**

97.    Bankruptcy Code section 1129(a)(12) requires that certain fees listed in 28

U.S.C. § 1930, determined by the Court at the hearing on confirmation of a plan, be paid or that

provision be made for their payment.  The Plan includes a provision reflecting that all

outstanding fees payable to the Office of the United States Trustee under section 1930 shall be

paid by the Debtors on or before the Effective Date in compliance with Bankruptcy Code

section 1129(a)(12):

> All outstanding fees payable pursuant to 28 U.S.C. § 1930 shall be
> paid on the Effective Date.  All such fees payable after the
> Effective Date shall be paid prior to the closing of the Chapter 11
> Cases when due or as soon thereafter as practicable.

Plan section XIII.B..  *See* Plan section I.C.2, II.A. and D.  Consequently, Bankruptcy Code

section 1129(a)(12) is satisfied.

**N.**    **Continuation of the Debtors' Obligations to Pay Retiree Benefits
(Bankruptcy Code Section 1129(a)(13)**[28]

98.    Bankruptcy Code section 1129(a)(13) requires that a plan provide for the

continuation of retiree benefits at levels established by agreement or by court order pursuant to

Bankruptcy Code section 1114 for the duration of the period that the debtor has obligated itself

to provide such benefits.  Under the Plan, to the extent that the Debtors have any such retiree

benefit plans within the meaning of Bankruptcy Code section 1114, they are being assumed.  *See*

Plan section IV.I.

---

[28] The remaining elements of Bankruptcy Code § 1129 (a), namely, subsections (a)(14) (domestic obligations), (15) (individual debtors) and (16) (nonprofit entities), are inapplicable to the Debtors and will not be discussed.  *See* 11 U.S.C. § 1129(a)(14), (a)(15) and (a)(16).

**O.**     **The "Cramdown" Requirements of Bankruptcy Code Section 1129(b)(1)**

99.     Section 1129(b) of the Bankruptcy Code provides a mechanism for

confirmation of a plan in circumstances where not all impaired classes of claims and interests

accept a plan, as required by section 1129(a)(8), which is referred to as "cramdown:"

> [I]f all of the applicable requirements of [section 1129(a) of the
> Bankruptcy Code] other than [the requirement contained in section
> 1129(a)(8) that a plan must be accepted by all impaired classes] are
> met with respect to a plan, the court, on request of the proponent of
> the plan, shall confirm the plan notwithstanding the requirements
> of such paragraph if the plan does not discriminate unfairly, and is
> fair and equitable, with respect to each class of claims or interests
> that is impaired under, and has not accepted, the plan.[29]

Thus, under section 1129(b), a bankruptcy court may "cram down" a plan over the rejection (or

deemed rejection) of a plan by an impaired class of claims or interests as long as the plan does

not "discriminate unfairly" and is "fair and equitable" with respect to such class.[30]

100.     The "unfair discrimination" standard of section 1129(b)(1) of the

Bankruptcy Code requires that a dissenting class receive "treatment which allocates value to the

[dissenting] class in a manner consistent with the treatment afforded to other classes with similar

legal claims against the debtor,"  so that "a dissenting class will receive relative value equal to

the value given to all other similarly situated classes."  11 U.S.C. § 1129(b)(1).  Generally

speaking, section 1129(b)(1) of the Bankruptcy Code is intended to prevent a plan proponent

---

[29] 11 U.S.C. § 1129(b)(1).

[30] *See Johns-Manville Corp.*, 843 F.2d at 650 (2d Cir. 1988); *John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assocs.*, 987 F.2d 154, 157 n.5 (3d Cir. 1993); *Zenith*, 241 B.R. at (explaining that "[w]here a Class of creditors or shareholders has not accepted a plan of reorganization, the court shall nonetheless confirm the plan if it does not discriminate unfairly and is fair and equitable").

from "segregat[ing] two similar claims or groups of claims into separate classes and provide

disparate treatment for those classes."[31]

101.     Under the foregoing standards, the Plan does not "discriminate unfairly"

against any Holder of a Claim or Equity Interest in a Class that is deemed or voted to reject the

Plan (the "Rejecting Class").  The treatment of Holders of Claims in the Rejecting Class is

proper because all similarly situated Holders of Claims will receive the same treatment under the

Plan.

102.     Section 1129(b)(2)(B) and section 1129(b)(2)(C) set forth the

requirements of the "fair and equitable" test with respect to unsecured creditors and equity

holders, with each subsection specifying an alternative requirement.  A chapter 11 plan must

satisfy the applicable requirement to be found to be fair and equitable with respect to a dissenting

class of unsecured creditors or equity interests.[32]

103.     The Bankruptcy Code states that a plan is "fair and equitable" with respect

to a class of unsecured claims if "the holder of any claim or interest that is junior to the claims of

such class will not receive or retain under the plan on account of such junior claim or interest any

property. . . ."  11 U.S.C. § 1129(b)(2)(B)(ii).  Further, a plan is fair and equitable with respect to

a class of interests if the plan provides that "the holder of any interest that is junior to the

---

[31] *Id.*; *see also Armstrong World*, 348 B.R. at ("hallmarks of the various tests have been whether there is a reasonable basis for the discrimination, and whether the debtor can confirm and consummate a plan without the proposed discrimination"); *In re Buttonwood Partners, Ltd.*, 111 B.R. 57, 63 (Bankr. S.D.N.Y. 1990) ("some courts hold that for discriminatory treatment of claims to be fair, four tests must be satisfied: (i) there is a reasonable basis for discriminating, (ii) the debtor cannot consummate the plan without discrimination, (iii) the discrimination is proposed in good faith, and (iv) the degree of discrimination is in direct proportion to its rationale"); *Zenith*, 241 B.R. at 105 (Bankr. D. Del. 1999) (explaining that '[w]here a class of creditors or shareholders has not accepted a plan. . . , the court shall nonetheless confirm the plan if it 'does not discriminate unfairly and is fair and equitable'"); *In re TCI 2 Holdings, LLC*, 428 B.R. 117, 157 (Bankr. D.N.J. 2010) (citing *Armstrong World Indus.*, 348 B.R. at 121).

[32] *See In re P.J. Keating Co.*, 168 B.R. 464, 468 (Bankr. D. Mass. 1994) (noting that the "test under Section 1129(b)(2)(C) is an alternative one").

interests of such class will not receive or retain under the plan on account of such junior interest

any property." *Id.,* § 1129(b)(2)(C)(ii).

104.    As stated above, while more than one-half in number of Holders of Class 4

Claims that voted approved the Plan, less than two-thirds of such voters by amount did not.

Therefore, the Plan "crams down" the proposed treatment of Class 4 Claims, as authorized by

Bankruptcy Code section 1129(b) because the Plan does not unfairly discriminate and is fair and

equitable with respect to Class 4.  The Plan does not unfairly discriminate because all Holders of

General Unsecured Claims are treated the same, and the Plan is fair and equitable because no

junior Class receives a distribution under the Plan (as discussed below with respect to Classes 5

and 9).  *See* 11 U.S.C. § 1129(b)(2)(B)(ii) ("[T]he condition that a plan be fair and equitable with

respect to a class includes the following requirements: . . .  [w]ith respect to a class of unsecured

claims–the holder of any claim or interest that is junior to the claims of such class will not

receive or retain under the plan on account of such junior claim or interest any property.").

105.    Although the Plan provides that the Holders of Preserved Intercompany

Claims in Class 5 and Intercompany Interests in Class 9 will technically receive property through

the reinstatement, the Plan nonetheless satisfies the "fair and equitable" requirement because

(a) courts recognize that the reinstatement of intercompany claims and equity interests

constitutes a device to allow the Debtors to maintain their organizational structure and avoid the

unnecessary cost of having to reconstitute that structure;[33] and (b) the reinstatement of

---

[33] *See Ion Media Networks v. Cyrus Select Opp. Master Fund (In re Ion Media Networks)*, 419 B.R. 585, 601 (Bankr. S.D.N.Y. 2009) ("This technical preservation of equity is a means to preserve the corporate structure that does not have any economic substance and that does not enable any junior creditor or interest holder to retain or recover any value under the Plan."); *In re MPM Silicones, LLC*, 531 B.R. 321, 331, n.8 (S.D.N.Y. 2015) (citing *Ion Media Networks*), *aff'd in relevant part*, 874 F.3d 787 (2d Cir. 2017)); *see also In re DACCO Transmission Parts (NY), Inc.*, No. 16-13245 (MKV) (Bankr. S.D.N.Y. Mar. 21, 2017), Docket No. 415, *In re Pacific Ethanol Holding*

44

Intercompany Claims and Intercompany Interests is a purely administrative act because all of the direct and indirect Assets of RTI will be transferred to RT Asset Company and RT Lodge Company as of the Effective Date pursuant to the Plan.[34]  Plan section I.C.147 and V.C., P. and Q.

106.    The Debtors are not aware of any material Intercompany Claims and are reinstating such claims merely as a precautionary measure.  The Debtors have determined to

---

*Co.*, No. 09-11713 (KG) (Bankr. D. Del. June 8, 2010), Docket No. 604 (finding plan that preserved the corporate structure for purposes of distributing equity interests in the debtors to be fair and equitable); *In re Global Ocean Carriers Ltd.*, 251 B.R. 31, 48 (MFW) (Bankr. D. Del. 2000), ("If substantive consolidation is granted, for purposes of plan confirmation, all the assets of all Debtors will be considered for repayment of creditors. Thus, the retention of the corporate structure among the Debtors will not adversely affect any creditors and the only equity retention issue should be at the ultimate parent level for purposes of section 1129(b).").

[34] Similar to Class 9 Intercompany Interests, Class 5 Preserved Intercompany Claims preserves the corporate structure through Subsidiary Structure Maintenance along with the Class 9 Intercompany Interests, as set forth in Plan sections I.C.130 ("'Preserved Intercompany Claims' shall mean Intercompany Claims that are listed as preserved post-Effective Date in a schedule to the Plan Supplement.") and V.P. ("all Preserved Intercompany Claims and Intercompany Interests shall be reinstated in full or in part (collectively, the "Subsidiary Structure Maintenance"). . .").  *See In re Aspect Software Parent, Inc.*, No. 16-10597 (MFW) (Bankr. D. Del.), Docket No. 372, ¶ 33 at 17 ("[T]he Plan is fair and equitable with respect to Holders of Interests in Class 8 and Holders of Claims in Class 10 because there is no Class of Claims or Interests junior to Classes 8 or 10 that will receive or retain property under the Plan on account of such Claims or Interests.  Specifically, to the extent that Class 7 Intercompany Claims and/or Class 9 Intercompany Interests are Reinstated, such treatment is provided for administrative convenience and efficiency, and not on account of such Claims and/or Interests, and will not alter the treatment provided for any other Holder of any Claim or Interest."); *In re DAACO Transmission Parts*, No. 16-13245 (MKV) (Bankr. S.D.N.Y. March 21, 2017), Docket No. 415, ¶¶ M at 10 ("The Debtors were not required to solicit votes from the holders of . . . Class 5 (Intercompany Claims) and Class 6 (Intercompany Interests) . . . because Claims in each such Class are unimpaired under, and therefore are deemed to accept, the Plan and the Amended Plan.") and CC at 20 (same); in the related disclosure statement [Docket No. 317] the Intercompany Claims are shown to have an Estimated Allowed Amount of $2,000,000.  *Id.*, at Article II.  Cf. *Final Order Under Sections 105, 345, 363, 364, 503, 1107 and 1108 of the Bankruptcy Code Authorizing (I) Maintenance of Existing Bank Accounts; (II) Continuance of Existing Cash Management System, Bank Accounts, Checks and Related Forms; (III) Continued Performance of Intercompany Transactions; (IV) Limited Waiver of Section 345(b) Deposit and Investment Requirements and (V) Granting Related Relief* entered Nov. 5, 2020, Docket No. 324, at ¶¶ 7 at 4 ("In connection with the ongoing utilization of their Cash Management System, the Debtors shall continue to maintain records in the ordinary course of business with respect to all transfers so that all transactions (including any Intercompany Transactions) may be readily ascertained, traced and recorded properly on the applicable accounts and distinguished between prepetition and postpetition transactions. . . .") and ¶ 10 at 5 ("The Debtors are authorized to continue to consummate the Intercompany Transactions with other Debtors, and to create Intercompany Claims . . . .").  Here, Holders of Class 4 General Unsecured Claims receive a pro rata share of a set amount of money; whether the Preserved Intercompany Claims are reinstated does not change the amount so the Class 4 claimants are receiving no less because the Preserved Intercompany Claims are reinstated and their reinstatement are an integral part of the Restructuring Transactions under the RSA that result in the provision of funds for a distribution to Class 4.

reinstate such Intercompany Interests to preserve the Debtors' prepetition corporate structure for the Reorganized Debtors with respect to all entities not dissolved through the Plan.

107.     Accordingly, the Plan is "fair and equitable" with respect to the Rejecting Class and satisfies section 1129(b) of the Bankruptcy Code.

**P.     The Plan's Purpose Is Consistent With the Bankruptcy Code**
**(Bankruptcy Code Section 1129(d)**

108.     Bankruptcy Code section 1129(d) provides that a court may not confirm a plan if the principal purpose of the plan is to avoid taxes or the application of section 5 of the Securities Act of 1933, 15 U.S.C. § 77(e).  The principal purpose of the Plan is not avoidance of taxes or avoidance of the requirements of section 5 of the Securities Act of 1933.  Instead, the Plan, reflects the RSA and the Global Settlement which have the goals of reorganizing the Debtors as a going-concern business.

**Q.     Good Cause Exists to Waive the Stay of the Confirmation Order**

109.     Bankruptcy Rule 3020(e) provides that "[a]n order confirming a plan is stayed until the expiration of 14 days after the entry of the order, unless the Court orders otherwise."  Fed. R. Bankr. P. 3020(e).  Bankruptcy Rules 6004(h) and 6006(d) provide similar stays to orders authorizing the use, sale, or lease of property (other than cash collateral) and orders authorizing a debtor to assign an executory contract or unexpired lease under Bankruptcy Code section 365(f).  Each rule also permits modification of the imposed stay upon court order.

110.     The Debtors are subject to a deadline under the RSA to cause the Plan to go effective.  *See* Final DIP Order, Schedule 8.1 (Milestones) to Exhibit A (DIP Credit Agreement) [Docket No. 558-1, PDF 147 of 147].  Thus, the Debtors submit that good cause

46

exists for waiving any stay of the Confirmation Order pursuant to Bankruptcy Rules 3020, 6004, and 6006 so that the Confirmation Order will be effective immediately upon its entry.[35]

## VI.

## DEBTORS' RESPONSES TO CONFIRMATION OBJECTIONS

111.    As set forth above, certain of the formal and informal objections and responses of the parties listed above have been addressed in the Proposed Confirmation Order or by modifications to the Plan, or have been otherwise resolved between the Debtors and the responding party.  Addressed below are what the Debtors believe are the remaining non-cure amount-related formal objections.

## A.    Adams Family Trust Objection

112.    Objector's contention:  The Adams Family Trust is a former landlord of RTI that asserts that it brought suit against RTI in the General District Court of the City of Lynchburg, Virginia, and obtained a judgment against RTI in the amount of $396,772.08 for unpaid rent and other damages.  The Debtors appealed the judgment and, as required, provided an appeal bond in the amount of $250,883.49 (the "Appeal Bond").  The Appeal Bond was posted on May 14, 2020.

113.    The Adams Family Trust states that the Plan does not address the Appeal Bond or the pending appeal from judgment and objects to the Plan "to the extent it does not

---

[35] *See, e.g., In re Sorenson Commc'ns.,* No. 14-10454 (BLS) (Bankr. D. Del. Apr. 10, 2014), Docket No. 180, waiving stay of confirmation order and causing it to be effective and enforceable immediately upon its entry by the court); *In re Physiotherapy Holdings,* No. 13-12965 (KG) (Bankr. D. Del. Dec. 23, 2013), Docket No. 197 (same); *In re Gatehouse Media,* No. 13-12503 (MFW) (Bankr. D. Del. Nov. 6, 2013), Docket No. 137 (same); *In re Dex One Corp.,* No. 13-10533 (KG) (Bankr. D. Del. Apr. 29, 2013), Docket No. 192 (same); *In re Geokinetics Inc.,* No. 13-10472 (KJC) (Bankr. D. Del. Apr. 25, 2013), Docket No. 280 (same).

47

include any language addressing the Appeal Bond and the Virginia Litigation." The Adams

Family Trust asserts that the Debtors must either (a) abandon their appeal and allow the Adams

Family Trust to collect the Appeal Bond and retain an allowed general unsecured claim against

Debtors for the balance of the judgment in excess of the Appeal Bond or, (b) stipulate to relief

from the automatic stay pursuant to 11 U.S.C. § 362 to allow the appeal to continued. The

Adams Family Trust states the Plan should reflect the Debtors' choice.

114.    The day before the Plan confirmation hearing, the Adams Family Trust

filed a *Motion of Keith E. Adams and Kim D. Adams, as Trustees of the Adams Family Trust for*

*an Order Compelling Debtors to Abandon Appeal of State Court Judgment and Contingent*

*Interest, if any, in Related Appeal Bond, or Alternatively, Granting Relief from the Automatic*

*Stay* [Docket No. 1103] (the "Motion to Compel/Relief from Stay"), which it scheduled for

hearing before this Court on March 4, 2021.

115.    Debtors' response:  As the filing of the Motion to Compel/Relief from

Stay belies, the Adams Family Trust's Limited Objection is not an objection to confirmation of

the Plan. It is an attempt to leverage the confirmation process to force the Debtors to make a

choice between relinquishing their appeal rights and stipulating to relief from the automatic stay.

The Adams Family Trust's request will be addressed in connection with their Motion to

Compel/Relief from Stay. The Debtors reserve all rights with respect to the motion. The

objection, however, should be overruled is it does not constitute grounds to deny confirmation of

the Plan.

**B.**    **Bowie Central Appraisal District (CAD), Texas's Objection [Docket No. 981]**

116.    <u>Objector's contention</u>:  On December 15, 2020, Bowie Central Appraisal

District, Texas ("<u>Bowie CAD</u>") filed its *Bowie CAD, Texas' Objection to Debtor's Chapter 11*

*Plan* [Docket No. 731] (the "<u>Bowie CAD Confirmation Objection</u>") subsequent to filing its proof

of claim, designated as claim no. 225 (the "<u>Bowie CAD Claim</u>"), on December 3, 2020, in the

amount of $3,449.37.  Bowie CAD objects to confirmation of the Plan because it does not

provide for the payment of interest on account of prepetition property taxes.  Bowie CAD

Confirmation Objection, ¶¶ 2, 3, 6 at 1-3.

117.    <u>Debtors' response</u>:  Pursuant to section II.D. of the Plan, the Debtors will

pay the Bowie CAD Claim on or before the Effective Date

**C.**    **Objection of Various Landlords [Docket No. 981] and National Retail Landlord**
         **Group [Docket No. 1014]**

118.    <u>Objector's contention</u>:  The Various Landlords raise a smattering of

issues, including:   the Administrative Expense Claim Reserve must be sufficient to pay all post-

petition rent in full; the Exit Financing should not impose liens on leases; the Debtors must

demonstrate adequate assurance of future performance; and the Debtors should not be permitted

to extend the time to assume or reject leases.  The National Retail group of landlords raises

similar issues.

119.    <u>Debtors' response</u>:  Throughout their bankruptcy cases, the Debtors have

engaged productively with various landlords in order to reach consensus.  The Debtors will

continue to do so with respect to the issues raised.

120.    With respect to the reserve for Administrative Expense Claims, section I.C.171 of the Plan, the Debtors are required to make an estimate in consultation with their lenders and the Creditors' Committee.  Accordingly, the reserve amount will not be unilaterally determined and it is unclear how the Debtors could provide more than a good faith estimate until after the Administrative Expense Claims Bar Date, which will be 30 days after the Effective Date.

121.    To the best of the Debtors' knowledge, the proposed Exit Financing does not impose liens on leases to the extent prohibited, except where overridden by the Uniform Commercial Code.

122.    As set forth in section V.L. above and the NeJame Declaration, the Debtors have demonstrated adequate assurance of future performance through projections indicating sufficient liquidity through the projection period to satisfy their requisite obligations, including to landlords.

123.    Finally, courts in this district have extended the time for a debtor to assume or reject leases post-confirmation for reasonable periods of time.  *See, e.g., In re GNC Holdings, Inc.,* Case No. 20-11662 (KBO) (Docket No. 1415; Oct. 14, 2020) (permitting post-confirmation rejection within 10 days of resolution of material dispute over assumption or cure amount); *In re Chisholm Oil & Gas, LLC*, Case No. 20-11593 (BLS) (Docket No. 322; Sept. 23, 2020)(rejection may be done within 30 days after resolution of a disputed cure amount or any other matter bearing on assumption); *In re True Religion Apparel, Inc.*, 17-11460 (CSS) (Docket No. 522; Oct. 5, 2017)( post-confirmation rejection of executory contracts allowed).  *In re*

*Triangle Petroleum USA, Inc.*, Case No. 16-11566 (MFW) (Docket No. 825; Mar. 10, 2017)

(may defer decision to reject pending post-effective date resolution of certain disputes).

## VII.

## CONCLUSION

WHEREFORE, for the reasons set forth in this Memorandum, the Debtors respectfully submit that (a) the Plan fully satisfies all applicable requirements of the Bankruptcy Code and (b) all remaining unresolved objections to the Plan as of the commencement of the Confirmation Hearing should be overruled; and (c) the Court enter an order confirming the Plan substantially in the form of the Proposed Confirmation Order.

Dated:  February 10, 2021                PACHULSKI STANG ZIEHL & JONES LLP

/s/ James E. O'Neill
Richard M. Pachulski (CA Bar No. 90073)
Malhar S. Pagay (CA Bar No. 189289)
James E. O'Neill (Bar No. 4042)
PACHULSKI STANG ZIEHL & JONES LLP
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware  19899-8705 (Courier 19801)
Telephone:  302-652-4100
Facsimile:   302-652-4400
Email: rpachulski@pszjlaw.com
        mpagay@pszjlaw.com
        joneill@pszjlaw.com

Counsel for Debtors and Debtors in Possession