# IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| RTI HOLDING COMPANY, LLC, et al.,[1] | ) | Case No. 20-12456 (JTD) |
| | ) | (Jointly Administered) |
| Reorganized Debtors. | ) | **Ref. Docket No. 1288** |

## REPLY TO RESPONSE TO OBJECTION TO PROOFS OF CLAIM NOS. 10877 AND 10878 FILED BY POWELL ANDERSON CAPITAL, L.P.

Ruby Tuesday Operations LLC ("RTO"), successor in interest to Ruby Tuesday, Inc. ("RTI") pursuant to the confirmed and effective *Debtors' Second Amended Chapter 11 Plan, as Modified,* Docket No. 1135 (the "Plan"), and one of the reorganized debtors (the "Reorganized Debtors" and, prior to the Plan's Effective Date, the "Debtors"),[2] hereby replies (this "Reply") to the response, Docket No. 1360 (the "Response"), of Powell Anderson Capital, L.P. (the "Claimant") to RTO's objection, Docket No. 1290 (the "Objection"),[3] to the Proofs of

---

[1] The Debtors in these chapter 11 cases and the last four digits of each Debtor's U.S. tax identification number are as follows: RTI Holding Company, LLC (4966); Ruby Tuesday, Inc. (5239); Ruby Tuesday, LLC (1391); RTBD, LLC (6505); RT of Carroll County, LLC (8836); RT Denver Franchise, L.P. (2621); RT Detroit Franchise, LLC (8738); RT Distributing, LLC (6096); RT Finance, LLC (7242); RT FL Gift Cards, Inc. (2189); RT Florida Equity, LLC (7159); RT Franchise Acquisition, LLC (1438); RT of Fruitland, Inc. (1103); RT Indianapolis Franchise, LLC (6016); RT Jonesboro Club (2726); RT KCMO Franchise, LLC (7020); RT Kentucky Restaurant Holdings, LLC (7435); RT Las Vegas Franchise, LLC (4969); RT Long Island Franchise, LLC (4072); RT of Maryland, LLC (7395); RT Michiana Franchise, LLC (8739); RT Michigan Franchise, LLC (8760); RT Minneapolis Franchise, LLC (2746); RT Minneapolis Holdings, LLC (7189); RT New England Franchise, LLC (4970); RT New Hampshire Restaurant Holdings, LLC (7438); RT New York Franchise, LLC (1154); RT Omaha Franchise, LLC (7442); RT Omaha Holdings, LLC (8647); RT One Percent Holdings, LLC (6689); RT One Percent Holdings II, LLC (2817); RT Orlando Franchise, LP (5105); RT Restaurant Services, LLC (7283); RT South Florida Franchise, LP (3535); RT Southwest Franchise, LLC (9715); RT St. Louis Franchise, LLC (6010); RT Tampa Franchise, LP (5290); RT Western Missouri Franchise, LLC (6082); RT West Palm Beach Franchise, LP (0359); RTTA, LP (0035); RTT Texas, Inc. (2461); RTTT, LLC (9194); Ruby Tuesday of Allegany County, Inc. (8011); Ruby Tuesday of Bryant, Inc. (6703); Ruby Tuesday of Columbia, Inc. (4091); Ruby Tuesday of Frederick, Inc. (4249); Ruby Tuesday of Linthicum, Inc. (8716); Ruby Tuesday of Marley Station, Inc. (1641); Ruby Tuesday of Pocomoke City, Inc. (0472); Ruby Tuesday of Russellville, Inc. (1601); and Ruby Tuesday of Salisbury, Inc. (5432). The Debtors' mailing address is 333 East Broadway Ave., Maryville, TN 37804.

[2] The pre-Effective Date debtors and debtors in these chapter 11 cases are defined herein as the "Debtors" and each individually as a "Debtor."

[3] RTO reserves all rights reserved in Objection ¶¶ 37-38 at 16.

Claim numbered 10877 and 10878 (collectively, the "Claims") filed by the Claimant.[4]  In support of its Reply, RTO states the following:

## Preliminary Statement

1.      The Claimant hopes to achieve precisely what the United States Court of Appeals for the Third Circuit cautioned against in the absence of subordination under section 510(b) of the Bankruptcy Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code"): "disappointed shareholders . . . recovering their investment loss by using . . . securities claims to bootstrap their way to parity with general unsecured creditors in a bankruptcy proceeding . . . ." *Baroda Hill Inv. v. Telegroup, Inc. (In re Telegroup, Inc.)*, 281 F.3d 133, 142 (3d Cir. 2001).[5]

2.      The Claimant is a disappointed shareholder that previously demanded payment for its 74,000 shares in RTI, leading to its assertion of claims in the Debtors' bankruptcy cases, one of which is "a claim for its Shares at the time of the merger" and another is a "claim based on Shares it held at the time of the merger."[6]  The Claims assert the Claimant's damages arising from the difference in the fair value of such claims asserted by the Claimant and the share price offered by RTI in connection with the merger transaction.

---

[4] Capitalized terms not expressly defined herein shall have the meanings ascribed to such terms in the *Findings of Fact, Conclusions of Law and Order Confirming the Debtors' Second Amended Chapter 11 Plan, as Modified*, entered February 17, 20121, Docket No. 1144 (the "Confirmation Order"), the Objection and/or the Plan.

[5] In its Response, the Claimant addresses "bootstrap" or "bootstrapping" seven times.  Response ¶ 2 at 3, ¶ 28 at 13 (twice), ¶ 33 at 15, ¶ 38 n.11 at 19, ¶ 40 at  21.  The Claimant tries to distinguish its attempt to "participate in any type of 'bootstrapping to become a creditor to avoid an absolute equity loss." *Id*. ¶ 2 at 3.  However, in doing so, it in fact admits to its own bootstrapping:  "Powell Anderson's claims are further distinguishable because Powell Anderson purchased its shares of RTI knowing the Merger would cash out its shares." *Id*. ¶ 33 n. 9 at 15-16.  *See Telegroup*, 281 F.3d at 141 (quoting John J. Slain & Homer Kripke, *The Interface Between Securities Regulation and Bankruptcy—Allocating the Risk of Illegal Securities Issuance Between Security Holders and the Issuer's Creditors*, 48 N.Y.U. L. Rev. 261, 268 (1973) ("Investors in stock or in subordinated debentures may be able to bootstrap their way to parity with, or preference over, general creditors even in the absence of express contractual rights.")).

[6] *See Request for Judicial Notice in Support of Objection to Proofs of Claim Nos. 10877 and 10878 Filed by Powell Anderson Capital, L.P.*, Docket No. 1289 (the "RFJN"), Ex. 2 (Defendant Powell Anderson Capital,, LP's Answer/Response to Plaintiff's Petition for Appraisal and Other Relief) ¶¶ 32 at 7, 35 at 8, 36 at 8, and Prayer for Relief a. ¶ a at 8 (each referencing Powell Anderson's demand), Ex. 4 (Proof of Claim, Claim No. 10877, Addendum) ¶ 5, Ex. 5 (Proof of Claim, Claim No. 10878, Addendum) ¶ 5.

3.	Significantly, the nature of the relief sought by the Claimant in the dissenters action that forms the basis for the Claims is the sine qua non of equity ownership.  The Claimant seeks the valuation of its interests in RTI arising under Georgia law, which "provide[s] an opportunity for shareholders who think that they are entitled to a higher share price to dissent from the merger and obtain 'fair value' of their shares . . . ."  Appraisal Petition ¶ 15 at 4.  The Claims relate to RTI's offer to purchase the Claimant's shares at the Merger price instead of at the higher purchase price demanded by the Claimant.[7]  In essence, the Claims are for the "damages" the Claimant believes it suffered if RTI were permitted to purchase the Claimant's shares at the Merger price.  A valuation in excess of the price at which the Claimant originally acquired such shares represents the Claimant's "upside" while value less than such amount would represent the Claimant's loss on the investment.  *Cf.* Response ¶ 33 n.9 at 15 ("Powell Anderson's claims are further distinguishable because Powell Anderson purchased its shares of RTI knowing the Merger would cash out its shares.").[8]  *See* Objection ¶ 35 at 15-16.

4.	The Claims relate directly to the Claimant's status as a shareholder.  With respect to the Plan, the Claims should not compete with the claims of Class 4 general unsecured creditors, but instead should be subordinated in Class 7 under Bankruptcy Code section 510(b).  Therefore, the Claims should be subordinated and disallowed as requested herein.

5.	As set forth in greater detail below and in direct contravention to the allegations in the Response, RTO demonstrates that (a) Bankruptcy Code section 510(b) indeed

---

[7] *See* Answer ¶ 29 at 6.

[8] *Frunkun v. International Wireless (In re International Wireless)*, 68 F. App'x 275, 278 (3d. Cir. 2003) ("Just as shareholders accept gladly the upside potential of increases in their shares' value (whatever the reason), they should also assume the risk of decline in value for whatever reason, including (but not limited to) fraud in the issuance, by having their claims subordinated—shorthand for the result that because they purchased stock, they are at the end of the line in bankruptcy distribution priority.").  *Cf. Kaiser*, 260 B.R. at 689 ("Even during the restricted period, the ICT Shareholders retained the 'upside' in any value of the Debtor's stock.  The Merger Agreement provided that if the stock price went above the Merger Value during the restricted period, the ICT Shareholders would require the Debtors to buy the stock from them or arrange its sale.  Thus, they retained their essential rights as shareholders at all times.").

subordinates the Claims to the priority of common stock as contemplated by the case law cited in the Objection and this Reply[9] and (b) the Claimant has no prima facie valid claim due to lack of attached writings and therefore fails to meet its burden for substantiating its Claims.

**Background**

6.      The Claimant was a shareholder of RTI that dissented from the 2017 merger (the "Merger") through which RTI became a private company.  In connection with the Merger, shareholders were offered $2.40 per share for the purchase of their shares.  Certain RTI shareholders, including the Claimant, declined to accept the offered share amount and sought a higher price for the purchase of their shares.

7.      Five dissenting shareholders, including the Claimant, asserted damage claims arising from the difference between their requested share purchase price and the Merger $2.40 per share price by filing claims in RTI's bankruptcy case:  The Claimant asserts nonpriority general unsecured claims for the fair value of its shares under a state appraisal remedy statute.

8.      Dissenting shareholder claims (including the Claims) were classified in Class 7 of the Plan, which contains all claims that are subordinated pursuant to section 510(b) of the Bankruptcy Code to the priority of common stock; Class 7 did not and will not receive distributions under the Plan.

9.      In connection with the plan confirmation process, on January 21, 2021, the this Court entered its *Order Approving Stipulation Deeming Proofs of Claim of Powell Anderson Capital, L.P. Timely Filed*, Docket No. 909, approving a stipulation between Powell Anderson

---

[9] The Response is similar to the response to RTO's objections to the claims of Quadre Investments, L.P.

and the Debtors pursuant to which Powell Anderson stipulated to temporary disallowance of its

Claims for voting purposes.  *See* Docket No. 909-1 ¶ 3.

       10.     By agreement between the Debtors and the Claimant and as set forth in the

Confirmation Order, the parties agreed to defer the determination of subordination of the Claims

until after confirmation through the claims objection process.  *See* Docket No. 1144 ¶ 25.

Accordingly, RTO filed the Objection, as well as objections to the claims filed by the four other

dissenting shareholders.  *See* Docket Nos. 1284-1293.  Three dissenting shareholders failed to

oppose the objections, which were sustained by orders of this Court entered on May 13, 2021.

*See* Docket Nos. 1366-1368.  RTO's objection to the dissenters' claims of Quadre Investments,

L.P., Docket No. 1290, is pending, and is scheduled to be heard at the date and time of the

hearing on the Objection to Powell Anderson's Claims.

## Basis for Reply

### A.    The Claims Are Subject to Subordination Under Bankruptcy Code Section 510(b)

       11.     Bankruptcy Code section 510(b) provides:

> For the purpose of distribution under this title, a claim arising from rescission of a purchase or sale of a security of the debtor or of an affiliate of the debtor, **for damages arising from the purchase or sale of such a security**, or for reimbursement or contribution allowed under section 502 on account of such a claim, shall be subordinated to all claims or interests that are senior to or equal the claim or interest represented by such security, except that if such security is common stock, such claim has the same priority as common stock.

11 U.S.C. § 510(b) (emphasis added).

### A Dissenting Shareholder Is Still a Shareholder

12.     The Claimant asserts that "Powell Anderson ceased to be a shareholder of RTI as of the closing of the Merger . . . and retained only its narrow statutory right to payment under the Georgia law that arose from the Merger . . . and went from being a shareholder of RTI to being a creditor of RTI."  Response ¶¶ 2 at 2-3, ¶ 24 at 10.  In other words, the Claimant's argument hinges on the pretense that it lost all indicia of ownership, when it admits it has not.

13.     As former Bankruptcy Judge Allan L. Gropper stated:  "Courts are concerned with 'the temptation to lay aside the garb of a stockholder, on one pretense or another and to assume the role of a creditor . . . and all attempts of that kind should be viewed with suspicion.'"  *CIT Group v. Tyco Int'l. (In re CIT Group)*, 460 B.R. 533, 642-43 (Bankr. S.D.N.Y. 2011) (quoting *Jezarian v. Raichle (In re Stirling Homex Corp.)*, 579 F.2d 206, 213 (2d Cir. 1978)), *aff'd,* 479 F. App'x 393 (2d Cir. 2011).  RTO asks that this Court heed Judge Gropper's warning and view the Claimant's blatant attempt at "bootstrapping" with suspicion.

14.     First, the Claimant cites to the Georgia Supreme Court's opinion in *Grace Bros. v. Farley Indus.* for its statements that "shareholders who object to a merger are entitled to receive the fair value of their shares prior to the effectuation of the merger," and that the Georgia dissenters' statute "permits a dissenting shareholder to be paid the fair value of his shares and preempts any other remedy where the claim is essentially one regarding the price the shareholder is to receive for his shares."  Response ¶ 24 at 10-11.  In *Grace*, the Georgia Supreme Court juxtaposed a shareholder's right (a) "to receive fair value" under the dissenters' statute, for which it does not use the word "claim," with the right (b) to any other remedy, which is expressly referenced as a "claim":  any other remedy where the *claim* is essentially one regarding

6

the price the shareholder is to receive for his shares."  450 S.E.2d 814, 817-18 (Ga. 1994)

(emphasis added), *quoted in* Response ¶ 24 at 10-11.

15.     Therefore, *Grace* does not support the Claimant's contention that it was

divested of its status as a shareholder and became solely a creditor under Georgia law once it

dissented.  While the exercise of such rights may fall within the broad definition of a "claim"

under Bankruptcy Code section 101(5), such claim remains that of a shareholder and is precisely

the type of bankruptcy "claim" that is subordinated to the priority of common stock under

Bankruptcy Code section 510(b) (as discussed below).[10]

16.     Claimant then cites to the Georgia Court of Appeals opinion in *Haskins v.*

*Haskins*, claiming falsely that "Georgia law is clear that a former shareholder that has dissented

no longer holds status as a shareholder."  Response ¶ 25 at 11 (citing *Haskins*, 278 Ga. App. 514

(2006)).  However, *Haskins* is not a dissenters' rights case; it involves standing to assert a

derivative action.  In *Haskins*, the court found the Georgia dissenters' statute inapplicable

because the former shareholders had redeemed their shares for the merger consideration:

> The CBI Board of Directors sent notice to Drewry Haskins III and
> members of his family who owned CBI stock under OCGA § 14-2-
> 1322.  Because the resolution only offered to pay $427 per share of
> the old stock, however, Drewry Haskins III and his family rejected
> the offer and CBI filed a petition under OCGA § 14-2-1330 to
> determine the fair market value of the old stock shares ("the
> dissenter case").  In connection with this proceeding, CBI paid
> $2,508,625 into the registry of the court, and **Drewry Haskins III**
> **and the members of the family later surrendered all of their**
> **CBI shares and withdrew the full amount of the money paid**
> **into the registry.**

---

[10] Next, in Response ¶ 24 at 11, it cites to two Delaware cases that make the generic point that the Delaware dissenters' statute is focused on the value of the dissenters' stock.  *Cede & Co. v. Technicolor*, 542 A.2d 1182, 1186 (Del. 1987); *Kaye v. Pantone, Inc.*, 395 A.2d 369, 374-75 (Del. 1978).

. . . .

**Because Drewry Haskins III has redeemed his shares in CBI, he no longer has standing to maintain a derivative action** because the "'commenced or maintained' language in the shareholders' derivative statute, OCGA § 14-2-741, requires a continuation of shareholder status throughout litigation."

*Id.*, at 516-17 and 520 (emphasis added) (quoting *Grace*, 450 S.E.2d at 816).

17.     As the Claimant recognizes, the dissenting shareholders rights are addressed in Merger Agreement § 2.04.  *See* Response ¶ 23 at 10.  Such section states in pertinent part that the:

> shares of Company Stock . . . held by a holder who has . . . demanded and properly exercised appraisal rights for such shares in accordance with [O.C.G.A. ¶¶ 14-2-1301, *et seq*., of the Georgia Business Corporations Code ("GBCC")].  GBCC shall not be converted into the right to receive the Merger Consideration, but instead shall only be entitled to such rights as are granted by the GBCC, **unless such holder** fails to perfect, **withdraws** or otherwise loses the right to appraisal.

(Emphasis added.)

18.     Such section is also summarized in the related Proxy Statement (defined below):

> each share of Ruby Tuesday common stock the holder of which has properly demanded dissenters' rights in accordance with Georgia law **will not be canceled** and converted into the right to receive the merger consideration **unless and until such holder** fails to perfect or **withdraws** or otherwise loses its dissenters' right.

Proxy Statement excerpt at 65, Docket No. 1291-1 at 3 (emphasis added).

19.     Therefore, under the Merger Agreement, the Claimant's shares were not extinguished at the time of the Merger but were on deposit pending an appraisal for fair value or

8

their withdrawal by the Claimant from deposit. *See* Objection ¶¶ 32-34 at 13-15; Response ¶ 24 at 10 ("Powell Anderson . . . surrendered its share certificate to RTI on February 15, 2018.").

20.     The GBCC expressly states that the Georgia state court appraisal action has "the effect of an action quasi in rem against their shares," O.C.G.A. § 14-2-1330, so the shares must continue to exist post-deposit. Also, as stated in O.C.G.A § 14-2-1323(b):

> A record shareholder who demands payment and deposits his shares under subsection (a) of this Code section retains all other rights as a shareholder until these rights are cancelled or modified by the taking of the proposed corporate action.

*See* Comment to O.C.G.A. § 14-2-1323 ("A shareholder who deposits his shares retains all other rights of a shareholder until those rights are modified by effectuation of the proposed corporate action.").

21.     Case law, however, supports RTO's view that the Claimant retains its status as a shareholder here. In *California DHI, Inc. v. Erasmus*, the United States Court of Appeals for the Tenth Circuit held that a dissenting shareholder did not become a creditor upon his exercise of his statutory right to dissent to a merger. 393 F. App'x 554 (10th Cir. 2020),[11] *aff'g* 2008 U.S.Dist. LEXIS 101444 (D. Colo. Dec. 16, 2008). It addressed Colorado's dissenters' statute as it existed in 2004, which was similar to Georgia's current statute, in particular O.C.G.A § 14-2-1323(b) quoted above.[12]

---

[11] "This order and judgment is not binding precedent . . . It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1." 393 F. App'x at 555 n.1.

[12] The main difference between the Colorado statute in 2004 and the Georgia statute now is that, in Georgia, the shares are deposited to prevent transfers and in Colorado the shares were subject to the statute's express restriction on transfer. *Cf. VSI Enters. v Edwards*, 518 S.E.2d 765, 768 (Ga. App. 1999) ("O.C.G.A. § 14-2-1324 provides a method in which a corporation can prevent a dissenter from using the dissent as a way to hedge against the market by restricting transfer from the date of the demand.").

DOCS_LA:338014.3 76136/003

22.     In *California DHI*, Dr. Udo Erasmus, a nutritionist, owned a one-third interest in pet supplement company Designing Health, Inc., a Colorado corporation that was majority owned by a veterinarian Robert Collet and his brother Bernard.  After a shareholders' meeting, Designing Health merged with California DHI, Inc., a California corporation, on March 19, 2004.  Dr. Erasmus dissented under a Colorado dissenters' rights statute (then Colo. Rev. Stat. § 7-113-204(2)) and demanded the purchase of his shares at fair value.  California DHI then commenced an action under what was then then section 7-113-301 to have a court determine the value of Dr. Erasmus's shares.  393 F. App'x at 555-56.  The Tenth Circuit affirmed and summarized:

> [T]he district court rejected Dr. Erasumus's argument that [Designing Health's] corporate debt should be subordinated to his own. The district court concluded instead that because Dr. Erasmus was asserting rights as an equity holder, he could only claim his proportionate share of the going concern value of [Designing Health].

*Id*. at 556.  The district court had elaborated:

> The Defendant's argument that his financial interest in the corporation changed from equity holder to general creditor at the moment he exercised his dissenter's rights appears to arise from the Defendant's misreading of C.R.S. § 7-113-204(2).  That statute states: "A shareholder [who invokes dissenter's rights] retains all the rights of a shareholder, except the right to transfer the shares, until the effective date of the proposed corporate action . . . and has only the right to receive payment for the shares after the effective date of such corporate action."  **Nothing in this language is susceptible to an interpretation that a dissenter's role shifts from shareholder to general creditor of the corporation as of the effective date of the corporate action**.  Rather, the statutory language clearly juxtaposes the dissenter retaining "all the rights of a shareholder" up until the effective date, and retaining only the shareholder's right to "payment for [his] shares" after that date.  **Put differently, the status of the dissenter as a shareholder**

**never changes, but the bundle of rights he enjoys as a shareholder is eventually whittled away to a single one – to cash out his share of the corporation – once the challenged corporate action occurs.**

> . . . .

**. . . To suggest that, upon invoking dissenter's rights, a shareholder can leap from equity holder to general creditor would be to entitle the dissenter to a priority status above other shareholders. It would allow the dissenting shareholder to escape the effect of the accumulated debts of the corporation on the value of his/her shares (and saddle the remaining shareholders with a disproportionate burden of existing corporate debt), and simultaneously grant a windfall to a dissenter who chooses to abandon an insolvent or undercapitalized company**. This is clearly not the social policy that the dissenter's rights statute was intended to encourage. By contrast, reading the statute to ensure that the dissenter receives his share of the corporate value after all corporate debts are accounted for avoids creating perverse incentives and ensures that a dissenter receives precisely that which his shares entitle him to: a portion of whatever excess equity exists in the corporation. Accordingly, the Defendant's argument on this point is without merit.

2008 U.S. Dist. LEXIS 101444, at *9-11 (emphasis added).[13] Therefore, under *California DHI*, a shareholder does not become a creditor when it exercises its rights under a state dissenter's statute and seeks fair value for its shares.

        23.     Similarly, the Virginia Supreme Court recognized that statutory dissenter's rights are part of a shareholder's bundle of rights and remain so after dissent, which confirms they are not creditors' rights, so the shareholder is *not* transformed into a creditor by exercising them. In *Willard v. Moneta Building Supply, Inc.*, the Virginia Supreme Court stated:

---

[13] 208 U.S. Dist. LEXIS 101444, at * 9-10 n. 3 ("The cases cited by the Defendant [Dr. Erasmus] for the proposition that the shareholder's status change to that of a creditor are plainly inapposite. . . . The Defendant appears to have cited the cases simply because they appear to acknowledge some sort of distinction between a person having a thing and a person having 'the right to receive payment for' the thing, although the rationale and significance of that distinction is never elaborated upon in either case.").

[W]e have not, until today, had occasion to consider whether stockholders' dissenters' rights are property rights for the purpose of the statute of limitations.

. . . .

. . . Ownership of stock provides the shareholder with a bundle of rights, some of which are provided by contract while others are provided by the Code. . . . We have previously stated, for example, that the right to vote shares of stock at a corporate meeting is an incident of ownership; it is a part of the stockholder's property interest. . . .

Similarly, Code § 13.1-730(A)(3) gives a shareholder a right incident to ownership of stock, the right to dissent from certain corporate actions. A share of stock with such rights may be more valuable than one without such rights. **The presence of dissenters' rights triggers a series of rights and obligations under the Code that ultimately provides the shareholder the opportunity to demand the fair value of his shares**. . . .

. . . .

Essentially, an appraisal is the method of **paying shareholders** for taking their property; **it is the statutory means whereby shareholders can avoid the conversion of their property into other property not of their choosing** and is given to shareholders as compensation for the abrogation of the common-law rule that a single shareholder could block a merger. . . .
. . . [T]he loss of dissenter's rights, an incident of stock ownership, is the injury alleged. . . .

Willard alleged an "injury to property" and his claim was thus subject to the five-year limitation . . . .

551 S.E.2d 596, 599-600 (Va. 2001) (emphasis added).[14]

24.     As already discussed in the Objection, a court has determined that claims

arising from shareholders' rights of appraisal or other determinations regarding the value of

---

[14] At the time of *Willard*, the then applicable Virginia dissenters' statute was similar to the current Georgia statute: "The shareholder who deposits his shares pursuant to subsection A of this section retains all other rights of a shareholder except to the extent that these rights are canceled or modified by the taking of the proposed corporate action." Va. Code Ann. § 13.1-735(A and B) (2000, repealed 2005).

shares are properly subordinated under Bankruptcy Code section 510(b).  *See* Objection ¶ 26 at

10-11.  In *Official Comm. v. FLI Deep Marine LLC (In re FLI Deep Marine Holdings)*, the

claimants were minority shareholders that refused an offer for their shares in a merger and were

also parties to stayed Delaware Chancery Court litigation challenging the price offered as being

below fair value.  2011 Bankr. LEXIS 579 (Bankr. S.D. Tex. Jan. 19, 2011).  Bankruptcy Judge

Marvin Isgur of the United States Bankruptcy Court for the Southern District of Texas granted

the debtor's motion for summary judgment:

> "The Defendants sought appraisal rights for their shares but the
> Debtors filed for bankruptcy before that process got very far." . . .
> **Through the Delaware Litigation, the Defendants sought to
> exercise their statutory appraisal rights for the shares . . . .**
>
> These claims are causally linked to Defendants' status as DMTI's
> shareholders.  Given the circuit court precedent [e.g., *Telegroup*]
> and § 510(b)'s underlying policies, **the Court finds mandatory
> subordination is required**.

2011 Bankr. LEXIS 579, at *19-21 (emphasis added).  *See* Objection ¶ 27 at 11.

       25.     The Claimant denigrates Judge Isgur's opinion, contending, without

explanation, that it is an "excessively expansive application of Section 510(b) . . . ."  Response

¶ 38 n.11 at 19.   The Claimant attempts to distinguish *FLI Deep Marine* on its facts, such as the

timing of the shareholders' dissent under state law to a merger relative to the commencement of

the bankruptcy case, and the amount of the merger consideration involved.  However, it does not

cite to any case law in support of its criticism.  *Cf. In re Telegroup*, 281 F.3d at 142 ("More

important than the timing of the actionable conduct, from a policy standpoint it is the fact that the

claims in this case seek to recover a portion of claimants' equity investment. In enacting

§ 510(b), Congress intended to prevent disaffected equity investors from recouping their

investment losses in parity with general unsecured creditors in the event of bankruptcy.").

Indeed, the Claimant does not cite to any authority that overrules, distinguishes, chooses not to

follow, criticizes, or even questions *FLI Deep Marine*.

26.     The case law that the Claimant cites and quotes in support of its effort to

transform itself from a shareholder to a nonsubordinated general unsecured claimholder is

distinguishable. For instance, the Claimant cites *CIT,* which involved the issue of "whether the

Tyco Claim, based on the rejection of a tax agreement executed by an affiliated seller in a

corporate restructuring that included a stock issuance, is one for damages 'arising from' the sale

of a security and is therefore subject to subordination under § 510(b)." 460 B.R. at 637. In *CIT*,

the court held for Tyco because (among other reasons) "the real question is whether the claimant

bargained for the risk and rewards of a holder or equity rather than a holder of debt. Based on

the present record . . . it is clear that Tyco contracted for the status of creditor not an equity

holder." *Id*. at 639. Here, there was neither an exchange of an equity interest for debt nor even

any bargaining; there was merely the exercise of a statutory right of a shareholder, which was

part of its bundle of rights that it obtained when it acquired RTI's common stock pre-merger.

Also, the Claimant's exercise of its dissenters' rights was not in the "distant past." *Id*. at 642

("CIT cites no authority that subordinates a claim under 510(b) merely because it was derived

from an equity interest that was exchanged for a debt interest in the distant past.") (quoted in

14

Response ¶ 32 at 14-15).[15]  Therefore, *CIT* does not support the Claimant's contention that it is

no longer a shareholder but was instead elevated to the status of creditor by operation of

Georgia's dissenters' statute.

27.     Next, the Claimant argues because it "has enjoyed no such profit

participation in RTI since 2017," the *Telegroup* ruling should not apply.  Response ¶ 33 at 15.  In

*Telegroup*, the Third Circuit applied section 510(b) to subordinate claims based on a debtor's

contractual failure to register stock and make it freely tradable.  281 F.3d at 135.  The Claimant

argues here that its Claims should not be subordinated under *Telegroup* because the court found

that the shareholders had assumed the risk of insolvency along with participating in profits.

Response ¶ 33 at 15 (citing *Telegroup*, 281 F.3d at 142).  In contrast, here, the Claimant

contends that it no longer participates in profits and was only entitled to the fair value of its

shares under Georgia's dissenters' statute, no more, no less, once it dissented.

28.     To the contrary, the Claimant did, in fact, assume the risk of loss if the

Debtors' business lost value or failed, as well as to participate in the "upside" if the fair value of

its stock was determined to be greater than the $2.40 per share Merger Consideration.  In fact,

the Debtors filed for chapter 11 relief, making real the risk of insolvency assumed by the

Claimant by owning shares in RTI for which it had not completed the dissent process to

judgment.  *Cf. Cole Taylor Bank v. Ratner*, 146 B.R. 211, 221 (Bankr. N.D. Ill. 1992) ("[U]ntil

they surrender their share certificates at the time of payment of the appraisal remedy judgment

---

[15] In *CIT*, "the tax agreement . . . was entered into as an integral part of the spinoff of CIT from Tyco's corporate group in 2002," 460 B.R. at 635, and the *CIT* opinion is dated December 21, 2011, so the "distant past" referenced by Judge Gropper is almost a decade.  Here, the Claimant states that it deposited its shares for its dissent on January 24, 2018, Response ¶ 24 at 10, and it filed its Claims on November 11, 2020, RFJN Exhs 5 and 6, which is approximately two years and nine months; not nearly as distant in the past as in *CIT*.

they have yet to receive, the Dissenting Shareholders still occupy shareholder status, notwithstanding their pending appraisal claims against FCC.").

29.     The Claimant also admits that it "purchased its shares of RTI knowing the Merger would cash out its shares."  Response ¶ 33 n.9 at 15-16.  Presumably, it did so to seek a perceived "fair value" of its pre-merger RTI shares well in excess of the price it paid for them and make a profit.  The determination of fair value would be future-looking, thereby incorporating projections of future profits and losses.[16]  The profit motive and risk of loss existed here, as it did in *Telegroup*.

30.     Thus, case law shows that courts have rebuffed attempts by disgruntled equity holders to place form over substance and have repeatedly and consistently subordinated such claims to the level of prepetition equity.  Therefore, the Claims—each on its face asserted to be "a claim for [Claimant's] Shares at the time of the merger"—arise from the Claimant's status as a shareholder notwithstanding the exercise of its dissenter rights.

### Based on the Plain Meaning of Section 510(b), the Claims Are Based on Alleged Damages Arising From Claimant's Shares

31.     The Claimant states that its argument that its Claims are not subject to subordination is based on the "plain meaning" of section 510(b), baselessly asserting that "the

---

[16] Under O.C.G.A. 14-2-1301(5), "'Fair value,' with respect to a dissenter's shares, means the value of the shares immediately before the effectuation of the corporate action to which the dissenter objects, excluding any appreciation or depreciation in anticipation of the corporate action." *See Grace*, 265 S.E.2d at 818 ("And any facts which shed light on the value of the dissenting shareholders' interests are to be considered in arriving at 'fair value.'") (quoting *Atlantic States Constr. v. Beavers*, 169 Ga. App. 584, 586, 314 S.E.2d 245 (1984). *See Weinberger v. Uop*, 457 A.2d 701, 713 (Del. 1983) ("elements of future value, including the nature of the enterprise, which are known or susceptible of proof as of the date of the merger, and not the product of speculation, may be considered").  The determination of fair value would likely include a discounted cash-flow (DCF) analysis based on projected cash flows (i.e., inputs to future profits and losses). *See Cede & Co. v. JRC Acquisition Corp.*, 2004 Del. Ch. LEXIS 12, at *7 (Del. Ch. Feb. 10, 2004) ("In recent years, the DCF valuation methodology has featured prominently in this Court because 'it is the approach that merits the greatest confidence' with the financial community.  In appropriate cases, this Court has relied exclusively on DCF Models.") (footnotes omitted). Therefore, profits and losses are integral to determining fair value.

16

Appraisal Litigation did not involve any damages and simply was a nonjury equitable valuation

proceeding." Response ¶ 30 at 14.

32.     As to the phrase "arising from" in section 510(b), the treatise *Collier*

states:

> **Section 510(b) provides for the mandatory subordination of claims "arising from" a securities transaction**. Courts have viewed this language as ambiguous, generally interpreting the provision broadly to include a wide variety of causes of actions arising out of securities transactions. Under this broad reading, the claim need not flow directly from the securities transaction or arise contemporaneously with the purchase or sale of a security, but **will be viewed as "arising from" a securities transaction if the transaction is part of the causal link leading to the injury.** For example, the Court of Appeals for the Third Circuit has held that a claim arising from the failure to register shares, clearly occurring after the securities transaction had been completed, must be subordinated under section 510(b).

4 *Collier on Bankruptcy* ¶ 510.04[3] (16th ed. 2021) (emphasis added). *See* Objection ¶ 25 at 10.

33.     In *Telegroup*, the Third Circuit stated with respect to such "arising from"

and the "purchase or sale" phrases that:

> [I]t is, in our view, more natural, as a textual matter to read 'arising from' as requiring **some nexus or causal relationship** between the claims and the purchase of the securities, but not as a limiting nexus to claims alleging illegality in the purchase itself. In particular, the text of § 510(b) is reasonably read to encompass the claims in this case, since the claims would not have arisen **but for** the purchase of Telegroup's stock and allege a breach of a provision of the stock purchase agreement.

281 F.3d at 138 (emphasis added), *discussed in International Wireless*, 68 F. App'x at 278 (3d

Cir. 2003). Here, the Claims would not have arisen "but for" the purchase of stock by the

Claimant or its predecessors in interest in the stock. Indeed, as noted above, Claimant sets forth on its proofs of claim that the Claims are on account of its shares at the time of the Merger.[17]

34. Also as addressed in the Objection, in *Liquidating Trust v. Wax (In re U.S. Wireless Corp.)*, the United States Bankruptcy Court for the District of Delaware stated that:

> This finding required the arbitrator to **determine the value of the stock** and various other equity interests Wax would have received if U.S. Wireless had not breached the employment agreement. **The damages Wax received were based on this determination**.
>
> . . .
>
> Based on the claims asserted by Wax at state court and upon which the arbitrator based Wax's recovery, **it is clear that Wax's claim is for damages arising from the purchase or sale of the Equity Package. Accordingly, the Court is required to subordinate Wax's claim … under section 510(b) of the Bankruptcy Code**.

---

[17] Also, the word "damages," as used in section 510(b), is not defined in the Bankruptcy Code. *Cf.* 11 U.S.C. § 101. However, state law may provide guidance in this area. *Raleigh v. Ill. Dep't of Revenue*, 530 U.S. 15, 20 (2000) ("The basic federal rule in bankruptcy is that state law governs the substance of claims."). For example, in *Cason v. Cason*, the Georgia Supreme Court referred to a difference in values of publicly held stock as a calculation of "damages." 637 S.E.2d 716, 719-20 (Ga. 2006) ("Husband further asserts that even if the trial court's interpretation of the agreement is correct, its calculation of ***damages*** is not . . . . [The] wife demanded that husband deliver to her the cash and stock he received in the Gold Kist redemption . . . . The trial court correctly applied OCGA § 44-12-152 and awarded wife an amount determined based on the highest market value of the Gold Kist stock between the time it was eligible to be sold by husband and the time of trial.") (citing *Hamil v. Flowers*, 133 Ga. 216, 65 S.E. 961 (1909), for the proposition that "'Personalty' includes shares of stock, such as those in issue here."); *see* O.C.G.A. § 44-12-152 ("For personalty unlawfully detained, the plaintiff may recover a sum in the amount of the highest value which he is able to prove existed between the time of the conversion and the trial.").

The relief sought and granted in *Cason* is analogous to the relief sought in the appraisal action here (i.e., valuation of shares pursuant to a Georgia statute), and the conclusion should be the same: the determination of value amounts to "damages" under Georgia law. *See also Weinberger.*, 457 A.2d at 713 (appraisal of fair value under 8 Del. C. § 262(h): "When the trial court deems it appropriate, fair value also includes any damages, resulting from the taking, which the stockholders sustain as a class."), *quoted in Scattergood v. Perelman*, 1990 U.S. Dist. LEXIS 6482, at *12-13 (E.D. Pa. May 29, 1990); *Stauffacher v. Chectoa*, 1989 Wisc. App. LEXIS 306, at *22 (Mar. 9, 1989)).[17] *See* 11 U.S.C. § 101(5)(b) (recognizing that an "equitable remedy for breach of performance" may give "rise to a right to payment"); *see In re Richter*, 525 B.R. 735, 748 (Bankr. C.D. Cal. 2015) ("a right to an equitable remedy will constitute a claim if monetary payment (i.e., money damages) can be a viable alternative remedy for breach of the underlying obligation.").

384 B.R. 713, 727-28 (Bankr. D. Del. 2008) (emphasis added).[18]  *See* Objection ¶ 28 at 11-12.

Thus, claims arising from the valuation of purchased or sold shares are damage claims subject to

subordination.

### The Claims Are Based on Claimant's Share Ownership, Not a Separate Debt Obligation

35.     The Claimant then attempts to apply the holding in *In re Cybersight LLC*,

2004 U.S. Dist. LEXIS 24426, at *9 (D. Del. Nov. 17, 2004), to show that "just like Powell

Anderson, the claimant [in *Cybersight*] was no longer able to participate in the benefits and risks

associated with being an equity holder of the debtors."  Response ¶ 34 at 16.  However, as the

Claimant admits that, "[a]s part of its subordination analysis, the [District Court for the District

of Delaware] in *Cybersight* **placed *extreme* importance to the fact that the claimant's former**

**equity interest had been converted to a fixed debt obligation**."  Response ¶ 34 at 16

(emphasis added) (citing *Cybersight*, *id.* at *9 :  "Once the state court entered Mr. Gannon's

judgment, the judgment became a fixed debt obligation of Cybersight and Mr. Gannon was

entitled to general unsecured claim status.").  Here, the Claimant had not exchanged its shares for

a fixed obligation; it instead deposited its shares pending a determination of fair value and

receipt of a judgment, which did not occur.  As stated above, its rights were to fair value, which

---

[18] *See also In re Peregrine Sys.*, 2004 Bankr. LEXIS 346, at *7 (Bankr. D. Del. Mar. 30, 2004) ("[Claimant's] alleged $ 15 million claim is based on the fact that he entered into the merger agreement, through which he allegedly lost money. Regardless of the fact that he now contends he was defrauded into making the exchange, **in reality his complaint is tied to the stock transaction** . . . .  For these reasons, proof of claim number 1126 shall be classified in Class 9 and subordinated pursuant to § 510(b).") (emphasis added); *In re Kaiser Group Int'l*, 260 B.R. 684, 688-89 (Bankr. D. Del. 2001) ("Nor is the Merger Agreement in any sense of the word a 'debt' instrument. . . .  For the foregoing reasons, we conclude that the claims of the ICT Shareholders are for damages arising from the purchase of stock of the Debtors. Consequently, they are subordinated to the claims of creditors pursuant to section 510(b)"), *aff'd*, 2001 U.S. Dist. LEXIS 25574 (D. Del. Nov. 29, 2001).

has not been determined, subject to calculations that included projected future cash flow, reflecting future profits and loses that would affect valuation. The fact that there has been no determination of "fair value" here, much less a judgment, belies the Claimant's statement that "[t]he 'fair value' figure that Powell Anderson was entitled to receive was fixed on December 21, 2017." (i.e, the date of the Merger). Response ¶ 36 at 17.

36.    An entirely separate fixed debt obligation is also the subject of *Official Comm. v. American Capital Fin. Servs. (In re Mobile Tool Int'l)*, 306 B.R. 778 (Bankr. D. Del. 2004), cited by Claimant. *See* Response ¶ 35 at 16-17. However, in *Mobile Tool*, while the court found that section 510(b) did not subordinate the claims at issue, the debtors had repurchased stock under a stockholder agreement and then issued put purchase notes under a put purchase note agreement including to some former stockholders that sold their shares to the debtors under the stockholders agreement. 306 B.R. at 779. *See* Response ¶ 35 at 16-17. Accordingly, because the former stockholders were now parties to a separate debt instrument, subordination was appropriate under those circumstances. The Claimant is not asserting its Claims on account of notes—the Claims are based on its shares.

37.    The Claimant then addresses *Raven Media Invs. v. DirecTV Latin Am. (In re DirecTV Latin Am.)*, stating that "Powell Anderson, like the claimant in *Raven Media Inv.*, unequivocally did not contract for the risk of business failure and therefore should not be subordinated." Response ¶ 35 at 17 (citing *DirecTV Latin Am.*, 2004 U.S. Dist. LEXIS 2425, at *13 (D. Del. Feb. 4, 2004) (no subordination of claims under put agreement). The Claimant also

20

has not been determined, subject to calculations that included projected future cash flow, reflecting future profits and loses that would affect valuation. The fact that there has been no determination of "fair value" here, much less a judgment, belies the Claimant's statement that "[t]he 'fair value' figure that Powell Anderson was entitled to receive was fixed on December 21, 2017." (i.e, the date of the Merger). Response ¶ 36 at 17.

36.    An entirely separate fixed debt obligation is also the subject of *Official Comm. v. American Capital Fin. Servs. (In re Mobile Tool Int'l)*, 306 B.R. 778 (Bankr. D. Del. 2004), cited by Claimant. *See* Response ¶ 35 at 16-17. However, in *Mobile Tool*, while the court found that section 510(b) did not subordinate the claims at issue, the debtors had repurchased stock under a stockholder agreement and then issued put purchase notes under a put purchase note agreement including to some former stockholders that sold their shares to the debtors under the stockholders agreement. 306 B.R. at 779. *See* Response ¶ 35 at 16-17. Accordingly, because the former stockholders were now parties to a separate debt instrument, subordination was appropriate under those circumstances. The Claimant is not asserting its Claims on account of notes—the Claims are based on its shares.

37.    The Claimant then addresses *Raven Media Invs. v. DirecTV Latin Am. (In re DirecTV Latin Am.)*, stating that "Powell Anderson, like the claimant in *Raven Media Inv.*, unequivocally did not contract for the risk of business failure and therefore should not be subordinated." Response ¶ 35 at 17 (citing *DirecTV Latin Am.*, 2004 U.S. Dist. LEXIS 2425, at *13 (D. Del. Feb. 4, 2004) (no subordination of claims under put agreement). The Claimant also

cites *DirecTV Latin Am.* for its statement that "[w]hile participation in profits is a critical aspect of an equity interest, participation in the risk of loss is similarly crucial." *Id*. As stated above, the Claimant knowingly assumed the risk of loss when it bought its shares in order to participate as a dissenter (admitted, as quoted above). It must have known that the dissenters' fair-valuation process took some time and that while it litigated, it took the risk that RTI's financial condition would deteriorate, which occurred. In addition, the facts of *DirecTV Latin Am.* are distinguishable because that case involved a put agreement to sell stock back to the debtor at a fixed price, unlike here. Response ¶ 35 at 17.

38.     In its Response, the Claimant also attempts to distinguish the facts in *U.S. Wireless*, as discussed in the Objection ¶ 28 at 11-12, by making the untrue assertion that the Claimant's shares in RTI were extinguished at the time of the Merger: "Thus, the facts of *U.S. Wireless* are distinguishable from the facts of this case because Powell Anderson's shares were extinguished at the time of the Merger, thereby eliminating all benefits and risks of being an equity holder. Thus, unlike the claimant in *U.S. Wireless*, Powell Anderson singularly retained the statutory right to payment of the fair value of its pre-Merger shares." Response ¶ 38 at 20. As discussed above, under the GBCC, the Claimant's share certificate was deposited and it and the shares it represents continue to exist.

39.     In the present case, the Claimant is a minority shareholder that refused the Debtor's offer of $2.40 per share as "fair value" in a merger and is a party to a stayed prepetition action seeking a determination of whether fair value for the Claimant's shares is the offered price

21

or a higher amount.  *See* Objection ¶ 29 at 12.  "But for" the Claimant's purchase of the pre-

Merger shares, it would not have had shareholder fair-value appraisal rights under Georgia law.[19]

Also, there is a clear "nexus and causal connection" between such rights and the Claimant's

ownership of such shares.[20]

## B.      The Claims Are Not Prima Facie Valid, and the Claimant Has Not Met Its Burden

40.      Bankruptcy Rule 3001(f) provides that:  "A proof of claim executed and

filed in accordance with these rules shall constitute prima facie evidence of the validity and

amount of the claim."  Fed. R. Bankr. P. 3001(f).  Bankruptcy Rule 3001(c) states in pertinent

part:  "when a claim . . . is based on a writing, a copy of the writing shall be filed with the proof

of claim."  *Id.* 3001(c).

41.      As former Bankruptcy Judge Kevin J. Carey of this Court stated in two

different opinions in *In re New Century TRS Holdings, Inc.*:

> A proof of claim that lacks the supporting documentation required
> by Rule 3001 does not receive the presumption of *prima facie*
> validity.  Rather the claimant maintains the burden of proving his
> or her claim by a preponderance of the evidence.
>
>                     . . . .
>
> . . . If the objecting party succeeds in overcoming the *prima facie*
> effect of the proof of claim, the ultimate burden of persuasion then
> rests on the claimant to prove the claims validity by the
> preponderance of the evidence.

---

[19] As discussed above, the GBCC also include the potential purchase of dissenter's shares.  O.C.G.A. § 14-2-1323 ("payment for his shares under this article").

[20] Claimant cites two additional opinions that are inapposite.  The facts here are distinguishable from *Nisselson v. Softbank AM Corp. (In re MarketXT Holdings, Corp.)*, 361 B.R. 369, 389 (Bankr. S.D.N.Y. 2007) (default judgment on promissory notes that "some time in the past" had its genesis in a stock interest).  *See* Response ¶ 37 at 18.  As well, *Racusin v. American Wagering, Inc. (In re American Wagering, Inc.)*, 493 F.3d 1067, 1073 (9th Cir. 2007) (commission agreement that "only gave him the monetary value of the shares of stock, not the stock itself"; "Racusin did not sue debtors as an equity investor . . .  He sued as an agent who did not receive compensation promised in an employment agreement"), is distinguishable from the facts here.  *See* Response ¶ 37 at 18-19.

495 B.R. 625, 633 (Bankr. D. Del. 2013); *see also* 2014 Bankr. LEXIS 1591, at *17 (Bankr. D. Del. Apr. 10, 2014) (same).[21]

42.     Here, the Claimant contends that its Claims are based solely on a statute, not on any writing, so it argues that is not required to attach any writings to its Claims.  Response ¶¶ 12-13 at 6.  However, the applicable provisions of the GBCC require writings in order to establish a dissenter's right to an appraisal of its shares at fair value under such statute.

43.     The Claimant relies on *In re Cluff*, 313 B.R. 323, 332 (Bankr. D. Utah 2004), *aff'd*, 2006 U.S. Dist LEXIS 71904 (D. Utah 2006), for the proposition that if a claim is based solely on an obligation created by statute, it is not based on a writing.[22]  313 B.R. at 332-334; *see* Response ¶ 12 at 6.   However, in *Cluff*, now retired Bankruptcy Judge Judith A. Boulden of the United States Bankruptcy Court for the District of Utah qualified her holding, stating "a claim 'based' on a writing would be a claim where the writing constitutes a fundamental part."  313 B.R. at 333.  She also states that "the phase 'based on a writing' should be interpreted to include the fundamental part that creates a legal obligation."  *Id*. at 334.

---

[21] *See In re F-Squared Inv. Mgt.,* 546 B.R. 538, 546 (Bankr. D. Del. 2016) (Bankr. Judge Laura Selber Silverstein) ("In order for a proof of claim to be filed 'in accordance' with Bankruptcy Rule 3001, it must be in writing and conform to the Official Form.  Consistent with the treatment of the claim as evidence, the Official Form requires the claimant to sign the form under penalty of perjury.  Multiple courts and commentators also require that a proof of claim 'allege facts sufficient to support the claim.'  In determining whether a proof of claim contains sufficient allegations, a reviewing court will assume the allegations are true and ask whether the facts establish the necessary elements of a claim.") (footnotes omitted) (quoting *In re Allegheny Int'l.,* 954 F.2d 167-173-74 (3d Cir. 1992), regarding shifting burdens of proof and persuasion:  "The burden of proof for claims brought in bankruptcy court under 11 U.S.C.A. § 502(a) rests on different parties at different times. . . .  The burden of persuasion is always on the claimant.").

[22] The Claimant also cites to two cases regarding IRS claims made under the Internal Revenue Code.  Response ¶ 13 at 6.  Tax claims are recognized by courts to be statutory, without the need for the attachment of writings; however, the Claimant is not a taxing authority and the GBCC is not a tax statute.  The Claimant also cites to *Spiers v. Ohio Dept. of Nat. Res.* (*In re Jenny Lynn Mining Co.*), 780 F.2d 585, 587 (6th Cir. 1992).  In *Jenny Lynn Mining*, the Sixth Circuit recognized that the relevant statute did not require a writing to be operative:  "The statutory requirement that strip mine operators post performance bonds to obtain permits is clear and unconditional.  There was no documentation that would have provided additional notice to the trustee of the basis for the claim.  Attaching a copy of the statute would have added nothing to the proof of claim.  Proof of claim #15 was not based on a 'writing.'" *Id.*  In contrast, as stated above, GBCC sections regarding dissenting shareholders require writings by such sections to be operative.

DOCS_LA:338014.3 76136/003

44.     In O.C.G.A § 14-2-1301(4), a "Dissenter" is defined as "a shareholder who is entitled to dissent from corporate action under Code Section 14-2-1302 and who exercises that right when **and in a manner** required by Code Sections 14-2-1320 through 12-4-1337." (Emphasis added.)  GBCC subsection 14-2-1322(b)(1) requires that a dissenters' notice sent by a corporation to shareholders must "[s]tate where the payment demand must be sent and where certificates for certificated shares must be deposited."  O.C.G.A § 14-2-1322(b)(1).

45.     The Claimant must therefore attach to its proof of claim its demand for payment and evidence of the deposit of its shares under O.C.G.A. § 12-2-1323(a) ("A record shareholder sent a dissenters' notice described in Code Section 14-2-1322 must demand payment and deposit his certificates in accordance with the terms of the notice.").  The Claimant also must provide with its proof of claim an estimate of fair value and related demand for payment if it sent them to RTI.  O.C.G.A. § 12-2-1327(a) ("A dissenter may notify the corporation in writing of his own estimate of the fair value of his shares and amount of interest due, and demand payment of his estimate of the fair value of his shares and interest due.").  Therefore, the Claims, which arise both under the Dissenters' Rights sections of the GBCC as well as the required and optional writings contemplated by such statute, are deficient because they have none of the required writings attached to them—writings that are fundamental to the exercise of Claimant's rights under the applicable dissenter statute.

46.     The Claimant has not met its burdens of proof and persuasion due to lack of evidence presented and, in the absence of sufficient admissible evidence,[23] its Claims should be disallowed.

## Conclusion

WHEREFORE, RTO respectfully requests that the Court enter its order, in substantially in the form attached to the Objection as its Exhibit A, (i) sustaining the Objection; (ii) subordinating and disallowing the Claims; and (iii) granting RTO such other and further relief as is just and proper.

Dated:   May 20, 2021
         Wilmington, Delaware

PACHULSKI STANG ZIEHL & JONES LLP

*/s/ James E. O'Neill*

Richard M. Pachulski (CA Bar No. 90073)
Malhar S. Pagay (CA Bar No. 189289)
James E. O'Neill (Bar No. 4042)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE  19899-8705 (Courier 19801)
Telephone:  302-652-4100
Facsimile:  302-652-4400
Email: rpachulski@pszjlaw.com
       mpagay@pszjlaw.com
       joneill@pszjlaw.com

*Counsel to the Reorganized Debtors*

---

[23] In Response ¶ 20 at 8, the Claimant asserts that "RTO does not contest the amount of the Claims or the Debtors' liability with respect to the Claims." Such statement is untrue. RTI contested the fair valuation of the Claimant's shares in the appraisal action and RTO contests the Debtors' liability for the Claims other than as Dissenters' Claims classified and treated in Class 7 of the Plan.

DOCS_LA:338014.3 76136/003