**<u>Exhibit B</u>**

**Complaint**

## IN THE CHANCERY COURT FOR THE TWENTIETH
## JUDICIAL DISTRICT OF TENNESSEE, DAVIDSON COUNTY

| | |
|---|---|
| **BNA ASSOCIATES, LLC,** | |
| **Plaintiff,** | Case No. _____ |
| v. | **JURY DEMAND** |
| **GOLDMAN SACHS SPECIALTY LENDING GROUP, L.P.,** | |
| **Defendant.** | |

## COMPLAINT

Plaintiff, BNA Associates, LLC ("BNA Associates"), for its complaint against Defendant, states:

### INTRODUCTION

1.     Plaintiff BNA Associates, through its business relationships with Ruby Tuesday, Inc. and Maryville College, had an exciting opportunity to purchase a 50-year leasehold interest in a unique boutique hotel/resort property located on the campus of Maryville College. But Defendant Goldman Sachs Specialty Lending Group, L.P. ("Goldman Sachs") unlawfully interfered with BNA Associates' contractual and business relationship with Ruby Tuesday, Inc. and/or Maryville College concerning the leasehold interest. Goldman Sachs, Ruby Tuesday, Inc.'s lender, wanted the leasehold opportunity for itself. Goldman Sachs, improperly exploiting its position as Ruby Tuesday, Inc.'s lender, refused to consent to the sale of the leasehold interest even though its indebtedness was going to be paid in full. Because Goldman Sachs' consent was required and never provided, Ruby Tuesday,

Inc. terminated its contract with BNA Associates. Goldman Sachs' tortious misuse of confidential information and use of sharp business practices to cause the termination of BNA Associates' business relations and gain control of this special property was unlawful and damaged plaintiff.

## PARTIES AND JURISDICTION

2.      Plaintiff BNA Associates, LLC is a Tennessee limited liability company.

3.      Defendant Goldman Sachs Specialty Lending Group, L.P. is a limited partnership organized pursuant to the laws of Delaware. Goldman Sachs may be served through the Tennessee Secretary of State pursuant to Rule 4B of the Tennessee Rules of Civil Procedure. The Tennessee Secretary of State may serve Goldman Sachs at its registered agent's office on file with the State of Delaware, which is The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

4.      This Court has personal jurisdiction over Goldman Sachs because Goldman Sachs, directly or indirectly, (a) transacted business in this state; (b) purposely availed itself of the benefits of doing business in this state; (c) lent or facilitated the lending of money to a business with its principal office located in the State of Tennessee that was secured by real property located in the State of Tennessee; and/or (d) caused damage to a Tennessee limited liability company through its tortious acts.

5.      Venue is proper in this Court pursuant to Tenn. Code Ann. § 20-1-104(3)(B).

## FACTUAL BACKGROUND

### A.  BNA Associates Focuses on Developing and Restoring Unique Properties Like the RT Lodge in Maryville

6.      BNA Associates is a Nashville-based real estate development company founded in 2009 that targets distinctive real estate projects. BNA Associates chooses to develop hotels, restaurants, multi-family complexes, and mixed-use projects that have a differentiating or unique quality. Although BNA Associates has a few projects outside of Tennessee, BNA Associates' focus is on projects within Tennessee, including the Fairlane Hotel located at 401 Union Street in Nashville. BNA Associates prides itself on being a good long-term partner with the communities in which it develops projects.

7.      BNA Associates has an excellent track record of successfully developing, restoring, and operating distinctive properties in the Knoxville, Tennessee area, including the Oliver Royale restaurant, Tupelo Honey restaurant, and the historic Oliver Hotel originally built in 1876. Furthermore, BNA Associates' sterling reputation caused the Knox County government to award BNA Associates the right to redevelop the 17-story historic Andrew Johnson Hotel originally built in the 1920s.[1]

8.      Through its reputation for high-quality work, BNA Associates was presented with an opportunity relating to the property at issue in this case: the property known as the RT Lodge in Maryville, Tennessee. (Although the property has been known by different names throughout its history, for clarity, Plaintiff will refer

---

[1] Oliver Hospitality LLC, an affiliate of BNA Associates, serves as the management company of properties developed or renovated by BNA Associates.

4829-3157-9624.1

to the property as the RT Lodge in this Complaint.) A brief description of the history of the distinctive RT Lodge is useful and important.

**B.     The Distinctive Nature of the RT Lodge**

**The Construction and Conveyance of the RT Lodge to Maryville College**

9.     In the early 1930s, Susan Wiley Walker wished to build a beautiful home near her sister, who was the wife of Maryville College's first chaplain. Maryville College agreed to let Ms. Walker build the 26-room home on the condition that the house would be conveyed to Maryville College upon her death. Ms. Walker died in 1950 at the age of 98 and RT Lodge (then known as Morningside) was conveyed to Maryville College.

10.     The RT Lodge is situated on 7 acres of Maryville College's campus that is itself surrounded by 140 acres of the Maryville College Woods. The RT Lodge provides guests a secluded, pastoral retreat experience with walking trails surrounded by streams and meadows.

11.     From 1950 to about 1975, the RT Lodge served as the residence for Maryville College presidents.

**Maryville College Leases the RT Lodge to Ruby Tuesday, Inc. for 50 Years**

12.     In or about 1985, Maryville College elected to convert what is now known as the RT Lodge to a restaurant known as the Morningside Inn. Twelve years later in 1997, seeking a longer-term arrangement and to improve the facility, Maryville College entered into a 50-year lease with Ruby Tuesday, Inc., which is headquartered in Maryville (the "1997 RT Lodge Lease"), and it is from that point

that the property became known as the RT Lodge. (A true and accurate copy of the 1997 RT Lodge Lease is attached hereto as Exhibit A.)

13.     After execution of its 1997 lease with Maryville College, Ruby Tuesday, Inc. renovated the building and gardens, added two additional structures, and began using the RT Lodge as its company training facility and to host events.

14.     In 2018, Maryville College and Ruby Tuesday, Inc. executed a Memorandum of Understanding relating to the RT Lodge (the "2018 MOU"). The 2018 MOU walked through the RT Lodge's important place as part of the heritage of Maryville College. The 2018 MOU noted that RT Lodge's "renovation and expansion as RT Lodge has been a point of pride for the Maryville College community, as well as the larger Blount County community." (A true and accurate copy of the 2018 MOU is attached hereto as Exhibit B.)

15.     The 2018 MOU outlines the goal of Maryville College and Ruby Tuesday, Inc. to partner together to "promote hospitality, environmentally sustainable practices, artisanal techniques and education in natural settings . . ." (Ex. B, Part I.)

16.     In the 2018 MOU, Maryville College and Ruby Tuesday, Inc. each made commitments to each other. (Ex. B, Part II.) For example, Maryville College committed to promote RT Lodge "as an option for dining and overnight accommodations in marketing materials, including the [Maryville College] website." (Ex. B, Part II.) Likewise, Ruby Tuesday, Inc. committed to "organizing and promoting professional development opportunities for students, including hiring events for jobs and internship opportunities . . ." (Ex. B, Part II.)

**Ruby Tuesday, Inc. Decides to Sell Its Leasehold Interest to BNA Associates**

17.    In January 2020, HVS, a global consulting firm focused on the hospitality industry who was serving as the broker and agent for Ruby Tuesday, Inc., approached BNA Associates about an exciting opportunity to buy Ruby Tuesday, Inc.'s leasehold interest in the RT Lodge. At that time, there were approximately 27 years remaining on the 1997 RT Lodge Lease.

18.    Upon information and belief, Ruby Tuesday, Inc. was divesting non-core assets that were not directly related to its primary business of operating restaurants under the Ruby Tuesday brand. Included in these non-core assets were one or more private jets, an office building in Maryville, Tennessee, and the leasehold interest in the RT Lodge.

19.    Because of the significance of the RT Lodge to Maryville College, and pursuant to paragraph 11 of the 1997 RT Lodge Lease, any assignment of Ruby Tuesday, Inc.'s leasehold interest to BNA Associates required the approval of Maryville College.

20.    Beginning in January 2020, all interested parties began due diligence. Representatives of BNA Associates met with executives of Ruby Tuesday, Inc. BNA Associates evaluated the 1997 RT Lodge Lease and the 2018 MOU and expressed its willingness and desire to work with Maryville College as a long-term partner. Maryville College likewise evaluated BNA Associates as a prospective long-term partner as the lessee of the RT Lodge. As part of these discussions, BNA Associates agreed to increase job and internship opportunities for Maryville College students interested in hospitality business management. BNA Associates further agreed to

4829-3157-9624.1

partner with Maryville College's Outdoor Studies and Tourism Program to market various outdoor programs to prospective retreat groups at the RT Lodge.

21.     Prior to Maryville College consenting to the assignment of the 1997 RT Lodge Lease, but knowing that contingency remained, BNA Associates and Ruby Tuesday, Inc. executed an asset purchase and sale agreement for Ruby Tuesday, Inc.'s leasehold interest in the RT Lodge on March 14, 2020 (the "March 14, 2020 PSA"). The purchase price for the leasehold interest was $5,250,000. (A true and accurate copy of the March 14, 2020 PSA is attached hereto as Exhibit C.)

22.     Following the execution of the March 14, 2020 PSA, as the scope of the COVID-19 pandemic became clearer, there were various bumps in the road and delays. Indeed, at one point, BNA Associates and Ruby Tuesday, Inc. agreed to let the March 14, 2020 PSA expire. But throughout June and July 2020, BNA Associates and Ruby Tuesday, Inc. continued to discuss BNA Associates' purchase of Ruby Tuesday, Inc.'s leasehold interest in the RT Lodge and continued to work together to obtain Maryville College's consent to the assignment of the 1997 RT Lodge Lease.

23.     In June 2020, Maryville College consented to the assignment of the 1997 RT Lodge Lease to BNA Associates or its affiliates, Oliver Hospitality LLC and RT Lodge LLC. Maryville College's written consent to the assignment of the 1997 RT Lodge Lease is reflected in the Second Amendment to the 1997 RT Lodge Lease executed on June 26, 2020 (the "June 26, 2020 Amendment to the 1997 RT Lodge Lease"). (Ex. D, ¶ 7.) BNA Associates and its affiliates, Oliver Hospitality LLC and RT Lodge LLC, are the only persons to which Maryville College consented to assign

the 1997 RT Lodge Lease. (A true and accurate copy of the June 26, 2020 Amendment to the 1997 RT Lodge Lease is attached hereto as Exhibit D.)

24.    Because of the commitments made by BNA Associates to Maryville College, and as a demonstration of its return commitment to BNA Associates, Maryville College agreed to extend the 1997 RT Lodge Lease until December 31, 2070, effectively a fresh 50-year lease. (Ex. D, ¶ 3.)

**Goldman Sachs Tortiously Interferes With BNA Associates' Business Relationship With Ruby Tuesday and/or Maryville College**

25.    In December 2017, Ruby Tuesday, Inc. pledged its leasehold interest in the RT Lodge as security for loan(s) from Goldman Sachs. The loan documents required that Ruby Tuesday, Inc. obtain Goldman Sachs' consent prior to closing on the sale of its leasehold interest in the RT Lodge.

26.    In June or July 2020, if not earlier, Ruby Tuesday, Inc. contacted Goldman Sachs as its lender to obtain consent to the sale and assignment of the 1997 RT Lodge Lease to BNA Associates. Rather than evaluate Ruby Tuesday, Inc.'s request on the merits, Goldman Sachs unreasonably withheld its consent and exploited its position as Ruby Tuesday, Inc.'s lender for its own improper advantage.

27.    Starting in July 2020—after Ruby Tuesday, Inc. requested that Goldman Sachs consent to the assignment of the 1997 RT Lodge Lease to BNA Associates—Goldman Sachs regularly contacted Maryville College (and the management staff of RT Lodge) to express a strong interest in acquiring an assignment of the 1997 RT Lodge Lease because Goldman Sachs knew that Maryville College had to consent to any assignment.

28.    After conducting due diligence, Maryville College declined Goldman Sachs' request that Maryville College consent to an assignment of the 1997 RT Lodge Lease to Goldman Sachs or its designee. Maryville College expressed to Goldman Sachs its desire to move forward with BNA Associates (or BNA Associates' affiliate, Oliver Hospitality LLC).

29.    On August 14, 2020, Goldman Sachs recorded a deed of trust against Ruby Tuesday, Inc.'s leasehold interest (the "Goldman Deed of Trust"). The debt secured by the Goldman Deed of Trust was a loan extended on December 21, 2017. (Ex. E, p. 2.) As reflected on the first page of the Goldman Deed of Trust, the maximum principal indebtedness for Tennessee recording tax purposes was curiously listed as $5,252,000, $2,000 more than the purchase price that BNA Associates had previously agreed to pay for the 1997 RT Lodge Lease. (Ex. E., p. 1.) (A true and accurate copy of the Goldman Deed of Trust is attached hereto as Exhibit E.)

30.    On August 28, 2020, BNA Associates and Ruby Tuesday, Inc. executed a reinstated, amended and restated asset purchase and sale agreement (the "August 28, 2020 Restated PSA"). (A true and accurate copy of the August 28, 2020 Restated PSA is attached hereto as Exhibit F.)

31.    Given that Maryville College had already approved the assignment of the 1997 RT Lodge Lease to BNA Associates, the transaction should have closed without difficulty. By letter dated September 21, 2020, BNA Associates' counsel advised Ruby Tuesday, Inc. that it was prepared to proceed (the "September 21, 2020 Letter"). (A true and accurate copy of the September 21, 2020 Letter is attached hereto as Exhibit G.)

4829-3157-9624.1

32.    But Goldman Sachs was not acting in good faith. Goldman Sachs improperly used its position as Ruby Tuesday, Inc.'s lender to refuse to consent to Ruby Tuesday, Inc.'s sale of its leasehold interest to BNA Associates even though Ruby Tuesday, Inc.'s indebtedness to Goldman Sachs was to be paid in full at the closing.

33.    By letter dated October 30, 2020 (the "October 30, 2020 Letter"), Ruby Tuesday, Inc.'s counsel advised BNA Associates that "Seller's Lender [Goldman Sachs] has not consented to the proposed transaction." Therefore, Ruby Tuesday, Inc. terminated the August 28, 2020 Restated PSA. (A true and accurate copy of the October 30, 2020 Letter is attached hereto as Exhibit H.)

34.    As a result of its tortious interference with BNA Associates' business relations with Ruby Tuesday, Inc. and/or Maryville College, Goldman Sachs became the owner of the leasehold interest memorialized in the 1997 RT Lodge Lease, as extended through December 31, 2070 by the June 26, 2020 Amendment to the 1997 RT Lodge Lease. Upon information and belief, Goldman Sachs has already sold a portion of its ill-gotten leasehold interest in the RT Lodge for a significant profit and stands to profit even more in the years to come.

## LEGAL CLAIMS

## COUNT I
### (Intentional Interference With Business Relations)

35.    BNA Associates hereby incorporates the allegations set forth in paragraphs 1 through 34 of this Complaint as fully as if set out verbatim.

36. BNA Associates had an existing or prospective business relationship with Ruby Tuesday, Inc. and Maryville College relating to the RT Lodge.

37. Goldman Sachs knew of BNA Associates' existing or prospective business relationship with Ruby Tuesday, Inc. and/or Maryville College.

38. By refusing to consent to Ruby Tuesday, Inc.'s sale of its leasehold interest to BNA Associates, Goldman Sachs intended to cause the termination, and did cause the termination, of BNA Associates' business relationship with Ruby Tuesday, Inc. and/or Maryville College relating to the RT Lodge.

39. In intending to cause and in fact causing the termination of the business relationship between BNA Associates, on the one hand, and Ruby Tuesday, Inc. and/or Maryville College on the other hand, Goldman Sachs had an improper motive and used improper means. *See **Trau-Med of America, Inc. v. Allstate Ins. Co.**,* 71 S.W.3d 691, 701 (Tenn. 2002).

40. Specifically, and without limitation, Goldman Sachs improperly used its position as Ruby Tuesday, Inc.'s lender to block the sale of an asset that it wanted for itself or its affiliate. This is precisely the misuse of confidential information and sharp business practice that constitutes improper motive and improper means under Tennessee law.

41. As a result of Goldman Sachs' intentional interference with BNA Associates' business relations, BNA Associates has sustained substantial damages, including but not limited to the lost profits and fees it would have earned from owning and managing the leasehold interest in the RT Lodge for the next 50 years.

WHEREFORE, Plaintiff respectfully requests the following relief:

4829-3157-9624.1

11

A.     That the Court enter judgment in favor of the Plaintiff;

B.     That a jury try all issues triable of right by a jury;

C.     That the Court award Plaintiff compensatory damages in an amount in

excess of $54,000,000;

D.     That the Court award Plaintiff punitive damages;

E.     That the Court award Plaintiff its costs and expenses; and

F.     That the Court award Plaintiff such other and further relief as it deems

just and equitable.

Respectfully submitted,

/s *Eric W. Smith*
Eugene N. Bulso, Jr. (No. 12005)
Eric W. Smith (No. 21694)
BULSO PLC
155 Franklin Road, Suite 400
Brentwood, Tennessee 37027
(615) 913-5191
gbulso@bulso.com
esmith@bulso.com

*Attorneys for Plaintiff*

4829-3157-9624.1

12

**E-FILED**
**5/4/2021 3:31 PM**
**CLERK & MASTER**
**DAVIDSON CO. CHANCERY CT.**

# EXHIBIT A
# 1997 RT LODGE LEASE

<u>LEASE</u>

THIS AGREEMENT made and entered into on this the 11th day of September, 1997, by and between MARYVILLE COLLEGE, a Tennessee corporation with offices in Maryville, Blount County, Tennessee, and hereinafter referred to as "Lessor," and RUBY TUESDAY, INC., a corporation organized and existing under and by virtue of the laws of the State of Georgia with an office in Maryville, Blount County, Tennessee, hereinafter referred to as "Lessee."

WITNESSETH:

THAT FOR AND IN CONSIDERATION of the rents, covenants and agreements hereinafter contained, the Lessor does hereby let, demise and lease unto the Lessee, the following described premises, to-wit:

SITUATED in District No. 9 of Blount County, Tennessee, and being more particularly described as follows:

BEGINNING at a 1/2 inch New Iron Rod along the northerly side of Wilkinson Pike and corner to the remaining property of Maryville College, said New Iron Rod lying S. 86-37-50 E. 406.82 feet from the intersection of said Wilkinson Pike and Court Street; thence departing said Wilkinson Pike N. 11-36-09 E. with the remaining property of Maryville College 552.35 feet to a 1/2 inch New Iron Rod; thence N. 40-40-47 E. continuing with the remaining property of said Maryville College, 420.28 feet to a 1/2 inch New Iron Rod; thence S. 52-18-50 E. continuing with the remaining property of said Maryville College 200.00 feet to a 1/2 inch New Iron Rod; thence S. 08-26-03 W. continuing with the remaining property of said Maryville College 783.13 feet to a 1/2 inch New Iron Rod along the northerly side of said Wilkinson Pike; thence N. 85-02-45 W. along the northerly side of said Wilkinson Pike, 430.06 feet to a 1/2 inch New Iron Rod and the point of beginning and containing 7.256 acres more or less, as surveyed by Sterling Engineering, Inc.

The Lessee is further granted an easement and the right to use all private roadways on the Lessor's campus leading to the leased premises, which right shall not be exclusive, but shall be used in common with others. The Lessee is further granted a 40 foot easement over an existing gravel road which leads to the brick guest house, and is further granted a 40 foot easement from the guest house through the woods to the Morningside Inn. The location of the 40 foot easement from the guest house to Morningside Inn shall be determined by the Lessee.

This Lease is upon the following terms and conditions:

1.   TERM.

This Lease shall be for a period of fifty (50) years beginning on the later of October 1, 1997, or the date Lessee notifies Lessor that Lessee is satisfied with the state of title, survey, soils, and environmental, subject to the right of termination as hereinafter provided.

2.   RENT.

The Lessee shall pay to the Lessor upon the execution of this Lease the sum of Thirty Five Thousand Dollars ($35,000.00) in addition to the rentals hereinafter provided. The Lessee shall pay the Lessor the sum of Thirty Seven Thousand, Five Hundred Dollars ($37,500.00) per year, which shall be paid annually on the 1st of October, 1997, and the 1st day of each and every succeeding October thereafter, provided, however that the rent herein provided shall be increased each five years based on the U.S. Department of Labor Consumer Price Index, All Urban Consumers, All Items, not however to exceed two and one-half percent (2.5%) per year.

3.   USE OF FACILITIES.

The Lessee intends to use the property as an inn, lodge, non-public or private restaurant, and training facility and the Lessee is granted the right to close the entrance to the

property from Wilkinson Pike and shall restore the parking area and driveway to its natural state. Lessee is also granted the right to refurbish and expand Morningside Inn into a lodge and dining facility, construct cottages accommodating up to one hundred (100) people, improve the entrance and road into the area leading to the lodge, construct additional parking, add major planting and landscaping, create signage and access control system and landscape the access roads, create a recreational path system through the woods, pay for the initial improvements to all roads leading to the property. Plans for all improvements herein recited shall be subject to the approval of the Lessor which plans shall be submitted by the Lessee to the Lessor prior to the making of any improvements and which consent of the Lessor shall not be unreasonably withheld. The Lessee may demolish and remove the guest house located on the leased premises. At the end of the fifty-year lease term, all improvements on the leased premises shall become the property of the Lessor.

     4.   <u>TAXES</u>.

The Lessee shall pay all taxes, both city and county, which may be assessed against the leased premises.

     5.   <u>INSURANCE</u>.

The Lessee shall provide and pay for fire insurance with extended coverage and liability insurance on the leased premises, including all improvements thereon, and all improvements to be constructed. The fire insurance with extended coverage shall be in the full insurable value of said improvements and the liability shall be in the amount of Two Million Dollars ($2,000,000.00) and which insurance shall name the Lessor as an additional insured, and the Lessee shall provide proof of said coverage during the entire term of this Lease. Said insurance shall provide that it will not be

cancelled except on fifteen (15) days written notice to the Lessor.

6. <u>MAINTENANCE OF ROADWAYS</u>.

The Lessor, after the Lessee has improved the roadways as hereinabove provided, shall be responsible for the maintenance of all roadways.

7. <u>RECIPROCAL USE OF FACILITIES</u>.

The Lessor and Lessee will exchange reasonably limited use of each other's facilities in accordance with pre-determined and mutually agreed upon annual availability schedules, fee schedules, and guidelines.

After use of the Lessor's property, the Lessee shall return the premises to the Lessor in as good as condition as when taken possession of, ordinary wear and tear excepted, and shall repay the cost of any repairs made necessary by the use of said facilities by the Lessee.

8. <u>MAINTENANCE OF LEASED PREMISES</u>.

The Lessee shall maintain the leased premises in a good condition and shall return the same to the Lessor at the end of the term of this Lease in their original condition, ordinary wear and tear excepted.

9. <u>PERSONAL PROPERTY OF THE LESSOR</u>.

It is understood and agreed that there are certain items of personal property of the Lessor located in Morningside Inn, and the parties hereto agree that the parties hereto will make a list of all items of personal property which are to remain in Morningside Inn after the execution of this Lease and both shall sign said list and attach the same hereto as Exhibit A to this Lease. The Lessor agrees that it will remove all items of personal property which are not to remain in Morningside Inn.

-4-

10.  <u>CONDITION OF PREMISES</u>.

It is understood by the parties hereto that the  Lessor is  leasing  said premises in their presently existing condition and the Lessee has inspected the premises and is aware of  their condition.

11.  <u>ASSIGNMENT</u>.

The Lessee shall not assign (except in the  case  of  a name change,  change  of  state of  incorporation or statutory merger) or sublet the demised premises or  any  portion  thereof without  the  prior  written  consent  of  the Lessor.  Lessor's consent shall not be unreasonably withheld.  Notwithstanding the foregoing, Lessee  shall  have  the  right,  without  Lessor's approval,  to assign this lease or sublet the premises to Samuel E.  Beall, III, or to Blackberry Hotel Company.

12.  <u>DESTRUCTION OF PREMISES</u>.

In the event of  the  damage  or  destruction of  any improvements  on the leased premises by fire, windstorm or other perils covered by the insurance required to be  carried  by  the terms  of this Lease, the Lessee shall immediately repair and/or rebuild said premises to their condition prior to  the  casualty and  the Lessor shall assign to the Lessee all rights to collect the insurance proceeds because of the casualty.

13.  <u>TERMINATION</u>.

Provided  always  that  these  presents  are  on  these expressed conditions, that if the Lessee fails to perform any of the  obligations  imposed upon it, or fails to pay any rent when the same becomes due and payable, the Lessor  shall  notify  the Lessee  of  such  default,  and  if such default continues for a period of thirty (30) days from and after said notice,  then at the  option  of  the  Lessor  this  Lease shall be forfeited and become void and it shall be lawful for the  Lessor  without  any further  notice  or  demand, which notice or demand is expressly waived to re-enter said premises and to occupy and possess  them

-5-

as of its former estate without paying the Lessee for any improvements placed upon said premises by the Lessee.

In addition to the rights to terminate for the failure of the Lessee to pay rent or to perform other conditions on its part to be kept and performed, the Lessor is granted the right to cancel this Lease in the event the Lessee is sold, unless Samuel E. Beall, III, continues as Chairman of the Board or Chief Executive Officer, or both, or ceases to use the facility, which right shall be contingent upon the Lessor paying the Lessee the cost of all improvements placed on the premises by the Lessee less depreciation based on a thirty nine (39) year straight line depreciation.

The Lessor is also granted the right to cancel this Lease for any reason after twenty five (25) years contingent upon the Lessor paying to the Lessee the market value of any improvements placed on the leased premises by the Lessee as determined by an appraiser selected by the Lessor and Lessee.

14. **QUIET ENJOYMENT**.

The Lessor hereby warrants and agrees that the Lessee, performing the obligations specified and reserved herein in the manner aforesaid, and keeping all of the covenants and agreements on its part to be kept and performed, shall and may peaceably and quietly have, hold and enjoy the said premises for and during the term aforesaid without any lawful let, hindrance or molestation by or from any person or persons having or lawfully claiming any rights in said premises.

15. **WARRANTY OF TITLE**.

The Lessor warrants that it has good title to the leased premises; that the same are unencumbered and that it will warrant and defend the title thereto against the lawful claims of all persons whomsoever.

16. **BINDING EFFECT**.

It is understood that this agreement shall bind and inure to the benefit of parties and their successors and assigns except as to the limitation on assignment hereinabove provided.

17. **ENTIRE AGREEMENT**.

This is the entire agreement between the parties and shall be constructed in accordance with the laws of the state of Tennessee.

18. **MEMORANDUM OF LEASE**.

Either party may require a memorandum of lease or short form lease and the requesting party shall pay the recording fees for the document.

IN WITNESS WHEREOF, the parties hereto have caused this agreement to be signed and executed by the proper persons thereunto duly authorized on the day and date first above written.

MARYVILLE COLLEGE

BY: _~Bradley W. Bateson~_

_President_____, Title

ATTEST:

_~Ron Arnold~_

_TREASURER_____, Title

LESSOR

RUBY TUESDAY, INC.

BY: _~signature~_____

_Chm CEO_____, Title

LESSEE

STATE OF TENNESSEE )
                   ) SS
COUNTY OF BLOUNT   )

Before me, the undersigned authority, a Notary Public of said state and county, personally appeared

-7-

_GERALD GIBSON_, with whom I am personally acquainted, and who, upon oath, acknowledged himself to be the _PRESIDENT_ of MARYVILLE COLLEGE, the within named bargainor, a corporation, and that he, as such _PRESIDENT_, being authorized so to do, executed the within instrument for the purposes therein contained by signing the name of the corporation by himself as _PRESIDENT_.

Witness my hand and seal at office this the _16TH_ day of _SEPTEMBER_, 1997.

_____
NOTARY PUBLIC

My Commission Expires:

_02.21.2002_

STATE OF TENNESSEE     I
                       SS
COUNTY OF BLOUNT     I

Before me, the undersigned authority, a Notary Public of said state and county, personally appeared _SANDY BEALL_, with whom I am personally acquainted, and who, upon oath, acknowledged himself to be the _CHAIRMAN/CEO_ of RUBY TUESDAY, INC., the within named bargainor, a corporation, and that he, as such _CHAIRMAN/CEO_, being authorized so to do, executed the within instrument for the purposes therein contained by signing the name of the corporation by himself as _CHAIRMAN/CEO_.

Witness my hand and seal at office this the _14_ day of _September_, 1997.

_____
NOTARY PUBLIC

My Commission Expires:

_02.21.2002_

-8-

E-FILED
5/4/2021 3:31 PM
CLERK & MASTER
DAVIDSON CO. CHANCERY CT.

# EXHIBIT B
# 2018 MEMORANDUM
# OF UNDERSTANDING



## MEMORANUM OF UNDERSTANDING FOR THE
## MARYVILLE COLLEGE AND RT LODGE PARTNERSHIP

### I. History

Maryville College has a long history with RT Lodge. Completed in 1932 and originally named "Morningside," the home was designed by and for Susan Wiley Walker, the sister of Elizabeth Stevenson, wife of Maryville College's first chaplain and first resident of the House in the Woods. Mrs. Walker persuaded the College's administration to build on the property as long as she left her 26-room home to the college upon her death. After Mrs. Walker's death in 1950, Morningside served as the home of the President of Maryville College for 27 years. In 1997, the College entered into a 50-year lease agreement with Ruby Tuesday, Inc. for the former Morningside Inn and surrounding acres. Morningside's renovation and expansion as RT Lodge has been a point of pride for the Maryville College community, as well as the larger Blount County community.

### Mission

This is a Memorandum of Understanding for the partnership between Maryville College and the RT Lodge to promote a shared focus on the community. Maryville College's mission is to prepare students "for lives of citizenship and leadership as we challenge each one to search for truth, grow in wisdom, work for justice and dedicate a life of creativity and service to the peoples of the world." Today, RT Lodge is still surrounded by the natural setting with 140 acres of Maryville College Woods and offers guests at the lodge a secluded and pastoral experience with walking trails, streams and meadows just steps from the front door. Maryville College and RT Lodge partner to promote hospitality, environmentally sustainable practices, artisanal techniques and education in natural settings for the local, national and international community.

### II. Mutually Beneficial Opportunities

*Maryville College commits to:*

1. providing access to faculty and staff expertise for the purposes of Lodge programming;
2. providing access to student artwork and student musical ensembles for Lodge programming;
3. accommodating requests for research, studies and other academic collaborations when the College is able;
4. promoting RT Lodge as an option for dining and overnight accommodations in marketing materials, including the MC website;
5. promoting job and internship opportunities to Maryville College students and alumni;
6. facilitating collaborative engagements that may include, but are not limited to, encouraging campus departments and affiliates to host occasional meetings, workshops, conferences and events at RT Lodge; and
7. promoting the RT Lodge location and services to guests on campus tours.

*RT Lodge commits to:*

1. providing guided tours or visits of the property for students enrolled in courses for relevant programs (Outdoor Studies and Tourism, Management, etc.) at times approved in advance by RT Lodge;
2. organizing and promoting professional development opportunities for students, including hiring events for jobs and internship opportunities on a date convenient for RT Lodge;

3. providing space for one Strategic Partnership Group Reception, annually, on a date convenient for RT Lodge;

4. making available, whenever possible, lodging accommodations at agreed upon rates for the College's constituents during major events such as Homecoming and Commencement;

5. discounting meals by 15% hosted by the College's President and Advancement Officers for donors and potential donors;

6. discounting meals by 10% in the Restaurant at RT Lodge for Maryville College faculty members and staff with guests up to four people per dinner when presenting Maryville College ID (excludes specific special events designated as non-discountable);

7. providing an area at RT Lodge for guests to receive Maryville College marketing materials; and

8. providing a link to Maryville College's website from the RT Lodge site.

## III. Timeline

This Memorandum of Understanding shall be effective upon the signatures of authorized officials. It shall be in force from June 1, 2018 to June 1, 2021; provided however, either party shall have the right to terminate this Memorandum of Understanding upon 6 months written notice.

**Signatures**

_____                      5/14/18
William T. Bogart, President, Maryville College        Date

_____                      5/14/18
[Official], Ruby Tuesday, Inc.                         Date

Stephanie Medley, Chief Strategy Officer, Ruby Tuesday
Ray Blanchette, Chief Executive Officer, Ruby Tuesday

E-FILED
5/4/2021 3:31 PM
CLERK & MASTER
DAVIDSON CO. CHANCERY CT.

# EXHIBIT C
# MARCH 14, 2020 PSA

**ASSET PURCHASE AND SALE AGREEMENT**
**RT LODGE**
**DISTRICT NO. 9, BLOUNT COUNTY, TENNESSEE**

**INFORMATION SHEET**

**EFFECTIVE DATE:** MARCH 14 , 2020

The date that this "**Agreement**" (as defined in the first paragraph of the Standard Terms and Conditions) is executed and delivered by the last of Seller or Buyer.

**BUYER:** BNA ASSOCIATES LLC, a Tennessee limited liability company
401 Union Street, 2nd Floor
Nashville, TN 37219
Attn: Philip Welker, Managing Partner
Phone: (917) 325-4055
E-Mail Address: philip@bna-re.com

**SELLER:** RUBY TUESDAY, INC., a Georgia corporation
333 East Broadway Avenue
Maryville, TN 37804
Attn: Legal Real Estate Dept.
Phone: (407) 241-3418
E-Mail Address: dwindham@rubytuesday.com

**LEASED PREMISES:**
(*SEE SECTION 1.2.1*)

The property commonly known as RT Lodge
District No. 9, Blount County, Tennessee
Street Address:  1406 Wilkinson Pike
                       Maryville, TN 37803
More particularly described in the Lease (defined below).

**LEASE:** That certain Lease, dated September 11, 1997, as amended by that certain First Amendment to Lease, having an effective date of July 1, 2001, and as further amended by that certain Memorandum of Understanding, dated May 14, 2018 (collectively, and as the same may be further amended, the "**Lease**"), between Seller, as tenant, and MARYVILLE COLLEGE (the "**College**"), a Tennessee corporation, as landlord, for the Leased Premises and improvements located thereon.

A copy of the Lease is attached hereto as **Exhibit "A"**.

**PURCHASE PRICE:**
(*SEE SECTION 2.1*)

$5,250,000.00

**DEPOSIT/EARNEST MONEY:**
(*SEE SECTION 2.2*)

**Deposit - $25,000.00**, payable within three (3) business days after the Effective Date by wire transfer of immediately available funds to the Escrow Agent.

The term "**Earnest Money**" shall mean and include the Deposit if and to the extent deposited by Buyer with the Escrow Agent, together with any interest earned thereon.

The term "**business day**" means any day, except Saturday or

1

Sunday, that the banks in Blount County, Tennessee, are open for business.

**INSPECTION PERIOD:**
*(SEE SECTION 4.1)*

The period commencing on the Effective Date and expiring at 6:00 pm (local time in Blount County, Tennessee) thirty (30) days thereafter.

**SCHEDULED CLOSING DATE:**
*(SEE SECTION 6)*

The term "**Scheduled Closing Date**" means the date which is fifteen (15) days after the expiration of the Inspection Period.

The term "**Closing Date**" means the date on which the Closing (as defined in Section 6.1 of the Standard Terms and Conditions attached hereto) actually occurs.

**TITLE COMPANY/ESCROW AGENT:**

**OLD REPUBLIC NATIONAL TITLE INSURANCE COMPANY**
424 Church Street, Suite 1750
Nashville, TN 37219
Attn: Mike Davis
Phone: _615 - 244 - 2101_
Email: mdavis2@OldRepublicTitle.com

**Issuing Agent for Title Insurance Policy: Tarpy, Cox, Fleishman & Leveille, PLLC**
1111 Northshore Drive, Suite N-290
Knoxville, TN 37919
Attn: Steffanie M. Speck, Attorney
Phone: (865) 588-1096
E-Mail Address: smspeck@tcflattorneys.com

**TITLE COMMITMENT:**
*(SEE SECTION 3.1)*

Buyer may obtain, at Buyer's expense, a leasehold title insurance commitment from the Title Company issued through its agent, Tarpy, Cox, Fleishman & Leveille, PLLC (the "**Title Commitment**"). Within twenty (20) days after the Effective Date (the "**Title Objection Date**"), Buyer shall provide to Seller a copy of the Title Commitment, copies of all exception matters listed therein and written notice of Buyer's Title Objections (defined in Section 3.1 of the Standard Terms and Conditions attached hereto).

**SURVEY:**
*(SEE SECTION 3.2)*

Buyer may obtain, at Buyer's expense, a current ALTA/NSPS survey of the Leased Premises (the "**Survey**"). If Buyer obtains a Survey, then within twenty (20) days after the Effective Date (the "**Survey Objection Date**"), Buyer shall provide to Seller a copy of the Survey and written notice of Buyer's Survey Objections (defined in Section 3.2 of the Standard Terms and Conditions attached hereto).

**BROKERS:**
*(SEE SECTION 12.2)*

JDS Real Estate Services, Inc. ("**Broker**"). All fees and commissions of Broker are to be paid by Seller pursuant to a separate agreement.

**CLOSING COSTS:**
*(SEE SECTION 6.5)*

Seller shall pay (a) the fees of any counsel representing it in connection with this transaction, and (b) one-half (1/2) of any escrow fee charged by Escrow Agent to hold the Earnest Money.

2

Buyer shall pay all other Closing costs, including, without limitation: (i) any and all state and county transfer taxes, recording fees, documentary stamp taxes, property owners' association transfer/resale assessments, Grantor's and Grantee's transfer taxes and other taxes and fees imposed on account of the transaction contemplated by this Agreement; (ii) the fees of any counsel representing Buyer in connection with this transaction; (iii) one-half (1/2) of any escrow fees charged by the Escrow Agent; (iv) recording fees; (v) the premium for the Leasehold Title Policy and Title Commitment costs as well as the premium for any endorsements and lender's policies (provided, however, that Buyer acknowledges and agrees that this Agreement is not contingent upon Buyer obtaining financing); (vi) the cost of Buyer's inspections of the Leased Premises and the Subject Assets (defined in <u>Section 1.2</u> of the Standard Terms and Conditions attached hereto);(vii) all costs associated with the assignment of the Permits and Licenses (defined in <u>Section 1.2.4</u> of the Standard Terms and Conditions attached hereto); and (viii) any costs associated with the Survey.

Except as otherwise provided in this Agreement, all other costs and expenses incident to this transaction and the closing thereof shall be paid by the party incurring such costs.

**ASSIGNMENT:**

Buyer may not assign this Agreement and/or its rights and/or obligations under this Agreement without first obtaining Seller's written approval, which approval may be given or withheld in Seller's sole and absolute discretion.

Notwithstanding the foregoing, within ten (10) business days after the Effective Date, Buyer may assign its rights under this Agreement to RT Lodge LLC, a Tennessee limited liability company (in formation) or to an entity controlling, controlled by, or under common control with Buyer, without obtaining Seller's written approval. In either instance, Buyer shall (within ten (10) business days after the Effective Date) provide Seller with notice and an executed copy of the agreement effectuating such assignment. Notwithstanding any such assignment, Buyer shall not be released of Buyer's obligations hereunder.

**NON-INTERFERENCE WITH OPERATIONS:**

Buyer acknowledges that the Leased Premises is a fully functional lodge/hotel (including, without limitation, a restaurant). From and after the Effective Date, Buyer shall ensure that its activities and the activities of Buyer's Representatives (defined in <u>Section 4.1.1</u> of the Standard Terms and Conditions attached hereto) do not unreasonably interfere with or disrupt the operations, activities and/or employees of Seller. In addition, Buyer shall not, and shall cause Buyer's Representatives not to, contact or hold discussions with any suppliers, customers, vendors, licensors, licensees or employees of Seller, other than the following, regarding the transaction contemplated by this Agreement.

Edward G. Milgrim, Esq.                    Brian P. Esser, Esq.

3

(407) 790-4966
edwardmilgrim@milgrimlaw.com

(865) 379-5759
BEsser@rubytuesday.com

Stuart Kramer, Esq.
(407) 790-4966
stuartkramer@milgrimlaw.com

Debbie Windham
Director, Real Estate
(407) 241-3418
dwindham@rubytuesday.com

Buyer acknowledges and agrees that Seller would be irreparably harmed by any breach or threatened breach of this provision and, therefore, in addition to any other right or remedy which Seller might have under this Agreement or at law or in equity as a result of any such breach, or threatened breach, Seller shall be entitled to seek an injunction without posting a bond.

THE INFORMATION CONTAINED ON THIS INFORMATION SHEET IS PART OF THE AGREEMENT BETWEEN BUYER AND SELLER AND IS SUBJECT TO AND GOVERNED BY THE ATTACHED STANDARD TERMS AND CONDITIONS AND ANY EXHIBITS THERETO. CAPITALIZED TERMS USED AND NOT DEFINED IN THE STANDARD TERMS AND CONDITIONS SHALL HAVE THE MEANINGS ASCRIBED THERETO ON THIS INFORMATION SHEET.

## ASSET PURCHASE AND SALE AGREEMENT
## RT LODGE
## DISTRICT NO. 9, BLOUNT COUNTY, TENNESSEE

## STANDARD TERMS AND CONDITIONS

**THIS ASSET PURCHASE AND SALE AGREEMENT** (this "**Agreement**") is made and entered into as of the Effective Date (as set forth on the Information Sheet), by and between Seller and Buyer (as set forth on the Information Sheet). This Agreement includes the Information Sheet attached hereto, these Standard Terms and Conditions and all Exhibits attached hereto (which are all incorporated herein by this reference).

**WHEREAS,** Seller, as tenant, and the College, as landlord, are parties to the Lease for the Leased Premises and improvements located thereon;

**WHEREAS,** Seller operates the Lodge, commonly known as the RT Lodge, under the Lease (the "**Business**");

**WHEREAS,** Seller desires to sell and Buyer desires to purchase Seller's interest as tenant under the Lease and certain assets of Seller used exclusively in the Business;

**WHEREAS,** Seller and Buyer have agreed to set forth in this Agreement the terms governing the purchase and sale; and

**NOW, THEREFORE,** for and in consideration of the mutual covenants and agreements herein contained and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

## ARTICLE 1
## PURCHASE AND SALE

1.1    **Agreement of Purchase and Sale**. Subject to the terms of this Agreement, Seller shall assign, sell and convey, and Buyer shall assume, acquire and purchase, any and all rights of Seller in, to and under (as applicable) the specific assets owned by Seller and used exclusively in the Business, all as located or used at the Leased Premises (the Subject Assets) as described below.

1.2    **Definition of "Subject Assets"**. For all purposes hereof, the "**Subject Assets**" shall be deemed to include the following:

1.2.1    **The Lease**. The Lease.

1.2.2    **The Assumed Contracts**. During the Inspection Period, Seller and Buyer shall determine which existing contracts are to be assigned by Seller and assumed by Buyer (the "**Assumed Contracts**"). If any of the Assumed Contracts are not assignable without the consent of the other party to such Assumed Contract, the parties shall execute such agreements as may be necessary to delegate Seller's rights, duties and obligations under such Assumed Contracts to Buyer, which delegation agreement or agreements shall contain reciprocal indemnities or, at Seller's election, Seller may terminate such Assumed Contract(s) and pay any termination fee in connection therewith. The form of such delegation agreement or agreements shall be mutually agreed upon by Seller and Buyer prior to the Closing. Notwithstanding anything contained herein to the contrary, in no event shall the failure to obtain a consent to the assignment of any of the Assumed Contracts on or before Closing delay the Closing or relieve Buyer from its obligations to assume the obligations of Seller under all of the Assumed Contracts pursuant to the terms set forth in this Agreement.

**1.2.3**   **FF&E**. The furniture, fixtures and equipment physically located at the Leased Premises, all of which will be provided "AS IS", "WHERE IS," but expressly excluding any of the same which are Excluded Assets (defined in Section 1.3 below), subject to any right the College may have in and to the same under the Lease.

**1.2.4**   **Permits and Licenses**. During the Inspection Period, Seller and Buyer shall determine which existing permits and licenses are to be transferred (if and to the extent transferable) by Seller to Buyer (the "**Permits and Licenses**"). Buyer shall, at its sole cost and expense, promptly execute and file all necessary forms, applications and other documents with the appropriate authorities prior to the Closing so that such acquisition of the appropriate Permits and Licenses shall take effect, if possible, prior to or upon completion of Closing (but the failure or inability of Buyer to obtain such Permits and Licenses on or before Closing shall not relieve Buyer of its obligation to proceed with Closing hereunder). Seller shall cooperate with Buyer, at no expense to Seller, in the orderly transfer of the Permits and Licenses to Buyer at the Closing. Buyer's attempts to obtain such Permits and Licenses shall not diminish, prior to the Closing, the full force and effect of the Permits and Licenses maintained by Seller in the operation of the Leased Premises. If any such Permits and Licenses cannot be assigned to Buyer until after Closing, then Seller shall cooperate reasonably with Buyer and Buyer's operator if any, to the extent permitted by law, at no cost or expense to Seller, in keeping open the liquor facilities within the Lodge and, to the extent permitted by law, to continue the management operations between the Closing and the time when such Permits and Licenses are obtained by Buyer or its operator, by entering into an Interim Operating Agreement at Closing (the "**Interim Operating Agreement**"), the form of which shall be mutually agreed upon by Seller and Buyer prior to Closing, for the continued operation for up to ninety (90) days of and under the Permits and Licenses. In no event shall Seller be required to obtain any additional permits or licenses which it does not possess at the time of Closing. The provisions of this Section 1.2.4 shall survive the Closing for a period of one hundred eighty (180) days.

**1.2.5**   **Consumables**. All: (i) food and beverage inventory (including liquor only if and to the extent such items are permitted by law and regulations to be transferred); (ii) supplies, glassware, plates and similar supplies; and (iii) all other supplies and inventory of all kinds, whether used, unused, or held in reserve storage for future use in connection with the maintenance or operation of the Leased Premises on hand at the Leased Premises at Closing, which are owned by Seller at the Closing (collectively, the "**Consumables**").

**1.2.6**   **Accounts Receivable**. All accounts receivable related to the Leased Premises owned by Seller at Closing (the "**Accounts Receivable**").

**1.2.7**   **Bookings**. Any and all bookings, contracts or other reservations (including, without limitation, any booking for which a written proposal has been made by or on behalf of Seller and accepted by the recipient thereof or for which a written proposal has been received and accepted by or on behalf of Seller, regardless of whether any deposit or other amount has been received with respect thereto, or not) for the future use of guest rooms, recreational facilities, banquet facilities or meeting rooms or other facilities and services of the Leased Premises with respect to any period from and after the Closing Date, together with any rents and/or other considerations related thereto (collectively, the "**Bookings**").

**1.2.8**   **Customer Deposits**. Any and all cash or cash equivalent deposits for the Bookings (other than any such deposits which have been irrevocably forfeited by the depositing party as of the Closing Date and with respect to which Seller is no longer obligated to provide any goods or services, which shall be retained by Seller) (collectively, the "**Customer Deposits**").

**1.2.9** <u>**Vouchers**</u>. Any and all issued and outstanding gift cards, certificate, coupon, comp card, promotional allowance, voucher or other writing that entitles the holder or bearer thereof to a credit (whether in a specified dollar amount or for a specified item, e.g., a meal or a room) to be applied against the usual charge for goods or services (collectively, the "**Vouchers**").

**1.2.10** <u>**Numbers and Marketing Materials**</u>. All rights of Seller in and to the telephone numbers (including facsimile numbers) used by Seller solely in the operation of the Leased Premises, if allowed by the telephone company, excluding the telephone (and facsimile) numbers associated with Ruby Tuesday, all rights of Seller in and to websites (including @RTlodge.com), mobile sites, social media sites and designations, or online or mobile platforms of Seller with respect to the Business, excluding any of the same associated with Ruby Tuesday, and all rights of Seller in and to any marketing materials, advertising materials, promotional materials and any yellow page or similar directory listing used in the operation of the Leased Premises ("**Numbers and Marketing Materials**"), if and to the extent the same do not include, reference or incorporate any Protected Materials (as defined on **Exhibit "D"**).

**1.2.11** <u>**Warranties and Guaranties**</u>.  To the extent assignable, all existing warranties and guaranties issued to Seller in connection with the Leased Premises, if any ("**Warranties and Guaranties**").

**1.2.12** <u>**Name**</u>.  The name "RT Lodge" (the "**Name**"); provided, however, that Seller makes no representation or warranty: (i) that such name has been registered or reserved by Seller as a trademark, tradename, service mark, fictitious name or otherwise; (ii) that Seller has any right, title or interest in and to such name; and/or (iii) that no third party has any right, title or interest in and to such name.

**1.2.13** <u>**Cash-On-Hand**</u>. Any cash actually on-hand in any cash registers located on the Leased Premises ("**Cash-On-Hand**").

**1.2.14** <u>**Owned Vehicles.**</u> **Any** vehicles and trailers, if any, owned by Seller, used in the operation or maintenance of the Lodge and not removed from the Leased Property prior to the Closing.

**1.3** <u>**Excluded Assets**</u>. Notwithstanding the foregoing or anything to the contrary contained in this Agreement, the assets of the Business described on **Exhibit "D"** attached hereto as well as those items that, according to law and regulation, may not be transferred, are expressly excluded from the purchase and sale contemplated hereby (the "**Excluded Assets**") and, as such, are not included in the Subject Assets.

**1.4** <u>**Assumed Liabilities**</u>. At Closing, Buyer agrees to assume, pay, perform and discharge when due, and be exclusively responsible for, the obligations of Seller: (i) in connection with the Subject Assets; and (ii) as described on **Exhibit "E"** attached hereto (collectively, the "**Assumed Liabilities**").

### ARTICLE 2
### PURCHASE PRICE AND EARNEST MONEY

**2.1** <u>**Purchase Price**</u>. The Purchase Price for the Subject Assets is indicated on the Information Sheet and shall be payable at Closing by wire transfer of immediately available funds, against which the Earnest Money shall be applied, subject to adjustment as provided herein.

**2.2** <u>**Prorations**</u>. The items set forth in this <u>Section 2.2</u> shall be prorated and adjusted between Seller and Buyer effective as of 11:59 p.m. (local time in Blount County, Tennessee) on the day preceding the Closing Date ("**Effective Time**"), and Buyer and Seller shall be charged or credited for such prorations on

the closing statement, as applicable, with all liabilities accruing prior to the Effective Time being the responsibility of Seller, and all liabilities accruing on or after the Effective Time being the responsibility of Buyer, except as otherwise specified.

**2.2.1    General**. Except as otherwise expressly provided herein, all income and expenses of the Leased Premises with respect to the period prior to the Effective Time shall be for the account of Seller and all income and expenses of the Leased Premises with respect to the period from and after the Effective Time shall be for the account of Buyer.

**2.2.2    Revenue, Accounts Receivable, Accounts Payable**. All revenue, sales and income of any kind resulting from the ownership or operation of the Leased Premises, including, but not limited to, revenue, sales and income from the rental of rooms, suites and meeting and banquet facilities, food and beverage sales, parking charges, laundry (including coin operated equipment, if any) charges, telephone charges, and vending machines shall be apportioned as of the Effective Time, subject to the following provisions of this Section 2.2.

**2.2.2.1    Accounts Receivable**. Buyer shall pay to Seller an amount equal to all Accounts Receivable (including, without limitation, credit card sales and all items that are entered as Accounts Receivable on the books and records maintained by Seller) with respect to the ownership or operation of the Leased Premises as of the Effective Time.

**2.2.2.2    Bookings**. All amounts paid or payable in respect of Bookings shall be apportioned as of the Effective Time. At the Closing, Buyer shall assume all of the obligations of Seller with respect to Bookings as of the Effective Time, including obligations with respect to any prepaid room charges, rents and other consideration, all Customer Deposits and all other liabilities with respect to Bookings not earned as of the Effective Time (which obligations shall be the obligations of Buyer from and after the Closing), and Buyer shall receive a credit against the Purchase Price at Closing for all prepaid room charges, rents and other considerations, all Customer Deposits and all other liabilities with respect to Bookings that were received by Seller and are unused and unreturned as of the Effective Time (and, thereafter, Seller shall have the right to retain any amounts relating to such items on deposit in Seller's account).

**2.2.2.3    Vouchers**. Buyer shall receive a credit at Closing against the Purchase Price for the amount of issued and outstanding Vouchers. At or before Closing Buyer and Seller shall determine the amount of the credit. Such credit shall not exceed seventy-five (75%) percent of the face value of the issued and outstanding Vouchers.

**2.2.3    Lease and Assumed Contracts**. All periodic charges, fees and expenses under the Lease and Assumed Contracts shall be apportioned between the parties as of the Effective Time, including, without limitation, rent, real estate and personal property taxes and special or other assessments or levies in respect of the Leased Premises, sales, revenue and excise taxes (relating to Leased Premises operations), room occupancy and use taxes, entertainment taxes, gaming taxes, water and sewer rents, rates and charges and vault charges, other municipal permit fees and governmental assessments shall be apportioned as of the Effective Time, subject to the following provisions of this Section 2.2. Buyer acknowledges and agrees that: (i) the two (2) RT Lodge logoed passenger vans (the "**Vans**") at the Leased Premises are leased from Enterprise; (ii) Seller will use commercially reasonable efforts to cause Enterprise to allow Buyer to assume the lease for the Vans (the "**Van Lease**"), provided that Seller is not obligated to allow any assumption that does not include a complete release of Seller from the Van Lease; (iii) if Seller cannot cause Enterprise to allow Buyer to assume the Van Lease, Seller shall purchase the Vans from Enterprise; and (iv) Buyer shall, at Closing, pay, or reimburse Seller for amounts paid by Seller, for the assignment/assumption of the Lease or the purchase of the Vans (as applicable).

**2.2.3.1    Property Taxes**. Real property taxes and assessments shall be prorated based on amounts for the current year (with maximum discount, if any, taken), except that if tax amounts for the current year are not available, prorations shall be made based upon the taxes for the preceding year

8

(with maximum discount, if any, taken). Certified and pending municipal or county liens and assessments for which work has been substantially completed as of the Closing Date shall be paid by Seller and other pending liens shall be assumed by Buyer. Notwithstanding anything to the contrary contained herein, Seller shall be entitled to the full amount of all refunds and rebates resulting from any property tax appeals or requests for reassessments filed by Seller for tax years prior to the tax year in which the Closing occurs. If, subsequent to a Closing, the real property taxes relating to the Leased Premises for the year of Closing are determined to be higher or lower than as prorated, or if any re-assessment or re-billing is made for such taxes, a re-proration and adjustment will be made at the request of either party upon presentation of actual tax bills and any payment required as a result of the re-proration shall be made within thirty (30) days following demand therefore.

**2.2.3.2  Utilities, Utility Deposits.** Amounts paid or payable under telephone contracts and contracts for the supply of heat, steam, water, electric power, gas, lighting and other utilities services shall be apportioned as of the Effective Time, with Seller receiving a credit for the deposits, if any, made by Seller as security under any such public service contract(s), provided such deposit is transferable and remains on deposit for the benefit of Buyer. Seller shall have the right to a return of any deposits in the form of letters of credit or bonds upon Closing, and Buyer shall be responsible for posting any substitute deposits required therefore from and after Closing. Where possible, cutoff readings will be secured for all utilities as of the Effective Time. To the extent that cutoff readings are not available, the costs of such utilities shall be apportioned between the parties as of the Effective Time, on the basis of the most recent actual (not estimated) bill for such service. Buyer shall be responsible for causing such utilities and services to be changed to its name as of Closing, and shall be liable for and shall pay all utility bills for services rendered after the Effective Time.

**2.2.3.3  Insurance.** Notwithstanding anything to the contrary, there shall be no apportionment of amounts paid or payable for Seller's insurance relating to the Leased Premises, which insurance shall not be assigned to Buyer at Closing, and Seller shall be entitled to any refunds and payments with respect to its insurance relating to the Leased Premises (it being understood that Buyer shall be solely responsible for obtaining insurance coverage, in such amounts as it desires or is required by law or the Lease to obtain, with respect to the period from and after Closing).

**2.2.4  Intentionally Omitted**

**2.2.5  Cash-On-Hand.** Seller shall minimize the Cash-On-Hand defined as Petty Cash on Property as small of an amount as acceptable to Seller..

**2.2.6  Consumables.** Seller shall cause Property to have and maintain no less than one-week worth of Consumables (as reasonable determined by Seller) as would be standard business-as-usual inventory. Buyer shall pay to Seller an amount equal to the estimated value of the food and beverage inventory to be transferred (as reasonably determined by Seller) as of the Effective Time. All other Consumables shall be transferred without any cost to Buyer.

**2.2.7  Other Items.** The parties shall apportion as of the Effective Time such other items as are provided for in this Agreement or as are customarily prorated and adjusted in the sale of a hotel and restaurant.

**2.2.8  Adjustments Post-Closing.** Seller and Buyer shall cooperate in good faith and act reasonably after Closing to make a final determination of the prorations required hereunder. Ninety (90) days following the Closing (or such other time as the parties may agree), there shall be a reconciliation of the proration adjustments. With respect to such prorations that cannot be finalized and/or accurately determined within ninety (90) days following the Closing (or such other time as the parties may agree), the provisions of this Section 2.2.7 providing for post-Closing adjustments of prorations upon receipt of final information will survive for a period of one (1) year after the Closing.

**2.3  Earnest Money.** The Deposit is indicated on the Information Sheet and shall be payable by Buyer

9

as and when indicated on the Information Sheet. If the Closing hereunder occurs, the Earnest Money shall be applied towards payment of the Purchase Price. The Escrow Agent shall hold and dispose of the Earnest Money strictly in accordance with the provisions contained herein.

**2.4**     **Consideration**. Notwithstanding anything to the contrary contained in this Agreement, if Buyer is entitled to a return of the Earnest Money under this Agreement, then Escrow Agent shall deliver $100.00 of the Earnest Money to Seller as good and sufficient independent consideration for entering into this Agreement and the balance of the Earnest Money to Buyer.

**2.5**     **Allocation of Purchase Price**. During the Inspection Period, Seller and Buyer shall prepare a schedule allocating the Purchase Price among the Subject Assets (including any Assumed Liabilities treated as consideration for the Subject Assets for tax purposes) (the "**Allocation Schedule**"). The Allocation Schedule shall be prepared in accordance with Section 1060 of the Internal Revenue Code of 1986, as amended, and shall otherwise be mutually agreed between Seller and Buyer. Notwithstanding the foregoing, if Seller and Buyer cannot agree upon an Allocation Schedule by Closing, each party may use its own determination and bear any consequences related thereto and Seller's allocation shall be utilized in calculating transfer, sales and similar tax and related filings under this Agreement.

### ARTICLE 3
### TITLE AND SURVEY

**3.1**     **Title, Examination and Objections**. As and when indicated on the Information Sheet, the designated party shall obtain/deliver the Title Commitment and copies of all exception matters listed therein. On or before the Title Objection Date, Buyer shall notify Seller, in writing and in reasonable detail, of Buyer's objections to the Title Commitment (the "**Title Objections**").

**3.2**     **Survey, Examination and Objections**. As and when indicated on the Information Sheet, the designated party shall obtain/deliver the Survey. The Survey shall be prepared by a surveyor or engineer licensed in the State where the Subject Assets is located and shall be certified to Buyer, Seller and Title Company. On or before the Survey Objection Date, Buyer shall notify Seller, in writing, and in reasonable detail, of Buyer's objections to the Survey (the "**Survey Objections**").

**3.3**     **Addressing Title and Survey Objections**.

**3.3.1**     **Objections**. Prior to notifying Seller of any Title Objections and/or Survey Objections, Buyer shall endeavor in good faith to cause Title Company and surveyor (as applicable) to modify and update the Title Commitment and/or Survey (as applicable) to reflect Buyer's requested corrections and revisions. Failure to timely notify Seller of its Title Objections and/or Survey Objections shall be deemed Buyer's acceptance of title as indicated in the Title Commitment and the Subject Assets as indicated on the Survey (as applicable). Buyer shall not object to the Permitted Exceptions (as defined herein).

**3.3.2**     **Seller Remedies**. Seller shall notify Buyer no later than five (5) days after receiving Buyer's notice of the Title Objections under Section 3.1 herein and notice of the Survey Objections under Section 3.2 herein of whether Seller shall attempt to cause any Title Objections and/or Survey Objections (as applicable) to be removed from title, insured over and/or cured (by endorsement, by "writing over" or in another manner reasonably satisfactory to Buyer). Seller's failure to provide such notice to Buyer within the required period as to the action Seller shall take with respect to any Title Objection and/or Survey Objections shall be deemed an election by Seller to not attempt to cause any Title Objections and/or Survey Objections (as applicable) to be removed from title, insured over and/or cured.

**3.3.3**     **Buyer's Termination Right**. If: (i) Seller so notifies (or is deemed to have notified) Buyer under Section 3.3.2 herein that Seller will not attempt to cause any or all of the Title Objections and/or Survey Objections to be removed from title, insured over and/or cured; or (ii) after having notified Buyer that Seller shall attempt to cause any or all of such Title Objections and/or Survey Objections to be removed

from title, insured over and/or cured, Seller notifies Buyer that Seller has not caused any or all of such Title Objections and/or Survey Objections to be removed from title, insured over and/or cured, then Buyer shall have until the end of the Inspection Period (as indicated on the Information Sheet) to notify Seller whether Buyer will: (a) proceed with the purchase and acquire the Subject Assets subject to the Title Objections and without any reduction in the Purchase Price, in which case any or all of the Title Objections and/or Survey Objections are deemed approved and to be Permitted Exceptions, or (b) terminate this Agreement, in which case the Earnest Money shall be refunded to Buyer in accordance with the provisions herein and Seller and Buyer shall have no further rights and obligations hereunder except those which expressly survive termination of this Agreement. Buyer may not elect clause (b) above if Buyer is in default under this Agreement. If Buyer is in default or fails to timely give Seller the aforesaid notice, Buyer shall be deemed to have elected clause (a) above.

   **3.3.4    No Obligation to Cure**. Notwithstanding anything to the contrary contained in this Agreement, Seller has no obligation to take any steps, bring any action, and/or incur any costs, efforts and/or expenses whatsoever regarding any Title Objections and/or Survey Objections; provided, however, that, prior to Closing, Seller shall discharge and release the Subject Assets from any mortgages and security interests.

**3.4    Permitted Exceptions**. "**Permitted Exceptions**" includes and refers to: (i) all exceptions to title in the Title Commitment approved or deemed approved by Buyer pursuant to Section 3.3.3 herein; (ii) the Title Company's standard exception for surveys, unless Buyer obtains and delivers to the Title Company a survey acceptable to the Title Company to permit the Title Company to remove such exception; (iii) zoning ordinances and regulations and other laws or regulations governing use or enjoyment of the Leased Premises and the Subject Assets; (iv) matters affecting title created by, on behalf of, or with the consent of Buyer; (v) any state of facts that would be disclosed by an accurate survey of the Leased Premises and/or which are shown on the Survey and are approved or deemed approved by Buyer pursuant to Section 3.3.3 herein; (vi) liens to secure taxes and assessments not yet due and payable (vii) and the Lease.

## ARTICLE 4
## INSPECTION

**4.1    General**.

   **4.1.1    Right of Inspection**. During the Inspection Period specified on the Information Sheet, Seller hereby grants to Buyer and Buyer's employees, agents, consultants and contractors (collectively, and together with anyone entering the Leased Premises on behalf of, or with the consent of, Buyer "**Buyer's Representatives**"), subject to the conditions set forth on the Information Sheet and below, the right to enter the Leased Premises in order to evaluate the Leased Premises and the Subject Assets and perform non-invasive inspections (including a so-called Phase I audit) and/or any other reasonable investigations, tests, searches, reviews, studies or examinations into the status of the Leased Premises and the Subject Assets as Buyer desires. Buyer shall have access to the Leased Premises at such times as Seller shall reasonably designate and only following seven (7) days prior notice to Seller. Buyer must obtain Seller's advance written approval (which approval may be granted or withheld in Seller's sole and absolute discretion) for the performance, scope and method, described with reasonable specificity, of: (i) a so-called Phase II environmental inspection and any other intrusive, or invasive testing or inspection; and/or (ii) any testing or inspection which could alter the physical condition of any portion of the Leased Premises. Buyer shall promptly deliver to Seller all information produced or procured by Buyer; provided, however, that Buyer shall only provide copies of environmental studies, reports and other findings if expressly requested by Seller. Buyer shall promptly restore the Leased Premises and the Subject Assets to a condition that is at least as good as its previous condition immediately following any entry, test or inspection.

   **4.1.2    Responsibility and Indemnity**. Buyer shall be liable for all damage and/or injury to any person or property resulting from, relating to, and/or arising out of Buyer's activities (and/or the activities of Buyer's Representatives) on the Leased Premises and Buyer shall keep the Leased Premises and the

Subject Assets free and clear of any liens arising from work performed on behalf of Buyer (and Buyer's Representatives) in connection with its inspection activities. Buyer indemnifies, defends and holds harmless Seller, Seller's affiliates and their respective members, directors, officers, shareholders, interest holders, employees, advisors, agents, attorneys and managers and their respective successors and assigns (collectively, the "**Indemnitees**") from and against any and all claims, suits, actions, causes of action, orders, judgments, decrees, losses, liabilities, damages, costs and expenses (whether direct, indirect, consequential or punitive and including, without limitation, Attorney's Fees (as hereinafter defined)) of any kind or nature whatsoever arising from any personal injury, loss of life, damage to property and/or any other matter whatsoever arising out of, relating to and/or due to Buyer's activities (and/or the activities of Buyer's Representatives). If any liens are filed against the Leased Premises and/or the Subject Assets as a result of Buyer's activities (and/or the activities of Buyer's Representatives), Buyer shall cause such liens to be removed, satisfied or transferred to bond within ten (10) days after Buyer receives notice of such liens. If Buyer fails to do so, in addition to any other rights and/or remedies of Seller, Seller may cause the same to be removed, satisfied, or transferred to bond and Buyer shall be responsible for Seller's costs associated therewith (including, without limitation, Attorney's Fees) and shall reimburse Seller therefor within five (5) business days after Seller's written demand therefor. As used in this Agreement, the term "**Attorney's Fees**" means and includes reasonable attorneys' and paralegals' fees, costs and disbursements prior to trial, at trial, on appeal and/or as part of a bankruptcy proceeding, whether or not litigation is commenced and all court costs. The provisions of this <u>Section 4.1.2</u> shall survive the Closing or any termination of this Agreement.

       **4.1.3**   <u>**Seller's Information**</u>. In furtherance of Buyer's exercise of its inspection rights hereunder, within three (3) business days following the Effective Date, Seller shall make available to Buyer, for Buyer's review, copies of environmental and engineering studies, existing title insurance documents, surveys, site plans and other documentation in Seller's possession and reasonably relevant to Buyer's evaluation of the Leased Premises and the Subject Assets. All such materials shall be delivered without representation or warranty by Seller, except that, to Seller's actual knowledge, all such materials are complete and unaltered copies of such materials as received by Seller. Buyer's access to and use of such materials is subject to the confidentiality provisions set forth herein.  Seller may redact any personal information (name, social security #, phone #, e-mail address, etc.) with respect to any Bookings and Vouchers.

       **4.1.4**   <u>**Landlord's Consent**</u>. During the first ten (10) business days of the Inspection Period, Seller and Buyer will attempt to agree upon the form of: (i) an amendment to the Lease which shall include, among other things, the deletion of the second and third paragraphs of Section 13 of the Lease, the extension of the term of the Lease until December 31, 2070 and inclusion of the updated parking plan (the "**Lease Amendment**"); and (ii) a consent of the College, as landlord under the Lease, which consent must contain a full release of Seller as tenant (the "**Consent**") to the Lease Assignment and Assumption Agreement (defined in Section 6.2.1 below). If Seller and Buyer are unable to agree upon the form of the Lease Amendment and/or the Consent prior to the expiration of the aforesaid ten (10) business day period, then either party may terminate this Agreement by giving written notice to the other on or before the expiration of the Inspection Period. If neither Seller nor Buyer delivers such notice to the other on or before the expiration of the Inspection Period, this Agreement shall automatically terminate upon the expiration of the Inspection Period without the need for any action on the part of either party. Upon such termination, the Earnest Money shall be refunded to Buyer in accordance with the provisions herein and Seller and Buyer shall have no further rights and obligations hereunder except those which expressly survive termination of this Agreement.

**4.2**   <u>**Insurance Requirement**</u>. Before Buyer or any of Buyer's Representatives may enter the Leased Premises, Buyer must provide Seller with a certificate of insurance naming Seller (and any other person designated by Seller) as an additional insured, issued by an insurance company licensed in the State in which the Leased Premises are located and otherwise satisfactory to Seller and with insurance limits in a minimum amount of $1,000,000.00 per occurrence and $2,000,000.00 in the aggregate, on an occurrence

basis, covering commercial general liability (including, without limitation, contractual liability) and automobile liability.

**4.3**    **Confidentiality**. Unless Seller specifically and expressly otherwise agrees in writing, Buyer agrees that: (i) the results of all inspections, analyses, studies and similar reports relating to the Leased Premises and the Subject Assets prepared by or for Buyer; (ii) all information regarding the Leased Premises and the Subject Assets of whatsoever nature made available to Buyer by Seller and/or Seller's agents or representatives (the "**Proprietary Information**"); and (iii) the terms and existence of this Agreement and the contemplated terms of any of the other agreements set forth herein (collectively, "**Confidential Information**"), are confidential and shall not be disclosed to any other person or entity, except Buyer's employees, agents, attorneys, advisors, consultants, partners and lenders who have a bona fide reason to know or review such Confidential Information, and even then, only on a strict "need to know" basis and following Buyer making such persons aware of this confidentiality restriction and procuring such persons' agreement to be bound hereby. Buyer agrees not to use, or allow to be used, any such Confidential Information for any purpose other than to determine whether to proceed with the contemplated purchase, or if same is consummated, in connection with the operation of the Leased Premises and the Subject Assets post-closing. Further, if Closing does not occur for any reason whatsoever, Buyer agrees to return to Seller, or cause to be returned to Seller, all Proprietary Information, the foregoing being a condition to the return of the Earnest Money if Buyer is entitled to the return thereof. In furtherance and not in limitation of the foregoing, Buyer agrees that Buyer shall not, unless and until the Closing has been consummated, release or issue any press release, announcement or statement regarding this Agreement or the transaction contemplated hereby unless the same has been approved by Seller in its sole and absolute discretion. Buyer acknowledges, consents and agrees that, if it breaches or attempts to breach or otherwise violate any of the provisions of this Agreement, Seller would suffer irreparable harm. Accordingly, in addition to any other remedies that Seller may have under this Agreement or otherwise, Seller shall be entitled, in addition to any other remedies which are made available to it at law or in equity, to apply to any court of competent jurisdiction for an injunction restraining Buyer from committing or continuing any breach or violation of this Agreement, and without being required to furnish a bond or other security. Nothing in this Agreement shall be construed as prohibiting Seller from pursuing any other remedy or remedies, including, without limitation, recovery of damages. The provisions of this <u>Section 4.3</u> shall survive the Closing or any termination of this Agreement.

**4.4**    **Contact with Governmental Authority**. In furtherance and not in limitation of the provisions of <u>Section 4.3</u> herein, Buyer shall not disclose any information about the environmental condition of the Leased Premises and the Subject Assets to, or otherwise contact, any governmental authority regarding environmental matters that come to Buyer's attention in the course of its inspections without the prior written consent of Seller in its sole and absolute discretion, unless otherwise required by law. In the event such disclosure is required by law, Buyer shall notify Seller prior to making any such disclosure and shall allow Seller to elect to satisfy such obligation by Seller making the required disclosure. Routine searches of government data bases or other typical inquiries made by an environmental consultant in the course of a Phase 1 audit are not subject to the restriction set forth in this <u>Section 4.4</u>. The provisions of this <u>Section 4.4</u> shall survive the Closing or any termination of this Agreement.

**4.5**    **Sale of Subject Assets "As-Is"**. TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW AND EXCEPT FOR SELLER'S REPRESENTATIONS AND WARRANTIES AS SET FORTH HEREIN AND ANY WARRANTY CONTAINED IN THE DEED TO BE PROVIDED BY SELLER AT CLOSING (COLLECTIVELY, THE "**WARRANTIES**"), THIS SALE IS MADE AND SHALL BE MADE WITHOUT REPRESENTATION, COVENANT, OR WARRANTY OF ANY KIND (WHETHER EXPRESS, IMPLIED, OR, TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, STATUTORY) BY SELLER AND ALL SUCH REPRESENTATIONS, COVENANTS AND WARRANTIES ARE HEREBY DISCLAIMED. AS A MATERIAL PART OF THE CONSIDERATION FOR THIS AGREEMENT, BUYER AGREES TO ACCEPT THE LEASED PREMISES AND THE SUBJECT ASSETS AT CLOSING ON AN "**AS-IS**" AND "**WHERE IS**" BASIS, WITH ALL FAULTS AND ANY AND ALL LATENT AND PATENT DEFECTS AND WITHOUT ANY

REPRESENTATION OR WARRANTY, ALL OF WHICH SELLER HEREBY DISCLAIMS, EXCEPT FOR THE WARRANTIES. WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, SELLER MAKES NO EXPRESS OR IMPLIED WARRANTY OF SUITABILITY OR FITNESS OF THE LEASED PREMISES AND THE SUBJECT ASSETS FOR ANY PURPOSE OR USE OR AS TO THE MERCHANTABILITY, TITLE, VALUE, QUALITY, QUANTITY, CONDITION OR SALABILITY OF THE LEASED PREMISES AND THE SUBJECT ASSETS. NOTWITHSTANDING ANYTHING CONTAINED IN THIS AGREEMENT TO THE CONTRARY, BUYER AGREES THAT, BY CLOSING, BUYER WARRANTS AND REPRESENTS THAT BUYER HAS EXAMINED (OR HAD THE OPPORTUNITY TO EXAMINE) AND APPROVE ALL THINGS CONCERNING THE LEASED PREMISES AND THE SUBJECT ASSETS WHICH BUYER DEEMS MATERIAL INCLUDING, BUT NOT LIMITED TO, TOPOGRAPHY, GEOLOGY, CONDITION OF THE SOIL, ENVIRONMENTAL CONDITION OF THE LEASED PREMISES AND THE SUBJECT ASSETS, CONDITION OF TITLE TO THE LEASED PREMISES AND THE SUBJECT ASSETS, DIMENSIONS, AVAILABILITY AND CAPACITY OF UTILITIES AND SANITARY FACILITIES (INCLUDING, WITHOUT LIMITATION, WATER AND SEWER CONNECTIONS), ANY RESTRICTIONS RELATED TO THE DEVELOPMENT AND/OR USE OF THE LEASED PREMISES AND THE SUBJECT ASSETS, SUITABILITY FOR AND FEASIBILITY OF INTENDED USE AND ANY OTHER USE, ZONING, THE APPLICABILITY OF ANY GOVERNMENTAL REQUIREMENTS INCLUDING, BUT NOT LIMITED TO, ENVIRONMENTAL REQUIREMENTS, ANY APPLICABLE GOVERNMENTAL GENERAL PLANS AND THE AVAILABILITY OF PERMITS, APPROVALS AND OTHER ENTITLEMENTS FROM GOVERNMENTAL AUTHORITIES HAVING JURISDICTION OVER SELLER, BUYER, OR THE LEASED PREMISES AND THE SUBJECT ASSETS. The provisions of this Section 4.5 shall survive the Closing or any termination of this Agreement.

**4.6** **Right of Termination**. Seller agrees that, so long as Buyer is not in default under this Agreement, Buyer may terminate this Agreement for any reason or no reason by giving written notice to Seller on or before the expiration of the Inspection Period. Upon such termination, the Earnest Money shall be refunded to Buyer in accordance with the provisions herein and Seller and Buyer shall have no further rights and obligations hereunder except those which expressly survive termination of this Agreement. If Buyer delivers a notice to proceed prior to or on the date the Inspection Period expires, the Earnest Money shall become non-refundable and Buyer shall proceed to the Closing in accordance with the terms hereof subject only to the satisfaction of Seller's closing obligations as set forth herein. If Seller has not received a notice to proceed prior to or on the date the Inspection Period expires, then Buyer shall be deemed to have terminated this Agreement, the Earnest Money shall be refunded to Buyer in accordance with provisions herein, and the parties shall have no further obligations to each other, except as expressly provided in this Agreement to survive the termination of this Agreement.

## ARTICLE 5
## EMPLOYEES

5.1    **Hired Employees**. Prior to Closing, Seller will provide Buyer with access to employee files and Buyer will evaluate for employment all employees of Seller at the Leased Premises. If such employees meet Buyer's standards for employment, including satisfactory results of background checks and e-Verify submissions, Buyer will offer employment to such employees at the Leased Premises on terms and conditions determined by Buyer, with such employment to be effective immediately following, and contingent upon the occurrence of, Closing. Seller's employees who accept offers of employment from Buyer and who complete all necessary documents in order to commence employment with Buyer shall become employees of Buyer immediately following the Closing (each a "**Hired Employee**"). Each Hired Employee shall cease to be an employee of Seller at the time of Closing and Buyer shall be responsible for all liabilities and obligations relating to or arising out of the employment, engagement, remuneration, or cessation of employment with Buyer of any Hired Employees, with respect to all periods immediately after Closing (collectively the "**Buyer Retained Employee Obligations**"). Buyer shall not have any responsibility for any of Seller's employees not hired by Buyer.

5.2    **Seller Obligations**. Except as set forth in Section 5.1: (i) Seller is responsible for any and all of Seller's obligations to any present or past employee of Seller incurred by Seller prior to Closing; and (ii) Seller agrees to retain responsibility for its employees who are not Hired Employees with respect to all employment matters, including, but not limited to, any obligations or claims arising from the termination of such employees' employment with Seller which will occur immediately prior to Closing. No Seller employee is or is intended to be a third-party beneficiary of this Agreement. The parties agree to coordinate on a communication plan associated with the employees at the Leased Premises regarding the prospective employment and employment decisions to be made by Buyer.

5.3    **Personnel Records**. The Subject Assets do not include the personnel records of Seller's employees. Those personnel records remain the property of Seller. However, Seller agrees to transfer copies of the personnel records for the Hired Employees to Buyer upon receipt of authorization from the Hired Employees, the form of which authorization shall be as mutually agreed upon by Buyer and Seller and which authorization Seller agrees to use reasonable efforts to obtain from the Hired Employees.

5.4    **Notifications**. Seller will provide all of Seller's employees the requisite notices under the Consolidated Omnibus Budget Reconciliation Act of 1986 and will proceed as required by that law. Seller will terminate at its expense its employees' participation in other employee benefit plans in accordance with the provisions of those plans.

5.5    **WARN Act**. Notwithstanding anything to the contrary contained herein, Buyer or one of its affiliates shall hire a sufficient number of the Employees to work at or from the Leased Premises upon such terms and for such compensation as Buyer may elect in its sole and absolute discretion in order that the actions of the parties pursuant to this Agreement will not trigger the application of the Worker Adjustment and Retraining Notification Act (or similar local or state laws or regulations) (collectively, the "**WARN Act**") and Buyer or one of its Affiliates shall retain such Employees for a period of at least ninety (90) days from and after the Closing Date.

5.6    **Survival**.        This Article 5 shall survive the Closing and shall not be deemed merged into any instrument of conveyance delivered at the Closing.

### ARTICLE 6
### CLOSING

**6.1**    **Time and Place of Closing**. The consummation of the transaction contemplated by this Agreement (the "**Closing**") shall be held by escrow deliveries to the Escrow Agent and the closing of escrow shall be on or before the Scheduled Closing Date specified on the Information Sheet. At Closing, Seller shall deliver to Buyer possession and occupancy of the Leased Premises subject to the Permitted Exceptions.

**6.2**    **Seller's Closing Obligations**. Not later than one (1) business day prior to the Scheduled Closing Date, Seller shall deposit the following items into escrow with the Escrow Agent, duly executed and notarized where necessary:

        **6.2.1**    **Assignment and Assumption of Lease**. An assignment and assumption of the Lease in substantially the form attached as **Exhibit "H"** (the "**Lease Assignment and Assumption Agreement**");

        **6.2.2**    **Lease Amendment**. The Lease Amendment executed by the College, as the landlord under the Lease, and by Seller, as the tenant under the Lease;

        **6.2.3**    **Consent of Landlord**. The Consent executed by the College, as the landlord under the Lease;

        **6.2.4**    **Bill of Sale**. A bill of sale in substantially the form attached as **Exhibit "I"** attached hereto (the "**Bill of Sale**");

15

**6.2.5   Omnibus Assignment and Assumption**. An assignment and assumption of the Assumed Contracts, the Permits and Licenses, the Accounts Receivable, the Bookings, the Numbers and Marketing Materials, the Warranties and Guaranties, the Name, and the Assumed Liabilities. (the "**Omnibus Assignment Agreement**"). Prior to the Closing, Seller and Buyer shall agree upon the form of the Omnibus Assignment Agreement;

**6.2.6   Other Consents**. Any other required consents of third parties to the assignment of the Assumed Contracts;

**6.2.7   Authority**. A current certificate of existence or good standing for Seller from the office of the Secretary of State (or other appropriate office) in its state of formation, a copy of resolutions of the Board of Directors of Seller, authorizing the execution, delivery and performance of this Agreement and the other documents referred to herein to be executed by Buyer, and the consummation of the transactions contemplated hereby, and such evidence as the Title Company may reasonably require as to the authority of the person or persons executing documents on behalf of Seller;

**6.2.8   FIRPTA**. An affidavit stating that Seller is not a "foreign person" as defined in the Federal Foreign Investment in Real Property Tax Act of 1980 and the 1984 Tax Reform Act, in form and content reasonably satisfactory to Seller and Title Company;

**6.2.9   Title Affidavit**. A title insurance affidavit, if required by the Title Company, duly executed by Seller, in form and content reasonably satisfactorily to Seller and Title Company and sufficient to allow the Title Company to remove the standard exceptions from the Title Commitment;

**6.2.10   Settlement Statement**. A settlement statement setting forth amounts paid by or on behalf of or credited to Buyer and Seller;

**6.2.11   Statements**. The following statements:
6.2.11.1   Schedule of all prorations to be made as of the Effective Time, together with reasonable back-up therefor.
6.2.11.2   Schedule of all Vouchers (and terms and conditions thereof) issued by Seller.
6.2.11.3   Schedule of all Bookings (and terms and conditions thereof).
6.2.11.4   Schedule of all Employees.
6.2.11.5   Inventory of FF&E and Consumables
6.2.11.6   Copies of all Assumed Contracts.

**6.2.12   Form 1099S**. A Form 1099S shall be executed by Buyer and/or Seller, as may be required, disclosing the financial terms of this transaction;

**6.2.13   Transition Letters**. A letter advising the other party to all Bookings and Assumed Contracts that the Lease has been conveyed by Seller to Buyer and containing such other terms as mutually agreed to by the parties;

**6.2.14   Interim Operating Agreement**. The Interim Operating Agreement, if applicable; and

**6.2.15   Other Items**. Such additional documents as shall be reasonably requested by the Title Company and/or required to consummate the transactions contemplated by this Agreement.

In addition, at Closing Seller shall deliver to Buyer the Leased Premises in broom clean condition and otherwise in compliance with the terms of this Agreement.

**6.3   Buyer's Closing Obligations**. On or before 12:00 Noon (local time in Blount County, Tennessee) one (1) business day prior to the Scheduled Closing Date, Buyer shall deliver into escrow with the Escrow Agent the following items, duly executed and notarized where necessary:

**6.3.1** __Purchase Price__. The full amount of the Purchase Price, less the Earnest Money and as adjusted by prorations and credits, in immediately available federal funds wire transferred to Escrow Agent's account and instructions to the Escrow Agent to immediately release the full amount to Seller upon Seller's satisfaction of Seller's closing obligations;

**6.3.2** __Authority__. A current certificate of existence or good standing for Buyer from the office of the Secretary of State (or other appropriate office) in its state of formation, a copy of appropriate consents of the managers and members of Buyer, authorizing the execution, delivery and performance of this Agreement and the other documents referred to herein to be executed by Buyer, and the consummation of the transactions contemplated hereby, and such evidence as the Title Company may reasonably require as to the authority of the person or persons executing documents on behalf of Buyer;

**6.3.3** __Assignment and Assumption of Lease__. The Assignment and Assumption Agreement;

**6.3.4** __Lease Amendment__. The Lease Amendment executed by Buyer, as assignee of the Lease, if applicable;

**6.3.5** __Omnibus Assignment and Assumption__. The Omnibus Assignment and Assumption Agreement;

**6.3.6** __Settlement Statement__. A settlement statement setting forth the amount paid by or on behalf of or credited to Buyer and Seller;

**6.3.7** __Form 1099S__. A Form 1099S shall be executed by Buyer and/or Seller, as may be required, disclosing the financial terms of this transaction;

**6.3.8** __Transition Letters__. A letter advising the other party to all Bookings and Assumed Contracts that the Lease has been conveyed by Seller to Buyer and containing such other terms as mutually agreed to by the parties;

**6.3.9** __Interim Operating Agreement__. The Interim Operating Agreement, if applicable;

**6.3.10** __Post-Closing Letter Agreement__. A post-closing letter agreement pursuant to which Buyer agrees that for so long as NRD Capital Management II, LLC ("**NRD**"), a Delaware limited liability company, and/or its affiliates, owns and/or controls Ruby Tuesday, Inc., Buyer shall reserve and provide rooms (subject to availability) in the Leased Premises, at a rate of $145 per night, to corporate travelers (i.e. employees of Seller, NRD and their respective affiliates who do not live in Maryville, Tennessee).

**6.3.11** __Other Items__. Such additional documents as shall be reasonably requested by the Title Company and/or required to consummate the transactions contemplated by this Agreement.

**6.4** __Negotiation in Good Faith__. With respect to any documents, instruments or other matters described in this Agreement that must be negotiated and approved by the parties after the Effective Date and prior to the expiration of the Inspection Period or Closing, the parties hereby agree that they shall negotiate in good faith and shall attempt to reach an acceptable agreement as to the form and substance of any such document, instrument or other matter diligently, and with the exercise of commercial reasonableness. In the event that, after good faith, diligent and commercially reasonable negotiation, the parties are unable to agree upon the form and substance of any such document, instrument or other on or before the expiration of the Inspection Period or Closing, as applicable, either party shall have the option to terminate this Agreement, Buyer shall receive a refund of the Earnest Money (unless Seller shall have declared Buyer in default), and thereafter neither party shall have any further liability hereunder to the other party, except for those obligations which by their terms expressly survive the termination of this Agreement. The provisions of this Section 6.4 shall be deemed to be a Buyer's condition to closing and a Seller's condition to closing.

**6.5.** **Closing Costs**. Closing costs shall be paid by the parties as indicated on the Information Sheet.

**6.6** **Conditions to Closing**. Seller's and Buyer's obligations to consummate the transactions contemplated by this Agreement are conditioned upon fulfillment of the following conditions, each of which may be waived by the party whose obligation to close is conditioned on the fulfillment of such condition:

**6.6.1** **Representations and Warranties**. All of the representations and warranties of the other party shall be true and correct in all material respects, subject to permitted changes in facts or circumstances pursuant to this Agreement, both as of the date of this Agreement and as of the Closing Date.

**6.6.2** **Required Consents**. Seller shall have obtained the Consent from the College.

**6.6.3** **Adverse Position**. There shall be no outstanding or threatened claims, causes of actions or suits investigations or proceedings which affect: (i) Buyer's ability to satisfy its obligations under this Agreement and/or any of the ongoing obligations of Buyer as set forth in this Agreement; and/or (ii) Buyer's ability to operate the Leased Premises in accordance with the Lease and the Assumed Contracts

**6.6.4** **Conditions Precedent**. All other conditions precedent to each party's obligation to consummate the transactions contemplated by this Agreement shall have been satisfied on or before the Scheduled Closing Date.

**6.6.5** **Failure of Condition Precedent**. If any of the foregoing conditions benefiting a party (the "**Benefitted Party**") have not been satisfied by the Scheduled Closing Date, then the Benefitted Party may, by written notice delivered to the other party on or before the Scheduled Closing Date, elect to: (i) close without any reduction in the Purchase Price; (ii) terminate this Agreement, so long as the Benefitted Party is not in default under this Agreement; or (iii) extend the Scheduled Closing Date by up to ten (10) days to allow the other party to satisfy the conditions. If the Benefitted Party elects to extend the Scheduled Closing Date and any of the foregoing conditions remain unsatisfied at the end of such extension period, the Benefitted Party may, by written notice delivered to the other party on or before the Scheduled Closing Date, elect to: (i) close without any reduction in the Purchase Price; or (ii) terminate this Agreement, so long as the Benefitted Party is not in default under this Agreement. If Buyer is in default or fails to timely deliver a termination or extension notice, Buyer will be deemed to have elected to close without any reduction in the Purchase Price. Upon an election of termination, so long as the non-terminating party is not in default under this Agreement, Escrow Agent shall disburse the Earnest Money to the Benefitted Party in accordance with the provisions herein and Seller and Buyer shall have no further rights and obligations hereunder except those which expressly survive termination of this Agreement. Notwithstanding anything to the contrary contained herein, if any of the foregoing conditions have not been satisfied due to a default by Buyer or Seller, then Buyer's and Seller's respective rights, remedies and obligation shall be determined in accordance with Article 8 herein.

**ARTICLE 7**
**REPRESENTATIONS AND COVENANTS**

**7.1** **Representations**. Seller represents to Buyer that the following statements are true and correct as of the Effective Date of this Agreement and covenants (subject to the limitation provided below) that the same shall be true and correct on the Closing Date:

**7.1.1** **Authority**. Seller is duly organized and validly exists as the type of entity and under the laws of the State indicated on the Information Sheet and (if required by applicable law) is qualified to do business in the State of Tennessee. Seller has the right and authority to enter into this Agreement and to transfer the Subject Assets pursuant to this Agreement, subject to obtaining the Consent and the consents described in Section 6.2.6 above. The person signing this Agreement on behalf of Seller is authorized to do so. This Agreement has been duly authorized, executed and delivered by Seller, is a valid and binding

obligation of Seller and is enforceable against Seller in accordance with its terms.

**7.1.2   Pending Actions**. There is no agreement to which Seller is a party or, to Seller's knowledge, without inquiry, that is binding on Seller which is in conflict with this Agreement. To Seller's knowledge, without inquiry, there is no action or proceeding pending or threatened against Seller or relating to the Subject Assets, which challenges or impairs Seller's ability to execute or perform its obligations under this Agreement.

**7.1.3   Condemnation**. To Seller's knowledge, without inquiry, no condemnation proceedings are pending against the Leased Premises, nor has any written notice from a governmental authority threatening condemnation been received.

**7.1.4   FIRPTA**. Seller is not a "foreign person" within the meaning of Section 1445(f)(3) of the Internal Revenue Code of 1986.

**7.1.5   Bankruptcy**. Seller has not filed for itself any petition under Federal bankruptcy law or any Federal or state insolvency laws.

**7.1.6   Environmental**. To Seller's knowledge, without inquiry, Seller has not caused the Leased Premises to be in violation of, and Seller has received no written notice from a governmental authority with jurisdiction over the Leased Premises that the Leased Premises is in violation of, any Environmental Law. For purposes hereof, (i) **"Environmental Law"** means any Federal, state, local or administrative agency law, rule, regulations, ordinance or order relating to Hazardous Materials (as defined herein), including, without limitation, the Comprehensive Environmental Response, Compensation and Liability act of 1980, as amended (42 U.S.C. Section 9601 et. seq.) and the Resource Conservation and Recovery Act of 1976, as amended (42 U.S.C. Section 6901 et seq.); and (ii) "Hazardous Material" means any substance, chemical, waste or other material listed as "hazardous" or "toxic" under any Environmental Law, including, without limitations, petroleum and petroleum by products.

**7.1.7   Tax Matters**. To Seller's knowledge, without inquiry, there are no tax liens (other than liens for current taxes not yet due) upon, or which could be asserted in the future upon, any of the Subject Assets. Each tax required to have been paid, or claimed by any governmental authority to be payable, by Seller with respect to the Leased Premises or the Business conducted at the Leased Premises has been duly paid in full on a timely basis. Any tax required to have been withheld or collected by Seller with respect to the Leased Premises or the Business conducted at the Leased Premises has been duly withheld and collected, and (to the extent required) each such tax has been paid to the appropriate governmental authority.

**7.1.8   Parties in Possession**. To Seller's knowledge, without inquiry, there are no parties other than Seller in possession of, or claiming any right to possess, any portion of the Leased Premises as lessees, tenants, trespassers or otherwise, other than rights of parties under the Bookings or Vouchers.

If, at any time after the Effective Date but prior to the Closing Date, Seller learns of any facts or circumstances that would render any of the representations contained in this Section 7.1 to be materially untrue, then Seller shall promptly notify Buyer in writing of all such facts and circumstances and Buyer shall have the right to elect to either: (a) terminate this Agreement, so long as Buyer is not in default under this Agreement; or (b) waive any claim against Seller arising out of or related to the information disclosed and proceed with the transaction, in which case the representation shall be deemed modified as necessary to conform with the additional information disclosed to Buyer. Upon such termination, Escrow Agent shall disburse the Earnest Money to Buyer in accordance with the provisions herein and Seller and Buyer shall have no further rights and obligations hereunder except those which expressly survive termination of this Agreement. If Buyer is in default or fails to timely give Seller the aforesaid notice, Buyer shall be deemed to have elected clause (b) above. Notwithstanding anything to the contrary contained herein, if any of the foregoing representations are materially untrue due to a default by Seller, then Buyer's rights, remedies and obligation shall be determined in accordance with Article 8 herein.

Any representations or warranties made as to "Seller's actual knowledge and belief" or to "Seller's knowledge" or words of like import shall be deemed to refer to any of the following representatives of Seller being actually aware of such fact or other matter, or given the particular facts and circumstances, a prudent individual in the identified individual's position should have been aware of such fact or other matter: Chief Strategy Officer. Seller represents and warrants that, due to the operational and strategic planning responsibilities of its Chief Strategy Officer, Seller's Chief Strategy Officer is knowledgeable about the Business conducted at the Leased Premises.

**7.2    Seller's Covenants**. Seller covenants with Buyer, from the Effective Date until the end of the Closing Date or earlier termination of this Agreement, as follows:

**7.2.1    Operation of the Leased Premises and Subject Assets**. Seller shall operate and maintain the Leased Premises and the Subject Assets in a manner generally consistent with the manner in which Seller has operated and maintained the Leased Premises and the Subject Assets prior to the Effective Date, ordinary wear and tear, casualty and condemnation excepted. In furtherance and not in limitation of the foregoing, Seller may, in the ordinary course of business, continue to accept Bookings and issue Vouchers.

**7.2.2    Provide Copies of Notices**. Seller shall furnish Buyer with a copy of all notices received by Seller from any governmental authority or other party of any alleged violation of any law, statute, ordinance, regulation or order of any governmental or public authority relating to the Leased Premises and the Subject Assets within five (5) business days following Seller's receipt thereof.

**7.2.3    Execution of New Contracts**. After the Inspection Period, Seller shall not, without Buyer's prior written consent in each instance, not to be unreasonably withheld, conditioned and/or delayed, enter into any contract or agreement that will be an obligation affecting the Leased Premises and the Subject Assets or binding on Buyer after the Closing and which is not terminable upon ninety (90) days' notice or less.

**7.3    Buyer's Representations**. Buyer represents to Seller that the following statements are true and correct on the Effective Date and covenants (subject to the limitation provided below) that the same shall be true and correct on the Closing Date:

**7.3.1    Buyer's Authority**. Buyer is duly organized and validly exists as the type of entity and under the laws of the State indicated on the Information Sheet and is qualified to do business in the State of Tennessee. Buyer has the right and authority to enter into this Agreement. The person signing this Agreement on behalf of Buyer is authorized to do so. The execution and delivery of this Agreement or any other document in connection with the transactions contemplated by this Agreement will not violate any provision of Buyer's organizational documents and/or any regulations and/or laws to or by which Buyer is bound. This Agreement has been duly authorized, executed and delivered by Buyer, is a valid and binding obligation of Buyer and is enforceable against Buyer in accordance with its terms. Buyer has the adequate resources to pay the Purchase Price and any other amounts due hereunder at Closing in the manner as required herein.

**7.3.2    Conflicts and Pending Actions**. There is no contract and/or other agreement to which Buyer is a party or that is binding on Buyer which is in conflict with and/or which would be violated by this Agreement. To Buyer's knowledge, there is no action or proceeding pending or threatened against Buyer which challenges or impairs Buyer's ability to execute and/or perform its obligations under this Agreement.

**7.3.3    Financial Status**. Buyer has adequate financial resources to purchase the Subject Assets. Buyer if solvent, has not made an assignment for the benefit of creditors and has not filed any bankruptcy, reorganization, arrangement, insolvency or liquidation proceedings, nor has any such proceeding been instituted by or against Buyer.

20

**7.3.4   Patriot Act; Anti-Corruption**. Buyer's funds are derived from legitimate business activities that do not violate any applicable law and are from lawful and permissible sources. Buyer is not a, and is not acting directly or indirectly for or on behalf of any, person, group, entity or nation with whom Seller is prohibited or restricted from engaging in this transaction due to any United States governmental embargos, sanctions, or terrorism or money laundering laws, including, without limitation, due to Buyer or any party that has ownership in or control over Buyer being (i) subject to United States government embargos or sanctions, (ii) in violation of terrorism or money laundering laws, or (iii) listed on a published United States government list or subject to any law, order, rule or regulation that is enforced or administered by the Office of Foreign Assets Control (e.g., Specially Designated Nationals and Blocked Persons List maintained by the Office of Foreign Assets Control or other lists of similar import) and Buyer is not engaged in this transaction, directly or indirectly, on behalf of, or instigating or facilitating this transaction, directly or indirectly, on behalf of any such person, group, entity or nation.

If, at any time after the Effective Date but prior to the Closing Date, Buyer learns of any facts or circumstances that would render any of the representations contained in this Section 7.3 to be untrue, then Buyer shall promptly notify Seller in writing of all such facts and circumstances and Seller shall have the right to elect to either (a) terminate this Agreement; or (b) waive any claim against Buyer arising out of or related to the information disclosed and proceed with the transaction, in which case the representation shall be deemed modified as necessary to conform with the additional information disclosed to Seller. Notwithstanding anything to the contrary contained herein, if any of the foregoing representations are untrue due to a default by Buyer, then Seller's rights, remedies and obligation shall be determined in accordance with Article 8 herein.

## ARTICLE 8
## DEFAULT AND REMEDIES

**8.1   Default by Buyer**. If the sale of the Subject Assets under this Agreement does not occur because of Buyer's default under this Agreement, Seller may terminate this Agreement and receive the Earnest Money as liquidated damages (and not as a penalty) for such failure to close, it being agreed between the parties that the actual damages to Seller in the event of a failure to close by Buyer are impractical to ascertain and the amount of the Earnest Money is a reasonable estimate.

**8.2   Default by Seller**. If the sale of the Subject Assets under this Agreement does not occur because of Seller's default under this Agreement, then Buyer may, at its option: (i) declare Seller in default under this Agreement and terminate this Agreement by written notice delivered to Seller, in which event the Earnest Money shall be promptly refunded to Buyer in accordance with the provisions herein and Seller and Buyer shall have no further rights and obligations hereunder except those which expressly survive termination of this Agreement; or (ii) in lieu of terminating this Agreement, enforce specific performance of this Agreement provided Buyer institutes an action for specific performance within sixty (60) days following the default by Seller and the expiration of any cure period. Buyer hereby waives any other rights and remedies in respect of any such default. Notwithstanding anything contained herein to the contrary, if there is a failure to satisfy any Buyer's condition to Closing, which is not a result of a failure of Seller to perform under the terms of this Agreement, such event or circumstance shall not be deemed a default by Seller, but shall entitle Buyer to the sole and exclusive remedy of terminating this Agreement, in which event the Earnest Money shall be promptly refunded to Buyer in accordance with the provisions herein and Seller and Buyer shall have no further rights and obligations hereunder except those which expressly survive termination of this Agreement. Notwithstanding anything to the contrary contained herein, Buyer shall not be entitled to a return of the Earnest Money if Buyer is in default.

**8.3   Notice of Default**. Prior to declaring a default and exercising the remedies described herein, the non-defaulting party shall issue notice of default to the defaulting party pursuant to Section 12.4 herein describing the event or condition of default in sufficient detail to enable a reasonable person to determine the action necessary to cure the default. The defaulting party shall have five (5) business days from receipt of the notice in which to cure the default. If the default has not been cured within the foregoing five (5)

business day period, the non-defaulting party may exercise the remedies described above. Notwithstanding anything contained herein to the contrary, the notice required and period to cure under this <u>Section 8.3</u> for any failure of Buyer or Seller (as applicable) to deliver the Earnest Money or to complete the Closing on the Scheduled Closing Date shall be two (2) business days.

**8.4**     **Election of Remedies**. Except as expressly provided herein, the remedies provided in this Article 8 shall not be deemed to be exclusive. Accordingly, the exercise by any party of any of its rights under Article 8 shall not be deemed to be an election of remedies and shall not be deemed to prejudice, or to constitute or operate as a waiver of, any other right or remedy that such party may be entitled to exercise (whether under this Agreement, under any other contract, or under any statute, rule or other Law, at common law, in equity or otherwise).

**8.5.**     **Survival**. The provisions of this <u>Article 8</u> shall survive the Closing or termination of this Agreement.

## ARTICLE 9
## RISK OF LOSS AND CONDEMNATION

**9.1**     **Condemnation**. If, prior to Closing, a governmental authority initiates action to take the Leased Premises or a material portion thereof by eminent domain proceedings, then Seller shall promptly notify Buyer. Buyer may elect, by written notice delivered to Seller within fifteen (15) days after receipt of such notice, either to (a) terminate this Agreement, in which event the Earnest Money shall be promptly refunded to Buyer in accordance with the provisions herein and Seller and Buyer shall have no further rights and obligations hereunder except those which expressly survive termination of this Agreement, or (b) continue to Closing without any reduction in the Purchase Price. Failure to timely notify Seller of its election to terminate this Agreement shall be deemed Buyer's election to continue to Closing. Should Buyer elect (or be deemed to have elected) clause (b), then Buyer shall, at Closing, be assigned the award of the condemning authority up to the amount of the Purchase Price. The Scheduled Closing Date may be extended as necessary to permit Buyer the full fifteen (15) days set forth above.

**9.2**     **Casualty**. Except as provided in Article 4 and <u>Section 1.2.3</u> herein, Seller assumes all risks and liability for damage to or injury occurring to the Leased Premises by fire, storm, accident or any other casualty or cause ("**Damage**") until Closing. If, between the Effective Date and the Closing Date, the Leased Premises suffers any Damage, then Seller shall, promptly after discovering that the Leased Premises has experienced Damage, notify Buyer of such Damage. Seller may elect, by written notice delivered to Buyer within thirty (30) days after becoming aware the Damage has occurred, to repair and/or restore the portions of the Leased Premises included in the sale to the condition existing immediately prior to the occurrence of the Damage ("**Repair the Property**"), in which event the parties shall continue to Closing as provided in this Agreement. If Seller elects to Repair the Property and such repair cannot reasonably be completed prior to the Scheduled Closing Date, Seller shall have the right to extend the Scheduled Closing Date until such repairs are completed. If Seller fails to notify Buyer of such election to Repair the Property, Seller shall be deemed to have elected not to Repair the Property. Within fifteen (15) days after the earlier to occur of: (i) receipt of such notice from Seller that Seller will not Repair the Property; and (ii) the expiration of the aforesaid thirty (30) day period, Buyer shall notify Seller of its election to either to: (a) terminate this Agreement, in which event the Earnest Money shall be promptly refunded to Buyer in accordance with the provisions herein and Seller and Buyer shall have no further rights and obligations hereunder except those which expressly survive termination of this Agreement, or (b) continue to Closing without any reduction in the Purchase Price and/or other consideration from Seller. Failure to timely notify Seller of its election to terminate this Agreement shall be deemed Buyer's election to continue to Closing The Scheduled Closing Date may be extended as necessary to permit Buyer the full fifteen (15) days.

## ARTICLE 10
## ESCROW AGENT

**10.1**     **Investment of Earnest Money**. Escrow Agent shall invest the Deposit in an interest bearing

account at a commercial bank whose deposits are insured by the Federal Deposit Insurance Corporation. Escrow Agent shall notify Seller, no later than one (1) business day after Escrow Agent's receipt thereof, that Escrow Agent has received the Earnest Money in immediately available funds and is holding the same in accordance with the terms of this Agreement. However, Escrow Agent shall invest the Earnest Money only in such accounts as will allow Escrow Agent to disburse the Earnest Money upon no more than one (1) business days' notice.

**10.2    Payment at Closing**. If the Closing takes place under this Agreement, Escrow Agent shall deliver the Earnest Money to, or upon the instructions of, Seller on the Closing Date.

**10.3    Payment on Demand**. In the event that Buyer or Seller claims the Earnest Money pursuant to the provisions of this Agreement, other than with respect to the Closing, such party claiming the Earnest Money shall deliver written notice of such claim to the Escrow Agent and to the other such party (i.e., Buyer or Seller, whichever did not claim the Earnest Money pursuant to such notice) and, unless such other party, within ten (10) days thereafter, notifies Escrow Agent of any objection to such requested disbursement of the Earnest Money, Escrow Agent shall disburse the Earnest Money to the party demanding the same, subject to the provisions of Section 2.4, and the Escrow Agent shall thereupon be released and discharged from any further duty or obligation hereunder.

**10.4    Exculpation of Escrow Agent**. It is agreed that the duties of Escrow Agent are herein specifically provided and are purely ministerial in nature and that Escrow Agent shall incur no liability whatsoever except for its willful misconduct or negligence, so long as Escrow Agent is acting in good faith. Seller and Buyer do each hereby release Escrow Agent from any liability for any error of judgment or for any act done or omitted to be done by Escrow Agent in the good faith performance of its duties hereunder and do each hereby indemnity Escrow Agent against and agree to hold, save and defend Escrow Agent harmless from, any costs, liabilities and expenses incurred by Escrow Agent in serving as Escrow Agent hereunder and in faithfully discharging its duties and obligations hereunder except for its willful misconduct or negligence.

**10.5    Interest**. All interest and other income earned on the Deposit held by Escrow Agent hereunder shall be reported for income tax purposes as earnings of Buyer.

**10.6    Execution by Escrow Agent**. Escrow Agent has executed this Agreement solely for the purpose of acknowledging and agreeing to the provisions of this Article 10. Escrow Agent's consent to any modification or amendment of this Agreement other than this Article 10 shall not be required.

### ARTICLE 11
### MUTUAL INDEMNIFICATION

**11.1    Indemnification by Seller**. Seller agrees to defend, indemnify and hold harmless Buyer and each of its affiliates, officers, directors, employees, agents, successors and assigns (collectively, "**Buyer Indemnified Parties**") and shall reimburse Buyer Indemnified Parties for, from and against each claim, loss, liability, cost and expense (including without limitation, interest, penalties, costs of preparation and investigation, and the reasonable fees, disbursements and expenses of attorneys, accountants and other professional advisors) (individually, a "**Loss**" and collectively, "**Losses**") directly or indirectly relating to, resulting from or arising out of the conduct of the business operations of the Seller as to the Business, the Leased Premises or the operation of the Subject Assets prior to the Closing Date or the actions or omissions of the directors, managers, officers, shareholders, employees or agents of the Seller as to the Business, the Leased Premises or the operation of the Subject Assets prior to the Closing Date, other than Losses arising from the Assumed Liabilities.

**11.2    Indemnification by Buyer**. Buyer, jointly and severally, agree to defend, indemnify and hold harmless Seller, and each of its affiliates, officers, directors, employees, agents, successors and assigns ("**Seller Indemnified Parties**"; together with the Buyer Indemnified Parties collectively, "**Indemnified Parties**" and individually, an "**Indemnified Party**") and shall reimburse the Seller Indemnified Parties for,

23

from and against each all Losses, directly or indirectly relating to, resulting from or arising out of: (i) the Assumed Liabilities; (ii) the conduct of the business operations of Buyer as to the Leased Premises or the operation of the Subject Assets on or after the Closing Date or the actions or omissions of the directors, managers, officers, shareholders, employees or agents of Buyer as to the Leased Premises or the operation of the Subject Assets after the Closing Date; and (iii) any Buyer Retained Employee Obligations.

**11.3**   **Mitigation of Damages**. Each Indemnified Party shall take commercially reasonable steps as necessary or appropriate to mitigate any Losses they might otherwise suffer.

**11.4**   **Terms**. The party against whom such claims are asserted under this Article 11 is referred to as an **"Indemnifying Party"**.

**11.5**   **Limitations**. Notwithstanding anything to the contrary contained in this Agreement, the aggregate amount of all Losses for which either party shall be liable to the other party with respect to this Agreement shall in no event exceed the Purchase Price, except that such limitation shall not apply to an Indemnifying Party for any Losses of an Indemnified Party related to any Third Party Claim (as defined below). In no event shall any Indemnifying Party be liable to any Indemnified Party for any punitive, incidental, consequential, special or indirect damages, including loss of future revenue or income, loss of business reputation or opportunity relating to the breach or alleged breach of this Agreement, or diminution of value or any damages based on any type of multiple, except to the extent such Losses are third party Losses subject to a Third Party Claim (as defined below) for which the Indemnifying Party owes indemnification under Section 11.1 or 11.2 above.

**11.6**   **Indemnification Procedures.**

   **11.6.1 Third Party Claims**. If any Indemnified Party receives notice of the assertion or commencement of any action, suit, claim or other legal proceeding made or brought by any person who is not a party to this Agreement or an affiliate of a party to this Agreement or a representative of the foregoing (a **"Third Party Claim"**) against such Indemnified Party with respect to which the Indemnifying Party is obligated to provide indemnification under this Agreement, the Indemnified Party shall give the Indemnifying Party prompt written notice thereof. The failure to give such prompt written notice shall not, however, relieve the Indemnifying Party of its indemnification obligations, except and only to the extent that the Indemnifying Party forfeits rights or defenses by reason of such failure. Such notice by the Indemnified Party shall describe the Third Party Claim in reasonable detail, shall include copies of all material written evidence thereof and shall indicate the estimated amount, if reasonably practicable, of the Loss that has been or may be sustained by the Indemnified Party. The Indemnifying Party shall have the right to participate in, or by giving written notice to the Indemnified Party, to assume the defense of any Third Party Claim at the Indemnifying Party's expense and by the Indemnifying Party's own counsel who is reasonably acceptable to the Indemnified Party, and the Indemnified Party shall cooperate in good faith in such defense. In the event that the Indemnifying Party assumes the defense of any Third Party Claim, subject to Section 11.6.2 below, it shall have the right to take such action as it deems necessary to avoid, dispute, defend, appeal or make counterclaims pertaining to any such Third Party Claim on behalf of the Indemnified Party, and the Indemnifying Party shall keep the Indemnified Party informed of all material developments and events relating to such Third Party Claim. In the event that the Indemnifying Party assumes the defense of any Third Party Claim, the Indemnified Party shall have the right, at its own cost and expense, to participate in the defense of any Third Party Claim with counsel selected by it subject to the Indemnifying Party's right to control the defense thereof. If the Indemnifying Party elects not to compromise or defend such Third Party Claim or fails to promptly notify the Indemnified Party in writing of its election to defend as provided in this Agreement, the Indemnified Party may, subject to Section 11.6.2 below pay, compromise, and defend such Third Party Claim using the Indemnified Party's own counsel and seek indemnification for any and all Losses based upon, arising from or relating to such Third Party Claim. Seller and Buyer shall cooperate with each other in all reasonable respects in connection with the defense of any Third Party Claim, including making available (subject to the provisions of Section 11.6.2 below records relating to such Third Party Claim) and furnishing, without expense (other than

reimbursement of actual out-of-pocket expenses) to the defending party, management employees of the non-defending party as may be reasonably necessary for the preparation of the defense of such Third Party Claim.

**11.6.2  Settlement of Third Party Claims.** Notwithstanding any other provision of this Agreement, the Indemnifying Party shall not enter into settlement of any Third Party Claim without the prior written consent of the Indemnified Party (which consent shall not be unreasonably withheld or delayed), except as provided in this Section 11.6.2. If a firm offer is made to settle a Third Party Claim without leading to liability or the creation of a financial or other obligation on the part of the Indemnified Party and provides, in customary form, for the unconditional release of each Indemnified Party from all liabilities and obligations in connection with such Third Party Claim, no admission of wrongdoing by the Indemnified Party, and no loss of material rights by the Indemnified Party, and the Indemnifying Party desires to accept and agree to such offer, the Indemnifying Party shall give written notice to that effect to the Indemnified Party. If the Indemnified Party fails to consent to such firm offer within ten (10) days after its receipt of such notice, the Indemnified Party may continue to contest or defend such Third Party Claim and in such event, the maximum liability of the Indemnifying Party as to such Third Party Claim shall not exceed the amount of such settlement offer. If the Indemnified Party fails to consent to such firm offer and also fails to assume defense of such Third Party Claim, the Indemnifying Party may settle the Third Party Claim upon the terms set forth in such firm offer to settle such Third Party Claim. If the Indemnified Party has assumed the defense of such claim, it shall not agree to any settlement without the written consent of the Indemnifying Party (which consent shall not be unreasonably withheld or delayed).

**11.6.3  Direct Claims.** Any claim by an Indemnified Party on account of a Loss which does not result from a Third Party Claim (a "**Direct Claim**") shall be asserted by the Indemnified Party giving the Indemnifying Party prompt written notice thereof. The failure to give such prompt written notice shall not, however, relieve the Indemnifying Party of its indemnification obligations, except and only to the extent that the Indemnifying Party forfeits rights or defenses by reason of such failure. Such notice by the Indemnified Party shall describe the Direct Claim in reasonable detail, shall include copies of all material written evidence thereof and shall indicate the estimated amount, if reasonably practicable, of the Loss that has been or may be sustained by the Indemnified Party. The Indemnifying Party shall have thirty (30) days after its receipt of such notice to respond in writing to such Direct Claim. During such thirty (30) day period, the Indemnified Party shall allow the Indemnifying Party and its professional advisors, subject to appropriate confidentiality obligations, to investigate the matter or circumstance alleged to give rise to the Direct Claim, and whether and to what extent any amount is payable in respect of the Direct Claim and the Indemnified Party shall assist the Indemnifying Party's investigation by giving such information and assistance (including access to the Indemnified Party's premises and personnel and the right to examine and copy any applicable, non-privileged accounts, documents or records) as the Indemnifying Party or any of its professional advisors may reasonably request. If the Indemnifying Party does not so respond within such thirty (30) day period, the Indemnifying Party shall be deemed to have rejected such claim, in which case the Indemnified Party shall be free to pursue such remedies as may be available to the Indemnified Party on the terms and subject to the provisions of this Agreement.

## ARTICLE 12
## MISCELLANEOUS

**12.1  Severability.** This Agreement is intended to be performed in accordance with and only to the extent permitted by all applicable laws, ordinances, rules and regulations. If any term, clause or provision of this Agreement, or the application thereof to any person or circumstance, shall for any reason and to any extent be determined or held by a court of competent jurisdiction to be illegal, invalid or unenforceable, the remainder of this Agreement and the application of such provision to other persons or circumstances shall not be affected thereby and shall be enforced to the maximum extent possible. In lieu of any such term, clause or provision of this Agreement which is so determined or held by a court to be illegal, invalid or unenforceable, there shall, to the extent practicable and reasonable, given the circumstances, be inserted as a part of this Agreement a term, clause or provision as nearly identical to that stricken from this Agreement

by virtue of such determination or holding which is not illegal, invalid or unenforceable; it being expressly; provided, however, that, notwithstanding the foregoing provisions of this sentence, if the effect of a determination or holding by a court that a particular term, clause or provision of this Agreement is illegal, invalid or unenforceable is such that either of Seller or Buyer shall no longer have the substantial benefit of its respective bargain under this Agreement or any material portion of this Agreement, then, and in such event, whichever of Seller or Buyer is thus adversely affected, may, at its option and in its sole and absolute discretion, cancel and terminate this Agreement upon its delivery of written notice thereof to the other of them and to Escrow Agent. The provisions of this Section 12.1 shall apply to any amendment of this Agreement and shall survive the Closing or termination of this Agreement.

**12.2** **Broker**. The party or parties, if any, as indicated on the Information Sheet, shall be responsible for all commissions and fees due and owing to the Broker. Each party represents to the other that the representing party has incurred no liability for any finder's fee or a brokerage commission arising from or relating to the transaction contemplated by this Agreement other than as indicated on the Information Sheet. Each party agrees to indemnify, defend and hold harmless the other party for all costs and expenses incurred, including, without limitation, reasonable Attorneys' Fees, as a result of: (i) any claim of any broker or finder, other than the Broker if any indicated on the Information Sheet, arising out of or resulting from any agreement, arrangement and/or understanding alleged to have been made by such party (or on its behalf) with any broker or finder in connection with this Agreement and/or the transaction contemplated hereby; and/or (ii) the failure of the party to pay the Broker all commissions and fees due and owing to the Broker as indicated on the Information Sheet. The provisions of this Section 12.2 shall survive the Closing or termination of this Agreement.

**12.3** **Exchange of Properties**. If requested by a party, Seller and Buyer shall cooperate in structuring this transaction to accommodate a tax deferred exchange under Internal Revenue Section 1031. This cooperation shall include execution of all documents reasonably required to accomplish the exchange, including participation with an exchange intermediary. No exchange cooperation is required if it will delay the close of this transaction or will impose additional expense on a cooperating party.

**12.4** **Notices**. Any notice or document required or permitted to be delivered under this Agreement (other than closing documents) shall be given in writing and delivered by hand or overnight courier (such as United Parcel Service or Federal Express), sent by United States registered or certified mail, return receipt requested, postage prepaid, or transmitted by email and addressed to each party at its address as set forth on the Information Sheet or at such other address as the parties have theretofore specified by written notice delivered in accordance herewith. Notice is considered given and received: (i) on the date of hand or courier delivery or refusal of acceptance; (ii) the next business day after deposit with overnight courier for next business day delivery; (iii) two (2) business days after deposit in the United States mail; or (iv) the same day (or next-following business day if sent after 5:00 P.M. on a business day or at any time on a day that is not a business day) when sent by confirmed e-mail, provided that any notice by e-mail must also be sent, no later than the next-following business day, by one (1) of the other approved methods of delivery. Attorneys may provide notices and other communications on behalf of their clients.

**12.5** **General Provisions**. Whenever used, the singular number shall include the plural, the plural the singular and the use of any gender shall be applicable to all genders. Seller and Buyer have participated freely in the negotiation and preparation hereof and have had the opportunity to have an attorney involved in such review and negotiations. Neither this Agreement nor any amendment hereto shall be more strictly construed against Seller or Buyer. Nothing herein contained shall be deemed to: (1) create a relationship between Seller and Buyer as other than buyer and seller; or (2) create a fiduciary duty on the part of either party to the other.

**12.6** **Governing Law**. This Agreement shall be governed by and construed in accordance with, the law of the State of Tennessee without regard to its conflicts of laws provisions.

**12.7** **Counterparts**. This Agreement may be executed in counterparts, each of which shall be deemed

an original and all of which shall constitute one and the same instrument. Moreover, delivery of said counterparts of this Agreement may be effectuated electronically for the purposes of this Agreement.

**12.8    Time**. Time is of the essence; however, whenever in this Agreement a period of time is stated as a number of days, unless otherwise specified, it shall be construed to mean calendar days; provided, however, that when any period of time so stated would end upon a Saturday, Sunday or legal holiday, such period shall be deemed to end upon the next day following which is not a Saturday, Sunday or legal holiday.

**12.9    Caption**. The captions in this Agreement are inserted for convenience of reference only and in no way define, describe or limit the scope or intent of this Agreement or any of the provisions hereof.

**12.10    Exhibits and Schedules**. The following exhibits attached hereto shall be deemed to be an integral part of this Agreement:

| | | |
|---|---|---|
| **Exhibit "A"** | - | The Lease |
| **Exhibit "B"** | | Reserved |
| **Exhibit "C"** | | Reserved |
| **Exhibit "D"** | | Excluded Assets |
| **Exhibit "E"** | - | Assumed Liabilities |
| **Exhibit "F"** | - | Reserved |
| **Exhibit "G"** | - | Reserved |
| **Exhibit "H"** | - | Form of Lease Assignment and Assumption |
| **Exhibit "I"** | - | Form of Bill of Sale |
| **Exhibit "J"** | - | Reserved |

**12.11    Entire Agreement, Review and Waiver**. This Agreement, including Exhibits, contains the entire agreement between the parties pertaining to the subject matter hereof and fully supersedes all prior written and oral agreements and understandings between the parties pertaining to such subject matter and may not be amended except in writing, signed by both Seller and Buyer. Seller and Buyer each represent and warrant to the other that it has carefully read the terms and conditions of this Agreement and has discussed with its legal counsel its terms and conditions, its reasonableness and its legal consequences. Based upon the foregoing, Seller and Buyer each agree that (A) this Agreement is reasonable in all respects; and, (B) this Agreement does not impose any undue hardship on any party and that this Agreement is no broader than reasonably necessary to afford each of the parties with desired protection. The failure or delay of any party at any time or times to require performance of any provision or to exercise its rights with respect to any provision hereof, shall in no manner operate as a waiver of or affect such party's right at a later time to enforce the same

**12.12    Attorney's Fees**. Should either Seller or Buyer employ an attorney (whether or not an action is filed), or file an action, to enforce this Agreement, the prevailing party is entitled to recover, in addition to the remedies and/or damages, Attorneys' Fees incurred in connection therewith. The term "**prevailing party**" shall mean that party whose positions substantially prevail. The provisions of this Section 12.12 shall survive the Closing or termination of this Agreement.

**12.13    Survival**. All provisions of this Agreement which are not fully performed as of Closing shall survive Closing; provided, however, that, except as expressly provided in Section 7.1, the representations of Seller contained in Section 7.1 and the representations of Buyer contained in Section 7.3 shall survive Closing for a period of six (6) months.

**12.14    No Recordation**. No part of this Agreement, any Memorandum of Agreement or any notice relating to the Agreement may be recorded in any public records.

**12.15    Merger**. Except as expressly provided in this Agreement, all rights of Buyer shall merge into the Deed and other instruments delivered by Seller at Closing and shall not survive Closing.

**12.16   Jury Trial Waiver**. THE PARTIES KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE THEIR RIGHT TO A JURY TRIAL IN CONNECTION WITH THIS AGREEMENT, THE TRANSACTION CONTEMPLATED UNDER THE AGREEMENT OR ANY COURSE OF DEALINGS OR ACTIONS BY THE PARTIES RELATING TO THIS AGREEMENT. THIS WAIVER IS A MATERIAL INDUCEMENT FOR SELLER TO EXECUTE THIS AGREEMENT AND SURVIVES CLOSING UNDER OR TERMINATION OF THIS AGREEMENT. The provisions of this Section 12.16 shall survive the Closing or termination of this Agreement.

**12.17   Limitation on Liability**. No member, director, officer, shareholder, employee, advisor, agent, attorney or manager in or of Seller (each, a "**Seller Party**") has any personal liability, directly or indirectly, under this Agreement. Buyer and Buyer's successors and assigns and all other interested parties are entitled only to, and shall only, look to Seller's interest in the Subject Assets (and the proceeds thereof) for the payment of any claim or for any performance and Buyer waives all other rights relating thereto. These limitations are in addition to and not in limitation of any other Seller limitation of liability. The provisions of this Section 12.17 shall survive the Closing or termination of this Agreement.

**12.18   Non-Binding/Offer and Acceptance**. Unless and until this Agreement is fully executed and delivered by both parties, any discussions, negotiations, correspondence or communications between Seller and Buyer and their respective attorneys, agents and representatives in connection or with respect to the subject matter of this Agreement, including, without limitation, the delivery and exchange of unsigned draft copies of this Agreement, are intended only as non-binding discussions, negotiations and communications and either party shall have the absolute right to withdraw from such discussions, negotiations and communications at any time without incurring any liability or obligation whatsoever to the other party (except to the extent otherwise expressly specified in the letter of intent executed by the parties).

**12.19   Successors and Assigns**. All the terms and provisions of this Agreement shall be binding upon, shall inure to the benefit of and shall be enforceable by the respective heirs, successors, permitted assigns and legal or personal representatives of the parties hereto.

**12.20   Notice of Lender Approval. BUYER ACKNOWLEDGES THAT SELLER MUST OBTAIN APPROVAL FROM ITS LENDER FOR THE TRANSACTION CONTEMPLATED HEREIN (THE "LENDER APPROVAL"). PROMPTLY FOLLOWING RECEIPT OF THE LENDER'S APPROVAL, SELLER SHALL PROVIDE BUYER NOTICE THEREOF. IF SELLER FAILS TO DELIVER SUCH NOTICE WITHIN THIRTY (30) DAYS AFTER THE EFFECTIVE DATE, EITHER PARTY SHALL HAVE THE RIGHT TO TERMINATE THIS AGREEMENT BY DELIVERING WRITTEN NOTICE THEREOF TO THE OTHER. IN THE EVENT OF SUCH TERMINATION, THE ESCROW AGENT SHALL DISBURSE THE EARNEST MONEY (SUBJECT TO SECTION 2.4 HEREIN) TO BUYER AND THE PARTIES SHALL HAVE NO FURTHER RIGHTS, DUTIES OR OBLIGATIONS UNDER THIS AGREEMENT, OTHER THAN THOSE WHICH ARE EXPRESSLY PROVIDED IN THIS AGREEMENT TO SURVIVE THE TERMINATION OF THIS AGREEMENT.**

**[SIGNATURES ON FOLLOWING PAGE]**

**IN WITNESS WHEREOF**, the parties have caused this Agreement of Purchase and Sale to be executed as of the Effective Date.

**WITNESSES:**

Name: _____

Name: _Michael Medley_

**SELLER:**

**RUBY TUESDAY, INC.,**
a Georgia corporation

By: _____
Name: _STEPHANIE DICE MEDLEY_
Title: _Chief STRATEGY OFFICER_
Date: _MARCH 14_, 2020

**BUYER:**

Name: _____

Name: _Amanda Rankin_

**BNA ASSOCIATES LLC,**
a Tennessee limited liability company

By: _____
Name: _PHILIP WALKER_
Title: _MANAGING MEMBER_
Date: _14TH MARCH_, 2020

Escrow Agent has executed this Agreement for the limited purposes set forth in this Agreement.

**ESCROW AGENT:**

**OLD REPUBLIC NATIONAL TITLE INSURANCE COMPANY**

By: _____
Name: _____
Title: _____
Date: _____

29

**EXHIBIT "A"**

**THE LEASE**

**EXHIBIT "B"**

**RESERVED**

**<u>EXHIBIT "C"</u>**

**RESERVED**

**EXHIBIT "D"**

**EXCLUDED ASSETS**

1. Personal property containing trade names, proprietary marks, trademarks or brand marks and derivatives thereof of Seller and/or any affiliate of Seller.

2. Ruby Tuesday branded equipment.

3. Leased equipment and other leased property.

4. Equipment and property owned by the College.

5. All cash, cash equivalents, and bank accounts held by Seller as of the Closing, other than Cash-On-Hand.

6. Books and records of the Business (including, without limitation, all accounting and tax books and records, and all restaurant, concept, franchise and Business-system books and records), except for copies of certain records provided to Buyer in connection with this Agreement that are related to the Subject Assets.

7. Insurance policies and insurance plans of Seller related to the Business, and all rights to applicable claims or proceeds thereof.

8. Personnel records for employees of the Business, except as otherwise provided in this Agreement, and any other records that Seller is required by law to retain in its possession.

9. Contracts of Seller related to the Business that are not listed as Assumed Contracts.

10. Employee benefit plans and trusts or other assets attributable thereto with respect to Business personnel.

11. Tax assets including any tax refunds and prepayments.

12. Rights to any actions, suits, causes of action or claims pending or available to be pursued by Seller with respect to the Business.

13. Rights that accrue to Seller under this Agreement (or any agreement or instrument entered into at Closing in connection herewith).

14. Any deposits not included with the Assumed Contracts.

15. Permits and licenses of Seller other than the Licenses and Permits.

16. Intangible assets of Seller except as expressly provided in this Agreement.

17. Except for the name "RT Lodge", all intellectual property and other similar proprietary rights of Seller and/or its affiliates with respect to the Business or otherwise, including, without limitation, all names, logos, designs, tradenames, trademarks and servicemarks including "RT" and "Ruby Tuesday" (the **"Protected Materials"**).

18. Software, hardware, technology, including, without limitation, all point of sale software, hardware, terminals and equipment that are licensed to or financed by Ruby Tuesday

19. Piano located in the Lodge on the Effective Time.

For clarity, Seller is selling and Buyer is purchasing only the Subject Assets specifically enumerated in this Agreement, no assets of Seller other than as physically located at the Leased Premises, and no assets of any of the direct or indirect owners, members, affiliates, parents, or subsidiaries of Seller, or any Seller divisions not operating the Business at the Leased Premises (collectively, "**Excluded Entities**"), constitute Subject Assets, and all such assets are Excluded Assets, including, without limitation, any business, corporate, tax or personnel, minute books, transfer records, or other books or records related to the corporate organization and operation of Seller or any of the Excluded Entities, and including any assets, contracts or agreements of any kind or nature (other than the Assumed Contracts), whether or not they include, in whole or in part, information that relates to Seller or the Business, and whether or not such have been made available by Seller or an Excluded Entity in connection with the operation of the Business.

**EXHIBIT "E"**

**ASSUMED LIABILITIES**

1.  All obligations under the Lease which are required to be performed or fulfilled on or after the Closing Date, except as expressly otherwise provided in this Agreement, but excluding any obligations or liabilities arising out of any breaches or failure to perform by Seller occurring prior to the Closing.

2.  Buyer Retained Employee Obligations; and

3.  Obligations and liabilities arising out of or relating to Buyer's ownership and operation of the Leased Premises and the Subject Assets, on or after the Closing Date, but excluding any Excluded Liabilities as defined below.

With the exception of the Assumed Liabilities, Buyer shall not assume and shall have no liability for any liabilities or obligations of Seller or any Excluded Entity, and the Assumed Liabilities specifically exclude the following ("**Excluded Liabilities**"):

    (a)    any obligation to Seller's employees for severance, termination or similar benefits, including, without limitation, any such liability to Seller employees who are not hired by Buyer;

    (b)    any obligation arising under or related to any pension, retirement, vacation, insurance, option or other form of benefit plan of Seller or relating to Seller employees, including Seller employee expenses and expense reimbursements; provided, however, that Buyer will be responsible for Buyer Retained Employee Obligations; and

    (c)    any obligation of Seller under any contract or agreement pursuant to which goods and/or services are provided to or for the Business conducted at the Leased Premises or otherwise related to the Subject Assets, except for the Assumed Contracts.

**EXHIBIT "F"**

**RESERVED**

**EXHIBIT "G"**

**RESERVED**

**EXHIBIT "H"**

**FORM OF**

**LEASE ASSIGNMENT AND ASSUMPTION AGREEMENT**

**[SEE ATTACHED]**

<u>ASSIGNMENT AND ASSUMPTION OF LEASE</u>

THIS ASSIGNMENT AND ASSUMPTION OF LEASE (this "**Assignment**"), is made as of _____ ___, 2020 (the "**Effective Date**") by and between **RUBY TUESDAY, INC.**, a Georgia corporation ("**Assignor**"), and _____, a _____ ("**Assignee**").

WITNESSETH:

WHEREAS, pursuant to that certain Lease, dated September 11, 1997, as amended by that certain First Amendment to Lease, having an effective date of July 1, 2001, and as further amended by that certain Memorandum of Understanding, dated May 14, 2018 (collectively, and as the same may be further amended, the "**Lease**"), between Assignor, as tenant, and MARYVILLE COLLEGE ("**Landlord**"), a Tennessee corporation, as landlord, a copy of which is attached hereto as <u>Exhibit A</u>, Landlord leased to Assignor certain premises commonly known as RT Lodge, located in District No. 9, Blount County, Tennessee, and having a street address of 1406 Wilkinson Pike, Maryville, TN 37803 as more particularly described in the Lease (the "**Premises**"), together with fixtures and improvements therein, all as more particularly described in the Lease; and

WHEREAS, Assignor and Assignee are parties to that certain Asset Purchase and Sale Agreement, dated ___, 2020 (the "**Agreement**"); and

WHEREAS, pursuant to the Agreement, Assignor has agreed to assign to Assignee, and Assignee has agreed to assume, all of Assignor's rights, entitlement, and obligations in, to and under the Lease, all as more particularly hereinafter set forth; and

WHEREAS, Assignor, Assignee, and Landlord desire to enter into this Agreement for the purpose of evidencing: (i) said assignment and assumption, and (ii) certain agreements and understandings between them with respect thereto, all as more particularly hereinafter set forth.

NOW, THEREFORE, in consideration of the premises, the mutual covenants herein contained and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereby covenant and agree as follows:

1.      **Recitals; Capitalized Terms; Amendment Effective Date**. The foregoing recitals are true and correct and such recitals are incorporated herein by reference. Any capitalized term used and not otherwise defined in this Assignment shall have the same meaning as set forth in the Agreement. The terms and provisions of this Assignment shall be deemed effective from and after the Effective Date.

2.      **Assignment**. Assignor hereby assigns, transfers and conveys to Assignee, all right, title and interest of Assignor under the Lease from and after the Effective Date.

3.      **Assumption**. Assignee, by acceptance of this Assignment and the Lease, hereby assumes and agrees to keep, observe and perform all of the covenants, conditions, terms and provisions under the Lease to be kept, observed and performed by the Lessee thereunder from and after the Effective Date.  This acceptance and assumption are subject to all of the liens, easements, restrictions and other matters set forth in the Lease and affecting the Premises.

4.      **Indemnification by Assignor**. Assignor agrees to defend, indemnify and hold harmless Assignee and each of its affiliates, officers, directors, employees, agents, successors and assigns (collectively, "**Assignee Indemnified Parties**") and shall reimburse Assignee Indemnified Parties for, from

H-2

and against each claim, loss, liability, cost and expense (including without limitation, interest, penalties, costs of preparation and investigation, and the reasonable fees, disbursements and expenses of attorneys, accountants and other professional advisors) (individually, a "**Loss**" and collectively, "**Losses**") directly or indirectly relating to, resulting from or arising out of the Lease to the extent the same accrue prior to the Effective Date or otherwise result from Assignor's failure to pay or perform any obligations of the tenant under the Lease that are payable or performable prior to the Effective Date or from any other act or omission occurring prior to the Effective Date.

     5.     <u>**Indemnification by Assignee**</u>. Assignee agrees to defend, indemnify and hold harmless Assignor, and each of its affiliates, officers, directors, employees, agents, successors and assigns ("**Assignor Indemnified Parties**") and shall reimburse the Assignor Indemnified Parties for, from and against each all Losses, directly or indirectly relating to, resulting from or arising out of the Lease to the extent the same accrue from and after the Effective Date or otherwise result from Assignee's failure to pay or perform any obligations of the tenant under the Lease that are payable or performable from and after the Effective Date or from any other act or omission occurring from and after the Effective Date.

     6.     <u>**Mitigation of Damages**</u>. Assignor and Assignee shall take commercially reasonable steps as necessary or appropriate to mitigate any Losses they might otherwise suffer.

     7.     <u>**Miscellaneous**</u>. This Assignment and the obligations of the parties hereunder shall survive the Closing of the transaction referred to in the Assignment Agreement and shall not be merged therein, shall be binding upon and inure to the benefit of the parties hereto, their respective legal representatives, successors and assigns and may not be modified or amended in any manner other than by a written agreement signed by the party to be charged therewith. Each capitalized term used in this Assignment and not otherwise defined herein shall have the meaning ascribed to such term in the Assignment Agreement.

     8.     <u>**Severability**</u>. If any term or provision of this Assignment or the application thereof to any persons or circumstances shall, to any extent, be invalid or unenforceable, the remainder of this Assignment or the application of such term or provision to persons or circumstances other than those as to which it is held invalid or unenforceable shall not be affected thereby, and each term and provision of this Assignment shall be valid and enforced to the fullest extent permitted by law.

     9.     <u>**Counterparts**</u>. This Assignment may be signed in counterparts and all of such counterparts when properly executed by the appropriate parties thereto together shall serve as a fully executed document, binding upon the parties. Any signature delivered by a party by electronic transmission shall be deemed to be an original signature to this Assignment.

[SIGNATURES ON FOLLOWING PAGE]

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.

RUBY TUESDAY, INC.,
a Georgia corporation

_____,
a _____

By: _____
Name: _____
Title: _____
Date: _____

By: _____
Name: _____
Title: _____
Date: _____

**EXHIBIT "I"**

**FORM OF**
**BILL OF SALE**

**KNOW ALL MEN BY THESE PRESENTS**, that the undersigned, **RUBY TUESDAY, INC.**, a Georgia corporation ("**Seller**") for good and valuable consideration, to it in hand paid by _____, a _____ ("**Buyer**"), the receipt and sufficiency of which is hereby acknowledged, by these presents does grant, bargain, sell, transfer, assign and deliver to Buyer all of the personal property and vehicles (the "**Personal Property**") owned by the undersigned and located on that certain tract or parcel of real property in District No. 9, Blount County, Tennessee, having a physical address of 1406 Wilkinson Pike, Maryville, TN 37803 as more particularly described in **Exhibit A** attached hereto and incorporated herein by this reference, free and clear of all liens and encumbrances.

TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW AND EXCEPT FOR SELLER'S REPRESENTATIONS AND WARRANTIES AS SET FORTH HEREIN THAT THE PERSONAL PROPERTY IS FREE AND CLEAR OF ALL LIENS AND ENCUMBRANCES (THE "**WARRANTIES**"), THIS BILL OF SALE AND THE TRANSFER CONTEMPLATED HEREBY ARE MADE AND SHALL BE MADE WITHOUT REPRESENTATION, COVENANT, OR WARRANTY OF ANY KIND (WHETHER EXPRESS, IMPLIED, OR, TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, STATUTORY) BY SELLER AND ALL SUCH REPRESENTATIONS, COVENANTS AND WARRANTIES ARE HEREBY DISCLAIMED. AS A MATERIAL PART OF THE CONSIDERATION FOR THIS BILL OF SALE, BUYER AGREES TO ACCEPT THE PERSONAL PROPERTY ON AN "**AS-IS**" AND "**WHERE IS**" BASIS, WITH ALL FAULTS AND ANY AND ALL LATENT AND PATENT DEFECTS AND WITHOUT ANY REPRESENTATION OR WARRANTY, ALL OF WHICH SELLER HEREBY DISCLAIMS, EXCEPT FOR THE WARRANTIES. WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, SELLER MAKES NO EXPRESS OR IMPLIED WARRANTY OF SUITABILITY OR FITNESS OF THE PERSONAL PROPERTY FOR ANY PURPOSE OR USE OR AS TO THE MERCHANTABILITY, TITLE, VALUE, QUALITY, QUANTITY, CONDITION OR SALABILITY OF THE PERSONAL PROPERTY.

**SELLER**:

RUBY TUESDAY, INC
a Georgia corporation

Witness: _____

Witness: _____

By: _____
Its: _____

EXHIBIT A TO BILL OF SALE

SITUATED in District No. 9 of Blount County, Tennessee, and being more particularly described as follows:

BEGINNING at a 1/2 inch New Iron Rod along the northerly side of Wilkinson Pike and corner to the remaining property of Maryville College, said New Iron Rod lying S. 86-37-50 E. 406.82 feet from the intersection of said Wilkinson Pike and Court Street; thence departing said Wilkinson Pike N. 11-36-09 E. with the remaining property of Maryville College 552.35 feet to a 1/2 inch New Iron Rod; thence N. 40-40-47 E. continuing with the remaining property of said Maryville College, 420.28 feet to a 1/2 inch New Iron Rod; thence S. 52-18-50 E. continuing with the remaining property of said Maryville College 200.00 feet to a 1/2 inch New Iron Rod; thence S. 08-26-03 W. continuing with the remaining property of said Maryville College 783.13 feet to a 1/2 inch New Iron Rod along the northerly side of said Wilkinson Pike; thence N. 85-02-45 W. along the northerly side of said Wilkinson Pike, 430.06 feet to a 1/2 inch New Iron Rod and the point of beginning and containing 7.256 acres more or less, as surveyed by Sterling Engineering, Inc.

**EXHIBIT "J"**

**RESERVED**

E-FILED
5/4/2021 3:31 PM
CLERK & MASTER
DAVIDSON CO. CHANCERY CT.

# EXHIBIT D
# JUNE 26, 2020 AMENDMENT TO 1997 RT LODGE LEASE

## SECOND AMENDMENT TO LEASE

**THIS SECOND AMENDMENT TO LEASE** (this "**Second Amendment**") is made and entered into effective as ~~June 26~~ , 2020 (the "**Second Amendment Effective Date**") by and between **MARYVILLE COLLEGE**, a Tennessee corporation ("Lessor") and **RUBY TUESDAY, INC.**, a Georgia corporation ("Lessee").

### RECITALS:

**WHEREAS**, Lessor and Lessee are parties to that certain Lease dated September 11, 1997, as amended by that certain First Amendment to Lease, having an effective date of July 1, 2001, and as further amended by that certain Memorandum of Understanding dated May 14, 2018 (collectively, and as the same may be further amended, the "**Lease**"), for the premises commonly known as RT Lodge as more particularly described in the Lease (the "**Premises**"); and

**WHEREAS**, Lessor and Lessee wish to amend the Lease in the respects set forth below.

**NOW THEREFORE**, in consideration of these Recitals, the mutual promises, covenants, and conditions hereinafter set forth and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

### AMENDMENT

1.      The foregoing recitals are true and correct and are incorporated herein by reference. Any capitalized term used and not otherwise defined in this Second Amendment shall have the same meaning as set forth in the Lease. The terms and provisions of this Second Amendment shall be deemed effective from and after the Second Amendment Effective Date.

2.      The following paragraph is added after the first paragraph on page 2 of the Lease:

"Lessee is further granted an easement and right to use those portions of Lessor's property as shaded on that certain survey prepared by Lynch Surveys LLC, dated 5/07/2020, Project No. 4276, attached hereto as **Exhibit "A"** and made a part hereof (the "**Easement Property**") to permit the encroachment of Lessee's existing improvements and for the use, operation, maintenance, repair and replacement of such improvements, together with an easement over an additional twenty (20) feet on all sides of the Easement Property for purposes of ingress and egress to carry out its aforesaid rights. The Easement Property shall be treated as a portion of the leased premises for purposes of Lessee's rights and obligations under this Lease."

3.      Section 1 of the Lease is modified to provide that, notwithstanding anything contained in the Lease to the contrary, the term of the Lease shall be extended until December 31, 2070.

4.      Section 2 of the Lease is modified by adding the following at the end of the first paragraph:

"The rent described in this paragraph shall be known as "**Minimum Rent**".

In addition to Minimum Rent, for each twelve (12) month period (each a "**Percentage Rent Year**") commencing on October 1, 2022, and expiring on the termination of this Lease, Lessee shall pay to Lessor an amount ("**Percentage Rent**") equal to: (i) the amount, if any, by which Lessee's Gross Receipts (hereinafter defined) exceed the applicable Percentage Rent Breakpoint (hereinafter defined) during such Percentage Rent Year; multiplied by (ii) one percent (1%). Percentage Rent

1

for each Percentage Rent Year, if any, shall be paid on November 30 following such Percentage Rent Year.

(a) The term **"Percentage Rent Breakpoint"** shall initially mean Four Million Five Hundred Thousand Dollars ($4,500,000.00). The Percentage Rent Breakpoint shall be increased each five years based on the U.S. Department of Labor Consumer Price Index, All Urban Consumers, All Items, not however to exceed two and one-half percent (2.5%) per year.

(b) The term "Gross Receipts" shall mean any and all revenues, receipts and income of any kind (whether for cash, charge, credit, barter, exchange or otherwise) paid to or received by Lessee, in, from, on or through the leased premises from whatever source. Each sale or transaction upon installment or credit shall be treated as a sale for the full price in the month during which the sale was made, regardless of whether or when Lessee receives payment therefor. Gross Receipts shall not be deemed cumulative from one Percentage Rent Year to any succeeding Percentage Rent Year; rather, Gross Sales shall be computed separately for each Percentage Rent Year on an accrual basis in accordance with generally accepted accounting principles consistently applied. Without limiting the generality of the term Gross Receipts, Gross Receipts shall include all revenues, receipts and income derived in, from, on or through lodging; rental of exhibition, meeting and conference facilities or equipment; all food and beverages; banquet or group events; mini-bars; merchandise, sundries or other items; parking or valet services; ground transportation services, business services (including, without limitation, audio-visual, technical, production or similar services); recreational or entertainment activities of any kind (whether conducted on or off-site); arcade or other devices, equipment or services for entertainment or amusement; florist services; and all service charges (including, but not limited to, room service), but excluding tips and gratuities (as hereinafter provided). Notwithstanding the foregoing, Gross Receipts shall exclude: (i) condemnation proceeds (other than those received in respect of a temporary taking); (ii) insurance proceeds, other than so-called "rent insurance" proceeds, if Lessee elects to maintain the same; (iii) actual returns of and refunds for room rates/charges, merchandise, food or beverage items from or on behalf of guests; (iv) service charges paid by guests but only to the extent actually paid to employees of the Property as tips and gratuities; (v) sales of used furnishings or other personal property used in the operation of the Property that are not in the ordinary course of business; (vi) commissions actually paid to a travel agent or online booking services for services actually rendered and for occupancy at the Property; (vii) the amount of any taxes collected by Lessee pursuant to Tennessee Statutes which Lessee actually remits to the State of Tennessee or other appropriate Governmental Authority and which are not subsequently rebated or refunded; (viii) interest income earned by Lessee; (ix) revenues derived from the sale of gift cards or gift certificates (however revenues derived from the redemption of gift certificates or gift cards shall be included in Gross Receipts); (x) returns to vendors, shippers or manufacturers; (xi) receipts from sales of alcoholic beverages if applicable governmental requirements prohibit the payment or collection of percentage rent on the sale of alcoholic beverages; (xii) uncollected accounts and bad checks; (xiii) the dollar value of coupons utilized by customers in purchases at the Premises; (xiv) the amount of any sales to Lessee, Ruby Tuesday, Inc., NRD Capital or their respective employees; (xv) deposits received for future events and bookings including, but not limited to, weddings, conferences and meetings (said deposits, however, shall be included in Gross Receipts in the month in which the event actually occurs) or the deposit is forfeited to Lessee; and (xvi) service charges leveled against sales through the use of credit cards or other similar third party credit services such as Visa , Mastercard or American Express and (xvii) any discounts given by Lessee.

(c) During the term of this Lease, Lessee shall keep and maintain accurate, complete and up-to-date books and records pertaining to all operations at or with respect to the leased premises (separate from Lessee's other business operations, if any), including books of account reflecting all Gross Receipts ( **"Books and Records"**). The Books and Records shall be kept and maintained in

accordance with (i) generally accepted accounting principles as are at the time applicable and otherwise consistently applied ("GAAP").

(d) Lessee shall record all sales and other transactions at the time each sale is made. The Books and Records shall include information appropriate for the accurate determination of Percentage Rent. Lessor and its employees, agents or representatives shall have, during normal business hours, access to the Books and Records. The Books and Records shall be kept at the Premises or at Lessee's main offices in the United States. Lessor shall have the right to cause its own or a reputable firm of independent accountants' audit of the Books and Records to be made at any time, at Lessor's cost and expense, but not more often than one time in any calendar year and upon not less than fifteen (15) days prior written notice to Lessee. Such right of inspection and audit may be exercised by Lessor at any time within two (2) years after the end of the Percentage Rent Year to which such Books and Records relate, and Lessee shall maintain all Books and Records for at least such period of time and, if any dispute between the parties with respect to this Lease has arisen and remains unresolved at the expiration of such period of time, for such further period of time until the final resolution of such dispute. If, upon any examination by Lessor or its employees, agents or representatives of the Books and Records, an error shall be revealed which results in there being due to Lessor more Percentage Rent than was actually paid to Lessor, then the amount of any such error regarding Percentage Rent that may be disclosed by such review, together with interest accrued thereon (from the date on which such underpayment should have been made until the amount thereof is paid) at the per annum interest rate which is equal to the lesser of: (i) ten percent (10%); or (ii) the highest rate of interest then allowable pursuant to applicable law during such period, shall be paid by Lessee to Lessor within thirty (30) days after demand. If such error results in there being due to Lessor additional Percentage Rent for any Percentage Rent Year in an amount equal to or exceeding three percent (3%) of the Percentage Rent theretofore paid by Lessee in respect of such Lease Year, then the cost of the examination revealing such error (whether the examination was conducted by Lessor's own employees, or independent agents or representatives of Lessor, or a combination of both) shall also be paid by Lessee to Lessor, within thirty (30) days after demand, but, in no event, more than One Thousand Five Hundred Dollars ($1,500.00) in the aggregate.

(e) On or before November 30 of each year (commencing with November 30, 2023) during the term of this Lease and on the thirtieth (30th) day of the month immediately following the date in which this Lease expires, Lessee shall deliver to Lessor a statement of Gross Receipts made during the preceding Percentage Rent Year, certified to be true and correct by the chief financial officer of Lessee or other duly authorized officer of Lessee, together with a copy of Lessee's monthly sales and use tax reports submitted for the preceding Percentage Rent Year.

As used in this Lease, the term "rent" shall include Minimum Rent and Percentage Rent (as applicable)."

5.    The last sentence of Section 3 of the Lease is modified to delete the phrase "fifty-year".

6.    Section 3 of the Lease grants Lessee the right to construct certain improvements, including, but not limited to, additional parking, subject to the approval of Lessor. Lessor hereby consents to Lessee's construction of additional parking as depicted on **Exhibit "B"** attached hereto and made a part hereof.

7.    The third sentence of Section 11 of the Lease is modified to add the following after the phrase "to Samuel E. Beal III or to Blackberry Hotel Company": "or to BNA Associates LLC, a Tennessee limited liability company, RT Lodge LLC, a Tennessee limited liability company, Oliver Hospitality LLC, a Tennessee limited liability company or to an entity controlling, controlled by or under common control with any of the foregoing, provided that such assignment or sublease occurs before the close of business on

3

December 31, 2021." In addition, Lessor agrees that Lessee may enter into a secured financing transaction which may include, without limitation, a deed of trust with respect to this Lease (provided, such secured financing transaction shall not include Lessor's fee ownership interest in the leased premises, and Lessor does not agree to subordinate or subject its fee ownership interest in any such secured financing transaction)."

8. The second paragraph of <u>Section 13</u> of the Lease is amended to read as follows:

"In addition to the rights to terminate for the failure of the Lessee to pay rent or to perform other conditions on its part to be kept and performed, the Lessor is granted the right to cancel this Lease, (a) except with respect to a permitted assignment or unless otherwise approved by Lessor, in the event the Lessee is sold, unless such sale is to an entity controlling, controlled by or under common control with Lessee or (b) a "Change of Control" occurs without the prior written consent of Landlord (consent not to be unreasonably withheld) with respect to Lessee, or (c) if Lessee ceases to use the facility as permitted in this Lease. Such right to terminate shall be contingent upon the Lessor paying the Lessee the cost of all improvements placed on the premises by the Lessee less depreciation based on a thirty-nine (39) year straight line depreciation. For purposes hereof, "Change of Control" shall mean any of the following events: (i) the sale of all or substantially all of the assets of Lessee; (ii) any merger, consolidation, share exchange or recapitalization in which Lessee is not the surviving entity or (iii) any merger, consolidation, share exchange, recapitalization or issuance, sale or transfer of stock or other ownership interests of Lessee in each case as a result of which voting control of the stock or ownership interests of Lessee changes from the current owners of such stock or their immediate families."

9. The third paragraph of <u>Section 13</u> of the Lease is deleted in its entirety.

10. The Lease is hereby amended by adding the following as <u>Section 19</u>:

"**FORCE MAJEURE**. If either Lessee or Lessor is delayed or hindered in whole or in part, or prevented from, the performance of any covenant or obligation hereunder as a result of acts of God, fire or other casualty, earthquake, hurricane, flood, epidemic, pandemic, landslide, enemy act, acts of war, acts of terrorism or bioterrorism, riot, intervention by civil or military authorities of government, insurrection or other civil commotion, general unavailability of certain materials, strikes, boycotts, lockouts, labor disputes or work stoppage beyond the reasonable control of such party, or any other occurrence and/or circumstance beyond the reasonable control of such party, then the performance of such covenant or obligation shall be excused for the period of such delay, hindrance or prevention and the period of the performance of such covenant or obligation shall be extended by the number of days equivalent to the number of days of such delay, hindrance or prevention. The party claiming it is delayed, hindered or prevented from performing any obligation or covenant shall promptly notify the other party of any force majeure event."

11. Upon execution of this Second Amendment, Lessor and Lessee agree to execute and record in the Blount County, Tennessee Register's Office, an Amended and Restated Memorandum of Lease. Lessee shall pay the cost of recording such document.

12. This Second Amendment may be executed in counterparts, each of which is an original and all of which constitute one and the same instrument. This Second Amendment may also be executed and delivered by electronic delivery of a .pdf file, which shall constitute an original for all purposes.

13. This Second Amendment shall be governed by and construed pursuant to the laws of the State of Tennessee. If any provision of this Second Amendment or the application thereof to any person or circumstances shall be held invalid, illegal or unenforceable to any extent by a court of competent

4

jurisdiction, such determination shall not affect the enforceability of the remaining terms and provisions of this Second Amendment. In such event, this Second Amendment shall be construed and interpreted as if such invalid, illegal or unenforceable terms were limited to the extent whereby such terms would be valid, legal and enforceable. If such limitation is not possible, this Second Amendment shall be construed and interpreted as if such invalid, illegal or unenforceable terms were severed and not included in this Second Amendment.

**14.**    Except as herein expressly modified, all of the provisions of the Lease are hereby ratified and confirmed. This Second Amendment shall be binding upon and shall inure to the benefit of the successors and assigns of the respective parties. Any provisions of the Lease that are inconsistent with any of the provisions set forth herein are hereby deemed to be deleted or modified, as necessary to give effect to the provisions set forth herein. This Second Amendment represents the entire agreement between the parties with respect to the matters set forth herein, and there are no other agreements or arrangements, written or oral, pertaining to the matters set forth herein. No provision of this Second Amendment may be modified, amended or waived except by the execution of a written document signed by each party.

*[THE BALANCE OF THIS PAGE IS INTENTIONALLY LEFTY BLANK]*

5

**IN WITNESS WHEREOF**, the parties have executed this Second Amendment to Lease as of the dates set forth below.

**LESSOR:**

**MARYVILLE COLLEGE**

By: _William T. Bogart_

Name: _William T. Bogart_

Its: _President_

Date: _June 26_, 2020

STATE OF TENNESSEE

                                 SS

COUNTY OF BLOUNT

     Before me, the undersigned authority, a Notary Public of said state and county, personally appeared _William T. Bogart_ with whom I am personally acquainted, and who, upon oath, acknowledged himself/herself to be the _President_ of MARYVILLE COLLEGE, the within named bargainor, a corporation, and that he/she, as such _President_, being authorized so to do, executed the within instrument for the purposes therein contained by signing the name of the corporation by himself/herself as _President_.

    Witness my hand and seal at office this _26_ day of _June_, 2020.

_Lisa Vitale_

NOTARY PUBLIC

My Commission Expires:

_2-28-24_

*[SIGNATURES CONTINUED ON FOLLOWING PAGE]*

6

**[SIGNATURE PAGE CONT'D TO SECOND AMENDMENT TO LEASE]**

**LESSEE:**

**RUBY TUESDAY, INC.**

By:

Name: Stephanie Burke Medley

Its: Chief Strategy Officer

Date: 6/26/2020 , 2020

STATE OF TENNESSEE

                         SS

COUNTY OF BLOUNT

       Before me, the undersigned authority, a Notary Public of said state and county, personally appeared Stephanie Burke Medley with whom I am personally acquainted, and who, upon oath, acknowledged himself/herself to be the Chief Strategy Officer of RUBY TUESDAY, INC., the within named bargainor, a corporation, and that he/she, as such Chief Strategy Officer being authorized so to do, executed the within instrument for the purposes therein contained by signing the name of the corporation by himself/herself as Chief Strategy Officer

       Witness my hand and seal at office this 26 day of June, 2020.

NOTARY PUBLIC Jennifer Lynn Miles

My Commission Expires:

12/2/23

7

## EXHIBIT A

## LYNCH SURVEY



A-1



**E-FILED**
**5/4/2021 3:31 PM**
**CLERK & MASTER**
**DAVIDSON CO. CHANCERY CT.**

# EXHIBIT E
# GOLDMAN DEED OF TRUST

RUBY TUESDAY, INC., as trustor

(Grantor)

to

JAMES E. SPRUILL, as trustee

(Trustee)

for the benefit of

GOLDMAN SACHS SPECIALTY LENDING GROUP, L.P., as beneficiary

(Grantee)

---

## LEASEHOLD DEED OF TRUST, ASSIGNMENT OF LEASES AND RENTS, SECURITY AGREEMENT AND FIXTURE FILING

---

Dated:       as of August 11, 2020
Location:    1406 Wilkinson Pike
             Maryville, Tennessee 37803
County:      Blount

PREPARED BY AND UPON
RECORDATION RETURN TO:
Hunton Andrews Kurth LLP
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, Virginia 23219
Attention: Michael E. Sievers, Esq.

MAXIMUM PRINCIPAL INDEBTEDNESS FOR TENNESSEE RECORDING TAX PURPOSES IS $5,252,000.00.

THIS INSTRUMENT IS ALSO A UNIFORM COMMERCIAL CODE FINANCING STATEMENT WHICH IS BEING FILED AS A FIXTURE FILING IN ACCORDANCE WITH TENNESSEE CODE ANNOTATED SECTION 47-9-502(C). THE COLLATERAL IS DESCRIBED IN THIS DEED OF TRUST, AND SOME OF THE COLLATERAL DESCRIBED HEREIN IS OR IS TO BECOME FIXTURES ON THE REAL ESTATE DESCRIBED HEREIN. THE SECURED PARTY, TO-WIT: GOLDMAN SACHS SPECIALTY LENDING GROUP, L.P., MAY BE CONTACTED AT THE ADDRESS SET FORTH HEREIN FOR INFORMATION REGARDING THE SECURITY INTEREST.

PURSUANT TO TENNESSEE CODE ANNOTATED SECTION 47-28-104, NOTICE IS HEREBY GIVEN THAT THIS DEED OF TRUST SECURES OBLIGATORY ADVANCES AND IS FOR COMMERCIAL PURPOSES. THIS DEED OF TRUST ALSO SECURES OPTIONAL ADVANCES WHICH ARE NONOBLIGATORY.

Phyllis Lee Crisp, Register
Blount County Tennessee
Rec #: 578065        Instrument #: 881349
Rec'd:    170.00        Recorded
State:   6037.50     8/14/2020 at 3:41 PM
Clerk:      1.00        in Record Book
Other:      2.00
Total:   6210.50        2604
         Pages 2739-2772

<u>LEASEHOLD DEED OF TRUST, ASSIGNMENT OF LEASES AND RENTS,</u>
<u>SECURITY AGREEMENT, AND FIXTURE FILING</u>

THIS **LEASEHOLD DEED OF TRUST, ASSIGNMENT OF LEASES AND RENTS, SECURITY AGREEMENT, AND FIXTURE FILING** (this "**Security Instrument**") is made as of August 11, 2020, by **RUBY TUESDAY, INC.**, a Georgia corporation, having its principal place of business at 333 East Broadway Avenue, Maryville, TN 37804, as trustor ("**Grantor**"), to **JAMES E. SPRUILL**, having an address of c/o Fidelity National Title Insurance Company, 6840 Carothers Pkwy, Suite 200, Franklin, TN 37067, as trustee ("**Trustee**"), for the benefit of **GOLDMAN SACHS SPECIALTY LENDING GROUP, L.P.**, a Delaware limited partnership, having an address at 6011 Connection Drive, Irving, Texas 75039, as beneficiary (together with its successors and assigns, collectively, "**Grantee**").

## W I T N E S S E T H:

**WHEREAS,** reference is made to that certain Credit and Guaranty Agreement, dated as of December 21, 2017 (as previously amended, supplemented or otherwise modified, and as further amended, restated, supplemented or otherwise modified from time to time, the "**Credit Agreement**"), by and among Grantor and the other Credit Parties party thereto from time to time, the Lenders party thereto from time to time, and Grantee, as Administrative Agent, Collateral Agent, and Syndication Agent;

**WHEREAS,** pursuant to and in accordance with the Credit Agreement, the Lenders have extended certain credit facilities to Grantor and the other Credit Parties, in an aggregate amount not to exceed ONE HUNDRED TWENTY-SEVEN MILLION FIVE HUNDRED THOUSAND AND 00/100 DOLLARS ($127,500,000.00), with a maturity date of December 21, 2022, subject to certain extension options as set forth in the Credit Agreement;

**WHEREAS,** subject to the terms and conditions of the Credit Agreement, Grantor and the other Credit Parties may enter into one or more Interest Rate Agreements with one or more Lender Counterparties; and

**WHEREAS,** in consideration of the extensions of credit and other accommodations of the Lenders and Lender Counterparties as set forth in the Credit Agreement and the Interest Rate Agreements, respectively, Grantor has agreed, subject to the terms and conditions hereof, each other Credit Document and each of the Interest Rate Agreements, to secure Grantor's obligations under the Credit Documents and the Interest Rate Agreements as set forth herein.

**NOW, THEREFORE,** in consideration of the premises and the agreements, provisions and covenants herein contained, and Grantor agrees as follows:

## ARTICLE I - GRANTS OF SECURITY

**Section 1.1    <u>Property Mortgaged</u>.**  Grantor does hereby irrevocably mortgage, grant, bargain, sell, pledge, assign, warrant, transfer and convey to Trustee with power of sale for the benefit of Grantee and its successors and assigns all of Grantor's right, title, and interest in and to

the following property, rights, interests and estates now owned, or hereafter acquired by Grantor (collectively, the "**Property**"):

      (a)    <u>Intentionally Deleted</u>.

      (b)    <u>Intentionally Deleted</u>.

      (c)    <u>Master Lodge Lease</u>. That certain Lease dated September 11, 1997, by and between Maryville College, a Tennessee corporation, as lessor, and Grantor, as lessee, as amended by that certain First Amendment to Lease, having an effective date of July 1, 2001, as further supplemented by that certain Memorandum of Understanding dated May 14, 2018, and as further amended by that certain Second Amendment to Lease dated and effective as of June 26, 2020 (collectively, the "**Master Lease**"), which Master Lease is evidenced of record by that certain Amended and Restated Memorandum of Lease recorded with the Blount County, Tennessee Register's Office at Deed Book 2599, Page 2856, of the real property described in <u>Exhibit A</u> attached hereto and made a part hereof (the "**Land**"), and the leasehold estate created thereby (the "**Leasehold Estate**");

      (d)    <u>Assignments/Modifications</u>. All assignments, modifications, extensions and renewals of the Master Lease and all credits, deposits, options, privileges and rights of Grantor as tenant under the Master Lease, including, but not limited to, rights of first refusal, if any, and the right, if any, to renew or extend the Master Lease for a succeeding term or terms, and also including all the right, title, claim or demand whatsoever of Grantor either in law or in equity, in possession or expectancy, of, in and to Grantor's right, as tenant under the Master Lease, to elect under Section 365(h)(1) of the Bankruptcy Code to terminate or treat the Master Lease as terminated in the event (i) of the bankruptcy, reorganization or insolvency of the landlord under the Master Lease (the "**Landlord**"), and (ii) the rejection of the Master Lease by Landlord, as debtor in possession, or by a trustee for Landlord, pursuant to Section 365 of the Bankruptcy Code.

      (e)    <u>Improvements</u>. The buildings, structures, fixtures, additions, enlargements, extensions, modifications, repairs, replacements and improvements now or hereafter erected or located on the Land and owned by Grantor (collectively, the "**Improvements**");

      (f)    <u>Easements</u>. All easements, rights-of-way or use, rights, strips and gores of land, streets, ways, alleys, passages, sewer rights, water, water courses, water rights and powers, air rights and development rights, and all estates, rights, titles, interests, privileges, liberties, servitudes, tenements, hereditaments and appurtenances of any nature whatsoever, in any way now or hereafter belonging, relating or pertaining to the Leasehold Estate, including, but not limited to, those arising under and by virtue of the Master Lease, if any, and the reversions and remainders, and all land lying in the bed of any street, road or avenue, opened or proposed, in front of or adjoining the Land, to the center line thereof and all the estates, rights, titles, interests, dower and rights of dower, curtesy and rights of curtesy, property, possession, claim and demand whatsoever, both at law and in equity, of Grantor of, in and to the Leasehold Estate and the Improvements, including, but not limited to, those arising under and by virtue of the Master Lease, if any, and every part and parcel thereof, with the appurtenances thereto;

GS/RT – Security Instrument (RT Lodge)

(g)    Equipment. All "goods" and "equipment," as such terms are defined in Article 9 of the Uniform Commercial Code (as hereinafter defined), now owned or hereafter acquired by Grantor, which is used at or in connection with the Improvements or the Leasehold Estate or is located thereon or therein (including, but not limited to, all machinery, equipment, furnishings, and electronic data-processing and other office equipment now owned or hereafter acquired by Grantor and any and all additions, substitutions and replacements of any of the foregoing), together with all attachments, components, parts, equipment and accessories installed thereon or affixed thereto (collectively, the "**Equipment**");

(h)    Fixtures. All fixtures and Equipment now owned, or the ownership of which is hereafter acquired, by Grantor which is so related to the Leasehold Estate and Improvements forming part of the Property that it is deemed fixtures or real property under the law of the particular state in which the Equipment is located, including, without limitation, all building or construction materials intended for construction, reconstruction, alteration or repair of or installation on the Property, construction equipment, appliances, machinery, plant equipment, fittings, apparatuses, fixtures and other items now or hereafter attached to, installed in or used in connection with (temporarily or permanently) any of the Improvements or the Leasehold Estate, including, but not limited to, engines, devices for the operation of pumps, pipes, plumbing, cleaning, call and sprinkler systems, fire extinguishing apparatuses and equipment, heating, ventilating, laundry, incinerating, electrical, air conditioning and air cooling equipment and systems, gas and electric machinery, appurtenances and equipment, pollution control equipment, security systems, disposals, dishwashers, refrigerators and ranges, recreational equipment and facilities of all kinds, and water, gas, electrical, storm and sanitary sewer facilities, utility lines and equipment (whether owned individually or jointly with others, and, if owned jointly, to the extent of Grantor's interest therein) and all other utilities whether or not situated in easements, all water tanks, water supply, water power sites, fuel stations, fuel tanks, fuel supply, and all other structures, together with all accessions, appurtenances, additions, replacements, betterments and substitutions for any of the foregoing and the proceeds thereof (collectively, the "Fixtures");

(i)    Personal Property. All furniture, furnishings, objects of art, machinery, goods, tools, supplies, appliances, inventory and articles of personal property and accessions thereof and renewals and replacements thereof and substitutions therefor, if any (including, but not limited to, tables, carpeting, screens, paintings, hangings, pictures, stools, chinaware, linens, glassware, foodcarts, cookware, bars, bar fixtures, liquor and other drink dispensers, icemakers, radios, television sets, intercom and paging equipment, electric and electronic equipment, medical equipment, potted plants, heating, lighting and plumbing fixtures, fire prevention and extinguishing apparatus, elevators, escalators, fittings, plants, tools, machinery, engines, dynamos, motors, boilers, incinerators, conduits, compressors, vacuum cleaning systems, floor cleaning, waxing and polishing equipment, brackets, electrical signs, bulbs, and cabinets), licenses (including liquor licenses), certificates and permits, and all other personal property of any kind or character whatsoever as defined in and subject to the provisions of the Uniform Commercial Code, other than Fixtures, which are now or hereafter owned by Grantor and which are located within or about the Leasehold Estate and the Improvements, together with all accessories, replacements and substitutions thereto or therefor and the proceeds thereof (collectively, the "**Personal Property**"), and the right, title and interest of Grantor in and to any of the Personal Property which may be subject to any security interests, as defined in the Uniform Commercial Code, as adopted and

GS/RT – Security Instrument (RT Lodge)

enacted by the state or states where any of the Property is located (the "**Uniform Commercial Code**"), and all proceeds and products of the above;

(j)    <u>Leases and Rents</u>.    All subleases or subsubleases, lettings, licenses, licenses, concessions or other agreements (whether written or oral) of the Leasehold Estate, pursuant to which any Person is granted a possessory interest in, or right to use or occupy all or any portion of the Leasehold Estate, and every modification, amendment or other agreement relating to such subleases, subsubleases, or other agreements entered into in connection with subleases, subsubleases, or other agreements and every guarantee of the performance and observance of the covenants, conditions and agreements to be performed and observed by the other party thereto, heretofore or hereafter entered into (collectively, the "**Leases**"), whether before or after the filing by or against Grantor of any petition for relief under the Bankruptcy Code and all right, title and interest of Grantor, its successors and assigns therein and thereunder, including, without limitation, cash or securities deposited thereunder to secure the performance by the lessees of their obligations thereunder and all rents, additional rents, revenues, issues and profits (including all oil and gas or other mineral royalties and bonuses) income, receivables, receipts, revenues, deposits (including, without limitation, security, utility and other deposits), accounts, cash, issues, profits, charges for services rendered, and other consideration of whatever form or nature received by or paid to or for the account of or benefit of Grantor or its agents or employees from any and all sources arising from or attributable to the Leasehold Estate, including, all receivables, customer obligations, installment payment obligations and other obligations now existing or hereafter arising or created out of the sublease, license, concession or other grant of the right of the use and occupancy of the Leasehold Estate or rendering of services by Grantor or any operator or manager of the commercial space located in the Improvements or acquired from others whether paid or accruing before or after the filing by or against Grantor of any petition for relief under the Bankruptcy Code (collectively, the "**Rents**") and all proceeds from the sale or other disposition of the Leases and the right to receive and apply the Rents to the payment of the Obligations;

(k)    <u>Condemnation Awards</u>.    All awards or payments, including interest thereon, which may heretofore and hereafter be made with respect to the Property, whether from the exercise of the right of eminent domain (including, but not limited to, any transfer made in lieu of or in anticipation of the exercise of the right), or for a change of grade, or for any other injury to or decrease in the value of the Property;

(l)    <u>Insurance Proceeds</u>.    All proceeds in respect of the Property under any insurance policies covering the Property, including, without limitation, the right to receive and apply the proceeds of any insurance, judgments, or settlements made in lieu thereof, for damage to the Property;

(m)    <u>Tax Certiorari</u>.    All refunds, rebates or credits in connection with reduction in real estate taxes and assessments charged against the Property as a result of tax certiorari or any applications or proceedings for reduction;

(n)    <u>Conversion</u>.    All proceeds of the conversion, voluntary or involuntary, of any of the foregoing including, without limitation, proceeds of insurance and condemnation awards, into cash or liquidation claims;

GS/RT – Security Instrument (RT Lodge)

(o)    <u>Rights</u>. The right, in the name and on behalf of Grantor, to appear in and defend any action or proceeding brought with respect to the Property and to commence any action or proceeding to protect the interest of Grantee in the Property;

(p)    <u>Agreements</u>. All agreements, contracts, certificates, instruments, permits, licenses (including without limitation, liquor licenses), franchises, plans, specifications and other documents, now or hereafter entered into, and all rights therein and thereto, respecting or pertaining to the use, occupation, construction, management or operation of the Leasehold Estate and any part thereof and any Improvements or respecting or pertaining to any business or activity conducted on the Leasehold Estate and any part thereof and all right, title and interest of Grantor therein and thereunder, including, without limitation, the right, upon the happening of any default hereunder, to receive and collect any sums payable to Grantor thereunder;

(q)    <u>Trademarks</u>. All tradenames, trademarks, servicemarks, logos, copyrights, goodwill, books and records and all other general intangibles relating to or used in connection with the operation of the Property;

(r)    <u>Accounts</u>. All deposit accounts maintained by Grantor with respect to the Property, including, without limitation, the Controlled Account, together with all deposits or wire transfers made to such accounts, all cash, checks, drafts, certificates, securities, investment property, financial assets, instruments and other property held therein from time to time and all proceeds, products, distributions or dividends or substitutions thereon and thereof;

(s)    <u>Letter of Credit</u>. All letter-of-credit rights (whether or not the letter of credit is evidenced by a writing) Grantor now has or hereafter acquires relating to the properties, rights, titles and interests referred to in this Section 1.1;

(t)    <u>Tort Claims</u>. All commercial tort claims Grantor now has or hereafter acquires relating to the properties, rights, titles and interests referred to in this Section 1.1;

(u)    <u>Interest Rate Agreement</u>. The Interest Rate Agreement, including, but not limited to, all "accounts", "chattel paper", "general intangibles" and "investment property" (as such terms are defined in the Uniform Commercial Code as from time to time in effect) constituting or relating to the foregoing; and all products and proceeds of any of the foregoing in accordance with the terms of the Interest Rate Agreement; and

(v)    <u>Other Rights</u>. Any and all other rights of Grantor in and to the items set forth in <u>Subsections (a)</u> through <u>(u)</u> above.

AND without limiting any of the other provisions of this Security Instrument, to the extent permitted by applicable law, Grantor expressly grants to Grantee, as secured party, a security interest in the portion of the Property which is or may be subject to the provisions of the Uniform Commercial Code which are applicable to secured transactions; it being understood and agreed that the Improvements and Fixtures are part and parcel of the Leasehold Estate (the Leasehold Estate, the Improvements and the Fixtures collectively referred to as the **"Real Property"**) appropriated to the use thereof and, whether affixed or annexed to the Real Property or not, shall

GS/RT – Security Instrument (RT Lodge)

-5-

for the purposes of this Security Instrument be deemed conclusively to be real estate and mortgaged hereby.

**Section 1.2    Assignment of Leases and Rents.**    Grantor hereby absolutely and unconditionally assigns to Grantee all of Grantor's right, title and interest in and to all current and future Leases and Rents; it being intended by Grantor that this assignment constitutes a present, absolute assignment and not an assignment for additional security only. Nevertheless, subject to the terms of Section 7.1(h) of this Security Instrument, Grantee grants to Grantor a revocable license to collect, receive, use and enjoy the Rents and Grantor shall hold all Rents, or portion thereof sufficient to discharge all current sums then due and payable on the Obligations, for use in the payment of such sums, otherwise Grantor may use the balance of the Rents collected in any manner not inconsistent with the Credit Documents.

**Section 1.3    Security Agreement.**    This Security Instrument is both a leasehold deed of trust and a "security agreement" within the meaning of the Uniform Commercial Code. The Property includes both a leasehold estate and personal property and all other rights and interests, whether tangible or intangible in nature, of Grantor in the Property. By executing and delivering this Security Instrument, Grantor hereby grants to Grantee, as security for the Obligations, a security interest in the Fixtures, the Equipment and the Personal Property and other property constituting the Property, whether now owned or hereafter acquired, to the full extent that the Fixtures, the Equipment, the Personal Property and such other property may be subject to the Uniform Commercial Code (said portion of the Property so subject to the Uniform Commercial Code being called the "**Collateral**"). If an Event of Default shall occur and be continuing, Grantee, in addition to any other rights and remedies which it may have, shall have and may exercise immediately and without demand, any and all rights and remedies granted to a secured party upon default under the Uniform Commercial Code, including, without limiting the generality of the foregoing, the right to take possession of the Collateral or any part thereof, and to take such other measures as Grantee may deem reasonably necessary for the care, protection and preservation of the Collateral. Upon request or demand of Grantee after the occurrence and during the continuance of an Event of Default, Grantor shall, at its expense, assemble the Collateral and make it available to Grantee at a convenient place (at the Leasehold Estate if tangible property) reasonably acceptable to Grantee. Grantor shall pay to Grantee within ten (10) days of written demand any and all out-of-pocket expenses, including legal expenses and reasonable attorneys' fees, incurred or paid by Grantee in protecting its interest in the Collateral and in enforcing its rights hereunder with respect to the Collateral after the occurrence and during the continuance of an Event of Default. Any notice of sale, disposition or other intended action by Grantee with respect to the Collateral sent to Grantor in accordance with the provisions hereof at least ten (10) days prior to such action, shall, except as otherwise provided by applicable law, constitute reasonable notice to Grantor. The proceeds of any disposition of the Collateral, or any part thereof, may, except as otherwise required by applicable law, be applied by Grantee to the payment of the Obligations in such priority and proportions as Grantee in its discretion shall deem proper. Grantor's (debtor's) principal place of business is as set forth on page one hereof and the address of Grantee (secured party) is as set forth on page one hereof.

**Section 1.4    Fixture Filing.**    Certain of the Property is or will become "fixtures" (as that term is defined in the Uniform Commercial Code) on the Land, and this Security Instrument, upon

GS/RT – Security Instrument (RT Lodge)

being filed for record in the real estate records of the city or county wherein such fixtures are situated, shall, for purposes of the Uniform Commercial Code, operate also as a financing statement filed as a fixture filing in accordance with the applicable provisions of said Uniform Commercial Code upon such of the Property that is or may become fixtures. The addresses of Grantor (the "Debtor") and Grantee (the "Secured Party") are set forth above. The Debtor is the record owner of the Collateral.

**Section 1.5    Pledges of Monies Held.**  Grantor hereby pledges to Grantee any and all monies now or hereafter held by Grantee or on behalf of Grantee.

## CONDITIONS TO GRANT

TO HAVE AND TO HOLD the above granted and described Property unto Trustee for the use and benefit of Grantee and its successors and assigns, forever;

PROVIDED, HOWEVER, these presents are upon the express condition that, if Grantor shall pay to Grantee the Obligations at the time and in the manner provided in the Credit Agreement and this Security Instrument, shall perform the Other Obligations as set forth in this Security Instrument and shall abide by and comply with each and every covenant and condition set forth herein and in the Credit Agreement and the other Credit Documents, then Grantee shall instruct Trustee to reconvey to Grantor, or the person or persons legally entitled thereto, without recourse or warranty, the Property or portions thereof then held hereunder. Grantor's obligation to indemnify and hold harmless Grantee pursuant to the provisions hereof shall survive any such reconveyance.

## ARTICLE II - DEBT AND OBLIGATIONS SECURED

**Section 2.1    Obligations.**  This Security Instrument and the grants, assignments and transfers made in Article I are given for the purpose of securing the Obligations, including but not limited to the Indebtedness evidenced by the Notes.

**Section 2.2    Other Obligations.**  This Security Instrument and the grants, assignments and transfers made in Article I are also given for the purpose of securing the performance of all other obligations of Grantor contained herein (the **"Other Obligations"**).

## ARTICLE III - GRANTOR COVENANTS

Grantor covenants and agrees that:

**Section 3.1    Payment of the Obligations.**  Grantor will pay, or cause to be paid, the Obligations at the time and in the manner provided in the Credit Agreement, the Credit Documents, and this Security Instrument.

**Section 3.2    Incorporation by Reference.**  All of the covenants, conditions and agreements contained in the Credit Agreement and all and any of the other Credit Documents, are hereby made a part of this Security Instrument to the same extent and with the same force as if fully set forth herein.

GS/RT – Security Instrument (RT Lodge)

**Record Book 2604 Page 2746**

**Section 3.3**    <u>Insurance</u>. Grantor shall obtain and maintain in full force and effect at all times insurance with respect to Grantor and the Property as required pursuant to the Credit Agreement.

**Section 3.4**    <u>Maintenance of Property</u>.    Grantor shall cause the Property to be maintained in a good and safe condition and repair in accordance with the terms of the Master Lease. The Improvements, the Fixtures, the Equipment and the Personal Property shall not be removed, demolished or materially altered (except for normal replacement of the Fixtures, the Equipment or the Personal Property, tenant finish and refurbishment of the Improvements or as otherwise explicitly permitted under the Credit Agreement or required under the Credit Agreement or the Master Lease) without the consent of Grantee, which shall not be unreasonably withheld, conditioned, or delayed. Except as otherwise explicitly permitted or required under the Credit Agreement, and provided that Net Insurance/Condemnation Proceeds are made available to Grantor pursuant to the Credit Agreement and that such repairs are the responsibility of the tenant under the Master Lease, Grantor shall pursuant to the terms and conditions of the Master Lease: (i) promptly repair, replace or rebuild any part of the Property which may be destroyed by any casualty or become damaged, worn or dilapidated or which may be affected by any condemnation, and (ii) complete and pay for any structure at any time in the process of construction or repair on the Leasehold Estate.

**Section 3.5**    <u>Waste; Use; Minerals</u>.    Grantor shall not commit or suffer any physical waste of the Property or make any change in the use of the Property which will materially increase the risk of fire or other hazard arising out of the operation of the Property, or take any action that might invalidate or allow the cancellation of any insurance policy required under the Credit Documents, or do or permit to be done thereon anything that may materially impair the value of the Property or the security of this Security Instrument. Grantor will not, without the prior written consent of Grantee, such consent not to be unreasonably withheld, conditioned, or delayed, permit any drilling or exploration for or extraction, removal, or production of any minerals from the surface or the subsurface of the Land, regardless of the depth thereof or the method of mining or extraction thereof, except for any drilling or exploration rights granted pursuant to the Permitted Encumbrances (as defined below).

**Section 3.6**    <u>Payment for Labor and Materials</u>.

(a)    Grantor will promptly pay when due all bills and costs for labor, materials, and specifically fabricated materials ("**Labor and Material Costs**") incurred in connection with the Property and never permit to exist beyond the due date thereof in respect of the Property or any part thereof any lien or security interest, except for Permitted Encumbrances, even though inferior to the liens and the security interests hereof, and in any event never permit to be created or exist in respect of the Property or any part thereof any other or additional lien or security interest other than the liens or security interests hereof, except for Permitted Encumbrances.

(b)    After prior written notice to Grantee, Grantor, at its own expense, may contest by appropriate legal proceeding, promptly initiated and conducted in good faith and with due diligence, the amount or validity or application in whole or in part of any of the Labor and Material Costs, provided that (i) no Event of Default has occurred and is continuing, subject to any

GS/RT – Security Instrument (RT Lodge)

applicable grace or cure periods under the Credit Agreement, this Security Instrument, or any of the other Credit Documents, (ii) Grantor is permitted to do so under the provisions of any other mortgage, deed of trust or deed to secure debt affecting the Property, (iii) such proceeding shall suspend the collection of the Labor and Material Costs from Grantor and from the Property or Grantor shall have paid all of the Labor and Material Costs under protest, (iv) such proceeding shall be permitted under and be conducted in accordance with the provisions of any other instrument to which Grantor is subject and shall not constitute a default thereunder, (v) neither the Property nor any part thereof or interest therein will be in danger of being sold, forfeited, terminated, canceled or lost, and (vi) Grantor shall have furnished the security as may be required in the proceeding, or as may be reasonably requested by Grantee to insure the payment of any contested Labor and Material Costs, together with all interest and penalties thereon, if any.

(c)    Notwithstanding anything to the contrary in this <u>Section 3.6</u> or in <u>Section 6.2</u> of the Credit Agreement, if a mechanics' or materialman's lien shall be filed against the Property for Labor and Material Costs (each, a "**Mechanic's Lien**"), then Grantor shall (i) provide Grantee with written notice of such Mechanic's Lien within thirty (30) days of notice of the filing thereof, and (ii) at its expense, cause such Mechanic's Lien to be discharged of record by payment, bond or otherwise within sixty (60) days after notice of the filing thereof. If Grantor shall fail to cause such Mechanic's Lien to be discharged of record within such sixty (60) day period, Grantee may, in Grantee's sole discretion, cause such Mechanic's Lien to be discharged by payment, bond or otherwise without investigation as to the validity thereof or as to any offsets or defenses thereto, and Grantor shall, upon demand, reimburse Grantee for all amounts paid and costs incurred in connection therewith including, without limitation, reasonable attorneys' fees.

**Section 3.7**    <u>Performance of Other Agreements</u>.  Grantor shall observe and perform each and every term, covenant and provision to be observed or performed by Grantor pursuant to the Credit Agreement and any other Credit Document and any amendments, modifications or changes thereto. Grantor shall observe and perform each and every material term, covenant and provision to be observed or performed by Grantor pursuant to any other agreement or recorded instrument affecting or pertaining to the Property and any amendments, modifications or changes thereto.

**Section 3.8**    <u>Change of Name, Identity or Structure</u>.  No Grantor shall change its name, identity (including its trade name or names) or, if not an individual, its corporate, partnership or other structure without notifying Grantee of such change in writing at least thirty (30) days prior to the effective date of such change and, in the case of a change in Grantor's structure, without first obtaining the prior written consent of Grantee. If requested by Grantee, Grantor shall execute and deliver to Grantee, prior to or contemporaneously with the effective date of any such change, any reasonable documentation (including, without limitation, financing statements) necessary and required by Grantee to establish or maintain the validity, perfection and priority of the security interest granted herein.  At the request of Grantee, Grantor shall execute a certificate in form satisfactory to Grantee listing the trade names under which Grantor intends to operate the Property, and representing and warranting that Grantor does business under no other trade name with respect to the Property.

GS/RT – Security Instrument (RT Lodge)

**Section 3.9**    <u>Title</u>. Grantor has good, marketable and insurable leasehold title to the real property comprising part of the Property and Grantor, as applicable, has good title to the balance of such Property, free and clear all Liens whatsoever, except the Permitted Encumbrances and the Liens created by the Credit Documents. Grantor has legal power and authority to mortgage, convey, and hypothecate its interest in the Property, and this Security Instrument constitutes a valid first lien on Grantor's interest in the Property all in accordance with the terms hereof, subject only to the Permitted Encumbrances, the Landlord's fee interest in the Land, and the Liens created by the Credit Documents. To Grantor's knowledge, there are no claims for payment for work, labor or materials affecting the Property which are past due and are or may become a lien prior to, or of equal priority with, the Liens created by the Credit Documents unless such claims for payments are being contested in accordance with the terms and conditions of this Security Instrument.

"**Permitted Encumbrances**" shall mean, with respect to the Property, (a) the Liens and security interests created by the Credit Documents, (b) all Liens, encumbrances and other matters disclosed in the mortgagee title insurance policy issued with respect to the Property and insuring the lien of this Security Instrument (the "**Title Insurance Policy**"), (c) Liens, if any, for Taxes with respect to the Property imposed by any Governmental Authority not yet delinquent or which are being contested in good faith and for which adequate reserves have been established in accordance with the Credit Agreement if Grantor is required to pay such Taxes under the Master Lease or the Credit Agreement, (d) mechanics', materialmen's or similar Liens, if any, that are being contested in good faith and by appropriate proceedings in accordance with the applicable provisions of this Security Instrument and the other Credit Documents, (e) such other title and survey exceptions as are covered in the Title Insurance Policy or that Grantee has approved or may approve in writing in its reasonable discretion, and (f) any Permitted Liens.

**Section 3.10**    <u>Letter of Credit Rights</u>. If Grantor is at any time a beneficiary under a letter of credit relating to the properties, rights, titles and interests referenced in Section 1.1 of this Security Instrument now or hereafter issued in favor of Grantor, Grantor shall promptly notify Grantee thereof and, at the request and option of Grantee, Grantor shall, pursuant to an agreement in form and substance satisfactory to Grantee, either (a) arrange for the issuer and any confirmer of such letter of credit to consent to an assignment to Grantee of the proceeds of any drawing under the letter of credit or (b) arrange for Grantee to become the transferee beneficiary of the letter of credit, and Grantee agrees, in each case that the proceeds of any drawing under the letter of credit are to be applied as provided in Section 7.2 of this Security Instrument.

## ARTICLE IV - OBLIGATIONS AND RELIANCES

**Section 4.1**    <u>Relationship of Grantor and Grantee</u>. The relationship between Grantor and Grantee is solely that of debtor and creditor, and Grantee has no fiduciary or other special relationship with Grantor, and no term or condition of any of the Credit Agreement, this Security Instrument and the other Credit Documents shall be construed so as to deem the relationship between Grantor and Grantee to be other than that of debtor and creditor.

**Section 4.2**    <u>No Reliance on Grantee</u>. The general partners, members, principals and (if Grantor is a trust) beneficial owners of Grantor are experienced in the ownership and operation of properties similar to the Property, and Grantor and Grantee are relying solely upon such

GS/RT – Security Instrument (RT Lodge)

Record Book 2604 Page 2749

expertise and business plan in connection with the ownership and operation of the Property. Grantor is not relying on Grantee's expertise, business acumen or advice in connection with the Property.

**Section 4.3**    <u>No Grantee Obligations</u>.

    (a)    Notwithstanding the provisions of <u>Subsections 1.1(j)</u> and <u>(p)</u> or <u>Section 1.2</u>, Grantee is not undertaking the performance of (i) any obligations under the Leases; or (ii) any obligations with respect to such agreements, contracts, certificates, instruments, franchises, permits, trademarks, licenses and other documents.

    (b)    By accepting or approving anything required to be observed, performed or fulfilled or to be given to Grantee pursuant to this Security Instrument, the Credit Agreement, or the other Credit Documents, including, without limitation, any officer's certificate, balance sheet, statement of profit and loss or other financial statement, survey, appraisal, or insurance policy, Grantee shall not be deemed to have warranted, consented to, or affirmed the sufficiency, the legality or effectiveness of same, and such acceptance or approval thereof shall not constitute any warranty or affirmation with respect thereto by Grantee.

**Section 4.4**    <u>Reliance</u>.    Grantor recognizes and acknowledges that in accepting the Credit Agreement, this Security Instrument and the other Credit Documents, Grantee is expressly and primarily relying on the truth and accuracy of the warranties and representations set forth in Section 4.13 of the Credit Agreement without any obligation to investigate the Property and notwithstanding any investigation of the Property by Grantee; that such reliance existed on the part of Grantee prior to the date hereof; that the warranties and representations are a material inducement to Grantee in making the Loan; and that Grantee would not be willing to make the Loan and accept this Security Instrument in the absence of the warranties and representations as set forth in Section 4.13 of the Credit Agreement.

## ARTICLE V - FURTHER ASSURANCES

**Section 5.1**    <u>Recording of Security Instrument, Etc.</u>    Grantor forthwith upon the execution and delivery of this Security Instrument and thereafter, from time to time upon Grantee's reasonable request, will cause this Security Instrument and any of the other Credit Documents, if Grantor is a party thereto, creating a lien or security interest or evidencing the lien hereof upon the Property and each instrument of further assurance to be filed, registered or recorded in such manner and in such places as may be required by any present or future law in order to publish notice of and fully to protect and perfect the lien or security interest hereof upon, and the interest of Grantee in, the Property. Grantor will pay all taxes, filing, registration or recording fees, and all expenses incident to the preparation, execution, acknowledgment and/or recording of this Security Instrument, the other Credit Documents, any note, deed of trust or mortgage supplemental hereto, any security instrument with respect to the Property and any instrument of further assurance, and any modification or amendment of the foregoing documents, and all federal, state, county and municipal taxes, duties, imposts, assessments and charges arising out of or in connection with the execution and delivery of this Security Instrument, any deed of trust or mortgage supplemental hereto, any security instrument with respect to the Property or any instrument of further assurance,

GS/RT – Security Instrument (RT Lodge)

**Record Book 2604 Page 2750**

and any modification or amendment of the foregoing documents, except where prohibited by law so to do.

Section 5.2    Further Acts, Etc.    Grantor will, at the cost of Grantor, and without expense to Grantee, do, execute, acknowledge and deliver all and every such further acts, deeds, conveyances, deeds of trust, mortgages, assignments, notices of assignments, transfers and assurances as Grantee shall, from time to time, reasonably require, for the better assuring, conveying, assigning, transferring, and confirming unto Grantee the property and rights hereby mortgaged, deeded, granted, bargained, sold, conveyed, confirmed, pledged, assigned, warranted and transferred or intended now or hereafter so to be, or which Grantor may be or may hereafter become bound to convey or assign to Grantee, or for carrying out the intention or facilitating the performance of the terms of this Security Instrument or for filing, registering or recording this Security Instrument, or for complying with all Legal Requirements (as defined below). Grantor, upon reasonable request of Grantee, shall execute and deliver, and in the event it shall fail to so execute and deliver such reasonable documentation necessary for Grantee to obtain and maintain perfection of its security interests in the Property, hereby authorizes Grantee to file one or more financing statements to evidence more effectively the security interest of Grantee in the Property. Such financing statements may describe as the collateral covered thereby as "all assets of the debtor, whether now owned or hereafter acquired" or words to that effect. Grantor grants to Grantee an irrevocable power of attorney coupled with an interest for the purpose of exercising and perfecting any and all rights and remedies available to Grantee at law and in equity, including without limitation, the right (a) to execute and/or record any notices of completion, cessation of labor or any other notices that Grantee deems appropriate to protect Grantee's interest, if Grantor shall fail to do so within three (3) Business Days after written request by Grantee, (b) upon the issuance of a deed or assignment of lease pursuant to the foreclosure of this Security Instrument or the delivery of a deed or assignment of lease in lieu of foreclosure, to execute all instruments of assignment, conveyance or further assurance with respect to the Leases, Rents, personalty, Fixtures, plans and property agreements in favor of the grantee of any such deed or the assignee of any such assignment of lease and as may be necessary or desirable for such purpose, (c) to prepare, execute and file or record financing statements, continuation statements, applications for registration and like papers necessary to create, perfect or preserve Grantee's security interests and rights in or to any of the Collateral, and (d) to perform any obligation of Grantor hereunder; however: (1) Grantee shall not under any circumstances be obligated to perform any obligation of Grantor; (2) any sums advanced by Grantee in such performance shall be included in the Obligations and shall bear interest at the Default Rate; (3) Grantee as such attorney-in-fact shall only be accountable for such funds as are actually received by Grantee; and (4) Grantee shall not be liable to Grantor or any other person or entity for any failure to take any action that it is empowered to take under this Section 5.2.

"Legal Requirements" shall mean all federal, state, county, municipal and other governmental statutes, laws, rules, orders, regulations, ordinances, judgments, decrees and injunctions of Governmental Authorities affecting the Property or any part thereof, or the construction, use, alteration or operation thereof, or any part thereof, whether now or hereafter enacted and in force, and all permits, licenses and authorizations and regulations relating thereto (including, without limitation, all licenses), and all covenants, agreements, restrictions and encumbrances contained in any instruments, either of record or known to Grantor, at any time in

GS/RT – Security Instrument (RT Lodge)

force affecting Grantor, the Property or any part thereof, including, without limitation, any which may (a) require repairs, modifications or alterations in or to the Property or any part thereof, or (b) in any way limit the use and enjoyment thereof.

**Section 5.3**   **Changes in Tax, Obligations, Credit and Documentary Stamp Laws.**

(a)   If any law is enacted or adopted or amended after the date of this Security Instrument which deducts the Obligations from the value of the Property for the purpose of taxation or which imposes a tax, either directly or indirectly, on the Obligations or Grantee's interest in the Property, Grantor will pay the tax, with interest and penalties thereon, if any. If Grantee is advised by counsel chosen by it that the payment of tax by Grantor would be unlawful or taxable to Grantee or unenforceable or provide the basis for a defense of usury then Grantee shall have the option by written notice of not less than thirty (30) days to require a mandatory prepayment of the Obligations in an amount not to exceed 100% of the appraised value of the Property and release this Security Instrument, pursuant to and in accordance with the terms of the Credit Documents.

(b)   Grantor will not claim or demand or be entitled to any credit or credits on account of the Obligations for any part of the Taxes or other maintenance charges or impositions assessed against the Property, or any part thereof, and no deduction shall otherwise be made or claimed from the assessed value of the Property, or any part thereof, for real estate tax purposes by reason of this Security Instrument or the Obligations. If such claim, credit or deduction shall be required by law, Grantee shall have the option, by written notice of not less than thirty (30) days, to require a mandatory prepayment of the Obligations in an amount not to exceed 100% of the appraised value of the Property and release this Security Instrument, pursuant to and in accordance with the terms of the Credit Documents.

(c)   If at any time the United States of America, any state thereof or any subdivision of any such state shall require revenue or other stamps to be affixed to this Security Instrument, or any of the other Credit Documents or impose any other tax or charge on the same, Grantor will pay for the same, with interest and penalties thereon, if any, except for any interest or penalties caused by Grantee's willful misconduct or gross negligence.

**Section 5.4**   **Replacement Documents.**   Upon receipt of an affidavit of an officer of Grantee as to the loss, theft, destruction or mutilation of any Credit Document to which Grantor is a party which is not of public record, and, in the case of any such mutilation, upon surrender and cancellation of such Credit Document, Grantor will issue in lieu thereof, a replacement Credit Document, dated the date of such lost, stolen, destroyed or mutilated Credit Document in the same principal amount thereof and otherwise in the same form as such lost, stolen, destroyed or mutilated Credit Document.

## ARTICLE VI - DUE ON SALE/ENCUMBRANCE

**Section 6.1**   **Grantee Reliance.**   Grantor acknowledges that Grantee has examined and relied on the experience of Grantor and their respective members in owning and operating properties such as the Property in agreeing to make the Loan, and will continue to rely on Grantor's interest in the Property as a means of maintaining the value of the Property as security for

GS/RT – Security Instrument (RT Lodge)

repayment of the Obligations and the performance of the Other Obligations. Grantor acknowledges that Grantee has a valid interest in maintaining the value of the Property so as to ensure that, should Grantor default in the repayment of the Obligations or the performance of the Other Obligations, Grantee can recover the Obligations, or part thereof, by a sale of the Property.

**Section 6.2    No Sale/Encumbrance.** Except as expressly permitted under any Permitted Encumbrances, Grantor shall not sell, convey, mortgage, grant, bargain, encumber, pledge, assign, grant options with respect to, or otherwise transfer or dispose of (directly or indirectly, voluntarily or involuntarily, by operation of law or otherwise, and whether or not for consideration or of record) (collectively, a "**Transfer**") the Property or any part thereof or any interest therein or permit or suffer the Property or any part thereof or any interest therein to be Transferred except as expressly permitted pursuant to the terms of the Credit Agreement.

## ARTICLE VII - RIGHTS AND REMEDIES UPON DEFAULT

**Section 7.1    Remedies.** Upon the occurrence and during the continuance of any Event of Default, subject to any applicable grace or cure periods in any Credit Document, Grantor agrees that Grantee may take such action, without notice or demand, as it deems advisable to protect and enforce its rights against Grantor and in and to the Property, including, but not limited to, the following actions, each of which may be pursued concurrently or otherwise, at such time and in such order as Grantee may determine, in its sole discretion, without impairing or otherwise affecting the other rights and remedies of Grantee:

(a)    declare the Obligations to be immediately due and payable;

(b)    institute proceedings, judicial or otherwise, for the complete foreclosure of this Security Instrument under any applicable provision of law, in which case the Property or any interest therein may be sold for cash or upon credit in one or more parcels or in several interests or portions and in any order or manner;

(c)    with or without entry, to the extent permitted and pursuant to the procedures provided by applicable law, institute proceedings for the partial foreclosure of this Security Instrument for the portion of the Obligations then due and payable, subject to the continuing lien and security interest of this Security Instrument for the balance of the Obligations not then due, unimpaired and without loss of priority;

(d)    sell for cash or upon credit the Property or any part thereof and all estate, claim, demand, right, title and interest of Grantor therein and rights of redemption thereof, pursuant to power of sale or otherwise, at one or more sales, as an entirety or in parcels, at such time and place, upon such terms and after such notice thereof as may be required or permitted by law;

(e)    institute an action, suit or proceeding in equity for the specific performance of any covenant, condition or agreement contained herein, in the Credit Agreement or in the other Credit Documents;

(f)    recover judgment on the Notes either before, during or after any proceedings for the enforcement of this Security Instrument or the other Credit Documents;

GS/RT – Security Instrument (RT Lodge)

(g)  apply for the appointment of a receiver, trustee, liquidator or conservator of the Property, which Grantor hereby irrevocably consents to and waives any right to object to or otherwise contest such appointment during the continuance of an Event of Default to the extent permitted by applicable law, and without regard for the adequacy of the security for the Obligations and without regard for the solvency of Grantor, any guarantor or any indemnitor with respect to the Loan or of any Person liable for the payment of the Obligations;

(h)  the license granted to Grantor under Section 1.2 hereof shall automatically be revoked and Grantee may enter into or upon the Property, either personally or by its agents, nominees or attorneys and dispossess Grantor and its agents and servants therefrom, subject to the terms of the Master Lease, without liability for trespass, damages or otherwise and exclude Grantor and its agents or servants wholly therefrom, and take possession of all books, records and accounts relating thereto and Grantor agrees to surrender possession of the Property and of such books, records and accounts to Grantee upon demand, and thereupon Grantee may (i) use, operate, manage, control, insure, maintain, repair, and restore all and every part of the Property and conduct the business thereat, subject to the terms of the Master Lease; (ii) to notify any tenant or other person that the Leases have been assigned to Grantee and that all Rents are to be paid directly to Grantee, whether or not Grantee has commenced or completed foreclosure or taken possession of the Property; (iii) subject to the terms of the Master Lease, complete any construction on the Property in such manner and form as Grantee deems advisable; (iv) subject to the terms of the Master Lease, make alterations, additions, renewals, replacements and improvements to or on the Property (provided Grantor shall not be responsible for costs incurred by Grantee in connection with such alterations, additions, renewals, replacements and improvements unless the same are reasonably necessary to maintain the Property in good and safe condition and repair and in compliance with applicable laws); (v) exercise all rights and powers of Grantor with respect to the Property, whether in the name of Grantor or otherwise, including, without limitation, the right to make, cancel, enforce or modify the Leases, obtain and evict tenants, and demand, sue for, collect and receive all Rents of the Property and every part thereof; (vi) require Grantor to pay monthly in advance to Grantee, or any receiver appointed to collect the Rents, the fair and reasonable rental value for the use and occupation of such part of the Property as may be occupied by Grantor; (vii) require Grantor to vacate and surrender possession of the Property to Grantee or to such receiver and, in default thereof, Grantor may be evicted by summary proceedings or otherwise; and (viii) apply the receipts from the Property to the payment of the Obligations, in such order, priority and proportions as Grantee shall deem appropriate in its sole discretion after deducting therefrom all expenses (including reasonable attorneys' fees) incurred in connection with the aforesaid operations and all amounts necessary to pay the Taxes (if Grantor is required to pay Taxes under the Master Lease), maintenance charges, impositions other than Taxes (if Grantor is required to pay such impositions under the Master Lease) and any other charges, insurance and other expenses in connection with the Property, as well as just compensation for the services of Grantee, its counsel, agents and employees. Notwithstanding the generality of the foregoing, the license granted under Section 1.2 hereof shall be reinstated immediately within one (1) day following the cure of the Event of Default which caused the suspension of such license pursuant to this Section 7.1(h);

(i)  exercise any and all rights and remedies granted to a secured party upon default under the Uniform Commercial Code, including, without limiting the generality of the

GS/RT – Security Instrument (RT Lodge)

Record Book 2604 Page 2754

foregoing: (i) the right to take possession of the Fixtures, the Equipment, the Personal Property or any part thereof, and to take such other measures as Grantee may deem necessary for the care, protection and preservation of the Fixtures, the Equipment, the Personal Property, and (ii) request Grantor at its expense to assemble the Fixtures, the Equipment, the Personal Property and make it available to Grantee at a convenient place acceptable to Grantee. Any notice of sale, disposition or other intended action by Grantee with respect to the Fixtures, the Equipment and/or the Personal Property sent to Grantor in accordance with the provisions hereof at least ten (10) days prior to such action, shall constitute commercially reasonable notice to Grantor;

(j)       apply any sums then deposited or held in escrow or otherwise by or on behalf of Grantee in accordance with the terms of the Credit Agreement, this Security Instrument or any other Credit Document to the payment of the following items in any order in its sole discretion: (i) Taxes and maintenance charges, impositions other than Taxes and any other charges, provided that Grantor is required to pay such Taxes and other impositions under the Master Lease; (ii) insurance premiums; (iii) interest on the unpaid principal balance of the Notes; (iv) the unpaid principal balance of the Notes and (v) all other sums payable pursuant to the Notes, the Credit Agreement, this Security Instrument and the other Credit Documents, including without limitation advances made by Grantee pursuant to the terms of this Security Instrument;

(k)       subject to the terms of the Master Lease, surrender the insurance policies maintained pursuant to the Credit Documents, collect the unearned insurance premiums for such insurance policies and apply such sums as a credit on the Obligations in such priority and proportion as Grantee in its discretion shall deem proper, and in connection therewith, Grantor hereby appoints Grantee as agent and attorney-in-fact (which is coupled with an interest and is therefore irrevocable) for Grantee to collect such insurance premiums; or

(l)       pursue such other remedies as Grantee may have under applicable law.

In the event of a sale, by foreclosure, power of sale or otherwise, of less than all of the Property, this Security Instrument shall continue as a lien and security interest on the remaining portion of the Property unimpaired and without loss of priority.

Section 7.2    **Application of Proceeds**. Upon the occurrence and during the continuance of an Event of Default, subject to any applicable grace or cure periods in any Credit Document, the purchase money, proceeds and avails of any disposition of the Property, and or any part thereof, or any other sums collected by Grantee pursuant to this Security Instrument or the other Credit Documents, shall be applied by Grantee to the payment of the Obligations in such priority and proportions as Grantee in its discretion shall deem proper.

Section 7.3    **Right to Cure Defaults**. Upon the occurrence and during the continuance of any Event of Default, subject to any applicable grace or cure periods in any Credit Document, or if Grantor fails to make any payment or to do any act as herein provided, Grantee may, but without any obligation to do so and without notice to or demand on Grantor and without releasing Grantor from any obligation hereunder, make any payment or do any act required of Grantor hereunder in such manner and to such extent as Grantee may deem necessary to protect the security hereof. Grantee is authorized to enter upon the Property for such purposes, or appear in, defend,

GS/RT – Security Instrument (RT Lodge)

-16-

or bring any action or proceeding to protect its interest in the Property or to foreclose this Security Instrument or collect the Obligations, and all cost and expense thereof (including attorneys' fees to the extent permitted by law), with interest as provided in this Section 7.3, shall constitute a portion of the Obligations and shall be due and payable to Grantee upon demand.  All such costs and expenses incurred by Grantee in remedying such Event of Default or such failed payment or act or in appearing in, defending, or bringing any such action or proceeding shall bear interest at the Default Rate, for the period after notice from Grantee that such cost or expense was incurred to the date of payment to Grantee.  All such costs and expenses incurred by Grantee together with interest thereon calculated at the Default Rate shall be deemed to constitute a portion of the Obligations and be secured by this Security Instrument and the other Credit Documents and shall be immediately due and payable upon demand by Grantee therefor.

Section 7.4    <u>Actions and Proceedings</u>.  Grantee has the right to appear in and defend any action or proceeding brought with respect to the Property and to bring any action or proceeding, in the name and on behalf of Grantor, which Grantee, in its discretion, decides should be brought to protect its interest in the Property.

Section 7.5    <u>Recovery of Sums Required To Be Paid</u>.  Grantee shall have the right from time to time to take action to recover any sum or sums which constitute a part of the Obligations as the same become due, without regard to whether or not the balance of the Obligations shall be due, and without prejudice to the right of Grantee thereafter to bring an action of foreclosure, or any other action, for any Event of Default existing at the time such earlier action was commenced.

Section 7.6    <u>Examination of Books and Records</u>.  At reasonable times and upon reasonable notice to Grantor, Grantee, its agents, accountants and attorneys shall have the right to examine the records, books, management and other papers of Grantor which reflect upon their financial condition, at the Property or at any office regularly maintained by Grantor where the books and records are located.  Grantee and its agents shall have the right to make copies and extracts from the foregoing records and other papers.  In addition, Grantee, its agents, accountants and attorneys shall have the right to examine and audit the books and records of Grantor pertaining to the income, expenses and operation of the Property during business hours at any office of Grantor where the books and records are located.  This Section 7.6 shall apply throughout the term of the Loans and without regard to whether an Event of Default has occurred.  Notwithstanding the foregoing, Grantee shall use commercially reasonable efforts not to unreasonably interfere with or interrupt Grantor's business operations when exercising its rights under this Section 7.6.

Section 7.7    <u>Other Rights, Etc</u>.

(a)    The failure of Grantee to insist upon strict performance of any term hereof shall not be deemed to be a waiver of any term of this Security Instrument.  Grantor shall not be relieved of Grantor's obligations hereunder by reason of (i) the failure of Grantee to comply with any request of Grantor or any guarantor or any indemnitor with respect to the Loans to take any action to foreclose this Security Instrument or otherwise enforce any of the provisions hereof or of the other Credit Documents, (ii) the release, regardless of consideration, of the whole or any part of the Property, or of any person liable for the Obligations or any portion thereof, or (iii) any

GS/RT – Security Instrument (RT Lodge)

agreement or stipulation by Grantee extending the time of payment or otherwise modifying or supplementing the terms of this Security Instrument or the other Credit Documents.

(b)     It is agreed that the risk of loss or damage to the Property is on Grantor, and Grantee shall have no liability whatsoever for decline in value of the Property, for failure to maintain the insurance policies required to be maintained pursuant to the Credit Documents, or for failure to determine whether insurance in force is adequate as to the amount of risks insured. Possession by Grantee shall not be deemed an election of judicial relief if any such possession is requested or obtained with respect to any Property or collateral not in Grantee's possession.

(c)     Grantee may resort for the payment of the Obligations to any other security held by Grantee in such order and manner as Grantee, in its discretion, may elect. Grantee may take action to recover the Obligations, or any portion thereof, or to enforce any covenant hereof without prejudice to the right of Grantee thereafter to foreclose this Security Instrument. The rights of Grantee under this Security Instrument shall be separate, distinct and cumulative and none shall be given effect to the exclusion of the others. No act of Grantee shall be construed as an election to proceed under any one provision herein to the exclusion of any other provision. Grantee shall not be limited exclusively to the rights and remedies herein stated but shall be entitled to every right and remedy now or hereafter afforded at law or in equity.

**Section 7.8     Right to Release Any Portion of the Property.** Grantee may release any portion of the Property for such consideration as Grantee may require, without, as to the remainder of the Property, in any way impairing or affecting the lien or priority of this Security Instrument, or improving the position of any subordinate lienholder with respect thereto, except to the extent that the obligations hereunder shall have been reduced by the actual monetary consideration, if any, received by Grantee for such release, and may accept by assignment, pledge or otherwise any other property in place thereof as Grantee may require without being accountable for so doing to any other lienholder. This Security Instrument shall continue as a lien and security interest in the remaining portion of the Property.

**Section 7.9     Violation of Laws.** If the Property is not in material compliance with Legal Requirements, Grantee may impose additional reasonable requirements upon Grantor in connection therewith.

**Section 7.10     Recourse and Choice of Remedies.** Notwithstanding any other provision of this Security Instrument or the Credit Agreement, including, without limitation, Section 10.14 of the Credit Agreement, to the fullest extent permitted by applicable law, Grantee and other Indemnitees (as hereinafter defined) are entitled to enforce the obligations of Grantor contained in Sections 9.1, 9.2 and 9.3 herein and Section 10.14 of the Credit Agreement without first resorting to or exhausting any security or collateral and without first having recourse to the Notes or any of the Property, through foreclosure or acceptance of a deed in lieu of foreclosure or otherwise, and in the event Grantee commences a foreclosure action against the Property, Grantee is entitled to pursue a deficiency judgment with respect to such obligations against Grantor. The provisions of Sections 9.1, 9.2 and 9.3 herein and Section 10.14 of the Credit Agreement are exceptions to any non-recourse or exculpation provisions in the Credit Agreement, the Notes, this Security Instrument or the other Credit Documents, and Grantor is fully and personally liable for the

GS/RT – Security Instrument (RT Lodge)

Record Book 2604 Page 2757

obligations pursuant to Sections 9.1, 9.2 and 9.3 herein and Section 10.14 of the Credit Agreement. The liability of Grantor pursuant to Sections 9.1, 9.2 and 9.3 herein and Section 10.14 of the Credit Agreement is not limited to the original principal amount of the Notes. Notwithstanding the foregoing, nothing herein shall inhibit or prevent Grantee from foreclosing or exercising any other rights and remedies pursuant to the Credit Agreement, the Notes, this Security Instrument and the other Credit Documents, whether simultaneously with foreclosure proceedings or in any other sequence. A separate action or actions may be brought and prosecuted against Grantor pursuant to Sections 9.1, 9.2 and 9.3 herein and Section 10.14 of the Credit Agreement whether or not action is brought against any other Person or whether or not any other Person is joined in the action or actions. In addition, Grantee shall have the right but not the obligation to join and participate in, as a party if it so elects, any administrative or judicial proceedings or actions initiated in connection with any matter addressed in Article 9 herein.

**Section 7.11   Right of Entry**. Upon reasonable notice to Grantor, Grantee and its agents shall have the right to enter and inspect the Property at all reasonable times, subject to the terms and conditions of the Master Lease. Notwithstanding the foregoing, Grantee and its agents shall use commercially reasonable efforts not to unreasonably interfere with or interrupt Grantor's business operations when exercising its rights under this Section 7.11.

## ARTICLE VIII - PREPAYMENT

**Section 8.1   Prepayment**. The Obligations may not be prepaid in whole or in part except in accordance with the express terms and conditions of the Credit Agreement.

## ARTICLE IX - INDEMNIFICATION

**Section 9.1   General Indemnification**. Grantor shall, at its sole cost and expense, protect (with legal counsel reasonably acceptable to Grantee), defend, indemnify, release and hold harmless the Indemnitees from and against any and all claims, suits, liabilities, actions, proceedings, obligations, debts, damages, losses, costs, expenses, diminutions in value, fines, penalties, charges, fees, expenses, judgments, awards, amounts paid in settlement, damages, of whatever kind or nature (including but not limited to reasonable attorneys' fees and other costs of defense) (collectively, the "**Losses**") imposed upon or incurred by or asserted against any Indemnitees and directly or indirectly arising out of or in any way relating to any one or more of the following: (a) ownership of this Security Instrument, the security interest in the Property or any interest therein or receipt of any Rents; (b) any amendment to, or restructuring of, the Obligations, the Credit Agreement, this Security Instrument, or any other Credit Document; (c) any and all lawful action that may be taken by Grantee in connection with the enforcement of the provisions of this Security Instrument, the Credit Agreement, or any of the other Credit Documents, whether or not suit is filed in connection with same, or in connection with Grantor, any guarantor or any indemnitor and/or any partner, joint venturer or shareholder thereof becoming a party to a voluntary or involuntary federal or state bankruptcy, insolvency or similar proceeding; (d) any accident, injury to or death of persons or loss of or damage to property occurring in, on, or about the Property or any part thereof or on the adjoining sidewalks, curbs, adjacent property or adjacent parking areas, streets or ways; (e) any use, nonuse or condition in, on, or about the Property or on the adjoining sidewalks, curbs, adjacent property or adjacent parking areas, streets

GS/RT – Security Instrument (RT Lodge)

**Record Book 2604 Page 2758**

or ways; (f) any failure on the part of Grantor to perform or be in compliance with any of the terms of this Security Instrument, the Credit Agreement or any of the other Credit Documents; (g) performance of any labor or services or the furnishing of any materials or other property in respect of the Property or any part thereof; (h) the failure of any person to file timely with the Internal Revenue Service an accurate Form 1099-B, Statement for Recipients of Proceeds from Real Estate, Broker and Barter Exchange Transactions, which may be required in connection with this Security Instrument, or to supply a copy thereof in a timely fashion to the recipient of the proceeds of the transaction in connection with which this Security Instrument is made; (i) any failure of the Property to be in compliance with any Legal Requirements; (j) the enforcement by any Indemnitee of the provisions of this Article 9; (k) any and all claims and demands whatsoever which may be asserted against Grantee by reason of any alleged obligations or undertakings on its part to perform or discharge any of the terms, covenants, or agreements contained in any Lease; (l) the payment of any commission, charge or brokerage fee to anyone claiming through Grantor which may be payable in connection with the funding of the Loan; or (m) any misrepresentation made by Grantor in this Security Instrument or the other Credit Documents; provided, in each case, that Grantor shall not have any obligation to any Indemnitee hereunder with respect to any Losses to the extent that such Losses arise from the bad faith, gross negligence or willful misconduct of Grantee, as determined by a court of competent jurisdiction in a final, non-appealable order, of that Indemnitee. Any losses incurred by Grantee by reason of the application of this Section 9.1 shall become immediately due and payable and shall bear interest at the Default Rate from the date loss or damage is sustained by Grantee until paid. Notwithstanding the foregoing, Grantor shall not be liable for the payment of Losses to the extent the same arise as a result of the Indemnitee's gross negligence or willful misconduct.

Section 9.2    **Mortgage and/or Intangible Tax.**    Grantor shall, at its sole cost and expense, protect, defend, indemnify, release and hold harmless the Indemnitees from and against any and all Losses imposed upon or incurred by or asserted against any Indemnitees and directly or indirectly arising out of or in any way relating to any tax on the making and/or recording of this Security Instrument or any of the other Credit Documents, but excluding any income, franchise or other similar taxes. Grantor hereby agrees that, in the event that it is determined that any documentary stamp taxes or intangible personal property taxes are due hereon or on any mortgage or promissory note executed in connection herewith (including, without limitation, the Notes), Grantor shall indemnify and hold harmless the Indemnitees for all such documentary stamp and/or intangible taxes, including all penalties and interest assessed or charged in connection therewith, if any, except for any penalties and interest that are caused by the willful misconduct or gross negligence of the Indemnitees.

Section 9.3    Intentionally Deleted.

Section 9.4    **Duty to Defend; Reasonable Attorneys' Fees and Other Fees and Expenses.**    Upon written request by any Indemnitee, Grantor shall defend such Indemnitee (if requested by any Indemnitee, in the name of the Indemnitee) by attorneys and other professionals approved by the Indemnitees, from and against any Losses. Notwithstanding the foregoing, if the defendants in any such claim or proceeding include both Grantor and any Indemnitee and Grantor and such Indemnitee shall have reasonably concluded that there are any legal defenses available to it and/or other Indemnitees that are different from or additional to those available to Grantor,

GS/RT – Security Instrument (RT Lodge)

such Indemnitee shall have the right, at Grantor's sole expense, to select separate counsel to assert such legal defenses and to otherwise participate in the defense of such action on behalf of such Indemnitee, provided that no compromise or settlement shall be entered without Grantor's consent, which consent shall not be unreasonably withheld. Upon demand, Grantor shall pay or, in the sole and absolute discretion of the Indemnitees, reimburse, the Indemnitees for the payment of reasonable fees and out-of-pocket expenses of attorneys, engineers, environmental consultants, and other professionals in connection therewith.

## ARTICLE X - WAIVERS

**Section 10.1    Waiver of Counterclaim.**  To the fullest extent permitted by applicable law, Grantor hereby waives the right to assert a counterclaim, other than a mandatory or compulsory counterclaim, in any action or proceeding brought against it by Grantee arising out of or in any way connected with this Security Instrument, the Credit Agreement, any of the other Credit Documents, or the Obligations.

**Section 10.2    Marshalling and Other Matters.**   To the fullest extent permitted by applicable law, Grantor hereby waives the benefit of all appraisement, valuation, stay, extension, reinstatement and redemption laws now or hereafter in force and all rights of marshalling in the event of any sale hereunder of the Property or any part thereof or any interest therein. Further, Grantor hereby expressly waives any and all rights of redemption from sale under any order or decree of foreclosure of this Security Instrument on behalf of Grantor, and on behalf of each and every person acquiring any interest in or title to the Property subsequent to the date of this Security Instrument and on behalf of all persons.

**Section 10.3    Waiver of Notice.**  To the extent permitted by applicable law, Grantor shall not be entitled to any notices of any nature whatsoever from Grantee except with respect to matters for which this Security Instrument specifically and expressly provides for the giving of notice by Grantee to Grantor and except with respect to matters for which Grantee is required by applicable law to give notice, and Grantor hereby expressly waives the right to receive any notice from Grantee with respect to any matter for which this Security Instrument does not specifically and expressly provide for the giving of notice by Grantee to Grantor.

**Section 10.4    Waiver of Statute of Limitations.**  To the fullest extent permitted by applicable law, Grantor hereby expressly waives and releases to the fullest extent permitted by law, the pleading of any statute of limitations as a defense to payment of the Obligations or performance of its Other Obligations.

**Section 10.5    Survival.**  The indemnifications made pursuant to Sections 9.1, 9.2 and 9.3 herein shall continue indefinitely in full force and effect and shall survive and shall in no way be impaired by any of the following: any satisfaction or other termination of this Security Instrument, any assignment or other transfer of all or any portion of this Security Instrument or Grantee's interest in the Property (but, in such case, shall benefit both Indemnitees and any assignee or transferee), any exercise of Grantee's rights and remedies pursuant hereto including, but not limited to, foreclosure or acceptance of a deed in lieu of foreclosure, any exercise of any rights and remedies pursuant to the Credit Agreement or any of the other Credit Documents, any transfer of

GS/RT – Security Instrument (RT Lodge)

-21-

all or any portion of the Property (whether by Grantor or by Grantee following foreclosure or acceptance of a deed in lieu of foreclosure or at any other time), any amendment to this Security Instrument, the Credit Agreement or the other Credit Documents, and any act or omission that might otherwise be construed as a release or discharge of Grantor from the obligations pursuant hereto.

## ARTICLE XI - EXCULPATION

The provisions of Section 10.3 of the Credit Agreement are hereby incorporated by reference into this Security Instrument to the same extent and with the same force as if fully set forth herein.

## ARTICLE XII - NOTICES

All notices or other written communications hereunder shall be delivered in accordance with Section 10.1 of the Credit Agreement; provided that any notice or other written communication to Trustee shall be delivered to Trustee at the address set forth on page 1 hereof.

## ARTICLE XIII - APPLICABLE LAW

**Section 13.1   Governing Law.** This Security Instrument shall be governed in accordance with the terms and provisions of Section 10.14 of the Credit Agreement; provided that the provisions of this Security Instrument regarding the creation, perfection and enforcement of the Liens and security interests herein granted shall be governed by and construed under the laws of the state in which the Property is located.

**Section 13.2   Usury Laws.** Notwithstanding anything to the contrary, (a) all agreements and communications between Grantor and Grantee are hereby and shall automatically be limited so that, after taking into account all amounts deemed interest, the interest contracted for, charged or received by Grantee shall never exceed the maximum lawful rate or amount, (b) in calculating whether any interest exceeds the lawful maximum, all such interest shall be amortized, prorated, allocated and spread over the full amount and term of all principal indebtedness of Grantor to Grantee, and (c) if through any contingency or event, Grantee receives or is deemed to receive interest in excess of the lawful maximum, any such excess shall be deemed to have been applied toward payment of the principal of any and all then outstanding indebtedness of Grantor to Grantee, or if there is no such indebtedness, shall immediately be returned to Grantor.

**Section 13.3   Provisions Subject to Applicable Law.** All rights, powers and remedies provided in this Security Instrument may be exercised only to the extent that the exercise thereof does not violate any applicable provisions of law and are intended to be limited to the extent necessary so that they will not render this Security Instrument invalid, unenforceable or not entitled to be recorded, registered or filed under the provisions of any applicable law. If any term of this Security Instrument or any application thereof shall be invalid or unenforceable, the remainder of this Security Instrument and any other application of the term shall not be affected thereby.

GS/RT – Security Instrument (RT Lodge)

**Record Book 2604 Page 2761**

# ARTICLE XIV - DEFINITIONS

All capitalized terms not defined herein shall have the respective meanings set forth in the Credit Agreement. Unless the context clearly indicates a contrary intent or unless otherwise specifically provided herein, words used in this Security Instrument may be used interchangeably in singular or plural form and the word "**Grantor**" shall mean "the Grantor and any subsequent owner or owners of the Property or any part thereof or any interest therein (other than Grantee, its designee or any Person that acquires title to all or any portion of the Property from Grantee or such designee)", the word "**Grantor**" shall mean "the Grantor" together with its successors and assigns, the word "**Grantee**" shall mean "Grantee and any of Grantee's successors and assigns," the word "**Note**" shall mean "the Notes and any other evidence of indebtedness secured by this Security Instrument," the word "**Property**" shall include any portion of the Property and any interest therein, and the phrases "**attorneys' fees**", "**legal fees**" and "**counsel fees**" shall include any and all attorneys', paralegal fees and out-of-pocket expenses, including, but not limited to, fees and out-of-pocket expenses at the pre-trial, trial and appellate levels incurred or paid by Grantee in protecting its interest in the Property, the Leases and the Rents and enforcing its rights hereunder.

# ARTICLE XV - MISCELLANEOUS PROVISIONS

**Section 15.1   No Oral Change.**  This Security Instrument, and any provisions hereof, may not be modified, amended, waived, extended, changed, discharged or terminated orally or by any act or failure to act on the part of Grantor or Grantee, but only by an agreement in writing signed by the party against whom enforcement of any modification, amendment, waiver, extension, change, discharge or termination is sought.

**Section 15.2   Successors and Assigns.**  This Security Instrument shall be binding upon and inure to the benefit of Grantor and Grantee and their respective successors and assigns forever.

**Section 15.3   Inapplicable Provisions.**  If any term, covenant or condition of the Credit Agreement, this Security Instrument, or any of the other Credit Documents is held to be invalid, illegal or unenforceable in any respect, the Credit Agreement, this Security Instrument, and the other Credit Documents shall be construed without such provision.

**Section 15.4   Headings, Etc.**  The headings and captions of various Sections of this Security Instrument are for convenience of reference only and are not to be construed as defining or limiting, in any way, the scope or intent of the provisions hereof.

**Section 15.5   Number and Gender.**  Whenever the context may require, any pronouns used herein shall include the corresponding masculine, feminine or neuter forms, and the singular form of nouns and pronouns shall include the plural and vice versa.

**Section 15.6   Subrogation.**  If any or all of the proceeds of the Notes have been used to extinguish, extend or renew any indebtedness heretofore existing against the Property, then, to the extent of the funds so used, Grantee shall be subrogated to all of the rights, claims, liens, titles, and interests existing against the Property heretofore held by, or in favor of, the holder of such indebtedness and such former rights, claims, liens, titles, and interests, if any, are not waived but

GS/RT – Security Instrument (RT Lodge)

Record Book 2604 Page 2762

rather are continued in full force and effect in favor of Grantee and are merged with the lien and security interest created herein as cumulative security for the repayment of the Obligations, the performance and discharge of Grantor's obligations hereunder, under the Credit Agreement, the Notes and the other Credit Documents and the performance and discharge of the Other Obligations.

Section 15.7   Entire Agreement.  The Credit Agreement, this Security Instrument and the other Credit Documents constitute the entire understanding and agreement between Grantor and Grantee with respect to the transactions arising in connection with the Obligations and supersede all prior written or oral understandings and agreements between Grantor and Grantee with respect thereto.  Grantor hereby acknowledges that, except as incorporated in writing in the Credit Agreement, this Security Instrument and the other Credit Documents, there are not, and were not, and no persons are or were authorized by Grantee to make, any representations, understandings, stipulations, agreements or promises, oral or written, with respect to the transaction which is the subject of the Credit Agreement, this Security Instrument and the other Credit Documents.

Section 15.8   Lien Absolute.  Grantor acknowledges that this Security Instrument and a number of other Credit Documents and those documents required by the Credit Documents together secure the Obligations.  Grantor agrees that, to the extent permitted by law, the lien of this Security Instrument and all obligations of Grantor hereunder shall be absolute and unconditional and shall not in any manner be affected or impaired by:

(i)     any lack of validity or enforceability of the Credit Agreement or any other Credit Document, any agreement with respect to any of the Obligations or any other agreement or instrument relating to any of the foregoing;

(ii)    any acceptance by Grantee of any security for or guarantees of any of the Obligations;

(iii)   any failure, neglect or omission on the part of Grantee to realize upon or protect any of the Obligations or any of the collateral security therefor, including the Credit Documents, or due to any other circumstance that might otherwise constitute a defense available to, or a discharge of, Grantor in respect of the Obligations and Obligations hereby secured or any collateral security therefor, including the Credit Documents, or due to any other circumstance that might otherwise constitute a defense available to, or a discharge of, Grantor in respect of the Obligations or this Security Instrument (other than the indefeasible payment in full in cash of all the Obligations hereby secured);

(iv)    any change in the time, manner or place of payment of, or in any other term of, all or any of the Obligations;

(v)     any release (except as to the property released), sale, pledge, surrender, compromise, settlement, nonperfection, renewal, extension, indulgence, alteration, exchange, modification or disposition of any of Obligations hereby secured or of any of the collateral security therefor;

OS/RT – Security Instrument (RT Lodge)

-24-

(vi)    any amendment or waiver of or any consent to any departure from the Credit Agreement or any other Credit Documents or of any guaranty thereof, if any, and Grantee may in its discretion foreclose, exercise any power of sale, or exercise any other remedy available to it under any or all of the Credit Documents without first exercising or enforcing any of its rights and remedies hereunder; and

(vii)   any exercise of the rights or remedies of Grantee hereunder or under any or all of the Credit Documents.

Section 15.9   **Release of Security Instrument**. Notwithstanding anything to the contrary contained herein, Grantee shall promptly deliver to Grantor, in proper recordable form and otherwise in form and substance reasonably acceptable to Grantor, a full satisfaction and release of this Security Instrument and any other security documents affecting the Property upon a permitted sale of the Property or a mandatory prepayment pursuant to Section 5.3 and application of the proceeds of such permitted sale of the Property or such mandatory prepayment in accordance with and pursuant to the terms of the Credit Agreement.

Section 15.10   **Limitation on Grantee's Responsibility**.  No provision of this Security Instrument shall operate to place any obligation or liability for the control, care, management or repair of the Property upon Grantee, nor shall it operate to make Grantee responsible or liable for any waste committed on the Property by the tenants or any other Person, or for any dangerous or defective condition of the Property, or for any negligence in the management, upkeep, repair or control of the Property resulting in loss or injury or death to any tenant, licensee, employee or stranger.  Nothing herein contained shall be construed as constituting Grantee a "mortgagee in possession."

Section 15.11   **Last Dollars Secured**.  The parties agree that any payments or repayments of the Obligations shall be and be deemed to be applied first to the portion of the Obligations that is not secured by a mortgage, if any, it being the parties' intent that the portion of the Obligations last remaining unpaid shall be secured by this Security Instrument and the other mortgages contained within the Credit Documents.

Section 15.12   **Multiple Exercise of Remedies**.  To the extent permitted by law, Grantor specifically consents and agrees that Grantee may exercise rights and remedies hereunder and under the other Credit Documents separately or concurrently and in any order that Grantee may deem appropriate.

Section 15.13   **Counterparts**.  This Security Instrument may be executed in any number of counterparts, each of which when so executed and delivered shall be an original, but all of which shall together constitute one and the same instrument.

Section 15.14   **Conflict of Terms**.  In the event of any conflict between the terms of this Security Instrument and the terms of the Credit Agreement, the terms of the Credit Agreement shall control.

GS/RT – Security Instrument (RT Lodge)

**Record Book 2604 Page 2764**

## ARTICLE XVI - MASTER LEASE PROVISIONS

**Section 16.1    No Merger of Fee and Leasehold Estates; Releases.**  So long as any portion of the Indebtedness shall remain unpaid, unless Grantee shall otherwise consent, the fee title to the Land and the Leasehold Estate shall not merge but shall always be kept separate and distinct, notwithstanding the union of such estates in Grantor, Landlord or in any other Person by purchase, operation of law or otherwise. Grantee reserves the right, at any time, to release portions of the Property, including, but not limited to, the Leasehold Estate, with or without consideration, at Grantee's election, without waiving or affecting any of its rights hereunder or under the Credit Documents and any such release shall not affect Grantee's rights in connection with the portion of the Property not so released.

**Section 16.2    Grantor's Acquisition of Fee Estate.**  In the event that Grantor, so long as any portion of the Indebtedness remains unpaid and this Security Instrument has not been released pursuant to the terms of Section 15.9, shall become the owner and holder of Landlord's fee interest in the portion of the Property demised pursuant to the Master Lease, the lien of this Security Instrument shall be spread to cover such interest and such interest shall be deemed to be included in the Property.  Grantor agrees that it will, upon Grantee's request, at Grantor's sole cost and expense, including without limitation, Grantee's reasonable attorney's fees, (i) execute any and all documents or instruments necessary to subject the foregoing interest to the lien of this Security Instrument; and (ii) provide a title insurance policy which shall insure that the lien of this Security Instrument is a first lien on such interest. The foregoing shall not be construed to permit Grantor to acquire the aforesaid fee interest and Grantor rights to acquire additional property shall remain subject to the restrictions relating thereto, if any, contained in the Credit Agreement and the other Credit Documents.

**Section 16.3    Rejection of the Master Lease.**

(a)     If the Master Lease is terminated by Landlord for any reason in the event of the rejection or disaffirmance of the Master Lease by Landlord pursuant to the Bankruptcy Code or any other law affecting creditor's rights, (i) Grantor, immediately after obtaining notice thereof, shall give notice thereof to Grantee, (ii) Grantor, without the prior written consent of Grantee, not to be unreasonably withheld or delayed, shall not elect to treat the Master Lease as terminated pursuant to Section 365(h) of the Bankruptcy Code or any comparable federal or state statute or law, and any election by Grantor made without such consent shall be void, and (iii) this Security Instrument and all the liens, terms, covenants and conditions of this Security Instrument shall extend to and cover Grantor's possessory rights under Section 365(h) of the Bankruptcy Code and to any claim for damages due to the rejection of the Master Lease or other termination of the Master Lease.  In addition, Grantor hereby assigns irrevocably to Grantee Grantor's rights to treat the Master Lease as terminated pursuant to Section 365(h) of the Bankruptcy Code and to offset rents under the Master Lease in the event any case, proceeding or other action is commenced by or against Landlord under the Bankruptcy Code or any comparable federal or state statute or law, provided that Grantee shall not exercise such rights and shall permit Grantor to exercise such rights with the prior written consent of Grantee, not to be unreasonably withheld or delayed, unless an Event of Default shall have occurred and be continuing, subject to any grace or cure periods in any Credit Document.

GS/RT – Security Instrument (RT Lodge)

Record Book 2604 Page 2765

(b)    Grantor hereby assigns to Grantee Grantor's right to reject the Master Lease under Section 365 of the Bankruptcy Code or any comparable federal or state statute or law with respect to any case, proceeding or other action commenced by or against Grantor under the Bankruptcy Code or comparable federal or state statute or law, provided Grantee shall not exercise such right, and shall permit Grantor to exercise such right with the prior written consent of Grantee, not to be unreasonably withheld or delayed, unless an Event of Default shall have occurred and be continuing, subject to any grace or cure periods in any Credit Document. Further, if Grantor shall desire to so reject the Master Lease, at Grantee's request, to the extent not prohibited by the terms of the Master Lease and applicable law, Grantor shall assign its interest in the Master Lease to Grantee in lieu of rejecting the Master Lease as described above and Grantee shall assume Grantor's obligations in the Master Lease, upon receipt by Grantor of written notice from Grantee of such request together with Grantee's agreement to cure any existing defaults of Grantor under the Master Lease and to provide adequate assurance of future performance of Grantor's obligations thereunder.

(c)    Grantor hereby assigns to Grantee Grantor's right to seek an extension of the 60-day period within which Grantor must accept or reject the Master Lease under Section 365 of the Bankruptcy Code or any comparable federal or state statute or law with respect to any case, proceeding or other action commenced by or against Grantor under the Bankruptcy Code or comparable federal or state statute or law, provided Grantee shall not exercise such right, and shall permit Grantor to exercise such right with the prior written consent of Grantee, not to be unreasonably withheld or delayed, unless an Event of Default shall have occurred and be continuing, subject to any grace or cure periods in any Credit Document.

(d)    Grantor hereby agrees that if the Master Lease is terminated for any reason in the event of the rejection or disaffirmance of the Master Lease pursuant to the Bankruptcy Code or any other law affecting creditor's rights, any Personal Property of Grantor not removed from the Property by Grantor as permitted or required by the Master Lease, shall at the option of Grantee be deemed abandoned by Grantor, provided that Grantee may remove any such Personal Property required to be removed by Grantor pursuant to the Master Lease and all reasonable out-of-pocket costs and expenses associated with such removal shall be paid by Grantor within fifteen (15) days of receipt by Grantor of an invoice for such removal costs and expenses.

## ARTICLE XVII - DEED OF TRUST PROVISIONS

**Section 17.1    Concerning the Trustee**. Trustee shall be under no duty to take any action hereunder except as expressly required hereunder or by law, or to perform any act which would involve Trustee in any expense or liability or to institute or defend any suit in respect hereof, unless properly indemnified to Trustee's reasonable satisfaction. Trustee, by acceptance of this Security Instrument, covenants to perform and fulfill the trusts herein created, being liable, however, only for bad faith, gross negligence or willful misconduct, and hereby waives any statutory fee and agrees to accept reasonable compensation, in lieu thereof, for any services rendered by Trustee in accordance with the terms hereof. Trustee may resign at any time upon giving thirty (30) days' notice to Grantor and to Grantee. Grantee may remove Trustee at any time or from time to time and select a successor trustee. In the event of the death, removal, resignation, refusal to act, or inability to act of Trustee, or in its sole discretion for any reason whatsoever Grantee may, without

GS/RT – Security Instrument (RT Lodge)

notice and without specifying any reason therefor and without applying to any court, select and appoint a successor trustee, by an instrument recorded wherever this Security Instrument is recorded and all powers, rights, duties and authority of Trustee, as aforesaid, shall thereupon become vested in such successor. Such substitute trustee shall not be required to give bond for the faithful performance of the duties of Trustee hereunder unless required by Grantee. The procedure provided for in this paragraph for substitution of Trustee shall be in addition to and not in exclusion of any other provisions for substitution, by law or otherwise.

Section 17.2   **Trustee's Fees**. Grantor shall pay all reasonable costs, fees and expenses incurred by Trustee and Trustee's agents and counsel in connection with the performance by Trustee of Trustee's duties hereunder and all such costs, fees and expenses shall be secured by this Security Instrument.

Section 17.3   **Certain Rights**. With the approval of Grantee, Trustee shall have the right to take any and all of the following actions: (a) to select, employ, and advise with counsel (who may be, but need not be, counsel for Grantee) upon any matters arising hereunder, including the preparation, execution, and interpretation of the this Security Instrument or the other Credit Documents, and shall be fully protected in relying as to legal matters on the advice of counsel, (b) to execute any of the trusts and powers hereof and to perform any duty hereunder either directly or through his/her agents or attorneys, (c) to select and employ, in and about the execution of his/her duties hereunder, suitable accountants, engineers and other experts, agents and attorneys-in-fact, either corporate or individual, not regularly in the employ of Trustee, and Trustee shall not be answerable for any act, default, negligence, or misconduct of any such accountant, engineer or other expert, agent or attorney-in-fact, if selected with reasonable care, or for any error of judgment or act done by Trustee in good faith, or be otherwise responsible or accountable for any act, default, negligence, or misconduct of any accountant, engineer or other expert, agent or attorney-in-fact under any circumstances whatsoever, except for Trustee's gross negligence, willful misconduct, or bad faith and (d) any and all other lawful action as Grantee may instruct Trustee to take to protect or enforce Grantee's rights hereunder. Trustee shall not be personally liable in case of entry by Trustee, or anyone entering by virtue of the powers herein granted to Trustee, upon the Property for debts contracted for or liability or damages incurred in the management or operation of the Property, except for Trustee's bad faith, gross negligence or willful misconduct. Trustee shall have the right to rely on any instrument, document, or signature authorizing or supporting an action taken or proposed to be taken by Trustee hereunder, believed by Trustee in good faith to be genuine. Trustee shall be entitled to reimbursement for actual reasonable expenses incurred by Trustee in the performance of Trustee's duties hereunder and to reasonable compensation for such of Trustee's services hereunder as shall be rendered.

Section 17.4   **Retention of Money**. All moneys received by Trustee shall, until used or applied as herein provided, be held in trust for the purposes for which they were received, but need not be segregated in any manner from any other moneys (except to the extent required by applicable law) and Trustee shall be under no liability for interest on any moneys received by Trustee hereunder.

Section 17.5   **Perfection of Appointment**. Should any deed, conveyance, or instrument of any nature be reasonably required from Grantor by any Trustee or substitute trustee to more

GS/RT – Security Instrument (RT Lodge)

-28-

fully and certainly vest in and confirm to the Trustee or substitute trustee such estates rights, powers, and duties granted hereunder, then, upon request by the Trustee or substitute trustee, any and all such deeds, conveyances and instruments shall be made, executed, acknowledged, and delivered and shall be caused to be recorded and/or filed by Grantor.

Section 17.6  **Succession Instruments**.  Any substitute trustee appointed pursuant to any of the provisions hereof shall, without any further act, deed, or conveyance, become vested with all the estates, properties, rights, powers, and trusts of its or his/her predecessor in the rights hereunder with like effect as if originally named as Trustee herein; but nevertheless, upon the written request of Grantee or of the substitute trustee, the Trustee ceasing to act shall execute and deliver any instrument transferring to such substitute trustee, upon the trusts herein expressed, all the estates, properties, rights, powers, and trusts of the Trustee so ceasing to act, and shall duly assign, transfer and deliver any of the property and moneys held by such Trustee to the substitute trustee so appointed in the Trustee's place.

## ARTICLE XVIII - STATE-SPECIFIC PROVISIONS

Section 18.1  **Principles of Construction**.  In the event of any inconsistencies between the terms and conditions of this Article 18 and the terms and conditions of this Security Instrument, the terms and conditions of this Article 18 shall control and be binding.

Section 18.2  The words "the statutory right of redemption under Tennessee Code Annotated Section 66-8-101, and" are hereby inserted after the words "Grantor hereby expressly waives" in Section 10.2 of this Security Instrument.

Section 18.3  **Foreclosure.**  Upon the occurrence and during the continuance of any Event of Default, subject to any applicable grace or cure periods in any Credit Document, Grantee may require Trustee (a) to advertise the sale of the Property or any part thereof once each week for three (3) consecutive weeks, giving notice of time, place and date of sale, which shall be not less than twenty-one (21) days after the publication of the first notice in some newspaper published in the County where the Property is located, (b) to give written notice to Grantor and to any co-debtor prior to such publication, and (c) to sell all or part of the Property, at public auction, to the highest bidder for cash (or for credit against the Obligations if Grantee is the highest bidder) or upon such other terms that are satisfactory to Trustee and Grantee, free from the equity of redemption and any statutory or common law right of redemption, including, without limitation, those rights of redemption contained in Tennessee Code Annotated Section 66-8-101 et seq., homestead, dower, elective share and rights of appraisement or valuation and all other rights and exemptions of every kind (all of which are hereby expressly waived), at the front door of the County Courthouse of the County where the Property is located, between the hours of 10:00 A.M. and 4:00 P.M. of the day fixed in the notices. Trustee may sell all or any portion of the Property, together or in lots or parcels, and may execute and deliver to the purchaser or purchasers of such property good and sufficient deeds of conveyance of fee simple title as provided herein below.  In no event shall Trustee be required to exhibit, present or display at any such sale any of the personalty described herein to be sold at such sale. Notwithstanding the foregoing, the real property and personalty described herein may, at Grantee's sole option, be sold together or separately, in whole or in part,

GS/RT – Security Instrument (RT Lodge)

**Record Book 2604 Page 2768**

in bulk or individually, or in any combination thereof. Payment of the purchase price to Trustee shall satisfy the obligation of the purchaser at such sale therefor, and such purchaser shall not be responsible for the application thereof. The sale or sales by Trustee of less than the whole of the Property shall not exhaust the power of sale herein granted, and Trustee is specifically empowered to make a successive sale or sales under such power until the whole of the Property shall be sold; and if the proceeds of such sale or sales of less than the whole of the Property shall be less than the aggregate of the Obligations and the expenses thereof, this Security Instrument and the lien, security interest and assignment hereof shall remain in full force and effect as to the unsold portion of the Property just as though no sale or sales had been made. Upon the occurrence and during the continuance of any Event of Default, subject to any applicable grace or cure periods in any Credit Document, the holder of the Obligations shall have the option to proceed with satisfaction of such Event of Default either through judicial proceedings or by directing Trustee to proceed to foreclose pursuant to the power of sale, conducting the sale as herein provided. At any such sale Trustee shall deliver to the purchaser a trustee's deed conveying the property so sold without any covenant or warranty expressed or implied. Grantor hereby agrees, in its behalf and in behalf of its successors and assigns, that any and all recitals made in any deed of conveyance given by trustee with respect to the identity of Grantee, the occurrence or existence of any default, the acceleration of the maturity of any of the Obligations, the request to sell, the notice of sale, the giving of notice to all debtors legally entitled thereto, the time, place, terms, and manner of sale, receipt, distribution and application of the money realized therefrom, or the due and proper appointment of a substitute Trustee and, without being limited by the foregoing, with respect to any other act or thing having been duly done by Grantee or by Trustee hereunder, shall be taken by all courts of law and equity as prima facie evidence of the truth of such statements and that the statements or recitals state facts and are without further question to be so accepted, and Grantor hereby ratifies and confirms every act that Trustee or any substitute Trustee hereunder may lawfully do in the Property by virtue hereof, Grantee or Grantee's designee may bid and become the purchaser of all or any part of the Property at any trustee's or foreclosure sale hereunder, and the amount of Grantee's successful bid may be credited on the Obligations. In the event Grantee purchases the Property at any such sale, to the extent Grantee's bid price exceeds the Obligations, Grantee shall pay the Trustee cash equal to such excess, to be applied as set forth herein. In addition, Grantee may pursue such other remedies as Grantee may have under applicable law.

Section 18.4    Section 10.4 of the Security Instrument entitled "**Waiver of Statute of Limitations**" shall be renamed "**Waivers**" and the following shall be added at the end of the paragraph after the word "Obligations":

"and all rights of exemption or redemption, including the statutory right of redemption in Tennessee".

**[NO FURTHER TEXT ON THIS PAGE]**

GS/RT – Security Instrument (RT Lodge)

Record Book 2604 Page 2769

**IN WITNESS WHEREOF**, this Security Instrument has been executed by Grantor as of the day and year first above written.

RUBY TUESDAY, INC., a Georgia
corporation

By: _____
Name: Shawn Lederman
Title: Chief Executive Officer

## ACKNOWLEDGMENT

STATE OF *Tennessee*          §
                              §
COUNTY OF *Blount*            §

Before me the undersigned, a Notary Public in and for said County and State, on this day personally appeared Shawn Lederman, the Chief Executive Officer of Ruby Tuesday, Inc., known to me to be the person whose name is subscribed to the foregoing instrument, and thereupon he acknowledged that he was authorized to execute the within instrument on behalf of said corporation, and that he executed said instrument as the voluntary act of the said corporation, and for the purposes and consideration expressed therein and in the capacity stated therein.

Given under my hand and seal of office this _11_ day of August, 2020.

(Seal)

_____, Notary Public
*Clara K Heaton*
(signature of Notary Public)

My Commission Expires: *Jan. 30, 2021*

EXHIBIT A

LEGAL DESCRIPTION

SITUATED in District No. 9 of Blount County, Tennessee, and being more particularly described as follows:

BEGINNING at a 1/2 inch New Iron Rod along the northerly side of Wilkinson Pike and corner to the remaining property of Maryville College, said New Iron Rod lying S. 86-37-50 E. 406.82 feet from the intersection of said Wilkinson Pike and Court Street; thence departing said Wilkinson Pike N. 11-36-09 E. with the remaining property of Maryville College 552.35 feet to a 1/2 inch New Iron Rod; thence N. 40-40-47 E. continuing with the remaining property of said Maryville College, 420.28 feet to a 1/2 inch New Iron Rod; thence S. 52-18-50 E. continuing with the remaining property of said Maryville College 200.00 feet to a 1/2 inch New Iron Rod; thence S. 08-26-03 W. continuing with the remaining property of said Maryville College 783.13 feet to a 1/2 inch New Iron Rod along the northerly side of said Wilkinson Pike; thence N. 85-02-45 W. along the northerly side of said Wilkinson Pike, 430.06 feet to a 1/2 inch New Iron Rod and the point of beginning and containing 7.256 acres more or less, as surveyed by Sterling Engineering, Inc.

TOGETHER WITH easements further described in said lease.

Being the same property in Memorandum of Lease between Maryville College, a Tennessee corporation (Lessor) and Ruby Tuesday, Inc., a Georgia corporation (Lessee) of record in Book 147, Page 560, in the Register's Office for Blount County, Tennessee, as amended by the Amended and Restated Memorandum of Lease of record in Record Book 2599, Page 2856, in the Register's Office for Blount County, Tennessee.

Being a portion of the same property conveyed to Maryville College by Deeds in Book 456, Page 820; Book BB, Page 471; Book II, Page 281; Book 99, Page 128; Book 113, Page 156, and Book 461, Page 825, in the Register's Office for Blount County, Tennessee.

GS/RT – Security Instrument (RT Lodge)

## Tennessee Certification of Electronic Document

I, _Jana Vernese fka Morris_ , do hereby make oath that I am a licensed attorney and/or the
     *Signer's Name*

custodian of the electronic version of the attached document tendered for registration herewith and that this

is a true and correct copy of the original document executed and authenticated according to law.

_____
                    *Signature*

State of _Florida_

County of _Palm Beach_

Personally appeared before me, _Jessica Heard_ , a notary public for this county and

state, _Jana Hutchins_ , who acknowledges that this certification of an electronic
              *Signer's Name*

document is true and correct and whose signature I have witnessed.

_____
                *Notary Signature*

MY COMMISSION EXPIRES: _12 | 18 | 20_

NOTARY'S SEAL

```
        JESSICA LEE HEARD
      MY COMMISSION # GG 033304
       EXPIRES: December 18, 2020
      Bonded Thru Notary Public Underwriters
```

(3) All electronic documents eligible for registration pursuant to this subsection are validly registered when
accepted for recording by the county register. Electronic documents registered by county registrars prior to
July 1, 2007 shall be considered validly registered with or without the certification provided in subsection (2).

SA0241
00569731
-2-

Record Book 2604 Page 2772

E-FILED
5/4/2021 3:31 PM
CLERK & MASTER
DAVIDSON CO. CHANCERY CT.

# EXHIBIT F
# AUGUST 28, 2020
# RESTATED PSA

## REINSTATED AND AMENDED AND RESTATED
## ASSET PURCHASE AND SALE AGREEMENT
## RT LODGE
## DISTRICT NO. 9, BLOUNT COUNTY, TENNESSEE

### INFORMATION SHEET

**EFFECTIVE DATE:** August 28, 2020

The date that this "**Agreement**" (as defined in the first paragraph of the Standard Terms and Conditions) is executed and delivered by the last of Seller or Buyer.

**BUYER:**

**BNA ASSOCIATES LLC**, a Tennessee limited liability company
401 Union Street, 2nd Floor
Nashville, TN 37219
Attn: Philip Welker, Managing Partner
Phone: (917) 325-4055
E-Mail Address: philip@bna-re.com

**SELLER:**

**RUBY TUESDAY, INC.**, a Georgia corporation
333 East Broadway Avenue
Maryville, TN 37804
Attn: Legal Real Estate Dept.
Phone: (407) 241-3418
E-Mail Address: dwindham@rubytuesday.com

**LEASED PREMISES:**
(*SEE SECTION 1.2.1*)

The property commonly known as RT Lodge
District No. 9, Blount County, Tennessee
Street Address: 1406 Wilkinson Pike
　　　　　　　　Maryville, TN 37803
More particularly described in the Lease (defined below).

**LEASE:**

That certain Lease, dated September 11, 1997, as amended by that certain First Amendment to Lease, having an effective date of July 1, 2001, as further amended by that certain Memorandum of Understanding, dated May 14, 2018, and as further amended by that certain Second Amendment to Lease, having an effective date of June 26, 2020 (collectively, and as the same may be further amended, the "**Lease**"), between Seller, as tenant, and MARYVILLE COLLEGE (the "**College**"), a Tennessee corporation, as landlord, for the Leased Premises and improvements located thereon.

A copy of the Lease is attached hereto as **Exhibit "A"**.

**PURCHASE PRICE:**
(*SEE SECTION 2.1*)

**$5,250,000.00**

**DEPOSIT/EARNEST MONEY:**
(*SEE SECTION 2.2*)

**Deposit – $100,000.00,** payable within three (3) business days after the Effective Date by wire transfer of immediately available funds to the Escrow Agent.

The term "**Earnest Money**" shall mean and include the Deposit if and to the extent deposited by Buyer with the Escrow Agent, together with any interest earned thereon.

Notwithstanding anything contained in this Agreement to the contrary, Twenty-Five Thousand and NO/100 Dollars ($25,000.00) of the Deposit is, immediately upon deposit with Escrow Agent, non-refundable to Buyer (except in the event of a default by Seller not cured within any prescribed notice and cure period or Seller's failure to fulfill its Conditions to Closing as described in Section 6.6, herein), but is applicable to the Purchase Price.

The term **"business day"** means any day, except Saturday or Sunday, that the banks in Blount County, Tennessee, are open for business.

**INSPECTION PERIOD:**
*(SEE SECTION 4.1)*

The period commencing on the Effective Date and expiring at 6:00 pm (local time in Blount County, Tennessee) eight (8) business days thereafter.

**SCHEDULED CLOSING DATE:**
*(SEE SECTION 6)*

The term **"Scheduled Closing Date"** means the date which is forty-five (45) days after the expiration of the Inspection Period.

The term **"Closing Date"** means the date on which the Closing (as defined in Section 6.1 of the Standard Terms and Conditions attached hereto) actually occurs.

**TITLE COMPANY/ESCROW AGENT:**

**OLD REPUBLIC NATIONAL TITLE INSURANCE COMPANY**
424 Church Street, Suite 1750
Nashville, TN 37219
Attn: Mike Davis
Phone: (615) 244-2101
Email: mdavis2@OldRepublicTitle.com

**Issuing Agent for Title Insurance Policy: Tarpy, Cox, Fleishman & Leveille, PLLC**
1111 Northshore Drive, Suite N-290
Knoxville, TN 37919
Attn: Steffanie M. Speck, Attorney
Phone: (865) 588-1096
E-Mail Address: smspeck@tcflattorneys.com

**TITLE COMMITMENT:**
*(SEE SECTION 3.1)*

Buyer may obtain, at Buyer's expense, a leasehold title insurance commitment from the Title Company issued through its agent, Tarpy, Cox, Fleishman & Leveille, PLLC (the **"Title Commitment"**). Within five (5) business days after the Effective Date (the **"Title Objection Date"**), Buyer shall provide to Seller a copy of the Title Commitment, copies of all exception matters listed therein and written notice of Buyer's Title Objections (defined in Section 3.1 of the Standard Terms and Conditions attached hereto).

**SURVEY:**
*(SEE SECTION 3.2)*

Buyer may obtain, at Buyer's expense, a current ALTA/NSPS survey of the Leased Premises (the **"Survey"**). If Buyer obtains a Survey, then within three (3) business days after the Effective Date (the **"Survey Objection Date"**), Buyer shall provide to Seller a

2

copy of the Survey and written notice of Buyer's Survey Objections (defined in <u>Section 3.2</u> of the Standard Terms and Conditions attached hereto).

**BROKERS:**
*(SEE SECTION 12.2)*

JDS Real Estate Services, Inc. (**"Broker"**). All fees and commissions of Broker are to be paid by Seller pursuant to a separate agreement.

**CLOSING COSTS:**
*(SEE SECTION 6.5)*

Seller shall pay (a) the fees of any counsel representing it in connection with this transaction, and (b) one-half (1/2) of any escrow fee charged by Escrow Agent to hold the Earnest Money.

Buyer shall pay all other Closing costs, including, without limitation: (i) any and all state and county transfer taxes, recording fees, documentary stamp taxes, property owners' association transfer/resale assessments, Grantor's and Grantee's transfer taxes and other taxes and fees imposed on account of the transaction contemplated by this Agreement; (ii) the fees of any counsel representing Buyer in connection with this transaction; (iii) one-half (1/2) of any escrow fees charged by the Escrow Agent; (iv) recording fees; (v) the premium for the Leasehold Title Policy and Title Commitment costs as well as the premium for any endorsements and lender's policies (provided, however, that Buyer acknowledges and agrees that this Agreement is not contingent upon Buyer obtaining financing); (vi) the cost of Buyer's inspections of the Leased Premises and the Subject Assets (defined in <u>Section 1.2</u> of the Standard Terms and Conditions attached hereto);(vii) all costs associated with the assignment of the Permits and Licenses (defined in <u>Section 1.2.4</u> of the Standard Terms and Conditions attached hereto); and (viii) any costs associated with the Survey.

Except as otherwise provided in this Agreement, all other costs and expenses incident to this transaction and the closing thereof shall be paid by the party incurring such costs.

**ASSIGNMENT:**

Buyer may not assign this Agreement and/or its rights and/or obligations under this Agreement without first obtaining Seller's written approval, which approval may be given or withheld in Seller's sole and absolute discretion.

Notwithstanding the foregoing, within ten (10) business days after the Effective Date, Buyer may assign its rights under this Agreement to RT Lodge LLC, a Tennessee limited liability company (in formation), or to an entity controlling, controlled by, or under common control with Buyer, without obtaining Seller's written approval. In either instance, Buyer shall (within ten (10) business days after the Effective Date) provide Seller with notice and an executed copy of the agreement effectuating such assignment. Notwithstanding any such assignment, Buyer shall not be released of Buyer's obligations hereunder.

3

**NON-INTERFERENCE WITH OPERATIONS:**

Buyer acknowledges that the Leased Premises is a fully functional lodge/hotel (including, without limitation, a restaurant). From and after the Effective Date, Buyer shall ensure that its activities and the activities of Buyer's Representatives (defined in Section 4.1.1 of the Standard Terms and Conditions attached hereto) do not unreasonably interfere with or disrupt the operations, activities and/or employees of Seller. In addition, Buyer shall not, and shall cause Buyer's Representatives not to, contact or hold discussions with any suppliers, customers, vendors, licensors, licensees or employees of Seller, other than the following, regarding the transaction contemplated by this Agreement.

Edward G. Milgrim, Esq.
(407) 790-4966
edwardmilgrim@milgrimlaw.com

Brian P. Esser, Esq.
(865) 379-5759
BEsser@rubytuesday.com

Stuart Kramer, Esq.
(407) 790-4966
stuartkramer@milgrimlaw.com

Debbie Windham
Director, Real Estate
(407) 241-3418
dwindham@rubytuesday.co[

Buyer acknowledges and agrees that Seller would be irreparably harmed by any breach or threatened breach of this provision and, therefore, in addition to any other right or remedy which Seller might have under this Agreement or at law or in equity as a result of any such breach, or threatened breach, Seller shall be entitled to seek an injunction without posting a bond.

THE INFORMATION CONTAINED ON THIS INFORMATION SHEET IS PART OF THE AGREEMENT BETWEEN BUYER AND SELLER AND IS SUBJECT TO AND GOVERNED BY THE ATTACHED STANDARD TERMS AND CONDITIONS AND ANY EXHIBITS THERETO. CAPITALIZED TERMS USED AND NOT DEFINED IN THE STANDARD TERMS AND CONDITIONS SHALL HAVE THE MEANINGS ASCRIBED THERETO ON THIS INFORMATION SHEET.

**REINSTATED AND AMENDED AND RESTATED
ASSET PURCHASE AND SALE AGREEMENT
RT LODGE
DISTRICT NO. 9, BLOUNT COUNTY, TENNESSEE**

**STANDARD TERMS AND CONDITIONS**

**THIS REINSTATED AND AMENDED AND RESTATED ASSET PURCHASE AND SALE AGREEMENT** (this "**Agreement**") is made and entered into as of the Effective Date (as set forth on the Information Sheet), by and between Seller and Buyer (as set forth on the Information Sheet). This Agreement includes the Information Sheet attached hereto, these Standard Terms and Conditions and all Exhibits attached hereto (which are all incorporated herein by this reference).

**WHEREAS,** Seller and Buyer are parties to that certain Asset Purchase and Sale Agreement RT Lodge District No. 9, Blount County, Tennessee dated March 14, 2020, as amended by that certain First Amendment to Asset Purchase and Sale Agreement dated March 19, 2020 and as further amended by that certain Second Amendment to Asset Purchase and Sale Agreement dated April 3, 2020 (the "**Original Agreement**");

**WHEREAS,** Buyer terminated the Original Agreement on May 14, 2020;

**WHEREAS,** as a result of the termination, the Earnest Money delivered to Escrow Agent in accordance with the terms of the Original Agreement was returned and delivered to the parties in accordance with the terms of the Original Agreement

**WHEREAS,** Seller and Buyer desire to reinstate and amend and restate the Original Agreement as set forth in this Agreement governing the purchase and sale of the Lease.

**NOW, THEREFORE,** for and in consideration of the mutual advantages arising by virtue of this Reinstated and Amended and Restated Asset Purchase and Sale Agreement, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by Seller and Purchaser, Seller and Purchaser hereby covenant and agree as follows::

**ARTICLE 1
PURCHASE AND SALE**

**1.1**     **Agreement of Purchase and Sale**. Subject to the terms of this Agreement, Seller shall assign, sell and convey, and Buyer shall assume, acquire and purchase, any and all rights of Seller in, to and under (as applicable) the specific assets owned by Seller and used exclusively in the Business, all as located or used at the Leased Premises (the Subject Assets) as described below.

**1.2**     **Definition of "Subject Assets"**. For all purposes hereof, the "**Subject Assets**" shall be deemed to include the following:

**1.2.1**     **The Lease**. The Lease.

**1.2.2**     **The Assumed Contracts**. During the Inspection Period, Seller and Buyer shall determine which existing contracts are to be assigned by Seller and assumed by Buyer (the "**Assumed Contracts**"). If any of the Assumed Contracts are not assignable without the consent of the other party to such Assumed Contracts, the parties shall execute such agreements as may be necessary to delegate Seller's rights, duties and obligations under such Assumed Contracts to Buyer, which delegation agreement or agreements shall contain reciprocal indemnities or, at Seller's election, Seller may terminate such Assumed Contract(s) and pay any termination fee in connection therewith. The form of such delegation agreement or agreements shall be mutually agreed upon by Seller and Buyer prior to the Closing.

5

Notwithstanding anything contained herein to the contrary, in no event shall the failure to obtain a consent to the assignment of any of the Assumed Contracts on or before Closing delay the Closing or relieve Buyer from its obligations to assume the obligations of Seller under all of the Assumed Contracts pursuant to the terms set forth in this Agreement.

1.2.3    **FF&E**. The furniture, fixtures and equipment physically located at the Leased Premises, all of which will be provided "AS IS", "WHERE IS," but expressly excluding any of the same which are Excluded Assets (defined in Section 1.3 below), subject to any right the College may have in and to the same under the Lease.

1.2.4    **Permits and Licenses**. During the Inspection Period, Seller and Buyer shall determine which existing permits and licenses are to be transferred (if and to the extent transferable) by Seller to Buyer (the "**Permits and Licenses**"). Buyer shall, at its sole cost and expense, promptly execute and file all necessary forms, applications and other documents with the appropriate authorities prior to the Closing so that such acquisition of the appropriate Permits and Licenses shall take effect, if possible, prior to or upon completion of Closing (but the failure or inability of Buyer to obtain such Permits and Licenses on or before Closing shall not relieve Buyer of its obligation to proceed with Closing hereunder). Seller shall cooperate with Buyer, at no expense to Seller, in the orderly transfer of the Permits and Licenses to Buyer at the Closing. Buyer's attempts to obtain such Permits and Licenses shall not diminish, prior to the Closing, the full force and effect of the Permits and Licenses maintained by Seller in the operation of the Leased Premises. If any such Permits and Licenses cannot be assigned to Buyer until after Closing, then Seller shall cooperate reasonably with Buyer and Buyer's operator if any, to the extent permitted by law, at no cost or expense to Seller, in keeping open the liquor facilities within the Lodge and, to the extent permitted by law, to continue the management operations between the Closing and the time when such Permits and Licenses are obtained by Buyer or its operator, by entering into an Interim Operating Agreement at Closing (the "**Interim Operating Agreement**"), the form of which shall be mutually agreed upon by Seller and Buyer prior to Closing, for the continued operation for up to ninety (90) days of and under the Permits and Licenses. In no event shall Seller be required to obtain any additional permits or licenses which it does not possess at the time of Closing. The provisions of this Section 1.2.4 shall survive the Closing for a period of one hundred eighty (180) days.

1.2.5    **Consumables**. All: (i) food and beverage inventory (including liquor only if and to the extent such items are permitted by law and regulations to be transferred); (ii) supplies, glassware, plates and similar supplies; and (iii) all other supplies and inventory of all kinds, whether used, unused, or held in reserve storage for future use in connection with the maintenance or operation of the Leased Premises on hand at the Leased Premises at Closing, which are owned by Seller at the Closing (collectively, the "**Consumables**").

1.2.6    **Accounts Receivable**. All accounts receivable related to the Leased Premises owned by Seller at Closing (the "**Accounts Receivable**").

1.2.7    **Bookings**. Any and all bookings, contracts or other reservations (including, without limitation, any booking for which a written proposal has been made by or on behalf of Seller and accepted by the recipient thereof or for which a written proposal has been received and accepted by or on behalf of Seller, regardless of whether any deposit or other amount has been received with respect thereto, or not) for the future use of guest rooms, recreational facilities, banquet facilities or meeting rooms or other facilities and services of the Leased Premises with respect to any period from and after the Closing Date, together with any rents and/or other considerations related thereto (collectively, the "**Bookings**").

1.2.8    **Customer Deposits**. Any and all cash or cash equivalent deposits for the Bookings (other than any such deposits which have been irrevocably forfeited by the depositing party as of

the Closing Date and with respect to which Seller is no longer obligated to provide any goods or services, which shall be retained by Seller) (collectively, the "**Customer Deposits**").

1.2.9    <u>Vouchers</u>. Any and all issued and outstanding gift cards, certificate, coupon, comp card, promotional allowance, voucher or other writing that entitles the holder or bearer thereof to a credit (whether in a specified dollar amount or for a specified item, e.g., a meal or a room) to be applied against the usual charge for goods or services (collectively, the "**Vouchers**").

1.2.10    <u>Numbers and Marketing Materials</u>. All rights of Seller in and to the telephone numbers (including facsimile numbers) used by Seller solely in the operation of the Leased Premises, if allowed by the telephone company, excluding the telephone (and facsimile) numbers associated with Ruby Tuesday, all rights of Seller in and to websites (including @RTlodge.com), mobile sites, social media sites and designations, or online or mobile platforms of Seller with respect to the Business, excluding any of the same associated with Ruby Tuesday, and all rights of Seller in and to any marketing materials, advertising materials, promotional materials and any yellow page or similar directory listing used in the operation of the Leased Premises ("**Numbers and Marketing Materials**"), if and to the extent the same do not include, reference or incorporate any Protected Materials (as defined on **Exhibit "D"**).

1.2.11    <u>Warranties and Guaranties</u>. To the extent assignable, all existing warranties and guaranties issued to Seller in connection with the Leased Premises, if any ("**Warranties and Guaranties**").

1.2.12    <u>Name</u>. The name "RT Lodge" (the "**Name**"); provided, however, that Seller makes no representation or warranty: (i) that such name has been registered or reserved by Seller as a trademark, tradename, service mark, fictitious name or otherwise; (ii) that Seller has any right, title or interest in and to such name; and/or (iii) that no third party has any right, title or interest in and to such name.

1.2.13    <u>Cash-On-Hand</u>. Any cash actually on-hand in any cash registers located on the Leased Premises ("**Cash-On-Hand**").

1.2.14    <u>Owned Vehicles.</u> Any vehicles and trailers, if any, owned by Seller, used in the operation or maintenance of the Lodge and not removed from the Leased Property prior to the Closing.

**1.3**    <u>Excluded Assets</u>. Notwithstanding the foregoing or anything to the contrary contained in this Agreement, the assets of the Business described on **Exhibit "D"** attached hereto as well as those items that, according to law and regulation, may not be transferred, are expressly excluded from the purchase and sale contemplated hereby (the "**Excluded Assets**") and, as such, are not included in the Subject Assets.

**1.4**    <u>Assumed Liabilities</u>. At Closing, Buyer agrees to assume, pay, perform and discharge when due, and be exclusively responsible for, the obligations of Seller: (i) in connection with the Subject Assets; and (ii) as described on **Exhibit "E"** attached hereto (collectively, the "**Assumed Liabilities**").

### ARTICLE 2
### PURCHASE PRICE AND EARNEST MONEY

**2.1**    <u>Purchase Price</u>. The Purchase Price for the Subject Assets is indicated on the Information Sheet and shall be payable at Closing by wire transfer of immediately available funds, against which the Earnest Money shall be applied, subject to adjustment as provided herein.

**2.2** **Prorations**. The items set forth in this <u>Section 2.2</u> shall be prorated and adjusted between Seller and Buyer effective as of 11:59 p.m. (local time in Blount County, Tennessee) on the day preceding the Closing Date ("**Effective Time**"), and Buyer and Seller shall be charged or credited for such prorations on the closing statement, as applicable, with all liabilities accruing prior to the Effective Time being the responsibility of Seller, and all liabilities accruing on or after the Effective Time being the responsibility of Buyer, except as otherwise specified.

**2.2.1** **General**. Except as otherwise expressly provided herein, all income and expenses of the Leased Premises with respect to the period prior to the Effective Time shall be for the account of Seller and all income and expenses of the Leased Premises with respect to the period from and after the Effective Time shall be for the account of Buyer.

**2.2.2** **Revenue, Accounts Receivable, Accounts Payable**. All revenue, sales and income of any kind resulting from the ownership or operation of the Leased Premises, including, but not limited to, revenue, sales and income from the rental of rooms, suites and meeting and banquet facilities, food and beverage sales, parking charges, laundry (including coin operated equipment, if any) charges, telephone charges, and vending machines shall be apportioned as of the Effective Time, subject to the following provisions of this Section 2.2.

        **2.2.2.1** **Accounts Receivable**. Buyer shall pay to Seller an amount equal to all Accounts Receivable (including, without limitation, credit card sales and all items that are entered as Accounts Receivable on the books and records maintained by Seller) with respect to the ownership or operation of the Leased Premises as of the Effective Time.

        **2.2.2.2** **Bookings**. All amounts paid or payable in respect of Bookings shall be apportioned as of the Effective Time. At the Closing, Buyer shall assume all of the obligations of Seller with respect to Bookings as of the Effective Time, including obligations with respect to any prepaid room charges, rents and other consideration, all Customer Deposits and all other liabilities with respect to Bookings not earned as of the Effective Time (which obligations shall be the obligations of Buyer from and after the Closing), and Buyer shall receive a credit against the Purchase Price at Closing for all prepaid room charges, rents and other considerations, all Customer Deposits and all other liabilities with respect to Bookings that were received by Seller and are unused and unreturned as of the Effective Time (and, thereafter, Seller shall have the right to retain any amounts relating to such items on deposit in Seller's account).

        **2.2.2.3** **Vouchers**. Buyer shall receive a credit at Closing against the Purchase Price for the amount of issued and outstanding Vouchers. At or before Closing Buyer and Seller shall determine the amount of the credit. Such credit shall not exceed seventy-five (75%) percent of the face value of the issued and outstanding Vouchers.

**2.2.3** **Lease and Assumed Contracts**. All periodic charges, fees and expenses under the Lease and Assumed Contracts shall be apportioned between the parties as of the Effective Time, including, without limitation, rent, real estate and personal property taxes and special or other assessments or levies in respect of the Leased Premises, sales, revenue and excise taxes (relating to Leased Premises operations), room occupancy and use taxes, entertainment taxes, gaming taxes, water and sewer rents, rates and charges and vault charges, other municipal permit fees and governmental assessments shall be apportioned as of the Effective Time, subject to the following provisions of this Section 2.2. Buyer acknowledges and agrees that: (i) the two (2) RT Lodge logoed passenger vans (the "**Vans**") at the Leased Premises are leased from Enterprise; (ii) Seller will use commercially reasonable efforts to cause Enterprise to allow Buyer to assume the lease for the Vans (the "**Van Lease**"), provided that Seller is not obligated to allow any assumption that does not include a complete release of Seller from the Van Lease; (iii) if Seller cannot cause Enterprise to allow Buyer to assume the Van Lease, Seller shall purchase the Vans from Enterprise; and (iv) Buyer shall, at Closing, pay, or reimburse Seller for amounts paid by Seller, for the assignment/assumption of the Lease or the purchase of the Vans (as applicable).

**2.2.3.1 Property Taxes**. Real property taxes and assessments shall be prorated based on amounts for the current year (with maximum discount, if any, taken), except that if tax amounts for the current year are not available, prorations shall be made based upon the taxes for the preceding year (with maximum discount, if any, taken). Certified and pending municipal or county liens and assessments for which work has been substantially completed as of the Closing Date shall be paid by Seller and other pending liens shall be assumed by Buyer. Notwithstanding anything to the contrary contained herein, Seller shall be entitled to the full amount of all refunds and rebates resulting from any property tax appeals or requests for reassessments filed by Seller for tax years prior to the tax year in which the Closing occurs. If, subsequent to a Closing, the real property taxes relating to the Leased Premises for the year of Closing are determined to be higher or lower than as prorated, or if any re-assessment or re-billing is made for such taxes, a re-proration and adjustment will be made at the request of either party upon presentation of actual tax bills and any payment required as a result of the re-proration shall be made within thirty (30) days following demand therefore.

**2.2.3.2 Utilities, Utility Deposits**. Amounts paid or payable under telephone contracts and contracts for the supply of heat, steam, water, electric power, gas, lighting and other utilities services shall be apportioned as of the Effective Time, with Seller receiving a credit for the deposits, if any, made by Seller as security under any such public service contract(s), provided such deposit is transferable and remains on deposit for the benefit of Buyer. Seller shall have the right to a return of any deposits in the form of letters of credit or bonds upon Closing, and Buyer shall be responsible for posting any substitute deposits required therefore from and after Closing. Where possible, cutoff readings will be secured for all utilities as of the Effective Time. To the extent that cutoff readings are not available, the costs of such utilities shall be apportioned between the parties as of the Effective Time, on the basis of the most recent actual (not estimated) bill for such service. Buyer shall be responsible for causing such utilities and services to be changed to its name as of Closing, and shall be liable for and shall pay all utility bills for services rendered after the Effective Time.

**2.2.3.3 Insurance**. Notwithstanding anything to the contrary, there shall be no apportionment of amounts paid or payable for Seller's insurance relating to the Leased Premises, which insurance shall not be assigned to Buyer at Closing, and Seller shall be entitled to any refunds and payments with respect to its insurance relating to the Leased Premises (it being understood that Buyer shall be solely responsible for obtaining insurance coverage, in such amounts as it desires or is required by law or the Lease to obtain, with respect to the period from and after Closing).

**2.2.4    Intentionally Omitted**

**2.2.5    Cash-On-Hand**. Seller shall minimize the Cash-On-Hand defined as Petty Cash on Property as small of an amount as acceptable to Seller..

**2.2.6    Consumables**. Seller shall cause Property to have and maintain no less than one-week worth of Consumables (as reasonable determined by Seller) as would be standard business-as-usual inventory. Buyer shall pay to Seller an amount equal to the estimated value of the food and beverage inventory to be transferred (as reasonably determined by Seller) as of the Effective Time. All other Consumables shall be transferred without any cost to Buyer.

**2.2.7    Other Items**. The parties shall apportion as of the Effective Time such other items as are provided for in this Agreement or as are customarily prorated and adjusted in the sale of a hotel and restaurant.

**2.2.8    Adjustments Post-Closing**. Seller and Buyer shall cooperate in good faith and act reasonably after Closing to make a final determination of the prorations required hereunder. Ninety (90) days following the Closing (or such other time as the parties may agree), there shall be a reconciliation of the proration adjustments. With respect to such prorations that cannot be finalized and/or accurately determined within ninety (90) days following the Closing (or such other time as the parties may agree), the

provisions of this Section 2.2.8 providing for post-Closing adjustments of prorations upon receipt of final information will survive for a period of one (1) year after the Closing.

**2.3**    **Earnest Money**. The Deposit is indicated on the Information Sheet and shall be payable by Buyer as and when indicated on the Information Sheet. If the Closing hereunder occurs, the Earnest Money shall be applied towards payment of the Purchase Price. The Escrow Agent shall hold and dispose of the Earnest Money strictly in accordance with the provisions contained herein.

**2.4**    **Consideration**. Notwithstanding anything to the contrary contained in this Agreement, if Buyer is entitled to a return of the entire amount of the Earnest Money under this Agreement, then Escrow Agent shall deliver $100.00 of the Earnest Money to Seller as good and sufficient independent consideration for entering into this Agreement and the balance of the Earnest Money to Buyer.

**2.5**    **Allocation of Purchase Price**. During the Inspection Period, Seller and Buyer shall prepare a schedule allocating the Purchase Price among the Subject Assets (including any Assumed Liabilities treated as consideration for the Subject Assets for tax purposes) (the "**Allocation Schedule**"). The Allocation Schedule shall be prepared in accordance with Section 1060 of the Internal Revenue Code of 1986, as amended, and shall otherwise be mutually agreed between Seller and Buyer. Notwithstanding the foregoing, if Seller and Buyer cannot agree upon an Allocation Schedule by Closing, each party may use its own determination and bear any consequences related thereto and Seller's allocation shall be utilized in calculating transfer, sales and similar tax and related filings under this Agreement.

**ARTICLE 3**
**TITLE AND SURVEY**

**3.1**    **Title, Examination and Objections**. As and when indicated on the Information Sheet, the designated party shall obtain/deliver the Title Commitment and copies of all exception matters listed therein. On or before the Title Objection Date, Buyer shall notify Seller, in writing and in reasonable detail, of Buyer's objections to the Title Commitment (the "**Title Objections**").

**3.2**    **Survey, Examination and Objections**. As and when indicated on the Information Sheet, the designated party shall obtain/deliver the Survey. The Survey shall be prepared by a surveyor or engineer licensed in the State where the Subject Assets is located and shall be certified to Buyer, Seller and Title Company. On or before the Survey Objection Date, Buyer shall notify Seller, in writing, and in reasonable detail, of Buyer's objections to the Survey (the "**Survey Objections**").

**3.3**    **Addressing Title and Survey Objections**.

**3.3.1**    **Objections**. Prior to notifying Seller of any Title Objections and/or Survey Objections, Buyer shall endeavor in good faith to cause Title Company and surveyor (as applicable) to modify and update the Title Commitment and/or Survey (as applicable) to reflect Buyer's requested corrections and revisions. Failure to timely notify Seller of its Title Objections and/or Survey Objections shall be deemed Buyer's acceptance of title as indicated in the Title Commitment and the Subject Assets as indicated on the Survey (as applicable). Buyer shall not object to the Permitted Exceptions (as defined herein).

**3.3.2**    **Seller Remedies**. Seller shall notify Buyer no later than two (2) business days after receiving Buyer's notice of the Title Objections under Section 3.1 herein and notice of the Survey Objections under Section 3.2 herein of whether Seller shall attempt to cause any Title Objections and/or Survey Objections (as applicable) to be removed from title, insured over and/or cured (by endorsement, by "writing over" or in another manner reasonably satisfactory to Buyer). Seller's failure to provide such notice to Buyer within the required period as to the action Seller shall take with respect to any Title Objection and/or Survey Objections shall be deemed an election by Seller to not attempt to cause any Title Objections and/or Survey Objections (as applicable) to be removed from title, insured over and/or cured.

**3.3.3**    **Buyer's Termination Right**. If: (i) Seller so notifies (or is deemed to have notified) Buyer

under Section 3.3.2 herein that Seller will not attempt to cause any or all of the Title Objections and/or Survey Objections to be removed from title, insured over and/or cured; or (ii) after having notified Buyer that Seller shall attempt to cause any or all of such Title Objections and/or Survey Objections to be removed from title, insured over and/or cured, Seller notifies Buyer that Seller has not caused any or all of such Title Objections and/or Survey Objections to be removed from title, insured over and/or cured, then Buyer shall have until the end of the Inspection Period (as indicated on the Information Sheet) to notify Seller whether Buyer will: (a) proceed with the purchase and acquire the Subject Assets subject to the Title Objections and without any reduction in the Purchase Price, in which case any or all of the Title Objections and/or Survey Objections are deemed approved and to be Permitted Exceptions, or (b) terminate this Agreement, in which case Seventy-Five Thousand and No/100 Dollars ($75,000.00) of the Earnest Money shall be refunded to Buyer and Twenty-Five Thousand and No/100 Dollars ($25,000.00) of the Earnest Money shall be delivered to Seller in accordance with the provisions herein and Seller and Buyer shall have no further rights and obligations hereunder except those which expressly survive termination of this Agreement. Buyer may not elect clause (b) above if Buyer is in default under this Agreement. If Buyer is in default or fails to timely give Seller the aforesaid notice, Buyer shall be deemed to have elected clause (a) above.

3.3.4    **No Obligation to Cure**. Notwithstanding anything to the contrary contained in this Agreement, Seller has no obligation to take any steps, bring any action, and/or incur any costs, efforts and/or expenses whatsoever regarding any Title Objections and/or Survey Objections; provided, however, that, prior to Closing, Seller shall discharge and release the Subject Assets from any mortgages and security interests.

3.4    **Permitted Exceptions**. "**Permitted Exceptions**" includes and refers to: (i) all exceptions to title in the Title Commitment approved or deemed approved by Buyer pursuant to Section 3.3.3 herein; (ii) the Title Company's standard exception for surveys, unless Buyer obtains and delivers to the Title Company a survey acceptable to the Title Company to permit the Title Company to remove such exception; (iii) zoning ordinances and regulations and other laws or regulations governing use or enjoyment of the Leased Premises and the Subject Assets; (iv) matters affecting title created by, on behalf of, or with the consent of Buyer; (v) any state of facts that would be disclosed by an accurate survey of the Leased Premises and/or which are shown on the Survey and are approved or deemed approved by Buyer pursuant to Section 3.3.3 herein; (vi) liens to secure taxes and assessments not yet due and payable (vii) and the Lease.

**ARTICLE 4**
**INSPECTION**

4.1    **General**.

4.1.1    **Right of Inspection**. During the Inspection Period specified on the Information Sheet, Seller hereby grants to Buyer and Buyer's employees, agents, consultants and contractors (collectively, and together with anyone entering the Leased Premises on behalf of, or with the consent of, Buyer "**Buyer's Representatives**"), subject to the conditions set forth on the Information Sheet and below, the right to enter the Leased Premises in order to evaluate the Leased Premises and the Subject Assets and perform non-invasive inspections (including a so-called Phase I audit) and/or any other reasonable investigations, tests, searches, reviews, studies or examinations into the status of the Leased Premises and the Subject Assets as Buyer desires. Buyer shall have access to the Leased Premises at such times as Seller shall reasonably designate and only following one (1) day prior notice to Seller. Buyer must obtain Seller's advance written approval (which approval may be granted or withheld in Seller's sole and absolute discretion) for the performance, scope and method, described with reasonable specificity, of: (i) a so-called Phase II environmental inspection and any other intrusive, or invasive testing or inspection; and/or (ii) any testing or inspection which could alter the physical condition of any portion of the Leased Premises. Buyer shall promptly deliver to Seller all information produced or procured by Buyer; provided, however, that Buyer shall only provide copies of environmental studies, reports and other findings if expressly requested by Seller. Buyer shall promptly restore the Leased Premises and the Subject Assets to a condition that is at least as good as its previous condition immediately following any entry, test or inspection.

**4.1.2    Responsibility and Indemnity**. Buyer shall be liable for all damage and/or injury to any person or property resulting from, relating to, and/or arising out of Buyer's activities (and/or the activities of Buyer's Representatives) on the Leased Premises and Buyer shall keep the Leased Premises and the Subject Assets free and clear of any liens arising from work performed on behalf of Buyer (and Buyer's Representatives) in connection with its inspection activities. Buyer indemnifies, defends and holds harmless Seller, Seller's affiliates and their respective members, directors, officers, shareholders, interest holders, employees, advisors, agents, attorneys and managers and their respective successors and assigns (collectively, the "**Indemnitees**") from and against any and all claims, suits, actions, causes of action, orders, judgments, decrees, losses, liabilities, damages, costs and expenses (whether direct, indirect, consequential or punitive and including, without limitation, Attorney's Fees (as hereinafter defined)) of any kind or nature whatsoever arising from any personal injury, loss of life, damage to property and/or any other matter whatsoever arising out of, relating to and/or due to Buyer's activities (and/or the activities of Buyer's Representatives). If any liens are filed against the Leased Premises and/or the Subject Assets as a result of Buyer's activities (and/or the activities of Buyer's Representatives), Buyer shall cause such liens to be removed, satisfied or transferred to bond within ten (10) days after Buyer receives notice of such liens. If Buyer fails to do so, in addition to any other rights and/or remedies of Seller, Seller may cause the same to be removed, satisfied, or transferred to bond and Buyer shall be responsible for Seller's costs associated therewith (including, without limitation, Attorney's Fees) and shall reimburse Seller therefor within five (5) business days after Seller's written demand therefor. As used in this Agreement, the term "**Attorney's Fees**" means and includes reasonable attorneys' and paralegals' fees, costs and disbursements prior to trial, at trial, on appeal and/or as part of a bankruptcy proceeding, whether or not litigation is commenced and all court costs. The provisions of this Section 4.1.2 shall survive the Closing or any termination of this Agreement.

**4.1.3    Seller's Information**. In furtherance of Buyer's exercise of its inspection rights hereunder, within three (3) business days following the Effective Date, Seller shall make available to Buyer, for Buyer's review, copies of environmental and engineering studies, existing title insurance documents, surveys, site plans and other documentation in Seller's possession and reasonably relevant to Buyer's evaluation of the Leased Premises and the Subject Assets. All such materials shall be delivered without representation or warranty by Seller, except that, to Seller's actual knowledge, all such materials are complete and unaltered copies of such materials as received by Seller. Buyer's access to and use of such materials is subject to the confidentiality provisions set forth herein. Seller may redact any personal information (name, social security #, phone #, e-mail address, etc.) with respect to any Bookings and Vouchers.

**4.1.4    Landlord's Consent**. During the Inspection Period, Seller will attempt to obtain a consent of the College, as landlord under the Lease, which consent must contain a full release of Seller as tenant (the "**Consent**") to the Lease Assignment and Assumption Agreement (defined in Section 6.2.1 below). If Seller is unable to obtain the Consent prior to the expiration of the Inspection Period, then either party may terminate this Agreement by giving written notice to the other on or before the expiration of the Inspection Period. If neither Seller nor Buyer delivers such notice to the other on or before the expiration of the Inspection Period, this Agreement shall automatically terminate upon the expiration of the Inspection Period without the need for any action on the part of either party. Upon such termination, the entire amount of the Earnest Money shall be refunded to Buyer in accordance with the provisions herein and Seller and Buyer shall have no further rights and obligations hereunder except those which expressly survive termination of this Agreement.

**4.2    Insurance Requirement**. Before Buyer or any of Buyer's Representatives may enter the Leased Premises, Buyer must provide Seller with a certificate of insurance naming Seller (and any other person designated by Seller) as an additional insured, issued by an insurance company licensed in the State in which the Leased Premises are located and otherwise satisfactory to Seller and with insurance limits in a minimum amount of $1,000,000.00 per occurrence and $2,000,000.00 in the aggregate, on an occurrence basis, covering commercial general liability (including, without limitation, contractual liability) and automobile liability.

**4.3**    **Confidentiality**. Unless Seller specifically and expressly otherwise agrees in writing, Buyer agrees that: (i) the results of all inspections, analyses, studies and similar reports relating to the Leased Premises and the Subject Assets prepared by or for Buyer; (ii) all information regarding the Leased Premises and the Subject Assets of whatsoever nature made available to Buyer by Seller and/or Seller's agents or representatives (the "**Proprietary Information**"); and (iii) the terms and existence of this Agreement and the contemplated terms of any of the other agreements set forth herein (collectively, "**Confidential Information**"), are confidential and shall not be disclosed to any other person or entity, except Buyer's employees, agents, attorneys, advisors, consultants, partners and lenders who have a bona fide reason to know or review such Confidential Information, and even then, only on a strict "need to know" basis and following Buyer making such persons aware of this confidentiality restriction and procuring such persons' agreement to be bound hereby. Buyer agrees not to use, or allow to be used, any such Confidential Information for any purpose other than to determine whether to proceed with the contemplated purchase, or if same is consummated, in connection with the operation of the Leased Premises and the Subject Assets post-closing. Further, if Closing does not occur for any reason whatsoever, Buyer agrees to return to Seller, or cause to be returned to Seller, all Proprietary Information, the foregoing being a condition to the return of the Earnest Money if Buyer is entitled to the return of any portion thereof. In furtherance and not in limitation of the foregoing, Buyer agrees that Buyer shall not, unless and until the Closing has been consummated, release or issue any press release, announcement or statement regarding this Agreement or the transaction contemplated hereby unless the same has been approved by Seller in its sole and absolute discretion. Buyer acknowledges, consents and agrees that, if it breaches or attempts to breach or otherwise violate any of the provisions of this Agreement, Seller would suffer irreparable harm. Accordingly, in addition to any other remedies that Seller may have under this Agreement or otherwise, Seller shall be entitled, in addition to any other remedies which are made available to it at law or in equity, to apply to any court of competent jurisdiction for an injunction restraining Buyer from committing or continuing any breach or violation of this Agreement, and without being required to furnish a bond or other security. Nothing in this Agreement shall be construed as prohibiting Seller from pursuing any other remedy or remedies, including, without limitation, recovery of damages. The provisions of this Section 4.3 shall survive the Closing or any termination of this Agreement.

**4.4**    **Contact with Governmental Authority**. In furtherance and not in limitation of the provisions of Section 4.3 herein, Buyer shall not disclose any information about the environmental condition of the Leased Premises and the Subject Assets to, or otherwise contact, any governmental authority regarding environmental matters that come to Buyer's attention in the course of its inspections without the prior written consent of Seller in its sole and absolute discretion, unless otherwise required by law. In the event such disclosure is required by law, Buyer shall notify Seller prior to making any such disclosure and shall allow Seller to elect to satisfy such obligation by Seller making the required disclosure. Routine searches of government data bases or other typical inquiries made by an environmental consultant in the course of a Phase 1 audit are not subject to the restriction set forth in this Section 4.4. The provisions of this Section 4.4 shall survive the Closing or any termination of this Agreement.

**4.5**    **Sale of Subject Assets "As-Is"**. TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW AND EXCEPT FOR SELLER'S REPRESENTATIONS AND WARRANTIES AS SET FORTH HEREIN AND ANY WARRANTY CONTAINED IN THE DEED TO BE PROVIDED BY SELLER AT CLOSING (COLLECTIVELY, THE "**WARRANTIES**"), THIS SALE IS MADE AND SHALL BE MADE WITHOUT REPRESENTATION, COVENANT, OR WARRANTY OF ANY KIND (WHETHER EXPRESS, IMPLIED, OR, TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, STATUTORY) BY SELLER AND ALL SUCH REPRESENTATIONS, COVENANTS AND WARRANTIES ARE HEREBY DISCLAIMED. AS A MATERIAL PART OF THE CONSIDERATION FOR THIS AGREEMENT, BUYER AGREES TO ACCEPT THE LEASED PREMISES AND THE SUBJECT ASSETS AT CLOSING ON AN "**AS-IS**" AND "**WHERE IS**" BASIS, WITH ALL FAULTS AND ANY AND ALL LATENT AND PATENT DEFECTS AND WITHOUT ANY REPRESENTATION OR WARRANTY, ALL OF WHICH SELLER HEREBY DISCLAIMS, EXCEPT FOR THE WARRANTIES. WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, SELLER MAKES NO EXPRESS OR IMPLIED WARRANTY OF SUITABILITY OR FITNESS OF THE LEASED PREMISES AND THE SUBJECT ASSETS FOR ANY PURPOSE OR USE OR AS TO THE

MERCHANTABILITY, TITLE, VALUE, QUALITY, QUANTITY, CONDITION OR SALABILITY OF THE LEASED PREMISES AND THE SUBJECT ASSETS. NOTWITHSTANDING ANYTHING CONTAINED IN THIS AGREEMENT TO THE CONTRARY, BUYER AGREES THAT, BY CLOSING, BUYER WARRANTS AND REPRESENTS THAT BUYER HAS EXAMINED (OR HAD THE OPPORTUNITY TO EXAMINE) AND APPROVE ALL THINGS CONCERNING THE LEASED PREMISES AND THE SUBJECT ASSETS WHICH BUYER DEEMS MATERIAL INCLUDING, BUT NOT LIMITED TO, TOPOGRAPHY, GEOLOGY, CONDITION OF THE SOIL, ENVIRONMENTAL CONDITION OF THE LEASED PREMISES AND THE SUBJECT ASSETS, CONDITION OF TITLE TO THE LEASED PREMISES AND THE SUBJECT ASSETS, DIMENSIONS, AVAILABILITY AND CAPACITY OF UTILITIES AND SANITARY FACILITIES (INCLUDING, WITHOUT LIMITATION, WATER AND SEWER CONNECTIONS), ANY RESTRICTIONS RELATED TO THE DEVELOPMENT AND/OR USE OF THE LEASED PREMISES AND THE SUBJECT ASSETS, SUITABILITY FOR AND FEASIBILITY OF INTENDED USE AND ANY OTHER USE, ZONING, THE APPLICABILITY OF ANY GOVERNMENTAL REQUIREMENTS INCLUDING, BUT NOT LIMITED TO, ENVIRONMENTAL REQUIREMENTS, ANY APPLICABLE GOVERNMENTAL GENERAL PLANS AND THE AVAILABILITY OF PERMITS, APPROVALS AND OTHER ENTITLEMENTS FROM GOVERNMENTAL AUTHORITIES HAVING JURISDICTION OVER SELLER, BUYER, OR THE LEASED PREMISES AND THE SUBJECT ASSETS. The provisions of this Section 4.5 shall survive the Closing or any termination of this Agreement.

**4.6**    **Right of Termination**. Seller agrees that, so long as Buyer is not in default under this Agreement, Buyer may terminate this Agreement for any reason or no reason by giving written notice to Seller on or before the expiration of the Inspection Period. Upon such termination, Seventy-Five Thousand and No/100 Dollars ($75,000.00) of the Earnest Money shall be refunded to Buyer and Twenty-Five Thousand and No/100 Dollars ($25,000.00) of the Earnest Money shall be delivered to Seller and Seller and Buyer shall have no further rights and obligations hereunder except those which expressly survive termination of this Agreement. If Buyer delivers a notice to proceed prior to or on the date the Inspection Period expires, the entire amount of the Earnest Money shall become non-refundable (except in the event of a default by Seller not cured within any prescribed notice and cure period or Seller's failure to fulfill its Conditions to Closing as described in Section 6.6, herein) and Buyer shall proceed to the Closing in accordance with the terms hereof subject only to the satisfaction of Seller's closing obligations as set forth herein. If Seller has not received a notice to proceed prior to or on the date the Inspection Period expires, then Buyer shall be deemed to have terminated this Agreement, a portion of the Earnest Money shall be refunded to Buyer and a portion of the Earnest Money shall be delivered to Seller in accordance with the provisions above, and the parties shall have no further obligations to each other, except as expressly provided in this Agreement to survive the termination of this Agreement.

**ARTICLE 5**
**EMPLOYEES**

**5.1**    **Hired Employees**. Prior to Closing, Seller will provide Buyer with access to employee files and Buyer will evaluate for employment all employees of Seller at the Leased Premises. If such employees meet Buyer's standards for employment, including satisfactory results of background checks and e-Verify submissions, Buyer will offer employment to such employees at the Leased Premises on terms and conditions determined by Buyer, with such employment to be effective immediately following, and contingent upon the occurrence of, Closing. Seller's employees who accept offers of employment from Buyer and who complete all necessary documents in order to commence employment with Buyer shall become employees of Buyer immediately following the Closing (each a "**Hired Employee**"). Each Hired Employee shall cease to be an employee of Seller at the time of Closing and Buyer shall be responsible for all liabilities and obligations relating to or arising out of the employment, engagement, remuneration, or cessation of employment with Buyer of any Hired Employees, with respect to all periods immediately after Closing (collectively the "**Buyer Retained Employee Obligations**"). Buyer shall not have any responsibility for any of Seller's employees not hired by Buyer.

**5.2**    **Seller Obligations**. Except as set forth in Section 5.1: (i) Seller is responsible for any and all of

14

Seller's obligations to any present or past employee of Seller incurred by Seller prior to Closing; and (ii) Seller agrees to retain responsibility for its employees who are not Hired Employees with respect to all employment matters, including, but not limited to, any obligations or claims arising from the termination of such employees' employment with Seller which will occur immediately prior to Closing. No Seller employee is or is intended to be a third-party beneficiary of this Agreement. The parties agree to coordinate on a communication plan associated with the employees at the Leased Premises regarding the prospective employment and employment decisions to be made by Buyer.

5.3     **Personnel Records**. The Subject Assets do not include the personnel records of Seller's employees. Those personnel records remain the property of Seller. However, Seller agrees to transfer copies of the personnel records for the Hired Employees to Buyer upon receipt of authorization from the Hired Employees, the form of which authorization shall be as mutually agreed upon by Buyer and Seller and which authorization Seller agrees to use reasonable efforts to obtain from the Hired Employees.

5.4     **Notifications.** Seller will provide all of Seller's employees the requisite notices under the Consolidated Omnibus Budget Reconciliation Act of 1986 and will proceed as required by that law. Seller will terminate at its expense its employees' participation in other employee benefit plans in accordance with the provisions of those plans.

5.5     **WARN Act**. Notwithstanding anything to the contrary contained herein, Buyer or one of its affiliates shall hire a sufficient number of the Employees to work at or from the Leased Premises upon such terms and for such compensation as Buyer may elect in its sole and absolute discretion in order that the actions of the parties pursuant to this Agreement will not trigger the application of the Worker Adjustment and Retraining Notification Act (or similar local or state laws or regulations) (collectively, the "**WARN Act**") and Buyer or one of its Affiliates shall retain such Employees for a period of at least ninety (90) days from and after the Closing Date.

5.6     **Survival**.     This Article 5 shall survive the Closing and shall not be deemed merged into any instrument of conveyance delivered at the Closing.

### ARTICLE 6
### CLOSING

6.1     **Time and Place of Closing**. The consummation of the transaction contemplated by this Agreement (the "**Closing**") shall be held by escrow deliveries to the Escrow Agent and the closing of escrow shall be on or before the Scheduled Closing Date specified on the Information Sheet. At Closing, Seller shall deliver to Buyer possession and occupancy of the Leased Premises subject to the Permitted Exceptions.

6.2     **Seller's Closing Obligations**. Not later than one (1) business day prior to the Scheduled Closing Date, Seller shall deposit the following items into escrow with the Escrow Agent, duly executed and notarized where necessary:

6.2.1     **Assignment and Assumption of Lease**. An assignment and assumption of the Lease in substantially the form attached as **Exhibit "H"** (the "**Lease Assignment and Assumption Agreement**");

6.2.2     **Intentionally Omitted**

6.2.3     **Consent of Landlord**. The Consent executed by the College, as the landlord under the Lease in substantially the form attached hereto as **Exhibit "J"** (the "**Consent to Assignment of Lease**");

6.2.4     **Bill of Sale**. A bill of sale in substantially the form attached as **Exhibit "I"** attached hereto (the "**Bill of Sale**");

6.2.5     **Omnibus Assignment and Assumption**. An assignment and assumption of the Assumed

Contracts, the Permits and Licenses, the Accounts Receivable, the Bookings, the Numbers and Marketing Materials, the Warranties and Guaranties, the Name, and the Assumed Liabilities. (the "**Omnibus Assignment Agreement**"). Prior to the Closing, Seller and Buyer shall agree upon the form of the Omnibus Assignment Agreement;

     **6.2.6**   **Other Consents**. Any other required consents of third parties to the assignment of the Assumed Contracts;

     **6.2.7**   **Authority**. A current certificate of existence or good standing for Seller from the office of the Secretary of State (or other appropriate office) in its state of formation, a copy of resolutions of the Board of Directors of Seller, authorizing the execution, delivery and performance of this Agreement and the other documents referred to herein to be executed by Buyer, and the consummation of the transactions contemplated hereby, and such evidence as the Title Company may reasonably require as to the authority of the person or persons executing documents on behalf of Seller;

     **6.2.8**   **FIRPTA**. An affidavit stating that Seller is not a "foreign person" as defined in the Federal Foreign Investment in Real Property Tax Act of 1980 and the 1984 Tax Reform Act, in form and content reasonably satisfactory to Seller and Title Company;

     **6.2.9**   **Title Affidavit**. A title insurance affidavit, if required by the Title Company, duly executed by Seller, in form and content reasonably satisfactorily to Seller and Title Company and sufficient to allow the Title Company to remove the standard exceptions from the Title Commitment;

     **6.2.10**   **Settlement Statement**. A settlement statement setting forth amounts paid by or on behalf of or credited to Buyer and Seller;

     **6.2.11**   **Statements**. The following statements:
        6.2.11.1   Schedule of all prorations to be made as of the Effective Time, together with reasonable back-up therefor.
        6.2.11.2   Schedule of all Vouchers (and terms and conditions thereof) issued by Seller.
        6.2.11.3   Schedule of all Bookings (and terms and conditions thereof).
        6.2.11.4   Schedule of all Employees.
        6.2.11.5   Inventory of FF&E and Consumables
        6.2.11.6   Copies of all Assumed Contracts.

     **6.2.12**   **Form 1099S**. A Form 1099S shall be executed by Buyer and/or Seller, as may be required, disclosing the financial terms of this transaction;

     **6.2.13**   **Transition Letters**. A letter advising the other party to all Bookings and Assumed Contracts that the Lease has been conveyed by Seller to Buyer and containing such other terms as mutually agreed to by the parties;

     **6.2.14**   **Interim Operating Agreement**. The Interim Operating Agreement, if applicable; and

     **6.2.15**   **Other Items**. Such additional documents as shall be reasonably requested by the Title Company and/or required to consummate the transactions contemplated by this Agreement.

     In addition, at Closing Seller shall deliver to Buyer the Leased Premises in broom clean condition and otherwise in compliance with the terms of this Agreement.

**6.3**   **Buyer's Closing Obligations**. On or before 12:00 Noon (local time in Blount County, Tennessee) one (1) business day prior to the Scheduled Closing Date, Buyer shall deliver into escrow with the Escrow Agent the following items, duly executed and notarized where necessary:

     **6.3.1**   **Purchase Price**. The full amount of the Purchase Price, less the Earnest Money and as

adjusted by prorations and credits, in immediately available federal funds wire transferred to Escrow Agent's account and instructions to the Escrow Agent to immediately release the full amount to Seller upon Seller's satisfaction of Seller's closing obligations;

**6.3.2    Authority**. A current certificate of existence or good standing for Buyer from the office of the Secretary of State (or other appropriate office) in its state of formation, a copy of appropriate consents of the managers and members of Buyer, authorizing the execution, delivery and performance of this Agreement and the other documents referred to herein to be executed by Buyer, and the consummation of the transactions contemplated hereby, and such evidence as the Title Company may reasonably require as to the authority of the person or persons executing documents on behalf of Buyer;

**6.3.3    Assignment and Assumption of Lease**. The Assignment and Assumption Agreement;

**6.3.4    Intentionally Omitted**

**6.3.5    Omnibus Assignment and Assumption**. The Omnibus Assignment and Assumption Agreement;

**6.3.6    Settlement Statement**. A settlement statement setting forth the amount paid by or on behalf of or credited to Buyer and Seller;

**6.3.7    Form 1099S**. A Form 1099S shall be executed by Buyer and/or Seller, as may be required, disclosing the financial terms of this transaction;

**6.3.8    Transition Letters**. A letter advising the other party to all Bookings and Assumed Contracts that the Lease has been conveyed by Seller to Buyer and containing such other terms as mutually agreed to by the parties;

**6.3.9    Interim Operating Agreement**. The Interim Operating Agreement, if applicable;

**6.3.10  Post-Closing Letter Agreement**.  A post-closing letter agreement pursuant to which Buyer agrees that for so long as NRD Capital Management II, LLC ("**NRD**"), a Delaware limited liability company, and/or its affiliates, owns and/or controls Ruby Tuesday, Inc., Buyer shall reserve and provide rooms (subject to availability) in the Leased Premises, at a rate of $145 per night, to corporate travelers (i.e. employees of Seller, NRD and their respective affiliates who do not live in Maryville, Tennessee);

**6.3.11  Other Items**. Such additional documents as shall be reasonably requested by the Title Company and/or required to consummate the transactions contemplated by this Agreement.

**6.4    Negotiation in Good Faith**. With respect to any documents, instruments or other matters described in this Agreement that must be negotiated and approved by the parties after the Effective Date and prior to the expiration of the Inspection Period or Closing, the parties hereby agree that they shall negotiate in good faith and shall attempt to reach an acceptable agreement as to the form and substance of any such document, instrument or other matter diligently, and with the exercise of commercial reasonableness. In the event that, after good faith, diligent and commercially reasonable negotiation, the parties are unable to agree upon the form and substance of any such document, instrument or other on or before the expiration of the Inspection Period or Closing, as applicable, either party shall have the option to terminate this Agreement, Buyer shall receive a refund of the Earnest Money (unless Seller shall have declared Buyer in default), and thereafter neither party shall have any further liability hereunder to the other party, except for those obligations which by their terms expressly survive the termination of this Agreement. The provisions of this Section 6.4 shall be deemed to be a Buyer's condition to closing and a Seller's condition to closing.

**6.5.    Closing Costs**. Closing costs shall be paid by the parties as indicated on the Information Sheet.

**6.6    Conditions to Closing**. Seller's and Buyer's obligations to consummate the transactions



contemplated by this Agreement are conditioned upon fulfillment of the following conditions, each of which may be waived by the party whose obligation to close is conditioned on the fulfillment of such condition:

    **6.6.1**   **Representations and Warranties**. All of the representations and warranties of the other party shall be true and correct in all material respects, subject to permitted changes in facts or circumstances pursuant to this Agreement, both as of the date of this Agreement and as of the Closing Date.

    **6.6.2**   **Required Consents**. Seller shall have obtained the Consent from the College.

    **6.6.3**   **Adverse Position**. There shall be no outstanding or threatened claims, causes of actions or suits investigations or proceedings which affect: (i) Buyer's ability to satisfy its obligations under this Agreement and/or any of the ongoing obligations of Buyer as set forth in this Agreement; and/or (ii) Buyer's ability to operate the Leased Premises in accordance with the Lease and the Assumed Contracts

    **6.6.4**   **Conditions Precedent**. All other conditions precedent to each party's obligation to consummate the transactions contemplated by this Agreement shall have been satisfied on or before the Scheduled Closing Date.

    **6.6.5**   **Failure of Condition Precedent**. If any of the foregoing conditions benefiting a party (the "**Benefitted Party**") have not been satisfied by the Scheduled Closing Date, then the Benefitted Party may, by written notice delivered to the other party on or before the Scheduled Closing Date, elect to: (i) close without any reduction in the Purchase Price; (ii) terminate this Agreement, so long as the Benefitted Party is not in default under this Agreement; or (iii) extend the Scheduled Closing Date by up to ten (10) days to allow the other party to satisfy the conditions. If the Benefitted Party elects to extend the Scheduled Closing Date and any of the foregoing conditions remain unsatisfied at the end of such extension period, the Benefitted Party may, by written notice delivered to the other party on or before the Scheduled Closing Date, elect to: (i) close without any reduction in the Purchase Price; or (ii) terminate this Agreement, so long as the Benefitted Party is not in default under this Agreement. If Buyer is in default or fails to timely deliver a termination or extension notice, Buyer will be deemed to have elected to close without any reduction in the Purchase Price. Upon an election of termination, so long as the non-terminating party is not in default under this Agreement, Escrow Agent shall disburse the entire amount of the Earnest Money to the Benefitted Party in accordance with the provisions herein and Seller and Buyer shall have no further rights and obligations hereunder except those which expressly survive termination of this Agreement. Notwithstanding anything to the contrary contained herein, if any of the foregoing conditions have not been satisfied due to a default by Buyer or Seller, then Buyer's and Seller's respective rights, remedies and obligation shall be determined in accordance with Article 8 herein.

### ARTICLE 7
### REPRESENTATIONS AND COVENANTS

**7.1**   **Representations**. Seller represents to Buyer that the following statements are true and correct as of the Effective Date of this Agreement and covenants (subject to the limitation provided below) that the same shall be true and correct on the Closing Date:

    **7.1.1**   **Authority**. Seller is duly organized and validly exists as the type of entity and under the laws of the State indicated on the Information Sheet and (if required by applicable law) is qualified to do business in the State of Tennessee. Seller has the right and authority to enter into this Agreement and to transfer the Subject Assets pursuant to this Agreement, subject to obtaining the Consent, the consents described in Section 6.2.6 above and the approval referenced in Section 12.20 below. The person signing this Agreement on behalf of Seller is authorized to do so. This Agreement has been duly authorized, executed and delivered by Seller, is a valid and binding obligation of Seller and is enforceable against Seller in accordance with its terms.

    **7.1.2**   **Pending Actions**. There is no agreement to which Seller is a party or, to Seller's

knowledge, without inquiry, that is binding on Seller which is in conflict with this Agreement. To Seller's knowledge, without inquiry, there is no action or proceeding pending or threatened against Seller or relating to the Subject Assets, which challenges or impairs Seller's ability to execute or perform its obligations under this Agreement.

   **7.1.3   Condemnation**. To Seller's knowledge, without inquiry, no condemnation proceedings are pending against the Leased Premises, nor has any written notice from a governmental authority threatening condemnation been received.

   **7.1.4   FIRPTA**. Seller is not a "foreign person" within the meaning of Section 1445(f)(3) of the Internal Revenue Code of 1986.

   **7.1.5   Bankruptcy**. Seller has not filed for itself any petition under Federal bankruptcy law or any Federal or state insolvency laws.

   **7.1.6   Environmental**. To Seller's knowledge, without inquiry, Seller has not caused the Leased Premises to be in violation of, and Seller has received no written notice from a governmental authority with jurisdiction over the Leased Premises that the Leased Premises is in violation of, any Environmental Law. For purposes hereof, (i) **"Environmental Law"** means any Federal, state, local or administrative agency law, rule, regulations, ordinance or order relating to Hazardous Materials (as defined herein), including, without limitation, the Comprehensive Environmental Response, Compensation and Liability act of 1980, as amended (42 U.S.C. Section 9601 et. seq.) and the Resource Conservation and Recovery Act of 1976, as amended (42 U.S.C. Section 6901 et seq.); and (ii) "Hazardous Material" means any substance, chemical, waste or other material listed as "hazardous" or "toxic" under any Environmental Law, including, without limitations, petroleum and petroleum by products.

   **7.1.7   Tax Matters**. To Seller's knowledge, without inquiry, there are no tax liens (other than liens for current taxes not yet due) upon, or which could be asserted in the future upon, any of the Subject Assets. Each tax required to have been paid, or claimed by any governmental authority to be payable, by Seller with respect to the Leased Premises or the Business conducted at the Leased Premises has been duly paid in full on a timely basis. Any tax required to have been withheld or collected by Seller with respect to the Leased Premises or the Business conducted at the Leased Premises has been duly withheld and collected, and (to the extent required) each such tax has been paid to the appropriate governmental authority.

   **7.1.8   Parties in Possession**. To Seller's knowledge, without inquiry, there are no parties other than Seller in possession of, or claiming any right to possess, any portion of the Leased Premises as lessees, tenants, trespassers or otherwise, other than rights of parties under the Bookings or Vouchers.

   If, at any time after the Effective Date but prior to the Closing Date, Seller learns of any facts or circumstances that would render any of the representations contained in this Section 7.1 to be materially untrue, then Seller shall promptly notify Buyer in writing of all such facts and circumstances and Buyer shall have the right to elect to either: (a) terminate this Agreement, so long as Buyer is not in default under this Agreement; or (b) waive any claim against Seller arising out of or related to the information disclosed and proceed with the transaction, in which case the representation shall be deemed modified as necessary to conform with the additional information disclosed to Buyer. Upon such termination, Escrow Agent shall disburse the entire amount of the Earnest Money to Buyer in accordance with the provisions herein and Seller and Buyer shall have no further rights and obligations hereunder except those which expressly survive termination of this Agreement. If Buyer is in default or fails to timely give Seller the aforesaid notice, Buyer shall be deemed to have elected clause (b) above. Notwithstanding anything to the contrary contained herein, if any of the foregoing representations are materially untrue due to a default by Seller, then Buyer's rights, remedies and obligation shall be determined in accordance with Article 8 herein.

   Any representations or warranties made as to "Seller's actual knowledge and belief" or to "Seller's knowledge" or words of like import shall be deemed to refer to any of the following representatives of Seller being actually aware of such fact or other matter, or given the particular facts and

circumstances, a prudent individual in the identified individual's position should have been aware of such fact or other matter: Chief Strategy Officer. Seller represents and warrants that, due to the operational and strategic planning responsibilities of its Chief Strategy Officer, Seller's Chief Strategy Officer is knowledgeable about the Business conducted at the Leased Premises.

**7.2    Seller's Covenants**. Seller covenants with Buyer, from the Effective Date until the end of the Closing Date or earlier termination of this Agreement, as follows:

**7.2.1    Operation of the Leased Premises and Subject Assets**. Seller shall operate and maintain the Leased Premises and the Subject Assets in a manner generally consistent with the manner in which Seller has operated and maintained the Leased Premises and the Subject Assets prior to the Effective Date, ordinary wear and tear, casualty and condemnation excepted. In furtherance and not in limitation of the foregoing, Seller may, in the ordinary course of business, continue to accept Bookings and issue Vouchers.

**7.2.2    Provide Copies of Notices**. Seller shall furnish Buyer with a copy of all notices received by Seller from any governmental authority or other party of any alleged violation of any law, statute, ordinance, regulation or order of any governmental or public authority relating to the Leased Premises and the Subject Assets within five (5) business days following Seller's receipt thereof.

**7.2.3    Execution of New Contracts**. After the Inspection Period, Seller shall not, without Buyer's prior written consent in each instance, not to be unreasonably withheld, conditioned and/or delayed, enter into any contract or agreement that will be an obligation affecting the Leased Premises and the Subject Assets or binding on Buyer after the Closing and which is not terminable upon ninety (90) days' notice or less.

**7.3    Buyer's Representations**. Buyer represents to Seller that the following statements are true and correct on the Effective Date and covenants (subject to the limitation provided below) that the same shall be true and correct on the Closing Date:

**7.3.1    Buyer's Authority**. Buyer is duly organized and validly exists as the type of entity and under the laws of the State indicated on the Information Sheet and is qualified to do business in the State of Tennessee. Buyer has the right and authority to enter into this Agreement. The person signing this Agreement on behalf of Buyer is authorized to do so. The execution and delivery of this Agreement or any other document in connection with the transactions contemplated by this Agreement will not violate any provision of Buyer's organizational documents and/or any regulations and/or laws to or by which Buyer is bound. This Agreement has been duly authorized, executed and delivered by Buyer, is a valid and binding obligation of Buyer and is enforceable against Buyer in accordance with its terms. Buyer has the adequate resources to pay the Purchase Price and any other amounts due hereunder at Closing in the manner as required herein.

**7.3.2    Conflicts and Pending Actions**. There is no contract and/or other agreement to which Buyer is a party or that is binding on Buyer which is in conflict with and/or which would be violated by this Agreement. To Buyer's knowledge, there is no action or proceeding pending or threatened against Buyer which challenges or impairs Buyer's ability to execute and/or perform its obligations under this Agreement.

**7.3.3    Financial Status**. Buyer has adequate financial resources to purchase the Subject Assets. Buyer if solvent, has not made an assignment for the benefit of creditors and has not filed any bankruptcy, reorganization, arrangement, insolvency or liquidation proceedings, nor has any such proceeding been instituted by or against Buyer.

**7.3.4    Patriot Act; Anti-Corruption**. Buyer's funds are derived from legitimate business activities that do not violate any applicable law and are from lawful and permissible sources. Buyer is not a, and is not acting directly or indirectly for or on behalf of any, person, group, entity or nation with whom Seller is prohibited or restricted from engaging in this transaction due to any United States governmental

embargos, sanctions, or terrorism or money laundering laws, including, without limitation, due to Buyer or any party that has ownership in or control over Buyer being (i) subject to United States government embargos or sanctions, (ii) in violation of terrorism or money laundering laws, or (iii) listed on a published United States government list or subject to any law, order, rule or regulation that is enforced or administered by the Office of Foreign Assets Control (e.g., Specially Designated Nationals and Blocked Persons List maintained by the Office of Foreign Assets Control or other lists of similar import) and Buyer is not engaged in this transaction, directly or indirectly, on behalf of, or instigating or facilitating this transaction, directly or indirectly, on behalf of any such person, group, entity or nation.

If, at any time after the Effective Date but prior to the Closing Date, Buyer learns of any facts or circumstances that would render any of the representations contained in this <u>Section 7.3</u> to be untrue, then Buyer shall promptly notify Seller in writing of all such facts and circumstances and Seller shall have the right to elect to either (a) terminate this Agreement; or (b) waive any claim against Buyer arising out of or related to the information disclosed and proceed with the transaction, in which case the representation shall be deemed modified as necessary to conform with the additional information disclosed to Seller. Notwithstanding anything to the contrary contained herein, if any of the foregoing representations are untrue due to a default by Buyer, then Seller's rights, remedies and obligation shall be determined in accordance with <u>Article 8</u> herein.

**ARTICLE 8**
**DEFAULT AND REMEDIES**

**8.1**    <u>**Default by Buyer**</u>. If the sale of the Subject Assets under this Agreement does not occur because of Buyer's default under this Agreement, Seller may terminate this Agreement and receive the Earnest Money as liquidated damages (and not as a penalty) for such failure to close, it being agreed between the parties that the actual damages to Seller in the event of a failure to close by Buyer are impractical to ascertain and the amount of the Earnest Money is a reasonable estimate.

**8.2**    <u>**Default by Seller**</u>. If the sale of the Subject Assets under this Agreement does not occur because of Seller's default under this Agreement, then Buyer may, at its option: (i) declare Seller in default under this Agreement and terminate this Agreement by written notice delivered to Seller, in which event the entire amount of the Earnest Money shall be promptly refunded to Buyer in accordance with the provisions herein and Seller and Buyer shall have no further rights and obligations hereunder except those which expressly survive termination of this Agreement; or (ii) in lieu of terminating this Agreement, enforce specific performance of this Agreement provided Buyer institutes an action for specific performance within sixty (60) days following the default by Seller and the expiration of any cure period. Buyer hereby waives any other rights and remedies in respect of any such default. Notwithstanding anything contained herein to the contrary, if there is a failure to satisfy any Buyer's condition to Closing, which is not a result of a failure of Seller to perform under the terms of this Agreement, such event or circumstance shall not be deemed a default by Seller, but shall entitle Buyer to the sole and exclusive remedy of terminating this Agreement, in which event the entire amount of the Earnest Money shall be promptly refunded to Buyer in accordance with the provisions herein and Seller and Buyer shall have no further rights and obligations hereunder except those which expressly survive termination of this Agreement. Notwithstanding anything to the contrary contained herein, Buyer shall not be entitled to a return of any portion of the Earnest Money if Buyer is in default.

**8.3**    <u>**Notice of Default**</u>. Prior to declaring a default and exercising the remedies described herein, the non-defaulting party shall issue notice of default to the defaulting party pursuant to <u>Section 12.4</u> herein describing the event or condition of default in sufficient detail to enable a reasonable person to determine the action necessary to cure the default. The defaulting party shall have five (5) business days from receipt of the notice in which to cure the default. If the default has not been cured within the foregoing five (5) business day period, the non-defaulting party may exercise the remedies described above. Notwithstanding anything contained herein to the contrary, the notice required and period to cure under this <u>Section 8.3</u> for any failure of Buyer or Seller (as applicable) to deliver the Earnest Money or to complete the Closing on the Scheduled Closing Date shall be two (2) business days.

21

**8.4** **Election of Remedies**. Except as expressly provided herein, the remedies provided in this Article 8 shall not be deemed to be exclusive. Accordingly, the exercise by any party of any of its rights under Article 8 shall not be deemed to be an election of remedies and shall not be deemed to prejudice, or to constitute or operate as a waiver of, any other right or remedy that such party may be entitled to exercise (whether under this Agreement, under any other contract, or under any statute, rule or other Law, at common law, in equity or otherwise).

**8.5.** **Survival**. The provisions of this Article 8 shall survive the Closing or termination of this Agreement.

### ARTICLE 9
### RISK OF LOSS AND CONDEMNATION

**9.1** **Condemnation**. If, prior to Closing, a governmental authority initiates action to take the Leased Premises or a material portion thereof by eminent domain proceedings, then Seller shall promptly notify Buyer. Buyer may elect, by written notice delivered to Seller within fifteen (15) days after receipt of such notice, either to (a) terminate this Agreement, in which event the Earnest Money shall be promptly refunded to Buyer in accordance with the provisions herein and Seller and Buyer shall have no further rights and obligations hereunder except those which expressly survive termination of this Agreement, or (b) continue to Closing without any reduction in the Purchase Price. Failure to timely notify Seller of its election to terminate this Agreement shall be deemed Buyer's election to continue to Closing. Should Buyer elect (or be deemed to have elected) clause (b), then Buyer shall, at Closing, be assigned the award of the condemning authority up to the amount of the Purchase Price. The Scheduled Closing Date may be extended as necessary to permit Buyer the full fifteen (15) days set forth above.

**9.2** **Casualty**. Except as provided in Article 4 and Section 1.2.3 herein, Seller assumes all risks and liability for damage to or injury occurring to the Leased Premises by fire, storm, accident or any other casualty or cause ("**Damage**") until Closing. If, between the Effective Date and the Closing Date, the Leased Premises suffers any Damage, then Seller shall, promptly after discovering that the Leased Premises has experienced Damage, notify Buyer of such Damage. Seller may elect, by written notice delivered to Buyer within thirty (30) days after becoming aware the Damage has occurred, to repair and/or restore the portions of the Leased Premises included in the sale to the condition existing immediately prior to the occurrence of the Damage ("**Repair the Property**"), in which event the parties shall continue to Closing as provided in this Agreement. If Seller elects to Repair the Property and such repair cannot reasonably be completed prior to the Scheduled Closing Date, Seller shall have the right to extend the Scheduled Closing Date until such repairs are completed. If Seller fails to notify Buyer of such election to Repair the Property, Seller shall be deemed to have elected not to Repair the Property. Within fifteen (15) days after the earlier to occur of: (i) receipt of such notice from Seller that Seller will not Repair the Property; and (ii) the expiration of the aforesaid thirty (30) day period, Buyer shall notify Seller of its election to either to: (a) terminate this Agreement, in which event the Earnest Money shall be promptly refunded to Buyer in accordance with the provisions herein and Seller and Buyer shall have no further rights and obligations hereunder except those which expressly survive termination of this Agreement, or (b) continue to Closing without any reduction in the Purchase Price and/or other consideration from Seller. Failure to timely notify Seller of its election to terminate this Agreement shall be deemed Buyer's election to continue to Closing The Scheduled Closing Date may be extended as necessary to permit Buyer the full fifteen (15) days.

### ARTICLE 10
### ESCROW AGENT

**10.1** **Investment of Earnest Money**. Escrow Agent shall invest the Deposit in a non-interest bearing account at a commercial bank whose deposits are insured by the Federal Deposit Insurance Corporation. Escrow Agent shall notify Seller, no later than one (1) business day after Escrow Agent's receipt thereof, that Escrow Agent has received the Deposit in immediately available funds and is holding the same in accordance with the terms of this Agreement. However, Escrow Agent shall invest the Deposit only in such accounts as will allow Escrow Agent to disburse the Earnest Money upon no more than one (1) business

days' notice.

**10.2    Payment at Closing**. If the Closing takes place under this Agreement, Escrow Agent shall deliver the Earnest Money to, or upon the instructions of, Seller on the Closing Date.

**10.3    Payment on Demand**. In the event that Buyer or Seller claims any portion of the Earnest Money pursuant to the provisions of this Agreement, other than with respect to the Closing, such party claiming any portion of the Earnest Money shall deliver written notice of such claim to the Escrow Agent and to the other such party (i.e., Buyer or Seller) and, unless such other party, within ten (10) days thereafter, notifies Escrow Agent of any objection to such requested disbursement of the Earnest Money, Escrow Agent shall disburse the applicable portion of the Earnest Money to the party demanding the same, subject to the provisions of Section 2.4, and the Escrow Agent shall thereupon be released and discharged from any further duty or obligation hereunder.

**10.4    Exculpation of Escrow Agent**. It is agreed that the duties of Escrow Agent are herein specifically provided and are purely ministerial in nature and that Escrow Agent shall incur no liability whatsoever except for its willful misconduct or negligence, so long as Escrow Agent is acting in good faith. Seller and Buyer do each hereby release Escrow Agent from any liability for any error of judgment or for any act done or omitted to be done by Escrow Agent in the good faith performance of its duties hereunder and do each hereby indemnity Escrow Agent against and agree to hold, save and defend Escrow Agent harmless from, any costs, liabilities and expenses incurred by Escrow Agent in serving as Escrow Agent hereunder and in faithfully discharging its duties and obligations hereunder except for its willful misconduct or negligence. If a dispute arises between the parties hereto, then Escrow Agent may tender the Earnest Money into a court of competent jurisdiction where the Leased Premises is located, together with such legal pleadings as it deems appropriate, and thereupon be discharged from all further duties and liabilities under this Agreement.

**10.5    Intentionally Omitted**

**10.6    Execution by Escrow Agent**. Escrow Agent has executed this Agreement solely for the purpose of acknowledging and agreeing to the provisions of this Article 10. Escrow Agent's consent to any modification or amendment of this Agreement other than this Article 10 shall not be required.

**ARTICLE 11**
**MUTUAL INDEMNIFICATION**

**11.1    Indemnification by Seller**. Seller agrees to defend, indemnify and hold harmless Buyer and each of its affiliates, officers, directors, employees, agents, successors and assigns (collectively, "**Buyer Indemnified Parties**") and shall reimburse Buyer Indemnified Parties for, from and against each claim, loss, liability, cost and expense (including without limitation, interest, penalties, costs of preparation and investigation, and the reasonable fees, disbursements and expenses of attorneys, accountants and other professional advisors) (individually, a "**Loss**" and collectively, "**Losses**") directly or indirectly relating to, resulting from or arising out of the conduct of the business operations of the Seller as to the Business, the Leased Premises or the operation of the Subject Assets prior to the Closing Date or the actions or omissions of the directors, managers, officers, shareholders, employees or agents of the Seller as to the Business, the Leased Premises or the operation of the Subject Assets prior to the Closing Date, other than Losses arising from the Assumed Liabilities.

**11.2    Indemnification by Buyer**. Buyer, jointly and severally, agree to defend, indemnify and hold harmless Seller, and each of its affiliates, officers, directors, employees, agents, successors and assigns ("**Seller Indemnified Parties**"; together with the Buyer Indemnified Parties collectively, "**Indemnified Parties**" and individually, an "**Indemnified Party**") and shall reimburse the Seller Indemnified Parties for, from and against each all Losses, directly or indirectly relating to, resulting from or arising out of: (i) the Assumed Liabilities; (ii) the conduct of the business operations of Buyer as to the Leased Premises or the operation of the Subject Assets on or after the Closing Date or the actions or omissions of the directors,

managers, officers, shareholders, employees or agents of Buyer as to the Leased Premises or the operation of the Subject Assets after the Closing Date; and (iii) any Buyer Retained Employee Obligations.

**11.3    Mitigation of Damages.** Each Indemnified Party shall take commercially reasonable steps as necessary or appropriate to mitigate any Losses they might otherwise suffer.

**11.4    Terms.** The party against whom such claims are asserted under this Article 11 is referred to as an "**Indemnifying Party**".

**11.5    Limitations.** Notwithstanding anything to the contrary contained in this Agreement, the aggregate amount of all Losses for which either party shall be liable to the other party with respect to this Agreement shall in no event exceed the Purchase Price, except that such limitation shall not apply to an Indemnifying Party for any Losses of an Indemnified Party related to any Third Party Claim (as defined below). In no event shall any Indemnifying Party be liable to any Indemnified Party for any punitive, incidental, consequential, special or indirect damages, including loss of future revenue or income, loss of business reputation or opportunity relating to the breach or alleged breach of this Agreement, or diminution of value or any damages based on any type of multiple, except to the extent such Losses are third party Losses subject to a Third Party Claim (as defined below) for which the Indemnifying Party owes indemnification under Section 11.1 or 11.2 above.

**11.6    Indemnification Procedures.**

**11.6.1    Third Party Claims.** If any Indemnified Party receives notice of the assertion or commencement of any action, suit, claim or other legal proceeding made or brought by any person who is not a party to this Agreement or an affiliate of a party to this Agreement or a representative of the foregoing (a "**Third Party Claim**") against such Indemnified Party with respect to which the Indemnifying Party is obligated to provide indemnification under this Agreement, the Indemnified Party shall give the Indemnifying Party prompt written notice thereof. The failure to give such prompt written notice shall not, however, relieve the Indemnifying Party of its indemnification obligations, except and only to the extent that the Indemnifying Party forfeits rights or defenses by reason of such failure. Such notice by the Indemnified Party shall describe the Third Party Claim in reasonable detail, shall include copies of all material written evidence thereof and shall indicate the estimated amount, if reasonably practicable, of the Loss that has been or may be sustained by the Indemnified Party. The Indemnifying Party shall have the right to participate in, or by giving written notice to the Indemnified Party, to assume the defense of any Third Party Claim at the Indemnifying Party's expense and by the Indemnifying Party's own counsel who is reasonably acceptable to the Indemnified Party, and the Indemnified Party shall cooperate in good faith in such defense. In the event that the Indemnifying Party assumes the defense of any Third Party Claim, subject to Section 11.6.2 below, it shall have the right to take such action as it deems necessary to avoid, dispute, defend, appeal or make counterclaims pertaining to any such Third Party Claim on behalf of the Indemnified Party, and the Indemnifying Party shall keep the Indemnified Party informed of all material developments and events relating to such Third Party Claim. In the event that the Indemnifying Party assumes the defense of any Third Party Claim, the Indemnified Party shall have the right, at its own cost and expense, to participate in the defense of any Third Party Claim with counsel selected by it subject to the Indemnifying Party's right to control the defense thereof. If the Indemnifying Party elects not to compromise or defend such Third Party Claim or fails to promptly notify the Indemnified Party in writing of its election to defend as provided in this Agreement, the Indemnified Party may, subject to Section 11.6.2 below pay, compromise, and defend such Third Party Claim using the Indemnified Party's own counsel and seek indemnification for any and all Losses based upon, arising from or relating to such Third Party Claim. Seller and Buyer shall cooperate with each other in all reasonable respects in connection with the defense of any Third Party Claim, including making available (subject to the provisions of Section 11.6.2 below records relating to such Third Party Claim) and furnishing, without expense (other than reimbursement of actual out-of-pocket expenses) to the defending party, management employees of the non-defending party as may be reasonably necessary for the preparation of the defense of such Third Party Claim.



**11.6.2** <u>Settlement of Third Party Claims</u>. Notwithstanding any other provision of this Agreement, the Indemnifying Party shall not enter into settlement of any Third Party Claim without the prior written consent of the Indemnified Party (which consent shall not be unreasonably withheld or delayed), except as provided in this <u>Section 11.6.2</u>. If a firm offer is made to settle a Third Party Claim without leading to liability or the creation of a financial or other obligation on the part of the Indemnified Party and provides, in customary form, for the unconditional release of each Indemnified Party from all liabilities and obligations in connection with such Third Party Claim, no admission of wrongdoing by the Indemnified Party, and no loss of material rights by the Indemnified Party, and the Indemnifying Party desires to accept and agree to such offer, the Indemnifying Party shall give written notice to that effect to the Indemnified Party. If the Indemnified Party fails to consent to such firm offer within ten (10) days after its receipt of such notice, the Indemnified Party may continue to contest or defend such Third Party Claim and in such event, the maximum liability of the Indemnifying Party as to such Third Party Claim shall not exceed the amount of such settlement offer. If the Indemnified Party fails to consent to such firm offer and also fails to assume defense of such Third Party Claim, the Indemnifying Party may settle the Third Party Claim upon the terms set forth in such firm offer to settle such Third Party Claim. If the Indemnified Party has assumed the defense of such claim, it shall not agree to any settlement without the written consent of the Indemnifying Party (which consent shall not be unreasonably withheld or delayed).

**11.6.3** <u>Direct Claims</u>. Any claim by an Indemnified Party on account of a Loss which does not result from a Third Party Claim (a "**Direct Claim**") shall be asserted by the Indemnified Party giving the Indemnifying Party prompt written notice thereof. The failure to give such prompt written notice shall not, however, relieve the Indemnifying Party of its indemnification obligations, except and only to the extent that the Indemnifying Party forfeits rights or defenses by reason of such failure. Such notice by the Indemnified Party shall describe the Direct Claim in reasonable detail, shall include copies of all material written evidence thereof and shall indicate the estimated amount, if reasonably practicable, of the Loss that has been or may be sustained by the Indemnified Party. The Indemnifying Party shall have thirty (30) days after its receipt of such notice to respond in writing to such Direct Claim. During such thirty (30) day period, the Indemnified Party shall allow the Indemnifying Party and its professional advisors, subject to appropriate confidentiality obligations, to investigate the matter or circumstance alleged to give rise to the Direct Claim, and whether and to what extent any amount is payable in respect of the Direct Claim and the Indemnified Party shall assist the Indemnifying Party's investigation by giving such information and assistance (including access to the Indemnified Party's premises and personnel and the right to examine and copy any applicable, non-privileged accounts, documents or records) as the Indemnifying Party or any of its professional advisors may reasonably request. If the Indemnifying Party does not so respond within such thirty (30) day period, the Indemnifying Party shall be deemed to have rejected such claim, in which case the Indemnified Party shall be free to pursue such remedies as may be available to the Indemnified Party on the terms and subject to the provisions of this Agreement.

**ARTICLE 12**
**MISCELLANEOUS**

**12.1** <u>Severability</u>. This Agreement is intended to be performed in accordance with and only to the extent permitted by all applicable laws, ordinances, rules and regulations. If any term, clause or provision of this Agreement, or the application thereof to any person or circumstance, shall for any reason and to any extent be determined or held by a court of competent jurisdiction to be illegal, invalid or unenforceable, the remainder of this Agreement and the application of such provision to other persons or circumstances shall not be affected thereby and shall be enforced to the maximum extent possible. In lieu of any such term, clause or provision of this Agreement which is so determined or held by a court to be illegal, invalid or unenforceable, there shall, to the extent practicable and reasonable, given the circumstances, be inserted as a part of this Agreement a term, clause or provision as nearly identical to that stricken from this Agreement by virtue of such determination or holding which is not illegal, invalid or unenforceable; it being expressly; provided, however, that, notwithstanding the foregoing provisions of this sentence, if the effect of a determination or holding by a court that a particular term, clause or provision of this Agreement is illegal, invalid or unenforceable is such that either of Seller or Buyer shall no longer have the substantial benefit of its respective bargain under this Agreement or any material portion of this Agreement, then, and in such

event, whichever of Seller or Buyer is thus adversely affected, may, at its option and in its sole and absolute discretion, cancel and terminate this Agreement upon its delivery of written notice thereof to the other of them and to Escrow Agent. The provisions of this <u>Section 12.1</u> shall apply to any amendment of this Agreement and shall survive the Closing or termination of this Agreement.

**12.2** **Broker**. The party or parties, if any, as indicated on the Information Sheet, shall be responsible for all commissions and fees due and owing to the Broker. Each party represents to the other that the representing party has incurred no liability for any finder's fee or a brokerage commission arising from or relating to the transaction contemplated by this Agreement other than as indicated on the Information Sheet. Each party agrees to indemnify, defend and hold harmless the other party for all costs and expenses incurred, including, without limitation, reasonable Attorneys' Fees, as a result of: (i) any claim of any broker or finder, other than the Broker if any indicated on the Information Sheet, arising out of or resulting from any agreement, arrangement and/or understanding alleged to have been made by such party (or on its behalf) with any broker or finder in connection with this Agreement and/or the transaction contemplated hereby; and/or (ii) the failure of the party to pay the Broker all commissions and fees due and owing to the Broker as indicated on the Information Sheet. The provisions of this <u>Section 12.2</u> shall survive the Closing or termination of this Agreement.

**12.3** **Exchange of Properties**. If requested by a party, Seller and Buyer shall cooperate in structuring this transaction to accommodate a tax deferred exchange under Internal Revenue Section 1031. This cooperation shall include execution of all documents reasonably required to accomplish the exchange, including participation with an exchange intermediary. No exchange cooperation is required if it will delay the close of this transaction or will impose additional expense on a cooperating party.

**12.4** **Notices**. Any notice or document required or permitted to be delivered under this Agreement (other than closing documents) shall be given in writing and delivered by hand or overnight courier (such as United Parcel Service or Federal Express), sent by United States registered or certified mail, return receipt requested, postage prepaid, or transmitted by email and addressed to each party at its address as set forth on the Information Sheet or at such other address as the parties have theretofore specified by written notice delivered in accordance herewith. Notice is considered given and received: (i) on the date of hand or courier delivery or refusal of acceptance; (ii) the next business day after deposit with overnight courier for next business day delivery; (iii) two (2) business days after deposit in the United States mail; or (iv) the same day (or next-following business day if sent after 5:00 P.M. on a business day or at any time on a day that is not a business day) when sent by confirmed e-mail, provided that any notice by e-mail must also be sent, no later than the next-following business day, by one (1) of the other approved methods of delivery. Attorneys may provide notices and other communications on behalf of their clients.

**12.5** **General Provisions**. Whenever used, the singular number shall include the plural, the plural the singular and the use of any gender shall be applicable to all genders. Seller and Buyer have participated freely in the negotiation and preparation hereof and have had the opportunity to have an attorney involved in such review and negotiations. Neither this Agreement nor any amendment hereto shall be more strictly construed against Seller or Buyer. Nothing herein contained shall be deemed to: (1) create a relationship between Seller and Buyer as other than buyer and seller; or (2) create a fiduciary duty on the part of either party to the other.

**12.6** **Governing Law**. This Agreement shall be governed by and construed in accordance with, the law of the State of Tennessee without regard to its conflicts of laws provisions.

**12.7** **Counterparts**. This Agreement may be executed in counterparts, each of which shall be deemed an original and all of which shall constitute one and the same instrument. Moreover, delivery of said counterparts of this Agreement may be effectuated electronically for the purposes of this Agreement.

**12.8** **Time**. Time is of the essence; however, whenever in this Agreement a period of time is stated as a number of days, unless otherwise specified, it shall be construed to mean calendar days; provided, however, that when any period of time so stated would end upon a Saturday, Sunday or legal holiday, such period

shall be deemed to end upon the next day following which is not a Saturday, Sunday or legal holiday.

**12.9    Caption.** The captions in this Agreement are inserted for convenience of reference only and in no way define, describe or limit the scope or intent of this Agreement or any of the provisions hereof.

**12.10    Exhibits and Schedules.** The following exhibits attached hereto shall be deemed to be an integral part of this Agreement:

| | | |
|---|---|---|
| **Exhibit "A"** | - | The Lease |
| **Exhibit "B"** | | Reserved |
| **Exhibit "C"** | | Reserved |
| **Exhibit "D"** | | Excluded Assets |
| **Exhibit "E"** | - | Assumed Liabilities |
| **Exhibit "F"** | - | Reserved |
| **Exhibit "G"** | - | Reserved |
| **Exhibit "H"** | - | Form of Lease Assignment and Assumption |
| **Exhibit "I"** | - | Form of Bill of Sale |
| **Exhibit "J"** | - | Form of Consent to Assignment of Lease |

**12.11    Entire Agreement, Review and Waiver.** This Agreement, including Exhibits, contains the entire agreement between the parties pertaining to the subject matter hereof and fully supersedes all prior written and oral agreements and understandings between the parties pertaining to such subject matter and may not be amended except in writing, signed by both Seller and Buyer. Seller and Buyer each represent and warrant to the other that it has carefully read the terms and conditions of this Agreement and has discussed with its legal counsel its terms and conditions, its reasonableness and its legal consequences. Based upon the foregoing, Seller and Buyer each agree that (A) this Agreement is reasonable in all respects; and, (B) this Agreement does not impose any undue hardship on any party and that this Agreement is no broader than reasonably necessary to afford each of the parties with desired protection. The failure or delay of any party at any time or times to require performance of any provision or to exercise its rights with respect to any provision hereof, shall in no manner operate as a waiver of or affect such party's right at a later time to enforce the same

**12.12    Attorney's Fees.** Should either Seller or Buyer employ an attorney (whether or not an action is filed), or file an action, to enforce this Agreement, the prevailing party is entitled to recover, in addition to the remedies and/or damages, Attorneys' Fees incurred in connection therewith. The term "**prevailing party**" shall mean that party whose positions substantially prevail. The provisions of this Section 12.12 shall survive the Closing or termination of this Agreement.

**12.13    Survival.** All provisions of this Agreement which are not fully performed as of Closing shall survive Closing; provided, however, that, except as expressly provided in Section 7.1, the representations of Seller contained in Section 7.1 and the representations of Buyer contained in Section 7.3 shall survive Closing for a period of six (6) months.

**12.14    No Recordation.** No part of this Agreement, any Memorandum of Agreement or any notice relating to the Agreement may be recorded in any public records.

**12.15    Merger.** Except as expressly provided in this Agreement, all rights of Buyer shall merge into the Deed and other instruments delivered by Seller at Closing and shall not survive Closing.

**12.16    Jury Trial Waiver.** THE PARTIES KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE THEIR RIGHT TO A JURY TRIAL IN CONNECTION WITH THIS AGREEMENT, THE TRANSACTION CONTEMPLATED UNDER THE AGREEMENT OR ANY COURSE OF DEALINGS OR ACTIONS BY THE PARTIES RELATING TO THIS AGREEMENT. THIS WAIVER IS A MATERIAL INDUCEMENT FOR SELLER TO EXECUTE THIS AGREEMENT AND SURVIVES

CLOSING UNDER OR TERMINATION OF THIS AGREEMENT. The provisions of this Section 12.16 shall survive the Closing or termination of this Agreement.

**12.17**    **Limitation on Liability.** No member, director, officer, shareholder, employee, advisor, agent, attorney or manager in or of Seller (each, a **"Seller Party"**) has any personal liability, directly or indirectly, under this Agreement. Buyer and Buyer's successors and assigns and all other interested parties are entitled only to, and shall only, look to Seller's interest in the Subject Assets (and the proceeds thereof) for the payment of any claim or for any performance and Buyer waives all other rights relating thereto. These limitations are in addition to and not in limitation of any other Seller limitation of liability. The provisions of this Section 12.17 shall survive the Closing or termination of this Agreement.

**12.18**    **Non-Binding/Offer and Acceptance.** Unless and until this Agreement is fully executed and delivered by both parties, any discussions, negotiations, correspondence or communications between Seller and Buyer and their respective attorneys, agents and representatives in connection or with respect to the subject matter of this Agreement, including, without limitation, the delivery and exchange of unsigned draft copies of this Agreement, are intended only as non-binding discussions, negotiations and communications and either party shall have the absolute right to withdraw from such discussions, negotiations and communications at any time without incurring any liability or obligation whatsoever to the other party (except to the extent otherwise expressly specified in the letter of intent executed by the parties).

**12.19**    **Successors and Assigns.** All the terms and provisions of this Agreement shall be binding upon, shall inure to the benefit of and shall be enforceable by the respective heirs, successors, permitted assigns and legal or personal representatives of the parties hereto.

**12.20**    **Notice of Lender Approval.** BUYER ACKNOWLEDGES THAT SELLER MUST OBTAIN APPROVAL FROM ITS LENDER FOR THE TRANSACTION CONTEMPLATED HEREIN (THE "LENDER APPROVAL"). PROMPTLY FOLLOWING RECEIPT OF THE LENDER'S APPROVAL, SELLER SHALL PROVIDE BUYER NOTICE THEREOF. IF SELLER FAILS TO DELIVER SUCH NOTICE WITHIN FIVE (5) BUSINESS DAYS AFTER THE EFFECTIVE DATE, EITHER PARTY SHALL HAVE THE RIGHT TO TERMINATE THIS AGREEMENT BY DELIVERING WRITTEN NOTICE THEREOF TO THE OTHER. IN THE EVENT OF SUCH TERMINATION, THE ESCROW AGENT SHALL DISBURSE THE ENTIRE AMOUNT OF THE EARNEST MONEY (SUBJECT TO SECTION 2.4 HEREIN) TO BUYER AND THE PARTIES SHALL HAVE NO FURTHER RIGHTS, DUTIES OR OBLIGATIONS UNDER THIS AGREEMENT, OTHER THAN THOSE WHICH ARE EXPRESSLY PROVIDED IN THIS AGREEMENT TO SURVIVE THE TERMINATION OF THIS AGREEMENT.

**[SIGNATURES ON FOLLOWING PAGE]**

**IN WITNESS WHEREOF**, the parties have caused this Agreement of Purchase and Sale to be executed as of the Effective Date.

**WITNESSES:**

Name: _Debbie Windham_
Debbie Windham (Aug 28, 2020 17:53 EDT)

Name: _____

**SELLER:**

**RUBY TUESDAY, INC.,**
a Georgia corporation

By: _____
Stephanie Medley (Aug 28, 2020 18:05 EDT)
Name: _Stephanie Burke Medley_
Title: _Chief Strategy Officer_
Date: _August 28_____, _2020_

**BUYER:**

**BNA ASSOCIATES LLC,**
a Tennessee limited liability company

Name: _____

Name: _____

By: _____
Name: _Philip Walker_
Title: _Managing Partner_
Date: _August 28_, _2020_

Escrow Agent has executed this Agreement for the limited purposes set forth in this Agreement.

**ESCROW AGENT:**

**OLD REPUBLIC NATIONAL TITLE INSURANCE COMPANY**

By: _____
Name: _Michael Davis_
Title: _AVP_
Date: _8/31/2020_

**EXHIBIT "A"**

**THE LEASE**

E-FILED
5/4/2021 3:31 PM
CLERK & MASTER
DAVIDSON CO. CHANCERY CT.

# EXHIBIT G
# SEPTEMBER 21, 2020 LETTER



**TARPY, COX,
FLEISHMAN
&
LEVEILLE**
P.L.L.C.

ATTORNEYS AT LAW

T. LYNN TARPY
EDWARD A. COX, JR.
LORI F. FLEISHMAN
THOMAS M. LEVEILLE
STEFFANIE M. SPECK*
LUKE D. DURHAM
R. SETH OAKES
JEDIDIAH C. MCKEEHAN+
JOHN D. HAINES
EDWARD J. SHULTZ

OF COUNSEL
CHAD A. SPECK
JARED B. KARNES

TELEPHONE
(865) 588-1096

FACSIMILE
(865) 588-1171

WEB
tcflattorneys.com

1111 N. NORTHSHORE DRIVE
LANDMARK CENTER NORTH TOWER
SUITE N-290
KNOXVILLE, TENNESSEE 37919

*RULE 31 LISTED GENERAL CIVIL MEDIATOR
+RULE 31 LISTED FAMILY MEDIATOR

September 21, 2020

Debbie Windham
333 East Broadway Avenue
Maryville, TN 37804
Email: dwindham@rubytuesday.com

     Re: <u>Notice to Proceed</u>

Dear Debbie:

Please be advised that BNA Associates, LLC, intends to proceed with the purchase of the property commonly referred to as RT Lodge. Buyer and Seller have been in direct communication regarding the intent to proceed. I look forward to continuing to work with you on this transaction.

Sincerely,

*Steffanie M. Speck (w/ permission KMW)*

Steffanie M. Speck

SMS

cc: Philip Welker
    Stephanie Burke Medley (*smedley@rubytuesday.com*)

**E-FILED**
**5/4/2021 3:31 PM**
**CLERK & MASTER**
**DAVIDSON CO. CHANCERY CT.**

# EXHIBIT H
# OCTOBER 30, 2020 LETTER



## MILGRIM LAW GROUP

3216 Corrine Drive
Orlando, FL 32803

Phone 407.790.4966
Fax     888.802.1885
edwardmilgrim@milgrimlaw.com

October 30, 2020

**By Federal Express and E-mail to:**
philip@bna-re.com
BNA ASSOCIATES LLC
401 Union Street, 2nd Floor
Nashville, TN 37219
Attn: Philip Welker, Managing Partner

**By Federal Express and E-mail to:**
smspeck@tcflattorneys.com
Tarpy, Cox, Fleishman & Leveille, PLLC
Landmark Tower North
1111 Northshore Drive, Suite N-290
Knoxville, TN 37919
Attn: Steffanie M. Speck, Esq.

Re:    Reinstated and Amended and Restated Asset Purchase and Sale Agreement between RUBY
TUESDAY, INC., as Seller, and BNA ASSOCIATES, LLC, as Buyer, dated August 28,
2020, as amended (the "**Agreement**") for property commonly known as RT Lodge, District
No. 9, Blount County, Tennessee / Notice of Termination

Dear Phillip and Steffanie:

Our firm represents Seller in connection with the transaction evidenced by the Agreement.

In accordance with Section 12.20 of the Agreement, we hereby advise you that Seller's Lender has
not consented to the proposed transaction. We further advise you that Seller elects to terminate the
Agreement pursuant to 12.20(a) thereof. As part of Seller's Chapter 11 proceeding, Seller has
entered into a Restructuring Support Agreement which will govern the disposition of assets,
including but not limited to the RT Lodge.

In accordance with the terms of Section 12.20(a) of the Agreement, we will direct the Escrow Agent
to disburse the entire amount of the Earnest Money to you (subject to the provisions of Section 2.4
of the Agreement) and the parties shall have no further rights, duties or obligation under the terms
the Agreement, other than those which expressly survive the termination of the Agreement. In
addition, in accordance with Section 12.20(b) of the Agreement please provide Buyer's Notice
regarding the Pursuit Costs, if any, within five (5) business days after the date of this letter.

Sincerely,

Edward G. Milgrim

cc:  Stephanie B. Medley – smedley@rubytuesday.com
     Debbie Windham – dwindham@rubytuesday.com