## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>RTI HOLDING COMPANY, LLC, *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 20-12456 (JTD)<br><br>(Jointly Administered)<br><br>**Hearing Date**:<br>**August 3, 2021, at 3:00 p.m. (ET)**<br><br>**Objection Deadline**:<br>**July 26, 2021, at 4:00 p.m. (ET)**<br><br>**Ref. Docket No. 1465** |

### OBJECTION OF BNA ASSOCIATES, LLC TO MOTION OF GOLDMAN SACHS SPECIALTY LENDING GROUP, L.P. TO ENFORCE CONFIRMATION ORDER

BNA Associates, LLC ("BNA"), by and through its undersigned counsel, hereby objects

(this "Objection") to the *Motion of Goldman Sachs Specialty Lending Group, L.P. to Enforce*

*Confirmation Order* [D.I. 1465] (the "Injunction Motion").  In support of this Objection, BNA

respectfully represents as follows:

---

[1]     The Debtors in these chapter 11 cases and the last four digits of each Debtor's U.S. tax identification number are as follows: RTI Holding Company, LLC (4966); Ruby Tuesday, Inc. (5239); Ruby Tuesday, LLC (1391); RTBD, LLC (6505); RT of Carroll County, LLC (8836); RT Denver Franchise, L.P. (2621); RT Detroit Franchise, LLC (8738); RT Distributing, LLC (6096); RT Finance, LLC (7242); RT FL Gift Cards, Inc. (2189); RT Florida Equity, LLC (7159); RT Franchise Acquisition, LLC (1438); RT of Fruitland, Inc. (1103); RT Indianapolis Franchise, LLC (6016); RT Jonesboro Club (2726); RT KCMO Franchise, LLC (7020); RT Kentucky Restaurant Holdings, LLC (7435); RT Las Vegas Franchise, LLC (4969); RT Long Island Franchise, LLC (4072); RT of Maryland, LLC (7395); RT Michiana Franchise, LLC (8739); RT Michigan Franchise, LLC (8760); RT Minneapolis Franchise, LLC (2746); RT Minneapolis Holdings, LLC (7189); RT New England Franchise, LLC (4970); RT New Hampshire Restaurant Holdings, LLC (7438); RT New York Franchise, LLC (1154); RT Omaha Franchise, LLC (7442); RT Omaha Holdings, LLC (8647); RT One Percent Holdings, LLC (6689); RT One Percent Holdings II, LLC (2817); RT Orlando Franchise, LP (5105); RT Restaurant Services, LLC (7283); RT South Florida Franchise, LP (3535); RT Southwest Franchise, LLC (9715); RT St. Louis Franchise, LLC (6010); RT Tampa Franchise, LP (5290); RT Western Missouri Franchise, LLC (6082); RT West Palm Beach Franchise, LP (0359); RTTA, LP (0035); RTT Texas, Inc. (2461); RTTT, LLC (9194); Ruby Tuesday of Allegany County, Inc. (8011); Ruby Tuesday of Bryant, Inc. (6703); Ruby Tuesday of Columbia, Inc. (4091); Ruby Tuesday of Frederick, Inc. (4249); Ruby Tuesday of Linthicum, Inc. (8716); Ruby Tuesday of Marley Station, Inc. (1641); Ruby Tuesday of Pocomoke City, Inc. (0472); Ruby Tuesday of Russellville, Inc. (1601); and Ruby Tuesday of Salisbury, Inc. (5432). The Debtors' mailing address is 333 East Broadway Ave., Maryville, TN 37804.

## PRELIMINARY STATEMENT[2]

1.      Goldman Sachs Specialty Lending Group, L.P. ("Goldman") incorrectly argues that the Tennessee Action is barred as an impermissible collateral attack on the Confirmation Order. It tries to make this single argument in several different ways, but none works.

2.      *The Tennessee Action does not collaterally attack the Confirmation Order.* The Tennessee Action addresses different circumstances, different parties, and different legal principles than those addressed by this Court in confirming the Debtors' Plan.  Goldman's efforts to argue the contrary relies on calculated imprecision about the terms and effect of the Plan, the Confirmation Order, and BNA's prior participation in proceedings before this Court.

3.      *The Tennessee Action does not challenge the good-faith finding in the Confirmation Order.* Paragraph Q pertains to the content of the Plan and, at most, the Debtors' conduct in proposing it. The Tennessee Action, by contrast, attacks Goldman's prepetition conduct in torpedoing a transaction between the Debtor and BNA.  That conduct and its injurious effect on BNA was complete before the Petition Date.  Even if the Confirmation Order's good-faith finding applied to Goldman, that finding could exist alongside the allegations in the Tennessee Action.

4.      *The Tennessee Action does not challenge the free-and-clear provision of the Confirmation Order.*  The power the Court exercised under section 1141 to authorize the vesting of the Debtors' assets "free and clear" immunizes the reorganized debtor entities from liability they might otherwise incur by virtue of the transfer.  BNA's claim in the Tennessee Action (a) does not depend on any assets having been transferred to Goldman, (b) was choate as to Goldman before confirmation, and (c) does not allege a claim BNA ever had against the Debtors themselves. Indeed, BNA is not and never has been a creditor of any Debtor.  Moreover, Goldman makes no

---

[2]      Capitalized terms used but not otherwise defined in the Preliminary Statement shall have the meanings ascribed to them in the body of this Objection.

effort to show that it, as the new parent of the reorganized Debtor that owns the pertinent Leasehold Interest, benefits from the provision in the first place. Nor does Goldman explain how the free-and-clear language, which defines the scope of the conferred immunity primarily by reference to inapplicable Plan-defined terms, encompasses BNA's claim. And its principal authorities are cases concerning § 363 sale orders. This case does not involve a § 363 sale.

5. *The Tennessee Action is not barred by the res judicata effect of Confirmation.* BNA could not have litigated its Tennessee tort claim against Goldman in the confirmation proceeding. Not only is Goldman wrong about the factual and legal overlap between the Plan Objection and the Complaint in the Tennessee Action, but claim preclusion does not apply here in any event because the bankruptcy court was not a reasonable forum for resolving BNA's Tortious Interference Claim. Because the Third Circuit squarely holds that the peculiarities of bankruptcy practice require this test to be met for res judicata to apply, there is no bar in this context.

6. *The Tennessee Action is not barred by the issue-preclusive effect of Confirmation.* Goldman cryptically claims that issue-preclusion, a doctrine axiomatically tied to given issues, bars the Tennessee Action without identifying precisely what issue it claims is precluded. But to the extent it relies upon the good-faith finding in the Confirmation Order, that finding fails to bar the Tennessee Action because, in addition to points made elsewhere, any relevant finding would have been unnecessary to confirmation and, concomitantly, not something BNA could have fully litigated before the bankruptcy court. As for BNA's Plan Objection, it was withdrawn, and therefore not actually litigated, as required for issue preclusion to apply.

7. *The Tennessee Action's merits are not on trial.* Goldman takes a throwaway swipe at the merits of BNA's claim, which are not before this Court. The Court does not possess jurisdiction under 28 U.S.C. §1334(b) to hear and resolve the merits of the Tortious Interference Claim asserted in the Tennessee Action.

3

8.      The Tennessee Action is not a collateral or direct attack on the Confirmation Order. The confirmation proceedings could not have provided BNA relief on its Tennessee tort claim, nor could BNA have prevented confirmation by proving its Tennessee tort claim.  The Court did not make factual determinations dispositive of the Tennessee Action in confirming the Plan, and a court hearing the Tennessee Action will never need to make a factual determination contrary to any binding element of the Plan or Confirmation Order.  As such, the Confirmation Order is no bar to BNA's suit.

9.      The Injunction Motion should be denied.

## BACKGROUND

### A.      The Chapter 11 Cases Generally

10.     On October 7, 2020 (the "Petition Date"), the above-captioned debtors (the "Debtors") filed voluntary petitions under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), commencing the above-captioned cases (the "Chapter 11 Cases").

11.     As set forth in the *Declaration of Shawn Lederman, Chief Executive Officer, In Support of First Day Pleadings* [D.I. 3] (the "First Day Declaration"), the Debtors developed, operated, and franchised casual dining restaurants in the United States, Guam, and five foreign countries under the Ruby Tuesday brand.  First Day Decl. ¶ 5.  In 1997, Debtor Ruby Tuesday, Inc. ("RTI") acquired a leasehold interest (the "Leasehold Interest") in a former residence, restaurant, and corporate retreat and the surrounding 7.25 acre property located on the campus of Maryville College in Maryville, Tennessee (the "RT Lodge").  *Id.* ¶ 19.

12.     In pertinent part, the Debtors financed their operations pursuant to, among other financing vehicles, that certain Credit and Guaranty Agreement dated as of December 21, 2017 (the "Prepetition Credit Agreement"), by and among Debtor RTI Holding Company, LLC and the

4

Prepetition Secured Lenders, including Goldman. *Id.* ¶ 20. The Prepetition Credit Agreement required Goldman's consent to the sale of assets, including the RT Lodge. Injunction Motion ¶ 7.

13.     According to the First Day Declaration, prior to commencing the Chapter 11 Cases, the Debtors entered into a Restructuring Support Agreement with the Prepetition Secured Lenders [D.I. 354] (the "RSA"), which contemplated, among other things, (a) debtor in possession financing to sustain the Debtors' operations during the Chapter 11 Cases, (b) the formulation of a business plan for the future of Ruby Tuesday, (c) confirmation of a plan of reorganization that would result in certain members of the Prepetition Lender Group acquiring ownership in the company, and (d) the provision of exit financing to sustain a reorganized Ruby Tuesday post-emergence. First Day Decl. ¶¶ 34, 48; Injunction Motion ¶ 9. The disclosure statement [D.I. 354] for the Debtors' *Second Amended Chapter 11 Plan* [D.I. 1135] (with [D.I. 920], the "Plan") states that the "Plan reflects the agreement reached with the Prepetition Secured [Lenders] to reorganize the Debtors as a going-concern, back-stopped by a parallel sale process." Disclosure Statement Art. I.C.

14.     On November 20, 2020, the Court entered an order approving procedures for bidding on the Debtors' assets, including the Leasehold Interest in the RT Lodge [D.I. 585] (the order, the "Bidding Procedures Order" and the authorized procedures thereunder, the "Bidding Procedures"), imposing a bid deadline of January 14, 2021, for an auction to be held no later than January 19, 2021 (the "Auction").

15.     The Bidding Procedures provide that "a bidder may bid on a portion or all of the Assets, provided that such bid, either individually or in combination with other bids, must qualify

as a Topping Bid."[3]  Bidding Procedures at 2.   On January 18, 2021, the Debtors filed a notice of cancellation of the Auction [D.I. 886] (the "<u>Notice of Cancellation</u>").

16.     According to the Enforcement Motion, because the Auction did not result in any Topping Bids, Goldman "became the indirect owner of the Reorganized RTI (which would remain the owner of the RT Lodge) and the other Secured Lender [became] the owner of the Debtors' legacy restaurant operations."  Injunction Motion ¶ 16; *id.* at ¶ 22 (Goldman, "as the sole Holder of an Allowed Subclass 3A Claim, received 100% of the equity in the RT Lodge Company, which after the Effective Date retained the RT Lodge through its subsidiary, Reorganized RTI.").

## B.    <u>Goldman's Prepetition Interference</u>

17.     BNA is a Nashville-based real estate development company founded in 2009 that targets distinctive real estate projects, and develops hotels, restaurants, multi-family complexes, and mixed-use projects that have a differentiating or unique quality.  Compl. ¶ 6.[4]

18.     On March 14, 2020, BNA and RTI executed an asset purchase and sale agreement (the "<u>PSA</u>") pursuant to which BNA would acquire RTI's Leasehold Interest in the RT Lodge through December 31, 2070, for $5.25 million, subject to the consent of the property owner, Maryville College.  *Id.* ¶ 21.  As a result of the COVID-19 pandemic, BNA and RTI executed various amendments, and the closing of the transaction under the PSA was delayed.  *See id.* ¶ 22.  On August 28, 2020, BNA and RTI executed a reinstated, amended and restated PSA (the "<u>Amended PSA</u>").  *Id.* ¶ 30.  Approximately two months prior to the Amended PSA, on June 26,

---

[3]     A "Topping Bid . . . (a) must provide for cash consideration at closing that is sufficient to pay all DIP Facility Claims and Pre-Petition Secured Debt Claims in full on the closing date or (b) the Debtors, in consultation with the Consultation Parties [including Goldman], must be able to combine such Bid with other Bids for subsets of Assets such that, collectively, such Bids meet the criteria for a Topping Bid."  Bidding Procedures at 6; *see* Injunction Motion ¶ 15 n.4.

[4]     References to the Complaint refer to the Complaint in the Tennessee Action, as defined below.  A copy of the Complaint is attached hereto as **<u>Exhibit A</u>**.

2020, Maryville College had consented to RTI's proposed assignment of its Leasehold Interest in the RT Lodge to BNA.  *Id.* ¶ 24.

19.    RTI contacted Goldman no later than July 2020 to obtain its consent to assignment of its Leasehold Interest to BNA under the Amended PSA.  *Id.* ¶ 27.  Rather than evaluate RTI's (prepetition) request on the merits, Goldman unreasonably withheld its consent and exploited its position as RTI's lender for its own improper advantage.  *Id.* ¶ 26.  Right after RTI requested Goldman's consent to the sale, Goldman contacted Maryville College to express a strong interest in obtaining the assignment of the Leasehold Interest to Goldman, which consent Maryville College refused.  *Id.* ¶¶ 27-28.

20.    On August 14, 2020, Goldman recorded a deed of trust against RTI's Leasehold Interest (the "Leasehold Deed of Trust") to secure indebtedness in the amount of $5.252 million— $2,000 more than BNA's purchase price under the Amended PSA—purportedly based on a loan from Goldman to RTI dated December 21, 2017.  *Id.* ¶ 29.

21.    By letter dated September 21, 2020, BNA advised RTI that it was prepared to proceed with the transaction contemplated by the Amended PSA (the "Proposed BNA Sale").  *Id.* ¶ 31.  By letter dated October 30, 2020, following the Petition Date, RTI officially advised BNA that Goldman had not consented to the Proposed BNA Sale.  *Id.* ¶ 33.

**C.**        **The Plan Objection**

22.    On January 14, 2021, in accordance with the Bidding Procedures—and well after the events giving rise to BNA's cause of action in the Tennessee Action—BNA submitted a bid in the amount of $5.3 million (the "Bid") for the purchase of the RT Lodge.  Injunction Motion ¶ 15; *see also BNA Associates LLC's Objection to Confirmation of Plan and Cancellation of Sale and*

*Joinder* [D.I. 998] (the "<u>Plan Objection</u>")[5] ¶ 17.  BNA's Bid did not satisfy the requirements of

the Bidding Procedures because it was purportedly insufficient to constitute a Topping Bid.

Injunction Motion ¶ 15.

23.    As set forth in the Plan Objection, BNA was not contemporaneously advised of the

reason for the rejection of its $5.3 million Bid (which exceeded the RSA's stated value of the RT

Lodge and would have satisfied the indebtedness secured by the Leasehold Deed of Trust), or the

filing of the Notice of Cancellation.  *See* Plan Obj. ¶ 17 (BNA was informed that "there was an

unidentified problem with another unidentified bidder that would likely result in the cancellation

of the [A]uction"); *id.* ¶ 18 (recounting BNA's unsuccessful efforts to determine the reason for the

filing of the Notice of Cancellation).  Accordingly, BNA objected to the Plan:

> [T]he sale of the RT Lodge to BNA for $5.3 million will satisfy in
> full the maximum principal indebtedness of [Goldman's] Leasehold
> Deed of Trust in the RT Lodge and provide additional
> unencumbered proceeds to the Debtors' estate.  The proposed Plan
> does not provide the same value with respect to the RT Lodge.
> Therefore, the proposed Plan is not in the best interest of creditors
> and should be denied [under section 1129(a)(7) of the Bankruptcy
> Code].
>
> For these same reasons, it does not appear that the Plan has been
> proposed in good faith, as required by Bankruptcy Code section
> 1129(a)(3). . . .  At least with respect to the RT Lodge, the Debtors
> fail to demonstrate that section 1129(a)(3) is satisfied, given BNA's
> binding [B]id, cancellation of the [A]uction without explanation,
> and proposed conveyance of those assets to Goldman through the
> proposed Plan.

*Id*. ¶¶ 24-25.

24.    Thus, while the Plan Objection recounts as background certain facts relevant to the

Tennessee Action, *see* Injunction Motion ¶ 25, ***even Goldman concedes that the Plan Objection***

***was premised on the Debtors' conduct of the Auction, and rooted in section 1129 of the***

---

[5]    A copy of the Plan Objection is attached hereto as **Exhibit B**.

**Bankruptcy Code**. *See id.* ¶ 18 (emphasis added) ("Based on these allegations, and BNA Associates' allegations of impropriety in the auction process, BNA Associates argued that the Plan was not confirmable because it was not proposed in 'good faith.'") (citing Plan Obj. ¶ 25).

25.     In connection with the Plan Objection, the Court subsequently authorized BNA to seek discovery from the Debtors[6] given "'some indication that there was a tainted [Auction] process that didn't result in [BNA's] ability to purchase [the RT Lodge].'"  Injunction Motion ¶ 20 (quoting Feb. 2, 2021 Hr'g Tr. At 16:8-11.)   However, after informally receiving additional information with respect to the Auction, including the reasons for the rejection of its Bid and the filing of the Notice of Cancellation, and following Maryville College's withdrawal of its objection to the Plan [D.I. 971, 1102], BNA withdrew the Plan Objection prior to the confirmation hearing. *See* Injunction Motion ¶ 21.

26.     On February 17, 2021, the Court entered an order confirming the Debtors' Plan [D.I. 1144] (the "<u>Confirmation Order</u>") and the Plan went effective on February 24, 2021 (the "<u>Effective Date</u>") [D.I. 1163].

**D.      The Tennessee Action**

27.     On May 4, 2021, BNA commenced an action (the "<u>Tennessee Action</u>") in the Chancery Court for the Twentieth Judicial District of Tennessee, Davidson County, seeking damages from Goldman based on Goldman's intentional interference with business relationships prior to the commencement of the Chapter 11 Cases (the "<u>Tortious Interference Claim</u>").

28.     Under Tennessee law, a claim for intentional interference with business relationships requires a showing of:

---

[6]      The Debtors—not Goldman—filed a motion for a protective order.  [D.I. 1012.]  Goldman is not mentioned therein, and Goldman's counsel is not included on the signature block.  *See generally id.*  BNA did not seek discovery from Goldman.

(1) an existing business relationship with specific third parties or a prospective relationship with an identifiable class of third persons; (2) the defendant's knowledge of that relationship and not a mere awareness of the plaintiff's business dealings with others in general; (3) the defendant's intent to cause the breach or termination of the business relationship; (4) the defendant's improper motive or improper means, and finally, (5) damages resulting from the tortious interference.

*Trau-Med of Am., Inc. v. Allstate Ins. Co*., 71 S.W.3d 691, 701 (Tenn. 2002).

29.    On June 22, 2021, Goldman filed the Injunction Motion in this Court, seeking an order requiring BNA "to immediately dismiss the Complaint with prejudice and . . . forever enjoining BNA from pursuing the claims alleged in the Complaint." Injunction Motion ¶ 26.

30.    Also on June 22, 2021, Goldman removed the Tennessee Action to the United States District Court for the Middle District of Tennessee where it remains pending as Case No. 3:21-cv-00481.

## ARGUMENT

### A.    The Tennessee Action Does Not Collaterally Attack the Confirmation Order and, as such, the Confirmation Order Does Not Bar the Tennessee Action.

31.    Goldman makes overlapping arguments concerning claim preclusion, issue preclusion, and the collateral-attack rule. While neither the discrete claim-preclusive nor issue-preclusive effect of the Confirmation Order bars the Tennessee Action, neither does the Tennessee Action constitute, generally speaking, a collateral attack. It seeks different relief, against a different party, that could not have been obtained in the bankruptcy proceedings.

### i.    The Plan Objection and the Tennessee Action Represent Distinct Requests for Relief from Different Parties.

32.    Goldman's Injunction Motion fails to distinguish BNA's allegations in the Plan Objection—which are directed at the *Debtors' conduct* of the Auction and the post-petition sale process—from BNA's allegations in the Tennessee Action that relate to *Goldman's pre-petition*

*conduct* improperly using its position as RTI's lender and employment of sharp business practices illegal in the State of Tennessee to block the Proposed BNA Sale prior to the commencement of the Chapter 11 Cases.  *See* Injunction Motion ¶ 32 (BNA's "economic tort claims raised in the Complaint are inseparably related to the Chapter 11 Cases and BNA's unhappiness with the auction process and the Plan."); *id.* ¶ 42 ("BNA Associates raised the same issues in the BNA Plan Objection that it now alleges in the Complaint.").  The Tortious Interference Claim asserted in the Tennessee Action is separate from the post-petition sale process.  Indeed, the claim is not directed at the same parties or based upon the same theory as the Plan Objection.

33.    While the Plan Objection provided some background that overlaps with the allegations in the Tennessee complaint, it was just that: background.  In its argument in the Plan Objection, BNA asked this Court to deny confirmation of the Plan under section 1129(a)(3) and 1129(a)(7) of the Bankruptcy Code based on the Debtors' "apparent failure to maximize the value of assets combined with the lack of justification for the decision to cancel the [Auction]."  Plan Objection ¶ 23; *see id.* ¶¶ 24-25.  BNA was left in the dark as to the Debtors' reasons for rejecting BNA's Bid and for filing the Notice of Cancellation and "BNA . . . requested discovery from the Debtors on these issues" to determine whether the Debtors were acting in good faith.  *Id.* ¶ 27. The Plan Objection focused on the post-petition sale process.

34.    In contrast, the Tortious Interference Claim is a tort claim under Tennessee law, directed at Goldman's prepetition conduct in blocking the proposed BNA Sale by, among other things, (i) refusing its consent to the assignment contemplated by the Amended PSA (Compl. ¶ 32), (ii) covertly seeking Maryville College's consent to assignment of the Leasehold Interest (*id.* ¶¶ 27-28), and (iii) filing the Leasehold Deed of Trust in August 2020, identifying secured indebtedness just $2,000 over BNA's prepetition purchase offer (*id.* ¶ 29), only after RTI had requested Goldman's consent to the Proposed BNA Sale in July 2020 (*id.* ¶ 26).  *See also* Compl.

¶ 40 ("Goldman Sachs was not acting in good faith.  Goldman Sachs improperly used its position as Ruby Tuesday, Inc.'s lender to block the sale of an asset that it wanted for itself or its affiliate. This is precisely the misuse of confidential information and sharp business practice that constitutes improper motive and improper means under Tennessee law.").

35.     Because the Tennessee Action (i) involves a tort claim arising under Tennessee law that fully accrued prepetition,  (ii) is a two-party dispute between two non-debtors, and (iii) is premised on conduct occurring prior to, and outside of the context of, the Chapter 11 Cases, Tennessee is the appropriate forum for adjudicating the merits of the Tortious Interference Claim.

36.     BNA was not obligated to, nor would it have been appropriate for BNA, a non-debtor, to raise and attempt to litigate its prepetition state law tort claim against Goldman, another non-debtor, in the context of the approval of the Debtors' Plan.  *See Brown Media Corp.*, 854 F.3d at 162 ("[W]e are not persuaded that, had the plaintiffs asserted their present claims in bankruptcy court or sought to litigate the issues necessary to those claims, the bankruptcy court would have structured a different disposition vis-à-vis the Liquidation Plan.").  The issue before this Court was whether the Debtors' Plan complied with the Bankruptcy Code and was in the best interests of all creditors.  *See, e.g., Kaiser Aerospace & Elec. Corp. v. Teledyne Indus., Inc. (In re Piper Aircraft Corp.)*, 244 F.3d 1289, 1300 (11th Cir. 2001) (observing that when confirming a debtor's chapter 11 plan, a bankruptcy court is "primarily determining whether the plan . . . [meets] the literal requirements and policy objectives of the Bankruptcy Code.").  The confirmation hearing was not the proper forum for a dispute regarding a prepetition state law tort claim involving two non-debtors.  The existence of some factual overlap between facts pertaining to the Chapter 11 Cases and the facts underlying the Tortious Interference Claim does not, by itself, change that.  *See id.* at 1292–93 (holding tort claim predicated on defendant having abandoned one plan-proponent team and joined another not to be a collateral attack on defendant's confirmed plan).

37.     Indeed, it is irrelevant in the Tennessee Action that Goldman indirectly acquired the Leasehold Interest in the RT Lodge by virtue of the Plan. That is not an element of BNA's cause of action against Goldman. BNA's claim against Goldman fully accrued as a result of Goldman's prepetition conduct. For the avoidance of doubt, BNA does not seek to unwind the Plan or otherwise alter the current ownership of the RT Lodge through the Tennessee Action. This is confirmed by reference to the prayer for relief clause of the Complaint in the Tennessee Action, which seeks compensatory and punitive damages, and attorneys' fees. *See Brown Media Corp. v. K&L Gates, LLP*, 854 F.3d 150, 163 (2d Cir. 2017) ("We are mindful that bankruptcy proceedings are a forum where finality of court orders is particularly important and that a § 363 sale protects the reasonable expectations of good faith third-party purchasers by preventing the overturning of a completed sale. As the plaintiffs' lawsuit poses no threat to the finality of the bankruptcy court's orders, allowing that lawsuit to proceed will do no violence to these principles.") (internal citations and quotation marks omitted).

### ii.     The Good Faith Finding in Paragraph Q Does Not Bar the Tennessee Action.

38.     Because Goldman wrongly conflates the relevant time periods, conduct, and defending parties, Goldman inaccurately contends that the Tortious Interference Claim asserted in the Tennessee Action is barred by the good faith finding in Paragraph Q of the Confirmation Order.[7] *See* Injunction Motion ¶ 29 ("[A]ll of [Goldman's] actions in connection with the RSA and the Plan, fall squarely within the scope of the good faith finding in Paragraph Q of the

---

[7]     Although Goldman invokes the Confirmation Order's good-faith finding in its "collateral attack" argument, not in its separate issue-preclusion argument, it implicitly argues that this finding's issue-preclusive effect bars the Tennessee Action. But this is wrong for at least three reasons: (a) the Confirmation Order does not say what Goldman insists; (b) even if it did, BNA lacked a full and fair opportunity to litigate the issue; and (c) the finding would have been unnecessary and thus non-preclusive. *See also* Part C, *infra*.

Confirmation Order."); *id.* ¶ 39 ("[T]he claims in the Complaint are based on the same underlying

events that were addressed by this Court's good faith findings in the Confirmation Order.").

39.     Goldman's    interpretation    of    Paragraph    Q    of    the    Confirmation    Order

("Paragraph Q") is overly broad and inaccurate.  That paragraph provides in its entirety:

> The Plan has been proposed in good faith and not by any means
> forbidden by law, and therefore complies with Bankruptcy Code
> section 1129(a)(3).  The Plan is the result of extensive, good faith,
> arm's-length negotiations among the Debtors, the Prepetition
> Secured [Lenders], the Creditors' Committee and the Equity Parent,
> bears the support of a Class of impaired creditors (Class 3
> Prepetition Secured Debt Claims [i.e., Goldman and the Prepetition
> Secured Lenders]), and implements a result that is in keeping with
> (and, indeed, central to) the goals of the Bankruptcy Code.  The Plan
> is designed to maximize the values available for distribution and to
> distribute them equitably.  The Plan contains only provisions that
> are consistent with the Bankruptcy Code.

Confirmation Order ¶ Q.

40.     Paragraph Q therefore provides that the Debtors proposed *their Plan* (which was

not a joint plan and certainly was not Goldman's Plan) in good faith and that *the Debtors' Plan*

was the result of good faith negotiations that the Debtors conducted with certain parties, including

Goldman.  It is not a general finding that Goldman acted in good faith with respect to all other

parties at all times.  It can be true that Goldman engaged in good faith negotiations with the

Debtors, the Creditors' Committee, and the Equity Parent, but acted in bad faith with respect to

third parties, such as BNA, not involved in the Plan process.

41.     The Confirmation Order, therefore, is silent as to whether Goldman acted in "good

faith" in blocking the Proposed BNA Sale on a prepetition basis, and Paragraph Q does not

constitute an affirmative finding that would defeat BNA's state law claim based on Goldman's

prepetition conduct.[8]  *See In re Lyondell Chem. Co.,* 445 B.R. 277 (Bankr. S.D.N.Y. 2011) (holding that a good-faith finding tied to a particular statutory prerequisite did not constitute a "general finding [of] . . . good faith in any other respect."); *see also Piper Aircraft Corp.*, 244 F.3d at 1300 (the good faith finding at confirmation did not bar a claim when the allegedly wrongful conduct formed no part of the necessary inquiry under section 1129(a)(3)).

42.     And there is good reason for this silence.  Goldman's good faith in dealing with BNA was not a prerequisite for plan confirmation.   In the Third Circuit, "good faith" under section 1129(a)(3) focuses on whether a plan "will fairly achieve a result consistent with the objectives and purposes of the Bankruptcy Code," i.e., "preserving going concerns and maximizing property available to satisfy creditors."  *In re Am. Cap. Equip. LLC*, 688 F.3d 145, 156 (3d Cir. 2012) (cleaned up).  So even if Paragraph Q were read to encompass Goldman's conduct vis-à-vis BNA, that finding would not have been necessary for the Confirmation Order.  Because necessity is an essential element of an issue-preclusion defense under federal law, *see Peloro v. United States*, 488 F.3d 163, 175 (3d Cir. 2007), "extra" findings not required to support the judgment are not preclusive.  *See Albanese v. Emerson Elec. Co.*, 552 F. Supp. 694, 700 (D. Del. 1982).

43.     Similarly, even if the requirements for issue preclusion were met, which they were not, an exception would apply here.  A party may relitigate an issue that would otherwise be barred where it lacked a full and fair opportunity to do so in the first proceeding.  *See Doe v. Hesketh*, 828 F.3d 159, 173–74 (3d Cir. 2016); RESTATEMENT (SECOND) OF JUDGMENTS § 28 (Am. L. Inst. 1982); *see also B&B Hardware Inc. v. Hargis Indus. Inc.*, 575 U.S. 138, 148 (2015) (discussing

---

[8]     Additionally, standard rules of interpretation preclude Goldman's reading.  If Paragraph Q were as broad as Goldman contents, it would nullify the limitation in the Plan's release provision excepting "any act . . . that constitutes . . . bad faith."  *See* Plan Art. X.C.  Elementarily, such constructions are to be avoided: "every word and every provision is to be given effect. . . .  None should needlessly be given an interpretation that causes it to . . . have no consequence."  A. Scalia & B. Garner, *Reading law: The Interpretation of Legal Texts* 174 (2012).

with approval Restatement §§ 27–28 in the federal-law context).  Because Goldman's "good faith" or lack thereof in declining to consent to the assignment of the Leasehold Interest in the RT Lodge was not at issue in the confirmation proceeding and would not have prevented confirmation even if proven, any finding made concerning it—assuming one had been made—would not bar direct reexamination of the question in a subsequent suit.

44.    Goldman's assertion that the preclusive effect of Paragraph Q bars the Tennessee Action lacks merit.

**iii.    Goldman Does Not Have the Benefit of Any Finding Under Section 363(f).**

45.    Goldman repeatedly cites the Confirmation Order's directive that estate assets vest pursuant to the Plan "free and clear of all Liens, Claims, charges or other encumbrances."  But this language does not immunize Goldman.  First, "Claims" is a defined term in the Confirmation Order, and it does not encompass BNA's Tortious Interference Claim in the Tennessee Action.  Second, Goldman premises its general free-and-clear argument on inapposite cases concerning § 363 sales, which this was not.  Third, Goldman did not acquire any assets covered by the language in question.  And fourth, even if the Plan were construed as vesting Goldman with the covered asset, Goldman did not become liable on the Tortious Interference Claim by acquiring the asset; it cannot have done so "free and clear" of a claim that had already accrued against it.

46.    The Plan in fact defines "Claim" as "any 'claim' *against any Debtor* as defined in section 101(5) of the Bankruptcy Code."  Plan Art. I.C ¶ 26 (emphasis added); *see also* Confirmation Order at 2 n.2 (incorporating Plan definitions).  BNA's claim was never a claim against a Debtor.  *See* ¶ 59, *infra*.  The claim asserted in the Tennessee Action is not a "Lien" (*see* Plan Art. I.C. ¶ 116), nor is it an "encumbrance," an undefined term generally confined to *in rem* interests.  *See Port of Corpus Christi Auth. v. Shewin Alumina Co. (In re Shewin Alumina Co.)*, 952 F.3d 229, 234 (5th Cir. 2020).  There is also no definition for "charge," a term bankruptcy

courts have employed specifically for a right to obtain payment out of given property. *See In re Adamson*, 312 B.R. 16, 20 (Bankr. D. Mass. 2004). But the Court need not conduct the inquiry: Goldman has waived any argument that either of these undefined terms encompass the Tennessee Action by failing to develop an argument to that effect in its brief. *See, e.g.*, *In re Kunec*, 27 B.R. 650, 651 (Bankr. M.D. Pa. 1982).

47.    Goldman also relies on a variety of non-binding and distinguishable § 363 sale cases, with different orders and different circumstances, including *In re Christ Hospital*, to support its contention that the Tennessee Action is an impermissible collateral attack on the Confirmation Order. Injunction Motion ¶ 32 (citing *In re Christ Hospital,* 502 B.R. 158 (Bankr. D.N.J. 2013)). ***But unlike its cited cases, Goldman does not have the benefit of any finding under section 363(f) or 363(m) of the Bankruptcy Code here.*** Further, the language of this Court's order is only directed toward prohibiting later creditor claims against the reorganized Debtors, not Goldman.

48.    Moreover, BNA's claims here lack a key quality that the movant in every case Goldman cites had: they in no way depend upon the defendant's acquisition of the debtor's assets. *See* ¶ 57, *infra*.

49.    Under the Plan, Prepetition Secured Debt Claims received "one hundred percent (100%) of the equity in RT Lodge Company, which will own Reorganized RTI on the Effective Date." Plan Art. III.C.3.c. Reorganized RTI holds the Leasehold Interest in the RT Lodge. *See* Plan Art. V.C ("[T]he RT Lodge shall vest in Reorganized RTI" on the Effective Date). Thus, Goldman became the parent company of the parent company of the company that owns the asset.

50.    The Confirmation Order provides that "on or after the Effective Date, all property and Assets of the Estates (including, without limitation, Causes of Action, Litigation Claims) and any property and Assets acquired by the Debtors pursuant to the Plan shall vest in Reorganized

RTI, RT Lodge Company, or the Reorganized Debtors or their successors, free and clear of all Liens, Claims, charges or other encumbrances." Confirmation Order ¶ 5.

51.    Paragraph 5 of the Confirmation Order therefore states that RT Lodge Company and Reorganized RTI, and the respective assets held by those reorganized debtor entities vested "free and clear of all Liens, Claims, charges or other encumbrances." *Id.* That Goldman acquired 100% of the equity in Reorganized RTI's direct parent does not afford Goldman its own discharge of liability for prepetition misconduct,[9] and the Tortious Interference Claim does not seek recovery from or against the RT Lodge (which would be barred). Goldman overstates the import of the "free and clear" language in the Confirmation Order, which stands in stark contrast to the "free and clear" language at issue in *Christ Hospital*.

52.    *Christ Hospital*, cited by Goldman and unlike this case, is a § 363 sale case. In that case, the Court entered an order authorizing the sale of the debtor's assets to a successful bidder ("<u>Hudson</u>") free and clear of claims under section 363(f) of the Bankruptcy Code. 502 B.R. at 162. The sale order included findings that:

> the "Successful Bidder," per § 363(m), "is a purchaser in good faith" (¶ K); that the Purchase Agreement is not the product of collusion, and developed from arm's length bargaining positions (¶ L); that the hospital assets may sell "free and clear of 'Liens and Claims'" per one or more of the § 363(f)(1)-(5) requirements and that nonobjecting holders of such liens and claims are deemed to have consented to the free and clear sale (¶ P); that the transfer of assets at closing "will vest the Successful Bidder . . . with all right, title, and interest in and to the Assets, free and clear of the Liens and Claims. . . ." (¶ S); that *"an injunction against creditors and third parties pursuing the Liens and Claims . . . is necessary to induce the Successful Bidder to close"* (¶ T); and, that the transfer of assets to the Successful Bidder will not subject it to an expansive array of liability, including liability on "any theory of law or equity" (¶ U).

---

[9]    Goldman is not, nor does it purport to be, a successor of the Reorganized Debtors. *See, e.g.*, *Berg Chilling Sys., Inc. v. Hull Corp.*, 435 F.3d 455, 464 (3d Cir. 2006) ("The ordinary rule of successor liability is rooted in corporate law, and it states that a firm that buys assets from another firm does not assume the liabilities of the seller merely by buying its assets.").

*Id*. at 168 (emphasis in original).

53.     In that case, following entry of the sale order and the confirmation order, a competitor of the debtor ("Prime") filed a state court action asserting economic tort claims against the Hudson—the purchaser *expressly* protected by the § 363 sale order—alleging, among other things, that Hudson maligned Prime to make it untenable for Prime to purchase the hospital, in order to force the debtor into bankruptcy so that Hudson could purchase the struggling facility for less than what was agreed upon between Prime and the debtor in their asset purchase agreement. *Id.* at 166-67.

54.     The Court held that Prime's economic tort claims against Hudson were directly attributable to the sale, transfer and use of assets by Hudson, and thus were "interests" as that term was used in section 363 of the Bankruptcy Code.  *Id.* at 170-73.  The Court continued that such claims were barred by the *in rem* protected sale of property "free and clear."  *Id.* at 176.  As such, the Court enjoined the state court litigation against Hudson to the extent that Prime sought redress for tortious interference allegedly committed in the course of negotiating and consummating the section 363 sale because such claims directly related to Hudson's acquisition and use of assets.[10]  *Id.* at 176-77.  Thus, the section 363 sale order in *Christ Hospital* explicitly found that

---

[10]     Goldman does not even mention one of the governing 363(f) sale cases in the Third Circuit which would have highlighted the type of section 363 language one would expect to see if Goldman were entitled to the protection it now seeks.  In *Trans World Airlines*, the Third Circuit held that employment discrimination claims against the asset purchaser, as successor in interest to the debtors, were barred by the "free and clear" nature of the sale under § 363(f) of the Bankruptcy Code. 322 F.3d 283 (3d Cir. 2003).  As support for its holding, the Third Circuit looked to the express language of the sale order, which provided that, "in accordance with § 363(f) of the Bankruptcy Code:"

> the free and clear delivery of the Assets shall include, but not be limited to, all asserted or unasserted, known or unknown, employment related claims, payroll taxes, employee contracts, employee seniority accrued while employed with any of the Sellers and successorship liability accrued up to the date of closing of such sale.

*Id*. at 286–87.

the Successful Bidder was a purchaser in good faith under section 363(m), determined that the Successful Bidder was vested with the assets free and clear of liens and claims, and included an additional wide-ranging injunction against creditors *and third parties* so that the Successful Bidder would not be subject to an array of liability on any theory of law or equity.

55.     *Christ Hospital* is inapposite.  First, this is not a § 363 case.  Second, unlike here, Prime alleged that Hudson drove Christ Hospital into bankruptcy in order to acquire Christ Hospital.  *Id.* at 163.  BNA makes no such allegation.  Third, unlike here, Prime's claims were premised on "the sale of hospital assets at a diminished price to Hudson in a bankruptcy auction." *Id.* at 172.  Again, that is not the case here. To prevail in the Tennessee Action, BNA does ***not*** need to demonstrate that Goldman acquired the RT Lodge.  BNA's claims in the Tennessee Action are and would be meritorious even if a completely unrelated entity had acquired the RT Lodge through the bankruptcy process.

56.     Further, unlike *Christ Hospital,* the Court did not enter a separate order authorizing the sale of the Leasehold Interest in the RT Lodge to Goldman under section 363(f), and the Confirmation Order entered by this Court has no such protections for Goldman.  Instead, Goldman received 100% of the equity in RT Lodge Company under the Plan, and RT Lodge Company's direct subsidiary, Reorganized RTI, continues to holds the Leasehold Interest in the RT Lodge.  In the absence of a § 363 sale order giving it protection, Goldman is limited to the narrow finding in the Confirmation Order.

57.     Furthermore, Goldman ignores the fact that the Tennessee Action neither attacks the integrity of a sale process[11] (there having been none) nor asserts liability based on Goldman's

---

[11]     One of the cases relied upon by Goldman, *In re Met-L-Wood*, 861 F.2d 1012 (7th Cir. 1988), while involving a sale, did not turn on the free-and-clear term.  Rather, the suit there expressly attacked the propriety of the sale process and was therefore barred by the bankruptcy court's approval of that very process. *Id.* at 1017–18. *Farmland Industries,*

acquisition of the Leasehold Interest out of the bankruptcy estate.  Most litigation over free-and-clear orders has focused on efforts to argue that a particular right was not a "claim" or "interest" within the meaning of section 363(f) or 1141(c).  But the cases assume, or involve situations where there is no dispute, that the mechanism by which the plaintiff asserts the right against the purchaser is of the kind that can be barred by a free-and-clear order.  Here, the terms of the Confirmation Order and the governing free-and-clear case law show the opposite.

58.     The Confirmation Order provides that "all property and Assets of the Estates . . . [or] acquired by the Debtors pursuant to the Plan shall vest in Reorganized RTI, [or the applicable affiliate entity] free and clear of all Liens, Claims, charges, or other encumbrances."  The phrase "shall vest" indicates that this provision addresses the *effect* of a transferee's receipt of estate property.  Saying the property "shall vest free and clear of" something means the recipient gets the property without other things that might otherwise come with that property, not that something else the recipient already has (here, potential liability on a claim) is thereby taken away.  That is a distinct concept that would be communicated by different terms. Cases discussing § 363 sales make this clear. *See Trans World Airlines*, 322 F.3d at 284, 288 ("[T]his bankruptcy appeal involve[s] the doctrine of successor liability. . . .  The Airlines . . . argue . . . a bankruptcy court [can] bar any interest that could potentially travel with the property being sold. . . .  We agree."); *In re Chrysler LLC*, 576 F.3d 108, 126 (2d Cir. 2009), *vacated as moot*, 558 U.S. 1087 (2009) ("It is the transfer of Old Chrysler's … property to New Chrysler that could lead to successor liability [on appellant's claims].").

59.     Here, by contrast, the claim in the Tennessee Action (a) was never a claim against the Debtors, and (b) does not assert liability against Goldman as a result of any transfer effected

---

on which Goldman also relies, was similar, involving a claim that sale approval had been obtained through fraud on the court.  *In re Farmland Indus.*, 376 B.R. 718, 724–25 (Bankr. W.D. Mo. 2007).

by Confirmation.  It bears repeating: ***BNA would have the same claim against Goldman had Goldman not obtained any interest in the RT Lodge, or any interest in the Reorganized Debtors, or if a third party had purchased the Leasehold Interest, or if the Debtors had never filed bankruptcy in the first place.***  Even if BNA's claim were covered by the Confirmation Order's terms, *cf.* ¶ 47, *supra*, and even if the Order had actually vested the Leasehold Interest in the RT Lodge in Goldman, the free-and-clear bar would not apply because the Tennessee Action does not assert a claim that "travel[ed] with" the Debtor's assets or arose in connection with their conveyance.

60.     The Tennessee Action is not a collateral attack on the Confirmation Order.

**B.     BNA's Claims in the Tennessee Action Are Not Barred by *Res Judicata.***

61.     The Tortious Interference Claim also does not satisfy the three-factor test for claim preclusion, and Goldman fails to note that the Court could not have afforded BNA its requested relief had BNA tried to assert its Tortious Interference Claim in connection with confirmation of the Plan.

62.     It is well established that "bankruptcy cases require a careful application of *res judicata*.  Although the first two prongs of the doctrine will usually be readily apparent, the third prong, whether the present suit is based on the previous cause of action, is usually far less clear." *In re Target Indus., Inc.,* 328 B.R. 99, 116 (Bankr. D.N.J. 2005).  Within the Third Circuit, a cause of action should be barred only where "the factual underpinnings, theory of the case, and relief sought against the parties to the proceeding are so close to a claim actually litigated in the bankruptcy that it would be unreasonable *not* to have brought them both at the same time in the bankruptcy forum." *Eastern Minerals & Chems. Co. v. Mahan,* 225 F.3d 330, 337–38 (3d Cir. 2000) (emphasis added).

22

63.     Goldman's *res judicata* argument fails because, as set forth above, Goldman conflates BNA's arguments against the Debtors in connection with the Plan Objection—whereby BNA sought denial of confirmation of the Plan based on the Debtors' conduct of the Auction—with BNA's claim against Goldman in the Tennessee Action—whereby BNA seeks compensation based on Goldman's prepetition conduct in blocking the Proposed BNA Sale—which conduct is entirely outside of the context of the Chapter 11 Cases.  Goldman's assertion that "the claims in the Complaint are based on the same underlying events that were addressed by this Court's good faith findings in the Confirmation Order" is incorrect.  *See* Injunction Motion ¶ 39.

64.     To the extent Goldman also argues that BNA should or could have raised its Tortious Interference Claim in the context of the confirmation hearing, that argument also lacks merit.  Under the most basic principles of *res judicata*, BNA did not have to sue Goldman in a forum where it could not receive full relief; to be sure, BNA's only possible remedy at the confirmation hearing was to prevent confirmation of the Plan.  *See, e.g., Brown Media Corp.*, 854 F.3d at 162; *In re Atlanta Retail, Inc.,* 456 F.3d 1277, 1286 (11th Cir. 2006) (holding that plaintiff did not have to raise objections to the plan's confirmation because, even if successful, the objections would only have resulted in defeating the confirmation, not providing the relief sought under state law); *see also* RESTATEMENT (SECOND) OF JUDGMENTS § 26(1)(c) (a claim may be split where "The plaintiff was unable to rely on a certain theory of the case or to seek a certain remedy or form of relief in the first action. . . .").

65.     Goldman's arguments regarding the preclusive effect of the Confirmation Order fail.

**C.**  **The Doctrine of Collateral Estoppel Does Not Apply Because BNA Withdrew the Plan Objection.**

66.     Goldman's arguments regarding the preclusive effect of the Confirmation Order fail.

67.     As Goldman notes, "[C]ollateral estoppel applies when '(1) the issue sought to be precluded [is] the same as that involved in the prior action; (2) *that issue [was] actually litigated*; (3) it [was] determined by a final and valid judgment; and (4) the determination [was] essential to the prior judgment.'"  Injunction Motion ¶ 41 (quoting, *inter alia, Burlington Northern R. Co., v. Hyundai Merchant Marine Co., Ltd*., 63 F.3d 1227, 1231-32 (3d Cir. 1995)) (emphasis added)). Goldman's contention that the doctrine of collateral estoppel bars BNA from litigating its Tortious Interference Claim in the Tennessee Action is inaccurate.

68.     Even assuming that the issues relevant to the Plan Objection and the Complaint in the Tennessee Action were the same (as set forth above, they are not), they were never "actually litigated" because BNA withdrew the Plan Objection.  *See* Injunction Motion ¶ 21 (acknowledging withdrawal); *In re Cowden*, 337 B.R. 512, 538 (Bankr. W.D. Pa. 2006) ("Although Soviero raised within her exemption objection, albeit cryptically, the issue of a fraudulent conveyance by the Debtor, such issue was never actually litigated—instead, such issue, as well as the remainder of Soviero's exemption objection, was withdrawn by her so that actual litigation never occurred.")

**D.**  **The Merits of the Tennessee Action Are Not Before the Court.**

69.     In its Injunction Motion, Goldman improperly attempts to place the merits of BNA's state law claim against a non-debtor before this Court, contending that the Tortious Interference Claim is "meritless."  Injunction Motion ¶ 44.  BNA disagrees with Goldman's contention.  But, regardless, this Court does not have jurisdiction to consider the merits of the Tortious Interference Claim under 28 U.S.C. §§ 1334(b) and 157(b).  *See In re Combustion Eng'g*

*Inc.*, 391 F.3d 190, 226 (3d Cir. 2004) (describing bankruptcy jurisdiction as extending to proceedings whose "outcome . . . could conceivably have any effect on the estate being administered," by altering "the debtor's rights, liabilities, options, or freedom of action.")

70.     Under the Confirmation Order, this Court's jurisdiction after the Effective Date is limited to "matters arising out of, and related to, the Chapter 11 Cases, including the matters set forth in Article XII of the Plan and section 1142 of the Bankruptcy Code."  Confirmation Order ¶ 58; *see also* Article XII of the Plan, ¶¶ 1-15 (limiting post-confirmation jurisdiction to "all matters related to the Chapter 11 Cases, the Debtors, the Plan, the Plan Supplement and Confirmation Order as legally permissible").

71.     As set forth above, the Tennessee Action involves a tort claim under Tennessee law that accrued prepetition, asserted by a non-Debtor, against a non-Debtor, based on conduct occurring prior to, and outside of the context of, the Chapter 11 Cases, and is therefore outside the Confirmation Order's grant of jurisdiction.

72.     For the avoidance of doubt, BNA consents to this Court's jurisdiction and authority solely with respect to the Injunction Motion and this Objection thereto.  BNA does not consent to having this Court determine the substantive issues between BNA and Goldman that are set forth in the complaint in the Tennessee Action.

[*Remainder of Page Intentionally Left Blank*]

## CONCLUSION

WHEREFORE, for the reasons set forth above, BNA respectfully requests that the Court

sustain the Objection and deny the Motion, and grant any such other and further relief as the Court

deems just and proper.

Dated: July 26, 2021
Wilmington, Delaware

**FAEGRE DRINKER BIDDLE & REATH LLP**

*/s/ Brett D. Fallon*
Brett A. Fallon (Bar No. 2480)
Ian J. Bambrick (Bar No. 5455)
Jaclyn C. Marasco (Bar No. 6477)
222 Delaware Avenue, Suite 1410
Wilmington, Delaware 19801
Telephone: (302) 467-4200
Emails: Brett.Fallon@faegredrinker.com
       Ian. Bambrick@faegredrinker.com
       Jaclyn.Marasco@faegredrinker.com

-and-

**BULSO PLC**

*/s/ Eric W. Smith*
Eugene N. Bulso, Jr.
Eric W. Smith (Admitted *pro hac vice*)
Paul Krog (Admitted *pro hac vice*)
155 Franklin Road, Suite 400
Brentwood, Tennessee 37027
Telephone: (616) 913-5191
Emails: gbulso@bulso.com
       esmith@bulso.com

*Attorneys for BNA Associates, LLC*