## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Ch. 11 |
| | ) | |
| RTI HOLDING COMPANY, LLC, *et al.*, | ) | Case No. 20-12456 |
| | ) | (Jointly Administered) |
| Reorganized Debtors. | ) | |
| | ) | **Re: D.I. 1288 & 1290** |

### OPINION AND ORDER

Ruby Tuesday Operations LLC ("**RTO**"), successor-in-interest to Ruby Tuesday, Inc. ("**RTI**"), one of the reorganized debtors, objected to proofs of claim 10877 and 10878 filed by Powell Anderson Capital, L.P ("**Powell**")[1] and proofs of claim 10103, 10104 and 10105 filed by Quadre Investments, L.P. ("**Quadre**")[2] (collectively, the "**Claims**"). The Objections are made pursuant to sections 105(a), 502(b), 510(b), 1122(a) and 1141(a) of the Bankruptcy Code, and Rule 3007 of the Federal Rules of Bankruptcy Procedure, and as contemplated by the Order Confirming the Debtors' Second Amended Chapter 11 Plan, as Modified, entered on February 17, 20121 (the "**Confirmation Order**").[3] RTO objects because the Claims were classified under the Plan as shareholder claims that are subordinated pursuant to Bankruptcy Code section 510(b) and did not and will not receive a Plan distribution. Powell and Quadre (collectively the "**Claimants**") argue that, in connection with a prepetition merger, their shares were cancelled and that, under Georgia law, the remaining appraisal rights are the equivalent of a judgment that does not fall within the purview of section 510(b) of the Code. A hearing was held on June 23, 2021. For the reasons set forth below, the Objections to the Claims are sustained.

---

[1] D.I. 1288.

[2] D.I. 1290 (together with D.I. 1288, the "**Objections**").

[3] D.I. 1144.

## BACKGROUND

Claimants were shareholders of RTI that exercised their rights under Georgia law to dissent from RTI's 2017 merger with a subsidiary of RTI Holding Company, LLC, through which RTI became a private company (the "**Merger**").  The merger agreement provided for each outstanding shareholder of RTI at the time of the Merger to receive $2.40 per share.  On November 20, 2017, RTI sent shareholders, including Claimants, a Proxy Statement soliciting shareholder votes for the proposed merger, describing why its board of directors thought $2.40 per share was fair, and including a fairness opinion from RTI's financial advisor.

On January 24, 2018, Quadre rejected RTI's offer and made a demand for payment for its 3,000,000 shares of common stock at a price of $5.91 per share and deposited its certificates as required by Georgia statute.  On February 2, 2018, RTI sent an offer of payment (of $2.40 per share plus interest) as required by Georgia law.  On February 16, 2018, Powell rejected RTI's offer and made a demand for payment for its 74,000 shares of common stock at a price of $5.06 per share and deposited its certificates as required by Georgia statute.[4]

On April 19, 2018, as required by the Georgia Code, RTI commenced an appraisal action in Georgia Superior Court.[5]  The Appraisal Petition sought an order of the Georgia Court: (a) determining the fair value of Claimants' and other respondents' shares to be at or less than the

---

[4]  Objections, D.I. 1288, 1290. While Claimants' initial demands valued the shares at these prices, the Claims filed in these cases each attach an addendum that describes the claims as ones for fair value of RTI's shares at $4.00 per share, plus interest.  See Exhibit 4 to the Request for Judicial Notice, D.I. 1289 and 1291.

[5]  See Petition for Appraisal and Other Relief (the "**Appraisal Petition**"), attached as Exhibit 2 to the Request for Judicial Notice, D.I. 1289, at 3-6. The Appraisal Petition was filed in the Georgia Superior Court (Fulton County) (the "**Georgia Court**"), in the matter captioned *Ruby Tuesday, Inc. v. Cede & Co.*, No. 2018-cv-304101 (the "**Dissenters Action**").  See also O.C.G.A § 14-2-1330(a) ("If a demand for payment under Code Section 14-2-1327 remains unsettled, the corporation shall commence a proceeding within 60 days after receiving the payment demand and petition the court to determine the fair value of the shares and accrued interest.").

merger price of $2.40 per share; (b) awarding a fair and equitable interest rate; and (3) assessing costs and expenses, including reasonable attorneys' and experts' fees, in favor of RTI.[6]

On October 7, 2020 (the "**Petition Date**"), the Debtors filed their voluntary chapter 11 petitions. Upon filing, the Dissenters' Action was automatically stayed.

Claimants timely filed their Claims in these bankruptcy cases, asserting nonpriority general unsecured claims. All the dissenters' claims were classified in Class 7 of the Debtors' Second Amended Chapter 11 Plan (the "**Plan**") which contains all claims subordinated under section 510(b).[7] Class 7 claims did not and will not receive a Plan distribution. The Confirmation Order was entered on February 17, 2021, and on February 24, 2021, the Plan became effective (the "**Effective Date**").[8]

In its Objections, RTO argues that the Claims arise from rescission of a purchase or sale of a security of the debtor and are therefore subordinated to Class 4 general unsecured claims under the Plan pursuant to Bankruptcy Code section 510(b).[9]

Claimants argue that the Claims are not subject to subordination because (1) under Georgia law their shares were cancelled as of the closing date of the Merger; and (2) their right to payment under Georgia law is not the type of claim that section 510(b) encompasses.

## JURISDICTION

This Court has jurisdiction over this Objection pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

---

[6] Appraisal Petition at 8.

[7] D.I. 1135.

[8] D.I. 1163.

[9] RTO alternatively argues that the Claims are unsubstantiated. As I have resolved the Objections on the first argument, I do not need to consider this issue.

**DISCUSSION**

Section 510(b) of the Bankruptcy Code provides, in part, that, "[f]or purposes of distribution …, a claim arising from rescission of a purchase or sale of a security of the debtor or of an affiliate of the debtor, for damages arising from the purchase or sale of such a security … shall be subordinated to all claims or interests that are senior to or equal the claim or interest represented by such security …." 11 U.S.C. § 510(b).  The Third Circuit had the opportunity to construe section 510(b) in *Baroda Hill Inv. v. Telegroup, Inc.* (*In re Telegroup, Inc.*), 281 F.3d 133 (3d Cir. 2002).

In *Telegroup*, the Court considered whether "a claim for breach of a provision in a stock purchase agreement requiring the issuer to use its best efforts to register its stock and ensure that the stock is freely tradeable 'arises from' the purchase of the stock for purposes of section 510(b) and therefore must be subordinated." *Id.* at 136.  Finding the phrase "arising from" in section 510(b) to be ambiguous, the Court observed that "[f]or a claim to 'arise from' the purchase or sale of . . . a security, there must obviously be some nexus or causal relationship between the claim and the sale of the security, but § 510(b)'s language alone provides little guidance in delineating the precise scope of the required nexus." *Id.* at 138. Examining the legislative history, the Court found that:

> [w]hile the legislative history fails to define explicitly the intended scope of §510(b), [it] sheds light on the policies animating §510(b), which provide guidance in deciding whether the claims in this case arise from the purchase of Telegroup's stock. Ultimately, the [] proposal that inspired §510(b) appears intended to prevent disappointed shareholders from recovering the value of their investment by filing bankruptcy claims predicated on the issuer's unlawful conduct at the time of issuance, when the shareholders assumed the risk of business failure by investing in equity rather than debt instruments.

> Section 510(b) thus represents a Congressional judgment that, as between shareholders and general unsecured creditors, it is shareholders who should bear the risk of illegality in the issuance of stock in the event the issuer enters bankruptcy.

*Id.* at 140-41 citing John J. Slain and Homer Kripke, *The Interface Between Securities Regulation and Bankruptcy -- Allocating the Risk of Illegal Securities Issuance Between Security Holders and the Issuer's Creditors*, 48 N.Y.U. L. Rev. 261 (1973). The Court then went on to hold that section 510(b) could be read to encompass the claims in that case:

> The policy considerations underlying the Congressional judgment in § 510(b) that those who purchase the debtor's stock, rather than general unsecured creditors, should bear the risk of loss caused by illegality in the issuance of the stock, seem to us to apply equally to the claims in this case. In both cases, the claim would not exist but for claimants' purchase of debtor's stock. In both cases, the claim seeks compensation for a decline in the stock's value caused by actionable conduct on the debtor's part. And in both cases, because the stockholder, as an equity investor, assumed the risk of business failure, the stockholder must bear the risk, in the event of bankruptcy, of any unlawful conduct on the debtor's part that causes the stock's value to drop.

*Id.* at 143.

The parties here agree that *Telegroup* controls, but they disagree about what it requires. RTO argues that *Telegroup* requires application of a strict "but for" rule: if the claim would not arise "but for" stock ownership, it must be subordinated. Claimants agree that *Telegroup* requires "some nexus or causal relationship" between a shareholder's purchase of the securities and their claims, but they argue that that "does not mean every claim by a former shareholder, or a former shareholder whose claim derives from an intermediary non-equity interest, should be subordinated." I find that neither characterization accurately describes *Telegroup*'s mandate.

While the *Telegroup* Court did state that a causal nexus was required, it applied a "but for" test in determining whether that nexus was present in the case before it. Subsequent opinions applying *Telegroup* agree, including a later one from the Third Circuit. *See In re Int'l*

5

*Wireless Communications Holdings, Inc.*, 68 Fed. Appx. 275, 278 (3d Cir. 2003) (stating that *Telegroup* held that because "plaintiffs' damages claim would not exist 'but for' plaintiffs' stock ownership, it is subordinated" and affirming subordination of claims where claimant "would not have filed the proof of claim but for their purchase of the IWCH shares."); *In re Spectrum Alliance*, 609 B.R. 11, 18 (E.D. Pa. 2019) (describing *Telegroup* as "utilizing a 'but for' causation analysis to answer the question of whether a claim arises from the purchase or sale of a security, the Court of Appeals found the broader reading of § 510(b) 'more comfortable.'").

Applying this "but for" analysis here, I find that the necessary causal nexus is present. The Claims arise under a provision of the Georgia corporate code that provides relief to dissenting stockholders and Claimants' right to assert a claim under that statute is one that is only given to those who have purchased shares. Therefore, the Claims would not exist but for Claimants' status as shareholders.

Claimants make multiple arguments as to why the Claims are not encompassed by section 510(b), but I am not persuaded. Claimants argue that (1) under Georgia law they are no longer shareholders, but rather only holders of narrow statutorily granted rights under Georgia's corporate code; and (2) even if they were shareholders, the Claims are not ones for "damages" as section 510(b) requires. While I disagree,[10] it is of no consequence. Regardless of how Claimants characterize their Claims on the petition date, the relief they were seeking is

---

[10] Claimants argue that when they dissented from the Merger they lost all benefits and rights of equity holders and instead became creditors whose debts were fixed on the Merger date. They further argue that the award in the appraisal proceeding does not constitute damages but instead is merely a "statutory right to payment" in a "nonjury equitable valuation proceeding." I disagree. Dissenting to a merger does not convert one's equity to debt. This is evident from the face of the statute, which provides that an appraisal proceeding will result in a judgment that represents "Each dissenter . . . is entitled to judgment for the amount which the court finds to be the fair value <u>of his shares</u>. . . ."). O.C.G.A. § 14-2-1330 (emphasis added). See also O.C.G.A. § 14-2-1323, cmt. ("A shareholder who deposits his shares retains all other rights of a shareholder until those rights are <u>modified</u> by effectuation of the proposed corporate action. To conclude from these provisions that dissenters lose their status as shareholders after a merger and are suddenly converted to creditors would be absurd. The District Court for the District of Colorado reached this conclusion in interpreting a similar statute in *California DHI, Inc. v. Erasmus*:

inextricably bound to their stock purchase and the Claims are therefore encompassed by section 510(b). *See In re Tristar Esperanza Properties, LLC*, 782 F.3d 492, 497 (9th Cir. 2015) (rejecting argument that because claimant was not a shareholder on the petition date her claims should not be subordinated, stating "[s]ection 510(b) does not ask what the claim *is*, but what it *arises from*.") (emphasis in original).

However, while the existence of a causal nexus is necessary, it is not always sufficient. *See Telegroup*, 281 F.3d 133, 144 n.2 ("Nothing in our rationale would require the subordination of a claim simply because the identity of the claimant happens to be a shareholder, where the claim lacks any causal relationship to the purchase or sale of stock and when subordinating the claims would not further the policies underlying § 510(b)."). Accordingly, in determining whether subordination is required, I must also ensure that subordination furthers the policy goals of section 510(b). If subordination would not serve the purpose of section 510(b) -- specifically preventing shareholders from recovering their equity investment – then it may not be necessary. In *Telegroup*, the Court found that subordination was appropriate because:

---

> To suggest that, upon invoking dissenter's rights, a shareholder can leap from equity holder to general creditor would be to entitle the dissenter to a priority status above other shareholders. It would allow the dissenting shareholder to escape the effect of the accumulated debts of the corporation on the value of his/her shares (and saddle the remaining shareholders with a disproportionate burden of existing corporate debt), and simultaneously grant a windfall to a dissenter who chooses to abandon an insolvent or undercapitalized company. This is clearly not the social policy that the dissenter's rights statute was intended to encourage. By contrast, reading the statute to ensure that the dissenter receives his share of the corporate value after all corporate debts are accounted for avoids creating perverse incentives and ensures that a dissenter receives precisely that which his shares entitle him to: a portion of whatever excess equity exists in the corporation.

2008 U.S. Dist. LEXIS 101444, *10-11 (D. Colo. Dec. 15, 2008), *aff'd by* 393 F. App'x 554 (10th Cir. 2020). Though *Erasmus* was not a bankruptcy case and the Court did not consider section 510(b), I find its reasoning on this point of corporate law persuasive and, to the extent necessary to my holding, conclude that Claimants have not converted their equity to debt here.

> Since claimants in this case are equity investors seeking compensation for a decline in the value of Telegroup's stock, we believe that the policies underlying § 510(b) require resolving the textual ambiguity in favor of subordinating their claims. Put differently, because claimants retained the right to participate in corporate profits if Telegroup succeeded, we believe that § 510(b) prevents them from using their breach of contract claim to recover the value of their equity investment in parity with general unsecured creditors. Were we to rule in claimants' favor in this case, we would allow stockholders in claimants' position to retain their stock and share in the corporation's profits if the corporation succeeds, and to recover a portion of their investment in parity with creditors if the corporation fails.

*Telegroup*, 281 F.3d at 142.

Like the claimants in *Telegroup*, the Claimants here are seeking to recover their equity investment. As they state in their briefs, Claimants purchased the shares of RTI knowing that they would be cashed out by the Merger.[11] While Claimants argue this distinguishes them from the claimants in *Telegroup*, I find the opposite to be true. The fact that Claimants purchased shares in view of the Merger demonstrates an intention to take on the risk and return expectations of a shareholder rather than those of a creditor. Claimants affirmed this intention when they chose to exercise dissenters' rights. On the upside, the court conducting the appraisal might have found that the fair value of Claimants' stock far exceeded the merger price (issuing a judgment that would, in essence, allow Claimants to share in the corporation's profits). On the downside, the court might have found that the fair value was far below the merger price (issuing a judgment that would reflect Claimants' share of the corporation's losses). If I rule here that the Claims are not subordinated, I would effectively be removing that downside risk by allowing Claimants to recover their investment in parity with creditors following the corporation's demise. This is precisely the result that section 510(b) was designed to prevent. *See In re Int'l Wireless*

---

[11] D.I. 1359, at 15 n.9; D.I. 1360 at 16 n.9.

*Communications Holdings, Inc.*, 68 Fed. Appx. 275, 278 (3d Cir. 2003) ("To allow shareholders to become creditors when they assert fraud claims would (improperly) give them the best of both worlds: a claim to their stock's appreciation in the upside case and creditor-like protection on the downside.").

Claimants cite to several cases for the proposition that their claims are not of the type intended to be subordinated by section 510(b). But each of those cases is distinguishable either because the claimants had converted their equity interests to debt prepetition or because subordination would not serve the policy interests of section 510(b). See, e.g., *In re CIT Group Inc.*, 460 B.R. 633, 639 (Bankr. S.D.N.Y. 2011) (subordination not required despite existence of causal nexus because purposes of the statute would not be served by subordination where claimant "contracted for the status of a creditor and not a holder of equity"); *In re Mobile Tool Int'l, Inc.*, 306 B.R. 778, 782 (Bankr. D. Del. 2004) (subordination not required where claimants exchanged their stock for promissory notes, thereby removing the variable nature of their investment and placing themselves in the position of general creditors); *In re DirectTV Latin America, LLC*, 2004 WL 302303, at *4 (D. Del. Feb. 4, 2004) (reversing bankruptcy court's decision to subordinate because "while [claimant] held equity in name, it possessed few of the characteristics consistent with that status[,]" such that subordination would not serve the intended purpose of section 510(b)"); *In re MarketXT Holdings Corp.*, 361 B.R. 369, 389-90 (Bankr. S.D.N.Y. 2007) (subordination not necessary where there was an insufficient causal nexus between the stock purchase and the claim and where subordination would not further the policies underlying section 510(b)). As I discussed above, the same cannot be said of the Claims here. Accordingly, section 510(b) requires their subordination.

It is therefore ORDERED that the Objections are SUSTAINED and the Claims shall be treated as Class 7 shareholder claims and subordinated under 11 U.S.C. § 510(b) to the claims of Class 4 general unsecured creditors.

Dated:  August 4, 2021

                                          *John T. Dorsey*
JOHN T. DORSEY, U.S.B.J.